**VOLUME I OF II (Appx1-2849)**

**Nos. 2024-1278, 2024-1354**

# United States Court of Appeals for the Federal Circuit

CPC PATENT TECHNOLOGIES PTY, LTD.,
*Appellant*

v.

APPLE, INC.,
*Appellee*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00601, IPR2022-00602

## JOINT APPENDIX

GEORGE C. SUMMERFIELD
JONAH B. HEEMSTRA
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
george.summerfield@klgates.com

DARLENE F. GHAVIMI-ALAGHA
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, TX 78746
(512) 482-6800

*Attorneys for Appellant*

SETH W. LLOYD
BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6946
SLloyd@mofo.com

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Attorneys for Appellee*

July 31, 2024

**TABLE OF CONTENTS**
**APPENDIX INDEX**

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 31 | Final Written Decision - 35 U.S.C. §318(a) IPR2022-00601, 9/27/2023 | Appx1-Appx65 |
| 31 | Final Written Decision - 35 U.S.C. §318(a) IPR2022-00602, 9/27/2023 | Appx66-Appx125 |
| 1001 | U.S. Patent No. 9,269,208 to Burke, 2/23/2016 | Appx126-Appx146 |
| 1001 | U.S. Patent No. 9,665,705 to Burke, 5/30/2017 | Appx147-Appx168 |
| | Certified List of Materials from the USPTO for IPR2022-00601 | Appx169-Appx170 |
| | Certified List of Materials from the USPTO for IPR2022-00602 | Appx171-Appx172 |
| **Docket Entries for IPR2022-00601** | | |
| 1 | Petition for Inter Partes Review of U.S. Patent No. 9,269,208, 2/23/2022 | Appx173-Appx260 |
| 3 | Notice of Filing Date Accorded to Petition, 3/31/2022 | Appx261-Appx265 |
| 7 | Preliminary Patent Owner's Response, 6/30/2022 | Appx266-Appx292 |
| 17 | Patent Owner's Response, 12/22/2022 | Appx381-Appx419 |
| 30 | Oral Hearing Transcript, 6/29/2023 | Appx519-Appx571 |
| 32 | Patent Owner's Request for Director Review, 10/27/2023 | Appx572-Appx589 |
| 33 | Order Denying Director Review, 11/6/2023 | Appx590-Appx592 |
| 34 | Patent Owner's Notice of Appeal, 12/18/2023 | Appx593-Appx597 |
| **Exhibits for IPR2022-00601** | | |
| 1003 | Declaration of Dr. Andrew Sears | Appx1035-Appx1272 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 1004 | U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. | Appx1273-Appx1301 |
| 1005 | U.S. Patent No. 6,766,456 to McKeeth | Appx1302-Appx1311 |
| 1006 | U.S. Patent No. 6,509,847 to Anderson | Appx1312-Appx1326 |
| 1077 | Case No. 6:21-cv-00165 (W.D. Tex.), Claim Construction Order Dated February 10, 2022 | Appx2246-Appx2249 |
| 1089 | Deposition Transcript of Dr. William C. Easttom, III on February 27, 2023 | Appx2271-Appx2326 |
| 1090 | Supplemental Declaration of Dr. Andrew Sears | Appx2341-Appx2354 |
| 2010 | Deposition Transcript of Dr. Sears, Dated November 8, 2022 | Appx2836-Appx2940 |
| 2011 | Declaration of William C. Easttom II (Chuck Easttom) Ph.D., D.Sc. | Appx2968-Appx3003 |
| 2013 | Deposition Transcript of Dr. Sears, Dated May 19, 2023 | Appx3046-Appx3115 |
| **Docket Entries for IPR2022-00602** | | |
| 1 | Petition for Inter Partes Review of U.S. Patent No. 9,665,705, 2/23/2022 | Appx3204-Appx3284 |
| 7 | Preliminary Patent Owner's Response, 6/30/2022 | Appx3290-Appx3316 |
| 17 | Patent Owner's Response, 12/22/2022 | Appx3390-Appx3431 |
| 34 | Patent Owner's Request for Director Review, 10/4/2023 | Appx3525-Appx3541 |
| 35 | Order Denying Director Review, 11/6/2023 | Appx3542-Appx3544 |
| 36 | Patent Owner's Request for Rehearing of Director's Denial of Panel Review, 12/5/2023 | Appx3545-Appx3553 |
| 37 | Order Dismissing Request for Rehearing, 1/8/2024 | Appx3554-Appx3556 |
| 38 | Patent Owner's Notice of Appeal, 1/8/2024 | Appx3557-Appx3561 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| | **Exhibits for IPR2022-00602** | |
| 1003 | Declaration of A. Sears ('705 Patent) | Appx3811-Appx4030 |
| | **Additional Materials** | |
| | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-01006, 11/30/2023 | Appx4220-Appx4307 |
| | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-01045 and IPR2022-01089, 12/20/2023 | Appx4308-Appx4401 |

Trials@uspto.gov                                    Paper 31
571-272-7822                          Date: September 27, 2023

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

---

IPR2022-00601
Patent 9,269,208 B2

---

Before SCOTT A. DANIELS, BARRY L. GROSSMAN, and
AMBER L. HAGY, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

**Appx1**

IPR2022-00601
Patent 9,269,208 B2

## I. INTRODUCTION

### A. Background and Summary

Apple Inc. ("Petitioner" or "Apple") filed a Petition requesting *inter partes* review of claims 1, 3–7, 9–11, and 13 (collectively, the "challenged claims") of U.S. Patent No. 9,269,208 B2 (Ex. 1001, "the '208 patent"). Paper 1 ("Pet."). CPC Patent Technologies PTY, Ltd. ("Patent Owner" or "CPC") filed a Preliminary Response to the Petition. Paper 7 ("Prelim. Resp."). With our authorization, Petitioner filed a Preliminary Reply (Paper 8 ("Prelim. Reply")) addressing the issue of discretionary denial raised in the Preliminary Response and Patent Owner filed a Prelim. Sur-Reply (Paper 9 ("Prelim. Sur-Reply")).

We concluded that Petitioner satisfied the burden, under 35 U.S.C. § 314(a), to show that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. Accordingly, on behalf of the Director (37 C.F.R. § 42.4(a)), and in accordance with *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1353 (2018), we instituted an *inter partes* review of all the challenged claims, on the single asserted ground. Paper 11 ("Dec. Inst.").

Patent Owner filed a Response. Paper 17 ("PO Resp."). Petitioner filed a Reply. Paper 20 ("Reply"). Patent Owner filed a Sur-reply. Paper 26 ("Sur-reply").

Petitioner submitted seventy-six exhibits. *See* Exs. 1001–1091[1] (some consecutive exhibit numbers were *not* used; *e.g*, there are no exhibits

---

[1] Exhibit 1091 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. *See* PTAB Consolidated Trial Practice Guide, 84 (Nov. 2019 ("TPG")) ("Demonstrative exhibits used at the final hearing are aids to oral argument and not evidence.").

IPR2022-00601
Patent 9,269,208 B2

numbered 1056–1064); *see also* Paper 28 (Petitioner's Updated Exhibit List stating that Exhibit numbers 1056–1064 were "Intentionally left blank."). Petitioner relies on the Declaration testimony of Andrew Sears, Ph.D. *See* Exs. 1003, 1090.

Patent Owner submitted fourteen exhibits. *See* Exs. 2001–2014[2]; *see also* Paper 29 (Patent Owner's Updated Exhibit List). Petitioner relies on the Declaration testimony of William C. Easttom III, D. Sc., Ph.D. *See* Exs. 2011, 2012.

A hearing was held June 29, 2023. *See* Paper 30 ("Transcript" or "Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings and conclusions below, we determine that Petitioner has proven that claims 1, 3–7, 9–11, and 13 are unpatentable.

### B. Real Parties-in-Interest

Apple identifies itself as the sole real party-in-interest. Pet. 72.

CPC also identifies itself as the sole real party-in-interest. Paper 4, 2.

There is no dispute between the parties concerning the real party-in-interest.

### C. Related Matters

Petitioner and Patent Owner each identify the following two district court proceedings as related matters: (1) *CPC Patent Technologies Pty Ltd.*

---

[2] Exhibit 1014 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. *See id.*

IPR2022-00601
Patent 9,269,208 B2

*v. Apple Inc.,* Case No. 6:21-cv-00165-ADA (W.D. Tex.); and (2) *CPC Patent Technologies Pty Ltd. v. HMD Global Oy,* Case No. 6:21-cv-00166-ADA (W.D. Tex.) (the "*HMD* Litigation"). Pet. 72; Paper 4, 2–3.

The first listed case, between the same parties involved in this *inter partes* review proceeding, however, has been transferred to the Northern District of California. *See In re Apple Inc.*, 2022 WL 1196768 (Fed. Cir. Apr. 22, 2022); *see also* Ex. 3002 (Text Order granting Motion to Change Venue). The case is now styled *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 5:22-cv-02553 (N.D. Cal.). *See* Ex. 3003 (PACER Docket for the transferred case); Prelim. Resp. 1, fn 1 (Patent Owner acknowledging the transfer from the Western District of Texas to the Northern District of California). Also, the '208 patent is no longer involved in the Northern District of California case. Patent Owner states it "dismissed its infringement claim for the '208 Patent in the district court action." Prelim. Resp. 1.

Petitioner and Patent Owner also each identify the following two pending *inter partes* review proceedings as related matters: (1) IPR2022-00600, challenging claims in Patent 8,620,039; and (2) IPR2022-00602, challenging claims in Patent 9,665,705, which is based on a continuation of the application that matured into the '208 patent in the proceeding before us. *See* Ex. 3001, code (63). A final written decision in the 00600 IPR is due October 17, 2023. A final written decision in the 00602 IPR is being issued simultaneously with this Decision in the case before us.

### D. The '208 Patent

We make the following findings concerning the disclosure of the '208 patent.

IPR2022-00601
Patent 9,269,208 B2

The '208 patent discloses a system "for providing secure access to a controlled item." Ex. 1001, Abstr.  Examples of a "controlled item" include "a door locking mechanism on a secure door, or an electronic key circuit in a personal computer" that can be accessed only by an authorized user. Ex. 1001, 6:13–16.  The system uses a database of "biometric signatures," such as a fingerprint, for determining authorized access.  *Id.* at 1:29–30; 5:63–65 ("the user database [ ] contains biometric signatures for authorised[3] users against which the request [ ] can be authenticated").

Figure 2 from the '208 patent is reproduced below.



Fig. 2

_____

[3] The Specification uses the British spelling, which we also use when quoting the Specification.

IPR2022-00601
Patent 9,269,208 B2

Figure 2 is a functional block diagram of an arrangement for providing secure access according to the system disclosed in the '208 patent. Ex. 1001, 5:15–16.

As described in the written description of the '208 patent, and as illustrated generally in Figure 2, user 101 makes request 102 to "code entry module 103." *Id.* at 5:51–55. Code entry module 103 includes biometric sensor 121. *Id.* The specific type of biometric sensor 121 used depends on the type of request 102, or biometric input signal, to be used. *Id.* If biometric sensor 121 is a fingerprint sensor, for example, then biometric input signal 102 "typically takes the form of a thumb press" on a sensor panel (not shown) on code entry module 103. Ex. 1001, 5:56–59. 403. "Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, [and] palm configuration." *Id.* at 1:30–32.

Code entry module 103 then "interrogates" authorized user identity database 105, which contains "biometric signatures" for authorized users, to determine if user 101 is an authorized user. *Id.* at 5:60–65. Database 105 is prepared by an "administrator." *Id.* at 10:28–34 ("The first user of the code entry module 103 . . . is automatically categorised as an administrator.").

The disclosed system and method compare biometric input "*signal*" 102 to database 105 of authorized biometric "*signatures*" to determine if user 101 is an authorized user. *Id.* at 5:61–65 ("Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 [producing a thumbprint] then the user database 105 contains biometric signatures [*i.e.*, thumbprints] for authorised users against which the request 102 can be authenticated."). If user 101 is an authorized user, code entry module 103

6

**Appx6**

IPR2022-00601
Patent 9,269,208 B2

sends a signal to "controller/transmitter" 107 allowing access to the controlled item. *Id.* at 5:65–67.

When biometric sensor 121 is a fingerprint sensor,[4] the biometric signatures stored in database 105 are not limited to a single fingerprint. The '208 patent also discloses that, if so programed by an administrator, code entry module 103 may be activated by providing a succession of finger presses to biometric sensor 121 included in module 103. *Id.* at 10:45–47. If these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time, controller 107 accepts the presses "as potential control information," or a biometric signal, and checks the input information against a stored set of "legal [authorized] control signals," or the database of biometric signatures. *Id.* at 10:47–67. "In one arrangement, the control information is encoded by *either or both* (a) the number of finger presses and (b) the relative duration of the finger presses." *Id.* at 10:49–52 (emphasis added).

An example of this type of "control information" or "legal control signal" is "dit, dit, dit, dah," where "dit" is a finger press of one second's duration and "dah" is a "finger press of two second's duration."[5] *Id.* at 10:57–63.

---

[4] *See* Ex. 1001, 10:35 – 38 ("Although the present description refers to 'Users', in fact it is 'fingers' which are the operative entities in system operation *when the biometric sensor 121 (see FIG. 2) is a fingerprint sensor*.") (emphasis added). Thus, it is clear that biometric sensor 121 is *not* limited to a fingerprint sensor.

[5] We have not been directed to any persuasive evidence, and have found none on our own review of the evidence, which establishes why the Specification refers to the number and duration of finger presses as "control information" and "legal control signals," rather than a "biometric signal" and a "database" of "biometric signatures," respectively, which are the terms

7

IPR2022-00601
Patent 9,269,208 B2

If user 101 is an authorized user based on the inputs to code entry module 103, controller/transmitter 107 then sends "an access signal," based on a "rolling code," to controller 109. Ex. 1001, 6:1–5. According to the written description, "[t]he rolling code protocol offers non-replay encrypted communication." *Id.* at 6:5–6. Other secure codes, such as "the Bluetooth™ protocol, or the Wi Fi™ protocols" also can be used. *Id.* at 6:28–34.

If controller 109 determines that the rolling code received is "legitimate," then controller 109 sends a command to "controlled item 111," which, for example "can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer" that is to be accessed by user 101. *Id.* at 6:7–16.

Code entry module 103 also incorporates at least one mechanism for providing feedback to user 101. *Id.* at 6:20–21. This mechanism can, for example, take the form of "one or more Light Emitting Diodes (LEDs) 122," and/or audio transducer 124, which provide visual or audio feedback to the user. Ex. 1001, 6:22–27.

---

used throughout the Specification for the input signal and the database of authorized users.

The Specification is required to include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112(a). Neither we nor the parties, however, have jurisdiction in this *inter partes* review proceeding to address an enablement issue. *See id.* at § 311(b) ("A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.").

IPR2022-00601
Patent 9,269,208 B2

In Figure 2, "sub-system 116," shown on the left of vertical dashed line 119, communicates with "sub-system 117," shown on the right of dashed line 119, "via the wireless communication channel" used by access signal 108 between controller/transmitter 107 and controller/receiver 109. *Id.* at 6:62–65. As disclosed in the '208 patent, "[a]lthough typically the communication channel uses a wireless transmission medium, there are instances where the channel used by the access signal 108 can use a wired medium." *Id.* at 7:3–8.

### E.  Illustrative Claim

Among the challenged claims, claims 1, 9, and 10 are independent claims. Independent claim 1 is directed to a "system for providing secure access to a controlled item." Ex. 1001, 15:42–16:3. Independent claim 9 is directed to a "transmitter sub-system for operating in a system for providing secure access to a controlled item." *Id.* at 16:64–17:18. Independent claim 10 is directed to a "method for providing secure access to a controlled item." *Id.* at 17:19–18:13.

Independent claim 1 is illustrative and is reproduced below.

1. A system for providing secure access to a controlled item, the system comprising:
  a database of biometric signatures;
  a transmitter sub-system comprising:
    a biometric sensor for receiving a biometric signal;
    means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and
    means for emitting a secure access signal conveying information dependent upon said accessibility attribute; and
  a receiver sub-system comprising:
    means for receiving the transmitted secure access signal; and

9

IPR2022-00601
Patent 9,269,208 B2

> means for providing conditional access to the controlled item dependent upon said information,
>
> wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures, the population means comprising:
>
> > means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
> > means for mapping said series into an instruction; and
> > means for populating the data base according to the instruction,
>
> wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

Ex. 1001, 15:42–16:3. [6]

### F. Prior Art and Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable on the following ground:

---

[6] Petitioner provides a Claim Listing Appendix as part of the Petition. Pet. 74–77. This Appendix includes all the challenged claims identified by individual clause, such as, for claim 1, labeling the clauses 1(a), 1(b), 1(b)(1), etc. Petitioner refers to these clause labels in its analysis.

IPR2022-00601
Patent 9,269,208 B2

| Claim(s) Challenged | 35 U.S.C. §[7] | Reference(s)/Basis |
|---|---|---|
| 1, 3–7, 9–11, 13 | 103(a) | Mathiassen,[8] McKeeth,[9] Anderson[10] |

Petitioner also relies on the declaration testimony of Andrew Sears, Ph.D. *See* Ex. 1003;[11] *see also* Ex. 1090 (Dr. Sears' Supplemental Declaration.

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Obviousness

Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

---

[7] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[8] Mathiassen et al, US 2004/0123113 A1, published June 24, 2004 (Ex. 1004, "Mathiassen").

[9] McKeeth, US 6,766,456 B1, issued July 20, 2004 (Ex. 1005, "McKeeth").

[10] Anderson, US 6,509,847 B1, issued Jan. 21, 2003 (Ex. 1006, "Anderson").

[11] Exhibit 1003 is a 238 page declaration from Dr. Sears, including its Appendix A, which is a detailed mapping of the disclosures of the three applied references to the challenged claims. Dr. Sears currently is a Professor and Dean of the College of Information Sciences and Technology at The Pennsylvania State University. Ex. 1003 ¶ 5. Dr. Sears earned a Bachelor of Science degree in Computer Science, and a Ph.D. degree, also in Computer Science. *Id.* ¶ 6. He has held various positions in academia, including serving as the Interim Chief Information Security Officer at Penn State. *Id.* ¶¶ 7, 8. He has authored or edited a number of computer-related publications and held leadership positions in several computer industry organizations.

IPR2022-00601
Patent 9,269,208 B2

invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls."). The Court in *Graham* explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To support this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

12

IPR2022-00601
Patent 9,269,208 B2

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious.").

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421.

Applying these general principles, we consider the evidence and arguments of the parties.

## B. Level of Ordinary Skill in the Art

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). "This reference point prevents . . . factfinders

13

IPR2022-00601
Patent 9,269,208 B2

from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

"The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a district court [or an administrative Board] cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Ruiz v. A.B. Chance*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("The determination of the level of skill in the art is an integral part of the *Graham* analysis.").

Petitioner asserts that a person of ordinary skill in the art would have had "at least a bachelor's degree in computer engineering, computer science,

14
**Appx14**

IPR2022-00601
Patent 9,269,208 B2

electrical engineering, or a related field, with at least one year experience in the field of human-machine interfaces and device access security." Pet. 3 (citing Ex. 1003 ¶¶ 35–38). Petitioner also states that "[a]dditional education or experience may substitute for the above requirements." *Id.*

In forming an opinion on the level of ordinary skill applicable to this proceeding, Dr. Sears testifies that he considered various factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field. Ex. 1003 ¶ 35. Dr. Sears also testifies that he "placed myself back in the time frame of the claimed invention and considered the colleagues with whom I had worked at that time." *Id.* Dr. Sears opines that a person of ordinary skill would have had the education and experience adopted by Petitioner. *Id.* at ¶ 36.

Patent Owner states it "does not dispute [Petitioner's] characterization" of the level of ordinary skill in the art *See* PO Resp. 5–6.

Based on the prior art, the sophistication of the technology at issue, and Dr. Sears' Declaration testimony, we adopt, with minor modification, Petitioner's undisputed definition of the level of ordinary skill. We determine that in this proceeding a person of ordinary skill would have had a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with one year of experience in the field of human-machine interfaces and device access security, or an equivalent balance of education and work experience. We have eliminated the open-ended phrase of "at least" in describing the education and experience of a person of ordinary skill. This open-ended description fails to provide the specificity necessary to define the level of ordinary skill.

15

IPR2022-00601
Patent 9,269,208 B2

### C.   Claim Construction

We construe each claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b) (2021).  Under this standard, claim terms are generally given their ordinary and customary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.'" (citations omitted)).

The challenged claims make extensive use of "means-plus-function" claiming.  *See* 35 U.S.C. § 112, ¶ 6 (we cite to the pre-AIA version of the statute applicable to the challenged claims).  Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*See* 35 U.S.C. § 112, ¶ 6.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).

Independent claim 1, for example, includes numerous means-plus-function clauses:  *See, e.g.*, Ex. 1001, 15:47–52, 54–67.  Independent claim 9 also uses numerous means-plus-function clauses.  *Id.* at 17:1–15.  On the record before us, we have not been directed to any dispute between the

16

**Appx16**

IPR2022-00601
Patent 9,269,208 B2

parties as to whether § 112, ¶ 6 applies to numerous clauses in the challenged claims.

Where claim language may be construed according to 35 U.S.C. § 112(f) (or its predecessor, § 112, ¶ 6), a petitioner must provide a construction that includes both the claimed function and the specific portions of the specification that describe the structure, material, or acts corresponding to each claimed function. 37 C.F.R. § 42.104(b)(3).

In accordance with these requirements, Petitioner provides specific constructions for all the means-plus-function clauses in the challenged claims. Pet. 6–9. Petitioner asserts its proposed constructions are consistent with constructions made by the Texas district court in the related litigation between the parties (*see* Ex. 1077), constructions agreed to by the parties in the related litigation (*see* Ex. 1079), or constructions proposed by Patent Owner in the related litigation (*see* Ex. 1073). [12]

Patent Owner does not dispute any of the myriad means-plus-function clauses construed by Petitioner. *See* Response; Sur-reply.

Thus, we adopt Petitioner's undisputed findings and conclusions for these means-plus-function terms as our own, and repeat them below for convenient reference. *See* Pet. 6–9.

---

[12] The cited exhibits 1073, 1077, and 1079 are from the case *prior to* its transfer from the Western District of Texas to the Northern District of California.

IPR2022-00601
Patent 9,269,208 B2

| *Claim Term* | *Support* | *Structure and Function* |
|---|---|---|
| Claims 1, 9: "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"<br><br>**Court Construction, Ex. 1077** | *'208 Patent*, 4:8–13, 4:15–17, 4:40–45, 4:47–49, 5:50–67, 6:56–7:2, 7:65–8:10, 8:67–9:5, 14:10–42, Fig. 2, items 103, 105, Fig. 3, item 202, (Ex. 1077, 4) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute |
| Claim 10: "means for emitting a secure access signal capable of granting more than two types of access to the controlled item"<br><br>**CPC Construction, Ex. 1073** | *'208 Patent*, 4:8–13, 4:18–22, 4:40–45, 4:50–54, 8:17–28, 10:24–44 (Ex. 1073, 7) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: emitting a secure access signal capable of granting more than two types of access to the controlled item |

IPR2022-00601
Patent 9,269,208 B2

| Claim Term | Support | Structure and Function |
|---|---|---|
| Claims 1, 9: "means for emitting a secure access signal conveying said information dependent upon said accessibility attribute"<br><br>**CPC Construction, Ex. 1073** | *'208 Patent*, 4:8–13, 4:18–22, 4:40–45, 4:50–54, 5:65–6:6, 6:28–55, 8:19–35, 14:16–20 (Ex. 1073, 4). | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: emitting a secure access signal conveying said information dependent upon said accessibility attribute |
| Claims 1, 10: "means for receiving the transmitted secure access signal"<br><br>**Agreed-Upon Construction, Ex. 1079** | *'208 Patent,* 6:16–19, FIGs. 2, 4, 10 (Ex. 1079)<br><br>* Note the Parties' communications in the district court correspondence did not identify specification support | Structure: receiver 118<br><br>Function: receiving the transmitted secure access signal |
| Claims 1, 10: "means for providing conditional access to the controlled item dependent upon [said] information [in said secure access signal]"<br><br>**Agreed-Upon Construction, Ex. 1079** | *'208 Patent,* 8:65–9:15, 8:17–35, 11:27–12:38, FIGs. 2, 4, 7, 10 (Ex. 1079)<br><br>* Note the Parties' communications in the district court correspondence did not identify specification support | Structure: controller 109 executing software 304<br><br>Function: providing conditional access to the controlled item dependent upon information in said secure access signal |

19

IPR2022-00601
Patent 9,269,208 B2

| Claim Term | Support | Structure and Function |
|---|---|---|
| Claims 1, 9: "means for receiving a series of entries of the biometric signal"<br><br>**CPC Construction, Ex. 1079** | *'208 Patent,* 4:8–14, 4:25–34, 4:40–46, 5:53–59, 7:66–8:6, 10:45–63, 12:55–59 (Ex. 1073, 4–5) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: receiving a series of entries of the biometric signal |
| Claims 1, 9: "means for mapping said series into an instruction"<br><br>**Court Construction, Ex. 1077** | *'208 Patent,* 4:25–31, 4:37, 5:50–6:27, 10:45–11:2, 12:55–59, 12:67–13:3, Fig. 2, items 103, 107, 121 (Ex. 1077, 3) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: mapping said series into an instruction |
| Claims 1, 9: "means for populating the database according to the instruction"<br><br>**Court Construction, Ex. 1077** | *'208 Patent,* 4:25–31, 4:38–39, 10:57–11:2, 12:43–45, 13:9–11, 13:15–19 (Ex. 1077, 3) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: populating the database according to the instruction |

IPR2022-00601
Patent 9,269,208 B2

| Claim Term | Support | Structure and Function |
|---|---|---|
| Claims 1, 9: "means for populating the data base of biometric signatures"<br><br>**Court Construction, Ex. 1077** | *'208 Patent*, 4:25–31, 4:38–39, 10:32–34, 10:57–11:2, 12:43–45, 13:9–1, 13:15–19 (Ex. 1077, 3–4) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: populating the data base of biometric signatures |

Concerning claim terms that are *not* in means-plus-function format, Petitioner also proposes constructions for the claim terms "database," "conditional access," "biometric signal," and "accessibility attribute." Pet. 9. Petitioner asserts the proposed constructions are either agreed to by the parties (*see* Ex. 1079) or made by the district court (*see* Ex. 1077).

Patent Owner proposes "constructions" (1) for the term "accessibility attribute" (Resp. 6–7); (2) the phrase requiring a series of entries of the biometric signal "characterised according to at least one of the number of said entries and a duration of each said entry" (*id*. at 7–11); and (3) the "populate" the database limitation concerning enrolling or authorizing new users (*id*. at 11–12).

"[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd*., 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999)). Here, we determine the claim terms that need specific

21

IPR2022-00601
Patent 9,269,208 B2

construction are the three terms proposed by Patent Owner for specific construction. Accordingly, we construe these terms below.

### 1. General Claim Construction Principles

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (citations omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324). Fortunately, however, there is substantial judicial guidance.

Claim construction requires determining how a skilled artisan would understand a claim term "in the context of the entire patent, including the specification." *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313. *Id.* (citation omitted). "[C]laims must be read in view of the specification, of which they are a part." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc)). The Specification, or more precisely, the written description, is the "single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims." *Id.* (citation omitted). Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the Specification into the claims. *Phillips*, 415 F.3d at 1323. Thus, we are careful not to cross that "fine line" that exists between properly construing a claim in light of the specification and improperly importing into the claim a limitation from the specification." *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("We recognize that there is sometimes a fine line between reading a

22

IPR2022-00601
Patent 9,269,208 B2

claim in light of the specification, and reading a limitation into the claim from the specification.").

While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

We also consider the patent's prosecution history. *Phillips, 415 F.3d* at 1317.

In construing the claims, we may also look to available "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

## 2.    *"Accessibility Attribute"*

In our Decision to Institute this proceeding, we adopted, for purposes of that Decision, Petitioner's unopposed asserted claim construction for "accessibility attribute," which was an "attribute that establishes whether and under which conditions access to the controlled item should be granted." Dec. Inst. 13 (citing Pet. 9 (citing the Texas District Court's claim construction, Ex. 1077, 2–3)). We note here that the District Court included the phrase "to a user" at the end of the construed term, which Petitioner did *not* include. The complete construction by the District Court is an "attribute that establishes whether and under which conditions access to the controlled item should be granted *to a user*." Ex. 1077, 2 (emphasis added). The District Court did not cite any intrinsic or extrinsic evidence to support its construction.

IPR2022-00601
Patent 9,269,208 B2

In Patent Owner's Response, Patent Owner acknowledges Petitioner's proposed construction but asserts that "a mere binary decision to grant access to a device does not constitute an 'accessibility attribute.'" PO Resp. 6–7; *see also* Ex,2011 ¶ 45 (Patent Owner's expert, Dr. Easttom,[13] testimony that the construction of the term "accessibility attribute" in our Decision to Institute this proceeding "requires more than the binary determination of whether to grant access to a controlled item by virtue of the 'under which conditions' language"). Patent Owner also asserts that Petitioner's "position on the 'accessibility attribute' limitation is muddied at best." *Id.* at 12. According to Patent Owner, Petitioner "and its expert appear to argue that 'accessibility attribute' can be a binary access decision." *Id.* at 13 (citing Paper [Pet.] 1 at 42–44).

Thus, Patent Owner asserts what an "accessibility attribute" is not (it is not a binary decision), but fails to assert a construction of what an "accessibility attribute" is.

We do *not* understand Petitioner to be asserting a construction of the term "accessibility attribute" to mean simply a "binary decision" to grant or not grant access to a locked structure or device. Nor, did our Decision to Institute adopt such a "binary decision." The construction asserted by

---

[13] Exhibit 2011 is a 36-page declaration from Dr. Easttom. Dr. Easttom earned a D.Sc. degree in Cyber Security, a Ph.D. degree in Technology, and three master's degrees (one in Applied Computer Science, one in Education, and one in Systems Engineering). Ex. 2011 ¶ 7. Dr. Easttom testifies that he has 30 years of experience in the computer science industry including extensive experience with computer security, computer software, and computer networking; that he has authored 37 computer science books; that he has authored over 70 research papers; and that he is an inventor with 25 patents, including patents related to computer networking. His CV (Ex. 2012) provides details of his extensive experience and education.

IPR2022-00601
Patent 9,269,208 B2

Petitioner in this proceeding, and the construction adopted in our Decision to Institute this proceeding requires "an attribute that establishes *whether and under which conditions* access to the controlled item should be granted." Dec. Inst. 13 (citing Pet. 9 (citing the Texas District Court's claim construction, Ex. 1077, 2–3) (emphasis added)).

As we explain in our analysis below, to avoid any confusion of the meaning of "accessibility attribute," we clarify the construction to add the phrase "if any" to modify the "conditions" that may, or may not, be imposed to allow access. Thus, we determine that an "accessibility attribute" is "an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted." Based on the language of the claims and Specification, the "accessibility attribute" may include only an "access attribute," which is "unconditional." *See* Ex, 1001, 8:19–25 (stating "the accessibility attribute may comprise one or more of an access attribute (granting unconditional access) . . . ), 16:13–23 (claim 3 requiring "at least one of" an access attribute, a duress attribute, and an alert attribute).[14]

Notwithstanding Patent Owner's Response, Petitioner asserts that "[t]he Parties agree to apply the District Court's construction for the claimed "accessibility attribute." Reply 1. Petitioner also states, however, that Petitioner is relying on McKeeth for teaching two accessibility attributes (duress and alert) even though "the '208 Patent's independent claims only require outputting a single accessibility attribute." *Id.* at 2.

Petitioner clarifies its position on the construction of "accessibility attribute" by further explaining Petitioner's view that "the '208 Patent

---

[14] To avoid any confusion, we note that an "access attribute" is one specific example of the generic term "accessibility attribute." Ex. 1001, 8:19–25.

25
**Appx25**

IPR2022-00601
Patent 9,269,208 B2

describes outputting an accessibility attribute that includes 'access' without any conditions, which satisfies the under which conditions' construction component." Reply. 4.

We begin our claim construction analysis with the language used in the claims.

### a) Claims

The term "accessibility attribute" appears in all the challenged claims.

Independent claim 1 includes the following two clauses that refer to an "accessibility attribute": (1) "means for matching the biometric signal against members of the database of biometric signatures *to thereby output an accessibility attribute*" (Ex. 1001, 15:47–49)[15]; and (2) "means for *emitting a secure access signal conveying information dependent upon said accessibility attribute*" (*id*. at 15:50–52). These two references merely establish that an "accessibility attribute" is an output access signal based on matching the biometric signal against the authorized user database of biometric signatures. *See id.* at 5:61–65 ("Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 then the user database 105 contains biometric signatures for authorised [sic] users against which the request 102 can be authenticated.").

These clauses provide no further structure or function of the claimed "accessibility attribute."

Claim 1 also includes a clause stating that "conditional access" to a user is "dependent upon" information in the "accessibility attribute." *Id.* at 15:56–57. This clause does not require or state that there is, or is not, conditional access. It merely states that "conditional access," if any,

---

[15] All italicized emphasis of claim language has been added.

IPR2022-00601
Patent 9,269,208 B2

depends on what information is in the "accessibility attribute." *See id.* at 15:50–52 (stating that the "information" in the "access signal" in claim 1 is "dependent upon" the "accessibility attribute"). Thus, based on the claim language in claim 1, the scope of the "accessibility attribute" is undefined. The only requirement is that it provide access for authorized users.

Claim 3, dependent on claim 1, states that "the [authorized user] database of biometric signatures comprises signatures in *at least one of* a system administrator class, a system user class, and a duress class." Ex. 1001, 16:13–16 (emphasis added). Thus, consistent with Petitioner's argument summarized above (*see* Reply 4–5), the system administrator may be the only authorized user in the database. Claim 3 also further defines the "accessibility attribute" as comprising:

> *an access attribute* if the biometric signal matches a member of the database of biometric signatures;
>
> *a duress attribute* if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class; and
>
> *an alert attribute* if the biometric signal does not match a member of the database of biometric signatures.

*Id.* at 16:18–24 (emphasis added).

In claim 3, the conditional "duress attribute" applies only if the user is a member of the "duress class" in the database of biometric signatures. There is, however, no requirement that any member of the "duress class" be in the database.

We recognize that the Federal Circuit has held that the plain and ordinary meaning of "at least one of" is "one or more," but that when the phrase is used in a claim, the issue is what "at least one of" is used to

27
**Appx27**

IPR2022-00601
Patent 9,269,208 B2

modify. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004). In *SuperGuide*, the court held that, when "[t]he phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria," the phrase connotes a conjunctive list and requires selecting at least one value for each category. *Id.* For example, in *SuperGuide*, the claim phrase "storing at least one of a desired program start time, a desired program end time, a desired program service, and a desired program type" was interpreted as requiring storing at least one desired program start time, at least one desired program end time, and so forth. *Id.* at 884.

Courts have not, however, interpreted *SuperGuide* as setting forth a *per se* rule that the use of "at least one of" followed by "and" necessarily connotes a conjunctive list. *See Fujifilm Corp. v. Motorola Mobility LLC*, Case No. 12–CV–03587–WHO, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015) (summarizing cases and noting that "*SuperGuide* did not erect a universal rule of construction for all uses of 'at least one of' in all patents"). In particular, courts have found *SuperGuide* inapplicable when the listed items following "at least one of" are not categories containing many possible values. *See id.*; *see also TQ Delta, LLC v. Comcast Cable Commc'ns, LLC*, No. 1:15–CV–00611–RGA, 2016 WL 7013481, at *8 (D. Del. Nov. 30, 2016) (list following "at least one of" was of parameters to be selected from, not categories). The Board has also distinguished *SuperGuide* on this basis. *See Hewlett–Packard Co. v. MPHJ Tech. Invs., LLC*, Case IPR2013–00309, Paper 9, slip op. at 8 (PTAB Nov. 21, 2013); *Daifuku Co., Ltd. v. Murata Machinery, Ltd.*, Case IPR2015–00083, Paper 63, slip op. at 4–5 (PTAB May 3, 2016); *Apple, Inc. v. Evolved Wireless LLC*, No. IPR2016-01177, 2017 WL 6543970, at *4 (P.T.A.B. Dec. 20, 2017).

IPR2022-00601
Patent 9,269,208 B2

Relevant to our inquiry, therefore, is whether the items that follow "at least one of" in the challenged claims of the '208 patent are categories that may have multiple values (such as in *SuperGuide*) or individual parameters having only one value. Here, we think it is clear that the accessibility attributes and the classes of users are individual parameters that apply to individual people.

As noted above, the first user of the disclosed and claimed invention "is automatically categorised as an administrator." Ex. 1001, 10:28–32. This first user may be the only authorized user. Thus, the only database entry for this first user is a "system administrator class" entry that will generate only an "access attribute (granting *unconditional* access)." *Id.* at 8:19–21 (emphasis added). This is not unlikely because the claims are specifically limited to a "controlled item" that is either "a locking mechanism of a physical access structure," or "an electronic lock on an electronic computing device." *See, e.g.*, Ex. 1002, 336 (Examiner's amendment to application claim 69, which became patent claim 1 (*id.* 355, Index of Claims). A similar Examiner's Amendment was entered in each independent claim. *See id.* at 338–339 (amending application claims 78, 79, which became patent claims 9 and 10). The owner of an individual computing device may be the only authorized user of that device.

Claim 3 allows a database of only a first and only user, who is automatically the system administrator. Ex. 1001, 16:13–16. ("the database of biometric signatures comprises signatures in *at least one of* a system administrator class, a system user class, and a duress class" (emphasis added)). There may be no other individuals in the "system user class" or the "duress class."

29
**Appx29**

IPR2022-00601
Patent 9,269,208 B2

Additionally, dependent claim 3 further limits claim 1 by stating the "accessibility attribute" in claim 1 "preferably" comprises[16] the three specific attributes stated in claim 3 – "an "access attribute"; "a duress attribute"; and "an alert attribute." This listing in claim 3 establishes a presumption that these three requirements are *not* included in the claimed "accessibility attribute" in claim 1. *Phillips*, 415 F.3d at 1314–15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." (citations omitted)).[17]

---

[16] "[I]n general, a patent claim reciting an apparatus "comprising" various components merely means that the apparatus "includ[es] but is not limited to" those components. *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 562 (Fed. Cir. 2020) (nonprecedential) (citations omitted).

[17] We recognize that the Board "must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *Masimo Corp. v. Apple Inc.*, Nos. 2022-1631 *et al*, slip op. at 8 (Fed. Cir. Sep. 12, 2023 (nonprecedential)) (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). The parties argued claim construction, but did not discuss specifically claim differentiation as part of their claim construction analysis. Petitioner argued, however, that the claims allowed for "administrator access as an exemplary access without conditions." Reply 4–5. Patent Owner addressed this in its Sur-reply. Sur-reply 22. Our claim construction analysis, as stated in the text, follows controlling procedures from *Phillips*. The parties also were advised that:

> claim construction, in general, is an issue to be addressed at trial. Claim construction will be determined at the close of all the evidence and after any hearing. The parties are expected to assert all their claim construction arguments and evidence in the Petition, Patent Owner's Response, or otherwise during trial, as permitted by our rules.

IPR2022-00601
Patent 9,269,208 B2

Claim 5, dependent on claim 1, specifies the claimed system "comprises" conditional approval or denial of access based on "*one of*" three specific types of the "accessibility attribute" stated in claim 3 – "an access attribute;" "a duress attribute;" and "an alert attribute." Thus, a system with only an "access attribute" type of "accessibility attribute" satisfies the requirement of claim 5 for only "one of" the three types of attributes. The access attribute merely provides access, without any conditions if the user's biometric signal is in the database. No conditional "duress attribute;" or "alert attribute" is required in claim 5.

Independent claim 9, directed to a "transmitter sub-system" includes the same two clauses as in claim 1 concerning the "accessibility attribute."

Independent claim 10, directed to a "method for providing secure access" also includes the same two clauses as in claim 1 concerning the "accessibility attribute." Method claim 10, however, states the verb form of "matching" and "emitting" rather than the patent law "means-plus-function form in system claim 1 of "means for matching" and "means for emitting."

Based on the claim language, the doctrine of claim differentiation, and the analysis above, we determine that an "accessibility attribute," as used in claims 1, 9, and 10, means that a user with a biometric signature in the database is given access to the controlled item. As used in the independent claims, there are no other conditions imposed.

For dependent claims 3 and 5, however, the "accessibility attribute" may also include a "duress attribute" and/or an "alert attribute."

---

Dec. Inst. 14.

IPR2022-00601
Patent 9,269,208 B2

Thus, based on the claim language, an "accessibility attribute" is an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted.

### b) Specification

Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citation omitted). "The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citation omitted). Thus, we turn to the Specification for additional guidance on the meaning of the claim term "accessibility attribute."

The Specification states that the "accessibility attribute establishes whether and under which conditions access to the controlled item 111 should be granted to a user." Ex. 1001, 8:17–19. This is the construction adopted in our Decision to Institute this proceeding,

The Specification further states:

> the accessibility attribute may comprise *one or more of* an *access attribute (granting unconditional access)*, a *duress attribute* (granting access but with activation of an alert tone to advise authorities of the duress situation), an *alert attribute* (sounding a chime indicating that an unauthorised [sic], but not necessarily hostile, person is seeking access, and a *telemetry attribute*, which represents a communication channel for communicating state information for the transmitter sub-system to the receiver sub-system such as a "low battery" condition.

*Id.* at 8:19–28 (emphases added). Thus, while four different accessibility attributes are disclosed (access attribute, duress attribute, alert attribute, and telemetry attribute), the Specification, consistent with the claims discussed above, states that the disclosed invention "may comprise *one or more of*"

32

IPR2022-00601
Patent 9,269,208 B2

these four attributes. Ex. 1001, 8:20. The Specification also states that an "access attribute" grants "unconditional access." *Id.* at 8:20–21.

The term "accessibility attribute" does not appear in the Specification after column 8 until it appears again in the claims.

Thus, based on the Specification, an "accessibility attribute" is an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted. The term "if any" is required because an "access attribute" grants "unconditional access" (*id.*) and it may be the only attribute included as an "accessibility attribute." *See id.* at 8:19–25 (stating the accessibility attribute "may comprise one or more of" the four disclosed specific attributes).

### c)   *Prosecution History*

The parties have not directed us to any persuasive evidence from the proceedings leading to issuance of the '208 patent to inform our construction of the term "accessibility attribute."

We note that in its final amendment and response prior to allowance of the application that matured into the '208 patent, the applicant characterized the "claimed invention" as "matching a received biometric signal against members of a database of biometric signatures." Ex. 1002, 297. Applicant also asserted that "new [application] claim 69 [patent claim 1] is not directed towards performing a simple biometric authentication, but rather is directed towards using biometric authentication to either produce or prevent physical access to a controlled item." *Id.* at 300. Thus, the claim uses a biometric authentication to produce a result, which is whether, and under what conditions, if any, access to a controlled item will be permitted. We also note that applicant's argument that "using biometric authentication

33

IPR2022-00601
Patent 9,269,208 B2

to either produce or prevent physical access to a controlled item" (*id.*) is a

binary determination concerning access.

The Examiner entered the following statement under the heading

"EXAMINER'S STATEMENT OF REASONS FOR ALLOWANCE"

> Regarding the claimed terms, the Examiner notes that a 'general term must be understood in the context in which the inventor presents it.' In re Glaug 283 F.3d 1335, 1340, 62 USPQ2d 1151, 1154 (Fed. Cir. 2002) [sic].    Therefore the Examiner must interpret the claimed terms as found on the specification of the instant application.  Clearly almost all the general terms in the claims may have multiple meanings.  So where a claim term 'is susceptible to various meanings, . . . the inventor's lexicography must prevail. . . . ' Id. [sic] Using these definitions for the claims, the claimed invention was not reasonably found in the prior art.

> This communication warrants No Examiner's Reason for Allowance, Applicant's reply make[s] evident the reasons for allowance, satisfying the 'record as a whole' proviso of the rule 37 CFR 1.104(e).  Specifically, amended independent claims 69, 78, and 79 in view of examiner's amendment and the substance of applicant's persuasive arguments, see pp. 11-16 in remarks filed 07/27/2015 from the record and no statement is deemed necessary (see MPEP 1302.14).

> None of the prior art of record taken by itself or in any combination, would have anticipated or made obvious the claimed invention of the present application at or before the time it was filed.

Ex. 1002, 323–324.

### d)  *Extrinsic Evidence*

The parties do not direct us to any persuasive extrinsic evidence

concerning the meaning of the term "accessibility attribute."

IPR2022-00601
Patent 9,269,208 B2

### e)  Claim Construction Conclusion for "Accessibility Attribute"

We recognize that "[t]he very nature of words would make a clear and unambiguous claim a rare occurrence." *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967).  The Federal Circuit, however, has provided a beacon, which we have followed, to guide us in determining the proper construction when we encounter ambiguities or differing interpretations from the parties:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

Based on the evidence and the analysis above, we determine that that the term "accessibility attribute" means "an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted."  This is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention.

### 3.  Biometric Signal Characterised by Number and Duration

All of the challenged claims include a clause that requires "receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry." *See* Ex. 1001, 15:61–64 (for independent claim 1), 17:9–12 (for independent claim 9), 17:30–32 (for independent claim 10).  In claims 1 and 9, this clause is expressed in a "means-plus-function" format.  In claim 10,

IPR2022-00601
Patent 9,269,208 B2

this clause is expressed as the method steps of "receiving" entries of biometric signals and "determining" at least one of the number of entries and a duration of each entry. We refer to these clauses collectively as the "number and duration" clauses.

These number and duration clauses all go to the embodiment of the invention that allows the administrator to require a biometric input signal that comprises "either or both (a) the number of finger presses and (b) the relative duration of the finger presses." *Id.* at 10:49–52 (This is the "dit, dit, dit, dah" form of biometric signal discussed in the Specification (*id.* at 10:57–63) and discussed above in this Decision.). The capability for an administrator to use this disclosed embodiment exists in the claimed system and method whether the administrator chooses to use it or not. As stated in the Specification, the administrator may use a single thumb press on a sensor for the required biometric signal. *Id.* at 5:56–59 ("for example, if the biometric sensor 121 in the code entry module 103 is a fingerprint sensor, then the request 102 typically takes the form of a thumb press on a sensor panel"). Alternatively, the administrator "can provide control information to the code entry module by providing a succession of finger presses to the biometric sensor 121." Ex. 1001, 10:5–7. Thus, whether using a single thumb press or a succession of finger presses of variable number and duration, the input vehicle is the same – biometric sensor 121.

Patent Owner asserts that Petitioner, and the Board in its Decision to Institute this proceeding, improperly "blur the lines" between "'knowledge-based' security features (those based on knowledge, such as a passcode or particular pattern, and not on any attribute of the user), and a biometric signal based on the unlearnable attribute of the user." PO Resp. 9. We

IPR2022-00601
Patent 9,269,208 B2

disagree. Patent Owner fails to properly understand Petitioner's, and our, analysis of the number and duration clauses.

Patent Owner asserts:

> Crucially, the antecedent for this series is 'a series of entries of the biometric signal,' *i.e.*, the entries and corresponding series are 'of the biometric signal,' and the 'number of said entries and a duration of each said entry' refers to the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information.

*Id.* at 9–10. As explained above, in our Decision to Institute, and in this Decision, we construe the number and duration clauses to require a number and duration of biometric signals because the input for these biometric signals is a biometric sensor, as disclosed in the Specification. A fingerprint sensor's ability to recognize a fingerprint is not turned off when a succession of finger presses is applied to the fingerprint sensor. Thus, contrary to Patent Owner's argument (*see* PO Resp. 11), our construction of the number and duration clauses is not based on a "knowledge-based security feature."

In summary, our construction of the number and duration clauses is that the number and/or duration of entries is based on entries of a biometric signal, such as a finger press on a fingerprint sensor. Based on the claim language and the Specification (*see* Ex. 1001, 10:50–52 ("the control information is encoded by either or both (a) the number of finger presses and (b) the relative duration of the finger presses"), this is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention.

### 4. *Populate the Database*

Patent Owner asserts that if and when the number and duration clause (citing clause 1(d)(1) in Petitioner's Claim Listing Appendix (Pet. 74)) is

IPR2022-00601
Patent 9,269,208 B2

used by an administrator to establish an authorized user, that information is "mapped into an instruction and the resulting instruction is used to populate the database of biometric signatures." PO Resp. 11 (citing representative clauses 1(d)(2) and 1(d)(3) from Petitioner's Claim Listing Appendix). Patent Owner also acknowledges that "the 'populate' limitation in claim 1 is part of that enrolling feature." PO Resp. 11. We understand that reference to the "enrolling" feature is a reference to the administrator establishing a database of authorized users that will be used to match a received biometric signal against members of a database of biometric signatures and provide access to the controlled item dependent upon the success or otherwise of the matching operation. Ex. 1002, 297–298.

Patent Owner asserts that "[t]o satisfy the requirements for antecedent claiming, 'said series' in clause 1(d2) must refer to the 'series of entries of the biometric signal' in clause 1(d1)." PO Resp. 11. Patent Owner provides the following flow diagram for populating the database:



*Id.* at 12 (citing Ex. 2011 ¶ 82). The flow diagram provides Patent Owner's graphic interpretation of the three steps involved in populating the database of approved users. These basic steps apply whether the biometric signal is a single finger press or a series of finger presses.

In its claim construction arguments, Patent Owner attempts to draw a sharp distinction between a process using a single finger press, and a process that uses the number and duration of finger presses, as two technologically distinct processes. Patent Owner has not, however, cited any persuasive

38

IPR2022-00601
Patent 9,269,208 B2

evidence to support this asserted distinction. In fact, the evidence is to the contrary. As we have noted throughout this claim construction analysis, the controlling case law is consistent in stating that the Specification is the single best guide to the meaning of a disputed term, and is, thus, the primary basis for construing the claims. *E.g.*, *Grace Instrument*, 57 F.4th at 1008. In the '208 patent, the Specification also is consistent in stating that using a number and duration of finger presses as a biometric input signal, and using a single finger press, are done exactly the same way – both use the same biometric fingerprint sensor. *See, e.g.*, Ex. 1001, 10:5–7 (the administrator "can provide control information to the code entry module by providing a succession of finger presses *to the biometric sensor 121*") (emphasis added).

The Specification also is consistent in stating that the system administrator establishes a database of authorized users, or authorized biometric signatures, by using appropriate software to create, or populate, the database. *See, e.g.*, *Id.* at 14:10–20.[18] There is no persuasive evidence to which we have been directed that the biometric fingerprint sensor ceases to function as a biometric fingerprint sensor when the administrator establishes a database using the number and duration of finger presses. Patent Owner's

---

[18] The cited text from the Specification states:

> FIG. 10 is a schematic block diagram of the system in. FIG. 2. The disclosed secure access methods are preferably practiced using a computer system arrangement 100', such as that shown in FIG. 10 wherein the processes of FIGS. 3-4, and 6-9 may be implemented as software, such as application program modules executing within the computer system 100'. In particular, the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117.

IPR2022-00601
Patent 9,269,208 B2

argument is actually to the contrary in that Patent Owner asserts that the number and duration of finger presses is a biometric signal. PO Resp. 9–10 ("the entries and corresponding series are 'of the biometric signal,' and the 'number of said entries and a duration of each said entry' refers to the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information."). This means the number and duration of entries must include a biometric component.

If the number and duration of presses did not include a biometric component, it would be simply a "knowledge-based" security measure, based on a pattern rather than based on a unique physical attribute of the user. Patent Owner asserts that such a pattern can be learned, and thus is inconsistent with the '208 patent's claims and disclosure. PO Resp. 8–10. Whether the software used by the administrator to populate the database of approved users relies on this biometric component is not disclosed in the '208 Specification.

We now turn to the merits of Petitioner's asserted Grounds of unpatentability.

### D. Ground 1
### Claims 1, 3–7, 9–11, 13
### Based on Mathiassen, McKeeth, and Anderson

Petitioner contends that claims 1, 3–7, 9–11, 13 would have been obvious over the combination of Mathiassen, McKeeth, and Anderson. Pet. 12–63.

### 1. Mathiassen (Ex. 1004)

We make the following finding of facts concerning Mathiassen.

Rather than using passwords or "tokens," such as an entry card, Mathiassen discloses a portable fob-type fingerprint sensor to access secured

40
**Appx40**

IPR2022-00601
Patent 9,269,208 B2

items, such as vehicles, computers, safes, medicine cabinets, and weapons cabinets. Ex. 1004 ¶¶ 1–4, 16–18, 109–113.

Figure 8 from Mathiassen is reproduced below.



Figure 8 is a schematic illustration of a "user input device" providing access to a vehicle door. As shown in Figure 8, portable device 20 contains fingerprint sensor 5 coupled to a miniature printed circuit board 21 on which is mounted integrated circuit ("IC") 1. Ex. 1004 ¶ 147. Thus, remote control 20 becomes a biometric sensor. *Id.* ¶ 5. Remote biometric control 20 includes battery 25 as a power supply. Ex. 1004 ¶ 147. Battery 25 is connected to printed circuit board ("PCB") 21 by wires. *Id.*

Remote biometric control 20 also is equipped with wireless 2-way transceiver 27. All the active components are connected to integrated circuit 1 by cables 23 through printed circuit board 21. *Id.*

Ignition control device 15 (*see* Fig. 6) is mounted inside the car on gear stick 71 or on steering wheel 72. *Id.* ¶ 148. Remote control 20 and embedded ignition control 15 are both connected to a central computer (not

41

IPR2022-00601
Patent 9,269,208 B2

shown) in the car. *Id.* ¶ 149.  Remote control 20 is connected to the central computer by 2-way wireless transceiver 27, while ignition control 15 is hard-wired to the central computer. *Id.*

### 2.  McKeeth (Ex. 1005)

We make the following finding of facts concerning McKeeth.

McKeeth discloses a method and system for authenticating a user to access a computer system.  Ex. 1005, Abstr.

McKeeth summarizes the problems with current systems for accessing computers, such as using a private identification code or password (Ex. 1005, 1:14–30),[19] or a machine-readable card (*id.* at 1:31–36). McKeeth also notes that "some computer makers considered using the user's fingerprint to authenticate and grant access to the computer system." *Id.* at 1:36–38.  McKeeth recognized, however, that even using fingerprints was not without problems because "a sophisticated computer hacker may be able to copy the user's fingerprint and provide a simulated signal to the computer system to obtain access." *Id.* at 1:51–54.

The method and system disclosed in McKeeth provide for one or more of various types of user inputs to be used, alone or in combination, for authentication.  These various inputs can be a password, a unique series of clicks of a mouse, a unique geometric pattern created by the user (*see* Figs. 3A–3D (illustrating a simple triangle, rectangle, line, or circle drawn by the user), an audio sensor (for voice recognition), or an optical scanner for fingerprint, retina scans, or other biometric inputs.  Ex. 1005, 2:2:53–3:12.

Figure 1 from McKeeth is reproduced below.

---

[19] Citations are to column:line of McKeeth.

IPR2022-00601
Patent 9,269,208 B2



Figure 1 from McKeeth is a block diagram showing one version of the method and system for authenticating the identity of a user disclosed in McKeeth. Ex. 1005, 2:36–37. As shown in Figure 1, computer system 100 includes user interface 110 that is operationally connected to process circuit 120. *Id.* at 2:55–57. User interface 110 may be any input device that is used to enter or communicate information to computer system 100, such as a keyboard, mouse, trackball, pointer, touch-screen, remote terminal, audio sensor, optical scanner, telephone, or any similar user interface. *Id.* at 2:57–61.

Process circuit 120 is configured to receive input signals from user interface 110. The process circuit is operationally connected with timer 130 that measures time duration between the various input signals. Ex. 1005, 3:36–38. If, for example, the user performs a fingerprint scan and/or pattern within the designated time, process circuit 120 communicates the input signals to compare circuit 150 for authentication. *Id.* at 3:52–55. Compare

43

IPR2022-00601
Patent 9,269,208 B2

circuit 150 is operationally coupled to memory 140, which stores a list of legitimate user identifications (ID's) with respective passwords, fingerprint, pattern, or any other type of security information for recognition by the computer system. *Id.* at 3:55–60. If there is a match between the user inputs, within the designated time, and stored security information, the compare circuit 150 issues a "pass" signal to computer system 100. *Id.* at 65–67.

### 3. *Anderson Ex. (1006)*

We make the following finding of facts concerning Anderson.

Anderson also discloses a system and method for authenticating an authorized user to access a secured device. Anderson's disclosed system inputs an access code "via temporal variations in the amount of pressure applied to a touch interface." Ex. 1006, Abstr.

Anderson's method of inputting an access code uses digitizer pad 120 as a touch interface, which may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint. Ex. 1006, 5:43–44, 7:4–7. The user enters the access code as a series of pressure pulses having varying durations. *Id.* at 6:45–47. This fingerprint access code is then compared with a stored code template to determine whether they match. If they do, access is permitted. *Id.* at 6:48–54.

Anderson discloses a system where the touch interface may sense only "temporal applications of pressure," relying on *timing* of the pressure applications for entry of the access code. Ex. 1006, 7:28–30; Fig. 4A. Alternately, as shown in FIG. 4B, the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity. *Id.* at 7:34–37. Thus, the access code would be entered as a series

44
**Appx44**

IPR2022-00601
Patent 9,269,208 B2

of alternating short and long pressure applications that vary both in duration and magnitude. *Id.* at 7:37–39.

Annotated Figures 4A from Anderson is reproduced below.



Figure 4A from Anderson is a diagram illustrating entry of an access code via temporal pressure variation. Ex. 1006, 2:65–67. The annotations are provided by Dr. Sears in his declaration testimony. Ex. 1003 ¶ 100. As explained by Dr. Sears, in Figure 4A, "the height of each bar the same because the magnitude or intensity of the finger pressure press is not detected. However, at least some of the presses have a different duration than other presses, as represented by the width of each bar." *Id.*

Annotated Figure 4B from Anderson is reproduced below.



Figure 4B from Anderson is a diagram illustrating entry of an access code via temporal pressure variation. Ex. 1006, 2:65–67. The annotations are provided by Dr. Sears in his declaration testimony. Ex. 1003 ¶ 101. As explained by Dr. Sears, Figure 4B "illustrates variations in both the amount

IPR2022-00601
Patent 9,269,208 B2

of pressure applied using the height of each bar and the duration of the applied pressure using the width of each bar." *Id.*

### a) Analysis of Independent Claim 1

Petitioner provides a clause-by-clause analysis of independent claim 1, identifying where in each of the cited references, Mathiassen, McKeeth, or Anderson, the claimed element is disclosed, and why it would have been obvious to a person of ordinary skill to combine the various disclosed elements with a reasonable expectation of success. *See* Pet. 50–56. Throughout its analysis, Petitioner cites the Declaration testimony (Ex. 1003) of Dr. Sears for evidentiary support.

For ease of reference and consistency, we will refer to Petitioner's Claim Listing Appendix convention, as did Patent Owner.

Patent Owner asserts that Petitioner has not met its burden to prove unpatentability because:

(1) Mathiassen, alone or in combination with other references, does not disclose the "accessibility attribute" limitation, as properly construed, and, moreover, there is no motivation to combine Mathiassen with the other references (PO Resp. 12–23);

(2) Anderson, alone or combined with Mathiassen, does not disclose the "biometric signal duration limitation," and, also, there is no motivation to combine Anderson and Mathiassen (*id.* at 24–30);

(3) the references, alone or in combination, do not "populate" the database according to an "instruction" (*id.* at 30–33); and

(4) there were simpler solutions available to a skilled person than the Mathiassen/Anderson combination (Sur-reply 4–8).

Patent Owner states these same arguments apply to independent claims 9 and 10, as well as to the challenged dependent claims. *Id.* at 33.

IPR2022-00601
Patent 9,269,208 B2

Patent Owner's defenses are based in large part on accepting Patent Owner's asserted claim constructions, which we have *not* done.

We begin our claim analysis with claim 1.

### b)  Preamble
### *"A system for providing secure access to a controlled item."*

Petitioner asserts that "[t]o the extent the preamble is limiting, Mathiassen teaches a system for providing secure access to a controlled item."  Pet. 50 (citing Mathiassen, Abstr., ¶¶ 145–147).

Patent Owner does not contest specifically Petitioner's arguments with respect to the preamble of claim 1.  *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests the preamble of claim 1.

### c)  Limitation 1(a)
### *"a database of biometric signatures"*

Petitioner asserts that Mathiassen discloses a stored database of tables. Pet. 14–16 (citing Ex. 1004, ¶¶ 50, 147, Fig. 2B; Ex. 1003 ¶¶ 117–121.

Patent Owner does not contest specifically Petitioner's arguments with respect to the limitation of claim 1.  *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(a).

### d)  Limitation 1(b)
### *"a transmitter sub-system"*

Petitioner asserts Mathiassen teaches a transmitter subsystem, including transceiver 27, fingerprint sensor 5, processor 2 (of integrated circuit 1) executing administrative code, and non-volatile memory 7, 7A,

47

IPR2022-00601
Patent 9,269,208 B2

each housed in portable control 20.  Pet. 16, 17 (citing Ex. 1004 ¶¶ 185–188; Ex. 1003 ¶¶ 122–125).

Patent Owner does not contest specifically Petitioner's arguments with respect to the limitation of claim 1.  *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b).

### e)   Claim 1(b1)
### *"a biometric sensor for receiving a biometric signal"*

Petitioner asserts that Mathiassen's "fingerprint sensor 5" is a "biometric sensor for receiving a biometric signal" because it detects a finger on the sensor and processes raw images of fingerprints.  Pet. 18 (citing Ex. 1004 ¶ 49; Ex. 1003 ¶¶ 126–127).

Patent Owner does not contest specifically Petitioner's arguments with respect to the limitation of claim 1.  *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b1).

### f)   Claim 1(b2)
### *"means for matching the biometric signal against members*
### *of the database of biometric signatures*
### *to thereby output an accessibility attribute"*

Based on the claim constructions discussed in Section II.C. of this Decision, the disclosed structure for this means-plus-function clause is a "database and computer program product having a computer readable medium having a computer program recorded therein."  Pet. 6.

Petitioner asserts "Mathiassen teaches fingerprint sensor 5 of portable control 20 receiving a fingerprint reduced to access minutiae and comparing

IPR2022-00601
Patent 9,269,208 B2

such access minutiae to master minutiae tables (i.e., database) to authenticate a user." Pet. 51 (citing Ex. 1004 ¶¶ 71–72, 175–180; Ex. 1003 ¶ 279).

Petitioner's application of the references is as follows:

> *Mathiassen* and *McKeeth* each teaches **whether** access is granted. In *Mathiassen*, access *is granted* (as opposed to denied) by opening (i.e., unlocking) the car doors. *Mathiassen*, [0181-0182]; *Dec.,* 241. The issued "open door" command indicates "whether" access should be granted. *Mathiassen* teaches the open door command is issued in response to access minutiae matching a stored biometric signature of the car owner/administrator. *Mathiassen,* [0182]; *Dec.,* 241. In contrast, if the processor 2 does not find a match, then no access will be granted because "the process will be aborted." *Mathiassen,* [0181]. Thus, the "open door" command indicates that access should be granted.

Pet. 41–42.

Here, consistent with the proposed construction, Petitioner relies solely on Mathiassen to satisfy the proposed claim construction of an attribute that establishes whether and *under which conditions* access to the controlled item should be granted to a user. If the processor 2 in Mathiassen does not find a match, then no access will be granted. *Id.* Petitioner also, separately, asserts that McKeeth discloses a system in which "access is granted where 'there is a match between the input and security information.'" *Id.* at 42 (citing Ex. 1005, 3:65–67, 3:11–28).

McKeeth discloses different types of input security information, including audio sensors to detect a voice recognition and an optical scanner for fingerprint and/or retina scans. Ex. 1005, 3:1–10. Any one or more, or all, of the described types of input signals may be used to authenticate a user. *Id.* at 3:11–12. If the input and security information do not match the

49

IPR2022-00601
Patent 9,269,208 B2

stored information, the compare circuit issues a "flag signal" indicating denial of access by the user." *Id.* at 4:2–4.

Petitioner concludes that Mathiassen and McKeeth "each teaches **under what conditions** access is granted." Pet. 42. "Specifically, both references teach outputting an accessibility attribute upon there being a match of a live or access biometric signal to a stored biometric signal." *Id.* Petitioner notes that McKeeth "teaches both a duress instruction and an alert instruction when there is no match," but the duress instruction is distinct from the conditions under which access is, or is not, granted. *Id.*

Patent Owner asserts that Mathiassen either grants or denies access but does not provide any other condition or alternative "beyond the 'whether' inquiry, and Apple's reading of Mathiassen consequently merges the 'whether' and 'under which conditions' components of its own construction of the 'accessibility attribute' limitation." PO Resp. 13. Further, Patent Owner asserts that the Board ignored the "under which conditions" aspect in adopting Petitioner's construction of the "accessibility attribute." *Id.* at 14.

Patent Owner reasons that "[u]nder the Board's treatment of Mathiassen, a binary decision limited to access/abort satisfies both the 'whether' and 'under which conditions' requirement for 'accessibility attribute.'" PO Resp. 15. Patent Owner misconstrues our analysis of Mathiassen, as we have explained above based on our construction of the term "accessibility attribute."

Our construction of the "accessibility attribute" allows for conditional access, if any conditions are imposed, or unconditional access, if no conditions are imposed. Patent Owner's arguments fail to account for this construction.

IPR2022-00601
Patent 9,269,208 B2

Patent Owner argues that there is no motivation to combine Mathiassen and McKeeth because there were simpler alternative solutions available, the existence of which undermines the motivation to combine. PO Resp. 19–23; Sur-reply 4–8. This argument is inconsistent with controlling caselaw that makes clear "[i]t's not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) (citing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014) (emphasis in original)); *see also Netflix, Inc. v. DivX, LLC*, No. 2022-1083, 2023 WL 2298768, at *5 (Fed. Cir. Mar. 1, 2023) (citing *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) and *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

The motivation-to-combine analysis is a flexible one. "*[A]ny* need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420 (emphasis added). And "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421. Thus, "in many cases[,] a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420. The motivation-to-combine analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court [or this Board] can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418.

Here, based on our claim construction and analysis of the references, we determine that Petitioner establishes the claimed "accessibility attribute."

51

**Appx51**

IPR2022-00601
Patent 9,269,208 B2

### g) Claim 1(b3)
*"means for emitting a secure access signal conveying information"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is a "computer program product having a computer readable medium having a computer program recorded therein" for performing the claimed function. Pet. 7 (citing Ex. 1073).

Petitioner asserts Mathiassen discloses the "means for emitting," which is "administrative code," (e.g., algorithm) stored in non-volatile memory 7, 7A generating the encrypted "open door" command (i.e., secure access signal) and directing the transceiver to transmit the signal to the ignition control of the car. Pet. 52 (citing Ex. 1003 ¶¶ 281, 282).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b3).

### h) Claim 1(c)
*"a receiver sub-system"*

Petitioner asserts Mathiassen discloses a receiver sub-system, which includes ignition control 15, central car computer, and "transceivers of the door locks and the central car computer." Pet. 25 (citing Ex. 1004 ¶¶ 186–187). Petitioner also asserts the central car computer includes a transceiver receiving the signal (e.g., "open door" command) from portable control 20. *Id.* (citing Ex. 1003 ¶¶ 169–171; Ex. 1004 ¶¶ 149, 167, 186). According to

IPR2022-00601
Patent 9,269,208 B2

Petitioner, a "transceiver," as disclosed in Mathiassen, "is well understood by a POSITA[20] to include a receiver."  Pet. 25 (citing Ex. 1003 ¶ 173).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1.  *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(c).

### i)    Claim 1(c1)
*"means for receiving the transmitted secure access signal"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is receiver 118.  Pet. 7 (citing Ex. 1079).

Petitioner asserts Mathiassen discloses a receiver sub-system comprising the ignition control 15, central car computer, and "transceivers of the door locks and the central car computer."  Pet. 52, 25 (citing Ex. 1004 ¶¶ 186–187).  The central car computer includes a transceiver receiving the signal (e.g., "open door" command) from portable control 20.  *Id.* (citing Ex. 1003 ¶¶ 169–171; Ex. 1004 ¶¶ 149, 167, 186).  According to Petitioner, both the door locks and central car computer in Mathiassen include a transceiver.  *Id.* (citing Ex. 1004 ¶ 186; Ex. 1003 ¶¶ 170–172).  Petitioner

---

[20] "POSITA" is a commonly used patent law acronym for a "person of ordinary skill in the art." *See* 35 U.S.C. § 103(a) stating a statutory standard for obtaining a patent ("A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 , if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made *to a person having ordinary skill in the art* to which said subject matter pertains.") (emphasis added).

IPR2022-00601
Patent 9,269,208 B2

also asserts that "[a] 'transceiver' is well understood by a POSITA to include a receiver." Pet. 52, 25 (citing Ex. 1003 ¶ 13).

Petitioner also asserts that the signal received by the car computer's transceiver is sent either to the ignition control processor or the car computer's processor for decryption. Pet. 52, 25–26 (citing Ex. 1004 ¶¶ 187–188). After decrypting the command, a "similar encrypted command will be relayed to the door locks by the car computer," i.e., part of the mapped "receiver sub-system." *Id.* at 26; Ex. 1003 ¶ 170.

Petitioner concludes that Mathiassen's disclosed transceiver "performs the function of 'receiving the secure access signal,' (e.g., 'open door' command) transmitted from the transceiver 27 of portable control 20, Pet. 52, 26 (citing Ex. 1003 ¶¶ 170–171, 174; Ex. 1004 ¶ 186).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(c1).

### *j)   Claim 1(c2)*
*"means for providing conditional access*
*to the controlled item dependent upon said information"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is "controller 109 executing software 304." Pet. 7–8 (citing Ex. 1079).

Similar to the analysis for clause 1(c1) discussed above, Petitioner asserts "Mathiassen's processor of the ignition control, central car computer, or both, individually or collectively, comprise the "controller" structure. Pet. 26 (citing Ex. 1003 ¶¶ 176–183). As explained by Petitioner,

IPR2022-00601
Patent 9,269,208 B2

Mathiassen teaches two implementations: "a first in which the ignition control decrypts and authenticates the received command," and "a second in which the central car computer decrypts and authenticates the command." Pet. 27 (citing Ex. 1003 ¶¶ 177–183). Dr. Sears' testimony explains that a person of ordinary skill "would have understood that for the central car 'computer' to perform such algorithms, it includes or otherwise renders obvious a processor, as these same algorithms are disclosed as being performed by a processor when implemented in the ignition n control." Ex. 1003 ¶ 183. Dr. Sears also testifies that Mathiassen's "processor 2 of IC 1 in ignition control 15 performing decryption and authentication." *Id.*

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(c2).

### k)  Claim 1(d)
*"wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is "database and computer program product having a computer readable medium having a computer program recorded therein." Pet. 8–9 (citing Ex. 1077).

Petitioner asserts Mathiassen discloses administrative software that will "require a minimum of say 3 minutiae fingerprint representations of acceptable quality" that are stored in nonvolatile memory. Pet. 53 (citing Ex. 1004 ¶ 130). It is Petitioner's position that, in Mathiassen, the "administrative code directs the processor to store the acceptable fingerprint

55

IPR2022-00601
Patent 9,269,208 B2

representations in the form of master minutiae tables." Pet. 53 (citing Ex. 1004 ¶¶ 130–131; Ex. 1003 ¶ 287). According to Petitioner, "[s]toring master minutiae tables from a car owner or 'other users' is at least equivalent to the '208 Patent describing storing biometric signatures of an administrator and 'ordinary' users in database 105." *Id.* (citing Ex. 1004 ¶¶ 164–165, 190).

Petitioner also asserts that Mathiassen and McKeeth "enroll[ ] signatures indicating a user is under duress, which is at least equivalent to the '208 Patent describing storing a 'duress signature.'" Pet. 53. Petitioner concludes that "a POSITA would have understood or found it obvious that Mathiassen's administrative code in the non-volatile memory 7, 7A of IC 1 comprises the "means for populating." *Id.* (citing Ex. 1003 ¶ 287).

Patent Owner does not contest specifically Petitioner's arguments with respect to the limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(d).

l)    *Claim 1(d1)*
*"means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is "computer program product having a computer readable medium having a computer program recorded therein." Pet. 8 (citing Ex. 1079).

Petitioner asserts that "Mathiassen's sensor receives a series of entries of the biometric signal by a movement analyzing program identifying the fingerprint motions." Pet. 54. According to Petitioner, the representations

IPR2022-00601
Patent 9,269,208 B2

"are generated once a finger is detected on the sensor surface, which is at least equivalent to the '208 Patent checking a biometric is received on the biometric sensor." *Id.* (citing Ex. 1004 ¶ 49).

Petitioner also asserts that "Anderson [Ex. 1006] teaches receiving a series of fingerprint pressure pulses of varying duration." Pet. 54 (citing Ex. 1006, 7:28–34, Fig. 4A). As we explained above in our discussion of Anderson, there can be no reasonable dispute that Anderson discloses input biometric signals that vary in number and duration.

As explained by Petitioner,

> In *Mathiassen*, the series of directional finger movements instruct a command on *Mathiassen's* portable device (as modified by *McKeeth*). A POSITA would have been motivated and found it obvious to substitute or modify such directional finger movements with a series of presses of varying duration, as taught by *Anderson*, for instructing a command at portable device 20.

*Id.* at 35 (citations omitted).

Petitioner also provides argument and probative evidence as to why a person of ordinary skill would have combined the disclosures of the references, with a reasonable expectation that the combination would be successful. Pet. 35–36. As explained by Petitioner,

> There would have been a reasonable expectation of success in modifying *Mathiassen's* control 20, because it contains software and hardware for detecting directional movement and touch/no touch. *Mathiassen's* sensor 5 already detects a finger press because it receives fingerprint representations. The modification therefore only requires simple programming techniques (e.g., modifying the translation program to count the number and duration of "touch" or "no touch") that were within a POSITA's expertise.

*Id.* at 36.

IPR2022-00601
Patent 9,269,208 B2

Patent Owner asserts that the "pressure pulses" in Anderson do not generate biometric signals because they are captured "as the pressure code is entered," and are therefore not part of the pressure code itself. *See* PO Resp. 25. Patent Owner also explains that "combining Mathiassen's fingerprint sensor with Anderson's pressure code does not produce the claimed invention, as any duration would apply to a nonbiometric signal." *Id.* (citing Ex. 2011 ¶¶ 69-71). Dr. Easttom testifies that Anderson does not capture a biometric signal. Ex. 2011 ¶¶ 69–71. Petitioner, however, relies on Mathiassen and McKeeth for the biometric sensing, but relies on Anderson, which suggests the benefits and options of using a number and duration of pulses as inputs. *E.g.*, Pet. 32–36 Because Mathiassen, like the '208 patent, uses a biometric sensor as the input device, it will detect the biometric part of the input signal, while also sensing the number and duration of inputs.

Patent Owner also asserts that a "simpler combination" was available. PO Resp. 28. According to Patent Owner, "a simpler solution would have been to add Anderson's pushbutton to Mathiassen's key fob." *Id.* at 29 (citing Ex. 2011 ¶ 80). As explained above, "[i]t's not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp.*, 61 F.4th at 1380 (citations omitted).

Based on the Petitioner's arguments and evidence summarized above, we determine Petitioner has sufficiently shown that the cited references, as combined by Petitioner, disclose or suggest limitation 1(d1).

*m) Claim 1(d2)*
*"means for mapping said series[of entries of the biometric signal] into an instruction"*

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is "computer program product

58

IPR2022-00601
Patent 9,269,208 B2

having a computer readable medium having a computer program recorded therein." Pet. 8 (citing Ex. 1077).

Petitioner asserts Mathiassen discloses the "software translation program" executed by the processor in integrated circuit 1 performs the function of "mapping said series into an instruction" by translating the series of finger movements to a command in a command table. Pet. 55 (citing Ex. 1004 ¶ 192). The cited disclosure in Mathiassen states:

> As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory (7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). *Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences* including directional and touch/no-touch finger movement sequences. *A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor.*

Ex. 1004 ¶ 192 (emphases added). Based on this cited disclosure from Mathiassen, there can be no reasonable dispute that Mathiassen discloses a computer implemented software translation program for converting finger movements into control signals. *See also* Pet. 54 (explaining that

IPR2022-00601
Patent 9,269,208 B2

Mathiassen's sensor receives a series of entries of the biometric signal by a movement analyzing program identifying the fingerprint motions).

### n) Claim 1(d3)
### "means for populating the data base according to the instruction"

Based on the claim constructions discussed above, the disclosed structure for this means-plus-function clause is "database and computer program product having a computer readable medium having a computer program recorded therein" with code for performing the claimed function Pet. 8–9 (citing Ex. 1077).

Petitioner asserts "Mathiassen-McKeeth teaches or renders obvious administrative code directing processor 2 of portable door control to store fingerprint representations (from sensor 5) in master minutiae tables (i.e., database of biometric signatures) stored in memory 7, 7A when enrolling a new user, a car owner (i.e., administrator), or a duress signature." Pet. 55–56. Petitioner also argues that "Mathiassen discloses, for the medicine cabinet embodiment, the administrator initiates enrollment of 'the next user' by 'authenticating himself by his fingerprint.'" *Id.* at 37 (citing Ex. 1004 ¶ 131). According to Petitioner, enrolling new users includes "creating master minutiae tables subsequently stored in memory 7, 7A, i.e., the 'populating the database.'" *Id.* (citing Ex. 1004 ¶ 71; Ex. 1003 ¶¶ 222–224).

Patent Owner argues that "*Mathiassen* has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process." PO Resp. 31.

Petitioner asserts that "Mathiassen teaches receiving entries of a series of fingerprints" and that "Anderson teaches receiving a series of fingerprint

IPR2022-00601
Patent 9,269,208 B2

pressure pulses of varying duration." Pet. 54 (citing Ex, 1004 ¶ 192 and Ex. 1006, 7:28–34). As Petitioner correctly states, "Mathiassen's fingerprint sensor receives this series of entries of the biometric signal, similar to the '208 Patent's code entry module 103 containing a biometric sensor 121 that receives a user's fingerprint." Pet. 55. Mathiassen's processor translates the series of fingerprints (received by its biometric sensor into a command, such as "open door" command, for authenticating the user to access the car doors. Ex. 1004 ¶ 192.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that the cited disclose or suggest limitation 1(d3).

*o)   Claim 1(e)*
*"wherein the controlled item is one of: a locking mechanism*
*of a physical access structure or an electronic lock*
*on an electronic computing device"*

Petitioner asserts "Mathiassen teaches the controlled item is a 'locking mechanism of a physical access structure' (i.e., the car door locks of the central locking system)." Pet. 49 (citing Ex. 1004 ¶ 187; Ex. 1003 ¶ 266 (testifying that "Mathiassen teaches a controlled item that is 'a locking mechanism of a physical access structure,'" [*i.e.* a car door])). We also note that Mathiassen clearly discloses use of its disclosed computer-based locking and access system on a "laptop computer," "hotel safe," "medicine cabinet," and as a "door control" in "automotive applications." Ex. 1004 ¶¶ 41–44, 109–113.

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

61

IPR2022-00601
Patent 9,269,208 B2

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(e).

### 4. Conclusion for Independent Claim 1

Based on the evidence and our analysis above, we determine that Petitioner has established by a preponderance of the evidence that claim 1 of the '208 patent would have been obvious, and thus is not patentable.

### 5. Independent Claims 9 and 10

Patent Owner concedes that patentability of independent claims 9 and 10 stands or falls with patentability of independent claim 1. PO Resp. 33. Thus, applying the same analysis and evidence as discussed above in the context of claim 1, we determine that Petitioner has established by a preponderance of the evidence that independent claims 9 and 10 of the '208 patent would have been obvious, and thus are not patentable.

### 6. Dependent Claims 3–7, 9–11, 13

Petitioner provides an element-by-element analysis of where each element in the challenged claims 3–7, 9–11, and 13 is disclosed in, or would have been obvious in view of, the cited references. Pet. 12–63. For clauses in claims 3–7, 9–11, and 13 that are similar to those in claim 1, Petitioner refers to its arguments for claim 1, or other claims. *See, e.g.*, Pet. 62–63 (referring to its analysis for claims 1 and 10). Petitioner also provides a reason why it would have been obvious to modify and combine the references with a reasonable expectation of success, as proposed by Petitioner. *Id.* Petitioner relies throughout the analysis of these claims on the testimony of Dr. Sears (Ex. 1003) for evidentiary support.

Patent Owner concedes that patentability of dependent claims 3–7, 9–11, and 13 depend on its arguments for patentability of independent claim 1.

IPR2022-00601
Patent 9,269,208 B2

PO Resp. 33. Thus, applying the same analysis and evidence as discussed above in the context of claim 1, we determine that Petitioner has established by a preponderance of the evidence that dependent claims 3–7, 9–11, and 13 of the '208 patent would have been obvious, and thus are not patentable.

## III. CONCLUSION[21]

Petitioner has established by a preponderance of the evidence that claims 1, 3–7, 9–11, and 13 are unpatentable.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has shown by a preponderance of the evidence that claims 1, 3–7, 9–11, and 13 are unpatentable.

---

[21] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.* *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

63

IPR2022-00601
Patent 9,269,208 B2

## V.  SUMMARY TABLE

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 3–7, 9–11, 13 | 103 | Mathiassen, McKeeth, Anderson | 1, 3–7, 9–11, 13 | |
| **Overall Outcome** | | | 1, 3–7, 9–11, 13 | |

64
**Appx64**

IPR2022-00601
Patent 9,269,208 B2

For PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com


For PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

Trials@uspto.gov
571-272-7822

Paper 31
Date: September 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

---

IPR2022-00602
Patent 9,665,705 B2

---

Before SCOTT A. DANIELS, BARRY L. GROSSMAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

GROSSMAN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

**Appx66**

IPR2022-00602
Patent 9,665,705 B2

# I.　INTRODUCTION

## A.　Background and Summary

Apple Inc. ("Petitioner" or "Apple") filed a Petition for *inter partes* review of claims 1, 4, 6, 10–12, and 14–17 (collectively, the "challenged claims") of U.S. Patent No. 9,655,705 B2 (Ex. 1001, "the '705 patent"). Paper 1 ("Pet."). CPC Patent Technologies PTY, Ltd. ("Patent Owner" or "CPC") timely filed a Preliminary Response to the Petition. Paper 7 ("Prelim. Resp."). With our authorization, Petitioner filed a Preliminary Reply (Paper 8 ("Prelim. Reply")) addressing the issue of discretionary denial raised in the Preliminary Response and Patent Owner filed a Prelim. Sur-Reply (Paper 9 ("Prelim. Sur-Reply")).

We concluded that Petitioner satisfied the burden, under 35 U.S.C. § 314(a), to show that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. Accordingly, on behalf of the Director (37 C.F.R. § 42.4(a)), and in accordance with *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1353 (2018), we instituted an *inter partes* review of all the challenged claims, on all the asserted grounds. Paper 11 ("Dec. Inst.").

Patent Owner filed a Response. Paper 17 ("PO Resp."). Petitioner filed a Reply. Paper 20 ("Reply"). Patent Owner filed a Sur-reply. Paper 26 ("Sur-reply").

Petitioner submitted eighty exhibits. *See* Exs. 1001–1091[1] (some consecutive exhibit numbers were *not* used; *e,g*, there are no exhibits

---

[1] Exhibit 1091 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. See PTAB Consolidated Trial Practice Guide, 84 (Nov. 2019 ("TPG")) ("Demonstrative exhibits used at the final hearing are aids to oral argument and not evidence").

IPR2022-00602
Patent 9,665,705 B2

numbered 1056–1064); *see also* Paper 28 (Petitioner's Updated Exhibit List stating that Exhibit numbers 1056–1064 were "Intentionally left blank."). Petitioner relies on the Declaration testimony of Andrew Sears, Ph.D. *See* Exs. 1003, 1090.

Patent Owner submitted sixteen exhibits. *See* Exs. 2001–2016[2]; *see also* Paper 29 (Patent Owner's Updated Exhibit List). Patent Owner relies on the Declaration testimony of William C. Easttom III, D. Sc,, Ph.D. *See* Exs. 2013, 2014.

A hearing was held June 29, 2023. (Paper 30) ("Transcript or "Tr."").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings and conclusions below, we determine that Petitioner has proven that claims 1, 4, 6, 10–12, and 14–17 are unpatentable.

### B.    Real Parties-in-Interest

Apple identifies itself as the sole real party-in-interest. Pet. 62.

CPC also identifies itself as the sole real party-in-interest. Paper 4, 2.

### C.   Related Matters

Petitioner and Patent Owner each identify the following two district court proceedings as related matters: (1) *CPC Patent Technologies Pty Ltd. v. Apple Inc.,* Case No. 6:21-cv-00165-ADA (W.D. Tex.); and (2) *CPC Patent Technologies Pty Ltd. v. HMD Global Oy,* Case No. 6:21-cv-00166-ADA (W.D. Tex.) (the "HMD W.D. Texas case"). Pet. 62; Paper 4, 2.

---

[2] Exhibit 2016 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. *See id.*

IPR2022-00602
Patent 9,665,705 B2

The first listed case, between the same parties involved in this *inter partes* review proceeding, however, has been transferred to the Northern District of California. *See In re Apple Inc.*, 2022 WL 1196768 (Fed. Cir. Apr. 22, 2022); *see also* Ex. 3002 (Text Order granting Motion to Change Venue). The case is now styled *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 5:22-cv-02553 (N.D. Cal.) (the "Apple N.D. California case"). *See* Ex. 3003 (PACER Docket for the transferred case); Prelim. Resp. 1, fn 1 (Patent Owner acknowledging the transfer from the Western District of Texas to the Northern District of California).

Petitioner and Patent Owner also each identify the following two pending *inter partes* review proceedings as related matters: (1) IPR2022-00600, challenging claims in Patent 8,620,039; and (2) IPR2022-00601, challenging claims in Patent 9,269,208, which is the "parent" of the '705 patent. *See* Ex. 1001, code (63). A final written decision in the 00600 IPR is due October 17, 2023. A final written decision in the 00601 IPR is being issued simultaneously with this Decision in the case before us.

### D. The '705 Patent

We make the following findings concerning the disclosure of the '705 patent.

The '705 patent discloses a system "for providing secure access to a controlled item." Ex. 1001, Abstr. The "controlled item" can be, for example, the locking mechanism of a door or an electronic lock on a personal computer. *Id.* at 1:43–46.[3] The system uses a database of "biometric signatures" (*id.* at 2:32), such as a fingerprint (*id.* at 7:36) for determining authorized access.

---

[3] Citations are to column:line[s] of the '705 patent.

IPR2022-00602
Patent 9,665,705 B2

Figure 2 from the '705 patent is reproduced below.



Fig. 2

Figure 2 is a functional block diagram of an arrangement for providing secure access according to the system disclosed in the '705 patent. Ex. 1001, 5:18–19.

As described in the written description of the '705 patent, and as illustrated generally in Figure 2, user 101 makes a request to code entry module 103. *Id.* at 5:56–57. Code entry module 103 includes biometric sensor 121. *Id.* at 5:57–58. If biometric sensor 121 is a fingerprint sensor, for example, then the request "typically takes the form of a thumb press" on a sensor panel (not shown) on code entry module 103. *Id.* at 5:60–63. "Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, [and] palm configuration." *Id.* at 1:30–32; *see also id.* at 16:45–49 (claim 4 stating "the biometric sensor

5

IPR2022-00602
Patent 9,665,705 B2

is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration").

Code entry module 103 then "interrogates" an authorized user identity database 105, which contains "biometric signatures" for authorized users, to determine if user 101 is an authorized user. Ex. 1001, 5:64–6:2. If user 101 is an authorized user, code entry module 103 sends a signal to "controller/transmitter" 107. *Id.* at 6:2–4. Database 105 is prepared by an "administrator." *Id.* at 10:38–42 ("The first user of the code entry module 103 . . . is automatically categorised[4] as an administrator.").

The disclosed system and method compare biometric input "*signal*" 102 to database 105 of authorized biometric "*signatures*" to determine if user 101 is an authorized user. *Id.* at 5:65–6:2 ("Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 [producing a thumbprint] then the user database 105 contains biometric signatures [*i.e.,* thumbprints] for authorised users against which the request 102 can be authenticated."). If user 101 is an authorized user, code entry module 103 sends a signal to "controller/transmitter" 107 allowing access to the controlled item. *Id.* at 6:2–10.

When biometric sensor 121 is a fingerprint sensor,[5] the biometric signatures stored in database 105 are not limited to a single fingerprint. The '705 patent also discloses that, if so programed by an administrator, code

---

[4] The Specification uses the British spelling, which we also use when quoting the Specification.

[5] *See* Ex. 1001, 10:35 – 38 ("Although the present description refers to 'Users', in fact it is 'fingers' which are the operative entities in system operation *when the biometric sensor 121 (see FIG. 2) is a fingerprint sensor*.") (emphasis added). Thus, it is clear that biometric sensor 121 is *not* limited to a fingerprint sensor.

IPR2022-00602
Patent 9,665,705 B2

entry module 103 may be activated by providing a succession of finger presses to biometric sensor 121 included in module 103. *Id.* at 10:56–58. If these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time, controller 107 accepts the presses "as potential control information," or a biometric signal, and checks the input information against a stored set of "legal [authorized] control signals," or the database of biometric signatures. *Id.* at 10:59–67. "In one arrangement, the control information is encoded by *either or both* (a) the number of finger presses and (b) the relative duration of the finger presses." *Id.* at 10:60–63 (emphasis added).

An example of this type of "control information" or "legal control signal" is "dit, dit, dit, dah," where "dit" is a finger press of one second's duration . . . and "dah" is a finger press of two second's duration."[6] *Id.* at 11:1–7.

---

[6] We have not been directed to any persuasive evidence, and have found none on our own review of the evidence, which establishes why the Specification refers to the number and duration of finger presses as "control information" and "legal control signals," rather than a "biometric signal" and a "database" of "biometric signatures," respectively, which are the terms used throughout the Specification for the input signal and the database of authorized users.

The Specification is required to include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112(a). Neither we nor the parties, however, have jurisdiction in this *inter partes* review proceeding to address this enablement issue. *See id.* at § 311(b) ("A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.").

7

**Appx72**

IPR2022-00602
Patent 9,665,705 B2

If user 101 is an authorized user based on the inputs to code entry module 103, controller/transmitter 107 then sends "an access signal," based on a "rolling code," to controller 109. Ex. 1001, 6:2–9. According to the written description, "[t]he rolling code protocol offers non-replay encrypted communication." *Id.* at 6:9–10. Other secure codes, such as "the Bluetooth™ protocol, or the Wi Fi™ protocols" also can be used. *Id.* at 6:32–38.

If controller 109 determines that the rolling code received is "legitimate," then controller 109 sends a command to "controlled item 111," which, for example "can be a door locking mechanism on a secure door, or an electronic key +circuit in a personal computer" that is to be accessed by user 101. *Id.* at 6:11–20.

Code entry module 103 also incorporates at least one mechanism for providing feedback to user 101. *Id.* at 6:24–25. This mechanism can, for example, take the form of "one or more Light Emitting Diodes (LEDs) 122," and/or audio transducer 124, which provide visual or audio feedback to the user. *Id.* at 6:25–31.

In Figure 2, "sub-system 116," shown on the left of vertical dashed line 119, communicates with "sub-system 117," shown on the right of dashed line 119, "via the wireless communication channel" used by access signal 108 between controller/transmitter 107 and controller/receiver 109. *Id.* at 6:61–67. As disclosed in the '705 patent, "[a]lthough typically the communication channel uses a wireless transmission medium, there are instances where the channel used by the access signal 108 can use a wired medium." *Id.* at 7:9–14.

8
**Appx73**

IPR2022-00602
Patent 9,665,705 B2

### E. Illustrative Claim

Among the challenged claims, claims 1, 10, 11, 14, 15, 16, and 17 are independent claims.

Independent claims 1 and 15 are directed to a "system for providing secure access to a controlled item." Ex. 1001, 15:62–63; 18:39–40. These claims are identical except for claim 1 using the phrase "configured to," whereas claim 15 uses the phrase "capable of." For example, claim 1 includes "a biometric sensor *configured to receive* a biometric signal" (*id.* at 15:66–67 (emphasis added)), whereas claim 15 includes "a biometric sensor *capable of receiving* a biometric signal." (*id.* at 18:43–44 (emphasis added)). This same distinction also applies to the claimed elements of "a transmitter sub-system controller," "a transmitter," and "a receiver sub-system controller." *Compare id.* at 16:1–23 (claim 1) *with id.* at 18:45–67 (claim 15).

We discuss below in Section II.C (Claim Construction) whether use of the phrase "capable of" rather than the phrase "configured to" is a distinction without a substantive difference.

Independent claims 10 and 16 are directed to a "transmitter sub-system for operating in a system for providing secure access to a controlled item." *Id.* at 17:19–20; 19:1–2. The only distinction between claims 10 and 16 is the same "capable of"/"configured to" distinction discussed above for claims 1 and 15. *Compare id.* at 17:19–39 (claim 10) *with id.* at 19:1–20 (claim 16).

Independent claims 11 and 17 are directed to a "method for providing secure access to a controlled item." *Id.* at 17:40–41. The only distinction between claims 11 and 17 is the same "capable of"/"configured to" distinction discussed above for claims 1 and 15. Again, the only distinction

9

IPR2022-00602
Patent 9,665,705 B2

between claims 11 and 17 is the same "capable of"/"configured to" distinction discussed above for claims 1 and 15. *Compare id.* at 17:40–67 (claim 11) *with id.* at 19:21–20:23 (claim 17).

Independent claim 14 is directed to a "non-transitory computer readable storage medium storing a computer program." *Id.* at 18:18–19.

Independent claim 1 is illustrative and is reproduced below.

> 1. A system for providing secure access to a controlled item, the system comprising:
>> a memory comprising a database of biometric signatures;
>> a transmitter sub-system comprising:
>> a biometric sensor configured to receive a biometric signal;
>> a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and
>> a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and
>> a receiver sub-system comprising:
>> a receiver sub-system controller configured to:
>> receive the transmitted secure access signal; and
>> provide conditional access to the controlled item dependent upon said information;
>> wherein the transmitter sub-system controller is further configured to:
>> receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
>> map said series into an instruction; and
>> populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

IPR2022-00602
Patent 9,665,705 B2

Ex. 1001, 15:62–16:23.[7]

### F. Prior Art and Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable on the following ground:

| Claim(s) Challenged | 35 U.S.C. §[8] | Reference(s)/Basis |
|---|---|---|
| 1, 4, 6, 10–12, 14–17 | 103(a) | Mathiassen,[9] McKeeth,[10] Anderson[11] |

Petitioner also relies on the declaration testimony of Andrew Sears, Ph.D. *See* Ex. 1003.[12]

---

[7] Petitioner provides a Claim Listing Appendix as part of the Petition. Pet. 64–69. This Appendix includes all the challenged claims identified by individual clause, such as, for claim 1, labeling the clauses 1(a), 1(b), 1(b)(1), etc. Petitioner refers to these clause labels in its analysis.

[8] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[9] Mathiassen et al, US 2004/0123113 A1, published June 24, 2004 (Ex. 1004, "Mathiassen").

[10] McKeeth, US 6,766,456 B1, issued July 20, 2004 (Ex. 1005, "McKeeth").

[11] Anderson, US 6,509,847 B1, issued Jan. 21, 2003 (Ex. 1006, "Anderson").

[12] Exhibit 1003 is a 238-page declaration from Dr. Sears, including its Appendix A, which is a detailed mapping of the disclosures of the three applied references to the challenged claims. Dr. Sears currently is a Professor and Dean of the College of Information Sciences and Technology at The Pennsylvania State University. Ex. 1003 ¶ 5. Dr. Sears earned a Bachelor of Science degree in Computer Science, and a Ph.D. degree, also in Computer Science. *Id.* ¶ 6. He has held various positions in academia, including serving as the Interim Chief Information Security Officer at Penn State. *Id.* ¶¶ 7, 8. He has authored or edited a number of computer-related publications and held leadership positions in several computer industry organizations. *Id.* ¶¶ 10–12.

11
**Appx76**

IPR2022-00602
Patent 9,665,705 B2

## II. ANALYSIS

### A. Obviousness

Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long felt but unsolved needs, and failure of others.[13] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls."). The Court in *Graham* explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." *Graham*, 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions.

---

[13] Patent Owner does not direct us to any objective evidence of non-obviousness in its Preliminary Response.

IPR2022-00602
Patent 9,665,705 B2

*Id.* at 417. To support this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious.").

13
**Appx78**

IPR2022-00602
Patent 9,665,705 B2

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421.

Applying these general principles, we consider the evidence and arguments of the parties.

### B.   Level of Ordinary Skill in the Art

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). "This reference point prevents . . . factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

"The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a district court cannot

14

IPR2022-00602
Patent 9,665,705 B2

properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Ruiz v. A.B. Chance*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("The determination of the level of skill in the art is an integral part of the *Graham* analysis.").

Neither party provides any persuasive evidence or argument concerning the factors identified above or any other factors relevant to determining the level of ordinary skill.

Petitioner asserts that a person of ordinary skill in the art would have had "at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year experience in the field of human-machine interfaces and device access security." Pet. 4 (citing Ex. 1003 ¶¶ 31–35).[14]  Petitioner also states that "[a]dditional education or experience may substitute for the above requirements." *Id.*

In forming an opinion on the level of ordinary skill applicable to this proceeding, Dr. Sears testifies that he considered various factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field. Ex. 1003 ¶ 31.  Dr. Sears also testifies that he "placed myself back in the time frame of the claimed invention and considered the colleagues with whom I had worked at that time." *Id.*  Dr. Sears opines that a person of ordinary skill

---

[14] Petitioner cites this testimony as "Dec."  Pet. 4, fn 1.  We will cite it, as we do all other evidence, by reference to its Exhibit number, which is Exhibit 1003.

IPR2022-00602
Patent 9,665,705 B2

would have had the education and experience adopted by Petitioner.
*Id.* at ¶ 32.

Patent Owner states it "does not dispute [Petitioner's] characterization" of the level of ordinary skill in the art   *See* PO Resp. 5–6.

Based on the prior art, the sophistication of the technology at issue, and Dr. Sears' Declaration testimony, we adopt, with minor modification, Petitioner's undisputed definition of the level of ordinary skill.  We determine that in this proceeding a person of ordinary skill would have had a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with one year of experience in the field of human-machine interfaces and device access security, or an equivalent balance of education and work experience.  We have eliminated the open-ended phrase of "at least" in describing the education and experience of a person of ordinary skill.  This open-ended description fails to provide the specificity necessary to define the level of ordinary skill.

## C.  Claim Construction

We construe each claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)."  37 C.F.R. § 42.100(b) (2021).  Under this standard, claim terms are generally given their ordinary and customary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc) ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.'" (citations omitted)).

Petitioner states that in the related district court litigation between the parties, the Western District of Texas court entered a Claim Construction

16

IPR2022-00602
Patent 9,665,705 B2

Order on February 10, 2022. (Ex. 1077). Pet. 5. Petitioner also states "the Parties agreed to certain constructions in a Joint Claim Construction Statement" in the Western District of Texas litigation (Ex. 1074). *Id.* Petitioner then proposes that "[f]or purposes of this IPR, Apple applies the District Court's constructions from the *Apple* litigation [Ex. 1077] and constructions agreed to by the Parties (Ex. 1074)[15] that are not otherwise plain and ordinary meaning." *Id.*

Petitioner also highlights specific constructions for the claim terms "database," "conditional access," "biometric signal," and "accessibility attribute" from Exhibits 1074 and 1077. Pet. 6.

Patent Owner proposes "constructions" (1) for the term "accessibility attribute" (PO Resp. 6–7); (2) the phrase requiring a series of entries of the biometric signal "characterised according to at least one of the number of said entries and a duration of each said entry" (*id.* at 7–11); and (3) the "populate" the database limitation concerning enrolling or authorizing new users (*id.* at 11–12).

Patent Owner also provided its views on the differences in claim scope between the term "configured to" and the term "capable of" as used in the challenged claims. *Id.* at 12–14. Petitioner also addresses this topic. Reply 26.

"[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795,

---

[15] The cited Exhibits 1074 and 1077 are from the case *prior to* its transfer from the Western District of Texas to the Northern District of California.

IPR2022-00602
Patent 9,665,705 B2

803 (Fed. Cir. 1999)).  Here, we determine the claim terms that need specific construction are the three terms proposed by Patent Owner for specific construction.  Accordingly, we construe these terms below.

### 1.    General Claim Construction Principles

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (citations omitted).  "[T]here is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324).  Fortunately, however, there is substantial judicial guidance.

Claim construction requires determining how a skilled artisan would understand a claim term "in the context of the entire patent, including the specification." *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313.  *Id.* (citation omitted).  "[C]laims must be read in view of the specification, of which they are a part." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc)).  The Specification, or more precisely, the written description, is the "single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), and "is, thus, the primary basis for construing the claims." *Id.* (citation omitted).  Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the Specification into the claims. *Phillips*, 415 F.3d at 1323.  Thus, we are careful not to cross that "fine line" that exists between properly construing a claim in light of the specification and improperly importing into the claim a limitation from the specification." *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir.

18

IPR2022-00602
Patent 9,665,705 B2

1998) ("We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.").

While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

We also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317.

In construing the claims, we may also look to available "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### 2. "Accessibility Attribute"

In our Decision to Institute this proceeding, we adopted, for purposes of that Decision, Petitioner's unopposed asserted claim construction for "accessibility attribute," which was an "attribute that establishes whether and under which conditions access to the controlled item should be granted." Dec. Inst. 13 (citing Pet. 6 (citing the Texas District Court's claim construction, Exs. 1074, 1077)). We note here that the District Court included the phrase "to a user" at the end of the construed term, which Petitioner did *not* include. The complete construction by the District Court is an "attribute that establishes whether and under which conditions access to the controlled item should be granted *to a user*." Ex. 1077, 2 (emphasis

19

IPR2022-00602
Patent 9,665,705 B2

added).    The District Court did not cite any intrinsic or extrinsic evidence to support its construction.

In Patent Owner's Response, Patent Owner acknowledges Petitioner's proposed construction but asserts that "a mere binary decision to grant access to a device does not constitute an 'accessibility attribute.'" PO Resp. 6–7; *see also* Ex. 2013 ¶ 45 (Patent Owner's expert, Dr. Easttom,[16] testimony that the construction of the term "accessibility attribute" in our Decision to Institute this proceeding "requires more than the binary determination of whether to grant access to a controlled item by virtue of the 'under which conditions' language."). Patent Owner also asserts that Petitioner's "position on the 'accessibility attribute' limitation is muddied at best." PO Resp. 14. According to Patent Owner, Petitioner "and its expert appear to argue that 'accessibility attribute' *can* be a binary access decision." *Id.* at 15 (citing Paper 1 [Pet.] at 18–20).

Thus, Patent Owner asserts what an "accessibility attribute" is not (it is not a "binary decision"), but fails to assert a construction of what an "accessibility attribute" is.

We do *not* understand Petitioner to be asserting a construction of the term "accessibility attribute" to mean simply a "binary decision" to grant or

---

[16] Exhibit 2013 is a 36-page declaration from Dr. Easttom. Dr. Easttom earned a D.Sc. degree in Cyber Security, a Ph.D. degree in Technology, and three master's degrees (one in Applied Computer Science, one in Education, and one in Systems Engineering). Ex. 2013 ¶ 7. Dr. Easttom testifies that he has 30 years of experience in the computer science industry including extensive experience with computer security, computer software, and computer networking; that he has authored 37 computer science books; that he has authored over 70 research papers; and that he is an inventor with 25 patents, including patents related to computer networking. His CV (Ex. 2014) provides details of his extensive experience and education.

IPR2022-00602
Patent 9,665,705 B2

not grant access to a locked structure or device. Nor did our Decision to Institute adopt such a "binary decision." The construction asserted by Petitioner in this proceeding, and the construction adopted in our Decision to Institute this proceeding, requires "an attribute that establishes *whether and under which conditions* access to the controlled item should be granted." Dec. Inst. 13 (citing Pet. 6 (citing the Texas District Court's claim construction, Exs. 1074, 1077) (emphasis added)).

As we explain in our analysis below, to avoid any confusion of the meaning of "accessibility attribute," we clarify the construction to add the phrase "if any" to modify the "conditions" that may, or may not, be imposed to allow access. Thus, we determine that an "accessibility attribute" is "an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted." Based on the language of the claims and Specification, the "accessibility attribute" may include only an "access attribute," which is "unconditional." *See* Ex. 1001, 8:29–38 (stating "the accessibility attribute may comprise *one or more of* an access attribute (granting unconditional access)," a "duress attribute," an "alert attribute," and a "telemetry attribute"); *see also id.* at 16:34–44 (unchallenged claim 3 requiring an access attribute, a duress attribute, and an alert attribute).[17]

Notwithstanding Patent Owner's Response that an "accessibility attribute" is not a "binary decision," Petitioner asserts that "[t]he Parties agree to apply the District Court's construction for the claimed 'accessibility attribute.'" Reply 1. Petitioner also states, however, that Petitioner is relying on McKeeth for teaching two accessibility attributes (duress and

---

[17] To avoid any confusion, we note that an "access attribute" is one specific example of the generic term "accessibility attribute." Ex. 1001, 8:29–38.

IPR2022-00602
Patent 9,665,705 B2

alert) even though "the '705 Patent's independent claims only require outputting a single accessibility attribute." *Id.* at 2.

Petitioner clarifies its position on the construction of "accessibility attribute" by further explaining Petitioner's view that "the '705 Patent describes "outputting an accessibility attribute that includes 'access' without any conditions, which satisfies the 'under which conditions' construction component." Reply. 4.

We begin our claim construction analysis with the language used in the claims.

### a) Claims

The term "accessibility attribute" appears directly or through dependency in all the challenged claims.

Independent claim 1 includes the following two clauses that refer to an "accessibility attribute":

(1) "a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an *accessibility attribute*;" (Ex. 1001, 16:1–4)[18]; and

(2) "a transmitter configured to emit a secure access signal conveying information dependent upon said *accessibility attribute*" (*id*. at 16:5–7).

These two references merely establish that an "accessibility attribute' is an output access signal based on matching the biometric signal against the authorized user database of biometric signatures. *See id.* at 5:65–6:2 ("Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 then the user database 105 contains biometric signatures for authorised [sic] users against which the request 102 can be authenticated.").

---

[18] All italicized emphasis of claim language has been added.

22

IPR2022-00602
Patent 9,665,705 B2

These clauses provide no further structure or function of the claimed "accessibility attribute."

Claim 1 also includes a clause stating that "conditional access" to a user is "dependent upon" information in the "accessibility attribute." *Id.* at 16:11–12. This clause does not require or state that there is, or is not, conditional access. It merely states that "conditional access," if any, depends on what information is in the "accessibility attribute." *See id.* at 16:5–7 (stating that the "information" in the "access signal" in claim 1 is "dependent upon" the "accessibility attribute"). Thus, based on the claim language in claim 1, the scope of the "accessibility attribute" is undefined. The only requirement is that it provide access for authorized users.

Claim 3 (not challenged, but still relevant to claim construction), dependent on claim 1, states that "the [authorized user] database of biometric signatures comprises signatures in *at least one of* a system administrator class, a system user class, and a duress class." Ex. 1001, 16:34–37 (emphasis added). Thus, consistent with Petitioner's argument summarized above (*see* Reply 4–5), the system administrator may be the only authorized user in the database. Claim 3 also further defines the "accessibility attribute" as "comprising:

> *an access attribute* if the biometric signal matches a member of the database of biometric signatures;
>
> *a duress attribute* if the biometric signal matches a member of the database of biometric signatures *and said member belongs to the duress class*; and
>
> *an alert attribute* if the biometric signal does not match a member of the database of biometric signatures.

*Id.* at 16:18–24 (emphases added).

IPR2022-00602
Patent 9,665,705 B2

In claim 3, the conditional "duress attribute" applies only if the user is a member of the "duress class" in the database of biometric signatures. There is, however, no requirement that any member of the "duress class" be in the database.

We recognize that the Federal Circuit has held that the plain and ordinary meaning of "at least one of" is "one or more," but that when the phrase is used in a claim, the issue is what "at least one of" is used to modify. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004). In *SuperGuide*, the court held that, when "[t]he phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria," the phrase connotes a conjunctive list and requires selecting at least one value for each category. *Id.* For example, in *SuperGuide*, the claim phrase "storing at least one of a desired program start time, a desired program end time, a desired program service, and a desired program type" was interpreted as requiring storing at least one desired program start time, at least one desired program end time, and so forth. *Id.* at 884.

Courts have not, however, interpreted *SuperGuide* as setting forth a *per se* rule that the use of "at least one of" followed by "and" necessarily connotes a conjunctive list. *See Fujifilm Corp. v. Motorola Mobility LLC*, Case No. 12–CV–03587–WHO, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015) (summarizing cases and noting that "*SuperGuide* did not erect a universal rule of construction for all uses of 'at least one of' in all patents"). In particular, courts have found *SuperGuide* inapplicable when the listed items following "at least one of" are not categories containing many possible values. *See id.*; *see also TQ Delta, LLC v. Comcast Cable Commc'ns, LLC*, No. 1:15–CV–00611–RGA, 2016 WL 7013481, at *8 (D. Del. Nov. 30,

24

IPR2022-00602
Patent 9,665,705 B2

2016) (list following "at least one of" was of parameters to be selected from, not categories). The Board has also distinguished *SuperGuide* on this basis. *See Hewlett–Packard Co. v. MPHJ Tech. Invs., LLC*, Case IPR2013–00309, Paper 9, slip op. at 8 (PTAB Nov. 21, 2013); *Daifuku Co., Ltd. v. Murata Machinery, Ltd.*, Case IPR2015–00083, Paper 63, slip op. at 4–5 (PTAB May 3, 2016); *Apple, Inc. v. Evolved Wireless LLC*, No. IPR2016-01177, 2017 WL 6543970, at *4 (P.T.A.B. Dec. 20, 2017).

Relevant to our inquiry, therefore, is whether the items that follow "at least one of" in the challenged claims of the '705 patent are categories that may have multiple values (such as in *SuperGuide*) or individual parameters having only one value. Here, we think it is clear that the accessibility attributes and the classes of users are individual parameters that apply to individual people.

As noted above, the first user of the disclosed and claimed invention "is automatically categorised as an administrator." Ex. 1001, 10:38–42. This first user may be the only authorized user. Thus, the only database entry for this first user is a "system administrator class" entry that will generate only an "access attribute (granting *unconditional* access)." *Id.* at 8:29–30 (emphasis added). This is not unlikely because the claims are specifically limited to a "controlled item" that is either "a locking mechanism of a physical access structure," or "an electronic lock on an electronic computing device." *See, e.g., id.* at 16:21–23 (claim 1 stating "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"). A similar limitation is in each independent claim. The owner of an individual computing device may be the only authorized user of that device, thus having unconditional access as the "administrator."

25
**Appx90**

IPR2022-00602
Patent 9,665,705 B2

Claim 3 allows a database of only a first and only user, who is automatically the system administrator. Ex. 1001, 16:34–37 ("the database of biometric signatures comprises signatures in *at least one of* a system administrator class, a system user class, and a duress class" (emphasis added)). There may be no other individuals in the "system user class" or the "duress class."

Claim 3 further limits claim 1 by stating the "accessibility attribute" in claim 1 comprises[19] the three specific attributes stated in claim 3 – "an "access attribute;" "a duress attribute;" and "an alert attribute." This listing in claim 3 establishes a presumption that these three requirements are *not* included in the claimed "accessibility attribute" in claim 1. *Phillips*, 415 F.3d at 1314–15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." (citations omitted)).[20]

---

[19] "[I]n general, a patent claim reciting an apparatus 'comprising' various components merely means that the apparatus 'includ[es] but is not limited to' those components." *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 562 (Fed. Cir. 2020) (nonprecedential) (citations omitted).

[20] We recognize that the Board "must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *Masimo Corp. v. Apple Inc.*, Nos. 2022-1631 *et al*, slip op. at 8 (Fed. Cir. Sep. 12, 2023 (nonprecedential)) (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). The parties argued claim construction, but did not discuss specifically claim differentiation as part of their claim construction analysis. Petitioner argued, however, that the claims allowed for "administrator access as an exemplary access without conditions." Reply 4–5. Patent Owner addressed this in its Sur-reply. Sur-

26
**Appx91**

IPR2022-00602
Patent 9,665,705 B2

Based on the claim language, the doctrine of claim differentiation, and the analysis above, we determine that an "accessibility attribute," as used in the challenged independent claims means that a user with a biometric signature in the database is given access to the controlled item. As used in the independent claims, there are no other conditions imposed.

Thus, based on the claim language, an "accessibility attribute" is an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted.

### b) Specification

Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citation omitted). "The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citation omitted). Thus, we turn to the Specification for additional guidance on the meaning of the claim term "accessibility attribute."

The Specification states that the "accessibility attribute establishes whether and under which conditions access to the controlled item 111 should be granted to a user." Ex. 1001, 8:26–28. This is the construction adopted in our Decision to Institute this proceeding.

---

reply 22. Our claim construction analysis, as stated in the text, follows controlling procedures from *Phillips*. The parties also were advised that:

> claim construction, in general, is an issue to be addressed at trial. Claim construction will be determined at the close of all the evidence and after any hearing. The parties are expected to assert all their claim construction arguments and evidence in the Petition, Patent Owner's Response, or otherwise during trial, as permitted by our rules.

Dec. Inst. 14.

IPR2022-00602
Patent 9,665,705 B2

The Specification further states:

> the accessibility attribute may comprise *one or more of* an *access attribute (granting unconditional access)*, a *duress attribute* (granting access but with activation of an alert tone to advise authorities of the duress situation), an *alert attribute* (sounding a chime indicating that an unauthorised, but not necessarily hostile, person is seeking access, and a *telemetry attribute*, which represents a communication channel for communicating state information for the transmitter sub-system to the receiver sub-system such as a "low battery" condition.

*Id.* at 8:29–38 (emphases added). Thus, while four different accessibility attributes are disclosed (access attribute, duress attribute, alert attribute, and telemetry attribute), the Specification, consistent with the claims discussed above, states that the disclosed invention "may comprise *one or more of*" these four attributes. Ex. 1001, 8:29–30. The Specification also states that an "access attribute" grants "unconditional access." *Id.* at 8:30.

The term "accessibility attribute" does not appear in the Specification after column 8 until it appears again in the claims.

Thus, based on the Specification, an "accessibility attribute" is an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted. The term "if any" is required because an "access attribute" grants "unconditional access" (*id.*) and it may be the only attribute included as an "accessibility attribute." *See id.* at 8:29–38 (stating the accessibility attribute "may comprise one or more of" the four disclosed specific attributes).

### c)  *Prosecution History*

The parties have not directed us to any persuasive evidence from the proceedings leading to issuance of the '705 patent to inform our construction of the term "accessibility attribute."

IPR2022-00602
Patent 9,665,705 B2

*d)  Extrinsic Evidence*

The parties do not direct us to any persuasive extrinsic evidence concerning the meaning of the term "accessibility attribute."

*e)  Claim Construction Conclusion for "Accessibility Attribute"*

We recognize that "[t]he very nature of words would make a clear and unambiguous claim a rare occurrence." *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967).  The Federal Circuit, however, has provided a beacon, which we have followed, to guide us in determining the proper construction when we encounter ambiguities or differing interpretations from the parties:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

Based on the evidence and the analysis above, we determine that that the term "accessibility attribute" means "an attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted." This is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention.

*3.  Biometric Signal
Characterised by Number and Duration*

All of the challenged claims include a clause that requires receiving, being configured to receive, or being capable of receiving "a series of entries of the biometric signal," where the series is "characterised" or determined by

29
**Appx94**

IPR2022-00602
Patent 9,665,705 B2

"at least one of the number of said entries and a duration of each said entry."
*See*, Ex. 1001, 16:13–18 (for independent claim 1).  We refer to these clauses collectively as the "number and duration" clauses.

These number and duration clauses all go to the embodiment of the invention that allows the administrator to require a biometric input signal that comprises "either or both (a) the number of finger presses and (b) the relative duration of the finger presses."  Ex. 1001, 10:60–63 This is the "dit, dit, dit, dah" form of biometric signal discussed in the Specification (*id.* at 11:1–7) and discussed above in this Decision.  The capability for an administrator to use this disclosed embodiment exists in the claimed system and method whether the administrator chooses to use it or not.

As stated in the Specification, the administrator may use a single thumb press on a sensor for the required biometric signal.  Ex. 1001, 5:60–63 ("for example, if the biometric sensor 121 in the code entry module 103 is a fingerprint sensor, then the request 102 typically takes the form of a thumb press on a sensor panel").  Alternatively, the administrator "can provide control information to the code entry module by providing *a succession of finger presses to the biometric sensor 121*."  *Id.* at 10:56–58.  Thus, as disclosed in the '705 patent, whether using a single thumb press or a succession of finger presses of variable number and duration, the input vehicle is the same – biometric sensor 121.

Patent Owner asserts that Petitioner, and the Board in its Decision to Institute this proceeding, improperly "blur the lines" between "'knowledge-based' security features (those based on knowledge, such as a passcode or particular pattern, and not on any attribute of the user), and a biometric signal based on the unlearnable attribute of the user."  PO Resp. 9.  We

30

IPR2022-00602
Patent 9,665,705 B2

disagree. Patent Owner fails to properly understand Petitioner's, and our, analysis of the number and duration clauses.

> Patent Owner asserts:

> Crucially, the antecedent for this series is 'a series of entries of the biometric signal,' *i.e.*, the entries and corresponding series are 'of the biometric signal,' and the 'number of said entries and a duration of each said entry' refers to the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information.

*Id.* at 9. As explained above, in our Decision to Institute, and in this Decision, we construe the number and duration clauses to require a number and duration of biometric signals because the input for these biometric signals is a biometric sensor, as disclosed in the Specification. A fingerprint sensor's ability to recognize a fingerprint is not turned off when a succession of finger presses is applied to the fingerprint sensor. Thus, contrary to Patent Owner's argument (*see* PO Resp. 10), our construction of the number and duration clauses is not based on a "knowledge-based security feature."

In summary, our construction of the number and duration clauses is that the number and/or duration of entries is based on entries of a biometric signal, such as a finger press on a fingerprint sensor. Based on the claim language and the Specification (*see* Ex. 1001, 10:61–63 ("the control information is encoded by *either or both* (a) the number of finger presses and (b) the relative duration of the finger presses") (emphasis added)), this is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention.

### 4. *Populate the Database*

Patent Owner asserts that if and when the number and duration clause (citing clause 1(d)(1) in Petitioner's Claim Listing Appendix (Pet. 64)) is

IPR2022-00602
Patent 9,665,705 B2

used by an administrator to establish an authorized user, that information is "mapped into an instruction and the resulting instruction is used to populate the database of biometric signatures." PO Resp. 11 (citing representative clauses 1(d)(2) and 1(d)(3) from Petitioner's Claim Listing Appendix). Patent Owner also acknowledges that "the 'populate' limitation in claim 1 is part of that enrolling feature." PO Resp. 11. We understand that reference to the "enrolling" feature is a reference to the administrator establishing a database of authorized users ("biometric signatures") that will be used to match against a received biometric signal to provide access to the controlled item dependent upon the success or otherwise of the matching operation. *See, e.g.* claim 12.

Patent Owner asserts that "[t]o satisfy the requirements for antecedent claiming, 'said series' in clause 1(d2) must refer to the 'series of entries of the biometric signal' in clause 1(d1)." PO Resp. 11. Patent Owner provides the following flow diagram for populating the database:



*Id.* at 12 (citing Ex. 2011 ¶ 82). The flow diagram provides Patent Owner's graphic interpretation of the three steps involved in populating the database of approved users. These basic steps apply whether the biometric signal is a single finger press or a series of finger presses.

In its claim construction arguments, Patent Owner attempts to draw a sharp distinction between a process using a single finger press, and a process that uses the number and duration of finger presses, as two technologically distinct processes. Patent Owner has not, however, cited any persuasive

IPR2022-00602
Patent 9,665,705 B2

evidence to support this asserted distinction. In fact, the evidence is to the contrary.

As we have noted throughout this claim construction analysis, the controlling case law is consistent in stating that the Specification is the single best guide to the meaning of a disputed term, and is, thus, the primary basis for construing the claims. *E.g.*, *Grace Instrument*, 57 F.4th at 1008. In the '705 patent, the Specification also is consistent in stating that the using a number and duration of finger presses as a biometric input signal, and using a single finger press, are done exactly the same way – both use the same biometric fingerprint sensor. *See, e.g.*, Ex. 1001, 10:56–58 (the administrator "can provide control information to the code entry module by providing a succession of finger presses *to the biometric sensor 121*") (emphasis added).

The Specification also is consistent in stating that the system administrator establishes a database of authorized users, or authorized biometric signatures, by using appropriate software to create, or populate, the database. *See, e.g.*, *id.* at 14:27–37.[21] There is no persuasive evidence to which we have been directed that the biometric fingerprint sensor ceases to

---

[21] The cited text from the Specification states:

> FIG. 10 is a schematic block diagram of the system in. FIG. 2. The disclosed secure access methods are preferably practiced using a computer system arrangement 100', such as that shown in FIG. 10 wherein the processes of FIGS. 3–4, and 6–9 may be implemented as software, such as application program modules executing within the computer system 100'. In particular, the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117.

IPR2022-00602
Patent 9,665,705 B2

function as a biometric fingerprint sensor when the administrator establishes a database using the number and duration of finger presses. Patent Owner's argument is actually to the contrary in that Patent Owner asserts that the number and duration of finger presses is a biometric signal. PO Resp. 9 ("[T]he entries and corresponding series are 'of the biometric signal,' and the 'number of said entries and a duration of each said entry' refers to the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information."). This means the number and duration of entries must include a biometric component.

If the number and duration of presses did not include a biometric component, it would be simply a "knowledge-based" security measure, based on a pattern rather than based on a unique physical attribute of the user. Patent Owner asserts that such a pattern can be learned, and thus is inconsistent with the '705 patent's claims and disclosure. PO Resp. 7–11. Whether the software used by the administrator to populate the database of approved users relies on this biometric component is not disclosed in the '705 Specification.

We now turn to the merits of Petitioner's asserted Grounds of unpatentability.

### D.  Ground 1
### Claims 1, 4, 6, 10–12, 14–17
### Based on Mathiassen, McKeeth, and Anderson

Petitioner contends that claims 1, 4, 6, 10–12, and 14–17 would have been obvious over the combination of Mathiassen, McKeeth, and Anderson. Pet. 9–54.

### 1.  Mathiassen (Ex. 1004)

We make the following finding of facts concerning Mathiassen.

34

IPR2022-00602
Patent 9,665,705 B2

Rather than using passwords or "tokens," such as an entry card, Mathiassen discloses a portable fob-type fingerprint sensor to access secured items, such as vehicles, computers, safes, medicine cabinets, and weapons cabinets. Ex. 1004 ¶¶ 1–4, 16–18, 109–113.

Figure 8 from Mathiassen is reproduced below.



Figure 8 is a schematic illustration of a "user input device" providing access to a vehicle door. As shown in Figure 8, portable device 20 contains fingerprint sensor 5 coupled to a miniature printed circuit board 21 on which is mounted integrated circuit ("IC") 1. Ex. 1004 ¶ 147. Thus, remote control 20 becomes a biometric sensor. *Id.* ¶ 5. Remote biometric control 20 includes battery 25 as a power supply. *Id.* ¶ 147. Battery 25 is connected to printed circuit board ("PCB") 21 by wires. *Id.*

Remote biometric control 20 also is equipped with wireless 2-way transceiver 27. All the active components are connected to integrated circuit 1 by cables 23 through printed circuit board 21. *Id.*

IPR2022-00602
Patent 9,665,705 B2

Ignition control device 15 (*see* Fig. 6) is mounted inside the car on gear stick 71 or on steering wheel 72. *Id.* ¶ 148. Remote control 20 and embedded ignition control 15 are both connected to a central computer (not shown) in the car. *Id.* ¶ 149. Remote control 20 is connected to the central computer by 2-way wireless transceiver 27, while ignition control 15 is hard-wired to the central computer. *Id.*

## 2. McKeeth (Ex. 1005)

We make the following finding of facts concerning McKeeth.

McKeeth discloses a method and system for authenticating a user to access a computer system. Ex. 1005, Abstr.

McKeeth summarizes the problems with current systems for accessing computers, such as using a private identification code or password (Ex. 1005, 1:14–30),[22] or a machine readable card (*id.* at 1:31–36). McKeeth also notes that "some computer makers considered using the user's fingerprint to authenticate and grant access to the computer system." *Id.* at 1:36–38. McKeeth recognized, however, that even using fingerprints was not without problems because "a sophisticated computer hacker may be able to copy the user's fingerprint and provide a simulated signal to the computer system to obtain access." *Id.* at 1:51–54.

The method and system disclosed in McKeeth provide for one or more of various types of user inputs to be used, alone or in combination, for authentication. These various inputs can be a password, a unique series of clicks of a mouse, a unique geometric pattern created by the user (*see* Figs. 3A–3D (illustrating a simple triangle, rectangle, line, or circle drawn by the

---

[22] Citations are to column:line of McKeeth.

IPR2022-00602
Patent 9,665,705 B2

user), an audio sensor (for voice recognition), or an optical scanner for fingerprint, retina scans, or other biometric inputs.  Ex. 1005, 2:2:53–3:12.

Figure 1 from McKeeth is reproduced below.



Figure 1 from McKeeth is a block diagram showing one version of a the method and system for authenticating the identity of a user disclosed in McKeeth.  Ex. 1005, 2:36–37.  As shown in Figure 1, computer system 100 includes user interface 110 that is operationally connected to process circuit 120.  *Id.* at 2:55–57.  User interface 110 may be any input device that is used to enter or communicate information to computer system 100, such as a keyboard, mouse, trackball, pointer, touch-screen, remote terminal, audio sensor, optical scanner, telephone, or any similar user interface.  *Id.* at 2:57–61.

Process circuit 120 is configured to receive input signals from user interface 110.  The process circuit is operationally connected with timer 130 that measures time duration between the various input signals.  Ex. 1005,

37

IPR2022-00602
Patent 9,665,705 B2

3:36–38. If, for example, the user performs a fingerprint scan and/or pattern within the designated time, process circuit 120 communicates the input signals to compare circuit 150 for authentication. *Id.* at 3:52–55. Compare circuit 150 is operationally coupled to memory 140, which stores a list of legitimate user identifications (ID's) with respective passwords, fingerprint, pattern, or any other type of security information for recognition by the computer system. *Id.* at 3:55–60. If there is a match between the user inputs, within the designated time, and stored security information, the compare circuit 150 issues a "pass" signal to computer system 100. *Id.* at 65–67.

### 3. *Anderson Ex. (1006)*

We make the following finding of facts concerning Anderson.

Anderson also discloses a system and method for authenticating an authorized user to access a secured device. Anderson's disclosed system inputs an access code "via temporal variations in the amount of pressure applied to a touch interface." Ex. 1006, Abstr.

Anderson's method of inputting an access code uses digitizer pad 120 as a touch interface, which may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint. Ex. 1006, 5:43–44, 7:4–7. The user enters the access code as a series of pressure pulses having varying durations. *Id.* at 6:45–47. This fingerprint access code is then compared with a stored code template to determine whether they match. If they do, access is permitted. *Id.* at 6:48–54.

Anderson discloses a system where the touch interface may sense only "temporal applications of pressure," relying on *timing* of the pressure applications for entry of the access code. Ex. 1006, 7:28–30; Fig. 4A. Alternately, as shown in FIG. 4B, the touch interface may sense both

38

IPR2022-00602
Patent 9,665,705 B2

temporal applications of pressure and variations in pressure magnitude or intensity. *Id.* at 7:34–37. Thus, the access code would be entered as a series of alternating short and long pressure applications that vary both in duration and magnitude. *Id.* at 7:37–39.

Annotated Figure 4A from Anderson is reproduced below.



Figure 4A from Anderson is a diagram illustrating entry of an access code via temporal pressure variation. Ex. 1006, 2:65–67. The annotations are provided by Dr. Sears in his declaration testimony. Ex. 1003 ¶ 100. As explained by Dr. Sears, in Figure 4A, "the height of each bar the same because the magnitude or intensity of the finger pressure press is not detected. However, at least some of the presses have a different duration than other presses, as represented by the width of each bar." *Id.*

Annotated Figure 4B from Anderson is reproduced below.



Figure 4B from Anderson is a diagram illustrating entry of an access code via temporal pressure variation. Ex. 1006, 2:65–67. The annotations are provided by Dr. Sears in his declaration testimony. Ex. 1003 ¶ 101. As

IPR2022-00602
Patent 9,665,705 B2

explained by Dr. Sears, Figure 4B "illustrates variations in both the amount of pressure applied using the height of each bar and the duration of the applied pressure using the width of each bar." *Id.*

We begin our claim analysis with claim 1.

### 4. Analysis of Independent Claim 1

Petitioner provides a clause-by-clause analysis of independent claim 1, identifying where in each of the cited references, Mathiassen, McKeeth, or Anderson, the claimed element is disclosed, and why it would have been obvious to a person of ordinary skill to combine the various disclosed elements with a reasonable expectation of success. *See* Pet. 9–42. Throughout its analysis, Petitioner cites the Declaration testimony (Ex. 1003) of Dr. Sears for evidentiary support. [23]  In general, Petitioner explains the proposed combination of references as:

> First, Mathiassen's biometric security system is modified to output a duress and/or alert condition, per McKeeth, responsive to a user's biometric signature.  Mathiassen already contemplates outputting various commands based on different user-inputted biometric signals, indicating a duress and/or alert condition based on a particular inputted biometric requires only simple programming.  Second, Mathiassen is modified to recognize a touch duration, per Anderson, of the fingerprint representation on the fingerprint sensor.

Reply 1.

For ease of reference and consistency, we will refer to Petitioner's Claim Listing Appendix convention (Pet. 64–69), as did Patent Owner (*see, e.g.*, PO Resp. 11 referring to "transmitter subsystem (representative

---

[23] Petitioner cites this testimony as "Dec."  Pet. 3, fn 1.  We will cite it, as we do all other evidence, by reference to its Exhibit number, which is Exhibit 1003.

40

IPR2022-00602
Patent 9,665,705 B2

clause 1(d1)), that series is mapped into an instruction (representative clause 1(d2)), and the resulting instruction is used to populate the database of biometric signatures (representative clause 1(d)(3))").

Patent Owner asserts that Petitioner has not met its burden to prove unpatentability because:

(1) Mathiassen, alone or in combination with other references, does not disclose the "accessibility attribute" limitation, as properly construed, and, moreover, there is no motivation to combine Mathiassen with the other references (PO Resp. 14–25);

(2) Anderson, alone or combined with Mathiassen, does not disclose the "biometric signal duration limitation," and, also, there is no motivation to combine Anderson and Mathiassen (*id.* at 26–32);

(3) the references, alone or in combination, do not "populate" the database according to an "instruction" (*id.* at 32–35); and

(4) there were simpler solutions available to a skilled person than the Mathiassen/Anderson combination (*e.g.*, PO Resp. 3–4, 24–25, 30–31; Sur-reply 6–17).

Patent Owner states these same arguments apply to independent claims 10, 11 and 14–17, as well as the challenged dependent claims. PO Resp. 35 (asserting that these claims "contain the 'populating,' 'duration,' and 'accessibility attribute' limitations, and, as the prior art cited by Apple does not teach these limitations, the cited prior art does not render these [ ] claims obvious as a result thereof").

Patent Owner's defenses are based in large part on accepting Patent Owner's asserted claim constructions, which we have *not* done.

IPR2022-00602
Patent 9,665,705 B2

### a) Preamble
### "A system for providing secure access to a controlled item"

Petitioner asserts that "[t]o the extent the preamble is limiting, Mathiassen teaches a system for providing secure access to a controlled item." Pet. 9 (citing Mathiassen, Abstr., ¶¶ 16, 122–123, 145–147; Ex. 1003 ¶¶ 112–113).

Patent Owner does not contest specifically Petitioner's arguments with respect to the preamble of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests the preamble of claim 1.

### b) Clause 1(a)
### "a memory comprising a database of biometric signatures"

Petitioner asserts that Mathiassen discloses a stored database of tables stored in memory 7, 7A. Pet. 11–13 (citing Ex. 1004, ¶¶ 50, 147, Fig. 2B; Ex. 1003 ¶¶ 119–121).

Patent Owner does not contest specifically Petitioner's arguments with respect to the preamble of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests the claimed memory of a database of biometric signatures.

### c) Clause 1(b)
### "a transmitter sub-system"

Petitioner asserts Mathiassen teaches a transmitter subsystem, including transceiver 27, fingerprint sensor 5, processor 2 (of integrated circuit 1), and non-volatile memory 7, 7A, each housed in portable control 20. Pet. 13–14 (citing Ex. 1004 ¶¶ 185–188; Ex. 1003 ¶¶ 123–126).

IPR2022-00602
Patent 9,665,705 B2

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b).

### d) Clause 1(b1)
*"a biometric sensor configured to receive a biometric signal"*

Petitioner asserts that Mathiassen's "fingerprint sensor 5" is a "biometric sensor for receiving a biometric signal" because it detects a finger on the sensor and processes raw images of fingerprints. Pet. 14 (citing Ex. 1004 ¶ 49; Ex. 1003 ¶¶ 127–128).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b1).

### e) Clause 1(b2)
*"a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"*

As discussed in detail in Section II.C.2 (Claim Construction), the term "accessibility attribute" is an "attribute that establishes whether and under which conditions, if any, access to the controlled item should be granted to a user." Thus, the attribute may, or may not, impose any conditions on permitting access.

Petitioner asserts "Mathiassen's processor 2 of the IC 1 in the portable door control 20 discloses a "transmitter sub-system controller," as recited in

43

IPR2022-00602
Patent 9,665,705 B2

claim 1.  Pet 15.  According to Petitioner, Mathiassen's portable control processor is configured to match the user's biometric signal against the database of biometric signatures.  Pet. 16 (citing Ex. 1003 ¶¶ 131, 133–135).  If there is a match, the processor will proceed to open (or lock) the car doors. *Id.* at 17 (citing Ex. 1004, ¶¶ 180–182); Ex. 1003 ¶ 136).

Petitioner also asserts Mathiassen's "open door" command as modified by McKeeth's "teaching of duress and alert conditions" discloses "or renders obvious" outputting an accessibility attribute, as claimed.  Pet. 17 (citing Ex. 1003 ¶¶ 137–171).

Petitioner also asserts that McKeeth discloses a system in which "access is granted where 'there is a match between the input and security information.'"  Pet. 18 (citing Ex. 1005, 3:65–67, 3:11–28).  McKeeth discloses different types of input security information, including audio sensors to detect a voice recognition and an optical scanner for fingerprint and/or retina scans.  Ex. 1005, 3:1–10.  Any, a combination, or all of the described types of input signals may be used to authenticate a user.  Ex. 1005, 3:11–12.  If the input and security information do not match the stored information, the compare circuit issues a "flag signal" indicating denial of access by the user.  *Id.* at 4:2–4.

Petitioner concludes that the "collective teachings" of Mathiassen and McKeeth:

> teach outputting an accessibility attribute, where the accessibility attribute may be one of an access attribute (Mathiassen and granting access to a car owner/administrator), a duress attribute (McKeeth and granting limited access along with a security alert), and an alert attribute (McKeeth and denying access along with a security alert).

IPR2022-00602
Patent 9,665,705 B2

Pet. 21–22 (italic font for reference names deleted throughout herein). Thus, Mathiassen combined with McKeeth suggests a more comprehensive "accessibility attribute" than Mathiassen alone.

As discussed above, Petitioner's position is that an "accessibility attribute" without any conditions satisfies the 'under which conditions' construction component." Reply 4. Based on our claim construction of "accessibility attribute, we agree with Petitioner's position.

Petitioner concludes that Mathiassen and McKeeth "each teaches **under what conditions** access is granted." Pet. 18. "Specifically, both references teach outputting an accessibility attribute upon there being a match of a live or access biometric signal to a stored biometric signal." *Id.* Petitioner notes that McKeeth "teaches both a duress instruction and an alert instruction when there is no match." *Id.*

Petitioner also provides reasoning why it would have been obvious to combine Mathiassen and McKeeth with a reasonable expectation of success. Pet. 22–24. According to Petitioner, it would have been obvious to a person of ordinary skill, that is a person with a degree in computer engineering, computer science, electrical engineering, or a related field, and with one year of relevant experience, to increase user safety of Mathiassen by providing accessibility attributes indicating duress access or alert access, as proposed in McKeeth, to thereby increase user security. *Id.* (citing Ex. 1003 ¶¶ 149, 151–161).

Patent Owner asserts that Mathiassen and McKeeth disclose only a "binary" system, without specifying the conditions under which access is permitted. PO Resp. 14–17. We disagree based on our analyses above. Our construction of the "accessibility attribute" allows for conditional access, if

IPR2022-00602
Patent 9,665,705 B2

any conditions are imposed, or unconditional access, if no conditions are imposed. Patent Owner's arguments fail to account for this construction.

Patent Owner also argues that there is no motivation to combine Mathiassen and McKeeth because there were simpler alternative solutions available, the existence of which undermines the motivation to combine. PO Resp. 19–23; Sur-reply 4–8. This argument is inconsistent with controlling caselaw that makes clear "[i]t's not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) (citing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014) (emphasis in original)); *see also Netflix, Inc. v. DivX, LLC*, No. 2022-1083, 2023 WL 2298768, at *5 (Fed. Cir. Mar. 1, 2023) (citing *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) and *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

The motivation-to-combine analysis is a flexible one. "*[A]ny* need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420 (emphasis added). And "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421. Thus, "in many cases[,] a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420. The motivation-to-combine analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court [or this Board] can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418.

IPR2022-00602
Patent 9,665,705 B2

Here, based on our claim construction and analysis of the references, we determine that Petitioner establishes the claimed "accessibility attribute."

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b2).

### f)    Clause 1(b3)
*"a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute"*

Petitioner asserts Mathiassen teaches a "transmitter," namely transceiver 27 of portable control 20, that is "configured to emit a secure access signal conveying information dependent upon said accessibility attribute." Pet. 24 (citing Ex. 1004 ¶¶ 147, 186; Ex. 1003 ¶¶ 172–173).

Petitioner also asserts the IC processor in Mathiassen encrypts a command, such as "open door," with a temporary password or key. Pet. 25 (citing Ex. 1004 ¶¶ 50, 185). Transceiver 27 wirelessly transmits the encrypted command to a transceiver at the central car computer. *See* Ex. 1004 ¶¶ 186–188); Ex. 1003 ¶ 178. Petitioner concludes that "[b]ecause Mathiassen teaches the key used to encrypt the command sent from the portable control to the ignition control/car computer changes for each transaction, the encrypted command is non-repeatable and non-replayable. Therefore, Mathiassen teaches a 'secure access signal.'" Pet. 26 (citing Ex. 1003 ¶¶ 182–183).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(b3).

IPR2022-00602
Patent 9,665,705 B2

> g)  *Clauses 1(c and 1(c1))*
> *"a receiver sub-system comprising: a receiver sub-system controller configured to: receive the transmitted secure access signal"*

Petitioner discusses clauses 1(c) and 1(c1) together, and we follow this format.

Petitioner asserts Mathiassen teaches a receiver sub-system comprising "the central car computer and door lock transceivers, the central car computer, and ignition control 15." Pet. 28 (citing Ex. 1004 ¶¶ 186–188).  As asserted by Petitioner, the central car computer includes a transceiver receiving the secure access signal (the "open door" command) from the portable control.  *Id.*  As Petitioner states correctly "the door locks include a transceiver receiving the relayed and authenticated open door command."  Pet. 28. (citing Ex. 1003 ¶¶ 187–189; Ex. 1004 ¶¶ 149, 167, 186–187).  According to Petitioner, a "transceiver" is well understood to include a receiver.  *Id.* (citing Ex. 1003 ¶ 190).  Petitioner concludes that Mathiassen discloses a receiver sub-system, as claimed.  *Id.* (citing Ex. 1003 ¶ 191).

Petitioner also asserts that Mathiassen discloses a receiver sub-system, including the transceivers, the central car computer, and ignition control. Pet. 28–30.  According to Petitioner, "a POSITA would have understood a processor performing the claimed function of receiving the signal and providing conditional access," which is "at least equivalent to the claimed "controller."  *Id.* at 28 (citing Ex. 1003 ¶¶ 192–197).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1.  *See generally* PO Resp.

IPR2022-00602
Patent 9,665,705 B2

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests clauses 1(c) and 1(c1).

### h)   Clause 1(c2)
*"a receiver sub-system control . . . configured to: provide conditional access to the controlled item dependent upon said information"*

Petitioner's proposed construction in this proceeding for the phrase "conditional access" is "access based on accessibility attributes." Pet. 6, 30; *see also* Ex. 1074, 3 (the Joint Claim Construction Statement in the related parallel litigation). We have defined the term "accessibility attribute" above and discussed its application in previous clauses. We need not repeat this analysis.

Petitioner asserts Mathiassen discloses access to a closed item, such as a door, dependent upon the information in the secure access signal. Pet. 30. According to Petitioner, because Mathiassen's commands specifically instruct a function (i.e., open door locks vs. lock door locks), the command (i.e., the "secure access signal") includes information specific to the instructed function. *Id.* (citing Ex. 1004 ¶ 167; Ex. 1003 ¶ 200).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests clauses 1(c2).

### i)   Clause 1(d)
*"wherein the transmitter sub-system controller is further configured to:"*

Similar to the analysis for clause 1(b2) discussed above, Petitioner asserts that "processor 2 of IC 1 in [the] portable door control" in

49
**Appx114**

IPR2022-00602
Patent 9,665,705 B2

Mathiassen discloses this element. Pet. 31 (citing Ex. 1004 ¶¶ 50, 147; Ex. 1003 ¶ 202).

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests clauses 1(d).

### j) Clause 1(d1)
*"[configured to] receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;"*

Petitioner acknowledges that [a]lthough Mathiassen teaches inputting a command via a series of fingerprint representations, Mathiassen does not teach determining a duration of each entry. Anderson teaches inputting an access code including fingerprint presses of varying duration." Pet. 3.

Petitioner asserts Mathiassen discloses storing "a series of consecutive fingerprint representations generated by the fingerprint sensor signal capture and preprocessing block (5C))" that represent various "finger movements across the sensor in two dimensions." Pet. 32 (citing Ex. 1004 ¶ 192; Ex. 1003 ¶¶ 205–210).

Petitioner relies on Anderson for the disclosure of a "series of fingerprint pressure pulses of varying duration. Pet. 33–34 (citing Ex. 1006, 6:45–48 ("For example, wherein the access code is entered by the user as a series of pressure pulses having varying durations, a predetermined tolerance may be provided for variations in the lengths of the pulses."), 7:40–47); *see also id.* at 7:34–39 (disclosing that, "as shown in FIG. 4B, the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity. Thus, the access code would be entered as

IPR2022-00602
Patent 9,665,705 B2

a series of alternating short and long pressure applications that vary both in duration and magnitude")).

As we explained above in our discussion of Anderson, there can be no reasonable dispute that Anderson discloses input biometric signals that vary in number and duration.

As explained by Petitioner,

> In Mathiassen, the series of directional finger movements instruct a particular command. A POSITA would have found it obvious to substitute or modify such directional finger movements with a series of presses of varying duration, as taught by Anderson, for instructing a command at portable device 20.

Pet. 36 (citations omitted).

Petitioner also provides argument and probative evidence as to why a person of ordinary skill would have combined the disclosures of the references, with a reasonable expectation that the combination would be successful. Pet. 35–36. As explained by Petitioner,

> There would have been a reasonable expectation of success in modifying Mathiassen's processor 2 in control 20, because it executes software and directs hardware for detecting and categorizing directional movement and touch/no touch. Mathiassen's processor is already operable to detect a finger press because it receives the fingerprint representations, in the form of captured raw images, from the fingerprint sensor. *Id.* The modification therefore only requires simple programming techniques (e.g., modification of the disclosed translation program to count the number and duration of a "touch" or "no touch") that were within a POSITA's expertise.

*Id.* at 37 (citing Ex. 1004 ¶ 192; Ex. 1003 ¶¶ 224–225).

Patent Owner asserts that the "pressure pulses" in Anderson do not generate biometric signals because they are captured "as the pressure code is entered," and are therefore not part of the pressure code itself. *See* PO

51

IPR2022-00602
Patent 9,665,705 B2

Resp. 27.  Patent Owner also explains that "combining Mathiassen's fingerprint sensor with Anderson's pressure code does not produce the claimed invention, as any duration would apply to a nonbiometric signal." *Id.* at 28 (citing Ex. 2013 ¶¶ 69–71).  Dr. Easttom testifies that Anderson does not capture a biometric signal.  Ex. 2013 ¶¶ 69–71.

Petitioner, however, relies on Mathiassen and McKeeth for the biometric sensing, but also relies on Anderson, which suggests the benefits and options of using a number and duration of pulses as inputs.  Reply 1.  As explained by Petitioner,

> First, Mathiassen's biometric security system is modified to output a duress and/or alert condition, per McKeeth, responsive to a user's biometric signature.  Mathiassen already contemplates outputting various commands based on different user-inputted biometric signals, indicating a duress and/or alert condition based on a particular inputted biometric requires only simple programming.  Second, Mathiassen is modified to recognize a touch duration, per Anderson, of the fingerprint representation on the fingerprint sensor.

*Id.*

Because Mathiassen, like the '705 patent, uses a biometric sensor as the input device, it will detect the biometric part of the input signal, while also sensing the number and duration of inputs.

Dr. Sears' annotated figures 4A and 4B from Anderson (*see* Ex. 1003 ¶¶ 97, 98; also discussed in Section II.D.3 of this Decision) are reproduced again below for convenient reference.

IPR2022-00602
Patent 9,665,705 B2



FIG. 4A

FIG. 4B

Dr. Sears testifies that Anderson's method of inputting an access code uses digitizer pad 120 as a touch interface, which may "include an optical scanner or thermal sensor for collecting an image of the user's fingerprint. Ex. 1003 ¶ 96 (citing Ex. 1006, 5:43–44, 7:4–7). The user then enters the access code "as a series of pressure pulses having varying durations." *Id.* (quoting Ex. 1006, 6:45–47). This fingerprint access code is then compared with the "stored code template" in Anderson to determine a "match" to enable the desired function. *Id.* (citing Ex. 1006, 6:48–54). Dr. Sears testifies that "Anderson teaches two different access code applications: one where both the pressure of each press *and* the duration of each press is detected (Fig. 4A), and another where only the duration of each press is detected (Fig. 4B)." *Id.* (citing Ex. 1006, 7:28–39).

Dr. Sears also states, "Anderson discloses that in the second option, the 'access code would be entered as a series of alternating pressure applications of varying duration' where the touch interface 'may only sense temporal applications of pressure' and "not detect variations in pressure

53

IPR2022-00602
Patent 9,665,705 B2

magnitude or intensity." Ex. 1003 ¶ 96 (citing Ex. 1006, 7:28–34, discussing Figure 4A in Anderson). It is Dr. Sears' opinion that "in the first [option] the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity." *Id.* (citing Ex. 1006, 7:34–37, discussing Fig. 4B in Anderson).

Patent Owner asserts that a "simpler combination" was available. PO Resp. 30; Sur-reply 4–8. According to Patent Owner, "a simpler solution would have been to add Anderson's pushbutton to Mathiassen's key fob." PO Resp. 30 (citing Ex. 2013 ¶ 77). However, as explained above, "[i]t's not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp.*, 61 F.4th at 1380 (citations omitted).

Based on the Petitioner's arguments and evidence summarized above, we determine Petitioner has sufficiently shown that the cited references, as combined by Petitioner, disclose or suggest limitation 1(d1).

k) *Clause 1(d2)*
*"[the transmitter sub-system controller is further configured to:]*
*map said series [of entries of the biometric signal]*
*into an instruction"*

Petitioner asserts Mathiassen discloses the processor in integrated circuit 1 maps the series of biometric signal entries into an instruction by translating the series of finger movements to a command in a command table. Pet. 37–38 (citing Ex. 1004 ¶ 192). The cited disclosure in Mathiassen states:

> As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory (7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). *Movement analyzing means, in the form*

54

IPR2022-00602
Patent 9,665,705 B2

> *of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences* including directional and touch/no-touch finger movement sequences. *A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor.*

Ex. 1004 ¶ 192 (emphases added).  There can be no reasonable dispute that Mathiassen discloses a computer implemented software translation program for converting finger movements into control signals.

### l)    Clause 1(d3)
*[the transmitter sub-system controller is further configured to:]*
*populate the data base according to the instruction*

Petitioner asserts the cited references "teache[ ] or render[ ] obvious a system enrolling or populating a database of new users."  Pet. 38–42 (citing Ex. 1004 ¶¶ 71, 131, 162–167, 192; Ex. 1003 ¶¶ 231, 236–238, 241–245). Petitioner explains the mapping or the previous clause, and the "populating" of this clause as follows:

> Mathiassen teaches mapping "said series" into an instruction by translating the series of movements obtained from the series of fingerprint representations into a command using the command table. (Paper 1, 37-38; Ex. 1003, ¶¶ 226-230).  Mathiassen also teaches enrolling new users by generating master minutiae tables and storing the tables in memory 7,7A. (Paper 1, 38; Ex. 1003, ¶¶ 231, 233-238).  Mathiassen-Anderson renders obvious populating the database according to the instruction mapped from the "said series," as a POSITA would have found it obvious to include an enrollment command in the command table.

IPR2022-00602
Patent 9,665,705 B2

(Ex. 1004, [0192]; Ex. 1003, ¶¶ 233-246, pinpoint at ¶ 241). Thus, the administrator's input series of finger movements is mapped into an instruction, i.e., an instruction to enroll a user. (Ex. 1001, 10:56–11:3 (describing an administrator's finger press series mapping to a control signal to "[e]nroll an ordinary user"). The database is then populated "according to the instruction," as claimed, by storing the new user's master minutiae tables in memory. (Paper 1, 38-42; Ex. 1003, ¶¶ 231-245, pinpoint at ¶¶ 233-237).

Reply 23.  Petitioner provides the following table which "summarizes how the prior art teaches Claims 1(d1)–1(d3)" (*id.*):

| 1(d1)-1(d3) | Petition's Mapping |
|---|---|
| Receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry | *Mathiassen's* processor receives information indicating a series of consecutive fingerprint representations i.e., a series of touches in a touch/no-touch sequence characterized according to the number of touches and duration of each touch (per *Anderson*). |
| Map said series into an instruction | *Mathiassen* translates the series of touches into a command using *Mathiassen's* command table. |
| Populate the data base according to the instruction | *Mathiassen+Anderson* renders obvious generating and storing master minutiae tables for a newly enrolled user according to the instruction to enroll commanded by the series of fingerprint representations in touch/no-touch sequence of particular durations. |

*Id.* at 24.

Patent Owner argues that "Mathiassen has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process."  PO Resp. 33.

IPR2022-00602
Patent 9,665,705 B2

It is clear that Mathiassen's fingerprint sensor receives this series of entries of the biometric signal, similar to the '705 patent's code entry module 103 containing a biometric sensor 121 that receives a user's fingerprint. Ex. 1004 ¶ 192. Mathiassen's processor then translates the series of fingerprints received by its biometric sensor into a command, such as "open door" command, for authenticating the user to access the car doors. *Id*.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that the prior art discloses or suggests limitation 1(d3).

> *m) Clause 1(e)*
> *"wherein the controlled item is one of: a locking mechanism*
> *of a physical access structure or an electronic lock*
> *on an electronic computing device"*

Petitioner asserts "Mathiassen teaches the controlled item is a 'locking mechanism of a physical access structure' (i.e., the car door locks of the central locking system)." Pet. 42 (citing Ex. 1004 ¶ 187; Ex. 1003 ¶ 247 (testifying that Mathiassen discloses a controlled item that is a locking mechanism of a physical access structure, *i.e.* a car door). We also note that Mathiassen clearly discloses use of its disclosed computer-based locking and access system on a "laptop computer," "hotel safe," "medicine cabinet," and as a "door control" in "automotive applications." Ex. 1004 ¶¶ 41–44, 109–113.

Patent Owner does not contest specifically Petitioner's arguments with respect to this limitation of claim 1. *See generally* PO Resp.

Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests limitation 1(e).

IPR2022-00602
Patent 9,665,705 B2

After having analyzed the entirety of the trial record and assigning appropriate weight to the cited supporting evidence, we determine Petitioner has shown by a preponderance of the evidence that, at the time of the filing of the '705 patent, one of ordinary skill would have been motivated to combine the teachings of Mathiassen, McKeeth, and Anderson in the manner recited in claim 1.

5.    *Analysis of Claims 4, 6, 10–12, and 14–17*

Petitioner also provides an element-by-element analysis of where each element in the challenged claims 4, 6, 10–12, and 14–17 is disclosed in, or would have been obvious in view of, the cited references.  Pet. 42–54.  For clauses in claims 4, 6, 10–12, and 14–17 that are similar to those in claim 1, Petitioner refers to its arguments for claim 1, or other claims.  *See, e.g.*, Pet. 49–50 (referring to its analysis for claim 14).  Petitioner also provides a reason why it would have been obvious to modify and combine the references with a reasonable expectation of success, as proposed by Petitioner.  *Id.*  Petitioner also relies throughout the analysis of these claims on the testimony of Dr. Sears (Ex. 1003, 1090) for evidentiary support.

Patent Owner concedes that patentability of claims 4, 6, 10–12, and 14–17 stands or falls with patentability of independent claim 1.  PO Resp. 35.  Thus, applying the same analysis and evidence as discussed above in the context of claim 1, we determine that Petitioner has established by a preponderance of the evidence that dependent claims 4, 6, 10–12, and 14–17 of the '705 patent would have been obvious, and thus are not patentable.

IPR2022-00602
Patent 9,665,705 B2

### III. CONCLUSION[24]

Petitioner has established by a preponderance of the evidence that claims 1, 4, 6, 10–12, and 14–17 are unpatentable.

### IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has shown by a preponderance of the evidence that claims 1, 4, 6, 10–12, and 14–17 are unpatentable.

### V.  SUMMARY TABLE

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 6, 10–12, 14–17 | 103 | Mathiassen, McKeeth, Anderson | 1, 4, 6, 10–12, 14–17 | |
| **Overall Outcome** | | | 1, 4, 6, 10–12, 14–17 | |

---

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00602
Patent 9,665,705 B2

For PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com


For PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

US009269208B2

## (12) United States Patent
### Burke

(10) **Patent No.:** US 9,269,208 B2
(45) **Date of Patent:** *Feb. 23, 2016

(54) **REMOTE ENTRY SYSTEM**

(75) Inventor: **Christopher John Burke**, Ramsgate (AU)

(73) Assignee: **SECURICOM (NSW) PTY LTD**, Ramsgate (AU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 78 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/572,166**

(22) Filed: **Aug. 10, 2012**

(65) **Prior Publication Data**

US 2012/0311343 A1     Dec. 6, 2012

### Related U.S. Application Data

(63) Continuation of application No. 10/568,207, filed as application No. PCT/AU2004/001083 on Aug. 13, 2004, now Pat. No. 8,266,442.

(30) **Foreign Application Priority Data**

Aug. 13, 2003    (AU) ................................ 2003904317

(51) **Int. Cl.**
*H04L 29/06* (2006.01)
*G07C 9/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G07C 9/00158* (2013.01); *G06F 21/32* (2013.01); *G06F 21/35* (2013.01); *H04L 63/0861* (2013.01); *H04W 12/08* (2013.01); *H04W 84/12* (2013.01); *H04W 84/18* (2013.01)

(58) **Field of Classification Search**
CPC ............................. H04L 63/0861; G06F 21/32

USPC ......................................................... 713/186
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,109,428 A | * | 4/1992 | Igaki et al. .................... | 382/125 |
| 5,933,515 A | * | 8/1999 | Pu ...................... | G06K 9/00006 |
| | | | | 340/5.53 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 0212660 A1 | * | 2/2002 |
| WO | WO 02/095589 A1 | | 11/2002 |

OTHER PUBLICATIONS

Notice of Acceptance dated Sep. 18, 2012 for co-pending Australian Patent Office Application No. 2009201293 (3 pp.).

(Continued)

*Primary Examiner* — Mohammad L Rahman
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57) **ABSTRACT**

A system is disclosed for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute, and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol, and a receiver sub-system comprising means for receiving the transmitted secure access signal and means for providing conditional access to the controlled item dependent upon said information.

**13 Claims, 10 Drawing Sheets**



IPR2022-00601
Apple EX1001 Page 1

US 9,269,208 B2

Page 2

(51) **Int. Cl.**

| | | |
|---|---|---|
| **G06F 21/32** | (2013.01) | |
| **G06F 21/35** | (2013.01) | |
| **H04W 12/08** | (2009.01) | |
| *H04W 84/12* | (2009.01) | |
| *H04W 84/18* | (2009.01) | |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,195,447 | B1 * | 2/2001 | Ross | 382/125 |
| 6,229,906 | B1 * | 5/2001 | Pu et al. | 382/116 |
| 6,992,562 | B2 * | 1/2006 | Fuks et al. | 340/5.52 |
| 7,152,045 | B2 * | 12/2006 | Hoffman | 705/43 |
| 7,174,017 | B2 * | 2/2007 | Bantz et al. | 380/255 |
| 2002/0038818 | A1 | 4/2002 | Zingher et al. | |
| 2003/0126439 | A1 | 7/2003 | Wheeler et al. | |
| 2004/0042642 | A1 * | 3/2004 | Bolle | G07C 9/00134 |
| | | | | 382/115 |

OTHER PUBLICATIONS

Extended European Search Report for corresponding EP application No. 14188004 dated Apr. 22, 2015.
Office Action for corresponding Canadian application No. 2,535,434 dated Mar. 27, 2015.

* cited by examiner

IPR2022-00601
Apple EX1001 Page 2



Fig. 1
(prior art)

IPR2022-00601
Apple EX1001 Page 3

Case: 24-1278      Document: 22-1      Page: 133      Filed: 07/31/2024



Fig. 2

IPR2022-00601
Apple EX1001 Page 4

Case: 24-1278    Document: 22-1    Page: 134    Filed: 07/31/2024



Fig. 3

IPR2022-00601
Apple EX1001 Page 5



Fig. 4

IPR2022-00601
Apple EX1001 Page 6



Fig. 5

IPR2022-00601
Apple EX1001 Page 7



Fig. 6

IPR2022-00601
Apple EX1001 Page 8



Fig. 7

IPR2022-00601
Apple EX1001 Page 9



Fig. 8

IPR2022-00601
Apple EX1001 Page 10

Case: 24-1278    Document: 22-1    Page: 140    Filed: 07/31/2024



Fig. 9

IPR2022-00601
Apple EX1001 Page 11



Fig. 10

IPR2022-00601
Apple EX1001 Page 12

US 9,269,208 B2

1

# REMOTE ENTRY SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation patent application of U.S. Non-Provisional application Ser. No. 10/568,207 for REMOTE ENTRY SYSTEM, filed Jun. 4, 2008 now U.S. Pat. No. 8,266,442, the disclosure of which is incorporated by reference in its entirety.

## FIELD OF THE INVENTION

The present invention relates to secure access systems and, in particular, to systems using wireless transmission of security code information.

## BACKGROUND

FIG. 1 shows a prior art arrangement for providing secure access. A user 401 makes a request, as depicted by an arrow 402, directed to a code entry module 403. The module 403 is typically mounted on the external jamb of a secure door. The request 402 is typically a secure code of some type which is compatible with the code entry module 403. Thus, for example, the request 402 can be a sequence of secret numbers directed to a keypad 403. Alternately, the request 402 can be a biometric signal from the user 401 directed to a corresponding biometric sensor 403. One example of a biometric signal is a fingerprint. Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration and so on.

The code entry module 403 conveys the request 402 by sending a corresponding signal, as depicted by an arrow 404, to a controller 405 which is typically situated in a remote or inaccessible place. The controller 405 authenticates the security information provided by the user 401 by interrogating a database 407 as depicted by an arrow 406. If the user 401 is authenticated, and has the appropriate access privileges, then the controller 405 sends an access signal, as depicted by an arrow 408, to a device 409 in order to provide the desired access. The device 409 can, for example, be the locking mechanism of a secure door, or can be an electronic lock on a personal computer (PC) which the user 401 desires to access.

A proximity card can also be used to emit the request 402, in which case the code entry module 403 has appropriate functionality.

Although the request 402 can be made secure, either by increasing the number of secret digits or by using a biometric system, the communication infrastructure in FIG. 1 is typically less secure. The infrastructure 400 is generally hardwired, with the code entry module 403 generally being mounted on the outside jamb of a secured door. In such a situation, the signal path 404 can be over a significant distance in order to reach the controller 405. The path 404 represents one weak point in the security system 400, providing an unauthorised person with relatively easy access to the information being transmitted between the code entry module 403 and the controller 405. Such an unauthorised person can, given this physical access, decipher the communicated information between the code entry module 403 and the controller 405. This captured information can be deciphered, replayed in order to gain the access which rightfully belongs to the user 401, or to enable modification for other subversive purposes.

Current systems as depicted in FIG. 1 utilise a communication protocol called "Wiegand" for communication between the code entry module 403 and the controller 405.

2

The Wiegand protocol is a simple one-way data protocol that can be modified by increasing or decreasing the bit count to ensure uniqueness of the protocol among different security companies. The Wiegand protocol does not secure the information being sent between the code entry module 403 and the controller 405.

More advanced protocols such as RS 485 have been used in order to overcome the vulnerability of the Wiegand protocol over the long distance route 404. RS 485 is a duplex protocol offering encryption capabilities at both the transmitting and receiving ends, i.e. the code entry module 403 and the controller 405 respectively in the present case. The length of the path 404 nonetheless provides an attack point for the unauthorised person.

Due to the cost and complexity of re-wiring buildings and facilities, security companies often make use of existing communication cabling when installing and/or upgraded security systems, thereby maintaining the vulnerability described above.

## SUMMARY

It is an object of the present invention to substantially overcome, or at least ameliorate, one or more disadvantages of existing arrangements.

According to a first aspect of the present invention, there is provided a system for providing secure access to a controlled item, the system comprising:

a database of biometric signatures;

a transmitter subsystem comprising:

a biometric sensor for receiving a biometric signal;

means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and a receiver sub-system comprising;

means for receiving the transmitted secure access signal; and

means for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a transmitter sub-system for operating in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a receiver sub-system comprising means for receiving a secure access signal transmitted by the transmitter sub-system, and means for providing conditional access to the controlled item dependent upon information conveyed in the secure access signal; wherein the transmitter subsystem comprises:

a biometric sensor for receiving a biometric signal;

means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

means for emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided receiver sub-system for operating in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, means for matching the biometric signal against

IPR2022-00601
Apple EX1001 Page 13

US 9,269,208 B2

**3**

members of the database of biometric signatures to thereby output an accessibility attribute, and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; wherein the receiver sub-system comprises:

means for receiving the transmitted secure access signal; and

means for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a method for providing secure access to a controlled item, the method comprising the steps of:

receiving a biometric signal;

matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;

emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and

providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a method for populating a database of biometric signatures in a system for providing secure access to a controlled item, the system comprising said database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal, and a receiver sub-system comprising means for receiving the transmitted secure access signal, and means for providing conditional access to the controlled item dependent upon information in said secure access signal, said method comprising the steps of:

receiving a series of entries of the biometric signal;

determining at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the database according to the instruction.

According to another aspect of the present invention, there is provided a method for transmitting a secure access signal in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a receiver sub-system comprising means for receiving the secure access signal transmitted by a transmitter sub-system, and means for providing conditional access to the controlled item dependent upon information conveyed in the secure access signal, said method comprising the steps of:

receiving a biometric sensor by biometric signal;

matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided a method for receiving a secure access signal in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute, and means for emitting a secure access signal conveying information

**4**

dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol, said method comprising the steps of:

receiving the transmitted secure access signal; and

providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to provide secure access to a controlled item, said computer program product comprising:

code for receiving a biometric signal;

code for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;

code for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and

code for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to populate a database of biometric signatures in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving a series of entries of the biometric signal;

code for determining at least one of the number of said entries and a duration of each said entry;

code for mapping said series into an instruction; and

code for populating the database according to the instruction.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to transmit a secure access signal in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving a biometric sensor by biometric signal;

code for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

code for emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to receive a secure access signal in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving the transmitted secure access signal; and

code for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a system for providing secure access, the system comprising:

a biometric sensor for authenticating the identity of a user;

IPR2022-00601
Apple EX1001 Page 14

US 9,269,208 B2

5

a transmitter for transmitting information using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and

a control panel for receiving the information and for providing the secure access requested.

Other aspects of the invention are also disclosed.

BRIEF DESCRIPTION OF THE DRAWINGS

Some aspects of the prior art and one or more embodiments of the present invention are described with reference to the drawings, in which:

FIG. **1** shows a prior art arrangement for providing secure access;

FIG. **2** is a functional block diagram of an arrangement for providing secure access according to the present disclosure;

FIG. **3** shows an example of a method of operation of the remote control module of FIG. **2**;

FIG. **4** shows an example of a method of operation of the (fixed) control device of FIG. **2**;

FIG. **5** shows incorporation of a protocol converter into the arrangement of FIG. **2**; and

FIG. **6** shows another example of how the remote access system operates;

FIG. **7** shows an access process relating to the example of FIG. **6**;

FIG. **8** shows one enrolment process relating to the example of FIG. **6**;

FIG. **9** shows another enrolment process relating to the example of FIG. **6**; and

FIG. **10** is a schematic block diagram of the system in FIG. **2**.

DETAILED DESCRIPTION INCLUDING BEST MODE

It is to be noted that the discussions contained in the "Background" section relating to prior art arrangements relate to discussions of documents or devices which form public knowledge through their respective publication and/or use. Such should not be interpreted as a representation by the present inventor(s) or patent applicant that such documents or devices in any way form part of the common general knowledge in the art.

Where reference is made in any one or more of the accompanying drawings to steps and/or features, which have the same reference numerals, those steps and/or features have for the purposes of this description the same function(s) or operation(s), unless the contrary intention appears.

FIG. **2** is a functional block diagram of an arrangement for providing secure access according to the present disclosure. A user **101** makes a request, as depicted by an arrow **102**, to a code entry module **103**. The code entry module **103** includes a biometric sensor **121** and the request **102** takes a form which corresponds to the nature of the sensor **121** in the module **103**. Thus, for example, if the biometric sensor **121** in the code entry module **103** is a fingerprint sensor, then the request **102** typically takes the form of a thumb press on a sensor panel (not shown) on the code entry module **103**.

The code entry module **103** interrogates, as depicted by an arrow **104**, a user identity database **105**. Thus for example if the request **102** is the thumb press on the biometric sensor panel **121** then the user database **105** contains biometric signatures for authorised users against which the request **102** can be authenticated. If the identity of the user **101** is authenticated successfully, then the code entry module **103** sends a signal **106** to a controller/transmitter **107**. The controller/

6

transmitter **107** checks, as depicted by an arrow **112**, the current rolling code in a database **113**. The controller **107** then updates the code and sends the updated code, this being referred to as an access signal, as depicted by an arrow **108** to a controller **109**. The rolling code protocol offers non-replay encrypted communication.

The controller **109** tests the rolling code received in the access signal **108** against the most recent rolling code which has been stored in a database **115**, this testing being depicted by an arrow **114**. If the incoming rolling code forming the access signal **108** is found to be legitimate, then the controller **109** sends a command, as depicted by an arrow **110**, to a controlled item **111**. The controlled item **111** can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer (PC) that is to be accessed by the user **101**. It is noted that the controller **109** contains a receiver **118** that receives the transmitted access signal **108** and converts it into a form that is provided, as depicted by an arrow **120**, into a form that the controller **109** can use.

The code entry module **103** also incorporates at least one mechanism for providing feedback to the user **101**. This mechanism can, for example, take the form or one or more Light Emitting Diodes (LEDs) **122** which can provide visual feedback, depicted by an arrow **123** to the user **101**. Alternately or in addition the mechanism can take the form of an audio signal provided by an audio transducer **124** providing audio feedback **125**.

The arrangement in FIG. **2** has been described for the case in which the secure code in the access signal **108** used between the sub-systems **116** and **117** is based upon the rolling code. It is noted that this is merely one arrangement, and other secure codes can equally be used. Thus, for example, either of the Bluetooth™ protocol, or the Wi Fi™ protocols can be used.

Rolling codes provide a substantially non-replayable non-repeatable and encrypted radio frequency data communications scheme for secure messaging. These codes use inherently secure protocols and serial number ciphering techniques which in the present disclosure hide the clear text values required for authentication between the key fob (transmitter) sub-system **116** and the receiver/controller **118/109**.

Rolling codes use a different code variant each time the transmission of the access signal **108** occurs. This is achieved by encrypting the data from the controller **107** with a mathematical algorithm, and ensuring that successive transmissions of the access signal **108** are modified using a code and/or a look-up table known to both the transmitter sub-system **116** and the receiver sub-system **117**. Using this approach successive transmissions are modified, resulting in a non-repeatable data transfer, even if the information from the controller **107** remains the same. The modification of the code in the access signal **108** for each transmission significantly reduces the likelihood that an intruder can access the information replay the information to thereby gain entry at some later time.

The sub-system in FIG. **2** falling to the left hand side, as depicted by an arrow **116**, of a dashed line **119** can be implemented in a number of different forms. The sub-system **116** can for example be incorporated into a remote fob (which is a small portable device carried by the user **101**), or alternately can be mounted in a protected enclosure on the outside jamb of a secured door. The sub-system **116** communicates with the sub-system **117** on the right hand side of the dashed line **119** via the wireless communication channel used by the access signal **108**. The sub-system **117** is typically located in an inaccessible area such as a hidden roof space or alternately in a suitable protected area such as an armoured cupboard.

US 9,269,208 B2

7

The location of the sub-system 117 must of course be consistent with reliable reception of the wireless access signal 108.

Although typically the communication channel uses a wireless transmission medium, there are instances where the channel used by the access signal 108 can use a wired medium. This is particularly the case when the transmitter sub-system 116 is mounted in an enclosure on the door jamb rather than in a portable key fob.

The biometric signature database 105 is shown in FIG. 2 to be part of the transmitter sub-system 116. However, in an alternate arrangement, the biometric signature database 105 can be located in the receiver sub-system 117, in which case the communication 104 between the code entry module 103 and the signature database 105 can also be performed over a secure wireless communication channel such as the one used by the access signal 108. In the event that the secure access system is being applied to providing secure access to a PC, then the secured PC can store the biometric signature of the authorised user in internal memory, and the PC can be integrated into the receiver sub-system 117 of FIG. 1.

In the event that the sub-system 116 is implemented as a remote fob, the combination of the biometric verification and the strongly encrypted wireless communication provides a particularly significant advantage over current systems. The remote key fob arrangement allows easy installation, since the wired communication path 404 (see FIG. 1) is avoided. Other existing wiring elements of the present systems 400 can be used where appropriate. When the sub-system 116 is implemented as a remote fob, the fob incorporates the biometric (eg fingerprint) authentication arrangement, in which case only one biometric signature is stored in the fob. This arrangement reduces the requirements on the central database 115. Once the key fob authenticates the user through biometric signature (eg fingerprint) verification, the rolling code in the access signal 108 is transmitted to the controller 109 for authorisation of the user for that location at that time.

In addition to authenticating the user 101 the biometric sensor 121 in the code entry module 103 in conjunction with the controller 107 can also check other access privileges of the user 101. These access privileges can be contained in the database 105 which can be located either locally in the remote key fob, or in the receiver sub-system 117 as previously described. In one example, Tom Smith can firstly be authenticated as Tom Smith using the thumb press by Tom on the biometric sensor panel (not shown). After Tom's personal biometric identity is authenticated, the transmitter sub-system 116 can check if Tom Smith is in fact allowed to use the particular door secured by the device 111 on weekends. Thus the security screening offered by the described arrangement can range from simple authentication of the user's identity, to more comprehensive access privilege screening.

The incorporation of the biometric sensor 121 into the code entry module 103 in the form of a remote key fob also means that if the user 101 loses the remote key fob, the user need not be concerned that someone else can use it. Since the finder of the lost key fob will not be able to have his or her biometric signal authenticated by the biometric sensor 121 in the code entry module 103, the lost key fob is useless to anyone apart from the rightful user 101.

The transmitter sub-system 116 is preferably fabricated in the form of a single integrated circuit (IC) to reduce the possibility of an authorised person bypassing the biometric sensor 121 in the code entry module 103 and directly forcing the controller 107 to emit the rolling code access signal 108.

FIG. 3 shows the method of operation of the remote control module (i.e. the sub-system 116) of FIG. 2. The method 200 commences with a testing step 201 in which the biometric

8

sensor 121 in the code entry module 103 checks whether a biometric signal 102 is being received. If this is not the case, then the method 200 is directed in accordance with an NO arrow back to the step 201 in a loop. If, on the other hand, the biometric signal 102 has been received, then the method 200 is directed in accordance with a YES arrow to a step 202. The step 202 compares the received biometric signal 102 with information in the biometric signature database 105 in order to ensure that the biometric signal received 102 is that of the rightful user 101 of the sub-system 116.

A subsequent testing step 203 checks whether the comparison in the step 202 yields the desired authentication. If the biometric signature matching is authenticated, then the process 200 is directed in accordance with a YES arrow to a step 204. The authentication of the biometric signature matching produces an accessibility attribute for the biometric signal 102 in question. The accessibility attribute establishes whether and under which conditions access to the controlled item 111 should be granted to a user. Thus, for example, the accessibility attribute may comprise one or more of an access attribute (granting unconditional access), a duress attribute (granting access but with activation of an alert tone to advise authorities of the duress situation), an alert attribute (sounding a chime indicating that an unauthorised, but not necessarily hostile, person is seeking access, and a telemetry attribute, which represents a communication channel for communicating state information for the transmitter sub-system to the receiver sub-system such as a "low battery" condition. The step 204 enables the user 101 to select a control option by providing one or more additional signals (not shown) to the controller 107. Thus for example the control option could enable the user 101 to access one of a number of secure doors after his or her identity has been authenticated in the step 203. In the subsequent step 205 the controller 107 sends the appropriate access signal 108 to the controller 109. The process 200 is then directed in accordance with an arrow 206 back to the step 201.

Thus for example the sub-system 116 can be provided with a single biometric sensor 121 in the code entry module 103 which enables the user 101 to select one of four door entry control signals by means of separate buttons on the controller 107 (not shown). This would enable the user 101, after authentication by the biometric sensor 121 in the code entry module 103 and the controller 107 to obtain access to any one of the aforementioned for secure doors.

Returning to the testing step 203, if the signature comparison indicates that the biometric signal 102 is not authentic, and has thus not been received from the proper user, then the process 200 is directed in accordance with a NO arrow back to the step 201. In an alternate arrangement, the NO arrow from the step 203 could lead to a disabling step which would disable further operation of the sub-system 116, either immediately upon receipt of the incorrect biometric signal 102, or after a number of attempts to provide the correct biometric signal 102.

FIG. 4 shows the method of operation of the control sub-system 117 of FIG. 2. The method 300 commences with a testing step 301 which continuously checks whether the access signal 108 has been received from 107. The step 301 is performed by the controller 109. As long as the access signal 108 is not received the process 300 is directed in accordance with a NO arrow in a looping manner back to the step 301. When the access signal 108 is received, the process 300 is directed from the step 301 by means of a YES arrow to a step 302. In the step 302, the controller 109 compares the rolling code received by means of the access signal 108 with a reference code in the database 115. A subsequent testing step

IPR2022-00601
Apple EX1001 Page 16

US 9,269,208 B2

9

303 is performed by the controller 109. In the step 303 if the code received on the access signal 108 is successfully matched against the reference code in the database 115 then the process 300 is directed in accordance with a YES arrow to a step 304.

In the step 304 the controller 109 sends the control signal 110 to the controlled item 111 (for example opening the secured door). The process 300 is then directed from the step 304 as depicted by an arrow 305 back to the step 301. Returning to the testing step 303 if the code received on the access signal 108 is not successfully matched against the reference code in the database 115 by the controller 109 then the process 300 is directed from the step 303 in accordance with a NO arrow back to the step 301.

As was described in regard to FIG. 3, in an alternate arrangement, the process 300 could be directed, if the code match is negative, from the step 303 to a disabling step which would disable the sub-system 117 if the incorrect code where received once or a number of times.

FIG. 5 shows incorporation of a protocol converter into the arrangement of FIG. 2. In the arrangement of FIG. 2 the receiver 118 in the controller 109 is able to directly receive and process the rolling code in the access signal 108 in a manner as to provide, as depicted by the arrow 120, the necessary information to the controller 109. FIG. 5 shows how an existing controller depicted by a reference numeral 109' that uses Wiegand input signalling can be used in the disclosed arrangement when alarm systems are upgraded. FIG. 5 shows how the incoming access signal 108 is received by a receiver 118' as is the case in FIG. 2. In FIG. 5 however the receiver 118' provides, as depicted by an arrow 503, the received rolling code from the access signal 108 to a rolling code/Wiegand protocol converter 501. The converter 501 converts, as depicted by an arrow 504, the incoming rolling code 503 to a form that can be used by the controller 109' that is designed to handle Wiegand protocol incoming signals. Therefore, the converted incoming signal 504 is in the Wiegand format.

The converter 501 uses a microprocessor-based arrangement running software code to process the incoming rolling code information 503 and decode this information 503 to clear text form. The converter 501 converts this clear text to a Wiegand variable bit-length data stream. In FIG. 2, the receiver 118 performs the conversion of the incoming rolling code access signal 108 to clear text which enables the controller 109 to identify the serial number of the originating key fob sub-system 116 to enable the access rights of the user to be verified.

Further to the Wiegand conversion arrangement, the protocol converter 501 approach can be adapted to convert between the incoming rolling code 503 (or any other appropriate secure code) to any other convenient protocol used by the controller 169'

The advantage of the rolling code/Wiegand converter 501 is that security system upgrades can be made without replacing Wiegand compatible controller 109'. Accordingly, existing systems as are described in FIG. 1 can be upgraded by replacing the code entry module 403 and the transmission path 404, leaving the other components of the system 400 (i.e., the controller 405, the code database 407, and the controlled item 409, together with existing wiring 408 and 406), largely intact. Minor modifications might however be necessary. When upgrading systems in this manner, the sub-system 116 can either be used in a remote fob configuration, or can be placed in a secure housing on an external door jamb.

10

From a practical perspective, incorporating the protocol converter 501 into an existing controller 109' would require direct wiring of the converter 501 into the housing of the secure controller 109'.

FIG. 6 shows another process 700 of operation of the remote access system. The process 700 commences with a step 701 that determines if a biometric signal has been received by the biometric sensor 121 in the code entry module in FIG. 2. If not, then the process 700 follows a NO arrow back to the step 701. If however a biometric signal has been received, then the process 700 follows a YES arrow to a step 702 that determines if the user ID database 105 in FIG. 2 is empty. This would be the case, for example, if the code entry module is new and has never been used, or if the user 101 has erased all the information in the database 105.

If the database 105 is empty, then the process 700 is directed by an arrow 703 to 706 in FIG. 8 which depicts a process 800 dealing with the enrolment or the administration function for loading relevant signatures into the database 105. If on the other hand the database 105 is not empty, then the process 700 is directed to a step 704 that determines if the biometric signal that has been received is an administrator's biometric signal.

The disclosed remote entry system can accommodate at least three classes of user, namely administrators, (ordinary) users, and duress users. The administrators have the ability to amend data stored, for example, in the database 105, while the ordinary users do not have this capability. The first user of the code entry module 103, whether this is the user who purchases the module, or the user who programs the module 103 after all data has been erased from the database 105, is automatically categorised as an administrator. This first administrator can direct the system 100 to either accept further administrators, or alternately to only accept further ordinary users.

Although the present description refers to "Users", in fact it is "fingers" which are the operative entities in system operation when the biometric sensor 121 (see FIG. 2) is a fingerprint sensor. In this event, a single user can enrol two or more of his or her own fingers as separate administrators or (ordinary) users of the system, by storing corresponding fingerprints for corresponding fingers in the database 105 via the enrolment process 800 (see FIG. 8).

Some class overlap is possible. Thus a stored signature can belong to an administrator in the duress class.

The first administrator can provide control information to the code entry module by providing a succession of finger presses to the biometric sensor 121, providing that these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time. In one arrangement, the control information is encoded by either or both (a) the number of finger presses and (b) the relative duration of the finger presses. If the successive finger presses are provided within this predetermined time, then the controller 107 accepts the presses as potential control information and checks the input information against a stored set of legal control signals.

One example of a legal control signal can be expressed as follows:

"Enrol an ordinary user"→dit, dit, dit, dah

where "dit" is a finger press of one second's duration (provided by the user 101 in response to the feedback provided by the Amber LED as described below), and "dah" is a finger press of two second's duration.

In the event that a legitimate sequence of finger presses are not delivered within the predetermined time, then the presses are considered not to be control information and merely to be presses intended to provide access to the controlled item 111.

IPR2022-00601
Apple EX1001 Page 17

US 9,269,208 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

Legitimate control sequences are defined in Read Only Memory (ROM) in the controller **107**.

The code entry module **103** has feedback signalling mechanisms **122**, implemented for example by a number of LEDs, and **124**, implemented by an audio transducer. The LEDs **122** and the audio transducer **124** are used by the controller to signal the state of the code entry module **103** to the user **101**, and to direct the administration process. Thus, in one example, three LEDs, being Red, Amber and Green are provided.

When the Amber LED is flashing, it means "Press the sensor". When the Amber LED is steady ON, it means "Maintain finger pressure". When the Amber LED is OFF, it means "Remove finger pressure". When the system enters the enrolment state (depicted by the process **800** in FIG. **8**), then the audio transducer **124** emits the "begin enrolment" signal (dit dit dit dit) and the Red LED flashes. Enrolment of a normal user (according to the step **807** in FIG. **8**) is signalled by the OK audio signal (dit dit) and a single blink of the Green LED.

Returning to the step **704**, if the step determines that the biometric signal received is an administrator's signal, then the process **700** is directed by a YES arrow to **706** in FIG. **8** as depicted by the arrow **703**. If on the other hand, the step **704** indicates that the received biometric signal does not belong to an administrator then the process **700** is directed by a NO arrow to **707** in FIG. **7**.

FIG. **7** shows the access process **600** by which a biometric signal **102** (see FIG. **2**) is processed in order to provide access to the controlled item **111**, or to take other action. Entering the process at **707** from FIG. **6**, the process **600** proceeds to a step **602** that compares the received biometric signature to signatures stored in the database **105**. A following step **603** determines if the received signal falls into the "duress" category. Signatures in this category indicate that the user **101** is in a coercive situation where, for example, an armed criminal is forcing the user **101** to access the secure facility (such as a bank door). If the step **603** determines that the signature is in the duress class, then a following step **604** prepares a "duress" bit for incorporation into the code access signal **108**. The aforementioned duress bit is an access attribute of the biometric signal **102**. Thereafter the process **600** proceeds to a step **605**.

Modules used in the code entry module for producing the rolling code enable a number of user defined bits to be inserted into the access signal **108**, and these bits can be used to effect desired control functions in the receiver sub-system **117**. The disclosed system **100** utilises four such user bits, namely (a) to indicate that the user belongs to the duress category, (b) to indicate a "battery low" condition, or other desired system state or "telemetry" variable, for the code entry module **103**, (c) to indicate that the biometric signal represents a legitimate user in which case the secure access to the controlled item **111** is to be granted, or (d) to indicate that the biometric signal is unknown, in which case the controller **109** in the receiver sub-system **117** sounds an alert tone using a bell (not shown) or the like.

Returning to FIG. **7**, if the step **603** determines that the biometric signal is not in the duress class, then the process **600** proceeds according to a NO arrow to the step **605**. The step **605** determines if the code entry module **103** has a low battery condition, in which event the process **600** proceeds according to a YES arrow to a step **606** that prepares a telemetry bit for insertion into the access signal **108**. The aforementioned telemetry bit is an access attribute of the biometric signal **102**. Thereafter, the process proceeds to a step **607**.

If the step **605** determines that telemetry signalling is not required, then the process **600** proceeds according to a NO

arrow to the step **607**. The step **607** checks the biometric signal against the signatures in the database **105**. If the received biometric signal matches a legitimate signature in the database **105**, then the process is directed to a step **608** that prepares an "access" bit for insertion into the access signal **108**. This access bit directs the controller **109** in the receiver sub-system **117** to provide access to the controlled item **111**. The aforementioned access bit is an access attribute of the biometric signal **102**. The process **600** then proceeds to a step **610**.

If the step **607** determines that the biometric input signal does not match any legitimate signatures in the database **105**, then the process **600** proceeds according to a NO arrow to a step **609** that prepares an "alert" bit for insertion into the access signal **108**. The aforementioned alert bit is an access attribute of the biometric signal **102**. This alert bit directs the controller **109** (a) not to provide access to the controlled item **111**, and (b) to provide an alert tone, like ringing a chime or a bell (not shown), to alert personnel in the vicinity of the receiver sub-system **117** that an unauthorised user is attempting to gain access to the controlled item **111**. The alert bit can also cause a camera mounted near the controlled item **111** to photograph the unauthorised user for later identification of that person. The camera can be activated if the person attempting to gain access is unauthorised, and also if the person attempting to gain access is authorised but uses a duress signature.

An optional additional step (not shown) can prepare an identification field for insertion into the access signal **108**. This sends, to the receiver sub-system **117**, ID information that the receiver sub-system can use to construct an audit trail listing which users, having signatures in the database **105**, have been provided with access to the controlled item **111**.

The process **600** is then directed to the step **610** which inserts the various user defined bits into the access signal **108** and sends the signal **108** to the receiver sub-system **117**. Thereafter, the process **600** is directed by an arrow **611** to **705** in FIG. **6**.

FIG. **8** shows a process **800** for implementing various enrolment procedures. The process **800** commences at **706** from FIG. **6** after which a step **801** determines if the biometric signal is a first administrators input (which is the case if the database **105** is empty). If this is the case, then the process **800** is directed to a step **802** that stores the administrator's signature in the database **105**. From a terminology perspective, this first administrator, or rather the first administrator's first finger (in the event that the biometric sensor **121** in FIG. **2** is a fingerprint sensor), is referred to as the "superfinger". Further administrator's fingers are referred to as admin-fingers, and ordinary users fingers are referred to merely as "fingers". The reason that someone would enrol more than one of their own fingers into the system is to ensure that even in the event that one of their enrolled fingers is injured, the person can still operate the system using another enrolled finger.

It is noted that the step **802**, as well as the steps **805**, **807** and **809** involve sequences of finger presses on the biometric sensor **121** in conjunction with feedback signals from the LEDs **122** and/or the audio speaker **124**. The process **800** then proceeds to a step **810** that determines if further enrolment procedures are required. If this is the case, then the process **800** proceeds by a YES arrow back to the step **801**. If no further enrolment procedures are required, then the process **800** proceeds by a NO arrow to **705** in FIG. **6**.

Returning to the step **801**, if the biometric signal is not a first administrator's signal, then the process **800** proceeds by a NO arrow to a step **803**. The step **803** determines if a further administrator signature is to be stored. It is noted that all

IPR2022-00601
Apple EX1001 Page 18

US 9,269,208 B2

13

signatures stored in the database are tagged as belonging to one or more of the classes of administrator, ordinary user, and duress users. If a further administrator signature is to be stored, then the process **800** proceeds by a YES arrow to the step **802** that stores the biometric signal as a further administrator's signature.

If a further administrator's signature is not required, then the process **800** proceeds according to a NO arrow to a step **804** that determines if a duress signature is to be stored. If this is the case then the process **800** follows a YES arrow to a step **805** that stores a duress signature. The process **800** then proceeds to the step **810**. If however the step **804** determines that a duress signature is not required, then the process **800** proceeds by a NO arrow to s step **806**.

The step **806** determines if a further simple signature (i.e. belonging to an ordinary user) is to be stored. If a further simple signature is to be stored, then the process **800** proceeds by a YES arrow to the step **807** that stores the biometric signal as a further ordinary signature.

If a further simple signature is not required, then the process **800** proceeds according to a NO arrow to a step **808** that determines if any or all signatures are to be erased from the database **105**. If this is the case then the process **800** follows a YES arrow to a step **809** that erases the desired signatures. The process **800** then proceeds to the step **810**. If however the step **804** determines that no signatures are to be erased, then the process **800** proceeds by a NO arrow to the step **810**.

FIG. **9** shows another enrolment process relating to the example of FIG. **6**. The process **900** commences at **706** from FIG. **6** after which a step **901** determines if the received biometric signal comes from the first administrator. If this is the case, then the process **900** proceeds according to a YES arrow to a step **902**. The step **902** emits an "Enrolment" tone and flashes the green LED once only. Thereafter, a step **905** reads the incoming biometric signal which is provided by the user as directed by the Amber LED. When the Amber LED flashes continuously, this directs the user to "Apply Finger". When the Amber LED is in a steady illuminated state, this directs the user to "Maintain Finger Pressure". Finally, when the amber LED is off, this directs the user to "Remove Finger".

Returning to the step **901**, if the incoming biometric signal does not belong to the first administrator, then the process **900** proceeds according to a NO arrow to a step **903**. The step **903** emits an "Enrolment" tone, and flashes the Red LED in an on-going fashion. Thereafter, the process **900** proceeds according to an arrow **904** to the step **905**.

Following the step **905**, a step **906** determines whether the incoming biometric signal is legible. If this is not the case, then the process **900** proceeds according to a NO arrow to a step **907**. The step **907** emits a "Rejection" tone, after which the process **900** is directed, according to an arrow **908** to **705** in FIG. **6**. Returning to the step **906**, if the incoming biometric signal is legible, then the process **900** follows a YES arrow to a step **909**. The step **909** determines whether the finger press exceeds a predetermined time. If this is not the case, then the process **900** follows a NO arrow to a step **910** which stores the biometric signal, which in the present case is a fingerprint signature. Thereafter the process **900** follows an arrow **911** to **705** in FIG. **6**.

Returning to the step **909** if the finger press does exceed the predetermined period, then the process follows a YES arrow to a step **912**. The step **912** erases relevant signatures depending upon the attributes of the incoming biometric signal. Thus, for example, if the incoming biometric signal belongs to an ordinary user, then the ordinary user's signature in the database **105** is erased by the step **912**. If, on the other hand,

14

the incoming biometric signal belongs to the first administrator, then all the signatures in the database **105** are erased. Administrators who are not the first administrator can be granted either the same powers as the first administrator in regard to erasure of signatures, or can be granted the same powers as ordinary user in this respect.

Once the step **912** has completed erasure of the relevant signatures, then the process **900** follows an arrow **913** to **705** in FIG. **6**.

FIG. **10** is a schematic block diagram of the system in. FIG. **2**. The disclosed secure access methods are preferably practiced using a computer system arrangement **100'**, such as that shown in FIG. **10** wherein the processes of FIGS. **3-4**, and **6-9** may be implemented as software, such as application program modules executing within the computer system **100'**. In particular, the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules **107** and **109** in the transmitter and receiver sub-systems **116** and **117**. The instructions may be formed as one or more code modules, each for performing one or more particular tasks. The software may also be divided into two separate parts, in which a first part performs the provision of secure access methods and a second part manages a user interface between the first part and the user. The software may be stored in a computer readable medium, including the storage devices described below, for example. The software is loaded into the transmitter and receiver sub-systems **116** and **117** from the computer readable medium, and then executed under direction of the respective processor modules **107** and **109**. A computer readable medium having such software or computer program recorded on it is a computer program product. The use of the computer program product in the computer preferably effects an advantageous apparatus for provision of secure access.

The following description is directed primarily to the transmitter sub-system **116**, however the description applies in general to the operation of the receiver sub-system **117**. The computer system **100'** is formed, having regard to the transmitter sub-system **116**, by the controller module **107**, input devices such as the bio sensor **121**, output devices including the LED display **122** and the audio device **124**. A communication interface/transceiver **1008** is used by the controller module **107** for communicating to and from a communications network **1020**. Although FIG. **2** shows the transmitter sub-system **116** communicating with the receiver sub-system **117** using a direct wireless link for the access signal **108**, this link used by the access signal **108** can be effected over the network **1020** forming a tandem link comprising **108-1020-108'**. The aforementioned communications capability can be used to effect communications between the transmitter sub-system **116** and the receiver sub-system **117** either directly or via the Internet, and other network systems, such as a Local Area Network (LAN) or a Wide Area Network (WAN).

The controller module **107** typically includes at least one processor unit **1005**, and a memory unit **1006**, for example formed from semiconductor random access memory (RAM) and read only memory (ROM). The controller module **107** also includes an number of input/output (I/O) interfaces including an audio-video interface **1007** that couples to the LED display **122** and audio speaker **124**, an I/O interface **1013** for the bio-sensor **121**, and the interface **1008** for communications. The components **1007**, **1008**, **1005**, **1013** and **1006** the controller module **107** typically communicate via an interconnected bus **1004** and in a manner which results in a conventional mode of operation of the controller **107** known to those in the relevant art.

IPR2022-00601
Apple EX1001 Page 19

US 9,269,208 B2

| 15 | 16 |
|---|---|

Typically, the application program modules for the transmitter sub-system **116** are resident in the memory **1006** iROM, and are read and controlled in their execution by the processor **1005**. Intermediate storage of the program and any data fetched from the bio sensor **121** and the network **1020** may be accomplished using the RAM in the semiconductor memory **1006**. In some instances, the application program modules may be supplied to the user encoded into the ROM in the memory **1006**. Still further, the software modules can also be loaded into the transmitter sub-system **116** from other computer readable media, say over the network **1020**. The term "computer readable medium" as used herein refers to any storage or transmission medium that participates in providing instructions and/or data to the transmitter sub-system **116** for execution and/or processing. Examples of storage media include floppy disks, magnetic tape, CD-ROM, a hard disk drive, a ROM or integrated circuit, a magneto-optical disk, or a computer readable card such as a PCMCIA card and the like, whether or not such devices are internal or external of the transmitter sub-system **116**. Examples of transmission media include radio or infra-red transmission channels as well as a network connection to another computer or networked device, and the Internet or Intranets including e-mail transmissions and information recorded on Websites and the like.

### INDUSTRIAL APPLICABILITY

It is apparent from the above that the arrangements described are applicable to the security industry.

The foregoing describes only some embodiments of the present invention, and modifications and/or changes can be made thereto without departing from the scope and spirit of the invention, the embodiments being illustrative and not restrictive.

The system **100** can also be used to provide authorised access to lighting systems, building control devices, exterior or remote devices such as air compressors and so on. The concept of "secure access" is thus extendible beyond mere access to restricted physical areas.

What is claimed is:

1. A system for providing secure access to a controlled item, the system comprising:
    a database of biometric signatures;
    a transmitter sub-system comprising:
      a biometric sensor for receiving a biometric signal;
      means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and
      means for emitting a secure access signal conveying information dependent upon said accessibility attribute; and
    a receiver sub-system comprising:
    means for receiving the transmitted secure access signal; and
    means for providing conditional access to the controlled item dependent upon said information,
    wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures, the population means comprising:
      means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
      means for mapping said series into an instruction; and
      means for populating the data base according to the instruction,

    wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

2. The system according to claim **1**, further comprising:
    means for providing a signal for directing input of the series of entries of the biometric signal;
    means for incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and
    means for constructing an audit trail of biometric signals provided to the biometric sensor for the purpose of accessing the controlled item.

3. The system according to claim **1**, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class, the accessibility attribute preferably comprising:
    an access attribute if the biometric signal matches a member of the database of biometric signatures;
    a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class; and
    an alert attribute if the biometric signal does not match a member of the database of biometric signatures.

4. The system according to claim **1**, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system.

5. The system according to claim **1**, wherein said conditional access comprises one of:
    provision of access to the controlled item if the accessibility attribute comprises an access attribute:
    provision of access to the controlled item and sounding of an alert if the accessibility attribute comprises a duress attribute; and
    denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute.

6. The system as claimed in claim **1**, wherein:
    the biometric sensor is for authenticating the identity of a user;
    the means for emitting comprises a transmitter for transmitting information capable of granting more than two types of access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and
    the system further comprising a control panel for receiving the information and for providing the secure access requested.

7. The system according to claim **6**, wherein the control panel includes a converter for receiving the secure wireless signal and for outputting the information, and/or the biometric sensor authenticates the identity of the user by comparing a biometric input from the user with a biometric signature for the user in a biometric database, and/or the biometric sensor, the biometric database, and the transmitter are located in a remote fob.

8. The system according to claim **7**, wherein the secure wireless signal comprises an RF carrier and a rolling code, and the converter preferably converts the rolling code to the Wiegand protocol.

9. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:
    a biometric sensor for receiving a biometric signal;

IPR2022-00601
Apple EX1001 Page 20

US 9,269,208 B2

17

means for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and

means for emitting a secure access signal conveying said information dependent upon said accessibility attribute;

wherein the transmitter sub-system further comprises means for populating the database of biometric signatures, the populating means comprising:

means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;

means for mapping said series into an instruction; and

means for populating the database according to the instruction,

wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

10. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal capable of granting more than two types of access to the controlled item, and a receiver sub-system comprising means for receiving the transmitted secure access signal, and means for providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising the steps of:

populating the database of biometric signatures by:

receiving a series of entries of the biometric signal;

determining at least one of the number of said entries and a duration of each said entry;

18

mapping said series into an instruction; and

populating the database according to the instruction;

receiving a biometric signal;

matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;

emitting a secure access signal conveying information dependent upon said accessibility attribute; and

providing conditional access to the controlled item dependent upon said information,

wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

11. The method according to claim 10, wherein the step of populating the database of biometric signatures further comprises the step of enrolling a biometric signature into the database of biometric signatures comprising the steps of:

receiving a biometric signal; and

enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty.

12. The method according to claim 11, wherein the step of enrolling the biometric signature further comprises receiving another biometric signal to confirm the enrolling of the biometric signal as an administrator signature, and is preferably performed dependent upon generation of a feedback signal adapted to direct provision of at least one of the biometric signal and the other biometric signal.

13. A non-transitory computer readable storage medium for storing a computer program comprising instructions, which when executed by processors causes the processors to perform the steps of the method of claim 10.

\*   \*   \*   \*   \*

IPR2022-00601
Apple EX1001 Page 21

US009665705B2

## (12) United States Patent
### Burke

(10) **Patent No.:**    **US 9,665,705 B2**
(45) **Date of Patent:**    ***May 30, 2017**

(54) **REMOTE ENTRY SYSTEM**

(71) Applicant: **Securicom (NSW) Pty. Ltd.**, Ramsgate, NSW (AU)

(72) Inventor: **Christopher John Burke**, Ramsgate (AU)

(73) Assignee: **SECURICOM (NSW) PTY LTD**, Ramsgate (AU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/000,818**

(22) Filed: **Jan. 19, 2016**

(65) **Prior Publication Data**

US 2016/0132672 A1    May 12, 2016

### Related U.S. Application Data

(63) Continuation of application No. 13/572,166, filed on Aug. 10, 2012, now Pat. No. 9,269,208, which is a
(Continued)

(30) **Foreign Application Priority Data**

Aug. 13, 2003    (AU) ................................. 2003904317

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 29/06* | (2006.01) |
| *G06F 21/32* | (2013.01) |
| *G06F 21/35* | (2013.01) |
| *G07C 9/00* | (2006.01) |
| *H04W 12/08* | (2009.01) |

(Continued)

(52) **U.S. Cl.**
CPC .............. *G06F 21/32* (2013.01); *G06F 21/35* (2013.01); *G07C 9/00158* (2013.01); *H04L*

*63/0861* (2013.01); *H04W 12/08* (2013.01); *H04W 84/12* (2013.01); *H04W 84/18* (2013.01)

(58) **Field of Classification Search**
CPC ....................................................... G06F 21/32
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,109,428 | A | * | 4/1992 | Igaki .................... | A61B 5/1172 356/71 |
| 5,933,515 | A | * | 8/1999 | Pu ....................... | G06K 9/00006 340/5.53 |
| 7,152,045 | B2 | * | 12/2006 | Hoffman ................. | G06F 21/32 235/379 |

OTHER PUBLICATIONS

Klosterman, Andrew J., and Gregory R. Ganger. "Secure continuous biometric-enhanced authentication." (2000).*

* cited by examiner

*Primary Examiner* — Shawnchoy Rahman
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57)    **ABSTRACT**

A system is disclosed for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute, and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol, and a receiver sub-system comprising means for receiving the transmitted secure access signal and means for providing conditional access to the controlled item dependent upon said information.

**17 Claims, 10 Drawing Sheets**



IPR2022-00602
Apple EX1001 Page 1

**US 9,665,705 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 10/568,207, filed as application No. PCT/AU2004/001083 on Aug. 13, 2004, now Pat. No. 8,266,442.

(51) **Int. Cl.**
     *H04W 84/12*          (2009.01)
     *H04W 84/18*          (2009.01)

IPR2022-00602
Apple EX1001 Page 2

**U.S. Patent**    May 30, 2017    Sheet 1 of 10    US 9,665,705 B2



Fig. 1
(prior art)

IPR2022-00602
Apple EX1001 Page 3

Case: 24-1278     Document: 22-1     Page: 154     Filed: 07/31/2024



Fig. 2

IPR2022-00602
Apple EX1001 Page 4



Fig. 3

IPR2022-00602
Apple EX1001 Page 5



Fig. 4

IPR2022-00602
Apple EX1001 Page 6

**U.S. Patent**       May 30, 2017       **Sheet 5 of 10**       US 9,665,705 B2



Fig. 5

IPR2022-00602
Apple EX1001 Page 7



Fig. 6

IPR2022-00602
Apple EX1001 Page 8



Fig. 7

IPR2022-00602
Apple EX1001 Page 9



Fig. 8

IPR2022-00602
Apple EX1001 Page 10



Fig. 9



Fig. 10

US 9,665,705 B2

## 1
### REMOTE ENTRY SYSTEM

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation patent application of U.S. Non-Provisional application Ser. No. 10/568,207 for REMOTE ENTRY SYSTEM, filed Jun. 4, 2008, the disclosure of which is incorporated by reference in its entirety.

#### FIELD OF THE INVENTION

The present invention relates to secure access systems and, in particular, to systems using wireless transmission of security code information.

#### BACKGROUND

FIG. 1 shows a prior art arrangement for providing secure access. A user 401 makes a request, as depicted by an arrow 402, directed to a code entry module 403. The module 403 is typically mounted on the external jamb of a secure door. The request 402 is typically a secure code of some type which is compatible with the code entry module 403. Thus, for example, the request 402 can be a sequence of secret numbers directed to a keypad 403. Alternately, the request 402 can be a biometric signal from the user 401 directed to a corresponding biometric sensor 403. One example of a biometric signal is a fingerprint. Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration and so on.

The code entry module 403 conveys the request 402 by sending a corresponding signal, as depicted by an arrow 404, to a controller 405 which is typically situated in a remote or inaccessible place. The controller 405 authenticates the security information provided by the user 401 by interrogating a database 407 as depicted by an arrow 406. If the user 401 is authenticated, and has the appropriate access privileges, then the controller 405 sends an access signal, as depicted by an arrow 408, to a device 409 in order to provide the desired access. The device 409 can, for example, be the locking mechanism of a secure door, or can be an electronic lock on a personal computer (PC) which the user 401 desires to access.

A proximity card can also be used to emit the request 402, in which case the code entry module 403 has appropriate functionality.

Although the request 402 can be made secure, either by increasing the number of secret digits or by using a biometric system, the communication infrastructure in FIG. 1 is typically less secure. The infrastructure 400 is generally hardwired, with the code entry module 403 generally being mounted on the outside jamb of a secured door. In such a situation, the signal path 404 can be over a significant distance in order to reach the controller 405. The path 404 represents one weak point in the security system 400, providing an unauthorised person with relatively easy access to the information being transmitted between the code entry module 403 and the controller 405. Such an unauthorised person can, given this physical access, decipher the communicated information between the code entry module 403 and the controller 405. This captured information can be deciphered, replayed in order to gain the access which rightfully belongs to the user 401, or to enable modification for other subversive purposes.

## 2

Current systems as depicted in FIG. 1 utilise a communication protocol called "Wiegand" for communication between the code entry module 403 and the controller 405. The Wiegand protocol is a simple one-way data protocol that can be modified by increasing or decreasing the bit count to ensure uniqueness of the protocol among different security companies. The Wiegand protocol does not secure the information being sent between the code entry module 403 and the controller 405.

More advanced protocols such as RS 485 have been used in order to overcome the vulnerability of the Wiegand protocol over the long distance route 404. RS 485 is a duplex protocol offering encryption capabilities at both the transmitting and receiving ends, i.e. the code entry module 403 and the controller 405 respectively in the present case. The length of the path 404 nonetheless provides an attack point for the unauthorised person.

Due to the cost and complexity of re-wiring buildings and facilities, security companies often make use of existing communication cabling when installing and/or upgraded security systems, thereby maintaining the vulnerability described above.

#### SUMMARY

It is an object of the present invention to substantially overcome, or at least ameliorate, one or more disadvantages of existing arrangements.

According to a first aspect of the present invention, there is provided a system for providing secure access to a controlled item, the system comprising:

a database of biometric signatures;

a transmitter subsystem comprising: a biometric sensor for receiving a biometric signal; means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and

a receiver sub-system comprising; means for receiving the transmitted secure access signal; and means for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a transmitter sub-system for operating in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a receiver sub-system comprising means for receiving a secure access signal transmitted by the transmitter sub-system, and means for providing conditional access to the controlled item dependent upon information conveyed in the secure access signal; wherein the transmitter subsystem comprises: a biometric sensor for receiving a biometric signal; means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and means for emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided receiver sub-system for operating in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for

IPR2022-00602

Apple EX1001 Page 13

US 9,665,705 B2

**3**

receiving a biometric signal, means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute, and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; wherein the receiver sub-system comprises; means for receiving the transmitted secure access signal; and means for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a method for providing secure access to a controlled item, the method comprising the steps of:

receiving a biometric signal;

matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;

emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and

providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a method for populating a database of biometric signatures in a system for providing secure access to a controlled item, the system comprising said database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal, and a receiver subsystem comprising means for receiving the transmitted secure access signal, and means for providing conditional access to the controlled item dependent upon information in said secure access signal, said method comprising the steps of:

receiving a series of entries of the biometric signal;

determining at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the database according to the instruction.

According to another aspect of the present invention, there is provided a method for transmitting a secure access signal in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a receiver sub-system comprising means for receiving the secure access signal transmitted by a transmitter sub-system, and means for providing conditional access to the controlled item dependent upon information conveyed in the secure access signal, said method comprising the steps of: receiving a biometric sensor by biometric signal; matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided a method for receiving a secure access signal in a system for providing secure access to a controlled item, the system comprising a database of biometric signatures, a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute,

**4**

and means for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol, said method comprising the steps of:

receiving the transmitted secure access signal; and providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to provide secure access to a controlled item, said computer program product comprising:

code for receiving a biometric signal;

code for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;

code for emitting a secure access signal conveying information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol; and

code for providing conditional access to the controlled item dependent upon said information.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to populate a database of biometric signatures in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving a series of entries of the biometric signal;

code for determining at least one of the number of said entries and a duration of each said entry;

code for mapping said series into an instruction; and

code for populating the database according to the instruction.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to transmit a secure access signal in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving a biometric sensor by biometric signal;

code for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

code for emitting the secure access signal conveying said information dependent upon said accessibility attribute, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol.

According to another aspect of the present invention, there is provided a computer program product having a computer readable medium having a computer program recorded therein for directing a processor to receive a secure access signal in a system for providing secure access to a controlled item, said computer program product comprising:

code for receiving the transmitted secure access signal; and

code for providing conditional access to the controlled item dependent upon said information.

IPR2022-00602
Apple EX1001 Page 14

US 9,665,705 B2

5

According to another aspect of the present invention, there is provided a system for providing secure access, the system comprising:

a biometric sensor for authenticating the identity of a user;

a transmitter for transmitting information using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and

a control panel for receiving the information and for providing the secure access requested.

Other aspects of the invention are also disclosed.

BRIEF DESCRIPTION OF THE DRAWINGS

Some aspects of the prior art and one or more embodiments of the present invention are described with reference to the drawings, in which:

FIG. 1 shows a prior art arrangement for providing secure access;

FIG. 2 is a functional block diagram of an arrangement for providing secure access according to the present disclosure;

FIG. 3 shows an example of a method of operation of the remote control module of FIG. 2;

FIG. 4 shows an example of a method of operation of the (fixed) control device of FIG. 2;

FIG. 5 shows incorporation of a protocol converter into the arrangement of FIG. 2; and

FIG. 6 shows another example of how the remote access system operates;

FIG. 7 shows an access process relating to the example of FIG. 6;

FIG. 8 shows one enrollment process relating to the example of FIG. 6;

FIG. 9 shows another enrollment process relating to the example of FIG. 6; and

FIG. 10 is a schematic block diagram of the system in FIG. 2.

DETAILED DESCRIPTION INCLUDING BEST MODE

It is to be noted that the discussions contained in the "Background" section relating to prior art arrangements relate to discussions of documents or devices which form public knowledge through their respective publication and/or use. Such should not be interpreted as a representation by the present inventor(s) or patent applicant that such documents or devices in any way form part of the common general knowledge in the art.

Where reference is made in any one or more of the accompanying drawings to steps and/or features, which have the same reference numerals, those steps and/or features have for the purposes of this description the same function(s) or operation(s), unless the contrary intention appears.

FIG. 2 is a functional block diagram of an arrangement for providing secure access according to the present disclosure. A user 101 makes a request, as depicted by an arrow 102, to a code entry module 103. The code entry module 103 includes a biometric sensor 121 and the request 102 takes a form which corresponds to the nature of the sensor 121 in the module 103. Thus, for example, if the biometric sensor 121 in the code entry module 103 is a fingerprint sensor, then the request 102 typically takes the form of a thumb press on a sensor panel (not shown) on the code entry module 103.

The code entry module 103 interrogates, as depicted by an arrow 104, a user identity database 105. Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 then the user database 105 contains biometric

6

signatures for authorised users against which the request 102 can be authenticated. If the identity of the user 101 is authenticated successfully, then the code entry module 103 sends a signal 106 to a controller/transmitter 107. The controller/transmitter 107 checks, as depicted by an arrow 112, the current rolling code in a database 113. The controller 107 then updates the code and sends the updated code, this being referred to as an access signal, as depicted by an arrow 108 to a controller 109. The rolling code protocol offers non-replay encrypted communication.

The controller 109 tests the rolling code received in the access signal 108 against the most recent rolling code which has been stored in a database 115, this testing being depicted by an arrow 114. If the incoming rolling code forming the access signal 108 is found to be legitimate, then the controller 109 sends a command, as depicted by an arrow 110, to a controlled item 111. The controlled item 111 can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer (PC) that is to be accessed by the user 101. It is noted that the controller 109 contains a receiver 118 that receives the transmitted access signal 108 and converts it into a form that is provided, as depicted by an arrow 120, into a form that the controller 109 can use.

The code entry module 103 also incorporates at least one mechanism for providing feedback to the user 101. This mechanism can, for example, take the form or one or more Light Emitting Diodes (LEDs) 122 which can provide visual feedback, depicted by an arrow 123 to the user 101. Alternately or in addition the mechanism can take the form of an audio signal provided by an audio transducer 124 providing audio feedback 125.

The arrangement in FIG. 2 has been described for the case in which the secure code in the access signal 108 used between the sub-systems 116 and 117 is based upon the rolling code. It is noted that this is merely one arrangement, and other secure codes can equally be used. Thus, for example, either of the Bluetooth™ protocol, or the Wi Fi™ protocols can be used.

Rolling codes provide a substantially non-replayable non-repeatable and encrypted radio frequency data communications scheme for secure messaging. These codes use inherently secure protocols and serial number ciphering techniques which in the present disclosure hide the clear text values required for authentication between the key fob (transmitter) sub-system 116 and the receiver/controller 118/109.

Rolling codes use a different code variant each time the transmission of the access signal 108 occurs. This is achieved by encrypting the data from the controller 107 with a mathematical algorithm, and ensuring that successive transmissions of the access signal 108 are modified using a code and/or a look-up table known to both the transmitter sub-system 116 and the receiver sub-system 117. Using this approach successive transmissions are modified, resulting in a non-repeatable data transfer, even if the information from the controller 107 remains the same. The modification of the code in the access signal 108 for each transmission significantly reduces the likelihood that an intruder can access the information replay the information to thereby gain entry at some later time.

The sub-system in FIG. 2 falling to the left hand side, as depicted by an arrow 116, of a dashed line 119 can be implemented in a number of different forms. The sub-system 116 can for example be incorporated into a remote fob (which is a small portable device carried by the user 101), or alternately can be mounted in a protected enclosure on the outside jamb of a secured door. The sub-system 116 com-

IPR2022-00602

Apple EX1001 Page 15

US 9,665,705 B2

7

municates with the sub-system 117 on the right hand side of the dashed line 119 via the wireless communication channel used by the access signal 108. The sub-system 117 is typically located in an inaccessible area such as a hidden roof space or alternately in a suitable protected area such as an armoured cupboard. The location of the sub-system 117 must of course be consistent with reliable reception of the wireless access signal 108.

Although typically the communication channel uses a wireless transmission medium, there are instances where the channel used by the access signal 108 can use a wired medium. This is particularly the case when the transmitter sub-system 116 is mounted in an enclosure on the door jamb rather than in a portable key fob.

The biometric signature database 105 is shown in FIG. 2 to be part of the transmitter sub-system 116. However, in an alternate arrangement, the biometric signature database 105 can be located in the receiver sub-system 117, in which case the communication 104 between the code entry module 103 and the signature database 105 can also be performed over a secure wireless communication channel such as the one used by the access signal 108. In the event that the secure access system is being applied to providing secure access to a PC, then the secured PC can store the biometric signature of the authorised user in internal memory, and the PC can be integrated into the receiver sub-system 117 of FIG. 1.

In the event that the sub-system 116 is implemented as a remote fob, the combination of the biometric verification and the strongly encrypted wireless communication provides a particularly significant advantage over current systems. The remote key fob arrangement allows easy installation, since the wired communication path 404 (see FIG. 1) is avoided. Other existing wiring elements of the present systems 400 can be used where appropriate. When the sub-system 116 is implemented as a remote fob, the fob incorporates the biometric (eg fingerprint) authentication arrangement, in which case only one biometric signature is stored in the fob. This arrangement reduces the requirements on the central database 115. Once the key fob authenticates the user through biometric signature (eg fingerprint) verification, the rolling code in the access signal 108 is transmitted to the controller 109 for authorisation of the user for that location at that time.

In addition to authenticating the user 101 the biometric sensor 121 in the code entry module 103 in conjunction with the controller 107 can also check other access privileges of the user 101. These access privileges can be contained in the database 105 which can be located either locally in the remote key fob, or in the receiver sub-system 117 as previously described. In one example, Tom Smith can firstly be authenticated as Tom Smith using the thumb press by Tom on the biometric sensor panel (not shown). After Tom's personal biometric identity is authenticated, the transmitter sub-system 116 can check if Tom Smith is in fact allowed to use the particular door secured by the device 111 on weekends. Thus the security screening offered by the described arrangement can range from simple authentication of the user's identity, to more comprehensive access privilege screening.

The incorporation of the biometric sensor 121 into the code entry module 103 in the form of a remote key fob also means that if the user 101 loses the remote key fob, the user need not be concerned that someone else can use it. Since the finder of the lost key fob will not be able to have his or her biometric signal authenticated by the biometric sensor 121 in the code entry module 103, the lost key fob is useless to anyone apart from the rightful user 101.

8

The transmitter sub-system 116 is preferably fabricated in the form of a single integrated circuit (IC) to reduce the possibility of an authorised person bypassing the biometric sensor 121 in the code entry module 103 and directly forcing the controller 107 to emit the rolling code access signal 108.

FIG. 3 shows the method of operation of the remote control module (i.e. the sub-system 116) of FIG. 2. The method 200 commences with a testing step 201 in which the biometric sensor 121 in the code entry module 103 checks whether a biometric signal 102 is being received. If this is not the case, then the method 200 is directed in accordance with an NO arrow back to the step 201 in a loop. If, on the other hand, the biometric signal 102 has been received, then the method 200 is directed in accordance with a YES arrow to a step 202. The step 202 compares the received biometric signal 102 with information in the biometric signature database 105 in order to ensure that the biometric signal received 102 is that of the rightful user 101 of the sub-system 116.

A subsequent testing step 203 checks whether the comparison in the step 202 yields the desired authentication. If the biometric signature matching is authenticated, then the process 200 is directed in accordance with a YES arrow to a step 204. The authentication of the biometric signature matching produces an accessibility attribute for the biometric signal 102 in question. The accessibility attribute establishes whether and under which conditions access to the controlled item 111 should be granted to a user. Thus, for example, the accessibility attribute may comprise one or more of an access attribute (granting unconditional access), a duress attribute (granting access but with activation of an alert tone to advise authorities of the duress situation), an alert attribute (sounding a chime indicating that an unauthorised, but not necessarily hostile, person is seeking access, and a telemetry attribute, which represents a communication channel for communicating state information for the transmitter sub-system to the receiver sub-system such as a "low battery" condition. The step 204 enables the user 101 to select a control option by providing one or more additional signals (not shown) to the controller 107. Thus for example the control option could enable the user 101 to access one of a number of secure doors after his or her identity has been authenticated in the step 203. In the subsequent step 205 the controller 107 sends the appropriate access signal 108 to the controller 109. The process 200 is then directed in accordance with an arrow 206 back to the step 201.

Thus for example the sub-system 116 can be provided with a single biometric sensor 121 in the code entry module 103 which enables the user 101 to select one of four door entry control signals by means of separate buttons on the controller 107 (not shown). This would enable the user 101, after authentication by the biometric sensor 121 in the code entry module 103 and the controller 107 to obtain access to any one of the aforementioned for secure doors.

Returning to the testing step 203, if the signature comparison indicates that the biometric signal 102 is not authentic, and has thus not been received from the proper user, then the process 200 is directed in accordance with a NO arrow back to the step 201. In an alternate arrangement, the NO arrow from the step 203 could lead to a disabling step which would disable further operation of the sub-system 116, either immediately upon receipt of the incorrect biometric signal 102, or after a number of attempts to provide the correct biometric signal 102.

FIG. 4 shows the method of operation of the control sub-system 117 of FIG. 2. The method 300 commences with

IPR2022-00602
Apple EX1001 Page 16

US 9,665,705 B2

9 10

a testing step **301** which continuously checks whether the access signal **108** has been received from **107**. The step **301** is performed by the controller **109**. As long as the access signal **108** is not received the process **300** is directed in accordance with a NO arrow in a looping manner back to the step **301**. When the access signal **108** is received, the process **300** is directed from the step **301** by means of a YES arrow to a step **302**. In the step **302**, the controller **109** compares the rolling code received by means of the access signal **108** with a reference code in the database **115**. A subsequent testing step **303** is performed by the controller **109**. In the step **303** if the code received on the access signal **108** is successfully matched against the reference code in the database **115** then the process **300** is directed in accordance with a YES arrow to a step **304**.

In the step **304** the controller **109** sends the control signal **110** to the controlled item **111** (for example opening the secured door). The process **300** is then directed from the step **304** as depicted by an arrow **305** back to the step **301**. Returning to the testing step **303** if the code received on the access signal **108** is not successfully matched against the reference code in the database **115** by the controller **109** then the process **300** is directed from the step **303** in accordance with a NO arrow back to the step **301**.

As was described in regard to FIG. **3**, in an alternate arrangement, the process **300** could be directed, if the code match is negative, from the step **303** to a disabling step which would disable the sub-system **117** if the incorrect code where received once or a number of times.

FIG. **5** shows incorporation of a protocol converter into the arrangement of FIG. **2**. In the arrangement of FIG. **2** the receiver **118** in the controller **109** is able to directly receive and process the rolling code in the access signal **108** in a manner as to provide, as depicted by the arrow **120**, the necessary information to the controller **109**. FIG. **5** shows how an existing controller depicted by a reference numeral **109'** that uses Wiegand input signalling can be used in the disclosed arrangement when alarm systems are upgraded. FIG. **5** shows how the incoming access signal **108** is received by a receiver **118'** as is the case in FIG. **2**. In FIG. **5** however the receiver **118'** provides, as depicted by an arrow **503**, the received rolling code from the access signal **108** to a rolling code/Wiegand protocol converter **501**. The converter **501** converts, as depicted by an arrow **504**, the incoming rolling code **503** to a form that can be used by the controller **109'** that is designed to handle Wiegand protocol incoming signals. Therefore, the converted incoming signal **504** is in the Wiegand format.

The converter **501** uses a microprocessor-based arrangement running software code to process the incoming rolling code information **503** and decode this information **503** to clear text form. The converter **501** converts this clear text to a Wiegand variable bit-length data stream. In FIG. **2**, the receiver **118** performs the conversion of the incoming rolling code access signal **108** to clear text which enables the controller **109** to identify the serial number of the originating key fob sub-system **116** to enable the access rights of the user to be verified.

Further to the Wiegand conversion arrangement, the protocol converter **501** approach can be adapted to convert between the incoming rolling code **503** (or any other appropriate secure code) to any other convenient protocol used by the controller **169'**.

The advantage of the rolling code/Wiegand converter **501** is that security system upgrades can be made without replacing Wiegand compatible controller **109'**. Accordingly, existing systems as are described in FIG. **1** can be upgraded

by replacing the code entry module **403** and the transmission path **404**, leaving the other components of the system **400** (i.e., the controller **405**, the code database **407**, and the controlled item **409**, together with existing wiring **408** and **406**), largely intact. Minor modifications might however be necessary. When upgrading systems in this manner, the sub-system **116** can either be used in a remote fob configuration, or can be placed in a secure housing on an external door jamb.

From a practical perspective, incorporating the protocol converter **501** into an existing controller **109'** would require direct wiring of the converter **501** into the housing of the secure controller **109'**.

FIG. **6** shows another process **700** of operation of the remote access system. The process **700** commences with a step **701** that determines if a biometric signal has been received by the biometric sensor **121** in the code entry module in FIG. **2**. If not, then the process **700** follows a NO arrow back to the step **701**. If however a biometric signal has been received, then the process **700** follows a YES arrow to a step **702** that determines if the user ID database **105** in FIG. **2** is empty. This would be the case, for example, if the code entry module is new and has never been used, or if the user **101** has erased all the information in the database **105**.

If the database **105** is empty, then the process **700** is directed by an arrow **703** to **706** in FIG. **8** which depicts a process **800** dealing with the enrollment or the administration function for loading relevant signatures into the database **105**. If on the other hand the database **105** is not empty, then the process **700** is directed to a step **704** that determines if the biometric signal that has been received is an administrator's biometric signal.

The disclosed remote entry system can accommodate at least three classes of user, namely administrators, (ordinary) users, and duress users. The administrators have the ability to amend data stored, for example, in the database **105**, while the ordinary users do not have this capability. The first user of the code entry module **103**, whether this is the user who purchases the module, or the user who programs the module **103** after all data has been erased from the database **105**, is automatically categorised as an administrator. This first administrator can direct the system **100** to either accept further administrators, or alternately to only accept further ordinary users.

Although the present description refers to "Users", in fact it is "fingers" which are the operative entities in system operation when the biometric sensor **121** (see FIG. **2**) is a fingerprint sensor. In this event, a single user can enroll two or more of his or her own fingers as separate administrators or (ordinary) users of the system, by storing corresponding fingerprints for corresponding fingers in the database **105** via the enrollment process **800** (see FIG. **8**).

Some class overlap is possible. Thus a stored signature can belong to an administrator in the duress class.

The first administrator can provide control information to the code entry module by providing a succession of finger presses to the biometric sensor **121**, providing that these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time. In one arrangement, the control information is encoded by either or both (a) the number of finger presses and (b) the relative duration of the finger presses. If the successive finger presses are provided within this predetermined time, then the controller **107** accepts the presses as potential control information and checks the input information against a stored set of legal control signals.

IPR2022-00602
Apple EX1001 Page 17

US 9,665,705 B2

11

One example of a legal control signal can be expressed as follows:

"Enroll an ordinary user"→dit, dit, dit, dah where "dit" is a finger press of one second's duration (provided by the user 101 in response to the feedback provided by the Amber LED as described below), and "dah" is a finger press of two second's duration.

In the event that a legitimate sequence of finger presses are not delivered within the predetermined time, then the presses are considered not to be control information and merely to be presses intended to provide access to the controlled item 111. Legitimate control sequences are defined in Read Only Memory (ROM) in the controller 107.

The code entry module 103 has feedback signalling mechanisms 122, implemented for example by a number of LEDs, and 124, implemented by an audio transducer. The LEDs 122 and the audio transducer 124 are used by the controller to signal the state of the code entry module 103 to the user 101, and to direct the administration process. Thus, in one example, three LEDs, being Red, Amber and Green are provided.

When the Amber LED is flashing, it means "Press the sensor". When the Amber LED is steady ON, it means "Maintain finger pressure". When the Amber LED is OFF, it means "Remove finger pressure". When the system enters the enrollment state (depicted by the process 800 in FIG. 8), then the audio transducer 124 emits the "begin enrollment" signal (dit dit dit dit) and the Red LED flashes. Enrollment of a normal user (according to the step 807 in FIG. 8) is signaled by the OK audio signal (dit dit) and a single blink of the Green LED.

Returning to the step 704, if the step determines that the biometric signal received is an administrator's signal, then the process 700 is directed by a YES arrow to 706 in FIG. 8 as depicted by the arrow 703. If on the other hand, the step 704 indicates that the received biometric signal does not belong to an administrator then the process 700 is directed by a NO arrow to 707 in FIG. 7.

FIG. 7 shows the access process 600 by which a biometric signal 102 (see FIG. 2) is processed in order to provide access to the controlled item 111, or to take other action. Entering the process at 707 from FIG. 6, the process 600 proceeds to a step 602 that compares the received biometric signature to signatures stored in the database 105. A following step 603 determines if the received signal falls into the "duress" category. Signatures in this category indicate that the user 101 is in a coercive situation where, for example, an armed criminal is forcing the user 101 to access the secure facility (such as a bank door). If the step 603 determines that the signature is in the duress class, then a following step 604 prepares a "duress" bit for incorporation into the code access signal 108. The aforementioned duress bit is an access attribute of the biometric signal 102. Thereafter the process 600 proceeds to a step 605.

Modules used in the code entry module for producing the rolling code enable a number of user defined bits to be inserted into the access signal 108, and these bits can be used to effect desired control functions in the receiver sub-system 117. The disclosed system 100 utilises four such user bits, namely (a) to indicate that the user belongs to the duress category, (b) to indicate a "battery low" condition, or other desired system state or "telemetry" variable, for the code entry module 103, (c) to indicate that the biometric signal represents a legitimate user in which case the secure access to the controlled item 111 is to be granted, or (d) to indicate that the biometric signal is unknown, in which case the

12

controller 109 in the receiver sub-system 117 sounds an alert tone using a bell (not shown) or the like.

Returning to FIG. 7, if the step 603 determines that the biometric signal is not in the duress class, then the process 600 proceeds according to a NO arrow to the step 605. The step 605 determines if the code entry module 103 has a low battery condition, in which event the process 600 proceeds according to a YES arrow to a step 606 that prepares a telemetry bit for insertion into the access signal 108. The aforementioned telemetry bit is an access attribute of the biometric signal 102. Thereafter, the process proceeds to a step 607.

If the step 605 determines that telemetry signalling is not required, then the process 600 proceeds according to a NO arrow to the step 607. The step 607 checks the biometric signal against the signatures in the database 105. If the received biometric signal matches a legitimate signature in the database 105, then the process is directed to a step 608 that prepares an "access" bit for insertion into the access signal 108. This access bit directs the controller 109 in the receiver sub-system 117 to provide access to the controlled item 111. The aforementioned access bit is an access attribute of the biometric signal 102. The process 600 then proceeds to a step 610.

If the step 607 determines that the biometric input signal does not match any legitimate signatures in the database 105, then the process 600 proceeds according to a NO arrow to a step 609 that prepares an "alert" bit for insertion into the access signal 108. The aforementioned alert bit is an access attribute of the biometric signal 102. This alert bit directs the controller 109 (a) not to provide access to the controlled item 111, and (b) to provide an alert tone, like ringing a chime or a bell (not shown), to alert personnel in the vicinity of the receiver sub-system 117 that an unauthorised user is attempting to gain access to the controlled item 111. The alert bit can also cause a camera mounted near the controlled item 111 to photograph the unauthorised user for later identification of that person. The camera can be activated if the person attempting to gain access is unauthorised, and also if the person attempting to gain access is authorised but uses a duress signature.

An optional additional step (not shown) can prepare an identification field for insertion into the access signal 108. This sends, to the receiver sub-system 117, ID information that the receiver sub-system can use to construct an audit trail listing which users, having signatures in the database 105, have been provided with access to the controlled item 111.

The process 600 is then directed to the step 610 which inserts the various user defined bits into the access signal 108 and sends the signal 108 to the receiver sub-system 117. Thereafter, the process 600 is directed by an arrow 611 to 705 in FIG. 6.

FIG. 8 shows a process 800 for implementing various enrollment procedures. The process 800 commences at 706 from FIG. 6 after which a step 801 determines if the biometric signal is a first administrators input (which is the case if the database 105 is empty). If this is the case, then the process 800 is directed to a step 802 that stores the administrator's signature in the database 105. From a terminology perspective, this first administrator, or rather the first administrator's first finger (in the event that the biometric sensor 121 in FIG. 2 is a fingerprint sensor), is referred to as the "superfinger". Further administrator's fingers are referred to as admin-fingers, and ordinary users fingers are referred to merely as "fingers". The reason that someone would enroll more than one of their own fingers into the system is to

IPR2022-00602

Apple EX1001 Page 18

US 9,665,705 B2

13      14

ensure that even in the event that one of their enrolled fingers is injured, the person can still operate the system using another enrolled finger.

It is noted that the step **802**, as well as the steps **805**, **807** and **809** involve sequences of finger presses on the biometric sensor **121** in conjunction with feedback signals from the LEDs **122** and/or the audio speaker **124**. The process **800** then proceeds to a step **810** that determines if further enrollment procedures are required. If this is the case, then the process **800** proceeds by a YES arrow back to the step **801**. If no further enrollment procedures are required, then the process **800** proceeds by a NO arrow to **705** in FIG. **6**.

Returning to the step **801**, if the biometric signal is not a first administrator's signal, then the process **800** proceeds by a NO arrow to a step **803**. The step **803** determines if a further administrator signature is to be stored. It is noted that all signatures stored in the database are tagged as belonging to one or more of the classes of administrator, ordinary user, and duress users. If a further administrator signature is to be stored, then the process **800** proceeds by a YES arrow to the step **802** that stores the biometric signal as a further administrator's signature.

If a further administrator's signature is not required, then the process **800** proceeds according to a NO arrow to a step **804** that determines if a duress signature is to be stored. If this is the case then the process **800** follows a YES arrow to a step **805** that stores a duress signature. The process **800** then proceeds to the step **810**. If however the step **804** determines that a duress signature is not required, then the process **800** proceeds by a NO arrow to s step **806**.

The step **806** determines if a further simple signature (i.e. belonging to an ordinary user) is to be stored. If a further simple signature is to be stored, then the process **800** proceeds by a YES arrow to the step **807** that stores the biometric signal as a further ordinary signature.

If a further simple signature is not required, then the process **800** proceeds according to a NO arrow to a step **808** that determines if any or all signatures are to be erased from the database **105**. If this is the case then the process **800** follows a YES arrow to a step **809** that erases the desired signatures. The process **800** then proceeds to the step **810**. If however the step **804** determines that no signatures are to be erased, then the process **800** proceeds by a NO arrow to the step **810**.

FIG. **9** shows another enrollment process relating to the example of FIG. **6**. The process **900** commences at **706** from FIG. **6** after which a step **901** determines if the received biometric signal comes from the first administrator. If this is the case, then the process **900** proceeds according to a YES arrow to a step **902**. The step **902** emits an "Enrollment" tone and flashes the green LED once only. Thereafter, a step **905** reads the incoming biometric signal which is provided by the user as directed by the Amber LED. When the Amber LED flashes continuously, this directs the user to "Apply Finger". When the Amber LED is in a steady illuminated state, this directs the user to "Maintain Finger Pressure". Finally, when the amber LED is off, this directs the user to "Remove Finger".

Returning to the step **901**, if the incoming biometric signal does not belong to the first administrator, then the process **900** proceeds according to a NO arrow to a step **903**. The step **903** emits an "Enrollment" tone, and flashes the Red LED in an on-going fashion. Thereafter; the process **900** proceeds according to an arrow **904** to the step **905**.

Following the step **905**, a step **906** determines whether the incoming biometric signal is legible. If this is not the case, then the process **900** proceeds according to a NO arrow to

a step **907**. The step **907** emits a "Rejection" tone, after which the process **900** is directed, according to an arrow **908** to **705** in FIG. **6**. Returning to the step **906**, if the incoming biometric signal is legible, then the process **900** follows a YES arrow to a step **909**. The step **909** determines whether the finger press exceeds a predetermined time. If this is not the case, then the process **900** follows a NO arrow to a step **910** which stores the biometric signal, which in the present case is a fingerprint signature. Thereafter the process **900** follows an arrow **911** to **705** in FIG. **6**.

Returning to the step **909** if the finger press does exceed the predetermined period, then the process follows a YES arrow to a step **912**. The step **912** erases relevant signatures depending upon the attributes of the incoming biometric signal. Thus, for example, if the incoming biometric signal belongs to an ordinary user, then the ordinary user's signature in the database **105** is erased by the step **912**. If, on the other hand, the incoming biometric signal belongs to the first administrator, then all the signatures in the database **105** are erased. Administrators who are not the first administrator can be granted either the same powers as the first administrator in regard to erasure of signatures, or can be granted the same powers as ordinary user in this respect.

Once the step **912** has completed erasure of the relevant signatures, then the process **900** follows an arrow **913** to **705** in FIG. **6**.

FIG. **10** is a schematic block diagram of the system in FIG. **2**. The disclosed secure access methods are preferably practiced using a computer system arrangement **100'**, such as that shown in FIG. **10** wherein the processes of FIGS. **3-4**, and **6-9** may be implemented as software, such as application program modules executing within the computer system **100'**. In particular, the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules **107** and **109** in the transmitter and receiver sub-systems **116** and **117**. The instructions may be formed as one or more code modules, each for performing one or more particular tasks. The software may also be divided into two separate parts, in which a first part performs the provision of secure access methods and a second part manages a user interface between the first part and the user. The software may be stored in a computer readable medium, including the storage devices described below, for example. The software is loaded into the transmitter and receiver sub-systems **116** and **117** from the computer readable medium, and then executed under direction of the respective processor modules **107** and **109**. A computer readable medium having such software or computer program recorded on it is a computer program product. The use of the computer program product in the computer preferably effects an advantageous apparatus for provision of secure access.

The following description is directed primarily to the transmitter sub-system **116**, however the description applies in general to the operation of the receiver sub-system **117**. The computer system **100'** is formed, having regard to the transmitter sub-system **116**, by the controller module **107**, input devices such as the bio sensor **121**, output devices including the LED display **122** and the audio device **124**. A communication interface/transceiver **1008** is used by the controller module **107** for communicating to and from a communications network **1020**. Although FIG. **2** shows the transmitter sub-system **116** communicating with the receiver sub-system **117** using a direct wireless link for the access signal **108**, this link used by the access signal **108** can be effected over the network **1020** forming a tandem link comprising **108-1020-108'**. The aforementioned communi-

Apple EX1001 Page 19

US 9,665,705 B2

15

cations capability can be used to effect communications between the transmitter sub-system **116** and the receiver sub-system **117** either directly or via the Internet, and other network systems, such as a Local Area Network (LAN) or a Wide Area Network (WAN).

The controller module **107** typically includes at least one processor unit **1005**, and a memory unit **1006**, for example formed from semiconductor random access memory (RAM) and read only memory (ROM). The controller module **107** also includes an number of input/output (I/O) interfaces including an audio-video interface **1007** that couples to the LED display **122** and audio speaker **124**, an I/O interface **1013** for the bio-sensor **121**, and the interface **1008** for communications. The components **1007**, **1008**, **1005**, **1013** and **1006** the controller module **107** typically communicate via an interconnected bus **1004** and in a manner which results in a conventional mode of operation of the controller **107** known to those in the relevant art.

Typically, the application program modules for the transmitter sub-system **116** are resident in the memory **1006** iROM, and are read and controlled in their execution by the processor **1005**. Intermediate storage of the program and any data fetched from the bio sensor **121** and the network **1020** may be accomplished using the RAM in the semiconductor memory **1006**. In some instances, the application program modules may be supplied to the user encoded into the ROM in the memory **1006**. Still further, the software modules can also be loaded into the transmitter sub-system **116** from other computer readable media, say over the network **1020**. The term "computer readable medium" as used herein refers to any storage or transmission medium that participates in providing instructions and/or data to the transmitter sub-system **116** for execution and/or processing. Examples of storage media include floppy disks, magnetic tape, CD-ROM, a hard disk drive, a ROM or integrated circuit, a magneto-optical disk, or a computer readable card such as a PCMCIA card and the like, whether or not such devices are internal or external of the transmitter sub-system **116**. Examples of transmission media include radio or infra-red transmission channels as well as a network connection to another computer or networked device, and the Internet or Intranets including e-mail transmissions and information recorded on Websites and the like.

INDUSTRIAL APPLICABILITY

It is apparent from the above that the arrangements described are applicable to the security industry.

The foregoing describes only some embodiments of the present invention, and modifications and/or changes can be made thereto without departing from the scope and spirit of the invention, the embodiments being illustrative and not restrictive.

The system **100** can also be used to provide authorised access to lighting systems, building control devices, exterior or remote devices such as air compressors and so on. The concept of "secure access" is thus extendible beyond mere access to restricted physical areas.

The invention claimed is:

1. A system for providing secure access to a controlled item, the system comprising:
a memory comprising a database of biometric signatures;
a transmitter sub-system comprising:
    a biometric sensor configured to receive a biometric signal;

16

    a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and
    a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and
a receiver sub-system comprising:
    a receiver sub-system controller configured to:
        receive the transmitted secure access signal; and
        provide conditional access to the controlled item dependent upon said information;
wherein the transmitter sub-system controller is further configured to:
    receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
    map said series into an instruction; and
    populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

2. The system according to claim **1**, wherein the transmitter sub-system controller is further configured to:
provide a signal for directing input of the series of entries of the biometric signal;
incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and
construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item.

3. The system according to claim **1**, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class, the accessibility attribute comprising:
an access attribute if the biometric signal matches a member of the database of biometric signatures;
a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class; and
an alert attribute if the biometric signal does not match a member of the database of biometric signatures.

4. The system according to claim **1**, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system.

5. The system according to claim **1**, wherein said conditional access comprises one of:
provision of access to the controlled item if the accessibility attribute comprises an access attribute:
provision of access to the controlled item and sounding of an alert if the accessibility attribute comprises a duress attribute; and
denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute.

6. The system as claimed in claim **1**, wherein the biometric sensor is further configured to authenticate the identity of a user;
wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and

IPR2022-00602
Apple EX1001 Page 20

US 9,665,705 B2

17

the system further comprising a control panel configured to receive the information and provide the secure access requested.

7. The system according to claim 6, wherein the control panel includes a converter configured to receive the secure wireless signal and output the information, and/or the biometric sensor is configured to authenticate the identity of the user by comparing a biometric input from the user with a biometric signature for the user in a biometric database, and/or the biometric sensor, the biometric database, and the transmitter are located in a remote fob.

8. The system according to claim 7, wherein the secure wireless signal comprises an RF carrier and a rolling code, and the converter converts the rolling code to the Wiegand protocol.

9. The system according to claim 1, wherein:

the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device.

10. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:

a biometric sensor configured to receiving a biometric signal;

a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and

a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute;

wherein the controller is further configured to:

receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;

map said series into an instruction; and

populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising:

populating the database of biometric signatures by:

receiving a series of entries of the biometric signal;

determining at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the database according to the instruction;

receiving the biometric signal;

matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;

emitting a secure access signal conveying information dependent upon said accessibility attribute; and

providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

18

12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises:

receiving a biometric signal; and

enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty.

13. The method according to claim 12, wherein enrolling the biometric signature further comprises receiving another biometric signal to confirm the enrolling of the biometric signal as an administrator signature, and wherein enrolling the biometric signature is dependent upon generation of a feedback signal adapted to direct provision of at least one of the biometric signal and the other biometric signal.

14. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to:

receive a series of entries of a biometric signal;

determine at least one of a number of said entries and a duration of each of said entries;

map said series into an instruction;

populate a database of biometric signatures according to the instruction;

receive the biometric signal;

match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;

emit a secure access signal conveying information dependent upon said accessibility attribute; and

provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

15. A system for providing secure access to a controlled item, the system comprising:

a memory comprising a database of biometric signatures;

a transmitter sub-system comprising:

a biometric sensor capable of receiving a biometric signal;

a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and

a receiver sub-system comprising:

a receiver sub-system controller capable of:

receiving the transmitted secure access signal; and

providing conditional access to the controlled item dependent upon said information;

wherein the transmitter sub-system controller is further capable of:

receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

IPR2022-00602
Apple EX1001 Page 21

US 9,665,705 B2

**19**

16. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:

a biometric sensor capable of receiving a biometric signal;

a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and

a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute;

wherein the controller is further capable of:

receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

17. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of grant-

**20**

ing access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising:

populating the database of biometric signatures by:

receiving a series of entries of the biometric signal;

determining at least one of the number of said entries and a duration of each said entry;

mapping said series into an instruction; and

populating the database according to the instruction;

receiving the biometric signal;

matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;

emitting a secure access signal conveying information dependent upon said accessibility attribute; and

providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

\* \* \* \* \*

IPR2022-00602
Apple EX1001 Page 22

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**February 21, 2024**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

**v.**

**CPC PATENT TECHNOLOGIES PTY, LTD.,**
**Patent Owner.**

**Case:  IPR2022-00601**
**Patent No. 9,269,208 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Appx169**

**Prosecution History ~ IPR2022-00601**

| Date | Document |
| --- | --- |
| 2/23/2022 | Petition for Inter Partes Review |
| 2/23/2022 | Petitioner's Power of Attorney |
| 3/31/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 4/20/2022 | Patent Owner's Power of Attorney |
| 4/20/2022 | Patent Owner's Mandatory Notices |
| 6/30/2022 | Patent Owner's Preliminary Response |
| 6/30/2022 | Patent Owner's Updated Mandatory Notices |
| 8/5/2022 | Petitioner's Reply Brief to Patent Owner's Preliminary Response |
| 8/12/2022 | Patent Owner's Sur-Reply |
| 9/12/2022 | Petitioner's Updated Exhibit List |
| 9/28/2022 | Scheduling Order |
| 9/28/2022 | Decision - Institution of Inter Partes Review |
| 10/31/2022 | Unopposed Motion for Pro Hac Vice Admission - Heemstra |
| 10/31/2022 | Unopposed Motion for Pro Hac Vice Admission - Summerfield |
| 10/31/2022 | Notice of Deposition - Sears |
| 11/3/2022 | Decision - Pro Hac Vice Admission - Summerfield and Heemstra |
| 12/22/2022 | Patent Owner's Response |
| 1/24/2023 | Notice of Deposition - Easttom, III |
| 1/30/2023 | Updated Notice of Deposition - Easttom, III |
| 3/16/2023 | Petitioner's Reply to Patent Owner's Response |
| 4/10/2023 | Notice of Remote Deposition - Sears |
| 4/10/2023 | Joint Stipulation to Modify Due Date 3 |
| 5/18/2023 | Patent Owner's Request for Oral Argument |
| 5/18/2023 | Petitioner's Request for Oral Argument |
| 5/23/2023 | Petitioner's Notice of Supplemental Authority |
| 5/25/2023 | Patent Owner's Sur-Reply |
| 6/14/2023 | Order - Requests for Oral Argument |
| 6/22/2023 | Patent Owner's Updated Exhibit List |
| 6/22/2023 | Petitioner's Updated Exhibit List |
| 9/8/2023 | Oral Hearing Transcript |
| 9/27/2023 | Final Written Decision |
| 10/27/2023 | Patent Owner's Request for Director Review |
| 11/6/2023 | Order - Request for Director Review |

**U.S. DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

February 21, 2023

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

v.

**CPC PATENT TECHNOLOGIES PTY, LTD.,**
**Patent Owner.**

**Case:  IPR2022-00602**
**Patent No. 9,665,705 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

***Certifying Officer***



**Appx171**

**Prosecution History ~ IPR2022-00602**

| Date | Document |
| --- | --- |
| 2/23/2022 | Petition for Inter Partes Review |
| 2/23/2022 | Petitioner's Power of Attorney |
| 3/31/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 4/20/2022 | Patent Owner's Power of Attorney |
| 4/20/2022 | Patent Owner's Mandatory Notices |
| 6/30/2022 | Patent Owner's Preliminary Response |
| 6/30/2022 | Patent Owner's Updated Mandatory Notices |
| 8/5/2022 | Petitioner's Reply Brief to Patent Owner's Preliminary Response |
| 8/12/2022 | Patent Owner's Sur-Reply |
| 9/12/2022 | Petitioner's Updated Exhibit List |
| 9/28/2022 | Scheduling Order |
| 9/28/2022 | Decision - Institution of Inter Partes Review |
| 10/31/2022 | Unopposed Motion for Pro Hac Vice Admission - Heemstra |
| 10/31/2022 | Unopposed Motion for Pro Hac Vice Admission - Summerfield |
| 10/31/2022 | Notice of Deposition - Sears |
| 11/3/2022 | Decision - Pro Hac Vice Admission - Summerfield and Heemstra |
| 12/22/2022 | Patent Owner's Response |
| 1/24/2023 | Notice of Deposition - Easttom, III |
| 1/30/2023 | Updated Notice of Deposition - Easttom, III |
| 3/16/2023 | Petitioner's Reply to Patent Owner's Response |
| 4/10/2023 | Notice of Remote Deposition - Sears |
| 4/10/2023 | Joint Stipulation to Modify Due Date 3 |
| 5/18/2023 | Patent Owner's Request for Oral Argument |
| 5/18/2023 | Petitioner's Request for Oral Argument |
| 5/23/2023 | Petitioner's Notice of Supplemental Authority |
| 5/25/2023 | Patent Owner's Sur-Reply |
| 6/14/2023 | Order - Requests for Oral Argument |
| 6/22/2023 | Patent Owner's Updated Exhibit List |
| 6/22/2023 | Petitioner's Updated Exhibit List |
| 9/8/2023 | Oral Hearing Transcript |
| 9/27/2023 | Final Written Decision |
| 10/4/2023 | Patent Owner's Request for Director Review |
| 11/6/2023 | Order - Request for Director Review |
| 12/5/2023 | Patent Owner's Request for Rehearing |
| 1/8/2024 | Order - Request for Rehearing |

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner

v.

CPC Patent Technologies PTY, LTD.,
Patent Owner

_____

*Inter Partes* Review Case No. IPR2022-00601
U.S. Patent No. 9,269,208

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,269,208**

**Appx173**

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................*1*

II.   SUMMARY OF THE '208 PATENT...................................................*1*

  A.   Description of the Alleged Invention ...............................................1

  B.   Summary of Unpatentability of the Challenged Claims..........................2

  C.   Priority Date of the Challenged Claims ...........................................3

  D.   Level of Skill of a POSITA ...........................................................3

III.  REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104 ........................*4*

  A.   Grounds for Standing Under 37 C.F.R. § 42.104(a) ................................4

  B.   Identification of Challenge Under 37 C.F.R. § 42.104(b) and Relief
Requested ...................................................................................4

  C.   Claim Construction Under 37 C.F.R. § 42.104(b)(3) ..............................5

    1.   Constructions Pursuant to 35 U.S.C. § 112, ¶ 6 ...........................6

    2.   Additional Constructions ....................................................9

IV.   THE CITED REFERENCES ARE ANALOGOUS PRIOR ART .............*10*

V.    MATHIASSEN'S COMPUTER PROGRAM PRODUCT..........................*11*

VI.   GROUND 1: CLAIMS 1, 3-7, 9-11, AND 13 ARE OBVIOUS OVER
MATHIASSEN, MCKEETH, AND ANDERSON.......................................*12*

  A.   Claim 10 ....................................................................................12

    1.   Claim 10(Pre1)...............................................................12

    2.   Claim 10(Pre2)...............................................................14

    3.   Claim 10(Pre3)...............................................................16

    4.   Claim 10(Pre4)...............................................................25

    5.   Claim 10(Pre5)...............................................................26

    6.   Claim 10(a) ...................................................................29

    7.   Claim 10(a1) ..................................................................29

    8.   Claim 10(a2) ..................................................................31

    9.   Claim 10(a3) ..................................................................36

    10.  Claim 10(a4)..................................................................37

    11.  Claim 10(b) ...................................................................40

    12.  Claim 10(c)....................................................................40

    13.  Claim 10(d) ...................................................................47

14.    Claim 10(e)................................................................................48
15.    Claim 10(f) ...............................................................................49

**B.  Claim 11** ....................................................................................**49**

**C.  Claim 13** ....................................................................................**50**

**D.  Claim 1** ......................................................................................**50**
1.    Claim 1(Pre).............................................................................50
2.    Claim 1(a) ................................................................................50
3.    Claim 1(b) ................................................................................50
4.    Claim 1(b1)..............................................................................51
5.    Claim 1(b2)..............................................................................51
6.    Claim 1(b3)..............................................................................52
7.    Claim 1(c) ................................................................................52
8.    Claim 1(c1)..............................................................................52
9.    Claim 1(c2)..............................................................................52
10.    Claim 1(d) ..............................................................................52
11.    Claim 1(d1) ............................................................................54
12.    Claim 1(d2) ............................................................................55
13.    Claim 1(d3) ............................................................................55
14.    Claim 1(e) ..............................................................................56

**E.  Claim 3** ......................................................................................**56**
1.    Claim 3(a) ................................................................................56
2.    Claim 3(b) ................................................................................58
3.    Claim 3(c) ................................................................................59
4.    Claim 3(d) ................................................................................60

**F.  Claim 4** ......................................................................................**60**

**G.  Claim 5** ......................................................................................**60**

**H.  Claim 6** ......................................................................................**60**
1.    Claim 6(a) ................................................................................60
2.    Claim 6(b) ................................................................................61
3.    Claim 6(c) ................................................................................61

**I.   Claim 7** ......................................................................................**62**

**J.  Claim 9** ......................................................................................**62**
1.    Claim 9(Pre).............................................................................62
2.    Claim 9(a) ................................................................................62
3.    Claim 9(b) ................................................................................62
4.    Claim 9(c) ................................................................................62

5.  Claim 9(d) ...........................................................................................63
6.  Claim 9(d1) .........................................................................................63
7.  Claim 9(d2) .........................................................................................63
8.  Claim 9(d3) .........................................................................................63
9.  Claim 9(e) ...........................................................................................63

VII.  **DISCRETIONARY CONSIDERATIONS** ...............................................**63**

A.  **The *Fintiv* Factors Favor Institution** ..............................................**63**
1.  Stay .....................................................................................................63
2.  Proximity of the Court's Trial Date ...................................................64
3.  Investment in Parallel Proceeding .....................................................67
4.  Overlap ...............................................................................................67
5.  Same Party ..........................................................................................68
6.  Other Circumstances ..........................................................................68

B.  **The *Fintiv* Framework Should Be Overturned** ..............................**69**
1.  The Fintiv Framework Exceeds the Director's Authority ....................69
2.  The Fintiv Framework Is Arbitrary and Capricious ...........................69
3.  The Fintiv Framework Was Impermissibly Adopted Without Notice-and-Comment Rulemaking ..................................................................................70

VIII.  **CONCLUSION** ...........................................................................................**70**

IX.  **MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(a)(1)** ......................**72**

A.  **Real Party-In-Interest** .......................................................................**72**

B.  **Related Matters** ..................................................................................**72**

C.  **Lead and Back-Up Counsel** ..............................................................**72**

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) . passim

*Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 (PTAB May 15, 2020) ................................................................................68

*DISH Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 (PTAB Feb. 4, 2021) ...............................................................................65

*Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) . 70

*In re Apple Inc.*, No 20-135, slip op. (Fed. Cir. Nov. 9, 2020) ...............................65

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)................................................................71

*NHK Spring Co., Ltd., v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018)................................................................64, 70

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) .............................70

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)........................5

*Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007) ........................................70

*Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 (PTAB Jun. 16, 2020)................................................64

*Shenzhen Carku Tech. Co., Ltd. v. The Noco Co.*, IPR2020-00944, Paper 20 (PTAB Nov. 12, 2020).................................................................64

**Statutes**

35 U.S.C. § 112 ..........................................................................................6
35 U.S.C. § 314 ..........................................................................................63
35 U.S.C. § 316 ....................................................................................65, 70

**Regulations**

37 C.F.R. § 42.100........................................................................................5
37 C.F.R. § 42.104....................................................................................4, 5
37 C.F.R. § 42.105......................................................................................83
37 C.F.R. § 42.24........................................................................................82
37 C.F.R. § 42.6..........................................................................................83
37 C.F.R. § 42.8....................................................................................72, 82

## I.    INTRODUCTION

Petitioner Apple Inc. ("Petitioner") requests *Inter Partes* Review ("IPR") of Claims 1, 3-7, 9-11, and 13 (collectively, the "Challenged Claims") of U.S. Patent No. 9,269,208 ("the '208 Patent"). The purportedly distinguishing features of the Challenged Claims were (1) emitting a "secure" access signal in a secure access system; and (2) enrolling a new user's fingerprint by providing control information via a sequence of presses of certain amount and duration. Both features were well-known before the '208 Patent, rendering the Challenged Claims obvious. IPR of the Challenged Claims should thus be instituted.

## II.    SUMMARY OF THE '208 PATENT

### A.    Description of the Alleged Invention

The '208 Patent describes a secure access system. At a transmitter subsystem, a sensor receives a fingerprint, matched against a stored fingerprint, and an accessibility attribute is outputted. A secure access signal carrying information corresponding to the accessibility attribute is transmitted to a receiver subsystem providing access to a controlled item. *'208 Patent*, Abstract, 5:53–6:16, 6:62-65, 8:15-28, FIG. 2.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208



Fig. 2

The sensor may receive a series of fingerprint presses of certain duration that are compared to stored control signals. *'208 Patent*, 10:45-67.

## B.    Summary of Unpatentability of the Challenged Claims

Access systems using biometrics to send a "secure access signal" were well-known. *Mathiassen* teaches a secure access system unlocking car doors, where a portable control emits an encrypted, single-use command. *Mathiassen's* portable control includes a fingerprint sensor for authenticating to lock/unlock car doors. *Mathiassen* also teaches a user-input series of fingerprint representations instructing various commands. Upon matching a live fingerprint against a stored fingerprint, car door locks are opened.

*Mathiassen* does not teach more than two types of access. *McKeeth* teaches providing different types of access when a user is under duress or unauthorized.

2

Although *Mathiassen* teaches inputting a command via a series of fingerprint representations, *Mathiassen* does not teach determining a duration of each entry. *Anderson* teaches inputting an access code including fingerprint presses of varying duration.

Modifying *Mathiassen's* portable control to provide duress and alert access in addition to the taught grant access and further modifying *Mathiassen* to determine a *duration* of the taught series of entries would have been obvious to a POSITA.

### C.    Priority Date of the Challenged Claims

The '208 Patent was filed August 10, 2012, as U.S. Patent Application 13/572,166 ("'166 Application"). The '208 Patent claims priority to AU2003904317, filed August 13, 2003. *'208 Patent,* (30).

For this IPR *only*, Apple applies August 13, 2003 as the priority date for the Challenged Claims.

### D.    Level of Skill of a POSITA

A POSITA at the time of the '208 Patent (August 13, 2003) would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year experience in the field of human-machine interfaces and device access security. Additional education or experience may substitute for the above requirements. *Dec.,* 35-38.[1]

---

[1] All citations to "*Dec.*" are to Ex. 1003, Declaration of Dr. Andrew Sears.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## III.   REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

### A.   Grounds for Standing Under 37 C.F.R. § 42.104(a)

Apple certifies the '208 Patent is available for IPR and Apple is not barred or estopped from requesting IPR challenging the '208 Patent. Apple is not the owner of the '208 Patent, has not filed a civil action challenging the validity of any claim of the '208 Patent, and this Petition is filed less than one year after Apple was served with a complaint alleging infringement of the '208 Patent.

### B.   Identification of Challenge Under 37 C.F.R. § 42.104(b) and Relief Requested

In view of this Petition, the Challenged Claims of the '208 Patent are unpatentable and institution should be granted. 37 C.F.R. § 42.104(b)(1); 37 C.F.R. § 42.104(b)(2).

| Proposed Grounds of Unpatentability |
| --- |
| **Ground 1:** Claims 1, 3-7, 9-11, and 13 are **obvious** under § 103(a) over *Mathiassen* (Ex. 1004) in view of *McKeeth* (Ex. 1005) and *Anderson* (Ex. 1006) |

Sections V-VI identify where each element of the Challenged Claims is found in the prior art. 37 C.F.R. § 42.104(b)(4). The exhibit numbers of evidence relied upon to support the challenges are provided above and the relevance of evidence to the challenges raised is provided in Section IV. 37 C.F.R. § 42.104(b)(5). Exhibits 1001-1080 are attached.

4

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## C.    Claim Construction Under 37 C.F.R. § 42.104(b)(3)

Claims are interpreted under the same standard applied by Article III courts (the *Phillips* standard). 37 C.F.R. § 42.100(b); 83 Fed. Reg. 197 (Oct. 11, 2018); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). With the exceptions discussed below, Petitioner applies the plain and ordinary meaning of all claim terms. Petitioner does not waive any argument in any litigation that claim terms in the '208 Patent are indefinite or additional terms need construction.

In the related district court litigation involving Apple, a *Markman* Order was entered February 10, 2022. (Ex. 1077). Previously, the Parties agreed to certain constructions in a Joint Claim Construction Statement (JCCS). (Ex. 1074). In a communication from the District Court to the Parties on February 10, 2022, the Court ordered CPC to narrow its asserted claims and for the Parties to meet and confer on claim terms not addressed in the Claim Construction Order. (Ex. 1078). CPC sent an email to the Court on February 14, 2022 (Ex. 1079), agreeing to Apple's proposed construction for two means-plus-function terms and further narrowing its asserted claims to thereby remove the claims having remaining means-plus-function terms that were not construed. Additionally, another district court litigation involving defendant HMD resulted in a *Markman* Order. (Ex. 1080).

For purposes of this IPR, Apple applies (1) the constructions from the *Markman* Order for the *Apple* case, where applicable; (2) the Parties' agreed-upon

5

**Appx182**

constructions, where applicable; and (3) CPC's constructions, where there is no construction from the Court nor did the Parties agree to a construction. The below chart indicates whether the constructions was from the Court, agreed to by the Parties, or CPC's construction.

Regarding CPC's constructions from the *Apple* litigation, CPC served Initial Constructions (Ex. 1072) on October 27, 2021, and updated constructions (Ex. 1073) on November 3, 2021. The Parties served the JCCS (Ex. 1074) on January 12, 2022.

### 1.    *Constructions Pursuant to 35 U.S.C. § 112, ¶ 6*

Certain Challenged Claims include limitations in means-plus-function format, creating a rebuttable presumption CPC intended to invoke § 112(6).

| Claim Term | Support | Structure and Function |
|---|---|---|
| Claims 1,9: "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"<br><br>**Court Construction, Ex. 1077** | '208 Patent, 4:8-13, 15-17, 40-45, 47-49, 5:50-67, 6:56-7:2, 7:65-8:10, 8:67-9:5, 14:10-42, Fig. 2, items 103, 105, Fig. 3, item 202, (Ex. 1077, 4) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute |
| Claim 10: "means for emitting a secure access signal capable of granting more than two | '208 Patent, 4:8-13, 18-22, 40-45, 50-54, 8:17-28, 10:24-44 (Ex. 1073, 7) | Structure: computer program product having a computer readable medium having a |

| | | |
|---|---|---|
| types of access to the controlled item"<br><br>**CPC Construction, Ex. 1073** | | computer program recorded therein, with code for<br><br>Function: emitting a secure access signal capable of granting more than two types of access to the controlled item |
| Claims 1,9: "means for emitting a secure access signal conveying said information dependent upon said accessibility attribute"<br><br>**CPC Construction, Ex. 1073** | *'208 Patent*, 4:8-13, 4:18-22, 4:40-45, 4:50-54, 5:65-6:6, 6:28-55, 8:19-35, 14:16-20 (Ex. 1073, 4). | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: emitting a secure access signal conveying said information dependent upon said accessibility attribute |
| Claims 1,10: "means for receiving the transmitted secure access signal"<br><br>**Agreed-Upon Construction, Ex. 1079** | *'208 Patent,* 6:16-19, FIGs. 2, 4, 10 (Ex. 1079)<br><br>* Note the Parties' communications in the district court correspondence did not identify specification support | Structure: receiver 118<br><br>Function: receiving the transmitted secure access signal |
| Claims 1,10: "means for providing conditional access to the controlled item dependent upon [said] information [in said secure access signal]" | *'208 Patent,* 8:65-9:15, 8:17-35, 11:27-12:38, FIGs. 2, 4, 7, 10 (Ex. 1079)<br><br>* Note the Parties' communications in the district court | Structure: controller 109 executing software 304<br><br>Function: providing conditional access to the controlled item dependent upon |

| Agreed-Upon Construction, Ex. 1079 | correspondence did not identify specification support | information in said secure access signal |
|---|---|---|
| Claims 1,9: "means for receiving a series of entries of the biometric signal"<br><br>**CPC Construction, Ex. 1079** | *'208 Patent,* 4:8-14, 4:25-34, 4:40-46, 5:53-59, 7:66-8:6, 10:45-63, 12:55-59 (Ex. 1073, 4-5) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: receiving a series of entries of the biometric signal |
| Claims 1,9: "means for mapping said series into an instruction"<br><br>**Court Construction, Ex. 1077** | *'208 Patent,* 4:25-31, 4:37, 5:50-6:27, 10:45-11:2, 12:55-59, 12:67-13:3, Fig. 2, items 103, 107, 121 (Ex. 1077, 3) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: mapping said series into an instruction |
| Claims 1,9: "means for populating the database according to the instruction"<br><br>**Court Construction, Ex. 1077** | *'208 Patent*, 4:25-31, 4:38-39, 10:57-11:2, 12:43-45, 13:9-11, 13:15-19 (Ex. 1077, 3) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: populating the database according to the instruction |
| Claims 1,9: "means for populating the data base of biometric signatures" | *'208 Patent*, 4:25-31, 4:38-39, 10:32-34, 10:57-11:2, 12:43-45, 13:9-11, 13:15-19 (Ex. 1077, 3-4) | Structure: database and computer program product having a computer readable |

8
**Appx185**

| | | |
|---|---|---|
| **Court Construction, Ex. 1077** | | medium having a computer program recorded therein, with code for<br><br>Function: populating the data base of biometric signatures |

## *2.    Additional Constructions*

For certain non means-plus-function terms, Apple applies the constructions agreed to by the Parties that are not otherwise plain and ordinary or a construction provided by the Court.

| *Claim Term* | *Construction* |
|---|---|
| Claims 1-2,9-11: "database"<br><br>**Agreed-Upon Construction, Ex. 1079** | "Organized structure of data" (Ex. 1074, 3) |
| Claims 1,10: "conditional access"<br><br>**Agreed-Upon Construction, Ex. 1079** | "Access based on accessibility attribute" (Ex. 1074, 3), |
| Claims 1,2,9,10: "biometric signal"<br><br>**Agreed-Upon Construction, Ex. 1079** | "Physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" (Ex. 1074, 3), |
| Claims 1,9,10: "accessibility attribute"<br><br>**Court Construction, Ex. 1077** | "attribute that establishes whether and under which conditions access to the controlled item should be granted" (Ex. 1077, 2-3) |

9
**Appx186**

## IV.    THE CITED REFERENCES ARE ANALOGOUS PRIOR ART

*Mathiassen*, a U.S. patent application filed December 18, 2002, and published June 24, 2004, qualifies as prior art under § 102(e). *Mathiassen* teaches a secure access system transmitting wireless signals providing access to a controlled item. *Mathiassen,* [0175-186]. *Mathiassen* teaches enrolling an administrator's biometric and inputting a series of fingerprint representations instructing a command. *Mathiassen*, [0162-0165], [0192]. Because *Mathiassen,* like the '208 Patent, discloses a system providing secure access to a controlled item, *Mathiassen* is in the same field of endeavor and is pertinent to the '208 Patent's problem to solve. *Dec.,* 84-91. *Mathiassen* is analogous art.

*McKeeth,* a U.S. patent filed February 23, 2000, and issued July 20, 2004, qualifies as prior art to the '208 Patent under § 102(e). *McKeeth* teaches a computer system granting access and issuing an alert when a user is under duress or denying access when a user is unauthorized. *McKeeth,* 4:28-35, 5:48-53. Because *McKeeth*, like the '208 Patent, discloses a system for providing or denying access, *McKeeth* is in the same field of endeavor and is pertinent to the '208 Patent's problem to solve. *Dec.,* 92-96. *McKeeth* is analogous art.

*Anderson*, a U.S. patent filed September 1, 1999, and issued January 21, 2003, qualifies as prior art to the '208 Patent under § 102(e). *Anderson* teaches inputting a fingerprint code to a touch interface via "temporal variations." *Anderson*, 7:1-39.

Because *Anderson,* like the '208 Patent, discloses providing a series of biometric entries authenticating a user and enabling a function, *Anderson* is in the same field of endeavor and is pertinent to the '208 Patent's problem to solve. *Dec.,* 97-103. *Anderson* is analogous art.

## V.　*MATHIASSEN'S* COMPUTER PROGRAM PRODUCT

The Court and CPC construe the structure of means-plus-function terms as a "computer program product having a computer readable medium having a computer program recorded therein, comprising code," with some terms including additional database structure. *See* Section III.C.1. *Mathiassen* teaches an integrated circuit (IC) as the "core device" of the secure access system that includes a non-volatile memory 7/7A containing "program code, e.g., administrative software." *Mathiassen,* [0048, 0050]. This administrative software includes algorithms for providing secure access, such as a matching and SKG algorithm. *Mathiassen,* [0050, 0072, 0076]. Movement analyzing and translation software are additionally described as providing secure access. *Mathiassen,* [0192]. A POSITA would have understood or found it obvious these software products are stored in non-volatile memory of IC 1, which already stores other program code (i.e., administrative software). *Dec.* 32.

Non-volatile memory is a well-known "computer readable medium." *See Mathiassen, Claim 13. Mathiassen* describes software as "program code" [0050] containing algorithms. *Mathiassen,* [0072, 0076]. A POSITA would have

understood *Mathiassen's* software stored in non-volatile memory teaches or renders obvious a "computer program product having a computer readable medium having a computer program recorded therein, comprising code." *Dec.* 33.

Apple applies this Section V discussion for each claimed "means for" and corresponding "computer program product" structure to avoid repetitive mapping.

## VI.    GROUND 1: CLAIMS 1, 3-7, 9-11, AND 13 ARE OBVIOUS OVER *MATHIASSEN*, *MCKEETH*, AND *ANDERSON*

Claim 10 is mapped first because it recites "*more than two* types of access."

### A.    Claim 10[2]

#### 1.    *Claim 10(Pre1)*

To the extent the preamble is limiting, *Mathiassen* teaches a method for providing secure access to a controlled item. *Mathiassen*, [0018]; *Dec.,* 111-112. *Mathiassen* teaches a "portable access device…for allowing only authorized users access to an access-limited apparatus, device, network or system…." *Mathiassen*, [0016], Abstract. *Mathiassen* discloses access-limited apparatus ("controlled items") including a USB interface ([0054]), hotel safe ([0119]), medicine cabinet ([0122-0123]), and portable control 20 for unlocking a car ([0145-0147]). *Mathiassen* teaches "a method of providing **secured access control** and user input in stand-alone appliances…."[3] *Mathiassen*, Abstract; *Dec.,* 111-112.

---

[2] A Listing of the Claims is provided in the Claims Appendix.

[3] All emphases added unless otherwise noted.

*Mathiassen* teaches a "system" implementing this "method of providing secured access control." *Mathiassen*, Abstract. Integrated circuit (IC) 1 couples with a "biometric sensor" for performing secure access control. *Mathiassen*, [0048-0050], FIGs. 2A-2B; *Dec.,* 113 (opining the IC is used for the portable control 20 of *Mathiassen*, [0147]). The IC includes components, such as processor 2 and non-volatile memory 7,7A,7E, and function blocks, such as pre-processing block 5C for processing the biometric and encryption blocks 8,8B,8C. *Id.* In some embodiments, the IC is coupled with a network [0053], while in other embodiments IC is used in "stand-alone applications," such as "within a car" [0108].

In stand-alone applications, such as portable control 20, *Mathiassen's* "system" includes fingerprint sensor 5 and transceiver 27 (both housed in unit 20), and ignition control 15 (including IC 1), a central car computer, door locks, and transceivers of the central car computer and door locks (each of which resides in the car). *Mathiassen*, [0167-0168], [0186-0188]. Portable control 20 connects to the ignition control via the central computer's transceiver:

13



Figure 8

*Mathiassen*, Fig. 8, [0147], [0149], [0186]; *Dec.*, 114-115.

Claim 10's mapping relies on *Mathiassen's* portable control 20 embodiment, where the "controlled item" is *Mathiassen*'s door locks in the "central locking system." The portable control remotely controls door locks. *Mathiassen*, [0145]; *Dec.*, 116. *Mathiassen's* IC ([0048-0050]) is used in each embodiment, including the car door lock embodiment, where it resides in the portable door control. *Dec.*, 116 (*citing Mathiassen*, [0146], FIG. 2B). An internal motivation to combine other embodiment details with the car door embodiment is provided below.

### 2.    *Claim 10(Pre2)*

Under the agreed claim construction, "database" is an "organized structure of data." (Ex. 1074, 3). To the extent the preamble is limiting, *Mathiassen* teaches a

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

"database," namely the master minutiae tables of fingerprint representations stored

in non-volatile memory 7,7A of the portable control's IC:



*Mathiassen,* Fig. 2B, [0050], [0147].

The IC generates minutiae by reducing images captured when a user places

finger(s) on the fingerprint sensor. *Mathiassen,* [0162-0164], [0190]. A POSITA

would have understood master minutiae tables contain biometric signatures of car

users. *Dec.,* 117-120. Master minutiae tables are fingerprint representations taken

from "raw images" of the fingerprint applied to the sensor. *Mathiassen*, [0049-

0050]; *Dec.,* 117-118. The "fingerprint representations" are stored as "minutiae" in

non-volatile memory 7,7A,7E. *Mathiassen*, [0050]. Because the master minutiae tables represent the user's fingerprint(s), and because fingerprints provide "secure identification by biometrics," *Mathiassen's* master minutiae tables comprise biometric signatures. *Mathiassen*, [0005]; *Dec.,* 118-120.

*Mathiassen's* master minutiae tables stored in memory 7,7A is a "database" of biometric signatures because a POSITA would have understood tables form an "organized structure of data." *Dec.,* 121.

### 3.    *Claim 10(Pre3)*

#### a)    **"transmitter subsystem"**

To the extent the preamble is limiting, *Mathiassen* teaches a transmitter subsystem, namely transceiver 27, fingerprint sensor 5, processor 2 (of IC 1) executing administrative code, and non-volatile memory 7,7A (of IC), each housed in portable control 20:





*Mathiassen*, FIGs. 8, 2B (illustrating IC containing processor), [0147-0149]. The processor 2 executes "program code, e.g., administrative code" stored in non-volatile memory to control operation of the portable door control 20. *Mathiassen*, [0050] (describing administrative software is "run on the central processor (2)"); *Dec.* 124.

The collective transceiver 27, fingerprint sensor 5, processor 2 executing code, and memory 7,7A is a "transmitter subsystem" because the components transmit a signal to a receiver subsystem. Transceiver 27 transmits a command issued by processor 2, such as "open door." *Mathiassen*, [0185-0188]; *Dec.,* 122-125.

### b)     **"biometric sensor for receiving a biometric signal"**

Under the agreed construction, "a physical attribute of a user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" is a "biometric signal."

*Mathiassen's* "fingerprint sensor 5" satisfies a "biometric sensor for receiving a biometric signal" because it detects a finger on the sensor and processes raw images of fingerprints. *Mathiassen*, [0049]; *Dec.,* 126-127. "[C]aptured raw images from the sensor" ([0049]) and/or processed "intermediate fingerprint data" ([0050]) are "biometric signals" because each indicates a fingerprint received by the fingerprint sensor. *Dec.,* 127.

### c)　"means for emitting a secure access signal…"

*Mathiassen* teaches administrative code stored in non-volatile memory for sending a rolling code (i.e., a "secure access signal"), applying CPC's construction.[4] *Dec.,* 131.

The '208 Patent describes rolling codes use a different code each time the access signal is transmitted, with such "achieved by encrypting the data from the

---

[4] Claims 1, 9-10 recite "means for emitting a secure access signal." The specification portions CPC identified for Claim 10 (Ex. 1073, 7) do not refer to the '208 Patent's discussion of what makes the access signal "secure," whereas CPC's identified specification portions for Claims 1, 9 (Ex. 1073, 4) do refer to relevant sections of the '208 Patent (e.g., 5:65-6:6, 6:28-55). Apple's Claim 10 mapping refers to the "secure" access signal discussions CPC identified for Claims 1, 9 to establish the signal is "secure."

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

controller…." *'208 Patent,* 6:42-55; *Dec.,* 128-129. "[S]uccessive transmissions" are modified using a code/look-up table known to both transmitter and receiver sub-systems, "resulting in a non-repeatable data transfer…." *Id.* A "secure access signal" encompasses a non-repeatable, non-replayable, encrypted code allowing single-use transmission. *Dec.,* 128-130.

*Mathiassen* teaches "means for emitting" via administrative code executed by processor 2 of IC 1 and directing operation of transceiver 27 to issue an open door command, all mapped within the "transmitter sub-system." *Dec.* 131.



*Mathiassen,* Fig. 2B, [0050]; *Dec.,* 131.

*Mathiassen* teaches the processor and transceiver collectively emit an encrypted "secure access signal," such as an "open door" command, usable for a single transaction. *Mathiassen*, [0182-0188], [0050]; *Dec.,* 132-137 (opining *Mathiassen's* "command" is a "signal"). *Mathiassen's* IC feeds a seed to SKG block 8A upon matching access minutiae (live fingerprint representations) to stored master minutiae. *Mathiassen*, [0050], [0182-0184]; *Dec.,* 133. The SKG block 8A generates a temporary password/key based on the unique seed. *Mathiassen*, [0050], [0183-0185]. A POSITA would have understood *Mathiassen's* administrative software contains code for generating and emitting the secure access signal. *Mathiassen* teaching the administrative software "calculate[s] a secure key" would have indicated that the SKG algorithm for generating the secure access signal is "embedded" in the administrative software. *Mathiassen,* [0050], [0076], *Dec.* 133. The IC processor then encrypts a command, such as "open door," with the temporary password/key. *Mathiassen,* [0183-0185]. Transceiver 27 wirelessly transmits the encrypted command to a transceiver at the central car computer. *Mathiassen*, [0186-0188]; *Dec.,* 133. The central car computer or ignition control's resident IC fetches the seed to generate the same temporary password for decrypting the received command. If a valid and authenticated command was sent, a command to open the car door locks is sent from the central car computer's transceiver to the door locks. *Mathiassen*, [0187-0188]; *Dec.,* 134-136.

*Mathiassen's* pseudo-random, identical password generated by the SKG algorithm to encrypt and decrypt the "open door" command renders the command non-repeatable and non-replayable. *Dec.,* 137-138. *Mathiassen* discloses the SKG algorithm is run on a processor within both the portable IC (transmitter subsystem) and the central car computer (within the receiver subsystem, *see* Claim 10(Pre4)), such that the transmitter IC and receiver IC generate the same key/password via an identical seed. *Mathiassen*, [0050], [0187-0188]. "The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that…**alternatively changes for each transaction**." *Mathiassen*, [0050].

Because *Mathiassen* teaches (1) administrative code containing the SKG algorithm generates and emits the secure access signal; and (2) the key used to encrypt the command changes for each transaction and is thus non-repeatable and non-replayable, *Mathiassen* teaches means for emitting a secure access signal. *Dec.,* 137-138.

> d)     **"capable of providing more than two types of access to the controlled item"**

CPC's construction support describes providing three types of access, namely unconditional administrator access, and duress access, and alert access. Section III.C.1. Similarly, *Mathiassen's* secure access signal may provide a first type of "access," namely unconditionally opening door locks. *McKeeth* teaches two additional types of access: a *duress access* where a silent alarm is generated and an

*alert access* where an audible alarm is generated. It would have been obvious to modify *Mathiassen's* portable control to include duress and alert access taught by *McKeeth*. *Dec.,* 139, 151-168.

*Mathiassen* teaches opening the car door locks via an open door command. A POSITA would have understood opening door locks provides a type of access in which a user is granted access to the car door locks via the car's "central locking system." *Mathiassen*, [0145]; *Dec.,* 140-142, 145-147. (comparing *'208 Patent*, 7:21-36, discussing granting access responsive to a fingerprint provided at a portable fob and 6:14-16, discussing the controlled item can be a "door locking mechanism"). A POSITA would have understood this access is without conditions (i.e., "unconditional") because the car owner is enrolled as the "system administrator of the biometrics system in the car." *Mathiassen,* [0162-0163]; *Dec.,* 146-147.

*Mathiassen* also teaches enrolling other user fingerprints corresponding to distinct commands. *Mathiassen*, [0164], [0192]. As noted below for the motivation to combine *Mathiassen* and *McKeeth*, *Mathiassen* teaches hardware and software for receiving fingerprint inputs instructing various commands. *Dec.,* 165-166.

In related art, *McKeeth* teaches two other access types. *McKeeth* teaches providing access and issuing a "silent security alarm" when the authentication input indicates "the user is experiencing **duress** or force." *McKeeth,* 4:10-14, 29-34. A POSITA would have understood that granting access to the door locks and issuing a

security alarm, as taught by *McKeeth*, when the user is under duress is a type of access. *Dec.,* 143, 148.

*McKeeth* also teaches the system may "lock up" and "generate a security alert to the responsible authorities," indicating to a POSITA access is denied. *McKeeth,* 5:51-53; *Dec.,* 149. A POSITA would have understood that "locking up" or otherwise denying access is a type of access preventing non-authorized use of the car door locks. *Dec.,* 144, 149-150 (explaining *'208 Patent,* 8:23-25, describing an "alert attribute" <u>not</u> providing access).

### e)      Motivation to Combine *Mathiassen* and *McKeeth*

*Mathiassen* teaches the "means for emitting a secure access signal" (administrative code executed by processor of portable control 20) emitting at least one secure access signal unconditionally unlocking car doors. It would have been obvious to modify the control's administrative software to grant more than two access types (i.e., issuing other commands for providing different access types).

A POSITA would have been motivated and found it obvious to modify *Mathiassen's* system to grant access and issue a silent alarm when a user was under duress and deny access and alert authorities of the access attempt, as taught by *McKeeth*, in addition to unlocking a car door lock unconditionally, as taught by *Mathiassen. Dec.,* 151-168. *Mathiassen's* control 20 increases car owner security by requiring biometric authorization prior to unlocking car doors, indicating to a

POSITA increased safety was an intended goal of the system. *Mathiassen,* [0145]; *Dec.,* 153. *Mathiassen* discusses preventing "theft or non-authorized use of the car," stating that "[t]he automotive industry is emphasizing secure access by blocking non-authorized users access to the car." *Id.*

A POSITA would have been motivated to include duress and alert access to increase security and block non-authorized use. *Dec.,* 153-163. Providing access in car control systems for users in duress situations was well-known in the prior art. *Dec.,* 154-159. Allowing car access during duress while sending an alert dissuades an assailant from immediately harming the car owner. *Dec.,* 154-157.

*Mathiassen* teaches denying unauthorized access to a vehicle is a "key issue." *Mathiassen,* [0145]; *Dec.,* 160. A POSITA would have found it obvious and been motivated when denying access to additionally alert security personnel, as taught by *McKeeth*. *Dec.,* 160-163. A POSITA would have appreciated when a carjacker found a stolen/lost portable door control, the car owner would have wanted authorities to be notified swiftly. *Id.* Vehicle security systems denying access by locking car doors and concurrently alerting security personnel were well-known. *Dec.*, 162-163.

There would have been a reasonable expectation of success in modifying *Mathiassen* to include *McKeeth's* duress access and denial of access. *Dec.,* 164-168. *Mathiassen* contemplates the portable control sending other types of commands by

enrolling other user fingers, mapping omni-directional finger movements to commands in a "command table," indicating multiple accesses were technically feasible. *Dec.,* 165-166; *Mathiassen*, [0164], [0192]. These finger movements are mapped to certain commands via a "software translation program." *Mathiassen,* [0192]. The proposed modification requires simple programming techniques within a POSITA's expertise. *Dec.,* 165-166. The fingerprint sensor in control 20 would receive the user's indication of unconditionally unlocking the doors, or, as taught by *McKeeth*, providing access when a user was under duress or denying access and issuing a security alert. *Dec.,* 167-168.

### 4.    *Claim 10(Pre4)*

The construed "means for receiving" includes at least a receiver. Section III.C.1; *Dec.,* 174. *Mathiassen* teaches a receiver sub-system comprising the ignition control 15, central car computer, and "transceivers of the door locks and the central car computer." *Mathiassen,* [0186-0187]. The central car computer includes a transceiver receiving the signal (e.g., "open door" command) from portable control 20. *Dec.,* 169-171; *Mathiassen*, [0149], [0167], [0186]. Both the door locks and central car computer include a transceiver. *Mathiassen*, [0186]; *Dec.,* 170-172. A "transceiver" is well understood by a POSITA to include a receiver. *Dec.,* 173. The signal received by the car computer's transceiver is sent either to the ignition control 15's processor or the car computer's processor for decryption. *Mathiassen,* [0187-

0188]. After decrypting the command, a "similar encrypted command will be relayed to the door locks by the car computer," i.e., part of the mapped "receiver sub-system." *Mathiassen*, [0187]; *Dec.,* 170.

*Mathiassen*'s disclosed receiver sub-system includes or renders obvious a "means for receiving," namely the transceiver of the central car computer. This transceiver performs the function of "receiving the secure access signal," (e.g., "open door" command) transmitted from the transceiver 27 of portable control 20, as mapped for Claim 10(Pre3). *Dec.,* 170-171, 174; *Mathiassen*, [0186].

### 5.    *Claim 10(Pre5)*

Under the agreed construction, "conditional access" is "access based on accessibility attributes." Section III.C.2. The agreed structure for "means for providing" includes at least a controller executing software 304, where Step 304 includes "the controller 109 send[ing] the control signal 110 to the controlled item 111 (for example opening the secured door)." Section III.C.1; *'208 Patent*, 9:6-8; *Dec.*, 176. The '208 Patent uses the terms "processor" and "controller" interchangeably. *Compare '208 Patent*, 6:2 (describing "controller 107"), *with* 14:16-20 (describing "processor modules 107"), 14:55-58. A POSITA would have understood controllers 107,109 are functionally equivalent to a processor(s). *Dec.,* 176. Thus, *Mathiassen's* processor of the ignition control, central car computer, or both, individually or collectively, comprise the "controller" structure. *Dec.* 176-183.

*Mathiassen* teaches two implementations: a first in which the ignition control decrypts and authenticates the received command, and a second in which the central car computer decrypts and authenticates the command. *Dec.,* 177-183. Both implementations include the "means for," namely processor executing administrative code stored in non-volatile memory 7,7A for providing access to the controlled item. *Dec.,* 177-184, 190; Section VI.A.14 (Claim 10(e) mapping "conditional access" based on "accessibility attributes").

When the ignition control performs decryption and authentication, *Mathiassen* teaches processor 2 of IC 1 performs the decryption by executing the SKG algorithm comprised in administrative code and, if the decrypted message is valid and authenticated, the central car computer relays an encrypted command to the door locks. *Mathiassen*, [0187]; *Dec.,* 178-179; Section VI.A.3.c. A POSITA would have understood the ignition control's processor 2 executing administrative code provides access to the car door locks, or alternatively, the processors of the ignition control and central car computer collectively provide access to the car door locks. *Dec.,* 178-180.

In the second implementation, the central car computer's processor executes administrative code to provide access to the controlled item, as the car computer processor performs the decryption/authentication. *Mathiassen*, [0188]; *Dec.,* 181-183.

27
**Appx204**

Because *Mathiassen's* commands specifically instruct a function (open vs. lock door locks), the command ("secure access signal") includes information specific to the instructed function. *Dec.,* 186-189. This information grants access based on an accessibility attribute, e.g., the administrative user having full access rights to open the car doors. *Mathiassen*, [0167], [0182], [0185]; *Dec.,* 184, 190; Section VI.A.14.

Additionally or alternatively, *Mathiassen* in view of *McKeeth* also teaches "means for providing conditional access" via *Mathiassen's* modified administrative code generating duress and alert commands, in addition to the "open door" command. *Dec.*, 185. In the modified *Mathiassen*, the instructed command from the user (e.g., a car owner/administrator) is responsive to a biometric signal inputted by the user specific to instruct the command (as taught by *Mathiassen,* [0192]). For example, and as discussed for Claims 10(c)-(e), in the modified *Mathiassen*, the instructed command grants duress access responsive to the user's biometric signature (e.g., a specific series of finger movements taught by *Mathiassen*, [0192]). Because the instructed command grants duress access, the command provides conditional access, i.e., access based on an accessibility attribute. *Dec.,* 185, 190, 262. The access is dependent on information in the secure access signal because the command instructs providing access and sounding an alert (as taught by *McKeeth* and discussed further for Claims 10(c)-(e)).

### 6.    Claim 10(a)

*Mathiassen* teaches "providing secured access control" begins with enrolling an administrator (e.g., car owner). *Mathiassen*, Abstract, [0162-0167]; *Dec.,* 191-192. The car owner (e.g., administrator) enrolls their fingerprint by storing fingerprint images as master minutiae tables in the portable control's IC memory 7,7A. *Mathiassen*, [0163-0165]. After the tables are encrypted, the owner may enroll other users. *Mathiassen*, [0173-0174], [0190].

*Mathiassen* thus teaches populating the database of biometric signatures for "one or more" fingers for at least one car user. *Mathiassen*, [0164]. As discussed for Claim 10(Pre2), each table includes information for a user's fingerprint, and one or more master minutiae tables is a *database* of biometric signatures stored in memory 7,7A. *Dec.,* 192; *Claim 10(Pre2)*.

### 7.    Claim 10(a1)

*Mathiassen* teaches or renders obvious Claim 10(a1). *Mathiassen* teaches fingerprint sensor 5 receiving a fingerprint "biometric signal" entry, as discussed for Claim 10(Pre3), subsection "a."

*Mathiassen* also teaches the portable control receiving "a series of entries." *Dec.,* 193-197. *Mathiassen* teaches storing "**a series of consecutive fingerprint representations** generated by the fingerprint sensor signal capture and pre-processing block (5C))" that comprise various "finger movements across the sensor

in two dimensions." *Mathiassen*, [0192]. The finger movements are categorized

according to predefined sets of movements, which translate to a particular command.

*Mathiassen* states:

> Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes **the obtained series of fingerprint representations** to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to **predefined sets of finger movement sequences** including **directional and touch/no-touch finger movement sequences**. A **command table** is used to translate the categorized finger movements into **control signals** whereby the translating means **generates control signal for controlling the device**, e.g. the stand-alone appliance, **in response to the finger movements on the sensor**.

*Mathiassen*, [0192], Claim 20. *Mathiassen's* portable device thus detects a series of

finger movements across the fingerprint sensor via the movement analyzing

program, categorizing series according to predefined sets of finger movement

sequences and determining a command and associated control signal for controlling

the portable device via the translation program. *Dec.,* 194-196. The finger

movements may be a touch/no-touch finger movement, and predefined sets of these

touch/no-touch movements correspond to particular commands. *Id. Mathiassen's*

finger movements thus constitute a "series" because these movements are formed by a number of things or events of the same class coming one after the other in spatial or temporal succession, namely a number of touch/no touch movements coming sequentially. *Mathiassen,* [0192] (describing "finger movement sequences").

*Mathiassen* also teaches touch/no-touch finger movements may be applied to a portable device [0192], indicating to a POSITA the series of finger movements are used in portable control 20 or that such would be obvious. *Dec.,* 196-198. *Mathiassen* does not indicate the portable device includes buttons to instruct open versus lock door commands, further indicating to a POSITA *Mathiassen* contemplates instructing commands using the taught series of finger movements and corresponding command table. *Dec.,* 196. Single-switch inputs (e.g., a single fingerprint sensor) for receiving multiple instructions (e.g., open door vs. lock door) was well-known in the art. *Dec.,* 198. A POSITA would have understood *Mathiassen's* portable control 20 receives a series of entries of biometric signals or that such is obvious. *Id.*

### 8.    *Claim 10(a2)*

#### a)    *Anderson's* Teachings

The court found the claim term "at least" modifies "one of the number of said entries" and that the claim requires "a duration of each said entry." (Ex. 1077, 2). *Mathiassen* modified by *McKeeth* and *Anderson* teaches Claim 10(a2). *Mathiassen*

teaches determining a series of entries of a biometric signal, per Claim 10(a1), but does not teach determining a "duration" of each entry. In related art, *Anderson* teaches Claim 10(a2).

*Anderson* teaches inputting an access code at a fingerprint sensor comprising a "series of pressure pulses having varying durations." *Anderson*, 6:45-48, Abstract. The inputted series of finger presses are compared to a stored code, and if there is a match, "the code may be used to enable a function," such as "allowing access to a restricted area." *Anderson*, 2:4-21, 5:58–6:39, 7:4-7 (disclosing entering the access code on an optical sensor for simultaneously verifying the user's fingerprint), FIGs. 3A-3B; *Dec.,* 200.

*Anderson* includes a first embodiment where the amount of pressure is not determined and only a duration of presses is determined (FIG. 4A), and a second embodiment where the amount of pressure and the duration between each press are determined (FIG. 4B). *Anderson*, 7:27-39. *Anderson* describes the entered access code as a "series of pressure pulses having varying durations" and as "morse code" characterized by a "series of long and short pressure applications." *Anderson*, 6:45-48, 7:40-47.



FIG. 3A

The present mapping relies on *Anderson's* first embodiment where the pressure magnitude is not detected but the timing of each fingerprint press is determined: "[i]n such an embodiment, the touch interface would not detect variations in pressure magnitude or intensity." *Anderson*, 7:28-34, FIG. 4A; *Dec.,* 201-204. The sensor recognizes pressure was applied for a particular duration. *Id.* Figure 4A illustrates each finger press, where the applied pressure (height of each bar) is consistent because the magnitude of the finger pressure is not detected, but some of the presses have a different duration (width). *Dec.,* 204.



FIG. 4A

A POSITA would have understood this embodiment encompasses any pressure the user applies to the touch interface, such as placing the finger on a fingerprint sensor, pressing down to indicate a "press," holding the "press" for a particular duration, and then releasing the "press" while maintaining the finger on the fingerprint sensor. *Dec.,* 203-204, 206. *Anderson* thus teaches a user entering an access code comprising a series of entries of the fingerprint and a duration the user applied pressure for the fingerprint. *Id.*

*Anderson* further teaches "determining" a number of entries of the biometric signal and a duration of each entry for comparison to the stored code. *Anderson*, 6:22-36. *Anderson* teaches comparing the generated code to a stored code to authorize access. *Id.* At least some of the user's finger pressure pulses and a duration of the pulse would need to be determined for matching against the stored code. *Dec.,* 207. Because the duration and number of pressure pulses would be established and ascertained definitely after consideration, investigation, or calculation for comparison with the stored code, the number of entries and duration of each entry is "determined." *Dec.,* 207.

Because *Anderson* teaches inputting an access code comprising a series of finger pressure pulses of particular duration, *Anderson* teaches determining at least one of the number of said entries (i.e., pressure pulses) and a duration of each entry (i.e., the "varying duration" of pulses). *Dec.,* 206-207; *Anderson*, 7:32-34.

### b) Motivation to Combine *Anderson* with *Mathiassen-McKeeth*

In *Mathiassen*, the series of directional finger movements instruct a command on *Mathiassen's* portable device (as modified by *McKeeth*). *Mathiassen*, [0192]; *Dec.,* 208-209. A POSITA would have been motivated and found it obvious to substitute or modify such directional finger movements with a series of presses of varying duration, as taught by *Anderson*, for instructing a command at portable device 20. *Dec*., 210-211. When holding a key fob, pressing a finger against the fingerprint sensor to apply pressure of varying durations is simpler than *Mathiassen's* directional movements. *Dec.,* 210. Additionally, commanding via pressure/duration pulses simplifies processing required to capture quality fingerprint images compared to a directional movement of the finger on the sensor. *Dec.,* 211. Alternatively, it would have been obvious to add *Anderson's* access code method of pressure pulses and varying duration to *Mathiassen's* portable device using finger movements to instruct a command because another access code method may be desirable under some conditions, as discussed above. *Dec.,* 210.

There would have been a reasonable expectation of success in modifying *Mathiassen's* control 20, because it contains software and hardware for detecting directional movement and touch/no touch. *Mathiassen,* [0192]; *Dec.,* 212-213. *Mathiassen's* sensor 5 already detects a finger press because it receives fingerprint representations. *Id.* The modification therefore only requires simple programming techniques (e.g., modifying the translation program to count the number and duration of "touch" or "no touch") that were within a POSITA's expertise. *Id.*

### 9.    *Claim 10(a3)*

*Mathiassen* teaches Claim 10(a3). As discussed for Claim 10(a1), *Mathiassen* teaches or renders obvious the fingerprint sensor receiving a series of fingerprint movements and "translational means" to categorize the movements to predefined movement sequences. *Mathiassen*, [0192], Claim 20. These categorized finger movements are then translated to control signals via a command table, teaching or rendering obvious "mapping" the predefined set of finger movements to an instruction, as claimed. *Mathiassen*, [0192]; *Dec.,* 214-217.

A POSITA would have found obvious the processor of IC, alone or in combination with the fingerprint sensor, performs the claimed "mapping." *Dec.,* 218.

### 10.   Claim 10(a4)

As discussed for Claim 10(a), *Mathiassen* teaches "populating the database" with biometric signatures. *Mathiassen* alone or *Mathiassen* (as modified by *McKeeth*) in combination with *Anderson* further teaches or renders obvious populating the database "according to the instruction." *Mathiassen* teaches enrolling a user's biometric signature for accessing (e.g., opening) door locks. *Mathiassen*, [0131]. The first enrolled user is the "system administrator" who "enroll[s] one or more of his fingers on" portable control 20. *Mathiassen*, [0162-0164]. *Mathiassen* recognizes the car owner/administrator may enroll others, such as ordinary users. *Mathiassen*, [0190], [0131]; *Dec.,* 220-221; *see Claim 3(a)*.

*Mathiassen* discloses, for the medicine cabinet embodiment, the administrator initiates enrollment of "the next user" by "authenticating himself by his fingerprint." *Mathiassen*, [0131]. As with enrolling the administrator, enrolling new users includes creating master minutiae tables subsequently stored in memory 7,7A, i.e., the "populating the database." *Mathiassen*, [0071]; *Dec.,* 222-224.

A POSITA would have found it obvious and been motivated to apply *Mathiassen's* enrollment process taught for the medicine cabinet embodiment to the portable door control for car door locks because *Mathiassen* teaches enrollment of an administrator for the portable door control embodiment and that the administrator may desire to enroll other users. *Mathiassen*, [0162-0164], [0190]; *Dec.,* 225-226.

For the car owner/administrator to enroll other users via the portable control, the control 20 would need a method of initiating enrollment, similar to the medicine cabinet embodiment. *Dec.,* 225. *Mathiassen* teaches or renders obvious initiating enrollment by the car owner/administrator authenticating themselves via their fingerprint and subsequently populating the database with master minutiae tables for the new user. *Dec.,* 225.

*Mathiassen* teaches enrollment is initiated via the administrator's fingerprint. *Mathiassen*, [0131]; *Dec.,* 225.  As discussed for Claim 10(a3), *Mathiassen* teaches instructing a particular command with a series of fingerprint representations, and *Anderson* teaches enabling a requested function via a series of fingerprint pulses of varying durations. *Mathiassen*, [0192]; *Anderson*, 6:37-54, 7:28-34. A POSITA would have found it obvious and been motivated to modify *Mathiassen's* disclosed enrollment process initiated by an administrator's fingerprint to instead initiate enrollment with a series of fingerprint presses of particular durations, as taught by *Anderson*. *Dec.,* 227-231.

For example, in embodiments utilizing portable devices, such as portable door control 20, it would have been obvious to allow instructing commands via various finger movements. *Dec.,* 228-229. *Mathiassen* teaches requiring owner input to enroll new user fingerprints on the portable control, indicating to a POSITA that an instruction was invoked at least by a specific type of entry. *Mathiassen,* [0165],

[0190]; *Dec.,* 229-230. Thus, allowing for a user, such as an administrator, to differentiate commands is also taught. *Id.* It would have been desirable to differentiate an administrator instructing enrollment of a new user versus instructing access. *Dec.,* 231 (*citing* Ex. 1010 (*Bradford*), 14:21-41 (discussing an administrator entering two fingertips' worth of fingerprint data in succession to be allowed access to certain privileged screens for registering a new user)).

Because (1) *Mathiassen* teaches initiating enrollment of a new user via entering a fingerprint, (2) *Mathiassen* teaches instructing various commands using respective finger movements (and each set of finger movements representative of an instruction), and (3) *Anderson* teaches an access code comprising pressure pulses of varying durations, it would have been obvious to modify *Mathiassen* (modified by *McKeeth*) to populate a database according to an instruction, where an exemplary instruction is to enroll a new user. *Dec.,* 220, 231.

To the extent CPC contends the claimed "according to the instruction" means populating the database with a series of entries corresponding to a particular instruction, *Mathiassen* teaches such. Specifically, as discussed, *Mathiassen* teaches "[t]ranslation means…[that] analyzes and categorizes the omni-directional finger movements across the fingerprint sensor **according to predefined sets of finger movement sequences**" and then implementing specific commands by reference to a command table translating the categorized finger movements into control signals.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

*Mathiassen*, [0192]; *Dec.*, 232. Therefore, *Mathiassen* teaches a database of biometric signatures each representative of a particular instruction.

### 11.    Claim 10(b)

As discussed for Claim 10(Pre3)b, *Mathiassen* teaches a portable door control sensor receiving a biometric signal. *Dec.,* 233.

### 12.    Claim 10(c)

The Court construed "accessibility attribute" to mean "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user." Section III.C.2. *Mathiassen* (as modified by *Anderson*) as modified by *McKeeth* teaches or renders obvious Claim 10(c).

#### a)    "matching the biometric signal against members of the database of biometric signatures"

As discussed for Claim 10(Pre2), a POSITA would have understood *Mathiassen's* memory in portable control stores a "database of biometric signatures," namely stored master minutiae tables. *Mathiassen* teaches "matching the biometric signal…" by matching a received biometric signal against stored minutiae tables (i.e., "members of the database"). Upon a user swiping their finger across the fingerprint sensor of the portable control [0175-0176], the pre-processing block 5C and processor collectively reduce the fingerprint image to a compact master minutiae format [0178-0179]. The processor then "compare[s] this access minutiae table with the master minutiae table(s) pre-stored at time of enrolment in

40

non-volatile memory (7A)." *Mathiassen,* [0179-0182], [0050]; *Dec.,* 236-237.

*Mathiassen* teaches matching the user's biometric signal (raw images reduced to master minutiae) against members of the database of biometric signatures (stored master minutiae tables). *Dec.,* 236-237. Processor 2 performs the comparison via a matching algorithm that is a "subset" of the administrative software. *Mathiassen,* [0071-0072].

Mathiassen teaches if there is a "match" between the access minutiae table and the pre-stored master minutiae table(s), the processor will "open (or lock) the car doors." *Mathiassen*, [0180-0182]; *Dec.,* 238. Upon a match, the processor issues an "open door" command to the encryption block 8B,8C [0185], and the encryption block encrypts the command using a temporary password.

### b) "to thereby output an accessibility attribute"

Applying the Court's construction, *Mathiassen's* "open door" command as modified by *McKeeth's* teaching of duress and alert conditions teaches or renders obvious outputting an accessibility attribute, as claimed.

*Mathiassen* and *McKeeth* each teaches **whether** access is granted. In *Mathiassen*, access *is granted* (as opposed to denied) by opening (i.e., unlocking) the car doors. *Mathiassen*, [0181-0182]; *Dec.,* 241. The issued "open door" command indicates "whether" access should be granted. *Mathiassen* teaches the open door command is issued in response to access minutiae matching a stored

biometric signature of the car owner/administrator. *Mathiassen,* [0182]; *Dec.,* 241. In contrast, if the processor 2 does not find a match, then no access will be granted because "the process will be aborted." *Mathiassen,* [0181]. Thus, the "open door" command indicates that access should be granted.

In *McKeeth*, access is granted where "there is a match between the input and security information." *McKeeth*, 3:65-67, 3:11-28 (describing different types of input security information, including a fingerprint scan). "If the input and security information do not match, the compare circuit issues a 'flag' signal indicating denial of access by the user." *McKeeth*, 4:2-4.

*Mathiassen* and *McKeeth* also each teaches **under what conditions** access is granted. Specifically, both references teach outputting an accessibility attribute upon there being a match of a live or access biometric signal to a stored biometric signal, and *McKeeth* teaches both a duress instruction and an alert instruction when there is no match. As background, Dr. Sears notes the '208 Patent describes one of the accessibility attributes to be an "access attribute (granting unconditional access)." *'208 Patent,* 8:19-21, *Dec.* 240. The '208 Patent also describes that upon matching an access biometric signal with a stored signal, access is provided to the controlled item. *Id.* at 12:1-10. In the '208 Patent, the biometric signal provided by the user determines which category of access is provided, e.g., access, duress access, or alert access. *Id*. at 11:27-42, 12:1-27. Dr. Sears explains that because the biometric signal

itself, e.g., the user's fingerprint, determines which category of access is provided, then in the instances where the user is simply granted access without any conditions, e.g., a duress condition, then per the '208 Patent, 12:1-10, access to the controlled item is going to be instructed and granted. *Dec.* 240.

In *Mathiassen*, when the processor 2 of the portable door control 20 matches the owner's access minutiae table to a pre-stored master minutiae table, the "open door" command is issued to the encryption block to grant unconditional access. Per Dr. Sears, because the user is the car owner/administrator and is requesting access to the car's central locking system, a POSITA would have understood the access that is granted is unconditional access. *Dec.,* 240, 242-243 (explaining *Mathiassen's* administrator has full access, and comparing to the *'208 Patent*, 8:19-21, describing "access attribute" as "granting unconditional access").

Dr. Sears opines *Mathiassen's* teaching is substantially similar to the "access" accessibility attribute described in the '208 Patent. Specifically, *Mathiassen* teaches matching a car owner's/administrator's access minutiae to stored minutiae and responsively issuing an "open door" command. Similarly, the '208 Patent describes checking the biometric signal against the signatures in the database (step 607, 12:1-2), and if there is a match, then directing the controller to provide access. *'208 Patent*, 1-10; *Dec.,* 244.

43

Thus, *Mathiassen* teaches the "open door" command includes outputting an accessibility attribute indicating "under which conditions." Specifically, *Mathiassen* teaches providing full access to the car's central locking system based on the matching of the access minutiae to the car owner/administrator's pre-stored master minutiae table in response to the car owner/administrator requesting access to the car door locks, thereby issuing the "open door" command.

*McKeeth* also teaches the claimed outputting an accessibility attribute that indicates **under what conditions** access is granted. Specifically, *McKeeth* teaches granting access with certain conditions, such as a **duress** condition or an **alert** condition. *McKeeth* teaches a user requesting access provides their fingerprint for authorization. *McKeeth*, 3:38-42, 3:52–4:4. The user may also be required to perform a geometric pattern to indicate normal access (i.e., *not* indicating duress or an alert). *McKeeth*, 4:10-27. If the user does not perform the pattern, the system determines the user is under duress. *McKeeth*, 4:28-43. The system grants limited access to the user while sending a security alert to security personnel. *Id. McKeeth* teaches issuing a "flag signal" to indicate the duress condition. *McKeeth*, 4:23-27. Thus, *McKeeth* teaches granting access to the user (whether access is granted) and that access is granted under certain conditions (e.g., is limited access and an alert is sent). Thus, *McKeeth's* outputting of a duress instruction to the controlled item based on the user's biometric signature (specifically, the matching of the biometric

signature without completing the implicit input, 4:5-43) and issuing a flag signal satisfies the claimed outputting an accessibility attribute. *Dec.,* 245-247. As discussed below, it would have been obvious to a POSITA to modify *Mathiassen's* portable door control to issue a duress condition in response to a received biometric signature (i.e., access minutiae) from the user inputted for the purpose of indicating a duress situation.

*McKeeth* also teaches an alternative embodiment where if the user attempts to authenticate themselves via their fingerprint but does not perform a stored pattern, the system *denies* access and generates a security alert to the responsible authorities. *McKeeth*, 5:48-53. Although access is not granted, a POSITA would have understood that by transmitting an access signal that instructs denying access and generating a security alert, the system is also outputting an "accessibility attribute." *Dec.,* 248 (noting the '208 Patent describes a similar functionality as an "alert attribute" that is a type of accessibility attribute); *'208 Patent*, 8:23-25, 12:11-27. Therefore, *McKeeth* teaches outputting an alert condition in response to a user's inputted biometric signature not matching a stored biometric signature. As discussed below, it would have been obvious to a POSITA to modify *Mathiassen's* portable door control to issue an alert condition in response to a received biometric signature, i.e., access minutiae, from the user that does not match a stored biometric signature, i.e., stored minutiae.

The collective teachings of *Mathiassen* and *McKeeth* thus teach outputting an accessibility attribute, where the accessibility attribute may be one of an access attribute (*Mathiassen* and granting access to a car owner/administrator), a duress attribute (*McKeeth* and granting limited access along with a security alert), and an alert attribute (*McKeeth* and denying access along with a security alert).

### c) Motivation to Combine *McKeeth* with *Mathiassen-Anderson*

A POSITA would have found it obvious and been motivated to modify *Mathiassen's* portable control (as modified by *Anderson*) to also output a duress attribute or alert attribute, as taught by *McKeeth*, such that the emitted secure access signal conveys duress or alert attribute information (as recited for Claim 10(d)). *See Claim 10(Pre3), 10(d)*.

Modifying *Mathiassen's* issued command to include *McKeeth's* duress or alert accessibility attribute would have had a reasonable expectation of success. *Dec.* 250-255. *Mathiassen* teaches the hardware/software for receiving, storing, and matching access minutiae against stored minutiae tables and contemplates the user enrolling multiple fingers and instructing multiple commands via a series of finger movements. *Mathiassen*, [0180-0182], [0050], [0164], [0173], [0192]. *Mathiassen* recognizes denying access when the access minutiae do not match the stored master minutiae. *Mathiassen*, [0181]. Modifying *Mathiassen* to enroll a second finger, or series of finger movements, to indicate duress is a simple programming extension of

46

*Mathiassen's* taught techniques would require only enrolling a second fingerprint or finger movement (taught in *Mathiassen*) and encoding another command (i.e., the "issue security alert" information) in the transmitted signal. *Dec.,* 250-255.

### 13.    Claim 10(d)

*Mathiassen's* portable door control 20 emits a secure access signal conveying information dependent upon the accessibility attribute. *See Claim 10(Pre5), 10(c).* As mapped for Claim 10(Pre3), *Mathiassen* teaches the transceiver of portable control wirelessly transmits the encrypted "open door" command (i.e., "secure access signal") to the ignition control. *Mathiassen*, [0185-0186]. A POSITA would have understood a "command" issued by a processor and instructing a function is a signal. *Dec.,* 256.

The information conveyed in the encrypted "open door" command is the access to be granted. When the instruction by the user is to open the car door locks, the information conveyed in the secure access signal is information to grant access. This information is "dependent upon" the "accessibility attribute" (i.e., the grant access to the car owner/administrator) because the information results from determining the user's access to be granted and the encryption of that access information with a valid temporary password. *Dec.,* 257-259.

As for Claim 10(c), *Mathiassen-McKeeth* also teaches Claim 10(d), as the modified *Mathiassen* portable control emits a secure access signal to instruct a

duress signal or an alert signal. The encrypted command transmitted by the transceiver conveys a command including an accessibility attribute to open door locks and issue a silent security alert (for a duress signal) or to deny opening locks and issuing an alert (for an access signal), as taught by *McKeeth*. A motivation to combine *Mathiassen* and *McKeeth* was provided in Claim 10(c).

### 14.    Claim 10(e)

As in Claim 10(Pre4), *Mathiassen* teaches a receiver subsystem including ignition control 15, central car computer, and door lock transceivers that provides conditional access to the controlled item (door locks) dependent on information included in the secure access signal. As mapped for Claim 10(Pre4), the processor of ignition control decrypts the command received from portable control 20 and relays a "similar encrypted command" to the door locks if the decryption process "confirms a valid and authenticated 'open door' command." The similar encrypted command relayed to the door locks is, like the command received from the portable control, dependent upon the information, which is "based on the accessibility attribute". That is, the relayed command provides *"access based on the accessibility attribute"* to the car door locks, simply to "grant access" to an administrator. *'208 Patent*, 8:17-21; *Dec.,* 261-262; *Claim 10(c)*.

Similarly, *Mathiassen's* portable control modified to include *McKeeth's* duress or alert signals provides access based on the accessibility attribute because

access is determined based on a duress or an alert attribute, as mapped for Claims 10(c)-(d). Thus, the access that is granted in the modified portable control when a duress accessibility attribute is encoded in the signal is "grant access" and send alert. *Dec.,* 262-263. When an "alert" accessibility attribute is encoded in the signal, the access is "deny access" and send alert. *Dec.,* 264-265.

### 15.    Claim 10(f)

*Mathiassen* teaches the controlled item is a "locking mechanism of a physical access structure" (i.e., the car door locks of the central locking system). *Mathiassen,* [0187]; *Dec.,* 266.

### B.    Claim 11

*Mathiassen* teaches Claim 11. The "populating the database" including "enrolling a biometric signature" and "receiving a biometric signal" were mapped for Claim 10(a), cited for this Claim 11. *Mathiassen,* [0164]; *Dec.,* 267. *Mathiassen* teaches enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty. *Mathiassen* teaches the first person enrolled on portable control 20 "**becomes the 'owner' of the car, in the sense that he becomes the system administrator**." *Mathiassen,* [0165]. This disclosure would have indicated to a POSITA the fingerprint (i.e., biometric signal) is enrolled as an administrator when the database is empty, because no other users had previously been enrolled. *Dec.,* 268-269.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

### C.    Claim 13

*Mathiassen-McKeeth-Anderson* teaches Claim 13. A POSITA would have understood that to perform the functions mapped for Claim 10, the "program code" stored on memory 7,7A of *Mathiassen's* portable device and ignition control (both of which include an IC) contains instructions for performing the described functions. *Dec.,* 270. Non-volatile memory 7,7A,7E is well known to be a "non-transitory computer readable storage medium." *Dec.,* 271. It is well known that a processor, such as processor 2 of IC, executes program code to perform functions. *Dec.,* 272. The modified *Mathiassen* portable control and corresponding ignition control/car computer thus include or render obvious the storage medium with stored computer program instructions of Claim 13. *Dec.,* 270-273.

### D.    Claim 1

#### 1.    *Claim 1(Pre)*

To the extent the preamble is limiting, *Mathiassen* teaches a system for providing secure access to a controlled item, such as portable door control 20. *See Claim 10(Pre1)*; *Dec.,* 274; *Mathiassen*, Abstract, [0145-0147].

#### 2.    *Claim 1(a)*

*See* Claim 10(Pre2).

#### 3.    *Claim 1(b)*

*See* Claim 10(Pre3), 10(a).

### 4.    Claim 1(b1)

*See* Claim 10(Pre3), 10(b).

### 5.    Claim 1(b2)

*Mathiassen* teaches fingerprint sensor 5 of portable control 20 receiving a fingerprint reduced to access minutiae and comparing such access minutiae to master minutiae tables (i.e., database) to authenticate a user. *Mathiassen's* teaching is similar to the 208 Patent's code entry module 103 containing a biometric sensor that receives a fingerprint and interrogates a database 105 to authenticate a user. *Mathiassen,* [0175-0180]; *'208 Patent,* 5:50-67; *see Mapping, Claim 10(c)* (*"matching"*), *Claim 10(Pre2)* (*"members of the database of biometric signatures"*). Additionally, this is at least equivalent to the '208 Patent's Fig. 3, Step 202 comparing the received biometric to signatures in the database. *'208 Patent,* 8:11-15; *Dec.* 279. A POSITA would have understood *Mathiassen's* processor executing the matching algorithm teaches or renders obvious the structure for interrogating the database for the biometric signature and performing the matching of the signature is at least equivalent to the '208 Patent's "processor module" performing software that compares the biometric signal to biometric signatures in the database. *Compare Mathiassen,* [0071-0072] to *'208 Patent*, 14:11-20, Fig. 3 Step 202; *Dec.*, 279.

As for Claim 10(c), *Mathiassen* alone or modified by *McKeeth* teaches Claim 1(b2)'s function.

### 6.    Claim 1(b3)

As discussed for Claims 10(Pre3)(c) and 10(d), *Mathiassen* teaches the "means for emitting," namely administrative code (e.g., SKG algorithm) stored in non-volatile memory 7,7A generating the encrypted "open door" command (i.e., secure access signal) and directing the transceiver to transmit the signal to ignition control of the car. *Dec.,* 281. This is at least equivalent to the '208 Patent describing transmitting the secure access signal via a transmitter (5:67-6:5) contained in a "processor module 107" that is instructed via software (14:16-20).

Regarding the claimed function, see Claims 10(Pre3)(c) and 10(d)'s mapping; *Dec.,* 282.

### 7.    Claim 1(c)

*See* Claim 10(Pre4).

### 8.    Claim 1(c1)

*See* Claim 10(Pre4).

### 9.    Claim 1(c2)

*See* Claims 10(Pre5), 10(e).

### 10.    Claim 1(d)

The construed "means for populating" includes at least administrative code executed by processor 2 and master minutiae tables (i.e., database) in non-volatile

52

memory 7,7A, all comprised in portable control 20 of transmitter subsystem. *See Mapping,* Claim 1(a) ("*database of biometric signatures*") and Claim 1(b) ("*transmitter subsystem*"); *Dec.,* 286. The '208 Patent describes storing biometric signatures (including duress signatures) of an administrator or ordinary users in a database. *See* Section III.C.1.

*Mathiassen* teaches administrative software will "require a minimum of say 3 minutiae fingerprint representations of acceptable quality" that are stored in non-volatile memory. *Mathiassen,* [0130]. The administrative code directs the processor to store the acceptable fingerprint representations in the form of master minutiae tables. *Mathiassen,* [0130-131], *Dec.* 287. Storing master minutiae tables from a car owner or "other users" is at least equivalent to the '208 Patent describing storing biometric signatures of an administrator and "ordinary" users in database 105. *Compare Mathiassen,* [0164-0165, 0190], *with '208 Patent,* 10:32-34, 12:43-45, 13:15-19. Additionally, *Mathiassen-McKeeth* enrolls signatures indicating a user is under duress, which is at least equivalent to the '208 Patent describing storing a "duress signature." *'208 Patent,* 13:9-11; *See Mapping, Claim 3(a).* Thus, a POSITA would have understood or found it obvious that *Mathiassen's* administrative code in the non-volatile memory 7,7A of IC 1 comprises the "means for populating." *Dec.* 287. For the function of "populating the data base of biometric signatures," *see* Claim 10(a).

### 11. Claim 1(d1)

CPC's construction support describes detecting a finger applying a series of finger presses, each of a certain duration. Section III.C.1; *Dec.,* 290. *Mathiassen* modified by *McKeeth* and *Anderson* renders Claim 1(d1) obvious. *Mathiassen's* sensor receives a series of entries of the biometric signal by a movement analyzing program identifying the fingerprint motions. *See* Claim 10(a1). The representations are generated once a finger is detected on the sensor surface, which is at least equivalent to the '208 Patent checking a biometric is received on the biometric sensor. *Compare Mathiassen,* [0049], *with '208 Patent,* 5:53-59, 7:66-8:6. *Mathiassen's* translation program, modified by *Anderson*, characterizes the series of entries according to the number of entries and a duration of each said entry. *See* Claim 10(a2)). This is at least equivalent to the '208 Patent describing a series defined by the number of presses and duration of each press. *'208 Patent,* 10:45-52, *Dec.* 291. *Mathiassen* teaches receiving entries of a series of fingerprints. *Mathiassen*, [0192]. *Anderson* teaches receiving a series of fingerprint pressure pulses of varying duration. *Anderson*, 7:28-34, FIG. 4A; *Claims 10(a1)-(a2).* Because the accuracy of *Anderson's* matching of the inputted access code is dependent upon the user inputting the correct number of entries with each entry having a correct duration, the series of entries are "being characterized." *Dec.,* 292-293.

### 12.    Claim 1(d2)

*Mathiassen* alone or *Mathiassen-McKeeth-Anderson* teaches the "software translation program" executed by processor of IC performs the function of "mapping said series into an instruction" by translating the series of finger movements to a command in a command table. *Compare Mathiassen,* [0192], *with '208 Patent,* 10:53-56; *Mapping, Claim 10(a3)*. *Mathiassen's* fingerprint sensor receives this series of entries of the biometric signal, similar to the '208 Patent's code entry module 103 containing a biometric sensor 121 that receives a user's fingerprint. *'208 Patent,* 5:50-59.

*Mathiassen's* processor translates a series of fingerprints (received by biometric sensor) into a command, such as "open door" command, for authenticating the user to securely access the car doors. *Mathiassen*, [0192]. *Mathiassen's* teaching is at least equivalent to the '208 Patent's "processor module 107" providing a command for authenticating the user to securely access a controlled item. *'208 Patent,* 5:65-6:19, *Dec.*, 294-296.

### 13.    Claim 1(d3)

As mapped for Claim 1(d), *Mathiassen-McKeeth* teaches or renders obvious administrative code directing processor 2 of portable door control to store fingerprint representations (from sensor 5) in master minutiae tables (i.e., database of biometric signatures) stored in memory 7,7A when enrolling a new user, a car owner (i.e.,

administrator), or a duress signature. *Mathiassen-McKeeth* as modified by *Anderson* teaches or renders obvious storing of user fingerprint representations (i.e., "ordinary users") occurs "according to an instruction," with the movement analyzing and translation software detecting and mapping an administrator's series of finger movements to an instruction to enroll a new user. *See Claim 10(a4).* This is at least equivalent to the '208 Patent describing the administrator directing the system to "enrol [sic] an ordinary user" through a series of inputs. *'208 Patent,* 10:57-59. Thus, the *Mathiassen-McKeeth-Anderson* system teaches or renders obvious the movement analyzing, translation, and administrative code collectively form the "means for populating," as claimed. *Dec.* 298.

For the function of "populating the data base according to the instruction," *see* Claim 10(a4).

### 14.    Claim 1(e)

*See* Claim 10(f).

### E.    Claim 3

#### 1.    Claim 3(a)

The *Mathiassen-McKeeth-Anderson* combination renders obvious Claim 1.

*Mathiassen* (as modified by *Anderson*) as further modified by *McKeeth* teaches Claim 3. As discussed for Claims 1(b2)-(b3) (citing Claims 10(c)-(d)), *Mathiassen* teaches administrator access, and *McKeeth* teaches duress access. As

discussed for this Claim 3(a), below, *Mathiassen* also teaches user access that is less than administrator access.

*Mathiassen* teaches identifying fingerprint representations of the "first user to enroll his fingerprint in the portable door control 20" contained in master minutiae tables as "the 'owner' of the car, in the sense that he becomes the **system administrator.**" *Mathiassen,* [0164-165], *Dec.,* 303. A user having stored master minutiae tables associated with an administrator's access teaches or renders obvious a biometric signature in a system administrator class, as claimed. *Dec.,* 302-304, 307.

*Mathiassen* also teaches or renders obvious system users that are not administrators. *Dec.* 305. *Mathiassen* teaches the portable door control 20 includes fingerprints "of the car owner (**or other users he may have enrolled**)." *Mathiassen,* [0190]. A car owner enrolling fingerprints of "other users" indicates these other user fingerprint representations are similarly stored in master minutiae tables. *Compare Mathiassen* [0190, 0164] *to '208 Patent*, 10:32-34.

Per Dr. Sears, *Mathiassen* recognizes there are different classes of users, namely administrator users and the disclosed "other users." *Dec.,* 306 (citing *Mathiassen*, [0131-0132]). Dr. Sears notes that *Mathiassen* further teaches the administrator enrolling other users. *Mathiassen,* [0131-0132, 0190]. *Id.* Additionally, *Mathiassen* recognizes that some users will have "partial access"

[0063], further indicating *Mathiassen* teaches or renders obvious users that are system administrators versus users that are less than administrators and merely system users. *Id.* Dr. Sears opines that *Mathiassen* thus teaches or at least renders obvious (1) users who are administrators (e.g., the car owner/administrator of the portable control embodiment [0190] or the system administrator of the medicine cabinet embodiment [0131-0132]); and (2) users who are "other users" separate from administrator users and who are otherwise enrolled by an administrator user (e.g., the user with partial access or the other users enrolled by the car owner/administrator). These "other users" are system users belonging to a system user class, as claimed. *Dec.,* 306-307.

*McKeeth* teaches a user may enter an access sequence indicating duress, as discussed for Claim 10(c). *Dec.,* 308-309. A POSITA would have understood identifying the user's access sequence as indicating duress is a biometric signature in a duress class. As in Claim 10(c), *Mathiassen's* processor 2, modified by *McKeeth* to output a duress attribute, would have done so when a car owner provided a second (matching) finger to the sensor 5. *Mathiassen,* [0164], *Dec.,* 310.

### 2.    Claim 3(b)

*See* Claims 3(a), 10(c)-(d). Based on the discussion of an "access attribute" in the '208 Patent, a POSITA would have understood information/data included in the

secure access signal is dependent upon an "access attribute" indicating the type of access to grant to the user. *Dec.,* 311; *Claim 10(d).*

As in Claim 10(c), *Mathiassen* in view of *McKeeth* teaches "accessibility attributes," namely access conditions granted to the user. As in Claim 10(d), the combination teaches or renders obvious encrypting these access conditions in the secure access signal sent from portable control to ignition control when the "processor (2) established a match" between the presented fingerprint "biometric signal," and the fingerprint representations ("biometric signatures") in "resident master minutiae tables." *Mathiassen,* [0182], [0185]; *Dec.,* 312-313. A POSITA would have understood the secure access signal emitted by *Mathiassen's* transceiver 27 included information that depended upon an "access attribute" because it was the output of the "open door" command encrypted with a valid, temporary password. *Dec.,* 312-313.

### 3.    Claim 3(c)

As in Claim 3(a), the *Mathiassen-McKeeth* system teaches a "duress class" where biometric signatures of a finger are stored indicating a user is under a duress condition. As for Claim 1(b2), *Mathiassen-McKeeth* teaches outputting a secure access signal dependent upon a duress attribute when a user's biometric signal matches master minutiae indicating a duress condition. *Mathiassen-McKeeth's* teaching of a duress attribute renders obvious the output accessibility attribute being

a duress attribute if the presented fingerprint matches a master minutiae table (containing signatures) with the fingerprint representations in that master minutiae table belonging to a duress class. *Dec.,* 314-316.

### 4. Claim 3(d)

As for Claims 10(c), 1(b2), *Mathiassen-McKeeth* teaches emitting a secure access signal dependent upon an alert attribute denying access to unauthorized users and issuing a security alert. *Dec.,* 317.

### F. Claim 4

The *Mathiassen-McKeeth-Anderson* combination renders obvious Claim 1.

*See* Claim 1(a). *Mathiassen* teaches a database of biometric signatures located in the transmitter sub-system. *Dec.,* 318-319.

### G. Claim 5

The *Mathiassen-McKeeth-Anderson* combination renders obvious Claim 1.

*Mathiassen* alone and in combination with *McKeeth* teaches Claim 5. *See Claims 10(c), 10(e).* As in Claim 3(b), *Mathiassen* teaches access is provided to the car if the accessibility attribute comprises an access attribute (e.g., "open door" command). *Mathiassen,* [0182], *Dec.,* 321; *Claims 1(b2) and 3(d)* (discussing denying access and generating a security alert); *Dec.,* 322.

### H. Claim 6

### 1. Claim 6(a)

The *Mathiassen-McKeeth-Anderson* combination renders obvious Claim 1.

*Mathiassen* teaches the biometric sensor 5 authenticates the identity of a user via their fingerprints by matching an access fingerprint against stored master minutiae tables. *Mathiassen*, Abstract, [0053]; *Dec.,* 324-325.

### 2.    Claim 6(b)

*See* Claims 1(b3), 10(Pre3) (mapping "means for emitting," "two types of access," and "secure wireless signal"), *Mathiassen*, [0186]. *Mathiassen* modified by *McKeeth* grants access dependent upon the user's inputted fingerprint, i.e., the "request from the user." Signals are transmitted from the portable door control 20 dependent upon a user swiping "his finger across the sensor (5)" and "provided the processor (2) established a match between the access attempt and one of the resident master minutiae tables," indicating to a POSITA the secure wireless signal is transmitted "dependent upon a request from the user and the authentication of the user identity." *Mathiassen,* [0176-186]; *Dec.,* 326-329.

### 3.    Claim 6(c)

The '208 Patent does not describe a "control panel." *Dec.,* 330. Based on the function, *Mathiassen's* IC of ignition control 15 is a control panel receiving the information (i.e., receiving the secure wireless signal containing the access information) and providing the secure access requested. *Mathiassen,* [0186-187], *Dec.,* 330-332. A POSITA would have understood or found obvious the IC of ignition control performs the function and is a "control panel." *Dec.,* 332.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## I.    Claim 7

The *Mathiassen-McKeeth-Anderson* combination renders obvious Claim 7.

Claim 7 recites use of the disjunctive "or," requiring only a single limitation preceding the last "and/or" to be met.

As in Claim 6(a), *Mathiassen* teaches a biometric sensor, namely fingerprint sensor 5 that "authenticates the identity of the user." *Dec.,* 333.

*Mathiassen* teaches the biometric sensor 5, the biometric database (i.e., stored master minutiae tables in memory), and the transmitter (i.e., transceiver 27) are located in a remote fob. *Mathiassen*, [0147, 0174]. The portable control is a "**remote control for the car doors [that] can be made very compact….**" *Mathiassen,* [0147]; *Dec.,* 334.

## J.    Claim 9

### 1.    Claim 9(Pre)

*See* Claims 10(Pre3) ("transmitter subsystem"), 10(Pre1) ("for operating a system…").

### 2.    Claim 9(a)

*See* Claim 10(Pre3), 10(b).

### 3.    Claim 9(b)

*See* Claim 1(b2).

### 4.    Claim 9(c)

*See* Claim 1(b3).

### 5.    *Claim 9(d)*

*See* Claim 1(d).

### 6.    *Claim 9(d1)*

*See* Claim 1(d1).

### 7.    *Claim 9(d2)*

*See* Claim 1(d2).

### 8.    *Claim 9(d3)*

*See* Claim 1(d3).

### 9.    *Claim 9(e)*

*See* Claim 10(f).

## VII.    DISCRETIONARY CONSIDERATIONS

### A.    The *Fintiv* Factors Favor Institution

Under the "*Fintiv* factors," the Board asserted it may consider parallel litigation, including an early trial date, in determining whether to institute under 35 U.S.C. § 314(a). *NHK Spring Co., Ltd., v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 at 19–20 (PTAB Sept. 12, 2018) (precedential); *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 2–3, 6 (PTAB Mar. 20, 2020) (precedential). Those factors favor institution here.

### 1.    *Stay*

Parallel litigation is ongoing. While no stay has been requested, Petitioner will seek a stay if institution is granted, thus favoring institution. At worst, this factor is

neutral because the Board "will not attempt to predict" how the district court will proceed. *Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB Jun. 16, 2020).

## 2. *Proximity of the Court's Trial Date*

"This factor looks at the proximity of the trial date to the date of [FWD] to assess the weight to be accorded a trial date set earlier than the expected [FWD] date." *Shenzhen Carku Tech. Co., Ltd. v. The Noco Co.*, IPR2020-00944, Paper 20 at 61 (PTAB Nov. 12, 2020). The District Court scheduled trial for January 23, 2023, with the notation the "Court expects to set these dates at the conclusion of the *Markman* hearing," thus indicating the Court recognizes the scheduled date is pursuant to the Court's default schedule and may not be the "actual trial date." *See* Ex. 1065 (Scheduling Order in District Court Litigation), 5, FN 4.

Trial dates are notoriously unreliable and should be an insufficient basis upon which to deny institution. "A court's general ability to set a fast-paced schedule is not particularly relevant," especially where "the forum [i.e., WDTX] itself has not historically resolved cases so quickly." *In re Apple Inc.*, No 20-135, slip op. at 16 (Fed. Cir. Nov. 9, 2020); *DISH Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 at 13-16 (PTAB Feb. 4, 2021). The Federal Circuit found error in the Board's reliance on the case's scheduled trial date. *In re Apple Inc.*, No 20-135, slip op. at 15 (Ex. 1071). It would be error for the Board speculatively rely upon the

current schedule, especially with a motion to transfer pending. The Board would be no better suited to speculate as to the prospective trial date than it would be to speculate as to the likely outcome of the motion to transfer pending and especially as the District Court's own Scheduling Order recognizes the current trial date is set pursuant to "default" deadlines. (Ex. 1065, 5, FN 4).

Trial date speculation is particularly concerning where the statistics show frequent trial delays in WDTX. "70% of [WDTX] trial dates initially relied upon by the PTAB to deny petitions have slid," as of July 2020. *District Court Trial Dates Tend to Slip After PTAB Discretionary Denials* (Ex. 1068). Such delays impacted the *NHK* and *Fintiv* cases, where, after the Board denied institution, associated trial dates were delayed to after the FWD dates—the same WDTX court in *Fintiv* as is handling the Texas Litigation. IPR2018-01680, Paper 22 at 17, n. 6 (PTAB Apr. 3, 2019) ("In the district court case running parallel to *NHK Spring*, the court ultimately moved the trial date back six months, illustrating the uncertainty associated with litigation schedules."); *Order Setting Jury Selection and Trial* (Ex. 1069) (resetting *Fintiv* trial to June 21, 2022, nearly thirteen months after the FWD would have been due in the associated IPR). In contrast, the Board adhered to the one-year statutory deadline for FWDs prescribed by 35 U.S.C. § 316(a)(11).

CPC undoubtedly will argue that Apple waited too long to file its IPR and that the delay in filing the IPR should be a basis for discretionary denial. Any such

argument, however, should be given little merit. As the Board is aware, this Petition involves a significant number of means-plus-function terms. The Parties disputed the constructions, warranting waiting for the Court's *Markman* Order (recently issued on February 10, 2022; *see* Ex. 1077), followed by CPC narrowing its claims on February 14, 2022, to remove claims reciting means-plus-function terms <u>and</u> agreeing to other Apple constructions in view of the Court's mandate for the Parties to meet and confer. (Ex. 1079).

Reliance on CPC's constructions necessitated waiting until CPC came forward with its proposed constructions for the means-plus-function terms. However, CPC did not disclose its proposed structure for the means plus function terms until it filed its responsive claim construction brief on December 8, 2021 (Ex. 1075), and its sur-reply claim construction brief on January 5, 2022 (Ex. 1076). CPC then finalized the identification of its proposed structure in the parties' Joint Claim Construction Statement on January 12, 2022. (Ex. 1074). Without this information, Apple could not have filed a claim construction brief relying upon CPC's claim constructions because they had not been identified. Once briefing was complete and CPC's proposed algorithms identified, Apple diligently worked to finalize and file this Petition. Thus, CPC's failure to identify its proposed constructions prior to claim construction briefing prevented Apple from filing this IPR any earlier. Denying this petition because of a scheduled (but unlikely to hold) trial date would reward CPC

for its gamesmanship in refusing to identify the structure for the means-plus-function terms prior to the claim construction briefing.

Moreover, should the Board deny because of *Fintiv*, it would be creating a perverse incentive for other patent owners to engage in gamesmanship by hiding their proposed claim constructions until they were sure the trial date would precede the FWD. The Board should not countenance such gamesmanship and should assign no weight to the trial date's proximity in this matter.

### 3.    *Investment in Parallel Proceeding*

Beyond claim construction, the parties have invested little in the parallel proceeding. Petitioner has diligently worked since the litigation's filing on locating prior art and preparing the Petition and supporting evidence. Minimal fact discovery has been conducted. Expert discovery does not close until September 21, 2022. (Ex. 1065, 4). This factor weighs in favor of institution.

### 4.    *Overlap*

Petitioner stipulates that if the Board institutes the Petition on the same grounds presented, then Apple will not seek resolution in the District Court of any ground of invalidity that utilizes *Mathiassen*, *McKeeth*, or *Anderson*. In so stipulating, Apple seeks to avoid multiple proceedings addressing the validity of the '208 Patent based on any of the same prior art references. This factor weights in favor of institution.

### 5.    *Same Party*

The Parties are the same in the district court litigation. However, members of the Board have noted *Fintiv* addresses only the scenario in which the petitioner is unrelated to a defendant in a parallel proceeding, finding this should weigh against denying institution, but that *Fintiv* "says nothing about situations in which the petitioner is the same as, or is related to, the district court defendant." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 at 10 (PTAB May 15, 2020) (APJ Crumbley, dissenting) (noting that disfavoring a "defendant in the district court" is "contrary to the goal of providing district court litigants an alternative venue to resolve questions of patentability").

### 6.    *Other Circumstances*

The strength of the proposed grounds weighs strongly in favor of institution.

The *Fintiv* factors require the Board to take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Fintiv*, Paper 11 at 6. Were the Board to deny institution, years of district court litigation would be required just to obtain a finding of invalidity. Such a scenario runs directly counter to *Fintiv's* goals of preserving efficiency and the system's integrity. Denying institution harms system integrity by rejecting the PTAB as the lead agency in assessing patentability.

## B.    The *Fintiv* Framework Should Be Overturned

The *Fintiv* framework should be overturned because it is legally invalid and unwise policy. The framework (1) exceeds the Director's authority, (2) is arbitrary and capricious, (3) and was adopted without notice-and-comment rulemaking.

### 1.    *The Fintiv Framework Exceeds the Director's Authority*

The Director cannot deny IPRs based on parallel litigation if the IPR was timely under § 315(b). And the Director cannot create reasons to deny institution that conflict with the statutory language or exceed the authority under the AIA, such as, denial of institution based on parallel litigation.

Under § 315(b), IPRs are permissible when parallel litigation is pending. Ultimately, strategies like *Fintiv* "cannot be invoked to preclude adjudication of a claim…brought within the [statutory] window." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667, 677-680, 685 (2014). And the AIA's provisions confirm the Director lacks authority to apply the *Fintiv* framework. *See, e.g.*, §§ 315(a), (d), 325(d). None of the provisions grant the Director discretion to reject IPRs because there is a parallel lawsuit.

### 2.    *The Fintiv Framework Is Arbitrary and Capricious*

The *Fintiv* framework is arbitrary and capricious. First, it requires the Board to rely on speculation about parallel litigation. *See, e.g.*, *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("agency actions based upon speculation are arbitrary and capricious"). Second, the *Fintiv* factors are vague,

resulting in the Board treating "similar situations differently without reasoned explanation"—a hallmark of arbitrary and capricious agency action. *Port of Seattle v. FERC*, 499 F.3d 1016, 1034 (9th Cir. 2007). Third, the *Fintiv* framework is not connected to promoting efficiency. Instead, it pressures defendants to file premature IPRs and allows infringement plaintiffs to block IPRs through forum shopping.

### 3. The Fintiv Framework Was Impermissibly Adopted Without Notice-and-Comment Rulemaking

The *Fintiv* factors were adopted without notice-and-comment rulemaking. Through the Director's designation of *NHK* and *Fintiv* as precedential, those decisions' framework became "binding" on the Board "in subsequent matters involving similar facts or issues," Patent Trial and Appeal Board, Standard Operating Procedure 2 (Rev. 10) ("SOP-2"), at 11 (Sept. 20, 2018)—that is, they became a "rule" as defined in the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 551(4) (defining "rule"). But that designation process did not entail public notice or comment, contrary to the requirements of both the APA and the AIA. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019); §§ 2(b)(2), 316(a).

## VIII. CONCLUSION

Petitioner requests *inter partes* review of the Challenged Claims of U.S. Patent No. 9,269,208.

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

Respectfully submitted,

BY: _/s/     Jennifer C. Bailey_
Jennifer C. Bailey, Reg. No. 52,583
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

71
**Appx248**

## IX.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest

Apple Inc. is the real party-in-interest. 37 C.F.R. § 42.8(b)(1).

### B.    Related Matters

(1) a patent infringement lawsuit filed on February 23, 2021, by Patent Owner, CPC Patent Technologies Pty Ltd., against Petitioner in the United States District Court for the Western District of Texas, Case No. 6:21-cv-00165;

(2) *CPC Patent Technologies Pty Ltd., v. HMD Global Oy* in the United States District Court for the Western District of Texas, Case No. 6:21-cv-00166;

(3) *Apple Inc. v. CPC Patent Technologies Pty Ltd.*, *Inter Partes* Review Case No. IPR2022-00602, filed February 23, 2022, of U.S. Patent No. 9,665,705; and

(4) *Apple Inc. v. CPC Patent Technologies Pty Ltd.*, *Inter Partes* Review Case No. IPR2022-00600, filed February 23, 2022, of U.S. Patent No. 8,620,039 (unrelated patent).

### C.    Lead and Back-Up Counsel

Petitioner provides the following designation and service information for lead and back-up counsel. 37 C.F.R. § 42.8(b)(3) and (b)(4).

| Lead Counsel | Back-Up Counsel |
|---|---|
| Jennifer C. Bailey (Reg. No. 52,583) | Adam P. Seitz (Reg. No. 52,206) |
| Jennifer.Bailey@eriseip.com | Adam.Seitz@eriseip.com |
| PTAB@eriseip.com | PTAB@eriseip.com |
| | |
| Postal and Hand-Delivery Address: | Postal and Hand-Delivery Address: |
| ERISE IP, P.A. | ERISE IP, P.A. |

72

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

| 7015 College Blvd., Suite 700 Overland Park, Kansas 66211 Telephone: (913) 777-5600 Fax: (913) 777-5601 | 7015 College Blvd., Suite 700 Overland Park, Kansas 66211 Telephone: (913) 777-5600 Fax: (913) 777-5601 |
|---|---|

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

**CLAIMS LISTING APPENDIX**

U.S. Patent No. 9,269,208, Claims 1, 3-7, 9-11, and 13

| Claim Designation | Claim Language |
|---|---|
| Claim 1(Pre) | A system for providing secure access to a controlled item, the system comprising: |
| Claim 1(a) | a database of biometric signatures; |
| Claim 1(b) | a transmitter sub-system comprising: |
| Claim 1(b1) | a biometric sensor for receiving a biometric signal; |
| Claim 1(b2) | means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and |
| Claim 1(b3) | means for emitting a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 1(c) | a receiver sub-system comprising: |
| Claim 1(c1) | means for receiving the transmitted secure access signal; and |
| Claim 1(c2) | means for providing conditional access to the controlled item dependent upon said information, |
| Claim 1(d) | wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures, the population means comprising: |
| Claim 1(d1) | means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; |
| Claim 1(d2) | means for mapping said series into an instruction; and |
| Claim 1(d3) | means for populating the data base according to the instruction, |
| Claim 1(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 3(a) | 3. The system according to claim 1, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class, |
| Claim 3(b) | the accessibility attribute preferably comprising: an access attribute if the biometric signal matches a member of the database of biometric signatures; |

74
**Appx251**

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

| Claim Designation | Claim Language |
|---|---|
| Claim 3(c) | a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class; and |
| Claim 3(d) | an alert attribute if the biometric signal does not match a member of the database of biometric signatures. |
| Claim 4 | 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/ or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. |
| Claim 5 | 5. The system according to claim 1, wherein said conditional access comprises one of:<br>provision of access to the controlled item if the accessibility attribute comprises an access attribute:<br>provision of access to the controlled item and sounding of an alert if the accessibility attribute comprises a duress attribute; and<br>denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute. |
| Claim 6(a) | 6. The system as claimed in claim 1, wherein: the biometric sensor is for authenticating the identity of a user; |
| Claim 6(b) | the means for emitting comprises a transmitter for transmitting information capable of granting more than two types of access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and |
| Claim 6(c) | the system further comprising a control panel for receiving the information and for providing the secure access requested. |
| Claim 7 | 7. The system according to claim 6, wherein the control panel includes a converter for receiving the secure wireless signal and for outputting the information, and/or the biometric sensor authenticates the identity of the user by comparing a biometric input from the user with a biometric signature for the user in a biometric database, and/or the biometric sensor, the biometric database, and the transmitter are located in a remote fob. |

| Claim Designation | Claim Language |
|---|---|
| Claim 9(Pre) | 9. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: |
| Claim 9(a) | a biometric sensor for receiving a biometric signal; |
| Claim 9(b) | means for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and |
| Claim 9(c) | means for emitting a secure access signal conveying said information dependent upon said accessibility attribute; |
| Claim 9(d) | wherein the transmitter sub-system further comprises means for populating the database of biometric signatures, the populating means comprising: |
| Claim 9(d1) | means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; |
| Claim 9(d2) | means for mapping said series into an instruction; and |
| Claim 9(d3) | means for populating the database according to the instruction, |
| Claim 9(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 10(Pre1) | 10. A method for providing secure access to a controlled item in a system comprising |
| Claim 10(Pre2) | a database of biometric signatures, |
| Claim 10(Pre3) | a transmitter sub-system comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal capable of granting more than two types of access to the controlled item, and |
| Claim 10(Pre4) | a receiver sub-system comprising means for receiving the transmitted secure access signal, and |
| Claim 10(Pre5) | means for providing conditional access to the controlled item dependent upon information in said secure access signal, |
| Claim 10(a) | the method comprising the steps of: populating the database of biometric signatures by: |
| Claim 10(a1) | receiving a series of entries of the biometric signal; |
| Claim 10(a2) | determining at least one of the number of said entries and a duration of each said entry; |
| Claim 10(a3) | mapping said series into an instruction; and |

| Claim Designation | Claim Language |
|---|---|
| Claim 10(a4) | populating the database according to the instruction; |
| Claim 10(b) | receiving a biometric signal; |
| Claim 10(c) | matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; |
| Claim 10(d) | emitting a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 10(e) | providing conditional access to the controlled item dependent upon said information, |
| Claim 10(f) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 11 | 11. The method according to claim 10, wherein the step of populating the database of biometric signatures further comprises the step of enrolling a biometric signature into the database of biometric signatures comprising the steps of:<br>receiving a biometric signal; and<br>enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty. |
| Claim 13 | 13. A non-transitory computer readable storage medium for storing a computer program comprising instructions which when executed by processors causes the processors to perform the steps of the method of claim 10. |

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## APPENDIX OF EXHIBITS

| **Exhibit 1001** | U.S. Patent No. 9,269,208 to Burke ("the *'208 Patent'*) |
|---|---|
| **Exhibit 1002** | File History for the '208 Patent ("the *'166 Application File History*") |
| **Exhibit 1003** | Declaration of Dr. Andrew Sears |
| **Exhibit 1004** | U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*") |
| **Exhibit 1005** | U.S. Patent No. 6,766,456 to McKeeth ("*McKeeth*") |
| **Exhibit 1006** | U.S. Patent No. 6,509,847 to Anderson ("*Anderson*") |
| **Exhibit 1007** | U.S. Patent No. 6,927,668 to Odle et al. ("*Odle*") |
| **Exhibit 1008** | Exhibit intentionally left blank |
| **Exhibit 1009** | Exhibit intentionally left blank |
| **Exhibit 1010** | U.S. Patent No. 6,612,928 to Bradford, et al. ("*Bradford*") |
| **Exhibit 1011** | Anil Jain, et al., Biometric Identification, Communication of the ACM, February 2000 |
| **Exhibit 1012** | Henry C. Lee, et al., Advances in Fingerprint Technology, Second Edition, CRC Press, copyright 2001 |
| **Exhibit 1013** | P. Jonathon Phillips, et al., An Introduction to Evaluating Biometric Systems, National Institute of Standards and Technology, IEEE, copyright 2000 |
| **Exhibit 1014** | U.S. Patent Publication No. 2003/0117261 to Gunsch ("*Gunsch*") |
| **Exhibit 1015** | U.S. Patent Publication No. 2003/0036825 to Kim ("*Kim*") |
| **Exhibit 1016** | U.S. Patent No. 6,140,939 to Flick ("*Flick*") |
| **Exhibit 1017** | U.S. Patent No. 6,164,403 to Wuidart ("*Wuidart*") |
| **Exhibit 1018** | U.S. Patent No. 7,239,227 to Gupta, et al. ("*Gupta*") |
| **Exhibit 1019** | U.S. Patent No. 6,877,097 to Hamid, et al. ("*Hamid*") |
| **Exhibit 1020** | U.S. Patent Publication No. 2001/0049785 to Kawan, et al. ("*Kawan*") |
| **Exhibit 1021** | U.S. Patent Publication No. 2002/0091937 to Ortiz ("*Ortiz*") |
| **Exhibit 1022** | U.S. Patent Publication No. 2003/0046552 to *Hamid* ("*Hamid '552*") |
| **Exhibit 1023** | U.S. Patent Publication No. 2002/0063154 to Hoyos, et al. ("*Hoyos*") |
| **Exhibit 1024** | U.S. Patent No. 6,484,260 to Scott, et al. ("*Scott*") |
| **Exhibit 1025** | U.S. Patent No. 7,404,086 to Sands, et al. ("*Sands*") |
| **Exhibit 1026** | Ross Tester, A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code", Silicon Chip.com.au, July 2002 |

| | |
|---|---|
| **Exhibit 1027** | Brent A. Miller, et al., Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications, 2001 |
| **Exhibit 1028** | U.S. Patent No. 7,284,266 to Morris, et al. ("*Morris*") |
| **Exhibit 1029** | Bricolage: Data Compression – Morse Code, https://perl.plover.com/Huffman/huffman.html, 1998 |
| **Exhibit 1030** | U.S. Patent No. 6,323,565 to Williams, Jr., et al. ("*Williams*") |
| **Exhibit 1031** | U.S. Patent No. 7,020,270 to Ghassabian ("*Ghassabian*") |
| **Exhibit 1032** | U.S. Patent Publication No. 2003/0048260 to Matusis ("*Matusis*") |
| **Exhibit 1033** | International Publication WO 02/27455 to Mathiassen ("*Mathiassen '455*") |
| **Exhibit 1034** | European Patent Application No. 88301738.6 to Araki et al. ("*Araki*") |
| **Exhibit 1035** | U.S. Patent No. 7,152,045 to Hoffman ("*Hoffman*") |
| **Exhibit 1036** | U.S. Patent No. 6,833,785 to Brown, et al. ("*Brown*") |
| **Exhibit 1037** | U.S. Patent Publication No. 2004/0015450 to Zingher, et al. ("*Zingher*") |
| **Exhibit 1038** | U.S. Patent No. 6,498,970 to Colmenarez, et al. ("*Colmenarez*") |
| **Exhibit 1039** | U.S. Patent No. 6,100,811 to Hsu, et al. ("*Hsu*") |
| **Exhibit 1040** | U.S. Patent No. 4,638,292 to Mochida, et al. ("*Mochida*") |
| **Exhibit 1041** | K-9 Car Alarm Owner's Guide and Installation Instructions, K-9 Mundial, Omega Research and Development, 2000 |
| **Exhibit 1042** | U.S. Patent No. 7,110,580 to Bostrom ("*Bostrom*") |
| **Exhibit 1043** | U.S. Patent No. 7,336,174 to Maloney ("*Maloney*") |
| **Exhibit 1044** | JoAnne Woodcock, Microsoft Press Computer Dictionary, Second edition, 1994 |
| **Exhibit 1045** | Microsoft Computer Dictionary, fifth edition, Microsoft Press, 2002 |
| **Exhibit 1046** | OnStar Features, OnStar, https://web.archive.org/web/20000619021703/http://www.onstar.com/features/3button.htm June 19, 2000 |
| **Exhibit 1047** | U.S. Patent No. 6,420,975 to DeLine, et al. ("*DeLine*") |
| **Exhibit 1048** | Exhibit intentionally left blank |
| **Exhibit 1049** | PC Basics: Get a Great Start, Survive and Thrive, copyright 2002 |
| **Exhibit 1050** | U.S. Patent Publication 2003/0160692 to Nonaka ("*Nonaka*") |
| **Exhibit 1051** | U.S. Patent No. 5,307,048 to Sonders ("*Sonders*") |
| **Exhibit 1052** | Merriam Webster's Collegiate Dictionary, tenth edition, copyright 1998 |

79

| | |
|---|---|
| **Exhibit 1053** | Alan Gatherer, et al., The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications, 2002 |
| **Exhibit 1054** | McGraw-Hill, Dictionary of Electrical and Computer Engineering, 2003 |
| **Exhibit 1055** | U.S. Patent No. 6,970,970 to Jung et al. ("*Jung*") |
| **Exhibit 1056** | Exhibit intentionally left blank |
| **Exhibit 1057** | Exhibit intentionally left blank |
| **Exhibit 1058** | Exhibit intentionally left blank |
| **Exhibit 1059** | Exhibit intentionally left blank |
| **Exhibit 1060** | Exhibit intentionally left blank |
| **Exhibit 1061** | Exhibit intentionally left blank |
| **Exhibit 1062** | Exhibit intentionally left blank |
| **Exhibit 1063** | Exhibit intentionally left blank |
| **Exhibit 1064** | Exhibit intentionally left blank |
| **Exhibit 1065** | Case No. 6:21-cv-00166-ADA Scheduling Order (Dkt No. 37) |
| **Exhibit 1066** | Case No. 6:21-cv-00165-ADA Motion to Transfer Venue (Dkt No. 22) |
| **Exhibit 1067** | Federal Court Management Statistics–Comparison Within Circuit, June 30, 2021 (Average time to trial statistics) |
| **Exhibit 1068** | Scott McKeown, District Court Trial Dates Tend to Slip After PTAB Discretionary Denials, July 24, 2020 |
| **Exhibit 1069** | Case No. 1:21-cv-00896-ADA (W.D. Tex.), Order Setting Jury Selection and Trial (Dkt No. 423) |
| **Exhibit 1070** | Judge Albright's Second Amended Standing Order Regarding Motions for Inter-District Transfer, August 18, 2021 |
| **Exhibit 1071** | In re Apple Inc., No 20-135 Order (Dkt No. 55) |
| **Exhibit 1072** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Proposed Claim Constructions ("*CPC's Initial Constructions*") |
| **Exhibit 1073** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Proposed Updated Claim Constructions ("*CPC's Initial Updated Constructions*") <br> * Note that document was served without a cover page |
| **Exhibit 1074** | Case No. 6:21-cv-00165 (W.D. Tex.), Joint Claim Construction Statement ("JCCS") (Dkt No. 57) |
| **Exhibit 1075** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Response to Defendant Apple Inc.'s Claim Construction Brief |

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

| | |
|---|---|
| **Exhibit 1076** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Sur-Reply to Defendant Apple Inc.'s Claim Construction Brief |
| **Exhibit 1077** | Case No. 6:21-cv-00165 (W.D. Tex.), Claim Construction Order, Dated February 10, 2022 |
| **Exhibit 1078** | Case No. 6:21-cv-00166 (W.D. Tex.), Email from Peter Tong, Law Clerk to J. Albright, to the Parties Re Meet & Confer, Dated February 10, 2022 |
| **Exhibit 1079** | Case No. 6:21-cv-00165 (W.D. Tex.), Email from George Summerfield, CPC Counsel, to the Court Re Narrowed Claims and Agreed-Upon Constructions, Dated February 14, 2022 |
| **Exhibit 1080** | Case No. 6:21-cv-00166 (W.D. Tex.), Claim Construction Order, Dated January 25, 2022 ("HMD Claim Construction Order") |

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

## CERTIFICATION OF WORD COUNT

The undersigned certifies pursuant to 37 C.F.R. § 42.24 that the foregoing Petition for *Inter Partes* Review, excluding any table of contents, mandatory notices under 37 C.F.R. § 42.8, certificates of service or word count, or appendix of exhibits, contains 13,734 words according to the word-processing program used to prepare this document (Microsoft Word).

Dated: February 23, 2022

Respectfully submitted,

BY:  /s/    Jennifer C. Bailey
Jennifer C. Bailey, Reg. No. 52,583
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

*Inter Partes* Review No. IPR2022-00601
U.S. Patent No. 9,269,208

**CERTIFICATE OF SERVICE ON PATENT OWNER**
**UNDER 37 C.F.R. § 42.105**

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105, the undersigned certifies that on

February 23, 2022, a complete and entire copy of this Petition for *Inter Partes*

Review including exhibits was provided via Priority Mail Express to the Patent

Owner by serving the correspondence address of record for the '208 Patent as listed

on PAIR:

> Crowell/BGL
> P.O. Box 10395
> Chicago, IL 60610

Further, a courtesy copy of this Petition for *Inter Partes* Review was sent via

electronic mail to Patent Owner's litigation counsel:

> Ben Roxborough (ben.roxborough@klgates.com)
> Dhohyung Kim (dk.kim@klgates.com)
> George C. Summerfield (george.summerfield@klgates.com)
> James A. Shimota (jim.shimota@klgates.com)
> Stewart Mesher (stewart.mesher@klgates.com)
> Elizabeth Abbott Gilman (beth.gilman@klgates.com)
> Jonah Heemstra (jonah.heemstra@klgates.com)

Respectfully submitted,

BY:  __/s/     Jennifer C. Bailey__
Jennifer C. Bailey, Reg. No. 52,583
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

83
**Appx260**

Trials@uspto.gov                                                    Paper No. 3
571-272-7822

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

—————————

Case IPR2022-00601
Patent 9,269,208

—————————

Mailed: March 31, 2022

Before STEVEN M. AMITRANI, *Trial Paralegal*

NOTICE OF FILING DATE ACCORDED TO PETITION
AND
TIME FOR FILING PATENT OWNER PRELIMINARY RESPONSE

The petition for *inter partes* review filed in the above proceeding has been accorded the filing date of February 23, 2022.

Patent Owner may file a preliminary response to the petition no later than three months from the date of this notice.  The preliminary response is limited to setting forth the reasons why the requested review should not be

IPR2022-00601
Patent 9,269,208

instituted. Patent Owner may also file an election to waive the preliminary response to expedite the proceeding. For more information, please consult the Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012), which is available on the Board Web site at http://www.uspto.gov/PTAB.

Patent Owner is advised of the requirement to submit mandatory notice information under 37 C.F.R. § 42.8(a)(2) within 21 days of service of the petition.

The parties are encouraged to use the heading on the first page of this Notice for all future filings in the proceeding.

The parties are advised that under 37 C.F.R. § 42.10(c), recognition of counsel pro hac vice requires a showing of good cause. The parties are authorized to file motions for pro hac vice admission under 37 C.F.R. § 42.10(c). Such motions shall be filed in accordance with the "Order -- Authorizing Motion for Pro Hac Vice Admission" in Case IPR2013-00639, Paper 7, a copy of which is available on the Board Web site under "Representative Orders, Decisions, and Notices." **The parties are reminded that, in order for any motion for *pro hac vice* admission to be considered by the Board, the requisite fees must first be paid.** The current fee schedule is available at https://www.uspto.gov/learning-and-resources/fees-and-payment/uspto-fee-schedule.

The parties are reminded that unless otherwise permitted by 37 C.F.R. § 42.6(b)(2), all filings in this proceeding must be made electronically in Patent Trial and Appeal Board End to End (PTAB E2E), accessible from the Board Web site at http://www.uspto.gov/PTAB. To file documents, users must register with PTAB E2E. Information regarding how to register with and use PTAB E2E is available at the Board Web site.

2

IPR2022-00601
Patent 9,269,208

If there are any questions pertaining to this notice, please contact Steven M. Amitrani at 469-270-5927 or the Patent Trial and Appeal Board at 571-272-7822.

PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com

PATENT OWNER:

CROWELL/BGL
P.O. BOX 10395
CHICAGO IL 60610

3

IPR2022-00601
Patent 9,269,208

## NOTICE CONCERNING ALTERNATIVE DISPUTE RESOLUTION (ADR)

The Patent Trial and Appeal Board (PTAB) strongly encourages parties who are considering settlement to consider alternative dispute resolution as a means of settling the issues that may be raised in an AIA trial proceeding. Many AIA trials are settled prior to a Final Written Decision. Those considering settlement may wish to consider alternative dispute resolution techniques early in a proceeding to produce a quicker, mutually agreeable resolution of a dispute or to at least narrow the scope of matters in dispute. Alternative dispute resolution has the potential to save parties time and money.

Many non-profit organizations, both inside and outside the intellectual property field, offer alternative dispute resolution services. Listed below are the names and addresses of several such organizations. The listings are provided for the convenience of parties involved in cases before the PTAB; the PTAB does not sponsor or endorse any particular organization's alternative dispute resolution services. In addition, consideration may be given to utilizing independent alternative dispute resolution firms. Such firms may be located through a standard keyword Internet search.

| CPR INSTITUTE FOR DISPUTE RESOLUTION | AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION (AIPLA) | AMERICAN ARBITRATION ASSOCIATION (AAA) | WORLD INTELLECTUAL PROPERTY ORGANIZATION (WIPO) | AMERICAN BAR ASSOCIATION (ABA) |
|---|---|---|---|---|
| Telephone: (212) 949-6490 | Telephone: (703) 415-0780 | Telephone: (212) 484-3266 | Telephone: 41 22 338 9111 | Telephone : (202) 662-1000 |
| Fax: (212) 949-8859 | Fax: (703) 415-0786 | Fax: (212) 307-4387 | Fax: 41 22 733 5428 | N/A |
| 575 Lexington Ave | 241 18th Street, South, Suite 700 | 140 West 51st Street | 34, chemin des Colombettes | 1050 Connecticut Ave, NW |
| New York, NY 10022 | Arlington, VA 22202 | New York, NY 10020 | CH-1211 Geneva 20, Switzerland | Washington D.C. 20036 |
| www.cpradr.org | www.aipla.org | www.adr.org | www.wipo.int | www.americanbar.org |

If parties to an AIA trial proceeding consider using alternative dispute resolution, the PTAB would like to know whether the parties ultimately decided to engage in alternative dispute resolution and the reasons why or why not. If the parties actually engage in alternative dispute resolution, the PTAB would be interested to learn what mechanism (e.g., arbitration, mediation, etc.) was used and the general result. Such a statement from the parties is not

4

**Appx264**

IPR2022-00601
Patent 9,269,208

required but would be helpful to the PTAB in assessing the value of alternative dispute resolution to parties involved in AIA trial proceedings. To report an experience with ADR, please forward a summary of the particulars to the following email address: PTAB_ADR_Comments@uspto.gov

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**PATENT TRIAL AND APPEAL BOARD**

---

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

---

Case IPR2022-00601
U.S. Patent No. 9,269,208

---

**PRELIMINARY PATENT OWNER'S RESPONSE**

IPR2022-00601
U.S. Patent No. 9,269,208

## TABLE OF CONTENTS

I.    Introduction.................................................................................................1

II.   Discussion...................................................................................................3

    A.    The Genesis of the *Fintiv* Factors for Discretionary Denial of
Institution ...............................................................................................3

    B.    The Application of the *Fintiv* Factors, as Supplemented by the *Interim*
Procedures, Mandates Discretionary Denial of Institution ...........................5

        1.    *Fintiv* Factor One ........................................................................5

        2.    *Fintiv* Factor Two........................................................................6

        3.    *Fintiv* Factor Three......................................................................8

        4.    *Fintiv* Factor Four .....................................................................10

        5.    *Fintiv* Factor Five......................................................................11

        6.    *Fintiv* Factor Six........................................................................12

            a.    Apple's Numerous Other Prior Art References .............12

            b.    The Petition's Merits .......................................................13

                i.   The "Duration" Limitation ......................................13

                ii.  The "Under Which Conditions" Requirement.........17

                iii.  The Circumstances Do Not Compel Institution......18

        7.    Conclusion Regarding the *Fintiv* Factors .................................19

    C.    *Finitv* Should not be Overruled..........................................................19

        1.    *Fintiv* did not Exceed the Director's Authority ........................19

        2.    *Finisar* is Neither Arbitrary nor Capricious ............................20

        3.    *Finisar* does not Represent Improper Rulemaking...................21

III.  Conclusion ...............................................................................................22

i

IPR2022-00601
U.S. Patent No. 9,269,208

## EXHIBIT LISTING

| Exhibit | Description |
|---|---|
| 2001 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, 6:21-cv-00166 (Dkt. 27) (Sept. 23, 2021) |
| 2002 | HMD Global Oy's Final Invalidity Contentions, Chart B15 - Mathiassen, dated March 16, 2022 |
| 2003 | Defendant Apple Inc.'s Notice of Motion and Motion to Stay Pending *Inter Partes* Review, 5:22-cv-02553 (Dkt. 119) (June 14, 2022) |
| 2004 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 37) (Sept. 23, 2021) |
| 2005 | March 19, 2020 Letter from George Summerfield to Brian Ankenbrandt |

## I.    INTRODUCTION

Patent Owner, CPC Patent Technologies ("CPC" or "Patent Owner"), submits this Patent Owner Preliminary Response ("POPR") pursuant to 37 C.F.R. § 42.107(a) to the *Inter Partes* Review ("IPR") petition ("Petition") filed by Petitioner Apple Inc. ("Apple" or "Petitioner") for Claims 1, 3-7, 9-11, and 13 ("Challenged Claims") of U.S. Patent No. 9,269,208 ("the '208 Patent," Ex. 1001).

The instant Petition presents a novel, but nonetheless compelling, set of circumstances as it concerns the *Fintiv* factors for discretionary denial of institution. Apple filed its Petition while the '208 Patent was also the subject of a pending district court action between the parties ("the Apple Litigation").[1] *See* Paper No. 1 at 72.  In the *interim*, Patent Owner, CPC Patent Technologies Pty, Ltd. ("CPC"), dismissed its infringement claim for the '208 Patent in the district court action.  However, CPC maintains its infringement claim for U.S. Patent No. 9,665,705 ("the '705 Patent")

---

[1] Apple succeeded in having the Apple Litigation, originally filed in the Western District of Texas (*CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 6:21-cv-00165 (W.D. Tex.)), transferred to the Northern District of California.  *In re Apple Inc.*, No. 2022-128, 2022 WL 1196768 (Fed. Cir. Apr. 22, 2022).  The case is now styled *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 5:22-cv-02553 (N.D. Cal.).

– a patent that is separately the subject of IPR2022-00602, and which is related to the '208 Patent. *See id.*

Specifically, as explained herein, the challenged claim of both the '208 and '705 Patents all contain the limitation "at least one of the number of said [biometric signal] entries and a duration of each said entry" ("the Duration Limitation"), and Apple relies upon the same prior art combination in the same way as purportedly satisfying that limitation as to both challenged patents. *Compare* Paper No. 1 at 3 and *Apple Inc. v. CPC Patent Technologies Pty, Ltd.*, IPR2022-00602, Paper 1 at 3 (PTAB Feb. 23, 2022).

Furthermore, in a co-pending matter styled *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, No. 6:21-cv-00166 (W.D. Tex.) ("the HMD Litigation"),[2] defendant HMD Global Oy ("HMD"), as part of its invalidity defenses, cites the same prior art combination as allegedly teaching the Duration Limitation in the '705 Patent. Ex. 2002 at 63-64. That case is scheduled for trial in January 2023. Ex. 2001 at 5. Thus, whether that same prior art combination in fact teaches that limitation will be litigated in district court nine months ***before*** the Final Written Decision would be scheduled to issue in this proceeding in the event of institution. These circumstances warrant discretionary denial of institution.

---

[2] Apple identifies the HMD Litigation as a Related Matter. Paper No. 1 at 72.

IPR2022-00601
U.S. Patent No. 9,269,208

Apple recognizes the problem it faces in light of the Board's decisions in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019 ("*Fintiv*"). In fact, after presenting a lukewarm analysis of the six *Fintiv* factors, Apple ultimately resorts to arguing that the analytical framework under *Fintiv*, as explained in informational (Paper 15) and precedential (Paper 11) opinions of this Board, should be overruled. *See* Paper No. 1 at 69-70. Of course, Apple is wrong and not a single *Fintiv* factor weighs in favor of institution, as explained herein. The case for discretionary denial of the instant Petition is so clear that Patent Owner has determined not to burden the Board with a full discussion of the merits of the Petition in this Preliminary Response.[3] The Board should exercise its discretion under 35 U.S.C. § 314(a) to deny institution in this case.

## II.    DISCUSSION

### A.    The Genesis of the *Fintiv* Factors for Discretionary Denial of Institution

As Apple notes, the Board has the discretionary ability to deny institution under 35 U.S.C. § 314(a) in light of parallel litigation. In 2019, the Board issued its

---

[3] Patent Owner will address the merits of the Petition in the unlikely event that the Board institutes *inter partes* review, notwithstanding the result mandated by the application of the *Fintiv* factors.

3
**Appx271**

IPR2022-00601
U.S. Patent No. 9,269,208

precedential opinion in *NHK Spring Co., Ltd. v. Intri-plex Technologies, Inc.*, wherein it exercised its discretion under section 314(a) to deny institution of an otherwise timely-filed petition for *inter partes* review in light of the advanced stage of an earlier-filed district court litigation. *NHK Spring Co., Ltd. v. Intri-plex Technologies, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018) (designated precedential May 7, 2019). Thereafter, the Board issued its precedential opinion in *Fintiv* in which it identified six factors that are to be considered for discretionary denial in light of a corresponding district court litigation. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (designated precedential May 5, 2020).[4]

---

[4] CPC is cognizant of the *interim* procedures regarding discretionary denial propounded by the Director on June 21, 2022 ("*Interim* Procedures"). CPC understands those procedures as clarifying the *Fintiv* decision, rather than undoing that decision. The clarifications contained in the *Interim* Procedures are addressed herein where appropriate.

**B.** **The Application of the *Fintiv* Factors, as Supplemented by the *Interim* Procedures, Mandates Discretionary Denial of Institution**

**1.** ***Fintiv* Factor One**

The first factor articulated by the Board in *Fintiv* is whether there has been a stay of the subject district court proceeding, which is as neutral when there has been no district court ruling on a stay. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 12 (PTAB May 13, 2020) (designated informative July 13, 2020); *Sand Revolution II, LLC v. Continental Intermodal Grp. Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020); *MediaTek Inc. v. Nippon Tel. and Tel. Corp.*, IPR2020-01607, Paper 12 at 12 (PTAB April 2, 2021) ("Petitioner represents it will move to stay the District Court Lawsuit [if institution is granted but does not know] how the District Court will rule . . . [t]hus, this factor should be viewed as neutral"). This is because the Board has consistently declined to infer "how the District Court would rule should a stay be requested by the parties." *Fintiv*, Paper No. 15 at 12. *See also Dish Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 at 13 (PTAB Feb. 4, 2021) (*Dish Network*) (how a court might handle the issue of stay in the absence of a motion therefor "invites conjecture" and this factor remains "neutral").

Despite having indicated to the Board that it would seek a stay of the district court action in the event institution is granted (Paper No. 1 at 63), Apple has moved

for a **pre-institution** stay now that the matter has been transferred to the Northern District of California. *See* Ex. 2003. Putting aside Apple's about-face on this issue, there has been no ruling regarding the requested stay in the Apple Litigation. Separately, in the co-pending HMD Litigation, HMD has not moved for a stay, meaning that, as currently scheduled, the cited prior art's teaching of the Duration Limitation (or lack thereof) will be litigated in January 2023. *See* Ex. 2001 at 5. Absent such a stay, this factor is neutral at best.

### 2.    *Fintiv* Factor Two

The second *Fintiv* factor considers the relative timing between a district court trial and a projected date for a Final Written Decision from the Board. If the district court trial is projected to be earlier than the projected Final Written Decision date, this factor tends to weigh in favor of institution denial. *Fintiv*, Paper No. 11 at 9. The *Interim* Procedures further admonish that "[t]he PTAB will weigh this factor against exercising discretion to deny institution under *Fintiv* if the median time-to-trial is around the same time or after the projected statutory deadline for the PTAB's final written decision." *Interim* Procedures at 9.

This case is unusual as to this factor as the subject trial will be in a co-pending matter, and pertains to a related, albeit different, patent. Nonetheless, this factor counsels in favor of discretionary denial. In the co-pending matter, HMD urges that the Duration Limitation of the '705 Patent is taught by the same

*Mathiassen/Anderson* combination relied upon by Apple in this proceeding for a purported teaching of that same limitation in the '208 Patent. *See* Ex. 2002 at 63-64. The trial in that co-pending matter is scheduled for January 2023, **nine months** before the final written decision is scheduled to issue in this proceeding, assuming institution. Ex. 2001 at 5.

The Board has consistently found that a gap of at least six months from district court trial to the Board's final written decision weighs heavily in favor of institution denial. *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.,* IPR2020-00122, Paper 15 at 7-8 (PTAB May 15, 2020); *SK Innovation Co. v. LG Chem, Ltd.*, IPR2020-01240, Paper 15 at 16-17 (PTAB Jan. 12, 2021); *Supercell Oy v. Gree, Inc.*, IPR2020-00310, Paper 13 at 10-12 (PTAB Jun. 18, 2020). The *Interim* Procedures, which mandate weighing this factor against denial only where the time to trial is around the same time or after the final written decision, does not disturb the Board's decisions on this point. *Interim* Procedures at 9. Accordingly the nine-month gap between the trial in the HMD Litigation and the final written decision weighs heavily in favor of denial.

Apple argues that a scheduled trial date "may not be the 'actual trial date,'" which would presumably apply to the HMD litigation as well. Paper No. 1 at 64. The *Interim* Procedures actually address this issue by referencing "median time-to-trial" in the relevant jurisdiction as the appropriate metric. *Interim* Procedures at 9.

The most recent statistics indicate that, in the Western District of Texas, the approximate time to trial is two years from the filing of the complaint. *VoIP-Pal.com v. Google LLC*, 6:21-cv-00667, 2022 WL 2068254, at *7 (W.D. Tex. June 8, 2022). CPC filed the complaint in the HMD Litigation on February 23, 2021. *See CPC Patent Technologies Pty Ltd., v. HMD Global Oy*, No. 6:21-cv-00166 (W.D. Tex. Feb. 23, 2021) [ECF Docket No. 1]. Given that filing date, the median time to trial in the Western District of Texas would be approximately February 2023, which coincides with the trial schedule in that case. In light of the *Interim* Procedures, this second *Fintiv* factor weighs against institution.

### 3.    *Fintiv* Factor Three

The third *Fintiv* factor includes a diligence component. *Fintiv*, Paper No. 11 at 11. This factor, evaluated "at the time of the institution decision," considers whether "the parallel proceeding is more advanced . . . and instituting would lead to duplicative costs." *Id.* at 9-10. This factor favors denial where "the district court has issued substantive orders related to the patent," such as a claim construction order. *Id.* As such, filing a petition "at or around the same time that the patent owner responded to the petitioner's invalidity contentions," may weigh in favor of discretionary denial. *Medtronic, Inc. v. Teleflex Innovs. S.A.R.L.*, IPR2020-01341, Paper 11 at 10-11 (PTAB Feb. 9, 2021).

The Western District of Texas issued claim construction orders in the Apple Litigation and in the HMD Litigation on February 10, 2022 and January 25, 2022, respectively. Paper No. 1 at 5; Exs. 1077; 1080. The litigants' final infringement and invalidity contentions in both the HMD and Apple Litigations were exchanged on March 16, 2022. Ex. 2001 [HMD Schedule] at 3; Ex. 2004 [Apple Schedule] at 3. In the HMD litigation, factual discovery closes on July 29, 2022. Ex. 2001 at 3. The parties' initial expert reports are due in that litigation on August 12, 2022 and expert discovery closes on September 21, 2022. *Id.* at 4. Therefore, both fact and expert discovery will be fully complete before "the time of the institution decision." *Id*. at 4.

Further, Apple may argue that it was entitled to avail itself of the one year statutory deadline for filing a review Petition. *See* Paper No. 1 at 65-66. However, Apple was on notice of CPC's position regarding infringement of the '705 Patent by virtue of a letter CPC sent on March 19, 2020. Ex. 2005. While Apple may have been statutorily entitled to take the entire one-year period to file the instant Petition (which it did),[5] that does not establish the diligence required to avoid discretionary denial.

---

[5] CPC served the complaint on Apple on March 1, 2021. *CPC Patent Technologies Pty Ltd. v. Apple Inc*., 6:21-cv-00165 (W.D. Tex. March 3, 2022) [ECF Docket No.

Apple also argues that its delay in filing was attributable to its waiting for CPC's constructions of the means-plus-function limitations in the '208 Patent. Paper No. 1 at 66. Apple provides no explanation as to why CPC's proposed constructions were a prerequisite to seeking *inter partes* review, as the Board regularly performs claim construction as part of such a review.

Given Apple's lack of diligence in waiting almost two years after becoming aware of Patent Owner's infringement position, and the amount of effort that the parties have already expended, this factor weighs in favor of exercising the Board's discretion to deny institution.

### 4.    *Fintiv* Factor Four

The fourth *Fintiv* factor examines the extent to which issues before the district court and the Board will overlap. Where a "petition includes the same or substantially the same claims, grounds, arguments, and evidence" as presented in a district court litigation, the "concerns of inefficiency and the possibility of conflicting decisions [are] particularly strong." *Fintiv*, Paper No. 11 at 12.

As explained above, in the HMD Litigation, HMD is urging that the *Mathiassen/Anderson* prior art combination teaches the Duration Limitation

---

10] (reflecting complaint service on March 1, 2022). The Petition was filed on February 23, 2022, or 359 days after service.

common to both the '705 and '208 Patents. *See* Ex. 2002 at 63-64. This is the same prior art combination relied upon by Apple for an alleged teaching of that limitation. *See* Paper No. 1 at 2-3. In other words, this issue, common to both the instant proceeding and the HMD Litigation, will be decided ***nine months*** before the final written decision would issue in this proceeding.

Apple has stated that, in the event of institution, it will not urge "any ground of invalidity that utilizes *Mathiassen*, *McKeeth*, or *Anderson*" in the Apple Litigation. Paper No. 1 at 67. Given that CPC is no longer asserting the '208 Patent against Apple, this stipulation is moot as far as Apple is concerned.[6] However, this stipulation is ineffective as to HMD, which remains free to assert each of these references in the HMD Litigation.

### 5.    *Fintiv* Factor Five

Under the fifth *Fintiv* factor, when the petitioner is also a defendant in the district court litigation, this factor has generally weighed in favor of discretionary

---

[6] To the extent the Board finds Apple's stipulation relevant, the *Interim* Procedures make clear, a stipulation is only effective "where a petitioner stipulates not to pursue in a parallel district court proceeding the same grounds as in the petition ***or any grounds that could have reasonably been raised in the petition***." *Interim* Procedures at 9 (emphasis added). Apple has not so stipulated.

denial.  *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 16 (PTAB Dec. 1, 2020) (designated precedential Dec. 17, 2020).  Apple cites to the dissenting opinion in *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 at 10 (PTAB May 15, 2020), which noted that there had been no pronouncement "about situations in which the petitioner is the same as, or is related to, the district court defendant."  Paper No. 1 at 68.  Certainly, the precedential opinion in *Sotera* has changed that, and Apple being both Petitioner here, and a defendant in a co-pending district court action weighs in favor of discretionary denial, especially given that its former co-defendant, HMD, has cited the very same prior art in challenging a claim limitation common to both the '705 and '208 Patents.

### 6.     *Fintiv* Factor Six

#### a.       Apple's Numerous Other Prior Art References

Finally, the sixth *Fintiv* factor involves an all-encompassing consideration of the "relevant circumstances" in the case.  *Fintiv*, Paper No. 11 at 14.  In addition to the three references forming its single challenge ground, Apple references more than three dozen additional prior art references in its Petition.  *See* Exs. 1011-1016, 1018, 1021, 1022, 1024, 1026, 1027-1047, 1050-1051, 1053 and 1055.  Apple's Trojan horse approach to introducing several dozen additional references would not result in an efficient use of the Board's time and resources, and discretionary denial is warranted.  *Deeper, UAB v. Vexilar, Inc.*, Case IPR2018-01310, Paper No. 7, at 43

(PTAB Jan. 24, 2019). Indeed, through this approach, Apple has shifted a substantial amount of work to the Board (and Patent Owner), who will be required to study each of these dozens of references and ascertain what they do and do not teach. This stands in stark contradiction to the requirement of the patent statute's directive for IPR petitions to identify "**with particularity**…the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016).

More importantly, the inclusion of several dozen additional references beyond those relied upon in the single ground raised by the Petition undermines the strength of the merits of the formal ground Apple is asking the Board to review. In other words, had Apple been confident in its asserted combination of *Mathiassen*, *McKeeth*, and *Anderson*, it would not have had to resort to raising any additional references—let alone dozens. This approach just creates unnecessary work and inefficiencies for Patent Owner and the Board, explicitly against the policy of efficiency that motivated Congress to establish *inter partes* reviews in the first place. *See Intelligent Bio-Sys.*, 821 F.3d at 1369.

### b. The Petition's Merits

### i. The "Duration" Limitation

The strength of the merits of the Petition is relevant to the analysis when weighing this sixth factor. *Fintiv*, Paper No. 11 at 14. In this case, all of the

13

challenged claims contain the Duration Limitation.[7]  The Western District of Texas construed this limitation such that "at least" modifies "one of the number of said entries" and that the claims further require "a *duration* of each said entry," and Apple relies on that construction in the instant Petition.  *See* Paper No. 1 at 31 (emphasis added).  Thus, to teach this limitation, a prior art reference must disclose a duration for each entry in a series of *biometric* signal entries.

The sole teaching of this claimed "duration" requirement in the cited prior art according to Apple is contained in the *Anderson* reference.  Apple characterizes *Anderson*'s teachings as "inputting an access code at a *fingerprint* sensor that is a 'series of pressure pulses having varying durations.'"  Paper No. 1 at 32 (emphasis added).  Apple's characterization of *Anderson* is wrong, as it conflates two separate features described in that reference.  On the one hand, *Anderson* teaches an "access code" generated by "inputting information by temporally varying the amount of pressure applied to a touch interface such as *a digitizer (touch) pad, cursor control stick, touch screen, or the like*."  Ex. 1006, col. 1, lines 52-65 (emphasis added).

On the other hand, *Anderson* teaches that "[t]he entered access code may be utilized *in conjunction with* other security measures," such as where a  "digitizer

---

[7] In Apple's Claim Listing Appendix, this limitation is included in what Apple labeled as elements 1(d1), 3(a), 9(d1) & 10(a2).

pad" also includes "an optical scanner or thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered." *Id.*, col. 7, lines 1-7 (emphasis added).    In other words, the digitizer pad works with or without fingerprint imaging, and the durational variation applied to *Anderson*'s digitizer pad is unrelated to the optionally simultaneous fingerprint imaging taught by *Anderson*. In fact, *Anderson* denigrates "fingerprint recognition," which "utilize[s] specialized equipment and may require sophisticated software for implementation." *Id.*, col. 1, lines 54-58.  Thus, *Anderson* fails to teach any duration for the individual biometric signals within a series of such signals.  Even if the Board believes resolution of this issue warrants further investigation, that investigation will be fully resolved in the HMD Litigation nearly nine months before a Final Written Decision is expected through this Petition.

Apple's expert, Dr. Andrew Sears, opined that "[a] POSITA would have been motivated and found it obvious to add *Anderson*'s series of presses or pulses as an input on the portable door control or replace *Mathiassen's* finger movements with *Anderson*'s series of presses or pulses to input commands into the portable door control 20." Ex. 1003, ¶¶ 210-11.  However, Dr. Sears failed to address the distinction between *Anderson's* digitizer pad, which allows durational variation, and the optional optical scanner or thermal sensor, which allows for fingerprint imaging.

Rather, Dr. Sears opined in conclusory fashion that "[m]odifying *Mathiassen's* portable control to include receipt of a command via presses of a particular duration allows for simplified input of multiple commands using *Mathiassen's* portable door control." *Id.* at ¶ 210. Dr. Sears fails to explain how *Mathiassen's* fingerprint sensor could be modified to receive any durational information, in *lieu* of receiving traditional fingerprint data. Such a conclusory argument is insufficient to support a petitioner's burden for institution purposes. *See Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012); *see also Coalition for Affordable Drugs V LLC v. Biogen Int'l GmbH*, IPR2015-01086, Paper No. 18 at 11 (PTAB Oct. 27, 2015). Further, it is improper to ignore instances of teaching away, such as *Anderson's* denigration of fingerprint recognition, while favoring broad statements regarding a motivation to combine. *Andrea Electronics Corp. v. Apple, Inc.,* App. No. 2021-1248, 2022 WL 1197341, at *5 (Fed. Cir. April 22, 2022).

Finally, even if one could jerry-rig a combination of the teachings of *Mathiassen* and *Anderson*, Dr. Sears provides no explanation regarding how the resulting durational information in such combination relates to the ***biometric*** signal entries, as required by the challenged claims. This alone belies the conclusion that Apple is likely to satisfy its invalidity burden.

### ii.    The "Under Which Conditions" Requirement

As Apple notes, the district court defined "accessibility attribute" as an "attribute that establishes whether and ***under which conditions*** access to the controlled item should be granted to a user." Paper No. 1 at 9, 40 (emphasis added). The independent claims of the '208 Patent make clear that the output of the claimed "accessibility attribute" is a function of "matching the biometric signal against members of the database of biometric signatures." *See, e.g.,* Ex. 1001, col. 15, lines 47-49.

Apple relies on *McKeeth's* teaching of outputting "both a duress instruction and an alert instruction when there is no [biometric signal] match" to supplement *Mathiassen* in order to satisfy the "under which conditions" requirement of the "accessibility attribute" limitation. Paper No. 1 at 42. According to Apple, "[i]t would have been obvious to modify *Mathiassen*'s portable control to include duress and alert access taught by *McKeeth*." *Id.* at 22. *See also* Ex. 1003, ¶ 139.

Apple does not explain how the purported "accessibility attribute" taught by *McKeeth* results from a comparison of ***biometric*** information, as required by the challenged claims. In actuality, *McKeeth* teaches using a peripheral device to generate a "unique geometric pattern," *e.g.,* "a triangle," that the peripheral device then sends to a "computer system." *See* Ex. 1005, col. 6, lines 35-44. If the transmitted geometric pattern does not match a pattern stored in the computer

17

system, the computer system may "generate a security alert to the responsible authorities." *Id.,* col. 6, lines 48-52.

In other words, *McKeeth's* security alert is ***not*** a function of a comparison of any biometric information.  Thus, even if one were motivated to combine *Mathiassen* and *McKeeth* as Apple suggests, the result would not include outputting an "accessibility attribute" resulting from a comparison of biometric information. This belies Apple's claim that the combination of *Mathiassen* and *McKeeth* renders obvious the invention claimed in the '208 Patent.

Otherwise, Apple equates *Mathiassen's* "open door" command with "under which conditions" (as opposed to "whether") access to a car is granted.  *See* Paper No. 1 at 42.  However, as Apple acknowledges, its expert characterizes this "open door" command as "***unconditional*** access."  *Id.* at 42-43 (emphasis added).  By imputing a conditionality to unconditional access, Apple improperly attempts to conflate the "whether" and "under which conditions" requirements of the claimed "accessibility attribute."

### iii.    The Circumstances Do Not Compel Institution

The *Interim* Procedures provides for institution notwithstanding the *Fintiv* factors "when a petition presents compelling evidence of unpatentability."  *Interim* Procedures at 9.  In its Petition, Apple does not identify any compelling factor requiring institution.

### 7.    Conclusion Regarding the *Fintiv* Factors

Only the first *Fintiv* factor, regarding the absence of a stay, is neutral.  The remaining ***five*** factors weigh in favor of discretionary denial.  There can be little dispute under those circumstances that the Board should exercise its discretion under section 314(a) in denying institution of *inter partes* review in this case.

### C.    *Fintiv* Should not be Overruled

In a last gasp effort to avoid discretionary denial of its Petition, Apple argues that the precedential decision in *Fintiv* should be overruled for a variety of reasons, none of which is well-founded for the reasons set forth below.

### 1.    *Fintiv* did not Exceed the Director's Authority

Section 314(a) is clear on its face – "[t]he Director may not authorize an *inter partes* review to be instituted unless the Director determines that the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a).  While this plain language limits the Director's ability to institute *inter partes* review, it places no limit on the Director's discretion to deny institution.  *See Harmonic Inc. v. Avid Technology, Inc.*, 815 F.3d 1356, 1367 (given the language of section 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding").

Apple argues nonetheless that *Fintiv* exceeded the Director's authority. Paper No. 1 at 69. The sole authority cited by Apple for that proposition, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, deals with the inapposite issue of whether the common law doctrine of laches applies to bar a cause of action under the Copyright Statute. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686-87 (2014). There is nothing in the Copyright Statute equivalent to the Board's institution decision in an *inter partes* review. Rather, the copyright owner "is entitled, subject to the requirements of section 411,[8] to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. §501(b). *Petrella*, then, is unhelpful in evaluating the Director's authority as it concerns discretionary denial.

### 2.    *Fintiv* is Neither Arbitrary nor Capricious

Apple next critiques the *Fintiv* decision as requiring "speculation about parallel litigation." Paper No. 1 at 69. As noted above, the Board does not simply create its impressions about parallel litigation out of whole cloth. This is in contrast to the situation in *Horsehead Resource Dev. Co. v. Browner*, in which the Environmental Protection Agency had "***no*** information on this issue" of

---

[8] Section 411 addresses the registration of a copyright, and confers no discretion on a court not to proceed with a copyright infringement action. 17 U.S.C. § 411.

"quantifying CO and THC baselines." *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). Further, this purported speculation impacts one out of the six *Fintiv* factors. The remainder of the factors are based upon objective, knowable facts.

### 3.    *Fintiv* does not Represent Improper Rulemaking

Finally, Apple posits that *Fintiv* constitutes improper rulemaking without the requisite notice and public comment. Paper No. 1 at 70. In fact, the rules governing the denial of institution, which gives broad discretion therefor, is already in place. Specifically, "[a]t any time prior to a decision on institution of *inter partes* review, the Board may deny all grounds for unpatentability for all of the challenged claims." 37 C.F.R. § 42.108(b). The rules also parrot the language of the statute that only limits the ability to institute *inter partes* review with no corresponding limitation on the ability to deny such institution. 37 C.F.R. § 42.108(c). In short, far from representing improper rulemaking, *Fintiv* represents the Board's efforts to provide additional clarity to existing rules that it was not required to provide.

In any event, the Commissioner has now issued the *Interim* Procedures, which resulted from 822 comments from a wide range of stakeholders. *Interim* Procedures at 2. As the *Interim* Procedures clarify the *Fintiv* factors, the public rulemaking requirement, to the extent it applies here, has been satisfied.

IPR2022-00601
U.S. Patent No. 9,269,208

## III.    CONCLUSION

The decision in *Fintiv*, as clarified by the *Interim* Procedures, is precedential, and therefore binding.  The factors set forth in that decision weigh heavily in favor of a discretionary denial of institution.  As such, the Board should exercise its discretion and deny institution.

Dated: <u>June 30, 2022</u>                               Respectfully submitted,

                                                      By:    /Darlene F. Ghavimi-Alagha/
                                                             Darlene F. Ghavimi-Alagha
                                                             Reg. No. 72,631
                                                             K&L GATES LLP
                                                             Darlene.Ghavimi@klgates.com
                                                             T: (512) 482-6919
                                                             F: (512) 482-6859
                                                             2801 Via Fortuna, Suite 650
                                                             Austin, Texas 78746

                                                             *Counsel for Patent Owner*

IPR2022-00601
U.S. Patent No. 9,269,208

## CERTIFICATION UNDER 37 C.F.R. § 42.24(d)

Under the provisions of 37 C.F.R. § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Patent Owner's Preliminary Response totals 4,838 words, which is less than the 14,000 words allowed under 37 C.F.R. § 42.24(b)(1).

Dated: June 30, 2022

/Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

*Counsel for Patent Owner*

23
**Appx291**

IPR2022-00601
U.S. Patent No. 9,269,208

## CERTIFICATION OF SERVICE UNDER 37 C.F.R. § 42.6(E)(4)

I hereby certify that on June 30, 2022, I caused a true and correct copy of the

foregoing to be served on the following counsel for Petitioner by electronic mail to

the following email address:

Jennifer C. Bailey
Adam P. Seitz
Erise IP
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Email:  Jennifer.Bailey@eriseip.com
Email:  Adam.Seitz@eriseip.com
Email:  PTAB@eriseip.com

By:    /Darlene F. Ghavimi-Alagha/
        Darlene F. Ghavimi-Alagha
        Reg. No. 72,631
        K&L GATES LLP
        Darlene.Ghavimi@klgates.com
        T: (512) 482-6919
        F: (512) 482-6859
        2801 Via Fortuna, Suite 650
        Austin, Texas 78746

*Counsel for Patent Owner*

24

**UNITED STATES PATENT AND TRADEMARK OFFICE**


**PATENT TRIAL AND APPEAL BOARD**



APPLE INC.,
Petitioner

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner


CASE: IPR2022-00601
U.S. PATENT NO. 9,269,208


**PATENT OWNER RESPONSE**

IPR2022-00601
U.S. Patent No. 9,269,208

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    '208 PATENT OVERVIEW .................................................................4

III.   Level of Ordinary Skill.........................................................................5

IV.   Claim Construction ..............................................................................6

      A.    "Accessibility Attribute" ............................................................6

      B.    "A Series of Entries of the Biometric Signal, Said Series Being Characterised According to at Least One of the Number of Said Entries and a Duration of Each Said Entry"...........................................7

      C.    "Populate the Data Base According to the Instruction"......................11

V.    THE PRIOR ART FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS................................................................................12

      A.    The Prior Art Does Not Teach the "Accessibility Attribute" Limitation ...............................................................................12

            1.    *Mathiassen* Does Not Teach an "Accessibility Attribute" .......12

            2.    There is No Motivation to Combine Apple's Cited Prior Art to Arrive at the "Accessibility Attribute" as Properly Construed.16

      B.    The Prior Art Does Not Teach the Biometric Signal Duration Limitation ...............................................................................24

            1.    Anderson Does Not Teach a Durational Component to a Biometric Signal Entry .........................................................24

            2.    There is No Motivation to Combine *Mathiassen* and *Anderson* ..................................................................................26

      C.    Apple's Cited Prior Art Does Not Populate the Data Base According to the Instruction.................................................................30

      D.    Independent Claims 9 and 10 ................................................33

      E.    Dependent Claims ......................................................................33

VI.   CONCLUSION....................................................................................34

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 2001 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, 6:21-cv-00166 (Dkt. 27) (Sept. 23, 2021) |
| 2002 | HMD Global Oy – Final Invalidity Contentions dated March 16, 2022 |
| 2003 | Defendant Apple Inc.'s Notice of Motion and Motion to Stay Pending *Inter Partes* Review, 5:22-cv-02553 (Dkt. 119) (June 14, 2022) |
| 2004 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 37) (Sept. 23, 2021) |
| 2005 | March 19, 2020 Letter from George Summerfield to Brian Ankenbrandt |
| 2006 | Declaration of George C. Summerfield in Support of Motion for *Pro Hac Vice* Admission |
| 2007 | Biography of George C. Summerfield |
| 2008 | Declaration of Jonah Heemstra in Support of Motion for *Pro Hac Vice* Admission |
| 2009 | Apple's Opening Claim Construction Brief, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 46) (Nov. 19, 2021) |
| 2010 | Final Deposition Transcript of Dr. Andrew Sears, dated November 8, 2022 |
| 2011 | Declaration of William C. Easttom II (Chuck Easttom) Ph.D., D.Sc. |
| 2012 | CV of Dr. Chuck Easttom |

## I.    INTRODUCTION

The limitations of the independent claims of U.S. Patent No. 9,269,208 ("the '208 Patent"), using representative Claim 1 as an example, can be divided as follows: 1) the preamble; 2) a database of biometric signatures (representative clause 1(a));[1] 3) a transmitter subsystem and its components involved in capturing and matching of biometric data (representative clause 1(b)); 4) a receiver subsystem to give access to a device based upon information received from the transmitter subsystem (representative clause 1(c)); 5) the transmitter subsystem to the extent it is involved in the capture and registration of biometric data associated with a user (representative clause 1(d)); and 6) the device to be unlocked (representative clause 1(e)).  Apple cobbles together a single, three-reference challenge to the claims of the '208 Patent.  Even with these three references in hand, Apple must ignore its own characterization of the prior art and its construction of the subject claims to mount an obviousness challenge.

**First**, the "transmitter subsystem" (representative clause 1(b)) specifies a "means for matching the biometric signal against members of the database of biometric signatures to thereby output an ***accessibility attribute***" (emphasis added).

---

[1] These clauses refer to the numbering system used by the Board to label the various claim limitations in claim 1 of the '208 Patent.

Apple successfully urged before the district court and here that "accessibility attribute" be construed as an "attribute that establishes whether *and under which conditions* access to the controlled item should be granted to a user" (emphasis added). According to Apple, the challenged claims go beyond the binary access decision of "yes" or "no." Yet, Apple improperly calls upon prior art teachings that are limited to this very binary decision as allegedly teaching the "accessibility attribute" limitation.

**Second**, the transmitter subsystem limitation (representative clause 1(d)) specifies "a series of entries of the *biometric* signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry" (representative clause 1(d)(1)) (emphasis added) ("the Biometric Signal Duration Limitation"). In discussing the prior art that allegedly teaches this limitation, Apple's expert, Dr. Andrew Sears, initially draws a bright line distinction between biometric security devices, such as a fingerprint sensor, and knowledge-based security devices, such as a capacitive touch sensor and Morse code.

Yet, when cobbling together a multi-reference challenge to the validity of the subject claims, Dr. Sears and Apple completely blur that distinction, combining teachings from both realms, and treating knowledge-based security features as biometrics to satisfy the Biometric Signal Duration Limitation. This necessarily dooms Apple's challenge, unless the fundamental distinction between "knowledge,"

which can be learned and stolen, and "biometrics," which cannot, is ignored.  Apple also provides no explanation as to *how* or *why* teachings from these disparate technologies could be combined to arrive at the claimed invention, especially when simpler solutions, such as a push button, had presented themselves.

**Third**, the claim specifies that the received series of biometric signals be mapped into an instruction (representative clause 1(d)(2)), and that instruction is used to populate the data base (representative clause 1(d)(3)).  In other words, as Apple acknowledges, the series of biometric signal is used in the user enrollment process.  Yet, in describing its principal reference, Apple points to one thing – finger movements – as purportedly satisfying the "receive" and "map" limitations, and to another thing – "master minutiae tables" of fingerprints – for the "populate" limitation.  This clearly contravenes the plain language of the claims and the antecedents therein.

**Finally**, if Apple is somehow correct that combining knowledge-based and biometric security is fair game in challenging the claims of the '208 Patent, Apple fails to explain why one of ordinary skill in the art would have been motivated in the name of enhancing security to modify an existing biometric sensor in some fashion, with the reprogramming that would be required therefor, rather than employing myriad simpler, albeit unpatented, security alternatives, such as a physical push button, to be used in conjunction with such existing biometric sensor.  This is

particularly problematic, given that one of the three prior art references relied upon by Apple in its single challenge ground (*Anderson*) denigrates fingerprint recognition as requiring "sophisticated software for implementation," and itself teaches the use of a push button.

Any one of the foregoing problems with Apple's single challenge ground is sufficient to defeat the instant Petition. The combination of all four issues, however, means that the Board should give the Petition the short shrift it deserves.

## II.    '208 PATENT OVERVIEW

The '208 Patent issued on February 23, 2016 from an application claiming priority of August 13, 2003. The '208 Patent has 13 claims, claims 1, 9 and 10 of which are independent. Representative claim 1 of the '208 Patent reads:

> A system for providing secure access to a controlled item, the system comprising: a database of biometric signatures;
>
> a transmitter sub-system comprising:
>
> a biometric sensor for receiving a biometric signal;
>
> means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;
>
> and means for emitting a secure access signal conveying information dependent upon said accessibility attribute;
>
> and a receiver sub-system comprising: means for receiving the transmitted secure access signal;

and means for providing conditional access to the controlled item dependent upon said information,

wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures, the population means comprising:

means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry;

means for mapping said series into an instruction;

and means for populating the data base according to the instruction,

wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

Ex. 1001, 15:42-16:3.

As the Board noted, "[t]he '208 Patent discloses a system 'for providing secure access to a controlled item.'" Paper No. 11 at 4 (citation omitted). The controlled item "can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer," for example. *Id*. at 5 (citation omitted). "The system uses a database of 'biometric signatures,' such as a fingerprint, for determining authorized access." *Id*. at 4 (internal citations omitted).

## III.  LEVEL OF ORDINARY SKILL

CPC does not dispute Apple's characterization that a hypothetical person of ordinary skill in the art "would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least

one year experience in the field of human-machine interfaces and device access security," and "[a]dditional education or experience may substitute for the above requirements." Paper No. 1 at 3.

## IV.    CLAIM CONSTRUCTION

### A.    "Accessibility Attribute"

Claim 1 of the '208 Patent requires an output of an "accessibility attribute" based upon a biometric signal match, and emitting "a secure access signal conveying information dependent upon said accessibility attribute." Ex. 1001, 15:47-52. Apple proposed, and the Board adopted, an "attribute that establishes whether and under which conditions access to the controlled item should be granted" as the construction of "accessibility attribute." Paper No. 1 at 9; Paper No. 11 at 13. According to Apple, this construction "is consistent with the description of the invention throughout the specification and the claims, ***which goes beyond mere matching—the binary decision of "yes" or "no"***"—and instead describes a system that provides for different types of access." Ex. 2009 at 26 (emphasis added); *see also id.* at 28 ("[b]inary matching—"match/no match"—is not what the inventor was trying to invent").

The '208 Patent teaches the following examples of accessibility attributes:

[A]n access attribute (granting unconditional access), a duress attribute (granting access but with activation of an alert tone to advise authorities

of the duress situation), an alert attribute (sounding a chime indicating that an unauthorised, but not necessarily hostile, person is seeking access).

Ex. 1001, 8:20-25.

In short, a mere binary decision to grant access to a device does not constitute an "accessibility attribute" under Apple's claim construction. As discussed below, however, Apple improperly tries to back away from that distinction in challenging the validity of the subject claims.

### B. "A Series of Entries of the Biometric Signal, Said Series Being Characterised According to at Least One of the Number of Said Entries and a Duration of Each Said Entry"

As the Board noted, "[t]he '208 Patent discloses a system 'for providing secure access to a controlled item,'" wherein "[t]he 'controlled item' can be…an electronic key circuit in a personal computer." Paper No. 11 at 5. "The system uses a database of 'biometric signatures,' such as a fingerprint for determining authorized access." *Id.* at 4 (internal citations omitted).

Representative claim 1 of the '208 Patent requires, *inter alia*, a transmitter sub-system controller includes a "means for receiving a series of entries of the *biometric signal*, said series being characterised according to at least one of the number of said entries and a duration of each said entry" (representative clause 1(d1)). Paper No. 11 at 30 (emphasis added). Subsumed within this Biometric

Signal Duration Limitation is the term "biometric signal."  Apple proposed, and the Board adopted, "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" as the construction of that term.  Paper No. 1 at 9; Paper No. 11 at 13.  In other words, biometric information identifies "an individual via unique physiological or behavioral characteristics."  Ex. 1003, ¶ 41; *see also* Ex. 2010 at 20:9-21, 21:13-15 (a biometric signal is unique to an individual user).  According to Apple's own expert, a biometric signal is based on an inherent attribute of an individual, cannot be learned, and cannot be stolen.  Ex. 1003, ¶ 41; Ex. 2010 at 28:12-21.

The construction of the term "biometric signal" in the claims is in contradistinction to what Dr. Sears references in the prior art as "knowledge-based" security measures, such as a password.  Ex. 1003, ¶¶ 40-41.  According to Dr. Sears, a knowledge-based approach is "not based on any inherent attributes of an individual."  *Id.*, ¶ 41.  The '208 Patent itself speaks of a "biometric signal" as an "alternative" to a "secure code," such as "a sequence of secret numbers," *i.e.*, a knowledge-based security measure.  Ex. 1001, 1:25-32 ("Thus, for example, the request 402 can be a sequence of secret numbers directed to a keypad 403.  Alternately, the request 402 can be a biometric signal from the user 401 directed to a corresponding biometric sensor 403.").  The following table summarizes the distinctions between knowledge-based and biometric-based security measures:

| Knowledge-Based Security | Biometric-Based Security |
|---|---|
| Knowledge can be learned by another. Ex. 2010 at 28:12-21. | A biometric feature cannot be "learned." Ex. 2010 at 36:5-11 (cannot "teach" a mug shot). |
| Knowledge is not based on an inherent attribute of an individual. Ex. 1003, ¶ 41. | Biometric information identified an individual via unique physiological or behavioral characteristics. Ex. 2010 at 20:9-21, ("unique to the user"). *See also id.* at 29:4-16 ("essentially part of a person"); *id.* at 33:11-16 ("unique patterns form via the ridges and bifurcations on the skin of fingerprints" are "biometric"); and Ex. 1003, ¶¶ 41 & 43. |
| Knowledge, e.g., a password, can be stolen. Ex. 1003, ¶ 41. | One cannot "steal" biometric information. Ex. 1003, ¶ 41; Ex. 2010 at 20:9-21, 21:13-15. |

Despite proposing this construction, Apple seeks to blur the lines between what its expert calls "knowledge-based" security features (those based on knowledge, such as a passcode or particular pattern, and not on any attribute of the user), and a biometric signal based on the unlearnable attribute of the user, in an effort to show the Biometric Signal Durational Limitation is taught by its single challenge ground. Indeed, Apple itself proposed, the District Court found, and the Board has preliminarily adopted, a construction that the claimed "series [is] characterised according to at least one of the number of said entries and a duration of each said entry." Crucially, the antecedent for this series is "a series of entries of the biometric signal," *i.e.*, the entries and corresponding series are "of the biometric signal," and the "number of said entries and a duration of each said entry" refers to

9

the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information.

The distinction between knowledge-based and biometric information is also evident in the prosecution history. The Examiner found the closest prior art of record to be three references disclosing biometric security. Ex. 1002 at 304-05 (*Hoffman*'s "biometric samples," *Igaki*'s "single finger press," and *Pu*'s "fingerprints"). The applicant successfully pointed out, however, that combining *Hoffman* and *Igaki*'s biometric sampling with *Pu*'s use of human body parts to form a "secret sequence code," *i.e.*, knowledge-based information, required impermissible hindsight. *Id.* at 304, 317.[2]

Blurring the line between knowledge-based and biometric information is improper given the construction Apple proposed, and the Board adopted, for the term "biometric signal" - "[p]hysical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." Paper No. 1 at 9; Paper No. 11 at 13. It is also improper considering the claims' clear requirement of a number and duration of each entry of the *biometric signal*. Ex. 2009 at 17-18; Ex. 1077 at 2.

---

[2] The Examiner based his Notice of Allowance on an "examiner initiated interview on 9/30/2015 and applicant's arguments/amendments filed 07/27/2015," which included applicant's statement regarding impermissible hindsight. Ex. 1002 at 304.

In short, given the foregoing, the Biometric Signal Durational Limitation *cannot* be disclosed by the duration of a signal generated by a knowledge-based security feature. As discussed below, however, that is precisely what Apple has attempted to do in its single challenge ground.

## C.    "Populate the Data Base According to the Instruction"

Apple points to "enrolling a new user's fingerprint by providing control information via a sequence of presses of certain amount and duration" as one of the purportedly distinguishing features of the invention claimed in the '208 Patent. Paper No. 1 at 1. The "populate" limitation in claim 1 is part of that enrolling feature. Ex. 2011, ¶ 82. Representative Claim 1 makes clear that, once the series of biometric signals characterized by number and duration is received by the transmitter subsystem (representative clause 1(d1)), that series is mapped into an instruction (representative clause 1(d2)), and the resulting instruction is used to populate the database of biometric signatures (representative clause 1(d)(3)). Ex. 1001, 15:61-67. To satisfy the requirements for antecedent claiming, "said series" in clause 1(d2) must refer to the "series of entries of the biometric signal" in clause 1(d1),[3] and "the

---

[3] The Board recognized that "said series" refers to the "series of entries of the biometric signal" as shown by the board placing "of entries of the biometric signal" in brackets. Paper No. 11 at 33.

instruction" in clause 1(d3) must refer to "an instruction" in clause 1(d2). *See, e.g.,* MPEP, § 2173.05(e). The following is a depiction of this information flow:



Ex. 2011, ¶ 82.

To show a teaching of these limitations, Apple must identify the same "biometric signal" series received by the transmitter sub-system, mapped into an instruction, and using the resulting instruction for populating the database. As discussed below, Apple did not do that.

## V.    THE PRIOR ART FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS

### A.    The Prior Art Does Not Teach the "Accessibility Attribute" Limitation

#### 1.    *Mathiassen* Does Not Teach an "Accessibility Attribute"

Apple's position on the "accessibility attribute" limitation is muddied at best. As explained above, Apple successfully argued before the district court that such limitation should be construed as having both "whether" and "under which conditions" components to an access decision, eschewing a construction limited to a binary (yes/no) access decision. Ex. 2009 at 26 ("The definition…goes beyond mere matching—the binary decision of 'yes' or 'no'…."); *see also id.* at 28 ("Binary

matching—"match/no match"—is not what the inventor was trying to invent").

Now, however, Apple and its expert appear to argue that "accessibility attribute" *can*

be a binary access decision. Paper 1 at 42-44.

Specifically, according to Dr. Sears, the binary decision whether to unlock a

car door using *Mathiassen*'s portable control, in addition to determining "whether"

to grant access to the car, also constitutes determining "under what conditions" such

"access should be granted," as such access grant in the event of a fingerprint match

is "unconditional." Ex. 1003, ¶¶ 241-242. The only alternative to granting access

is to deny access by aborting the process in the event that there is no fingerprint

match. *See id.* Such access does not provide any incremental condition to access

beyond the "whether" inquiry, and Apple's reading of *Mathiassen* consequently

merges the "whether" and "under which conditions" components of its own

construction of the "accessibility attribute" limitation.

Dr. Sears, for his part, could not point to another type of accessibility attribute

taught in *Mathiassen*, volunteering at deposition that *Mathiassen* somehow renders

other accessibility attributes "obvious." Ex. 2010 at 60:1-12. Apart from the fact

that Dr. Sears was not asked what *Mathiassen* by itself rendered obvious with regard

to the "accessibility attribute," neither Dr. Sears nor Apple ever raised *Mathiassen*

as a single-reference obviousness challenge.[4]  As such, Apple should not be allowed to avail itself of that theory now.  *See, e.g., Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'") (citing 35 U.S.C. § 312 (a)(3)).

The Board, in instituting this proceeding, adopted Apple's reasoning which plainly ignores the "under which conditions" aspect of Apple's own construction of "accessibility attribute:"

> Here, consistent with the proposed construction, Petitioner relies solely on *Mathiassen* to satisfy the proposed claim construction of an attribute that establishes whether and under which conditions access to the

---

[4] As Apple argues, while "Mathiassen teaches a secure access system unlocking car doors," "***McKeeth teaches providing different types of access when a user is under duress*** or when a user is unauthorized," and "[m]odifying Mathiassen's portable control to output information indicating duress access and alert access, in addition to Mathiassen's taught grant access . . . would have been obvious to a POSITA." Paper No. 1 at 2-3 (emphasis added).

controlled item should be granted to a user. ***If the processor 2 in Mathiassen does not find a match, then no access will be granted.*** Paper No. 11 at 25 (emphasis added).

In other words, the Board preliminarily found that the type of binary decision that Apple characterized as antithetical to the claimed invention in fact falls within the scope of the "accessibility attribute" limitation. Under the Board's treatment of *Mathiassen*, a binary decision limited to access/abort satisfies both the "whether" and "under which conditions" requirement for "accessibility attribute." This is inconsistent with the construction Apple fought for in the district court litigation, proposed in this proceeding, and adopted by the Board. Ex. 2009 at 26; Paper 1 at 9; Paper 11 at 13.

After Apple expended its energy championing a construction of "accessibility attribute" that excludes binary access decisions, it cannot now challenge the claims of the '208 Patent based upon a construction that incorporates such a binary decision. The necessary result is that *Mathiassen*'s access/abort teaching does not correspond to an "accessibility attribute" under the controlling construction of that term, and any invalidity decision based upon such correspondence is simply wrong.

**2. There is No Motivation to Combine Apple's Cited Prior Art to Arrive at the "Accessibility Attribute" as Properly Construed**

Recognizing that *Mathiassen* does not satisfy Apple's construction of "accessibility attribute," Dr. Sears falls back on the opinion that "*Mathiassen* in combination with *McKeeth* teaches outputting two or more accessibility attributes," *i.e.*, it is non-binary.  *See* Ex. 1003, ¶ 245.  The teaching from *McKeeth* to which Dr. Sears refers is a "geometric pattern (e.g., using a mouse)" that when *incorrectly* entered "concurrently with, or after a predetermined duration from, scanning his/her fingerprint," allows for a duress signal.  Ex. 1003, ¶ 247; Ex. 1005, 4:10-32.

Apart from being a tacit admission that *Mathiassen* only teaches binary access, this opinion, to be cognizable, must rely upon a motivation to combine these two references going beyond improper hindsight reconstruction.  *See, e.g., Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000) (citation omitted) (impermissible to use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention).

This purported combination presupposes that one would have thought it necessary to look beyond *Mathiassen* to add a duress signal to the existing fingerprint security thereof.  However, as Dr. Sears notes, *Mathiassen* teaches finger movement that can provide for additional security.  Ex. 1003, ¶ 89 ("*Mathiassen*

teaches commands other than 'open door' may be implemented in the secure access control system by a user providing certain finger movements"). One such command could be to send a distress signal. Ex. 2010 at 55:2-6. There would have been no reason, then, to look to *McKeeth* to modify *Mathiassen* in the fashion that Dr. Sears describes. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012); Ex. 2011, ¶ 51.

Even if *Mathiassen* could be modified to add a distress signal resulting from finger movements, such modification would not involve a biometric signal. Ex. 2011, ¶¶ 52-53. Claim 18 of *Mathiassen* calls for "a fingerprint sensor (5)." Ex. 1004 at 28. That device is the biometric sensor. Ex. 2010 at 47:16-48:6. Claim 20, which depends from claim 18, further calls for "translation means in the form of a hardware or a software translation program module for analyzing and categorizing the omni-directional finger movements across the fingerprint sensor." Ex. 1004 at 28. To one of ordinary skill in the art, these finger movements are not biometric signals, as something more than the fingerprint sensor is required to track them. Ex. 2011, ¶ 53. One of ordinary skill in the art would understand that, in the context of tracking "omni-directional finger movements," the translation means hardware or software, is not acting like a fingerprint sensor. *Id.* In light of *Mathiassen*'s teachings, there would have been no motivation to combine that reference with anything to arrive at a duress signal, let alone selecting *McKeeth* specifically.

17

**Appx400**

Assuming that one could presuppose looking beyond *Mathiassen*, Dr. Sears posits several reasons supporting a purported motivation to combine *Mathiassen* and *McKeeth*: 1) vehicle security was a known problem (Ex. 1003, ¶ 153); 2) duress access was known to be desirable (*id.*, ¶¶ 154-159); 3) denying access to unauthorized users was well known (*id.*, ¶¶ 160-163); and 4) there would have been a reasonable expectation of success in the modification (*id.*, ¶¶ 164-168).

To begin with, the first factor calls out a problem in the automotive space, *i.e.*, vehicle security.  Indeed, Apple maps claim 10 of the '208 Patent to "*Mathiassen*'s portable control 20 embodiment of Mathiassen, where the 'controlled item' is *Mathiassen*'s car door locks in the 'central locking system.'"  Paper No. 1 at 14. *McKeeth*, however, does not teach an automotive embodiment.  *See generally* Ex. 1005; *see also* Ex. 2010 at 61:14-62:4 ("Q. Does McKeeth teach an automotive embodiment, as far as you recall?  And if you need to look at it, please do. … A. Based on my quick review, I don't believe McKeeth teaches an automotive embodiment.  Q. Well, do you recall in your opinion relying upon any automotive embodiment that McKeeth taught?  A. I do not.").  Rather, as the Board noted, *McKeeth* discloses a method and system for authenticating a user to access a computer system.  Paper No. 11 at 16.

Indeed, while Apple repeatedly claims it would have been obvious to modify the portable control of *Mathiassen* with *McKeeth*, it wholly ignores this major

distinction between these references.  *See* Paper 1 at 46.  *McKeeth* teaches a user inputting a 1) password using a keyboard, 2) unique set of clicks using a mouse, or 3) geometric pattern using a computer peripheral device on a flat surface "concurrently with, or after a predetermined duration from, scanning his/her fingerprint" as the mechanism by which a duress access and/or alert generation takes place.  Ex. 1006, 2:65-3:4; 3:38-42; 4:10-32; 5:34-38 ("Accordingly, concurrently with or shortly after the fingerprint scan, the user may move the peripheral device 200 on a flat surface in a predetermined geometric pattern….").  The portable device of *Mathiassen* notably lacks a keyboard, screen, and even a button to perform these very functions.  Ex. 1004, ¶ [0147].  Apple's and Dr. Sears blind assumption that these references could be combined without explaining how the resulting combination would be achieved is therefore wholly inadequate.  *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

Neither Apple nor Dr. Sears explains why an ordinarily skilled person would have looked to computer art to solve a problem in the automotive field.  *See Belden Inv. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).  As explained below, given the simpler alternative solutions available in the automotive field, there would have been no reason to look for, let alone find, a reference such as *McKeeth* for modifying the teachings of *Mathiassen*.

19

Further, the second two factors only serve to demonstrate that there were countless references from which an ordinarily skilled person could have selected for combination with *Mathiassen*, assuming it would even have occurred to that person to modify *Mathiassen* at all. *See* Ex. 1003, ¶ 154 ("[v]ehicle security systems were well-known to provide specific types of access when a car owner indicated they were under a duress condition or in a dangerous situation"); *id.*, ¶ 162 ("car alarms very well-known and widely available security measures included in cars"); and *id.*, ¶ 265 ("[i]t was known prior to August 13, 2003, that portable vehicle key fobs included security measures that simultaneously locked car door locks and sounded an alarm"). Dr. Sears provides no explanation as to why one would have selected *McKeeth* specifically, from among all of this referenced art, to combine with *Mathiassen* – a burden of proof clearly and solely imposed upon Apple. *See, e.g.*, *IPR Licensing, Inc. v. ZTE Corp.*, 685 Fed. Appx. 933, 940 (Fed. Cir. 2017).

Looking at the individual prior art references discussed by Dr. Sears in connection with the alleged motivation to combine, several such references teach simple, non-biometric security measures. For example, the remote keyless entry system of *Williams* "included a button on the fob that performed different functions when pushed once or twice." Ex. 1003, ¶ 61, *citing* Ex. 1030, 14:5-31. This one press, two press system is not biometric. Ex. 2010 at 41:16-42:9. Similarly, *Araki* "discloses invoking certain commands based on user input but does so via a touch

sensor without sensing a user's fingerprint." Ex. 1003, ¶ 65, *citing* Ex. 1034, 5:28-33. As such, *Araki* teaches a knowledge-based security system. Finally, the key fob described in *K-9 Car Alarm Owner's Guide and Installation Instructions* ("*K-9*") has a "panic mode" security measure. Ex. 1003, ¶ 265, *citing* Ex. 1041 at 7. The panic mode is activated by a push button transmitter. Ex. 1041 at 7. This reference does not teach biometric sensing, either. Ex. 2010 at 77:8-78:1.

As Dr. Sears acknowledges, "creating a quickly, easily, and most importantly, natural-functioning entry system is vital in portable electronics using input devices was also desirable, and their making user manipulation of such devices easy was a key feature." Ex. 1003, ¶ 217 (internal quotation marks omitted). Furthermore, as is evident from the foregoing, push buttons on key fobs or similar devices were well known in the prior art. Ex. 2010 at 65:20-66:1. *Mathiassen* could have been modified by adding a well-known physical push button to generate a duress signal. *Id.*, 63:2-14. In addition, Dr. Sears suggests that if a fob is in a user's pocket or in a bag, "it would be simpler and more efficient for the user to simply press the fingerprint interface at varying durations rather than moving the finger directionally to enter commands." Ex. 1003, ¶ 210. This simplicity consideration would be a key feature in determining how one might modify an existing system, such as that described in *Mathiassen*. *See id.*; *see also* Ex. 2010 at 75:1-15.

Returning now to the alleged motivation to combine, and recognizing the afore-referenced desire for simplicity, Apple provides *no* rationale for a preference to combine two fingerprint recognition references (*Mathiassen* and *McKeeth*), and the programming associated therewith, over combining *Mathiassen*'s fingerprint sensor with the simpler push button feature taught in one of the references discussed below. The fingerprint sensor in this combination provides for biometric security in the first instance. *See Kinetic Concepts*, 688 F.3d at 1369; Ex. 2011, ¶¶ 46, 60-61.

Further, according to the references discussed by Dr. Sears, a push button can provide additional security, such as initiating a distress signal. Ex. 2011, ¶¶ 55-57. A push button is a simple mechanical feature, and is easy to install in a device such as a key fob, which explains why push buttons of the type contained in *Williams*, *Araki*, and *K-9* were as prevalent in the prior art as Dr. Sears describes. *Id.* Further, as Dr. Sears notes, the push button on a key fob located in a pocket or purse would be easy to operate in the event of a duress situation. Ex. 1003, ¶ 210.

In contrast, according to one of the references Apple cites in its single challenge ground (*Anderson*), fingerprint recognition requires "specialized equipment and may require sophisticated software for implementation." Ex. 1006, 1:54-58. Dr. Sears, for his part, has not evaluated what type of software modifications to *Mathiassen* would be required to accommodate a durational

component.[5]  Ex. 2010 at 65:15-19.  And, when testifying as to which option would have been easier as between adding a push-button and fingerprint sensor re-programming in *Mathiassen*, Dr. Sears stated that "I think it would depend on exactly who you're talking to and what -- and a lot of details of the context.  One involves changes of the hardware; the other involves changes to the software."  *Id.*, 64:14-18.

That Dr. Sears could not do better in responding to this question is unsurprising, given that he "was thinking about it at just this moment," *i.e.*, he had not considered this issue in rendering his opinions on the motivation to combine. *See id.* at 65:9-14.  In any event, CPC has now presented unrebutted testimony that a push button is the simpler solution to enhance security, undermining Apple's theory regarding the motivation to combine prior art that requires fingerprint sensor re-programming.  *See* Ex. 2011, ¶¶ 59-61.  Apple should not be allowed to provide contrary evidence for the first time in reply.[6]  *See Intelligent Bio-Sys.,* 821 F.3d at 1370.

---

[5] In point of fact, Dr. Sears has never written or modified software to recognize fingerprints.  Ex. 2010 at 99:5-19, 102:3-6.

[6] In response to questioning from Apple's counsel, Dr. Sears testified that "very minor modifications" would be required "to modify *Mathiassen*'s fingerprint sensor

B.     **The Prior Art Does Not Teach the Biometric Signal Duration Limitation**

1.     **Anderson Does Not Teach a Durational Component to a Biometric Signal Entry**

Apple expressly acknowledges that *Mathiassen,* which serves as its principal reference "does not teach determining a duration of each [biometric signal] entry." Paper No. 1 at 32; *see also id.* at 3. Apple therefore looks to *Anderson* for a purported teaching of "***fingerprint*** presses of varying duration." *Id.* (emphasis added). Apple's reference to "fingerprint presses" in Anderson is pure fiction. In fact, as the Board expressly noted, the portion of Anderson quoted in the Petition teaches "a series of ***pressure pulses*** having varying durations." *See* Paper No. 11 at 32, *quoting* Ex. 1006, 6:45-48 (emphasis added). That series of pressure pulses translates to an "access code," which is compared to a "stored code template." Ex. 1006 at 6:45-51. However, the term "***fingerprint*** access code," used by Dr. Sears and adopted by the Board on institution, does not even appear in *Anderson.* Ex. 2010 at 91:20-92:14; *see generally* Ex. 1006.

---

to detect a touch, no touch press of a particular duration." Ex. 2010 at 98:19-22. This entirely conclusory testimony fails to explain what these modifications would be, why they are "very minor," and, most importantly, why such modifications would be preferable to the installation of a push button.

In fact, the "pressure pulses" in *Anderson* are not, and do not generate, **biometric** signals as they are knowledge-based. Ex. 2010 at 58:3-10, 58:17-22; Ex. 2011, ¶ 66. The hardware embodiments taught in *Anderson* for accepting these "pressure pulses" include "resistive" and "capacitive touch pads." Ex. 1006 at 5:24-37. Such touch pads may optionally be equipped with "an optical scanner or thermal sensor for collecting an image of the user's fingerprint." *Id.* at 7:5-7. However, such fingerprint images (biometric signals) are captured "as the pressure code is entered," *i.e.*, they are not part of the pressure code itself. *See id.* at 7:4-7. And, as Dr. Sears acknowledged, *Anderson*'s pressure code is knowledge-based – not biometric. Ex. 2010 at 58:3-22. If a sensor only captures the knowledge of a user, it is not properly characterized as a **biometric** sensor. *Id.* at 33:4-8. More specifically, a capacitive touch sensor that merely captures user taps or finger movements is not a biometric sensor. *Id.* at 39:21-40:6, 42:12-43:16.

Further illustrating that its pressure code is not biometric, *Anderson* provides as examples of such code "[a] known code key (e.g., Morse code) or a memory mnemonic (*e.g.*, the melody of a favorite song) may be utilized to aid the user in selecting, remembering, and entering the access code." Ex. 1006 at 7:40-43. A Morse code key is obviously not a biometric signal. Ex. 2010 at 41:3-15. A memory mnemonic is also obviously not a biometric signal. Ex. 1003, ¶ 41; Ex. 2010 at 28:12-21. Nonetheless, the Board cited to waveforms corresponding to such

mnemonics as exemplifying a biometric signal. Paper 11 at 31, *citing* Ex. 1006, Figs. 4A and 4B.

The point to all of the foregoing is that, if one were to combine *Mathiassen* with *Anderson* in a purported effort to attain the Biometric Signal Duration Limitation, the result would be the fingerprint sensor of *Mathiassen*, which captures fingerprint images, and *Anderson*'s touch pad that captures a non-biometric pressure code at the same time fingerprint images are captured. Ex. 2011, ¶ 68. As Apple looks solely to *Anderson*'s teachings for the durational requirement of the biometric signal series, combining *Mathiassen*'s fingerprint sensor with *Anderson*'s pressure code does not produce the claimed invention, as any duration would apply to a ***non***-biometric signal. *Id.,* ¶¶ 69-71. In short, even if a person of ordinary skill were to combine *Mathiassen* and *Anderson*, the purported combination would not render obvious the claimed "means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said [biometric] entry." Ex. 1001, 15:61-64.

### 2. There is No Motivation to Combine *Mathiassen* and *Anderson*

Dr. Sears opines that there would have been a motivation to modify *Mathiassen* with *Anderson* to incorporate a durational component to biometric signals, which, in turn, would allow for additional types of signals to be sent. *See,*

*e.g.*, Ex. 1003, ¶ 210. As discussed above, if the sole purpose of modification were to enable sending additional signals, *Mathiassen* already provides the mechanism for doing so without modifications taught in other references. *See Kinetic Concepts*, 688 F.3d at 1369.

According to Dr. Sears, however, a skilled person "would have been motivated and found it obvious [*sic* "to"] add *Anderon's* [*sic "Anderson's"*] series of presses or pulses as an input on the portable door control or replace *Mathiassen*'s finger movements with *Anderson*'s series of presses or pulses to input commands into the portable door control 20." Ex. 1003, ¶ 210. Dr. Sears' rationale is that *Anderson*'s "press operations make the input operations easier for the user to perform in certain situations," as "a user holding the portable control fob in their hand could more easily press a series of finger presses against the control's fingerprint sensor, as opposed to directionally swipe the finger presses." *Id.*

As with the combination of *Mathiassen*'s automobile key fob and *McKeeth*'s computer, *Anderson* does not teach an automotive embodiment. *See generally* Ex. 1006; Ex. 2011, ¶ 75. Additionally, while *Anderson* shows a variety of devices for the entry of finger presses, it only suggests that the digitizer pad 120 (shown below) of a personal computer may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint. Ex. 1006 at 7:4-8.



Ex. 1006 at Fig. 1.  Neither Apple nor Dr. Sears explains why skilled persons would have turned to personal computer art to modify a security feature on an automotive key fob.  *See Belden*, 805 F.3d at 1073; *see also* Ex. 1006; Ex. 2011, ¶ 76.

Further, as noted above with regard to the proposed combination of *Mathiassen* and *McKeeth*, a push button would have been a simpler combination to arrive at the benefits of additional commands, especially in light of Dr. Sears' reasoning that pressing is easier than swiping.  Ex. 1003, ¶ 210; Ex. 2011, ¶ 77.  If a fob were in a user's pocket or purse, *i.e.*, out of eyesight of the user, it would be easier to feel a push button, which is typically raised or indented from the surface of the fob, than a flat capacitive touch surface.  Ex. 2011, ¶ 77.  Along these lines, an

embodiment is shown in *Anderson* wherein a keyboard 512 is equipped with a cursor control stick 514, as shown below.  Ex. 1006 at 7:54-55.



FIG. 5

Ex. 1006 at Fig. 5.

In that configuration, cursor control stick 514 may sense variations in force or pressure "applied along a 'Z' axis perpendicular to keyboard 512," and "may be utilized as a touch interface to facilitate entry of access codes," *i.e.,* a push button. *Id.*, at 7:55-59; Ex. 2011, ¶¶ 78-79.  To the extent Apple is correct that one would have thought to combine *Mathiassen*'s automotive embodiment with the computer teachings of *Anderson*, a simpler solution would have been to add *Anderson*'s push button to *Mathiassen*'s key fob.  Ex. 2011, ¶ 80.  However, as there is no suggestion

29

in *Anderson* to add a fingerprint sensor to the control stick,[7] the combination of *Mathiassen*'s fingerprint sensor with *Anderson*'s non-biometric push button would not have rendered the invention claimed in the '208 Patent obvious, as that combination would still lack the claimed duration of each entry in the "series of entries" of a ***biometric*** signal.

### C. Apple's Cited Prior Art Does Not Populate the Data Base According to the Instruction

As noted above, as part of the user enrollment process in representative Claim 1 of the '208 Patent, "said series" in representative clause 1(d2) refers to the "series of entries of the biometric signal" in representative clause 1(d1), and "the instruction" in representative clause 1(d3) refers to "an instruction" in representative clause 1(d2). Thus, Apple cannot point to one thing for the "series" that is mapped into an instruction, and another thing contained in an instruction to populate the database. Yet, that is precisely what Apple does.

The "series" requirement, according to Dr. Sears, is purportedly disclosed in *Mathiassen* as "omni-directional finger movements across the sensor in two

---

[7] Indeed, *Anderson* denigrates the use of fingerprint sensors, saying fingerprint recognition requires "specialized equipment and may require sophisticated software for implementation." Ex. 1006, 1:54-58.

dimensions." Ex. 1003 at ¶ 194 (emphasis omitted). For the requirement of "mapping," according to Petitioner's expert, these movements are categorized according to "***predefined*** sets of finger movement sequences." *Id.*, at ¶ 232 (emphasis added). A "command table" is then used "to translate the categorized finger movements into control signals." *Id.* This has nothing to do with user enrollment, as *Mathiassen* makes clear that the control signal are "for controlling the device." Ex. 2011, ¶ 85. *Mathiassen* has no teaching that either the "predefined sets of finger movement sequences" or the "command table" constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process, as required by representative Claim 1.

Unsurprisingly, then, with regard to the "populating" requirement, Apple points to "one or more ***master minutiae tables***," rather than the "predefined sets of finger movement sequences," or the "command table" used "to translate the categorized finger movements into control signals." *Id., ¶* 231 (emphasis added). This hodgepodge of teachings from *Mathiassen* does not line up with the language of representative Claim 1, as shown in the chart below:

| Clauses 1(d1)-(d3) | Apple's Position |
|---|---|
| receive a series of entries of the biometric signal | The transmitter subsystem receives a series of "omni-directional" finger movements. |

| map said series into an instruction; | The finger movements are categorized according to pre-defined movements. |
|---|---|
| and populate the data base according to the instruction, | The database is populated by "master minutiae tables." |

Ex. 2011, ¶ 87.

Otherwise, Dr. Sears claims that "[i]t would have been obvious to modify *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to populate a database according to an instruction that the portable door control recognized from a car owner/system administrator's input of a series of presses/pulses of varying durations, with such an instruction being to initiate the enrollment of a new user (i.e., populating the database)." Ex. 1003 at ¶ 220. Dr. Sears, however, does not explain what actually is being modified, and how such modification corresponds to the "populating" limitation.

If *Mathiassen*'s master *minutiae* tables are to be modified, Dr. Sears fails to explain how such tables could be modified with *Anderson*'s pressure and duration information, and why there would be a motivation to do so. Simply saying that such modification is possible and desirable is impermissibly conclusory. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (rejecting expert invalidity opinion as "conclusory and factually unsupported" where "[t]he expert failed to explain how specific references could be combined, which

combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims").

If, on the other hand, the proposed modification is to create a discrete database of pressure/duration information separate from the fingerprint data, such database would not have been created using *biometric* signals, as pressure and duration are not *biometric* measurements. Ex. 2010 at 58:3-22; Ex. 2011, ¶¶ 89-90. In short, Apple cannot show how the prior art reads on clauses 1(d1) through 1(d3) of claim 1.

### D.    Independent Claims 9 and 10

Independent claims 9 and 10 of the '208 Patent also contain the "populating," "duration," and "accessibility attribute" limitations, and, as the prior art cited by Apple does not teach these limitations, the cited prior art does not render these independent claims obvious as a result thereof. Ex. 2011, ¶ 91.

### E.    Dependent Claims

Each of the dependent claims of the '208 Patent depend from either independent Claim 1 or independent Claim 10, both of which contain the "populating," "duration," and "accessibility attribute" limitations. As the prior art cited by Apple does not teach these limitations, the cited prior art does not render these dependent claims obvious as a result thereof. Ex. 2011, ¶ 92.

IPR2022-00601
U.S. Patent No. 9,269,208

## VI.    CONCLUSION

Apple has thrown an enormous amount of information at the wall, hoping that such information will not be closely scrutinized.   Scrutiny, however, reveals that Apple has combined teachings when there is no compelling reason to do so, and, even when such combinations are considered, they lack features of the claimed invention.  Dr. Sears, in the 343 paragraphs of his declaration, does not remedy these infirmities, which are fatal to Apple's challenge.  The Board should find that Apple has failed in its burden to show the challenged claims of the '208 Patent are obvious.

Dated: December 22, 2022                     Respectfully submitted by

                                                 K&L GATES LLP,

                          By:    /Darlene F. Ghavimi-Alagha/
                                       Darlene F. Ghavimi-Alagha
                                       Reg. No. 72,631
                                       K&L GATES LLP
                                       Darlene.Ghavimi@klgates.com
                                       T: (512) 482-6919
                                       F: (512) 482-6859
                                       2801 Via Fortuna, Suite 650
                                       Austin, Texas 78746

IPR2022-00601
U.S. Patent No. 9,269,208

**Certification of Word Count Under 37 C.F.R. §42.24(d)**

The undersigned hereby certifies that the foregoing contains 7,380 words according to the word count feature of the word-processing software used to prepare the foregoing.

By:    /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

IPR2022-00601
U.S. Patent No. 9,269,208

## **Certification of Service Under 37 C.F.R. §42.6(e)(4)**

I hereby certify that on <u>December 22, 2022</u>, I caused a true and correct copy

of the foregoing to be served on the following counsel for Petitioner by electronic

mail to the following email address:

Jennifer C. Bailey
Adam P. Seitz
**ERISE IP**
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com


By:  <u>/Darlene F. Ghavimi-Alagha/</u>
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

Trials@uspto.gov
571-272-7822

Paper 30
Date: September 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner

_____

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

_____

Held:  June 29, 2023

_____

BEFORE:  SCOTT A. DANIELS, BARRY L. GROSSMAN, and
AMBER L. HAGY, Administrative Patent Judges.

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

APPEARANCES:

ON BEHALF OF THE PETITIONER:

    JENNIFER C. BAILEY, ESQUIRE
    Erise IP, P.A.
    7015 College Blvd., Ste. 700
    Overland Park, KS  66211


ON BEHALF OF THE PATENT OWNER:

    DARLENE GHAVIMI-ALAGHA, ESQUIRE
    K&L Gates LLP
    2801 Via Fortuna, Suite #650
    Austin, TX  78746


    The above-entitled matter came on for hearing on June 29, 2023, commencing at 10:00 a.m., via video teleconference.

2

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

P R O C E E D I N G S

- - - - -

JUDGE GROSSMAN:  This is Judge Grossman from the Patent Trial and Appeal Board, and with me are Judges Daniels and Hagy.  I assume everyone can hear me.  If not, try and wave or give me some signal that you can't.  This is a hearing for two related cases.  It's IPR2022-00601 and IPR2022-00602, involving the petitioner, which is Apple, versus the patent owner, CPC Patent Technologies.

And before we go over some of the basic administrative matters, what I'd like to do is have counsel for each of the parties formally to make their appearance, and I'll ask Counsel for Petitioner to go first.

MS. BAILEY:  Thank you, Your Honor.  This is Jennifer Bailey. With me is my co-counsel, Adam Seitz.  We are from the law firm of Arise IP.  I also have with me today in-house counsel from Petitioner, Apple, Garret Sakimae.

JUDGE GROSSMAN:  Okay.  And will you be making the presentation this morning, Ms. Bailey?

MS. BAILEY:  Yes, Your Honor.

JUDGE GROSSMAN:  Okay.  Thank you.  And for Patent Owner?  Patent Owner may be muted.  At least I'm not hearing the patent owner.  And Patent Owner, if you could just formally make your appearance, and state your name and what -- who will be making the presentation this morning?

MS. GHAVIMI:  Good morning, Your Honor.  This is Darlene Ghavimi from K&L Gates, representing the patent owner, Mr. George

3

**Appx521**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

Summerfield.  You see in the other picture; I believe they're having technical difficulties.  With us is Jonah Heemstra, from K&L Gates, and George Summerfield will be presenting today.

JUDGE GROSSMAN:  Okay.

MR. SUMMERFIELD:  And Your Honor, just to make sure that the microphone is now working?

JUDGE GROSSMAN:  If this is Mr. Summerfield, I can hear you, yes.

MR. SUMMERFIELD:  Thank you, Your Honor.  It is.

JUDGE GROSSMAN:  Okay.  And my understanding is you'll be making the presentation on behalf of the patent owner, Mr. Summerfield?

MR. SUMMERFIELD:  Yes, Your Honor.  I will be doing that.

JUDGE GROSSMAN:  Okay.  I just wanted to go over some of the basic ground rules.  I'm sure you are both familiar with them.  They were set out in our hearing order.  Petitioner and Patent Owner each requested 45 minutes for the total presentation concerning the two cases, and that's what we've allocated.  You can allocate your time as to how you discuss one or the other of the cases, but it'll be 45 minutes to cover both cases, in any way you'd like to organize it or present it.

The petitioner has the burden of proof, and Petitioner will go first, and followed by the patent owner.  Each party can reserve time for some rebuttal.  They can reserve up to half of the allocated time.  Also, as I mentioned at the start, we're hearing two cases this morning that are very closely related, and we will assume that the arguments that you make this morning will apply to both cases, unless you specifically tell us otherwise that it is a unique argument that only covers the 601 case or the 602 case.

4

**Appx522**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

Also, notwithstanding the glitch or two we might have had this morning, our technology team has done a great job over the past several years as we've been doing these video hearings. I don't expect any problems. But if at any time you encounter some technical difficulties, or you feel that there's a problem that's precluding you from adequately representing your client, let us know. Wave your hands, hold up a sign, or do something so we know that you can't hear us, or we'll try and do the same to tell you if we can't hear you.

Also, please mute yourself when you're not speaking, so we don't hear any background noise, or we don't hear any whispers into your co-counsel's ear. I also want to make sure that you're aware that this is a public proceeding. We have a public line that's available, and it's my understanding that there are some people who have dialed in on that public line. I don't think there's any confidential information that we're going to be discussing this morning. We don't have a -- there's no protective order that's been entered yet in this case. But just be aware that there is a public line, in case we get to anything that you might consider to be confidential.

And finally, one of the things we don't have on our video recordings, which we do have in the courtroom, which is a nice clock that had green, yellow, and red lights on it, so you would know how much time is left of the allocated 45 minutes. Judge Daniels will be -- has graciously agreed to be our timekeeper this morning. He'll make an effort to remind you when you're getting close. But he does the same thing I usually do when I am keeping time, is we're listening to your arguments, we're looking at the documents, and we're not always watching the clock. So you may want to either set your own time, or have a colleague help you to let you

5

**Appx523**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

know when your time is running out.

And so, with that -- I did want to also make sure that you remember, to the extent that you're referring to your demonstrative exhibits, please make sure you identify them by slide number. We have the entire record before us in our computers, but if you're referring to documents or slides, the transcript doesn't really know what's on the screen, so please make sure that you identify those. With that, unless we -- do we have any questions from Mr. Summerfield on behalf of the patent owner?

MR. SUMMERFIELD: No, Your Honor. We're ready to proceed.

JUDGE GROSSMAN: Okay. And Ms. Bailey, any questions on behalf of the petitioner?

MS. BAILEY: No questions, Your Honor.

JUDGE GROSSMAN: Okay. We'll let you start when you're ready, but first I'd like to know whether you're going to reserve any time for rebuttal.

MS. BAILEY: Yes, Your Honor. I'm going to reserve 15 minutes for a rebuttal.

JUDGE GROSSMAN: Okay. Thank you. You can proceed when ready.

MS. BAILEY: Thank you, Your Honors, and may it please the Board. Before we begin, if there are particular issues that you would like me to discuss first, I'm happy to jump around or go out of order from the presentation to make sure that your questions are answered today.

Turning first to DX2, as Judge Grossman mentioned at the opening, there are two IPRs at issue here. They do present substantially similar grounds, with a single ground covering all of the challenged claims,

6

**Appx524**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

that relies on Mathiassen, McKeeth, and Anderson.  My citations today during the discussion and general arguments are going to be with respect to the 705 Patent, for your reference.

At DX3 Petitioner's slides, we just have claim one of the 705 Patent.  We've highlighted limitation B2, and then limitations D1 through D3 that will be discussed today.  So --

JUDGE GROSSMAN:  Ms. Bailey, one thing as we're starting to get into the specific claims.  And it's fine to use the 705 Patent, which is involved in the 602 case as an example, but it brings up a question that I'd like to get your view on, and that is, do all the claims that are challenged in both cases, including both the 705 Patent and also the 208 Patent that's involved in the 601 case -- do they all rise or fall together?  So is there anything unique about any one of the challenged claims that would call it to be treated different than all of the ones that we're going to be discussing today?

MS. BAILEY:  Yes, Your Honor.  I'm glad you asked that question.  I was going to get to that.  The claims do not rise and fall together.  Claim 10 of the 208 Patent recites more than two types of access, although it does only recite outputting and accessibility attribute.  One of the arguments that has been raised by CPC is that the Mathiassen reference does not teach an accessibility attribute.  The proposed ground relies on McKeeth for teaching two types of accessibility attributes, namely a duress attribute and an alert attribute.  And so together, Mathiassen and McKeeth teach more than two types of access.

So we'll go through what Mathiassen teaches, but claim 10 of the 208 Patent does have the recitation of more than two types of access.  The

7

**Appx525**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

other independent claims of both the 208 and the 705 all simply recite outputting and accessibility attribute, which is taught by either Mathiassen or McKeeth.

JUDGE GROSSMAN:  Okay.  Thank you.

MS. BAILEY:  Yes, Your Honor.  So first I want to discuss what has been called a duration limitation.  This is turning to DX4 of Petitioner's slides.  The durational limitation arises in limitation D1 of the 705 Patent, claim one, and the modification to Mathiassen here is a fairly trivial change.  The claims recite receiving a series of entries of the biometric signal, where that series is characterized by a number of each entry and a duration of each entry.

Mathiassen, at paragraph 192, teaches receiving a series of consecutive fingerprint representations, where that series is received via directional finger movements.  So the finger is on the fingerprint sensor, and the directional finger movements are up, down, left, right, on the fingerprint sensor.  The proposed modification to Mathiassen is taking Anderson's durational presses, and either substituting them for or adding them to Mathiassen's directional finger movements, so this is a relatively trivial change here.

CPC is not arguing that Anderson fails to teach durational finger presses.  CPC's argument is a lack of a motivation to combine.  Now, CPC has not made any argument that the proposed modification to Mathiassen requires a substantial redesign, or changes Mathiassen's principal of operation, or any of the other common arguments that are used to defeat obviousness.

Instead, CPC spends a significant portion of its sur reply arguing

8

**Appx526**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

that the combination is non-obvious, because there are alleged simpler solutions for indicating duress.

JUDGE GROSSMAN:  Ms. Bailey?

MS. BAILEY:  Yes, Your Honor?

JUDGE GROSSMAN:  This is Judge Grossman.  And before we get into that combination, I have a question for you about Mathiassen, and that is the parties seem to characterize Mathiassen for its primary disclosure of the key fob that you -- that would have a fingerprint sensor.  But towards the back of Mathiassen -- I'm looking at I guess column or paragraph 192, Mathiassen talks about not only having a fingerprint recognition, but also allowing for something to -- what they call a translation means, in the form of hardware or software, that would allow that fingerprint to move around and create something else other than just a fingerprint.

So isn't that a -- isn't that a second input, so that Mathiassen itself already has a disclosure of using two inputs, both the fingerprint sensor and then the translation means, in moving their finger around that sensor to create something else?

MS. BAILEY:  Mathiassen's translation means -- and it does discuss that it's hardware or software -- is for the purposes of receiving and registering the directional finger movements on the fingerprint sensor.  So we have a fingerprint sensor, and it's going to recognize the fingerprint, the fact that there is a fingerprint and taking the images of the fingerprint, but Mathiassen also has -- its translation means that it is going to register the movement of the fingerprint, the finger with the fingerprint, on the fingerprint sensor.  So Mathiassen already has software or hardware to register the directional finger movements.  Does that answer your question,

9

**Appx527**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

Your Honor?

JUDGE GROSSMAN: Yes. Yes. Thank you.

MS. BAILEY: Thank you. So I believe we were on DX5, and talking about CPC's arguments with respect to a simpler solution, instead of the proposed modification limitation. So CPC's proposed simpler modification to Mathiassen is either adding a mechanical push button to Mathiassen to indicate duress or indicating duress via a second fingerprint.

The problem with CPC's argument is even if it is correct -- in other words, even if CPC's alternative proposed modifications are simpler than modifying Mathiassen to include the durational finger presses, it does not and should not change the Board's obviousness finding, and there are two reasons for this. First, federal circuit law is very clear and very consistent that a finding of obviousness does not require the combination be the simplest solution, or the most optimal solution, or the most preferable solution.

And now I want to be clear here. Apple does disagree that CPC's proposed simpler solutions are actually simpler, but even presuming that CPC is correct, and for the sake of argument, it does not change the Board's decision of obviousness, which kind of leads us to the second reason why CPC's simpler proposed combinations must fail. The evidence here shows that the proposed modification of adding or substituting Anderson's durational presses has an improvement, and this is evidence that CPC has wholly ignored in its briefing -- and I really stress that. They do not respond to it. They do not cite to it. And so, let's turn to DX6 to discuss this.

In the petition and the supporting declaration, Dr. Sears, which is Apple's expert, opined that there are known problems with registering

10

**Appx528**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

directional finger movements on a fingerprint sensor. And this is at Exhibit 1003, paragraph 223. Dr. Sears had a factual basis for his opinion in citing to Exhibit 1053, which goes into detail on known problems with registering the directional finger movements. This includes the skin distortion that happens when you're swiping or sliding your finger across the fingerprint sensor. This ends up requiring stitching of the fingerprint images, which has an increased complexity. And you have to compensate for varying shift of data skew in the finger position.

And so, Dr. Sears opined that if the directional finger movements are replaced with simply a duration of the finger press, that we don't have these known problems. This is evidence that has not been rebutted by CPC. Again, as I stressed earlier, CPC does not respond to this evidence. Instead, we have problems with CPC's mechanical push button. First of all -- and CPC has made clear in its briefings that it's proposing adding a mechanical push button to Mathiassen's portable control.

So now we have two entry points on the portable control that have to be addressed by the user, and as noted by Dr. Sears in his supplemental declaration and as discussed in the petitioner reply, when there is a mechanical push button, it is not receiving a fingerprint, and this foregoes Mathiassen's discussion of providing authorized access. And I refer for example to paragraph 151 of Mathiassen, although Mathiassen is replete that it is all about using fingerprints to authorize access to a control device.

In CPC's sur reply, it cites a number of cases at pages five through six, and these cases are essentially being argued by CPC that adding the durational fingerprint to Mathiassen is redundant. That's not the term that CPC uses, but that's the gist of why CPC is citing these cases. Apple

11

**Appx529**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

actually already had addressed the redundancy issue in its Petitioner reply, at pages 17 through 18, but because these cases are newly cited in the sur reply, I'd like to just quickly go through them, because they are each easily distinguishable.

Here, as a reminder, we have unrebutted improvements to Mathiassen of the directional finger movements being replaced with the durational finger presses. The first case cited by CPC is R.J. Reynolds. It is a Board decision. What CPC fails to tell the Board with respect to this case is that that panel had decided that the proposed motivation changes the principle of operation of the primary reference, which CPC does not mention in its briefing.

In that invention that was discussed, the goal in the primary reference was transporting liquid from a device. There was a discussion about papillary action. And the Board had said that that goal of transporting liquid was "reliably met." And it was unclear any detriment in the primary reference of transporting liquid, but as discussed here, we do have a known problem with the improved solution.

The next case is Kinetic Concepts. It's a Federal Circuit case. There, no motivation combined was provided, and there was also evidence of teaching away. The Court said, "The record is devoid of any reason someone would combine these references," and that's at page 1369 of the case. Here, we have a very detailed record, and once again, the established improvement to the proposed modification.

The third case cited by CPC is an Apple decision from the Board, where the decision was that the modification was a "wholesale modification, with only a conclusory motivation to combine," and again, changing the

12

**Appx530**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

basic principles of operation. And then the last case, Norman, which is also a Board decision, the Board found that there was no improvement with the modification. So each of the cases that CPC is citing are easily distinguishable for either lacking a motivation to combine whatsoever or changing principles of operation.

The other, simpler solution that CPC argues is enrolling an additional fingerprint to indicate duress. Now, what is interesting here is that -- and I want to just quickly refer the Board back to DX5. What is interesting here is that there's four issues with this argument, but it also shows that CPC has conflated limitation B2 with limitation D1, so I want to explain all of that.

So the first issue with CPC's argument with respect to enrolling a second fingerprint to indicate duress, is that this is what we mapped. For limitation B2, it recites outputting an accessibility attribute. Now, the claims are -- the independent claims, I should say, do not recite a duress accessibility attribute. They simply recite outputting an accessibility attribute. Now, the --

JUDGE GROSSMAN: Ms. Bailey, is there anything special about an accessibility attribute, other than it's a single signal that gets sent based on an input? You put your finger on the Mathiassen fob, and it reads your fingerprint, and it then sends that someplace, likely to the car door in Mathiassen, as a signal, saying that this fingerprint is registered in our database, and it's okay to open the door? Is the accessibility attribute something more than just a signal?

MS. BAILEY: The accessibility attribute itself is a signal. I agree with that. And the 705 Patent talks about how a bit is entered into the signal

13

**Appx531**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

to indicate the type of access. Your question is getting to Mathiassen, and the argument with respect to whether Mathiassen teaches the accessibility attribute. If you'd like, we can jump to that section and discuss that further.

JUDGE GROSSMAN: No. Just go on to just proceed with where you were going. You mentioned the accessibility attribute, and it was -- I just wanted to see if your understanding was consistent with what I understood the accessibility attribute to be, as well.

MS. BAILEY: I do agree that the accessibility attribute itself is outputting of a signal, and that signal is indicating the type of access to be given to the user.

JUDGE GROSSMAN: Okay. Thank you.

MS. BAILEY: Okay. Just quickly kind of going back to the enrolling additional fingerprints, limitation B2 recites outputting an accessibility attribute. That does not require any duration. It just simply requires a biometric signature. The duration limitation doesn't come until D2, so it's actually two different entries of the biometric signature going on in the claims.

And so, the petition did map that the biometric signature of limitation B2, that it would be obvious that to indicate duress, or to indicate alert, via -- and I'll concentrate on duress, because that's what CPC is arguing -- via a second fingerprint, or via the series of entries of the consecutive fingerprint representations already disclosed in Mathiassen.

The second issue with CPC's additional fingerprint argument is that even if simpler, it once again does not negate obviousness of improvement to substitute directional finger movements with duration.

Third, I would also note that this is a new sur reply argument that CPC did

14

**Appx532**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

not make in its Patent Owner response, and therefore it should not be considered, according to the Trial Practice Guide, page 74.

And fourth, just from a kind of motivation to combine, even though it's kind of odd what CPC is arguing with respect to a different proposed modification of Mathiassen, but adding an additional fingerprint to indicate duress is going to remove the ability for authorization that is described -- and remove, I should say, the additional safety feature that is described in Mathiassen at paragraph 192.

Turning now to DX7, I do want to quickly note two other arguments with respect to the motivation to combine on the duration limitation that CPC raises. One of them is with respect to Anderson, that Anderson does not teach collecting the fingerprint with the durational finger press. We disagree with this. We have there the text of Anderson, where it says that thermal sensor for collecting an image of the user's fingerprint as the pressure code is entered. That notwithstanding, Mathiassen already has the teaching of the series of fingerprint representations being received, in conjunction with the directional finger movements that are replaced with duration. So we don't actually need to rely on Anderson's teaching here. Yes, Your Honor?

JUDGE GROSSMAN: Yes. Let me just interrupt you for a second, Ms. Bailey. I want to make sure our record is clear. When we're looking at your demonstrative slide DX7 --

MS. BAILEY: Right, Judge.

JUDGE GROSSMAN: -- and you mentioned the Anderson disclosure, on the slide you've got a citation, and I just want to make it clear what we're looking at in Anderson. And my understanding is you're

15

**Appx533**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

directing us to column seven of Anderson, lines one through eight?

MS. BAILEY: Yes, Your Honor. I'm sorry if that was not clear with our notation of semicolon one through eight.

JUDGE GROSSMAN: It's clear on the slide.

MS. BAILEY: Oh.

JUDGE GROSSMAN: And I just want to make sure it's going to be clear in the record what we're talking about, exactly what part of Anderson --

MS. BAILEY: Yes, Your Honor. Thank you.

JUDGE GROSSMAN: -- that you're relying on.

MS. BAILEY: Thank you for that reminder. I'll be sure to note next time. The other argument that CPC makes with respect to Anderson is that Anderson allegedly denigrates fingerprint representations in accepting the fingerprint. Anderson actually has an embodiment that includes a fingerprint sensor, so Anderson -- there is no denigration.

Anderson does reference that using fingerprints requires specialized hardware and software, which it does. But Mathiassen already includes that specialized hardware and software, because Mathiassen is replete with teaching fingerprint sensors. So again, we don't need to rely on Anderson's fingerprint sensor. Anderson is only being used for its durational finger presses.

The next argument, at DX8, is CPC's computer art theory. CPC argues that a skilled person would not use Anderson or McKeeth to modify Mathiassen, because they allegedly relate to computer art. CPC originally presented this argument kind of as an analogous argument. Even though it did not use the term analogous, CPC clarified in its sur reply that it was not

16

**Appx534**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

referring to analogous art, I believe. And so, the references here, though, regardless of whether CPC's trying to make an analogous argument or not -- which is inappropriate, given the recent Federal Circuit precedential case that we cited -- here, we have all three references. Mathiassen, McKeeth, and Anderson are all directed to accessing an electronically secured item, and providing authorized access.

And CPC even agrees that Mathiassen is directed to security issues. I'll refer the Board to the sur reply, page 19. CPC's expert admits that both Mathiassen and McKeeth are fingerprint recognition references. I refer to Exhibit 2015, paragraph 60. So all we have from CPC to support this kind of computer art argument is conclusory opinion from -- testimony from Dr. Easttom where he simply just had a statement at paragraph 76 of Exhibit 2013, that a POSITA just wouldn't have turned to personal computer art.

I'm going to pause here, see if the panel has any questions before I move to the next discussion topic.

JUDGE GROSSMAN: I have none. It doesn't look like Judges Daniels or Hagy have any --

MS. BAILEY: All right.

JUDGE GROSSMAN: -- so you can proceed.

MS. BAILEY: Okay. Thank you. All right. Let's move to DX9, and switch topics to Mathiassen's accessibility attribute. So I find interesting that this was the opening argument in the Patent Owner response by CPC, and then CPC has relegated this argument to a miscellaneous section of one paragraph in its sur reply. And I think that's telling, because the evidence shows that Mathiassen's teaching of an administrator gaining

17

**Appx535**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

access is substantially similar to what is described in the 705 Patent for a type of accessibility attribute.

Mathiassen teaches that a type of user is an administrator, as compared to other non-administrator users, and we know this from Mathiassen, because Mathiassen discusses enrolling other users at paragraph 140. An administrator is discussed throughout as having like full privileges, for example. So we know that when --

JUDGE GROSSMAN: Well, let me -- just to make sure I -- it's clear that my understanding of administrator and what's going on with Mathiassen is clear to me, is it's a fob for getting into your car, is the preferred embodiment. And for lots of people, there may be more than one driver for that car. You might have a spouse and three kids, all who want to use your car, and each of them is going to want to record their fingerprint so that they can open the door, and somebody has got to go first.

So in Mathiassen, I think the first person to record their fingerprint becomes the administrator, in some -- and everybody else is then authorized. But that -- is that understanding of what's going on in Mathiassen accurate, in your view?

MS. BAILEY: I agree that Mathiassen teaches that the car owner, the first to be enrolled, is the administrator, and Mathiassen does teach that that administrator can enroll other users. That's paragraph 190, I believe, of Mathiassen. Does that answer your question, Your Honor?

JUDGE GROSSMAN: Yes. Thank you. Thank you.

MS. BAILEY: Okay. So in Mathiassen, when the administrator is granted access, the administrator is granted that access under the condition of being an administrator. And we discuss this in the petition, pages 18

18

**Appx536**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

through 19, Exhibit 1003, which is the declaration of Dr. Sears, at paragraphs 138, 140 through 142.

I want to emphasize here that CPC does not disagree with this mapping. CPC admits the administrator has broader access than other users, and even CPC's own expert agrees with this. Now I'm going to refer the Board to DX10, where Dr. Easttom was asked in his deposition -- and this is from Exhibit 1089, page 21 through page 22 -- and he was asked, would an administrator be a legitimate user? He answered yes. And if the legitimate user is granted access, would this output an accessibility attribute?

And Dr. Easttom agrees, and he says, under what conditions? Well, they're an administrator, so we're going to grant them a much broader access than a standard user. So yes, an accessibility attribute would be output from that process. So even Dr. Easttom -- yes, Your Honor?

JUDGE GROSSMAN: I'll let you finish your thought, and then I'll ask you the question I had in mind about accessibility attributes.

MS. BAILEY: I was just going to quickly say that even Dr. Easttom agrees that an administrator has a different -- has a type of access that is unconditional, that is broader than perhaps, say, an ordinary user. Go ahead, Your Honor.

JUDGE GROSSMAN: Now, if you only have one user, let's say in Mathiassen, that that user I guess automatically becomes the administrator. But why -- what's the close connection between being an administrator and the phrase accessibility attribute, as it's used in the patents and in the claims of the patents? Or what if there's no administrator? What if it's just a fingerprint reader, and it lets you get in?

You know, you go to your bank and you want to get into your safe

19

**Appx537**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

deposit box. The bank's the administrator, or you have no idea who the administrator is. You just know you've registered your fingerprint that allows you access to your safe deposit box. Is there some connection that directly controls the meaning of accessibility attribute as used in the claims, with the role of an administrator?

MS. BAILEY: Let me give you a couple of points in response to that question. First, claim three of the 705 Patent kind of takes all the concepts related to an administrator user versus an ordinary user, and shows that it -- claim three puts all of this disclosure together, to show that a biometric signature that is in a system administrator class, as long as it's stored, it's a legitimate user, that that biometric signature of the administrator is going to output an accessibility attribute.

JUDGE GROSSMAN: And excuse me. Is that claim three in the 705 Patent, or in the --

MS. BAILEY: Yes, Your Honor.

JUDGE GROSSMAN: Okay. Thank you.

MS. BAILEY: Also, we know from the 705 Patent that an administrator has the ability to amend data stored in the database, because they can enroll other users. I'll refer to column 10, lines 36 through 38 of the 705 Patent, and that's juxtaposed against an ordinary user in the 705 Patent. Similarly, in Mathiassen, an administrator has the ability to enroll data -- in other words, by enrolling other users.

So I believe Your Honor asked, you know, what is the difference between an administrator and an ordinary user, and it is, at the least, being able to enroll other users, or being able to otherwise amend the data stored. So even in the situation where you had a single user, that single user would

20

**Appx538**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

be an administrator, and they would have the ability to enroll other users. It just happens to be that the database only stores one legitimate signature.

JUDGE GROSSMAN: Thank you.

JUDGE DANIELS: Ms. Bailey, you have about a minute left in your initial presentation.

MS. BAILEY: All right. Thank you, Your Honor. Just quickly, let's move to DX11. And actually, before we do that, any other questions on accessibility attribute before I move on?

JUDGE GROSSMAN: None from me, and I don't see Judges Hagy or Daniels indicating that they have any, so why don't we move on to your next point.

MS. BAILEY: Very quickly, with respect -- I'm going to move you to DX12. This is CPC's argument that the series of consecutive fingerprint representations taught in Mathiassen does not receive a biometric signal. This is false on its face. We have underlying section on DX12 where paragraph 192 of Mathiassen says that the device may store a series of consecutive fingerprint representations, and it's those same fingerprint representations for which the directional finger movements are received in conjunction.

So I'm going to emphasize the fingerprint here. Mathiassen says that it is receiving fingerprint representations in conjunction with directional finger movements. This has been in the petition, the declaration, and in the Petitioner reply, and CPC does not respond to this argument whatsoever. I'm going to end there with the opening discussion, if there are no further questions.

JUDGE GROSSMAN: None from me, and seeing no indication of

21

**Appx539**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

questions from Judges Hagy and Daniels -- okay. Thank you. And Judge Daniels has -- we're keeping accurate time of your remaining time, which is probably somewhere a little -- 15 minutes plus a couple of seconds.

JUDGE DANIELS: Yes. Up to you, depending on how many questions we asked, Judge Grossman. You know, 14, 15 minutes left for Ms. Bailey.

JUDGE GROSSMAN: Okay. Mr. Summerfield, whenever you're ready, you may begin, and the first question I have is would you like to reserve any time for your rebuttal?

MR. SUMMERFIELD: Yes, Your Honor. I'll reserve 15 minutes as well.

JUDGE GROSSMAN: Okay. Thank you, and continue when ready.

MR. SUMMERFIELD: Thank you, Your Honor. May it please the Board, I also want to start with the durational limitation, because I think that's the most important issue here today. First of all, I want to make it very clear, CPC has never conceded that Anderson teaches a durational component to a fingerprint. And here we have to make a very clear distinction, because Anderson itself does, that there are these durational finger presses that are a function of pressure that Anderson receives. In addition, there's a simultaneous capture of fingerprint imaging -- and I'll get into that in a minute -- that says nothing about a durational component, and both experts agree on this.

So it is completely illusory to say that somewhere in the record, there is a concession by CPC that there is a durational component to fingerprints, or any other biometric signal in Anderson, such that if you

22

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

import Anderson's teachings into Mathiassen, you somehow get a durational component to a biometric signal series, which is in fact what the claims require.

JUDGE GROSSMAN: But on that point, Mr. Summerfield -- this is Judge Grossman -- I think that the disclosure that seems to be where both parties are focused in Anderson, about both having a fingerprint and then having the durational sensor, is in column seven, and I think we -- Ms. Bailey mentioned it. It's lines one through eight. It actually -- it may go a little bit further down, lines one through ten.

But the question is, I read that passage in Anderson, column seven, lines one through ten, as saying that in addition to your digitizer pad, recognizing the pulses or presses of your finger, it can include a thermal sensor for collecting an image of a user's fingerprint, as the pressure access code is entered and verified. So, that seems to suggest that Anderson is collecting two bits of data at the same time. Anderson is collecting the length of the press that was being recorded, as well as recognizing the user's fingerprint. So doesn't that mean that Anderson is collecting both bits of data at the same time, both the fingerprint and the length of the press?

MR. SUMMERFIELD: Yes, it does, Your Honor. The problem is it's not collecting a series of biometric information. As a matter of fact, that very passage that you cite, we cited as well, as does Apple. And that's the only passage that anyone cites that talks about collecting an image of a fingerprint. Not a multiplicity. And everybody agrees that for there to be a series, there has to be more than one. So if Anderson expressly teaches collecting an image of a fingerprint, even if it's simultaneous with the collection of this variable pressure, nonbiometric series, there's still no

23

**Appx541**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

teaching in Anderson of collecting a series of biometric images, let alone --

JUDGE GROSSMAN:  If I could just ask you to -- excuse me for interrupting, and I want to hear the conclusion, but if -- just to direct us to the claim language, let's say using the 705 Patent as the example, where the series of presses comes in, that you say isn't included within Anderson?

MR. SUMMERFIELD:  Well, if we look at what the claim requires, what the claim further requires the transmitter subsystem to do, it has to have a controller that receives a series of biometric signal entries, with each entry having a durational component.  So the series, whatever it is, has to be biometric.  No one has suggested that a series of pressure variable touches on a screen is biometric.  In fact, as we'll talk about in a minute, both experts agree that that's a knowledge-based entry of information.  And if I can teach you, Judge Grossman, how to vary pulses on a screen, such that the input device is agnostic as to whether it's you or I doing the entry, that's not biometric.

JUDGE GROSSMAN:  Okay.  I --

MR. SUMMERFIELD:  So we have --

JUDGE GROSSMAN:  Let me follow up with that question, but just to -- and I'll take the great risk of using an analogy, which may not work quite so well.  But when you're talking about the series of pulses that Anderson teaches, is that similar to a Morse code entry of dots and dashes?  You've got some long pulses, some short pulses, and the way you can put them together would send an understandable message in Morse code?  And are you telling me they're doing the same thing in Anderson?  It's your understandable message is your series of long pulses and short pulses?

MR. SUMMERFIELD:  Precisely, Your Honor.  And if we take a

24

**Appx542**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

look at the Patent Owner's slide number 14, we have both experts telling us their opinion that that very pattern that you just described is nonbiometric. According to Dr. Sears -- again, this is Apple's expert that says this -- that that is a knowledge-based bit of information.

JUDGE GROSSMAN: But --

MR. SUMMERFIELD: If it's --

JUDGE GROSSMAN: Okay. I'm sorry to interrupt. Go ahead. Why don't you finish your thought, and then I'll ask my question.

MR. SUMMERFIELD: If it's knowledge-based, Judge, it's not biometric, because I can teach you how to do it, which means anyone can enter that code. It doesn't have to be me.

JUDGE GROSSMAN: Okay. And as -- okay. We're looking -- we clearly need a biometric signal, but isn't the petitioner relying on Mathiassen for that biometric signal, that there is a biometric signal? And we've got it, and what we're going to do is see if it would have been obvious to a person of ordinary skill. I think in this case we have agreement among the parties of what that level of skill is. It's a degreed engineer and a relevant technology that has a year-plus of relevant experience. So would that person of ordinary skill, having Mathiassen's input of a biometric signal -- would it have been obvious to supplement that biometric signal, as suggested by Anderson?

So isn't -- and so, that is a long introduction to what is probably a confusing question, but let me clarify for you. So don't we have the biometric signal from Mathiassen, and we're just modifying that with the durational pulses of Anderson? Isn't that the proposed combination?

MR. SUMMERFIELD: It is, according to what Apple says, but

25

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

that's not where you get to if you add Anderson's teachings to Mathiassen. Let's unpack several things there. First of all, this presupposes that the finger motions, the touch/no touch, and the other mechanisms that Mathiassen talks about to enhance signaling capability are biometric themselves. And Ms. Bailey said they are, but for example, Mathiassen very clearly teaches a touch/no-touch finger pattern in paragraph 192, the paragraph that you cited, Judge Grossman. There's nothing that indicates that that's a biometric signal series.

So what happens if Anderson's teachings -- and there are two of them that are relevant here, admittedly. What happens if Anderson's teachings are added to Mathiassen? One of two things. Number one, the variable pulse nonbiometric signal series is imported into Mathiassen for the duress limitation, which Apple says is missing from Mathiassen, in which case you have a nonbiometric series, each with a durational limitation, or a durational component. Or you have Mathiassen's single image fingerprint capture, which doesn't give you duress at all.

And we know that because Dr. Sears admits it, if we take a look at slide number 13 from the patent. He's the one that says where Anderson does talk about fingerprints, he says nothing about duration. So basically, Apple has to use hindsight reconstruction to cherry pick teachings from Anderson to say, we are now going to take the fingerprint entry from Mathiassen, and we are going to impute some sort of series with a durational component, in light of Anderson's teachings. And it just doesn't follow, Your Honor. Anderson doesn't tell you to do that.

JUDGE GROSSMAN: As a practical matter, when you want to put in the pulses, let's say, that Anderson talks about, and you're using your

26

**Appx544**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

finger, and Anderson has some suggestion of combining the pulses with a fingerprint -- in order to have a series of pulses, don't you have to lift your finger off to stop?  So you've got a short pulse, you lift your finger off, and then you're going to touch your finger again and have a longer pulse. Otherwise I'm not sure how your -- how the software would recognize when one pulse ends, and a second pulse begins.

And so, each time that you do that press with your finger, if Anderson has a fingerprint recognition, it's both measuring the length of the press, the duration, and also identifying it as a valid fingerprint.  Isn't that a series of inputs that you're referring to as missing?

MR. SUMMERFIELD:  That's not what Anderson teaches, Your Honor.  Column seven, the passage that you referred us to, talks about capturing an image of a fingerprint.  It doesn't say each time the finger goes back down on the sensor to enter a different variable pressure pulse, that the fingerprint sensor -- which, by the way, Anderson teaches has to be something in addition to what's being used to enter the pressure pulses.  It doesn't say that each time you touch that pad, there's a separate recordation of a fingerprint image.  That is completely absent from Anderson.

And the only way Apple can argue that one would know to do something other than what Anderson expressly teaches -- i.e., capture a single fingerprint image -- is through hindsight reconstruction, to get to the claims that they are challenging in this proceeding.  And again -- sorry, Your Honor?

JUDGE GROSSMAN:  Yes.  I'm sorry.

JUDGE DANIELS:  Mr. Summerfield, this is Judge Daniels.  So if I'm understanding your argument, what you're saying is -- and there is no

**Appx545**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

tie, nor teaching, I guess to put it broadly, in Anderson and/or Mathiassen, that there is -- that these two things are inextricably linked, which is the biometric signal and the pressure together. That's what the claim is saying, if I'm understanding your argument.

MR. SUMMERFIELD: That's correct, Your Honor. Well, actually, I would go a step further. There's a teaching away from that. You do have a variable series of pulses, which is more than one by definition, on one hand. And then you have Anderson's teaching of collecting an image, singular. So very clearly, they are not conjoined, because you collect one in one instance, and you collect a series in the other, so they cannot be the same functionality. They just can't. And Anderson says nothing else about capturing fingerprints.

And again, to be clear, when Dr. Sears was asked this question under live fire depositions, he made it -- he expressed his opinion that Anderson says nothing about a durational component to fingerprint capture, as opposed to this nonbiometric signal series that Anderson also teaches. So what gets imported into Mathiassen, then, that changes Mathiassen's teachings? Is it going to be the nonbiometric signal series? Well, that doesn't get you to the claim invention. Is it the capture of a single image of a fingerprint, with no durational component? That doesn't get you there either. Those are the only two options. Unless again, you're sitting there with the claim in front of you, and using that as a roadmap.

JUDGE GROSSMAN: Okay. Mr. Summerfield, but before we leave that point, I just want to clarify one thing, to make sure I understand fully your argument. And in this column seven disclosure from Anderson, column seven, lines one through ten, the language there says that the pad

28

**Appx546**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered.  And it's your position -- what I understand from you, that what those few words mean, that it only records it once, and that when it says that the fingerprint is recorded as the pressure access code is entered, it means once it's satisfied that you've pressed it for your first durational input, it doesn't then access it again when you press your second durational input.  It just does it once.  Is my understanding of your interpretation of that language correct?

MR. SUMMERFIELD:  Well, it's actually the express language, Your Honor.  It says "an image," singular.  So it's not even my interpretation.  I'm just reading the claim words there, which indicate something other than a multiplicity.  And again, Dr. Sears said that there's no durational component here.  Logically, if the fingerprint sensor were registering the fingerprint every time a variable pressure entry were made, there would be a durational component.  Otherwise, the two are not coextensive.  Their own expert says they're not.  So --

JUDGE GROSSMAN:  And --

MR. SUMMERFIELD:  -- the claim language --

JUDGE GROSSMAN:  -- just to -- do you have a citation of where Dr. Sears made that admission, or where that testimony is?  Or is it in your briefing materials?

MR. SUMMERFIELD:  Actually, Your Honor, if you take a look at slide 13, we have the testimony replicated there.

JUDGE GROSSMAN:  And is this Patent Owner's slide 13?

MR. SUMMERFIELD:  It is, Your Honor.

JUDGE GROSSMAN:  Thank you.

29

**Appx547**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

MR. SUMMERFIELD:  That shows Dr. Sears' testimony basically captured in image form from his transcript, and that's where he said it.  So I would urge Apple, if there is other evidence, to bring it forward, but at the end of the day, there's been nothing that says that for the biometric component of Anderson's teachings, that there's any sort of series whatsoever, let alone a duration for each entry of the series.  And that is what is minimally required for the claims.

JUDGE GROSSMAN:  Okay.  Thank you.

JUDGE DANIELS:  What line in column seven has -- are we looking at, were we talking about before, Mr. Summerfield, where it says an?

MR. SUMMERFIELD:  Your Honor, if you take a look at slide 13, there's the excerpt there, and about midway down it says --

JUDGE DANIELS:  Oh, okay.

MR. SUMMERFIELD:  -- collecting an image of a fingerprint.

JUDGE DANIELS:  I can barely read that.  What line is it?  Just detail?

MR. SUMMERFIELD:  It's line six, Your Honor.

JUDGE DANIELS:  Line six?

MR. SUMMERFIELD:  And actually, if we go to slide seven of the petitioner's slide deck, they cite the same passage.  Perhaps it's more legible there.

JUDGE DANIELS:  No, I can see it.  I just have -- sorry.  I just have the patent up in front of me.  I just wanted to -- I see it.  I see it.  Perfect.  Thank you.

MR. SUMMERFIELD:  And the import of the fact the petitioner

30

**Appx548**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

cites the same passage is they couldn't find anything better, so that's what they're relying on as well. If we go to Petitioner's slide number four -- and again, this pertains to what Mathiassen actually teaches, before it's modified by Anderson -- this shows a graphic representation of what Apple contends results when you combines Mathiassen's teachings with those of Anderson.

And I want to look at bullet point number two, under the heading Mathiassen Teaches on the right-hand side. Or the left-hand side. Sorry. And it says that Mathiassen teaches detecting fingerprint touch/no touch sequences. And based on this characterization, then Apple claims that the result of the combination includes detecting a duration of fingerprint presses. Now, again, CPC never conceded that Anderson teaches a duration of fingerprint presses. Fingers, yes. Fingerprint presses, no.

Let's take a look at Petitioner's slide number 12. This is where Petitioner replicates paragraph 192, and Judge Grossman, you asked Ms. Bailey about this particular paragraph in your questioning of her. And if we look in between the green and yellow highlighted portions, we see Mathiassen's actual teaching, which is touch/no touch finger movement sequences. Not fingerprint, but finger. So there is no teaching in Mathiassen of a touch/no touch fingerprint series. It just isn't there.

And again, that's not surprising. Because Judge Grossman, as you pointed out, in order to have these kinds of movement analyzing capabilities, you have to have a movement analysis means and a translation means for the teachings of paragraph 192. It doesn't work with a fingerprint sensor alone. So it's not surprising, then, that what we're talking about in Mathiassen is a touch/no touch finger series. Not fingerprint, but finger.

Again, this teaching is at best ambiguous about whether we're

31

**Appx549**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

talking about a biometric signal series or not.  That can't invalidate these claims, given that Apple has the burden to do so.  They have to show which way this turns out, and they can't, because it's -- the word fingerprint isn't there, and again, you need additional hardware or software even to register the series.

And I want to address a related issue, because Ms. Bailey kept talking about how we didn't challenge evidence regarding data skew, if you have to actually analyze finger movements as opposed to presses.  What she didn't tell you --

JUDGE GROSSMAN:  Yes, but Mr. Summerfield -- this is Judge Grossman.  Before we leave that paragraph 192, I just want to clarify my understanding of one thing that you said, is that we're looking at the petitioner's slide DX12, demonstrative slide, which is an excerpt from Mathiassen, and it shows their -- Mathiassen's paragraph 192.

And the material that's highlighted in yellow on that slide says that the program module analyzes the obtained series of fingerprint representations to obtain a measure of the directional finger movements.  And I thought I understood you to say that Mathiassen did not have a series of fingerprint measurements, and does that -- am I reading that sentence incorrectly, about a series of fingerprint representations?

MR. SUMMERFIELD:  No, Judge.  We don't say there's no series of fingerprints.  That's clearly in paragraph 192.  What Ms. Bailey and Apple want to do, though, is extrapolate that to say that that means that the touch/no touch sequence is itself a biometric series.  There's nothing in there that says that.  And while there may be some accuracy to the notion that there's data skew when you move your fingers, as you pointed out during

32

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

the questioning of Ms. Bailey, Judge Grossman, all you're doing when you're raising and lowering your finger onto the pad is registering that a finger is there. That's it. There's no logical basis for at the same time recording the fingerprint. It's a series of touch/no touch. That's it. So there's nothing in Mathiassen at all that says that that is a biometric signal series.

Now back to my point about the evidence we didn't challenge. What we do -- what we do say is that because Mathiassen teaches these alternative mechanisms other than finger movements -- touch, no touch, and registering a second fingerprint -- to get the kind of signaling capabilities that Apple says is the motivation for combining the prior art, those aren't subject to the same criticisms that Apple raises with regard to finger movements. As a matter of fact, the touch/no touch series is precisely the thing they say should be modified with the teachings of Anderson to add a duration. It's already there.

So we're saying that it's just easier to do nothing with Mathiassen. Because the additional signaling capability is already present there, you don't need to add anything from Anderson. But if you don't modify with Anderson, you're still missing the durational component. And again, the only reason you would add that is because you've got the claim in front of you, and you're trying to invalidate it. All the additional signal capability is already present.

And to Ms. Bailey's point that, well, there isn't anything magical about, for example, a duress indication, that's the reason Apple says to modify Mathiassen with McKeeth, to add a duress component. That is the thing, the condition that Apple is pointing to as being added to with this

33

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

other prior art. So to now run away from that, saying, well, we don't really care about that, necessarily -- well, that's the whole point of this combination precisely, otherwise McKeeth becomes superfluous. But Apple is the one that fashioned this challenge. Not us.

And then it also goes to the question of whether the administrator even knows. I'll get into more detail about that in a minute, but Apple started this whole process by saying take Mathiassen, modify it with McKeeth to get a duress signal, and then add Anderson to get the durational component. Now they're saying, well, the condition we really care about is the distinction between an administrator and a user. But again, that's not what they came to the dance with.

They talked about duress as if it is a meaningful circumstance, that somehow would occasion the ability to engender signaling that talks about whether access is granted, pursuant to the accessibility attribute limitation, and under what conditions -- the condition here very clearly is duress, not the distinction between an administrator and a user.

I'd like to go to Petitioner's slide number 14 now, because Ms. Bailey spent a lot of time talking about how these plans were mapped by Apple, and I want to look at the upper right hand corner of that document, where Petitioner points to modifying the administrator's fingerprints from Mathiassen, with a durational component from Anderson. Now --

JUDGE GROSSMAN: Okay.

MR. SUMMERFIELD: -- the citation (CROSSTALK) --

JUDGE GROSSMAN: Mr. Summerfield, I'm sorry to interrupt you. It's Judge Grossman. When you say look at the upper right-hand corner of Petitioner's slide 14, is that the column that's got the heading

34

**Appx552**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

Petitions Mapping?

MR. SUMMERFIELD: Yes, Your Honor. Thank you. It is. And then the first mapping component for the receiving limitation, this is where Apple points to modifying the administrator's fingerprints in Mathiassen with a duration component from Anderson. Now, they have a very specific citation for supporting that proposed modification, and that's petition at 32-37. It's important to note that the word administrator appears nowhere in those six pages. What they do talk about is they start off with a discussion of what Mathiassen teaches on the one hand, and what Anderson teaches on the other hand, and then at page 36, the petitioner gets into a discussion of the combinations of the two references.

If we look at Petitioner 36 -- this is again 36 and 37. It's where they talk about a combination between Mathiassen and Anderson. Again, those pages say nothing about an administrator at all, but it does cite repeatedly to several paragraphs from Dr. Sears' declaration, Exhibit 1003. Those three paragraphs don't say anything about an administrator, either. And the paragraph that does the most heavy lifting in this discussion is paragraph 222. This paragraph spans over three pages, and it discusses several instances where people might find it better to use a variable pressure pulse, other than say finger motions --

JUDGE GROSSMAN: And --

MR. SUMMERFIELD: -- because it's easier.

JUDGE GROSSMAN: Excuse me, Mr. Summerfield. When you say paragraph 222, are we still looking at Dr. Sears' declaration testimony?

MR. SUMMERFIELD: Yes, Your Honor. I apologize. It's Exhibit 1003. So Dr. Sears has several different instances where a series of

35

**Appx553**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

pressure pulses would be the thing to use, as opposed to, for example, finger swipes. Now, keep in mind again, this is supposed to be support for the notion that one would be motivated to modify the administrator's series of signal entries with the durational component.

So what does Dr. Sears say? Well, they include an instance where a car owner has only a single hand free, when the key fob is in a pocket or a bag, when the user is holding various items, and when the user has to direct attention elsewhere, such as when buckling in children. That has nothing to do with an administrator enrolling another user. One would imagine that if the administrator is doing that, he's not doing it at the same time as trying to buckle in a two-year-old.

So again, this is the mapping that Apple proposes in its slides, but the evidence that Apple cites has nothing to do with modifying an administrator's signature at all. So the mapping that it now urges, at the tail end of this proceeding, isn't supported by the very evidence Apple cites. Now, why does it do that? Because basically Apple understands that there is no value whatsoever to modifying an administrator's biometric signal entry with a durational component.

And as a matter of fact, if you look at what Dr. Sears describes, the instances where one might have a durational variation -- again, buckling in a two-year-old. Does one really want to sit there and try to remember whether it's long-short-short-long, or short-long-long-short, when they're trying to do that at the same time? The answer is probably not. But again, that's not even the mapping that Apple proposes in its slides, so it doesn't even matter. It's enough to say the evidence they cite to support the mapping they now propose doesn't actually support it.

36

**Appx554**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

JUDGE DANIELS: Mr. Summerfield, that --

MR. SUMMERFIELD: I (CROSSTALK) --

JUDGE DANIELS: Mr. Summerfield, you've got about 20 seconds left in your 30 minutes, but feel free to use whatever time you want here.

MR. SUMMERFIELD: Thank you, Your Honor. I probably will reserve less time for rebuttal, under the circumstances. I want to turn to slide number 11, if we can.

JUDGE GROSSMAN: And Mr. Summerfield, this is Judge Grossman. Are we on the patent owner's slide 11?

MR. SUMMERFIELD: I apologize again, Your Honor. Yes. Patent Owner's slide 11. So this is a discussion of the definition of accessibility attributes, specifically the two components, the whether and under which conditions components of that limitation is. Now, when Apple proposed the definition of this term in the District Court, it made it very clear that under which conditions wouldn't be satisfied by a mere binary yes/no inquiry into whether access to a device should be granted.

It made the same proposal for claim construction to the Board, which the Board adopted for institution purposes. However, when the Board, in its preliminary institutional decision, looked at the Mathiassen teachings, it said that if in fact Mathiassen engenders a result where a lack of a biometric match means no access to the device, that's all this claim limitation requires.

In fact, that is contrary to the definition that Apple proposed, that basically said no, it isn't good enough that the inquiry is yes, no, and binary. So we would urge the Board to reconsider in evaluating any of the prior

37

**Appx555**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

references, Mathiassen included, that if all it does is give access to a door, for example, that is not sufficient to be an accessibility attribute, which is again why in fact Apple said in the first instance, well, you just modify it with McKeeth to get a duress signal.  So Mathiassen by itself doesn't teach an accessibility attribute, because it only says you get access or no.

I would also say, with regard to the difference between the administrator and the user for the key fob that Ms. Bailey spent some time talking about, I want to start with Dr. Easttom's testimony, which she cited. The part of the testimony immediately preceding the part that they excerpt for their slide shows that he's talking about the teachings of the 705 Patent, and not of Mathiassen.  So he's not talking about Mathiassen at all in distinguishing between an administrator and a user.  He's talking about the distinction in the 705 Patent where there clearly is a distinction.

Dr. Sears agrees.  On our slide number 17, we show you the quote from Dr. Sears' deposition testimony, where he says that Mathiassen is silent on any access distinction between an administrator and a user.  So again, any distinction there that Apple is imputing into Mathiassen between an administrator and a user is elusive.

JUDGE GROSSMAN:  And Mr. Summerfield, when we get to this distinction between administrator and user, are you able to direct me to the claim language in the challenged claims that supports your view of why Mathiassen doesn't disclose it?  Where is the claim language that you want us to focus on in making this determination?

MR. SUMMERFIELD:  So Your Honor, the claim language is the accessibility attribute language in claim one of the 705 Patent, for example, where it says that it is a determination of whether and under which

38

**Appx556**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

conditions access to a secure device is granted. So it's whether and under which conditions, which by normal tenets of claim construction must be something different. And again, if we trust Apple with regard to the way it read those claims in its proposed construction to the District Court and reiterated here, binary isn't enough. That's the whether part. But it also requires under which conditions, and that's where the different levels come in play. That's why again, Apple said, well, we have a duress attribute. So it's not just, are you getting access to the car -- are you setting off an alarm at the same time, for example?

Finally, Your Honor, I want to end with Patent Owner's slide number seven, and again, this is going back to the question of whether you just do nothing with Mathiassen, and rely upon all of its consistent teachings of additional signal capability, or do you modify that with the teachings of Anderson to get a duration component. Your Honor, there's no good reason to change what Mathiassen already teaches as far as the touch/no touch sequence is concerned, if all you want to do is send a duress signal, or if all you want to do is unlock four doors instead of one. It's already there.

And as this Board found in Provisur Technologies v. Weber, which is affirmed by the Federal Circuit, if you're adding needless complexity to a device in the name of arriving at the patented invention, that basically undoes any motivation to combine that a person of skill in the art might otherwise have. Just knowing about references isn't enough, especially when it undeniably makes the device more complicated. We present the evidence from both Dr. Easttom and Dr. Sears that says doing nothing to Mathiassen is simpler. That is just undisputed evidence at this point.

And again, Ms. Bailey will say, well, the finger movements skew

39

**Appx557**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

data. Perhaps. But touch/no touch does not. Registering a second fingerprint doesn't. And it doesn't really matter how Apple mapped these things. If Mathiassen already says you want to do more signaling to register more fingerprints, use your index finger for unlocking the door, use your middle finger for setting an alarm, that's already there. So what is the motivation for adding a durational limitation from Anderson to Mathiassen at all? There isn't. Unless there are any further questions, Your Honor, that concludes my presentation.

JUDGE GROSSMAN: Yes. I have no further questions at this time, and it seems -- does Judges Hagy or Daniels have any? It does not appear they've got any questions. And so thank you, and we'll let Ms. Bailey, who has about 14-plus minutes left for your rebuttal.

MS. BAILEY: Thank you, Your Honors. I'm going to try to take the rebuttal in the order presented by Counsel. Let's first talk about Mathiassen's teachings. I'm going to refer the Board to Petitioner's slides at DX12, where we have Mathiassen's teaching at paragraph 192, with relevant portions highlighted.

Counsel attempted to emphasize that the fingerprint in paragraph 192 is either a singular fingerprint, or that there is no simultaneous capture of the fingerprints with the directional finger movements. I actually believe that he did admit that there was simultaneous capture at the opening. I'd have to go back and look at the oral transcript.

But the thing that I want to emphasize here is that Counsel is struggling to rewrite paragraph 192. It says a series of consecutive fingerprint representations, plural. I don't know how else to read Mathiassen, paragraph 192, other than it is receiving a series of multiple, i.e.

40

**Appx558**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

a plurality, of fingerprint representations, plural. And those fingerprint representations, looking at this second block of text, the second yellow highlighted, analyzes the attained series of fingerprint representations to obtain a measure of the omnidirectional finger movements -- again, plural, across the fingerprint sensor.

So Mathiassen is teaching that as the fingerprint is received, each entry of it, the directional finger movement of that entry of a fingerprint is analyzed, and then the translation means determines what command those directional finger movements correspond to. Mathiassen goes on to talk that including directional and touch/no touch, so the touch/no touch simply gets replaced with Anderson's durational finger presses. I also refer the Board to Exhibit 1090, paragraphs 10 through 11. This is Dr. Sears' supplemental deposition, where he talks about this discussion, too, that I just had.

Second, Counsel raised a teaching away argument, with respect to -- I was unclear if it's Mathiassen or Anderson. This is a new argument. I don't recall a teaching away argument from them, so it should be disregarded. Second, Counsel's proposal with respect to how to read the claims on the series of entries of the biometric signal is inconsistent with the 705 Patent specification and the prosecution history.

So referring to slide DX15 of Petitioner's slides, we have a cite, an excerpt from the prosecution history, where Applicant cited to the text in the 705 Patent as support for the series of entries, and in this discussion in the 705 Patent, which I believe begins at the bottom of column 10 of the 705 Patent, is the discussion that an administrator is looking to enter a control signal, so the administrator touches the fingerprint press, fingerprint sensor with a dit, dit, dit, dah, as discussed, and then in response to that control

41

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

signal, a command is issued. That's exactly what is happening in Mathiassen, and that is what we have met.

Several times, Counsel, throughout his discussion, implied or outright said that Apple was changing its mapping. I strongly disagree with that, Your Honors. We have been consistent in our mapping throughout, and to this day -- go ahead, Your Honor. Did you have a question?

JUDGE GROSSMAN: Yes. I wanted to ask you a question about your slide 15. This is Judge Grossman.

MS. BAILEY: Yes.

JUDGE GROSSMAN: And that is, this is from the prosecution history of the 705 Patent, which is the subject of a challenge in our 602 case. And is it your position that this same prosecution history from the 705 Patent would make the same point for the 208 Patent, which is in the 601 case?

MS. BAILEY: Yes, Your Honor, and thank you. I should have clarified that it would also apply to the 208 Patent.

JUDGE GROSSMAN: Thank you.

MS. BAILEY: So just to follow up on the emphasizing that we aren't changing our mapping, and referring the Board back to our petition mapping, which leads us to the populating the database limitation, which Counsel discussed, I refer the Board to pages 38 through 40 of the petition, that does discuss the administrator entering an enrollment command to enroll a new user.

Just quickly on our mapping, the mapping is that the administrator would enter the series of biometric signal to instruct enrollment. That series is being mapped to an instruction to enroll. So Mathiassen's paragraph 192

42

**Appx560**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

teaches that with this command table, there is a command corresponding to a predefined set of stored series of entries.

So, I think that anyone that works in the biometric authentication space understands that there has to be a stored biometric signature, or a stored set of directional finger movements, that are then compared to the live entry. And I mention that because there is a discussion in the papers by CPC regarding Mathiassen's teaching of predefined there. Mathiassen is referring to comparing the live entry of the series of consecutive fingerprint representations to the predefined, I.e., the previously stored series of fingerprint representations.

And so, kind of following back up with the mapping, the mapping is that once the administrator has enrolled, or instructed the enrollment of the new user, then the populating the database, according to the instruction, per the claim language, is storing the new user's master minutiae tables. In other words, populating the databases, storing the new master minutiae tables for the new user, and it's according to the instruction, i.e. the instruction to enroll provided by the administrator.

Finally, I want to move to Counsel's discussion of the accessibility attribute. The mapping makes clear, both in the petition and deck, we have very distinct sections mapping the whether access is granted, and the under which it is. In fact, they're bolded for easy reference in both the petition and the declaration. And access is under the condition, again, of being in an administrator. There still hasn't been a dispute -- and I listened closely to Counsel's discussion. He is still not disputing that an administrator, per the 705 Patent's claims, has full or unconditional access. That has never been disputed. Even now, he is not disputing that, Your Honor. And again, his

43

**Appx561**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

expert agreed that the 705 Patent, when the administrator has access, that administrator has broader access.

That same discussion would apply for the Mathiassen reference, and we have testimony from Dr. Sears that has not been -- or has been unrebutted, and has not been responded to by Counsel, that the teaching in Mathiassen of an administrator is an administrator with unconditional access.

JUDGE GROSSMAN:  Ms. Bailey, and can you direct us to a cite for that testimony from Dr. Sears?

MS. BAILEY:  Yes, Your Honor.  I'll refer the Board to Exhibit 1003, specifically paragraphs 138, 140 through 142.

JUDGE GROSSMAN:  Thank you.

MS. BAILEY:  Mm-hmm.  And then I just want to remind the Board -- I discussed this during opening, but to the extent that Counsel wants to essentially find no distinction between the 705 Patent's discussion of an administrator class and a system user class, I emphasize that claim three does distinguish between the two, and outputs and accessibility attribute, responsive to the administrator's signature or the ordinary user's signature.

I was reminded also, Your Honor, paragraph 192 of Mathiassen begins with talking about an additional safety feature.  Counsel has raised this knowledge-based discussion, and I find this interesting, because the 705 Patent is a knowledge-based discussion.  The dit, dit, dit, dah is not from the -- let me rephrase that.  The dit, dit, dit, dah that's described in the 705 Patent at the top of column 11, it's either instructed by the system, or it's from the knowledge of the user, but it is simultaneous or in conjunction, or

44

**Appx562**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

what Counsel just said, with the entry of the biometric signal.

So Counsel has tried to put a lot of confusion with respect to what paragraph 192 of Mathiassen teaches, but it's fairly clear, and the mapping is, again, fairly trivial here, that those directional finger movements in Mathiassen are simply replaced with Anderson's durational press. The Board doesn't need to find that Anderson receives fingerprint sensor plus durational finger press at the same time, even though Anderson does teach that at column seven, lines one through eight. So the Board doesn't need to actually rely on Anderson, because Mathiassen already teaches receiving the series of fingerprint representations, in conjunction with the directional finger movements. And so, the only modification with respect to Anderson here is taking those directional finger movements, and substituting in the durational finger presses from Anderson, and then that achieves the additional safety feature, discussed at paragraph 192 of Mathiassen.

JUDGE GROSSMAN: Ms. Bailey, this is Judge Grossman. When you refer to Mathiassen's getting -- the administrator getting the series of fingerprints, those are series of fingerprints of different people, is my understanding. They're not a -- so that the administrator in Mathiassen is enrolling additional users, so that -- and using my example before of a family car, a spouse and children can all use, have access to the car. But it's not a series of the same user's fingerprints. The administrator puts into the database all of the people who are authorized to drive that car. Could be family members. It could be employees of a company who have access to a company car or a truck. And each of those individuals has their unique fingerprint in the database, and the key merely recognizes them one at a time.

45

**Appx563**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

They're not going to be put into -- in a series, are they?  You're not going to have the -- you know, driver number one uses the fob to get in, and then driver number two uses his or her fingerprints to also get in.  Once the doors are open, they're open for everybody who wants to get in the car or truck.  So isn't Mathiassen's -- the series that you talk about in the context of an administer in Mathiassen, it's a series of fingerprints, but they're all of different users, and they're not all going to be using it at the same time.

MS. BAILEY:  Respectfully, Your Honor, I completely disagree with that reading of Mathiassen.  I think that is --

JUDGE GROSSMAN:  Well, good.  That's what I -- that's why I wanted to ask you and see what your analysis of the series is in Mathiassen.

MS. BAILEY:  So, I think that is an incorrect reading of Mathiassen.  There's been no argument, even from CPC, that that is a correct reading of Mathiassen.  Mathiassen, when it talks about in paragraph 192 a series of consecutive fingerprint representations, it is referring to the user.  The user is taking their finger, the same finger, and making directional finger movements on the fingerprint sensor.  That is Dr. Sears' opinion with respect to this teaching, and that has not been rebutted.

I want to explore this more.  How, Your Honor, do you -- how are you pulling that that series of consecutive -- consecutive fingerprint representations.  There's no discussion of bringing in a second user or a third user in paragraph 192.  And it obtains the series of fingerprint representations, and it takes the command table to categorize the finger movements into control signals.  So the set, the series of finger movements leads to a command.  There's nothing in paragraph 192 that comes close to indicating that the series is from different users.

46

**Appx564**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

JUDGE GROSSMAN: No, I -- okay. I understand that your position that the series -- paragraph 192, a series of consecutive fingerprint representations is the fingerprint of a single user.

MS. BAILEY: Correct.

JUDGE GROSSMAN: And that series of fingerprint representations is then also used for the omnidirectional finger movements across the fingerprint sensor.

MS. BAILEY: Correct, Your Honor.

JUDGE GROSSMAN: All right. That was what I wanted to clarify, what your understanding of that paragraph, as opposed to, as I said, a different interpretation of that paragraph, which appears to be what the patent owner has.

MS. BAILEY: And Your Honor, I would actually push back against the fact that the patent owner has that argument. I have not seen that in the briefing. If the patent owner is making that argument now, which I don't think was their argument even in the opening, this is new argument, and I would strongly encourage the Board to disregard it. This discussion of a series of consecutive fingerprint representations being from different users has not been brought up whatsoever in this proceeding.

JUDGE GROSSMAN: Okay. Thank you.

MS. BAILEY: Okay. I have no further comments, Your Honor, if you have no further questions.

JUDGE GROSSMAN: I have none, and it appears that Judge Daniels and Judge Hagy are not signaling me that they have any. And so, thank you for your presentation, and we'll turn the podium back to Mr. Summerfield for his rebuttal, and Judge Daniels will tell us about how much

47

**Appx565**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

time Mr. Summerfield has left. Slightly under 15 minutes.

JUDGE DANIELS: Mr. Summerfield, you have 10 minutes left, and we gave Ms. Bailey another minute or so, so how about 11 minutes?

MR. SUMMERFIELD: Sold, Your Honor. Let's start with the last thing, Judge Grossman, that you were talking to Ms. Bailey about. She's right. We have never made the argument that a series of fingerprint entries are entries of different users. The problem we have, though, is that Ms. Bailey says, well, you've got the series of fingerprints up here in paragraph 192, and then down here you have finger movements and touch/no touch series, and that the two must be the same. There's nothing in paragraph 192 that says that.

As a matter of fact, Mathiassen knows when to use fingerprints when that's what he means, so if he's using finger instead of fingerprint to describe the movements and the touch/no touch sequence, impliedly, or even explicitly, he's not talking about fingerprints anymore. So there's nothing that ties the capturing of a series of fingerprints on the one hand in paragraph 192, with the various movement mechanisms that he teaches later on in that paragraph. There just isn't anything.

So I listened to Ms. Bailey very carefully, and the one thing I didn't hear was any dispute as to what Anderson actually teaches. As I told you in my first argument, Anderson talks about on the one hand, a nonbiometric signal series with variable durations. On the other hand, he talks about capturing an image of a fingerprint, which is singular. Nowhere does Mathiassen talk -- I'm sorry -- Anderson talks about a series of biometric signals, let alone a duration associated with it.

Ms. Bailey said nothing on that subject, and she can't, because the

48

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

experts basically agree.  Dr. Sears says there's no duration component in Anderson.  He also says that the variable duration series is nonbiometric.  So there is no evidence supporting any position to the contrary.  That is just unrebutted at this point.  So if you import Anderson's teachings into Mathiassen, you still don't have the claimed invention.

Ms. Bailey talked about the dit, dit, dit, dah teaching in the prosecution history.  The prosecution history and the issue patent make very clear that that entry is being made on a fingerprint sensor.  There isn't any teaching akin to what Anderson says about the simultaneous capture of a nonbiometric signal series on the one hand, and the capture of fingerprints on the other hand, using separate devices, or separate technology.

You recall that Anderson and Mathiassen say if you want to do more stuff than just capturing fingerprints, you need other things.  The 705 Patent doesn't say that, and neither does the prosecution history, so it's very clear, when you're talking about that dit, dit, dit, dah series sequence in the 705 and 208 Patents, you're talking about a biometric signal series.  That just simply is not true in Anderson, and both experts agree on this.

There's also no evidence that the -- there's also no argument that the evidence that Apple cites for its administrator modification mapping is supported by the evidence that it actually cites.  So again, we went through very carefully, and talked about what was in the part of the petition that Apple cites for this reported modification, and what Dr. Sears had to say about this.  And again, Dr. Sears identifies situations having absolutely nothing to do with an administrator enrolling another user, but that's the evidence that Apple relies upon for the proposition that one would have modified Mathiassen's teachings regarding an administrator to add a

49

**Appx567**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

durational component to a signal series entry.  The evidence just isn't there, and Ms. Bailey had nothing to say on that point.

JUDGE DANIELS:  Mr. Summerfield?  Mr. Summerfield, this is Judge Daniels.  I just want to go back to -- you said that Anderson doesn't have anything to do with duration, but I think what you mean is it doesn't have anything to do with duration in respect to a biometric fingerprint or biometric signal.  Is that -- am I right?

MR. SUMMERFIELD:  Yes, Your Honor.  I apologize if I misspoke.  Dr. Sears' testimony that I was referring to was with regard to the one task that we've talked repeatedly about today, which was the capture and image of a fingerprint.  It was that passage he was referring to when he said there was just no duration discussion there.

So yes, you are correct, but that's the operative point, because it is a biometric signal series that's called for in the claims.  Adding a durational component to a nonbiometric signal series does not get you to the claim convention.  Now, the distinction between --

JUDGE DANIELS:  Good.  So let's -- so my final point, I think question on this issue -- I get what you're saying, is that if we are looking at Petitioner's slide DX12, they have cited here the representation of Figure 4A, which shows that there is a duration.  But again, there's a duration difference -- but again, as it says in the very last sentence of the paragraph that's here, thus the access code would be entered as a series of alternating pressure applications of varying durations.  Those pressure applications are not, in your argument, the biometric signal?

MR. SUMMERFIELD:  And in the opinion on Dr. Sears, Your Honor.  Yes.

50

**Appx568**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

JUDGE DANIELS:  Thank you.

MR. SUMMERFIELD:  So --

JUDGE HAGY:  I have a question --

MR. SUMMERFIELD:  Yes, Your Honor?

JUDGE HAGY:  -- still on this same point, in column 7 in Anderson.  So it says -- you're saying that just because it says collects an image -- right?  So it says, collecting an image of the user's fingerprint as the pressure access code is entered and verified.  So is it your position that once it collects one image of the user's fingerprint, it doesn't care what else is used to enter the rest of the code?  It doesn't --

MR. SUMMERFIELD:  That's correct, Your Honor.

JUDGE HAGY:  It's not going to verify that it's the same finger?

MR. SUMMERFIELD:  That's correct, Your Honor.  It doesn't matter.  If there is -- if there is a fingerprint entry, that's sufficient for the security level talked about by Anderson.  Thereafter, there could be this variable pressure sequence, or there will be this variable pressure sequence there at the same time.  Keeping in mind that Anderson says fingerprint collection is optional, so obviously that's not the primary driver of Anderson's invention.  It's talking about doing this variable pressure pulse entry, and then simultaneously collecting an image.  It is a stretch to say that somehow that should be read to mean that there's a series of those signals being entered.

Again, at the very least, it is ambiguous, and Apple has the burden on this.  So there is no justification for reading it that way, as opposed to the way that seems to be consistent with the express language of Anderson's teachings.

51

**Appx569**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)

Now, turning now to the distinction between the administrator and the user, as I understand Ms. Bailey's argument, she says, well, the administrator gets unfettered access to the car. There is no indication in Mathiassen that a user, a regular garden variety user, gets anything less. That's the point. There's no distinction between the access granted to an administrator versus a user when you're talking about Mathiassen's key fob. Nothing. And that is what Dr. Sears admitted as well. Mathiassen is silent on any access distinction between an administrator and a user.

Finally, again, I listened to Ms. Bailey's presentation. We took pains to make the argument that if you do nothing to Mathiassen, and you rely simply on the nondurational touch/no touch sequence that Mathiassen teaches for the additional signaling that Apple says, is the impetus for combining the prior art. You get all the benefits that Apple says you get when you modify Mathiassen's teachings with Anderson, without the undue complexity of adding a durational component. Ms. Bailey said nothing about that. Unless there are any other questions, that concludes my presentation.

JUDGE GROSSMAN: I have no further questions, Mr. Summerfield, and it looks like Judges Daniels and Hagy also do not have any further questions. So thank you both for your presentations. They were -- I think they'll be very helpful to us in deciding the case. We will have our decision ready for you, I can guarantee on or before its statutory due date. And we will now adjourn the hearing.

(Whereupon, the above-entitled matter went off the record at 9:42 a.m.)

52

**Appx570**

IPR2022-00601 (Patent 9,269,208 B2)
IPR 2022-00602 (Patent 9,665,705 B2)


PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com


PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

Case IPR2022-00601
U.S. Patent No. 9,269,208 B2

## PATENT OWNER'S REQUEST FOR DIRECTOR REVIEW

**Appx572**

Pursuant to the Revised Interim Rules Governing the Director Review Process (Sept. 18, 2023), Patent Owner respectfully requests that the Commissioner review the Final Written Decision ("FWD") finding all claims of U.S. Patent No. 9,269,208 B2 ("the '208 Patent") invalid. The issues warranting such review are:

1)    After it adopted for institution purposes a construction of the limitation "accessibility attribute" previously urged by the Petitioner before the district court, the Panel changed that construction materially to capture the prior art without providing notice to the Patent Owner sufficient for due process under the Administrative Procedures Act ("APA"), thereby prejudicing Patent Owner. *See, e.g., Qualcomm Inc. v. Intel Corp.,* 6 F.4th 1256, 1265 (Fed. Cir. 2021).

2)    The proposed modification of the Mathiassen reference with the non-biometric teachings of Anderson does not result in a series of received biometric signal entries that are mapped into an instruction used to populate the database ***as part of an enrollment process***, as required by the challenged claims.

3)    The Panel misapplied the law regarding the motivation to combine references in recognizing the combination of the Mathiassen reference, on the one hand, and the McKeeth and Anderson references, on the other hand, as valid combinations.

## A.    The Panel's Changed Construction of "Accessibility Attribute"

The challenged claims of the '208 Patent require, *inter alia,* "a transmitter sub-system comprising: a biometric sensor for receiving a biometric signal; means for matching the biometric signal against members of the database of biometric signatures to thereby output an ***accessibility attribute*** . . . ." *See, e.g.,* Ex. 1001, claim 1 (emphasis added). The parties disputed the meaning of "accessibility attribute" in a co-pending district court proceeding, during which Petitioner vociferously argued that the term be construed as an "attribute that establishes whether ***and under which conditions*** access to the controlled item should be granted to a user." Ex. 2009 at 26 (emphasis added).

Petitioner argued that its proposed construction was "consistent with the description of the invention throughout the specification and the claims, which goes beyond mere matching—the binary decision of 'yes' or 'no'—and instead describes a system that provides for different types of access." *Id.* The Petitioner then described the "multi-tiered access" system taught in the '208 Patent, which "can only be facilitated by the different types of fingerprint (or other biometric) input - *i.e.*, the number of presses and duration—recited elsewhere in the claim" *See id.*

To drive the point home, Petitioner reiterated that "[b]inary matching— 'match/no match'—is not what the inventor was trying to invent. Instead, he sought to provide a more sophisticated system with, inter alia, multiple types of access." *Id.* at 28. In contrast, according to Petitioner, CPC's proposed plain and ordinary

meaning construction "would gut the clear definition given to it by the patentee, and improperly broaden the scope of the claims to encompass mere matching, a feature described as prior art." *Id.*

As the Panel acknowledged in the FWD, it adopted, for purposes of institution Petitioner's construction "accessibility attribute," which includes both the "whether" and "under which conditions" components of that construction. *See* FWD at 25. In doing so, the Panel confirmed that adopted the construction excludes "a 'binary decision' to grant or not grant access to a locked structure or device." *Id.* at 24.

The principal reference relied upon by Petitioner is Mathiassen, which it represented teaches a portable control processor configured to match the user's biometric signal against the database of biometric signatures. Petition at 17. If there is a match, "access is *granted* (as opposed to denied) by opening (i.e. unlocking) the car doors." FWD at 49 (emphasis in original). This is clearly a ***binary*** operation, as there are only two options—unlock the door if there is a match, or not if there is not. There is no third option. This was effectively confirmed by ***Petitioner's*** expert, who acknowledged that "Mathiassen is silent as to any incremental access that a car owner is granted, as opposed to any other user." PO Sur-Reply at 22, *citing* Ex. 2013 at 66:1-67:9. In other words, Mathiassen teaches precisely the type of "mere matching" that would "gut the clear definition" of "accessibility attribute" that Petitioner warned against. *See* Ex. 2009 at 28.

That Petitioner originally agreed with this proposition is evident from its Petition—"[a]pplying the [District] Court's construction, Mathiassen's 'open door' command *as modified by McKeeth's teaching of duress and alert conditions* teaches or renders obvious outputting an accessibility attribute, as claimed." Petition at 41 (emphasis added). Put another way, Mathiassen needs McKeeth's teachings to satisfy the "accessibility attribute" under the construction proposed by it, and adopted by both the district court and the panel.

In dealing with Mathiassen in the FWD, the Panel inexplicably found that, "[b]ased on the language of the claims and specification, the 'accessibility attribute' may include only an 'access attribute,' which is 'unconditional,'" which is precisely the type of binary (yes/no – lock/unlock) decision that Petitioner adamantly opposed including in the very construction it successfully urged to the Panel for institution purposes. *See* FWD at 25. Nonetheless, the Panel stated that its original construction (again expressly excluding binary decisions) includes "unconditional access, if no conditions are imposed." *Id*. at 50. Notwithstanding this supposed inclusion, the Panel felt compelled to "modify" the construction of "accessibility attribute" to include the term "if any," *i.e.,* potentially none, such that the new construction reads "an attribute that establishes whether and under which conditions, *if any*, access to the controlled item should be granted." *Id*. at 25 (emphasis added).

As a result of this obviously changed construction, the Panel went on to find that Mathiassen, which it found to teach at most a lock/unlock operation, teaches the accessibility attribute limitation. *See* FWD at 51. As such, Petitioner was allowed to benefit from one construction of that limitation before the district court and before the Panel on institution, but when that construction became inconvenient after institution, the Panel gave Petitioner a different construction, allowing the unique capture of prior art. More importantly, however, Patent Owner had no opportunity to address the impropriety of this changed construction, as the Panel gave ***no*** indication that there would be such a change.[1]

The Federal Circuit has ruled that a panel cannot, consistent with the APA, issue a new claim construction after institution without giving the parties notice thereof. *Qualcomm,* 6 F.4th at 1265. The Panel recognized as much in the FWD. *See* FWD at 30, n.17 (citation omitted) ("the Board 'must base its decision on arguments

---

[1] A stark example of this lack of opportunity is the Panel's reliance on claims 3 and 5 of the '208 Patent as purportedly supporting its changed construction. As the Panel acknowledged, the parties "did not discuss specifically claim differentiation as part of their claim construction analysis," the precise purpose for the Panel's reliance on claim 3 and 5. *See* FWD at 30, n.17. As an aside, Patent Owner indeed disagrees that claim 3 and 5 supports the Panel's changed construction.

that were advanced by a party, and to which the opposing party was given a chance to respond'"). Yet, as explained above, the Panel went on to ignore that administrative guardrail, changing claim construction with no opportunity for Patent Owner to respond thereto. Without its "if any" change to the construction of "accessibility attribute," which demonstrably allows for a binary access/no access operation, the Panel could *not* have found Mathiassen teaches that limitation. As such, the Panel's belated claim construction modification is clearly prejudicial to Patent Owner.[2] There cannot, then, be any doubt that this changed construction, which was neither proposed by Petitioner, nor addressable before the Panel by Patent Owner, runs afoul of the holding in *Qualcomm,* 6 F.4th at 1265, and its progeny.

### B.    The Mathiassen/Anderson Combination does not Yield a Series of Biometric Signals as Part of an Enrollment Process

"Illustrative" claim 1 requires receiving "a series of entries of the *biometric* signal, said series being characterised according to at least one of the number of said

---

[2] Of important note is that the Panel, after discussing the combination of the Mathiassen and McKeeth references, failed to find that it was that combination that teaches the "accessibility attribute" limitation – only that Mathiassen purportedly does so. *See* FWD at 51. ("Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests" the "accessibility attribute" limitation).

entries *and a duration of each said entry*." FWD at 10 (emphasis added). This function is part of the "enrolling feature." *Id*. at 38. The Panel concluded, according to the plain language of the claim, "the number and/or duration of entries is based on entries of a *biometric* signal, such as a finger press on a fingerprint sensor." FWD at 37 (emphasis added).

Petitioner admitted that "Mathiassen does not teach determining a duration of each entry." Petition at 3. Therefore, Petitioner relies upon Anderson for the purported teaching of "receiving a series of fingerprint pressure pulses of varying duration." *Id*. at 54. The substitution proposed by the Petitioner, and found invalidating by the Panel, is described in the FWD as follows:

> A POSITA would have been motivated and found it obvious to substitute or modify such directional finger movements [from Mathiassen] with a series of presses of varying duration, as taught by *Anderson*, for instructing a command at portable device 20.

FWD at 57.

As the Panel noted, Patent Owner argued in response to this proposed combination that "Mathiassen has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the

database as part of the enrollment process." FWD at 60. Specifically, the Patent Owner pointed out the following in the passage from the POR:

> The 'series' requirement, according to Dr. Sears, is purportedly disclosed in Mathiassen as 'omni-directional finger movements across the sensor in two dimensions.' For the requirement of 'mapping,' according to Petitioner's expert, these movements are categorized according to 'predefined sets of finger movement sequences.' A 'command table' is then used 'to translate the categorized finger movements into control signals.' This has nothing to do with user enrollment, as Mathiassen makes clear that the control signal are 'for controlling the device.' Mathiassen has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database **as part of the enrollment process**, as required by representative Claim 1.

POR at 30-31 (emphasis added) (internal citations omitted). *See also* Sur-Reply at 22-23 ("Mathiassen's finger movements providing command functionality are pre-defined, *i.e.*, they are not part of the enrollment process").

After expressly referencing this portion of the POR, the Panel entirely ignores this point. Instead, the Panel simply adopts Petitioner's arguments made in connection with the authentication process, ***not the enrollment process***. *See* FWD

at 61. Thus, even if everything else Petitioner maintains about the Mathiassen/Anderson combination were true, that combination would still lack a biometric signal series received as part of an enrollment process—a requirement that the Panel expressly called out as being part of the challenged claims.

The Panel does reference Mathiassen's master *minutiae* tables, which are part of Mathiassen's enrollment process. *See, e.g.,* FWD at 55-56. However, as Patent Owner has submitted, the master *minutiae* tables have **nothing** to do with Mathiassen's pre-stored finger movement sequences—the only feature from Mathiassen that Petitioner proposes to modify with Anderson. *See* POR at 31. The Panel, nonetheless, accepts Petitioner's mapping of the prior art to this claim limitation, including Petitioner's reference to the master *minutiae* tables, which is needed to tether the prior art's teachings to an enrollment process, despite its irrelevance to Mathiassen's pre-stored finger movements. *See* FWD at 56. As the Panel failed to provide **any** explanation as to how the Mathiassen/Anderson combination relates in any relevant way to an enrollment process, the FWD, which rejects Patent Owner's argument on this issue must be vacated. *See In re Nuvasive, Inc.,* 842 F.3d 1376, 1383 (2016) ("it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument").

Separately, even if one could get past the fact that the Mathiassen/Anderson combination is unrelated to an enrollment process, it remains that Anderson does not

teach a "biometric" signal series as required by the challenged claims. According to the Panel's findings, "Anderson's disclosed system inputs an access code 'via temporal variations in the ***amount of pressure*** applied to a touch interface'" FWD at 44 (emphasis added). Further, Anderson's system "may sense only 'temporal applications of pressure,' relying on ***timing*** of the pressure applications for entry of the access code." *Id.* (emphasis in original). Petitioner's own expert admitted that pressure and duration patterns of the type taught in Anderson are knowledge-based, *i.e.,* non-biometric, making that point undisputed. PO Sur-Reply at 20 *citing* Sears Dep. Tr. [Ex. 2010] at 18, 58:3-10.

The Panel, however, goes on to refer mistakenly to the purported teachings in Anderson of a "***fingerprint*** access code" (FWD at 44 (emphasis added)) and a "series of ***fingerprint*** pressure pulses of varying duration" (*id.* at 57 (emphasis added)). Based on these purported teachings, the Panel found that "there can be no reasonable dispute that Anderson discloses input ***biometric*** signals that vary in number and duration." *Id.* at 57 (emphasis added). The problem with the Panel's reasoning is that the terms "fingerprint pressure pulses" and "fingerprint access code" appear nowhere in Anderson, let alone in the portions of Anderson cited by the Panel as supposedly teaching these features. *See* Anderson [Ex. 1006] at 6:45-54 & 7:28-47. Rather, those terms were created by Petitioner's expert and adopted by the Panel for institution purposes. *See* POR at 24.

Anderson does teach "an optical scanner or thermal sensor for collecting *an* image of the user's fingerprint" that may optionally be part of the "digitizer pad 120" used "as a touch interface." FWD at 44 (emphasis added). This collection of "an" image of a fingerprint is contradistinct from the claimed "*series* of entries of the biometric signal" that are received as part of the enrollment process. FWD at 10 (emphasis added). At no point did Petitioner or the Panel identify any teaching in Anderson that a *series* of biometric signals is received at all, let alone as part of an enrollment process. As such, to the extent the Panel's decision turns on a purported teaching in Anderson of a "biometric" signal series, the decision must be reversed.[3]

### C.   The Lack of a Motivation to Combine Mathiassen, on the One Hand, and Anderson and McKeeth, on the Other Hand

The Petitioner and the Panel turned to the combination of Mathiassen and McKeeth to yield the "accessibility attribute" limitation, the latter of which "teaches

---

[3] The Panel appears to contradict itself regarding Anderson's teachings, stating that Anderson only contributes "a number and duration of pulses as inputs," while Mathiassen and McKeeth allegedly provide a teaching of "biometric sensing." FWD at 58. Even if that is the true nature of the combination, despite the Panel's great pains in finding a biometric signal series in Anderson, as explained above, any resulting biometric signal series from the Mathiassen/Anderson combination would not be part of an enrollment process.

both a duress instruction and an alert instruction when there is no match." FWD at 50. The panel gave short shrift to Patent Owner's argument against a motivation to combine, stating that, while there may have been "simpler alternative solutions available," "[i]t's not necessary to show that a combination is the ***best*** option, only that it be a ***suitable*** option." FWD at 51 (emphasis in original). The Patent Owner's alternative to the proposed combination was to look to the functionality already taught in Mathiassen, which was undeniably simpler, as the Petitioner's expert acknowledged. POR at 16-17; PO Sur-Reply at 5-6.

The lead case for the "suitable" proposition cited by the Panel, *Intel Corp. v. PACT XPP Schweiz AG*, illustrates the risk for mischief in blindly applying the "suitable" standard when evaluating the motivation to combine. The relevant portion of that decision reads as follows:

> '[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.' This is the so-called 'known-technique' rationale. And if there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

The ***entirety*** of Petitioner's reasoning upon which the Panel relies is that it would have been obvious to a skilled person "to modify *Mathiassen's* system to grant access and issue a silent alarm when a user was under duress and deny access and alert authorities of the access attempt, as taught by *McKeeth*, in addition to unlocking a car door lock unconditionally, as taught by *Mathiassen*." Petition at 23. There is no discussion in the FWD, for example, of a "known technique" in McKeeth, warranting the application of the rationale in *Intel.* Indeed, neither the Petitioner nor the Panel pointed to anything magical about McKeeth specifically that would have occasioned a skilled person to modify Mathiassen's teachings therewith, rather than using Mathiassen alone.

Further, this "suitability" test must be viewed in light of precedent cited by the Panel requiring that that "a person of ordinary skill at the time of the invention 'would have selected and combined ***those prior art elements*** in the normal course of research and development to yield the claimed invention.'" FWD at 12 (emphasis added) (citation omitted). As a corollary proposition, one cannot view the suitability of a prior art combination through the lens of hindsight reconstruction, especially where the functionality to be added already exists in the reference to be modified by such combination. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d

13

**Appx585**

1342, 1369 (Fed. Cir. 2012).[4] Intuitively, availing oneself of Mathiassen's own teachings is a simpler solution to the generation of a duress signal than looking to an entirely different reference for such modification. Under the circumstances, absent hindsight reconstruction, there is **no** motivation to combine Mathiassen with any other reference, including McKeeth.

As to motivation to combine Mathiassen and Anderson, again, Patent Owner contends that the simpler solution, were one to desire adding Anderson's functionality to Mathiassen to achieve the heightened security, would be to utilize Mathiassen's existing teachings alone. *See, e.g.,* PO Sur-Reply at 4-8. The Panel, however, simply reiterated that a combination need only be "suitable," rejecting any need to consider simplicity as an incentivizing factor when evaluating a purported motivation to combine. FWD at 58. Simply labeling a combination as "suitable" in a vacuum is insufficient to establish a motivation to combine references.

---

[4] Patent Owner is cognizant of decisions such as in *Elekta Limited v. ZAP Surgical Systems, Inc.*, Case No. 21-1985, (Fed. Cir., September 21, 2023), wherein the Federal Circuit ruled that the difficulty involved in combining references is not dispositive on the issue of the motivation to combine. However, that decision and those like it do not involve instances, such as here, where a reference sought to be modified already contained the functionality sought in the combination proposed.

In the case of both prior art combinations discussed herein, neither Petitioner nor the Panel disputed that: 1) Mathiassen already taught functionality that made combination with McKeeth and/or Anderson unnecessary; and 2) relying on Mathiassen alone was simpler than combining Mathiassen with another reference. As the test is ***motivation*** to combine, as opposed to a potential to combine, it was error simply to brush aside the simplicity of relying upon Mathiassen alone in favor of what was purportedly "suitable."[5] This is especially the case given that the Patent Owner submitted unrebutted expert testimony that, given Mathiassen's existing functionality, there would have been no reason to modify Mathiassen in the manner Petitioner and its expert proposed. *See* POR at 17, *citing* Ex. 2011, ¶ 51. That the Panel did not credit such testimony was error. *See, e.g., Polaris Industries, Inc. v. Arctic Cat, Inc.,* 882 F.3d 1056 (2018).

The three-issues discussed above, which were each mishandled by the Panel, merit Director review and reversal of the FWD.

---

[5] Petitioner did not propose a single-reference obviousness challenge based upon Mathiassen, so whether Mathiassen by itself renders the challenged claims is irrelevant. In any event, even availing oneself of Mathiassen's teachings alone would not yield the "duration" limitation. *See* FWD at 56-57.

Dated: October 27, 2023

Respectfully submitted by
K&L GATES LLP,

By: */Darlene F. Ghavimi-Alagha/*
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
darlene.ghavimi@klgates.com
(512) 482-6919
2801 Via Fortuna, Suite 650
Austin, Texas 78746

16

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 27, 2023, a true and correct copy of the foregoing Patent Owner's Request for Director Review was submitted in the Patent Trial and Appeal Case Tracking System (P-TACTS), and sent by electronic mail to the following:

Director
Email: Director_PTABDecision_Review@uspto.gov

Counsel for Petitioner:
Jennifer C. Bailey
Adam P. Seitz
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com

By: */Darlene F. Ghavimi-Alagha/*
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, Texas 78746
darlene.ghavimi@klgates.com
(512) 482-6919

17
**Appx589**

Director_PTABDecision_Review@uspto.gov
571.272.7822

Paper 33
Date: November 6, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

_____

APPLE INC.
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

_____

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

The Office received a request for Director Review of the Final Written Decision in each of the above-captioned cases. *See* IPR2022-00601, Paper 32; Ex. 3100; IPR2022-00602, Paper 34; Ex. 3100. The requests were referred to me.

Upon consideration of the requests, it is:

ORDERED that the requests for Director Review are denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decisions in these cases are the final decisions of the agency.

2

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

For PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com

For PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

3

**Appx592**

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY LTD.,
Patent Owner.

———————————

CASE: IPR2022-00601
U.S. PATENT NO. 9,269,208

———————————

# PATENT OWNER'S NOTICE OF APPEAL

IPR2022-00601
U.S. Patent No. 9,269,208

Notice is hereby given, pursuant to 37 C.F.R. §§ 90.2(a), 90.3, and 35 U.S.C. §§ 141 and 142, that Patent Owner CPC Patent Technologies PTY Ltd. ("Patent Owner") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board in IPR2022-00601, entered on September 27, 2023 (Paper 31), and from all underlying orders, decisions, rulings, and opinions. A copy of the Final Written Decision is attached hereto as Exhibit A.

This notice is timely because Patent Owner filed a Request for Director Review, which was decided on November 6, 2023 (Paper 33) (attached hereto as Exhibit B). *See* 37 C.F.R. § 90.3(b)(1).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner states that the issues on appeal include, but are not limited to, the Board's determination that the challenged claims of U.S. Patent No. 9,269,208 are unpatentable, and any related issues, findings, or determinations, leading thereto or underlying that decision.

Patent Owner is filing one copy of this Notice of Appeal with the Director of the United States Patent and Trademark Office, and a copy of this Notice of Appeal is being filed electronically with the Board. In addition, a copy of this Notice of Appeal is being electronically filed with the United States Court of Appeals for the Federal Circuit, along with the required docketing fee.

IPR2022-00601
U.S. Patent No. 9,269,208

Respectfully submitted,

Dated: December 18, 2023

/Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, Texas 78746
(512) 482-6919
Darlene.Ghavimi@klgates.com

*Counsel for Patent Owner*

IPR2022-00601
U.S. Patent No. 9,269,208

# CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 90.2(a)(1), on December 18, 2023 the foregoing Notice of Appeal was electronically filed with the Patent Trial and Appeal Board via the P-TACTS System in accordance with 37 C.F.R. § 42.6(b)(1), and mailed to the Director via Priority Mail Express in accordance with 37 C.F.R. §§ 1.10 and 104.2 at the following address:

> Director of the U.S. Patent and Trademark Office
> c/o Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

Pursuant to 37 C.F.R. § 90.2(a)(2) on December 18, 2023, the foregoing Notice of Appeal was electronically filed with the Court of Appeals for the Federal Circuit via CM/ECF with requisite fees paid via pay.gov.

Pursuant to 37 C.F.R. § 42.6(e) and the parties' agreement to accept electronic service, on December 18, 2023, the foregoing Notice of Appeal was served via email on the following counsel of record for Petitioners:

> Jennifer C. Bailey
> Adam P. Seitz
> **ERISE IP, P.A.**
> 7015 College Blvd., Suite 700
> Overland Park, Kansas 66211
> Telephone: (913) 777-5600
> Email: Jennifer.Bailey@eriseip.com
> Email: Adam.Seitz@eriseip.com
> Email: PTAB@eriseip.com

IPR2022-00601
U.S. Patent No. 9,269,208

By:   /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631

4
**Appx597**

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner

v.

CPC Patent Technologies PTY, LTD.,
Patent Owner

_____

*Inter Partes* Review Case No. IPR2022-00601

U.S. Patent No. 9,269,208

**DECLARATION OF DR. ANDREW SEARS**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 9

     A.    BACKGROUND AND QUALIFICATIONS .............................. 10

     B.    MATERIALS CONSIDERED................................................ 13

II.    LEGAL FRAMEWORK ............................................................ 15

     A.    ANALOGOUS ART ........................................................... 16

     B.    OBVIOUSNESS ................................................................ 16

     C.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS ..................... 22

III.   CLAIM CONSTRUCTION..................................................... 23

     A.    NON-CONSTRUED CLAIM TERMS...................................... 23

     B.    CONSTRUED CLAIM TERMS .............................................. 24

         1.    *Non Means-Plus Function Terms*.......................... 24

         2.    *Means-Plus-Function Limitations* ......................... 24

         3.    *Mathiassen's Teaching of "computer program product"*..... 27

IV.   BACKGROUND OF TECHNOLOGY ..................................... 30

     A.    BIOMETRIC ACCESS SYSTEMS ........................................ 31

     B.    HARDWARE COMPONENTS OF A BIOMETRIC ACCESS SYSTEM .......... 40

     C.    SECURE ACCESS SIGNAL ................................................ 44

     D.    INPUTTING A SERIES OF ENTRIES FOR INVOKING FUNCTIONS IN A BIOMETRIC ACCESS SYSTEM ............. 47

     E.    PROVIDING DIFFERENT TYPES OF ACCESS ........................ 51

V.    OPINIONS REGARDING THE '208 PATENT AND PRIOR ART .... 58

     A.    DESCRIPTION OF THE ALLEGED INVENTION OF THE '208 PATENT ..... 59

     B.    OPINIONS REGARDING *MATHIASSEN*.................................. 63

     C.    OPINIONS REGARDING *MCKEETH* ................................... 69

     D.    OPINIONS REGARDING *ANDERSON* .................................. 72

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

E.    BRIEF OVERVIEW OF THE OPINIONS ON THE '208 PATENT ............... 77

VI. GROUND 1: OPINIONS REGARDING THE COMBINATION
OF *MATHIASSEN*, *MCKEETH*, AND *ANDERSON* ........................... 80

A.    CLAIM 10 ................................................................. 80

1.    *Claim 10(Pre1): "A method for providing secure access to a controlled item in a system comprising"* ...................... 80

2.    *Claim 10(Pre2): "a database of biometric signatures"* ....... 85

3.    *Claim 10(Pre3): "a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal capable of granting more than two types of access to the controlled item"* ...................................................................... 89

4.    *Claim 10(Pre4): "a receiver sub-system comprising means for receiving the transmitted secure access signal, and"* ............................................................................ 121

5.    *Claim 10(Pre5): "means for providing conditional access to the controlled item dependent upon information in said secure access signal"* ................................................ 124

6.    *Claim 10(a): "the method comprising the steps of: populating the database of biometric signatures by"* ......... 133

7.    *Claim 10(a1): "receiving a series of entries of the biometric signal"* ............................................................. 134

8.    *Claim 10(a2): "determining at least one of the number of said entries and a duration of each said entry"* ................. 139

9.    *Claim 10(a3): "mapping said series into an instruction"* .. 153

10.   *Claim 10(a4): "populating the database according to the instruction"* ..................................................................... 156

11.   *Claim 10(b): "receiving a biometric signal"* .................... 167

12.   *Claim 10(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"* .......................... 168

IPR2022-00601
Apple EX1003 Page 3

**Appx1037**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

13.    *Claim 10(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute"* .. 181

14.    *Claim 10(e): "providing conditional access to the controlled item dependent upon said information"* ............ 184

15.    *Claim 10(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"* ........... 186

B.    CLAIM 11 ...................................................................... 187

CLAIM 11: "THE METHOD ACCORDING TO CLAIM 10, WHEREIN THE STEP OF POPULATING THE DATABASE OF BIOMETRIC SIGNATURES FURTHER COMPRISES THE STEP OF ENROLLING A BIOMETRIC SIGNATURE INTO THE DATABASE OF BIOMETRIC SIGNATURES COMPRISING THE STEPS OF: RECEIVING A BIOMETRIC SIGNAL; AND ENROLLING THE BIOMETRIC SIGNAL AS AN ADMINISTRATOR SIGNATURE IF THE DATABASE OF BIOMETRIC SIGNATURES IS EMPTY." ........ 187

C.    CLAIM 13 ...................................................................... 189

CLAIM 13: "A NON-TRANSITORY COMPUTER READABLE STORAGE MEDIUM FOR STORING A COMPUTER PROGRAM COMPRISING INSTRUCTIONS, WHICH WHEN EXECUTED BY PROCESSORS CAUSES THE PROCESSORS TO PERFORM THE STEPS OF THE METHOD OF CLAIM 10" ........................................................ 189

D.    CLAIM 1 ........................................................................ 191

1.    *Claim 1(pre): "A system for providing secure access to a controlled item, the system comprising"* ............................ 191

2.    *Claim 1(a): "a database of biometric signatures"* ............. 191

3.    *Claim 1(b): "a transmitter subsystem comprising:"* .......... 191

4.    *Claim 1(b1): "a biometric sensor for receiving a biometric signal"* ............................................................... 192

5.    *Claim 1(b2): "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"* ...................... 192

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

6.    *Claim 1(b3): "means for emitting a secure access signal conveying information dependent upon said accessibility attribute"* ................................................................... *194*

7.    *Claim 1(c): "a receiver subsystem comprising"* ............... *194*

8.    *Claim 1(c1): "means for receiving the transmitted secure access signal"* ................................................................... *194*

9.    *Claim 1(c2): "means for providing conditional access to the controlled item dependent upon said information"* ....... *194*

10.   *Claim 1(d): "wherein the transmitter subsystem further comprises means for populating the data base of biometric signatures, the population means comprising:"* . *195*

11.   *Claim 1(d1): "means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of entries and a duration of each said entry:"* ............................................ *196*

12.   *Claim 1(d2): "means for mapping said series into an instruction"* ..................................................................... *199*

13.   *Claim 1(d3): "means for populating the data base according to the instruction"* ............................................ *201*

14.   *Claim 1(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"* ........... *202*

E.    CLAIM 3 ................................................................................ *202*

1.    *Claim 3(a): "The system according to claim 1, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class"* ........................... *202*

2.    *Claim 3(b): "the accessibility attribute preferably comprising: an access attribute if the biometric signal matches a member of the database of biometric signatures"* ................................................................. *207*

**Appx1039**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

3.    *Claim 3(c): "a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class"*.. *209*

4.    *Claim 3(d): "an alert attribute if the biometric signal does not match a member of the database of biometric signatures"* ................................................................... *212*

F.    CLAIM 4: ............................................................................... 212

     CLAIM 4: "THE SYSTEM ACCORDING TO CLAIM 1, WHEREIN THE BIOMETRIC SENSOR IS RESPONSIVE TO ONE OF VOICE, RETINAL PATTERN, IRIS PATTERN, FACE PATTERN, AND PALM CONFIGURATION, AND/OR THE DATABASE OF BIOMETRIC SIGNATURES IS LOCATED IN AT LEAST ONE OF THE TRANSMITTER SUB-SYSTEM AND THE RECEIVER SUB-SYSTEM." ............................................................... 212

G.    CLAIM 5: ............................................................................... 213

     CLAIM 5: "THE SYSTEM ACCORDING TO CLAIM 1, WHEREIN SAID CONDITIONAL ACCESS COMPRISES ONE OF: PROVISION OF ACCESS TO THE CONTROLLED ITEM IF THE ACCESSIBILITY ATTRIBUTE COMPRISES AN ACCESS ATTRIBUTE, PROVIDING OF ACCESS TO THE CONTROLLED ITEM AND SOUNDING OF AN ALERT IF THE ACCESSIBILITY ATTRIBUTE COMPRISES A DURESS ATTRIBUTE, AND DENIAL OF ACCESS TO THE CONTROLLED ITEM AND SOUNDING OF AN ALERT IF THE ACCESSIBILITY ATTRIBUTE COMPRISES AN ALERT ATTRIBUTE." ............................................................... 213

H.    CLAIM 6 ............................................................................... 215

1.    *Claim 6(a): "The system as claimed in claim 1, wherein: the biometric sensor is for authenticating the identity of a user"* ................................................................. *215*

2.    *Claim 6(b): "the means for emitting comprises a transmitter for transmitting information capable of granting more than two types of access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity"* .......................................................... *216*

IPR2022-00601
Apple EX1003 Page 6

**Appx1040**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

   3. *Claim 6(c): "the system further comprising a control panel for receiving the information and for providing the secure access requested"* ................................... 218

I. CLAIM 7 ................................................................................... 221

  CLAIM 7: "THE SYSTEM ACCORDING TO CLAIM 6, WHEREIN THE CONTROL PANEL INCLUDES A CONVERTER FOR RECEIVING THE SECURE WIRELESS SIGNAL AND FOR OUTPUTTING THE INFORMATION, AND/OR THE BIOMETRIC SENSOR AUTHENTICATES THE IDENTITY OF THE USER BY COMPARING A BIOMETRIC INPUT FROM THE USER WITH A BIOMETRIC SIGNATURE FOR THE USER IN A BIOMETRIC DATABASE, AND/OR THE BIOMETRIC SENSOR, THE BIOMETRIC DATABASE, AND THE TRANSMITTER ARE LOCATED IN A REMOTE FOB." ................................................. 221

J. CLAIM 9 ................................................................................... 222

   1. *Claim 9(Pre): "A transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:"* ................ 222

   2. *Claim 9(a): "a biometric sensor for receiving a biometric signal"* ............................................................ 223

   3. *Claim 9(b): "means for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute"* .......................... 223

   4. *Claim 9(c): "means for emitting a secure access signal conveying said information dependent upon said accessibility attribute"* ........................................... 223

   5. *Claim 9(d): "wherein the transmitter sub-system further comprises: means for populating the database of biometric signatures, the populating means comprising"* .. 223

   6. *Claim 9(d1): "means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry"* ...................................... 223

**Appx1041**

7.    *Claim 9(d2): "means for mapping said series into an instruction"* ................................................................. 223

8.    *Claim 9(d3): "means for populating the database according to the instruction"* ............................................. 223

9.    *Claim 9(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"* ........... 224

**VII. CONCLUSION** ..................................................................................... **225**

I, Andrew Sears, PhD, hereby declare the following:

## I.    INTRODUCTION

1.      My name is Andrew Sears, and I am over 21 years of age and otherwise competent to make this Declaration. I make this Declaration based on facts and matters within my own knowledge and on information provided to me by others, and, if called as a witness, I could and would competently testify to the matters set forth herein.

2.      I have been retained as a technical expert witness in this matter by Counsel for the Petitioner, Apple Inc. ("Petitioner") to provide my independent opinions on certain issues requested by Counsel for Petitioner relating to the accompanying Petition for Inter Partes Review of U.S. Patent No. 9,269,208 ("the '208 Patent"). I am being compensated at an hourly rate of $750.00. My compensation in this matter is not based on the substance of my opinions or on the outcome of this matter. I have been informed that CPC Patent Technologies PTY, LTD. is the purported owner of the '208 Patent. I note that I have no direct financial interest in CPC Patent Technologies PTY, LTD. or Petitioner, and I have no other interest in the outcome of this matter.

3.      I have been informed by counsel that the claims being challenged in the accompanying Petition for the '208 Patent is Claims 1, 2-7, 9-11, and 13 ("the Challenged Claims of the '208 Patent).

### A.    Background and Qualifications

4.    I have summarized in this section my educational background, career history, and other qualifications relevant to this matter.  I have also included a current version of my curriculum vitae, attached as Appendix B.

5.    I am currently a Professor and Dean of the College of Information Sciences and Technology at The Pennsylvania State University ("Penn State").

6.    I received a Bachelor of Science degree in Computer Science from the Rensselaer Polytechnic Institute in May of 1988. I received my Ph.D. in Computer Science from University of Maryland-College Park in May of 1993. My dissertation focused on human-computer interaction.

7.    From July 1993 to June 1999, I was employed by DePaul University as an Assistant Professor for the School of Computer Science, Telecommunications and Information Systems. In July 1999, I joined the University of Maryland, Baltimore County (UMBC) as an Associate Professor in the Information Systems Department where I was subsequently promoted to Professor in 2003. I served as the Chair for the Information Systems Department (2002-2011). From August 2008 to July 2011, I served as the Constellation Professor of Information Technology and Engineering.

8.    In August of 2011, I joined the Rochester Institute of Technology as Professor and Dean of the B. Thomas Golisano College of Computing and

Information Sciences. In July of 2015, I joined Penn State as Professor and Dean of the College of Information Sciences and Technology, and I continue to serve in this position. From September 2015 to December 2017, I also served as the Interim Chief Information Security Officer at Penn State.

9.      My research has explored a variety of topics related to human-centered computing. My research projects have addressed topics related to interacting with touchscreen technologies, interacting with mobile computing devices, evaluating user interfaces, health information technologies, speech recognition-based interactions, and accessibility for individuals with a variety of disabilities. My research projects have been supported by a variety of government agencies (e.g., the National Science Foundation, the National Institute on Disability and Rehabilitation Research, the National Institute of Standards and Technology, and NASA), companies (e.g., IBM, Intel, Microsoft, and Motorola), and non-profit organizations (e.g., the Verizon Foundation).

10.      Beginning in 2006, I served as founding Editor-in-Chief of the Association for Computing Machinery's (ACM) Transactions on Accessible Computing, and I served in this capacity until 2013. From 2013 to 2018, I served as a Member of the Editorial Board for ACM's Transactions on Accessible Computing. From 2008 to 2020, I served as a Member of the Editorial Board for the International

Journal of Human-Computer Studies. From 2011 to 2021, I served as an Associate Editor for ACM's Transactions on Computer-Human Interaction.

11. From 2013 to 2019, I served as a Member of the Board of Directors for the Computing Research Association. I have also served as a member of the Accessibility Committee of the ACM U.S. Public Policy Council, as well as a member of the ACM Council, the ACM Special Interest Group Governing Board, and in various capacities with the ACM Special Interest Group for Accessible Computing. I have chaired or co-chaired various conferences including the premier conferences on human computer interaction and accessibility in the context of computing technologies. I have served on a numerous program and organizing committees for other conferences in this field.

12. I have served as editor on multiple scholarly books. In particular, I was an editor for the first and second editions of "The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications," published in 2003 and 2008 respectively. I am also author or co-author on more than a dozen book chapters and more than 100 journal articles and conference/workshop papers.

13. I am being compensated for my time spent in connection with this case. I have no financial interest in the outcome of this case. The opinions provided in this

report are my own and my compensation does not depend in any way on the substance of my opinions.

14.   Based on my experiences described above, and as indicated in my Curriculum Vitae, I am qualified to provide the following opinions with respect to the patents in this case. Additionally, I was at least a person having ordinary skill in the art as of the priority date of the '208 Patent.

### B.   Materials Considered

15.   As part of my work and in forming my opinions in connection with this proceeding, I have reviewed the following materials. For any prior art listed below, it is my opinion persons of ordinary skill in my field would reasonably rely upon such prior art in forming opinions regarding the subject matter of this proceeding:

- Petition for *Inter Partes* Review of U.S. Patent No. 9,269,208 (the "Petition");
- U.S. Patent No. 9,269,208 ("the '208 Patent") (Ex. 1001);
- File History for U.S. Patent 9,269,208 (Ex. 1002);
- U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*") (Ex. 1004);
- U.S. Patent No. 6,766,456 to McKeeth ("*McKeeth*") (Ex. 1005);
- U.S. Patent No. 6,509,847 to Anderson ("*Anderson*") (Ex. 1006);
- U.S. Patent No. 6,612,928 to Bradford et al. ("*Bradford*") (Ex. 1010);
- *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011);
- *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012);
- *An Introduction to Evaluating Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1013);

- U.S. Patent Application Publication No. 2003/0117261 to Gunsch ("Gunsch") (Ex. 1014);
- U.S. Patent Application Publication No. 2003/0036825 ("Kim") (Ex. 1015);
- U.S. Patent No. 6,140,939 to Flick ("Flick") (Ex. 1016);
- U.S. Patent No. 6,164,403 to Wuidart ("Wuidart") (Ex. 1017);
- U.S. Patent No. 7,239,227 to Gupta et al. ("Gupta") (Ex. 1018);
- U.S. Patent No. 6,877,097 to Hamid et al. ("Hamid") (Ex. 1019);
- U.S. Patent Application Publication No. 2001/0049785 to Kawan ("Kawan") (Ex. 1020);
- U.S. Patent Application Publication No. 2002/0091937 to Ortiz ("Ortiz") (Ex. 1021);
- U.S. Patent Application Publication No. 2003/0046552 to Hamid ("Hamid '552") (Ex. 1022);
- U.S. Patent Application Publication No. 2002/0063154 to Hoyos et al. ("Hoyos") (Ex. 1023);
- U.S. Patent No. 6,484,260 to Scott ("Scott") (Ex. 1024);
- U.S. Patent No. 7,404,086 to Sands ("Sands") (Ex. 1025);
- *A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code",* Ross Tester, Silicon Chip.com.au, July 2002 (Ex. 1026);
- *Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications,* Brent A. Miller, Chatschik Bisdikian, 2001 (Ex. 1027);
- U.S. Patent No. 7,284,266 to Morris et al. ("Morris") (Ex. 1028);
- *Bricolage: Data Compression – Morse Code,* https://perl.plover.com/Huffman/huffman.html, 1998 (Ex. 1029);
- U.S. Patent No. 6,323,565 to Williams, Jr. et al. ("Williams") (Ex. 1030);
- U.S. Patent No. 7,020,270 to Ghassabian ("Ghassabian") (Ex. 1031);
- U.S. Patent Application Publication No. 2003/0048260 to Matusis ("Matusis") (Ex. 1032);
- International Publication WO 02/27455 to Mathiassen ("Mathiassen '455") (Ex. 1033);
- European Patent Application No. 88301738.6 to Araki et al. ("Araki") (Ex. 1034);
- U.S. Patent No. 7,152,045 to Hoffman ("Hoffman") (Ex. 1035);
- U.S. Patent No. 6,833,785 to Brown et al. ("Brown") (Ex. 1036);

- U.S. Patent Application Publication No. 2004/0015450 to Zingher et al. ("Zingher") (Ex. 1037);
- U.S. Patent No. 6,498,970 to Colmenarez ("Colmenarez") (Ex. 1038);
- U.S. Patent No. 6,100,811 to Hsu et al. ("Hsu") (Ex. 1039);
- U.S. Patent No. 4,638,292 to Mochida ("Mochida") (Ex. 1040);
- *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041);
- U.S. Patent No. 7,110,580 to Bostrom ("Bostrom") (Ex. 1042);
- U.S. Patent No. 7,336,174 to Maloney ("Maloney") (Ex. 1043);
- *Microsoft Press Computer Dictionary,* Second edition, JoAnne Woodcock, 1994 (Ex. 1044);
- *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 (Ex. 1045);
- *OnStar Features*, OnStar, https://web.archive.org/web/20000619021703/http://www.onstar.com/features/3button.htm, June 19, 2000 (Ex. 1046);
- U.S. Patent No. 6,420,975 to DeLine et al. ("DeLine") (Ex. 1047);
- *PC Basics: Get a Great Start,* Survive and Thrive, copyright 2002 (Ex. 1049);
- U.S. Patent Application Publication No. 2003/0160692 to Nonaka et al. ("Nonaka") (Ex. 1050);
- U.S. Patent No. 5,307,048 to Sonders ("Sonders") (Ex. 1051);
- *Merriam Webster's Collegiate Dictionary,* tenth edition, copyright 1998 (Ex. 1052);
- *The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications*, Alex Gatherer and Edgar Auslander, 2002 (Ex. 1053);
- *Dictionary of Electrical and Computer Engineering,* McGraw-Hill, 2003 (Ex. 1054); and
- U.S. Patent No. 6,970,970 to Jung et al. ("Jung") (Ex. 1055).

## II.    LEGAL FRAMEWORK

16.    I am a technical expert and do not offer any legal opinions. However, I have been informed about certain legal principles regarding patentability and related

matters under United States patent law, which I have applied in performing my analysis and arriving at my technical opinions in this matter.

## A.    Analogous Art

17.    I have been informed by counsel that for prior art to be used to establish the unpatentability of a patent based on obviousness, the prior art must be "analogous art" to the claimed invention. I have also been informed by counsel that a prior art reference is analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention, even if it addresses a different problem; or (2) the reference is reasonably pertinent to the problem faced by the invention, even if it is not in the same field of endeavor as the claimed invention.

## B.    Obviousness

18.    I have been informed that a person cannot obtain a patent on an invention if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ("POSITA"). I have been informed that a conclusion of obviousness may be founded upon more than a single item of prior art. I have been further informed that obviousness is determined by evaluating the following factors: (1) the scope and content of the prior art, (2) the differences between the prior art and the claim at issue, (3) the level of ordinary skill in the pertinent art, and (4) secondary considerations of non-obviousness. In addition, the

obviousness inquiry should not be done in hindsight. Instead, the obviousness inquiry should be done through the eyes of a POSITA at the time of the alleged invention.

19.   In considering whether certain prior art renders a particular patent claim obvious, I have been informed that I can consider the scope and content of the prior art, including the fact that one of skill in the art would regularly look to the disclosures in patents, trade publications, journal articles, conference papers, industry standards, product literature and documentation, texts describing competitive technologies, requests for comment published by standard setting organizations, and materials from industry conferences, as examples. I have been informed that for a prior art reference to be proper for use in an obviousness analysis, the reference must be "analogous art" to the claimed invention. I have been informed that a reference is analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention (even if it addresses a different problem); or (2) the reference is reasonably pertinent to the problem faced by the inventor (even if it is not in the same field of endeavor as the claimed invention). In order for a reference to be "reasonably pertinent" to the problem, it must logically have commended itself to an inventor's attention in considering his problem. In determining whether a reference is reasonably pertinent, one should consider the problem faced by the inventor, as reflected either explicitly or implicitly, in the

specification. I believe that all of the references I considered in forming my opinions in this IPR are well within the range of references a POSITA would have consulted to address the type of problems described in the Challenged Claims.

20.    I have been informed that, in order to establish that a claimed invention was obvious based on a combination of prior art elements, a clear articulation of the reason(s) why a claimed invention would have been obvious must be provided. Specifically, I am informed that, under the U.S. Supreme Court's KSR decision, a combination of multiple items of prior art renders a patent claim obvious when there was an apparent reason for one of ordinary skill in the art, at the time of the invention, to combine the prior art, which can include, but is not limited to, any of the following rationales: (A) combining prior art methods according to known methods to yield predictable results; (B) substituting one known element for another to obtain predictable results; (C) using a known technique to improve a similar device in the same way; (D) applying a known technique to a known device ready for improvement to yield predictable results; (E) trying a finite number of identified, predictable potential solutions, with a reasonable expectation of success; (F) identifying that known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art; or (G) identifying an explicit teaching, suggestion, or motivation in the prior art that

would have led one of ordinary skill to modify the prior art reference or to combine the prior art references to arrive at the claimed invention. I am also informed that where there is a motivation to combine, claims may be rejected as prima facie obvious provided a POSITA would have had a reasonable expectation of success regarding the proposed combination.

21.    I am informed that the existence of an explicit teaching, suggestion, or motivation to combine known elements of the prior art is a sufficient, but not a necessary, condition to a finding of obviousness. This so-called "teaching-suggestion-motivation" test is not the exclusive test and is not to be applied rigidly in an obviousness analysis. In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. Instead, the important consideration is the objective reach of the claim. In other words, if the claim extends to what is obvious, then the claim is invalid. I am further informed that the obviousness analysis often necessitates consideration of the interrelated teachings of multiple patents, the effects of demands known to the technological community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art. All of these issues may be considered to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent.

22.    I also am informed that in conducting an obviousness analysis, a precise teaching directed to the specific subject matter of the challenged claim need not be sought out because it is appropriate to take account of the inferences and creative steps that a POSITA would employ. The prior art considered can be directed to any need or problem known in the field of endeavor at the time of invention and can provide a reason for combining the elements of the prior art in the manner claimed. In other words, the prior art need not be directed towards solving the same specific problem as the problem addressed by the patent. Further, the individual prior art references themselves need not all be directed towards solving the same problem. I am informed that, under the KSR obviousness standard, common sense is important and should be considered. Common sense teaches that familiar items may have obvious uses beyond their primary purposes.

23.    I also am informed that the fact that a particular combination of prior art elements was "obvious to try" may indicate that the combination was obvious even if no one attempted the combination. If the combination was obvious to try (regardless of whether it was actually tried) or leads to anticipated success, then it is likely the result of ordinary skill and common sense rather than innovation. I am further informed that in many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature or knowledge, will drive the design of an invention. I am

informed that an invention that is a combination of prior art must do more than yield predictable results to be non-obvious.

24.    I am informed that for a patent claim to be obvious, the claim must be obvious to a POSITA at the time of the alleged invention. I am informed that the factors to consider in determining the level of ordinary skill in the art include (1) the educational level and experience of people working in the field at the time the invention was made, (2) the types of problems faced in the art and the solutions found to those problems, and (3) the sophistication of the technology in the field.

25.    I am informed that it is improper to combine references where the references teach away from their combination. I am informed that a reference may be said to teach away when a POSITA, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the patent applicant. In general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the patentee. I am informed that a reference teaches away, for example, if (1) the combination would produce a seemingly inoperative device, or (2) the references leave the impression that the product would not have the property sought by the patentee. I also am informed, however, that a reference does not teach away if it

merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed.

### C.    Secondary Considerations of Non-Obviousness

26.    I am informed that even if a prima facie case of obviousness is established, the final determination of obviousness must also consider "secondary considerations" if presented. In most instances, the patentee raises these secondary considerations of non-obviousness. In that context, the patentee argues an invention would not have been obvious in view of these considerations, which include: (a) commercial success of a product due to the merits of the claimed invention; (b) a long-felt, but unsatisfied need for the invention; (c) failure of others to find the solution provided by the claimed invention; (d) deliberate copying of the invention by others; (e) unexpected results achieved by the invention; (f) praise of the invention by others skilled in the art; (g) lack of independent simultaneous invention within a comparatively short space of time; (h) teaching away from the invention in the prior art.

27.    I am further informed that secondary-considerations evidence is only relevant if the offering party establishes a connection, or nexus, between the evidence and the claimed invention. The nexus cannot be based on prior art features. The establishment of a nexus is a question of fact. While I understand that the Patent Owner here has not offered any secondary considerations at this time, I will

supplement my opinions in the event that the Patent Owner raises secondary considerations during the course of this proceeding.

## III.    CLAIM CONSTRUCTION

28.    I have been informed by counsel that the first step in an unpatentability analysis involves construing the claims, as necessary, to determine their scope. Second, the construed claim language is then compared to the disclosures of the prior art. I am informed that claims are generally given their ordinary and custom meaning as understood by one of ordinary skill in the art at the time of the invention, in light of the patent specification.

### A.    Non-Construed Claim Terms

29.    For any claim terms not construed, I have applied the meaning of the claim terms of the '208 Patent that are generally consistent with the terms' ordinary and customary meaning, as a person of ordinary skill in the art would have understood them at the time of the invention. I have been instructed to assume for purposes of this proceeding that the time of the invention is August 13, 2003.

**B.    Construed Claim Terms**

### 1.    Non Means-Plus Function Terms

30.    For purposes of this proceeding, I have been instructed to apply the below claim constructions for the listed terms:

| Claim Term | Construction |
|---|---|
| Claims 1-2, 9-11: "database" | "Organized structure of data" |
| Claims 1, 10: "conditional access" | "Access based on accessibility attribute" |
| Claims 1, 2, 9, 10: "biometric signal" | "Physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" |
| Claims 1,9,10: "accessibility attribute" | "attribute that establishes whether and under which conditions access to the controlled item should be granted" |

### 2.    Means-Plus-Function Limitations

31.    I have been informed that certain claims of the '208 Patent include claim terms written in a means-plus-function format. I have been instructed to adopt the constructions set forth below. I have further been informed the support for such structure and function is found, at the least, in the "Support" column, below.

| Claim Term | Support | Structure and Function |
|---|---|---|
| Claims 1,9: "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute" | '208 Patent, 4:8-13, 15-17, 40-45, 47-49, 5:50-67, 6:56-7:2, 7:65-8:10, 8:67-9:5, 14:10-42, Fig. 2, items 103, 105, Fig. 3, Step 202 | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for |

| | | Function: matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute |
|---|---|---|
| Claim 10: "means for emitting a secure access signal capable of granting more than two types of access to the controlled item" | *'208 Patent*, 4:8-13, 18-22, 40-45, 50-54, 8:17-28, 10:24-44 | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: emitting a secure access signal capable of granting more than two types of access to the controlled item |
| Claims 1,9: "means for emitting a secure access signal conveying said information dependent upon said accessibility attribute" | *'208 Patent*, 4:8-13, 4:18-22, 4:40-45, 4:50-54, 5:65-6:6, 6:28-55, 8:19-35, 14:16-20 | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: emitting a secure access signal conveying said information dependent upon said accessibility attribute |
| Claims 1,10: "means for receiving the transmitted secure access signal" | *'208 Patent,* 6:16-19, FIGs. 2, 4, 10 | Structure: receiver 118<br><br>Function: receiving the transmitted secure access signal |

| | | |
|---|---|---|
| Claims 1,10: "means for providing conditional access to the controlled item dependent upon [said] information [in said secure access signal]" | *'208 Patent,* 8:65-9:15, 8:17-35, 11:27-12:38, FIGs. 2, 4, 7, 10 | Structure: controller 109 executing software 304<br><br>Function: providing conditional access to the controlled item dependent upon information in said secure access signal |
| Claims 1,9: "means for receiving a series of entries of the biometric signal" | *'208 Patent,* 4:8-14, 4:25-34, 4:40-46, 5:53-59, 7:66-8:6, 10:45-63, 12:55-59 (Ex. 1073, 4-5) | Structure: computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: receiving a series of entries of the biometric signal |
| Claims 1,9: "means for mapping said series into an instruction" | *'208 Patent,* 4:25-31, 4:37, 5:50-6:27, 10:45-11:2, 12:55-59, 12:67-13:3, Fig. 2, items 103, 107, 121 (Ex. 1077, 3) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for<br><br>Function: mapping said series into an instruction |
| Claims 1,9: "means for populating the database according to the instruction" | *'208 Patent*, 4:25-31, 4:38-39, 10:57-11:2, 12:43-45, 13:9-11, 13:15-19 (Ex. 1077, 3) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for |

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

| | | |
|---|---|---|
| | | Function: populating the database according to the instruction |
| Claims 1,9: "means for populating the data base of biometric signatures" | '208 Patent, 4:25-31, 4:38-39, 10:32-34, 10:57-11:2, 12:43-45, 13:9-11, 13:15-19 (Ex. 1077, 3-4) | Structure: database and computer program product having a computer readable medium having a computer program recorded therein, with code for |
| | | Function: populating the data base of biometric signatures |

### 3.    *Mathiassen's Teaching of "computer program product"*

32.    As indicated above at ¶ 31, I apply the construed structure of some "means-plus-function" limitations as a "computer program product having a computer readable medium having a computer program recorded therein, comprising code." In my opinion, *Mathiassen* teaches the claimed "computer program product" applying the construction. Specifically, *Mathiassen* teaches an integrated circuit (IC) serves as the "core device" of the secure access system invention. *Mathiassen,* [0048]. The IC includes a non-volatile memory 7/7A that contains "program code, e.g., administrative software." *Mathiassen,* [0050]. Algorithms are included in the administrative software for providing secure access. For example, *Mathiassen* teaches a matching algorithm as a "subset" of the

administrative software. *Mathiassen,* [0072]. Additionally, *Mathiassen* teaches the administrative software including an SKG algorithm. *Mathiassen,* [0076]. *Mathiassen* teaches other software, such as movement analyzing and translation software that are additionally executed to provide secure access. *Mathiassen,* [0192]. A POSITA would have understood the movement analyzing and translation software are stored in non-volatile memory 7/7A because *Mathiassen* already teaches other software stored therein, namely administrative software. Additionally, *Mathiassen* only teaches one non-volatile memory 7/7A residing on IC that contains the only processor 2 that "runs" software. *Mathiassen,* [0050]. Thus, for the IC processor 2 to read the translation and movement analyzing software, a POSITA would have understood the software was stored on the IC in the non-volatile memory 7/7A.

33.    Additionally, as described below at Section VII.C, non-volatile memory is well-known as a "computer readable medium." *Mathiassen* refers to its described software as "program code" [0050] that contains algorithms like the matching and SKG algorithms. This reference to software stored on non-volatile memory as "code" would have indicated to a POSITA *Mathiassen's* software stored in non-volatile memory thus teaches or renders obvious a "computer program product having a computer readable medium having a computer program recorded therein, comprising code."

34.      I rely on this discussion in Section VII below for each claimed "means for" and corresponding "computer program product" so as not to repeat myself.

## IV.    OPINIONS REGARDING LEVEL OF SKILL OF A PERSON HAVING ORDINARY SKILL IN THE ART

35.      I was asked to provide my opinion as to the level of skill of a person having ordinary skill in the art ("POSITA") of the '208 Patent at the time of the claimed invention, which I have been instructed to assume is August 13, 2003. In determining the characteristics of a hypothetical person of ordinary skill in the art of the '208 Patent at the time of the claimed invention, I was told to consider several factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field. I also placed myself back in the time frame of the claimed invention and considered the colleagues with whom I had worked at that time.

36.      In my opinion, a person having ordinary skill in the art of the '208 Patent at the time of its filing would have been a person having, as of August 13, 2003, having at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year of experience in the field of human-machine interfaces and device access security. Additional education may substitute for lesser work experience and vice-versa. Such a person of ordinary

skill in the art would have been capable of understanding the '208 Patent and the prior art references discussed herein.

37.    Based on my education, training, and professional experience in the field of the claimed invention, I am familiar with the level and abilities of a person of ordinary skill in the art at the time of the claimed invention. Additionally, I met at least these minimum qualifications to be a person having ordinary skill in the art at least as of August 13, 2003. Further, although my qualifications may exceed those of the hypothetical person having ordinary skill in the art defined above, my analysis and opinions regarding the '208 Patent have been rendered from the perspective of a person having ordinary skill in the art at the time of the invention.

38.    My opinions provided in this Declaration are made as of the priority date of the '208 Patent (which counsel has informed me is August 13, 2003), unless expressly stated otherwise. To the extent that any verb tense used in this Declaration, or any deposition or testimony provided in this matter is a present tense, e.g., "would understand," such verb tense should be understood to be my opinion as of the '208 Patent's priority date (again, unless expressly stated otherwise).

## V.    BACKGROUND OF TECHNOLOGY

39.    I was asked to briefly summarize the background of the technology from the standpoint of a POSITA prior to August 13, 2003.

A.   **Biometric Access Systems**

40.   Traditionally, authorizing an individual in industries such as finance, healthcare, or government facilities, used a token-based or knowledge-based approach where the person provided a password or ID card. *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011),  p. 91, ("Knowledge-based and token-based automatic personal identification approaches have been the two traditional techniques widely used" for personal identification).

41.   Several disadvantages existed with these traditional methods, such as easily allowing intruders access and denying authorized personnel access when these passwords or cards were lost or stolen. *Id.* at pp. 91-92 ("Since these traditional approaches are not based on any inherent attributes of an individual to make a personal identification, they suffer from the obvious disadvantages: tokens may be lost, stolen, forgotten, or misplaced, and a PIN may be forgotten by a valid user or guessed by an impostor."). Biometric information identifies an individual via unique physiological or behavioral characteristics, which can help address the concerns that are often associated with traditional tokens or passwords. *Id.* at 92 ("Biometric identification refers to identifying an individual based on his or her distinguishing physiological and/or behavioral characteristics"; "Because many physiological or behavioral characteristics are distinctive to each person, biometric identifiers are

inherently more reliable and more capable than knowledge-based and token-based techniques"). Thus, several industries started using biometric authorization as an improved method of securing access (see Table below listing industries).

| Table 1. Biometric applications | | |
|---|---|---|
| **Forensic** | **Civilian** | **Commercial** |
| Criminal investigation | National ID | ATM |
| Corpse identification | Driver's license | Credit card |
| Parenthood determination | Welfare disbursement | Cellular phone |
| | Border crossing | Access control |

*Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011), p. 92.

42.    Biometric characteristics used in authorization included fingerprints, retinal, palm, speech, and face recognition. *Id.* at 95 ("There are a multitude of biometric techniques either widely used or under investigation. These include, facial imaging (both optical and infrared), hand and finger geometry, eye-based methods (iris and retina), signature, voice, vein geometry, key-stroke, and finger- and palm-print imaging."). Initially, the individual enrolled in a biometric system by scanning the biometric characteristic via a biometric sensor. *Id.* at 92 ("During the enrollment phase, the biometric characteristic of an individual is first scanned by a biometric sensor to acquire a digital representation of the characteristic."). The digital representation of the biometric was then stored in a central database or on a local memory of an issued card or device. *Id.* ("Depending on the application, the template

may be stored in the central database of the biometric system or be recorded on a magnetic card or smartcard issued to the individual."). Then, when a user required authorization, they presented their biometric to the system which compared the presented feature to the stored template and successfully identified the user when finding a match. *Id.* at 92 ("During the recognition phase, the biometric reader captures the characteristics of the individual to be identified and…" feeds a processed version "to the feature matcher that compares it against the template(s) to establish the identity of the individual.").

43.    Fingerprints served as one well-known biometric characteristic that had been used to identify individuals since the 1970's, as each person's fingerprints contained unique patterns formed via the ridges and bifurcations on the skin. *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012) at 3 ("The ridges and furrows form patterns on the last joint of the fingers and toes, forming four basic types", "The everyday use of fingers as an identification method and the production of finger and palm evidence in courts of law are based on one magnificent premise: no one has ever been found who has a sequence of ridge detail on the hands and feet that is identical to the ridge detail of any other person."), 6 ("During the summer of 1976, I was, as always, fully occupied in my work as a fingerprint expert in Hertfordshire, specializing in searching for the ownership of finger imprints found at crime scenes,

known in the U.S. by the particularly apt expression "cold searching."). The table below shows an example of the four well-known and established types of patterns found on human fingers.



**Figure 1.2** Basic fingerprint patterns.

*Id.* at 3. These ridges and bifurcations making up the patterns were known as "minutiae". *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011) at 96 ("… landmark features on a finger, for example, the fingerprint ridges endings and ridge bifurcations (collectively known as "minutiae"), are used in fingerprint-based authentication system."). Representations of fingerprints were stored in authorization systems by extracting these minutiae from fingerprint images. *Id.* ("The feature extraction system detects the minutiae from the input image"). The placement of the stored minutiae, as represented by vectors, was then compared to the vector generated from a person's fingerprint to distinguish a match and thus successfully identify an authorized user. *Id.* ("Once the feature vectors are aligned and overlaid, the number of corresponding minutiae, that is, minutiae in close

proximity to each other with similar attributes, constitutes a basis for quantifying the likelihood of fingerprint feature vectors originating from the same finger.").

44. Two types of biometric systems existed that served to (1) identify or (2) verify the individual. *An Introduction to Evaluating Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1011) at 56. Essentially, a biometric system for identification only compared the newly presented biometric with the stored signatures to recognize the person, with this system often used for identifying a criminal in a mugshot. *Id.* ("In identification systems, a biometric signature of an unknown person is presented to a system. The system compares the new biometric signature with a database of biometric signatures of known individuals.", "Systems that rely on identification include those that the police use to identify people from fingerprints and mug shots."). A verification system used the presented biometric as a claimed identity, and then checked whether the presentation matched their own stored representation (i.e. was the user who they claimed they were), with these systems used in such applications as a sale transaction or controlled access to computers or secure buildings. *Id.* at 56-57 ("In verification systems, a user presents a biometric signature and a claim that a particular identity belongs to the biometric signature.", "Verification applications include those that authenticate identity during point-of-sale transactions or that control access to computers or secure buildings.").

45.     Early biometric authentication systems included optical fingerprint sensors contained in desktop PCs and laptops to allow users secure access. *Id.* ("The small size and cost of these" optical fingerprint-capture "devices can provide secure access to desktop PCs, laptops…"). Implementing fingerprint sensors into mobile phones and palm computers also occurred prior to August 13, 2003. *Id.* at 58 ("The small size and cost of these" optical fingerprint-capture "devices can provide secure access… most recently, to mobile phones and palm computers"). Implementing biometric systems in automobiles to ensure secure vehicle access was also well-known, with manufacturers building "prototype cars with access and personalization (of seat position, radio channels, and so on) that are controlled by fingerprint authentication devices." *Id.* It was contemplated that these biometric verification systems would be placed in even smaller devices, such as a key fob, in order to "facilitate secure access to everything from front doors to car doors, computers, and bank machines." *Id., see also,* 60 (generally describing use of fingerprint systems in vehicular security).

46.     In fact, biometric vehicular security systems were well-known prior to August 13, 2003. *See, e.g., Gunsch, Odle*. For example, *Gunsch* disclosed a fingerprint reader on a car key fob for "user identification." *Gunsch* (Ex. 1012), Abstract. A microprocessor in the key fob compared the stored biometric signature with the presented fingerprint to authorize execution of certain commands. *Gunsch,*

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

[0070] ("All authorized users would have their fingerprints (at least two) scanned and stored in the transmitter's or secure asset's memory. The menu system can then define which user is allowed to perform which functions.").



Fig. 7B

*Gunsch,* 7B, (Fig. 7B shows "the primary operational logic of the universal transmitter's microprocessor."). Any user "unrecognized by the system would be denied access." *Id.*

47.    *Odle* disclosed a "Fingerprint Enrollment and Verification Module" (FEVM). *Odle* (Ex. 1007), 2:37-38 ("The system is referred to as Fingerprint Enrollment and Verification Module, FEVM."). *Odle* mounted the FEVM near the door handle of the car. *Odle,* 3:36-38 ("In one embodiment, the FEVM 14 is mounted in an aperture in the door near the door handle."). The FEVM stored a template of a

user's fingerprint in memory. *Odle,* 4:6-8, 4:15-17 ("The image of the fingerprint on the sensor 18 is processed by the FEVM to form a template of the fingerprint" and "When the template is complete, it is stored in the flash memory"). When the sensor then detected the presence of a user's finger, the FEVM compared the image to the stored template verify the user and, if matched, the desired operation was performed (e.g. unlocking a door). *Odle,* 4:35-45 ("The prospective operator places a finger on the passive sensor 18, the sensor activates and detects the presence of the finger, the fingerprint image is compared to the templates in the flash memory to verify the prospective user.", "If there is a verification and the fingerprint image has a template in the memory, the door unlocks."). Additionally, *Flick, Kim, Wuidart,* and *Gupta,* each disclosed a system including a fingerprint sensor for authenticating user access to a car. *Kim* (Ex. 1009)*,* [0017], [0032], [0034]; *Flick* (Ex. 1016), 5:39-56; *Wuidart* (Ex. 1015)*,* 3:9-36; *Gupta* (Ex. 1018), Abstract, 3:13-22. These vehicle security systems utilized biometric authorization to provide extra security to the owner and increase the security of the car. *See, e.g., Gunsch*, [0007]; *Gupta,* 1:22-30, 1:51-58; *Wuidart,* 1:40-51; *Kim,* [0006].

48.    Biometric systems authorizing access to devices and buildings were also well-known prior to August 13, 2003. For example, *Hamid* disclosed a portable device including a biometric sensor, such as a fingerprint sensor. *Hamid* (Ex. 1019)*,* 7:24-27 ("In Fig. 2a, the portable fingerprint device is housed in an ubiquitous

object, in this example within a housing 40 of a functional wristwatch…"), 7:30-33 ("biometric sensor" in the housing for "sensing biometric characteristics of any of a person's digit tips", such as "sensing of the finger's print."). The portable device then provided access to various doors within a building when the fingerprint presented matched one of the stored fingerprint patterns. *Hamid,* 8:46-59 ("A portable fingerprint security device 30a has been initialized to be responsive to 3 different fingerprint patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2, and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door."). *McKeeth* disclosed using a fingerprint sensor to authenticate users for accessing an electronic device, such as a computer. *McKeeth* (Ex. 1005)*,* 2:53-3:10 ("When using an optical scanner, the user may scan his/her fingerprint or other physical feature such as the retina into the computer system 100 for authentication."). If the presented biometric matched a stored fingerprint, then the user gained access to the computer system. *McKeeth,* 3:52-4:2 ("If there is a match between the input and security information, the compare circuit 150 issues a "pass" signal to the computer system 100 (e.g., a host processor) indicating acceptance of and authorizing access by the user."). Additionally, *Kawan* and *Ortiz* disclosed biometric systems including a fingerprint sensor for authenticating access to physical

locations and/or electronic devices. *Kawan* (Ex. 1020)*,* [0024]; *Ortiz* (Ex. 1021)*,* [0029], [0046], [0060-61].

49.    Thus, implementing biometric authorizing for providing access was well-known prior to August 13, 2003.

**B.    Hardware Components of a Biometric Access System**

50.    Biometric authorization systems were well-known to require certain hardware elements to successfully provide access to an individual prior to the filing date of the '208 Patent. For example, these systems required a biometric sensor, which included anything from audio sensor for speech recognition to an optical scanner for sensing fingerprints, or other physical features such as the retina, a user's face, or even a user's vein patterns. *Ortiz* (Ex. 1021)*,* [0089-90] ("User interface 222 may be integrated with a microphone 230 that may receive voiceprint from a user. User interface 222 may also be integrated with a fingerprint scanner 228 that captures fingerprints as biometric data from users."); *McKeeth* (Ex. 1005)*,* 3:5-10 ("When using an audio sensor, such as a microphone, the user may enter audio information, such the user's voice, which may be uniquely identified by the computer system 100. When using an optical scanner, the use may scan his/her fingerprint or other physical feature such as the retina into the computer system 100 for authentication."); *Flick* (Ex. 1016)*,* 4:61-66 ("The biometric sensor 29 may be any of a number of types, such as a sensor for fingerprints, retinal patterns, speech

recognition patterns, facial recognition patterns, skin patterns, hand patterns, venous patterns, etc. as would be readily appreciated by those skilled in the art.").

51.    These biometric authentication systems also required a storage medium to store biometric signatures of individuals which were authorized access. The representations of a user's biometric were stored in a memory or database. *Hamid '552* (Ex. 1022)*,* [0055] ("A processor 110 compares the captured biometric data with biometric data of an authorized person stored in memory 112 to produce a comparison result."); *Hoyos* (Ex. 1023)*,* [0045] ("…when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. That representation is compared to the local database of user information."). Thus, it was known prior to August 13, 2003 to include databases in biometric authorization systems for storing biometric signatures.

52.    These biometric authorization systems also included either a controller or processor that executed the step of comparing the presented biometric with the stored signatures to detect a match. *See, e.g., Hamid '552* (Ex. 1022)*,* [0055] (processor performing comparison between presented and stored fingerprint); *Hamid* (Ex. 1019)*,* 7:64-8:16; *Flick* (Ex. 1016)*,* 4:32-37, 8:30-34 (controller performing matching operation); *Wuidart* (Ex. 1017)*,* 4:37-40, 54-58 (microcontroller determining correspondence of a measured fingerprint with a stored biometric signature). In systems utilizing remote or portable fingerprint sensing

devices, the controller or processor additionally directed the transmission of a signal to provide access. *See, e.g., Hamid '522,* [0055] ("If the comparison result is indicative of a match an authorization signal is provided to a transmitter 114 for transmitting the signal to a port 120 of the receiving module 104."); *Wuidart,* 4:54-61 ("When the data elements of the measurement signal SM2 correspond to the data elements stored in one of the areas of the memory DB2, the microcontroller M1 delivers an output signal OUT." which was subsequently transmitted "through an antenna, infrared diode, or electrical connection."); *Scott* (Ex. 1024)*,* 11:14-25 ("Processing unit 16 causes transmitter module 28 to transmit a signal representing the encrypted random number to host system 30 (122)…"). The portable fingerprint sensing device then additionally included a transmitter. *Hamid '522* (Ex. 1020)*,* [0055]; *Scott,* 6:52-53 ("PID 6 further includes a communication unit 24, which has a transmitter module 28…"). Thus, biometric authorization systems were well-known to include a processor/controller for detecting a match with a stored biometric signature and causing a transmitter to send an access signal prior to august 13, 2003.

53.    When transmitting access signals, biometric authorization systems also contained a receiver for receiving the signal that connected to a different processor and/or controller to execute providing access to the individual, e.g., by unlocking a physical lock to a structure. *See, e.g., Hamid '552,* [0055] ("A locking mechanism 122 comprising a processor 124 at the receiving module 104 then provides access to

the secure entity or service in dependence upon the received authorization signals.").

Some of these processors in biometric authorization systems were also capable of providing access to a user to perform a certain function, instead of simply providing access to a lock. *Scott* (Ex. 1024)*, 12:17-21, ("… PID 6A is configured as shown in Fig. 2 to transmit, and host facility 4A is configured to only receive. Receiver module 38 is a standard automobile or garage door type of installation."), 12:30-59 ("…host processing unit 4A retrieves the stored encryption key and decrypts the encrypted portion of the received encrypted signal (21))…", "If the synchronization counter information matches the stored information, then the user is granted access," with such access "**determined by the function button information contained in the encrypted signal**.").

54.    These systems required some item which was being accessed, such as a physical lock (e.g., a door lock) as disclosed by *Hamid '552. Hamid '552* (Ex. 1022)*, [0055] ("A locking mechanism 122 comprising a processor 124 at the receiving module 104 then provides access to the secure entity or service in dependence upon the received authorization signals."). Furthermore, the item being accessed also included locks to electronic devices, such as an ATM login account. *Ortiz* (Ex. 1021)*, [0047] ("a user attempting to retrieve cash through ATM 20 can be required to authentication his or her identification, based on previously stored biometric attributes contained within database 14 and/or user profile 15.").

Biometric authorization systems even granted access to online networks via a user presenting their biometric credentials. *Sands* (Ex. 1025)*,* 5:10-18 ("The biometric scanner(s) are used to read one or more particular biometrics associated with an individual and send the biometric measurements to the computer network for use in authenticating the individual as a valid user of the computer network.").

55.    Thus, it was known that biometric authorization systems for providing access included such hardware components as a database for storing biometric signatures, processor and/or controller for executing comparison between the presented biometric and biometric signature, transmitters and receivers for communicating access signals, and another processor and/or controller for executing the step of providing access prior to August 13, 2003.

## C.    Secure Access Signal

56.    When implementing biometric authorization systems, maintaining security of the signal during transmission, especially in wireless transmission, was a well-known problem. *'208 Patent* (Ex. 1001)*,* 6:35-41 (describing using "secure protocols and serial number ciphering techniques which…hide the clear text values required for authentication between" the transmitter and receiver subsystems of the biometric authorization system). Security protocols such as rolling code or by another common name, code hopping, were known as ways "of preventing unauthorized access to a digital code which might be transmitted via a short-range

radio link to do something: open a garage door, lock or unlock a car and perhaps turn its own security system on and off – and much more." *A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code",* Ross Tester, Silicon Chip, July 2002 (Ex. 1026) at 23. In fact, Microchip invented a rolling code system that "simply present a different code every time" a piece of information is transmitted. *Id.* The receiver knows the algorithm that chooses the changing code "so it knows what code to expect." *Id.* The codes sent with the access signal are "random", but because the receiver knows the code algorithm it "can still work out what the code is going to be in advance." *Id.* This rolling code protocol was well-known to give users "almost total peace-of-mind", leading to its adoption in "many vehicle entry/exit and alarm system manufacturers, access controllers and so on." *Id.*

57.    Biometric authorization systems were known to employ this KeeLoq approach from Microchip Technology, Inc. *Scott* (Ex. 1024)*,* 6:41-44 ("PID 6 includes a biometric sensor."), 7:51-54, 7:59-63 (in one embodiment, PID 6A includes an encoder with encoder chip, "for example, the HSC200 or HSC300 KeeLoq® Code Hopping Encoder, available from Microchip Technology, Inc. of Chandler, Ariz., that contains the encryption algorithm."). *Scott* discloses the PID embodiment with the KeeLoq code hopping encryption was "employed with systems such as garage door openers, automobile security systems, door locks, and the like."

*Id.* at 8:1-3. Thus, it was known that code hopping or rolling code simply employed an "encryption algorithm" for encrypting the secure access signal. *Scott,* 7:59-63.

58.     Bluetooth was also known and employed as a secure wireless protocol due to its use of frequency hopping, where "a single message packet" was transmitted along several different frequencies, "thereby spreading the message across the available frequency spectrum." *Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications,* Brent A. Miller, Chatschik Bisdikian, 2001 (Ex. 1027) at 18. Frequency hopping was known to "provide a degree of security for communications in that only a receiver that knows the frequency hopping pattern can receive and assemble all the packets of a message.", with this protocol often "employed to hinder eavesdropping" on a given signal. *Id.* at 19.

59.     Biometric authorization systems were known to utilize these secure wireless protocols when sending sensitive access signals. *Morris* (Ex. 1028), 3:4-14 ("The encrypted biometric data signal is received by a server antenna 42 and a second wireless Bluetooth enabled transceiver 44.), *Scott* (Ex. 1024), 7:51-54, 7:59-63. Thus, it was known prior to August 13, 2003, that biometric authorization systems secured their transmitted access signals using various secure wireless protocols.

**D.     Inputting a Series of Entries for Invoking Functions in a Biometric Access System**

60.     Using a single switch for communicating various functions and commands has been known ever since the telegraph was used to send morse code messages by "tapping the switch at one end" and making "the relay at the other end click." *Bricolage: Data Compression – Morse Code,* https://perl.plover.com/Huffman/huffman.html, 1998 (Ex. 1029) at 1. Morse code then used a single switch to "tap" out any number of communications, with letters and digits represented by sequences of short and long clicks, or dots and dashes, respectively. *Id.* at 1. Thus, the length of time the switch was pressed and the number of presses in a row formed the information a user wanted to communicate.

61.     Additionally, vehicle remote keyless entry systems were also known to employ a single switch or button for invoking multiple functions in a vehicle security system. For example, *William's* remote keyless entry system included a button on the fob that performed different functions when pushed once or twice. *Williams* (Ex. 1030), 14:5-31 ("The Unlock input 60A **produces a different result if pressed twice within five seconds**, as illustrated by block 60I. **One press of the button will unlock only the drivers door**, block 60M, and **pressing the button twice will unlock all doors and the liftgate**, block 60K."). Thus, implementing a single switch or button for invoking multiple functions was well known prior to August 13, 2003.

62. As many electronic devices became portable for user convenience, it was important to ensure the input process was simple for the user to implement. *Ghassabian* (Ex. 1030), 7:65-67, 1:54-58 (a "key feature for a successful technological product is its easily manipulation," further stating a "**quickly, easily and most importantly, naturally…function entry system is vital**."). *Ghassabian* contemplated a method of simplifying user input on a portable device by providing "multiple presses of a single key." *Ghassabian,* 2:12-16. This method was implemented by including a "fingerprint detection device" that "maps a particular fingerprint with a corresponding symbol or function, such as a number, letter, macro or other activity." *Ghassabian,* 3:16-18, 8:23-26. *Ghassabian's* fingerprint detection device mapped "tapping once with a finger" to produce the number '0' while "the same finger with a double tap may produce the number '6.' *Ghassabian*, 9:1-4.

63. In more detail, *Ghassabian* teaches a "fingerprint detection device" that "**maps a particular fingerprint with a corresponding**…**function**." *Ghassabian,* 8:23-26. *Ghassabian* illustrates a "mapping table" that maps distinct fingerprint movements to certain functions, symbols, or activities, with the "fingerprint index" identifying what fingerprint is used for each operation.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208



FIG.2

*Ghassabian,* Fig. 2, *see also* 8:59-9:8 (describing the "mapping table" in further detail, "Illustratively, tapping once with a finger corresponding to identification number 212 may produce the number '0', whereas the same finger with a double tap may produce the number '6.'). *Ghassabian* states implementing fingerprint movements mapped to certain functions enhances "accuracy, but [] also **enables individuals to more easily and quickly input distinct** characters**, and/or function**." *Ghassabian,* 12:11-13.

64.    *Matusis* recognized the same issue in "the art of input devices or sensors," namely the need to increase "functionality and improving user-friendliness while minimizing the size of the device." *Matusis* (Ex. 1032)*, [0004], see also,* [0015] ("there is still a strong need to develop new systems and methods that would be able to maximize the number of actions while minimizing the size of the input

device"). *Matusis* teaches a system including an "input sensor [that] could be an arbitrary small input sensor" for detecting different "fingertips whereby each fingertip corresponds to an upward and a downward motion," each coinciding with a certain function. *Matusis,* [0045], [0046], Fig. 3.

65.    Additionally, *Mathiassen '455* also discloses implementing a user's series of fingerprint presses as input information to invoke certain functions. *Mathiassen '455* (Ex. 1031), 5:18-23 (analyzing means 2 coupled to a fingerprint sensor "measures the duration, direction and speed of finger moves on the switch, and categorises the signal from the switch into categories"), 12:12-19 (entering a period "**may be entered as two consecutive <Long Taps>**" with a user signaling the end of a text message "**by finger command sequence comprising two consecutive <Extra Long Taps>**"). *Araki* similarly discloses invoking certain commands based on user input but does so via a touch sensor without sensing a user's fingerprint. *Araki* (Ex. 1034)*,* 5:28-33 ("these commands can be issued by utilization of, for instance, seven finger operations on the touch panel" such as "**touching the panel with the finger twice (2HIT)**."), *see also* 5:56-58 ("The command HIT is output when the finger is kept on the panel for 0.5 second or less" while the "2HIT is outputted when, within two seconds after the issue of the command HIT, the finger is operated in the same manner").

66. Portable devices also started implementing biometric sensors as an input for the user to instruct certain functions to maintain security when using a portable device. *Ghassabian* (Ex. 1030), 3:18-22 ("Furthermore, such a technology should also provide means for a **more secure and efficient mechanism that can prevent unauthorized use of devices**, among other things, as compared with the prior art"). For example, both *Ghassabian* and *Mathiassen '455* also teach their systems authenticate users via fingerprints. *Ghassabian,* 4:20-25 ("…the fingerprint detection device is configured to distinguish between fingers based on their fingerprints" and thus "only operate based on a particular finger and is rendered useless in the hands of an unauthorized user."); *Mathiassen '455* (Ex. 1031)*,* 6:33-38 (describing the fingerprint sensor of the system "To provide combined user authentication by finger print biometrics, accurate cursor control and fast, versatile and flexible text input, all served by the very same single-button sensor"). Thus, invoking various functions base on a series of inputs of a user's single fingerprint was well-known to be included in biometric authorization systems prior to August 13, 2003.

### E. Providing Different Types of Access

67. Systems for providing secure access not only considered situations where a user was requesting access alone, but also coercive scenarios where an intruder or assailant was forcing a user to access a secure item. *Hoffman* (Ex. 1035)*,*

5:62-65 (disclosing the need for access systems that "affords an authorized user the ability to alert authorities that a third party is coercing the user to request access without the third party being aware that an alert has been generated"). For example, *Hoffman* teaches a biometric system that includes "emergency notification to permit an authorized user to alert authorities an access attempt is coerced." *Hoffman,* Abstract. The system stores different access codes for a single user, with some "recognized by the computer system as the standard access codes, and others which would be recognized as emergency codes." *Hoffman,* 9:21-24. When a user input an emergency code "simultaneously with a user's personal identification code," the system would "activate the emergency alert" and additionally afford limited "access to the requested secured computer system" to prevent the assailant or intruder from "knowing that an emergency notification had been entered by the user." *Hoffman,* 9:24-35. Separately, *Brown* disclosed a vehicle security system that allowed a user to enter their vehicle when "the duress code has been entered" but additionally "triggers a process by which authorities are notified and the location of the vehicle may be provided," with such code being a non-biometric number input. *Brown* (Ex. 1036), Abstract, 3:3-13 ("…the predetermined option codes may include: '0' to indicate no duress; and '1' through '9' to indicate duress" when entered with "the unique identification number"). *Brown's* vehicle security system "disabled" the

vehicle either after a "pre-determined amount of time passing or a pre-determined distance driven" when receiving a duress indication from a user input. *Id.*

68.    *Zingher* teaches a system that determines "whether the biometric information represents a normal identification or a duress identification" and if it indicates duress, initiates "an emergency response, such as (for example) triggering a silent alarm." *Zingher* (Ex. 1037)*,* Abstract. Specifically, *Zingher's* system addressed the "need for the discreet identification of a duress transaction and the discreet notification of authorities that a crime is being committed at an ATM where biometrics are used to confirm the identity of a user." *Zingher,* [0010]. *Zingher's* system recognized a user is in duress when a different fingerprint corresponding to the duress identification information is input to provide access. *Zingher,* [0014] ("However, by using a different finger, the ATM may also make a positive identification of a customer and instruct the system to trigger an alarm sequence without alerting a criminal that the transaction has been identified as a duress transaction.").

69.    *Zingher* additionally disclosed the system for "discreetly identifying and signaling a user's duress" at other "biometric identification" sites, including "an automobile. *Zingher,* [0011]. Thus, it was also known prior to August 13, 2003, that vehicle security systems including biometric authorization also benefited from recognizing when a user was under coercion, such as that taught by *Kim. Kim* taught

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

a "multiway control system for replacing conventional keyset with user's identification data," which included a "data input means" that comprised, as an example, "a finger print scanner." *Kim* (Ex. 1014)*, [0031, 0032]. In an embodiment where the system is used "for a vehicle," users enrolled "personal identification data" for both a normal driving situation and an emergency. *Kim,* [0045, 0047]. The user may then provide emergency data when an intruder is coercing them, which then signals the multiway control system to limit access by driving "the vehicle in a normal manner for 20 seconds only" and then sounds the horn, flashes the blinkers, etc. to alert any nearby persons of the dangerous situation, similar to the pre-determined disablement initiated in *Brown's* vehicle security system, as discussed above. *Kim,* [0048] ("When users are forced to hand over the driving card and or password that was used as "key" to the vehicle to an intruder, the users give a card and or password used for emergency situations."), [0049] ("…the CPU will control the ignition system (209) of vehicle through the control board (206) to drive the vehicle in a normal manner for 20 seconds only, and after 20 seconds, the CPU commences control of all lighting system (213) (e.g. blinking), the horn (212) is accidentally operated, and the door of the trunk compartment (214) is automatically opened.").

70. Thus, it was known prior to August 13, 2003, that biometric authorization systems providing access implemented different user inputs for indicating when a user was under coercion or duress from a third party.

71. Additionally, systems for providing access also implemented more stringent security measures when an unauthorized user requested entry, such as sounding alarms alerting authorities. *Colmenarez* (Ex. 1038), 1:51-52, 1:59-62 (disclosing a system for "activating a vehicle mechanism using biometrics", with the vehicle only "activated" via face recognition of an authorized user), 7:14-17 ("For example, a short sound of a buzzer may indicate that the person whose identification has been attempted is not authorized to activate any of the vehicle mechanisms."). Other systems simply denied access to unauthorized users when their presented fingerprint did not provide a match with stored biometric signatures. *Hamid* (Ex. 1019)*, 8:16-18 ("If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted."); *Hsu* (Ex. 1038), 8:50-53 ("In any event, when all permissible fingerprint reference data have been checked, as determined in decision block 130, access will be denied.").

72. Other secure access systems even issued security alerts or alarms when an unauthorized user attempted entry, such as *Mochida's* vehicle security system. *Mochida's* vehicle security system produced "an alarm signal in response to door opening when the theft preventive system is in the door-lock position." *Mochida*

(Ex. 1040), 1:35-43. In the system, an automotive keyless entry system contains the "theft preventive system," which includes a "push-button-type function key for operating a door-lock mechanism for locking a vehicle door." *Mochida,* 1:44-49. When the door is opened while the car is in a "door-locking condition," an alarm circuit produces "an alarm signal." *Mochida,* 1:53-56. Vehicle security systems for alerting when an unauthorized user attempted entry, especially in dangerous situations, were commercially available at least as early as 2000, such as the K-9 Car Alarm providing a "remote panic operation" where "Should it be needed in a threatening situation, the system can be activated remotely by using the transmitter" to sound sires and flash parking lights, while concurrently locking the vehicle's doors to keep any carjacker or thief from entering the vehicle. *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041) at 7 ("Upon activating panic: The siren sounds and parking lights flash." And "the vehicle's doors will lock.")

73.    Alerting security of potential unauthorized access was also implemented in biometric authorization systems, such as that disclosed by *Hsu. Hsu* disclosed an "exterior fingerprint sensor 14" attached to a car that was used to "unlock the car and to disable a security system 36." *Hsu* (Ex. 1038), 4:65-67. The "security system 36" shown in Fig 5., when enabled, included activating an alarm as well as a "call for help" feature. *Hsu,* Fig. 5.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208



*Hsu,* Fig. 5. *Bostrom* also disclosed a "biometric access control" apparatus for opening "a door, gate or the like of the entrance." *Bostrom* (Ex. 1042)*,* Abstract. *Bostrom's* apparatus "compares" a "fingerprint scan" with "fingerprint parameters in templates stored in memory device 64", and if no match was found, the person was "not granted access." *Bostrom,* 10:23-26, 10:33-36, 10:41-43 ("If the fingerprint parameters do not correspond to the template, the person is not identified in step G, is not authorized, and thus is not granted access."). Additionally, when a person was not granted access, "an alarm can be sounded" or "proper personnel can be notified." *Bostrom,* 10:43-46. *Maloney* disclosed a system using identification via a "biometric identification unit 26" for "scanning a selected unique biometric feature of users who request access to the system", which "may take the form of a fingerprint reader," among other biometric sensors. *Maloney* (Ex. 1041)*,* 6:42-48. When "biometric data

extracted from the user" did not match with any biometrics in "a stored biometric identification database", then the user was not provided "access to the system." *Maloney,* 7:57-63. When an unauthorized user requested access, "appropriate alarms may be generated and security personnel notified of the attempted unauthorized access." *Maloney*, 8:1-3.

74.    Thus, biometric authorization systems were well-known to include several types of access depending on the conditions which a person tried to authorize themselves prior to August 13, 2003.

75.    Accordingly, the solutions of the prior art had already developed the various features discussed above prior to August 13, 2003, including biometric authorization, transmitting wireless secure access signals, inputting a series of fingerprints to invoke different functions or commands, and providing different types of access to a controlled item. A POSITA would have been well aware of the above-described state of the art as of August 13, 2003.

## VI.    OPINIONS REGARDING THE '208 PATENT AND PRIOR ART

76.    I have been asked to review and provide my opinion as to unpatentability of at least some of the Challenged Claims of the '208 Patent. In my opinion, the below-discussed combinations of references teach or at least render obvious each of the Challenged Claims of the '208 Patent. A summary of the

mappings from each of these references to the claim language of the '208 Patent is provided below for reference as Appendix A.

## A.   Description of the Alleged Invention of the '208 Patent

77.    I have reviewed the '208 Patent (Ex. 1001). Descriptions of the system and method of the '208 Patent that may be pertinent to my analysis are provided herein, and my descriptions are intended only as a summary of the patent and/or intended as being pertinent to the Challenged Claims of the '208 Patent. My opinions provided herein are not intended as a discussion of my entire understanding of the '208 Patent.

78.    The '208 Patent describes a method and system for "providing secure access to a controlled item." *'208 Patent,* Abstract, 14:12-13 (stating the '208 Patent discloses "secure access methods"). The "controlled item 111 can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer (PC) that is to be accessed by the user 101." *Id.* at 6:13-16. Thus, the '208 Patent generally describes a system for providing secure access to either a physical lock (i.e., "door locking mechanism") or an electronic lock (i.e., "electronic key circuit" in a computer). *Id.* at 16:1-3.

79.    The system comprises two subsystems: a "transmitter sub-system 116" and a "receiver sub-system 117." The transmitter sub-system includes a user identity database 105 and a code entry module 103 that contains a biometric sensor 121. *Id.*

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

at 5:53-55. This database 105 stores biometric signatures. *Id.* at 7:15-16. The biometric sensor 121 may be "a fingerprint sensor," in which case any "request 102" for access "takes the form of a thumb press" on the sensor. *Id.* at 5:51-53, 56-59. The transmitter sub-system also includes a controller/transmitter 107 that sends an "access signal" to the controller 109 in the receiver sub-system 117. *Id.* at 6:2-5, 6:16-17 (noting the "controller 109 contains a receiver 118 that receives the transmitted access signal 108"). The receiver sub-system 117 also includes a database 115 of rolling codes and is in communication with the controlled item 111. *Id.* at 6:7-10, 6:13-16. Figure 2 below illustrates the components of the transmitter and receiver sub-systems.



Fig. 2

*Id.* at Fig. 2.

80.     The main purpose of the secure access system is to prevent unauthorized use of a system through the application of "wireless transmission of security code information." *Id.* at 1:14-16, 1:55-64 (describing the problem to be addressed to strengthen the security of a wireless signal to keep the access signal from being "deciphered, replayed in order" for an unauthorized user to "gain the access which rightfully belongs to" an authorized user). To strengthen the security of the access signal, the secure access system sends access signals over a wireless connection employing rolling codes, which "provide a substantially non-replayable non-repeatable and encrypted radio frequency data communications scheme for secure messaging." *Id.* at 6:35-37. The codes are different "each time the transmission of the access signal 108 occurs." *Id.* at 6:42-48. This variation of the code for each transmission then results "in a non-repeatable data transfer" that "significantly reduces the likelihood that an intruder can access the information replay the information to thereby gain entry…." *Id.* at 6:51-55.

81.     The system provides secure access to the controlled item as discussed below. The biometric sensor 121 receives a request from a user, such as a "thumb press on the biometric sensor panel 121." *Id.* at 5:61-63. This "thumb press" is also described as a "biometric signal." *Id.* at 7:66-8:2 (disclosing "the biometric sensor 121 in the code entry module 103 checks whether a biometric signal 102 is being received"), 1:29-30 (describing "One example of a biometric signal is a

fingerprint"). The "processor module 107" or controller 107 then "compares the received biometric signal 102" to signatures in the biometric signature database 105. *Id.* at 8:6-8, 14:11-19 (stating that "the method steps for providing secure access," such as the steps in Figs. 3-4 and 6-9, "are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117"). If the comparison "yields the desired authentication," or in other words, "the user 101 is authenticated successfully," then the controller 107 updates the rolling code and sends it as a secure access signal to the controller 109 of the receiver sub-system. *Id.* at 5:67–6:6.

82. Specifically, this authentication occurs via the matching of the biometric signal to a biometric signature in the database 105 to "produce[s] an accessibility attribute," which "establishes whether and under which conditions access to the controlled item 111 should be granted to a user." *Id.* at 8:15-19. Examples of accessibility attributes provided include granting unconditional access, granting access while also activating an alert (referred to as duress access), and alerting that an unauthorized user is trying to gain access. *Id.* at 8:19-25. The controller 107 includes this accessibility attribute in the access signal to the receiver sub-system controller 109. *Id.* at 8:34-35. When the controller 109 (containing a receiver) receives the access signal, the controller 109 checks if the rolling code in the signal matches the "reference code in the database 115." *Id.* at 8:63–9:1. If the

received code matches the reference code, "the controller 109 send the control signal 110 to the controlled item 111 (for example opening the secured door)." *Id.* at 9:1-8.

83.    The '208 Patent also describes a process by which a user is enrolled in the system, such that their biometric signature is stored in the biometric signature database 105 in the transmitter sub-system 116. The process is initiated when an "administrator" provides a "succession of finger presses to the biometric sensor 121," each of a certain duration and the succession including an "appropriate quantity" of presses. *Id.* at 10:45-49. The controller 107 then checks the "control information," or successive presses, "against a stored set of legal control signals." *Id.* at 10:53-56. The '208 Patent describes an example of such control signal being to "Enrol an ordinary user." 10:57-59.

## B.    Opinions Regarding *Mathiassen*

84.    I have been informed that U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*" or "Ex. 1004*")* is prior art to the '208 Patent. I have reviewed *Mathiassen* and provide herein my opinions on the teachings of *Mathiassen.* The opinions provided herein do not necessarily represent my entire understanding of *Mathiassen.*

85.    *Mathiassen* teaches a method for "providing secured access control" using "a portable or embedded access device…for allowing only authorized users

access to, an access-limited apparatus, device, network or system, e.g., a computer terminal, an internet bank or a corporate or government intranet." *Mathiassen,* Abstract. Additionally, *Mathiassen's* secure access system may provide "access control" to "stand-alone applications, or applications within a local network e.g. within a car," as well as stand-alone applications not in a network including access to a hotel safe and medicine cabinet, among others. *Mathiassen* (Ex. 1004)*,* [0108-0113].

86.    The "core of the device of the invention" is an integrated circuit (IC) 1 that contains several hardware blocks including an Image Capture and pre-processing block 5C, a secure key generation (SKG) block, an encryption block, as well as a central processor 2 and non-volatile memory. *Mathiassen,* [0049-0050]. The IC 1 also connects with a fingerprint sensor 5. *Mathiassen,* [0050]. The figure below illustrates the components of the IC 1.



*Mathiassen,* FIG. 2b.

87.    The method of providing secure access control using the IC 1 is outlined in *Mathiassen* in various different embodiments, including both networked and stand-alone embodiments. One such embodiment is a "central locking system" that acts as a "key to the doors of the car." *Mathiassen* (Ex. 1004), [0145]. The system for providing central locking access includes a portable door control 20 that "contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1)" and includes a transceiver 27. *Mathiassen,* [0147]. Figure 8 below depicts the portable door control and its various components.



Figure 8

*Mathiassen,* Fig. 8. The central locking system also includes an "embedded ignition control (15)" and "central car computer." *Mathiassen,* [0148-0149]. The portable door control connects to the central car computer via its transceiver 27 while the ignition control 15 connects to the central car computer through hard wires. *Mathiassen,* [0149]. The secure access control provided by the portable door control 20 is to the car door locks. *Mathiassen* (Ex. 1004)*,* [0187].

88.     Using the central locking embodiment, the method of providing secure access control starts by the car user or owner presenting their fingerprint on the fingerprint sensor 5 of the portable door control 20. *Mathiassen,* [0175-0176]. The pre-processing block 5C and processor 2 comprised in the IC 1 of the portable door control 20 then work together to reduce the received fingerprint images to "access

minutiae," which are then compared with pre-stored master minutiae tables in the non-volatile memory of the IC 1. *Mathiassen,* [0178-0180]. If the processor 2 determines a match through the comparison, then it feeds a seed to the SKG block (8A), which "will generate a valid, and temporary, password that will be input to the encryption block (8B or 8C)." *Mathiassen,* [0182-0184]. The processor then issues an "open door" command to the encryption block, which encrypts the command based on the temporary password. *Mathiassen,* [0185]. The transceiver 27 of the portable door control then wirelessly transmits the encrypted "open door" command to the embedded ignition control or the central car computer for decryption and authentication. *Mathiassen,* [0186-0188]. If the processor 2 of the IC 1 resident on the ignition control determines the decrypted message is "a valid and authenticated 'open door' command," then the command is relayed to the door locks. *Mathiassen,* [0187].

89.     *Mathiassen* also teaches the secure access control system implementing an enrollment process where minutiae (i.e., fingerprint representations) of a user generate master minutiae tables that are stored in non-volatile memory of the IC 1. *Mathiassen,* [0164], [0050] (disclosing a "captured fingerprint image" is reduced "to compact fingerprint representations, called minutiae"). Additionally, *Mathiassen* teaches commands other than "open door" may be implemented in the secure access control system by a user providing certain finger movements. *Mathiassen,* [0192].

90.    A POSITA would have understood *Mathiassen* is in the same field of invention as the '208 Patent, namely secure access systems. *Compare '208 Patent* (Ex. 1001), 1:14-16 ("The present invention relates to **secure access systems**…"), *with Mathiassen* (Ex. 1004)*, [0023] ("It is yet a further object of the invention to provide a method of improved **secure access control…**"), Abstract ("A portable or embedded access device is provided for…**allowing only authorized users access**…"). Furthermore, the secure access systems of *Mathiassen* and the '208 Patent similarly provide this access by receiving a biometric, comparing it to stored representations of authorized user's biometrics, and then outputting a signal to provide a user access to a physical door or electronic lock if a match is found. *Compare '208 Patent*, 5:61-14 (generally describing receiving a user's thumbprint request, comparing it against signatures in a biometric database, and sending out a signal to "a door locking mechanism on a secure door"), *with Mathiassen,* [0175-0187] (generally disclosing receiving a user's swipe of a fingerprint, comparing it against stored fingerprint representations, and sending out a command to open door locks).

91.    Additionally, both *Mathiassen* and the '208 Patent secure access systems provide a similar advantage, in that they make the wireless access signal secure by encrypting a non-repeatable, non-replayable signal. *Compare '208 Patent,* 6:42-55 (describing the rolling code as non-repeatable and encrypted), *with*

*Mathiassen,* [0184-0185] (disclosing the encryption block encrypting the command "based on the valid, and temporary password" generated at the SKG block). In fact, *Mathiassen* teaches the password used for encrypting this command "**changes for every transaction**," similar to the '208 Patent using a "different code variant each time" the access signal is transmitted. *Mathiassen,* [0050]; *'208 Patent*, 6:42-43. Thus, a POSITA would have understood that *Mathiassen's* secure access control system is in the same field of endeavor and solves the same problem as the system described in the '208 Patent.

## C.    Opinions Regarding *McKeeth*

92.    I have been informed that U.S. Patent No. 6,766,456 to *McKeeth* ("*McKeeth*" or "Ex. 1005") is prior art to the '208 Patent. I have reviewed *McKeeth* and provide herein my opinions on the teachings of *McKeeth*. The opinions provided herein do not necessarily represent my entire understanding of *McKeeth*.

93.    *McKeeth* generally teaches a "method and system for authenticating a user to access a computer system." *McKeeth* (Ex. 1005)*,* Abstract. The computer system 100 may include "an optical scanner," where the "user may scan his/her fingerprint or other physical feature such as the retina into the computer system 100 for authentication." *McKeeth,* 3:8-10. *McKeeth* also teaches the user providing his fingerprint to be scanned "from an optical scanner" while concurrently providing a specific pattern of movement. *McKeeth,* 3:12-16, 19-24. The user may not be granted

access to the computer system until the correct input is applied. *McKeeth,* 3:24-28, *see also* 38-42 ("…the computer system 100 may be configured to recognize and accept for processing input signals (e.g., password) that occur within a predetermined duration of time from other input signals (e.g., fingerprint scan or pattern)").

94.     To provide access to the computer system 100, "the user performs a fingerprint scan and/or pattern within the designated time" that is then compared with stored fingerprint information "for recognition by the computer system 100." *McKeeth,* 3:52-65. If a match is found, then the user is provided access to the computer system 100. *McKeeth,* 3:65-4:2. *McKeeth* also teaches that if the geometric pattern concurrently input with the fingerprint scan is not the correct pattern, the computer system recognizes that the user "is experiencing duress or force to access the computer system 100." *McKeeth* (Ex. 1005)*,* 4:10-14, 19-23. The computer system 100 then provides access (though limited) when recognizing a user is under duress and "concurrently with the limited access, a silent security alert may be issued to security personnel." *McKeeth,* 4:33-36, 4:39-41. *McKeeth* additionally teaches, in another configuration, that if the computer system 100 determines the input does not match, the system 100 may "lock up the computer system 100 and generate a security alert to the responsible authorities," thus denying user access and issuing a security alert. *McKeeth,* 5:48-53.

95.    A POSITA would have understood *McKeeth's* access system to be in the same field of endeavor as the '208 Patent. For example, *McKeeth's* system authenticates "a user to access a computer system." *McKeeth,* Abstract. Similarly, the access system of the '208 Patent provides an authenticated user access a personal computer. *'208 Patent* (Ex. 1001)*,* 5:65-6:13 (generally describing only providing access to the controlled item when the user is authenticated), 6:13-16 (stating controlled item may be a computer), *see also* Abstract (describing the system "for providing secure access to a controlled item.") Additionally, the process of authenticating a user in both *McKeeth* and the '208 Patent requires receiving a request via fingerprint, comparing the fingerprint to stored biometric information, and determining a match. *McKeeth,* 3:52-4:2 (generally describing a user is authenticated and provided access when the presented fingerprint matches with a stored fingerprint); *'208 Patent*, 5:61-65 (describing authenticating the user by comparing the presented thumb press with stored biometric signatures).

96.    Additionally, *McKeeth* and the '208 Patent both provide similar advantages by allowing different types of access to the "controlled item," such as when a user indicates they are in a duress situation as opposed to providing normal access. *McKeeth,* 4:29-36 (disclosing the computer system 100 may recognize "that while the user may be legitimate," their input "may be an indication that the user is experiencing duress or force…."), 4:39-41 (when the computer system 100

recognized the user is under duress it grants access, even though its limited, and issues a silent alert to authorities); *'208 Patent*, 8:21-23 (describing the access system may grant access "but with activation of an alert tone to advise authorities of the duress situation."), 11:32-37 (describing that the user's input may indicate they are under duress or coercion). Both systems also deny access and issue an alert when an unauthorized user attempts to access the system. *McKeeth*, 5:48-53 (teaching that if the user input does not match any "stored pattern," then the system denies access by locking up the computer system 100 and generating "a security alert"), *see also* 6:59-62 (stating that the "computer 100 applies a stringent authentication process and issues security alerts in the event of an absent or incorrect pattern signal."); *'208 Patent,* 8:23-25 (describing the access system "sounding a chime indicating that an unauthorized, but not necessarily hostile, person is seeking access…"), *see also* 12:11-13, 16-19 (generally describing when a user's input does not match any stored biometric, access is denied and an alert tone is sounded "to alert personnel in the vicinity…that an unauthorized user is attempting to gain access…"). Thus, a POSITA would have understood that *McKeeth* is both in the same field of endeavor and provides similar advantages to access systems as the '208 Patent.

### D.    Opinions Regarding *Anderson*

97.    I have been informed that U.S. Patent No. 6,509,847 to *Anderson* ("*Anderson*" or "Ex. 1006") is prior art to the '208 Patent. I have reviewed *Anderson*

and provide herein my opinions on the teachings of *Anderson*. The opinions provided herein do not necessarily represent my entire understanding of *Anderson*.

98.    *Anderson* teaches "a method for inputting an access code" so a user may gain access to certain functions in an information handling system. *Anderson* (Ex. 1006)*,* Abstract, 2:14-26 ("…the code may be used to enable a function" in an information handling system). A user gains access by "comparing the generated code with a stored code template" and providing access to information system functions if the comparison results in a match. *Anderson,* 2:10-15.

99.    *Anderson's* method of inputting an access code uses a "digitizer pad 120 as a touch interface," which may "include an optical scanner or thermal sensor for collecting an image of the user's fingerprint…." *Anderson,* 5:43-44, 7:4-7. The user then enters the access code "as a series of pressure pulses having varying durations." *Anderson,* 6:45-47. This fingerprint access code is then compared with the "stored code template" to determine a "match" to enable the desired function. *Anderson,* 6:48-54. *Anderson* teaches two different access code applications: one where both the pressure of each press and the duration of each press is detected (Fig. 4A), and another where only the duration of each press is detected (Fig. 4B). *Anderson,* 7:28-39. *Anderson* discloses that in the second option, the "access code would be entered as a series of alternating pressure applications of varying duration" where the touch interface "may only sense temporal applications of pressure" and

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

"not detect variations in pressure magnitude or intensity." *Anderson,* 7:28-34. In contrast, in the first "the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity." *Anderson,* 7:34-37.

100.   Figures 4A and 4B below show the touch interface detecting both the duration and pressure applied with each press (FIG. 4B), or the touch interface detecting only the duration of each press (FIG. 4A).



FIG. 4A



FIG. 4B

*Anderson,* FIGs. 4A and 4B. Below, I have annotated the figures to provide further context. In FIG. 4A, the height of each bar the same because the magnitude or intensity of the finger pressure press is not detected. However, at least some of the presses have a different duration than other presses, as represented by the width of each bar.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208



FIG. 4A

101. In contrast, FIG. 4B illustrates variations in both the amount of pressure applied using the height of each bar and the duration of the applied pressure using the width of each bar.



FIG. 4B

*Anderson*, FIG. 4A, FIG. 4B (illustrating variations in both pressure magnitude and duration), 7:34-39, 7:11-27.

102. A POSITA would have understood *Anderson* and the '208 Patent describe methods pertaining to the same field of endeavor, namely providing authorized users with access. *Anderson* (Ex. 1006), Abstract ("The method facilitates the input of access codes" to allow only authorized users to gain access "to a system or function"); *'208 Patent* (Ex. 1001), 3:12-14 ("a method for providing

secure access….”). Furthermore, both *Anderson* and the '208 Patent employ a biometric sensor that the users to provide an input in order to gain access. *Anderson*, 7:4-11 (disclosing the digitizer pad on the touch interface "may include an optical scanner…for **collecting an image of the user's fingerprint** as the pressure access code is entered and **verified against a stored fingerprint template**. Verification of both the collected fingerprint image and the access code may then be required before the **user is allowed access to the system or information**."); *'208 Patent,* 5:56-65 (describing the biometric sensor 121 may be "a fingerprint sensor" and a user requests access via "a thumb press on the biometric sensor panel 121"). Both *Anderson* and the '208 Patent are also concerned with providing a user with improved security when accessing a computer. *Anderson,* 1:65-2:3 (disclosing the method of inputting the access code is used to "reduce the possibility that the access code may be stolen and used for unauthorized access to a system or information by undesired third parties," with such a system being an "information handling system"); *'208 Patent*, 1:55-64 (generally describing the problem to be solved as keeping unauthorized users from easily obtaining access), *see also* 6:13-16 (describing such access may be provided to "a personal computer (PC) that is to be accessed by the user 101").

103. Additionally, similar to the '208 Patent describing inputting a series of "successive presses…of appropriate duration" to control the device, *Anderson*

teaches inputting a series of pressure applications of varying durations to invoke certain functions within the information handling-system. *'208 Patent,* 10:45-56; *Anderson,* 6:45-54. Thus, a POSITA would have understood *Anderson's* method to be in the same field of endeavor and provide similar advantages as the '208 Patent.

### E.    Brief Overview of the Opinions on the '208 Patent

104.    The following sections provide my detailed opinions on the '208 Patent and the respective claims mappings presented in the concurrently-filed '208 Petition.

105.    The independent claims of the '208 Patent generally comprise three concepts combined into a single access system or method of providing access: (1) storing a user's fingerprints in a database when an instruction formed by a series of fingerprints (of a certain number and each of certain duration) is received; (2) generating and transmitting a secure access signal; and (3) providing a certain type of access based on the information contained in the secure access signal. Additionally, to perform these steps, the specification of the '208 describes hardware, such as a transmitter, receiver, processor/controller, and biometric sensor, as well as certain security protocols to make the access signal "secure," such as Bluetooth or rolling code. These hardware components and wireless security protocols for performing such steps were well-known, developed, and documented prior to the priority date of the '208 Patent, as discussed above in my Background of the Technology Section.

106.    As I discuss below, each of these concepts and technologies was known in the art. *Mathiassen*, for example, teaches a secure access system comprising a central IC 1 connected to a fingerprint sensor 5 that includes a processor 2 as well as other components for encrypting an access signal using a changing password to make the signal secure. *Mathiassen* (Ex. 1004)*, [0050]. In one embodiment, the secure access system is a "central locking system" with an IC 1 contained in a remote portable door control 20, which transmits a secure access signal to "open (or lock) the car doors." *Mathiassen,* [0145], [0176-0188]. *McKeeth* teaches providing other types of access in a biometric access system, such as providing access but issuing a silent alert when recognizing a user is under duress or denying access and issuing a security alert to authorities. *McKeeth* (Ex. 1005)*, 4:28-42 (disclosing duress condition), 5:48-53 (disclosing alert condition). As I discuss in detail for the individual limitations, a POSITA would have found it obvious and been motivated to combine the teachings of *McKeeth* into the system of *Mathiassen* to result in increased safety of the user and higher levels of security than is taught by *Mathiassen* alone.

107.    Furthermore, the portable door control 20 of *Mathiassen* also senses finger movements or sequences of touch/no touch to instruct certain commands to operate the system. *Mathiassen,* [0192]. *Anderson* teaches providing an access code comprising a series of presses of a particular duration on a fingerprint sensor to

authorize the user and invoke a certain function. *Anderson* (Ex. 1006)*,* 7:4-11, 7:28-34, 7:40-47. As I discuss in detail for the individual limitations, a POSITA would have found it obvious and been motivated to combine the teachings of *Anderson* into *Mathiassen* to result in easier and simpler user command input on the sensor of the portable door control taught by *Mathiassen.*

108.   Additionally, *Mathiassen* teaches storing new users' fingerprints on the portable door control 20 by an administrator (or car owner) placing their finger on the sensor to initiate enrollment. *Mathiassen,* [0163-0166], [0190], [0131] (disclosing enrolling new users via input of an administrator's fingerprint in a different medicine cabinet embodiment). A POSITA would have found it obvious, upon these teachings, to enroll a new user in the portable door control 20 of the combined *Mathiassen-Anderson* system based on a series of pressure pulses correlating to an instruction to enroll.

109.   Notably, each of the references discussed above is directed to a biometric access system for authorizing access of a user when providing a fingerprint, leading a POSITA to a conclusion that the references would have been appropriate and beneficial for combination, with a reasonable expectation of success. *Mathiassen* (Ex. 1004)*,* [0018]; *McKeeth* (Ex. 1005)*,* Abstract, 3:8-10; *Anderson* (Ex. 1006)*,* 7:4-11.

110. A detailed discussion of my opinions is in the following sections. A summary of the mappings for each of these references to the claim language of the '208 Patent is provided in Appendix C. These appendices are not intended to be exhaustive and merely provide an overview or summary of the sections of the respective references teaching the respective claim limitations.

## VII. GROUND 1: OPINIONS REGARDING THE COMBINATION OF *MATHIASSEN*, *MCKEETH*, AND *ANDERSON*

### A. Claim 10

#### 1. Claim 10(Pre1): "A method for providing secure access to a controlled item in a system comprising"

111. *Mathiassen* expressly teaches "a method of providing **secure access control** and user input in stand-alone appliances." *Mathiassen* (Ex. 1004)*,* Abstract, [0023]. Examples of such stand-alone appliances disclosed in *Mathiassen* include hotel safes, medicine cabinets, and automobiles among others. *Mathiassen,* [0108-0113]. Specifically, *Mathiassen* discloses a portable remote door control 20 for unlocking car doors as part of a vehicle security system. *Mathiassen,* [0145], [0147], claim 23. The disclosed method uses "[a] portable access device…for allowing only authorized users access to, an access-limited apparatus, device, network or system…." *Mathiassen,* [0016], Abstract. The listed "stand-alone appliances" are some of the "access-limited" devices disclosed in *Mathiassen,* with each access-

limited item disclosed being a "controlled item," as claimed, because "only authorized users" may access them. *Mathiassen,* [0047].

112.  *Mathiassen's* disclosed method thus provides "secure access control" to these items because the access is controlled or otherwise secured, such that only authorized persons are granted access. *Mathiassen,* [0047]. *Mathiassen's* method aims to improve security in certain embodiments such as "car systems for the automotive industry," where "secure access by blocking non-authorized users access to the car" is emphasized. *Mathiassen,* [0145]. This method also provides the benefit of improved security because "the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some token." *Mathiassen,* [0190]. In this way, if the "portable access device" is lost, an individual who finds the item cannot easily access the item (i.e., car). Additionally, the access provided by *Mathiassen's* method "does not require a transfer of biometrics fingerprint information over otherwise open and insecure parts of communications systems." *Mathiassen,* [0020]. Based on these collective teachings, it is my opinion *Mathiassen* teaches "a method for providing secure access to a controlled item," as claimed.

113.  *Mathiassen* teaches a "system," as claimed, for providing such a method of "secure access control" that comprises several components. *Mathiassen,* Abstract. Generally, control of each "access-limited" device occurs via an integrated

circuit (IC) 1, with this component being "the core device of the invention." *Mathiassen,* [0048]. The IC 1 connects to a "biometrics sensor in the form of a fingerprint sensor (5)" to perform the method of secure access control. *Mathiassen,* [0049-0051], FIGs. 2A-2B. This disclosed IC with connection to fingerprint sensor 5 is the same IC 1 residing in the portable door control 20 implemented in the vehicle security embodiment, as *Mathiassen* teaches the same IC being used in each of the disclosed embodiments. *Mathiassen,* [0048] (referring to IC 1 being a core device "of the invention"). The IC 1 includes a central processor 2 and non-volatile memory 7,7A,7E as well as an additional pre-processing block 5C for processing images from the fingerprint sensor and "hardware blocks (8 or 8B or 8C)" for encrypting transactions to generate "secure communication between the IC (1) and a network server (30)." *Mathiassen,* [0049-0050]. *Mathiassen* notes that the IC 1 is "designed as a multi-purpose tool that can service a fingerprint sensor (5) in a stand-alone mode," with such stand-alone applications including "applications within a local network e.g. within a car." *Mathiassen,* [0051], [0108].

114.    One such stand-alone application taught by *Mathiassen* is the portable door control 20 used in a system providing vehicle security. *Mathiassen,* [0145, 0147]. In this embodiment, the system includes the IC 1 connected to the fingerprint sensor 5 and additionally connected to a "wireless 2-way transceiver (27)," all

housed inside the portable control 20. *Mathiassen,* [0147]. Figure 8 below illustrates

the components of the portable door control 20.



Figure 8

115.    The system also contains an ignition control 15 with its own IC 1

residing in the gear stick 71 or steering wheel 72 of the car. *Mathiassen,* [0148],

[0187] (describing the "resident IC 1" on the ignition control 15). Both the ignition

control 15 and portable control 20 are connected to a central car computer, with the

ignition control 15 connected via hard wires and the portable door control 20

connected via transceivers in the central car computer and the portable door control

20. *Mathiassen,* [0149], [0186] (describing the central car computer contains

transceivers). Additionally, the central car computer contains a transceiver 27 to

receive the "open door" command from the portable door control 20 [0186] and

"relay" (i.e., transmit) the re-encrypted "open door" command, after performing decryption and authentication, to transceivers on the door locks [0187]. The car door locks are also disclosed as part of this system and contain their own transceivers for communication with the central car computer and portable door control 20. *Mathiassen,* [0186-0187].

116.    As I noted above, *Mathiassen* discloses several embodiments for its access device, including a USB dongle and the portable remote door control 20. My discussion of how *Mathiassen* teaches certain claim elements of present patent primarily relies on *Mathiassen's* vehicle security system embodiment using the portable door control 20. *Mathiassen,* [0145]. In this embodiment, the claimed "controlled item" is each car door lock of the "central locking system," with the portable door control 20 "controlling" this item because it serves as the "keys to the doors of the car," thus controlling access to the car doors. *Id. Mathiassen's* IC 1 is used in all the embodiments of the system, including the car door lock embodiment, because the disclosed portable door control 20 contains the IC 1 that is illustrated in Fig. 2B. *Mathiassen,* [0146] ("**The automotive application of the invention will be explained by reference to FIGS. 2B**, 8 and 9," with FIG. 2B illustrating the IC 1). The mapping for which I provide this opinion additionally relies on other embodiments of *Mathiassen's* secure access control system, and in these cases I

provide motivations to combine these internal embodiments into the portable door control 20 embodiment for vehicles.

### 2.      Claim 10(Pre2): "a database of biometric signatures"

117.   I apply the construction of "database" to mean an "organized structure of data." *See* Section III.B.1. *Mathiassen* teaches storing fingerprint representations in master minutiae tables residing in non-volatile memory 7A/7B of the IC 1. *Mathiassen* (Ex. 1004), [0050]. As the portable door control 20 contains the IC 1, these master minutiae tables of fingerprint representations are stored in non-volatile memory 7A/7B of the portable door control 20. *Mathiassen,* [0174] (describing the master minutiae tables of the owner's fingerprint are stored in "the IC (1) of both the portable door control (20) and the embedded ignition control (15)"). *Mathiassen* teaches that one or more minutiae tables may be stored for a single user. *Mathiassen,* [0164] (describing "master minutiae tables" being stored when a car owner enrolls "**one or more of his fingers on the portable door control unit (20)**.") The figure below annotates where the non-volatile memory storing the master minutiae tables reside on the IC 1:

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208



*Mathiassen* at FIG. 2B.

118. Specifically, to store fingerprint representations in these master minutiae tables stored in memory 7A/7B, the "image capture and pre-processing block (5C)" of the IC 1 captures images of the user's fingerprint when presented on the sensor and processes "the captured raw images to…intermediate fingerprint data." *Mathiassen,* [0049-0050]. The processor then reduces the intermediate fingerprint data to "compact fingerprint representations, called minutiae," which are then stored in non-volatile memory. *Id.* This same process is applied by the IC 1 in

IPR2022-00601
Apple EX1003 Page 86

**Appx1120**

the portable door control 20 when an owner (or other user) enrolls their fingerprints. *Mathiassen,* [0162-0164] (describing storing a car owner's fingerprint "involves successful capturing of a minimum of images (say three) **reduced to master minutiae tables by the pre-processing block (50C) and the central processor (2) of the IC (1) on the portable device (20),**" with the master minutiae tables "stored in the non-volatile memory (7A) of the IC (1)"), [0190] (disclosing that the owner "may have enrolled" other users in addition to enrolling their own fingerprints on the portable door control 20).

119.   As discussed above at ¶ 43, it was well-known to reduce fingerprints to minutiae data prior to storage and that this minutiae uniquely identified each individual by including data indicating the ridge and bifurcation patterns of a person's fingerprint. *See also, Mathiassen* [0050] (describing minutiae as "**distinct points where fingerprint lines (ridges) starts or stops**…"). This minutiae data is unique because every person's fingerprints are unique, as **"no one has ever been found who has a sequence of ridge detail on the hands and feet that is identical to the ridge detail of any other person."** *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012) at 3; *see also, Mathiassen,* [0005] (stating **"fingerprints"** were known to serve as **"some sort of secure identification by biometrics"**). Furthermore, stored fingerprint representations were known to be defined as "biometric signatures." *See,*

¶ 44, *specifically, An Introduction to Evaluating Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1013) at 56 (describing the process of biometric identification via a fingerprint including comparing the newly presented print "**with a database of biometric signatures of known individuals**"). Thus, a POSITA would have understood the minutiae stored in *Mathiassen's* master minutiae tables serves as "biometric signatures," as claimed, because the minutiae identify users via their unique fingerprint representation.

120. Furthermore, the '208 Patent does not further define the term "biometric signatures," except to state that a user's "thumb press on the biometric sensor" authenticates the user by comparing this "request" to the database of biometric signatures. *'208 Patent* (Ex. 1001), 5:61-65 ("Thus for example if the request 102 is the **thumb press on the biometric sensor** panel 121 **then the user database 105 contains biometric signatures for authorized users against which the request 102 can be authenticated**"). This description of the "biometric signatures" would have additionally led a POSITA to understand these "biometric signatures" included some representation of a user's fingerprint. Thus, a POSITA would have understood *Mathiassen's* master minutiae tables comprise "biometric signatures," namely minutiae, because the minutiae represent users' fingerprints. *Mathiassen* (Ex. 1004), [0050] ("Access to such extended encryption will be given

to the user pending a positive match of his fingerprint with an authorized **fingerprint representation by compact minutiae tables**, **pre-stored in the non-volatile memory** (7, 7A or 7C).").

121.    A POSITA would have understood these master minutiae tables containing the minutiae (i.e., biometric signatures) and stored in memory 7,7A are a "database," as claimed, or otherwise renders such obvious. Tables are a well-known "structure" used for organizing data. Thus, when *Mathiassen* discloses master minutiae **tables** containing minutiae (i.e., biometric signatures), a POSITA would have understood or found it obvious that these tables are a database of biometric signatures, i.e., organized structure of data, specifically, biometric signatures.

> **3.    Claim 10(Pre3): "a transmitter subsystem comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal capable of granting more than two types of access to the controlled item"**

> **a)    "transmitter subsystem"**

122.    *Mathiassen* teaches a "transmitter subsystem," as claimed. Specifically, transceiver 27, fingerprint sensor 5, the IC 1 that contains processor 2 and non-volatile memory 7,7A included in portable door control 20 are collectively a "transmitter subsystem." *Mathiassen* (Ex. 1004), [0147] (disclosing the "door control, being a portable device (20)"). The portable door control 20 contains "**a**

**fingerprint sensor (5)** coupled to a miniature printed circuit board (21) on **which is mounted the IC (1)**" and "equipped **with a wireless 2-way transceiver (27)**." *Id.*

123.   A POSITA would have understood the transceiver 27 of the portable door control 20 to include a "transmitter," as transceivers were defined as "a device that can **both transmit** and receive signals," thus indicating to a POSITA that the transceiver 27 serves as a transmitter. *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 at 527 (Ex. 1045) ("short for **transmitter/receiver. A device that can both transmit** and receive **signals**."). The figure below shows the portable door control 20 with certain components annotated.



*Mathiassen,* Fig. 8 (with transceiver 27 annotated in green and fingerprint sensor 5 annotated in orange).

124.   As discussed above at Claim 10(Pre1), the IC 1 in the portable door control includes a processor 2 and connection to the fingerprint sensor 5, as well as

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

memory 7,7A. *Mathiassen,* [0050]. The figure below illustrates the components of

the IC 1 contained in the portable door control 20, with the processor 2, memory,

and connection to the fingerprint sensor 5 annotated:



*Mathiassen,* Figs. 8, 2B (annotated to show IC 1 of portable door control containing

processor 2, memory, and connection to fingerprint sensor 5). Additionally,

*Mathiassen* teaches "program code, e.g., administrative code" that is stored in non-

volatile memory 7/7A and that is "run on central processor (2)" of the IC 1.

*Mathiassen,* [0050]; *see* Section III.B.3, above. Thus, the processor 2 in the portable

door control executes the administrative code stored in memory 7/7A.

125.   The transceiver 27, fingerprint sensor 5, IC 1 including the processor 2

executing code and memory 7,7A form a "transmitter subsystem" in the portable

door control 20, as claimed, because the components work together to transmit a

signal to a receiver (or receiver subsystem). More specifically, the processor 2 of the IC 1 contained in the portable door control 20 executes code that instructs the issue of an "open door" command that is "**wirelessly transmitted by the transceiver (27) from the portable door control (20)**" to the ignition control 15 or central car computer. *Mathiassen,* [0185-0188].

### b)     "biometric sensor for receiving a biometric signal"

126.    As stated above at ¶¶ 45-50, a "biometric sensor" was well-known in the art to include a sensor for reading fingerprints. Thus, *Mathiassen's* disclosed fingerprint sensor 5 is a "biometric sensor," as claimed.

127.    Under the applied construction of a "biometric signal" being "a physical attribute of a user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)," *Mathiassen* teaches the biometric sensor (i.e., fingerprint sensor 5) receiving a "biometric signal" (i.e., fingerprint). *Mathiassen* teaches that "**When a finger is detected on the sensor (5) surface**," the pre-processing block 5C then processes "**the captured raw images to an intermediate stage of significantly compressed information**, i.e. a dataset of reduced size, **denoted intermediate fingerprint data**." *Mathiassen,* [0049-0050], [0178]. Thus, a POSITA would have understood either these "captured raw images" or the "intermediate fingerprint data" from the fingerprint received by the biometric sensor (fingerprint sensor 5) are biometric signals of the user's biometric, because they include "information" representing the

fingerprint. Therefore, *Mathiassen* teaches a biometric sensor for receiving a biometric signal, namely a fingerprint sensor 5 for receiving a fingerprint and processing said fingerprint into captured images or intermediate fingerprint data.

### c)  "means for emitting a secure access signal"

128.  I note that though the Claim 10 construction for "means for emitting a secure access signal" does not rely on support from the '208 Patent describing how the access signal is "secure" (*see* Section III.B.2), I describe such support in my discussion to explain how *Mathiassen* teaches the claimed "secure access signal." An exemplary secure access signal described in the '208 Patent is a rolling code. *'208 Patent* (Ex. 1001), 6:2-5 ("The controller 107 then updates the code and **sends the updated code, this being referred to as an access signal**, as depicted by an arrow 108 to a controller 109."). The system described in the '208 Patent allegedly improves upon prior access systems by encrypting wirelessly transmitted signals with codes hiding the original signal content from unauthorized individuals. *'208 Patent*, 1:48-64, 6:2-5, 6:35-41. Different encryption protocols including Bluetooth, WiFi, or a rolling code are described for securing the access signal. *Id.* at 6:28-34.

129.  Regarding the described rolling code in the '208 Patent, the rolling code protocol "uses a different code variant each time the transmission of the access signal 108 occurs," with this code variation "achieved by **encrypting the data from the controller 107 with a mathematical algorithm**." *'208 Patent*, 6:42-48. The rolling

code protocol thus generates "a non-repeatable data transfer" and "reduces the likelihood that an intruder can access the information replay the information to thereby gain entry…." *'208 Patent,* 6:48-54.

130.    As stated above at ¶¶ 56-59, the rolling code protocol was already well-known and commonly implemented in access systems including garage door openers, remote keyless entry for vehicles, etc. and even used in biometric authorization systems for transmitting access signals. In my opinion, a POSITA would have understood a rolling code protocol to include an algorithm that generated a different code every time a signal was sent, with the receiver knowing the unique algorithm that varies the code each time so that it can correctly match the code on the receiver side. *See,* ¶ 56, *specifically, A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code,"* Ross Tester, Silicon Chip.com.au, July 2002 (Ex. 1026) at 23. Thus, in a single use, the rolling code protocol would generate a single random code that was used when sending a signal that was then matched to a code generated by the same encryption algorithm on the receiver end. The varying nature of the "rolling code" assigned to each transmitted signal was known to decrease the likelihood of someone repeating the coded signal and gaining unauthorized access. *Id.* (describing the rolling code protocol "gives almost total peace-of-mind" to the user that their access is protected). Thus, a

POSITA would have understood the claimed "secure access signal" is a single use signal that is non-repeatable, non-replayable, and encrypted.

131.    As discussed above at Section III.B.2, the structure for performing the function of "emitting a secure access signal" includes computer program product having a computer readable medium having a computer program recorded therein, with code. In my opinion, *Mathiassen's* administrative code executed by processor 2 and controlling operation of transceiver 27 in the portable door control 20 satisfies the claimed "means for emitting." I note that administrative code in non-volatile memory 7/7A, the processor 2, and transceiver 27 are part of the mapped "transmitter sub-system." *Mathiassen* (Ex. 1004), [0050], Fig. 2B.



*Mathiassen,* Fig. 2B.

132.   *Mathiassen's* processor 2 and transceiver 27 together emit a "secure access signal," as claimed, via an encrypted command like an "open door" command, which is used for a single access request. *Mathiassen,* [0182-0188], [0050]. A POSITA would have understood *Mathiassen's* encrypted door command is a "signal," because it is electrically "issued" to other hardware components such as the encryption block 8B or 8C and it signals the encryption block 8B or 8C to initiate encryption. *Mathiassen,* [0186] ("The **processor will issue the "open door" command to the encryption block (8B or 8C) that in turn will encrypt it**"). Furthermore, the encrypted open door command is transmitted via transceiver 27 between electronic components, thus indicating to a POSITA that the encrypted "open door" command is a signal. Additionally, because *Mathiassen* teaches the executed administrative code causes a "secure communication," in my opinion a POSITA would have understood or found obvious that *Mathiassen's* administrative code directs the processor 2 to issue the "open door" command and the transceiver 27 to transmit the encrypted command (i.e., the secure communication). *Mathiassen,* [0050].

133.   In my opinion, the encrypted open door command is an ***access*** signal, as claimed, as the command instructs a type of access based on matching the user's biometric signature to a stored biometric signature. Specifically, when the "processor (2) establishes a match between the access attempt and one of the resident

master minutiae tables," the processor 2 (of the IC 1) instructs the SKG block 8A to "generate a valid, and temporary, password" via a seed passed to the SKG block. *Mathiassen,* [0182-0184], [0050]. The "match" refers to a match between the presented minutiae or live fingerprint representations and the stored master minutiae in the master minutiae tables. *Id.* at [0182]. I also note that a POSITA would have understood *Mathiassen's* administrative software includes code for generating and emitting the secure access signal. *Mathiassen* discusses earlier that the administrative software "calculate[s] a secure key" [0076], indicating that the SKG algorithm for generating the secure access signal is "embedded" in the administrative software. *Id.* at [0050] ("The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2)…."). The temporary password is input to the encryption block 8A/8C and the processor 2 issues an "open door" command, with this command encrypted "based on the valid, and temporary password from the SKG block (8A)." *Mathiassen,* [0185], [0050]. The transceiver 27 in the portable door control 20 then wirelessly transmits the encrypted "open door" command to a transceiver at the central car computer. *Mathiassen,* [0186]. After the signal is transmitted to the central car computer, either (1) the central car computer performs decryption and relays the "open door" command to transceivers in the door locks [0188], or (2) the central car computer sends the encrypted "open door" command

to the ignition control via wired connection so that ignition control 15 may decrypt the "open door" command [0187]. In the second scenario, the ignition control then sends the "similarly encrypted command" via wire back to the central car computer that relays the command to transceivers in the door locks. *Mathiassen,* [0187]. As discussed above at Claim 10(Pre1), the central car computer includes a transceiver 27, *see Mathiassen,* [0149], [0186].

134. In my opinion, the encrypted open door command is also a **secure** access signal, as claimed. To help explain why the transmitted open door command is secure, I will first explain how *Mathiassen* operates to transmit the open door command, receive the open door command, and open/lock the car door locks.

135. Upon the open door command being transmitted from the portable door control, the processor 2 on the resident IC of the ignition control 15 decrypts the received command by fetching a seed from its own memory 7A and entering the seed into the SKG block to generate "the **identical, and temporary** password fed on to the encryption block (8B or 8C)." *Mathiassen,* [0187].  A command to open car door locks is then sent from the wired connection to the central car computer and to the transceiver of the door locks via the central car computer's transceiver if "the decrypted message confirms a valid and authenticated 'open door' command was sent." *Id.*

136. As an aside, I note that in the first scenario of the central car computer performing "the decryption and authentication algorithms" instead of the ignition control 15. A POSITA would have understood the central car computer to include an IC in order to carry out and store the disclosed algorithms. *Mathiassen,* [0188]. Furthermore, in this implementation, the central car computer would also act as a "receiver" that received the encrypted "open door" command and performed the decryption and authentication.

137. In disclosing the encryption and decryption process carried out by the IC 1, *Mathiassen* teaches the SKG algorithms for generating the same temporary password must be identical in both the transmitter subsystem, i.e., the IC 1 of portable door control 20, and on the receiver end, such as the IC 1 in the central car computer or ignition control 15. *Mathiassen,* [0050] ("If the same SKG algorithm is run on two separate computers (e.g. a server (30) **and the central processor (2) on the IC (1)**) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed."), [0187-0188]. A POSITA would have understood the two "computers" of the car embodiment to be the IC 1 containing processor 2 in the portable door control 20 and the IC containing processor 2 in the central car computer or ignition control 15, and therefore the algorithms in the IC 1 of each are identical in order to produce the "identical, and temporary password." *Mathiassen,* [0187]. Furthermore, *Mathiassen* also teaches

that this SKG algorithm used to generate the secure "key" or password "may be constructed to produce a **pseudo-random identical key on both computers** (2 and 30) that is either valid for a time frame**, or alternatively changes for each transaction**." *Mathiassen,* [0050]. In the car embodiment, transmitting a single "open door" command from the portable door control 20 to the ignition control 15 or central car computer for decryption serves as a single "transaction."

138.  Thus, because *Mathiassen* teaches that the key or password used to encrypt and decrypt a single transaction "changes for each transaction," the encrypted command is non-repeatable and non-replayable. Additionally, *Mathiassen's* description of the encryption/decryption process having the same algorithm match between the transmitting system and the receiver as well as the password generated changing from transaction to transaction mirrors the definition of a rolling code as well-known in the art prior to August 13, 2003. *See,* ¶ 56. Therefore, *Mathiassen* teaches administrative code containing the SKG algorithm instructs the processor 2 and transceiver 27 to emit a "secure access signal," as claimed.

> **d)**    **"capable of providing more than two types of access to the controlled item"**

139.  As discussed above, *Mathiassen* teaches the secure access signal (i.e., the encrypted command transmitted from the transceiver 27 of portable door control

20), provides one type of access, namely opening the car door locks when the presented fingerprint matches one of the car owner's/administrator's stored master minutiae. In related art, *McKeeth* teaches this plus two other types of access: (1) providing a user duress access wherein access is granted while a silent alarm is additionally generated; and (2) not providing any access and generating an alert. As I discuss below, a POSITA would have found it obvious to modify *Mathiassen's* portable door control for car door locks to similarly provide *McKeeth's* duress and alert access, and thus provide "more than two types of access to the controlled item," as claimed.

### (1)    Discussion of the '208 Patent

140.  I first note the '208 Patent describes a similar portable control as disclosed in *Mathiassen*. The '208 Patent describes the transmitter sub-system 116 being "incorporated into a **remote fob (which is a small portable device carried by the user 101)**" for transmitting the access signal 108 (claimed "secure access signal") "**via the wireless communication channel**" to the receiver sub-system 117. *'208 Patent* (Ex. 1001)*,* 6:40-41 (describing the "key fob (transmitter) sub-system 116), 6:58-65.

141.  The '208 Patent describes the remote key fob transmitter sub-system transmits an "access signal 108" when the key fob "authenticates the user" through their presented fingerprint. *'208 Patent,* 7:21-36 ("Once the key fob authenticates

the user through biometric signature (e.g. fingerprint) verification, the rolling code in the access signal 108 is transmitted to the controller for authorisation of the user for that location at that time."). The user is then authorized to access the "controlled item," which the '208 Patent describes "can be a **door locking mechanism on a secure door**." *'208 Patent,* 6:13-16. Thus, the user is provided a type of access to a door locking mechanism after they are authenticated.

142. Additionally, the '208 Patent describes "unconditional access." *'208 Patent*, 8:17-21. The '208 Patent does not describe what is meant by "unconditional access," but in my opinion, a reasonable understanding would be that unconditional access is access without any conditions, e.g., simply grant access but without a duress condition. The '208 Patent also describes a system administrator that may enroll other users. *'208 Patent*, 10:16-34. The '208 Patent describes that the first user is automatically categorized as the administrator. *Id.* The '208 Patent also differentiates between classes of users, such as administrators, ordinary users, and duress users. *Id.*

143. The '208 Patent also describes a "duress" type of access where a requesting user is granted access "but with activation of an alert tone to advise authorities of the duress situation." *'208 Patent,* 8:21-23. Specifically, the '208 Patent describes a user providing an input that indicates "that the user 101 is in a coercive situation where, for example, an armed criminal is forcing the user 101" to

access the controlled item. *'208 Patent,* 11:32-37. Furthermore, the '208 Patent describes this duress type of access may "overlap" with other types of access provided to a user, such as an administrator having an input indicating duress stored in the biometric signature database in addition to a regular administrator signature indicating the user requesting normal access. *'208 Patent,* 10:38-44 (describing that a single person, such as an "administrator," can enroll multiple fingers for providing different levels of access (i.e., administrative access or ordinary user access)). Thus, based on the '208 Patent describing a person enrolling multiple fingers and describing an administrator may have a biometric signature saved for indicating they are under duress, it is my opinion that this duress access is provided to any type of user (administrator or ordinary user) when they provide an input that indicates they are under duress (i.e., scan a fingerprint of a different finger).

144.   The '208 Patent describes another type of "access to the controlled item" as "sounding a chime indicating that an **unauthorized**…person is seeking access." *'208 Patent,* 8:17-19, 23-25. Additionally, this type of access is described as "(a) **not to provide access to the controlled item 111**, and (b) **to provide an alert tone**, **like ringing a chime or a bell** (not shown), **to alert personnel in the vicinity…that an unauthorized user is attempting to gain access to the controlled item 111**." *'208 Patent,* 12:15-21. Therefore, one type of "access" described in the '208 Patent is *not* granting access.

#### (2)  *Mathiassen's* Teachings

145.   Turning first to the claimed "means for," *Mathiassen's* processor and transceiver collectively transmit an open door command, via executing administrative code, that provides a type of access. A user (e.g., car owner) initially provides their fingerprint to the sensor 5 on the portable door control 20. *Mathiassen* (Ex. 1004)*,* [0176]. If the processor 2 on the IC 1 of the portable control 20 determines a match between the presented fingerprint minutiae and the stored minutiae in the tables of memory 7/7A [0180-0182], then the processor 2 of the IC 1 in the portable door control 20 issues an "open door" command to be encrypted by the encryption block 8B or 8C (using the SKG algorithm in administrative code) also resident on the IC 1, with the transceiver 27 of portable door control then transmitting the encrypted command (the claimed "secure access signal") to the central car computer via transceiver 27 of the portable control 20. *Mathiassen,* [0185-0186] ("The **encrypted 'open door' command** will then be **wirelessly transmitted by the transceiver (27) from the portable door control (20) to the embedded ignition control (15) <u>via the transceivers</u>** of the door locks **<u>and the central car computer</u>**."). The ignition control 15 then decrypts the encrypted command, with a "similar encrypted command" then "relayed to the door locks by the car computer." *Mathiassen,* [0187]. Additionally, *Mathiassen* teaches that the "decryption and authentication algorithms may be performed on the central car

computer instead of the embedded ignition control," thus indicating, in both implementations, that the transceiver of the central car computer receives the command from the portable door control 20 and either passes it along to the ignition control 15 or decrypts the signal. *Mathiassen,* [0188]. *Mathiassen* teaches this portable door control 20 is "**a portable device (20)**" as well as being a "**remote control (20)**." *Mathiassen,* [0147]. Thus, *Mathiassen's* wireless transmission of the encrypted command (i.e., "secure access signal") from the remote portable control 20 to the central car computer via transceivers is similar to the key fob embodiment described in the '208 Patent for wirelessly transmitting the secure access signal to the receiver sub-system. *Mathiassen* thus teaches the claimed "means for," namely the administrative code executed by processor 2 and directing the transceiver 27 of the portable door control 20 providing a type of access.

146.   Turning to the claimed "types of access," *Mathiassen's* portable door control 20 authenticates a user's presented fingerprint by matching it with stored minutiae in the master minutiae tables and transmits an encrypted "open door" command to open the car door locks, thus providing a user access to the "central locking system." *Mathiassen,* [0145]. Thus, because *Mathiassen* teaches providing access to the "controlled item" (i.e., car door locks of central locking system) by opening door locks, a POSITA would have understood *Mathiassen* to teach a "type of access," as claimed.

147.  *Mathiassen* teaches a type of access similar to the access described in the '208 Patent. *Mathiassen* teaches "the first user to be enrolled [is] the system administrator of the biometrics system in the car" and "becomes the 'owner' of the car." *Mathiassen,* [0162-0164]. Because *Mathiassen* teaches the car owner is provided access to the "central locking system" by opening the car door locks and teaches that the first stored minutiae tables belong to the owner, a POSITA would have understood *Mathiassen's* "open door" command provides access to a system administrator when the car owner presented their fingerprint. The fingerprint of the enrolled first user of the car ("the system administrator of the biometrics system in the car") results in a condition of access, i.e., access is granted, such that the open door command issued in response to matching the car owner's fingerprint instructs the portable control's processor to "proceed to open (or lock) the car doors." *Mathiassen*, [0181-0182]. Therefore, *Mathiassen* teaches a secure access signal capable of providing one type of access, namely of opening the car door locks to a user, such as a system administrator.

### (3)    *McKeeth's* Teachings

148.  In related art, *McKeeth* teaches granting different types of access, such as access under duress or an alert access. *McKeeth* teaches a "system for authenticating a user to access a computer system," with different types of access provided by "considering the possibility of the user being legitimate but subject to

duress or force." *McKeeth* (Ex. 1005)*, Abstract. Specifically, *McKeeth* teaches authenticating a user to access the computer system by a user providing a "fingerprint scan and/or pattern." *McKeeth,* 3:44-49. In one embodiment, if the user cannot perform a "particular geometric pattern…concurrently with scanning his/her fingerprint," then the computer system 150 "recognizes that while the user may be legitimate, the user's failure to perform the geometric pattern **may be an indication that the user is experiencing duress or force to access the computer system 100.**" *McKeeth,* 4:10-14, 4:29-33. When the system recognizes the user is under duress, it grants "limited access" to the computer system 100 and "concurrently with the limited access, **a silent alert may be issued to security personnel**." *McKeeth,* 4:39-40. Thus, when a user's input indicates to the system that they are under duress, the user is provided a special "duress" type of access including being granted access (though limited) and issuing a security alert. When applied in *Mathiassen's* "central locking system," a POSITA would have understood granting access to the car door locks and setting off a silent alert when the user indicated they were under duress to be a type of access, as I discuss further below.

149. *McKeeth* additionally teaches the failure of a user to perform "the fingerprint scan" concurrently with a "geometric pattern" matching a "stored pattern" causes the computer system to "**lock up the computer system 100 and generate a security alert to the responsible authorities**." *McKeeth,* 5:34-37, 5:48-

53. The computer system 100 locking up the computer would have indicated to a POSITA that the user was denied access, as any electronic or physical lock is known to deny access when it is locked. Furthermore, *McKeeth* teaches that in a "less stringent" embodiment of the authorization system, the computer 100 simply "denies the user's request to access the computer system 100" and "avoids issuing" a security alert. *McKeeth,* 6:52-58, *see also* 5:50-52 (disclosing the computer system 100 may either simply deny access or deny access AND "generate a security alert"). Thus, based on *McKeeth's* teaching of the alert being "more stringent," a POSITA would have understood this response of the computer system 100 to deny access in a more stringent manner by **also** generating a security alert. *McKeeth*, 6:36-40.

150.  Thus, a POSITA would have understood *McKeeth's* denial of access and concurrent issue of a security alert to serve as a "type of access," as claimed, similar to the '208 Patent's described alert access. Thus, when applied in *Mathiassen's* central locking system, a POSITA would have understood denying access to open the car door locks and issuing a security alert is a type of access, as discussed below.

### e)    Motivation to Combine *Mathiassen* and *McKeeth*

151.  As discussed above at Section VI.A.3.c, *Mathiassen* alone teaches the "means for emitting a secure access signal," through administrative code stored in non-volatile memory 7/7A and executed by processor 2 of the IC 1 and transceiver

27, all in the portable door control 20. Furthermore, as discussed above at Section VI.A.3.d, *Mathiassen* teaches the processor 2 and transceiver 27 emit at least one secure access signal via executing administrative code containing SKG algorithm, namely the encrypted "open door" command to unconditionally unlock the car doors. In my opinion, it would have been obvious to modify *Mathiassen's* portable control's administrative code executed by processor and directing transceiver to grant more than two types of access via the secure access signal.

152.    A POSITA would have been motivated and found it obvious to modify the access provided by *Mathiassen's* secure access signal initially issued from the processor 2 and transmitted via the transceiver 27 of the portable door control 20 to include granting access and issuing a silent alert when a user indicated via input that they were under duress and denying access while concurrently issuing an alert, as taught by *McKeeth*, in addition to *Mathiassen's* teaching of unlocking a car door lock based on matching a system administrator's fingerprint.

### (1)    Vehicle Security Was a Known Problem

153.    *Mathiassen's* "central locking system," which is controlled by the portable door control 20, increases the security provided to a car owner by only allowing authorized users to unlock the car doors. *Mathiassen* (Ex. 1004), [0145]. In fact, *Mathiassen* expressly discloses "A **key issue** of the application of the invention to car systems is **the security issue**, **to prevent theft or non-authorized**

**use of the car**." And that this embodiment in particular may be placed anywhere in the car "**where additional access limitation is useful**." *Id.* This disclosure would have indicated to a POSITA that increasing security measures to make car owner's feel safer was a well-known and desirable feature in vehicle security systems, especially considering the "automotive industry **is emphasizing secure access**…" *Id.* Additionally, as stated above at ¶ 45-47, increasing the security of a car owner when accessing their car was well-known as a desirable feature of vehicle security systems implementing biometric authorization. *See, e.g., Gunsch* (Ex. 1014)*,* [0007] ("…this invention **provides security to the owner** by limiting the use of the universal transmitter to **registered users only, through an authorization mechanism**."); *Wuidart* (Ex. 1017)*,* 1:40-51 (describing increasing the security level of a vehicle locking/unlocking system via "a security system can **be associated with its authorized user (or users)** so that **only an authorized user can unlock the doors of the vehicle**."). Thus, a POSITA would have been motivated to further improve the safety of a car owner and security of *Mathiassen's* central locking system by providing other types of access when a user was under duress or denying unauthorized users access and generating a security alert.

### (2)    Duress Access Was Known to Be Desirable

154.   Vehicle security systems were well-known to provide specific types of access when a car owner was under duress or in a dangerous situation, such as

granting access and issuing a silent alert to authorities. *See,* ¶¶ 67-70. For example and as discussed above at ¶ 69, *Kim* teaches a vehicle security system that provides a specific type of access when the user indicates to the system that they are in an "**emergency situation**," such as under force by an intruder to provide the correct "key" for vehicle access. *Kim* (Ex. 1015)*,* [0048]. Upon detecting an "emergency situation" based on the user's input indicating duress, the vehicle security system grants access by controlling the ignition "to drive the vehicle in a normal manner for 20 seconds only, and after 20 seconds" issuing alerts such as blinking lights and honking the horn. *Kim,* [0049]. *Kim* even teaches the security system sending "a rescue message" when an "emergency situation is detected" if the vehicle is equipped with a mobile communication system. *Kim,* [0052]. This access provided when the user indicates they are under duress was considered an "**improved anti-theft of the vehicle**" and prevents carjacking, thus increasing the security of a vehicle security system. *Kim,* [0055].

155.   Another vehicle security system providing a different type of access when a user indicates they are under duress is taught by *Brown*, where the system "**triggers a process by which authorities are notified** and the location of the vehicle may be provided" when a user indicates they are under duress (i.e., "the duress code has been entered"). *Brown* (Ex. 1036)*,* Abstract. Additionally and similar to *Kim's* duress access, *Brown's* vehicle security system initially allowed the

intruder or carjacker to access the vehicle, but then "disabled" the vehicle after a "pre-determined amount of time passing or a pre-determined distance driven," thus providing access while concurrently notifying authorities. *Brown,* Abstract. Furthermore, this notification preferably occurred via a "telephone service" to send a message "**in a silent manner**." *Brown,* 4:20-28, 6:44-64 (describing the user indicating duress to cause the system to place "a **silent telephone call**" to play a "**recorded message to the authorities reporting the theft**," with this telephone call occurring "**without sending any audio signals to the vehicle**").

156. *Zingher* provides yet another example, implementing biometric authorization, where a user's fingerprint of a certain finger corresponds to a "duress identification" and when the system receives a "duress identification" from the user, it initiates "**an emergency response, such as (for example) triggering a silent alarm**." *Zingher* (Ex. 1037)*,* Abstract, [0014], *see also,* [0011] ("The present system and method provides for **discreetly identifying and signaling a user's duress** at an automatic teller machine **or other biometric identification site** (e.g., a building checkpoint or **an automobile**"). Thus, *Zingher's* security system grants access to the user while sending out a silent alert.

157. The above-discussed systems indicate the desirability and prevalence of secure access systems granting various types of access. These systems outlined the advantage of still providing access when a user was under duress and issuing a

silent alert as opposed to flat out denial in order to keep the user safe from the assailant while authorities were notified and came to their aid. *See, e.g., Kim* (Ex. 1015)*, [0048-0049]* (disclosing allowing the "intruder" to enter the car and drive "for 20 seconds only" when a user feels threatened by an "emergency situation"); *Zingher* (Ex. 1037)*, [0009, 0011]* (disclosing providing a duress access to solve the "security problem" of an assailant intimidating the user "**by threat of physical harm**" when accessing their "automobile"); *Brown* (Ex. 1036)*, 1:24-31, 39-46* (disclosing that "disabling a vehicle **during a forcible robbery in the presence of a car owner or operator can be dangerous, since the prolonged contact between the car owner and thief allows the thief to direct violence against the car owners**" and stating this issue as the reason "the vehicle may be entered and driven away" while "**alerting authorities**" when a user indicates to the security system they are under duress).

158. Furthermore, systems for sending a silent alert or silent alarm to authorities in cars for increasing user safety were well-known prior to August 13, 2003, as is seen by the references I describe above disclosing message notifications or silent alerts that are generated and sent to authorities from the vehicles implementing these security systems when a user indicates they are in duress. Furthermore, these silent alerting systems were common-place and commercially placed in vehicles, with one well-known example being the OnStar™ service. The

OnStar™ service was already "standard on some GM vehicles and featured as an option on others" in 2000. *OnStar Features*, OnStar, June 19, 2000 (Ex. 1046). In fact, the service was already "commercially available" by the end of 1999. *DeLine* (Ex. 1047), (22), 6:45-46 ("…an **emergency communication system, such as the ONSTAR™ system commercially available in certain General Motors vehicles**"). The emergency button included in the "three-button system" sent "**a priority call to an OnStar Advisor**" who will "**contact the nearest emergency services providers** who can dispatch ambulance, police, fire or other emergency services **to your location**."

159.    Because systems for silently alerting authorities were well-known to be included in commercial vehicles, a POSITA would have been motivated to implement a similar feature in *Mathiassen's* portable door control 20 for transmitting a secure access signal (as modified by *McKeeth* to indicate a duress type of access) in a car containing such silent alert capabilities and thus used this system, such as OnStar, to silently alert authorities that a user was under duress.

**(3)    Denying Access to Unauthorized Users Was Well Known**

160.    *Mathiassen* additionally teaches the importance of denying access to unauthorized users in the central locking system, stating that "[a] key issue of application of the invention to car systems is…**to prevent theft or non-authorized**

**use of the car**.” *Mathiassen* (Ex. 1004)*,* [0145]. This goal is achieved using *Mathiassen's* portable door control 20 of the central locking system because “the **security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled),** and not in some tokens….” *Mathiassen,* [0190]. As stated above at ¶ 67, one of the advantages of using biometric authorization in an access system over traditional access cards or passwords was preventing any intruder or thief from finding the lost device and gaining unauthorized entry.

161. *Mathiassen's* denial of access does not alert anyone that a theft is in progress or that an unauthorized user is attempting to access the vehicle. Thus, the issue is not entirely resolved, because the car thief or carjacker could find the lost portable door control or steal it, find their request for access fails due to them being unauthorized, and still continue to steal the car by physically jimmying the lock, breaking the car window, etc. even after being denied access. A POSITA would have appreciated that a car owner would therefore desire a more stringent security response of denying access and additionally issuing a security alert so the appropriate people would be alerted of the situation and stop the car thief from further physical break-in attempts after biometric authorization failed. This would have increased the peace-of-mind of the car owner to know that even if the portable door control was lost or stolen, someone would be notified and potentially call the police on the carjacker.

162.    A POSITA would have understood the "security alert," as taught by *McKeeth*, to include various forms of alerting people of the unauthorized access. This would include sounding an alarm, with car alarms very well-known and widely available security measures included in cars that would alert any nearby security personnel or individuals if someone tried to enter a locked car without having the key. As stated above at ¶ 70-72, several vehicle security systems implemented such alarms when denying access to an unauthorized person or recognizing a request was unauthorized. *See, e.g., Colmenarez* (Ex. 1038)*, 7:14-17; Bostrom* (Ex. 1042)*, 10:43-46; Maloney* (Ex. 1043)*, 8:1-3.* Thus, because vehicle security systems for sounding an alarm to alert authorities were well-known to be included in commercial vehicles, a POSITA would have implemented *Mathiassen's* portable door control 20 for transmitting a secure access signal (as modified by *McKeeth* to indicate an alert type of access) in a car containing such a car alarm and sounded the alarm when denying access to an unauthorized user to alert nearby authorities.

163.    Vehicle security systems denying access via locking the car doors and sounding an alarm to notify nearby security personnel were also well-known. For example, the K-9 Car Alarm included a remote transmitter with buttons for invoking certain functions, with one such function named the "remote panic operation" which, when pressed, sounded a siren in the car and additionally locked the vehicle doors to keep a carjacker or thief from entering the car. *K-9 Car Alarm Owner's Guide*

*and Installation Instructions,* K-9 Mundial, Omega Research and Development, 2000 (Ex. 1041) at 7. Thus, denying access to an unauthorized user by automatically locking car doors and issuing an alert (i.e., sounding an alarm) when an unauthorized user attempted access was well-known in the art, and a POSITA would have been motivated to increase the vehicle security provided by *Mathiassen's* central locking system to not only prevent unauthorized users from accessing the vehicle, but additionally sounding a car alarm so the potential break-in would be thwarted.

### (4)   There Would Have Been a Reasonable Expectation of Success in the Modification

164.   There would been a reasonable expectation of success when modifying *Mathiassen's* secure access signal to provide *McKeeth's* duress access (granting access and issuing a silent alert) and alert access (denying access and sounding an alarm) in addition to *Mathiassen's* unconditional access. The modification would have improved the security of *Mathiassen's* central locking system.

165.   *Mathiassen* already teaches translating different fingerprint representations into various commands. *Mathiassen* (Ex. 1004)*,* [0192]. *Mathiassen* teaches the portable door control 20 sending other commands that are mapped to different fingerprint movements provided by the user, even characterizing this capability "**as an additional safety feature"** of the portable device. *Id.* ("a **command table** is used to translate the **categorized** finger movements **into control**

**signals for controlling the device, e.g., the stand-alone appliance**."). Specifically, *Mathiassen* teaches storing a "series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C)," with these representations obtained and measured via "movement analyzing" hardware or software. *Id.* The fingerprint representations are then categorized "according to predefined sets of finger movement sequences" via "translation" software, with these sequences associated with a specific command in a "command table." *Id.* Thus, the user fingerprint input instructs specific commands via movement analyzing and translation software, and this input would be either movements of the same finger or movements of different fingers. Therefore, with respect to the described motivation to combine *Mathiassen* and *McKeeth* below, *Mathiassen* already teaches hardware and software for receiving multiple fingerprint inputs instructing different commands.

166.    Thus, a POSITA would have understood *Mathiassen's* portable door control 20 is "capable" of sending commands other than the "open door" command by sensing different fingerprint movements and accordingly instructing the command based on the fingerprint movements. *Mathiassen* also teaches that a user may enroll more than one of their fingerprints in the portable door control 20, indicating that *Mathiassen* contemplated using finger movements from different fingers to cause the portable door control 20 to send certain commands. *Mathiassen,*

[0164] ("…the **car owner will enroll one or more of his fingers on the portable door control unit (20)**"). Thus, a POSITA would have understood *Mathiassen's* portable door control 20 already contains hardware and software for translating user fingerprint inputs to various commands for controlling the central locking system. Therefore, *Mathiassen's* portable door control 20 is already capable of sending out different commands other than the "open door" command, and thus would have required only simple programming modifications to the administrative code to include a "duress" and "alert" command sent in the secure access signal to either grant access and issue a silent alert or deny access and sound an alarm. Furthermore, as discussed above, silent alert systems for notifying authorities and alarms were well-known and commonly available in commercial vehicles, so a POSITA would only need to use *Mathiassen's* modified portable control in an already-existing car having a silent alert system and alarm system, where *Mathiassen's* central car computer that received the secure access signal generates the appropriate response.

167. Additionally, there would have been a reasonable expectation of success in modifying *Mathiassen's* secure access signal to both grant access and send a silent alert or to both deny access and sound the car alarm because remote fobs for vehicles were well-known to use actuation of a single button to send a signal to control the operation of various vehicle components. For example, *Williams'* remote keyless entry system uses the same "unlock input 60A" to both send a signal

to only the driver side door to unlock (when pressed once) or to send a signal to each door lock of the car to unlock (when pressed twice). *Williams* (Ex. 1030)*, 14:30-34.* *Williams* even teaches a user performing a single input to then generate a signal that both (1) unlocks a door and (2) opens/closes a power-sliding door. *Williams,* 14:10-25. Thus, because other remote fob systems were well-known to be capable of sending one signal that performed multiple functions, a POSITA would have found reasonable success in modifying *Mathiassen's* secure access signal, as taught by *McKeeth,* to similarly perform multiple functions when including a duress or alert command by (1) unlocking car doors and issuing a silent alert to authorities, or (2) locking car doors (if not already locked, in order to deny access) and sounding the car alarm, respectively.

168.    A POSITA would also have understood that *Mathiassen's* fingerprint sensor 5 on the portable control 20 would be capable of receiving a user's input associated with an "open door" command (i.e., unlocking the doors responsive to a system administrator's fingerprint movement), as well as a user's input indicating a duress (granting access and issuing a silent alert) and alert (denying access and sounding an alarm) command, as modified by *McKeeth*. As discussed above, a single input, such as a button, was well-known to provide different accessibility through different actuation (i.e., pressed once or twice), such as unlocking only a single car door vs. unlocking all car doors. *Williams* (Ex. 1030)*, 14:10-25, 30-34.* Thus, a

POSITA would have understood *Mathiassen's* single input, being the fingerprint sensor 5, to similarly provide the unconditional, duress, and alert access through different finger movements either of the same finger or of a different finger. After all, *Mathiassen* already teaches a user providing different finger movements to output different commands from the portable door control 20. *Mathiassen* (Ex. 1004), [0192].

### 4. Claim 10(Pre4): "a receiver sub-system comprising means for receiving the transmitted secure access signal, and"

169. *Mathiassen* teaches a "receiver sub-system," as claimed, namely "**transceivers** of the door locks and the central car computer," as well as the ignition control 15 and central car computer itself. *Mathiassen,* [0186-0188], *see also* [0149] (disclosing the portable door control 20 and central car computer communicate via transceivers).

170. To assist with understanding the bases for my opinion, I will provide a detailed explanation of *Mathiassen's* teachings regarding transmission and receipt of the encrypted commands. As discussed above, the processor 2 of the IC 1 on portable control 20 executes administrative code to issue the "open door" command for encryption via encryption blocks, and the transceiver 27 of portable control 20 then transmits the encrypted command to the central car computer. *Mathiassen*, [0185-0186]. Specifically, once the administrative code (including SKG algorithm)

executed by processor 2 of the IC 1 in the portable door control 20 encrypts the command, such as the "open door" command, the portable control 20 transmits the encrypted command signal via its transceiver 27 "to the embedded ignition control (15) via the transceivers of the door locks and the central car computer." *Mathiassen,* [0186]. The open door command (which is a claimed "signal," as I discuss herein) is first received by the central car computer's transceiver and then electrically transmitted via a wired connection to the ignition control 15 for decryption and authentication via processor 2 executing administrative code. *Mathiassen,* [0187-0188], *see also* [0148] (disclosing ignition control 15 connects via "hard wires to the central car computer"); Section VI.A.3.c. *Mathiassen* discloses an alternative configuration, where the command received at the central car computer is not transmitted to the ignition control, and the central car computer instead performs the decryption and authentication. *Mathiassen*, [0188]. In both configurations, once the "open door" command is authenticated, "a **similar encrypted command will be relayed to the door locks by the car computer**." *Mathiassen,* [0187]. Thus, after the signal is decrypted and authenticated, the re-encrypted command is received by the car door locks via a car door lock transceiver, where the central car computer performs transmission to the transceiver of the car door locks.

171.    To summarize, in one configuration, the portable door control 20 transmits the encrypted "open door" command to the central car computer's

transceiver, which then relays the signal via hard wires to the ignition control 15 for decryption and authentication. A re-encrypted command is then sent by wire back to the central car computer and the central car computer then transmits the command to the car door locks' transceivers. In a second configuration, the portable door control 20 transmits the encrypted "open door" command to the central car computer's transceiver, where the central car computer decrypts and authenticates the received signal and "relays" a similar encrypted command to the car door locks' transceivers.

172.   In my opinion, a POSITA would have understood that both the central car computer and the door locks include a transceiver, because both receive the encrypted command. Specifically, the transceiver of the central car computer receives the encrypted command from the portable door control [0186], while the transceivers of the car door locks receive a "similar encrypted command" from the central car computer [0187]. Thus, because *Mathiassen* teaches the central car computer and door locks receive encrypted commands [0186-0187] and both include transceivers [0186], a POSITA would have understood the central car computer and door locks received the encrypted commands via the transceivers.

173. A POSITA would have understood the transceivers to include a "receiver," as transceivers are defined as "a device that can **both** transmit and **receive signals**," thus indicating to a POSITA that the transceivers in the door locks

and central car computer serve as receivers. *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 at 527 ("short for transmitter/**receiver. A device that can both** transmit and **receive signals**.") (Ex. 1045). Therefore, the claimed "receiver sub-system" includes, at least, *Mathiassen's* transceiver for the central car computer and transceiver for the door lock because *Mathiassen* discloses the transceivers of the door locks and central car computer to receive signals like the "open door" command signal. *Mathiassen* (Ex. 1004)*,* [0186-0187].

174. As discussed above at Section III.B.2, the structure for performing the function of "receiving the transmitted secure access signal" includes at least a receiver. *Mathiassen's* "receiver sub-system" comprises "means for receiving," as claimed, in the form of the transceiver of the central car computer because it receives the "open door" command (secure access signal – *see Claim 10(Pre3) mapping above*) from the transceiver 27 of the portable door control 20, thus performing the function of "receiving the secure access signal." *Mathiassen,* [0186].

> **5.    Claim 10(Pre5): "means for providing conditional access to the controlled item dependent upon information in said secure access signal"**

175. I apply the construction of "conditional access" meaning "access based on accessibility attributes." *See* Section III.B.1. Further discussion of "conditional access" and "accessibility attributes" is provided in Claim 10(e).

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

### a) Structure for "means for" and Function of "providing conditional access to the controlled item"

176. As discussed above at Section III.B.2, the structure for performing the function of "providing conditional access to the controlled item" includes at least a controller executing software step 304, namely sending a control signal to the controlled item. As a preliminary matter, the '208 Patent interchangeably uses the terms "controller" and "processor" in describing the claimed invention. *See, e.g., comparing '208 Patent* (Ex. 1001) 14:16-20 ("…**the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117.**") to 14:36-40 ("The computer system 100' is formed, having regard to the transmitter sub-system 116, by the **controller module 107**….") or 6:2 and 5:67 (referring to element 107 as "controller 107" or "controller/transmitter 107", respectively). Additionally, the '208 Patent describes the "**controller module 107** typically **includes at least one processor unit 1005.**" 14:55-58, Fig. 10. Because the inventor themselves used a "processor" and "controller" to describe the same element, and because it was well known that both controllers and processors execute "instructions in the software" described to provide secure access within the '208 Patent, a POSITA would have understood processors to be functionally equivalent to the disclosed controllers of the '208

Patent, including controller 107 and 109. Therefore, it is my opinion a POSITA would have understood any claimed functions being carried out by the controller 109 may equivalently be carried out by a processor, and thus a processor may equivalently serve as the structure for the "means for providing" term.

177. In my opinion, *Mathiassen* teaches the claimed structure. *Mathiassen* teaches two configurations for handling the received command, as I discussed above. In a first configuration where the ignition control decrypts and authenticates the received command, either the ignition control's processor executing administrative code alone or with the central car computer's respective processor executing administrative code meets the claimed structure and performs the claimed function. In a second configuration where the central car computer performs the decryption and authentication, the central car computer's processor executing administrative code meets the claimed structure and performs the claimed function.

178. Regarding the first configuration where the ignition control performs the decryption and authentication, *Mathiassen* teaches the processor 2 of the IC 1 in the ignition control 15 decrypting the received encrypted "open door" command (i.e., "secure access signal") and relaying the command "to the door locks by the car computer." *Mathiassen* (Ex. 1001), [0187]. Specifically, *Mathiassen* teaches the encrypted command "**will be decrypted by the embedded ignition control (15) by its processor (2) on its resident IC (1)**" by fetching the seed that generates the

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

"identical, and temporary password" matching the password used to encrypt the signal. *Id.* This matching password is generated via SKG algorithm that is contained in administrative code. *See* Section VI.A.3.c. "If the decrypted message confirms a valid and authenticated" command, then "**a similar encrypted command will be relayed to the door locks** by the car computer." *Id.* The ignition control's processor 2 executing administrative code thus provides access to the controlled item (i.e., the car door locks) when the processor "confirms a valid and authenticated" command. *Mathiassen,* [0187].

179.    Furthermore, the processor 2 of the IC 1 in the ignition control 15 provides access to the controlled item (i.e., car door locks) via executing administrative code because it relays the re-encrypted "open door" command **to the door locks** via the central car computer's transceiver. *Mathiassen,* [0187]. Thus, the administrative code of the ignition control 15 provides access to the car door locks by instructing the processor 2 to cause the transceiver of the central car computer to relay the "similar encrypted signal" to the car door locks, i.e., controlled item, thereby teaching the claimed "means for." *Mathiassen,* [0186-0187]. It is my opinion that this is at least equivalent to the '208 Patent's step 304 describing controller 109 sending a control signal to the controlled item.

180.    Additionally or alternatively, the collective processors of the ignition control and the central car computer satisfy the claimed "means for" that provide

access by executing administrative code respectively stored in non-volatile memory 7/7A of the ignition control and car computer. The central car computer also contains a processor executing administrative code (as I discuss below in ¶ 261) and collectively works with the processor of the ignition control to relay the "similar encrypted command" from processor 2 to the car door locks. *Mathiassen*, [0186-0187]. Thus, a POSITA would have understood either processor 2 of the ignition control executing administrative code alone, or the ignition control and central car computer's processors work together to provide access to the door locks.

181.  Regarding the second configuration where the central car computer performs the decryption and authentication, *Mathiassen* teaches the central car computer includes a processor executing administrative code for providing access. Specifically, *Mathiassen* teaches the same "**decryption and authentication algorithms**," as discussed above with regard to the processor 2 of IC 1 in ignition control, **"may be performed on the central car computer instead of on the embedded ignition control**." *Mathiassen,* [0188]. Therefore, a POSITA would have understood the central car computer provides access to the controlled item because administrative code executed by the processor decrypts and authenticates the command and sends the "similar encrypted command" to the door locks. *Mathiassen,* [0187-0188].

182.   Additionally, *Mathiassen* discloses the administrative code directing the access of physical locks in other "stand-alone applications," including a medicine cabinet [0134] or safe [0120], further indicating to a POSITA that the administrative code of the central car computer and/or ignition control forms the "means for providing" access to the controlled item (i.e., car door locks).

183.   A POSITA would have understood that for the central car "**computer**" to perform such algorithms, it includes or otherwise renders obvious a processor, as these same algorithms are disclosed as being performed by a processor when implemented in the ignition control. *Mathiassen,* [0187] (processor 2 of IC 1 in ignition control 15 performing decryption and authentication). A POSITA would have understood that computers contain a processor as a common component. *PC Basics: Get a Great Start,* Survive and Thrive, Copyright 2002 (Ex. 1049) at 7, 11 (listing a central processing unit as a common computer component and providing examples of such well-known CPU's as "the Pentium® and Celeron® **processors**."). Therefore, the central car computer also includes or renders obvious a processor, where the processor is providing access to the controlled item (the car door locks) due to relaying the open command to the car door locks.

184.   Regarding the provided access being "conditional" and as discussed in more detail for Claim 10(e), *Mathiassen's* processors of ignition control or central car computer provide "conditional access," namely access based on an accessibility

attribute. *See* Section III.B.1 (discussing construction for "conditional access" as "access based on accessibility attribute"). As discussed for Claim 10(e), when the car owner (otherwise referred to in *Mathiassen* as a system administrator) provides their fingerprint, and the car owner's fingerprint is matched against stored minutiae, the car owner/system administrator is provided access to the vehicle's central locking system. A POSITA would have understood this access is provided in response to the car owner/administrator providing their fingerprint for the purpose of accessing the car. *Mathiassen*, [0175] (discussing the "owner" of the car may now access the car). Thus, *Mathiassen* also teaches providing "conditional" access, where in *Mathiassen*, the access is based on the inputted fingerprint information corresponding to a car owner/system administrator applying the fingerprint for purposes of accessing the car. *See also*, Section VII.A.14.

185.   In the alternative, *Mathiassen's* administrative code, as modified by *McKeeth*, also teaches "means for providing conditional access" via the administrative code instructing the processor 2 to issue duress and alert commands, in addition to the "open door" command. *See also*, Section VI.A.14. This is similar to the '208 Patent describing duress or alert conditions of access. *'208 Patent,* 8:17-28.

### b)    "Secure Access Signal"

186.   As discussed above with regard to Claim 10(Pre3), a POSITA would have understood *Mathiassen's* encryption process to generate a "secure access signal" based on a rolling code because the encryption password "**changes for each transaction**." *Mathiassen* (Ex. 1004)*,* [0050]. Thus, the generated encrypted command, such as the "open door" command, is a "secure access signal," as claimed. Similar to the '208 Patent's controller 109, the processor 2 of the IC 1 in the ignition control only sends a signal to the door (specifically, door locks) if the **temporary** password matches that used to encrypt the command and thus successfully decrypts the signal. *Mathiassen,* [0187].

### c)    "dependent upon information…"

187.   As discussed above at Claim 10(Pre3), the encrypted command issued by the processor 2 of the IC 1 in the portable door control is the "secure access signal," as claimed. *Mathiassen,* [0185]. Additionally, *Mathiassen* also teaches the processor of the portable door control "will proceed to open (**or lock**) the car doors" [0182] and that the portable door control performs "**encryption and transmission of straight commands, such as 'open door' or 'lock door**.'" *Mathiassen,* [0167]. Therefore, the command invokes different functions depending on information in the command. Yet further, *Mathiassen* teaches instructing different commands according to the fingerprint input ([0192]), further indicating *Mathiassen* teaches the

command instructing a particular function depending on information in the command.

188.   The command relayed by the central car computer to the car door locks is also similar to the received command from the portable control. Specifically, either the processor of the central car computer or processor 2 of IC 1 in ignition control decrypts and authenticates the received command from the portable door control and accordingly relays a "**similar encrypted command**" to the door locks. *Mathiassen,* [0186-0188]. This similar command provides access "dependent upon information in said secure access signal" because the function provided is dependent upon the command information, namely locking or unlocking the car doors. Because *Mathiassen's* relayed command is "similar" to the received encrypted command from the portable door control 20, and because the received encrypted command includes information to either lock or open the car doors, the relayed command is "dependent upon information in said secure access signal," as claimed.

189.   Thus, *Mathiassen's* teachings of different encrypted commands (i.e., an open door command or a lock door command) invoking respective different functions indicates to a POSITA that the encrypted command (i.e., the secure access signal) includes information specific to the requested function, namely either locking or unlocking the car doors.

190. The opinions I provide below at Claim 10(e) further discuss the access provided being "conditional access," as claimed and as construed per Section III.B.1.

### 6. Claim 10(a): "the method comprising the steps of: populating the database of biometric signatures by"

191. *Mathiassen* teaches that prior to "providing secured access control" to the central locking system of the car, "the IC (1) of the portable door control (20) will be set in protected mode, **waiting for the first user to be enrolled to be the system administrator** of the biometrics system in the car." *Mathiassen,* Abstract, [0145], [0162]. During this enrollment process, "the **car owner will enroll one or more of his fingers on the portable door control unit (20)**" by presenting his fingerprint(s) for "successful capturing of a minimum of images (say three)" that are "**reduced to master minutiae tables** by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20)." *Mathiassen,* [0164]. These master minutiae tables are then stored in the memory 7,7A of the IC 1. *Id.* *Mathiassen* also teaches that other users may be enrolled, but that the "first person to enroll his fingerprint on the portable door control (20) **becomes the 'owner' of the car, in the sense that he becomes the system administrator**." *Mathiassen,* [0165], [0190] ("…the security of the complete system resides in the fingerprints of the car owner **(or other users he may have enrolled)**").

192. As discussed above at Claim limitation 10(Pre2), the one or more master minutiae tables comprise a "database of biometric signatures," as they include minutiae data representing a user's fingerprint or fingerprints. Thus, the generation of these master minutiae tables for one or multiple fingers of at least one user from minutiae taken by reducing raw images of a fingerprint populates the database of biometric signatures, as claimed, then storing these master minutiae tables in memory 7,7A.

### 7. Claim 10(a1): "receiving a series of entries of the biometric signal"

193. *Mathiassen* teaches or renders obvious "receiving a series of entries of the biometric signal." As discussed above with regard to Claim 10(Pre3), *Mathiassen* teaches the fingerprint sensor 5 of the portable door control 20 receives the claimed "biometric signal," namely a fingerprint. When a user presents their fingerprint on the sensor 5, the processor 2 and pre-processing block 5C of the IC 1 in the portable door control 20 then reduce the captured fingerprint "images…to master minutiae tables." *Mathiassen* (Ex. 1004)*, FIG. 2B, [0164], [0178-0180] (additionally disclosing the pre-processing block (5C) reduces the captured fingerprint image to an "intermediate format," which the processor (2) then further reduces "to compact master minutiae" placed in an "access minutiae table").

194.    Furthermore, *Mathiassen* also teaches the "portable device" (i.e., portable door control 20) receiving and storing "**a series of consecutive fingerprint representations** generated by the fingerprint sensor signal capturing and pre-processing block (5C)." *Mathiassen,* [0192], Claim 20. These "series of consecutive fingerprint representations" indicate "omni-directional **finger movements** across the sensor in two dimensions." *Id.* In other words, this "series" comes from multiple movements of the same fingerprint to categorize the received finger movements to stored sequences that translate to certain commands:

> Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the **<u>obtained series of fingerprint representations</u>** to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and **categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals** whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor.

*Mathiassen,* [0192], Claim 20.

195.  Therefore, a POSITA would have understood *Mathiassen* teaches the following:

(1) the portable door control 20 detects a series of finger movements across the sensor via movement analyzing program;

(2) the portable door control categorizes the series based on a known set of finger movement sequences via the translation program, and

(3) via this categorization, the portable door control further uses translation program to translate the movement to a particular command to then send out a control signal.

*Mathiassen* further teaches the control signals control the operation of components of "e.g., the stand-alone appliance, **in response to the finger movements on the sensor**." When the portable control is controlling the central locking system of the car door locks, the finger movement sequences on the portable control are used to instruct functions associated with the car door locks. These finger movements include "touch/no touch" operations where the user touches their finger to the sensor and the user does not touch their finger to the sensor. *Id.* It is my opinion that *Mathiassen's* finger movements are a "series" because they comprise a number of things or events of the same class coming one after the other in spatial or temporal succession.

196. A POSITA would have understood the predefined "touch/no touch" finger movements comprise pressing down on the sensor 5 of the portable control to indicate a touch and releasing at least some pressure on the sensor to indicate a "no touch," with certain sequences of touch/no touch associating with a specific command to control the portable door control. *Mathiassen,* [0147], [0192] ([0147] characterizing "The door control, being a **portable** device" compared to [192] stating "the **portable** or embedded **device could be equipped with means for the input of code or commands**"). I note *Mathiassen* does not teach that the portable door control 20 includes any other inputs, such as buttons or switches, to cause the portable door control 20 to distinguish between the open door and lock door commands. *Mathiassen,* [0182] ("the processor will proceed to **open (or lock) the car doors**"), [0167] ("At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of **straight commands, such as 'open door' or 'lock door'**"), FIG. 8. This further indicates to me that the portable door control 20 may use different received finger movements, e.g., touch/no touch, matching predefined finger movement sequences for instructing such commands to differentiate them from one another, especially given *Mathiassen* explicitly states each touch/no touch sequence translates to a certain "command." *Mathiassen,* [0192].

197.   In view of the above-discussed teachings of *Mathiassen*, a POSITA would thus have understood *Mathiassen* teaches "receiving a series of entries of the biometric signal," as claimed, where the biometric signal is a fingerprint and the series of entries corresponds to the user's series of fingerprint movements on the sensor 5 of the portable control 20.

198.   In my opinion, it also would have been obvious to use *Mathiassen's* portable door control to input different instructions via the sensor 5, as further indicated by *Mathiassen*, [0192]. Specifically, it was well known in the prior art to use a single input, such as a single button or single fingerprint sensor to receive multiple instructions. *See*, ¶¶ 20-24. For example, *Williams* uses a single "unlock button" to receive a first press and a second press within a predetermined amount of time to command different operations of unlocking only the driver-side door and unlocking all the car doors, respectively. *Williams* (Ex. 1030)*, 14:30-34. Matusis* teaches using a single input sensor to detect the upward or downward motion of a single fingertip to invoke two different functions. *Matusis* (Ex. 1032)*, Fig. 3, [0045] (disclosing each fingertip to have an "upward and downward motion" where each "function is now dependent on the selected fingertip and the provided motion by the selected fingertip"), [0046] (describing "input sensor" to be any input mechanism, with examples provided being a button, touchscreen, trackpad, among others). *Ghassabian* specifically uses a "fingerprint detection interface 100" to detect

fingerprint movements, such as tapping, double tapping, or swiping, that indicate different instructions. *Ghassabian* (Ex. 1031), 7:49-63 ("For example, an individual can double tap his or her right thumb" or "swipe his or her left index finger"), 9:1-6 (disclosing tapping once with a fingerprint to provide one instruction and tapping twice with that same finger providing a different instruction, stating that these instructions "**can be inputted with** one hand and **one fingerprint pad, by only using single and double taps**"). Thus, different instructions were known to be received by a single input, e.g., a single fingerprint sensor as taught in *Mathiassen*'s portable control 20. Thus, a POSITA would have understood or found it obvious that *Mathiassen's* fingerprint sensor 5 on the portable door control 20 receives a series of entries of biometric signals at least for instructing the "lock door" and "open door" commands.

### 8.   Claim 10(a2): "determining at least one of the number of said entries and a duration of each said entry"

199.    As a preliminary matter, I was instructed by counsel the claim term "at least" modifies "one of the number of said entries" and that the claim requires "a duration of each said entry." As discussed above at Claim 10(a1), *Mathiassen* teaches or renders obvious receiving a series of entries of the biometric signal, namely the fingerprint. However, I note that *Mathiassen* does not expressly teach determining a "duration" of each entry, as claimed. In my opinion, using the duration

of a fingerprint press as a parameter in determining the commanded instruction was well known, as taught by *Anderson*, and it would have been obvious to a POSITA to include a duration parameter as part of the series of fingerprint movements to instruct commands, as already taught by *Mathiassen*.

### a)    *Anderson's* Teachings

200.    *Anderson* teaches a "method for inputting an access code via **temporal variations**" applied to a touch interface. *Anderson* (Ex. 1006)*,* Abstract, 6:45-48 (describing the access code as "**a series of pressure pulses having varying durations**"). The user applies pressure "**in a temporal pattern**," thus generating an access code. *Anderson,* 6:11-18, 23-26. The generated access code is "utilized to allow the information handling system to enable" the requested function if it matches with a stored "code template." *Anderson,* 6:22-39, 6:51-54 ("Wherein **the inputted access code and the code template are a close match** (i.e., they match within the predetermined tolerance), the **function is enabled** at step 324."), 2:4-21, FIG. 3B. These enabled functions include "allowing access to a restricted area," amongst other functions. *Anderson,* 2:15-21. Additionally, *Anderson* teaches the access code may be "utilized in conjunction with other security measures," such as concurrently using an "optical scanner or thermal sensor for **collecting an image of the user's fingerprint as the pressure access code is entered and verified against a stored fingerprint template**." *Anderson,* 7:1-11. Figure 3B, below, summarizes the steps

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

of the method for enabling a function via an access code of "temporal pressure

variations":



*Anderson,* Fig. 3B, *see also,* FIG. 3A.

201.  *Anderson* teaches an example of the entered access code is "a **series of**

**pressure pulses having <u>varying durations</u>**," with a user implementing "a **known**

**code key (<u>e.g. Morse code</u>)** … to aid the user in selecting, remembering, and

entering the access code." *Anderson,* 6:45-48, 7:40-47 (describing the Morse code-

like pressure pulses "consisting of a **series of long and short pressure**

**applications**"). This teaching in *Anderson* indicates to me the access code is comprised of a series of finger movements, specifically including pressing down and releasing (i.e., pulses) the finger on the fingerprint sensor, with each pulse having a certain known duration. *Anderson's* comparison of the access code to Morse code would have been understood to represent a series of short and long presses, as Morse code is well known to be characterized as a series of presses of short and long duration.

202.   *Anderson* teaches two different embodiments of entering the access code. In a first embodiment, *Anderson* teaches "the touch interface may sense **only temporal applications** of pressure relying on timing of the pressure applications for entry of the access code**. In such an embodiment, "**the touch interface would not detect variations in pressure magnitude or intensity**." *Anderson,* 7:28-34. Instead, the touch interface would only detect variations in duration of each fingerprint application and "Thus, the access code would be entered as a series of alternative pressure applications of **varying duration**." *Id.* In a second embodiment, *Anderson* teaches varying both the *pressure* and the *duration* of each finger press. *Anderson*, 6:11-13 ("The user enters the access code by temporally varying the amount of pressure applied to the touch interface."), 7:34-39.

203.   *Anderson's* FIG. 4A illustrates the first embodiment where the access code comprises "a series of alternating pressure applications of varying duration."

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

*Id.* ("**As shown in Fig. 4A, the touch interface may sense only temporal applications**."). I annotated FIG. 4A, below, to highlight that the magnitudes or amount of pressure is recorded using just two values, one to indicate that pressure is being applied and a second indicating that little or no pressure is being applied. A POSITA would have understood that the user resting their finger on the fingerprint sensor interface causes some pressure on the sensor, which is indicated by the higher bars.

204.   Figure 4A further illustrates the durations of the finger presses are different, as indicated by the varying widths of each pressure bar. *Anderson,* 7:28-34. *Anderson* teaching "the pressure applications" illustrated in Figs. 4A and 4B "are sensed by the touch interface as variations in pressure **relative to a baseline pressure (e.g., no application of pressure)**" indicates the dashed line represents a pressure of zero with the bars representing other pressure amounts that are not zero. *Anderson,* 7:12-19. In other words, one bar represents a single finger press, with the width of each bar indicating the time for which the fingerprint sensor is pressed.



FIG. 4A

IPR2022-00601
Apple EX1003 Page 143

*Anderson,* Fig. 4A (blue bar annotating varying duration pressure is applied), (orange circle annotating a single pressure pulse), *see also* 7:28-34 (describing Fig. 4A), 7:11-27. The consistent magnitudes shown by the straight yellow bar indicate that though different pressures may be applied, the digitizer pad 120 only senses that a pressure is applied or not applied as the different pressure amounts (i.e. magnitudes) are not distinguishable from one another.

205.   *Anderson*, FIG. 4B, contrastingly, illustrates the touch interface sensing a varying duration of each pulse **and** a varying amount of pressure, as is depicted by the change in the bar heights.



*Anderson,* Fig. 4B, 7:34-39 ("Alternately, as shown in FIG. 4B, the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity.").

206.   I note that *Anderson's* teachings of determining a duration of a finger press as part of the access code is similar to the '208 Patent's description. The '208

IPR2022-00601
Apple EX1003 Page 144

**Appx1178**

Patent states "the first administrator can provide control information to the code entry module by providing a **succession of finger presses** to the biometric sensor 121, providing that **these successive presses are of the appropriate duration**, the appropriate quantity, and are input within a predetermined time." *'208 Patent* (Ex. 1001)*,* 10:45-49. *Anderson* similarly teaches finger presses to the fingerprint sensor comprising the access code. In the first embodiment where only the duration of each pulse is sensed without sensing the applied pressure (*see* FIG. 4A), these pulses would be generated from any pressure above some predefined threshold (e.g., threshold of zero/no pressure) being applied by the user's finger to the touch interface. Specifically, when employing the fingerprint access code via the optical scanner in the touch interface, such an applied pressure is sensed when a user places their finger on the fingerprint sensor, presses downward on the interface to generate a "press," holding that "press" down for a certain amount of time, and then releasing the "press." *Anderson* describes the user applying pressure of varying durations, which is consistent with the understanding that a press is the application of pressure. *Merriam Webster's Collegiate Dictionary,* tenth edition, copyright 1998 (Ex. 1052) at 923, *see also* 922 (the term "press" defined as "**to move by means of pressure**"). Thus, because the '208 Patent describes a "series of entries" as a "succession of presses" and *Anderson* teaches inputting an access code of a user's fingerprint, with the code including a series of fingerprint presses (i.e., entries) of particular duration,

*Anderson* teaches determining a duration of each received entry (i.e., fingerprint press).

207. *Anderson* also teaches the claimed "*determining* at least one of the number of said entries and a duration of each said entry." *Anderson* teaches the "temporal pattern of pressure applications," or finger presses, are used to generate the access code, with this code then compared to a stored "code template" to authorize access. *Anderson* (Ex. 1006)*,* 6:22-36 ("The temporal pattern of pressure applications applied by the user is **sensed by the touch interface**" and then "**compared, at step 320, with a code template** created by the user at an earlier time."). In order for the presented access code to be compared to the stored code template and find a match, some or more likely all of the finger presses would have to be characterized by the duration of the press to accurately determine the specific "temporal pattern." It is noted that *Anderson* teaches allowing for "some variation, within a predetermined tolerance, between the inputted access code and the code template" when performing the comparison, such as a predetermined tolerance being provided for "variations in the lengths of the pulses" (i.e., duration of the presses). *Anderson,* 6:39-54. However, *Anderson* also teaches that "a **determination** may then be made at step 322 whether the **entered access code and the code template** are a close match (i.e., **they match within the predetermined tolerance**)." *Anderson,* 6:48-51. *Anderson* teaching that a comparison is performed between the

access code and code template even when using a "predetermined tolerance" would have indicated to a POSITA that *Anderson* is "determining" the access code. Specifically, the duration of each pulse and the number of pulses is established and ascertained definitely after consideration, investigation, or calculation in order to result in a match. In other words, a POSITA would have understood that the "determination" still required characterizing the access code input even when allowing for variations in the entry, and that the access code would have been determined by at least one of the number of presses (i.e., pulses) and a "varying duration" of each press (i.e., pulse). Furthermore, as *Anderson* teaches the access code being entered as "a series of alternating pressure applications of **varying durations**," a POSITA would have understood that the system differentiated between these variations of duration to properly compare the access code to the code template. *Anderson,* 7:32-34. This determination of the variations of duration would have occurred whether using a predetermined tolerance or not, considering if the tolerance is "predetermined" that the durations would require checking with the stored code template durations to ensure they were within this tolerance range. Thus, *Anderson* teaches determining at least one of the number of said entries (i.e., at least one of the number of presses or pulses) and a duration of each entry (i.e., the "varying duration" of each press or pulse), as claimed.

b)    **Motivation to Combine *Anderson* with *Mathiassen* as Modified by *McKeeth***

208.   In my opinion, a POSITA would have been motivated and found it obvious to modify *Mathiassen's* portable control to determine input of an access code or other command via a series of presses of varying duration, as taught by *Anderson*, for the reasons I discuss below.

209.   *Mathiassen* teaches detecting a series of touch/no touch or directional finger movements to instruct a particular command, with these finger movements stored as "sequences" that associate with specific commands in the "command table." *Mathiassen* (Ex. 1004)*, [0192] ("A command table is used to translate the **categorized finger movements** into control signals…for controlling the device…**in response to the finger movements on the sensor**."). As discussed above with regard to Claim 10(a1), a POSITA would have understood or found it obvious that these finger movements were input on the sensor 5 of the portable door control 20 and translated to the associated command. Thus, *Mathiassen's* portable door control 20 already receives a series of entries determined by the movement of the fingerprint on the sensor surface and compares them to a stored finger movement sequence to invoke the correct command.

210.   Modifying *Mathiassen's* portable control to include receipt of a command via presses of a particular duration allows for simplified input of multiple

commands using *Mathiassen's* portable door control. A POSITA would have been motivated and found it obvious to add *Anderson's* series of presses or pulses as an input on the portable door control or replace *Mathiassen's* finger movements with *Anderson's* series of presses or pulses to input commands into the portable door control 20, as these press operations make the input operations easier for the user to perform in certain situations. For example, a user holding the portable control fob in their hand could more easily press a series of finger presses against the control's fingerprint sensor, as opposed to directionally swipe the finger presses. A car owner with only a single free hand to hold the key fob and enter the command would have additionally found it more challenging to input the correct directional swipe because they would have to ensure the single hand both stabilized the fob and allowed the finger to move enough to swipe directionally on the sensor. With a series of presses, the user would maintain a stable hold on the portable device more easily as they only had to use one finger to press down on the sensor. Further, if the fob was in the user's pocket or in a bag, it would be simpler and more efficient for the user to simply press the fingerprint interface at varying durations rather than moving the finger directionally to enter commands. Additionally, a POSITA would have appreciated that in certain situations, such as when the user was holding various items in their other hand and needed to open the car doors, that a series of press operations would have been easier for a car owner to perform than a finger movement, as discussed

above. Furthermore, in situations where the car owner had to direct their visual attention to something else while trying to unlock the car door, such as in monitoring their children before they were safely buckled in, a POSITA would additionally have appreciated that a simple press series would have been easier to input than a directional swipe when the user was unable to look while they performed the input.

211. Furthermore, a POSITA would have been motivated and found it obvious to modify *Mathiassen's* detection of finger movements with *Anderson's* detection of a number of presses and a duration of each press to decrease the complexity required when analyzing the fingerprint inputs. *The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications*, Alex Gatherer and Edgar Auslander (Ex. 1053) at 226 (stating that fingerprint sensing procedures that "require the user to slide his finger slowly across the sensor" are known to "seriously distort[ ] the skin and has significant operational and performance liabilities."). It was known in the art as of the August 13, 2003, date of the Patent that fingerprint sensors "that require finger movement (such as swiping) during scanning must compensate for varying shift in finger position during the scan process," otherwise known as data skew compensation or image stitching. *Id.* at 249. In contrast, using a scanning method to sense a press or "slap" that requires no finger movement "does not require data skew compensation or image stitching." *Id.* at 249-250. Furthermore, detecting and

scanning the fingerprint by placing the "stationary" finger on the sensor was also known to minimize distortion when applying certain algorithms for determining a match. *Id.* at 244, 245 (describing matching algorithms that "**benefit from the low distortion achieved by modern slap sensors when compared to rolled finger sensors and swipe sensors**"), 237 ("Strip sensors that are used with a swiping finger motion have very special sensor control and **image reconstruction needs that require much more complicated logic than stationary finger sensors**."). Therefore, a POSITA would have been motivated to substitute the more complex process of detecting finger direction movements (as taught by *Mathiassen*) with a simpler processing procedure of merely detecting duration pulses when capturing raw images and reducing them to fingerprint representations of presses or pulses.

212. The modification of the portable door control 20 receiving a series of presses or pulses determined by the duration of each press and the number of presses would have had a reasonable expectation of success because *Mathiassen's* control 20 already includes software and hardware for detecting a series of inputs, such as directional finger movement and even a series of touches and no touches. *Mathiassen* (Ex. 1004)*, [0192]. Mathiassen's* teaching of the door control 20 being capable of sensing a touch/no touch pattern is very similar to *Anderson's* method of sensing a press, as discussed above, in the embodiment where the access code is only detected based on the duration of each press and not the pressure applied. *Anderson*

(Ex. 1006)*, 7:28-34. In fact, a touch of the sensor 5 generates some pressure on the surface, even if it is small, indicating to a POSITA that the "touch/no touch finger movement sequences" included a series of presses/pulses. Thus, *Mathiassen's* sensor 5 is already capable of detecting finger presses because it receives a "series of consecutive fingerprint representations" when measuring a "touch/no touch finger movement sequence." *Mathiassen,* [0192]. Thus, because *Mathiassen's* portable door control 20 is already capable of receiving a series of presses, the modification would have simply required programming the software translation program to count the amount and the duration of touches in the touch/no touch sequence, with this programming modification being well within the knowledge of a POSITA at the time.

213.    *Mathiassen* discusses receiving finger movements across the sensor including directional and touch/no-touch finger movement sequences. *Mathiassen*, [0192]. In my opinion, finger sensors for detecting tapping or pressing motions were well known, and any modifications to *Mathiassen's* sensor to provide for receiving a series of entries of a particular duration would have required simply programming the software translation program to count the number and duration of touches in the touch/no touch sequence. *See* ¶ 63 (opining tapping sensors and their associated hardware/software were well-known in the art prior to August 13, 2003). Thus, it

would have been well within a POSITA's knowledge to employ such a sensor for receiving entries of a particular duration into *Mathiassen's* portable door control.

### 9.    Claim 10(a3): "mapping said series into an instruction"

214.    *Mathiassen* teaches "mapping said series into an instruction." As discussed above with regard to Claim 10(a1), *Mathiassen* teaches fingerprint sensor 5 on the portable door control 20 receiving a "series of fingerprint representations" correlating to directional finger movements that a "hardware or a software translation program module analyzes and categorizes…**according to pre-defined sets of finger movement sequences including directional and touch/no touch finger movement sequences**." *Mathiassen* (Ex. 1004), [0192]. After categorizing the finger movements, "a **command table is used to translate the categorized finger movements into control signals**" for controlling the device. *Id.*

215.    The '208 Patent describes checking "the input information" (i.e., series of entries) "**against a stored set of legal control signals**" when the "controller 107 **accepts the presses as potential control information**." *'208 Patent* (Ex. 1001), 10:52-56. A POSITA would have understood *Mathiassen's* command table translating the categorized finger movement sequences into control signals to at least be equivalent to or include checking the series of inputs against a stored set of control signals, as described in the '208 Patent, to find the appropriate command. In *Mathiassen*, translating the finger movements to control signals via the command

table assists with quickly determining the inputted instruction. Thus, *Mathiassen* disclosing the categorized finger movements are translated to a control signal based on a command table would have indicated to a POSITA that these predefined finger movements are mapped to an instruction, with the instruction being *Mathiassen's* disclosed commands within the command table. The reference to a command in the command table serves as a reference to an "instruction" because it is a command given to the processor 2.

216.    Additionally, *Mathiassen's* teaching that "a command table is used to **translate**" a plurality of **"categorized <u>finger movements</u> into <u>control signals</u>**…in response to the finger movements on the sensor" would have indicated to a POSITA that a plurality of predefined finger movements is each mapped to a specific command when applied to the sensor by the user, with this command then implemented via a corresponding control signal for "controlling the device." *Mathiassen* (Ex. 1004)*,* [0192]. *Mathiassen's* "predefined **sets** of finger movement sequences" that the presented finger movements are categorized into indicates that there is more than one "series." Each categorized finger movement sequence would have been mapped to a single command corresponding to a control signal.

217.    I note that *Mathiassen's* teaching of mapping a particular instruction or function to a specific fingerprint input was well-known in the art. Such multi-fingerprint movements were known as a desirable input method to simplify the

process for users, as it was well-known that creating a "quickly, easily, and most importantly, naturally…function[ing] entry system is vital" in portable electronics using input devices was also desirable, and that making user manipulation of such devices easy was a "key feature." *Ghassabian* (Ex. 1031), 1:54-58; *Mathiassen '455* (Ex. 1033), 6:33-38 (disclosing the mapping of fingerprint movements to certain text symbols or device instructions provides "combined user authentication by finger print biometrics, accurate cursor control and **fast, versatile, and flexible text input,** all served by the very same single-button sensor").

218. A POSITA would have understood or found it obvious that *Mathiassen's* "mapping" of the categorized finger movement to a particular command was performed by the processor of the IC 1 in the portable door control 20, either alone or with the fingerprint sensor. *Mathiassen* expressly teaches "translation means in the form of a hardware or a software **translation program** module" for categorizing the finger movements to predefined finger movements sequences, and that a "command table is used to **translate** the categorized finger movements into control signals." *Mathiassen* (Ex. 1004), [0192]. Because only one "translation means" is disclosed and the "mapping" of the particular command to the categorized finger movement is done via translation, a POSITA would have understood the "translation means," which includes a hardware or software translation program, performs both the categorizing and the mapping steps. The only

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

processor disclosed in the portable door control 20 for performing such a "software translation program" is the processor 2 of the IC 1, indicating to a POSITA that the processor 2 of IC 1 performs or would have obviously performed the translation program. Additionally, *Mathiassen* teaches that the "fingerprint sensor signal capturing and pre-processing block (5C)" on the IC 1 generates the "series of consecutive fingerprint representations," which are used by the "translation means" to categorize and map the finger movement to a particular command "in response to the finger movements on the sensor." *Mathiassen,* [0192]. From this teaching, a POSITA would have understood or found it obvious that the sensor 5 detected a fingerprint on the surface and generated fingerprint representations via the pre-processing block (5C), and the processor categorized the measured finger movements to predefined finger movement sequences and mapped these sequences to particular commands in the command table via executing the translation program or controlling the translation hardware. Thus, a POSITA would have understood or found it obvious that the processor 2 of the IC 1 in the portable door control executing the translation program performs "mapping said series into an instruction," with the pre-processing block (5C) of sensor 5 used for capturing the "series," namely the series of fingerprint representations.

**10.    Claim 10(a4): "populating the database according to the instruction"**

219.    As discussed above with regard to Claim 10(a), *Mathiassen* teaches "populating the database" with biometric signatures. Additionally, *Mathiassen* alone further teaches or renders obvious the database is populated "according to the instruction," as claimed. Alternatively, *Mathiassen* (as modified by *McKeeth*) modified by *Anderson* teaches or renders obvious population occurs "according to the instruction."

**a)    "populating the database"**

220.    This paragraph provides a summary of the mapping of *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* for "populating the database according to the instruction." First, *Mathiassen* renders obvious initiating the enrollment of a new user by the car owner/system administrator providing their fingerprint. *See* ¶ 227, below. *Mathiassen* also teaches instructing various commands using different finger movement sequences. Thus, *Mathiassen* teaches "populating the database" according to a specific user's input (e.g., administrator's fingerprint) and teaches instructing operations in the portable door control 20 "according to the instruction" (i.e., command translated from the presented finger movement). As stated above at Claim 10(a2), *Anderson* teaches providing a series of entries being presses/pulses of varying durations, and a POSITA would have found it obvious and

been motivated to either substitute *Mathiassen's* taught finger movements with *Anderson's* series of presses/pulses of varying durations or add *Anderson's* series of presses/pulses of varying durations. It would have been obvious to modify *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to populate a database according to an instruction that the portable door control recognized from a car owner/system administrator's input of a series of presses/pulses of varying durations, with such an instruction being to initiate the enrollment of a new user (i.e., populating the database).

221. In more detail, *Mathiassen* teaches enrolling a user's fingerprint (i.e., biometric signature) on the portable door control 20 so they can access the central locking system. *Mathiassen* (Ex. 1004)*, [0162-0165], see also,* [0131] (describing the enrollment procedure of *Mathiassen's* secure access control system in further detail for the medicine cabinet embodiment). *Mathiassen* also teaches that the first enrolled user in the portable door control 20 is the car owner, "**in the sense that he becomes the system administrator**." *Mathiassen,* [0165] ("This first person to enroll his fingerprint on the portable door control (20) becomes the 'owner' of the car, in the sense that he becomes the system administrator."), [0162] (further disclosing the "first user to be enrolled to be the **system administrator of the biometrics system in the car**"). The car owner (i.e., "system administrator") may "enroll one or more of his fingers on the portable door control unit (20)."

*Mathiassen,* [0164]. The car owner may also direct the enrollment of other user's biometric signatures on the portable door control (20), as indicated by *Mathiassen's* disclosure of the "**car owner** (or other users **he may have enrolled**)." *Mathiassen,* [0190]. *Mathiassen's* distinction of the car owner from these "other users" indicates they are less than administrators, for example, ordinary users. *See Claim 3(a) Mapping of "system user class"* (Section VI.E.1).

222.   In the medicine cabinet embodiment, *Mathiassen* teaches that "the system administrator will have to open" the enrollment "procedure by authenticating himself by his fingerprint." *Mathiassen,* [0131]. Once the system administrator is authenticated, "the next user can be enrolled." *Id. Mathiassen* discloses that this user enrollment process "is performed as described above," with such enrollment including creating master minutiae tables for each user for each enrolled finger which are stored in memory 7, 7A. *Mathiassen,* [0071] ("…a master minutiae table, **created during the enrolment of the authorized user(s), stored in non-volatile memory (7, 7A, or 7C)**.").

223.   This same process of creating master minutiae tables during enrollment occurs when the car owner enrolls "one or more of his fingers." *Mathiassen,* [0164]. Thus, enrolling both new users and the car owner involves creating master minutiae tables that are then stored in 7, 7A, which (as discussed above at Claim 10(a1)) teaches the claimed "populating the database."

224.   The created master minutiae tables make up a database, such that creating and storage of the tables is "populating the database," as claimed. As discussed above at Claim 10(Pre2), a POSITA would have understood the master minutiae tables comprise a "database of biometric signatures." Thus, a POSITA would have understood that the generation of the minutiae or fingerprint representations from a user's fingerprint that were then contained in these master minutiae tables thereby populates the database, as claimed.

225.   *Mathiassen* discloses for the medicine cabinet embodiment the process of the system administrator enrolling other users into the system, with the process beginning with the system administrator authenticating themselves. *Mathiassen*, [0131]. It would have been obvious to a POSITA for the enrollment process for the medicine cabinet embodiment to be similarly applied for the portable door control embodiment. *Mathiassen* expressly discloses the car owner becomes the system administrator, thus indicating the car owner has the capability to enroll other users. *Mathiassen,* [0131] (disclosing the system administrator enrolls "the next user"). The car owner, desiring to enroll other users, would then have initiated the enrollment process by providing their fingerprint (per *Mathiassen* as otherwise modified by *Anderson*). Furthermore, because *Mathiassen* teaches the portable door control embodiment is concerned with keeping un-authorized users from accessing the car, a POSITA would have been motivated to implement this extra level of

security of requiring the car owner/system administrator to initiate the enrollment process of creating master minutiae tables for a user. *Mathiassen,* [0145]. This extra level of security prevents just any person from providing their fingerprint to the portable door control and potentially becoming an authorized user, even if they were not meant to be one. *Mathiassen,* [0131] ("When the next user is to be enrolled, the system administrator **will have to open this procedure by authenticating himself by his fingerprint.** When such **access by the system administrator is authenticated**…the next user can be enrolled."). Thus, it would have been obvious and desirable for enrollment of other users on the portable control to be implemented in a similar method as for the medicine cabinet embodiment, i.e., by having the administrator initiate enrollment with the administrator's fingerprint.

226.   I note *Mathiassen* teaches the medicine cabinet embodiment and the portable door control embodiments are "fundamentally different" because the "main intention" of the medicine cabinet embodiment "was not to prevent access, but to guarantee access," as opposed to the goal of "blocking non-authorized users access to the car." *Mathiassen,* [0145]. In other words, the medicine cabinet embodiment grants access to everyone, while the central locking system of the car embodiment only grants access to authorized users. However, implementing an enrollment procedure similar to that disclosed for the medicine cabinet embodiment would not have kept *Mathiassen's* central locking system from still blocking an un-authorized

user of the car, because the access would still reside "**in the fingerprints of the car owner (or other users he may have enrolled**)." *Mathiassen,* [0190]. In fact, implementing an enrollment procedure similar to that disclosed for the medicine cabinet embodiment would facilitate the key objective of the car embodiment by allowing the system to know which individuals are known and should be granted access. Therefore, a POSITA would not have been dissuaded from looking to the procedure of enrolling other users in the medicine cabinet embodiment to understand the car owner (i.e., system administrator) enrolling other car users in the central locking system.

### b)    "according to the instruction"

227.    I note that Claim 10(a3) recites that the population of the database is "according to the instruction." As one example of *Mathiassen's* teachings of populating the database according to the instruction, *Mathiassen* teaches or renders obvious initiating an enrollment process via the car owner/administrator's fingerprint, as I discuss above in ¶¶ 220-226. However, *Mathiassen* does not directly teach that the enrollment process, which populates the database of biometric signatures, occurs according to an instruction mapped *from a series of fingerprint entries*. But, as discussed above with regard to Claim 10(a3), *Mathiassen* does teach directing a particular command (i.e., claimed "instruction") through a series of fingerprint representations. *Mathiassen,* [0192]. Additionally, *Anderson* similarly

teaches invoking a certain requested function via a series of fingerprint presses or pulses of specific durations. *Anderson* (Ex. 1006)*, 6:37-54, 7:28-34. Thus, a POSITA would have found it obvious and been motivated to modify *Mathiassen's* enrollment procedure to be initiated with a series of fingerprint presses of particular durations, as taught by *Anderson*, which is input by the car owner/system administrator, as taught by *Mathiassen*.

228. As discussed for Claim 10(a3) at ¶ 217, it was a well-known desire within the field of portable devices to increase the simplicity of user input. *See Ghassabian* (Ex. 1031)*, 1:54-58 (disclosing that a "key feature for a successful technological product is its easily manipulation," further stating a "**quickly, easily and most importantly, naturally…function entry system is vital**."); *see also*, *Mathiassen '455* (Ex. 1033)*, 6:33-38 (further disclosing the mapping of fingerprint movements to certain text symbols or device instructions provides "combined user authentication by finger print biometrics, accurate cursor control and **fast, versatile, and flexible text input,** all served by the very same single-button sensor"). Thus, a POSITA would have found it obvious or understood to employ a series of finger interactions on the sensor 5 of portable door control 20 to instruct certain commands, especially given *Mathiassen's* express teaching of predefined finger movement sequences being translated to commands in a command table for outputting certain control signals for controlling the device. *Mathiassen*, [0192]. This teaching

indicates to me that *Mathiassen* desires to use different finger movements to instruct different commands for operating the portable door control and central locking system. Furthermore, *Mathiassen's* disclosure at [0192] already teaches means for inputting of commands via a portable device. *Id.*

229.   Additionally, in cases where *Mathiassen's* method of secure access control is implemented in a portable device, such as portable door control 20, a POSITA would have appreciated that car owners/system administrators would have benefited from the increased functionality of enrolling users on-the-go, by simply providing a series of presses/pulses of certain durations (as modified by *Anderson*) to instruct a command to enroll. For example, when a car owner desired using a valet service, they would simply input the series of presses/pulses of certain durations (as modified by *Anderson*) to initiate the enrollment procedure in real-time as opposed to requiring a specific terminal. *Mathiassen,* [0062] (disclosing another enrollment procedure which requires use of a "terminal connected to the server (30)"). *Mathiassen* also already teaches requiring a certain type of input to instruct the portable door control 20 to enroll a new user by a car owner/system administrator providing their fingerprint, thus indicating to a POSITA that an instruction was directed by a certain type of entry. *Mathiassen,* [0190], [0165], [0131].

230.   *Mathiassen's* teaching of a car owner/system administrator's inputs both invoking the enrollment process <u>and</u> invoking access to the central locking

system (i.e., opening the car door locks) indicates to a POSITA that one user, namely an administrator, is operable to provide more than one command to the portable door control. *Mathiassen,* [0190], [0175-188] (describing the command of opening the car door locks), [0131] (describing the system administrator providing an instruction to start enrollment of a new user). For a car owner/system administrator to input different commands and for the portable door control to differentiate these inputs and categorize them to their respective requested commands, a POSITA would have desired implementing a different input, such as a series of presses/pulses of varying duration (as modified by *Anderson*) for initiating the enrollment process and a different input, such as a simple fingerprint, for commanding the car door locks to open. This differentiation of inputs for each command requested by the car owner would then have allowed the portable door control to easily translate the categorized finger movement using the command table to generate the correct control signal.

231.    Indeed, administrators providing a specific input for initiating the enrollment of new users was well-known in the field of biometric authorization. *Bradford* (Ex. 1010), 14:21-41 ("In one preferred embodiment, casino personnel **will be required to enter two fingertips' worth of fingerprint data in succession**…**to be allowed access to the privileged screens on the player ID system**."). More specifically, *Bradford* discloses a system using biometric authorization to create "an entry having biometric data in a player ID database." *Bradford,* 14:21-23. For a

player to create an entry, a "trusted employee" such as an "authorized casino personnel" presents an employee ID card followed by their biometric to "open the privileged screens allowing data entry." *Bradford*, 14:31-37. *Bradford* teaches in a "preferred embodiment" that the "casino personnel will be required" to enter two fingerprints in succession in order to open the privileged screens and thus allow enrollment of a new player to occur. *Bradford,* 14:37-41. Thus, *Bradford* illustrates that it was already known in the art to implement an enrollment procedure for populating a database by using a series of fingerprints, and that this procedure was specific for indicating enrollment initiation, as it was done after the administrator provided a first biometric (i.e., fingerprint). Therefore, a POSITA would have been motivated and found it obvious to similarly implement a specific series of presses/pulses of various durations, as taught by *Anderson*. The car owner/system administrator would have input to the portable door control 20 a command for initiating enrollment to thereby generate master minutiae tables, thus teaching "populating the database according to the instruction," as claimed.

232.   I have been asked to opine as to whether *Mathiassen* teaches populating the database "according to the instruction" if this claim phrase means populating the database with a series of entries corresponding to a particular instruction. In my opinion, *Mathiassen* also teaches such. *Mathiassen* teaches or renders obvious analyzing and categorizing finger movements "**according to predefined sets of**

**finger movement sequences**" to various commands by reference of a command **table**, with the command table used to translate the categorized finger movements into control signals. *Mathiassen,* [0192]. As previously discussed for Claim 10(a3), *Mathiassen's* teaching of "sets" of finger movement sequences and that these sets of finger movement sequences are translated to control signals via a command "table" indicates that there are multiple series of biometric signals, and that each series of biometric signals matches to a certain command in the table to invoke a particular control signal. A POSITA would have understood such a disclosed set corresponding to commands in a "command table" is at least equivalent to a database of instructions, as the '208 Patent similarly describes a "**stored set of legal control signals**." *'208 Patent,* 10:52-56.

### 11.    Claim 10(b): "receiving a biometric signal"

233.    As discussed above with respect to Claim 10(Pre3), *Mathiassen* teaches sensor 5 on portable door control 20 that receives a biometric signal (i.e., fingerprint). Specifically, *Mathiassen* teaches the car owner "swipe[ing] his finger across the sensor (5) of the portable door control (20)" in order to "access the car." *Mathiassen* (Ex. 1004)*,* [0175-0176]. The pre-processing block 5C of the IC 1 on portable door control 20 then "reduce[s] the captured fingerprint image to a reduced intermediate format" and feeds it to the processor 2 of the IC 1 which "reduce[s] the

captured and pre-processed fingerprint image to compact master minutiae format."

*Mathiassen,* [0177-0179].

### 12.   Claim 10(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"

234.   I apply the construction of "accessibility attribute" to mean "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user." Section III.B.1. It is my opinion that *Mathiassen* as modified by *Anderson* as further modified by *McKeeth* teaches "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute." As I discuss below, *Mathiassen* teaches outputting an accessibility attribute that is an "access" attribute, namely when the car owner/administrator's access minutiae match the stored minutiae. *McKeeth* teaches outputting an accessibility attribute that is either a "duress" attribute or an "alert" attribute. It would have been obvious to modify *Mathiassen* to include the duress and alert attributes described in *McKeeth* for the reasons I discuss in ¶¶ 249-255, below.

### a)   "database of biometric signatures"

235.   As discussed above for Claim 10(Pre2), a POSITA would have understood *Mathiassen* teaches a "database of biometric signatures," as claimed, which are the master minutiae tables stored in the memory 7,7A of the portable door

control 20. *Mathiassen* (Ex. 1004)*,* [0165] (disclosing storing master minutiae tables "in the non-volatile memory (7A) of the IC (1)" in the portable door control 20).

### b)    "matching the biometric signal against members"

236.    *Mathiassen* teaches "matching the biometric signal against members of the database of biometric signatures," as claimed, by comparing the "access minutiae table" reduced from the presented biometric signal (i.e., fingerprint) "with the master minutiae table(s) pre-stored at time of enrolment in non-volatile memory (7A)." *Mathiassen,* [0176-0180] (disclosing the process of the sensor 5 on the portable door control 20 receiving a biometric signal from the user and comparing it with master minutiae tables stored in memory). When comparing the represented biometric signal (in the form of an access minutiae table) to the master minutiae tables (i.e., database of biometric signatures), "[i]n case of **a match the process will be allowed to continue. If no match, the process will be aborted**." *Mathiassen,* [0181], *see also* [0182] ("Provided the processor (2)" of the portable door control 20 "established a **match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors**."). Processor 2 of the portable control 20's IC executes a matching algorithm that is a "subset" of the administrative software in order to perform the comparison. *Mathiassen,* [0071-0072].

237. The biometric signal is matched against members of the database of biometric signatures (stored master minutiae tables) because the raw images received from the biometric signal (i.e., fingerprint) are reduced to the access minutiae tables, which themselves are compared to the stored master minutiae tables. *Mathiassen,* [0050] (disclosing the minutiae are representations of the fingerprint reduced from "the captured fingerprint image"). Therefore, the biometric signal, as represented by the access minutiae tables, is matched "against members of the database of biometric signatures," as claimed.

*238. Mathiassen* teaches that if the access minutiae table matches with one of the pre-stored master minutiae table(s), the processor 2 of the portable door control 20 "will proceed to open (or lock) the car doors." *Mathiassen* (Ex. 1004)*,* [0180-0182]. When a user requests to open the car door locks, the processor 2 "issue[s] the 'open door' command to the encryption block (8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)." *Mathiassen,* [0185]. This temporary password is generated by the SKG block 8A when the processor 2 "fetch[es] the seed from the non-volatile memory (7A) and feed[s] it to the SKG block (8A)." *Mathiassen,* [0183-0184]. The encrypted "open door" command is then "wirelessly transmitted by the transceiver 27 from the portable door control (20) to the embedded ignition control," with this transmitting process further discussed above at Claim 10(d). *Mathiassen,* [0186].

### c)    "to thereby output an accessibility attribute"

239.  My opinions apply the construction of an "accessibility attribute" provided in Section III.B.1. *Mathiassen's* "open door" command as modified by *McKeeth's* teaching of duress and alert modes teaches or renders obvious outputting an accessibility attribute, as claimed.

240.  I first note that the '208 Patent describes one of the "accessibility attributes" to be an "access attribute (granting unconditional access)." *'208 Patent,* 8:19-21. The '208 Patent also describes that upon matching an access biometric signal with a stored signal, access is provided to the controlled item. *Id.* at 12:1-10. I note that in the '208 Patent, the biometric signal provided by the user determines which category of access is provided, e.g., access, duress access, or alert access. *Id*. at 11:27-42, 12:1-27. Therefore, in instances where the user is providing a biometric signal instructing opening the controlled item and without any further conditions (e.g., a duress condition), then per the '208 Patent, 12:1-10, access to the controlled item is granted. The '208 Patent further describes that when the user indicates a duress condition via their biometric signature, "duress" access is provided. *Id.* at 11:27-42. And, when there is no match with the provided biometric signature, access is not provided to the controlled item and an alert tone is actuated. *Id.* at 12:11-27.

241.  Turning to *Mathiassen's* teachings, *Mathiassen's* "open door" command issued by the processor 2 to the encryption block comprises outputting an

accessibility attribute because the "open door" command establishes "whether and under which conditions access to the controlled item should be granted to the user." When issuing the "open door" command, this command indicates "whether" access should be granted because the command instructs opening the car door locks in response to the user's access minutiae matching with a stored biometric signature of the car owner/administrator. *Mathiassen*, [0182]. Thus, access is granted to open the car door locks. *Id.* In contrast, if the processor 2 does not find a match, then no access will be granted because **"the process will be aborted**." *Mathiassen,* [0181]. Thus, the "open door" command indicates that access should be granted.

242.   *Mathiassen's* open door command issued in response to the matching of the car owner/system administrator's access minutiae also indicates **under what conditions** access is granted, specifically an access condition. In my opinion, a POSITA would have reasonably understood the car owner/administrator requesting access to the car doors has unconditional access to the central locking system. *See* ¶¶ 142, 151. This is especially true as *Mathiassen* describes the car owner/administrator enrolling other users, thus indicating that the administrator has full access capabilities, including requesting access and granting access to others.

243.   In *Mathiassen,* when the processor 2 of the portable door control 20 matches the owner's access minutiae table to a pre-stored master minutiae table, the "open door" command is issued to the encryption block to grant unconditional

access, much like the "accessibility attribute" example described in the '208 Patent.

Thus, *Mathiassen* also teaches the "open door" command includes outputting an accessibility attribute indicating under which conditions, namely providing full access based on the matching of the access minutiae to the car owner/administrator's pre-stored master minutiae table, to thereby issue the "open door" command.

244. I note that the access provided to the car owner/administrator in *Mathiassen* is substantially similar to the access granted to a user under the "access" attribute in the '208 Patent. *See '208 Patent*, 8:19-21, 12:1-10. Specifically, the '208 Patent describes that upon a successful match of a user's biometric signature to a stored signature in the "access" category, the user is granted access. This is substantially similar to *Mathiassen's* teaching of providing access upon a successful match to stored minutiae. Thus, *Mathiassen* teaches outputting an accessibility attribute, where the outputted accessibility attribute indicates under what conditions access is granted, namely full or unconditional access.

245. Turning now to *McKeeth's* teaching, in my opinion *Mathiassen* in combination with *McKeeth* teaches outputting two or more accessibility attributes. *McKeeth* teaches outputting at least two accessibility attributes, namely a duress attribute and an alert attribute. Specifically, *McKeeth* teaches different conditions under which a certain type of access may be granted, namely a **duress** condition and

an **alert** condition (which *McKeeth* refer to as a "mode of operation"). *McKeeth* (Ex. 1005)*, 4:29-43, 5:48-53, 6:36-40.

246.    In *McKeeth*, access is granted where "there is a match between the input and security information." *McKeeth*, 3:65-67, 3:11-28 (describing different types of input security information, including a fingerprint scan). "If the input and security information do not match, the compare circuit issues a 'flag' signal indicating denial of access by the user." *McKeeth*, 4:2-4. Therefore, *McKeeth*, like *Mathiassen*, teaches **whether access is granted**.

247.    *McKeeth* further teaches a user "performs a fingerprint scan and/or pattern" to gain access to the computer system 100. *McKeeth,* 3:52-4:4. The disclosed "pattern" is a geometric pattern that may be required "concurrently with, or after a predetermined duration from, scanning his/her fingerprint" that indicates the user is requesting normal access. *McKeeth,* 4:10-27. If the user incorrectly performs this geometric pattern, this input indicates to the system that the user is under duress. *McKeeth,* 4:29-33. Upon the user indicating a duress condition, the system grants access while concurrently issuing a "silent security alert" to security personnel. *McKeeth,* 4:33-43 (disclosing that "[u]sing the silent security alert mode silent alert minimizes risk to the user under duress"). The system determining the user is under duress and instructing such to the system teaches the claimed "outputting an accessibility attribute," because the instructed duress condition

indicates whether and **under what condition**, namely a duress condition, to grant access.

248. In an alternative configuration, if "**the computer system 100 determines that the generated pattern does not match a stored pattern**, the computer system 100 may…**lock up the computer system 100 and generate a security alert to the responsible authorities.**" *McKeeth,* 5:48-53. As discussed above for Claim 10(Pre3), *McKeeth's* teaching of locking up the computer system 100 indicates that access is denied, as the user cannot use the computer system 100. A POSITA would have understood this denial of access and generation of a security alert is outputting an accessibility attribute, as claimed. For example, the '208 Patent describes a similar example when listing accessibility attributes that comprises "an alert attribute" that does **not** "provide access to the controlled item 111, and (b) **to provide an alert tone**, like ringing a chime or a bell." *'208 Patent* (Ex. 1001)*,* 8:23-25, 12:15-19, *see also, '208 Patent,* 16:38-40 (claiming a type of conditional access includes "**denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute**"). Thus, the '208 Patent describing a similar denial of access (deny access and provide an alert tone) as *McKeeth* (deny access and generate a security alert to the authorities). *See also Discussion at Claim 10(Pre3).*

**d)    Motivation to Combine *McKeeth* with *Mathiassen* as Modified by *Anderson***

249.    A POSITA would have been motivated and found it obvious to modify *Mathiassen's* portable door control (as modified by *Anderson*) to output a duress attribute or an alert attribute, as taught by *McKeeth*, so that the emitted secure access signal conveys information regarding the user being in a duress or alert condition. *See also,* motivation to combine *Mathiassen* and *McKeeth* at Claim 10(Pre3) (Section VI.A.1.e) and discussion below regarding Claim 10(d).

*250.*    Modifying *Mathiassen's* command issued by the processor 2 of the portable door control 20 to include a duress or an alert accessibility attribute, as taught by *McKeeth,* would have had a reasonable expectation of success. *Mathiassen* already teaches the hardware and software for outputting duress and alert accessibility attributes. As noted above, *Mathiassen* teaches the car owner inputting their fingerprint to open the car door locks and that the car owner may enroll "one **or more of his fingers**." *Mathiassen,* [0164]. *Mathiassen* also teaches a user may instruct different commands for the central locking system by providing different finger movements on the portable door control 20. *Mathiassen,* [0192]. Thus, for the portable door control to output a duress attribute in an encrypted command, the modification to *Mathiassen* simply requires enrolling a car owner's second finger or series of fingers for this duress command while a first enrolled finger indicates an

"open door" command, so that when the second finger's or series of fingers' access minutiae match with the pre-stored master minutiae table, the processor 2 of the portable door control 20 issues a duress command (i.e., claimed outputting an accessibility attribute) indicating to grant access and issue a silent alert. Seeing as *Mathiassen* already teaches a "command table," where different finger movement inputs are translated to output different control signals, it would have been within a POSITA's expertise to include pre-set movement of the second fingerprint to translate to a duress command within this table, as taught by *McKeeth*.

251. Additionally, *Mathiassen* already teaches denying access to un-authorized users. *Mathiassen,* [0145], [0181] (disclosing aborting the process "to open (or lock) the car doors" when the provided fingerprint does not match any of the pre-stored master minutiae tables). *Mathiassen* also teaches the portable door control 20 is at least capable of outputting two commands: a lock command or an "open door" command. *Mathiassen,* [0182], [0167]. Thus, a POSITA would not have found it challenging to include an additional alert command output when the user was denied access to instruct the car alarm to sound (i.e., issuing a security alert). *See discussion above at motivation to combine for Claim 10(Pre3).* Thus, when the biometric signal did not match with any members of the database of biometric signatures, the alert command would be issued by the processor 2 (i.e., outputting an accessibility attribute).

252.    *Mathiassen* already teaches hardware/software for receiving, storing, and matching access minutiae tables with pre-stored master minutiae tables (database of biometric signatures), which includes the processor 2, pre-processing block 5C, sensor 5. *Mathiassen,* [0180-0182]. *Mathiassen* also already includes hardware/software for issuing a command to the encryption block 8A or 8C, namely processor 2, SKG block, and non-volatile memory (7A). *Mathiassen,* [0183-0185]. *Mathiassen* also contemplates a user enrolling multiple fingers and instructing multiple commands in a command table through a series of finger movements. *Mathiassen,* [0192]. Thus, modifying *Mathiassen* to enroll a second finger, or series of finger movements, to instruct a duress command requires simple programming add-on to the techniques already taught by *Mathiassen*, namely to simply enroll another fingerprint or finger movement (already taught by *Mathiassen*) and encoding another command for placement in the command table.

253.    This command would contain information indicating to the central locking system to issue a silent security alert or sound an alarm when a duress or alert command are encrypted in the transmitted signal, respectively. This encoding and issued command would not have required any challenging modification outside the knowledge of a POSITA, because *Mathiassen* already teaches embodiments connecting the secure access controlled item to the portable device via a network for sending the encrypted signal to a third-party, [0047] (disclosing using the portable

access device "in an access-limited apparatus, device, **network or system (N),** e.g. a computer terminal, an **internet** bank or a corporate or government **intranet**.") Furthermore, as stated above with respect to Claim 10(Pre3), commercially-available cars were well-known to include such connections to a third-party, such as OnStar™ for sending a silent alert. In the modified *Mathiassen*, when the central car computer or ignition control received a secure access signal conveying an alert accessibility attribute (i.e., alert command), the central car computer would not relay a command to the car door locks to keep them from opening and would send a signal to the car alarm to sound the alarm. *See, e.g., Nonaka* (Ex. 1050)*, [0072]* (describing a micro-computer of a vehicle controlling a speaker to output an "alarm sound or the like."), *see also* [0017-0018]; *Sonders* (Ex. 1051)*, 7:20-35, 8:61-65* (describing "logic control circuitry" in a vehicle sends a signal via a closed "relay" to sirens in a car to sound an alarm).

254.    Thus, a POSITA would have found it obvious to implement *Mathiassen's* central locking system in such a vehicle already containing network access to a third-party, such as through a cellular communication network or via an internet connection, and thus would have transmitted the duress command to this network, like OnStar™, to issue a silent alert. *See, e.g., Hsu* (Ex. 1039)*, 4:54-65, 5:46-54* (disclosing a car computer for fetching electronic mail, which is known to be retrieved via internet connection); *DeLine* (Ex. 1047)*, 31:46-48* (describing

OnStar™ as a "wireless telecommunication system"), *see also id.* at 32:2-3. In fact, *Mathiassen* even contemplates including "cellular phone" access within the car embodiment. *Mathiassen* (Ex. 1004)*, Fig. 9. Thus, a POSITA would have utilized *Mathiassen's* central locking system in a car capable of transmitting the encrypted duress command incorporating an output duress accessibility attribute to a third-party via a network, such as via a cellular network as used in OnStar™.

255. Additionally, *Mathiassen* teaches sending the transmitted encrypted command to the central car computer or embedded ignition control for decryption and authentication, which then relays the "similarly encrypted command to the car door locks." *Mathiassen,* [0186-0188]. Because *Mathiassen* teaches that central car computer or ignition control may send the encrypted signal to the car door locks, a POSITA would have found reasonable success in additionally relaying the signal with an outputted alert accessibility attribute to the vehicle's car alarm to issue an alert. All of these components are within the car, and *Mathiassen* states the car embodiment applies the secure access control method in a "local network," thus indicating to a POSITA that any components of the car may be connected to one another. *Mathiassen,* [0108]. Furthermore, a POSITA would have understood that because the central car computer is hard-wired to the ignition control, similarly wiring the central car computer to the car alarm would not have produced any technical hurdles. *Mathiassen,* [0149]. Thus, a POSITA would have found

reasonable success in modifying *Mathiassen's* central car computer to be wired to the car alarm for relaying the encrypted signal with an alert command encompassing an alert attribute so the car alarm would sound and thus generate a security alert.

### 13.    Claim 10(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute"

256.    As discussed for Claim 10(Pre5) and Claim 10(c), *Mathiassen's* portable door control 20 emits a secure access signal conveying information dependent upon the accessibility attribute. More specifically, *Mathiassen* teaches that processor 2 of the portable door control 20 "will issue the 'open door' command to **the encryption block (8A or 8C) that in turn will encrypt it based on the valid, and <u>temporary password</u> from the SKG block (8A)**," and this encrypted signal is "**wirelessly <u>transmitted</u>** by the transceiver (27) of the portable door control (20)…." *Mathiassen* (Ex. 1004)*,* [0185-0186]. As discussed for Claim 10(Pre3), the encrypted "open door" command is a "secure access signal," as claimed, because it is encrypted via a non-repeatable and non-replayable password that is unique for every "transaction" and because the signal includes instructions for the system to use to provide access to the user. Furthermore, as discussed for Claim 10(Pre3), a POSITA would have understood that this encrypted "open door" command, as well as any other encrypted command, is a "signal" because it is electronically "issued"

by a processor 2 to other hardware components and transmitted via a transceiver 27.

Thus, *Mathiassen* teaches emitting a secure access signal, as claimed.

257.    From the description in the '208 Patent, a POSITA would have understood the "information" to be conveyed by the secure access signal to convey the access being granted, e.g., granting access, granting duress access, or no access. *'208 Patent* (Ex. 1001)*,* 8:17-23 (describing unconditional access and providing access when the user is under duress), 12:17-20 (describing denying access to the controlled item).

258.    Similarly, in *Mathiassen* when a user requests to open the car door locks, the information conveyed in the encrypted "open door" command (i.e., secure access signal) is to grant access. This information conveying the access granted is dependent upon the accessibility attribute, such as granting full or unconditional access to the car owner/administrator. The information in the command results from determining the type of access that should be provided to the user and encrypting the command using the temporary password from the SKG block.

259.    In more detail, when viewing *Mathiassen* alone without *McKeeth's* teachings, we know that *Mathiassen* matches a fingerprint of a car owner/administrator and further provides for the car owner to enroll other users. When the car owner's fingerprint is matched against the stored minutiae tables, access is granted. The access has no restrictions or requires no further actions

because it is the car owner whose fingerprint was matched. By matching the car owner's fingerprint and issuing an open door command, *Mathiassen* teaches outputting an accessibility attribute, where the accessibility attribute is simply "grant access," similar to as described in the '208 Patent, 8:19-21.

260.  When viewing *Mathiassen* in combination with *McKeeth's* teachings, the modified *Mathiassen* portable control can now output multiple accessibility attributes. By providing another command input (e.g., series of fingerprint movements or another finger) to instruct another command, the modified *Mathiassen* portable control is operable to output an access attribute, a duress attribute, and an alert attribute, dependent on the input command. In each circumstance, the emitted command from the portable control conveys information specific to the inputted command. That is, the emitted command conveys information dependent on whether the matched fingerprint movements or fingerprint translated to an access command, a duress command, or an alert command. Thus, the emitted command conveys information dependent on the accessibility attribute, as claimed. *See the motivation to combine Mathiassen and McKeeth above at Claim 10(c).*

### 14.    Claim 10(e): "providing conditional access to the controlled item dependent upon said information"

261.    Regarding the claimed "conditional access," as discussed for Claims 10(Pre4) and 10(Pre5), *Mathiassen* teaches a receiver subsystem that includes the ignition control 15, central car computer, and transceivers at the car door locks that provide conditional access to the car door locks (i.e., the claimed "controlled item") dependent upon information in the secure access signal. When an "open door" command is received by *Mathiassen's* ignition control, the processor of ignition control decrypts the command and relays a "similar encrypted command" if the decryption process "confirms a valid and authenticated 'open door' command." *Mathiassen,* [0187]. Because the relayed command is similar to the "open door" command, the relayed re-encrypted command that is sent to the car door locks is also dependent upon "said information," i.e., the accessibility attribute in the received encrypted command. Thus, the access provided to the car door locks is "conditional" because it depends on the accessibility attribute output in the "open door" command.

262.    For example, in circumstances where the car owner/administrator desires to access the car door locks (*Mathiassen*, [0175-0176]), the relayed open door command includes full or unconditional access to the central locking system, as I discuss for Claim 10(c). Thus, the conditional access then provided to the car owner is to simply "grant access." Additionally or alternatively, in the modified

*Mathiassen* to include the duress and alert conditions of *McKeeth*, in circumstances where the user desires to indicate a duress condition, the relayed open door command instructs opening the door and sounding an alarm (as I discussed in Section VI.A.12.c-d and VI.A.13).

263.   As discussed above at Claim 10(c), a POSITA would have found it obvious and desirable to implement *Mathiassen's* central locking system in a vehicle containing a network connection to a third-party for receiving silent security alerts, such as OnStar™. When the central car computer or ignition control received a secure access signal with an encrypted duress command, the central car computer would have relayed a similarly encrypted command to open the car doors while also sending a signal via the communication network of OnStar to notify security personnel. This access would only be provided upon the condition that the central car computer or ignition control received a secure access signal conveying a duress accessibility attribute.

264.   Additionally, a POSITA would have understood that the access granted when the alert accessibility attribute (i.e., duress command) is encrypted in the signal is to "deny access" and sound the car alarm. As discussed above with regard to Claim 10(c), a POSITA would have also implemented *Mathiassen's* central locking system in a car with a car alarm, as it was well-known that cars included a car alarm prior

to August 13, 2003, and would have hard wired the central car computer to connect to the car alarm so the car alarm would be controlled by the central car computer.

265.    Alternatively, as discussed above at Claim 10(Pre3), it was known prior to August 13, 2003, that portable vehicle key fobs included security measures that simultaneously locked car door locks and sounded an alarm. *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041) at 7 (describing a "panic mode" security measure on a vehicle key fob where "**the siren sounds** and parking lights flash," and "**the vehicle's doors will lock**."). Thus, instead of not relaying a command, the central car computer would alternatively relay an encrypted command to lock the car doors and concurrently transmit a signal to the car alarm to activate it.

### 15.    Claim 10(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"

266.    As discussed above at Claim 10(Pre1), the "controlled item" of *Mathiassen* is the central locking system, with this locking system including physical locks on the car doors. *Mathiassen* (Ex. 1004)*,* [0187] ("If the decrypted message confirms a valid and authenticated 'open door' command, a similar encrypted command will be **relayed to the car door** locks by the computer."), [0145] (disclosing one "application" of the secure access control method "to car systems" as a "key to the doors of the car (central locking system)…"). These car door locks

are "a locking mechanism of a physical access structure," namely a locking mechanism of a door to the car. Thus, *Mathiassen* teaches a controlled item that is "a locking mechanism of a physical access structure."

### B.    Claim 11

**Claim 11: "The method according to claim 10, wherein the step of populating the database of biometric signatures further comprises the step of enrolling a biometric signature into the database of biometric signatures comprising the steps of: receiving a biometric signal; and enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty."**

267.    *Mathiassen* teaches Claim 11. As discussed above with regard to the mapping of Claim 10(a), *Mathiassen* teaches "populating the database of biometric signatures." This process includes enrolling a user's fingerprint into the portable door control by generating master minutiae tables (i.e., populating the database) that contain fingerprint representations in the form of minutiae (i.e., biometric signatures) reduced from raw captured fingerprint images when a fingerprint is received on the sensor 5 (i.e., biometric signal received), with these tables then stored in memory 7, 7A. *Mathiassen* (Ex. 1004)*, [0164] ("Then the car owner will **enroll one or more of his fingers on the portable door control unit (20)**" by capturing images of the fingerprint which are reduced to master minutiae tables stored in "memory (7A) of the IC (1)").

268.    *Mathiassen* teaches "enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty," because when the sensor

5 of the portable door control 20 receives a fingerprint (i.e. biometric signal) from "**the first person to enroll**," this person "**becomes the 'owner' of the car, in the sense that he becomes the <u>system administrator</u>**." *Mathiassen,* [0165], [0162] (disclosing the "IC (1) of the portable door control (20)" to be "waiting for the **<u>first user to be enrolled to be the system administrator</u> of the biometric system in the car**").

269.    A POSITA would have understood that because *Mathiassen* teaches the "first person to enroll" becoming the administrator, that the received fingerprint (i.e., biometric signal) is enrolled as an administrator when the database is empty (i.e., no master minutiae tables are generated). If the user is the first person to enroll, then no one else has enrolled their fingerprint and therefore no master minutiae tables have been generated to subsequently be stored in the memory 7, 7A. Furthermore, *Mathiassen's* teachings that the first person to enroll "becomes the 'owner' of the car, **in the sense that he becomes the system administrator**" would have indicated to a POSITA that minutiae of the car owner are stored in reference to the user being an administrator, thus making them an "administrator signature," as claimed.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

C.    **Claim 13**

**Claim 13: "A non-transitory computer readable storage medium for storing a computer program comprising instructions, which when executed by processors causes the processors to perform the steps of the method of claim 10"**

270.    *Mathiassen* as modified by *McKeeth* and *Anderson* teaches Claim 13. In order to perform the method of "providing secure access to a controlled item" (i.e., the functions mapped in Claim 10), the IC 1 of both the portable door control 20 and the ignition control 15 stores "program code" in non-volatile memory for performing the described steps. *Mathiassen,* [0050], *see* Section VII.

271.    The described non-volatile memory for storing the "program code" on the IC 1 is a well-known "non-transitory computer readable storage medium," as claimed. For example, the "non-volatile" memory taught by *Mathiassen* is "non-transitory" because information remains in the storage even when the power is disconnected. *Mathiassen,* [0050]. This is in contrast to *Mathiassen's* "volatile memory," which is only used for short periods of time to store the access minutiae when a user swipes their fingerprint across the sensor. *Mathiassen,* [0049], *see also* [0067-0069] (describing that the volatile memory is used temporarily for storing the intermediate representation of the fingerprint before it is finally sent to the processor 2 for reduction to minutiae). Additionally, the non-volatile memory 7, 7A  is a "computer readable storage medium" because it is a physical piece of hardware

residing on the IC 1 that contains instructions read by the processor 2, among other components of the IC 1. In fact, *Mathiassen* teaches such an example of the non-volatile memory being a "SmartCard" [0060], which was well-known to be a physical "storage medium." *Jung* (Ex. 1055), 1:12-15 (describing a smart card being a "data storage device" that contains a "non-volatile memory"). Thus, *Mathiassen's* "non-volatile memory 7, 7A" is a "computer readable storage medium."

272.    Additionally, it is well known that a processor, such as processor 2 in the IC 1, executes a "computer program **comprising instructions**," as claimed, to perform functions. *Microsoft Press Computer Dictionary,* Second Edition, JoAnne WoodCock, 1994 (Ex. 1044) at 69 (defining a processing unit as "The computational and control unit of a computer; the **device that interprets and executes instructions,"** further stating it "has the ability to fetch, decode, and execute instructions…").

273.    Therefore, for all of the reasons discussed above, the modified portable control of *Mathiassen* and ignition control/car computer include or render obvious the "non-transitory computer readable storage medium for storing a computer program comprising instructions, which when executed by processors causes the processor to perform the steps of the method of claim 10," namely the program code stored in non-volatile memory 7, 7A of the IC's in the ignition control and portable door control as well as memory in the central car computer. It is noted that computers

were known to contain "computer readable storage medium," and that the central car computer would have had a non-volatile memory for storing instructions to implement the decryption of the encrypted command so when power was lost to the central car computer the instructions were still maintained in the memory, as discussed above with regard to Claim 10(Pre4). *PC Basics Get a Great Start,* Gateway, 2002 (Ex. 1049) at 12-13 (listing both "memory cards" and "storage devices" as common components in a computer).

### D.    Claim 1

#### 1.    Claim 1(pre): "A system for providing secure access to a controlled item, the system comprising"

274.   *Mathiassen* teaches a system for providing secure access to a controlled item, such as the central locking system that includes portable door control 20, ignition control 15, and central car computer. *Mathiassen* (Ex. 1004)*, [0145-0147].* In short, the portable door control transmits encrypted commands to the ignition control 15 or central car computer which relays the authenticated command after decryption to the car door locks in order to "open (or lock) the car doors." *Mathiassen,* [0182-0188]; *See discussion above for mapping of Claim 10(Pre1) which recites a "method…in a system"*

#### 2.    Claim 1(a): "a database of biometric signatures"

275.   See discussion of mapping above for Claim 10(Pre2).

### 3.   Claim 1(b): "a transmitter subsystem comprising:"

276.   See discussion of mapping above for Claim 10(Pre3), subsection "a."

### 4.   Claim 1(b1): "a biometric sensor for receiving a biometric signal"

277.   See discussion of mapping above for Claim 10(Pre3), subsection "b."

### 5.   Claim 1(b2): "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute"

278.   The support relied on for describing the "means for matching" discussed at Section III.B.2 generally describes matching a received biometric signal to a biometric signature in the database. As discussed above with regard to Claim 10(c), *Mathiassen's* processor 2 in the IC 1 of the portable door control 20 executes the matching algorithm to perform the claimed "matching" function. *See discussion of mapping above for Claim 10(c).* In short, *Mathiassen* teaches the processor 2 of the IC 1 in the portable device executes a matching algorithm that compares access minutiae reduced from a fingerprint (i.e., biometric signal) received at the fingerprint sensor 5 to pre-stored master minutiae tables (i.e., members of the database) and continues to output an encrypted command if finding a match, thus authenticating a user. *Mathiassen* (Ex. 1004)*, [0180], See Claim 10(Pre2) discussion of "members of the database of biometric signatures."* This is at least equivalent to the '208 Patent's code entry module 103 containing a biometric sensor that receives a

fingerprint and interrogates a database 105 to authenticate a user. *'208 Patent,* 5:50-67.

279.    It is my opinion that this process is at least equivalent to the applied construction support from the '208 Patent pointing to Steps 202 of Fig. 3, which compares the received biometric to signatures in the database. More specifically, *Mathiassen* teaches processor 2 using the matching algorithm to "retrieve compact fingerprint minutiae information from a master minutiae table" and comparing it "with the access minutiae." *Mathiassen,* [0071], [0072]. When comparing this disclosure of *Mathiassen* to the '208 Patent's "processor module," a POSITA would have understood *Mathiassen's* matching algorithm in administrative code executed by processor 2 of portable control 20 for interrogating the database (i.e., master minutiae tables) to find a matching biometric signature and determining a match is at least equivalent to the '208 Patent's "processor module" performing the step 202 outlined in the '208 Patent's Figure 3. *'208 Patent,* 14:11-20. *See discussion above at Claim 10(c) regarding outputting an accessibility attribute.*

280.    As also discussed above for the mapping of Claim 10(c), *Mathiassen* alone or *Mathiassen* in combination with *McKeeth* teaches the function recited in Claim 1(b2).

**6.    Claim 1(b3): "means for emitting a secure access signal conveying information dependent upon said accessibility attribute"**

281.    As discussed above at Claim 10(Pre3) (section "c") and 10(d), *Mathiassen* teaches the "means for emitting," namely administrative software (containing SKG algorithm) stored in non-volatile memory 7/7A that generates the encrypted "open door" command (i.e., secure access signal) when executed by processor 2 in IC 1 of portable door control 20 and directs the transceiver 27 to transmit the command. Similarly, construction support relied upon from the '208 Patent describes software executed by "processor module 107" (14:16-20) directing a transmitter (5:67-6:5) to transmit the secure access signal.

282.    In regard to the claimed function, see discussion of mapping above for Claim (Pre3) (section "c") and 10(d).

**7.    Claim 1(c): "a receiver subsystem comprising"**

283.    *See* discussion of mapping above for Claim 10(Pre4).

**8.    Claim 1(c1): "means for receiving the transmitted secure access signal"**

284.    *See* discussion of mapping above for Claim 10(Pre4).

**9.    Claim 1(c2): "means for providing conditional access to the controlled item dependent upon said information"**

285.    *See* discussion of mappings above for Claim 10(Pre5) and 10(e).

### 10.    Claim 1(d): "wherein the transmitter subsystem further comprises means for populating the data base of biometric signatures, the population means comprising:"

286.    As discussed above at Section III.B.2, I apply the constructions of "means for populating the data base of biometric signatures" to at least include "computer program product having a computer readable medium having a computer program recorded therein, comprising code for" and a database. *Mathiassen* teaches or renders obvious such "means for populating," namely administrative code executed by processor 2 and master minutiae tables (i.e., database) stored in non-volatile memory 7/7A of portable control 20 that is mapped as the "transmitter sub-system" in Claim 1(b). Additionally, I apply construction support from the '208 Patent generally describing storing biometric signatures (including duress signatures) of an administrator or ordinary users in a database. Section III.B.2.

287.    As discussed above with regard to mapping at Claim 10(Pre2), *Mathiassen's* memory 7, 7A stores a "database of biometric signatures", namely master minutiae tables filled with minutiae representations of a fingerprint. Additionally, *Mathiassen* teaches "the administrative software will be set up to require a minimum of say 3 minutiae fingerprint representations of acceptable quality" prior to storing such representations as master minutiae tables in memory 7/7A. *Mathiassen,* [0130]. *Mathiassen* teaching the administrative code determines the acceptable representations for storage would have indicated to a POSITA that

this code also performs the function of storing the minutiae. Thus, a POSITA would have understood or found it obvious that *Mathiassen's* administrative code executed by processor 2 on portable control 20 comprises the "means for populating."

288.   *Mathiassen* teaching storing master minutiae tables from a car owner (i.e., administrator) or users "other" than an administrator [0164-0165, 0190] is at least equivalent to the '208 Patent storing biometric signatures of an administrator and a "simple" user's signature. *'208 Patent,* 10:32-34, 12:43-45, 13:15-19. Additionally, as mapped for Claim 3(a), *Mathiassen* as modified by *McKeeth* teaches enrolling signatures indicating a user is under duress, being at least equivalent to the '208 Patent describing storing a "duress signature." *'208 Patent,* 13:9-11.

289.   *See* my discussion of the mapping of Claim 10(a) above for the claimed function of "populating the database of biometric signatures."

> **11.    Claim 1(d1): "means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of entries and a duration of each said entry:"**

290.   As discussed above at Section III.B.2, the construction support I rely on generally describes detecting a finger applying a series of finger presses of a certain duration.

291.    *Mathiassen* (as modified by *McKeeth*) in combination with *Anderson* renders Claim 1(d1) obvious. *Mathiassen's* sensor 5 of the portable door control 20 receives a series of finger movements (i.e., claimed "series of entries of the biometric signal," mapped above at Claim 10(a1)) by a movement analyzing program "obtaining" the fingerprint motions. *Mathiassen* (Ex. 1004)*,* [0164], [0192]. I note that these finger movements are only generated once a finger is detected on the sensor surface. *Mathiassen,* [0049]. This is at least equivalent to the '208 Patent checking that the biometric sensor receives a biometric sensor. *'208 Patent,* 5:53-59, 7:66-8:6. Furthermore, *Mathiassen's* translation program executed by processor 2 of portable control 20, as modified by *Anderson,* characterizes the series of entries based on the number of presses/pulses and the duration of each press/pulse (i.e., "characterized according to at least one of the number of entries and a duration of each said entry"). *See* discussion of mapping above at Claim 10(a2) for motivation to combine and "at least one of the number of entries and a duration of each said entry." This is similar to the description in the '208 Patent of defining a series by the number of presses and duration of each press. *'208 Patent,* 10:45-52. Thus, *Mathiassen* (as otherwise modified by *McKeeth*) as modified by *Anderson,* teaches "means for populating," namely the modified translation program and movement analyzing program, which are all stored in non-volatile memory 7/7A.

292.   A POSITA would have understood *Anderson's* series of presses/pulses are "characterized according to" a number of presses/pulses and the duration of each press/pulse because the access code (i.e., series of presses/pulses) and the series is detected based on the duration of each specific press, and counts the number of presses, as shown by FIG. 4A's multiple presses "characterized" by the touch interface detecting each press and the length of time each press is applied. *Anderson,* Fig. 4A, 7:19-21 ("For example, digitizer pad 120, functioning as the touch interface, may generate an analog signal 412 § 422 proportional to the pressure applied to its surface by the user."), 7:28-30 ("As shown in FIG. 4A, the touch interface may **sense only temporal applications of pressure relying on timing of the pressure applications for entry of the access code**." and stating in this embodiment the "access code would be entered as a series of alternating pressure applications of varying duration"). Thus, *Anderson's* teaching that the touch interface "relying on timing of the pressure applications for entry of the access code" would have indicated to a POSITA that this series of presses/pulses is characterized according to the duration of each press. Additionally, the fact that this entered access code is "encoded **for comparison** to a **stored code template**" would also have indicated to a POSITA that not only the duration of each press but the number of pulses (i.e., presses) would be required to fully characterize the entered access code; otherwise, the system would not properly compare and match each entry with the entries in the

stored code template. *Anderson*, 7:18-19. *Anderson* indicates such, teaching the accuracy of the entered code being with a certain "predefined tolerance" and thus the accuracy of the matching procedure depends on both the number of entries with which to compare the code template to and the duration of each entry to ensure it is within the correct tolerance. *Anderson,* 6:45-51.

293. Therefore, a POSITA would have understood that in modifying *Mathiassen's* translation program to count the number of fingerprint presses and measure the duration of each finger press/pulse, as taught by *Anderson,* that this program would have characterized the series of entries "according to at least the number of entries and the duration of each said entry," as claimed. *See Motivation to Combine Anderson with Mathiassen at Claim 10(a2).*

### 12. Claim 1(d2): "means for mapping said series into an instruction"

294. As discussed above at Section III.B.2, the structure that performs the function of "mapping said series into an instruction" at least includes a database and "computer program product having a computer readable medium having a computer program recorded therein, comprising code for". Additionally, I apply construction support from the '208 Patent that generally describes identifying a control signal that correlates to a series of inputs. Section III.B.2.

295. As discussed above regarding the mapping of Claim 10(a3), *Mathiassen's* translation program teaches mapping the categorized series of fingerprint movements or pressure pulses (as modified by *Anderson*) into a command (i.e., instruction) stored in a command table. This is at least equivalent to the '208 Patent support describing checking an input series against a stored set of legal control signals. *'208 Patent,* 10:53-56. *Mathiassen's* fingerprint sensor 5 of portable control 20 receives the fingerprint movements, similar to construction support from the '208 Patent describing biometric sensor 121 on code entry module 103 receiving a user's fingerprint. *'208 Patent,* 5:50-59.

296. Additionally, *Mathiassen's* fingerprint sensor 5 of portable control receives the series of fingerprint movements and the processor 2 matches the received movements to master minutiae tables (i.e., database) and translates the movements into a command (such as "open door" command), thus authenticating the user to securely access car doors. *Mathiassen,* [0175-0180], [0192]. A POSITA would have understood this process is at least equivalent to the '208 Patent describing that the user provides their fingerprint on biometric sensor of code entry module 103, accesses a user database 105 of biometric signatures, and if the signatures match, a controller 107 sends the access signal. *'208 Patent*, 5:65-6:19, *see* Section VII.A.5.a discussing *Mathiassen's* processor is at least equivalent to "processor module 107."

297. For additional details and as discussed above with regard to the mapping of Claim 10(a3), *Mathiassen* alone or *Mathiassen* (as otherwise modified by *McKeeth*) modified by *Anderson* teaches claim 1(d2).

### 13.    Claim 1(d3): "means for populating the data base according to the instruction"

298. The construction support I apply for the "means for populating" generally describes an administrator providing a series of inputs that indicate to enroll an ordinary user. Section III.B. As discussed above with regard to Claim 1(d), *Mathiassen* (as modified by *McKeeth*) teaches or renders obvious administrative code executed by processor 2 on portable control 20 for storing fingerprint representations in master minutiae tables (i.e., database of biometric signatures) when enrolling a new user and a car owner (i.e., administrator), or a minutiae indicating a user is under duress. As mapped for Claim 10(a4), *Mathiassen* (as otherwise modified by *McKeeth*) modified by *Anderson* teaches or renders obvious this storage of user fingerprint representations, such as enrolling "other users" (i.e., ordinary users) occurs "according to an instruction," namely via movement analyzing software detecting the finger movements and translation software mapping an administrator's series of finger movements into an instruction to enroll a new user. This is at least equivalent to the administrator directing the system to enroll an ordinary user, as described in the '208 Patent. *'208 Patent,* 10:57-59.

Therefore, the "means for populating" of the *Mathiassen-McKeeth-Anderson* system comprises the movement analyzing, translation, and administrative code collectively populating the database according to the instruction.

299.   For a discussion of the mapping for the claimed function of "populating the database of biometric signatures according to an instruction", see Claim 10(a4) above.

> **14.   Claim 1(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"**

300.   *See* discussion of mapping above at Claim 10(f).

## E.   Claim 3

> **1.   Claim 3(a): "The system according to claim 1, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class"**

301.   In my opinion, *Mathiassen* (as otherwise modified by *Anderson*) as further modified by *McKeeth* teaches Claim 3. To summarize, and as discussed above at Claims 1(b2)-(b3) (referencing discussion of mappings at Claims 10(c)-(d)), *Mathiassen* teaches an administrator user having administrator-level access. *McKeeth* teaches a user having duress access. As I discuss below, *Mathiassen* additionally teaches a user having access to a controlled item but having access that is something other than administrator access.

302.    The '208 Patent describes the system can "accommodate at least three classes of user, namely administrators, (ordinary) users, and duress users" and that the "first user" of the system "is automatically categorised as an administrator." *'208 Patent* (Ex. 1001)*, 10:28-34. Thus, the '208 Patent describes that the first enrolled user in the system becomes the administrator, and thus, their biometric signature is in the "system administrator class."

303.    Turning to *Mathiassen's* teachings and in regard to the claimed "system administrator class," *Mathiassen* teaches that the first person to be enrolled "becomes the 'owner' of the car, in the sense that he becomes the **system administrator.**" *Mathiassen* (Ex. 1004)*, [0165], see also* [0162] (disclosing the first enrolled user in the portable door control "to be the system administrator of the biometrics system in the car"). Thus, the minutiae (i.e., biometric signature) stored in the master minutiae tables of the first user enrolled identify this user as the "system administrator." *Mathiassen,* [0164] (disclosing the fingerprint of the car owner (i.e. first enrollee) to be "reduced to master minutiae tables" which are "stored in non-volatile memory (7A)…").

304.    *Mathiassen* thus teaches a similar secure access control system to the '208 Patent, where the first user enrolled becomes the administrator. A POSITA would have understood or found it obvious that the first fingerprint representations (i.e., minutiae, or claimed "biometric signature") generating master minutiae tables

for the owner/system administrator to similarly be placed in a "system administrator class," as claimed.

305. *Mathiassen* also teaches or renders obvious a class of users that is not in the administrator class but still is granted access to the system, i.e., the claimed "system class" of users. *Mathiassen* distinguishes the car owner/system administrator from "**other users he may have enrolled**." *Mathiassen*, [0190]. In my opinion, a POSITA would have understood that for at least some of those persons enrolled by the car owner/administrator as "other users," such other users have less than administrator access while still having access to the car's central locking system.

306. My opinion is further informed by other teachings in *Mathiassen* indicating that there are different classes of users. For the medicine cabinet embodiment, *Mathiassen* again recognizes there are different classes of users, namely administrator users and the disclosed "other users." *Mathiassen*, [0131-0132]). And similar to the portable car door lock embodiment, *Mathiassen* teaches for the medicine cabinet embodiment the administrator enrolling other users. *Id.* Yet further, *Mathiassen* recognizes that these other enrolled users will have less than full, administrator access. For example, *Mathiassen* discusses that some users will have access for a specific time period if temporary staff or that some users will have access with restrictions. *Mathiassen*, [0131]. In another embodiment, *Mathiassen*

discusses that some users may have "partial access" to portions of the network. *Mathiassen*, [0063]. Each of these descriptions indicates to me that *Mathiassen* recognizes that some users are administrators, while other users are normal users with less than administrator access. Therefore, in my opinion, *Mathiassen* teaches or at least renders obvious (1) users who are administrators (e.g., the car owner/administrator of the portable control embodiment [0190] or the system administrator of the medicine cabinet embodiment [0131-0132]); and (2) users who are "other users" separate from administrator users and who are otherwise enrolled by an administrator user (e.g., the user with partial access [0063], the user with access for a certain period of time [0131], or the other users enrolled by the car owner/administrator [0190]). These "other users" are system users belonging to a system user class, as claimed.

307. In my opinion, *Mathiassen* teaches or renders obvious that the master minutiae for each user are assigned to one or more classes. This is a common sense and trivial assignment once the user is identified during enrollment as an administrator or other user, as already taught by *Mathiassen*. Therefore, assigning the user's master minutiae to an "administrator class" (if the user is an administrator) or a "system user class" (if the user is not an administrator but is otherwise granted access to the controlled item) is an obvious method of determining whether access is granted upon receipt of a live access minutiae. Therefore, a POSITA would have

understood or found it obvious that the owner's master minutiae tables contain minutiae or fingerprint representations (i.e., claimed "biometric signatures") categorized in an "system administrator class," as claimed. Similarly, a POSITA would have understood the same categorizing procedure is performed on master minutiae tables of the other users who are not administrator users.

308.   The '208 Patent does not describe a "duress class" besides stating that such a "class of user" exists. *'208 Patent* (Ex. 1001)*, 10:24-26. However, the '208 Patent does describe a "'duress' category" where biometric signatures "indicate that the user 101 is in a coercive situation where, for example, an armed criminal is forcing the user 101 to the secure facility." *'208 Patent,* 11:32-37. A POSITA would then have understood the "duress class" to include a biometric signature that, when provided by the user, indicates the individual is accessing under duress.

309. As discussed above with regard to the mapping at Claim 10(c), *McKeeth* teaches a user entering a fingerprint concurrently with an incorrect geometric pattern to indicate they are under duress. The particular input (which happens to exclude the geometric pattern) corresponds to a biometric signature, where the biometric signature indicates duress. As discussed above at Claim 10(d), *Mathiassen* as modified by *McKeeth* teaches emitting a secure access signal that grants access while also issuing a silent alert to authorities when a user indicates by their fingerprint input that they are under duress.

310. As discussed above with regard to the mapping of Claim 10(c), the modified processor 2 of *Mathiassen-McKeeth* system would have output a duress attribute, and this attribute would have been output to provide duress access when a car owner placed a fingerprint of a second finger on the sensor 5 of the portable door control. In short, *Mathiassen's* disclosure of a car owner being able to enroll "one or more" of their fingers on the portable door control [0164] and various "series of consecutive fingerprint representations" instructing specific commands for operating the device [0192] would have motivated a POSITA to store the fingerprint representations (i.e., minutiae) of the second finger in a designated "duress" master minutiae table that, when matched with the access minutiae, signaled a duress situation.

> **2.     Claim 3(b): "the accessibility attribute preferably comprising: an access attribute if the biometric signal matches a member of the database of biometric signatures"**

311. As discussed above with regard to the mapping of Claim 10(c), *Mathiassen* teaches an accessibility attribute included when the portable door control 20 emits a secure access signal after having received a biometric signal (i.e., fingerprint) from the car owner, with this accessibility attribute indicating to provide access because the user is the car owner/system administrator with full access to the central locking system. Similar to the '208 Patent's described "access attribute" as "granting unconditional access," *Mathiassen* teaches the open door command

instructing opening of the car door locks responsive to matching the car owner/administrator's master minutiae is an "access attribute." Furthermore, to output the "access attribute," the processor 2 of the portable door control finds a match between the access minutiae, representing the presented fingerprint (i.e., biometric signal), and pre-stored master minutiae tables of the car owner/system administrator (i.e., member of the database of biometric signatures). Thus, *Mathiassen* teaches emitting an "access attribute," as claimed, in the secure access signal "if the biometric signal matches a member of the database of biometric signatures," as claimed.

312.    As discussed above for the mapping of Claim 10(c), *Mathiassen* in view of *McKeeth* teaches "accessibility attributes," as claimed, which indicate the conditions upon which the access should be granted. As discussed above with regard to Claim 10(d), *Mathiassen* as modified by *McKeeth* teaches or renders obvious encoding these conditions of access in the encrypted command (i.e., secure access signal) transmitted from the portable door control 20 to the ignition control 15 when a match is established by the processor 2 "between the access attempt and one of the resident master minutiae tables." *Mathiassen* (Ex. 1004)*, [0182], [0185]. *Mathiassen's* access attempt is the car owner swiping their fingerprint (i.e., biometric signal) on the sensor 5, and this biometric signal (reduced to access minutiae) is compared to minutiae/fingerprint representations (i.e., biometric

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

signatures) in the master minutiae table. *Mathiassen,* [0179-0182]. This is similar to the '208 Patent describing "an access attribute" being inserted into the "access signal 108" when the "received biometric signal matches a legitimate signature in the database 105." *'208 Patent,* 12:1-9.

313.    Thus, a POSITA would have understood *Mathiassen's* "open door" command encrypted to create the secure access signal included an "access attribute" that contained information indicating the type of access to grant (i.e., open/unlock the car doors). In other words, because the "open door" command is output by *Mathiassen's* transceiver 27 only when the access minutiae match with a stored biometric signature (much like the '208 Patent description above), the encrypted command (i.e., secure access signal) would have included an "access attribute" to provide information indicating to open the car doors.

> **3.    *Claim 3(c): "a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class"***

314.    The '208 Patent describes a "duress attribute" as "granting access but with activation of an alert tone to advise authorities of the duress situation." *'208 Patent,* 8:21-23. The duress attribute is incorporated "into the code access signal 108" (i.e., secure access signal) when "the received signal falls into the 'duress' category" or if the matching signature to the received signal "is in the duress class," with these "duress class" signatures indicating "that the user 101 is in a coercive

situation." *Id.* at 11:32-37. Based on this description of a "duress attribute" being output as part of the secure access signal when the matching stored biometric signature indicates "that the user 101 is in a coercive situation," a POSITA would have understood the "duress attribute" to comprise information included in the secure access signal indicating the user requesting access to be under duress.

315.    Similar to the '208 Patent's description of the "duress attribute" and as discussed above with regard to the mapping of Claim 10(c) (with reference to discussion of mapping of Claim 10(Pre3), subsection "d"), *Mathiassen* as modified by *McKeeth* would similarly output a duress attribute in the secure access signal to indicate to the system the user was under duress and thus grant access while issuing a silent alert to authorities. A POSITA would have understood that because *Mathiassen's* portable door control (as modified by *McKeeth*) provides an instruction to open the car door locks, the control modified to include *McKeeth's* duress condition would also provide a duress instruction to thereby differentiate between a user under duress or a user simply requesting access. *Mathiassen* already differentiates between open door commands and lock door commands, thus indicating to me that *Mathiassen* includes the hardware and software to instruct particular commands (e.g., open door). *Mathiassen* (Ex. 1004), [0182-0185], *see also* [0167] (describing that "At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such

as "open door" or "lock door"). In the modified *Mathiassen*, the *Mathiassen* processor matches the biometric signature of a duress access input by the user and thereby outputs a signal commanding duress access.

316. As discussed above with regard to the mapping of Claim 3(a), *Mathiassen* in view of *McKeeth* teaches placing biometric signatures in a "duress class," where minutiae/fingerprint representations (i.e., biometric signature) of a finger are stored to indicate that a user is under duress when they are requesting access to open the car doors. Furthermore, as discussed above with regard to Claim 1(b2) (with reference to discussion of mapping of Claim 10(c)), *Mathiassen* as modified by *McKeeth* also teaches a duress attribute that is output when a received biometric signal (i.e., user's presented fingerprint) matches minutiae in a master minutiae table indicating a user is under a duress condition (which may include a car owner presenting a second fingerprint whose matching stored minutiae in the master minutiae table are in the duress class). *See also* discussion of mapping above for duress class at Claim 3(a). Therefore, a POSITA would have found it obvious that *Mathiassen,* as modified by *McKeeth,* would have output a duress attribute when the biometric signal (i.e., presented fingerprint or series of fingerprint representations) matched a master minutiae table (i.e., members of the database of biometric signatures) having fingerprint representations belonging to a duress class, such as representations of an owner's second finger or a series of fingerprint representations.

### 4. Claim 3(d): "an alert attribute if the biometric signal does not match a member of the database of biometric signatures"

317. As discussed above for the mapping of Claims 10(c) and 1(b2), *Mathiassen* as modified by *McKeeth* teaches emitting a secure access signal that contains an alert attribute to indicate an alert condition where access is denied to unauthorized users and a car alarm is sounded (i.e., security alert issued). The processor 2 executing the matching program code determines a user is unauthorized when the received biometric signal (i.e., fingerprint), in the form of an access minutiae table, does not match pre-stored master minutiae tables (member of the database of biometric signatures). Thus, *Mathiassen*, as modified by *McKeeth* to output an alert attribute, only includes the alert attribute in the secure access signal "if the biometric signal does not match a member of the database of biometric signatures," as claimed.

## F. Claim 4:

**Claim 4: "The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system."**

318. As discussed above with regard to the mapping of Claim 1, *Mathiassen* in view of *McKeeth* in further view of *Anderson* renders obvious Claim 1.

319. *Mathiassen* teaches a database of biometric signatures located in the transmitter sub-system. Specifically and as discussed above with regard to the

mapping of Claim 10(Pre2), *Mathiassen* teaches master minutiae tables containing fingerprint representations via minutiae data (i.e., database of biometric signatures) that are stored in the memory 7, 7A of the IC 1 included in the portable door control (20). As the portable door control 20 is the transmitter sub-system, *Mathiassen* thus teaches that the database of biometric signatures is located therein. *See discussion of claim mapping for 10(Pre3), subsection "a" (claimed "transmitter sub-system")*

### G.    Claim 5:

**Claim 5: "The system according to claim 1, wherein said conditional access comprises one of: provision of access to the controlled item if the accessibility attribute comprises an access attribute, providing of access to the controlled item and sounding of an alert if the accessibility attribute comprises a duress attribute, and denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute."**

320.    As discussed above with regard to the mapping of Claim 1, *Mathiassen* in view of *McKeeth* in further view of *Anderson* renders obvious Claim 1.

321.    *Mathiassen* alone and alternatively in combination with *McKeeth* teaches Claim 5. *See discussion of mappings for Claims 10(c), 10(e), and 3.* As discussed for the mapping of Claim 3(b), *Mathiassen* teaches the accessibility attribute contained in the secure access signal is an "access attribute" when the car owner/system administrator presents their fingerprint that matches the stored master minutiae table, with this "access attribute" indicating providing access due to the user being the car owner/administrator. If the fingerprint matches the stored master

minutiae table of the car owner/system administrator, then the portable door control issues an "open door" command for provision of access to the car door locks. *Mathiassen* (Ex. 1004), [0182] ("Provided the processor (2)" of the portable door control "established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors."), [0185] (disclosing after determining a match, "The processor will issue the 'open door' command to the encryption block (8B or 8C)"), [0187] (disclosing the 'open door' command is then relayed to the car door locks once it is confirmed to be a valid and authenticated command). Thus, *Mathiassen* alone teaches "provision of access to the controlled item" (i.e., provision of access to the car door locks) "if the accessibility attribute comprises an access attribute" (i.e., the secure access signal includes an "open door" command issued from a car owner/system administrator's presented fingerprint matching master minutiae tables), as claimed.

322. *Mathiassen* in view of *McKeeth* teaches denying access to the controlled item, namely denying access to the car door lock and sounding the car alarm (i.e., issuing an alert) when the accessibility attribute comprises an alert attribute. *See discussion of mapping at Claim 3(d)*. *McKeeth* teaches this security alert is generated in "alert mode" while "silent alert mode" generates a silent security alert. *McKeeth* (Ex. 1005), 5:48-53, 7:32-35. The distinction between these two types of alerts, with one including a "silent alert," would have indicated to a POSITA

that the security alert generated when denying access, or locking up the computer, would have included sounding an alarm, as claimed. Additionally, as discussed above with regard to the mapping of Claim 10(Pre3), subsections d-e, *Mathiassen's* portable door control, as modified by *McKeeth*, would have provided alert access by denying access to the unauthorized user and sending a signal to sound the car alarm. Thus, *Mathiassen* in view of *McKeeth* teaches "denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute," namely by denying access to the car door locks and sounding the car alarm if the accessibility attribute in the secure access signal comprises an alert attribute. *See discussion of mapping of Claim 1(B2) and 3(d) above regarding outputting an alert attribute.*

### H.  Claim 6

#### 1.  Claim 6(a): "The system as claimed in claim 1, wherein: the biometric sensor is for authenticating the identity of a user"

323.  As discussed above with regard to the mapping of Claim 1, *Mathiassen* in view of *McKeeth* in further view of *Anderson* renders obvious Claim 1.

324.  The '208 Patent describes "the identity of the user 10 is authenticated" when a user's "request 102 can be authenticated" against "biometric signatures for authorized users" stored in a "user identity database 105." *'208 Patent* (Ex. 1001), 5:60-65. This described process includes comparing a user's "request," in the form

of a fingerprint, "against" stored biometric signatures to successfully authenticate a user because the '208 Patent's description of emitting an access signal when "the identity of the user 101 is authenticated successfully" includes comparing the presented fingerprint to the biometric database. *'208 Patent,* 5:65-6:5.

325.  Similarly, *Mathiassen's* teaching of the car owner swiping "his finger across the sensor (5) of the portable door control (20)" to "establish a match between the access attempt and one of the resident master minutiae tables," authenticates the identity of the user, as claimed. *Mathiassen* (Ex. 1004)*, [0176-182]. Mathiassen* also expressly teaches that the user is authenticated, thus their identity is authenticated because fingerprint representations are well known to identify a person. [0053], Abstract (both disclosing using *Mathiassen's* IC 1 in the secure access control system for authenticating a user).

> **2.  Claim 6(b): "the means for emitting comprises a transmitter for transmitting information capable of granting more than two types of access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity"**

326.  *Mathiassen* in view of *McKeeth* teaches the means for emitting includes a "transmitter," namely transceiver 27, which includes a transmitter, "for transmitting information capable of granting more than two types of access," namely unconditional access, access when under duress, and denial of access, "dependent upon a request from the user and the authentication of the user identity," namely a

user swiping their fingerprint across the sensor and the result of comparing that fingerprint to fingerprint representations in the master minutiae tables. *See also Discussion for Claim 10(Pre3)*. I also note that *Mathiassen* teaches the portable control *wirelessly* transmits the open door command. *Mathiassen*, [0186].

327. In my opinion, *Mathiassen* in combination with *McKeeth* also teaches the granting of access is dependent upon (1) a request from the user; and (2) the authentication of the user identity. As explained above for Claim 10(Pre3), the *Mathiassen-McKeeth* combination grants more than two types of access (i.e., grants access, grants duress access, or grants alert access when no authentication). These types of access are akin to the described types of access in the '208 Patent, 8:15-25.

328. Regarding the claimed "dependent upon a request from the user," similar to the requesting action described in the '208 Patent, *Mathiassen* teaches a user "will swipe his finger across the sensor (5) of the portable door control (20)" in order to "access the car." *Mathiassen* (Ex. 1004), [0175-0176]. The "swipe" disclosed by *Mathiassen* is at least applying some form of pressure to the sensor 5, making it a press on the biometric sensor. Therefore, a POSITA would have understood that *Mathiassen's* swiping motion is a "request from the user," as claimed, because the fingerprint is pressed when swiped along the sensor.

329. Regarding the claimed "dependent upon…the authentication of the user identity," the *Mathiassen-McKeeth* combination also teaches such. For example,

depending on the authentication of the user identity as car owner/system administrator, full access is granted, but if the user enters a duress identity, a different type of access is granted. And, if the authentication of the user identity is not valid, an alert type of access is provided. *See also* Claim 10(Pre3). These types of accesses are indicated based on information in the encrypted command that is "wirelessly transmitted by the transceiver (27) of the portable door control (20)." *Mathiassen,* [0186]. Therefore, dependent on the authentication of the user identity as system administrator, duress, or alert, a particular type of access is granted in the *Mathiassen-McKeeth* combination.

### 3. Claim 6(c): "the system further comprising a control panel for receiving the information and for providing the secure access requested"

330. The '208 Patent does not describe a "control panel" except in the recited claim language. Thus, based on the function recited in the claim limitation of "receiving the information and for providing the secure access requested," *Mathiassen's* IC of the ignition control 15 serves as the "control panel." This is because the IC 1 in the ignition control 15 receives the encrypted "open door" command by the transceiver 27 of the portable door control 20, which wirelessly transmits the command to the central car computer transceivers that then sends the command via hard wire connection "to the embedded ignition control (15)." *Mathiassen* (Ex. 1004)*,* [0186], [0149] (describing hard wire connection of central

car computer to ignition control). *Mathiassen* then teaches "The encrypted message will be **decrypted by the embedded ignition control (15) by its processor (2) on its resident IC (1)**" and, if the message is valid and authenticated, the processor 2 of the "resident IC (1)" then relays a "similar encrypted command…to the car door locks…." *Mathiassen,* [0187]. The relayed command being similarly encrypted indicates that the processor 2 on the IC 1 once again encrypts the command and directs the sending of the command to the car door locks. Additionally, the "similar encrypted command" relays the claimed "information" to the car door locks to provide secure access to the car. Thus, the IC 1 on the ignition control 15 receives the information (i.e., encrypted command being a secure wireless signal that contains information regarding the access to provide) and provides the requested secure access, namely the requested opening of the car door locks. A diagram of the IC 1 is shown in Fig. 2b below.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208



*Mathiassen*, FIG. 2b.

331.    A POSITA would have understood or found obvious that the IC of ignition control performs the claimed functions of "receiving the information" and "providing the secure access requested" because it receives the encrypted command in order to decrypt it using the processor 2 and relays the encrypted command to the car door locks in order to provide secure access to open the car door locks.

332.    Additionally, a POSITA would have understood the IC 1 of the ignition control to be at least equivalent to a "control panel." It was known that a "control panel" is defined as containing "**an array of jacks or sockets in which wires (or other elements) may be plugged to control the action of an electromechanical device**." *Dictionary of Electrical and Computer Engineering,* McGraw-Hill, 2003

**Appx1254**

(Ex. 1054) at 118. The locks on a car door are an electromechanical device and these locks are controlled by the IC 1 in the ignition control to open. Furthermore, the IC contains wiring connections to elements for controlling the action of the car door locks, such as the wiring to the central car computer to then relay the "similar encrypted command" to the car door locks. *Mathiassen* (Ex. 1004)*, * [0187]. Therefore, a POSITA would have understood or found it obvious that the IC of ignition control either teaches or is at least equivalent to a "control panel."

## I.    Claim 7

**Claim 7: "The system according to claim 6, wherein the control panel includes a converter for receiving the secure wireless signal and for outputting the information, and/or the biometric sensor authenticates the identity of the user by comparing a biometric input from the user with a biometric signature for the user in a biometric database, and/or the biometric sensor, the biometric database, and the transmitter are located in a remote fob."**

333.   As discussed above for Claim 6(a), *Mathiassen* teaches a biometric sensor (i.e., fingerprint sensor 5) that "authenticates the identity of the user," as claimed. This is done, in short, by the user swiping their finger on the fingerprint sensor 5 and the processor 2 then comparing the biometric input (i.e., fingerprint, reduced to access minutiae) to minutiae (i.e., biometric signatures) of the user in the master minutiae tables (i.e., database). For processor 2 to of IC 1 in portable door control to determine a match in this comparison, a POSITA would have understood the biometric input is eventually compared to the user's previously stored minutiae

in one of the master minutiae tables (i.e., biometric signature for the user in a biometric database). Thus, *Mathiassen* teaches a "biometric sensor" that "authenticates the identity of the user by comparing a biometric input from the user with a biometric signature for the user in the biometric database," as claimed.

334.    Additionally, *Mathiassen* teaches the biometric sensor (i.e., fingerprint sensor 5), biometric database (i.e., master minutiae tables), and transmitter (i.e., transceiver 27) are all located in a remote fob, namely the portable door control 20. *Mathiassen* (Ex. 1004)*, [0147], [0174] (disclosing the master minutiae tables of the owner (i.e., biometric database) is "stored in the IC (1) of …the portable door control (20).") As discussed above with regard to Claim 10(Pre3), subsection d, a POSITA would have understood *Mathiassen's* portable door control to be a "remote fob," with *Mathiassen* describing the portable control is a "**remote** control for the car doors" that "can be made very compact…." *Mathiassen,* [0147].

## J.    Claim 9

### 1.    Claim 9(Pre): "A transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:"

335.    *See* discussion of mapping for Claim (Pre3) regarding the "transmitter sub-system" and discussion of the mapping for Claim 10(Pre1) "for operating a system for providing secure access to a controlled item…"

**2.    *Claim 9(a): "a biometric sensor for receiving a biometric signal"***

336.    *See* discussion of mapping for Claim 10(Pre3), subsection "b", above.

**3.    *Claim 9(b): "means for matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute"***

337.    *See* discussion of mapping for Claim 1(b2) above.

**4.    *Claim 9(c): "means for emitting a secure access signal conveying said information dependent upon said accessibility attribute"***

338.    *See* discussion of mapping for Claim 1(b3) above.

**5.    *Claim 9(d): "wherein the transmitter sub-system further comprises: means for populating the database of biometric signatures, the populating means comprising"***

339.    *See* discussion of mapping for Claim 1(d) above.

**6.    *Claim 9(d1): "means for receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry"***

340.    *See* discussion of mapping for Claim 1(d1) above.

**7.    *Claim 9(d2): "means for mapping said series into an instruction"***

341.    *See* discussion of mapping for Claim 1(d2) above.

**8.    *Claim 9(d3): "means for populating the database according to the instruction"***

342.    *See* discussion of mapping for Claim 1(d3) above.

9.    *Claim 9(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"*

**343.**  *See* discussion of mapping for Claim 10(f) above.

## VIII.  CONCLUSION

I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Date: _22 Feb 2022_____

By: _____
Dr. Andrew Sears

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

APPENDIX A – '208 PATENT

| U.S. Patent No. 9,269,208 Claim Language | Teachings of *Mathiassen*, *McKeeth*, and *Anderson* |
|---|---|
| 10(Pre1) A method for providing secure access to a controlled item in a system comprising: | **_Mathiassen_ teaches a method of providing secure access control to devices, such as car door locks.**<br><br>*Mathiassen* at [0023], [0145] (explaining car embodiment),<br><br>**_Mathiassen_ teaches a system for performing this method as a central locking system that includes portable door control, embedded ignition control, central car computer, and transceivers of car door locks.**<br><br>*Mathiassen* at [0147-0149] |
| 10(Pre2) a database of biometric signatures | **_Mathiassen_ teaches master minutiae tables containing minutiae/fingerprint representations that are stored in memory 7/7A residing on the portable door control's IC 1.**<br><br>*Mathiassen* at [0050], [0164] |
| 10(Pre3) A transmitter subsystem comprising a biometric sensor for receiving a biometric signal, and means for emitting a secure access signal capable of granting more than two types of access to the controlled item | **<u>"Transmitter subsystem"</u>**<br>**_Mathiassen_ teaches a portable door control 20 containing transceiver 27.**<br><br>*Mathiassen* at [0147].<br><br>**<u>"biometric sensor for receiving a biometric signal"</u>**<br>**_Mathiassen_ teaches fingerprint sensor 5 in portable door control 20  that receives a fingerprint from a user and reduces it to captured fingerprint images.**<br><br>*Mathiassen* at [0049-0050], [0176-0178] |

| | |
|---|---|
| | **"means for emitting a secure access signal ..."** *Mathiassen* teaches administrative code executed by processor 2 of IC 1 on portable door control issues an "open door" command to the encryption block of IC 1, which then directs transceiver 27 of portable door control to transmit the encrypted command. The encrypted "open door" command is the "secure access signal" because it is only valid for a single transaction and the password for encryption changes every time. The administrative code executed by processor 2 and directing the transceiver are the "means for emitting a secure access signal." <br><br> *Mathiassen* at [0050], [0182-0186] <br><br> **"...capable of granting more than 2 types of access to the controlled item"** <br><br> *Mathiassen* teaches the encrypted "open door command" is transmitted to the ignition control or central car computer for decryption/authentication. When the signal is successfully decrypted and authenticated, a similar encrypted command is sent to the door lock transceivers to provide access of unlocking the car door locks when the user requesting access is the car owner/administrator. <br><br> *Mathiassen* at [0186-0188] <br><br> *McKeeth* teaches providing two other types of access, namely duress and alert access. When a user indicates they are under duress, access is granted while a silent alert is issued. In another configuration, when a person fails to perform the |

| | |
|---|---|
| | **correct authorization input, access is denied, and a security alert is generated.**<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| 10(Pre4) a receiver sub-system comprising means for receiving the transmitted secure access signal, and | *Mathiassen* **teaches an ignition control 15, central car computer, and transceivers of the door locks. The transmitted encrypted command is received by the central car computer transceiver and either decrypted/authenticated by the computer itself or the ignition control. Once the command is successfully decrypted/authenticated, a similar encrypted "open door" command is relayed to the car door locks. The transceiver of the central car computer specifically teaches the "means for receiving the transmitted secure access signal."**<br><br>*Mathiassen* at [0186-0188], [0148-0149] |
| 10(Pre5) means for providing conditional access to the controlled item dependent upon information in said secure access signal | **"means for providing conditional access to the controlled item"**<br>*Mathiassen's* **processor 2 of ignition control OR processor of central car computer decrypts/authenticates the received encrypted "open door" command, and if successful, relays a similar encrypted command to door lock receivers. The access is conditional because it is provided based on the accessibility attribute, namely an attribute for access when a requesting fingerprint matches with stored master minutiae belonging to the car owner, thus indicating to provide unconditional access.**<br><br>*Mathiassen* at [0187-0188], [0063] (regarding other users – i.e., not car owner – having partial or less than total access).<br><br>**"…dependent upon information in said secure access signal"** |

|  | |
|---|---|
|  | ***Mathiassen's*** **processor of central car computer or ignition control uses the command in the transmitted encrypted command to send either a similar "open" or "lock" command to the door lock transceivers to provide the access of either unlocking or locking the doors. Thus, the access provided is dependent upon information in the secure access signal.** <br><br> ***Mathiassen*** at [0187], [0167] <br><br> **Alternatively, *Mathiassen* in view of *McKeeth* teaches providing conditional access based on the accessibility attribute being an alert attribute (indicating that the user is unauthorized), a duress attribute (indicating the user is under duress), or a full access rights attribute (indicating the user is the car owner/administrator).** <br><br> ***McKeeth*** at 4:29-43, 5:48-53 |
| Claim 10(a) the method comprising the steps of: populating the database of biometric signatures by | ***Mathiassen*** **teaches enrolling users on portable door control by generating master minutiae tables containing fingerprint representations.** <br><br> ***Mathiassen*** at [0164] |
| Claim 10(a1) receiving a series of entries of the biometric signal" | ***Mathiassen*** **teaches receiving a series of fingerprint movements on the portable door control.** <br><br> ***Mathiassen*** at [0192] |
| Claim 10(a2) determining at least one of the number of said entries and a duration of each said entry | ***Anderson*** **teaches detecting a fingerprint access code by the duration of a pressure pulse and number of pressure pulses.** <br><br> ***Anderson*** at 7:4-11, 28-34 |

| | |
|---|---|
| Claim 10(a3) mapping said series into an instruction | *Mathiassen* **teaches translating a categorized series of fingerprint sequence or pressure pulses (as modified by *Anderson*) to a control signal via a command table.**<br><br>*Mathiassen* at [0192]<br><br>*Anderson* at 7:28-34 |
| Claim 10(a4) populating the database according to the instruction | *Mathiassen* **renders obvious initiating the enrollment process for generating master minutiae tables containing fingerprint representations/minutiae data through an administrator applying a series of fingerprint movements that are translated to a command to enroll a new user.**<br><br>*Mathiassen* at [0131], [0190], [0192]<br><br>*Anderson* **teaches this series of fingerprint movements is determined by the duration of each pressure pulse and the number of pressure pulses.**<br><br>*Anderson* at 7:28-34 |
| Claim 10(b) receiving a biometric signal | *See Claim 10(Pre3) for "biometric sensor receiving a biometric signal"* |
| Claim 10(c) matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute | **<u>"Matching the biometric signal against members of the database of biometric signatures…"</u>**<br>*Mathiassen* **teaches processor 2 of portable door control matches the presented fingerprint minutiae to the stored minutiae in the master minutiae tables.**<br><br>*Mathiassen* at [0182] |

| | |
|---|---|
| | **"…output an accessibility attribute"**<br><br>*Mathiassen* teaches the "open door" command is output containing an accessibility attribute that establishes whether (i.e., access is granted) and under which conditions (i.e., access granted is unconditional) when processor 2 matches access minutiae to stored master minutiae tables of the car owner/administrator.<br><br>*Mathiassen* at [0182], [0185]<br><br>Additionally, *Mathiassen* as modified by *McKeeth* teaches processor 2 of portable door control outputting a duress attribute or alert attribute.<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| Claim 10(d) emitting a secure access signal conveying information dependent upon said accessibility attribute | *See mapping at Claim 10(Pre3) – emitting a secure access signal, 10(Pre5) and 10(c) – conveying information dependent upon said accessibility attribute.*<br><br>Namely, *Mathiassen* teaches transceiver 27 transmits the command issued by processor 2 that is encrypted by encryption block 5C. The encrypted command conveys information to unlock the car doors (i.e., "open door" command) when the car owner/administrator is requesting access (i.e. provide unconditional access).<br><br>*Mathiassen* at [0186]<br><br>Additionally, *Mathiassen's* processor 2 as modified by *McKeeth* to issue a duress and alert command in addition to an open door command. |

| | *McKeeth* at 4:29-43, 5:48-53. |
|---|---|
| Claim 10(e) providing conditional access to the controlled item dependent upon said information | ***See Claim (10Pre5) ("providing condition access to controlled item") and Claims 10(c)-(d) ("dependent upon said information")***<br><br>**Namely, *Mathiassen* alone teaches providing unconditional access to car door locks dependent on "open door" command from car owner requesting access.**<br><br>***Mathiassen*** at [0186-0187]<br><br>***Mathiassen*** as modified by ***McKeeth*** additionally teaches providing access while issuing a silent alarm when received encrypted command is duress command and denying access while sounding an alarm for alert command.<br><br>***McKeeth*** at 4:29-43, 5:48-53 |
| Claim 10(f) wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device | ***Mathiassen*** teaches car door locks.<br><br>***Mathiassen*** at [0187], [0145]. |
| Claim 11 The method according to claim 10, wherein the step of populating the database of biometric signatures further comprises the step of enrolling a biometric signature into the database of biometric signatures comprising the steps of: receiving a biometric | ***Mathiassen*** teaches receiving a fingerprint at the fingerprint sensor 5 of portable door control, enrolling this first fingerprint as the administrator when no other users have prior enrolled.<br><br>***Mathiassen*** at [0164-0165] |

| | |
|---|---|
| signal; and enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty." | |
| Claim 13 A non-transitory computer readable storage medium for storing a computer program comprising instructions, which when executed by processors causes the processors to perform the steps of the method of claim 10 | ***Mathiassen* teaches memory 7,7A,7E that stores administrative software executed by processor 2 in IC 1 of ignition control, portable door control, and processor of central car computer for providing secure access control.** <br><br> ***Mathiassen*** at [0050] |
| Claim 1(Pre) | ***See Claim 10(Pre1).*** |
| Claim 1(a) | ***See Claim 10(Pre2).*** |
| Claim 1(b) | ***See Claim 10(Pre3) regarding "transmitter subsystem…"*** |
| Claim 1(b1) | ***See Claim 10(Pre3) regarding "biometric sensor."*** |
| Claim 1(b2) | ***See Claim 10(c).* The "means for matching" is the administrative code executed by processor 2 of portable control 20.** |
| Claim 1(b3) | ***See Claim 10(d) and 10(Pre3) regarding "means for emitting…"*** |
| Claim 1(c) | ***See Claim 10(Pre4).*** |
| Claim 1(c1) | ***See Claim 10(Pre4).*** |
| Claim 1(c2) | ***See Claim 10(Pre5) and 10(e).*** |
| Claim 1(d) | ***See Claim 10(Pre3) regarding "transmitter subsystem…" and 10(a).*** |

|  |  |
|---|---|
|  | *Mathiassen's* "means for populating" includes the generated master minutiae tables stored in memory 7,7A (i.e., database) and administrative code executed by processor 2 on portable door control.<br><br>*Mathiassen* at [0164] |
| Claim 1(d1) | *See Claim 10(a1) and 10(a2).*<br><br>*Mathiassen's* "means for receiving" includes the movement analyzing and translation software executed by processor 2 of portable door control.<br><br>*Mathiassen* at [0164], [0192].<br><br>The movement analyzing and translation software of *Mathiassen's* portable door control as modified by *Anderson* characterizes the number of touch/no touch and duration of each touch/no touch operation.<br><br>*Anderson* at 7:19-21, 28-30 |
| Claim 1(d2) | *See Claim 10(a3).*<br><br>The "means for mapping" is the translation software executed by processor 2 and the stored master minutiae tables (i.e., database) |
| Claim 1(d3) | *See Claim 10(Pre3) regarding "transmitter sub-system…" and 10(a4).*<br><br>The "means for populating…according to the instruction" includes administrative code, translation software, and movement analyzing executed by processor 2 as well as the master minutiae tables (i.e., database). |

| | |
|---|---|
| Claim 3(a) The system according to claim 1, wherein the database of biometric signatures comprises signatures in at least one of a system administrator class, a system user class, and a duress class | *Mathiassen* **teaches master minutiae tables contain minutiae of car owner/administrator (i.e., "system administrator class") and minutiae of other users enrolled by the administrator (i.e., "system user class").**<br><br>*Mathiassen* at [0164-0165], [0190]<br><br>*Mathiassen* **as modified by** *McKeeth* **teaches storing minutiae of a different finger of car owner in a duress classification.**<br><br>*McKeeth* at 4:29-33<br><br>*Mathiassen* at [0164], [0192] |
| Claim 3(b) the accessibility attribute preferably comprising: an access attribute if the biometric signal matches a member of the database of biometric signatures | *See Claim 10(c).*<br><br>**Access attribute is included in "open door" command if the presented fingerprint minutiae matches master minutiae tables of car owner/administrator.**<br><br>*Mathiassen* at [0182], [0185] |
| Claim 3(c) a duress attribute if the biometric signal matches a member of the database of biometric signatures and said member belongs to the duress class | *See Claim 10(c) and 1(b2) regarding duress attribute indicating user is under duress and thus granting access while issuing a silent alarm.*<br><br>**Specifically,** *McKeeth* at 4:29-43 (regarding duress) |
| Claim 3(d) an alert attribute if the biometric signal does not match a member of the database of biometric signatures | *See Claim 10(c) and 1(b2) regarding alert attribute indicating an alert condition where access is denied to unauthorized users and a car alarm is sounded.*<br><br>**Specifically,** *McKeeth* at 5:48-53 |

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

| Claim 4 The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system | *See Claim 10(Pre3), subsection "a."*<br><br>**Mathiassen teaches the master minutiae tables containing fingerprint representations/minutiae are stored in the portable door control (i.e., claimed "transmitter sub-system."**<br><br>*Mathiassen* at [0164] |
|---|---|
| Claim 5 The system according to claim 1, wherein said conditional access comprises one of: provision of access to the controlled item if the accessibility attribute comprises an access attribute, providing of access to the controlled item and sounding of an alert if the accessibility attribute comprises a duress attribute, and denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute | *See Claims 10(c), 10(e), 3(a).*<br><br>**Access attribute provides access to controlled item:**<br><br>*Mathiassen* at [0182], [0185], [0187]<br><br>*See Claim 3(d).*<br><br>**Alert attribute denying access and sounding a car alarm:**<br><br>*McKeeth* at 5:48-53 |
| Claim 6(a) The system as claimed in claim 1, wherein: the biometric sensor is for authenticating the identity of a user | *Mathiassen* **teaches authenticating user when they swipe their finger on the portable door control by matching it to minutiae in stored tables.**<br><br>*Mathiassen* at [0176], [0182] |

IPR2022-00601
Apple EX1003 Page 236

**Appx1270**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

| | |
|---|---|
| Claim 6(b) the means for emitting comprises a transmitter for transmitting information capable of granting more than two types of access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity | *See Claim 6(a) for "request from the user and the authentication of the user identity," as claimed.*<br><br>*See Claim 10(Pre3), subsections "b"-"d" for transceiver 27 wirelessly emitting an encrypted command to either grant unconditional access, grant access while issuing a silent alert (as modified by McKeeth), or deny access and sound an alarm (as modified by McKeeth).*<br><br>*Mathiassen* at [0186]<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| Claim 6(c) the system further comprising a control panel for receiving the information and for providing the secure access requested | *Mathiassen teaches IC 1 of ignition control 15 receives the encrypted command and decrypts/authenticates it via processor 2 for providing access to the car door locks.*<br><br>*Mathiassen* at [0186], [0187] |
| Claim 7 The system according to claim 6, wherein the control panel includes a converter for receiving the secure wireless signal and for outputting the information, and/or the biometric sensor authenticates the identity of the user by comparing a biometric input from the user with a biometric signature for the user in a biometric database, and/or the biometric sensor, the biometric database, and the transmitter are located in a remote fob." | *Mathiassen teaches the fingerprint sensor 5 of portable door control authenticating the identity of the user by receiving a fingerprint, relaying intermediate data to processor 2 that compares access minutiae to stored minutiae in master tables.*<br><br>*Mathiassen* at [0176-0180]<br><br>*Mathiassen also teaches the fingerprint sensor 5, master minutiae tables stored in memory 7/7A, and transceiver 27 are located in remote portable door control 20.*<br><br>*Mathiassen* at [0147] |

| | |
|---|---|
| Claim 9(Pre) | *See Claim (Pre3) regarding "transmitter subsystem" and 10(Pre1) "for operating a system for providing secure access…"* |
| Claim 9(a) | *See Claim 10(Pre3), subsection "b."* |
| Claim 9(b) | *See Claim 1(b2).* |
| Claim 9(c) | *See Claim 1(b3).* |
| Claim 9(d) | *See Claim 1(d).* |
| Claim 9(d1) | *See Claim 1(d1).* |
| Claim 9(d2) | *See Claim 1(d2).* |
| Claim 9(d3) | *See Claim 1(d3).* |
| Claim 9(e) | *See Claim 10(f).* |



US 20040123113A1

(19) **United States**

(12) **Patent Application Publication** (10) **Pub. No.: US 2004/0123113 A1**

Mathiassen et al. (43) **Pub. Date:** **Jun. 24, 2004**

(54) **PORTABLE OR EMBEDDED ACCESS AND INPUT DEVICES AND METHODS FOR GIVING ACCESS TO ACCESS LIMITED DEVICES, APPARATUSES, APPLIANCES, SYSTEMS OR NETWORKS**

(76) Inventors: **Svein Mathiassen**, Heggedal (NO); **Ivar Mathiassen**, Narvik (NO)

Correspondence Address:
**ROTHWELL, FIGG, ERNST & MANBECK, P.C.**
**1425 K STREET, N.W.**
**SUITE 800**
**WASHINGTON, DC 20005 (US)**

(21) Appl. No.: **10/321,850**

(22) Filed: **Dec. 18, 2002**

**Publication Classification**

(51) **Int. Cl.$^7$** ....................................................... **H04L 9/32**
(52) **U.S. Cl.** ................................................................ **713/185**

(57) **ABSTRACT**

A portable or embedded access device is provided for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet. The access device comprises an integrated circuit (IC) (1) providing increased security by bridging the functionality of biometrics input from a user and, upon positive authentication of the user's fingerprint locally to provide secure communication with the said access-limited apparatus, device, network or system, whether local or remote.

A corresponding method of using the portable device or the embedded device is disclosed for providing a bridge from biometrics input to a computer locally, into secure communication protocol responses to a non-biometrics network.

An embedded access control and user input device or apparatus for being a built-in part of stand alone appliances with some form of access control, e.g. hotel safes, medicine cabinet or the like, and for providing increased security, is also provided.

Further, a method of providing secured access control and user input in stand-alone appliances having an embedded access control or user input device according to the invention is also explained.



IPR2022-00601
Apple EX1004 Page 1

Case: 24-1278     Document: 22-1     Page: 654     Filed: 07/31/2024



Figure 1a

Figure 1b

IPR2022-00601
Apple EX1004 Page 2

Case: 24-1278    Document: 22-1    Page: 655    Filed: 07/31/2024



Figure 2a

IPR2022-00601
Apple EX1004 Page 3

Case: 24-1278    Document: 22-1    Page: 656    Filed: 07/31/2024



Figure 2b

IPR2022-00601
Apple EX1004 Page 4



Figure 3a

Figure 3b

IPR2022-00601
Apple EX1004 Page 5

Case: 24-1278     Document: 22-1     Page: 658     Filed: 07/31/2024



Figure 4a

Figure 4b

Finger Guide

Sliding Lid

Sensor

F-SoC

Serial Flash

SDRAM

IPR2022-00601
Apple EX1004 Page 6



Figure 4c

Appx1279

IPR2022-00601
Apple EX1004 Page 7



Figure 5

IPR2022-00601
Apple EX1004 Page 8



Figure 6

IPR2022-00601
Apple EX1004 Page 9



Figure 7

IPR2022-00601
Apple EX1004 Page 10



Figure 8

IPR2022-00601
Apple EX1004 Page 11

Case: 24-1278    Document: 22-1    Page: 664    Filed: 07/31/2024



Figure 9

Display on dashboard operated by thumb finger commands from sensor on gear stick or on steering wheel.

Single sensor mounted on gear stick:
□ For audio, GPS and embedded cellular phone control, and access control (ignition).

Twin sensors mounted on steering wheel:
□ Left sensor for audio, GPS and embedded cellular phone control.
□ Right sensor for gearshift operation and access control (engine ignition).

**Modes**
□ Start Engine
□ Audio System
□ Cellular Phone
□ GPS Navigation
□ Adjust Seats & Mirrors
□ Enroll Profiles

IPR2022-00601
Apple EX1004 Page 12

1

## PORTABLE OR EMBEDDED ACCESS AND INPUT DEVICES AND METHODS FOR GIVING ACCESS TO ACCESS LIMITED DEVICES, APPARATUSES, APPLIANCES, SYSTEMS OR NETWORKS

[0001] This invention is in general related to access and input devices for giving access and allowing user input in access limited devices, apparatuses, appliances, systems or networks.

[0002] In particular the invention is related to a portable and an embedded access or input devices and methods of using these in order to obtain a high level of security.

[0003] Automated access from a device or terminal to another device or a network/server is subject to authentication of authorized users. Such automated access eliminates manual authentication of the user by human recognition, and has to rely on some form of electronic identification of the user.

[0004] One way to resolve such electronic identification of the user is to issue a secret password to the user. Another method is to issue a physical token to the user. In both cases the system relies on the assumption that the person knowing such password, or alternatively carrying such physical token, has proved his identity, assuming that this has authenticated the authorized user. This is not the case, as passwords, or tokens, may intentionally be passed away to a third person, or non-intentionally and illegally acquired by such third person. Despite these obvious shortcomings of such identification by something you know (e.g. a password) or something you carry (e.g. a token) this method is still the dominating method of user identification to networks/servers, etc. because it is practical, but mainly because no better alternative is still commercially available in greater scale.

[0005] An alternative identification method is by something you are, meaning some sort of secure identification by biometrics, such as fingerprints. Although biometrics is gaining ground, this happens slowly and is not employed in a greater scale. There are several reasons for this slow growth in biometrics identification for access to networks and servers;

[0006] a. Biometrics has to gain wide public acceptance. This will be the case as soon as the benefit from biometrics identification outranks assumed disadvantages. This includes lack of knowledge about, and lack of available biometrics solutions. Very few users will acquire biometrics solutions per se, if such biometrics do not form part of an overall solution that provides substantial benefits to the user in the form of increased convenience and availability. Basically this item will be resolved when items (b) and (c) are resolved.

[0007] b. The unit cost of biometrics sensors still needs to be reduced, to achieve widespread commercial solutions. This is partly pending on cost-efficient designs, which are continuously evolving, but mainly pending on volume. This item will accordingly be resolved when item (c) is resolved.

[0008] c. The major obstacle against secure access authentication by biometrics is that the systems and solution providers must embed biometrics access control in their systems. The major obstacle to this is that there are still no commonly accepted international standards of biometrics. A system or solution provider must therefore choose between several alternative emerging biometrics standards, at the risk of choosing the wrong one, or one of the standard proposals that will not be the dominating winner. Most major system providers are reluctant to make a choice on this basis, because of the grave consequences from a wrong selection;

[0009] The costs involved by modifying software on servers etc. are considerable, especially if the non-winning standard is selected, and the software modification process has to be repeated in the near future. The price of biometrics hardware adds to this.

[0010] The negative public relation effects from selecting the non-winning biometrics standard may be serious, and shall not be under-emphasized.

[0011] The time to market will be severely prolonged if selecting a non-winning biometrics standard. This is further aggravated by the lead this will give any major competitors having selected the winning biometrics standard from the outset. This may upset the entire ranking between major solution providers.

[0012] Prior-art attempts to resolve this problem have been to enforce biometrics standards. However, there are currently several alternative standards battling side-by-side without any clear winner yet. Some known attempts to resolve the problems have been to use extracted specifics of biometrics to form encryption keys. One such solution is described in U.S. Pat. No. 5,995,630 as it requires identical biometrics representation at the receiving end (e.g. a network server). A similar approach is described in U.S. Pat. No. 5,991,408. However, none of these resolves the problem of avoiding the need to choose a biometrics standard as they both pose an even more serious problem that will delay biometrics implementation even further; namely proprietary solutions. Other attempts to resolve the problem are focused on improving the communication security by the concept of public key cryptosystems, as e.g. per European patent EP 0 225 010 B1. Though such systems enhances the security of network communication over insecure communication lines, the public key cryptosystems do not prove that the bearer of electronic certificates (checksums of keys and other identity features) is actually the right person. In addition these systems do still require a PIN code for the user to access the PKI system with electronic certificates. This means that yet another PIN code has to be remembered by the user. Moreover, the system security is no better than the protection of this PIN code. As a countermeasure to breaking PIN codes, the industry tends to make longer and longer PIN codes, making it even more difficult for the user to remember these. The natural response of the users is to write down the PIN codes, leaving the potential security breach wide open.

[0013] Accordingly the present two main directions of prior-art attempts to resolve the problems (biometrics encryption, and biometrics representation on servers, on one hand and the concept of public key cryptosystems on the other hand) do not really solve the above problems in network communication, and certainly not for secure access to devices and apparatuses.

[0014] Apparent competitors to the portable embodiments of the present invention are so-called USB Dongles with

                                 IPR2022-00601
Apple EX1004 Page 13

US 2004/0123113 A1

Jun. 24, 2004

2

memory onboard (up to 1 Gb). Some of these USB Dongle memory devices are even equipped with fingerprint sensors to prevent unauthorized access to the information stored onboard the USB Dongle. While these devices may physically look somewhat like one of the preferred embodiments of the present invention, there is no similarity in their functionality at all. The USB Dongles presently on the market are purely portable storage means, while the present invention focuses on secure communication triggered by an authorized fingerprint on such portable devices.

[0015] On this basis the major solution providers are hesitant to make an early move, though there is a general consensus that biometrics access control is far more secure, and convenient, than password-based or token-based access control. However, when the market leaders are hesitant to provide biometrics access methods widely offered to the market, the lack of availability to the general public will continue to restrain the growth of biometrics access control systems.

[0016] It is one object of the present invention to overcome the above limitations by providing a portable access device for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet comprising a device interface, being electronic or mechanical or both, for coupling the device to the access-limited unit, e.g. a computer terminal port.

[0017] It is a second object of the present invention to overcome the above limitations by providing an embedded access device for integration into peripherals of networked computers or communication terminals, to allow only authorized users access to all types of proprietary networks (LAN, WAN, etc.) typically represented by internet banking applications, corporate and government intranets, and similar.

[0018] It is a third object to provide a method of using a portable access device or an embedded access device for providing a bridge from biometrics input to a computer, into secure communication protocol responses, to a non-biometrics network.

[0019] It is yet another object to provide a portable or embedded access device and methods of using these, which provides improved security as compared to present technology.

[0020] It is a further objective of the present invention provide a portable or embedded access device and methods of using such which does not require a transfer of biometrics fingerprint information over otherwise open and insecure parts of communication systems using such devices.

[0021] It is yet another object of the present invention provide a portable or embedded access device and methods of using such which does not rely on the development on international biometrics standards.

[0022] It is a further object of the invention to provide a combined embedded access control and user input device or apparatus and use of such a device which can be a built-in part of stand-alone appliances with some form of access control which also satisfies the objectives set out above.

[0023] It is yet a further object of the invention to provide a method of improved secure access control and user input

in stand-alone appliances having an embedded access control or user input device as given above.

[0024] The objects of the invention as set forth above are obtained with a portable device as given in independent claim 1.

[0025] Preferable embodiments of the portable device are given in the dependent claims 2-6.

[0026] The objectives of the invention are also obtained with an embedded access device as given in independent claim 7.

[0027] Preferable embodiments of the embedded access device are given in the dependent claims 8-9.

[0028] The objectives of the invention are also obtained with a method of using a portable access device according to claim 1 or an embedded access device according to claim 7 in a way as given in the independent claim 10.

[0029] Preferable embodiments of the method are given in the dependent claims 11-17.

[0030] The objectives of the invention are also obtained with an embedded access control and user input device or apparatus having the features as given in the independent claim 18.

[0031] Preferable embodiments of the embedded access control and user input device or apparatus are given in the dependent claims 19-21.

[0032] The objectives of the invention are also obtained with a method of secured access control and user input in stand-alone appliances as given in the independent claim 22.

[0033] The invention will now be described in detail by references to the accompanying figures where

[0034] FIG. 1a Shows a network (N) or a system using a fingerprint sensor according to prior art.

[0035] FIG. 1b Shows a network (N) or a system of devices employing a biometrics device according to the invention.

[0036] FIG. 2a Shows a first realization of an integrated circuit that is an integral part of the invention.

[0037] FIG. 2b Shows a second realization of an integrated circuit that is an integral part of the invention.

[0038] FIGS. 3a,3b Shows a portable access device according to the invention in the form of a USB dongle.

[0039] FIGS. 4a,4b Shows a portable access device according to the invention in the form of a PCMCIA card

[0040] FIG. 4c Shows a PCMCIA card where the integrated fingerprint sensor is protected underneath a sliding lid, for mechanical protection of the sensor.

[0041] FIG. 5 Illustrates how an access device according to the invention may be embedded as part of the keyboard or mouse of a computer terminal or laptop computer.

[0042] FIG. 6 Illustrates how an access control and user input device or apparatus according to the invention may be arranged as a built-in part of a hotel safe.

US 2004/0123113 A1    Jun. 24, 2004

3

[0043] **FIG. 7** Illustrates how an access control and user input device or apparatus according to the invention may be arranged as a built-in part of a medicine cabinet.

[0044] **FIG. 8** Illustrates how an access control and user input device or apparatus according to the invention can be applied in a portable door control unit for the electronic systems in automotive applications.

[0045] **FIG. 9** Illustrates how an access control and user input device or apparatus according to the invention can be embedded in the gear stick or steering wheel of a car.

[0046] The traditional biometrics approach, as per current methods, is illustrated in **FIG. 1A**. The User places, or swipes his finger (A) over the access/input device with a fingerprint sensor (B). The entire image from the sensor (B) is transmitted from the access/input device to the processor (C) (e.g. a PC) where implemented Software Module(s) (D) acquires the sensor signals and processes them to reconstruct a 2-dimensional fingerprint image, and thereafter extracts the particulars of the fingerprint, and finally either perform a matching locally at the PC (C) or transmits the interpreted fingerprint essentials to a server in a network (E).

[0047] In an access-limited apparatus, device, network or system (N), e.g. a computer terminal, an internet bank or a corporate or government intranet, a portable access device for allowing only authorized users access is preferably arranged as shown schematically in **FIG. 1B**. A biometrics processor (F1) may be integrated with the sensor (B), or alternatively mounted as a separate integrated circuit (F2) next to or closely coupled to the sensor (B), or alternatively be embedded in a PC or its peripherals (F3). The sensor (B) and the biometrics processor (F; referring to F1, F2, or F3) may work in a stand-alone mode (e.g. in a hotel safe without connection to a network) or be may be connected to another device (C) and optionally networked (E). The biometrics processor as an integrated circuit is exemplified in **FIGS. 2A and 2B**. The advantages of this configuration are multiple. As the biometrics processor (F) is directly connected to he sensor (B) the biometrics processor (F) can be tailored to optimize the interaction between the sensor (B) and the biometrics processor (F). Such tailoring of the biometrics processor (F) to the sensor (B) combined with is direct connection to the sensor (B), or integration therein, enables inclusion of methods and procedures that severely constrains interception of the signals between the sensor (B) and the biometrics processor (F). It further significantly reduces the network traffic between the sensor (B)/biometrics processor (F) and the other networked processors (C and N). The major advantage is, however, that the biometrics processor can transform the biometrics from the sensor (B) to general communication security measures in a network, such as including Secure Key Generation (SKG) as basis for encryption into the biometrics processor (F). By this method biometrics sensors (B) may be connected to a network (C and N) in a secure manner according to existing infrastructure, without requiring that the supplier of the network system architecture makes any decision on which biometrics standard will evolve in the future as the winning standard. By this method the biometrics processor (F) becomes a bridge between biometrics sensors (B) and current infrastructure of networks (E).

[0048] A biometrics sensor in the form of a fingerprint sensor (5) is coupled with a biometrics processor in the form of an integrated circuit—IC (1) that is the core device of the invention. Two versions of the IC are shown in **FIGS. 2A and 2B**. The details of the ICs will now be explained.

[0049] The sensor (5) is connected to a fingerprint sensor signal capturing and pre-processing block (5C) via a first interface block (5A) as well as a wake-up circuit (5B), the function of the latter being to power up all other blocks of the IC (1). When a finger is detected on the sensor (5) surface, the output signals from the sensor (5) will raise beyond a pre-set threshold, triggering the wake-up circuit (5B) to power up the rest of the IC (1) in a pre-set sequence. The first blocks to be powered up are the Image Capture and Pre-processing block (5C) as well as the high-speed bus (3) and the volatile memory (6 or 6C), all of which are connected to the high-speed bus (3). The pre-processing block is designed to perform the initial, heavy-duty processing of the captured raw images from the sensor (5). The intermediate results are stored in the volatile memory (6A or 6C) that is interfaced via the high speed bus (3) to a first memory interface block (6B or 6D). The volatile memory (6A or 6C) thus provides working memory that is available to other modules on the IC (1).

[0050] Meanwhile the remaining blocks of the IC (1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM **9**, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30)

    IPR2022-00601
Apple EX1004 Page 15

US 2004/0123113 A1

4

that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (**7, 7A** or **7C**). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (**8**) and stored on a regular Flash memory (**7**), or securely stored in SmartCard environments (**7A** or **7C**). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (**7, 7A** or **7C**) and run on the central processor (**2**) may then combine information to be part of a secure communication between the IC (**1**) and the network server (**30**). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (**8** or **8**B or **8**C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (**2**), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (**8, 8**B or **8**C) may also be used to encrypt general information transactions between the IC (**1**) and the network server (**30**), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (**7, 7A** or **7C**). The IC (**1**) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (**9A, 9B, 9**C or **9D**) for transferring data to other devices and networks (N) external to the IC (**1**). In the present invention the IC (**1**) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (**9A**), Ethernet (**9B**), GPIO (**9C**), PCMCIA/UART (**9D**) and/or SmartCard (**7C**) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (**4**) with lower bandwidth and capacity than the high-speed bus (**3**). The two buses (**3** and **4**) are connected by a bus bridge (**11C**). The hardware blocks that are not dependent on high speed are connected to the slower bus (**4**). The hardware blocks of the IC (**1**) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (**2**) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N).

[0051]  Thereby the IC (**1**) is designed as a multi-purpose tool that can service a fingerprint sensor (**5**) in a stand-alone mode, but it can also communicate with external devices and networks (N) by bridging the biometrics from the sensor (**5**) to a non-biometrics representation into the network (N) and onto its server(s) (**30**). The IC (**1**) transforms the fingerprint, under prevailing secure communication rules, to a regular representation by e.g. password and User ID on a server (**30**).

[0052]  The main difference between the ICs (**1**) of **FIG. 2A and 2B** is that the version in **FIG. 2B** has volatile memory (**6C**) and non-volatile memory (**7A**) as integrated blocks in the IC (**1**) thus reducing the demand for data exchange with external memory and thus further enhancing the security and speed of operation of the device by con-

taining almost all data processing of the fingerprints, and therefrom automatically triggered security responses, internally within the IC (**1**).

[0053]  The utilization of the IC (**1**) for authentication of an authorized user to access an intranet comprising a server (**30**) in a network (N) will first be explained for the alternative where the IC (**1**) is a portable device to be plugged into a terminal (**31**) of the network, either as USB dongle, as illustrated in **FIGS. 3A and 3B**, or as a PCMCIA card, as illustrated in **FIGS. 4A and 4B**.

[0054]  In one embodiment of the invention, the portable device has an IC (**1**) being mounted on a small printed circuit board PCB (**12B**) also carrying a fingerprint sensor (**5**). The PCB (**12B**) is connected to at least one of a USB interface (**12C**) or a PCMCIA mechanical interface (**13B**). Electronic surface components to support at least one of the USB mechanical interface (**12C**) and the PCMCIA mechanical interface (**13B**) are mounted on the PCB (**12B**). An SDRAM chip (**6**), typically at least with 4 MB capacity, is also mounted on the same PCB (**12B**). Further a non-volatile serial Flash chip (**7**), typically with at least 256 Kbytes capacity, is also mounted on the same PCB (**12B**). In this embodiment all preceding components and chips are protected inside a housing (**12A** or **13C**).

[0055]  In another alternative embodiment of the invention the portable device has a housing designed with a recess thus enabling a finger (A) to be placed on, or swiped over the sensor (**5**). With the sensor arranged in the bottom of the recess, it will be have some protection, while still being conveniently accessible by the finger (A).

[0056]  In yet another embodiment of the invention the portable device is designed with a housing which is equipped with a sliding lid (**13D**) enabling a finger (A) to be placed on, or swiped over the sensor (**5**) being protected under said sliding lid, but still conveniently accessible by the finger (A).

[0057]  The sliding lid (**13D**) may be forced into closed position by a spring, thus fully covering the sensor (**5**) when the sliding lid is not pushed aside by a finger (A) when a fingerprint image is to be captured. A finger guide structure (**13E**) is placed adjacent to the sliding lid (**13D**) when the sliding lid (**13E**) is in closed position, fully covering the sensor (**5**). The purpose of the finger guide (**13E**) is to intuitively guide the finger (A) in correct position to open the sliding lid (**13D**) and thereby swipe the finger (A) correctly over the sensor (**5**) if the sensor (**5**) is of the swipe type. In this embodiment the UART interface (**9D**) on the IC (**1**) typically supports the PCMCIA port (**13B**).

[0058]  In a further embodiment of the invention the portable device is equipped with non-volatile memory (**7**) that is expanded with extra capacity beyond the 256 Kbytes minimum capacity to provide extra storage capacity for data, thereby enabling the device to operate as a general portable data storage. For such extra storage capacity, the IC (**1**) can be equipped with a USB mass storage class controller with at least one control endpoint and 2 bulk endpoints (in/out) in order to provide access to data onboard the portable device, only accessible upon positive match of the captured fingerprint image with one of the fingerprint representations of authorized users stored onboard the portable device.

IPR2022-00601
Apple EX1004 Page 16

US 2004/0123113 A1

Jun. 24, 2004

5

[0059] The following operations will typically be performed for applications of the devices according to the invention:

[0060] The network administrator will organize issue of the portable devices (**12** or **13**) to the authorized users in a personalization process for the chip/IC (**1**) wherein data is pre-stored into the chip/IC (**1**). This involves loading the IP address of a targeted Intranet server, the selected encryption algorithm, and other data characterizing the Intranet, onto the portable device (**12** or **13**). This information is either scrambled by block (**8**) for storage on external non-volatile Flash memory (**7**), or alternatively stored securely in embedded non-volatile SmartCard memory (**7A**) or on an external non-volatile Smart-Card memory (**7E**).

[0061] The network administrator, or persons he has delegated authority to, will then enroll the user who will be the "owner" of the portable device (**12** or **13**). Such delegation may be performed by the administrator enrolling new sub-administrators on the server, with privilege to enroll new users. When the administrator has enrolled a sub-administrator, including capturing one or more of the sub-administrator's fingerprints, the administrator must counter-sign with his own pre-approved fingerprint, before the sub-administrator privilege to enroll new users is authorized by the software on the server (**30**). Thereby a delegation hierarchy is maintained, enabling tracking of administrator and sub-administrator authorizations, to check for non-intended use of the administrator rights, to detect any unfaithful servants in the hierarchy.

[0062] Enrolment of a new user, by the administrator or a sub-administrator, will be performed on a terminal connected to the server (**30**). The administrator (or a sub-administrator) will perform the enrolment procedure of a new user, including capturing one or more fingerprints of the new user, and issuing a seed for the SKG algorithm to such new user. Eventually the administrator, or sub-administrator, will complete this procedure by counter-signing with his fingerprint. If the counter-signature fingerprint matches that of an authorized administrator, or sub-administrator, the enrolment procedure is deemed valid, and the personalized data downloaded to the portable device (**12** or **13**) connected to the terminal. If the counter-signature is not authenticated, the enrolment is deemed to be non-valid, and will be aborted.

[0063] The user has, by the above enrolment and issuance of a portable device (**12** or **13**), become authorized to access the Intranet network (**N**), or parts thereof. In the latter case, with partial access, the definition of which parts of the network the user has authorized access to, or which directories on the server (**30**) will be defined in the User Profile, stored on the server (**30**).

[0064] The user may by means of such portable device securely access the server (**30**) of the network (**N**) from a terminal (**31**) in the network (**N**), or from any terminal connected to the server (**30**) in the network N, by Internet, either by landlines or by wireless connections. Such access will now be described by example of the USB Dongle as illustrated in **FIGS. 3A and 3B** containing an IC (**1**) as shown in **FIGS. 2A and 2B**.

[0065] This example involves a user traveling, wanting to connect to the Intranet server (**30**) of the network (**N**) from an Internet Café or a Business Center at a hotel. The user will insert the portable device (**12** or **13**) into the USB port (or alternatively into the PCMCIA slot of the terminal, if the portable device is a PCMCIA card). The USB Dongle (**12**) may have an extension cord for the USB connection, in case the USB port is awkwardly positioned on the back of the terminal (**31**).

[0066] To initiate the connection procedure, the user swipes his finger over the fingerprint sensor (**5**) of the USB Dongle. This will trigger a signal to the wake-up block (**5B**) of the sensor interface (**5A**) on the IC (**1**).

[0067] The triggering signal from the sensor (**5**) to the wake-up block (**5B**) will cause the wake-up circuitry (**5B**) to power up the pre-processing block (**5C**), the high-speed bus (**3**) and the volatile working memory (**6A** or **6C**). The pre-processing block (SC) will immediately start capturing the fingerprint image from the sensor (**5**) via a first interface block (**5A**), while the wake-up circuitry (**5B**) is powering up the remaining blocks of the IC (**1**), starting with the central processor (**2**).

[0068] The pre-processing block (SC) will crunch the raw data, i.e. the captured fingerprint images, using hardware-embedded algorithms optimized for the laborious initial high-speed processing of the fingerprint data, thus reducing them to an intermediate form, to be stored in the working volatile memory (**6A** or **6C**).

[0069] When this data reduction is completed by the pre-processing block (SC) designed to perform this number-crunching at a maximum speed in dedicated hardware block (SC), the reduced data are gradually transferred from the working volatile memory (SC) to the central processor (**2**) via the high-speed bus (**3**).

[0070] The central processor (**2**) will further reduce the fingerprint data to a compact form by so-called minutiae, where significant details of the fingerprint are transformed into an alphanumeric string comprising at least X and Y coordinates of each minutiae, plus its direction. This compact fingerprint representation by minutiae may be expanded with other features deemed necessary. When the central processor (**2**) has completed the reduction of the captured fingerprint image to compact minutia form, it will transfer this access minutiae table via the high-speed bus (**3**) for temporary storage in the working volatile memory (**6A** or **6C**).

[0071] Then the central processor (**2**) will retrieve the compact fingerprint minutia information from a master minutiae table, created during the enrolment of the authorized user(s), stored in non-volatile memory

IPR2022-00601
Apple EX1004 Page 17

US 2004/0123113 A1

Jun. 24, 2004

6

(7, 7A or 7C), and compare it with the access minutiae table temporarily stored in working volatile memory (6A or 6C).

[0072] The matching algorithm, being a subset of the administrative software, will position the minutiae points of the access attempt minutiae table over the minutiae points of the master minutiae table, and translate and rotate the upper until a best fit is established. Such best fit is deemed by allocating a pre-defined tolerance area around each of the master minutiae points, and checking if the position of the access attempt minutiae points are falling within the boundaries of the tolerance area. Thereby a comparison of the extracted features representing the captured fingerprint with features of the pre-stored master fingerprint representations is obtained.

[0073] The number of minutiae points matching between the access attempt minutiae table and the master minutiae table, required to validate an authenticated user is pre-set in a sub-set of the administrative software by the system administrator. The minimum number of coinciding minutiae points required to declare a positive match, may be varied by the system administrator according to the sensitivity of the contents of the directory which the user is seeking access to. The concept of a binary match or non-match may be expanded with a quality feature, where an absolute match, whereby the access attempt minutiae point is exactly coinciding with the corresponding master minutiae table, gives the highest quality score. The quality score of each matching minutiae pair may then be decreased gradually until the location of the access attempt minutiae falls towards the boundary of the tolerance area around the master minutiae point. If the matching is positive, the connection process will automatically continue. If the result of the matching is negative, then the connection process is aborted at this stage.

[0074] One result of the occurrence of a positive match could be that the release of an IP address from the SmartCard block (7C) or from the external SmartCard chip (7E).

[0075] The next step of the connection procedure comprises the device (USB Dongle or PCMCIA card) (12 or 13) automatically loading a Java applet from its non-volatile memory (7, 7A or 7E) onto the terminal (31) via the USB port (9A) in the case of the device being a USB Dongle, or via the UART port (9D) in the case the device is a PCMCIA board. This Java applet contains the IP address of the server (30) that the user is seeking authorized access to.

[0076] When the central processor (2) has established a positive match between the access attempt minutiae and the resident master minutiae, the administrative software [stored in the non-volatile memory (7, 7A or 7E)] will calculate a secure key. The secure key will either be calculated by an algorithm executed on the central processor (2) (in case of FIG. 2A), or alternatively by a dedicated hardware block (8A) in case of FIG. 2B). The general algorithm will generate the secure key, and the particular key or password will be generated as a result of the seed

being inputted to the algorithm. This seed will either be scrambled and stored in scrambled format in non-volatile memory (7) in the alternative of FIG. 2a, or be securely stored in a SmartCard environment (7A) in case of the alternative IC architecture outlined in FIG. 2b.

[0077] The secure key will be input to the encryption block (8, 8B or 8C) for encryption of a message/communication. The message will comprise the following elements;

[0078] The device number of the USB Dongle or the PCMCIA card (12 or 13) and the SKG key number (not the key itself) in non-encrypted format.

[0079] The IP address of the device (12 or 13) in encrypted format.

[0080] The secure key number (in encrypted format).

[0081] The user ID, in encrypted format.

[0082] Optionally PKI verification in encrypted format, in case of authentication of the user holding the electronic certificate.

[0083] Other encrypted information required by the particular requirements for secure communication, of the prevailing Intranet.

[0084] The calculated communication response is thus a result depending on the above comparison of fingerprints. This message/communication is encrypted to form a secure output in a predefined format and sequence (e.g. handshake procedures) and transferred to an external unit, network or system through one of the communication interfaces.

[0085] Thus if a positive match of the captured fingerprint with the fingerprint representation of an authorized user is obtained, an output signal from the IC/chip (1) including target IP address and encrypted communication is generated.

[0086] When this information is received by e.g. the target server (30) of the network (N) the receiving server (30) will look up the non-encrypted serial number, or IP address of the device (12 or 13) in the privilege subset of the data repository on the server (30).

[0087] From this data set the server (30) will retrieve the particular seed issued to this user, during enrolment. This seed is then inputted secure key generation algorithm SKG on the server (30), together with the open (non-encrypted) key number.

[0088] If the key number from the device (12 or 13) is higher than the key number which the server is currently using (keys are out of sync), the server will step up the key number to match that of the device (12 or 13), and generate the corresponding key from the SKG algorithm with the seed stored by the serial number of the device, as input to the decryption process.

[0089] If the key number provided by the device (12 or 13) is lower than the key the server (30) is

IPR2022-00601
Apple EX1004 Page 18

US 2004/0123113 A1                                                                    Jun. 24, 2004

7

currently using, the server will return its current key number to the device (**12** or **13**) implicating that the device steps up its key number correspondingly.

[0090] If this decryption fails (an erroneous password emerging), the server (**30**) will assume that the received communication attempt is false, and the server will abort further steps in the communication procedure.

[0091] A subset of the administrative software which tailors the output secure response to the target network or intranet (N) to a pre-defined format and sequence including handshake sequences, could be pre-loaded into the non-volatile memory (**7A, 7E, or 7**).

[0092] Preferably this pre-loaded subset of administrative software is able to combine one or more of the following steps:

[0093] generating a secure key or password (**8** or **8A**),

[0094] applying any of the encryption methods at hand and embedded in the hardware blocks, such as DES, ECB, CBC, TDES (**8** or **8B**) or any proprietary encryption algorithm also embedded in hardware (**8C**),

[0095] tailoring handshake sequences according to the rules of secure communication of the device, network or system (N). The pre-loaded subset of the administrative software is preferably also adapted to perform sequencing of the operation of the respective functionality blocks of the chip/IC (**1**) in order to produce secured output data which is suitable for transmission in the targeted network (C) and for processing by receiving units connected to the network (C).

[0096] The output from the IC (**1**) could be blocked (non-authorized access state) if the matching of the captured fingerprint is negative relative to any of the authorized fingerprint representations stored in the non-volatile memory (**7A, 7E or 7**).

[0097] The output from the IC (**1**) can be opened (authorized access state) if the above-mentioned matching is positive.

[0098] By these features of the invention a local fingerprint authentication at the device (**12** or **13**) will be transformed to a password and optionally hand-shake procedure as per the secure communication procedure of the prevailing network (**30**) without having to include a biometrics representation on the server (**30**). Thereby the system provider of the network (N) does not have to choose any of the emerging biometrics standards, with the embedded risk of choosing a non-winning biometrics standard. Yet the system administrator will have the security of biometrics, through devices (**12** or **13**) when authenticating authorized users.

[0099] In an alternative application according to the present invention an access device with the sensor (**5**) and the IC (**1**) is embedded in peripheral hardware of the terminal (**31**), such as e.g. embedding the sensor (**5**) and the IC (**1**) into a PC mouse or a PC keyboard or onto the chassis of a laptop PC. In general the access device for embedding

may have all or many of the technical features of the portable device described above, however, some aspects of this application will be explained in more detail by reference to **FIG. 5**.

[0100] The embedded system (**15**) comprises the fingerprint sensor (**5**) being connected by a cable (**15B**) to a printed circuit board PCB (**15A**), on which the IC (**1**) as well as external volatile memory (**6**) and external non-volatile memory (**7**) are mounted. The PCB (**15A**) also contains a connector (**15C**) for connecting the embedded device (**15**) into the peripherals of a terminal (**31**) or the computer of a stand-alone device. The biometrics device (**15**) may be embedded in a mouse (**41**), or the keyboard (**42**) of the terminal (**31**), or in the chassis of a laptop PC (**40**).

[0101] This method of using the embedded access device will follow the same procedure as described above for the portable device, possibly with an alternative enrolment method termed "remote enrolment" and described below. Note that this remote enrolment alternative may as well apply to portable devices (**12** or **13**) as to embedded applications.

[0102] This enrolment alternative implies that the system administrator does not personally oversee who is enrolling his fingerprint at the sensor (**5**).

[0103] The system administrator, or his delegates, will issue a seed to the potential user, e.g. by classified mail.

[0104] The mailed parcel may in addition to the seed also include a CD-ROM with the personalization data for the biometrics device (**15**), in case of the embedded alternative. In case of the portable device alternative (**12** or **13**) the mail parcel may include the device fully personalized, so that the first user only has to enroll his finger(s).

[0105] Alternatively the new user may connect via the network (N) to the system administrator, to perform the remote enrolment procedure in online mode. This will involve a special transmission where the personalization data for the embedded device (**15**) are transmitted over the network in a special session.

[0106] The first person enrolling his fingerprint is assumed to have the proper identity, and will become the "owner" of the device.

[0107] Once a person has performed a remote enrolment and has become the "owner" of the device, a particular sector of the non-volatile memory (**7, 7A** or **7E**) will be locked. This memory sector will contain the personalization data of a particular network (N). This sector can thereafter not be opened for modifications by anyone else than a system administrator with special privileges. However, other memory sectors will be available for other networks (N) or other service providers. The embedded device (**15**) will thereby comprise a multi-service chip in which each proprietary memory sector is non-accessible to other service providers or network system administrators.

[0108] Yet another aspect of the invention is related to stand-alone applications, or applications within a local network e.g. within a car. Examples of such applications are;

[0109] Hotel safes,

[0110] Personal safes (e.g. in student dormitories, etc.),

[0111] Medicine cabinets,

[0112] Weapon cabinets,

[0113] Biometrics system for the automotive industry.

[0114] Examples of such "stand-alone" applications will be described separately below. It should be understood, however, that this aspect of the invention may comprise all of or most of the technical aspects described above for the portable access device and the embedded access device.

[0115] The method of secured access control and user input in stand-alone applications according to this aspect of the invention will typically comprise many or all of the steps as described above for the embedded or portable access device, however, limited to operations being performed in the stand-alone application per se.

[0116] Typically, when an embedded access control and user input device or apparatus according to the invention is used in a stand-alone appliance the operating and control software of the stand-alone appliance is pre-loaded into the non-volatile memory block (**7** or **7A** or **7E**) of the integrated circuit IC (**1**). The central processor block (**2**) of the IC (**1**) executes the said operating and control software of the stand-alone appliance.

[0117] The method of secured access control and user input in stand-alone appliances having an embedded access control or user input device according to the invention typically comprises steps similar to the ones outlined above for the portable access device.

[0118] Hotel safes involve frequent enrolment of new guests for a limited time (e.g. a single night stay). Further there may be multiple users (e.g. a family) requiring access to the safe. An important feature is that when leaving the safe door open for a period (say 5 minutes) all resident master fingerprint minutiae tables shall be automatically erased, so that the memory is clean when the next guest(s) checks into the room. Another factor is the ability to trace non-authorized access attempts, e.g. by unfaithful servants.

[0119] The hotel safe stand-alone application will be explained with reference to **FIG. 6**. The hotel safe (**50**) of this example is not connected to any network, and has only a power supply from the mains (not shown). The safe is equipped with a hinged door (**51**) with locking bolts (**52**). At the front of the hinged door (**51**) there is a cover (**53**) accommodating the user interfaces comprising a fingerprint sensor (**5**) and a socket for connection of a service unit (not shown). The service unit may be a PDA that may be used to re-set the settings of the safe's administrative software, downloading event tables, and download fingerprints from unsuccessful opening attempts. The fingerprint sensor (**5**) is connected by a cable (**15B**) to the printed circuit board PCB (**15**). The PCB (**15A**) accommodates the integrated circuit (**1**), external volatile memory (**6**), external non-volatile memory (**7**) and optionally a connector (**15C**) to another printed circuit board (**54**) containing the control system for the safe, including a connection to the service unit (not shown). The two printed circuit boards (**15** and **54**) are

mounted on the inside of the hinged door (**51**) on the "safe side", while the sensor (**5**) is mounted on the outside, in the cover (**53**).

[0120] The safe will be operated as follows, with reference to **FIG. 6**, and **FIGS. 2A and 2B**. When a guest checks out of the hotel room he will leave the safe door (**51**) open. When the safe door (**51**) has been left open, for a pre-set time stored in the administrative software of the IC (**1**), all master minutiae fingerprint representations stored in the non-volatile memory (**7**) will automatically be deleted, leaving the safe memory in a "clean" state for the next guest. When the next guest(s) checks into the room the guest will find the safe (**50**) with the door (**53**) open, waiting for the next "owner" to enroll his fingerprint. The guest will now enroll his fingerprint by the sensor (**5**). When the guest touches the sensor (**5**) this will trigger an output voltage from the sensor (**5**) triggering the wake-up circuit (**5B**) of the IC (**1**). The fingerprint will be processed by the pre-processor block (**5C**) and the central processor (**2**) until stored in compact format as a minutiae table in non-volatile memory (**7, 7A or 7C**) using the volatile memory (**6** or **6C**) as working memory. Such processing of the fingerprint to compact minutiae representation shall take less than 1,0 seconds. When this processing is completed, a beeper (not shown) in the front cover (**53**) will beep for a pre-set period of say 10,0 seconds. Within this time frame a next fingerprint may be captured, processed and stored by the IC (**1**). This may be a second finger of the guest, or fingers of his family. This process may be repeated until the say 10 seconds time frame of beeping since the last fingerprint was enrolled elapses without a new fingerprint has been enrolled. At this stage a number of master fingerprint compact representations, in the form of minutiae, may be stored in the non-volatile memory (**7, 7A or 7C**). The safe door (**51**) may now be closed. However, at such door closure the locking bolt(s) (**52**) will not close until one of the enrolled users countersign with his fingerprint on the sensor (**5**), and this counter-signature fingerprint is found by the IC (**1**) to match with one of the enrolled master prints stored in the memory. This will prevent the safe from being erroneously locked by non-enrolled persons. When the safe door (**52**) is shut and locked, it is waiting for an authorized fingerprint to open the safe. Any non-authorized fingerprints attempting to open the safe may be recorded, for subsequent downloading to the service unit (not shown). This will have preventative effects on any unfaithful servants trying to tamper with the safes, to get illegal access. When a fingerprint image from the sensor (**5**) is captured and processed by the IC (**1**), the central processor (**2**) will perform a matching analysis of the access attempt minutiae with the authorized master minutiae templates stored in the non-volatile memory (**7, 7A or 7C**). In case of a positive match, the administrative software of the safe control PCB (**54**) will retract locking bolts (**52**) and the hinged door (**51**) will spring open. The safe control PCB (**54**) may be eliminated, by all administrative software of the safe control PCB (**54**) to be transferred to the IC (**1**) as this has ample capacity, as fingerprint processing will only be carried out a fraction of the time. The final stage of the operating procedure of the hotel safe (**50**) is that the user leaves the safe door (**51**) open when he checks out of the room, automatically causing all master prints to be erased from the non-volatile memory (**7, 7A or 7C**).

[0121] Personal safes (e.g. for student dormitories) will normally involve less frequent enrolment of new users,

IPR2022-00601
Apple EX1004 Page 20

9

while each user shall have access to the safe for a longer period than a hotel safe. Accordingly the feature of automatic erasure of master fingerprint minutiae when the door is left open for a period will be impractical. Instead the cover (53) on the front door (51) may be furnished with a keyboard, or at least some function buttons, enabling the user to send commands to the IC (1) such as e.g. "erase master fingerprints". Alternatively such commands may be communicated from the user to the IC (1) by fingerprint commands, utilizing the navigation mode of the IC (1). Whether a function -button or fingerprint commands be used, the user has to counter-sign with his fingerprint to authenticate the command. This will prevent any non-authorized persons to enter commands into the IC (1).

[0122] Medicine cabinets will have a different set-up than the above safe versions. The main purpose of a biometrics medicine cabinet is to prevent theft of narcotics and pre-scription drugs. Considering consequences from any emergency situations, the main purpose of the biometrics medicine cabinet is not to block access to the cabinet, but to log all accesses for subsequent review if inventory discrepancies are discovered at say each change of shifts. Further, this requires that the biometrics medicine cabinet fails to open mode, in case of a power cut, etc. Accordingly, the principles of the invention will be the same, but the flexibility of the invention will be utilized to accommodate these user interface principles. The functioning of the biometrics medicine cabinet will be made by reference to **FIG. 7**, and **FIGS. 2***a* and **2***b*.

[0123] The biometrics medicine cabinet will be made in two versions; a networked cabinet for clinics and hospitals, and a stand-alone version e.g. for private homes. The networked version will have an external terminal (42) for administration and printing of access logs, while the stand-alone cabinet version will have a front cover (62) only. The description will first be made for the networked cabinet, and thereafter for the stand-alone cabinet.

[0124] The biometrics medicine cabinet (60) has a hinged front door (61) containing a locking mechanism (65) and a front cover with a user interface (62) comprising a keyboard, a slot for the finger including a fingerprint sensor (5) plus 3 LEDs (Light Emitting Diodes; green, yellow and red). The user interface (62) and the locking mechanism (65) are connected to a printed circuit board PCB (15) (refer **FIG. 6**). The PCB (15) accommodates the IC (1), the external volatile memory (7), the external non-volatile memory (6) and a connector for connection (63) to the external terminal (42) as well as power supply (64) from the mains (64A) and from a rechargeable battery (64B) for emergency power.

[0125] The locking mechanism (65) is arranged for fail-to-open, in case of complete loss of power supply, including the rechargeable battery (64B). The handle shaft protrudes the hinged door (61) supported by a bearing inside the front plate. A cylinder with internal splines terminates the handle shaft. The inner locking mechanism has a corresponding cylinder with internal splines. This cylinder is attached to a lever pushing or retrieving the locking bolts. The said lever is attached to a spring assisting in keeping the locking bolts in closed position, requiring the handle to be pushed down to open the medicine cabinet. The outer and the inner cylinders may be connected with a locking pin, with external splines, operated by a solenoid controlled from the PCB

(15). In case of power loss [from the mains (64A) as well as the back-up rechargeable battery (64B)] this locking pin will connect the two cylinders (with internal splines) enabling the safe to be opened by the handle. When the system is active (power on) the solenoid will be controlled from the PCB so that the locking pin extends, and thereby connect the two cylinders, only when there is a positive fingerprint match enabling the door to be opened by the handle.

[0126] The operating procedure for the biometrics medicine cabinet for the networked version for clinics and hospitals is explained by reference to **FIGS. 7, 6** and **2***a* and **2***b*.

[0127] The person responsible for safe-keeping of drugs and prescription drugs at the ward (e.g. the head nurse) will be enrolled as the system administrator on the terminal (42) being in charge of administration of access to the medicine cabinet, and tracking access to the cabinet.

[0128] Enrolment of the system administrator is performed by bringing up the access administration menu on the monitor of the terminal (42). At first registration the access table is empty (clean). The first person that registers is assigned with system administrator rights. Registration is performed by entering the name of the system administrator into the access administration table, as well as user ID, which may be the unique national identity number.

[0129] The administrator will automatically be given full privileges. When the user name and user ID is entered, the system will come up in a training mode, enabling the person to be enrolled to practice on swiping his fingerprint, until a minimum number of consecutive attempts (e.g. minimum 3) are of sufficient quality to grant access. Fingerprint capture will be done by the sensor (5) mounted in the user interface front cover (62), or alternatively by a portable biometrics device (12 or 13) attached to the terminal (42) or by an embedded biometrics device (15) integrated in one of the terminal's (42) peripherals (40, 41 or 42).

[0130] The registration itself is explained with reference to **FIGS. 2***a* and **2***b*, representing the IC (1) being mounted on the PCB (15) in the front door (or embedded in the terminal's peripherals). The first fingerprint of the system administrator is captured by the sensor (5) waking up the IC (1) by a triggering signal to the wake-up circuit (5B). The pre-processor will capture the fingerprint image, and perform the initial heavy-duty processing, reducing the fingerprint image to a compressed intermediate format, using the volatile memory (6A or 6C) as working memory via the high-speed bus (3). These intermediate data are then fed to the central processor (2) reducing the fingerprint to compact representation by minutiae. The administrative software will be set up to require a minimum of say 3 minutiae fingerprint representations of acceptable quality. If any of these fingerprint captures are of inferior quality, the administrative software will reject the attempt. When sufficient (say three) minutiae tables of the system administrator has been captured with accepted qual-

US 2004/0123113 A1

Jun. 24, 2004

10

ity, these will be stored in non-volatile memory (**7, 7A** or **7C**) as the system administrator's master minutiae table.

[0131]   When the next user is to be enrolled, the system administrator will have to open this procedure by authenticating himself by his fingerprint. When such access by the system administrator is authenticated by a positive match versus the master minutiae tables of the system administrator stored in the non-volatile memory (**7, 7A** or **7C**), the next user can be enrolled. Such enrolment is performed as described above, by a training session followed by enrolment of a minimum (say three) fingerprint minutiae (per finger) of acceptable quality. The system administrator then enters the user name and user ID of the user, and finally assigns the user's access privileges (if any restrictions). Temporary staff can be enrolled for a given calendar period. Finally when all data are entered, the system administrator must countersign with his own fingerprint, to be authenticated versus the stored master minutiae of the system administrator. The enrolment of the new user will only be completed, and accepted, upon such authenticated counter-signature.

[0132]   Other users may be enrolled in the same way, at any time. The system administrator may delegate enrolment authority by entering such authorization as a special privilege in the database.

[0133]   For the networked version of the biometrics medicine cabinet, the access tables will be stored both in the non-volatile memory (**7, 7A** or **7C**) of the IC (**1**) embedded in the user interface cover (**62**) mounted on the front of the door (**61**) of the cabinet (**60**), as well as being backed up in the non-volatile memory of the terminal (**42**) or any server (**30**) which the system is connected to. Actual access control will be performed locally on the IC (**1**) of the medicine cabinet (**60**) while transactions will be copied to the back-up data storage of the terminal (**42**) or the server (**30**). Thereby the medicine cabinet (**60**) can be accessed even if the terminal (**42**) or the server (**30**) of the network (N) is down.

[0134]   Any authorized user may enter the biometrics medicine cabinet by punching a user ID onto the keyboard of the user interface cover at the front of the hinged door, followed by a fingerprint image capturing on the sensor (**5**) of the user interface cover (**62**). Punching the user ID will trigger the wake-up circuitry (**5B**) powering up the complete IC (**1**). When the user ID has been punched in on the keyboard of the user interface cover (**62**) the user will submit his fingerprint on the sensor (**5**) mounted in the user interface cover (**62**). The IC (**1**) will process the fingerprint image captured from the sensor (**5**) to compact access minutiae fingerprint representation locally in the IC (**1**). The administrative software on the IC (**1**) then looks up the user ID punched in on the local keyboard of the user interface cover (**62**) and then compares the access minutiae table with the master minutiae table stored together with the user ID on the non-volatile memory (**7, 7A** or **7C**) of the IC (**1**) during enrolment. If the minutiae matching by the central processor (**2**) confirms that the person seeking access is the authentic

owner of the user ID, then the administrative software of the IC (**1**) will power up the solenoid of the locking mechanism (**65**) thereby extending the locking pin with external splines to connect the two cylinders with internal splines of the locking mechanism (**65**). This connection by the locking pin will enable the medicine cabinet to be opened by pushing down the handle of the locking mechanism.

[0135]   The administrative software of the IC (l) will keep the locking pin of the locking mechanism (**65**) engaged for a pre-set time (e.g. 30 seconds) while one of the LEDs (light-emitting diodes) of the user interface cover (**62**) is flashing.

[0136]   When access is exerted, by opening the medicine cabinet door (**61**), the event is logged in the non-volatile memory (**7, 7A** or **7C**) of the IC (**1**), and copied to the database of the terminal (**42**) and optionally to a server (**30**) of a network (N).

[0137]   If the matching of the access minutiae table does not match the stored master minutiae table of the user ID entered, then the locking pin of the locking mechanism (**65**) will not extend into the splines of the outer cylinder. Such failure to connect will disengage the handle, so that the handle is isolated and the cabinet can not be opened.

[0138]   An option, to guarantee access, may be to open the medicine cabinet even if the fingerprint does not match, but then to record the fingerprint image and store it for later check. The opening procedure will be initiated the same way as above. The user enters his user ID on the keyboard of the user interface cover (**62**). If the user ID does not match any of the pre-stored authenticated users, the process is aborted and the red LED will flash. When a user ID match is established with a pre-stored authenticated user, his fingerprint image will be captured by the sensor (**5**) and reduced to access attempt minutiae by the IC (**1**). If there is no match of the pre-stored master minutiae of the user ID entered, the administrative software on the IC (**1**) may still open the medicine cabinet by extending the locking pin of the locking mechanism (**65**), but now this event will be recorded as a non-authenticated access event. This will cause the IC (**1**) to store the complete fingerprint image captured by the sensor (**5**) in the event table, for subsequent comparison with the owner of the user ID entered, or of other persons suspected to have accessed the medicine cabinet at the recorded time of entry. The prerequisite for such emergency opening of the cabinet is that the fingerprint image captured is of acceptable quality for subsequent matching of prints from candidate persons.

[0139]   The above procedure ensures that the biometrics medicine cabinet can be accessed even in case of an emergency, but the identity of the person seeking access is either authenticated by a matching fingerprint minutiae, or the complete fingerprint image is stored for subsequent identity search. The above method of looking up the user ID and then checking the authenticity of the owner by his fingerprint enables a so-called "one-to-one" match. Thereby the number of users does not dilute the security of the system. The

IPR2022-00601
Apple EX1004 Page 22

11

system will thereby provide maximum security, even for large user groups e.g. within a hospital. In this case the fingerprint will be reduced to compact minutiae form locally on the IC (**1**) of the PCB (**15**) in the door of the medicine cabinet, then encrypted by IC (**1**) before being transferred to a server (**30**) for authentication in the server data base.

[0140] The main difference between the networked version of the medicine cabinet (e.g. for hospitals and clinics, as described above) and the stand-alone version (e.g. for private homes) is that the terminal (**42**) and any network connection (N) to a server (**30**) will not be included. The differentiation between the two versions is simply a setting in the configuration of the administrative software on the IC (**1**) mounted on the PCB (**15**) embedded inside the user interface cover (**62**). All interfacing to the stand-alone medicine cabinet will accordingly be done through the user interface cover (**62**) using the individual keys of the keyboard for mode settings and commands. Any event tables from the stand-alone version of the medicine cabinet may be downloaded to a PDA functioning as a service unit, being connected by a port directly to the PCB (**15**). The administration of the stand-alone version will differ slightly from the above, as the user interface is limited to the front cover (**62**) only.

[0141] The first person to enroll the stand-alone version will be the system administrator ("owner") of the stand-alone version, given full access privileges.

[0142] The administrator may use the keys of the keyboard of the user interface cover (**62**) to enroll new users, or delete the previous users completely (except the system administrator).

[0143] Enrolment of new users will require authenticated matching of the counter-signature by the system administrator to be valid.

[0144] Application of the invention to weapon cabinets will be identical to the stand-alone version of the biometrics medicine cabinet, as outlined above.

[0145] Application of the invention to car systems for the automotive industry will be explained by two different preferable versions of hardware; for key to the doors of the car (central locking system) and for ignition control (ignition blocking). Although these are preferred placements of the devices according to the invention it will be understood that the same device could be embedded in any part of car that a user operates, but that it is particularly suitable to the parts where additional access limitation is useful. A key issue of application of the invention to car systems is the security issue, to prevent theft or non-authorized use of the car. Thereby this application is fundamentally different from the network version of the biometrics medicine cabinet, where the main intention was not to prevent access, but to guarantee access but leaving an audit trail by fingerprints of who has accessed the networked medicine cabinet. The automotive industry is emphasizing secure access by blocking non-authorized users access to the car. These two different applications of the invention demonstrate its versatility and flexibility, as the very same principles are applied, though with different settings of the administrative software.

[0146] The automotive application of the invention will be explained by reference to **FIGS. 2B, 8** and **9**.

[0147] The door control (central locking system) is outlined in **FIG. 8**. The door control, being a portable device (**20**), comprises an external housing (**20**) which contains a fingerprint sensor (**5**) coupled to a miniature printed circuit board (**21**) on which is mounted the IC (**1**). The remote control (**20**) further comprises a battery (**25**) for power supply retained in the housing (**20**) by a removable lid (**26**). The battery (**25**) is connected to the PCB (**21**) by wires. The remote control is also equipped with a wireless 2-way transceiver (**27**), and all the active components are connected to the IC (**1**) by cables (**23**) via the PCB (**21**). This remote control for the car doors can be made very compact, where the size of the housing (**20**) is determined by the size of the battery (**25**). Thereby the physical size of the housing may be compressed to the size of a key-ring holder.

[0148] Inside the car is mounted another embedded device (**15**) (refer **FIG. 6**) e.g. mounted on the gear stick (**71**) or on the steering wheel (**72**), for ignition control of the engine.

[0149] These two elements; the portable remote door control (**20**) and the embedded ignition control (**15**) are both connected to a central computer in the car. The connection of the portable remote door control (**20**) is by 2-way wireless transceiver (**27**), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (**15**).

[0150] Operation of the biometrics system for operation in cars will be explained by reference to **FIGS. 8, 9, 6** and **2**a. The protected mode of the system will not be activated until the car is sold from the dealer.

[0151] The dealer will at this stage enter an encrypted command into the system through wireless transmission to the portable door control unit (**20**), which in turn will transmit the command wirelessly to the embedded ignition device (**15**) via the door locks and the central computer of the car.

[0152] The dealer will access the database on the terminal (**42**) protected by fingerprint authentication.

[0153] The database at the terminal (**42**) will download the particulars of the car to be sold, including its serial number (e.g. the chassis number) from a server (**30**) in a network (N).

[0154] These downloaded particulars will include the unique seed for the secure key generation SKG algorithm, resident in each of the IC (**1**) of the portable door control (**20**) and the embedded ignition control (**15**) as well as on the terminal (**42**).

[0155] When the dealer has proven his authority (by fingerprint verification) to this procedure on the terminal (**42**) he will enter the mode change routine on the terminal (**42**) to change the mode of the portable door control (**20**) and the embedded ignition control (**15**) from open mode, to secure mode.

[0156] The terminal (**42**) will encrypt a communication message to the portable door control (**20**) based on the particular seed of the prevailing car, generating a unique password.

[0157] The encrypted message will be wirelessly transmitted from the terminal (**30**) to the portable

IPR2022-00601
Apple EX1004 Page 23

US 2004/0123113 A1

Jun. 24, 2004

12

door control (**20**) by two-way wireless transmission, inviting to a handshake communication procedure.

[0158]   The IC (**1**) of the portable door control (**20**) will receive the encrypted message and initiate decryption by fetching the seed from the non-volatile memory (**7A**).

[0159]   This seed will be fed into the secure key generating block SKG (**8A**) to generate a temporary password.

[0160]   The password is passed on to the encryption block (**8B** or **8C**) along with the encrypted message from the terminal (**42**). If the encryption fails, the communication procedure will be terminated by the IC (**1**) of the portable door control (**20**).

[0161]   If the encryption is successful the communication procedure will be completed, involving e.g. handshake sequences, until the portable door control (**20**) is satisfied that the message from the terminal (**42**) is genuine, and authorized.

[0162]   Then the IC (**1**) of the portable door control (**20**) will be set in protected mode, waiting for the first user to be enrolled to be the system administrator of the biometrics system in the car.

[0163]   The purchaser of the car (the car "owner") may then train in fingerprint capturing by a training module on the terminal (**42**).

[0164]   Then the car owner will enroll one or more of his fingers on the portable door control unit (**20**). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (**5C**) and the central processor (**2**) of the IC (**1**) on the portable device (**20**). These master minutiae tables will be stored in the non-volatile memory (**7A**) of the IC (**1**).

[0165]   This first person to enroll his fingerprint on the portable door control (**20**) becomes the "owner" of the car, in the sense that he becomes the system administrator. When he has successfully enrolled on the portable door control (**20**) he will countersign by his fingerprint to authorize and initiate encryption of his master minutiae table(s) from the IC (**1**) on the portable door control (**20**) via the door locks and the central car computer (not shown) to the IC (**1**) of the embedded ignition control (**15**) of the car.

[0166]   Such transfer of authorized master minutiae will start with retrieving the unique seed of the car from non-volatile memory (**7A**) of the IC (**1**) of the portable door control (**20**). The seed will be fed to the secure key generation SKG block (**8A**) of the IC (**1**) to generate a valid password.

[0167]   This password will then be fed to the encryption block (**8B** or **8C**) of the IC (**1**) at the portable door control (**20**), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (**20**) by means of two-way wireless transceiver (**27**) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae

tables are transmitted from the portable door unit (**20**). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door".

[0168]   If the central computer of the car is capable of successfully decrypting the message from the portable door control (**20**) it will forward the encrypted message to the embedded ignition control (**15**). Failure by the central computer of the car to decrypt the message (e.g. by non-matching temporary pseudo-random password) will terminate the communication procedure.

[0169]   When the encrypted message containing the master minutiae tables of the car owner reaches the embedded ignition control (**15**) it will be decrypted.

[0170]   The unique seed of the car will be fetched from the non-volatile memory (**7A**) of the IC (**1**) of the embedded ignition control (**15**).

[0171]   The seed will be inputted to the secure key generation SKG block (**8A**) to generate a pseudo-random temporary password.

[0172]   The pseudo-random temporary password will be fed to the encryption block (**8B** or **8C**) of the IC (**1**) to start decryption of the encrypted message.

[0173]   The "owner's" master minutiae tables of his finger(s), as retrieved from the decrypted message, will be stored in the non-volatile memory (**7A**) of the IC (**1**) of the embedded ignition control (**15**).

[0174]   By now the "owner's" master minutiae tables are securely stored in the IC (**1**) of both the portable door control (**20**) and the embedded ignition control (**15**).

[0175]   The "owner" of the car may now access the car as follows;

[0176]   He will swipe his finger across the sensor (**5**) of the portable door control (**20**).

[0177]   His finger on the sensor will trigger a signal from the sensor (**5**) to the wake-up circuit (**5B**) of the IC (**1**), powering up the IC (**1**) in a pre-set sequence.

[0178]   The pre-processing block (**5C**) will reduce the captured fingerprint image to a reduced intermediate format, feeding it via volatile working memory (**6B** or **6C**) and the high-speed bus (**3**) to the processor (**2**).

[0179]   The processor (**2**) will reduce the captured and pre-processed fingerprint image to compact master minutiae format.

[0180]   The processor (**2**) will then compare this access minutiae table with the master minutiae table(s) pre-stored at time of enrolment in non-volatile memory (**7A**).

[0181]   In case of a match the process will be allowed to continue. If no match, the process will be aborted.

IPR2022-00601
Apple EX1004 Page 24

US 2004/0123113 A1                                  Jun. 24, 2004

13

[0182] Provided the processor (2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors;

[0183] The processor (2) will fetch the seed from the non-volatile memory (7A) and feed it to the SKG block (8A).

[0184] The SKG block will generate a valid, and temporary, password that will be input to the encryption block (8B or 8C).

[0185] The processor will issue the "open door" command to the encryption block (8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A).

[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver (27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.

[0187] The encrypted message will be decrypted by the embedded ignition control (15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.

[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control.

[0189] The important part is that an authenticated fingerprint triggers the portable door control (20) and the embedded ignition control (15) to generate encrypted communication procedures, involving handshake procedures, fully compatible with the communication procedures of the central computer of the car, and the door locks. The benefit of the invention is that no fingerprints have to be transmitted between the car system security components (except for enrolment), but triggers the prevailing, secure communication protocols.

[0190] Another benefit from this application of the invention is that the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some tokens, such as e.g. electronic keys with complex key generation algorithms. If such an electronic key is lost, considerable logistics are involved in issuing a new electronic key. The involved logistics make such a key replacement both very expensive, and time-consuming. The latter may cause considerable grievances to the car owner.

[0191] If a fingerprint-based portable door control device (20) according to this invention is lost, then a new portable device may be stored on the shelf by the dealer, and immediately issued to the car owner. These replacement keys have not been personalized to any particular car as no seed has been downloaded. Such personalization is being initiated by a "replacement" version of the car mode control

software residing on the dealer's terminal (42). The car owner's fingerprint(s) is enrolled on the replacement portable door control (20). They may be authenticated versus pre-stored master minutiae tables in the dealer's database. When the car owner's identity is satisfactorily established, the proprietary seed of the car is downloaded from the dealer's database to the replacement portable door control (20) now being fully compatible with the embedded systems residing in the car.

[0192] As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory (7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor.

1. Portable access device for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet comprising

a device interface, being electronic or mechanical or both, for coupling the device to the access-limited unit, e.g. a computer terminal port,

characterized by

an integrated circuit (IC) (1) providing increased security by bridging the functionality of fingerprint input from a user and, upon positive authentication of the user's fingerprint to provide secure communication with the said access-limited apparatus, device, network or system, said IC comprising:

a processor unit (2) communicating with the other on-chip components via a high speed bus (3),

a first memory interface block (6B or 6D) being connected to the high speed bus (3) for interfacing with volatile memory (6A or 6C) as thus providing working memory available to other modules on the IC (1),

a second memory interface block (7B or 7D) being connected to the high speed bus (3) for interfacing with non-volatile memory (7A or 7 or 7E), for storing of program code, e.g. administrative software, tailored security output responses and fingerprint representations in the form of so-called fingerprint minutiae,

a first interface block (5A) for being coupled to a fingerprint sensor (5)

IPR2022-00601
Apple EX1004 Page 25

said first interface block (**5**A) is connected to an image capture and pre-processing block (**5**C),

said image capture and pre-processing block (**5**C) is adapted to perform the initial heavy-duty processing of the raw fingerprint images captured from the sensor (**5**) into a dataset of reduced size, denoted intermediate fingerprint data, the intermediate fingerprint data being submitted as output to the central processor block (**2**) via the high speed bus (**3**) for final processing to compact fingerprint representations by so-called minutiae, on the central processor (**2**),

encryption modules (**8** or **8**A, **8**B and **8**C) connected to the high-speed bus (**3**) for providing encryption information, or alternatively scrambling information,

the processor unit (**2**) is adapted to apply the encryption information to the fingerprint data for producing secured data as an output to the high speed bus (**3**) and

one or more second interface blocks (**9**A, **9**B, **9**C or **9**D) for supplying the secured data to the external access-limited apparatus, device or system via the device interface.

2. Portable device according to claim 1, wherein the integrated circuit (**1**) comprises hardware and software required to supply output signals to one or more of the second interface blocks (**9**A, **9**B, **9**C or **9**D), implemented in the form of a USB-port, a PCMCIA-port or a UART-port.

3. Portable device according to claim 1, wherein

the said IC (**1**) being mounted on a small printed circuit board PCB (**12**B)

the said PCB (**12**B) is connected to at least one of a USB interface (**12**C) or a PCMCIA mechanical interface (**13**B)

electronic surface components to support at least one of the USB mechanical interface (**12**C) and the PCMCIA mechanical interface (**13**B) being mounted on the same PCB (**12**B)

an SDRAM chip (**6**), typically at least with 4 MB capacity, being mounted on the same PCB (**12**B)

a non-volatile serial Flash chip (**7**), typically with at least 256 Kbytes capacity, being mounted on the same PCB (**12**B)

a fingerprint sensor (**5**) being mounted on the same PCB (**12**B)

all preceding components and chips being protected inside a housing (**12**A or **13**C).

4. Portable device according to claim 3, wherein said housing is designed with a recess enabling a finger (A) to be placed on, or swiped over the sensor (**5**) being protected down in said recess, but still conveniently accessible by the finger (A)

5. Portable device according to claim 3, wherein

said housing is equipped with a sliding lid (**13**D) enabling a finger (A) to be placed on, or swiped over the sensor (**5**) being protected under said sliding lid, but still conveniently accessible by the finger (A)

said sliding lid (**13**D) being forced into closed position fully covering the sensor (**5**) when the sliding lid is not pushed aside by a finger (A) when a fingerprint image is to be captured

a finger guide structure (**13**E) is placed adjacent to the sliding lid (**13**D) when the sliding lid (**13**E) is in closed position, fully covering the sensor (**5**). The purpose of the finger guide (**13**E) is to intuitively guide the finger (A) in correct position to open the sliding lid (**13**D) and thereby swipe the finger (A) correctly over the sensor (**5**) if the sensor (**5**) is of the swipe type

for this application the UART interface (**9**D) on the IC (**1**) will support the PCMCIA port (**13**B).

6. Portable device according to claim 3, wherein

the said non-volatile memory (**7**) is expanded with extra capacity beyond the 256 Kbytes minimum capacity, to provide extra storage capacity for data to enable the device to operate as a general portable data storage, and

the said IC chip (**1**) is equipped with a USB mass storage class controller with at least one control endpoint and **2** bulk endpoints (in/out), to provide access to data onboard the portable device upon positive match of the captured fingerprint image with one of the fingerprint representations of authorized users stored onboard the portable device.

7. Embedded access device for integration into peripherals of networked computers or communication terminals, to allow only authorized users access to all types of proprietary networks (LAN, WAN, etc.) typically represented by internet banking applications, corporate and government intranets, and similar, including

a device interface, being electronic or mechanical or both, for integration by embedment in peripherals of a computer terminal like in a PC mouse, keyboard or on the computer itself whether it is a laptop PC, a PDA or in cell phone with wired or wireless access to a network, or networked devices containing a computer permanently or occasionally serving as a terminal in a network,

characterized by

an integrated circuit (IC) (**1**) providing increased security by bridging the functionality of fingerprint input from a user and fingerprint authentication to provide secure communication with the said terminal and the network it is permanently or occasionally networked to, by wire or wireless connection, said IC comprising:

a processor unit (**2**) communicating with the other on-chip components via a high speed bus (**3**),

a first memory interface block (**6**B or **6**D) being connected to the high speed bus (**3**) for interfacing with volatile memory (**6**A or **6**C) thus providing working memory available to other modules on the integrated circuit,

a second memory interface block (**7**B or **7**D) being connected to the high speed bus (**3**) for interfacing with non-volatile memory (**7**A or **7** or **7**E), for storing of program code, e.g. administrative software, tailored security output responses, and fingerprint representations in the form of so-called fingerprint minutiae,

a first interface block (**5**A) for being coupled to a fingerprint sensor (**5**)

said first interface block (**5**A) is connected to an image capture and pre-processing block (**5**C),

IPR2022-00601
Apple EX1004 Page 26

US 2004/0123113 A1

Jun. 24, 2004

15

said sensor signal capturing and pre-processing block (**5C**) is adapted to perform the initial heavy-duty processing of the raw fingerprint images captured from the sensor (**5**) into a dataset of reduced size, denoted intermediate fingerprint data, the intermediate fingerprint data being submitted as output to the central processor block (**2**) via the high speed bus (**3**) for final processing to compact fingerprint representations by so-called minutiae, on the central processor (**2**),

encryption modules (**8** or **8A**, **8B** and **8C**) connected to the high-speed bus (**3**) for providing encryption information, or alternatively scrambling information,

the processor unit (**2**) is adapted to apply the encryption information to the fingerprint data for producing secured data as an output to the high speed bus (**3**)

one or more second interface blocks (**9A**, **9B**, **9C** or **9D**) for supplying the secured data to the external access-limited apparatus, device or system via the device interface.

**8**. Embedded/integrated device according to claim 7, wherein the integrated circuit comprises hardware and software required to supply output signals to one or more of the second interface blocks (**9A**, **9B**, **9C** or **9D**), implemented in the form of a USB-port, a PCMCIA-port or a UART-port.

**9**. Embedded/integrated device according to claim 7,

wherein said IC (**1**) is mounted on a small printed circuit board PCB (**12B**),

the said IC (**1**) is connected to the PCB (**12B**) by one or more of a USB (**9A**), an Ethernet (**9B**), a GPIO (**9C**), a UART (**9D**) or a SmartCard (**7C**) interface on the IC (**1**),

the said PCB (**12B**) is equipped with a mechanical/electronic interface suitable for the host device,

an SDRAM chip (**6**), typically with at least 4 MB capacity, being mounted on the same PCB (**12B**)

a non-volatile serial Flash chip (**7**), typically with at least 256 Kbytes capacity, being mounted on the same PCB (**12B**)

a fingerprint sensor (**5**) being mounted on the same PCB (**12B**), or mounted separately in the host device, and connected to the IC (**1**) on the PCB (**12B**) by cable

**10**. Method of using a portable device-according to claim 1 or an embedded device according to claim 7 for providing a bridge from biometrics input to a computer, into secure communication protocol responses to a non-biometrics network, comprising in a single integrated circuit (IC) (**1**) executing the following steps:

capturing (SC) an image from a fingerprint sensor (**5**) via a first interface block (**5A**),

pre-processing (SC) the captured fingerprint signal in the image capture and pre-processing block (SC) containing hardware-embedded algorithms optimized for high-speed processing of the most laborious initial processing of the raw fingerprint image data,

transferring the pre-processed data to the processor unit (**2**) for extracting compact minutiae features of the fingerprint via a high-speed bus (**3**)

retrieval by the processor unit (**2**) of compact fingerprint minutiae information from a non-volatile storage module (**7**, **7A** or **7E**) holding pre-stored master fingerprint representations of authorized persons

comparing in the processor unit (**2**) the extracted features representing the captured fingerprint with features of the pre-stored master fingerprint representations

producing in dependence of the result from the said comparison, a secure output in a pre-defined format to an external unit, network or system through one of the communication interfaces (**9A**, **9B**, **9C**, **9D** and **7C**).

**11**. Method according to claim 10, comprising pre-loading into the non-volatile memory (**7A**, **7E** or **7**) a subset of the administrative software which tailors the output secure communication response to the target network (N) or Intranet (E) to a pre-defined format and sequence, including e.g. handshake sequences.

**12**. Method according to claim 11, wherein the output from the chip (**1**) is blocked (non-authorized access state) if the matching by IC (**1**) of the captured fingerprint is negative relative to any of the authorized fingerprint representations stored in the non-volatile memory (**7A**, **7E** or **7**).

**13**. Method according to claim 11, wherein the output from the chip (**1**) is opened (authorized access state) if the matching by the IC (**1**) of the captured fingerprint is positive relative to any of the authorized fingerprint representations stored in the non-volatile memory (**7A**, **7E** or **7**).

**14**. Method according to claim 11, wherein the pre-loaded subset of the administrative software can combine the steps of

generating the pseudo-random secure key or password (**8** or **8A**),

applying any of the encryption methods at hand and embedded in the hardware blocks, such as DES, ECB, CBC, TDES (**8** or **8B**), or any proprietary encryption algorithm also embedded in hardware (**8C**)

tailoring handshake sequences according to the rules of secure communication of the device, network or system.

**15**. Method according to claim 11, wherein the pre-loaded subset of the administrative software is adapted to perform

sequencing the operation of the respective functionality blocks of the chip (**1**) in order to produce secured output data which is suitable for transmission in the targeted network (N) and for processing by receiving units connected to the network (N).

**16**. Method according to claim 10, wherein

the secure communication parameters of a network or a device, such as e.g. encryption seed, electronic certificates, PKI keys, IP address, etc. of the targeted server or resident computer in a device are pre-stored during personalization of the chip (**1**) into either embedded SmartCard block (**7C**) or external SmartCard chip (**7E**), or in scrambled format on external non-volatile memory (**7**)

**17**. Method according to clam **16**, wherein

the said secure communication parameters can only be retrieved from the embedded SmartCard block (**7C**) or from the external SmartCard chip (**7E**) upon a positive

IPR2022-00601
Apple EX1004 Page 27

match of the captured fingerprint relative to a finger-print representation of an authorized person, and

an output signal from the chip (1) including secure communication responses are initiated in dependence upon the result of a comparison of the captured finger-print relative with a fingerprint representation of an authorized person.

**18**. Embedded access control and user input device or apparatus for being a built-in part of stand alone appliances with some form of access control, e.g. hotel safes, medicine cabinet or the like, and for providing increased security, characterized by

an integrated circuit (IC) (1) for bridging the functionality of fingerprint input from a user to secure communica-tion with other parts of the said stand-alone appliance, said IC comprising

a processor unit (2) communicating with the other on-chip components via a high speed bus (3),

a first memory interface block (6B or 6D) being con-nected to the high speed bus (3) for interfacing with volatile memory (6A or 6C), thus providing working memory available to other modules on the integrated circuit,

a second memory interface block (7B or 7D) being connected to the high speed bus (3) for interfacing with non-volatile memory (7A or 7 or 7E), for storing of program code, e.g. administrative software, tailored security output responses, and fingerprint representa-tions in the form of so-called fingerprint minutiae,

a first interface block (5A) for being coupled to a finger-print sensor (5)

said first interface block (5A) is connected to an image capture and pre-processing block (5C),

said image capture and pre-processing block (5C) is adapted to perform the initial heavy-duty processing of the raw fingerprint images captured from the sensor (5) into a dataset of reduced size, denoted intermediate fingerprint data, the intermediate fingerprint data being submitted as output to the central processor block (2) via the high speed bus (3) for final processing to compact fingerprint representations by so-called minu-tiae, on the central processor (2),

encryption modules (8 or 8A, 8B and 8C) connected to the high-speed bus (3) for providing encryption informa-tion, or alternatively scrambling information or for performing encryption or scrambling,

the processor unit (2) is adapted to apply the encryption or scrambling information to the fingerprint data for producing secured data as an output to the high speed bus (3)

one or more second interface blocks (9A, 9B or 9C) for supplying the secured data to other modules of the stand-alone appliance.

**19**. Embedded access control device or apparatus accord-ing to claim 18 comprising

fingerprint information non-volatile storage means (7, 7A or 7E), such as e.g. a SmartCard unit, for storing information related to the fingerprint characteristics of authorized users,

fingerprint input means (5) for entering the fingerprint characteristics of authorized users into non-volatile memory (7, 7A or 7E) of the IC (1) and

fingerprint verification means in the form of processing capability (2) including biometrics software for check-ing the authenticity of the user trying to access the device.

**20**. Embedded access control or input device according to claim 18 which in addition allows the input of code or commands by also comprising

a fingerprint storage module (7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor sig-nal capturing and pre-processing block (5C),

movement analyzing means, in the form of a hardware or a software movement analyzing program module for analyzing the obtained series of fingerprint representa-tions to obtain a measure of the omni-directional finger movements across the sensor in two dimensions,

translation means in the form of a hardware or a software translation program module for analyzing and catego-rizing the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences

a command table for translating the categorized finger movements into control signals whereby the translating means generates control signal for controlling the stand-alone appliance in response to the finger move-ments on the sensor.

**21**. Embedded access control and user input device or apparatus according to claim 18, wherein

the operating and control software of the stand-alone appliance is loaded into the non-volatile memory block (7 or 7A or 7E) of the integrated circuit IC (1),

said operating and control software of the stand-alone appliance is executed by the central processor block (2) of the IC (1)

**22**. Method of secured access control and user input in stand-alone appliances having an embedded access control or user input device according to claim 18, the method comprising performing the following steps in the integrated circuit:

capturing (5C) an image in a fingerprint sensor (5) via a first interface block (5A),

pre-processing (5C) the captured signal in the image capture and pre-processing block (5C) containing hard-ware-embedded algorithms optimized for high-speed processing of the most laborious initial processing of the raw fingerprint image data,

transferring the pre-processed data to the processor unit (2) for extracting compact minutiae features of the fingerprint via a high-speed bus (3)

retrieval by the processor unit (2) of compact fingerprint minutiae information from a non-volatile storage mod-ule (7, 7A or 7E) holding pre-stored master fingerprint representations of authorized persons,

US 2004/0123113 A1

17

Jun. 24, 2004

comparing in the processor unit (**2**) the extracted features representing the captured fingerprint with features of the pre-stored master fingerprint representations,

producing in dependence of the said comparison, a pre-defined secure output to other parts of the stand-alone appliance.

**23**. Use of embedded access control device or apparatus according to claim 18 for implementing secure access to various functions in an automobile, such as door locks, engine ignition, or the like.

\* \* \* \* \*

IPR2022-00601
Apple EX1004 Page 29

US006766456B1

## (12) United States Patent
### McKeeth

(10) **Patent No.:**     **US 6,766,456 B1**
(45) **Date of Patent:**       **Jul. 20, 2004**

(54) **METHOD AND SYSTEM FOR AUTHENTICATING A USER OF A COMPUTER SYSTEM**

(75) Inventor: **James McKeeth**, Nampa, ID (US)

(73) Assignee: **Micron Technology, Inc.**, Boise, ID (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/511,092**

(22) Filed: **Feb. 23, 2000**

(51) **Int. Cl.**$^7$ ................................................. **H04K 1/00**
(52) **U.S. Cl.** ...................... **713/200**; 713/201; 713/202; 713/183; 713/186; 713/168
(58) **Field of Search** ................................ 713/200, 202, 713/201, 183, 184, 186; 345/168, 156, 158

(56)             **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,759,063 A | * | 7/1988 | Chaum | ......................... | 380/30 |
| 5,229,764 A | * | 7/1993 | Matchett et al. | ........... | 340/5.52 |
| 5,465,084 A | | 11/1995 | Cottrell | ................. | 340/825.31 |
| 5,559,961 A | | 9/1996 | Blonder | ................. | 395/188.01 |
| 5,608,387 A | | 3/1997 | Davies | ................. | 340/825.34 |
| 5,821,933 A | | 10/1998 | Keller et al. | ................. | 345/348 |
| 5,838,306 A | | 11/1998 | O'Connor et al. | | |
| 6,006,328 A | * | 12/1999 | Drake | ......................... | 713/200 |
| 6,035,406 A | * | 3/2000 | Moussa et al. | ............. | 713/202 |
| 6,091,835 A | * | 7/2000 | Smithies et al. | ............ | 382/115 |

| | | | | | |
|---|---|---|---|---|---|
| 6,298,447 B1 | * | 10/2001 | Wang | ......................... | 713/202 |
| 6,418,424 B1 | * | 7/2002 | Hoffberg et al. | ............... | 706/21 |

#### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | 60 171560 A | 9/1985 | ........... | G06F/15/00 |
| JP | 61 142835 A | 6/1986 | ............. | H04L/9/00 |

#### OTHER PUBLICATIONS

Knowledge Adventure, Inc., User's Guide, pp. 1–18, 1996, "Jump Start Toddlers".

Micron Electronics, Inc.—Assignee, U.S. App. S/N 09/033, 943, filed Mar. 2, 1998, "securing Restricted Operations of a Computer Program Using a Visual Key Feature."

* cited by examiner

*Primary Examiner*—Ly V. Hua
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP.

(57)                 **ABSTRACT**

A method and system for authenticating a user to access a computer system. The method comprises communicating security information to the computer system, and providing the computer system with an implicit input. The method further comprises determining whether the security information and implicit input match corresponding information associated with the user. The method further comprises granting the user access to the computer system in the event of a satisfactory match. When authenticating the user, the method and system consider the possibility of the user being legitimate but subject to duress or force by a computer hacker.

**15 Claims, 4 Drawing Sheets**





*FIG. 1*

IPR2022-00601
Apple EX1005 Page 2





*FIG. 2*

IPR2022-00601
Apple EX1005 Page 3



310

**FIG. 3A**



320

**FIG. 3B**



330

**FIG. 3C**



340

**FIG. 3D**

IPR2022-00601
Apple EX1005 Page 4



*FIG. 4*

US 6,766,456 B1

**1**

## METHOD AND SYSTEM FOR AUTHENTICATING A USER OF A COMPUTER SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to methods of accessing a secure computer system. More particularly, this invention relates to a method and system for authenticating identity of a user before accessing a computer system.

2. Description of the Related Art

In today's information age, a user is generally required to execute or pass some form of a security step, such as entering a private identification code or password, to access a computer system. As the computer stored information or application becomes more sensitive or valuable, greater security measures are desired to verify the identity and legitimacy of the user before allowing access to the computer system that contains such information or application. The use of a password alone, however, has become less reliable to authenticate the user. The reduced reliability of using a password alone has been due to a computer hacker's ability to locate, copy, or electronically identify or track the required password using specialized software programs. In some cases, computer hackers are simply able to obtain the user's password by exercising duress or force. Accordingly, the use of a password alone to authenticate the user for access to the computer system has not been very reliable.

Instead of or in combination with entering a password, some computer systems are designed to authenticate the user by requiring the user to turn a conventional key or swipe a machine readable card. These techniques, however, are still subject to the same weaknesses as those identified for using a password. Recently, some computer makers considered using the user's fingerprint to authenticate and grant access to the computer system. In such a system, a peripheral device, such as a mouse, includes a fingerprint acquisition module that provides to the computer a signal representative of the fingerprint of the user. The computer compares the user's fingerprint signal to a list of signals stored in its memory. If the user's fingerprint signal matches a signal that is stored in the computer memory, the user is granted access to the computer system, otherwise access is denied. For further details about such computer system, reference is made to U.S. Pat. No. 5,838,306 issued to O'Connor et al. on Nov. 17, 1998, which is incorporated in its entirety by reference. Using a fingerprint is still not immune to the computer hacker's ability to force the user to place his/her finger on the acquisition device. Moreover, a sophisticated computer hacker may be able to copy the user's fingerprint and provide a simulated signal to the computer system to obtain access.

Therefore, the above-described authentication techniques do not overcome a computer hacker's ability to access the computer by forcing the user to enter a password, turn a key, swipe a card, or place the user's finger on a fingerprint acquisition device. There is a need in the computer technology to provide an implicit authentication technique that is immune to force or theft by computer hackers.

### SUMMARY OF THE INVENTION

To overcome the above-mentioned limitations, the invention provides a method and system for authenticating a user to access a computer system. The method comprises com-

**2**

municating security information to the computer system, and providing the computer system with an implicit input. The method further comprises determining whether the security information and implicit input match corresponding information associated with the user. The method further comprises granting the user access to the computer system in the event of a satisfactory match.

The system comprises a user interface configured to communicate security information and an implicit input to the computer. The system further comprises a compare circuit that is operationally coupled to the user interface. The compare circuit is configured to determine whether the security information and implicit input match corresponding information associated'with the user. The system further comprises a process circuit that is operationally coupled to the compare circuit. The process circuit is configured to grant the user access to the computer in the event of a satisfactory match. In another embodiment, the system comprises means for interfacing the user with the computer. The interfacing means is configured to communicate security information and an implicit input to the computer. The system further comprises means, operationally coupled to the interfacing means, for comparing the security information and implicit input with corresponding information associated with the user. The system further comprises means, operationally coupled to the comparing means, for processing the compared information and granting the user access to the computer in the event of a satisfactory match.

### BRIEF DESCRIPTION OF THE DRAWINGS

The above and other aspects, features, and advantages of the invention will be better understood by referring to the following detailed description, which should be read in conjunction with the accompanying drawings, in which:

FIG. **1** is a block diagram showing one embodiment of a computer system in accordance with the invention.

FIG. **2** is a perspective view of a peripheral device that may be used with the invention.

FIGS. **3A**, **3B**, **3C**, and **3D** illustrate exemplary patterns that are recognized by the computer system of FIG. **1**.

FIG. **4** is a flowchart describing one embodiment of the method of authenticating a user in accordance with the invention.

### DETAILED DESCRIPTION OF THE INVENTION

The following description is not to be taken in a limiting sense, but is made merely for the purpose of describing the general principles of the invention. The scope of the invention should be determined with reference to the claims.

FIG. **1** is a block diagram showing one embodiment of a computer system **100** in accordance with the invention. As shown in FIG. **1**, the computer system **100** comprises a user interface **110** that is operationally connected to a process circuit **120**. The user interface **110** may be any input device that is used to enter or communicate information to the computer system **100**, such as a keyboard, mouse, trackball, pointer, touch-screen, remote terminal, audio sensor, optical scanner, telephone, or any similar user interface. The user interface may provide input signals to the computer system **100** in an analog form, which typically requires conversion to digital form by the computer system **100**, or in a digital form. For example, when using a keyboard, a computer user (not shown in this figure) may enter a password representing a unique series of keys. When using a mouse or trackball, the

IPR2022-00601
Apple EX1005 Page 6

US 6,766,456 B1

**3**

user may enter a unique series of clicks using left, center, and/or right buttons of the mouse. Alternatively, the user may enter a unique geometric pattern (see FIGS. 3A–3D) concurrently with or shortly after entering the password. When using an audio sensor, such as a microphone, the user may enter audio information, such the user's voice, which may be uniquely identified by the computer system **100**. When using an optical scanner, the user may scan his/her fingerprint or other physical feature such as the retina into the computer system **100** for authentication.

Any, a combination, or all of the above-described types of input signals may be used to authenticate a user. For example, the computer system **100** may be designed to receive a combination of input signals in a form of a password from a keyboard, in a form of a fingerprint scan from an optical scanner (e.g., placed on the keyboard or mouse), and in a form of a geometric pattern from a mouse or trackball. The user may input these signals substantially concurrently, or in any agreed upon sequence. For example, the user may enter a password through the keyboard and, within a predetermined duration of time (e.g., 5 seconds), place his/her finger on the mouse to be scanned while moving the mouse in a specified pattern, e.g., clockwise circle. As further described below, before granting the user's request for access, the computer system **100** may be configured to recognize the combination of a password, fingerprint, and a particular pattern that is unique to each user.

The process circuit **120** is configured to receive input signals from the user interface **110** for processing. If the input signals are in analog form, the process circuit **120** converts the input signals to digital form for further processing. If desired or necessary, the process circuit **120** filters undesired components of the input signals, so that only components that are necessary for identification are passed on. The process circuit is operationally connected with a timer **130** that measures time duration between the various input signals. As noted above, the computer system **100** may be configured to recognize and accept for processing input signals (e.g., password) that occur within a predetermined duration of time from other input signals (e.g., fingerprint scan or pattern). Accordingly, the process circuit **120** may instruct the timer **130** to measure time between input signals to determine whether the user is an authorized user. For example, the duration between entering a password and performing a fingerprint scan and/or pattern may be set to a maximum of 10 seconds. If, after entering a legitimate password, the user takes too long (i.e., greater than 10 seconds) to perform a fingerprint scan and/or pattern, the process circuit **120** may deny access to the computer system **100**, as described for the method of FIG. **4**.

If, on the other hand, the user performs a fingerprint scan and/or pattern within the designated time, the process circuit **120** communicates the input signals to a compare circuit **150** for authentication. The compare circuit **150** is operationally coupled to a memory **140**, which stores a list of legitimate user identifications (ID's) with respective passwords, fingerprint, pattern, or any other type of information ("security information") for recognition by the computer system **100**. The process circuit **120** may instruct the memory **140** to communicate security information to the compare circuit **150** for authentication. The compare circuit **150** also receives and compares input information from the process circuit **120** with the security information received from the memory **140**. If there is a match between the input and security information, the compare circuit **150** issues a "pass" signal to the computer system **100** (e.g., a host

**4**

processor) indicating acceptance of and authorizing access by the user. If the input and security information do not match, the compare circuit issues a "flag" signal indicating denial of access by the user.

In one embodiment, the user is always required to perform an implicit, invisible, or non-apparent act (the "implicit" act or input). The implicit input may include an active and/or a passive act. For instance, in performing the active act, the user may generate a geometric pattern (e.g., using a mouse) when requesting access to the computer system **100**. The computer system **100** may be configured to recognize a particular geometric pattern under the condition that the user performs such pattern concurrently with, or after a predetermined duration from, scanning his/her fingerprint. In performing the passive act, the user may wait a predetermined time intervals between entry of various components of the security information or, for instance, may skip a predetermined letter of each component of the security information. In heightened security applications, it may be desirable to configure the computer system **100** to issue a security alert to the responsible authority (e.g., security guards or law enforcement personnel) if the user fails to perform the geometric pattern. Accordingly, even if the compare circuit **150** determines that the input (e.g., fingerprint) and security information do match, the compare circuit **150** may still issue the flag signal because of the user's failure to perform the geometric pattern.

In such a scenario, the computer system **150** recognizes that while the user may be legitimate, the user's failure to perform the geometric pattern may be an indication that the user is experiencing duress or force to access the computer system **100**, as described for the method of FIG. **4**. In some applications, it may be desirable to grant a limited access to the user to give the false impression that access to the computer system **100** is granted as usual. As used herein, "limited access" is any access that provides a user or intruder access that is less than complete access to the computer system **100**. However, concurrently with the limited access, a silent security alert may be issued to security personnel, without allowing the user or intruder to know. Using the silent security alert mode silent alert minimizes risk to the user under duress.

Any of the structural components of the computer system **100**, e.g., the process circuit **120** and compare circuit **150**, may be implemented using commonly known hardware, such as one or more digital circuits, to perform the authentication functions of the computer system **100**. Alternatively, the functions of such structural components may be implemented using a dedicated signal processor, such as a digital signal processor (DSP), that is programmed with instructions to perform the authentication functions of the computer system **100**.

FIG. **2** is a perspective view of a peripheral device **200** that may be used with the invention. The peripheral device **200** may comprise a mouse that communicates signals with the computer system **100** (see FIG. 1) via a cable **230**, or via a wireless link (not shown in this figure) such as a radio frequency (RF) or infrared (IR) link. In one embodiment, the user interface **110** (see FIG. 1) may comprise the peripheral device **200** through which a user may send user security information (e.g., a user ID, password, fingerprint scan, and a specified pattern) to the computer system **100** to obtain access thereto.

As shown in FIG. **2**, the peripheral device **200** comprises one or more buttons **210**, **212**, **214**, and **216**, which, when pressed by the user, send various signals that are recognized

IPR2022-00601
Apple EX1005 Page 7

by the computer system **100**. As described above, in addition to a password and fingerprint scan, the computer system **100** may be configured to require the user to enter a pattern comprising a unique sequence of button pressings to authenticate the user. Accordingly, concurrently with or shortly after the fingerprint scan, the user may press one or more of the buttons **210–216** to generate a unique sequence of signals before the computer system **100** may grant access. For example, the sequence of signals may be generated by pressing the button sequence **214, 212, 216,** and **212**. In response to the user security information, the computer system **100** determines if the user may be granted access as described above.

The peripheral device **200** may optionally comprise a trackball (not shown in this figure) that allows the user to manipulate the position of a pointer on a visual display, such as a display monitor, in response and proportionally to the motion of the trackball on a surface, such as a pad. The characteristics and operation of such a trackball are well known in the art. The peripheral device **200** may also comprise one or more optical scanner windows **220, 222, 224,** and **226**. If the authentication process requires a fingerprint scan, one or more of the scanner windows **220–226** may scan the fingerprint of the user and form an electronic image of the fingerprint. The peripheral device **200** sends the electronic image to the computer system **100** for authenticating the user as described above. The characteristics and operation of the optical scanner windows **220–226** are well known in the art.

As noted above, in addition to entering a password and fingerprint scan, the computer system **100** may be configured to require the user to enter a unique geometric pattern via the peripheral device **200** to authenticate the user. Accordingly, concurrently with or shortly after the fingerprint scan, the user may move the peripheral device **200** on a flat surface in a predetermined geometric pattern to generate the unique geometric pattern, as outlined by the trackball of the peripheral device **200**. FIGS. **3A, 3B, 3C,** and **3D** illustrate exemplary patterns that are recognized by the computer system **100**. As shown in FIG. **3A**, the user may move the peripheral device **200** to generate a triangle **310** in a specified direction on the flat surface. The peripheral device **200** sends the generated pattern in a form of electrical signals to the computer system **100** for authentication. As described above, if the computer system **100** determines that the generated pattern matches a pattern stored in the memory **140** (see FIG. **1**), the computer system **100** grants the access. If, on the other hand, the computer system **100** determines that the generated pattern does not match a stored pattern, the computer system **100** may deny access or, if configured to do so, lock up the computer system **100** and generate a security alert to the responsible authorities.

FIG. **3B** shows another exemplary pattern in a form of a rectangle **320** that may be generated by the user via the peripheral device **200**. FIG. **3C** shows another exemplary pattern in a form of a straight line **330** that may be generated by the user via the peripheral device **200**. Finally, FIG. **3D** shows still another exemplary pattern in a form of a circle **340** that may be generated by the user in a clockwise direction via the peripheral device **200**.

FIG. **4** is a flowchart describing one embodiment of the method of authenticating a user in accordance with the invention. The method of the invention commences at block **400** when the computer system **100** (FIG. **1**) is first powered up. At block **410**, the user enters the user's security information such as a user identification, password, and/or fingerprint scan, pursuant to system access instructions. At a decision block **416**, the computer system **100** determines whether the entered security information matches corresponding information in the memory **140**. If the security information does not match, the method proceeds to block **470** where the computer system **100** denies access to the user. If, on the other hand, the security information matches corresponding information in the memory **140**, the method proceeds to block **420**.

In this embodiment, the computer system **100** is configured to recognize the implicit input that the user enters concurrently with, or within a predetermined duration of, entering the security information. As noted above, the implicit input may be a geometric pattern that the user generates via the user interface **110**. Accordingly, at block **420**, the computer system **100** waits and searches for a predetermined pattern signal from the user interface **110**. The pattern signal may be in analog or digital form that represents the pattern that the user generates, e.g., the circle **340**. At a decision block **424**, the computer system **100** determines if a pattern signal is received from the user interface **110** within the predetermined duration. If a pattern signal is not received or found, the method proceeds to block **436**. If, on the other hand, a pattern signal is received from the user interface **110**, the method proceeds to a decision block **428**, where the computer system **100** determines whether the pattern signal matches a corresponding pattern signal stored in memory **140**. If the entered pattern signal matches the stored pattern signal, the method proceeds to block **460** where the computer system **100** grants the user's request for access. If, on the other hand, the entered signal pattern does not match the stored pattern signal, the method proceeds to the decision block **436**.

As indicated above, the computer system **100** may be configured to operate in an alert mode if desired by the system administrator. The alert mode represents a mode of operation wherein the computer system **100** responds to an access request using an authentication process that is more stringent than when operating in a non-alert ("normal") mode. For instance, upon receiving instructions to heighten security measures (e.g., in response to an overt threat or intelligence information), the system administrator may configure the computer system **100** to operate in the alert mode. Alternatively, the system administrator may configure the computer system **100** to operate in the alert mode based on any desired criteria, such as geographic location of the computer system **100**, content or sensitivity of stored information, and/or other factors. In the alert mode, the computer system **100** alerts security personnel if it is determined that there is a possibility of a security breach. Accordingly, at block **436**, the computer system **100** determines if the alert mode is activated. If the alert mode is not activated, the method proceeds to block **470**, where the computer system **100** denies the user's request to access the computer system **100**. If, on the other hand, the alert mode is activated, the method proceeds to block **440**. Thus, in the event of an absent or incorrect pattern signal, the computer system **100** avoids issuing unwarranted security alerts when operating in the normal mode. However, if it is operating in the alert mode, the computer system **100** applies a stringent authentication process and issues security alerts in the event of an absent or incorrect pattern signal.

As noted above, the computer system **100** may represent at least a portion of a computer network that is accessible via multiple user terminals, including security and supervisory personnel terminals. Accordingly, if the alert mode is activated, then at block **440** the computer system **100** is

IPR2022-00601
Apple EX1005 Page 8

US 6,766,456 B1

7

configured to issue an alert signal to a predetermined destination, e.g., a security terminal that is accessible by security personnel. The alert signal may be a text message indicating that a potential security breach or unauthorized attempt to access the network has occurred at a particular location, e.g., electronic or physical address of the computer system **100**. At block **446**, the computer system **100** determines whether the silent alert mode is activated. As noted above, the silent alert mode allows a limited access to a user that is potentially under the influence of duress or force. Hence, the system administrator may selectively activate or deactivate the silent alert mode based on any desired criteria, such as the level of safety necessary for users at a particular location.

Accordingly, if the silent alert mode is not activated, the method proceeds to block **470** where the computer system **100** denies the user access to the computer system **100**. If, on the other hand, the silent alert mode is activated, the method proceeds to block **450** where the computer system **100** downgrades or limits the scope of access for the user who entered the security information. As noted above, limited access is any access that provides a user or intruder access that is less than complete access to the computer system **100**. For example, the limited access may allow the user to read or view only a particular list of files that do not contain sensitive information. The limited access may also include preventing the user from printing or copying any files that are stored in the computer system **100**. After downgrading the scope of access for the user, the method proceeds to block **460** where the computer system **100** provides the user with limited access to the computer system **100**. As noted above, while the computer system **100** grants the user with the limited access, the computer system issues the alert signal to security personnel without notifying the user or intruder that any such signal was issued. The method terminates at block **490** after. either granting the user's request at block **460** or denying the user's request at block **470** to access the computer system **100**.

In view of the foregoing, it will be appreciated that the invention overcomes the long-standing need for a method and system for correctly authenticating a user despite the presence of duress and force by a computer hacker. The invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiment is to be considered in all respects only illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather by the foregoing description. All changes that fall within the meaning and range of equivalency of the claims are to embraced within their scope.

What is claimed is:

1. A method of authenticating a user of an electronic device, the method comprising:

receiving security information from a user,

receiving in the electronic device an authorization pattern provided by a mouse, wherein the authorization pattern identifies a particular movement made by the mouse;

determining whether the authorization pattern matches a stored pattern;

measuring a duration of time between the receipt of the security information and the authorization; and

granting the user access to the electronic device in the event of a satisfactory match and the duration of time is less than a threshold.

2. The method of claim **1**, further comprising denying the user access to the electronic device in the event of an unsatisfactory match.

8

3. The method of claim **2**, further comprising issuing a security alert to security personnel in the event of an unsatisfactory match between the authorization pattern and the stored pattern.

4. The method of claim **2**, further comprising issuing a silent security alert to security personnel in event of an unsatisfactory match.

5. The method of claim **1**, further comprising limiting the scope of access in the event of an unsatisfactory match.

6. A system for authenticating a user of an electronic device, the system comprising:

a mouse configured to communicate an authorization pattern to the electronic device, wherein the authorization pattern identifies a particular movement made by the mouse;

a user interface configured to receive security information;

a compare circuit that is operationally coupled to the mouse, and configured to determine whether authorization pattern matches a stored pattern;

a process circuit that is operationally coupled to the compare circuit, and configured to grant the user access to the the electronic device in the event of a satisfactory match; and

a timer that is operationally connected to the process circuit the timer being configured to measure duration of time between entry of the security information and entry of the authorization pattern, the process circuit determining whether the measured duration exceeds a threshold, access to the electronic device being denied if the measured duration exceeds the threshold.

7. The system as defined in claim **6**, wherein the security information comprises a user identification and timer that is operationally connected to the process circuit, the timer being configured to measure duration of time between entry of security information and entry of the authorization pattern, the process circuit determining whether the measured duration exceeds a threshold, access to the electronic device being denied if the measured duration exceeds the threshold password.

8. The system as defined in claim **6**, wherein the process circuit is configured to generate an alert signal in the event an unsatisfactory match between the authorization pattern and the stored pattern.

9. The system as defined in claim **6**, wherein the process circuit is configured to grant the user a limited scope of access to the system, and further configured to generate a silent alert signal in the event of an unsatisfactory match between the authorization pattern and the stored pattern.

10. The system as defined in claim **6**, wherein the process circuit is configured to generate an alert signal in an event of an absence of the authorization pattern.

11. A system for authenticating a user of an electronic device, the system comprising:

means in a mouse for interfacing the user with the electronic device, the interfacing means being configured to communicate an authorization pattern to the electronic device, wherein the authorization pattern identifies a particular movement made by the mouse;

means, operationally coupled to the interfacing means, for comparing the authorization pattern with respective information associated with the user;

means, operationally coupled to the comparing means, for granting the user access to the computer in the event of a satisfactory match; and

means, operationally connected to the process circuit, for measuring the duration of time between entry of secu-

IPR2022-00601

Apple EX1005 Page 9

US 6,766,456 B1

**9**

rity information and entry of the authorization pattern, access to the electronic device being denied if the measured duration exceeds a threshold.

12. The system as defined in claim **11**, wherein the security information comprises at least one of a user identification and password.

13. The system as defined in claim **11**, wherein the processing means is configured to generate an alert signal in the event an unsatisfactory match between the authorization pattern and the respective information associated with the user.

**10**

14. The system as defined in claim **11**, wherein the processing means is configured to grant the user a limited scope of access to the system, and further configured to generate a silent alert signal, in the event of an unsatisfactory match between the authorization pattern and the respective information associated with the user.

15. The system as defined in claim **11**, wherein the processing means is configured to generate an alert signal in the an event of an absence of authorization pattern.

* * * * *

IPR2022-00601
Apple EX1005 Page 10



US006509847B1

(12) **United States Patent**

Anderson

(10) **Patent No.:**    **US 6,509,847 B1**

(45) **Date of Patent:**    **Jan. 21, 2003**

(54) **PRESSURE PASSWORD INPUT DEVICE AND METHOD**

(75) Inventor: **Glen J. Anderson**, Sioux City, IA (US)

(73) Assignee: **Gateway, Inc.**, Poway, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/388,284**

(22) Filed: **Sep. 1, 1999**

(51) **Int. Cl.**$^7$ ............................................. **H03M 11/00**

(52) **U.S. Cl.** ............................. **341/34**; 341/20; 341/22; 178/18.01; 345/173; 340/5.51; 382/124

(58) **Field of Search** ............................. 341/34, 22, 20; 345/168, 173; 382/115, 124; 340/5.51, 5.74; 178/18.01

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,621,334 A | | 11/1986 | Garcia | ......................... 364/550 |
| 4,725,817 A | | 2/1988 | Wihlborg | .................... 340/365 |
| 4,805,222 A | * | 2/1989 | Young et al. | .............. 340/5.51 |
| 5,241,308 A | | 8/1993 | Young | ......................... 341/34 |
| 5,386,219 A | | 1/1995 | Greanias et al. | ............ 345/174 |

| | | | | |
|---|---|---|---|---|
| 5,451,724 A | | 9/1995 | Nakazawa et al. | ............ 178/20 |
| 5,557,686 A | * | 9/1996 | Brown et al. | .............. 340/5.51 |
| 5,581,484 A | * | 12/1996 | Prince | ..................... 340/407.1 |
| 5,627,566 A | * | 5/1997 | Litschel | ...................... 345/168 |
| 5,768,386 A | | 6/1998 | Yokomoto et al. | ............ 380/24 |
| 5,982,357 A | * | 11/1999 | Burgett et al. | ................ 341/22 |
| 5,987,153 A | * | 11/1999 | Chan et al. | ................ 340/5.82 |
| 5,995,026 A | * | 11/1999 | Sellers | ......................... 341/22 |
| 6,073,497 A | * | 6/2000 | Jiang et al. | .............. 73/862.68 |
| 6,193,153 B1 | * | 2/2001 | Lambert | ...................... 235/380 |
| 6,307,956 B1 | * | 10/2001 | Black | .......................... 382/124 |

* cited by examiner

*Primary Examiner*—Michael Horabik
*Assistant Examiner*—Albert K. Wong
(74) *Attorney, Agent, or Firm*—Scott Charles Richardson; Kevin E. West; Suiter & Associates

(57) **ABSTRACT**

A method for inputting an access code via temporal variations in the amount of pressure applied to a touch interface is disclosed. The method facilitates the input of access codes such as passwords, personal identification codes, and the like in a manner that is indiscernible (via either sight or sound) to third parties thereby reducing the possibility that the access codes may be copied or stolen and used a third party to gain unauthorized access to a system or function.

**45 Claims, 8 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3A

IPR2022-00601
Apple EX1006 Page 4



FIG. 3B



FIG. 4A

FIG. 4B

**Appx1317**

IPR2022-00601
Apple EX1006 Page 6



FIG. 5



FIG. 6



700

712

FIG. 7

IPR2022-00601
Apple EX1006 Page 8



FIG. 8

**Appx1320**

IPR2022-00601
Apple EX1006 Page 9

US 6,509,847 B1

# 1

## PRESSURE PASSWORD INPUT DEVICE AND METHOD

### FIELD OF THE INVENTION

The present invention relates generally to systems employing user entered access codes such as passwords, personal identification numbers (PIN) and the like, and more particularly to a method for inputting such access codes via temporal variations in the amount of pressure applied to a touch interface.

### BACKGROUND OF THE INVENTION

Access codes such as passwords, personal identification numbers (PIN), and the like have long been employed as a security measure to restrict access to sensitive systems and information. Such access codes are typically entered as a unique string of alphanumeric characters that a user types into a keyboard or keypad. Once entered, the access code is compared against a stored code template. If the access code is legitimate, access is provided to the user.

Because access codes are entered via a keyboard or keypad, the possibility exists that an undesired third party may discover the access code as it is typed. For example, a user of a portable computer who must enter a password to access a network, runs the risk that a third party such as a business competitor seated nearby on a commercial airplane, can discern the password as it is typed. Such a person could then use the stolen password to access the network and compromise information contained therein. Similar concerns apply to security for telephone calling cards, for example, both for prepaid and for charge cards. And, in a similar vein, a person performing banking transactions at a automated teller machine (ATM) runs the risk that a third party may discern his or her personal identification number (PIN) as it is entered into the ATM's keypad. The PIN could then be used to access the user's bank accounts.

Because of such limitations, a variety of other security methods have been developed. However, all such methods suffer similar drawbacks. For example, one such method, signature recognition, employs digitizer pads for entry of a user's signature. The signature is then compared with a stored signature template or list of signature templates. If the signature matches within a predetermined tolerance, access is provided to the user. However, software applications capable of comparing an entered signature with a stored signature template are extremely sophisticated since they must account for natural variations in the user's signature. As a result, such systems are expensive and require large amounts of memory to implement. Further, users may have concerns that a third party may be capable of forging their signatures. Similarly, other methods such as fingerprint recognition and the use of electronic keys (e.g., radio frequency identification (RFID) transponders containing an access code) utilize specialized equipment and may require sophisticated software for implementation.

### SUMMARY OF THE INVENTION

Accordingly, the present invention is directed to a novel method for inputting information by temporally varying the amount of pressure applied to a touch interface such as a digitizer (touch) pad, cursor control stick, touch screen, or the like. The present invention thus facilitates the input access codes such as passwords and personal identification codes in a manner that is indiscernible (via either sight or

# 2

sound) to third parties so as to reduce the possibility that the access code may be stolen and used for unauthorized access to a system or information by undesired third parties.

In accordance with a first aspect of the invention, a method for inputting an access code by temporally varying the amount of pressure applied to the touch interface is disclosed. The method includes the steps of sensing temporal variations in pressure applied to the touch interface, encoding the sensed temporal variations in pressure to generate a code, and comparing the generated code with a stored code template to determine if the code and the code template match within a predetermined tolerance. Wherein the generated code and the code template match within the predetermined tolerance, the code may be used to enable a function. Exemplary functions which may be enabled in this manner include, but are not limited to, enabling startup of an information handling system, loading an operating system, executing a software application, establishing a communication link with a network, allowing access to a restricted area, allowing a transaction via a network, and allowing banking transactions via an automatic teller machine (ATM). In an exemplary embodiment, the method may be implemented as a program of instructions storable on a medium readable by an information handling system for causing the information handling system to perform the steps of the method.

In accordance with a second aspect of the present invention, an information handling system utilizing the method is disclosed. In an exemplary embodiment, the information handling system is comprised of a processor for executing the program of instructions implementing the method of the present invention, a memory coupled to the processor for storing the program of instructions, and a touch interface coupled to the processor for sensing variations in pressure applied by a user of the information handling system for entering the access code. Exemplary touch interfaces include, resistive or capacitive digitizer pads (e.g., touch pads), cursor control sticks, mouses which include keys having pressure sensing elements, touch sensitive display overlays (e.g., touch screens), and the like.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention claimed. The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate an embodiment of the invention and together with the general description, serve to explain the principles of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

The numerous objects and advantages of the present invention may be better understood by those skilled in the art by reference to the accompanying figures in which:

FIG. 1 is an isometric view of an exemplary information handling system having a touch interface and employing the method of the present invention for entry of an access code, wherein the touch interface is a digitizer pad;

FIG. 2 is a block diagram illustrating an exemplary computer based information handling system such as the server and client information handling systems shown in FIG. 1;

FIGS. 3A and 3B are flow diagrams illustrating methods in accordance with exemplary embodiments of the present invention;

FIGS. 4A and 4B are diagrams illustrating entry of an access code via temporal pressure variation in accordance with an exemplary embodiment of the present invention;

IPR2022-00601
Apple EX1006 Page 10

US 6,509,847 B1

3

FIG. **5** is an isometric view of an exemplary information handling system wherein the touch interface is a joystick cursor control device;

FIG. **6** is an isometric view of an exemplary information handling system wherein the touch interface is mouse;

FIG. **7** is an isometric view of an exemplary information handling system wherein the touch interface is a digitizer pad mounted to the bottom surface of the system housing; and

FIG. **8** is an isometric view of an automated teller machine (ATM) employing the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

Reference will now be made in detail to the presently preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

Referring now to FIG. **1**, an exemplary information handling system employing the method of the present invention is shown. In this embodiment, the information handling system is comprised of a portable computer **100**, commonly referred to in the art as a laptop or notebook computer. As shown in FIG. **1**, portable computer **100** includes a processor portion **112** having a keyboard **116**, and a lid portion **114** including a display **118**. The lid portion **114** is pivotally hinged to the processor portion **112** so that the lid portion **114** and processor portion **112** may be folded together for storage and transport of the computer **100**.

An exemplary hardware architecture **200** of an information handling system such as portable computer **100** of FIG. **1** is shown in FIG. **2**. In this embodiment, processor **204**, system controller **212**, cache **214**, and data-path chip **218** are each coupled to host bus **210**. Processor **204** is a microprocessor such as a 486-type chip, a Pentium 7, Pentium II7, Pentium III7, or the like suitable microprocessor. Cache **214** provides high-speed local-memory data (in one embodiment, for example, 512 KB of data) for processor **204**, and is controlled by system controller **212**, which loads cache **214** with data that is expected to be used soon after the data is placed in cache **212** (i.e. in the near future). Main memory **216** is coupled between system controller **212** and data-path chip **218**, and in one embodiment, provides random-access memory of between 16 MB and 128 MB of data. In one embodiment, main memory **216** is provided on SIMMs (Single In-line Memory Modules), while in another embodiment, main memory **216** is provided on DIMMs (Dual In-line Memory Modules), each of which plugs into suitable sockets provided on a motherboard holding these components and many of the other components shown in FIG. **2**. Main memory **216** includes standard DRAM (Dynamic Random-Access Memory), EDO (Extended Data Out) DRAM, SDRAM (Synchronous DRAM), or the like suitable memory technology. System controller **212** controls PCI (Peripheral Component Interconnect) bus **220**, a local bus for system **200** that provides a high-speed data path between processor **204** and various peripheral devices, such as video, disk, network, etc. Data-path chip **218** is also controlled by system controller **212** to assist in routing data between main memory **216**, host bus **210**, and PCI bus **220**.

In one embodiment, PCI bus **220** provides a 32-bit-wide data path that runs at 33 MHz. In another embodiment, PCI bus **220** provides a 64-bit-wide data path that runs at 33 MHz. In yet other embodiments, PCI bus **220** provides 32-bit-wide or 64-bit-wide data paths that run at higher speeds. In one embodiment, PCI bus **220** provides connectivity to I/O bridge **222**, graphics controller **227**, and one or

4

more PCI connectors **221**, each of which accepts a standard PCI card. In one embodiment, I/O bridge **222** and graphics controller **227** are each integrated on the motherboard along with system controller **212**, in order to avoid a board-to-connector-to-board signal crossing interface and thus provide better speed and reliability. In the embodiment shown, graphics controller **227** is coupled to a video memory **228** that includes memory such as DRAM, EDO DRAM, SDRAM, or VRAM (Video Random-Access Memory), and drives VGA (Video Graphics Adapter) port **229**. VGA port **229** can connect to VGA-type or SVGA (Super VGA)-type displays or the like. Other input/output (I/O) cards having a PCI interface can be plugged into PCI connectors **221**.

In one embodiment, I/O bridge **222** is a chip that provides connection and control to one or more independent IDE connectors **224**–**225**, to a USB (Universal Serial Bus) port **226**, and to ISA (Industry Standard Architecture) bus **230**. In this embodiment, IDE connector **224** provides connectivity for up to two or more standard IDE-type devices such as hard disk drives, CD-ROM (Compact Disk-Read-Only Memory) drives, DVD (Digital Video Disk or Digital Versatile Disk) drives, or TBU (Tape-Backup Unit) devices. In one similar embodiment, two IDE connectors **224** are provided, and each provide the EIDE (Enhanced IDE) architecture. In the embodiment shown, SCSI (Small Computer System Interface) connector **225** provides connectivity for preferably up to seven or fifteen SCSI-type devices (depending on the version of SCSI supported by the embodiment). In one embodiment, I/O bridge **222** provides ISA bus **230** having one or more ISA connectors **231** (in one embodiment, three connectors are provided). In one embodiment, ISA bus **230** is coupled to I/O controller **252**, which in turn provides connections to two serial ports **254** and **255**, parallel port **256**, and FDD (Floppy-Disk Drive) connector **257**. In one embodiment, FDD connector **257** is connected to FDD **258** that receives removable media (floppy diskette) **259** on which is stored data and/or program code **260**. In one such embodiment, program code **260** includes code that controls programmable system **200** to perform the methods described herein. In another such embodiment, serial port **254** is connectable to a computer network such as the Internet, and such network has program code **260** that controls programmable system **200** to perform the methods described herein. In one embodiment, ISA bus **230** is connected to buffer **232**, which is connected to X bus **240**, which provides connections to real-time clock **242**, keyboard/mouse controller **244** and keyboard BIOS ROM (Basic Input/Output System Read Only Memory) **245**, and to system BIOS ROM **246**.

FIG. **2** shows one exemplary embodiment of the present invention, however other bus structures and memory arrangements are specifically contemplated. In one embodiment, I/O bridge **222** is a chip that provides connection and control to one or more independent IDE connectors **224**–**225**, to a USB (Universal Serial Bus) port **226**, and to ISA (Industry Standard Architecture) bus **230**. In this embodiment, IDE connector **224** provides connectivity for up to two standard IDE-type devices such as hard disk drives or CD-ROM (Compact Disk-Read-Only Memory) drives, and similarly IDE connector **225** provides connectivity for up to two IDE-type devices. In one such embodiment, IDE connectors **224** and **225** each provide the EIDE (Enhanced IDE) architecture. In one embodiment, I/O bridge **222** provides ISA bus **230** having one or more ISA connectors **231** (in one embodiment, three connectors are provided). In one embodiment, ISA bus **230** is coupled to I/O controller **252**, which in turn provides connections to two serial ports

IPR2022-00601
Apple EX1006 Page 11

US 6,509,847 B1

5

254 and 255, parallel port 256, and FDD (Floppy-Disk Drive) connector 257. In one embodiment, ISA bus 230 is connected to buffer 232, which is connected to X bus 240, which provides connections to real-time clock 242, keyboard/mouse controller 244 and keyboard BIOS ROM (Basic Input/Output System Read Only Memory) 245, and to system BIOS ROM 246. It should be appreciated that modification or reconfiguration of information handling system 200 of FIG. 2 by one having ordinary skill in the art would not depart from the scope or the spirit of the present invention.

Referring again to FIG. 1, portable computer 100 includes a cursor control device comprised of a touch sensitive digitizer pad 120 mounted to the processor portion 112 of portable computer 100 adjacent to keyboard 116. Such digitizer pads 120 (often referred to in the art as touch pads, track pads, etc.) sense motion of the user's fingertip 122 to control the position of a cursor or pointer on a graphical user interface (GUI) displayed on the display 118 by providing position indications corresponding to positions on the display 118.

In accordance with the present invention, digitizer pad 120 may further sense variations in pressure applied along an axis generally perpendicular to its surface. For example, in an exemplary embodiment, digitizer pad 120 comprises a resistive touch pad capable of generating an analog signal proportional to the amount of pressure applied by the user's fingertip 122. This analog signal may be converted to a digital signal via an analog to digital converter (ADC) for processing by the system's processor 202 (FIG. 2). Such resistive touch pads have conventionally been utilized to allow the user to select a point on the display 118 by either tapping or applying an added downward pressure to the surface of the touch pad. Alternately, digitizer pad 120 may be a capacitive touch pad capable of sensing variations in applied pressure by measuring the area of the user's finger tip in contact with the surface of the pad. Such capacitive touch pads are conventionally used to control "edge motion" velocity wherein a displayed cursor will continue to move when the user's fingertip is dragged to the edge of the touch pad, and the velocity of movement is controlled by the amount of pressure applied to the touch pad by the user.

The method of the present invention utilizes the digitizer pad 120 as a touch interface to provide a means for inputting an access code or password via temporal variations in the amount of pressure applied to the surface of the pad 120 by the user. In this way, the present invention facilitates entry of access codes in a manner that is substantially indiscernible (via either sight or sound) to third parties, reducing the possibility that the access code may be stolen and used for access to a system or function by unauthorized persons. In an exemplary embodiment, the method of the present invention may be implemented in an information handling system, such as portable computer 100, as a program of instructions storable on a medium readable by the information handling system for causing the information handling system to execute the steps of the method.

Turning now to FIGS. 3A and 3B, a method 300 in accordance with an exemplary embodiment of the present invention is shown. The method 300 is initiated, at step 312, wherein a user attempts to access a function requiring an access code such as a password or personal identification number (PIN). For example, the user may power on an information handling system such as portable computer 100 (FIG. 1) wherein the computer's operating system is password protected. Similarly, the user of portable computer 100 may attempt to access a network such as a local area network

6

(LAN). The network may require entry of the user's password for access to network resources. Likewise, the user may attempt to access the Internet via an Internet service provider, online information service, etc wherein a legitimate user name and password is required to receive access to the network.

A request may be provided to the user to enter the access code, at step 314. This request may, for example, be displayed via display 118 of portable computer 100. Alternately, step 314 may be omitted, and the user may simply enter the access code without a prompt. The user enters the access code by temporally varying the amount of pressure applied to the touch interface. For example, wherein the touch interface is comprised of a digitizer pad 120 as shown in FIG. 1, the user would rest one or more fingers (or alternatively the point of a stylus) on the surface of digitizer pad 120 and would apply pressure in a temporal pattern. Preferably, the user would not move (e.g., flex, lift, tap, etc.) his finger while varying the amount of pressure applied to the digitizer pad 120. In this manner, entry of the access code would be essentially invisible to third parties since no motion of the user's hand could be detected.

The temporal pattern of pressure applications applied by the user is sensed by the touch interface (e.g., the digitizer pad 120), at step 316, and utilized to generate an access code, at step 318. The generated access code is then compared, at step 320, with a code template created by the user at an earlier time. In one embodiment, the user's access code itself will simply have been previously stored as the code template by the information handling system. In more general embodiments, the code template may, for example, be data structure created from the generated access code during a prior use of the information handling system. Similarly, a network server may allow a new user to choose a password the first time that user accesses the network. The password chosen would be saved by the server as the stored code template.

As shown in FIG. 3B, the entered access code may then be utilized to allow the information handling system to enable the function requested at step 312. It should be appreciated that a user may be unable to exactly duplicate the previously entered temporal pressure pattern of the code template when inputting the access code pattern. Thus, it may be necessary to allow some variation, within a predetermined tolerance, between the inputted access code and the code template. For example, wherein the access code is entered by the user as a series of pressure pulses having varying durations, a predetermined tolerance may be provided for variations in the lengths of the pulses. A determination may then be made at step 322 whether the entered access code and the stored code template match to within the predetermined tolerance. Wherein the inputted access code and the code template are a close match (i.e., they match to within the predetermined tolerance), the function is enabled at step 324.

Preferably, the user may be allowed more than one opportunity to correctly enter the access code. For example, a counter (COUNTER) may be initialized to a value (N), representing the allowable number of access code requests that may be made to the user, when the access code it first requested from the user, at step 314. A determination may then be made at step 326 whether the counter is greater than zero (0), wherein all allowed access code requests have been made. Wherein the counter (COUNTER) is greater than zero (0), the counter (COUNTER) is decremented ($COUNTER_n + 1 = COUNTER_{n-1}$), at step 328, and entry of the access code is again requested at step 314. Otherwise, the function is disabled at step 330.

IPR2022-00601
Apple EX1006 Page 12

US 6,509,847 B1

7

The entered access code may be utilized in conjunction with other security measures. For example, the access code may be utilized to verify identifying information (e.g., a user name) entered by the user via keyboard 116. Similarly, in an exemplary embodiment, digitizer pad 120 may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered and verified against a stored fingerprint template. Verification of both the collected fingerprint image and the access code may then be required before the user is allowed access to the system or information.

FIGS. 4A and 4B illustrate graphically access codes 400 & 420 entered by the user as a temporal series of pressure applications to a touch interface such as digitizer pad 120 (FIG.1). As they are entered, the pressure applications are sensed by the touch interface as variations in pressure relative to a baseline pressure (e.g., no application of pressure), and encoded for comparison with a stored code template. For example, digitizer pad 120, functioning as the touch interface, may generate an analog signal 412 & 422 proportional to the pressure applied to its surface by the user. The analog signal 412 & 422 may then be converted to a digital signal 414 & 424 via an analog to digital converter (ADC) or the like for comparison to a stored code template. Known rounding techniques for analog to digital conversion may be utilized to eliminate inconsistencies in entry of the access code by the user.

As shown in FIG. 4A, the touch interface may sense only temporal applications of pressure relying on timing of the pressure applications for entry of the access code. In such an embodiment, the touch interface would not detect variations in pressure magnitude or intensity. Thus, the access code would be entered as a series of alternating pressure applications of varying duration. Alternately, as shown in FIG. 4B, the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity. Thus, the access code would be entered as a series of alternating short and long pressure applications that vary both in duration and magnitude.

A known code key (e.g., Morse code) or a memory nemonic (e.g., the melody of a favorite song) may be utilized to aid the user in selecting, remembering, and entering the access code. Further, by using a code key such as Morse code, a conventional alphanumeric password previously entered via a keyboard or keypad may be converted into a pressure password consisting of a series of long and short pressure applications for use with the present invention.

Referring now to FIGS. 5 and 6, it should be appreciated that the present invention, when implemented in an information handling system, may utilize cursor control devices other than digitizer pad 120 (FIG. 1) as a touch interface. For example, as shown in FIG. 5, an information handling system is shown which is comprised of a portable computer 500 having a keyboard 512 employing a cursor control stick 514. In accordance with the present invention, cursor control stick 514 may sense variations in force or pressure applied along a "Z" axis perpendicular to keyboard 512. In this manner, cursor control stick 514 may be utilized as a touch interface to facilitate entry of access codes in accordance with the method of the present invention. For instance, in an exemplary embodiment, cursor control stick 514 may include a force sensitive resister (not shown) suitable for generating an analog signal proportional to the force applied by the user. The user would rest a finger on the cursor control stick 514 and apply a downward pressure in a temporal pattern. Preferably, cursor control stick, while being capable of sensing variations in force along the "Z" axis, would not

8

itself move along the "Z" axis so that the user's finger would not move while entering the access, and entry of the access code would thus not be discernable to third parties.

Similarly, as shown in FIG. 6, an information handling system such as a desktop personal computer, convergence system, etc., may employ a mouse 600 having a mouse body 612 and at least one key 614 including a force sensitive element (e.g., a force sensitive resister, etc.) functioning as a touch interface for implementation of the method of the present invention. The user, to input a pressure access code via such a mouse, would rest a finger on key 614, fully depress key 614, and apply downward pressure in a temporal pattern. Preferably, once key 614 is fully depressed, the force sensitive element would be capable of sensing variations in pressure applied to the key without additional movement of the key 614 by the user's finger tip. In an alternative embodiment, the mouse may employ a sensor disposed in the cavity receiving the mouse ball, operable to detect, by the receipt of upward pressure of the mouse ball, downward pressure upon the mouse by the user. In either of these embodiments using the system mouse, entry of the access code would not be discernable to third parties.

Referring now to FIG. 7, it should further be appreciated that the present invention, when implemented in an information handling system, may utilize a touch interface other than the information handling system's cursor control device. For instance, as shown in FIG. 7, an information handling system comprised of a portable computer 700 is shown having a touch interface 712 mounted to a bottom surface of its housing. Preferably, the touch interface 712 is positioned so that it is effectively shielded from the view of third parties by the computer's housing, thereby reducing the likelihood that access codes entered by the user may be discerned by third parties.

Referring now to FIG. 8, it will be apparent to those skilled in the art that the method of the present invention may be utilized by information handling systems in a wide variety of applications which in the past have employed keyboard or keypad entered access codes. For example, as shown in FIG. 8, the method of the present invention may be utilized by an automated teller machine (ATM) 800 to prevent third parties near the ATM, for example, standing in line behind the user, from discerning a user's personal identification number (PIN) as it is entered. ATM 800 is preferably comprised of an information handling system that is highly specialized for performing banking and banking related transactions. Thus, a typical ATM 800 may include many of the elements of the hardware architecture 200 of FIG. 2 such as, for example, processor 204, system controller 212, cache 214, data-path chip 218, and host bus 210. Such an ATM 800 may also include components for interfacing with banking customers such as a magnetic card slot 812 for receiving a magnetically encoded ATM card, a keypad 814, a display 816, a printer 818 for printing transaction receipts, and slots for distributing money and receiving deposit envelopes 820 & 822.

In an exemplary embodiment, ATM 800 may be provided with a touch interface for entry of the user's personal identification number (PIN). As shown in FIG. 8, the touch interface may comprise a separate digitizer pad 824 mounted to the ATM so as to be easily accessible by the user. Alternately, the touch interface may comprise a touch sensitive overlay (or touch screen) to display 816 that is capable of sensing temporal variations in pressure applied to the display 816 by the user.

It is believed that the method of the present invention and many of its attendant advantages will be understood by the

Apple EX1006 Page 13

US 6,509,847 B1

**9**

foregoing description, and it will be apparent that various changes may be made in the form, construction and arrangement of the components thereof without departing from the scope and spirit of the invention or without sacrificing all of its material advantages. The form herein before described being merely an explanatory embodiment thereof, it is the intention of the following claims to encompass and include such changes.

What is claimed is:

1. A method for inputting a code by temporally varying the amount of pressure applied to a touch interface wherein the code may be used to enable a function, the method comprising the steps of

sensing temporal variations in pressure applied to the touch interface;

encoding the sensed temporal variations in pressure to generate a single code based on the sensed pressure over the temporal period; and

comparing the generated code with a stored code template to determine if the generated code and the code template match within a predetermined tolerance.

2. A method as recited in claim **1**, further comprising the steps of:

wherein the generated code and the code template match within the predetermined tolerance, enabling the function; else

disabling the function.

3. A method as recited in claim **2**, wherein the function comprises at least one of enabling startup of an information handling system, loading an operating system, executing a software application, establishing a communication link with a network, allowing access to a restricted area, allowing a transaction via a network, and allowing a business transactions via an automatic teller machine (ATM).

4. A method as recited in claim **1**, wherein the sensing step comprises generating an analog signal proportional to the temporal variations in pressure and the encoding step comprises converting the generated analog signal to a digital signal corresponding to the code.

5. A method as recited in claim **4**, wherein the sensing step further comprises detecting variance in magnitudes of the sensed temporal variations in pressure applied to the touch interface.

6. A method as recited in claim **1**, further comprising the step of applying a plurality of temporal variations in pressure to the touch interface wherein the touch interface allows application of pressure without discernable movement and sound.

7. A method as recited in claim **1**, further comprising the steps of:

generating an image of a fingerprint collected from a finger of a subject generating the temporal variations in pressure, and

comparing the generated fingerprint image with a stored fingerprint template to determine if the generated fingerprint image and stored fingerprint template match with a predetermined tolerance.

8. A method as recited in claim **7**, further comprising the steps of:

wherein the generated code and the code template match within the predetermined tolerance, enabling the function and the generated fingerprint image and stored fingerprint template match with a predetermined tolerance, enabling the function; else

disabling the function.

9. A method as recited in claim **8**, wherein the function comprises at least one of enabling startup of an information

**10**

handling system, loading an operating system, executing a software application, establishing a communication link with a network, allowing access to a restricted area, allowing a transaction via a network, and allowing a business transaction via an automatic teller machine (ATM).

10. A program of instructions storable on a medium readable by an information handling system for causing the information handling system to execute steps for inputting a code via a touch interface of the information handling system, the steps comprising:

sensing temporal variations in pressure applied to the touch interface;

encoding the sensed temporal variations in pressure to generate a single code based on the sensed pressure over the temporal period; and

comparing the generated code with a stored code template to determine if the generated code and the code template match within a predetermined tolerance.

11. A program of instructions as recited in claim **10**, further comprising the steps of:

wherein the generated code and the code template match within the predetermined tolerance, enabling the function; else

disabling the function.

12. A program of instructions as recited in claim **11**, wherein the function comprises at least one of enabling startup of an information handling system, loading an operating system, executing a software application, establishing a communication link with a network, allowing access to a restricted area, allowing a transaction via a network, and allowing a business transactions via an automatic teller machine (ATM).

13. A program of instructions as recited in claim **10**, wherein the sensing step comprises generating an analog signal proportional to the temporal variations in pressure and the encoding step comprises converting the generated analog signal to a digital signal corresponding to the code.

14. A program of instructions as recited in claim **13**, wherein the sensing step further comprises detecting variance in magnitudes of the sensed temporal variations in pressure applied to the touch interface.

15. A program of instructions as recited in claim **10**, wherein the touch interface allows application of temporal variations in pressure without discernable movement and sound.

16. A program of instructions as recited in claim **10**, further comprising the steps of:

generating an image of a fingerprint collected from a finger of a subject generating the temporal variations in pressure, and

comparing the generated fingerprint image with a stored fingerprint template to determine if the generated fingerprint image and stored fingerprint template match with a predetermined tolerance.

17. A program of instructions as recited in claim **16**, further comprising the steps of:

wherein the generated code and the code template match within the predetermined tolerance, enabling the function and the generated fingerprint image and stored fingerprint template match with a predetermined tolerance, enabling the function; else

disabling the function.

18. A program of instructions as recited in claim **17**, wherein the function comprises at least one of enabling startup of an information handling system, loading an operating system, executing a software application, establishing

IPR2022-00601
Apple EX1006 Page 14

US 6,509,847 B1

**11**

a communication link with a network, allowing access to a restricted area, allowing a transaction via a network, and allowing a business transactions via an automatic teller machine (ATM).

19. An information handling system, comprising:

a processor for executing a program of instructions on the information handling system;

a memory coupled to the processor for storing the program of instructions executable by the processor; and

a digitizer pad coupled to the processor for sending temporal variations in pressure applied thereto;

wherein the program of instructions configures the information handling system to input a code via temporal variations in the amount of pressure applied to the digitizer pad.

20. An information handling system as recited in claim 19, wherein the program of instructions further causes the inputted code to be compared with a code template stored in the memory to determine if the code and the code template match within a predetermined tolerance.

21. An information handling system as recited in claim 20, wherein the program of instructions enables a function of the information handling system if the inputted code and the code template match within the predetermined tolerance.

22. An information handling system as recited in claim 21, wherein the function comprises at least one of enabling startup of an information handling system, loading an operating system, executing a software application, and allowing access to a restricted area.

23. An information handling system as recited in claim 19, further comprising a communication device suitable for connecting the information handling system to a network.

24. An information handling system as recited in claim 23, wherein the program of instructions further causes the inputted code to be communicated with the network via the communication device to be compared with a code template wherein a determination is made whether the code and the code template match within a predetermined tolerance.

25. An information handling system as recited in claim 20, wherein the program of instructions enables a function of the information handling system if the inputted code and the code template match within the predetermined tolerance.

26. An information handling system as recited in claim 25, wherein the function comprises at least one of establishing a communication link between the information handling system and the network, allowing a transaction via the network.

27. An information handling system as recited in claim 25, wherein the information handling system is an automatic teller machine (ATM) and the function comprises allowing a banking transaction.

28. An information handling system as recited in claim 19, wherein the digitizer pad is suitable for detecting variance in magnitudes of the sensed temporal variations in pressure applied to the touch interface.

29. An information handling system as recited in claim 19, wherein the digitizer pad allows application of temporal variations in pressure without discernable movement and sound.

30. An information handling system as recited in claim 19, wherein the digitizer pad is suitable for capturing an image of a fingerprint used to apply pressure thereto.

31. An information handling system as recited in claim 19, wherein the digitizer pad comprises a resistive digitizer pad suitable for sensing temporal variations in applied pressure.

32. An information handling system as recited in claim 19, wherein the digitizer pad comprises a capacitive digitizer pad suitable for sensing temporal variation in applied pressure.

**12**

33. An information handling system as recited in claim 19, wherein the digitizer pad comprises a cursor control stick suitable for sensing temporal variation in applied pressure.

34. An information handling system, comprising:

means for executing a program of instructions on the information handling system;

means coupled to the executing means, for storing the program of instructions executable by the executing means; and

means, coupled to the executing means, for sensing variations in pressure applied to a digitizer pad; wherein the program of instructions configures the information handling system to input a code via temporal variations in the amount of pressure applied to the digitizer pad for inputting a password.

35. An information handling system as recited in claim 34, wherein the program of instructions further causes the inputted code to be compared with a code template stored in the storage means to determine if the code and the code template match within a predetermined tolerance.

36. An information handling system as recited in claim 35, wherein the program of instructions enables a function of the information handling system if the inputted code and the code template match within the predetermined tolerance.

37. An information handling system as recited in claim 36, wherein the function comprises at least one of enabling startup of an information handling system, loading an operating system, executing a software application, and allowing access to a restricted area.

38. An information handling system as recited in claim 34, further comprising means for communicating with a network.

39. An information handling system as recited in claim 38, wherein the program of instructions further causes the inputted code to be communicated with the network by the communication means to be compared with a code template wherein a determination is made whether the code and the code template match within a predetermined tolerance.

40. An information handling system as recited in claim 39, wherein the program of instructions enables a function of the information handling system if the inputted code and the code template match within the predetermined tolerance.

41. An information handling system as recited in claim 40, wherein the function comprises at least one of establishing a communication link between the information handling system and the network and allowing a transaction via the network.

42. An information handling system as recited in claim 40, wherein the information handling system is an automatic teller machine (ATM) and the function comprises allowing a banking transaction.

43. An information handling system as recited in claim 34, wherein the pressure variation sensing means is suitable for detecting variance in magnitudes of the sensed temporal variations in pressure applied thereto.

44. An information handling system as recited in claim 34, wherein the digitizer pad allows application of temporal variations in pressure without discernable movement and sound.

45. An information handling system as recited in claim 34, wherein the digitizer pad is suitable for capturing an image of a fingerprint used to apply pressure thereto.

* * * * *

IPR2022-00601
Apple EX1006 Page 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **CPC PATENT TECHNOLOGIES PTY LTD,** | § § § § § § § § § § § § | |
| *Plaintiff* | | **CASE NO. 6:21-CV-00165-ADA** |
| **-v-** | | |
| **APPLE INC.,** | | |
| *Defendant* | | |

## <u>CLAIM CONSTRUCTION ORDER</u>

The Court provides the following claim constructions for U.S. Patent Nos. 9,269,208 ("'208 Patent); 8,620,039 ("'039 Patent"); and 9,665,705 ("'705 Patent") after considering the parties' briefs and oral argument held February 10, 2022. Dkt. Nos. 46, 49, 52. The Court enters its final constructions for each term:

| NO. | Claim Term | Court's Final Construction |
|---|---|---|
| 1 | "biometric card pointer system" <br><br> '039 Patent Cls. 1, 19 | Nonlimiting preamble term with no patentable weight. |
| 2 | "biometric card pointer enrollment system" <br><br> '039 Patent Cl. 13 | Nonlimiting preamble term with no patentable weight. |
| 3 | "means for defining, dependent upon the received card information, a memory location in a local memory external to the card" | Means plus function language pursuant to section 112. <br><br> The function of this limitation is "defining, dependent upon the received card information, a memory location in a local memory external to the card." <br><br> Structure corresponding to the claimed means is a computer system with a processor executing an application |

| | | |
|---|---|---|
| | '039 Patent, Cl. 13 | that uses any segment of card information 605 from a card 601 (1) as a memory reference as shown in Fig. 4 or (2) to determine a group of associated memory references or 3) all equivalents of (1) and (2). Structure is found in '039 Patent, col. 6, line 66 – col. 7, line 23; col. 7, lines 31-35, 39-42, 47-48; col. 8, lines 44-46; col. 11, lines 29-37; col. 12, lines 1-9; Fig. 4. |
| 4 | "means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location" | Means plus function language pursuant to section 112.<br><br>Function: storing, if the memory location is unoccupied, the biometric signature at the defined memory location.<br><br>Structure: a computer system with a processor unit 105 running software process(es) 401 and at least one of: a storage device 109 or memory 106. Structure is found in '039 Patent, col. 6, line 66 – col. 7, line 23; col. 5, lines 13-18 & lines 19-22 & 23-30; Fig. 7, step 401. |
| 5 | "being characterized according to/determining/determine at least one of the number of said entries and a duration of each said entry"<br><br>'208 Patent Cls. 1, 9, 10<br>'705 Patent Cls. 1, 10, 11, 14, 15, 16, 17 | "being characterized according to/determining/determine" is given its plain and ordinary meaning. The Court rejects the proposal to construe these words as "identifying and storing…"<br><br>"at least" modifies "one of the number of said entries." The claim additionally requires "a duration of each said entry."[1] |
| 6 | "biometric signature"<br><br>'208 Patent, Cls. 1, 9, 11;<br>'705 Patent, Cls. 1, 11, 12, 14, 15, 17 | Plain and ordinary meaning. |
| 7 | "accessibility attribute"<br><br>'208 Patent, Cls. 1, 9, 10; | "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user" |

---

[1] Both parties' arguments found support in case law and in and the specification, but Apple's argument found further support in the prosecution history.

| | | |
|---|---|---|
| | '705 Patent, Cls. 1, 10, 11, 14, 15, 16, 17 | |
| 8 | "collocated"<br><br>'705 Patent, Cl. 9 | Plain and ordinary meaning (which is not "occurring in conjunction with"). |
| 9 | "means for mapping said series into an instruction"<br><br>'208 Patent, Cls. 1, 9 | Means plus function language pursuant to section 112.<br><br>The function of this limitation is "mapping said series into an instruction."<br><br>Structure corresponding to the claimed means is a computer program product having a computer readable medium having a computer program recorded therein, with code for mapping said series into an instruction. Structure is found in '208 Patent, col. 4, lines 25-31 & 37; col. 5 line 50 – col. 6 line 27; col. 10 line 45 – col. 11 line 2; col. 12 lines 55-59; col. 12 line 67 – col. 13 line 3; Figure 2, items 103, 107, 121. |
| 10 | "means for populating the database of biometric signatures"<br><br>'208 Patent, Cls. 1, 9 | Means plus function language pursuant to section 112.<br><br>The function of this limitation is "populating the database of biometric signatures."<br><br>Structure corresponding to the claimed means is (1) the database and (2) a computer program product having a computer readable medium having a computer program recorded therein, with code for storing biometric signatures to the database. Structure is found in '208 Patent, col. 4, lines 25-31 & 38-39; col. 10 line 57 – col. 11 line 2; col. 12 lines 43-45; col. 13 lines 9-11, 15-19. |
| 11 | "means for populating the database according to the instruction"<br><br>'208 Patent, Cls. 1, 9 | Means plus function language pursuant to section 112.<br><br>The function of this limitation is "populating the database according to the instruction."<br><br>Structure corresponding to the claimed means is (1) the database and (2) a computer program product having a computer readable medium having a computer program recorded therein, with code for populating the database according to the instruction. Structure is found in '208 Patent, col. 4, lines 25-31 & 38-39; col. 10 lines 32-34; col. |

IPR2022-00601
Apple EX1077 Page 3

| | | 10 line 57 – col. 11 line 2; col. 12 lines 43-45; col. 13 lines 9-11, 15-19. |
|---|---|---|
| **12** | "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute" | Means plus function language pursuant to section 112.<br><br>The function of this limitation is "means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute."<br><br>Structure corresponding to the claimed means is a database and a computer program product having a computer readable medium having a computer program recorded therein, with code for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute. Structure is found in '208 Patent, col. 4, lines 8-13, 15-17, 40-45 & 47-49; col. 5, lines 50-67; col. 6 line 56 – col. 7 line 2; col. 7 line 65 – col. 8 line 10; col. 8, line 67 – col. 9, line 5; col. 14 lines 10-42; Figure 2, items 103, 105; figure 3, item 202. |

SIGNED this 10th day of February, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

IPR2022-00601
Apple EX1077 Page 4

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

_____

IPR2022-00601 of U.S. Patent No. 9,269,208
IPR2022-00602 of U.S. Patent No. 9,665,705

_____

VIDEOCONFERENCE DEPOSITION OF DR. WILLIAM C. EASTTOM, III

TAKEN ON BEHALF OF THE PETITIONER

ON FEBRUARY 27, 2023

REPORTED BY:  TRENA K. BLOYE, CSR

                    A P P E A R A N C E S


  All parties appeared via videoconference.


  For the Petitioner:

          JENNIFER C. BAILEY
          ERISE IP, PA
          7015 College Boulevard
          Suite 700
          Overland Park, Kansas 66211
          913-777-5600
          jennifer.bailey@eriseIP.com


  For the Patent Owner:

          JONAH B. HEEMSTRA
          K & L GATES, LLP
          70 West Madison Street
          Suite 3300
          Chicago, Illinois 60602
          312-807-4318
          jonah.heemstra@klgates.com


  Also Present:

          Virginia Brown

C O N T E N T S

                                                        Page

Examination by Ms. Bailey                                 5

Certificate                                              56

(No exhibits marked.)

* * * * * *

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED BY and between the parties hereto, through their respective attorneys, that the deposition of DR. WILLIAM C. EASTTOM, III, may be taken on behalf of the Petitioner on the 27th day of February, 2023, via videoconference, by Trena K. Bloye, Certified Shorthand Reporter for the State of Oklahoma, by notice pursuant to the Federal Rules of Civil Procedure.

\* \* \* \* \* \*

DR. WILLIAM C. EASTTOM, III,
after having been first duly sworn at 9:46 a.m., deposes
and says in reply to the questions propounded as
follows, to wit:

EXAMINATION

BY MS. BAILEY:

**Q   Good morning, Dr. Easttom.  Thank you for
being, here.  My name is Jennifer Bailey.  I'm with the
law firm of Erise IP and we represent Apple, Inc. in
this matter.**

**Could you state your name for the record,
please?**

A   William Charles Easttom, II.

**Q   Great. Thank you.  Dr. Easttom, have you been
deposed before?**

A   I have.

**Q   Okay.  Can you give me approximately how many
times you have been deposed?**

A   We're getting close to 60.

**Q   Okay.  So then you are very familiar with how a
deposition works where I'm going to ask you questions,
you'll answer the questions.  Counsel may object, but
unless counsel, instructs you not to answer the
question, you need to go ahead and answer the question.
Does that all sound familiar to you?**

A   It does, indeed.

Q   Okay.  I usually like to take breaks at least once every hour.  But, of course, if you ever need to take a break, just let me know.  I'm happy to take a break at any time.  Just ask that you go ahead and finish answering the question if there is one outstanding.  Is that fair?

A   That's fair.

Q   Great.  So we're here to take the deposition on two IPRs, IPR2022-006601 for the 208 patent and IPR2022-00602 for the 705 patent.

Most of my questions today are going to be with respect to the 705 patent.  And I'm just kind of letting you know that in advance.  If I ask anything specific to the 208 patent, I will try to kind of identify and highlight the specific for the 208 patent.

Can you confirm, I believe that your counsel provided you a clean, hard copy for the record for both IPRs; is that correct?

A   Yes, and I also have a clean PDF copy available I can use, whichever one you would rather me use.

Q   Right.  It's really up to you what your preference on which one to use.  I personally think using the hard copy is easier, but you can use whichever you like.  I do want to confirm you don't have any other

**notes in front of you, so nothing written or digital on your desk or your monitor in your line of sight; is that correct?**

A   That's correct.  I have also taken the time, since I have multiple computers in my office, to shut them all down except the one I'm on, turn off the phone, and e-mail is shut down, everything is shut down.

**Q   Great.  Thank you.  I appreciate that.**

**And is it fair for you to -- that we agree that you're only going to look at either that electronic digital copy or the hard copy of the reference when answering the questions today?**

A   Yes, of course.

**Q   Okay.  So I'm going to go ahead and note some documents for you to pull out or pull up online just for ease since I know that we're going to be referring to these.  If you want to go ahead and pull out the 705 patent, which is Exhibit 1001.**

MS. BAILEY:  And for the record, I am going to refer to the exhibits that are in the record for today's deposition.  So in the record and the IPR, Exhibit 1001 is the 705 patent.  And that's what I will reference today.  I assume that's okay with you, Counsel?

MR. HEEMSTRA:  Yeah.

**LEXITAS LEGAL**
www.lexitaslegal.com　　　**Phone: 1.800.280.3376**　　　**Fax: 314.644.1334**
IPR2022-00601
Apple EX1089 Page 7

**Appx2277**

Q   (By Ms. Bailey)  So, Dr. Easttom, if you could go ahead and pull out the 705 patent, which is Exhibit 1001.

A   I have it.

Q   The Mathieson reference, which is Exhibit 1004; the McKeeth reference, which is Exhibit 1005; the Anderson reference, which is Exhibit 1006; and your Declaration, which is Exhibit 2013.

A   Okay.  One moment, please.

Q   Sure.

A   I have those open.

Q   Great.  Thank you.  I want to go ahead and pull out your exhibit, Exhibit 2013 -- I'm sorry -- your Declaration Exhibit 2013.  And if you could, please turn to paragraph 45, which is on page 15.

A   It begins with, "The Board has construed this limitation"?

Q   Correct.  So throughout today's deposition there are several times I'm going to ask you to review something and read it to yourself.  You don't need to read it out loud unless I specifically request.  So in this instance can you go ahead and read to yourself paragraph 45, please?

A   I have done so.

Q   So the beginning of paragraph 45 says, The

Board has construed this limitation to mean and, quote, attribute that establishes whether and under which conditions access to the controlled items should be granted.

And we're specifically referring to the claim term "accessibility attribute."  Do you understand accessibility attribute to be that quoted, "attribute that establishes," that I just read back?

A    Yes.

Q    And that's the construction that you have applied in reviewing the claims in the prior art in this matter?

A    Correct.

Q    Okay.  I now want you to pull out the 705 patent, Exhibit 1001, and turn to column 8.

And, Dr. Easttom, I want to reference the column and line numbers when I reference the patents. Do you understand what that means when I reference a column and line number?

A    I do.

Q    Okay.  So please turn to paragraph 8 and read the paragraph to yourself beginning at line 20.  That's a long paragraph.  I'm mostly interested in what's in lines 20 through 35.  But feel free to read the entire paragraph and anything else you'd like.

A    Certainly.  I have read it.

**Q    Okay.  Great.  So do you see this paragraph is discussing an accessibility attribute?**

A    Well, that's certainly discussed within the patent, yes.

**Q    Okay.  And what are the examples of an accessibility attribute within the context of the 705 patent?**

MR. HEEMSTRA:  Objection, form.

A    Well, you can read it straight from the patent language.  "Thus, for example, the accessibility attribute may comprise one or more of an access attribute granting unconditional access, a duress attribute granting access with activation of an alert tone to advise authorities of a duress situation, an alert attribute sounding a chime indicating an unauthorized but not necessarily hostile person is seeking access, and a telemetry attribute which represents a communication channel for communicating state information for the transmitter subsystem to the receiver subsystem such as a low battery condition."

**Q    (By Ms. Bailey) Great.  Thank you.  So an access attribute is an example of an accessibility attribute within the 705 patent; is that correct?**

MR. HEEMSTRA:  Objection, form.

A   Well, I'm not sure an access attribute just granting unconditional access would be, because I'm reading the plain language here.  It says, "For example, the accessibility attribute may comprise one or more of an access attribute."  That indicates, "comprising," there are more components, more pieces.

Q   **(By Ms. Bailey) So let me reframe my question. Is an access attribute an example of an accessibility attribute within the 705 patent?**

A   Well, as I read this language I just don't see that, as it describes here, an access attribute just simply grants unconditional access by itself would meet the criteria in the patent itself of an accessibility attribute.

Q   **Is address attribute an example of an accessibility attribute as used within the 705 patent?**

A   Well, I think we have the exact same situation here.  What the actual language says, "For example, the accessibility attribute may comprise one or more of" -- and then it lists several including the access attribute we just discussed, an address attribute what you're now asking about.  From reading the language it does not appear to me that simply having an address attribute and nothing else would qualify as an accessibility attribute.

Q    Could you explain that opinion a little bit more?

A    Sure.  First and foremost, we have the PTABs own construction, whether and under what conditions, which also happens to be taken straight out of the patent itself.  If you simply have any binary decision, or in the case of simply granting unconditional access, which would also be a unitary condition, that doesn't tell us under what conditions.  It just tells us whether to grant access.

So based on the PTABs own construction and the patent's plain language, that could not possibly by itself be an accessibility attribute.  The second issue is the language in this section we're actually reading "may comprise."

They are simply giving you, the inventors, one of ordinarily skill in the art would see, the inventors are giving you the various things that might be part of an accessibility attribute.  You might have an accessibility attribute that one of the things it can do is grant unconditional access, or one of the things it can do can be the duress attribute.  And we could go down the whole list.  One of it could be an alert, one of it could be a low battery signal.  These are things that could be part of the accessibility attribute.

**Q   So is it your opinion that an accessibility attribute has to have two of the described attributes? For example an access attribute and a duress attribute, in order to be an accessibility attribute?**

A   Well, that's not quite what I said.  My opinion is that -- well, first of all, I think my understanding, not being an attorney, is that we are all operating under the PTABs claim construction, period.  Doesn't matter whatever else we might think.  But I think they got this exactly right because they pulled the language directly from the patent.

An attribute that establishes whether and under which conditions access the control item should be granted.  So if you have anything that simply establishes whether, but it doesn't establish under which conditions, then it is not an accessibility attribute.

**Q   So at column 8, lines 31 through 32, the 705 patent references a duress attribute, and it has in parentheses, "Granting access that, but with activation of an alert tone, to advise authorities of the duress situation."  Do you see that in the 705 patent?**

A   I do.

**Q   If an accessibility attribute is outputted that grants access, but with activation of an alert tone,**

would you believe -- is it your opinion that that is an accessibility attribute applying the PTAB's claim construction.

A   I'd have to know more about the entire situation, because the PTAB's construction, as we have been talking about, is whether and under what conditions.  So I would like to know in this hypothetical what are the other conditions, what are the possibilities of regarding granting access?

For example, is it the case that the accessibility attribute, pardon me, can grant, say, administrative access and an alert, or can grant lesser access and an alert.  We definitely in that scenario have whether and under what conditions.

If the only option is grant you full access or grant you full access and sound an alert -- again, this is a purely hypothetical, we're not talking about a certain asserted priority -- that would tend, at least my initial thought would be not to meet the PTAB's construction.

Q   Going back to the columns 71 through 72 of the 705 patent, it says that address attribute grants access.  So let's break this down.  Would if be -- granting access, would that fall under one of the whether and under what conditions required by the claim

construction?

A    Well, that's why we have to look at specifics of -- because you have been giving me a hypothetical so far.  I assume later we will talk about the actual assertive prior art.  But if the -- what is the nature of the access?  Are there possibilities?

For example, my office happens to have a biometric lock because I sometimes do digital forensics.  But there is no entries or even the possibility of entry for other people.  You either get access or you don't.  It's also the case that, given the layout of my office, there is no possibility of partial access.  You're either in or you're not.

That could not be an accessibility attribute because there is no under what conditions.  It is simply a binary.  You are granted access or not.  Now, given a hypothetical, let's say I change this and what I did is my fingerprint would open the door, but someone else's fingerprint, say my grandson's, would open the door, but automatically lock all my desk drawers so that he could come into the office, but couldn't open my desk drawers.

Now, that might be an accessibility attribute, because we certainly have under what conditions, we have varied conditions when someone is granted access.  The problem with hypotheticals, however, we have to look at

IPR2022-00601
Apple EX1089 Page 15

Appx2285

the entire system and see what's happening.

So the best I can say about this hypothetical that I, myself, just posited, is the second example might be an accessibility attribute, but the first one absolutely could not be.

**Q   If access is granted, but it's granted with the proviso that an alert is sent to the authorities, is the alert being sent to the authorities the "under what conditions" of the claim construction.**

A   Well, again, speaking purely hypothetically, not about an actual system, the most one could possibly say in that situation is it might be.  With no more information on the hypothetical, we don't know are there different levels of access?  That's a very important thing.  We don't know what are the options in this system.

Is it simply you get in or you get in and resend an alert with no other options.  And, again, I can't give a full answer without more details.  But in general in that last option I just outlined, my initial thought would be it might not be an accessibility attribute.

**Q   Is the sending of an alert, but also granting access, a condition on the granted access?**

MR. HEEMSTRA:  Object to the form.

A    Well, again, we've got a general hypothetical. I really think, with just that bare bones hypothetical, the most anyone can say is "might be."  We don't have enough information what's happening in the system.  It's possible, but it's also possible it's not.  That's why we have to look in detail at a given proposed system to see what all it's doing.

**Q    (By Ms. Bailey) Could you turn to the 705 patent, column 11, and read -- I'm specifically interested in lines 50 through 55, but, of course, feel free to read the entire paragraph and anything else you would like to.**

A    Certainly.  I have read it.

**Q    At the 705 patent, column 11, lines 50 through 55, this section is discussing a duress class, and that if the signature is in a duress class, a duress bit is incorporated into the access signal; is that correct?**

A    Well, partially correct.  What this paragraph is actually discussing is figure 7.  And if you scroll up to the figure 7 -- which my PDF version is page 9 -- we have first a step where we compare the signatures. Then, frankly, if you don't match the signature we do nothing else.  If you do then you ask, Is there also a duress signal?  If not is there a telemetry signal? Then we have is the ID okay?  We insert an access bit.

So one part of that section of reading and the figure 7 is, indeed, whether or not -- and in this example it's a duress bit should added to the accessibility attribute.

**Q   So if the user that is providing their biometric signature wants to indicate a duress situation to the system, the person enters a duress signature; is that correct?**

A   Well, no.  You can't enter a signature.  A signature is stored, and then your biometrics, for example your fingerprint, is taken down compared to the signatures that are stored in that database.

**Q   So how would the person indicate a duress situation?**

A   Well, let me just take a quick look at what the patent itself says on this.  One moment, please.

Well, probably the closest answer, I'm going to give more direct, but is actually in column 11 toward the bottom around 60.  "The disclosed system 100 utilizes four such user bits.  Namely A, to indicate the user belongs to the duress category; B, to indicate low battery condition or other desired system state or telemetry variable for the code entry module 103; C, to indicate the biometric signal represents a legitimate user, in which case the secure access to the controlled

item is granted; or, D, to indicate the signal is unknown, in which case the control 109 -- excuse me -- in the receiver subsystem 117 sounds an alert tone using a bell.

Now, what this is saying in more plain English is that, um, the system has a way of handling a duress signal.  But the system itself is not telling you how you must enter the duress signal.  It is possible to implement it in a variety of ways.

And as we go you through the patent there is actually a lot more that supports that perspective.  One moment.  I will give you something else here.

Claim 3 itself talks about the database of biometric signatures, comprises signatures in at least one of a system of administrative class, user class, and a duress class.

So one possibility -- this isn't explicitly stated in the patent, but it's implied from Claim 3. Perhaps I use my thumb print for my normal access and my pinky finger, I use that when I am being forced to open the door.  That would be one possibility but it's not required.  The focus of the 705 is what to do once you have entered your biometric signal and how we determine to proceed from that event.

Q   Is it fair to say that outputting a duress bit

**in the access signal is done for safety reasons?**

MR. HEEMSTRA:  Object to the form.

A   Well, I don't recall the 705 explicitly saying it had to be for safety reasons.  But I do give one example of being forced to open a bank vault.  Now, that might be a safety reason.  But one in the skill of the art could immediately come up with reasons that are not safety implied.  They are more about system security.  My personal safety is not in danger, but the system security is.

**Q   (By Ms. Bailey) So let me move on.  Please turn to the 705 patent again and read paragraph 12, lines 25 through 45.**

A   Can you give me those line numbers again, please?

**Q   Sure.  25, I said through 45, but really 42, just that paragraph beginning at line 25.**

A   Thank you.  I have read it.

**Q   So this paragraph is discussing inserting an alert bit into the access signal; is that correct?**

A   Well, I don't know if inserting is the right word, but preparing an alert bit.

**Q   And the alert bit is an access attribute of the biometric signal?**

A   Well, I believe there is very specific language

in here in this paragraph.  Let me just see.  Just one moment, please.

I'm just not seeing that specific terminology.  Perhaps I'm missing it.

**Q    Okay.  When is access granted to the system?**

A    Well, in the 705 when signatures match and this is an actual authorized user -- and 705 describes both standard users and administrative uses that have different access.  But when the signature matches, one of the stored signatures, then access is granted.  Now, that access may be granted and an alarm set off in some situations.

**Q    So if the user attempting to gain access has a stored signature in the database is that user considered a legitimate user?**

A    Well, the user is considered legitimate, but as we discussed earlier, they might have an alternate signature used to indicate, yes, I'm legitimate, but I'm being forced to do this.

**Q    So would an administrator whose signature is stored in the database be a legitimate user?**

A    The user would certainly be legitimate.

**Q    And if that legitimate user is granted access, would the system output an access attribute?**

A    Well, I believe it outputs an accessibility

attribute that is now saying whether or not to grant them access in our hypothetical, yes, would be the answer to that.  Under what conditions?  Well, they are an administrator so we're going to grant them a much broader access than a standard user.  So, yes, an accessibility attribute would be output from that process.

**Q   Could you turn to claim 1 of the 705 patent, please.**

A   I have it in front of me.

**Q   Thank you.  I specifically want you to read the limitation that begins at column 16, lines 1 through 4 beginning at transmitter subsystem.**

A   I have read it.

**Q   Do you agree that claim 1 requires only 1 accessibility attribute to be outputted?**

A   Well, I guess I'm a little puzzled by the wording there.  The accessibility attribute itself is not a binary thing.  It allows, well, as the PTAB has correctly stated, whether and under what conditions.

So I don't know that there would be a situation where you would need more than one accessibility attribute.  That accessibility attribute, an accessibility attribute, in the singular, gives you the information of whether we grant access and, secondly,

what conditions are applied to that access, whether it be limiting access, sounding an alert, or whatever it might be.

**Q   Within the context of the 705 patent, are there different types of accessibility attributes that can be outputted?**

MR. HEEMSTRA:  Object to the form.

A   Well, pardon, but the framing of these two questions sounds like you might be mixing up two things. We have bits, like alert bits and things like that, but then we have an accessibility attribute.  That attribute encompasses:  Do we need to put off an alert, do we simply grant access, is it administrative access, is it standard user access.  All of that is within the singular accessibility attribute.

Now, I don't see anything in the patent that would limit you, prevent you from breaking that down into multiple signals, but it's not required certainly.

**Q   (By Ms. Bailey) So let me make sure I understand your opinion correctly, and please correct me if I'm misstating.  Is it your opinion that for any given access situation -- and what I mean by that is the user is trying to access for a particular situation.  So for any given access situation the system will output an accessibility attribute; is that correct?**

MR. HEEMSTRA:  Object to the form.

A   Let me direct your attention back to figure 7. I think that will help elucidate this topic for everyone.

Notice that we started -- well, first of all, step 602 just comparing signatures.  Then 603, if it's duress then we insert a duress bit.  If it's telemetry, we insert a telemetry bit.  If the ID is okay, we insert an access bit.  Now, it's possible all three of those are true and all three of them get inserted.  But these are being inserted so that an accessibility attribute is sent.

Now, I guess, this whole concept of plurality isn't addressed in the patent, so I'm not quite sure what you're meaning when you're discussing a plurality of accessibility attributes.

Q   (By Ms. Bailey) So is it your opinion that an accessibility attribute may include a duress bit and a telemetry bit and an access bit?

A   I would think, just as a practical matter, that all three of those being included would certainly be an unusual situation, but I don't see anything in the 705 that prevents all of those from happening.

Q   Can you turn to the 705 patent, Claim 1.  I think we're already there, but if not --

A    I am.

**Q    -- please turn to that.  Great.  So let's look at the limitation that is at column 16, lines 15 through 18, the Receive A Series of Entries.**

A    I'm there.

**Q    So I want to understand that are your opinions on what a series of entries on a biometric signal symbol encompasses as it's used in claim 1 of the 705 patent.**

A    Well, first of all, we start with the biometric signal, which I believe has been construed to be a physical attribute of the user, such as fingerprint, facial recognition, voice, iris retina, those sorts of things.  So if we don't have that then the rest of the analysis is irrelevant.  You don't have a biometric signal.

But a series of entries indicates more than one in sequence and connected together.  So, for example, I have a water glass and a coffee mug sitting to my left, but they are not a series because there is no connection between them.  On the other hand, this patent is a series of 22 connected pages that work together.  So a series of entries would be -- for example, maybe I enter my fingerprint more than one time when I'm enrolling, that helps improve accuracy.  Now, that series has to have some ways of defining, of characterizing it.

And first, the number of said entries is one way we characterize it, and then a duration of each said entry, how long were they.  So we're going to characterize each of these entries, and I'm using fingerprint as just an exemplar.  It would apply to others.  I'm going to look at how many entries I made, how many fingerprint touches I made and how long each one was.  And now I have these series of entries of a biometric signal.

**Q    So within the context of the 705 patent is an example biometric signal the user fingerprint and touching a fingerprint sensor with the fingerprint, or with the finger?**

A    Well, it's not just touching it.  The sensor has to actually record it.  And as the claim goes on to state, it has to then, for some part of the system, has to map the series into an instruction and populate the database according to that instruction, which then described here is a process commonly called enrollment of a biometric signal.

**Q    So in your answer just now you said it wasn't enough that the user just touches their finger to the fingerprint sensor, that the -- it has to be recorded. Can you explain to me what you mean by recorded there?**

A    Well, let's assume, and this is hypothetical, I

have a sensor pad for a finger.  Now, it can record a biometric signal, or it can simply be used to say, draw some geometrical pattern.  If it's not actually processing a fingerprint, then, in that instance, it's not receiving a biometric signal, much less a series of biometric signals.  It's just letting me draw a geometric pattern.

Now, normally we have separate sensors for those things, but you certainly can get a sensor that will allow you to do both.  In that situation it has to be receiving a series of a biometric signal.  Receiving means the sensor is detecting it and doing something with it.

**Q   And that "it" that you just referred to is the fingerprint representation; is that correct?**

A   Well, in this particular example we're using fingerprints as an example; so, yes.

**Q   So going back to the language of a series of entries of the biometric signal, if the user touches their finger to the fingerprint sensor once and the fingerprint representation is recorded, is that entry of a biometric signal?**

A   Well, it certainly might be, but we don't have a series yet for one.  We don't have a series of entries.

Q    Correct.

A    We have an entry.

Q    Correct.  So continuing on with that same example, the user touches the fingerprint sensor with their finger, lifts up their finger, and then touches again the fingerprint sensor.  Would that be two entries of the fingerprint on the fingerprint sensor?

A    Well, that somewhat depends on what the system is doing with it.  Is it treating them as two entries and making a series, or is it simply ignoring the subsequent ones or simply taking the latest one.

Now, those second two options would not be a series of a biometric signal, but those would be highly unusual.  Most systems, if you are in the enrollment process, actually require you to enter your fingerprint more than once, thus, you get a series of entries of the biometric signal.

Q    And this goes back to what you were saying about the recording, that user touches finger to fingerprint sensor, lifts -- and it's recorded, lifts up their finger, touches the fingerprint sensor again, and that fingerprint representation is again recorded.  That would become a series of fingerprint representations of the biometric signal; is that correct?

A    Yes, but just keep in mind that what we're

discussing here is the enrollment process.  Obviously, when you're logging in you don't do that.  This is the enrollment process.

Q   Yes, I see.  Actually, as I hold my paper away from me, I can't actually see.

So turn to the 705 patent, column 10, lines 56 through 67, that paragraph that begins, "The first administrator," if you could read that to yourself, please.

A   I'm sorry.  Can you tell me where we're going again?  Ten?

Q   Sure.  Column 10, line 56 of the 705 patent, and go ahead and review that entire paragraph, although I'm going to just ask you about the first sentence.

A   I have read it.

Q   So the first sentence begins, "The first administrator can provide control information to the code entry module by providing a succession of finger presses to the biometric sensor 121, providing that the successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time.

Would you agree that claim 1's recited series of entries of the biometric signal that we were just looking at encompasses these successive presses

**described at column 10, line 60?**

A   Well, I think I'd put it this way.  I would say this section you just had me read is essentially what I just described from claim 1 a moment ago.  It is presses of the appropriate duration, appropriate quantity, but it adds an extra thing that I think is implied in claim 1, within a predetermined time.  I can't put my fingerprint now, go out to lunch, come back and enter a second entry.  The predetermined time is going to be a relatively brief time.

**Q   Okay.  So does claim 1 of the 705 patent require determining a duration of entry of the biometric signal?**

A   Let me go back to claim 1.  Well, it's very clearly saying series being characterized according to at least one of the number of said entries, and a duration of each said entry.  So that's pretty clear and plain English.

**Q   So you agree that claim 1 requires determining a duration of entry of the biometric signal?**

A   Well, I guess I'm hung up on the term "duration."  I don't know that there is a process required by the 705 for determining -- just somehow you have to characterize according to the number of said entries and duration of each said entry.  How you go

about getting that duration is up to the implementation.

MR. HEEMSTRA:  And I'll object to the form of that last question.

THE WITNESS:  Sorry.  I answered before you had the opportunity.  My apologies.

**Q   (By Ms. Bailey) So would an example of a duration of an entry of the biometric signal be how long the finger is pressed to the fingerprint sensor?**

A   Yes.

**Q   And so it, being the system, is determining that the user is pressing the fingerprint sensor for a particular duration and it's recording the fingerprint?**

MR. HEEMSTRA:  Object to the form.

A   I didn't get the question part of that.  I'm not sure what you're asking.  You sound like you made a statement, not a question.

**Q   (By Ms. Bailey) Let me reframe that.  Thank you.**

**When the system is determining how long the fingerprint is pressed against the sensor, the system is taking a fingerprint representation; is that correct?**

A   Well, the patent doesn't limit you in that area.  It's more concerned what we do after the fact.

So, for example, one possibility would be I put my finger down for X amount of time, let's say 5,000 --

500 milliseconds, it records that.  Then I put it down again for, say, 250 milliseconds, it records that, and then later put these all together.

Or it might suspend the processing as I put down my finger each time and simply add them all to one representation down the road.  That part the patent isn't concerned with.  But in some way we have to have a number of said entries and a duration of each said entry.  So there is a temporal element to the entries.

Q   Is that temporal element a knowledge-based component to the entry?

MR. HEEMSTRA:  Objection, foundation.

A   Well, I'm going to have to ask some clarifying questions.  By "knowledge base," are you referring to knowledge-based authentication, something you know, what's called type one authentication.

Q   (By Ms. Bailey) I'm referring to knowledge based as used in your declaration.

A   Let me turn to that declaration.

Q   Let me see if I can find a paragraph to point you to if you don't find it first.

A   Well, one place you're probably looking for is 47 where I'm discussing the geometric pattern input is one of several knowledge-based inputs described in McKeeth.

**DR. WILLIAM C. EASTTOM, III  2/27/2023**

**Q   I'm not talking about McKeeth at the moment.**

A   No.  You're looking for where I used the term "knowledge base" in my declaration.  That's a place where I used it.

**Q   That is correct.  You use it there.  And then earlier you just referred to type 1, and that is referenced at paragraph 35 of your declaration.**

A   Okay.  That helps clarify my question for you. The short answer is no, this would not be knowledge based, and here is why.  What we're doing when we're looking at a series of biometric signal, said series being characterized according to at least one of the number of said entries and a duration.

The duration doesn't authenticate.  It's not like I hold for half a second, hold for a second and make some pattern.  This is the enrollment process. This isn't even authenticating you.  This is how we make sure we have a good, clean biometric signal.

One of the things that's been a problem with biometrics from the early days is what we call false positives and false negatives.  False positives being, for example, Mr. Heemstra logs into my biometric door and gets in.  No offense to Mr. Heemstra, but that's not what I would like to occur.  False negative being I put my thumb up there and still don't get in.

One of the ways that can be mitigated is when I take that fingerprint or that face or that retinal, I do a series of entries, each one having a certain amount of time duration, which allows me a clear, more accurate picture. Because when you bring your finger back again, the probability that you will be at the sensor on the exact same angle and every characteristic you did when you enrolled is very slim. That's why we have the series.

Now, contrast this to knowledge-based authentication. We're not talking about enrollment now. We're talking about something you know, something you could memorize that would get you into the system, like a geometric pattern. I could give you, Mr. Heemstra, the guy out front cutting my yard, I can give them that geometric pattern and they can easily get into the system. I can't very readily give them my finger, or at least I'm not willing to.

**Q   So in your opinion, the duration that's recited in claim 1 of the 705 patent, what is the purpose of the duration component and the series of entries in the biometric signal?**

A   Well, as I have said a few times today, claim 1 makes it very clear that's part of the enrollment process. It's all about getting you enrolled. That's

the same reason we have a series of entries as opposed to just one.  And I said earlier that when you actually log in, you may not have to do a series.  One will do it.

The purpose of a series, each one characterized by duration, is that we can get a more accurate entry into that database, which is the next part of the -- the last part of the claim language, populate the database according to the instruction.  So now we have a better biometric database.

**Q   So let me understand -- let me try to understand this opinion a little bit more.  Is it your opinion, looking at the duration of the entry of the biometric signal instructs enrollment?**

A   Well, instructing enrollment is the wrong way to put it.  Now, this isn't often the case, but this patent they actually use pretty clean, clear English language that I think anyone not skilled in the art can understand.  So going back to the actual claim language, we have, first of all, a series of entries of the biometric signal.  We have been using fingerprint.  That's a great example.  I will continue with it.

That said series being characterized according to the number of entries, how many times do I enter my fingerprint, and a duration of each entry.  Now we have

the series.  At this point we've got the series, and the system can decide, do I need five entries, each at least a half second, do I need eight entries at least a second, however you want to implement it, as long as you get a series and a duration of each.

Once I have that series, now I can take the series and map it into an instruction, and then take that instruction and populate the database according to the instruction.

So it's not that the duration is instructing anything.  It is characterizing the series.  And it exactly says "said series being characterized to the number of said entries and a duration of each said entry."

**Q    So please turn to the 705 patent, column 11, and read beginning at line 1 through approximately line 14.**

A    One moment, please.  I'm going to read up a little before this to see what got us here.

**Q    Of course.**

A    Okay.  I'm ready.

**Q    So at column 11, approximately line 3 it says, "Enroll an ordinary user," it has an arrow, and then "dit, dit, dit, dah."  Is that "dit, dit, dit, dah" corresponding to the entry of the series of finger**

presses?

A    No, it's not.  And that's why I'm glad I read the preceding part at the end of column 10.  And it states, "The first administrator" -- so we're talking about an administrator doing administrative tasks.  We're not talking about users enrolling or authenticating -- "can provide control information to the code entry module by providing a succession of finger presses to the biometric signal."

Now, in this case the biometric sensor is not being used to process fingerprints.  We have already authenticated the administrator.  What we are doing now is the administrator wants to do some administrative stuff.  Now it goes on to describe the requirements for these series.  And then, as an example, we get to column 11.  And it exactly says, "One example of a legal control signal can be expressed as follows."

So what the situation we are in here is the administrator has already been authenticated, but now he wants to do something.  What would he like to do?  Well, I'd like for you to enroll another user.  So to initiate that process I do the dit, dit, dit, dah, and that starts a process.

We're not talking about the authentication here.  We are talking about operating an administrative

functionality.

Q  How do you know that the -- that the administrator is already authenticated?

A  Well, first of all, we can start where I was at in, uh, column 10, I believe it's line 56, "The first administrator can provide control information to the code entry module."  Well, first of all, we're talking about code entry, not authentication.  And, secondly, we have no way of knowing he's the first administrator unless he's already authenticated.  That's how we know he's the first administrator.

Now, you can go further back, and what this entire section is talking about, for at least several paragraphs, is an administrator is in the system.  They are already in.  They would like to do stuff, the kind of things administrators do.

And then the plain language of the paragraphs itself, it is literally calling these control signals.  In fact, the term it uses a set of "legal control signals."  Legal in this case I suspect has nothing to do with federal or state statutes, but rather what's allowed in the system.  These are control signals.  There is no system you can enter control signals in if you are not already authorized to access the system.

Q  Let's look at column 11, the paragraph

beginning approximately line 9 or 8, "In the event that," is how it begins.

A   I have read it.

Q   So this paragraph says that if the fingerprint presses are not delivered within the predetermined time, then the presses are considered not to be control information and merely to be presses intended to provide access.  Do you see that?

A   I do.

Q   Is that your understanding of this section at column 11?

A   It is, but we didn't talk about the next sentence, which actually illustrates what you asked me earlier.

It says, "Legitimate control sequences are defined in read only memory in the controller."  Read only means it's not changed.  In other words, when I built the controller I said dit, dit, dit, dah is going to enroll an ordinary user.  That's not something you can do during enrollment process, because it's read only memory.  I can't change it.  It's essentially firmware in some integrated circuit in the machine; which, again, reemphasizes the process we're talking about here is a post-authentication administrative activity.

Q   So is it your opinion that when the user is

**entering the dit, dit, dit, dah, fingerprint representations are not being recorded?**

A    Well, I didn't necessarily say that.  What I said is -- excuse me -- this section you have directed my attention to is describing what the patent calls legal control signals.  It's not discussing enrollment, we're not discussing authentication at this point. We're discussing how to enter control signals.

Now, the section we just looked at is what happens if you're supposedly entering control signals, but you don't deliver them within the appropriate time. Then the system is going to say, Well, these aren't control information.  These are simply attempts to authenticate.  So at this point we're still not enrolling.

But let's say I'm the administrator and I didn't do dit, dit, dit, dah, instead I just hold my finger down there.  Well, the system is going to stop and say, You didn't enter a legal control signal so I assume you would like to re-authenticate.  Maybe a different administrator is trying to use the system. Maybe you've logged in as one administrator and a different one wants to log in.  That's what's happening in that section we just directed our attention to.

Q    **So in both the scenario where the user presses**

the fingerprint sensor, dit, dit, dit, dah, then the appropriate amount of time -- I should say -- in the predetermined time, versus the scenario where the user does not press within the predetermined time, is the system recording the user's fingerprint representation in both of those scenarios?

A   Well, it's used the word recording, because nothing here is indicating that this is enrollment.  And recording at least implies some kind of permanent storage in the database.  And what this specifically says -- let's get down here to the exact wording -- "In the event that a legitimate sequence of finger presses are not delivered within the predetermined time, the presses are considered not to be control information and merely to be presses intended to provide access to the controlled item."

So this isn't about enrolling.  This is about accessing.  Presumably you previously enrolled.  Now, if by recording you mean temporarily storing in memory so I can compare it to a database of signatures, then, yes. If by recording you mean enrolling and adding a signature to a database, that's not what's being described in this paragraph.

Q   Thank you for that clarification.  I used the term recording because you used it earlier, and so I was

using language you had brought up.  Let me just ask my question so that we have a clear record.

I laid out two scenarios in my prior question. A first scenario where the user enters the series of presses within the predetermined time and a scenario where the user does not enter the presses within the predetermined time.

In both scenarios, is the system taking the fingerprint representation and storing it for comparison purposes to a stored fingerprint representation?

A   Well, reading the plain language right here, the only situation where -- and you clarified, thank you, storing for comparison to a previously stored -- it would say that, right here, "these presses are not considered to be control information and merely to be presses intended to provide access to the control item."

Now, it doesn't actually say it goes ahead and does that, at least in this paragraph.  So it's not clear in this paragraph if at this point it does actually capture the fingerprint and go into authentication.  It doesn't explicitly state that.

MR. HEEMSTRA:  Counsel, we've been going just a little over an hour.  I don't know if there is good stopping point soon.  I don't want to break your flow, but just to let you know.

MS. BAILEY:  Let me ask one more question if that's okay with you, Dr. Esttom.

THE WITNESS:  Sure.

MS. BAILEY:  Okay.  But I'm also happy to stop, too, if --

THE WITNESS:  No.  We can do another question.

Q   (By Ms. Bailey)  Going back to claim 1 of the 705 patent, is it your opinion that the series of entries in the biometric signal must encompass both a biometric signal and a number of entries in a duration of the biometric signal?

MR. HEEMSTRA:  Objection, form.

A   Well, again, choice of wording is important. The plain language says, "receive a series of entries to the biometric signal, said series being characterized according to at least on of the number of said entries in a duration of each said entry."

So I don't know if I would use the word "encompasses."  But, certainly, the series of biometric entries, of the series of entries of biometric signal are characterized to both -- by both number and duration of each entry.

Q   Where is an example of this claim limitation that we've been talking about, "receive a series of

**entries of the biometric signal," where is an example of that disclosed in the 705 patent applying your construction?**

A    Well, first of all, we're not applying my construction.  We're using the plain language.  I didn't do any construction.  But give me just a moment.

Well, there is several places.  The first that comes to mind is column 4.  And I really don't want to read a huge section here.  I'm sure you don't want me either, but it starts at about line 26.  And it's basically describing the invention and it's talking about a computer program, a computer readable media that directs a processor.  And it says it has source code for receiving that series of entries of the biometric signal, and then source code for determining at least one of the number of said entries and duration of each said entry.  So this is pointing to actual computer code that would execute the claim limitation we just discussed.

There are other places.  That's the first one I came to.  One moment.

With figure 9, the actual body of the patent specifically says this is related to the enrollment process.  So we're going to the figure 9 and we get down to step 909.  Does the finger press exceed a

predetermined period?  In other words, did you hold your finger long enough.  So we're seeing it here, right there used in the actual enrollment process that I have been discussing.

Q    Is that decision block 909 discussing a series of entries?

A    Well, at this point 909, the diagram is saying we're looking at the duration here.  Now, you will notice that we have a loop structure going on.  That's what denotes a series, or we can simply go into the patent language itself to see where it describes 909.

I think column 14 talks a lot about this.  And specifically a mentioned a loop structure.  It talks about returning to the step 906 if the incoming biometric signal is legible then the process 900 follows a yes arrow to step 909.  The step 909 determines whether the finger press exceeds a predetermined time.  If this is not the case then the process 900 follows a no arrow to step 910, which stores the biometric signal, which is, in the present case, is a fingerprint signature.

MS. BAILEY:  Okay.  Let's take a break. May we go off the record?

COURT REPORTER:  Yes.

(A break was had from 10:59 to 11:10

a.m.)

**Q   (By Ms. Bailey) Welcome back, Dr. Esttom.  Can you please pull out the McKeeth reference, which is Exhibit 1005.**

A   I have it open in front of me.

**Q   Is McKeeth's disclosed invention concerned with using fingerprint recognition to access the secured device?**

A   One moment, please.  I just want to confirm precisely what McKeeth says.

Can you repeat the question, please?

**Q   Sure.  Is McKeeth's disclosed invention concerned with using fingerprint recognition to access a secure device?**

A   Well, certainly fingerprint recognition is mentioned many, many times in McKeeth.

**Q   And the fingerprint recognition is used to access a secure device?**

A   One moment, please.

**Q   Sure.**

A   Well, the term "secure device" does not appear in McKeeth.

**Q   Would you agree that McKeeth is directed to authenticating a user to a computer system?**

A   Well, the background of the invention says

specifically the invention relates generally to methods of accessing a secure computer system.

Q   Is McKeeth's disclosed invention concerned with using various types of access codes to instruct different types of access to a secure device?

A   The reason I like the PDF version, I can search instead of hoping to do it from memory.  The word "access code" doesn't appear in McKeeth.

Q   Is McKeeth's disclosed invention concerned with using a geometric pattern to instruct a type of access to a secure device?

A   Well, that is certainly something disclosed in McKeeth.  There are, I think, 10 or 11 different places where it discusses.  For example, the top of column 3, "Alternatively the user may enter a unique geometric pattern concurrently with or shortly after entering the password."

Q   And so the geometric pattern is a type of access code to indicate a type of access to the secure device?

MR. HEEMSTRA:  Objection, form.

A   First of all, as we already stated, McKeeth never uses the term "access code."  It also doesn't talk about type of access.  A geometric pattern is one method of inputting a type 1 authentication, something you know

to access a system.

Q   (By Ms. Bailey) So what is the purpose of the geometric pattern in McKeeth?

A   Well, I'm looking right now at column 5, approximately line 30, "As noted above, in addition to entering a password and fingerprint scan, the computer system 100 may be configured to require the user to enter a unique geometric pattern via the peripheral device 200 to authenticate the user."

Now, there is a couple of interesting things in this excerpt.  First of all, it specifically says "in addition to entering a password and a fingerprint."  So at least this section of McKeeth says you've got to have both of those.  And then you might also have the user enter a unique geometric pattern, and all of that together is used to authenticate the user.

Q   Is there any other purpose for the geometric pattern other than authenticating a user as described in McKeeth?

A   One moment, please.

Sitting here right now I can't recall one.  If there is another use, please direct my attention to it.

Q   Would you review McKeeth, column 4, the paragraph beginning line 28.

A   Ah, yes.  Thank you very much.

It is possible, based on this reading that, "Failing to perform the geometric pattern may be an indication that the user is experiencing duress or force to access the computer system 100 as described for the method of figure 4."

**Q    So is it fair to say that McKeeth discloses a method of indicating duress to the system?**

A    Well, sort of, because what we just read specifically says not entering the geometric pattern. It could be configured to recognize that as a duress. So it's not entering a duress signal.  It's the absence of entering all of the required information, it's interpreted as duress.

**Q    And per McKeeth, what happens when the user is experiencing duress or force to access the computer system?**

A    Well, in this case, continue with that exact same section of column 4, we started at 28 going a little further now, it says, "In some applications it may be desirable to grant a limited access to the user to give the false impression that access to the computer system 100 is granted as usual."

**Q    Could you please pull out Mathiason, which is Exhibit 1004.**

A    I have it front of me.

Q    Is Mathiason disclosed invention concerned with using fingerprint recognition to access an access-limited device?

A    One moment, please.

Well, Mathiason starts off and it's right before paragraph 1 saying, "Portable or embedded access in input devices and methods for giving access to access-limited devices, apparatuses, appliances, systems, and networks."  So certainly Mathiason is contemplating how to get access to an access-limited device.

Q    And that access is provided using fingerprint recognition; is that correct?

A    Let me just ensure that's correct.  Yes.

Q    Is the computer required to perform fingerprint recognition within the context of Mathiason?

A    One moment, please.  Interesting question.  And I'm looking at paragraph 41 from Mathiason, figure 5 illustrates how an access device according to the invention may be embedded as part of the keyboard or mouse of a computer terminal or laptop computer.

So my answer to that question would depend in part on how you're using the word computer.  Are you referring to a desktop such as I'm sitting at now?

Q    Could you please turn to Anderson, which is

IPR2022-00601
Apple EX1089 Page 50

Appx2320

**Exhibit 1006?**

A   I have it in front of me.

**Q   Is Anderson's disclosed invention concerned with using various types of access codes to access a secure device?**

A   One moment, please.  Well, the field of the invention in column 1 of Anderson says, "The present invention relates generally to systems employing user-entered access codes, such as password, personal identification numbers and the like, and more particularly to a method for inputting such access codes via temporal variation to the amount of pressure applied to a touch interface."

**Q   So based on that field of the invention that you just read from Anderson, would you agree that Anderson's disclosed invention is concerned with using various types of access codes to access a secure device?**

A   Well, the problem is I don't see the term "secure device" in Anderson.  Certainly we're entering access codes, this is described in what we call type 1 authentication.  But what you're authenticating to, I don't see the word "secure device."

                MS. BAILEY:  Let's go off the record.
                (A break was had from 11:25 to 11:39
                a.m.)

MS. BAILEY:  Dr. Easttom, thank you.  I have no further questions.

THE WITNESS:  Thank you.

MR. HEEMSTRA:  No questions from me either.

COURT REPORTER:  All right.  Would you like to state your transcript orders for the record or do you have standing orders?

MS. BAILEY:  We have standing orders.  And I have learned that if I violate those standing orders I get in trouble with our paralegal, so...

COURT REPORTER:  All right.  That sounds good.  And, Mr. Heemstra, how about you?  Do you have standing?

MR. HEEMSTRA:  I do not know.  We'll do a rough and just standard on the other, the full.

MS. BAILEY:  Yeah.  I do need rough, but I think that is part of our standing.

COURT REPORTER:  All right.

(Deposition concluded at 11:40 am.)

LEXITAS LEGAL

March 8, 2023

JONAH B. HEEMSTRA
K & L GATES, LLP
70 West Madison Street
Suite 3300
Chicago, Illinois 60602

IN RE: APPLE, INC. v. CPC PATENT TECHNOLOGIES PTY, LTD.

Dear Mr. Heemstra:

Please find enclosed your copies of the deposition of DR. WILLIAM C. EASTTOM, III taken on February 27, 2023 in the above-referenced case. Also enclosed is the original signature page and errata sheets.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and notarized

signature page within 30 days to our office at 711 N

11th Street, St. Louis, MO 63101 for filing.

Sincerely,

Lexitas Legal

Enclosures

```
                        ERRATA SHEET
     Witness Name: DR. WILLIAM C. EASTTOM, III
     Case Name: APPLE, INC. v. CPC PATENT TECHNOLOGIES PTY,
                 LTD.
     Date Taken: FEBRUARY 27, 2023


     Page #_____    Line #_____

     Should read:  _____

     Reason for change:  _____


     Page #_____    Line #_____

     Should read:  _____

     Reason for change:  _____


     Page #_____    Line #_____

     Should read:  _____

     Reason for change:  _____


     Page #_____    Line #_____

     Should read:  _____

     Reason for change:  _____


     Page #_____    Line #_____

     Should read:  _____

     Reason for change:  _____


     Witness Signature:  _____
```

STATE OF _____)

COUNTY OF _____)

I, DR. WILLIAM C. EASTTOM, III, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _____, 20___, at _____.

_____

DR. WILLIAM C. EASTTOM, III

_____

NOTARY PUBLIC

My Commission Expires:

C E R T I F I C A T E

STATE OF OKLAHOMA      )

                       ) SS:

COUNTY OF OKLAHOMA     )

          I, Trena K. Bloye, Certified Shorthand Reporter within and for the State of Oklahoma, certify that DR. WILLIAM C. EASTTOM, III, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the witness chooses to read and sign the deposition; that the above and foregoing deposition was taken by me in shorthand and thereafter transcribed; that the same was taken on February 27, 2023, at 9:46 a.m., via videoconference; that I am not an attorney for, nor a relative of any of said parties or otherwise interested in the event of said action.

          IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 6th day of March, 2023.

_____

Trena K. Bloye, CSR

State of Oklahoma CSR No. 1522

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.
Petitioner

v.

CPC PATENT TECHNOLOGIES, INC.
Patent Owner

_____

IPR2022-00601
Patent No. 9,269,208

_____

**SUPPLEMENTAL DECLARATION OF DR. ANDREW SEARS**

IPR2022-00601
Apple EX 1090 Page 1

Appx2341

Supplemental Declaration of Dr. Andrew Sears
U.S. Patent No. 9,269,208

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................3

II.   OPINIONS.........................................................................3

    A.    CPC's "Push-Button" Argument ...............................3

    B.    *Mathiassen* and the Claimed "Series of Entries of the Biometric Signal".......................................................8

    C.    *Mathiassen* Is "Computer Art" ..............................11

    D.    Claims 1(D1)-1(D3)................................................13

III.  CONCLUSION ................................................................14

I, Dr. Andrew Sears, hereby declare the following:

## I.  INTRODUCTION

1.  I have been asked to respond to certain issues raised by Patent Owner in Patent Owner's Response dated December 22, 2022 ("POR"). All of my opinions expressed in my original declaration (Ex. 1003) remain the same. I have reviewed the relevant portions of the POR and the relevant portions of Dr. Easttom's declaration and deposition transcript in connection with preparing this supplemental declaration.

## II.  OPINIONS

### A.  CPC's "Push-Button" Argument

2.  As I discussed in my original declaration (Ex. 1003), a POSITA would have been motivated and found it obvious to modify *Mathiassen's* portable control to output *McKeeth's* duress and alert attributes, in addition to issuing an open door command that unlocks the car door locks for the car owner/administrator. (Ex. 1003, ¶¶ 249 (*citing* motivation to combine *McKeeth* with *Mathiassen* at Section VI.A.1.e, ¶¶ 153-168), 250-255). Providing access while issuing a silent alert to authorities when a user indicated they were under duress would have improved theft prevention "or non-authorized use of the car" because authorities would have been notified when the break-in or robbery was occurring. (Ex. 1003, ¶ 153 (*citing* Ex. 1004, [0145])). Additionally, as *Mathiassen* expressly teaches security of car systems

being a "key issue," a POSITA would have been motivated to increase such security to make car owners feel safer by providing duress access that included alerting authorities when an authorized user was under duress or alert access that included sounding an alarm when an unauthorized user was trying to access the vehicle. (Ex. 1003, ¶ 153 (*citing* Ex. 1004, [0145]); Ex. 1003, ¶¶ 154-163).

3.      *Mathiassen* understood that "security" was a "key issue" in car systems in order to "prevent theft or non-authorized use of the car," as the automotive industry was known to emphasize "secure access by blocking non-authorized users access to the car." (Ex. 1004, [0145]). Thus, due to the desirability of secure access for only authorized individuals, *Mathiassen* applies the fingerprint recognition access system to a car's central locking system to distinguish authorized users from un-authorized users. *Id.* Based on *Mathiassen's* express disclosure of using fingerprint recognition to provide the "secure access" that was known to be desired in car locking systems, a POSITA would not have looked to a less-secure push button as providing any type of access, such as duress, as a push button would not have prevented non-authorized users from gaining access to the vehicle.

4.      Dr. Easttom opines that a POSITA would have implemented a push button in *Mathiassen* to indicate duress because push buttons are "easy to install" and a "simple mechanical feature[.]" (Ex. 2011, *Declaration of Dr. William C. Easttom III*, ¶ 61). In my opinion, Dr. Easttom's opinion does not recognize or

address *Mathiassen's* express purpose of applying the fingerprint recognition access system to cars to **prevent un-authorized use**. Within the field of access security, duress was known as a condition where an *authorized* user was being forced to access a device (e.g., a vehicle). (Ex. 1003, ¶¶ 67-70, ¶ 94 (*McKeeth* teaching a user indicating they are "experiencing duress or force to access the computer system"), *comparing* ¶ 247 ( discussing *McKeeth's* duress condition) *with* ¶ 143 ( discussing the '208 Patent's disclosed "duress" situation occurring when an authorized user is in a "coercive situation"), ¶ 154). Thus, a POSITA would have understood providing access when a user is under duress includes identifying the user is an authorized user. If a push button, alone, was used to indicate duress, the car locking system would not be able to identify an authorized user from an un-authorized user pressing the button. Therefore, for a push button to provide duress access in *Mathiassen's* central locking system and for *Mathiassen* to accomplish the purpose of preventing un-authorized use, a POSITA would have understood *Mathiassen's* fingerprint sensor would have verified the user was authorized.

5.     Indicating duress by "discreetly" signaling duress was well-known to be desirable. (Ex. 1003, ¶ 156 (*citing Zhinger*)). A POSITA would have understood a user presenting their fingerprint and having to separately press a push button would not be as discreet as indicating duress in the same presented fingerprint. Dr. Easttom's opinions of a "simpler" duress indication would have required two

operations instead of a single fingerprint. In my opinion, it would not have been simpler for a user to perform two operations at two places on the portable door control than my proposed modification of *Mathiassen's* portable door control to enroll a fingerprint or fingerprint movement indicating duress that both authenticates the user by providing access and also sends out a silent security alert to authorities. (Ex. 1003, ¶¶ 165-168, 250, 252-255). Requiring a user to perform two operations would increase the risk that an assailant stop a user from indicating they are under duress and provides more opportunity for user error.

6.      I also note that *Mathiassen's* portable door control is relatively small in form factor, as shown in Fig. 8 of *Mathiassen*, and that adding a press button would have required additional space on the form factor along with additional internal wiring and hardware within the key fob. Contrastingly, the proposed modifications of the petition would not require such additional hardware, as I discussed in my original declaration. (Ex. 1003, ¶¶ 250, 252 (regarding modifying *Mathiassen* to include *McKeeth's* duress and alert attributes), ¶¶ 212-213 (regarding modifying *Mathiassen* to include *Anderson's* durational detection). Modifying *Mathiassen* to output a duress attribute simply requires modifying programming that is already included in the portable door control. (Ex. 1003, ¶¶ 250, 252). Namely, enrolling a second finger or different fingerprint movement sequence and including a duress command in the command table that is output when the second fingerprint or

fingerprint movement is provided by the user. *Id.* Modifying *Mathiassen* to detect the duration of each touch and the number of touches requires modifying already-existing software (i.e., programming the translation software to count the number and duration of touches in the touch/no-touch series). (Ex. 1003, ¶ 212).

7.     Dr. Easttom, at ¶ 61 of his Declaration, discusses my opinions at Ex. 1003, ¶ 210. In my opinion, Dr. Easttom is misstating my opinions at Ex. 1003, ¶ 210. In particular, I do not opine that a push button would be easier than modifying *Mathiassen*, as Dr. Easttom appears to opine. Instead, my original opinion was that a series of presses on a *fingerprint sensor* would be simpler to input than directional movements on that same fingerprint sensor. (Ex. 2011, ¶ 61; Ex. 1003, ¶¶ 210-211).

8.     [SD06] I note that Dr. Easttom opines a POSITA would not have been motivated to modify *Mathiassen* to include *Anderson's* detection of the duration because a push button would have been "a simpler combination[.]" (Ex. 2011, ¶¶ 77-80). However, for the same reasons discussed above, a POSITA would have understood that separating the biometric authentication from the durational detection of the entries of an input (e.g., button presses) would not have achieved *Mathiassen's* goal of addressing the "key issue" of car system security; namely, to prevent unauthorized users from accessing the vehicle. *See* ¶¶ 4-6. Additionally, requiring a user to perform two different input procedures (i.e., one on the biometric sensor and another on a push button) would have further complicated the user's input

experience and provided more room for error in entering the input. *See* ¶ 5. As Dr. Easttom agreed, creating a quick and easy entry system is vital in portable electronics, and making user manipulation of such entry system "easy was a key feature." (Ex. 2011, ¶ 58 (*citing* Ex. 1003, ¶ 217)). A POSITA would have understood two separate input operations to add complexity and slow down the input process for a user, and thus a POSITA would not have found including a push button in *Mathiassen* to be a simpler solution. Instead, a POSITA would have been motivated and found it obvious to modify *Mathiassen's* portable control to detect the durations of each of *Mathiassen's* fingerprint representations forming a touch operation, as I discussed in my original declaration. (Ex. 1003, ¶¶ 208-213).

**B.    *Mathiassen* and the Claimed "Series of Entries of the Biometric Signal"**

9.    As I discussed in my original declaration (Ex. 1003), *Mathiassen* teaches receiving a "series of entries of the biometric signal." (Ex. 1003, ¶ 197). Specifically, *Mathiassen* teaches receiving "**a series of consecutive fingerprint representations**" that are generated by the fingerprint sensor signal processing and pre-processing block (5C) of the portable control. (Ex. 1003, ¶ 194 (*citing* Ex. 1004, [0192])). *Mathiassen* expressly teaches "omni-directional finger movements" are "obtained" from analyzing the fingerprint representation series via movement analyzing software. *Id. Mathiassen's* teachings indicate the omni-directional finger movements and series of fingerprint representations are not "distinct," as Dr.

Easttom opines, because the series of "fingerprint representations" are analyzed to obtain the measured omni-directional finger movements. (Ex. 2011, ¶ 53). This teaching of the movement analyzing means determining the omni-directional finger movements from the series of fingerprint representations confirms *Mathiassen* teaches "receiving a series of entries of the biometric signal," as claimed.

10.    In my opinion, *Mathiassen's* collective teachings inform a POSITA that *Mathiassen's* omni-directional finger movements comprising fingerprint representations are a "series of entries of the biometric signal," because the movement analyzing means determines the finger movements from analyzing the series of fingerprint representations. Indeed, as I discussed in my original declaration (Ex. 1003) at ¶ 197, a POSITA would reasonably understand these omni-directional finger movements formed by the series of fingerprint representations as "a series of **fingerprint** movements" (emphasis added).

11.    *Mathiassen's* omni-directional movements that are formed by the series of fingerprint representations are then categorized based on a predefined set of finger movement sequences (e.g., touch/no touch). A command table "is used to translate the categorized finger movements into control signals" for controlling the device. (Ex. 1003, ¶ 194 (*citing* Ex. 1004, [0192])). In other words, the omni-directional finger movements comprising the series of fingerprint representations are translated (based on the categorization) to a particular command that sends out a control signal.

DocuSign Envelope ID: E   DFBD1-E70S-4182-98A   -46BDA9009E19

(Ex. 1003, ¶ 195). *Mathiassen's* translation means translating the omni-directional movements to a command in the command table further teaches mapping the series of fingerprint representations forming the omni-directional movements (i.e., "series of entries of the biometric signal") to an "instruction," as claimed.

12.    Dr. Easttom opines the "fingerprint sensor" of *Mathiassen* is not "acting like a fingerprint sensor" because the translation software is working in conjunction with the fingerprint sensor to track the "omni-directional finger movements[.]" (Ex. 2011, ¶ 53). Dr. Easttom does not discuss *Mathiassen's* teachings that the fingerprint sensor captures a series of fingerprint representations that form the omni-directional movements determined via the movement analyzing program. (Ex. 1004, [0192] (teaching the "series of consecutive fingerprint representations" are "generated by the fingerprint sensor signal capturing and pre-processing block")). Thus, the fingerprint sensor is still "acting" as a fingerprint sensor because the fingerprint minutiae data is still captured by the fingerprint sensor in conjunction with tracking the omni-directional finger movements on the fingerprint sensor. (Ex. 1003, ¶ 127 (opining the captured and stored fingerprint minutiae data generated by the pre-processing block are biometric signals)).

13.    I also note that Dr. Easttom seems to agree that code that receives the series of entries of the biometric signal and code that performs further processing on those biometric signal entries (e.g., characterizing the series) meets the claim

language of "receive a series of entries of the biometric signal." (Ex. 1089, 43:24–44:21 (discussing the '208 Patent's[1] description of source code for receiving a series of entries of the biometric signal and source code for determining at least one of the number of entries and duration of each entry)). Thus, the '208 Patent, per Dr. Easttom, describes a similar process as disclosed in *Mathiassen* of receiving each fingerprint representation on a fingerprint sensor, analyzing the movement of the finger on the fingerprint sensor, and determining the command based on the collective fingerprint representations that form the series.

### C.     *Mathiassen* Is "Computer Art"

14.     Patent Owner argues a POSITA would not have looked to modify *Mathiassen* with *McKeeth* or *Anderson's* teachings for solving a problem in *Mathiassen's* car locking system because *McKeeth* and *Anderson* are "computer art" and "do[] not teach an automotive embodiment[.]" (Paper 17, *Patent Owner Response,* 18-19, 27-28. However, a POSITA would have considered *Mathiassen* as directed to "computer art," because the car locking system includes a "central car computer" that is implemented in providing secure biometric access to a user. (Ex. 1003, ¶¶ 87-88 (*citing* Ex. 1004, [0148-0149]). Indeed, *Mathiassen* teaches the central car computer may decrypt the encrypted open door command transmitted by

---

[1] Dr. Easttom identified disclosure in the '705 Patent as an example of the claimed "series of entries of the biometric signal." As the '208 Patent also includes the identical disclosure and recites the same claimed "series of entries of the biometric signal," Dr. Easttom's statements apply to the '208 claim language.

the portable door control and relay the authenticated, re-encrypted command to the door locks to provide the user access. Ex. 1004, [0187-0188]. Thus, the central car computer controls the access to *Mathiassen's* controlled item (i.e., car door locks). Additionally, *Mathiassen* teaches the car locking system employs computing elements, such as processors, when performing the biometric recognition and provision of access. (Ex. 1003, ¶¶ 87-88 (*citing* Ex. 1003, [0178-0188])).

15.    Additionally, *Mathiassen*, *McKeeth*, and *Anderson* are all related to accessing a secured item, such as a door. And all three references use fingerprint recognition as a means for securing access to the secured item. Regarding *Anderson*, I note that Dr. Easttom opines *Anderson* "disavows" fingerprint recognition, but I disagree. (Ex. 2011, ¶¶ 67, 72). *Anderson*, 1:51-58 notes that fingerprint recognition requires specialized hardware and software, but here, *Mathiassen* already includes the hardware and software for fingerprint recognition, so this is certainly not a hindrance to combining the references. More notably, *Anderson*, 7:4-11 even provides an "exemplary embodiment" that utilizes fingerprint recognition, so in my opinion, *Anderson* also is directed to accessing a secure item, such as a door, via fingerprint recognition (along with other access code types). Because all three references relate to accessing secure items, such as doors, using computers employing fingerprint recognition, it is my opinion *Mathiassen's* embodiment of the central car computer controlling access to the car door locks is, much like *McKeeth*

and *Anderson,* in the field of "computer art." I do not see a "major distinction" between the fields of the references. (Paper 17, *Patent Owner Response,* 18-19).

### D.    Claims 1(d1)-1(d3)

16.    As an initial matter, I note that Dr. Easttom appears to misstate the mapping from the Petition and my corresponding opinions regarding claim limitations 1(d1)-1(d3). For purposes of completeness, this paragraph summarizes my opinion. First, *Mathiassen's* portable control receives a series of fingerprint representations that form the touch/no-touch movements. (Ex. 1003, ¶¶ 193-198). The series is detected by the duration of each touch and the number of touches, as taught by *Anderson. Id.* at ¶¶ 208-213. As discussed above, *Mathiassen* teaches the finger movements (i.e., touch/no touches) comprising the series of fingerprint representations are then categorized and translated to a specific command in a command table. *See* ¶¶ 11. Thus, the series of fingerprint representations forming the touch/no-touch movements are translated to a specific command in a command table (i.e., "mapping said series into an instruction"). (Ex. 1003, ¶¶ 214-218). Based on *Mathiassen's* teachings that an administrator can initiate enrollment of a user's fingerprints and the car owner/administrator may enroll other users, a POSITA would have found it obvious to include an enrollment command in *Mathiassen's* command table. (Ex. 1003, ¶¶ 219-231). The enrollment command is translated from the car owner/administrator's series of fingerprint representations. *Id.* And the

fingerprint representations comprise the series of touch/no-touches, further modified by *Anderson's* duration of each touch and the number of touches. *Id.* The enrollment command then initiates generation and storage of master minutiae tables for a new user's fingerprint (i.e., "populate the database according to the instruction"). *Id.*

## III.  CONCLUSION

I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Date: 3/16/2023 _____

By: ☐ *Dr. Andrew Sears*
DocuSigned by:
9258AD77B8F4440...

Andrew Sears, Ph.D.



# Transcript of Andrew Sears, Ph.D.

**Date:** November 8, 2022
**Case:** Apple, Inc. -v- CPC Patent Technologies PTY, Ltd. (PTAB)

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CPC EXHIBIT 2010
Apple Inc. v. CPC Patent Technologies PTY Ltd.
IPR2022-00601

**Appx2836**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

- - - - - - - - - - - - - -x

APPLE INC.,                      :

      Petitioner,          :

  v.                             :    Case No. IPR2022-00601

CPC PATENT                       :    U.S. Patent No. 9,269,208

TECHNOLOGIES PTY,                :    Case No. IPR2022-00602

LTD.,                            :    U.S. Patent No. 9,665,705

     Patent Owner.      :

- - - - - - - - - - - - - -x

Deposition of ANDREW SEARS, Ph.D.

Tuesday, November 8, 2022

7:58 a.m. CST

Job No.:  470087

Pages:  1 - 104

Reported by:  Tiffany M. Pietrzyk, CSR RPR CRR

Appx2837

Deposition of ANDREW SEARS, Ph.D., pursuant to notice, before Tiffany M. Pietrzyk, a Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter, and a Notary Public in and for the State of Illinois.

A P P E A R A N C E S

ON BEHALF OF THE PETITIONER:

JENNIFER C. BAILEY, ESQUIRE

ERISE IP

Suite 700

7015 College Boulevard

Overland Park, Kansas 66211

913.777.5600


ON BEHALF OF THE PATENT OWNER:

GEORGE SUMMERFIELD, ESQUIRE

DARLENE GHAVIMI, ESQUIRE

JONAH HEEMSTRA, ESQUIRE

K&L GATES, LLP

Suite 650

2801 Via Fortuna

Austin, Texas 78746

512.482.6800


ALSO PRESENT:

Jackson Schueler, Planet Depos Remote Tech

Transcript of Andrew Sears, Ph.D.
November 8, 2022                              4

C O N T E N T S

EXAMINATION OF ANDREW SEARS, Ph.D.          PAGE

  By Mr. Summerfield                            6

  By Ms. Bailey                                95

  By Mr. Summerfield                           99


E X H I B I T S

(Retained by counsel.)

DEPOSITION EXHIBITS                         PAGE

Exhibit 1001    United States Patent          10

                No. 9,269,208  B2

Exhibit 1003    Declaration of Dr. Andrew     11

                Sears in re '705

Exhibit         Declaration of Dr. Andrew     94

1003-208        Sears in re '208

Exhibit 1004    United States Patent          46

                Application Publication No.

                US 2004/0123113 A1

                Mathiassen, et al.

Exhibit 1005    U.S. Patent No. 6,766,456     61

Exhibit 1006    U.S. Patent No. 6,509,847     55

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    5

E X H I B I T S (Cont.)

DEPOSITION EXHIBITS                                    PAGE

Exhibit 1011    "Biometric Identification"           25

by Jain, Hong, and Pankanti

from February of 2000

Exhibit 1030    United States Patent                 77

No. 6,323,565 B1 Williams,

Jr., et al.

Exhibit 1034    European Patent Application          43

No. EP 0 330 767 A1 to

Araki, et al.

Exhibit 1041    K-9 Car Alarm Owner's Guide          77

and Installation

Instructions

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**Appx2841**

P R O C E E D I N G S

(Witness sworn.)

WHEREUPON:

ANDREW SEARS, Ph.D.,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:


EXAMINATION

BY MR. SUMMERFIELD:

Q. Good morning, Dr. Sears.

A. Good morning.

Q. My name is George Summerfield. I am an attorney at K&L Gates in Chicago. And we're here to take your deposition in a couple of inter partes reviews that are pending between Apple and CPC Technologies.

I know you've been deposed before; I know you've given testimony before. I don't want to spend a lot of time on the ground rules because I'm sure your counsel has gone through that with you. Just a couple things I do want to reiterate, though. Number one, as you heard in the instructions,

because we are taking a written record of what we do here today, only one of us should be talking at a time.  So I'll let you finish an answer before I ask my next question.  Please let me finish the question before you answer it.

And, from time to time, if Ms. Bailey has an objection, we need to let her say whatever she's got to say before we say anything else.  Okay?

A. Okay.

Q. Everything also has to be out loud to make sure the record is clear.  So no shakes or nods of the head in response to questions, shrugs of the shoulders.  Just everything has to be oral.  Okay?

A. Yes.

Q. If you need a break today, let me know. We'll take a break.  I just ask that any questions that are pending at the time are answered before we do so.  All right?

A. Yes.

Q. Ordinarily, you're -- you may have seen attorney catechism whereby exhibits are marked seriatim deponent name 1, 2, 3, 4.  Today we're not

going to do that.  We're actually going to refer to the exhibit numbers that these -- the documents that we are going to look at today already have in the IPRs and that you have referred to by those exhibits numbers in your declaration.  Your counsel has said that that's okay.  Is that okay with you as well?

A. Yes, that's fine.

Q. I mean, I'll make sure that we all understand what document we're on before we start asking questions about it.

But I understand from counsel that you have a hard copy of your papers and the various exhibits in front of you today; is that right?

A. Yes.

Q. All right.  What I will probably do for the vast majority of today is to have you refer to those paper copies rather than putting things up on the screen unless we need to.  And hopefully that will be more smooth than you having to manipulate an electronic version of the documents.  All right?

A. Sounds good.

Q. Do you have anything else in front of you

other than the -- the clean paper record from the two IPRs that we're here to talk about today?

A. Glass of water.

Q. Okay. Good, good. One less thing, as they say. All right.

Tell us your name, please.

A. Andrew Sears.

Q. And, Dr. Sears, in what city do you reside?

A. I reside in Port Matilda, Pennsylvania.

Q. Okay. So, as I mentioned before, we're here to take your deposition in connection with a couple of inter partes reviews. It's true, isn't it, that you have executed declarations in three different inter partes reviews for Apple against CPC; is that correct?

A. I believe so, yes.

Q. Okay. And the two that we're here to talk about today are with regard to two patents ending in the last three numbers '705 and '208. Is that your understanding?

A. Yes.

Q. And if I refer to those patents by those

last three numbers, you'll understand what I'm talking about?

A. Yes.

Q. Okay.  Can we go ahead and have put up the -- I guess the best way to refer to this is the patent ending in number '705.  Or, Dr. Sears, if you could find that patent for me, please.

A. Okay.

Q. And, for the record, that document bears Exhibit Number 1001 and the '705 IPR.

(Exhibit 1001 was marked for identification and was retained by counsel.)

Q. Dr. Sears, do you recall having reviewed that particular patent in connection with the work you've done for Apple in these different IPRs?

A. Yes, I do.

Q. All right.  And you also have your declaration in front of you; is that correct?

A. Yes.

Q. And, for the record, that document bears Exhibit Number 1003 and the '705 patent IPR.

///

(Exhibit 1003 was marked for identification and was retained by counsel.)

Q. Dr. Sears, does that declaration contain the opinions that you have formulated with regard to the '705 patent for purposes of that IPR?

A. Yes, it does.

Q. Can you describe, without divulging any communication you may have had with counsel, the process by which you prepared your declaration that is Exhibit 1003?

A. Sure.  I would describe it as a -- well, reading through the '705 patent, reading through a number of pieces of related art, having some conversations about different pieces of that.  And then it was a process of drafting the document and going through numerous iterations until we got to the point where the declaration represented my perspective on this case.

Q. All right.  If you'll turn to the last page of the declaration itself, you'll -- is that your signature there?

A. It is, yes.

Q. And what's the date that you signed the document?

A. The 22nd of February of 2022.

Q. Do you recall how much in advance of the 22nd of February, 2022, it was that you were first contacted in connection with this work?

A. Not offhand, no.

Q. Was it months?

A. I would believe it would have to be months, yes.  At least months.

Q. Okay.  So, going back to your description of how this was prepared, you said you reviewed a number of prior art references.  Obviously, you cite a number of prior art references in your declaration.

Who provided you with those, if anyone?

A. I think counsel provided some -- at least some of them.  I would have to go back and review them all in detail and review my records.  I don't know if I generated any of them myself or whether counsel had provided them.

Q. Well, let me ask, do you recall specifically

having found any yourself?  I understand you may not recall what -- you know, for each one who found what, but are there any that you recall having found yourself?

A.  I would have to review the complete collection.  We cited quite a few pieces of prior art.

Q.  Okay.  As we go through, I may ask you about particular references, and we can talk about those individually.

And then you said that there was a draft that was prepared?

Who prepared the first draft of your declaration?

A.  I think counsel provided some -- some of the initial text.

Q.  And by "initial text," what do you mean?

A.  Initial --

MS. BAILEY:  I'm going to interject here.

Counsel, your questions are starting to get into attorney-client privilege.

MR. SUMMERFIELD:  I don't know if they are;