**VOLUME II OF II (Appx2850-4401)**

**Nos. 2024-1278, 2024-1354**

# United States Court of Appeals
# for the Federal Circuit

CPC PATENT TECHNOLOGIES PTY, LTD.,
*Appellant*

v.

APPLE, INC.,
*Appellee*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00601, IPR2022-00602

## JOINT APPENDIX

GEORGE C. SUMMERFIELD
JONAH B. HEEMSTRA
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
george.summerfield@klgates.com

DARLENE F. GHAVIMI-ALAGHA
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, TX 78746
(512) 482-6800

*Attorneys for Appellant*

SETH W. LLOYD
BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6946
SLloyd@mofo.com

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Attorneys for Appellee*

July 31, 2024

**TABLE OF CONTENTS**
**APPENDIX INDEX**

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 31 | Final Written Decision - 35 U.S.C. §318(a) IPR2022-00601, 9/27/2023 | Appx1-Appx65 |
| 31 | Final Written Decision - 35 U.S.C. §318(a) IPR2022-00602, 9/27/2023 | Appx66-Appx125 |
| 1001 | U.S. Patent No. 9,269,208 to Burke, 2/23/2016 | Appx126-Appx146 |
| 1001 | U.S. Patent No. 9,665,705 to Burke, 5/30/2017 | Appx147-Appx168 |
| | Certified List of Materials from the USPTO for IPR2022-00601 | Appx169-Appx170 |
| | Certified List of Materials from the USPTO for IPR2022-00602 | Appx171-Appx172 |
| **Docket Entries for IPR2022-00601** | | |
| 1 | Petition for Inter Partes Review of U.S. Patent No. 9,269,208, 2/23/2022 | Appx173-Appx260 |
| 3 | Notice of Filing Date Accorded to Petition, 3/31/2022 | Appx261-Appx265 |
| 7 | Preliminary Patent Owner's Response, 6/30/2022 | Appx266-Appx292 |
| 17 | Patent Owner's Response, 12/22/2022 | Appx381-Appx419 |
| 30 | Oral Hearing Transcript, 6/29/2023 | Appx519-Appx571 |
| 32 | Patent Owner's Request for Director Review, 10/27/2023 | Appx572-Appx589 |
| 33 | Order Denying Director Review, 11/6/2023 | Appx590-Appx592 |
| 34 | Patent Owner's Notice of Appeal, 12/18/2023 | Appx593-Appx597 |
| **Exhibits for IPR2022-00601** | | |
| 1003 | Declaration of Dr. Andrew Sears | Appx1035-Appx1272 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 1004 | U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. | Appx1273-Appx1301 |
| 1005 | U.S. Patent No. 6,766,456 to McKeeth | Appx1302-Appx1311 |
| 1006 | U.S. Patent No. 6,509,847 to Anderson | Appx1312-Appx1326 |
| 1077 | Case No. 6:21-cv-00165 (W.D. Tex.), Claim Construction Order Dated February 10, 2022 | Appx2246-Appx2249 |
| 1089 | Deposition Transcript of Dr. William C. Easttom, III on February 27, 2023 | Appx2271-Appx2326 |
| 1090 | Supplemental Declaration of Dr. Andrew Sears | Appx2341-Appx2354 |
| 2010 | Deposition Transcript of Dr. Sears, Dated November 8, 2022 | Appx2836-Appx2940 |
| 2011 | Declaration of William C. Easttom II (Chuck Easttom) Ph.D., D.Sc. | Appx2968-Appx3003 |
| 2013 | Deposition Transcript of Dr. Sears, Dated May 19, 2023 | Appx3046-Appx3115 |
| **Docket Entries for IPR2022-00602** | | |
| 1 | Petition for Inter Partes Review of U.S. Patent No. 9,665,705, 2/23/2022 | Appx3204-Appx3284 |
| 7 | Preliminary Patent Owner's Response, 6/30/2022 | Appx3290-Appx3316 |
| 17 | Patent Owner's Response, 12/22/2022 | Appx3390-Appx3431 |
| 34 | Patent Owner's Request for Director Review, 10/4/2023 | Appx3525-Appx3541 |
| 35 | Order Denying Director Review, 11/6/2023 | Appx3542-Appx3544 |
| 36 | Patent Owner's Request for Rehearing of Director's Denial of Panel Review, 12/5/2023 | Appx3545-Appx3553 |
| 37 | Order Dismissing Request for Rehearing, 1/8/2024 | Appx3554-Appx3556 |
| 38 | Patent Owner's Notice of Appeal, 1/8/2024 | Appx3557-Appx3561 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
|  | **Exhibits for IPR2022-00602** | |
| 1003 | Declaration of A. Sears ('705 Patent) | Appx3811-Appx4030 |
|  | **Additional Materials** | |
| | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-01006, 11/30/2023 | Appx4220-Appx4307 |
| | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-01045 and IPR2022-01089, 12/20/2023 | Appx4308-Appx4401 |

they may.  And if --

Q. And, Dr. Sears, your counsel raised a point. If you believe that answering my question -- any questions requires you to divulge communications with counsel, please indicate that before you answer.

A. Okay.  I would say the -- the whole drafting process involved communication with counsel.

Q. Well, I'm not -- at this point all I'm asking for is a "who" as far as the first draft as opposed to "what."  So are you able to divulge who prepared the first draft of what you understood to be a draft of your declaration?

A. I -- a first draft of what ultimately became the declaration was provided to me.  I've reviewed all of that.  I've made many suggestions for changes and edits throughout the entire document to the point where I was comfortable that that represented my opinion on this case.

Q. Other than the documents that you refer to specifically in your declaration, do you recall having reviewed anything else in connection with the

preparation of your declaration?

A. Other than the documents that are cited?

Q. Yes.

A. I -- I don't recall reviewing any other specific materials.  I wouldn't be surprised if I looked at some additional materials and I didn't rely on them, but I don't recall any specific materials.

Q. Okay.  But, per your last answer, you don't recall anything that you relied upon in preparing your declaration that isn't cited in there?

A. No.

Q. Okay.  All right.  Let's go ahead and take a look at particular paragraphs, if we can.  If you could turn to paragraph 25 of Exhibit 1003, please?

A. Okay.

Q. And if you could just go ahead and read it to yourself and let me know when you're done.  I'm actually going to be asking you about the last sentence, but please read the whole thing and let me know when you're done.

A. Okay.

Q. Clarifying question on that last sentence, if a reference criticizes an invention, is it your understanding that that reference teaches away from that invention?

A. Well, what this states is that I was informed the reference does not teach away if it merely expresses a general preference for an alternative but does not criticize, discredit, or otherwise discourage. So I guess I would read that as a -- if it criticizes an invention, it may teach away, but it doesn't necessarily teach away from.

Q. Give me an example of when a reference would criticize an invention but not teach away from it.

A. Well, I think there are all sorts of different ways of criticizing a concept, and some of those criticisms are more severe and more significant, and some of them are not necessarily as significant. And it might criticize an aspect of the invention that isn't necessarily particularly important, given the direction you're intending to go. So I think it would all really depend on the context.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    17

Q. Well, for example, if a reference were to say that something were overly complicated, would you understand that generally to be a teaching away from that invention?

A. I would probably stick with my response. I think it depends on the context because that even "overly complicated" is a pretty broad statement.

Q. All right. Fair enough. Let's go to paragraph 30, if we can.

A. Okay.

Q. So if you could read that paragraph to yourself. Basically the way we'll handle this today, if it's okay with you, Dr. Sears, if I refer you to a paragraph, just why don't you go ahead and read it and then let me know when you're done. I want to make sure you have the paragraph in mind before I start asking questions, if that's okay.

A. Okay. Okay.

Q. All right. With regard to your discussion of "biometric signal" in that paragraph, does a physical attribute corresponding to a biometric signal need to be particular to an individual user?

A. Well, with that specific instruction that's presented there, it just says the physical attribute of a user, and then it does use examples that when -- I mean, depending on the implementation of the system, each of those has been identified as being unique to an individual, but it doesn't say that in the definition there.

Q. I understand that.  I'm asking for your understanding.  In other words, is it possible for two users to share the same physical attribute and, therefore, the same biometric signal?

A. Well, again, so the wording that is here just says that a physical attribute is something like a fingerprint, facial recognition, iris, retina, voice.  Depending on how you actually recognize those attributes, they may or may not be unique to an individual.  So you can have -- I mean, if you think about it, just the facial pattern, it would depend on what the definition of the facial pattern was in the system as to whether or not that's going to be unique to an individual.

Q. Well, Dr. Sears, you say the word in here.

This is your wording; right?

A. The quote there is what I was given.

Q. Okay. So with regard to the quote that you were given, do you understand that quote to allow for an attribute that is shared by more than one user?

MS. BAILEY: Objection. Scope.

A. So in the context of the patent, my understanding was that the intent was those were things that were unique to individuals. The definition that's presented here, it does not say that they have to be unique to individuals.

Q. What do you understand the significance of that definition to be?

MS. BAILEY: Objection. Foundation and clarification.

Q. All right. That's fine. That wasn't a great question.

Where do you understand that definition to have come from, Dr. Sears?

A. Well, to come from, I'd have to check on where the -- the claim construction was brought in

Transcript of Andrew Sears, Ph.D.
November 8, 2022                    20

from some other process.

Q. Well, you understand that to be a claim construction; right?

A. Yes.

Q. And what do you understand the purpose of that claim construction to have been?

A. Well, it was to define the term in the context of this patent.

Q. Right.  And you just testified a few minutes ago that, in the context of the patent, the intent is that an attribute be unique to individual users; right?

A. My understanding is that the -- in the context of the patent, that the intent is that you're using the biometric signal to identify an individual.

Q. Which means that the attribute --

A. Yes.

Q. -- corresponding to the biometric signal would need to be unique to the user; right?

A. Yes.

Q. Okay.  So you would expect this claim

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    21

construction to be consistent with that

understanding of the scope of the patent; correct?

        MS. BAILEY:  Objection.  Foundation.  And

form.

    Q. Go ahead.  You can answer that question,

Dr. Sears.

    A. My understanding is that that -- that the

intent is that this is defining how that term is

used in the context of the patent.  And, yes, in the

context of the patent, the biometric signals were

intended to identify individuals.  So that would be

the intent of this language.

    Q. The intent being that a physical attribute

be unique to a user; yes?

    A. I believe that is what was intended, yes.

    Q. Okay.  The accessibility attribute that you

reference in that paragraph, do you see that?

    A. Yes.

    Q. What is the difference in your understanding

in the claim construction for that term between

"whether" and "under which circumstances"?

        MS. BAILEY:  Objection.  Form.

A. So the "whether" piece means that the accessibility attribute is going to indicate whether or not access is granted.  And the "under which conditions" maps to under what conditions that outcome should be applied or is going to occur.

Q. Is it fair to characterize the "whether" piece as binary, yes or no?

A. I guess it depends on how you -- on exactly what you mean by that.  Could you rephrase?

Q. Sure.  You just -- I think you said that, for the "whether" piece, it's just a whether or not; right?

A. Yes.

Q. Okay.  Is that a binary inquiry, given the fact that all that is happening there is a determination of whether or not access is granted? Yes or no?

A. I think that the -- my understanding from the patent was that the "whether" piece dealt with the type of access that was being -- would deal with the type of access that was being granted.  I believe the patent -- I believe '705 talked about

several different types of access. So it didn't just talk about access or no access. It talked about different types of access.

Q. So I'll go back to my original question, then. What's the difference between the "whether" and "under which circumstances" pieces of the definition of accessibility attribute if "whether" also includes the type of access that's being granted?

MS. BAILEY: Objection. Foundation.

A. The "whether" is what type of access is being granted. The "under what conditions" would be what had to occur for that type of access to be granted.

Q. I guess I don't understand that answer, Dr. Sears. Can you explain it to me or give me an example?

A. Well, if we -- if you look -- I believe the '705 patent talks about the unconditional access being granted, it talks about a duress access being granted, and it talks about an alert access condition. So those are three different conditions.

The unconditional access might be granted when a user is simply authenticating and saying they want to access the item.  The duress access was illustrated by a scenario where the user is accessing the item but is indicating that they're under duress, that somebody is forcing them to access the system.  And the alert access condition was triggered when somebody who was not authorized tried to access the system.

So there were three different -- three different types of access -- unconditional, duress, and alert -- that result in different things happening.  And there were three different conditions under which those different types of access were initiated.

Q. Okay.  Let's go to paragraph 37 if we can.

A. Okay.

Q. There you discuss something called the knowledge-based approach.

Do you see that?

A. Yes.

Q. All right.  Let's go ahead and have pulled

up, if we can, what was marked for -- marked in the IPR as Exhibit 1011, and I'll get you what that is in a minute.  It should be a document entitled "Biometric Identification" by Jain, Hong, and Pankanti from February of 2000.

(Exhibit 1011 was marked for identification and was retained by counsel.)

A. Okay.  I have that.

Q. Okay.  First of all, this is not a reference that you understand to be contained in Apple's single invalidity challenge ground; is that correct?

A. I do not know.

Q. Do you understand how many challenge grounds Apple is urging in this case?

A. In this -- oh, like --

Q. This IPR.

A. This IPR.

Q. Yes.

A. I believe there was just one ground forward in this one; correct.

Q. And do you understand the references that are part of that challenge ground?

A. This is presented as background material. It is not part of the prior art that we're relying on directly.

Q. Okay. So this is not part of the three reference challenge ground --

A. Yes, correct.

MS. BAILEY: Objection. Form.

Q. Okay. All right. Let's go to page 3 of Exhibit 1011, if we can.

A. Just for clarity, that's the -- okay. Yeah. It says page 92 of the document but page 3.

Q. Yes. I'll be referring to physical pages --

A. Okay.

Q. -- here for the most part.

There's a paragraph that begins, [As read] Because knowledge-based and token-based approaches.

Do you see that paragraph?

A. On page 3?

Q. Yes.

A. Sorry. But actually I don't on page 3. Let me just make sure we're looking at the same pages.

MS. BAILEY: Counsel, if I may quickly

intervene, I also don't see a paragraph beginning on page 3 with that language.

MR. SUMMERFIELD: Did I cite the wrong page? That's possible. Can we go -- sorry. Can we blow that up because I'm having a hard time seeing it. Thanks. And then put it sort of in the middle.

All right. Maybe if we go to the previous page. Maybe I counted the cover page, which would be really embarrassing.

All right. Go down, please.

All right. Keep going.

All right. Well, there's -- all right. Sorry. Can we do a word search for "because knowledge-based"? There we go. I guess it doesn't start a paragraph. I apologize.

A. So that's the piece you're looking for?

BY MR. SUMMERFIELD:

Q. Yes, it is. Just that sentence. If you could read that yourself and let me know when you're done, please.

A. Okay.

Q. There's a reference in that sentence to an

impostor fraudulently acquiring the token or knowledge of the authorized person.

Do you see that?

A. Yes, I do.

Q. Is it possible to acquire biometric information of another person in the same fashion as is referenced here?

MS. BAILEY:  Objection.  Foundation.

A. I'm unaware of that, but that doesn't necessarily mean that it isn't theoretically possible.

Q. But I mean, that's the point of this sentence, right, that biometric-based security has its advantages over knowledge-based security because you can acquire knowledge; right?

A. Yes.  Yes.  The advantage is that you can acquire the knowledge.  You can learn somebody's password, or if there is a physical token that they're supposed to use, you can obtain that token. But at least in theory, you cannot obtain somebody's fingerprint or iris or other biometric.

Q. All right.  Let's go back to Exhibit 1003,

your declaration, if we can.  And let's go to paragraph 38.

A. Okay.

Q. So in that paragraph, there's a parenthetical quote from the reference you cite from pages 91 and 92.

Do you see that?

A. Yes.

Q. What do you understand "inherent attributes" to mean in the context of that quote?

A. I think the inherent attributes was intended to reference things such as the biometric signals.

Q. What does it mean to be inherent in that context?

A. Something which is essentially part of the person.

Q. And what makes something an inherent attribute as opposed to just a garden-variety attribute?

MS. BAILEY:  Objection.  Foundation.

A. Well, I think the intent in the context of this is that the inherent attributes are essentially

fixed, identifiable pieces of that individual that don't change.

Q. You'd agree with me that knowledge-based attributes are subject to change; is that correct?

A. Well, I think that's what this is trying to differentiate between, is the inherent attributes are essentially part of the individual versus a knowledge-based attribute is not part of the individual; it's just something that they've remembered.

Q. Okay. In that paragraph, there's also a parenthetical quote from page 92.

Do you see that quote?

A. Yes.

Q. What do you understand the term "biometric sensor" to mean in that context?

A. I might be missing -- I don't think biometric sensor is referenced in that quote.

Q. Sorry. Let me see where it is.

MR. SUMMERFIELD: Actually, can we just go ahead and have paragraph 39 of Exhibit 1003 put up?

MR. HEEMSTRA: Pardon me, if I may. This is

exhibit -- this is an IPR number 601. I think we're looking for 602, Exhibit 1003.

MR. SUMMERFIELD: Oh, I'm sorry. Yes. We should be on the '705 patent, if we're not. Just so we're all on the same page.

A. That's the one I'm looking at.

MR. SUMMERFIELD: Okay. Let's go ahead and put that one up, if we can, Jackson.

BY MR. SUMMERFIELD:

Q. So if you look at the sentence that bridges those two pages, Dr. Sears, it says, "During the enrollment phase, the biometric characteristic of an individual is first scanned by a biometric sensor."

A. Yes.

Q. "Require digital representation of a characteristic."

Do you see that?

A. Yes.

Q. What do you understand the term "biometric sensor" to mean in that context?

A. It is some presumably electronic device that is capable of recognizing -- of capturing

information about whatever biometric characteristic that you're interested in.  So it might be a sensor that scans a fingerprint, as an example.

Q. Dr. Sears, how does one know that something is a biometric sensor as opposed to some other kind of sensor?

MS. BAILEY:  Objection.  Foundation.  And form.

A. I think in the context of this, it is simply -- it's really a sensor that is being used to capture some biometric characteristic of the individual.

Q. As opposed to something that captures the knowledge of the individual, for example?

A. That would be one differentiation.  I was just thinking of it simply in terms of a sensor can capture a lot of different pieces of information. And you may use the same sensor to capture biometric -- a biometric characteristic as you would use to capture some other nonbiometric characteristic; just some other -- as an example, a sensor that's capturing some visual representation

of the user can capture a lot of images.  But it's a biometric sensor if it's being used to capture, say, the facial pattern of an individual.

Q. If a sensor is only capturing the knowledge of an individual, would that sensor be properly characterized as a biometric sensor?

A. I don't think that would be characterized as a biometric sensor, no.

Q. Let's go to paragraph 40, if we can.

A. Yeah.  Okay.

Q. Okay.  So in the first sentence, the thing that makes the unique patterns form via the ridges and bifurcations on the skin of fingerprints are what makes fingerprints a biometric as opposed to something else; right?

A. That is my understanding, yes.

Q. All right.  Let's go to paragraph 41, if we can.

A. Okay.

Q. So in the second sentence, the discussion of mug shots, the idea there is that one person would match the mug shot; right?

A. I think that was the intent of that.

Q. In other words, it's not possible to teach someone else how to match a mug shot; right?

MS. BAILEY: Objection. Foundation.

A. That was the example that I used to illustrate. I think the point was simply that if you -- you're trying to match some known collection of biometric characteristics. So in that context, the facial pattern and presumably mapping those things so you identify it.

Q. Right. But more specifically to my question, I couldn't teach you how to match my mug shot; right?

MS. BAILEY: Objection. Foundation and form.

A. I don't think that was the intent of what I was trying to convey there, no.

Q. I'm sorry. I don't understand that answer.

Is my statement correct? It can't teach someone to match someone else's mug shot?

A. I just don't know where that's coming from. I don't believe that's the case, no.

Q. I'm trying to figure out why mug shots are different than knowledge-based security.  And the reason, isn't it, is because you can't teach a mug shot; right?

MS. BAILEY:  Objection.  Foundation and form.

A. Can't teach -- the -- the point was simply that the mug shot is a -- if we think about it in terms of a facial pattern, I think that was one of the examples of biometric characteristics or biometric signals.  That that is supposed to be a unique identifier of an individual.  So if you're matching a person's face to mug shots, in theory you should be able to match to the correct individual.

Q. Right.  What I'm trying to do is draw a box around what's a knowledge-based security mechanism, what's a biometric.  Okay?  So in the case of mug shots -- for example, I can give you my personal identification number to unlock something; right?

A. Yes.

Q. And you can learn that personal identification number; correct?

A. Yes.

Q. And by having that PIN, you would be able to unlock whatever my PIN has been applied to; right?

A. Yes.

Q. In the case of a mug shot, I can't teach you my mug shot, can I, such that you would be able to match the mug shot?

A. Okay.  Now I think I understand your question.  So, no, you can't teach me your mug shot so that I can then use your mug shot to access a system.  I think that's what you're trying to --

Q. Okay.

A. -- say.

Q. All right.  Let's go to paragraph 47, if we can.

A. Okay.

Q. Dr. Sears, in the second sentence of that paragraph, the various biometric sensors that were taught in the prior art, do you recall any of the prior art that you looked at teaching a capacitive touch sensor as constituting a biometric sensor?

MS. BAILEY:  Objection.  Foundation.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    37

A. So just clarity, you say "a capacitive touch sensor."  Are you referring to essentially a capacitive touchscreen type of technology?

Q. As an example, sure.

A. I think the ones that I remember are dealing more with what were described here.  It's optical -- optical scanners of various kinds, voice capture technologies.  I don't have a complete list of the sensors that could possibly be used, but those are the ones that come to mind.

Q. No, I understand that.  But do you recall the prior art teaching, generally, that capacitive touch sensors should be included in the list of things that were considered to be biometric sensors?

MS. BAILEY:  Objection.  Foundation and scope.

A. In the context of a capacitive touch sensor, as I understand it, which I relate to more of a touchscreen technology, I don't recall that being listed as -- well, I don't recall it being listed specifically as a technology for capturing biometric signal.

Q. Okay.  And in your opinion, is a capacitive touch sensor screen a biometric sensor?

MS. BAILEY:  Objection.  Foundation and scope.

A. Yeah, I would be -- I guess I would be hesitant to say definitively one way or another.  I have not thought about the -- well, I haven't thought -- how should I say? -- I haven't thought deeply about whether or not you could use a capacitive touch sensor to capture biometrics of a user.

Q. Well, assuming the touch sensor, the capacitive touch sensor only detects touch, whether there's a touch or not, would you consider that to be a biometric sensor?

A. I think you're getting into some hypotheticals that are hard to really assess because exactly what it captures -- if it generates a single point of contact for when the user touches the screen and that's all it generates, that would probably -- off the top of my head, it's challenging to see how that's going to capture the biometrics of

Transcript of Andrew Sears, Ph.D.
November 8, 2022                    39

a user.

Q. Well, for example, we talked a few minutes ago about my giving you my PIN number and you could use that to unlock a device that I've applied my PIN number to; right?

A. Yes.

Q. And you're familiar with, for example, cellular telephones from days gone by, and even today, where one can use a PIN number on a touchscreen to unlock the phone; right?

A. Yes.

Q. And as long as you know the PIN number and you're touching the right numbers on the capacitive touch sensor, you can unlock the phone; correct?

A. Yes.

Q. Anyone could do that in that circumstance; right?

A. If you're doing a PIN-based access and the user knows the PIN and all that's being captured is whether or not they entered the correct PIN, yes.

Q. And you'd agree with me, wouldn't you, that in that circumstance, the capacitive touch sensor is

not acting as a biometric sensor; right?

A. In that scenario, it was described as just capturing whether or not they touched a certain sequence of numbers in a certain order. That wouldn't be -- that does not seem to be capturing biometric information.

Q. Okay. Let's go to paragraph 49 if we can.

A. Okay.

Q. So, in the first sentence, you reference the execution of the matching step being performed by a controller or a processor.

Do you see that?

A. Yes.

Q. In the context of the prior art that you reference there, are you aware of any other device that could have performed that matching step other than a controller or a processor?

MS. BAILEY: Objection. Foundation.

A. Just reflecting back on the prior art, off the top of my head, to me, I cannot think of a situation where some kind of controller or processor is not involved in doing that matching.

Q. Okay.  Let's go to paragraph 57, if we can.

A. Okay.

Q. So here you discuss Morse Code.  Would you agree with me that Morse Code is properly characterized as a knowledge-based system?

A. Yes.

Q. In other words, once I know Morse Code, I can tap out whatever the dots and dashes are representative of the message I want to send?

A. Yes.  The purpose of this was simply to highlight the fact that a single input -- for a very long time, we've known that we can use a single input to enter multiple different types of information.  This happens to be a knowledge-based approach, yes.

Q. All right.  Let's go to paragraph 58, if we can.

A. Okay.

Q. Here you discuss the Williams references disclosure of a one-press, two-press system.

Do you see that?

A. Yes.

Q. Was that a biometric signal, in your understanding?

A. I don't believe that was a biometric signal. That was a physical button that the user was pressing.

Q. And, again, that's something that anyone with the device in hand could press either once or twice to get the same result?

A. Yes.

Q. Okay.  Let's go to paragraph 62.

A. Okay.

Q. In the middle of that paragraph, there's a sentence that reads, [As read] Araki similarly discloses invoking certain commands based on user input but does so via a touch sensor without sensing a user's fingerprints.

Do you see that?

A. Yes.

Q. How does it do that?

A. I'd have to refer.

Q. Okay.

A. Okay.

Q. Let's go ahead and get out Araki, which, for the record, is marked as Exhibit 1034 to the IPR.

(Exhibit 1034 was marked for identification and was retained by counsel.)

Q. And, Dr. Sears, as you're reviewing that reference, the question I would like you to answer first is what device does Araki teach in order to detect a tap?

A. Okay.

That -- in that portion of Araki, they refer to a touch panel.

Q. And would that touch panel be collecting biometric signals, in your understanding?

A. Based on what I've reviewed right here, I don't believe that touch panel is capturing biometric signals.

Q. In other words, the user input that Araki teaches would be knowledge-based; is that fair?

MS. BAILEY:  Objection.  Foundation.

A. In this particular context, Araki is talking about finger movements on the screen, which include direction and duration.  So that would be a

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    44

combination of things that the user remembers and
then applies.

Q. In other words, if I have entered a series
of movements and durations as my code for the Araki
device, I could teach you what those are; right?

A. I believe that is the case in Araki, yes.

Q. And then you would be able to use those
movements and durations to unlock the device as
well; is that right?

A. I believe so.

Q. All right.  Let's go back to your
declaration to paragraph 64, if we can.

A. Okay.

Q. The Hoffman reference that you discuss in
that paragraph, does Hoffman teach an example of the
whether and under which conditions pieces for access
being allowed, in your opinion?

MS. BAILEY:  Objection.  Scope.

A. I haven't expressed an opinion on that at
that -- this point.  Let's see.

Q. Okay.  And by the way, Dr. Sears, if you
don't have an opinion on something, especially per

your counsel's objection, that's a perfectly fine answer.  I do not -- I don't think your counsel does either -- want you forming opinions on the fly.  Okay?

A. Okay.  Let me just reread the Hoffman section just real quickly.

Q. Please do.

A. Yeah.  I guess I'm reading through, and it does talk about different ways that users can access it, but I would want to analyze it in more detail before expressing an opinion on whether or not it explicitly teaches the whether and under what conditions.

Q. Okay.  Let's go to paragraph 86, if we can, of your declaration.

A. Okay.

Q. Now, in that paragraph, you reference other commands that can be implemented through the use of the user's fingerprint movements.

Do you see that?

A. Yes.

Q. Why don't we go ahead and have you pull out

Mathiassen, which is Exhibit 1004 to the IPR?

(Exhibit 1004 was marked for identification and was retained by counsel.)

A. Okay.

Q. You've read patents before in connection with your experting work; is that correct?

A. Yes.

Q. And you understand that when you're reading a patent, when you look at the claims, you have independent claims and dependent claims; right?

A. Yes.

Q. And an independent claim stands alone; is that correct?

A. Correct.

Q. And a dependent claim would include all the limitations from the independent claim from which it depends; is that right?

A. Can you just repeat that question?

Q. A dependent claim would include all the limitations of the independent claim from which it depends; correct?

A. Yes.

Q. In addition to any other limitations contained in the dependent claim itself; right?

A. Yes.

Q. And you also understand, when you're reading the claims of a patent, the different words in the various claims are presumed to have different meanings; is that right?

MS. BAILEY: Objection. Scope.

A. If words have meaning -- so different words particularly have different meanings, yes.

Q. Okay. And you also understand, don't you, that when you read a prior art reference for its teachings, you're supposed to be reading the whole thing and not just parts of it; right?

A. Yes.

Q. Okay. Let's turn to claim 18, if we can, of Mathiassen.

A. Okay.

Q. Now, about the middle of that claim, you'll see a reference to fingerprint sensor 5.

Do you see that?

A. Yes.

Q. And you understand that to be the device that's sensing the actual fingerprint of the user; is that right?

MS. BAILEY: Objection. Scope.

A. I believe that is the biometric sensor for this.

Q. Okay. Now take a look at claim 20, if you would.

A. Okay.

Q. And you'll see that claim 20 depends from claim 18; is that right?

A. Yes.

Q. And, as we talked about a few minutes ago, that means that claim 20 also includes everything in claim 18; right?

A. Yes.

Q. Including the fingerprint sensor; is that correct?

A. Yes, it does have the fingerprint sensor.

Q. Okay. It also has something in the second limitation after the preamble called a "movement-analyzing means."

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    49

Do you see that?

A. Yes.

Q. And as also we talked about a few minutes ago, that, because it's something worded differently, it's different than the fingerprint sensor; right?

MS. BAILEY:  Objection.  Scope and foundation.

A. Well, as I look at it, I guess what I'm thinking is that claim 20 has a fingerprint sensor, and the movement-analyzing means could be a version -- I mean, it could be, but it doesn't have to be part of that fingerprint sensor.

Q. What's detecting fingerprint movement in claim 18, i.e., the claim without the movement-analyzing means, if you know?

A. I can't say off the top of my head, but -- I'd have to read through in more detail.

Q. But you'd agree with me that, again, given the way one reads claims, the movement-analyzing means has to mean something different than the fingerprint sensor -- right? -- because different

words are being used?

MS. BAILEY:  Objection.  Foundation and scope.

A. I think, in this context, in claim 18, in theory, the fingerprint sensor could have had the capability of analyzing movement, but it wasn't necessary for claim 18.  So it wasn't described in that way.  The same sensor could appear in the system described within claim 20 that does use that capability.

Q. Dr. Sears, that wasn't my question.

My question was, because the term "fingerprint sensor" is used in one location and movement-analyzing means, which are different words -- you'll agree with me on that point; correct?

A. Yes.

Q. -- is used in another location, given what you said earlier about different words having different meanings in claims, that means they mean different things; right?

MS. BAILEY:  Objection.  Mischaracterizes

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                        51

the testimony of the witness.

A. Well, with regard to whatever I might have said previously, I think what I would want to say here is that, in claim 18, it describes a fingerprint sensor.  So it's something that has to be able to sense a fingerprint.  That is inherited over to claim 20 where they're talking about a movement-analyzing means.  So something has to be analyzing the movement.

That doesn't preclude the fingerprint sensor from being the device that's being used to do that.  It doesn't say it is.  It doesn't say it isn't.  But it could be.  It just wasn't necessary and wasn't described in that way in claim 18.

Q. So just to be clear, is it your understanding that claim 20 expressly teaches the fingerprint sensor also being the movement-analyzing means?

MS. BAILEY:  Objection.  Scope.

A. I don't think it expressly teaches it.  It allows for that to be the case, but it doesn't expressly teach that that is the case.

Q. So you're saying it allows for the fingerprint sensor to also be the movement-analyzing means, even though different words are used?

A. It's the movement-analyzing means in the form of hardware or software movement-analyzing program module.  So it says one form could be a hardware form.  That could be that it was embedded into a fingerprint sensor.  Or it might be accomplished in some other way.

Q. Dr. Sears, did you look at this wording from claims 18 and 20 in Mathiassen in forming your opinions as to what it taught, as far as you recall?

A. I know I've read all of Mathiassen more than once.

Q. Do you recall having noted this particular wording as between claims 18 and 20?

A. I don't recall specifically whether I focused on that or not.

Q. And certainly, as far as you recall, it's not anywhere in your declaration, is it?

A. Off the top of my head, I certainly couldn't point to a place where I reference those two

specific items.

Q. All right.  Let's go back to Exhibit 1003, if we can.

A. Okay.

Q. Let's go to paragraph 97.

A. Can we take a break?

(A short break was had.)

BY MR. SUMMERFIELD:

Q. Dr. Sears, can we just go back to Mathiassen for a minute and the topic we were talking about about the finger movements?

A. Sure.

Q. So as you note in paragraph 86, these finger movements can be used to implement additional commands other than just "open door"; correct?

A. Yes.

Q. What other kinds of commands could be implemented through the use of these finger movements?

A. I believe Mathiassen also talks about a command to lock the doors, and there's also reference to enrolling other users in the system.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                          54

Q. Well, would these finger movements be usable
to send additional duress commands?

A. I think that the fingerprint -- the
biometric sensor -- using the biometric sensor, the
user can enter information that would invoke duress,
enrolling other users, opening doors, locking doors.

Q. I'm asking about the fingerprint movement
specifically now, Dr. Sears.  Would the fingerprint
movement that you reference in paragraph 86 that's
taught in Mathiassen be usable to implement, for
example, a duress signal?

A. Well, I think Mathiassen presents a couple
of different ways that a duress signal could be
introduced.  It could either be through a series of
actions with a single finger, or it could be using a
different finger.  So, you know, that -- the
fingerprint movements could be one of a variety of
ways of indicating a duress signal.

Q. And these fingerprint movements, I believe
as you opine elsewhere, don't have a durational
component -- is that right? -- in Mathiassen?

A. If I recall correctly, Mathiassen does not

explicitly teach using duration.

Q. Nonetheless, these fingerprint movements could be used to generate a duress signal, in your opinion; right?

A. They would be one of a variety of ways that that could be done, yes.

Q. Okay.  Now we can go back to your declaration, paragraph 97.

A. Okay.

Q. What is the touch interface that you reference there from Anderson?

And, by the way, are you looking at Anderson now?  Just so the record is --

A. Yes, I am.

Q. Thank you.  And just, again, for identification purposes, Anderson is Exhibit 1006 to the IPR.

(Exhibit 1006 was marked for identification and was retained by counsel.)

A. I'm sorry.  Can you remind me of the question?

Q. What is the touch interface that you

reference in paragraph 97?

A. So Anderson refers to a touch interface repeatedly throughout the patent, and, in various places, it makes reference to different technologies, including in one place where it refers to a digitizer touch pad, cursor control stick, touchscreen or the like. So they're leaving it pretty open to various technologies that the ability to sense when the user is touching them.

Q. All right. You understand that the teachings of Anderson make a fingerprint sensor optional; right?

MS. BAILEY: Objection. Foundation.

A. Well, the only teaching from Anderson that we rely on is this idea that you can have durations attached to -- you can use duration as part of assessing when somebody is in contact -- is making a contact of some kind. So to go more general than that, I'd have to spend a little bit more time going back through the patent.

Q. Do you understand that -- you talked about a digitizer before, right, as part of Anderson's

teachings?

A. Yes.

Q. Is the digitizer that Anderson describes, as far as you understand it, a biometric sensor?

A. The digitizer that they mention may or may not be.  Again, the only teaching that I really rely on out of Anderson is the idea that, when you're touching -- when you're measuring when somebody has their finger down, that you can use the duration of that contact as one of the factors in kind of determining what they intend to do.

Q. I understand that, Dr. Sears.

But my question very specifically is, did you see any teaching in Anderson that talks about using duration when a biometric sensor is involved?

A. And, again --

MS. BAILEY:  Objection.  Form and foundation.

Q. And if the answer is "I don't have an opinion on that," Dr. Sears, that is fine if that is true.

A. Then I was -- I don't have an opinion on

that because I have not looked at Anderson for that specific detail.

Q. Would you characterize the pressure and duration patterns that Anderson teaches as knowledge-based?

A. Yes, I think when you start using things like the amount of pressure that you need to apply, and you might have a light pressure or more forceful pressure or a short contact or a long contact, that is starting to leverage some knowledge-based.

Q. Well, is there any biometric-based information in that kind of a sequence where pressure and number is varied, according to Anderson?

A. I would have to go back and look for it.  I can't give you an opinion on that right now.

Q. But you'd agree, if what we're talking about is a variation in pressure and number, I could teach you that if that were my code and you could unlock a device using that same number and pressure variation; right?

A. Yes.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                    59

MS. BAILEY:  Objection.  Scope and foundation.

Q. All right.  Let's go back to your declaration and go to paragraph 117, if we can.

Let me know when you're done reviewing that paragraph, if you would, please.

A. Okay.

Q. What you're telling us here, just so I understand it, is that your opinions rely upon more than just the car unlock embodiment of Mathiassen; is that correct?

A. That's correct.

Q. Paragraph 130.

A. Okay.

Q. Your opinion expressed here is that Mathiassen's teachings whether or not to grant access is just that, a whether or not to grant access; right?

MS. BAILEY:  Objection.  Form.

A. Well, Mathiassen teaches outputting an accessibility attribute, which teach whether and under what conditions to provide access.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    60

Q. Other than the "grant unlimited access" attribute, does Mathiassen teach any other kind of attribute, as far as you know?

A. I think Mathiassen makes it obvious that there are other types of attributes and that there are other types of access.

Q. Which is another way of saying, no, it doesn't expressly teach that?

MS. BAILEY: Objection. Form.

A. I think Mathiassen teaches the outputting of an accessibility attribute, and it renders obvious there are other accessibility attributes.

Q. Which is another way of saying it doesn't expressly teach those other attributes; right? That's why you use the word "obvious" in your answer instead of here is the teaching?

MS. BAILEY: Objection. Form.

A. So, again, I mean, it teaches the one accessibility attribute, that's correct.

Q. Does it teach any other? You understand the difference between an express teaching and an obvious advance --

A. Yes, I do.

Q. -- correct?

A. Yes. And I believe it teaches that one accessibility.

Q. But not others. That's the piece I'm still not hearing in your answer.

A. Yes.

Q. Sorry?

A. I thought I was clarifying, but correct, it teaches the one attribute, and it renders the others obvious.

Q. Paragraph 137.

A. Okay.

Q. Does McKeeth teach an automotive embodiment, as far as you recall? And if you need to look at it, please do.

A. Yeah.

MR. SUMMERFIELD: For the record, that's Exhibit 1005 to the IPR.

(Exhibit 1005 was marked for identification and was retained by counsel.)

A. Based on my quick review, I don't believe

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    62

McKeeth teaches an automotive embodiment.

Q. Well, do you recall in your opinion relying upon any automotive embodiment that McKeeth taught?

A. I do not.

Q. Okay.  Let's go back to your declaration and turn to paragraph 141, if we can.

Sorry.  Actually, let's go to paragraph 161.

A. Okay.

Q. So here you discuss the prior art teaching of pushing a button in a key fob.

Do you see that?

A. Yes.

Q. And by doing so, this would trigger the automobile's computer to send out an alarm.

Do you see that?

A. Yes.

Q. Would it have been possible to modify Mathiassen's teachings with a similar press-type button?

MS. BAILEY:  Objection.  Form and foundation.

A. I mean, I think you could certainly have

added a physical button to Mathiassen.

Q. So if one of ordinary skill in the art were thinking, well, I like the fingerprint application of Mathiassen for door unlock, but, gosh, I'd like to be able also to send out a duress signal if need be.

A button would be a viable way of doing that with Mathiassen; right?

MS. BAILEY:  Objection.  Form.

A. A button would have required adding some additional hardware to it where the -- there are other options as well.

Q. But that is a possibility; right?

A. It would be a possibility.

Q. Okay.  And in the case of modifying Mathiassen to add a durational component or to program additional commands as a result of fingerprint movement, that would require programming the software and perhaps modifying the fingerprint reader to accommodate those additional features; is that correct?

A. It would involve at least programming the

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                    64

software.

Q. And perhaps even modifying the fingerprint sensor, or do you have an opinion on that?

A. I don't have an opinion on that at the moment.  I haven't really thought about that.

Q. Do you have an opinion as to which would have been simpler as between adding a button and reprogramming the software to the extent necessary to accommodate these additional features?

MS. BAILEY:  Objection.  Form and foundation.

Q. And again, Dr. Sears, if the answer is "No, I don't," that's fine.

A. I think it would depend on exactly who you're talking to and what -- and a lot of details of the context.  One involves changes of the hardware; the other involves changes to the software.

Q. Do you --

A. -- could be easier.

Q. Do you have an opinion as to which would be the case in this circumstance?

Transcript of Andrew Sears, Ph.D.
November 8, 2022                    65

A. I think if you already had the system -- if the system existed, then changing the software is arguably easier than modifying -- physically modifying the hardware.

Q. When did you come to that conclusion, Dr. Sears?

MS. BAILEY:  Objection.  Foundation.

A. Hardware -- well --

Q. When did you come to that conclusion in the context of the question I just asked you?

A. When?

Q. Uh-huh.

A. I was -- I was thinking about it at this moment.

Q. Okay.  And have you determined what kind of software modifications would need to be made to Mathiassen to accommodate a durational component?

MS. BAILEY:  Objection.  Form.

A. I have not analyzed that.

Q. And as you say throughout your declaration, push-buttons on key fobs to send signals were fairly well known; right?

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                66

A. Yes.

Q. And to your knowledge, did anything in the prior art use a biometric sensor to accommodate a durational component to a biometric signal?

MS. BAILEY:  Objection.  Form.

A. I haven't rendered an opinion on that.  I'd have to look at the literature.

Q. Well, do you recall having opined that you saw anything in the prior art that taught using a biometric sensor to register a durational component to a biometric signal?

MS. BAILEY:  Objection.  Form.

Q. Just out of curiosity, Dr. Sears, what are you looking at right now?

A. I'm looking at the -- no -- Appendix A of my declaration.

Q. Okay.  Actually, Dr. Sears, let me see if I can make this easier for you.

A. Okay.

Q. Before, we were talking about Anderson.  And that is the reference that you said you relied upon for the notion that you could add a durational

component to a biometric signal; right?

A. Correct.

Q. As we talked about, you didn't opine that what did that in Anderson was a biometric sensor; right?

MS. BAILEY: Objection. Form.

A. I don't believe I expressed an opinion on that, no.

Q. Okay. And you didn't point to any other prior art reference that included a durational component to a biometric signal; right?

A. For that, I need to look back at my --

Q. Okay. Then please continue.

A. Yeah.

Q. Dr. Sears, I'm really not asking you to formulate an opinion on the fly here. I'm just asking you, based upon the work you've already done and what's contained in the four corners of your declaration, do you recall having seen anything where you talk about in your declaration that uses a biometric sensor to register durational component of a biometric signal?

A. I understand. I'm just going through that specific piece of the declaration right now. That's all I was doing.

Q. It looked like you were looking at the references too.

A. Well, I was taking a quick glance at -- in that case it was Williams, but that's because I got to Williams. So I mean, I can -- I can finish reading through this, if you like or --

Q. Is there any place in your declaration where you would expect that particular opinion to be so you don't have to go through all 200-and-however --

A. Yes.

Q. -- many pages it is?

A. I'm not going through the several hundred pages. I'm looking at one specific section that has three additional pages.

Q. Okay. Please go ahead.

A. So I think there are other -- I mean, just to kind of bring this one to close potentially, there are other references that deal with biometric sensors and also deal with temporal aspects of the

Transcript of Andrew Sears, Ph.D.
November 8, 2022                         69

input, which is essentially what we're dealing with
here.

Q. Which ones are you referring to?

A. So not quite sure how you pronounce the
name, but Exhibit 1031 talks about a fingerprint
detection interface and also includes things such as
tapping, double tapping, and other interactions.
And those inherently involve some kind of temporal
assessment as you're determining whether something
is a tap, a double tap, or two separate taps.

Q. Okay.  Two things.  First of all, because
you use the word "inherent," I'm assuming that means
that you don't find an express teaching of a
durational component in that reference; right?

MS. BAILEY:  Objection.  Foundation.

A. I would have to read that reference to say
one way or the other.

Q. And, secondly, a tap, a single tap, or
double tap doesn't necessarily have a durational
component, does it?

A. You have to have some kind of timing
characteristics in order to have taps and double

Transcript of Andrew Sears, Ph.D.
November 8, 2022                          70

taps.

Q. Does the tap itself have to have a particular duration?

A. There is timing involved in determining whether something is a tap, because they also talk about swiping movements. Swiping movements are different than tapping movements. Duration is one of the factors that comes into play with that.

Q. Dr. Sears, in the three-reference combination that Apple is using for its single challenge ground, the thing you point to for the durational component is Anderson; right?

A. That is the prior art that I use to provide a very clear illustration; duration can be used, yes.

Q. And the other two references, Mathiassen and McKeeth, don't talk about duration, do they? Well, let's put it this way. You didn't opine that they do; right?

A. That is correct.

Q. Okay. Dr. Sears, did you opine that it would be even possible to modify Mathiassen's

specific fingerprint reader to account for duration?

A. I don't recall whether I expressed an explicit opinion on that or not.

Q. Do you have an opinion as to whether it's even possible to make that modification to the touch sensor taught in Mathiassen?

MS. BAILEY:  Objection.  Form and foundation.

A. I think generically the idea of a touch sensor, you can certainly integrate timing into that.

Q. And, Dr. Sears, if it's possible, using the fingerprint movements taught in Mathiassen to generate a duress signal, as you testified earlier, why would it be necessary to add a durational component?

MS. BAILEY:  Objection.  Form.

Q. Let me ask the better question.  Given your earlier testimony that you can generate a duress signal using movement alone, it wouldn't be necessary to add a durational component to generate such a signal; right?

MS. BAILEY: Form. Objection.

A. There are a variety of ways you could generate a duress signal, but as I explained in my declaration, I think there was a clear motivation as to why you would want to combine Mathiassen and Anderson.

Q. Dr. Sears, that wasn't my question.

You testified earlier that, using Mathiassen, one could generate a duress signal using finger movements alone?

Do you recall that testimony?

A. Yes.

Q. Given that fact, if one were looking to generate a duress signal and one could do so using movements alone, there would be no need to add a durational component, would there?

A. I didn't opine on whether there would be a need. I opined on whether or not there would be a motivation to combine with another reference to provide that because I think that there would be. But it is not necessary to do that. But it is --

Q. One could use the movements by themselves to

generate such a signal; right?

A. That is something that could be done.

Q. Uh-huh.  And if one had already done that, there would be no need to add a durational component; right?

MS. BAILEY:  Objection.  Form.

A. I think it depends on context.  I think it depends on what you're trying to accomplish with the system.

Q. Sending a duress signal, Dr. Sears, it's what we've been talking about.  If one is able to program -- to program Mathiassen, which I believe we've agreed one can do, using fingerprints -- finger movements alone to generate a duress signal and one had done that, there would be no need to add a durational component, would there?

A. If one had already done it, there is no need, but that's not what we're dealing with here. We're dealing with whether or not -- I was looking at whether or not there is a motivation to bring in this idea of using duration, because I think when you look at the complexity of what's involved to

recognize those movements, you can have a simpler solution using the duration-based approach, among other things.

Q. But one would need incremental programming to account for duration; right?

MS. BAILEY: Objection. Form and foundation.

A. You would have to change the system in some way to do something different, yes.

Q. And if one were just doing movements, one wouldn't need to account for duration; right?

MS. BAILEY: Objection. Form.

A. I don't know that that's necessarily true because the way the movements are characterized often does include dealing with a durational component.

Q. But Mathiassen teaches using movements without any reference to duration at all; right?

A. They do talk about using movements. They don't explicitly talk about using duration.

Q. Okay. Paragraph 229.

A. Okay.

Q. You say that it was [As read] well known that creating a quickly, easily, and most importantly, natural-functioning entry system is vital in portable electronics using input devices was also desirable, and their making user manipulation of such devices easy was a key feature.

Do you see that?

A. Yes.

Q. And you believe that to be true; correct?

A. Yes.

Q. And in determining how one might modify an existing system, this particular consideration would be a key feature; correct?

A. It would certainly be one of the things you would consider, yes.

Q. And so it's fair to say the simpler the better in making any modification to existing systems?

MS. BAILEY:  Objection.  Form and foundation.

A. I guess the question is when you're -- where are you applying the word "simpler"?  Is simpler

with regard to the end result or the process of getting to the end result?

Q. Well, in the context of what you say here, that one -- it was preferable to create a quickly, easily, and most importantly, naturally functioning entry system.

A. Okay.  So the end result is what that was referring to.

And so now can you repeat the question so I can answer it correctly?

Q. Well, you say, "end result."  The sentence goes on, [As read] In portable electronics using input devices, it is also desirable, and making user manipulation of such devices easy was a key feature.

Do you see that?

A. Yes.

Q. That's not talking about the end result, is it?

A. Well, I guess it's talking about the -- what the user has to do to actually use the system. That's what I was referring to by the "end result."

Q. Would you agree that a push-button system,

as taught by Williams, is an easy-to-use system?

MS. BAILEY: Objection. Foundation. Form.

A. I think there are lots of systems that are easy to use. Push buttons are easy to use. The fingerprint sensor can be easy to use.

Q. Exhibit 1041, if you could pull that out, please?

(Exhibit 1041 was marked for identification and was retained by counsel.)

A. Okay.

Q. Does this reference teach -- involve biometric sensing?

MS. BAILEY: Objection. Foundation and scope.

A. So, based on a quick scan, I do not believe it talks about biometric sensing.

Q. Exhibit 1030, same question.

(Exhibit 1030 was marked for identification and was retained by counsel.)

A. So, without having gone through the entire patent, I mean, based on my initial scan of some key pieces, I don't see this reference to biometric

signals.

Q. Okay.  Can we go to paragraph 213 -- I'm sorry -- 218 of your declaration.

A. Okay.

Q. You say Anderson similarly teaches finger presses to the fingerprint sensor comprising the access code.

Can you show me where Anderson teaches finger presses corresponding to the access code applied to the fingerprint sensor?

A. So I think where I was -- what I was drawing on was in column 7 of Anderson where it talks about, [As read] For example, the access code may be utilized to verify identifying information entered by the user via the keyboard.  Similarly, in an exemplary embodiment, digitizer pad may include an optical scanner or a thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered and verified against the stored fingerprint template.

Q. In that circumstance, what's gathering the access code?  Or -- actually, strike that.

When the fingerprint sensor isn't there, what's gathering the access code?

A. Some other sensor that can determine contact and pressure.

Q. The digitizer; correct?

A. I mean, the digitizer is one of the embodiments that they talk about.

Q. Is there any other embodiment that's used to collect the code itself in Anderson?

A. They talk about a variety of things.  They talk about a digitizer pad, cursor control stick, touchscreen, or the like.  So they talk about a variety of different technologies that can be used.

Q. So, other than the teaching that you just read us, is there anyplace else that you think Anderson teaches tapping a code on the fingerprint sensor?

A. I can continue reading.

Well, I think, in a way, throughout the entire discussion, because, I mean, at this point, they've made the digitizer pad analogous to a fingerprint -- to a sensor that can pick up your

fingerprint.  So wherever they're talking about the idea that the digitizer pad can be used to capture the duration and pressure and the access code, they seem to be allowing for that option of the fingerprint to be part of that process.

Q. My question is where does it teach having the fingerprint sensor register the code as opposed to just the fingerprint data?

MS. BAILEY:  Objection.  Form.

A. I think the part that I was -- already addressed talks about that.  It talks about the fact that you're capturing the fingerprint, as they say, as the pressure access code is entered.  So as the user is entering that access code, the fingerprint is being captured.  I mean, doesn't that address what you're asking?

Q. No, because what you say specifically is that, in paragraph 218, [As read] Anderson similarly teaches finger presses to the fingerprint sensor comprising the access code.

And where we started with all of this, I think, is where that's taught.  And then I asked you

what captures the access code when there's no fingerprint sensor.

A. When there's no fingerprint sensor, it's using the touchscreen or whatever other technology happens to be provided in the system.

Q. And you'll agree with me that Anderson's teachings make clear that even when there's a fingerprint sensor, the digitizer is still there; right?

MS. BAILEY:  Objection.  Form and foundation.

A. I think you're -- can you repeat the question?

Q. You'll agree with me that, according to Anderson's teachings, when read in their entirety, even when there is a fingerprint sensor included, there's also the digitizer or the like in the Anderson device that's described; right?

A. I think those end up being the same device.

Q. What's your basis for saying that?

Actually, let me be very clear with what I'm asking.

A. Yeah.

Q. Where in Anderson do you see a teaching that the digitizer and fingerprint sensor are the same thing?

A. Well, I'm reading this as saying the digitizer pad includes the optical scanner or thermal sensor. So as part of that digitizer pad, there is the optical scanner and the sensor. So it's -- the fingerprint sensor is embedded into that digitizer pad.

Q. So the digitizer pad is still there even when the fingerprint sensor is there; right?

A. In my reading --

MS. BAILEY: Objection. Form.

A. In my reading that the digitizer pad is the fingerprint sensor.

Q. Okay. Let's turn to column 1 of Exhibit 1006 starting at line 54.

A. Column 1? Can you repeat what I'm looking for?

Q. Column 1, line 54.

A. The same reference?

Q. Exhibit 1006, Anderson, yes.

A. Okay.  That's what I was trying to confirm. Okay.

Q. It says, [As read]  Other methods, such as fingerprint recognition and the use of electronic keys, e.g., radio frequency identification, RFID, transponders containing an access code utilize specialized equipment and may require sophisticated software for implementation.

Do you see that?

A. Yes.

Q. Do you understand that passage, given especially where it appears in the patent, to be drawing a distinction between, for example, fingerprint recognition and the invention of Anderson because of the sophisticated software required for the forma?

MS. BAILEY:  Objection.  Scope and foundation.

A. Okay.  Can you repeat the question?  I was just reading that paragraph.

Q. Sure.  Do you understand this passage,

especially given where it appears in the Anderson reference, to be drawing a distinction between, for example, fingerprint recognition, which requires sophisticated software and additional hardware on the one hand, and the invention of Anderson, which would not implicitly?

MS. BAILEY:  Objection.  Form.

A. Well, I guess I'm having a little difficulty reconciling that particular interpretation because they go on to explicitly talk about having fingerprint recognition as part of it.  So I don't think they're saying that they don't have fingerprint recognition.  They're just saying, these are some alternative approaches.  And at least in one instance, they are actually apparently including fingerprint recognition within the invention that they're disclosing.

Q. At the risk of re-hoeing old ground, Dr. Sears, Anderson does make fingerprint technology optional as a feature in its described device; right?

A. Anderson does not make fingerprint

technology required.  It does not.

Q. Is that the same way of saying it's optional?

A. Yes.

Q. Okay.  And when -- by the way, that passage that we just talked about from column 1, what part of the patent is that in?

A. It's in the background of the invention.

Q. And do you understand typically when a patent has a background section, it's describing the prior art?

A. Yes.

Q. And the prior art --

MS. BAILEY:  Objection.  Objection. Foundation.

Q. And the problems with the prior art?

A. I think it's providing -- it's describing a combination of problems.  It's describing motivation for the system that's being put forward.

Q. The motivation for doing something else; right?

MS. BAILEY:  Objection.  Form.

A. I mean, in particular, motivation for doing what they're describing.

Q. Uh-huh. So, again, you wouldn't expect to see them touting the benefits of the prior art in the background section; right?

MS. BAILEY: Objection. Form. Foundation. And scope.

A. I think the prior art is usually laying a foundation. It's providing a foundation in context for why the invention that's being disclosed is presumably of value.

Q. And just to be clear on the passage we've looked at, you don't understand the characterization of fingerprint recognition as utilizing special equipment and maybe requiring sophisticated software for implementation as a positive, do you?

MS. BAILEY: Objection. Form.

A. I think it's providing an explanation of what is required if you were to choose to use that particular type of approach, in which case there are many -- and there are many reasons why you might want to use that particular approach.

Q. Dr. Sears, my question has to do with the express language here, not what may also --

A. Okay.

Q. The language that the inventor chose to use here, you don't consider that a positive feature of fingerprint recognition, do you?  The fact that there may be the need for specialized equipment and sophisticated software?

MS. BAILEY:  Objection.  Form and scope.

A. I would have a hard time characterizing it as positive or not positive because I think it all depends on the context.

Q. How about the context in which it appears in Anderson since that's what we've got?

A. Well, when I'm talking about context, I'm talking about the context in which you're trying to do something; the application that you're trying to use.  There might be -- there might be scenarios. There are plenty of scenarios where having sophisticated specialized equipment and sophisticated hardware is absolutely essential and important.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                                          88

Q. So you don't have an opinion one way or the other as to whether this passage is denigrating or touting the prior art?

A. I think it's providing some factual information about the prior art.

Q. So, again, my question, Dr. Sears, irrespective what else may be true, is you don't have an opinion on whether this passage is denigrating or touting the prior art; right?

MS. BAILEY:  Objection.  Foundation.

MR. SUMMERFIELD:  The foundational objection as to whether he has an opinion?

MS. BAILEY:  I don't know what prior art you're referring to in your question; so that is my objection.

MR. SUMMERFIELD:  The prior art that's been referred to in the passage we've been talking about for the last five minutes.

BY MR. SUMMERFIELD:

Q. Go ahead, Dr. Sears.

A. Well, to be clear, they don't actually reference any specific piece of prior art.  They

reference technologies and concepts.

Q. As your counsel suggested, yes.  But my question is, do you understand this passage to be denigrating or touting prior art?  And if you don't have an opinion, you can just say, "I don't have an opinion," and we can move on.

A. I would not characterize it as denigrating or touting the prior art.  I think it's presenting facts about the prior art.

Q. Okay.  Let's go back to paragraph 218 of your declaration, if we can.

A. Can we take a break at some point?

Q. I'm almost done.  I'm literally -- if we can just get through the rest of this relatively efficiently, I can be done in the next five minutes or ten minutes.

A. Okay.  Let's keep going.  218.

Q. Paragraph 218.

A. Okay.

Q. You use the term "fingerprint access code." Does that phrase appear anywhere in Anderson, to the best of your recollection?

A. Just to get me started, can you point to where in 218?  It's a long paragraph.  I can read it or --

MR. SUMMERFIELD:  Let's have it put up on the screen, please.

Q. Well, actually, putting aside that, do you see the phrase "fingerprint access code" anywhere in Anderson, or do you recall it being there?

A. Just to be -- to be careful, I do want to know where I reference in here just in case I point to somewhere in Anderson.

Q. I can represent that you do not.  But we can put it up on the screen if you'd like, and we can figure out where it is.

MR. SUMMERFIELD:  Jackson, why don't we do that.

A. It would be faster if you can just search for "fingerprint access code."  That would save a moment.  Oh, actually, here we go.

MR. SUMMERFIELD:  I think "fingerprint" is one word, Jackson.

A. I think I found the reference.  It's kind of

in the middle of the paragraph. "Employing the fingerprint access code via the optical scanner."

Q. There you go. If it's easier, we can just have Anderson put up, and we can do another word search to verify it's not there?

A. If you would like to do that, that would probably be faster.

Q. So Anderson is 1006.

A. Yeah, I think he has to pull up 1006 and search in that for "fingerprint access code." I mean, I don't know if that specific phrase is in there. I will point back to paragraph -- or column 7 where it talks about capturing the image of the user's fingerprint as the pressure access code is entered. So it's a combination of fingerprint and the access code being entered at the same time.

Q. Thank you for that clarification, Dr. Sears. I hadn't actually asked the question yet.

A. Okay.

Q. So you'll see from the search that the term "fingerprint access" isn't in there -- is not in Anderson. Do you see that?

A. Yes.

Q. So it's fair to say that the "fingerprint access code" phrase is not something you're quoting from Anderson but something that you, in fact, came up with yourself?

A. It wasn't --

MS. BAILEY:  Objection.  Form and foundation.

A. I don't believe my declaration presented it as a quote, and therefore, I don't think I'm quoting from it.  I do think it's referring to this idea, as I said, in paragraph -- or column 7 where it talks about the access code and capturing the fingerprint at the same time.

Q. So these are two different bits of information albeit captured simultaneously; is that fair?

MS. BAILEY:  Objection.  Foundation.

A. I guess I would characterize it as one thing that's being captured, and there are several parts to that thing.  Just like any of the other access codes or when you're -- like many other access codes

where there are multiple things being captured. Here, you need it to verify the fingerprint, you need to verify the access code, and they're done at the same time.

Q. So, Dr. Sears, again, just going back, when the fingerprint sensor is not present in the Anderson device -- you agree that's a possibility taught by Anderson?

A. Yes.

Q. And the access code is entered.  You'll agree that no fingerprint data is being recorded in that circumstance; right?

A. When there's no method of capturing a fingerprint, there's no fingerprint information being recorded.

Q. Yet the access code is still being recorded; correct?

A. Yes.

Q. Okay.

MR. SUMMERFIELD:  Let's go ahead and have -- I don't know -- I guess maybe the best way to do this would be just to reference -- okay.  Let's go

ahead and if you could take out your declaration for the 2008 -- or '208 -- sorry -- IPR.

MS. BAILEY:  Counsel, with respect to the break, do you think you are close to being done?

MR. SUMMERFIELD:  Depends on the answer to this next question.  I'm assuming we can get through this in a question or two.

MS. BAILEY:  Okay.  Great.

MR. SUMMERFIELD:  But, yeah, I really -- I'm not gonna go through all this again.  Don't worry.

A. Okay.

(Exhibit 1003-208 was marked for identification and was retained by counsel.)

BY MR. SUMMERFIELD:

Q. Dr. Sears, you have in front of you the declaration that you executed in connection with the '208 patent IPR.  That's also Exhibit 1003; is that correct?

A. Yes.

Q. And the process of preparation of that declaration would be similar to the one you described before with regard to the '705 patent?

A. Correct.

Q. If I were to go through and ask you the same questions about this declaration that I asked you about the one for the '705 patent, do you have any reason to believe that your answers would differ materially?

A. I don't believe so.

MR. SUMMERFIELD:  That's all I have.

MS. BAILEY:  Let's take a short break, and I want to see if I have any questions for redirect.

MR. SUMMERFIELD:  Okay.

(A short break was had.)

EXAMINATION

BY MS. BAILEY:

Q. Dr. Sears, I have a few questions for you.

A. Okay.

Q. Could you please turn to Mathiassen, which is Exhibit 1004 of the '705 IPR, and specifically paragraph 192 of Mathiassen?

A. You want me to read it first or --

Q. Yes, please go ahead and read the paragraph.

A. Okay.

Transcript of Andrew Sears, Ph.D.
November 8, 2022                    96

Q. Does Mathiassen teach a fingerprint sensor for sensing biometric information?

MR. SUMMERFIELD:  Objection.  Leading.

A. It teaches a fingerprint sensor for capturing and processing the information, biometric information.

Q. Can a user input code or commands via the fingerprint sensor?

MR. SUMMERFIELD:  Same objection.

A. Can you repeat the question?

Q. Sure.  Can the user input code or commands via the fingerprint sensor?

A. Yes.

Q. Does the fingerprint sensor detect a touch of the user's finger?

A. I believe the fingerprint sensor senses when you touch the sensor, yes.

Q. Does the fingerprint sensor detect a series of finger movements across the fingerprint sensor?

A. Yes, it does.

Q. And these finger movement sequences can be "touch" and 'no touch' finger movement sequences?

A. Yes, they can.

Q. Could you please turn to your Exhibit 1003 in the '705 IPR?

A. Okay.

Q. Please turn to paragraph 221, which is on page 151.  And please go ahead and read that paragraph.

A. Okay.

Q. Does modification of Mathiassen's fingerprint sensor to include detecting a duration of the "touch" or "no touch" finger movement sequences allow for a simplified input of a command or code?

MR. SUMMERFIELD:  Objection.  Leading.

A. I believe it does, yes.

Q. Could you please turn to paragraphs 223 through 224 and go ahead and read those to yourself, please?

A. Okay.

Q. Mathiassen describes finger movements across the fingerprint sensor; is that correct?

MR. SUMMERFIELD:  Objection.  Leading.

A. Yes.

Q. In your opinion, is detecting a duration of a "touch" or "no touch" finger press less complex than detecting finger movements across the fingerprint sensor?

A. Yes.

Q. Could you please expand upon that opinion?

A. I think, at a minimum, it is easier because, as I state in paragraph 223, when you're using a sensor where you're sliding your finger, where there is movement, there's distortion of the fingerprint as you're doing that.  So there's extra processing involved in addressing that distortion and recognizing the fingerprint and the movement correctly, whereas if you're just touching your finger down and lifting it up, you don't have to deal with that distortion and you're just measuring the duration of the contact.

Q. In your opinion, what would be needed to modify Mathiassen's fingerprint sensor to detect a touch, no touch press of a particular duration?

A. Some very minor software modifications.

Transcript of Andrew Sears, Ph.D.

November 8, 2022                    99

MS. BAILEY:  Thank you, Dr. Sears.  That's all I have.

FURTHER EXAMINATION

BY MR. SUMMERFIELD:

Q. Dr. Sears, have you ever programmed a touch sensor interface?

A. At what level are you referring?

Q. At any level.  Let's start with that.

A. I have certainly written software that has received information from touch sensors and processed it, yes.

Q. Have you ever dealt with a -- have you ever programmed fingerprint sensor software?

A. I have not written software to recognize fingerprints, no.

Q. Have you modified software that recognizes fingerprints?

A. I have not modified software recognizing fingerprints.

Q. Is it fair to say that this is the first case where you've addressed the question of how simple or difficult it would be to modify

fingerprint recognition software to accomplish a certain thing?

A. It is the first case where I've opined on that. I do just want to clarify, what we're talking about here is modifying the touch, no touch sensing piece of it and duration of that, and that I've done plenty of times.

Q. That would be generic to any touch sensor, whether it's fingerprint-based or not; right?

A. When you're -- when you get a signal saying that there's been contact and you get signal saying there's been no contact, that piece of it.

Q. Your answer to your counsel's question about how easy or difficult that would be, that's in the general context of simply whether there's a touch or not; right?

A. It's a measure or in response to the idea of measurement duration of an event.

Q. Specifically a touch or not; right?

A. Well, I think more generically of an event. I mean, events occur. And so, in this case, we're dealing with when you've touched the screen and when

you've lifted your finger off the screen.

Q. But, Dr. Sears, just cutting to the chase here, the duration of a football game isn't the same as a duration of a touch on a touch sensor; right?

A. No.

Q. Those are fundamentally different things even though both have durations?

MS. BAILEY: Objection. Form. Foundation.

A. Different events are different, yes.

Q. Right.  And what we're talking about here specifically and what your counsel asked you about just a minute ago had to do with a duration of a touch on a touchscreen; right?  Or did you understand the question to be the duration of anything?

A. It was --

MS. BAILEY: Objection. Form.

A. I understood it to be the duration of contact when the user is putting their finger on the screen, on the sensor and lifting it off.

Q. Whether that's a simple touch sensor, fingerprint sensor, or anything; right?

A. If it is a sensor that senses contact and the release of contact.

Q. And, just to be clear, you have never dealt with programming a fingerprint sensor to register duration, have you?

A. I have not.

MR. SUMMERFIELD:  That's all I have.

MS. BAILEY:  No further questions from me.

(Off the record at 10:56 a.m.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, TIFFANY M. PIETRZYK, Certified Shorthand Reporter No. 084-004371, CSR, RPR, CRR, and a Notary Public within and for the State of Illinois, do hereby certify:

That ANDREW SEARS, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me before the commencement of such deposition and that such deposition was taken before me and is a true record of the testimony given by such witness.

I further certify that the adverse party was represented by counsel at the deposition.

I further certify that the deposition of ANDREW SEARS, Ph.D. occurred virtually via Zoom videoconference, on Tuesday November 8, 2022, commencing at 7:58 a.m. CST to 10:56 a.m. CST.

I further certify that I am not related to any of the parties to this action by blood or marriage, I am not employed by or an attorney to any of the parties to this action, and that I am in no way interested, financially or otherwise, in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of November, 2022.

My commission expires:  February 28th, 2024

_____

NOTARY PUBLIC IN AND FOR THE

STATE OF ILLINOIS

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**PATENT TRIAL AND APPEAL BOARD**

APPLE INC.,
Petitioner

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner

CASE: IPR2022-00601
U.S. PATENT NO. 9,269,208

**DECLARATION OF DR. WILLIAM C. EASTTOM III**

CPC EXHIBIT 2011
**Appx2968**   Apple Inc. v. CPC Patent Technologies PTY Ltd.
IPR2022-00601

IPR2022-00601
U.S. Pat No. 9,269,208

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................1

II.     BACKGROUND ......................................................................................2

III.    RELEVANT LEGAL STANDARDS .........................................................7

        A.      Obviousness...................................................................................7

        B.      Presumption of Validity ...............................................................10

        C.      Claim Construction........................................................................10

IV.     LEVEL OF SKILL IN THE ART ............................................................11

V.      OPINIONS REGARDING APPLE'S INVALIDITY GROUND ................12

        A.      Accessibility Attribute..................................................................15

        B.      Series of Entries of the Biometric Signal, Said Series Being
                Characterised According to at Least One of the Number of Said
                Entries and a Duration of Each Said Entry ........................................22

        C.      Populate the Data Base According to the Instruction ........................29

        D.      Independent Claims 9 and 10 ...........................................................33

        E.      Dependent Claims 3-7, 11, and 13 .....................................................33

**Appx2969**

IPR2022-00601
U.S. Pat No. 9,269,208

I, Dr. William C. Easttom III, do hereby declare and say:

## I.    INTRODUCTION

1.    I am over the age of twenty-one (21) and competent to make this declaration. I am also qualified to give testimony under oath. The facts and opinions listed below are within my personal knowledge.

2.    I have been engaged in this matter to provide my independent analysis of certain issues I understand arise in connection with the above-mentioned *Inter Partes* Review of U.S. Patent No. 9,269,208 (which I refer to as "the '208 Patent") (Ex. 1001).

3.    I have considered the documents cited throughout this declaration, including the '208 Patent (Ex. 1001), and have been asked to provide my opinions on how those skilled in the art (as defined herein) would understand those documents. I provide my conclusions regarding the disclosures of these documents below.

4.    I have also not formulated any opinions regarding patent validity in light of any prior art other than that cited by Petitioner Apple Inc. ("Petitioner" or "Apple"). For the cited prior art, I have examined that art in light of the arguments made by Apple, the opinions expressed by Dr. Andrew Sears ("Dr. Sears"), and the preliminary determination by the Patent Trial and Appeal Board ("Board") in instituting this *inter partes* review.

1

5.    I am not offering any conclusions as to the ultimate determinations that I understand the Board will make in this proceeding. I am simply providing my opinion on the technical aspects of the documents.

## II.    BACKGROUND

6.    I have 30 years of experience in the computer science industry including extensive experience with computer security, computer software, and computer networking. I have authored 37 computer science books, including textbooks used at over 60 universities around the world. I also have authored over 70 research papers and am an inventor with 25 patents, including patents related to computer networking.

7.    I hold a Doctor of Science (D.Sc.) degree in Cyber Security from Capitol Technology University (Dissertation Topic: "A Comparative Study of Lattice Based Algorithms for Post Quantum Computing"). I also hold a Doctor of Philosophy (Ph.D.) in Technology (focused on nanotechnology. Dissertation Topic: "The Effects of Complexity on Carbon Nanotube Failures") from Capitol Technology University. I also have a Doctor of Philosophy (Ph.D.) in Computer Science from the University of Portsmouth (Dissertation Topic: topic "A Systematic Framework for Network Forensics Using Graph Theory"). I also hold three master's degrees (one in Applied Computer Science, one in Education, and one in Systems Engineering).

2

8.  I am currently an Adjunct Lecturer for Georgetown teaching graduate courses in requirements engineering and cryptography. I am also an adjunct for Vanderbilt University teaching graduate computer science courses, specifically courses in quantum computing and digital forensics.

9.  I am a Senior member and Distinguished Speaker for the Association of Computing Machinery (ACM) and a Senior Member and Distinguished Visitor of the Institute for Electrical and Electronics Engineering (IEEE). The IEEE is the world's largest and preeminent engineering organization. Among other activities, the IEEE creates industry standards for a wide range of engineering disciplines, including software development standards. I am also a Distinguished Visitor of the IEEE. I have been involved in IEEE standards creation for several years:

    a.  I worked on the DevOps 2675 standards group from 2017 to 2019.

    b.  I am also currently the Vice Chair of the IEEE p23026 Standards Group "Systems and Software Engineering -- Engineering and Management of Websites for Systems, Software, and Services Information."

    c.  I am the Chair of IEEE P3123 Standard for Artificial Intelligence and Machine Learning (AI/ML) Terminology and Data Formats.

    d.  I am a member of IEEE P2995 - Trial-Use Standard for a Quantum Algorithm Design and Development Standards Group from 2021 to

3

present.

e. I am a member of the IEEE Engineering in Medicine and Biology Standards Committee. Standard for a Unified Terminology for Brain-Computer Interfaces P2731 from 2020 to present.

f. I am also a member of the IEEE P3120 Working Group Quantum Computing Architecture.

10. I have extensive experience with mobile devices including mobile device security. I have worked with mobile devices for the last decade, including training law enforcement and DoD personnel in mobile device forensics. Several of the textbooks and research papers I have authored deal with mobile device operating systems:

a. Easttom, C. (2013). System Forensics, Investigation, and Response, 2nd Edition. Burlington Massachusetts: Jones & Bartlett.

b. Easttom, C. (2017). System Forensics, Investigation, and Response, 3rd Edition. Burlington Massachusetts: Jones & Bartlett.

c. Easttom, C. (2021). Digital Forensics, Investigation, and Response, 4th Edition. Burlington Massachusetts: Jones & Bartlett

d. Easttom, C. (2021). An In-Depth Guide to Mobile Device Forensics. CRC Press.

e. Easttom, C., Sanders, W. (2019). On the Efficacy of Using Android

4

Debugging Bridge for Android Device Forensics. IEEE 10th Annual Computing and Communication Conference UEMCON.

11. I am also very experienced with authentication including biometrics. Several of my published textbooks cover biometrics, including:

    a. Easttom, C. (2005). Introduction to Computer Security. New York City, New York: Pearson Press

    b. Easttom, C. (2011). Introduction to Computer Security, 2nd Edition. New York City, New York: Pearson Press.

    c. Easttom, C. & Dulaney, E. (2015). CompTIA Security+ Study Guide: SY0-401. Hoboken, New Jersey: Sybex Press.

    d. Easttom, C. (2015). Modern Cryptography: Applied Mathematics for Encryption and Information Security. New York City, New York: McGraw-Hill Publishing.

    e. Easttom, C. (2016). Computer Security Fundamentals, 3rd Edition. New York City, New York: Pearson Press.

    f. Easttom, C., & Christy, R. (2017). CompTIA Security+ Review Guide: SY0-501. Hoboken, New Jersey: Sybex Press.

    g. Easttom, C. & Roberts, R. (2018). Networking Fundamentals, 3rd Edition. Goodheart-Wilcox Publishing.

    h. Easttom, C. (2019). Computer Security Fundamentals, 4th Edition.

New York City, New York: Pearson Press.

    i. Easttom, C. (2022). Networking Fundamentals, 4th Edition. Goodheart-Wilcox Publishing. (Writing is complete as is editing, it will be published later this year).

    j. Easttom, C. (2022). Modern Cryptography: Applied Mathematics for Encryption and Information Security 3rd Edition. New York City, New York: Springer Press.

12. In addition to the summary, I have provided here, I describe my qualifications, issued patents, publications, and experience as an expert witness in greater detail in my curriculum vitae ("CV") which is Exhibit 2012 to this proceeding.

13. In the past five years I have testified on 45 occasions in hearings, trials and depositions. My entire record of testifying is in my curriculum vitae (Ex. 2012).

14. I am being compensated at my usual rate of $400/hour. No part of my compensation is contingent upon the outcome of this case nor upon my opinions.

15. The materials I have considered in rendering the opinions set forth herein are identified in this Declaration.

## III.  RELEVANT LEGAL STANDARDS

16. I am not a lawyer, and have relied upon counsel to explain the relevant legal

tests. I express no opinion regarding whether counsel's explanation was correct. For purposes of forming my opinions, I have assumed that such explanation was correct.

17. I understand that Apple is challenging the validity of claims 1, 3-7, 9-11, and 13 of the '208 Patent over *Mathiassen* (Ex. 1004) in view of *McKeeth* (Ex. 1005) and *Anderson* (Ex. 1006). Paper No. 1 at 4. The basis for this challenge is the alleged obviousness of those claims.

**A. Obviousness**

18. I understand that for a patent claim to be found obvious, it must be shown that the claim would have been obvious to a POSITA at the time of the invention.

19. I understand that obviousness may be shown by considering one or more pieces of prior art and/or the knowledge of a POSITA.

20. I understand that the following factors should be evaluated to determine whether the claimed subject matter is obvious: (1) the scope and content of the prior art; (2) the difference or differences, if any, between each claim of the patent and the prior art; (3) the level of ordinary skill in the art at the time the patent was filed; and (4) the objective evidence of non-obviousness, sometimes called "secondary considerations."

21. I understand that obviousness requires a reason to combine the teaching of the prior art references to achieve the claimed invention, and that the POSITA

7

must have had a reasonable expectation of success in doing so. Thus, it is my understanding that simply showing that each of several claimed elements was independently known in the prior art is not enough.

22.    Additionally, I understand that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be non-obvious.

23.    I further understand that in determining whether a claimed invention would have been obvious to a POSITA, it is necessary to avoid distortion caused by hindsight bias, which is likely to be present where the asserted motivation to combine does not provide a sufficient reason, supported by rational underpinnings, for combining the references in the claimed manner. I understand that the determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention. Rather, I understand that there must be a teaching or suggestion within the prior art, or within the general knowledge of a POSITA in the field of the invention, to look to particular sources of information, to select particular elements, and to combine them in the way they were combined by the inventor.

24.    I have been informed that relevant considerations for combining references include at least the following:

(A)   Combining prior art elements according to known methods to yield predictable results;

(B)   Simple substitution of one known element for another to obtain predictable results;

(C)   Use of known techniques to improve similar devices, methods, or products in the same way;

(D)   Applying a known technique to a known device, method, or product ready for improvement to yield predictable results;

(E)   "Obvious to try" - choosing from a finite number of identified, predictable solutions with a reasonable expectation of success;

(F)   Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art; and

(G)   Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

25.   I was asked to assess combinability without using "hindsight" reasoning. Instead, I was asked to consider the feasibility and combinability of the

9

**Appx2978**

asserted prior art references through the eyes of a POSITA as of August 13, 2003.

26. I understand that "secondary considerations" are also to be considered when assessing obviousness, including commercial success; long-felt but unresolved need; failure of others to solve the problem; unexpected results; copying of the invention by others; and industry praise. I also understand there must be a nexus between the secondary considerations and the claimed subject matter.

27. I have kept these considerations in mind when offering the opinions below regarding combinability.

## B. Presumption of Validity

28. I understand that an issued patent is presumed to be valid. Each claim of a patent shall be presumed valid independently of the validity of other claims. Dependent claims shall be presumed valid even if dependent upon an invalid claim. I understand that the presumption of validity requires a Petitioner to prove invalidity based on a preponderance of the evidence.

## C. Claim Construction

29. I have been informed that the challenged claims are generally given their "plain and ordinary" meaning, which is the meaning they would have to a POSITA at the time of the invention, in light of the claims, specification, and

prosecution history.

30. I understand that many sources can be used to ascertain the meaning of claims, including "intrinsic" evidence—claims, specification, prosecution history; and "extrinsic" evidence—expert testimony, dictionary definitions, and other evidence external to the patent itself.

31. I have been instructed to use the claim constructions on which the Board relied in Paper No. 11 at 12-14. To the extent I have applied a construction in addition to the Board's constructions, I have provided the basis for my understanding of that particular claim term in the relevant section.

## IV. LEVEL OF SKILL IN THE ART

32. I have been informed that a POSITA, in the context of a patent validity challenge, refers to a hypothetical person who is presumed to have known the relevant art at the time of the invention. I understand that many factors may be considered in determining the level of ordinary skill in the art. Those factors include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. I understand that a POSITA is also a person of ordinary creativity, not an automaton.

33. Apple has proposed that one of ordinary skill in the art at that time "would

11

have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year experience in the field of human-machine interfaces and device access security, and "[a]dditional education or experience may substitute for the above requirements." Paper No. 1 at 3. I have no basis for disagreeing with that characterization, but note that I satisfied those criteria on August 13, 2003.

## V.    OPINIONS REGARDING APPLE'S INVALIDITY GROUND

34.    As part of my work in this proceeding, I assessed Apple's and Dr. Sear's opinions that Claims 1, 3-7, 9-11, and 13 of the '208 Patent are rendered obvious by *Mathiasson* in view of *McKeeth* and *Anderson*. I disagree.

35.    As an initial matter, authentication is divided into three types. Type I is something you *know* (i.e., a password, pin, etc.). Type II is something you *have* (i.e., a key, swipe card, etc.). Type III authentication is something you *are* (i.e., a biometric signal).[1] Variations of these three types have been developed such as the use of tokens.

36.    Type III authentication, otherwise known as biometric authentication has the advantage of being directly tied to a specific user. The Department of

---

[1] https://www.cs.cornell.edu/courses/cs513/2005fa/NNLauthPeople.html

Homeland Security states "Biometrics are unique physical characteristics, such as fingerprints, that can be used for automated recognition."[2]

37.    While biometric authentication is not new, there are numerous divergent methods of accomplishing biometric authentication. A search for "biometric" in Google patents conducted on November 15, 2022, yielded over 135,000 results. This demonstrates that simply having technology related to biometric authentication does not in any way anticipate the '208 Patent. Rather, this demonstrates the diversity in approaches to biometric authentication.

38.    In his report Dr. Sear's spends many paragraphs discussing rolling codes and Bluetooth technology. However, this is not relevant to the inventive aspects of the '208 Patent. The '208 Patent discloses rolling codes and encrypted Bluetooth, specifically stating "the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol." Ex. 1001, 2:36-39; 3:4-5.  However, Dr. Sears does not point to is any prior technology that discloses "a secure access signal **conveying information dependent upon said accessibility attribute**, wherein the secure access signal comprises one of at least a rolling code, an encrypted Bluetooth™ protocol, and a WiFi™ protocol." *Id.*  (Emphasis added).

---

[2] https://www.dhs.gov/biometrics

39. Bluetooth, WiFi, rolling codes, or other transmissions are just that, transmission mediums. These transmission mediums may communicate a wide range of different data. The '208 Patent lists these protocols as possible transmission mediums for the secure access signal.

40. Dr. Sears devotes an entire section of his report, beginning at paragraph 60 to discussion of a series of entries. Ex. 1003, ¶ 60-66. In that discussion, Dr. Sears discusses Morse code, *Williams* (Exhibit 1030 to Dr. Sears report), and similar technology. Dr. Sears examples are entirely irrelevant to the '208 Patent. The '208 Patent discloses "receiving a series of entries of the biometric signal; determining at least one of the number of said entries and a duration of each said entry." Ex. 1001, 3:37-39; Claims 1, 2, and 9.

41. Morse code clearly is not a series of entries of a biometric signal. *Williams* discusses pushing a button either once or twice. Neither of these are even in the same field of technology as the '208 Patent.

42. The Petitioner argues that secure access signals were well known by 2003. Ex. 1003, ¶ 138. This is a misstatement of what is claimed in the '208 Patent. Rather than simply claim a 'secure access signal', the '208 Patent claims a "a secure access signal conveying information dependent upon said accessibility attribute." Ex. 1001, Claims 1, 9, 10, 2:35-36, 3:19-20, 3:66-4:1. The Petitioner claims that *Matthiassen* teaches a secure access signal. A POSITA

14

would first note that 'secure access signal' or even 'access signal' do not appear in *Matthiassen*.

43. The term 'signal' does appear in *Matthiassen*. Signal is used in the following contexts: sensor signal (paragraphs 46, 49, and 192, and claim 7), output signal from the sensor (paragraph 49, claim 2, claim 8), interception of signals between the sensor and the biometrics processor (paragraph 47), signal to the wake-up block (paragraphs 66, 67, 130, and 177), output signal from the IC/Chip (paragraph 85, claim 17), control signal (paragraph 192), captured fingerprint signal (claim 10), control signal for controlling the stand alone appliance in response to the finger movement on the sensor (claim 20), and captured signal (claim 22).  None of these even suggest a "a secure access signal conveying information dependent upon said accessibility attribute."

**A. Accessibility Attribute**

44. Claim 1 of the '208 Patent requires an output of an "accessibility attribute" based upon a biometric signal match, and emitting "a secure access signal conveying information dependent upon said accessibility attribute."  Ex. 1001, 15:47-52.

45. The Board has construed this limitation to mean an "attribute that establishes whether and under which conditions access to the controlled item should be granted" as the construction of "accessibility attribute," and that is the

15
Appx2984

construction that I have employed in rendering the opinions herein. I understand that this construction requires more than the binary determination of whether to grant access to a controlled item by virtue of the "under which conditions" language. In other words, there must be something else attendant to such access beyond either a grant or denial of such access.

46.   I agree with Dr. Sears' opinion that *Mathiassen* teaches using biometric information with a portable control to determine whether or not to grant access to an automobile, *i.e.*, a binary decision. Ex. 1003, ¶ 241. Specifically, such access is granted if there is a fingerprint match with a stored fingerprint, and the process is aborted if there is no match. *See id.* This constitutes only the binary determination of whether to grant access, and therefore does not teach the "under which conditions" portion of the Board's construction of the "accessibility attribute" limitation.

47.   Dr. Sears opines that "*Mathiassen* in combination with *McKeeth* teaches outputting two or more accessibility attributes," *i.e.*, it is non-binary. *See* Ex. 1003, ¶ 245. The teaching from *McKeeth* to which Dr. Sears refers as contributing to the combination is a "geometric pattern" that is input "concurrently with, or after a predetermined duration from, scanning his/her fingerprint." Ex. 1003, ¶ 247. In other words, the teaching from *McKeeth* allows for a duress signal when a second input is provided in addition to the

fingerprint recognition or biometric authentication. *Id.* This "geometric pattern" input is one of several knowledge-based inputs described in *McKeeth*. For example, *McKeeth* describes a password input, an input of a series of clicks using a mouse, or this geometric pattern input by moving a "peripheral device 200 on a flat surface." Ex. 1006, 2:65-3:4, 5:34-38.

48.   I understand that, in order to form a legitimate combination of prior art references forming the basis of an obviousness challenge, there can be no hindsight reconstruction involved in forming that combination. In other words, one cannot use a challenged claim as a blueprint for forming a prior art combination.

49.   I understand Dr. Sears to opine that there would have been a motivation to combine the binary biometric security measures (access or no) with the security measures of *McKeeth* because increased security is always beneficial. Ex. 1003, ¶ 109.

50.   The combination of *Mathiassen* and *McKeeth*, to avoid hindsight reconstruction, presupposes that one would have thought, without the benefit of the challenged claims, to look beyond *Mathiassen* to add a duress signal to the existing fingerprint security thereof.

51.   As Dr. Sears notes, *Mathiassen* already teaches finger movement that can provide for additional security. Ex. 1003, ¶ 89 ("*Mathiassen* teaches

17

Appx2986

commands other than 'open door' may be implemented in the secure access control system by a user providing certain finger movements"). In his deposition, Dr. Sears confirmed that one such command could be to send a distress signal. Ex. 2010, 51:6-10. Because of this, it is my opinion that there would have been no reason to look to *McKeeth* to modify *Mathiassen* in the fashion that Dr. Sears describes, and I disagree with his opinion that one would have been motivated to combine these references to arrive at the claims invention.

52. I also note that, even if *Mathiassen* were modified to add a distress signal resulting from finger movements, such modification would not involve a *biometric* signal for generating the distress signal. In particular, there is a difference between the fingerprint sensor for capturing a biometric signal of *Mathiassen*, which is described in ¶ [0048] and claimed in Claim 18, and the translation means "for analyzing and categorizing the omni-directional finger movements across the fingerprint sensor" which is described in ¶ [0192] and claimed in Claim 20 (which depends from Claim 18). *See* Ex. 1004 at 28.

53. I agree with Dr. Sear' opinion that there is a distinction between knowledge-based and biometric information. *See* Ex. 1003, ¶¶ 40-41. To one of ordinary skill in the art, the finger movements suggested in *Mathiassen*, as distinct from fingerprints themselves, are not biometric signals, as something more than the

fingerprint sensor is required to track them, and one can "learn" finger movements. Fingerprints are unique to a specific individual; finger movements are not. Anyone can duplicate particular set of finger movements. One of ordinary skill in the art would understand that, in the context of tracking "omni-directional finger movements," the fingerprint sensor, in conjunction with the translation means hardware or software, is not acting like a fingerprint sensor.

54. Thus, my opinion is that, even if one would have combined *Mathiassen* and *McKeeth*, one would still not have an accessibility attribute that determines whether and under which conditions access to a controlled item is granted based upon a biometric signal match, as both *Mathiassen* and *McKeeth* teach only using knowledge-based functions, separate from biometric matching, to establish "under which conditions" access is granted.

55. I also note that, even if one were motivated to look beyond *Mathiassen's* teachings to provide for additional security, there were simpler mechanisms for providing that security. Looking at other prior art references discussed by Dr. Sears, several such references teach simple, non-biometric security measures. For example, the remote keyless entry system of *Williams* (Ex. 1030) "included a button on the fob that performed different functions when pushed once or twice." Ex. 1003, ¶ 61, *citing* Ex. 1030, 14:5-31. This one-

press, two-press system is not biometric. Ex. 2010 at 37:18-38:11.

56. Similarly, *Araki* "discloses invoking certain commands based on user input but does so via a touch sensor without sensing a user's fingerprint." Ex. 1003, ¶ 65, *citing* Ex. 1034, 5:28-33. As such, *Araki* teaches a knowledge-based security system.

57. Finally, the key fob described in *K-9 Car Alarm Owner's Guide and Installation Instructions* ("*K-9*") has a "panic mode" security measure. Ex. 1003, ¶ 265, *citing* Ex. 1041 at 7. The panic mode is activated by a push button transmitter. Ex. 1041 at 7. This reference does not teach biometric sensing, either. Ex. 2010 at 73:17-74:10.

58. I agree with Dr. Sears that "creating a quickly, easily, and most importantly, natural-functioning entry system is vital in portable electronics using input devices was also desirable, and their making user manipulation of such devices easy was a key feature." Ex. 1003, ¶ 217.

59. Furthermore, I agree with Dr. Sears that push buttons on key fobs or similar devices were well known in the prior art. Ex. 2010 at 62:5-8. *Mathiassen* could have been modified by adding a well-known physical push button to generate a duress signal. Ex. 2010 at 59:9-21. In addition, Dr. Sears suggests if a fob is in a user's pocket or in a bag, "it would be simpler and more efficient for the user to simply press the fingerprint interface at varying durations rather than

moving the finger directionally to enter commands."  Ex. 1003, ¶ 210. This simplicity consideration would be a key feature in determining how one might modify an existing system, such as that described in *Mathiassen*. Ex. 2010 at 71:18-22. It is my opinion that a POSITA would not have looked to *McKeeth*, which teaches complex password, passcode, or geometric pattern inputs, in order to modify the teachings of *Mathiassen* because the POSITA would have looked to simpler, well-known solutions of adding this functionality, such as the solutions taught by the number of other references on which Dr. Sears and Apple rely.

60.    In my opinion, Dr. Sears provides no rationale for a preference to combine two fingerprint recognition references (*Mathiassen* and *McKeeth*), especially considering the complicated programming that would associated therewith, over combining *Mathiassen's* fingerprint sensor with the simpler push button feature taught in one of the references discussed above.

61.    The fingerprint sensor in this combination provides for biometric security in the first instance. And, according to the references discussed by Dr. Sears, a push button can provide additional security, such as initiating a distress signal. Ex. 1003, ¶¶ 61, 65, 265. A push button is a simple mechanical feature, and is easy to install in a device such as a key fob, which explains why push buttons of the type contained in *Williams*, *Araki*, and *K-9* were as prevalent in the prior

art as Dr. Sears describes. *See id.* Further, as Dr. Sears notes, the push button on a key fob located in a pocket or purse would be easy to operate in the event of a duress situation. *Id.*, ¶ 210.

62. In my opinion, therefore, neither Apple nor Dr. Sears have established that a POSITA would have looked to combine two fingerprint recognition references when what Dr. Sears describes as simpler, easier-to-operate solutions were well-known.

**B. Series of Entries of the Biometric Signal, Said Series Being Characterised According to at Least One of the Number of Said Entries and a Duration of Each Said Entry**

63. Claim 1 also requires "a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry." In other words, this characterization requires both a ***number*** of entries **and** a ***duration*** of each such entry. I understand that this is how the Board has construed this limitation, and this is the construction that I have used.

64. I note that Apple has acknowledged that *Mathiassen,* which serves as its principal reference, "does not teach determining a duration of each [biometric signal] entry." Paper No. 1 at 32; *see also id.*, 3. I understand that Apple therefore looks to *Anderson* for a purported teaching of "***fingerprint*** presses of varying duration." *Id.* (emphasis added).

65.  I have found nothing in *Anderson* constituting "finger*print* presses."  I do note that the Board references *Anderson's* teaching of "a series of ***pressure pulses*** having varying durations."  *See* Paper No. 11 at 32, *quoting* Ex. 1006, 6:45-48 (emphasis added). That series of pressure pulses translates to an "access code" which is compared to a "stored code template."  Ex. 1006 at 6:45-51. However, the term "***fingerprint*** access code," used by both Dr. Sears and the Board in its institution decision, does not even appear in *Anderson*. Ex. 2010 at 88:6-22; Ex. 1006.

66.  I agree with Dr. Sears that these "pressure pulses" in *Anderson* are not, and do not generate, ***biometric*** signals as the pressure pulses are knowledge-based. Ex. 1006 at 7:40-43 (describing the pressure pulses as Morse code or the melody of a song, both of which can be learned); Ex. 2010 at 54:9-16, 55:1-6. The hardware embodiments taught in *Anderson* for accepting these "pressure pulses" include "resistive" and "capacitive touch pads."  Ex. 1006 at 5:24.

67.  Even more clearly, *Anderson* disavows fingerprint recognition as part of the prior art stating "Similarly, other methods such as fingerprint recognition and the use of electronic keys (e.g., radio frequency identification (RFID) transponders containing an access code) utilize specialized equipment and may require sophisticated software for implementation." Ex. 1006, 1:53-58.

23

68. *Anderson* further describes that these touch pads may optionally be equipped with "an optical scanner or thermal sensor for collecting an image of the user's fingerprint." *Id.* at 7:5-7. However, such fingerprint images (biometric signals) are captured "as the pressure code is entered," *i.e.*, the fingerprint images are not part of the pressure code itself. *See id.* at 7:4-7.

69. As Dr. Sears acknowledged and as discussed above, *Anderson's* pressure code is knowledge-based, not biometric. Ex. 2010 at 54:9-55:6. Dr. Sears is certainly correct that, if a sensor only captures the knowledge of a user, it is not properly characterized as a **biometric** sensor. *Id.* at 29:6-10. More specifically, a capacitive touch sensor that merely captures user taps or finger movements is not a biometric sensor. *Id.* at 36:1-9, 38:14-39:19.

70. Further illustrating that *Anderson's* pressure code is not biometric, *Anderson* provides as examples of such code "[a] known code key (e.g., Morse code) or a memory mnemonic (*e.g.*, the melody of a favorite song) may be utilized to aid the user in selecting, remembering, and entering the access code." Ex. 1006 at 7:40-43. A Morse code key is obviously not a biometric signal. Ex. 2010 at 37:5-17. Morse code translates letters into a series of dots and dashes.[3] A memory mnemonic, such as the melody of a song, is also obviously not a

---

[3] https://web.northeastern.edu/stemout/morse-code

biometric signal. Ex. 1003, ¶ 41; Ex. 2010 at 24:14-25:1.

71. The point to all of the foregoing is that, if one were to combine *Mathiassen* with *Anderson* in a purported effort to attain the limitation claiming a "series of entries of a biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry," the result would be the fingerprint sensor of *Mathiassen*, which captures fingerprint images, and *Anderson's* touch pad that captures a non-biometric pressure code at the same time fingerprint images are captured. *See* Ex. 1006 at 7:4-7 ("digitizer pad 120 may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered"). As Dr. Sears looks solely to *Anderson's* teachings for the durational requirement of the biometric signal series, combining *Mathiassen's* fingerprint sensor with *Anderson's* pressure code does not produce the claimed invention, as any duration would apply to a ***non***-biometric signal.

72. I disagree with Dr. Sears that there would have been a motivation to modify *Mathiassen* with *Anderson* to incorporate a durational component to biometric signals, which, in turn, would allow for additional types of signals to be sent. *See, e.g.*, Ex. 1003, ¶ 210. *Furthermore*, combining *Mathiassen* with *Anderson* would have been difficult for a POSITA and the POSITA would not have an expectation of success, given that *Anderson* is not biometric (and in

facts denigrates biometric sensors) while *Mathiassen* to the extent it provides binary access to a device, is biometric.

73.   As I discuss above, if the sole purpose of modification were to enable sending additional signals, *Mathiassen* already provides the mechanism for doing so without modifications taught in other references.

74.   According to Dr. Sears, a skilled person "would have been motivated and found it obvious [*sic* "to"] add *Anderon's* [*sic* "*Anderson's*"] series of presses or pulses as an input on the portable door control or replace *Mathiassen's* finger movements with *Anderson's* series of presses or pulses to input commands into the portable door control 20." Ex. 1003, ¶ 210. Dr. Sears' rationale is that *Anderson's* "press operations make the input operations easier for the user to perform in certain situations," as "a user holding the portable control fob in their hand could more easily press a series of finger presses against the control's fingerprint sensor, as opposed to directionally swipe the finger presses." *Id.*

75.   While *Mathiassen's* entry device controls access to an automobile, *Anderson* does not teach an automotive embodiment. *See generally* Ex. 1006. Additionally, while *Anderson* shows a variety of devices for the entry of finger presses, it only suggests that the digitizer pad 120 (shown below) of a personal computer may include an optical scanner or thermal sensor for collecting an

26

IPR2022-00601
U.S. Pat No. 9,269,208

image of the user's fingerprint. Ex. 1006 at 7:4-8.



Ex. 1006 at Fig. 1.

76.    It is my opinion that one of ordinary skill in the art would not have turned to personal computer art to modify a security feature on an automotive key fob without the benefit of the challenged claims as a blueprint. Dr. Sears has offered no explanation as to why one would have done so.

77.    Further, as noted above with regard to the proposed combination of *Mathiassen* and *McKeeth,* a push button would have been a simpler combination to arrive at the benefits of additional commands, especially in light of Dr. Sears' reasoning that pressing is easier than swiping. Ex. 1003, ¶ 210. If a fob were in a user's pocket or purse, *i.e.*, out of eyesight of the user, it would be easier to feel a push button, which is typically raised or indented

IPR2022-00601
U.S. Pat No. 9,269,208

from the surface of the fob, than a flat capacitive touch surface. *Id.*

78.    Along these lines, an embodiment is shown in *Anderson* wherein a keyboard 512 is equipped with a cursor control stick 514. Ex. 1006 at 7:54-55.



FIG. 5

Ex. 1006 at Fig. 5.

79.    In that configuration, cursor control stick 514 may sense variations in force or pressure "applied along a 'Z' axis perpendicular to keyboard 512," and "may be utilized as a touch interface to facilitate entry of access codes," *i.e.*, a push button. *Id.*, at 7:55-59.

80.    To the extent one would have thought to combine *Mathiassen's* automotive embodiment with the computer teachings of *Anderson*, a simpler solution would have been to add *Anderson's* push button control – which lacks any reference to fingerprint sensing – to *Mathiassen's* key fob. *Id.* at 7:48-8:3.

Appx2997

### C. Populate the Data Base According to the Instruction

81.    Claim 1 of the '208 Patent requires that "the transmitter sub-system further comprises means for ***populating*** the data base of biometric signatures" (emphasis added).

82.    The language of claim 1 makes clear that this "populating" limitation is part of the user enrollment process, as such population is required before any later comparison to what is populated in the database can occur. I note that Apple points to "***enrolling*** a new user's fingerprint by providing control information via a sequence of presses of certain amount and duration" as one of the distinguishing features of the invention claimed in the '208 Patent. Paper No. 1 at 1.

83.    Claim 1 further makes clear that, once the series of biometric signals characterized by number and duration is received by the transmitter subsystem (clause 1(d1)[4]), that series is mapped into an instruction (clause 1(d2)), and the resulting instruction is used to populate the database of biometric signatures (clause 1(d)(3)). Ex. 1001, 15:61-67. Based on the progression of the claim, I understand that "said series" in clause 1(d2) must refer to the

---

[4] The references to certain "clauses" correspond to Apple's designation of the limitations of the claims.

"series of entries of the biometric signal" in clause 1(d1),[5] and "the instruction" in clause 1(d3) must refer to "an instruction" in clause 1(d2). The following is a depiction of this claimed information flow:



84.  The "series" requirement of claim 1, according to Dr. Sears, is purportedly disclosed in *Mathiasen* as "omni-directional finger movements across the sensor in two dimensions."  Ex. 1003, ¶ 194 (emphasis omitted). For the requirement of "mapping" in that claim, according to Dr. Sears, these movements are categorized according to "***predefined*** sets of finger movement sequences." *Id.*, ¶ 232 (emphasis added). A "command table" is then used "to translate the categorized finger movements into control signals."  *Id.*

85.  These sequences and command table have nothing to do with user enrollment, as *Mathiassen* makes clear that the control signal are "for controlling the device." Ex. 1004, ¶ [0192].  In other words, *Mathiassen* describes that the

---

[5] I note that the Board also recognized that "said series" refers to the "series of entries of the biometric signal" as shown by the board placing "of entries of the biometric signal" in brackets. Paper No. 11 at 33.

finger movement sequences are a control mechanism, not part of the enrollment process. *Mathiassen* has no teaching that either the "predefined sets of finger movement sequences" or the "command table" constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database for purposes of enrollment, as required by claim 1.

86. Turning to the final enrollment step of populating the database, Dr. Sears first points to a wholly separate reference pertaining to the enrollment of casino players, *Bradford*, suggesting that he does not believe that *Mathiassen* or *Anderson* teach this limitation. Ex. 1003, ¶ 231.

87. Next, Dr. Sears points generically to the "one or more **master minutiae tables**," rather than the "predefined sets of finger movement sequences," or the "command table" used "to translate the categorized finger movements into control signals" as satisfying the "populating" limitation. In my opinion, Dr. Sears does not address how the database is populated according to the instruction. The teachings from *Mathiassen* that Dr. Sears relies on do not line up with the language of claim 1, as shown in the chart below:

| Clauses 1(d1)-(d3) | Dr. Sears' Position |
|---|---|

| receive a series of entries of the biometric signal | The transmitter subsystem receives a series of "omni-directional" <u>finger movements</u>. |
|---|---|
| map said series into an instruction; | The <u>finger movements</u> are categorized according to pre-defined movements. |
| and populate the data base according to the instruction, | The database is populated by "master minutiae tables." |

88.     Dr. Sears opines that "[i]t would have been obvious to modify *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to populate a database according to an instruction that the portable door control recognized from a car owner/system administrator's input of a series of presses/pulses of varying durations, with such an instruction being to initiate the enrollment of a new user (i.e., populating the database)." Ex. 1003 at ¶ 220. I disagree for the reasons stated below.

89.     Dr. Sears does not explain what actually is being modified, and how such modification corresponds to the "populating" limitation. If *Mathiassen's* master minutiae tables are to be modified, Dr. Sears fails to explain how such tables could be modified with *Anderson's* pressure and duration information, and why there would be a motivation to do so.

90.     If, on the other hand, the proposed modification is to create a discrete database of pressure/duration information separate from the fingerprint data, such

database would not have been created using ***biometric*** signals, as pressure and duration are not ***biometric*** measurements. Ex. 2010 at 54:9-55:6.

### D. Independent Claims 9 and 10

91. Apple has also challenged independent Claims 9 and 10. Both Claims 9 and 10 include each of the three limitations discussed above in relation to Claim 1, and relies on the same combination of references and argument in support of its challenge of these Claims. For the same reasons discussed above, it is my opinion that Claims 9 and 10 would not be obvious to a POSITA.

### E. Dependent Claims 3-7, 11, and 13

92. Apple has also challenged the validity of Claims 3-7, which depend from Claim 1, and Claims 11 and 13, which depend from Claim 10. I understand that a dependent claim includes all of the limitations from the independent claim from which it depends. Because it is my opinion that independent Claims 1 and 10 would not have been obvious to a POSITA, the dependent claims stemming from these independent claims would also not have been obvious to a POSITA.

93.   I declare that all statements herein made of my own knowledge are true, and that all statements herein made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code.

Dated: December 22, 2022        _____

William C. Easttom II, Ph.D., D.Sc.



## Planet Depos
### We Make It *Happen*™

# Transcript of Andrew Sears, Ph.D.

**Date:** May 19, 2023
**Case:** Apple, Inc. -v- CPC Patent Technologies PTY, Ltd. (PTAB)

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CPC EXHIBIT 2013
Apple Inc. v. CPC Patent Technologies PTY Ltd.
IPR2022-00601

Appx3046

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY LTD.,

Patent Owner

_____

Case:  IPR2022-00601 & IPR2022-00602

U.S. Patent Nos. 9,269,208; 9,665,705

_____

Deposition of ANDREW SEARS, PH.D.

Conducted Virtually via Zoom

Friday, May 19, 2023

9:00 a.m. CST

Job No.:  488924

Pages:  1 - 69

Reported by:  THERESA A. VORKAPIC,

CSR, RMR, CRR, RPR

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    2

Deposition of Andrew Sears, Ph.D.,
conducted virtually via Zoom, pursuant to notice
before Theresa A. Vorkapic, a Certified Shorthand
Reporter, Registered Merit Reporter, Certified
Realtime Reporter, Registered Professional
Reporter and a Notary Public in and for the State
of Illinois.

```
            A P P E A R A N C E S

ON BEHALF OF THE PATENT OWNER:

    GEORGE C. SUMMERFIELD, ESQUIRE

    K&L GATES

    70 West Madison Street

    Suite 3300

    Chicago, Illinois 60602

    312-807-4376

    george.summerfield@klgates.com


ON BEHALF OF THE PETITIONER:

    JENNIFER C. BAILEY, ESQUIRE

    ERISE IP

    7015 College Boulevard

    Suite 700

    Overland Park, Kansas 66211

    913-777-5600

    jennifer.bailey@eriseip.com


ALSO PRESENT:

    Jackson Schueler, Audiovisual Technician,

     Planet Depos
```

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                                4

C O N T E N T S

EXAMINATION OF ANDREW SEARS, PH.D.              PAGE

    Examination By Mr. Summerfield               5

E X H I B I T S

(Retained by counsel.)

SEARS DEPOSITION EXHIBITS                        PAGE

Exhibit 2015 Deposition Notice                   7
         IPR2022-00601
Exhibit 2013 Deposition Notice                   7
         IPR2022-00602

PREVIOUSLY MARKED EXHIBITS                        PAGE

Exhibit        Sears Declaration in             12
1003           IPR2022-00602
Exhibit        Sears Supplemental                8
1090           Declaration in
               IPR2022-00602
Exhibit        US Pub. No. 2004/123113          28
1004           Mathiassen

P R O C E E D I N G S

THE REPORTER:  Would you raise your right hand, please.

(The witness was duly sworn.)

ANDREW SEARS, PH.D., called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SUMMERFIELD:

Q  Hey, Dr. Sears.  I wanted to get some housekeeping matters out of the way to begin with. I think it will simplify things.

First of all, do you have hard copies of anything with you today?

A  I have hard copies of a bunch of things, my declaration, petitioner's response, patent owner's response, background references for both of the patents.

Q  You have your supplemental declarations as well?

A  Yes.  That's the one I meant actually.

Q  Okay.  As we go through this, what I'm

going to do is ask you if you have hard copies of certain things. I think that will obviate the need for putting them on the screen and you can just refer to the hard copies as we go through if that's okay with everybody.

Secondly, we're here obviously to talk about your supplemental declaration in a couple of different IPRs, but do you agree that they are substantially the same?

A  Yes.

Q  Do you agree that your answer for one IPR would be the same for the other as concerns your supplemental declarations?

A  Yes.

Q  And just to be clear, if there's an instance where that wouldn't be the case, can you please let me know?

A  Absolutely, yes.

MR. SUMMERFIELD:  So here is what I think I'm going to do.  Oh, and Jennifer, as the last time, I am going to use the IPR exhibit numbers for the documents we're talking about today if

that's all right.

MS. BAILEY:  Yes.  That works for me.

MR. SUMMERFIELD:  The only other housekeeping matter is I'll go ahead and have the reporter mark the deposition notices in the two cases.  I don't know that Dr. Sears needs to take a look at them but for numbering purposes, in the 601 IPR, the deposition notice will be Exhibit No. 2013.

(A certain document was marked Sears Deposition Exhibit 2013 for identification, as of 05/19/2023.)

MR. SUMMERFIELD:  And in the 602 matter the deposition notice will be Deposition Exhibit No. 2015.

How does that sound?

MS. BAILEY:  That's fine for me.

(A certain document was marked Sears Deposition Exhibit 2015 for identification, as of 05/19/2023.)

BY MR. SUMMERFIELD:

Q   Dr. Sears, let's go ahead and move to your

supplemental declarations and the one I'm going to use is the one in the 602 proceeding, which is Exhibit 1090 in that proceeding.

Do you have that in front of you?

A  Yes, yes.

Q  I want to talk initially about how this was prepared.

Without revealing communications you may have had with counsel, can you outline for us the process by which the supplemental declaration was prepared.

A  I think it was prepared very much like the other declarations where I described it as a collaborative process where I drafted pieces, counsel may have provided some input, but most importantly by the time we had gone through the end, I had gone through everything repeatedly, recommended and made all the changes that I felt necessary for it to reflect my opinions.

Q  Are you able to tell me how the issues for your supplemental declaration were identified without revealing attorney communications?

A  I think it's safe to say they are based largely on the patent owner's response and some of the key points in there were that it was felt that some clarification of my perspective was useful.

Q  And, again, without revealing attorney communications, can you tell me the process by which the points that needed clarification were identified?

A  I think it certainly started -- well, from my perspective, it started by reading through the patent owner's response and just seeing the issues that were raised there and then from there I would say conversations of what I needed to address.

Q  And that would be conversations with counsel?

A  Yes.

Q  Were there any instances where it was determined that additional opinions were required in the supplement?

A  I'm not sure, just looking compared to what --

Q  As compared to clarifying opinions that

were already expressed in your original

declaration.

A  I think the purpose was really just to

clarify -- I would say it was to clarify the

opinions I had when the original declaration was

drafted and submitted.

Q  Let's go ahead and turn to Paragraph 5 of

Exhibit 1090 if we can.  The first sentence reads:

"Indicating duress by discretely signalling duress

was well known to be desirable."

Do you see that?

A  Yes.

Q  And then you cite to your original

declaration Paragraph 153, which in turn cites to

I believe that's supposed to be Zingher,

Z-i-n-g-h-e-r; is that right?

A  Quite possibly.  I would have to go back

and look to make sure, but that would seem

reasonable, yes.

Q  Why did you feel this was necessary to

clarify?

Just one favor, Dr. Sears, since we can't

see what you're looking at, if you're consulting anything in responding to the questions, if you can just let us know what that is.

A   Unless I say otherwise, it's my supplemental declaration at this point.

Q   Thank you.

A   So as I commented in that paragraph, I think this was motivated at least in part due to the material that was presented I think both in the patent owner's response and in Dr. Easttom's opinions where there was the talk about using the pushbutton and just thinking through if you have any pushbutton in addition to having the fingerprint scanner, you've got multiple things that people are interacting with.  It's going to be less discrete as you're interacting with them. You're going to be moving through different parts of the controls.

Really he was talking about the ideas that were put forward with regard to that pushbutton and, again, why that really didn't seem to make as much sense as was being argued.

Q  Were did you call out Zingher specifically in your supplement if you recall?

A  Let me go back and look at my original declaration.  Let me just figure this out.

Q  Just for the record, that's Exhibit 1003.

A  And, yes, it is Zingher without an h is the reference.

Q  I think the h is after the g actually?

A  Yes, z.  The h is in the wrong place there.

So in the paragraph of my original declaration, I cite to it's quoted from Zingher that the present system and method provides for discretely identifying a signalling a user's distress.

(Reporter clarification).

So in Paragraph 153 of my original declaration, I talk about Zingher and there's a quote there from Zingher that reads:  "The present system and method provides for discretely identifying the signal of the user's distress or duress at an ATM."

So it was simply an example that highlights that being discrete when indicating duress that was desirable.

Q  Do you have Zingher in front of which that was Exhibit 1037 to the petition?

A  I may.  I found it I believe. Exhibit 1037.

Q  It should be US Publication No. 20004/0015450.

A  Yes, I have it.

Q  From Paragraph 11 of Zingher the document defines biometric identifier emergency or BIDE?

Do you see that?

A  Yes.

Q  If we go to Paragraph 14, Zingher teaches that:  "Alternatively, a BIDE could be triggered by other means touch as tapping a fingerprint scanner or pressing hard on the lens of a fingerprint scanner."

Do you see that?

A  Yes.

Q  So focusing on the iteration where the

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                              14

user is pressing hard on the lens of a fingerprint
scanner, how does that work?

A   I can't speak to exactly how they were
envisioning it working from the description there.

Q   How do you understand it to be working
when the mechanism is pressing hard on the lens of
a fingerprint scanner?

A   One possibility since there's pressing
hard, there must be some mechanism for sensing the
amount of pressure that's being applied.

Q   What kind of mechanism would that be?

MS. BAILEY:  Counsel, your questions are
getting pretty far astray from the supplemental
declaration and, I appreciate Zingher was
mentioned in it, but none of this was in
Paragraph 153 of his original declaration.

MR. SUMMERFIELD:  I disagree.

MS. BAILEY:  I'm going to allow you to ask
another question or two to see where you're going
with this, but if it's apart from his supplemental
declaration in the citation of Zingher for the
purpose in the supplemental dec, I'll instruct the

witness not to answer.

MR. SUMMERFIELD:  Okay.

BY MR. SUMMERFIELD:

Q   Can you answer the question, Dr. Sears.

How is the fingerprint scanner functioning when the measure is of pressure variations?

A   That is a different technology beyond the ones that we've been talking about in this patent.

Q   So you don't know?

A   I didn't opine on that in my original declaration or my supplemental declaration.  So I don't feel comfortable to come up with new opinions here right now.

Q   Okay.  Take a look at Paragraph 50 of Zingher if you can, and if you could read that to yourself, please.

A   Okay.

Q   You did opine on the undesirability of having an pushbutton separate from the fingerprint scanner, correct?

A   I opined on the idea that moving your finger between things is less discrete than

keeping your finger on the fingerprint scanner.

Q  And the "things" in this circumstance were a fingerprint sensor and a pushbutton, right?

A  Yes.

Q  But that is precisely the configuration that Zingher teaches in Paragraph 50, correct?

MS. BAILEY:  I'm going to instruct the witness not to answer the question.

MR. SUMMERFIELD:  On what possible ground?

MS. BAILEY:  Because you are only allowed to ask him questions regarding the supplemental declaration.

MR. SUMMERFIELD:  Darn right.

MS. BAILEY:  And these questions are outside of what he opined upon in the supplemental declaration with respect to Zingher referenced. You could have asked him these questions during his original deposition.

MR. SUMMERFIELD:  Unfortunately, his original declaration didn't say anything about the lack of desirability of a separate pushbutton. That didn't show up until the supplemental

declaration which is why I'm asking them now.

MS. BAILEY: Counsel, you had the opportunity to ask him during his original deposition. You knew you were going to make the argument in the patent owner response and you could have asked him with respect to the Zingher reference.

MR. SUMMERFIELD: So your position is that I should have had him supplement his original declaration to rebut an argument that we were going to make that he hadn't made?

MS. BAILEY: My position is that you are limited to asking him questions with respect to his supplemental declaration.

THE WITNESS: His reference to Zingher was with respect to the duress condition has nothing to do with the pushbutton argument that you are now trying to make.

MR. SUMMERFIELD: Okay.

BY MR. SUMMERFIELD:

Q Dr. Sears, are you going to abide by your counsel's instruction?

A   I think that's what I'm supposed to do.

MS. BAILEY:  Counsel, if you would like to discuss this off the record, I'm happy --

MR. SUMMERFIELD:  No, I don't want to discuss this off the record.  You've made your objection.  I guess the witness is going to abide by it.  I'll address it with the board.

MS. BAILEY:  Understood.

BY MR. SUMMERFIELD:

Q   Speaking of that, Dr. Sears, if we look at Paragraph 5 again of Exhibit 1090, there is a sentence in there that says:  "Requiring a user to perform two operations would increase the risk that an assailant stop a user from indicating they are under duress and provides more opportunity for user error."

Do you see that?

A   Yes.

Q   Can you find where you said anything close that in your original report?

A   I can't point to somewhere specific or I probably would have cited it, but if you want me

to read through my entire original declaration --

Q  If that's what it takes you to do to answer the question, then, yes, I want you to read through your entire declaration unless you can tell me now, yes, it's not in there, then, yeah I want you to confirm it's not in there.

A  Okay.

Q  Actually, before we do that, do you remember having said that in your original report?

A  I don't remember saying that specific thing, but the report is 200-plus pages long.

Q  I understand.  Do you remember saying anything close to that in your original report?

A  I remember talking about duress.

Q  Specifically, Dr. Sears, do you remember saying anything about two operations being undesirable for whatever reason?

A  I can't point to a specific paragraph off the top of my head, no.

Q  Do you think you need to review your entire declaration to answer that question definitively?

A   To answer definitively absolutely, I'd have to read the entire thing because I don't remember every word I wrote in the 200-plus pages in my original declaration.

Q   Great.  Let's take a break.  How long do you think you need?

MS. BAILEY:  Counsel, I'm going to interrupt.

He needs to read it on the record.  We need to sit here.  If you're going to ask him to read, he needs to read it on the record.

MR. SUMMERFIELD:  He literally does not need to read it on the record.  There is no requirement that there be dead space for a half an hour on the record.

MS. BAILEY:  If you're asking him to review something, it needs to be on record.

MR. SUMMERFIELD:  Where is that coming from, Jennifer?  I don't know any rule that requires that.

MS. BAILEY:  Counsel, I don't know any rule that allows for what you're suggesting.

MR. SUMMERFIELD: Right. That's the point. There isn't a rule one way or the other which means he can do it.

MS. BAILEY: If you want him to review something, he need to do it on the record. You're asking him to review his entire original declaration, which he has already noted is 200-plus pages long. If you are going to insist on that, then I am going to assist it's done on the record.

MR. SUMMERFIELD: I'm going to insist that he do whatever is necessary to answer the question that I posed to him, which is is this opinion in Paragraph 5 anywhere in his original report? If that means he's got to read the whole thing to say it, okay. If he knows that it's not, okay. If you want to tell him it's not, okay. But whatever needs to happen to have him answer that question is going to happen. And if you want the camera to point on him for the next 20 minutes, half hour, hour, whatever it is, to answer that question, I guess that's fine with me. I'm going to turn my

video off, though, if that's okay with you.

MS. BAILEY:  Sure.  That's fine.  So let's keep it on the record and we can note that he is reading, and if you want to turn your video off, I'm fine with that.

MR. SUMMERFIELD:  That's fine with me.

BY MR. SUMMERFIELD:

Q   Dr. Sears, just let us know when you're done.

A   Okay.  I suggest you find something to keep yourself busy because it's going to be awhile.

Q   No worries there, Dr. Sears.  I've got plenty of other things to be doing right now.

A   Do I have to keep my audio on and stuff?

Q   Not as far as I'm concerned, Dr. Sears, but I'll leave that to your counsel.

MS. BAILEY:  No.  Dr. Sears, please turn your audio off and just remember to turn it off when you want to speak again.

(Witness reviewing document from 9:23 a.m.

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    23

to 9:46 a.m. CST)

BY THE WITNESS:

A   I'm back.  I have an answer.

BY MR. SUMMERFIELD:

Q   Go ahead.

A   Just for clarity, I did not read the entire original declaration, but I would say that statement is really derived from a number of comments in the original declaration that talked about the desire -- two key things.

One was the desire to allow for discrete interactions and the other was a desire to simplify interactions, both of which were in the context of allowing for a single type of interaction and interacting with single controls. If you look at the statement, it's about performing two operations with two different controls.  Clearly not be used discrete, clearly not as simple based on those other references that were talked about, the fact that you switch between different controls, and the fact that it's not as discrete is going to make it more obvious,

raise the opportunities for somebody to notice that you're doing these interactions and entering and I think that's what that sentence was getting at.

Q  I understand what the sentence is getting at.  You're talking about the sentence in your supplemental declaration, correct?

A  Yes.

Q  Where is there any discussion in your original declaration about a single operation being desirable?

A  I would say that is showing up primarily around Paragraph 59 through -- at least I would say Paragraphs 59 through maybe 64 or, so where it talks about Ghassabian -- so I'm not even sure how you pronounce it, Ghassabian, talking about wanting to -- a key feature is the easy manipulation, wanting quickly, easily, most importantly, naturally providing functionality and then they go on to talk about multiple presses of single keys as an example of how you would achieve that, and there are other examples in there as

well where they're talking about that idea of
simplifying the interactions, and in some of the
cases in terms of making them discrete and they
talk about them in the context of a single --
single key presses.

(Reporter clarification).

BY MR. SUMMERFIELD:

Q   So, Dr. Sears, then at least an example of
where you opine about the benefits of a single
operation would be the Ghassabian's multiple
finger presses?

A   That would be a example.

Q   Anything else that you saw?

A   As I said, there were other, I believe
Matusis, Exhibit 1032 has some similar
observations in it.

Q   Just before we leave that, you're talking
about the reference that you start discussing at
Paragraph 61?

A   Yes.

Q   And the example of the single operation
here would be towards the end of that paragraph

where we're talking about each fingertip corresponds to an upward or downward motion, each corresponding with a certain function; is that right?

A  It's essentially it.  The idea is that they're using one small input sensor to capture the input.

Q  Where do you describe the Matusis sensor in these paragraphs?

A  The very top of Paragraph 46, Matusis teaches a system including input sensor, arbitrarily small input sensor.  They are talking one in put sensor there.

Q  I'm sorry.  Which paragraph are you looking at?

A  The top of -- towards the end of Paragraph 61.  It's on the top of Page 46 of my original declaration.

Q  What do you understand the word "arbitrary" to mean there?

A  Arbitrary, I'd have to go back and look and I almost wonder what they meant arbitrarily

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                          27

small.  I would have to look at the original
reference.

Q   Any other examples that you saw?

A   I think Hoffman also kind of gets at that
point.  So down in Paragraph 64 where they allow,
again, where they allow -- again, allow the use of
one biometric sensor to enter different types of
input including inputs to alert other people to
things.

Q   Here in Paragraph 64 you describe Hoffman
as teaching a user input of an emergency code
simultaneously with the user's identification
code; is that right?

A   Yes.

Q   Just to be clear, Dr. Sears, did you see
anywhere in your report where you said that a
separate pushbutton is undesirable?

A   I did not see words stating that a
separate pushbutton would be undesirable.  What I
saw were words that talk about the preference or
the desirability of discrete interactions, and
moving between things is certainly less discrete

than operating on a single control.  Yes.

Q  Let's go back to your supplemental declaration at Paragraph 6.  And if you could just read the first sentence to yourself and let me know when you've finished that.

A  Okay.

Q  Do you have Mathiassen with you, by chance?

A  Yes.

Q  For the record, that's Exhibit 1004.  The key fob you mentioned in the first sentence of Paragraph 6, that's the key fob depicted in Figure 8 of Mathiassen, is that correct?

A  Let me find Mathiassen.  I know I have it.
   Can you repeat the question?

Q  The key fob that you reference in this first sentence of Paragraph 6 of your supplement, that's referring to the key fob depicted in Figure 88 of Mathiassen; is that correct?

A  Yes.

Q  Let's turn to Paragraph 192 of Mathiassen if we can.

Do you see the sentence that reads:  "As an additional safety feature, the portable or embedded device could be equipped with meanings for the input of code or commands."?

A  Yes.

Q  Do you understand the portable or imbedded device being referred to the automotive application described in the paragraphs preceding Paragraph 192?

A  Okay.  Sorry.  Can you repeat the question again?

Q  Yes.  So the portable or embedded device that's referred to as an additional safety feature -- strike that.

The sentence reads:  "The additional safety feature via portable or embedded device could be equipped with means for the input of code or commands."

Do you understand the portable or embedded device referenced there to be for the automotive application described in the paragraph preceding 192?

A   So your question is really about whether those two are exclusively in the context of the automotive application?

Q   Correct.

A   Okay.  In Paragraph 192, we're talking exclusively about the automotive application?

Q   That's correct.

A   Based on my quick review of things, I don't believe that would necessarily be the case.  I think they were talking -- they talk about a number of different examples of how this invention could be implemented.  They talk about the car one more extensively, but they talk about other ways they could be used, and I would think that that paragraph was referring to if it's embedded in I think there was a safe instance where there wasn't remote control, but the embedded part could have this built into it where in the car application could be in the portable control.

So I think the ideas would apply to all the different examples that they were talking about.

Q   But it would at least apply to the automotive example as well, right?

A   I believe so.

MS. BAILEY:  Counsel, when you get to a stopping point, may we take a break, please.

MR. SUMMERFIELD:  Just a few more questions on this and then we can.

BY MR. SUMMERFIELD:

Q   The first line of 192 again references an additional safety feature.

Additional to what?

MS. BAILEY:  Counsel, your questions are again getting outside of the supplemental declaration.  I don't see anything in Paragraph 6 that you just mentioned of the supplemental dec that relates to the safety feature described in Paragraph 192.

MR. SUMMERFIELD:  I'm getting there.

BY MR. SUMMERFIELD:

Q   Dr. Sears, additional to what?

A   I guess I'll ask can you help me understand where in Paragraph 6, what we're

referencing, what we're dealing with.

Q  Do you need to know that to answer that question?

A  My understand is I'm being deposed on my supplemental declaration.

Q  You are?

A  So it would be very useful to know what part of my supplemental declaration I'm being asked about.

Q  Why?  Why would it be useful for you to answer that question other than counsel just told you it was?

A  I'm struggling to find a way to describe it.  It's hard to answer a question about something you don't know what you're being asked about.

Q  I'm asking you what do you understand --

A  If your questions are supposed to be about my supplemental declaration, they are about words in this declaration.  I don't know what words in this declaration you're asking me about.

Q  I'm not.  Right now I'm asking you about

what the additional safety features refer to in Paragraph 192?

A   Where do I reference the additional safety features in Paragraph 192 --

Q   Dr. Sears, why don't you let your counsel worry about the objections and you answer the questions that I ask you if you're able to.

Additional to what?

MS. BAILEY:  Counsel, the witness is allowed to ask for clarification which is what he is doing.

MR. SUMMERFIELD:  Okay.  I'm saying that he doesn't need that clarification to answer this question except for the fact that you coached him into saying he does.  I would is exactly what just hand you and I both know it.

BY MR. SUMMERFIELD:

Q   Dr. Sears, let me ask it one more time.

In Paragraph 192 the first line an additional safety feature, additional to what?

A   I guess I'm going to go back to where do I reference that paragraph you're asking me about?

Q  Are you unable to answer that question unless I answer that question for you?

A  I can share lots of opinions about lots of different things.

Q  I'm not asking about lots of different things, Dr. Sears.

MS. BAILEY:  Counsel --

MR. SUMMERFIELD:  Jennifer, we're done with this diatribe.  We can move on if he's not going to answer the question, but we're not going to play this game anymore.

MS. BAILEY:  Counsel, you are interrupting his answer.

MR. SUMMERFIELD:  That's not an answer, Jennifer, just parroting the objection that you make which was speaking and completely out of bounds.

MS. BAILEY:  I was speaking to you, Counsel.

MR. SUMMERFIELD:  But your witness is on the line, Counsel.  He can hear you.

MS. BAILEY:  I already offered to take

this off the record if you would like and you said no.

MR. SUMMERFIELD:  You can't start making speaking objections, Jennifer.  You know this. This is exactly what you just did and your witness has latched on to it.

MS. BAILEY:  I disagree that that was a speaking objection.  We have already will issue on the records that your going outside the supplemental declaration.  I already asked to take discussion --

MR. SUMMERFIELD:  Jennifer, we have three choices right now, you can either instruct your witness not to answer, you can let him answer, and in that case you will either answer the question or he will say he's not able to.  That's it. There is no fourth option here.

MS. BAILEY:  Counsel, I have not instructed the witness to not answer this question.

MR. SUMMERFIELD:  I understand that.  I'm waiting for you to either do that or not.  It's

not hard.

MS. BAILEY:  Counsel, Dr. Sears is asking for clarification.

BY MR. SUMMERFIELD:

Q  Dr. Sears, I tell you what.  Since you need to know where I'm going with this I will tell you, all right.

You say that in Paragraph 6 you can't modify Mathiassen with additional stuff because it's a too small.

Do you say that effectively?

A  What I say in Paragraph 6 is that adding a press button would require additional space on the form factor along with additional internal wiring and hardware within the key fob.

Q  And a pushbutton is hardware, right?

A  Yes.

Q  So Paragraph 192, the one we've been wrestling with for the last few minutes, right, it talks about a couple of different things.

First of all, it talks about a movement analyzing means, correct?

A  I'm just rereading the sentence.

Q  You're fine.

A  Yes, it talks about a number of things and it does talk about a movement analyzing means.

Q  And one of the things it says the movement analyzing means can be is hardware, correct?

A  It says it can be in the form of hardware or software.

Q  Correct.  Okay.  Now going back to your question, the movement analyzing means would be part of what Paragraph 192 references as the additional safety feature, correct?

A  At analyzing means is talking about in the context of that additional safety feature.

Q  What Paragraph 192 says is that you can add safety features to among other things the Figure 8 key fob in the form of hardware, correct?

A  It does say you can add in the form of hardware.

Q  Now, let's move on to the translation means.

Do you see the translation means described

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                38

there as part of the additional safety feature

referenced in Paragraph 192?

    A   Yes.

    Q   That can also be hardware, correct?

    A   Yes, it did.

    Q   Or software, correct?

    A   Yes, it can.

    Q   And, again, this teaches that that

hardware or software could be added to among other

things the Figure 8 key fob, correct?

    A   Yes, it does.

        MR. SUMMERFIELD:  This is a fine place to

take a break, Jennifer.

        MS. BAILEY:  Sounds good.  Thank you.

        MR. SUMMERFIELD:  How long do you guys

want?

        MS. BAILEY:  Five minutes is fine for me.

        MR. SUMMERFIELD:  That's good.  Why don't

we take 10.

        (A recess was had.)

        MR. SUMMERFIELD:  We're back on record.

BY MR. SUMMERFIELD:

Q  Dr. Sears, let's go back to Exhibit 1090, your supplemental declaration, and let's turn to Paragraph 7 if we can.  About midway through the paragraph you reference "my original opinion".

Do you see that?

A  Yes.

Q  The original opinion you reference is that a series of presses on a fingerprint sensor would be simpler to input than directional movements on that same fingerprint sensor, and then you reference Paragraphs 222 and 23 of your original declaration.

Do you see that?

A  Yes.

Q  Can you turn to Paragraph 222.

A  Okay.

Q  On the first sentence of Paragraph 22 appearing on Page 152 it starts:  "A POSITA would have been motivated and found it obvious," et cetera.

Do you see that?

A  Yes.

Q  Can you just read that sentence to yourself and let me know when you're done?

A  Okay.

Q  Do you have Anderson there?

A  I believe I do.

Q  For record I believe it's Exhibit 1006.

A  Yes.

Q  If you could turn to Column 7, lines four through eight.  The sentence begins:  "Similarly," do you see that?

A  Yes, I do.

Q  Can you read that sentence and let me know when you're done.

A  Okay.

Q  How many touches of Anderson's pressure access code are used to collect the fingerprint image while addressing those being entered?

MS. BAILEY:  Counsel, once again, I'm going to talk about with respect to the supplemental declaration.  Happy to discuss it with you off the record.

MR. SUMMERFIELD:  I'm not going to explain

where I'm going, Jennifer.  I don't have to do that.

MS. BAILEY:  I'm not asking you to explain where you're going.

MR. SUMMERFIELD:  Well, you kind of are. You kind of are.

BY MR. SUMMERFIELD:

Q   Dr. Sears, can you answer that question?

MS. BAILEY:  Counsel, we clearly disagree on this issue.

MR. SUMMERFIELD:  Yes, we do.

MS. BAILEY:  Again, I am happy to discuss it off the record.

MR. SUMMERFIELD:  I'm not inclined to do that.

MS. BAILEY:  Okay.  Understood.

For the record, you do not want to discuss it off record.

MR. SUMMERFIELD:  No, I don't, Jennifer. I don't need to get a roadmap of my questions.

MS. BAILEY:  I'm not asking for a roadmap, but I am asking that they are centered around the

supplemental declaration.

MR. SUMMERFIELD:  They are.  They are centered around the original opinion that he expressed in Paragraph 222 which is referenced in Paragraph 7 of Exhibit 1090.

MS. BAILEY:  Nonetheless, you're going to be limited to the opinion that is in the supplemental declaration.

MR. SUMMERFIELD:  Which is where he reiterated his original opinion.  I didn't tell him to do that, but he did, so I get to ask him about why he's reiterating it and whether it holds for what he's using to support.  This isn't hard, Jennifer.

MS. BAILEY:  Counsel, you're being unnecessarily rude.  I don't appreciate the condescending tone.

MR. SUMMERFIELD:  I'm not trying to be condescending.  I'm just saying -- I'm not even trying to be particularly clever here.  I'm just asking him about his original opinion.

MS. BAILEY:  And that is the problem.  You

can only ask him with respect to the supplemental declaration.

MR. SUMMERFIELD: You reiterated his original opinion in his supplement.

MS. BAILEY: And I have allowed some of the questions that are with respect to opinions stated in the supplemental declaration. I am just telling you that some of your questions are outside of the supplemental declaration which you know is improper.

MR. SUMMERFIELD: And I also know they're not as we both know from the line of examination right before the break.

BY MR. SUMMERFIELD:

Q Let's try it again.

Dr. Sears, how many touches of Anderson's pressure access code are used to collect the fingerprint image while addressing those being entered?

A What I'm trying to piece together is you're saying while a duress signal is being entered.

Q  Yes.

A  Where is the duress signal being entered, what am I referencing for that?

Q  Anderson's pressure access code.  You reference that in your original opinion in Paragraph 222, do you not?

A  I reference Anderson there.  I don't see even right there where I'm referencing a duress signal.  You're asking a very specific question. How many times is the finger pressing during a duress and I don't think anybody ever defined anywhere a specific number of times for a finger to be pressed for a duress.

Q  Okay.  How about the pressure access code generally?  How many touches of Anderson's pressure access code are used to collect fingerprint images?

A  Anderson teaches a variable number of presses.

Q  How many of them are used to collect fingerprint images according to Anderson?

A  Well, I mean, the way that that's written,

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                        45

they're saying that the digitizer pad may include the optical scanner or thermal sensor for collecting the image of the user's fingerprint as the code is being entered and verified against the stored fingerprint template.  So you can be capturing a fingerprint image each time the finger is in contact with the digitizer tablet I would think.

   Q  Or just the first time, right?

   A  It does not get specific about that.

   Q  Either way, correct?

   A  From that one paragraph, I don't believe it gets specific about it.

   Q  How about anywhere else?

   A  If you want me to answer that question, I would need to go through the entire reference again.  That's a big, broad question.

   Q  Well, the finger taps that you reference in Paragraph 222, the presses or pulses, do you recall any teaching where any of those are used to capture fingerprint data in Anderson other than the passage you just read us?

A   That was the place I remember Anderson talking about fingerprints.

Q   Again, it doesn't say one way or the other whether it's one, some or all of the fingerprints that are used to capture fingerprint data, correct?

A   I don't believe it elaborates on that issue.

Q   Does Anderson say anything about a durational component about tap that's used for fingerprint capture?

A   If that's the only place where fingerprint capture is mentioned, I don't believe it mentions anything about the durational component there.

Q   Let's go to Exhibit 1003, your original declaration and let's take a look at Paragraph 165 if we can.

A   I'm there.

Q   There is a sentence that starts:  Thus for the portable door control to output address attribute."

Do you see that?

A   So I'm just going to go back so I have some context.

Again, can you just help me understand what paragraph of the supplemental declaration we're dealing with?

Q   Sure.  It's the one we've been talking about.

A   Paragraph 7?

Q   Yes.  And if you need to know more than that to be able to answer this question, the word simpler, just keep that in mind when you're answering the questions I'm about to ask you.

A   I don't see where I reference Paragraph 164 of my original declaration in Paragraph 7 of my supplemental declaration.

Q   It's Paragraph 165, Dr. Sears.

A   165, I don't see where I reference that one.

Q   Dr. Sears, before the break, you asked me over and over again what the additional safety features had to do with your supplemental declaration.

Do you remember that?

A   Yes.

Q   And then I asked a bunch of questions about the description of the additional safety features.

Do you remember that?

A   Yes.

Q   Did you understand what the questions had to do with your supplemental declaration after I asked those questions?

A   Yes.

Q   So just trust me that there is an tether to your supplemental declaration when I'm asking these questions, okay?

A   I guess I have to ask.

My understanding is I was deposed on my original declaration, and this is a deposition about my supplemental declaration.  If there is a place that I reference the paragraph that you want to get to, that's fine, but you say we're talking about Paragraph 7 of my supplemental declaration.

Q   Dr. Sears, Paragraph 165 if you can just

read the sentence starting:  "Thus for the portable door control" and then I'll ask my questions, and if you're still unclear as to why I'll be happy to explain it.

A  165, right?

Q  Yes.  "Thus for the portable door control to output a duress attribute."

A  My original declaration Paragraph 165.

Q  "Thus for the portable door control to output a duress attribute" et cetera, and it ends with a silent alert.

A  Okay.

Q  Here you're saying it's possible given Mathiassen as teachings to register a second fingerprint for purposes of a duress signal, correct?

A  Yes.

Q  So that's already in the Mathiassen, right, according to you?

A  Just to be really clear, I said that Mathiassen teaches that you can enroll one or more fingers and they teach you can have different

commands and so the modification that would be required would be to enroll a second finger for duress. So it teaches what's necessary and then there is that modification necessary, yes.

Q Already with Mathiassen's teachings, right?

A Yeah, building on what Mathiassen teaches, that's is a modification that you can make.

Q Wouldn't that be simpler than adding Anderson's finger presses taking what's already in Mathiassen and simply saying this will now be the duress command rather than adding an incremental series of finger presses that aren't already in Mathiassen?

A I guess it all depends on what you count simpler. It would be a relatively straight forward modification to add another command to Mathiassen.

Q Using a single fingerprint from a different finger?

A Yes.

Q By simpler, I'm using it in the same

fashion as you used it in Paragraph 7.  That form of simpler.

A  Yeah.

Q  Let's go ahead and look at Paragraph 96 Exhibit 1090 if we can.  So there is the sentence: "This teaching of the movement analyzing means.."

Do you see that?

A  Yes.

Q  Does the movement analyzing means care whose finger movements it is analyzing?

A  So what I'm reading here and we have Mathiassen is receiving a series of fingerprint representations that are -- let's see, they are generated by the fingerprint sensor and then the movement analyzing means uses those fingerprint representations to figure out the direction of movement so it's using a series of fingerprint representations that have been captured by the sensor and looking for the movement of those fingerprints.

Q  It's the movement that it's looking for and not whether the fingerprints actually

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023          52

fingerprints in some template, right?

A  That particular piece is focused on the movement of the fingerprints.

Q  And not the fingerprint template, per se, correct?

A  I believe that is correct.

Q  Can we go back to Exhibit 1003, Paragraph 150.

You'll see a sentence that begins:  "This disclosure would have indicated to a POSITA that increasing security measures"..  et cetera?

Do you see that?

A  Yes.

Q  Are there similar considerations with personal computers?

MS. BAILEY:  Objection.  Scope.

BY MR. SUMMERFIELD:

Q  Dr. Sears, you're able to answer the question if you can.

A  Yes.  So this disclosure -- I think there are pieces where there are parallels.

Q  Explain that to me.

A  They're talking about preventing theft or unauthorized use of a car, and there have certainly been conversations about people being put under duress in order to access computer systems and providing solutions in those situations.

Q  Where people are approached by unauthorized users and forced to unlock their computers?

A  That -- I believe there are places where that has been an issue where people are talking about being forced to authenticate into a computer system and how you can prevent that or deal with those situations.

Q  You'd agree with me that this problem is a lot more frequent in the automotive industry, right?

A  I can't speak to the frequency of one verus the other, but it certainly seems like it could be an issue in both environments.

Q  Where in your report do you talk about concerns for, for example, user safety when it

comes to unauthorized access to computers requiring, for example, discrete duress signals along the lines of what you described for the automotive industry?

A   So at this point, I guess I'm going to ask again where are we in my supplemental dec.

Q   Sure, Dr. Sears.  No problem.  You have an entire section talking about how all this art pertains to computers.

Do you remember that?

A   Yes.

Q   You say Mathiassen is computer art, correct?

A   Yes.

Q   Because a car has a computer, correct?

A   Because -- well, yes, Mathiassen what they're talking about is a computer-controlled security mechanism for electronically controlled objects generically.

Q   In a car?

A   And in other embodiments as well.

Q   But the embodiment you talk about since

we're limited to your supplemental declaration is key fob, correct?

A   That's where the focus in this document is, yes.

Q   This document being the supplemental declaration?

A   Yes.

Q   Which as you and your counsel have pointed out to me several times is the focus of this deposition, correct?  Correct?  Dr. Sears?

A   Sorry.  Somehow I got muted.  I said yes.

Q   So the computer we're talking about when it comes to the key fob is a computer in a car, correct?

A   It's one of the computers in a car, yes.

Q   One doesn't unlock a laptop with a key fob, right?

A   Not normally.

Q   One doesn't unlock a desktop PC with a key fob, right?

A   Actually I'm not sure I can say no because I remember very distinctly some medical

applications where people are carrying around a key fob as part of that access for those devices.

Q  Let's put it this way.  Mathiassen's Figure 8 doesn't depict a key fob for unlocking a computer for medical applications, right?

A  No, it does not.

Q  So Mathiassen's teachings, right, the key fob is used to unlock a car?

A  Yes.

Q  And it's fair to say that people typically don't park their PCs on the street, correct?

A  That's probably safe to say.

Q  And they don't park their laptop computers on the street, either, right?

A  Well, you don't park computers anywhere.  You leave them places.  They can be used anywhere including out in public, but, yeah.

Q  And when we were looking at Paragraph 150 a few minutes ago, the concern that you opted to include in Paragraph 150 as to why Mathiassen was addressing a known problem had to do with auto theft, right?

A   So I don't know what I'm really supposed to do on this particular one because I don't believe I reference Paragraph 150 in my original declaration anywhere in this discussion.

Q   Dr. Sears, let's just take a look at 150 and see what you say and maybe that will make things easier, the second sentence you say:  "In fact, Mathiassen expressly discloses a key issue of the application of the invention to car systems is the security issue to prevent theft or non-authorized use of the car", right?

A   That is the sentence that's written there.

Q   And that is a sentence you selected for inclusion in this paragraph, right?

A   Yes.

Q   "This embodiment in particular may be placed anywhere in the car where additional access limitation is useful," another sentence you selected for this paragraph?

A   Yes.

Q   And then if we go down a few more, we see more references to vehicle security system and to

car unlock and to the car's central locking system.

Do you see all those?

A  Yes, I do.

Q  Is there any discussion in here at all about any computer other than one that would be found in a car?

A  Well, just to be really clear, a computer is a computer wherever it's found.  Whether it's in a car or somewhere else, it's just a computer, but the references I see here are to a computer in a car.

Q  You'll agree with me that Anderson and McKeeth don't mention cars, correct?

A  I don't believe they do.

Q  Let's go to Paragraph 15.  This is -- sorry.  Exhibit 1090.  There is a sentence: Mathiassen, McKeeth and Anderson are all related to accessing a second item such as a door.

Do you see that?

A  Accessing a secured item, yes.

Q  What did I say?

A    Second.

Q    Sorry.  A secured item, yes.

A    Yes.

Q    Does Anderson contain the word door?

A    If we had an electronic copy it would be a whole lot faster to answer that question, but I can't tell you off the top of my head.

Q    Do you know whether McKeeth contains the word door?

A    I can't tell you off the top of my head.

Q    When you prepared this declaration, did you go back to look to see whether McKeeth and Anderson contain the word door in them before making the statement?

A    I do not recall.

Q    Also in Paragraph 15 you reference along with other access code types.

Do you see that?

A    Just to speed up, can you point me roughly where we're talking about.

Q    Yes.  Hold on, sorry about that.

It's the parenthetical that appears about

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    60

three quarters of the way down Page 12.

A   Yes.  Let me just read that sentence.

What's your question again?

Q   Just if you saw that.  My question, though, is the other access code types that you're referring to there would include the touch, no touch code referenced in that paragraph up above?

A   I believe that's correct.

Q   If we could go back to Mathiassen Exhibit 1004 and go to Paragraph 192.  I'm sorry, no.  Anderson.  No, I was right the first time. Mathiassen.

A   Okay.

Q   In Mathiassen, it's the translation means that records the touch, no touch pattern; is that correct?

MS. BAILEY:  Objection.  Form and foundation.

BY THE WITNESS:

A   Mathiassen captures the fingerprint representations, the movement and laying means gets the movements and then the translation means

translates between the representations that are generated from that movement analyzing means into commands.

BY MR. SUMMERFIELD:

Q So if Anderson were to modify Mathiassen to add touch, no touch, what in Mathiassen would register that pattern?

A When you say register, what specifically are you looking for?

Q Record, recognize, know that it's happening.

A So I would think that you would be -- it would be a combination -- well, probably be a combination of the movement analyzing means because that's where you're going to be getting the fingerprint representation information and converting it into the signals that you're interested in and then the translation means are going to take those signals and translate those into the commands.

Q Is it necessary to capture fingerprint information at the same time that the touch, no

touch code is being captured?

A  For what purpose and for what system.

Q  To register as a touch, no touch code being entered?

A  The a touch, no touch code could be entered, it can be enter using a biometric signal like a fingerprint.  It could be entered using a non-biometric signal.  So that code itself can be entered in a wide variety of ways including using biometric signals or not.

Q  There is a reference you mention the fingerprint movement sequences, too.

Do you see the reference to predefined sets of finger movement sequence in Paragraph 192?

A  Yes.

Q  What does the predefinition?

MS. BAILEY:  Objection.  Form.

BY THE WITNESS:

A  I think what that's saying is at some point prior to that specific operation happening, there are sets of movement of -- what does it say. The exact, so there are sets of finger movement

sequences that have been defined.  So at some point prior to that executing they've been defined.

BY MR. SUMMERFIELD:

Q  Defined by what or by whom?

A  It doesn't say right there.  I don't know that it says elsewhere.

Q  Is there anything that you're aware of in Mathiassen that grants different levels of access to a car depending on who is unlocking the door?

A  Just for context, can you give me a sense as to what part of my declaration we're talking about so I can figure out connections?

Q  Sure.  It has to do with adding Anderson's touch signals.

Is there anything in Mathiassen that grants different levels of access to a car depending on who is unlocking the car?

MS. BAILEY:  Objection.  Scope.

BY THE WITNESS:

A  Anything in Mathiassen -- so can you help me understand where in my supplemental dec I'm

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    64

talking about that?

BY MR. SUMMERFIELD:

Q   Dr. Sears, I've given you the nexus to the declaration.  You can either answer the question or not.

Is there anything in the Mathiassen that grants different levels of access to a car depending upon who is unlocking the car?

A   I'm looking for that now.  I believe there is something in there.  And I'll find it and since I don't reference it in my supplemental dec.  I'll have to dig.

I think the one point I would point to and it's scattered throughout Mathiassen a little bit is they talk extensively about the car owner, and I think at times they talk extensively about the car owner, I think at times they talk about the owner/administrator and they talk about granting access to other users.  And I think it's pretty clear from the preparation that the other users are not intended to be equivalent to the car owner.

Q   What's the difference?  What access does the car owner have that the other users would not according to Mathiassen's teachings?

MS. BAILEY:  Counsel, you are again asking questions outside of the supplemental declaration.

MR. SUMMERFIELD:  I disagree.

BY MR. SUMMERFIELD:

Q   Dr. Sears?

A   I asked previously where you are referencing the supplemental declaration.  I know you are going to have some issues, but I would still like to know what we're talking about.

Q   It has to do with the motivation to add additional methodologies for different levels of access or for anything for additional commands which is something you definitely opine about in your supplemental declaration, Dr. Sears.  I'm doing you a courtesy that I would not do to the vast majority of witnesses I've deposed.

A   Well, I still don't know which paragraphs you're talking about.

Can you repeat the question, please?

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    66

Q   What is the different level of access that is accorded to a car owner that is not accorded to another user?

MS. BAILEY:  Counsel, this was in his original declaration and you had an opportunity to depose him about this during the original declaration.  I don't see anything in the supplemental declaration direct to this.

BY MR. SUMMERFIELD:

Q   Dr. Sears?

MS. BAILEY:  Counsel?

MR. SUMMERFIELD:  I am not under examination, Jennifer.

MS. BAILEY:  I am happy to take this off the record and discuss with you.

MR. SUMMERFIELD:  That's not the way these depositions work, Jennifer.  You've heard the question.  You've heard my explanation which, again, I would never do, but I gave him one and if that's not good enough for you, then make your objection, instruct him not to answer, do whatever you want to do.  This is literally my last

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                    67

question, so once he answers it or not we're done.

MS. BAILEY:  I'm not instructing him not to answer.

MR. SUMMERFIELD:  Good.  Then let's have an answer.

BY THE WITNESS:

A  I believe Mathiassen leaves that open. They don't explicitly address what -- the specific types of different access this might be.

MR. SUMMERFIELD:  That's all I have, Dr. Sears.  Thank you, very, very much.

MS. BAILEY:  I have no questions.

(Deposition concluded at 11:04 a.m. CST.)

Transcript of Andrew Sears, Ph.D.
Conducted on May 19, 2023                                68

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Theresa A. Vorkapic, Certified Reporter and Notary Public within and for the State of Illinois do hereby certify:

That Andrew Sears, PhD, the witness whose deposition is hereinbefore set forth,

Was duly sworn by me before the commencement of such deposition and that such deposition was taken before me and is a true record of the testimony given by such witness.

I further certify that the adverse party, patent owner, was represented by counsel at the deposition.

I further certify that the deposition of Andrew Sears, PhD, occurred virtually via Zoom on Friday, May 19, 2023, commencing at 9:00 a.m. CST to 11:00 a.m. CST.

I further certify the inspection, reading and signing of said deposition was waived on the record by agreement of all parties.

I further certify that I am not related to any of the parties to this action by blood

or marriage, I am not employed by or an attorney
to any of the parties to this action, and that I
am in no way interested, financially or otherwise,
in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of May, 2023.

*Theresa A Vorkapic*

Theresa A. Vorkapic

My commission expires 11/6/23.

NOTARY PUBLIC IN AND FOR THE

ILLINOIS

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner

v.

CPC Patent Technologies PTY, LTD.,

Patent Owner

_____

*Inter Partes* Review Case No. IPR2022-00602
U.S. Patent No. 9,665,705

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,665,705**

**Appx3204**

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

**TABLE OF CONTENTS**

*I.   INTRODUCTION*...................................................................................*1*

*II.  SUMMARY OF THE '705 PATENT*..................................................*1*

   **A.  Description of the Alleged Invention** .............................................**1**

   **B.  Summary of Unpatentability of the Challenged Claims**........................**2**

   **C.  Priority Date of the Challenged Claims** .......................................**3**

   **D.  Level of Skill of a POSITA** ............................................................**4**

*III. REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104* ........................*4*

   **A.  Grounds for Standing Under 37 C.F.R. § 42.104(a)** ...................**4**

   **B.  Identification of Challenge Under 37 C.F.R. § 42.104(b) and Relief
Requested** .......................................................................................**4**

   **C.  Claim Construction Under 37 C.F.R. § 42.104(b)(3)** ...................**5**

*IV.  THE CITED REFERENCES ARE ANALOGOUS PRIOR ART* ...............*6*

*V.   MATHIASSEN'S ARCHITECTURE OVERVIEW* ........................................*7*

*VI.  GROUND 1: THERE IS A REASONABLE LIKELIHOOD CLAIMS 1, 4,
6, 10-12, and 14-17 ARE OBVIOUS OVER THE COMBINATION OF
MATHIASSEN, MCKEETH, AND ANDERSON*.....................................*9*

   **A.  Claim 1** ..............................................................................................**9**

     1.   Claim 1(Pre)..............................................................................9

     2.   Claim 1(a) ...............................................................................11

     3.   Claim 1(b).................................................................................13

     4.   Claim 1(b1)...............................................................................14

     5.   Claim 1(b2)...............................................................................15

     6.   Claim 1(b3)...............................................................................24

     7.   Claims 1(c) and 1(c1) ..............................................................28

     8.   Claim 1(c2) ..............................................................................30

     9.   Claim 1(d) ................................................................................31

     10.  Claim 1(d1) ..............................................................................31

     11.  Claim 1(d2) ..............................................................................37

     12.  Claim 1(d3) ..............................................................................38

     13.  Claim 1(e).................................................................................42

   **B.  Claim 4** ..............................................................................................**42**

C. **Claim 6** .................................................................................42
   1. Claim 6(a) .......................................................................42
   2. Claim 6(b) .......................................................................43
   3. Claim 6(c) .......................................................................44

D. **Claim 10** ...............................................................................44
   1. Claim 10(Pre) ..................................................................44
   2. Claim 10(a) .....................................................................44
   3. Claim 10(b) .....................................................................44
   4. Claim 10(c) .....................................................................44
   5. Claim 10(d) .....................................................................45
   6. Claim 10(d1) ...................................................................45
   7. Claim 10(d2) ...................................................................45
   8. Claim 10(d3) ...................................................................45
   9. Claim 10(e) .....................................................................45

E. **Claim 11** ...............................................................................45
   1. Claim 11(Pre1) ................................................................45
   2. Claim 11(Pre2) ................................................................45
   3. Claim 11(Pre3) ................................................................46
   4. Claim 11(Pre4) ................................................................47
   5. Claim 11(a) .....................................................................47
   6. Claim 11(a1)-(a2) ...........................................................47
   7. Claim 11(a3) ...................................................................47
   8. Claim 11(a4) ...................................................................48
   9. Claim 11(b) .....................................................................48
   10. Claim 11(c) ....................................................................48
   11. Claim 11(d) ...................................................................48
   12. Claim 11(e) ....................................................................48
   13. Claim 11(f) ....................................................................48

F. **Claim 12** ...............................................................................48

G. **Claim 14** ...............................................................................49
   1. Claim 14(Pre) ..................................................................49
   2. Claim 14(a) .....................................................................49
   3. Claim 14(b) .....................................................................49
   4. Claim 14(c) .....................................................................49
   5. Claim 14(d) .....................................................................49
   6. Claim 14(e) .....................................................................50
   7. Claim 14(f) .....................................................................50
   8. Claim 14(g) .....................................................................50

9.   Claim 14(h) ................................................................................50
10.  Claim 14(i) .................................................................................50

**H.  Claim 15** ................................................................................**50**
1.   Claim 15(Pre) .............................................................................50
2.   Claim 15(a) .................................................................................50
3.   Claim 15(b) .................................................................................50
4.   Claim 15(b1) ...............................................................................50
5.   Claim 15(b2) ...............................................................................50
6.   Claim 15(b3) ...............................................................................51
7.   Claim 15(c) .................................................................................51
8.   Claim 15(c1) ...............................................................................51
9.   Claim 15(c2) ...............................................................................51
10.  Claim 15(d) .................................................................................51
11.  Claim 15(d1) ...............................................................................51
12.  Claim 15(d2) ...............................................................................51
13.  Claim 15(d3) ...............................................................................51
14.  Claim 15(e) .................................................................................51

**I.  Claim 16** ................................................................................**51**
1.   Claim 16(Pre) .............................................................................51
2.   Claim 16(a) .................................................................................52
3.   Claim 16(b) .................................................................................52
4.   Claim 16(c) .................................................................................52
5.   Claim 16(d) .................................................................................52
6.   Claim 16(d1) ...............................................................................52
7.   Claim 16(d2) ...............................................................................52
8.   Claim 16(d3) ...............................................................................52
9.   Claim 16(e) .................................................................................52

**J.  Claim 17** ................................................................................**52**
1.   Claim 17(Pre1) ............................................................................52
2.   Claim 17(Pre2) ............................................................................52
3.   Claim 17(Pre3) ............................................................................53
4.   Claim 17(Pre4) ............................................................................53
5.   Claim 17(a) .................................................................................53
6.   Claim 17(a1) ...............................................................................53
7.   Claim 17(a2) ...............................................................................53
8.   Claim 17(a3) ...............................................................................53
9.   Claim 17(a4) ...............................................................................53
10.  Claim 17(b) .................................................................................53
11.  Claim 17(c) .................................................................................53

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

12.   Claim 17(d) ...................................................................53
13.   Claim 17(e) ...................................................................53
14.   Claim 17(f) ...................................................................54

**VII.   DISCRETIONARY CONSIDERATIONS** ......................................**54**

   **A.   The *Fintiv* Factors Favor Institution** ...................................**54**
      1.   Stay ...................................................................54
      2.   Proximity of the Court's Trial Date ...................................54
      3.   Investment in Parallel Proceeding ...................................57
      4.   Overlap ...................................................................57
      5.   Same Party ...................................................................58
      6.   Other Circumstances ...................................................58

   **B.   The *Fintiv* Framework Should Be Overturned** ....................**59**
      1.   The Fintiv Framework Exceeds the Director's Authority ........59
      2.   The Fintiv Framework Is Arbitrary and Capricious ..................59
      3.   The Fintiv Framework Was Impermissibly Adopted Without Notice-and-Comment Rulemaking ...................................................................60

**VIII.   CONCLUSION** ...................................................................**60**

**IX.   MANDATORY NOTICES UNDER Under 37 C.F.R. § 42.8(a)(1)** .............**62**

   **A.   Real Party-In-Interest** ...................................................**62**

   **B.   Related Matters** ...................................................................**62**

   **C.   Lead and Back-Up Counsel** ...........................................**62**

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

## TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) . *passim*
*Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 (PTAB May 15, 2020) ............................................................................................56
*DISH Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 (PTAB Feb. 4, 2021) ................................................................................................53
*Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246 (D.C. Cir. 1994) ...........57
*In re Apple Inc.*, No 20-135, slip op. (Fed. Cir. Nov. 9, 2020) ..............................53
*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)..................................................................58
*NHK Spring Co., Ltd., v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018)..........................................................................52, 54, 58
*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014) ......................57
*Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007) ........................................58
*Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 (PTAB Jun. 16, 2020)................................................52
*Shenzhen Carku Tech. Co., Ltd. v. The Noco Co.*, IPR2020-00944, Paper 20 (PTAB Nov. 12, 2020).........................................................................................52

**Statutes**

35 U.S.C. § 314 ......................................................................................................52
35 U.S.C. § 315 ......................................................................................................57
35 U.S.C. § 316 ......................................................................................................54
35 U.S.C. § 325 ......................................................................................................57

**Regulations**

37 C.F.R. § 42.100....................................................................................................5
37 C.F.R. § 42.104................................................................................................4, 5
37 C.F.R. § 42.105..................................................................................................73
37 C.F.R. § 42.24....................................................................................................72
37 C.F.R. § 42.6......................................................................................................73
37 C.F.R. § 42.8................................................................................................60, 72

## I.    INTRODUCTION

Petitioner Apple Inc. ("Petitioner") requests *Inter Partes* Review ("IPR") of Claims 1, 4, 6, 10-12, and 14-17 (collectively, the "Challenged Claims") of U.S. Patent No. 9,665,705 ("the '705 Patent"). The purportedly distinguishing features of the Challenged Claims were (1) emitting a "secure" access signal in a secure access system; and (2) enrolling a new user's fingerprint by providing control information via a sequence of presses of certain amount and duration. Both features were well-known before the '705 Patent, rendering the Challenged Claims obvious. IPR of the Challenged Claims should thus be instituted.

## II.    SUMMARY OF THE '705 PATENT

### A.    Description of the Alleged Invention

The '705 Patent describes a secure access system. At a transmitter subsystem, a biometric (e.g., fingerprint) is received by a sensor, matched against a stored fingerprint, and an accessibility attribute is outputted. A secure access signal carrying information corresponding to the accessibility attribute is transmitted to a receiver subsystem for providing access to a controlled item. *'705 Patent*, Abstract, 5:57–6:20, 6:67–7:3, 8:24-38, FIG. 2.

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705



Fig. 2

The sensor may receive a series of fingerprint presses of a certain duration that are compared to stored control signals. *'705 Patent*, 10:56–11:12.

## B.    Summary of Unpatentability of the Challenged Claims

Access systems sending a biometric "secure access signal" were well-known as of August 2003. *Mathiassen* teaches a secure access system for unlocking car doors, where a portable control emits an encrypted, single-use command. *Mathiassen's* portable control includes a fingerprint sensor for authenticating a user to lock/unlock car doors. *Mathiassen* also teaches a user-input series of fingerprint representations to instruct various commands. Upon matching a live fingerprint against a stored fingerprint, car door locks are opened.

*Mathiassen* teaches portable door control outputting an encrypted command to grant access to the car door locks. *McKeeth* teaches outputting other signals indicating when a user is under duress or when a user is unauthorized, i.e., to instruct duress access or alert access.

Although *Mathiassen* teaches inputting a command via a series of fingerprint representations, *Mathiassen* does not teach determining a duration of each entry. *Anderson* teaches inputting an access code including fingerprint presses of varying duration.

Modifying *Mathiassen's* portable control to output information indicating duress access and alert access, in addition to *Mathiassen's* taught grant access, and further modifying *Mathiassen* to determine a *duration* of the taught series of entries, would have been obvious to a POSITA.

## C.    Priority Date of the Challenged Claims

The '705 Patent was filed on January 19, 2016, as U.S. Patent Application No. 15/000,818, which claims priority to U.S. Patent No. 9,269,208 (for which an IPR is filed commensurately herewith), which claims priority to PCT/AU2004/001083, filed August 13, 2004, now U.S. Patent No. 8,266,442. *'705 Patent* (Ex. 1001), (63). The '705 Patent further lists priority to AU2003904317, filed August 13, 2003. *'705 Patent,* (30).

For this IPR *only*, Apple applies August 13, 2003, as the priority date for the Challenged Claims.

### D.    Level of Skill of a POSITA

A POSITA at the time of the '705 Patent (August 13, 2003) would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year of experience in the field of human-machine interfaces and device access security. Additional education or experience might substitute for the above requirements. *Dec.,* 31-35.[1]

## III.   REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

### A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

Apple certifies the '705 Patent is available for IPR and Apple is not barred or estopped from requesting IPR challenging the claims of the '705 Patent. Apple is not the owner of the '705 Patent, has not filed a civil action challenging the validity of any claim of the '705 Patent, and this Petition is filed less than one year after Apple was served with a complaint alleging infringement of the '705 Patent.

### B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Relief Requested

In view of the prior art and evidence presented, the Challenged Claims of the '705 Patent are unpatentable and institution should be granted. 37 C.F.R. § 42.104(b)(1); 37 C.F.R. § 42.104(b)(2).

---

[1] All citations to "*Dec.*" are to Ex. 1003, Declaration of Dr. Andrew Sears.

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

| Proposed Grounds of Unpatentability |
|---|
| **Ground 1:** Claims 1, 4, 6, 10-12, and 14-17 are **obvious** under § 103(a) over *Mathiassen* (Ex. 1004) in view of *McKeeth* (Ex. 1005) and *Anderson* (Ex. 1006) |

Sections V-VII identify where each element of the Challenged Claims is found in the prior art. 37 C.F.R. § 42.104(b)(4). The exhibit numbers of evidence relied upon to support the challenges are provided above and the relevance of evidence to the challenges raised is provided in Section IV. 37 C.F.R. § 42.104(b)(5). Exhibits 1001-1080 are also attached.

## C.    Claim Construction Under 37 C.F.R. § 42.104(b)(3)

Here, claims are interpreted under the same standard applied by Article III courts (i.e., the *Phillips* standard). 37 C.F.R. § 42.100(b); 83 Fed. Reg. 197 (Oct. 11, 2018); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). With the exceptions discussed below, Petitioner applies the plain and ordinary meaning of all claim terms. Petitioner does not waive any argument in any litigation that claim terms in the '705 Patent are indefinite or additional terms need construction.

In the related district court litigation, a *Markman* Order was entered February 10, 2022. (Ex. 1077). The Parties also agreed to certain constructions in a Joint Claim Construction Statement (JCCS). (Ex. 1074). For purposes of this IPR, Apple applies the District Court's constructions from the *Apple* litigation and constructions agreed to by the Parties (Ex. 1074) that are not otherwise plain and ordinary meaning, shown in the chart below.

5

| *Claim Term* | *Construction* |
|---|---|
| Claims 1, 4, 10-12, 14-17: "database"  **Agreed-Upon Construction, Ex. 1074** | "Organized structure of data" (Ex. 1074, 3) |
| Claims 1, 11, 14-17: "conditional access"  **Agreed-Upon Construction, Ex. 1074** | "Access based on accessibility attribute" (Ex. 1074, 3) |
| Claims 1, 10-12, 14-17: "biometric signal"  **Agreed-Upon Construction, Ex. 1074** | "Physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" (Ex. 1074, 3) |
| Claims 1, 10-11, 14-17: "accessibility attribute"  **Court's Construction, Ex. 1077** | "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user" (Ex. 1077, 2-3) |

## IV.    THE CITED REFERENCES ARE ANALOGOUS PRIOR ART

*Mathiassen*, a U.S. patent application filed December 18, 2002, and published June 24, 2004, qualifies as prior art under § 102(e). *Mathiassen* teaches a secure access system transmitting wireless signals providing access to a controlled item. *Mathiassen,* [0175-0186]. *Mathiassen* teaches enrolling an administrator's biometric and inputting a series of fingerprint representations instructing a command. *Mathiassen*, [0162-0165], [0192]. Because *Mathiassen,* like the '705 Patent, discloses a system providing secure access to a controlled item, *Mathiassen* is in the

same field of endeavor and is pertinent to the '705 Patent's problem to solve. *Dec.,* 81-88. *Mathiassen* is analogous art.

*McKeeth*, a U.S. patent filed February 23, 2000, and issued July 20, 2004, qualifies as prior art under § 102(e). *McKeeth* teaches a computer system granting access and issuing an alert when a user is under duress or denying access when a user is unauthorized. *McKeeth,* 4:28-35, 5:48-53. Because *McKeeth*, like the '705 Patent, discloses a system for providing or denying access, *McKeeth* is in the same field of endeavor and is pertinent to the problem to the '705 Patent's problem to solve. *Dec.,* 89-93. *McKeeth* is analogous art.

*Anderson,* a U.S. patent filed September 1, 1999, and issued January 21, 2003, qualifies as prior art under § 102(e). *Anderson* teaches inputting a fingerprint code to a touch interface via "temporal variations." *Anderson*, 7:1-39. Because *Anderson,* like the '705 Patent, discloses providing a series of biometric entries authenticating a user and enabling a function, *Anderson* is in the same field of endeavor and is pertinent to the '705 Patent's problem to solve. *Dec.,* 94-100. *Anderson* is analogous art.

## V.    *MATHIASSEN'S* ARCHITECTURE OVERVIEW

*Mathiassen* teaches an integrated circuit (IC) as the "core device" of the secure access system that contains a processor 2. *Mathiassen,* [0048, 0050]. The processor 2 executes "program code, e.g., administrative software" stored in non-volatile

memory 7/7A on the IC 1. *Id.* This administrative software includes algorithms for providing secure access, such as a matching and SKG algorithm. *Mathiassen,* [0050, 0072, 0076]. Movement analyzing and translation software are additionally described as providing secure access. *Mathiassen,* [0192]. A POSITA would have understood the analyzing and translation software, like the administrative software, are executed by processor 2. *Mathiassen,* [0192], *Dec.* 108.

The '705 Patent uses the terms "processor" and "controller" interchangeably. *Compare '705 Patent*, 6:7 (describing "controller 107"), *with* 14:33-37 (describing "processor modules 107"), 15:6-9, Fig. 10, 6:4 (describing "controller/transmitter 107"). A POSITA would have understood controllers 107,109 are functionally equivalent to a processor(s). *Dec.,* 109-111. The '705 Patent describes the controllers 107, 109 primarily in terms of functions performed. *'705 Patent*, 6:2–6:9; *Dec.,* 110. Thus, *Mathiassen's* processor teaches or renders obvious the controllers described and claimed in the '705 Patent. *Dec.* 111.

Apple applies this Section V discussion for each claimed "controller" to avoid repetitive mapping.

**VI.    GROUND 1: THERE IS A REASONABLE LIKELIHOOD CLAIMS 1, 4, 6, 10-12, AND 14-17 ARE OBVIOUS OVER THE COMBINATION OF *MATHIASSEN*, *MCKEETH*, AND *ANDERSON***

### A.    Claim 1

#### 1.    *Claim 1(Pre)*

To the extent the preamble is limiting, *Mathiassen* teaches a system for providing secure access to a controlled item. *Mathiassen,* Abstract. *Mathiassen* teaches a "portable access device…for allowing only authorized users access to, an access-limited apparatus, device, network or system…." *Mathiassen*, [0016], Abstract. *Mathiassen* discloses access-limited apparatus ("controlled items") including a USB interface ([0054]), hotel safe ([0119]), medicine cabinet ([0122-0123]), and portable control 20 for unlocking a car ([0145-0147]). Each access-limited item disclosed in *Mathiassen* is a "controlled item," as claimed, as access to the item is limited to "authorized users." *Mathiassen*, [0047]; *Dec.,* 112-113.

*Mathiassen* teaches a "system" implementing the "method of providing secured access control." *Mathiassen*, Abstract. Integrated circuit (IC) 1 couples with a "biometric sensor" for performing secure access control. *Mathiassen*, [0048-0050], FIGs. 2A-2B; *Dec.,* 114 (opining the IC is also used for the portable remote door control 20, described in *Mathiassen*, [0147]). The IC includes components, such as processor 2 and non-volatile memory 7,7A,7E, and function blocks, such as pre-processing block 5C for processing the biometric and encryption blocks 8,8B,8C.

*Id.* In some embodiments, the IC is coupled with a network [0053], while in other embodiments IC is used in "stand-alone applications," such as "within a car" [0108].

In stand-alone applications, such as portable control 20, *Mathiassen's* "system" includes fingerprint sensor 5 and transceiver 27 (both housed in unit 20), and ignition control 15 (including IC 1), a central car computer, door locks, and transceivers of the central car computer and door locks (each of which resides in the car). *Mathiassen*, [0167-0168], [0186-0188]. Portable control 20 connects to the ignition control via the central computer's transceiver:



*Mathiassen*, Fig. 8, [0147], [0149], [0186]; *Dec.,* 115-116.

Claim 1's mapping relies on *Mathiassen's* portable control 20 embodiment of *Mathiassen*, where the "controlled item" is *Mathiassen*'s car door locks in the "central locking system." The portable control remotely controls the door locks. *Mathiassen*, [0145]; *Dec.*, 117. *Mathiassen's* IC 1 ([0048-0050]) is used in each embodiment, including the car door lock embodiment. *Dec.*, 117 (*citing Mathiassen*, [0146], FIG. 2B). An internal motivation to combine from other embodiment details with the car door embodiment is provided below.

### 2.  *Claim 1(a)*

Under the agreed claim construction, "database" is an "organized structure of data." *See* Section III.C. *Mathiassen* teaches a "memory comprising a database of biometric signatures," as claimed, namely non-volatile memory 7,7A of IC residing in portable control 20 storing one or more master minutiae tables of fingerprint representations (i.e., "a database of biometric signatures"):

11



*Mathiassen,* [0147], Fig. 2B, [0050].

The IC generates minutiae by reducing images captured when a user places finger(s) on the fingerprint sensor. *Mathiassen,* [0162-164], [0190]. A POSITA would have understood master minutiae tables contain biometric signatures of car users. *Dec.,* 118-121. *Mathiassen* teaches the master minutiae tables are fingerprint representations taken from "raw images" of the fingerprint applied to the fingerprint sensor. *Mathiassen*, [0049-0050]; *Dec.,* 119. The "fingerprint representations" are stored as "minutiae" in non-volatile memory 7,7A,7E. *Mathiassen*, [0050]. Because the master minutiae tables represent the user's fingerprint(s), and because

fingerprints provide "secure identification by biometrics," a POSITA would have understood *Mathiassen's* master minutiae tables comprise biometric signatures. *Mathiassen*, [0005]; *Dec.,* 119-121.

*Mathiassen's* master minutiae tables stored in memory 7,7A is a "database" of biometric signatures because a POSITA would have understood tables form an "organized structure of data." *Dec.,* 122.

### 3.    *Claim 1(b)*

*Mathiassen* teaches a transmitter subsystem, namely transceiver 27, fingerprint sensor 5, processor 2 (of IC 1), and non-volatile memory 7,7A (of IC), each housed in portable control 20:





*Mathiassen,* Figs. 8, 2B (illustrating IC 1 containing processor 2), [0147-0149].

The collective transceiver 27, fingerprint sensor 5, processor 2, and memory 7,7A is a "transmitter subsystem" because the components transmit a signal to a receiver subsystem. Transceiver 27 transmits a command issued by processor 2, such as "open door." *Mathiassen*, [0185-0188]; *Dec.,* 123-126.

### 4.    Claim 1(b1)

Under the agreed construction, the claimed "biometric signal" is construed as "a physical attribute of a user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." *See* Section III.C.

*Mathiassen*'s "fingerprint sensor 5" satisfies the claimed "biometric sensor configured to receive a biometric signal," because it detects a finger on the sensor and "triggers the wake-up" of components in IC 1 to process raw images of the fingerprint. *Mathiassen*, [0049]; *Dec.,* 127-128.  A POSITA would have understood

14
**Appx3223**

"captured raw images from the sensor" ([0049]) and/or processed "intermediate fingerprint data" ([0050]) are "biometric signals" because each indicates a fingerprint received by the fingerprint sensor. *Dec.,* 128.

Specifically, *Mathiassen* teaches the car owner "access[ing] the car" by "swip[ing] his finger across the sensor (5) of the portable door control (20)" to thereby receive a biometric signal, as claimed. *Mathiassen*, [0175-0176]. The sensor's pre-processing block 5C "reduce[s] the captured fingerprint image to a reduced intermediate format," and the processor "reduce[s] the captured and pre-processed fingerprint image to compact master minutiae format." *Mathiassen*, [0177-0179], [0050]; *Dec.,* 129.

### 5.    *Claim 1(b2)*

The Court construed "accessibility attribute" to mean "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user." *See* Section III.C. *Mathiassen* as modified by *McKeeth* teaches or renders obvious Claim 1(b2).

#### a)    "a transmitter sub-system controller configured to"

*Mathiassen's* processor 2 of the IC 1 in the portable door control 20 teaches a "transmitter sub-system controller," as claimed. *See* Section V; *Dec.,* 132. *Mathiassen's* processor 2 of the IC 1 is mapped as part of the transmitter sub-system, as discussed for Claim 1(b). *See* Section VI.A.5.3. As discussed in the following

Sections VI.A.5.b-c, the processor of the IC of the portable door control receives the biometric signal from a user, matches the biometric signal to a stored biometric signal, and outputs an accessibility attribute, e.g., a command to open the door responsive to a car owner/administrator requesting access. Thus, the processor is "configured to" perform the claimed step(s) of Claim 1(b2).

### b)  "match the biometric signal against members of the database of biometric signatures"

As discussed for Claim 1(a), a POSITA would have understood *Mathiassen's* memory in portable control comprises a "database of biometric signatures," namely stored master minutiae tables. *Mathiassen* teaches processor 2 is "configured to match the biometric signal…" by matching a received biometric signal against these stored minutiae tables (i.e., the claimed "members of the database"). Upon a user swiping their finger across the fingerprint sensor of the portable control [0175-0176], the pre-processing block 5C and processor collectively reduce the fingerprint image to a compact master minutiae format [0178-0179]. The processor (of IC of portable control 20) "compare[s] this access minutiae table with the master minutiae table(s) pre-stored at time of enrolment in non-volatile memory (7A)." *Mathiassen,* [0179-0182], [0050]; *Dec.,* 134-135. Therefore, *Mathiassen* teaches processor of portable control is configured to match the user's biometric signal (raw images reduced to access minutiae) against members of the database of biometric signatures (stored master minutiae tables). *Dec.,* 131, 133-135.

*Mathiassen* teaches if there is a "match" between the access minutiae table and the pre-stored master minutiae table(s), "the processor will proceed to open (or lock) the car doors." *Mathiassen*, [0180-0182]; *Dec.,* 136. Upon a match of the access and stored master minutiae, the processor issues an "open door" command to the encryption block 8B,8C [0185], and the encryption block encrypts the command using a temporary password.

### c)    "to thereby output an accessibility attribute"

Applying the Court's construction, *Mathiassen's* "open door" command as modified by *McKeeth's* teaching of duress and alert conditions teaches or renders obvious outputting an accessibility attribute, as claimed. *Dec.* 137-171.

*Mathiassen* and *McKeeth* each teaches **whether** access is granted. In *Mathiassen*, access *is granted* (as opposed to denied) by opening (i.e., unlocking) the car doors. *Mathiassen*, [0181-0182]; *Dec.,* 139. The issued "open door" command indicates "whether" access should be granted. *Mathiassen* teaches the open door command is issued in response to access minutiae matching a stored biometric signature of the car owner/administrator. *Mathiassen,* [0182]; *Dec.,* 139. In contrast, if the processor 2 does not find a match, then no access will be granted because "the process will be aborted." *Mathiassen,* [0181]. Thus, the "open door" command indicates that access should be granted.

In *McKeeth*, access is granted where "there is a match between the input and security information." *McKeeth*, 3:65-67, 3:11-28 (describing different types of input security information, including a fingerprint scan). "If the input and security information do not match, the compare circuit issues a 'flag' signal indicating denial of access by the user." *McKeeth*, 4:2-4.

*Mathiassen* and *McKeeth* also each teaches **under what conditions** access is granted. Specifically, both references teach outputting an accessibility attribute upon there being a match of a live or access biometric signal, and *McKeeth* teaches outputting both a duress instruction and an alert instruction when there is no match. As background, Dr. Sears notes the '705 Patent describes one of the accessibility attributes to be an "access attribute (granting unconditional access)." *'705 Patent,* 8:28-30, *Dec.* 138. The '705 Patent also describes that upon matching an access biometric signal with a stored signal, access to the controlled item is provided. *Id.* at 12:15-24. In the '705 Patent, the biometric signal provided by the user determines which category of access is provided, e.g., access, duress access, or alert access. *Id.* at 11:40-55, 12:13-41. Dr. Sears explains that because the biometric signal itself, e.g., the user's fingerprint, determines which category of access is provided, then in the instances where the user is simply granted access without any conditions, e.g., a duress condition, then per the '705 Patent, 12:15-24, access is going to be instructed and granted. *Dec.* 138.

In *Mathiassen,* when the processor 2 of the portable door control 20 matches the owner's access minutiae table to a pre-stored master minutiae table, the "open door" command is issued to the encryption block to grant unconditional access. Per Dr. Sears, because the user is the car owner/administrator and is requesting access to the car's central locking system, a POSITA would have understood the access that is granted is unconditional access. *Dec.,* 138, 140-141 (explaining *Mathiassen's* administrator has full access, and comparing to the *'705 Patent*, 8:28-30, describing "access attribute" as "granting unconditional access").

Dr. Sears opines *Mathiassen's* teaching is substantially similar to the "access" accessibility attribute described in the '705 Patent. Specifically, *Mathiassen* teaches matching a car owner's/administrator's access minutiae to stored minutiae and responsively issuing an "open door" command. Similarly, the '705 Patent describes checking the biometric signal against the signatures in the database (step 607, 12:15-16), and if there is a match, then directing the controller to provide access. *'705 Patent*, 12:15-24; *Dec.,* 142.

Thus, *Mathiassen* teaches the "open door" command includes outputting an accessibility attribute indicating "under which conditions." Specifically, *Mathiassen* teaches providing full access to the car's central locking system based on the matching of the access minutiae to the car owner/administrator's pre-stored master

19

minutiae table and in response to the car owner/administrator requesting access to the car door locks, thereby issuing the "open door" command.

*McKeeth* also teaches the claimed outputting an accessibility attribute that indicates **under what conditions** access is granted. Specifically, *McKeeth* teaches granting access with certain conditions, such as a **duress** condition or an **alert** condition. *McKeeth* teaches a user requesting access provides their fingerprint for authorization. *McKeeth*, 3:38-42, 3:52–4:4. The user may also be required to perform a geometric pattern to indicate normal access (i.e., *not* indicating duress or an alert). *McKeeth*, 4:10-27. If the user does not perform the geometric pattern, then the system determines the user is under duress. *McKeeth*, 4:28-43. The system grants limited access to the user while also sending a security alert to security personnel. *Id. McKeeth* teaches issuing a "flag signal" to indicate the duress condition. *McKeeth*, 4:23-27. Thus, *McKeeth* teaches granting access to the user (whether access is granted) and that access is granted under certain conditions (e.g., is limited access and an alert is sent). Thus, *McKeeth's* outputting of a duress instruction to the controlled item based on the user's biometric signature (specifically, the matching of the biometric signature without completing the implicit input, 4:5-43) and issuing a flag signal satisfies the claimed outputting an accessibility attribute. *Dec.,* 143-146. As discussed below, it would have been obvious to a POSITA to modify *Mathiassen's* portable door control to issue a duress condition in response to a

received biometric signature (i.e., access minutiae) from the user inputted for the purpose of indicating a duress situation.

*McKeeth* also teaches an alternative embodiment where if the user attempts to authenticate themselves via their fingerprint but does not perform a stored pattern, the system *denies* access and generates a security alert to the responsible authorities. *McKeeth*, 5:48-53. Although access is not granted, a POSITA would have understood that by transmitting an access signal that instructs denying access and generating a security alert, the system is also outputting an "accessibility attribute." *Dec.,* 147-148 (noting the '705 Patent describes a similar functionality as an "alert attribute" that is a type of accessibility attribute); *'705 Patent*, 8:32-35, 12:25-41, Claim 5 (describing denial of access and sounding an alert "if the accessibility attribute comprises an alert attribute"). Therefore, *McKeeth* teaches outputting an alert condition in response to a user's inputted biometric signature not matching a stored biometric signature. As discussed below, it would have been obvious to a POSITA to modify *Mathiassen's* portable door control to issue an alert condition in response to a received biometric signature, i.e., access minutiae, from the user that does not match a stored biometric signature, i.e., stored minutiae.

The collective teachings of *Mathiassen* and *McKeeth* thus teach outputting an accessibility attribute, where the accessibility attribute may be one of an access attribute (*Mathiassen* and granting access to a car owner/administrator), a duress

21

attribute (*McKeeth* and granting limited access along with a security alert), and an alert attribute (*McKeeth* and denying access along with a security alert).

### d)    Motivation to Combine *McKeeth* with *Mathiassen*

A POSITA would have been motivated and found it obvious to modify *Mathiassen's* portable door control processor to output a duress or an alert accessibility attribute, as taught by *McKeeth*, in addition to outputting an accessibility attribute granting access to the car owner/administrator by unlocking a car door lock unconditionally, as otherwise taught by *Mathiassen*. *Dec.,* 149-171. In the modified *Mathiassen*, the emitted commands (i.e., secure access signal) are capable of conveying information dependent upon the accessibility attribute (as recited for Claim 1(b3)), including conveying an access instruction (taught by *Mathiassen*), a duress instruction (taught by *McKeeth*), or an alert instruction (also taught by *McKeeth*).

*Mathiassen's* portable door control 20 already increases car owner security by requiring biometric authorization prior to unlocking a car door, indicating to a POSITA increased safety was an intended goal of the system. *Mathiassen,* [0145]; *Dec.,* 150. *Mathiassen* discusses preventing "theft or non-authorized use of the car," stating that "[t]he automotive industry is emphasizing secure access by blocking non-authorized users access to the car." *Id.* Thus, a POSITA would have been motivated to output accessibility attributes to indicate duress access or alert access

to increase security and block non-authorized use. *Dec.,* 149, 151-161. Providing access in car control systems for users in duress situations was well-known in the prior art. *Dec.,* 151-156. Allowing for access to a car while in duress while sending an alert dissuades an assailant from immediate harmful action to the car owner. *Dec.,* 151-155.

*Mathiassen* teaches the importance of denying unauthorized access to a vehicle. *Mathiassen,* [0145]; *Dec.,* 157. A POSITA would have found it obvious and been motivated when denying access to additionally alert security personnel, as taught by *McKeeth*. *Dec.,* 157-161. A POSITA would have appreciated when a carjacker found a stolen/lost portable door control, the car owner would have wanted authorities to be notified swiftly. *Id.* Vehicle security systems denying access by locking car doors and concurrently alerting security personnel were well-known in the art. *Dec.,* 159-161.

Modifying *Mathiassen's* issued command to include information conveying a duress or an alert accessibility attribute, as taught by *McKeeth*, would have had a reasonable expectation of success. *Mathiassen* teaches the hardware/software for receiving, storing, and matching access minutiae against stored minutiae tables and contemplates the user enrolling multiple fingers and instructing multiple commands via a series of finger movements. *Mathiassen*, [0180-0182], [0050], [0164], [0173], [0192]. *Mathiassen* recognizes denying access when the access minutiae do not

match the stored master minutiae. *Mathiassen*, [0181]. Modifying *Mathiassen* to enroll a second finger, or series of finger movements, to indicate duress is a simple programming extension of *Mathiassen's* taught techniques and would require only enrolling a second fingerprint or finger movement (already taught in *Mathiassen*, [0192]) and encoding another command (i.e., the "issue security alert" information) in the transmitted signal. *Dec.,* 162-171.

### 6.    *Claim 1(b3)*

#### a)    "a transmitter configured to emit"

*Mathiassen* teaches a "transmitter," namely transceiver 27 of portable control 20. *Mathiassen,* [0147]. The transceiver 27 of portable door control 20 is "configured to emit a secure access signal conveying information dependent upon said accessibility attribute," as claimed, because it "wirelessly transmits" the encrypted "open door" command that conveys the access the user will be granted, as discussed further below. A POSITA would have understood *Mathiassen's* transceiver 27 of portable control is at least equivalent to a "transmitter" because it "transmits" an encrypted command to "transceivers of the door locks and the central car computer." *Mathiassen,* [0186], *Dec.,* 172-173.

#### b)    "a secure access signal"

The secure access signal in the '705 Patent is described as a rolling code. *'705 Patent*, 6:4-9,6:39-46. Rolling codes use a different code each time the access signal is transmitted, with such "achieved by encrypting the data from the controller

107….” *'705 Patent,* 6:47-53; *Dec.,* 174-175. “[S]uccessive transmissions” are modified using a code/look-up table known to both transmitter and receiver sub-systems, “resulting in a non-repeatable data transfer….” *Id.* at 6:47-60. A “secure access signal” has a non-repeatable, non-replayable, and encrypted code allowing single-use transmission. *Dec.,* 174-176.

*Mathiassen* teaches transceiver 27 emits a “secure access signal” generated by the processor (portable control 20 IC's processor), namely an encrypted command, such as an “open door” command, usable for a single transaction. *Mathiassen*, [0182-0188], [0050]; *Dec.,* 177-182 (opining *Mathiassen's* “command” is a “signal,” as claimed). *Mathiassen's* IC processor generates a secure key (SKG) at SKG block 8A upon matching access minutiae (live fingerprint representations) to stored master minutiae. *Mathiassen*, [0050], [0182-0184]; *Dec.,* 178. Next, a temporary password or key is generated. *Mathiassen*, [0050], [0183-0184]. The IC processor then encrypts a command, such as “open door,” with the temporary password or key. *Mathiassen*, [0050], [0185]. Transceiver 27 wirelessly transmits the encrypted command to a transceiver at central car computer. *Mathiassen*, [0186-0188]; *Dec.,* 178. The central car computer or ignition control's resident IC fetches the seed to generate the same temporary password for decrypting the received command. If a valid and authenticated command was sent, a command to open the

car door locks is sent from the transceiver at central car computer to the door locks. *Mathiassen*, [0187-0188]; *Dec.,* 179-181.

*Mathiassen's* pseudo-random, identical password generated by the SKG block to encrypt and decrypt the "open door" command renders the command non-repeatable and non-replayable. *Dec.,* 182-183. *Mathiassen* discloses the SKG algorithm is run on a processor in both the portable IC (transmitter subsystem) and the central car computer or ignition control (within the receiver subsystem, *see* Claim 1(c2)), such that the transmitter IC and receiver IC generate the same key or password based on the identical seed. *Mathiassen*, [0050], [0187-0188]. "The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that…**alternatively changes for each transaction**." *Mathiassen*, [0050].

Because *Mathiassen* teaches the key used to encrypt the command sent from the portable control to the ignition control/car computer changes for each transaction, the encrypted command is non-repeatable and non-replayable. *Dec.,* 182-183. Therefore, *Mathiassen* teaches a "secure access signal," with the transceiver 27 of portable control "configured to emit a secure access signal" (i.e., wirelessly transmit the encrypted command). *Mathiassen,* [0186]; *Dec.,* 183.

### c) Secure access signal "conveying information dependent upon said accessibility attribute"

*Mathiassen* alone and as modified by *McKeeth* teaches that the emitted secure access signal conveys information dependent upon the accessibility attribute. Specifically, *Mathiassen* teaches the emitted "open door" command (the claimed "secure access signal") conveys information instructing access of the car door locks, substantially similar to the '705 Patent's system directing the controller in the receiver subsystem to provide access to the controlled item. *'705 Patent*, 12:16-24; *see* Claim 1(b2) Mapping. The information conveyed in the encrypted "open door" command is the access to be granted. When the instruction by the user is to open the car door locks, and the user's access minutiae or matched against stored minutiae, then the information conveyed in the secure access signal is information to grant access. This information is "dependent upon" the "accessibility attribute" (i.e., the grant access to the car owner/administrator) because the information results from determining the user's access to be granted and the encryption of that access information with a valid, temporary password from the SKG block. *Dec.,* 184-185.

As similarly mapped for Claim 1(b2), *Mathiassen* modified by *McKeeth* also teaches Claim 1(b3), as the modified *Mathiassen* processor of portable control issues an encrypted command (i.e., "secure access signal") conveying duress access or alert access. The transceiver 27 then emits a secure access signal to instruct a duress signal or an alert signal. The encrypted command transmitted by the transceiver conveys a

command including an accessibility attribute to open the car door locks and issue a silent security alert (for a duress signal) or to deny opening the car door locks and issuing an alert (for an access signal), as taught by *McKeeth*. *Dec.* 186. A motivation to combine *Mathiassen* and *McKeeth* was provided in the Claim 1(b2) mapping (*see* Section VI.A.5.d).

### 7.    *Claims 1(c) and 1(c1)*

*Mathiassen* teaches a receiver sub-system comprising the central car computer and door lock transceivers, the central car computer, and ignition control 15. *Mathiassen,* [0186-0188]. The central car computer includes a transceiver receiving the signal (the "open door" command) from portable control, and the door locks include a transceiver receiving the relayed and authenticated open door command. *Dec.,* 187-189; *Mathiassen*, [0149], [0167], [0186-0187]. A "transceiver" is well understood to include a receiver. *Dec.,* 190. Therefore, because *Mathiassen* teaches, at the least, a transceiver (both a central car computer and door locks) including a receiver, *Mathiassen* teaches a receiver sub-system, as claimed. *Dec.,* 191.

*Mathiassen* teaches the receiver sub-system (the transceivers, the central car computer, and ignition control) include a receiver sub-system controller, as claimed. As discussed at Section V, a POSITA would have understood a processor performing the claimed function of receiving the signal and providing conditional access is at least equivalent to the claimed "controller." *Dec.,* 192-197. *Mathiassen*

teaches or renders obvious a receiver sub-system controller, namely the processor of the ignition control or central car computer, individually or collectively.

In more detail, *Mathiassen* teaches two implementations: a first implementation in which the ignition control decrypts and authenticates the received command, and a second in which the central car computer decrypts and authenticates the command. *Dec.,* 193-197. Both the central car computer and ignition control include processors. *Mathiassen*, [0187-0188]; *Dec.,* 193-194, 196-197. In the first implementation, *Mathiassen* teaches a "receiver sub-system controller," namely the respective processors of ignition control and central car computer, either individually or collectively. When decryption and authentication is performed by the ignition control, the ignition control's processor (on IC 1) receives the command, performs the decryption, and if the decrypted message is valid and authenticated, a similar encrypted command is relayed to the door locks by the car computer providing conditional access. *Mathiassen*, [0187]; *Dec.,* 194-195. Alternatively, the ignition control's processor receives the command, and the central car computer's processor provides conditional access because it relays the similar encrypted door command to the door locks. *Id.*

In the second implementation, the car computer's processor receives the signal for performing the decryption/authentication and provides conditional access

by transmitting a similar command to the car door locks. *Mathiassen*, [0186], [0188], *Dec.* 196-197.

### 8.    Claim 1(c2)

Under the agreed construction, "conditional access" is "access based on accessibility attributes." *See* Section III.C. *Mathiassen's* processor of ignition control or central car computer provides conditional access to the controlled item, namely, car door locks, dependent upon the accessibility attribute in the secure access signal. The relayed "open door" command sent to the door locks ([0187]) provides "access based on the accessibility attribute," as claimed, to the car door locks, because the access is provided based on the user being the car owner/administrator and requesting access via its biometric signature to the car door locks, such that the conditional access in this instance is simply grant unconditional access to an administrator. *'705 Patent*, 8:24-31; *Dec.,* 198-199; *Mapping for Claim 1(b3).*

Additionally, *Mathiassen* teaches access being provided "dependent upon said information" in the secure access signal, such as "open doors" or "lock doors." Because *Mathiassen's* commands specifically instruct a function (i.e., open door locks vs. lock door locks), the command (i.e., the "secure access signal") includes information specific to the instructed function. *Mathiassen,* [0167]; *Dec.,* 200. A POSITA would thus have understood access is granted, i.e., the car doors are

opened/unlocked, dependent upon information in the "open door" command that is relayed to the transceivers of car door locks by processor of the ignition control and/or central car computer. *Mathiassen*, [0167], [0182], [0185]; *Dec.,* 200.

As similarly mapped for Claim 1(b2-b3), *Mathiassen's* processor of IC 1 in portable door control, as modified by *McKeeth*, issues a duress or alert command that indicates what access to provide because it is determined based on the accessibility attribute being either a duress or an alert attribute. *Dec.* 201. The encrypted command transmitted by the transceiver conveys a command including a duress accessibility attribute to open door locks and issue a silent security alert or an alert attribute to deny opening locks and issuing an alert, as taught by *McKeeth*. A motivation to combine *Mathiassen* and *McKeeth* was provided in Claim 1(b2).

### 9.    Claim 1(d)

As mapped at Claim 1(b2), *Mathiassen* teaches a transmitter sub-system controller, namely processor 2 of IC 1 in portable door control. *Mathiassen,* [0050], [0147], *Dec.,* 202.

### 10.    Claim 1(d1)

The court found the claim term "at least" modifies "one of the number of said entries" and that the claim requires "a duration of each said entry." (Ex. 1077, 2). Under the Court's construction, *Mathiassen* (as modified by *McKeeth*) and further modified by *Anderson* teaches Claim 1(d1).

### a) *Mathiassen's* Teachings

*Mathiassen* teaches processor 2 of portable control receives a series of entries of the biometric signal. *Mathiassen* teaches the portable door control receiving a biometric signal (i.e., fingerprint). *Mathiassen,* [0176]; *Dec.,* 204. Additionally, *Mathiassen* teaches the processor 2 of IC 1 in portable door control receiving reduced fingerprint images generated from the fingerprint sensor 5, which are reduced to master minutiae tables, indicating to a POSITA the processor 2 is configured to receive a biometric signal. *Mathiassen,* [0179], [0050], [0164], FIG. 2B; *Dec.,* 204.

*Mathiassen* also teaches or renders obvious receiving "a series of entries." *Dec.,* 205-210. *Mathiassen* teaches storing "**a series of consecutive fingerprint representations** generated by the fingerprint sensor signal capture and pre-processing block (5C))" that comprise various "finger movements across the sensor in two dimensions." *Mathiassen*, [0192], Claim 20. The finger movements are categorized according to predefined sets of movements, which translate to a particular command. *Id.*; *Dec.*, 205-208. The finger movements may be a touch/no-touch finger movement, and predefined sets of these touch/no-touch movements correspond to particular commands to control the device. *Id. Mathiassen's* finger movements thus constitute a "series" because these movements are formed by a number of things or events of the same class coming one after the other in spatial or

temporal succession, namely a number of touch/no touch movements coming sequentially. *Mathiassen,* [0192] (describing "finger movement sequences").

*Mathiassen* also teaches the touch/no-touch finger movements may be applied to a portable device, indicating to a POSITA the series of finger movements are used in portable control 20 or that such would be obvious. *Id. Mathiassen* does not indicate the portable device includes any buttons to instruct open door versus lock door commands, further indicating to a POSITA *Mathiassen* contemplates instructing commands using the taught series of finger movements and corresponding command table. *Dec.,* 207-209. Thus, a POSITA would have understood *Mathiassen's* portable control 20 receives a series of entries of biometric signals or that such is obvious. *Dec.,* 209. Because the series of fingerprint movements are measured, categorized, and translated via "program modules," a POSITA would have understood the processor 2 of the portable door control is configure to "receive a series of entries of the biometric signal," as claimed. *Mathiassen,* [0192], *Dec.,* 210.

### b)   *Anderson's* Teachings

Although *Mathiassen* teaches processor 2 of portable control receiving a series of entries of a fingerprint (biometric signal), *Mathiassen* does not teach characterizing the series based on a "duration" of each entry. In related art, *Anderson*

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

teaches characterizing a series of entries according to at least one of the number of said entries and a duration of each said entry.

*Anderson* teaches inputting an access code at a fingerprint sensor that is a "series of pressure pulses having varying durations." *Anderson*, 6:45-48, Abstract, 7:40-47. The inputted series of finger presses are encoded and compared to a stored code, and if there is a match, "the code may be used to enable a function," such as "allowing access to a restricted area." *Anderson*, 2:4-21, 5:58–6:39, 7:4-7 (disclosing the access code may be entered on an optical sensor for simultaneously verifying the user's fingerprint), FIGs. 3A-3B; *Dec.,* 212.



FIG. 3A

In *Anderson*, the pressure magnitude is not detected but the timing of each fingerprint press is determined: "[i]n such an embodiment, the touch interface would

not detect variations in pressure magnitude or intensity." *Anderson*, 7:28-34, FIG. 4A; *Dec.,* 213-216. The sensor recognizes pressure was applied for a particular duration. *Id.* Figure 4A illustrates each finger press, where the applied pressure (bar height) is consistent because the magnitude of the finger pressure is not detected, but at least some of the presses have a different duration (bar width). *Dec.,* 215-216, 218.



*Anderson* thus teaches a user entering an access code comprising a series of entries of the fingerprint and a duration the user applied pressure for the fingerprint. *Id*.

*Anderson* further teaches characterizing the access code based on a number of the entries of the biometric signal and a duration of each entry for comparison to the stored code. *Anderson*, 6:22-36. *Anderson* teaches the temporal pressure applications generating a code compared to a stored code to authorize access. *Id*. For the codes to match, at least some (likely all) of the user's entered finger pressure pulses and a duration of the pulse would need to be characterized for matching against the stored code. *Dec.,* 219.

**c)      Motivation to Combine *Anderson* with *Mathiassen-McKeeth***

A POSITA would have been motivated and found it obvious to modify *Mathiassen's* processor 2 of the portable control (as otherwise modified by *McKeeth*) to characterize a series of pressure pulses by the number of pulses and duration of each pulse, as taught by *Anderson*. *Dec.,* 220-225. In *Mathiassen*, the series of directional finger movements instruct a particular command. *Mathiassen,* [0192]; *Dec.,* 221. A POSITA would have found it obvious to substitute or modify such directional finger movements with a series of presses of varying duration, as taught by *Anderson*, for instructing a command at the portable device 20. *Dec.,* 222-223. When a user holds a key fob, pressing a finger against the fingerprint sensor to apply pressure of varying durations is simpler than *Mathiassen's* directional movements. *Dec.,* 222. Additionally, receiving a command via pressure/duration pulses simplifies processing required to capture quality fingerprint images compared to directional movement of the finger on the sensor. *Dec.,* 223. Alternatively, it would have been obvious to add *Anderson's* access code method of detecting pressure pulses and varying duration to *Mathiassen's* processor of the portable control that uses finger movements to instruct a command because another access code method may be desirable under some use conditions, as discussed above. *Dec.,* 222.

There would have been a reasonable expectation of success in modifying *Mathiassen's* processor 2 in control 20, because it executes software and directs hardware for detecting and categorizing directional movement and touch/no touch. *Mathiassen,* [0192]; *Dec.,* 224-225. *Mathiassen's* processor is already operable to detect a finger press because it receives the fingerprint representations, in the form of captured raw images, from the fingerprint sensor. *Id.* The modification therefore only requires simple programming techniques (e.g., modification of the disclosed translation program to count the number and duration of a "touch" or "no touch") that were within a POSITA's expertise.

### 11.   *Claim 1(d2)*

*Mathiassen* alone or *Mathiassen* (modified by *McKeeth*) and *Anderson* teaches Claim 1(d2). As discussed for Claim 1(d1), *Mathiassen's* processor uses "translational means" to categorize the finger movements "according to predefined sets of finger movement sequences" and translates these categorized finger movements, with reference to a command table, to control signals for generating a command to control the device. *Mathiassen,* [0192]. A POSITA would have understood this translation of the predefined finger movements as teaching or rendering obvious "mapping" the predefined set of finger movements to an instruction, as claimed. *Mathiassen*, [0192]; *Dec.,* 226-229.

A POSITA would have found obvious the processor of IC (the claimed "transmitter sub-system controller") performs the claimed "map" operation. *Dec.,* 230. A POSITA would have understood the IC's processor, referencing the fingerprint sensor image capture and pre-processing block 5C, performs the claimed mapping or that such is obvious. *Dec.,* 230. The processor executes the software translation program that analyzes/categorizes finger movements and uses the command table to determine the corresponding instruction. *Mathiassen,* [0192]. The processor executes the software translation program that analyzes/categorizes the finger movements and refers to the command table to determine the instruction corresponding to the input series. *Id.*

### 12.　　*Claim 1(d3)*

*Mathiassen* teaches the processor of the portable control's IC "populate[s] the database." *Mathiassen* teaches "providing secured access control" begins with enrolling an administrator (e.g., car owner). *Mathiassen*, Abstract, [0162-0167]; *Dec.,* 231, 233. IC processor, with reference to the pre-processing block 5C, populates the database of biometric signatures by generating master minutiae tables for "one or more" fingers for at least one user of the car. *Mathiassen*, [0164]. As discussed for Claim 1(a), each master minutiae table includes information for a user's fingerprint, and one or more master minutiae tables is a *database* of biometric signatures stored in memory 7,7A. *Dec.,* 231.

*Mathiassen* alone or *Mathiassen* (as modified by *McKeeth*) in combination with *Anderson* further teaches or renders obvious the population of the database is "according to the instruction." *Mathiassen* teaches enrolling a user's biometric signature for accessing (e.g., opening) door locks. *Mathiassen*, [0131]. The first enrolled user is the "system administrator" who "enroll[s] one or more of his fingers on the portable door control unit (20)." *Mathiassen*, [0162-0164]. *Mathiassen* recognizes the car owner/administrator may enroll other users. *Mathiassen*, [0190], [0131]; *Dec.,* 234-235.

*Mathiassen* discloses, for the medicine cabinet embodiment, the administrator initiates enrollment of "the next user" by "authenticating himself by his fingerprint." *Mathiassen,* [0131]. As with enrolling the administrator, enrolling new users includes the processor, with pre-processing block 5C, creating master minutiae tables subsequently stored in memory 7,7A,7C, i.e., the "populating the database." *Mathiassen*, [0071]; *Dec.,* 236-238.

A POSITA would have found it obvious and been motivated to apply *Mathiassen's* enrollment process taught for the medicine cabinet embodiment to the portable door control for car door locks because *Mathiassen* teaches enrollment of an administrator for the portable door control embodiment and that the administrator may desire to enroll other users. *Mathiassen*, [0162-0164], [0190]; *Dec.,* 239-240. For the car owner/administrator to enroll other users via the portable control, the

portable control's processor would need to recognize when the car owner/administrator initiates enrollment, similar to the medicine cabinet embodiment. *Dec.,* 239. *Mathiassen* teaches or renders obvious initiating enrollment by the car owner/administrator authenticating themselves via their fingerprint and IC processor subsequently populating the database with master minutiae tables for the new user. *Dec.,* 239.

*Mathiassen* does not directly teach enrollment is initiated via a *series* of fingerprint entries but rather enrollment is initiated via the administrator's fingerprint. *Mathiassen,* [0131]; *Dec.,* 241. However, as discussed for Claim 1(d2), *Mathiassen* teaches instructing a particular command with a series of fingerprint representations, and *Anderson* teaches enabling a requested function via a series of fingerprint pulses of varying durations. *Mathiassen,* [0192]; *Anderson,* 6:37-54, 7:28-34. A POSITA would have found it obvious and been motivated to modify *Mathiassen's* disclosed enrollment process initiated by an administrator's fingerprint to instead initiate enrollment with a series of fingerprint presses of particular durations, as taught by *Anderson. Dec.,* 241-245. For example, in embodiments utilizing portable devices, such as portable door control 20, it would have been obvious to allow instructing commands via various finger movements. *Dec.,* 242-243. *Mathiassen* teaches or renders obvious the processor of a portable device executing programs for categorizing various series of finger movements into

commands. *Mathiassen*, [0192]. *Mathiassen* also teaches requiring owner input to enroll new user fingerprints on the portable control, indicating to a POSITA that an instruction was invoked at least by a specific type of entry. *Mathiassen,* [0165], [0190]; *Dec.,* 243-244. Thus, allowing for a user, such as an administrator, to differentiate commands is also taught. *Id.* It would have been desirable to apply such differentiation to an administrator instructing enrollment of a new user versus instructing access by the administrator. *Dec.,* 245 (*citing* Ex. 1010 (*Bradford*), 14:21-41 (discussing an administrator entering two fingertips' worth of fingerprint data in succession to be allowed access to certain privileged screens for registering a new user)).

Because (1) *Mathiassen* teaches initiating enrollment of a new user via entering a fingerprint and processor of portable door control authenticating that fingerprint, (2) *Mathiassen* teaches processor translating various respective finger movement sequences into commands to instruct certain functions, and (3) *Anderson* teaches an access code comprising pressure pulses of varying durations, it would have been obvious to modify *Mathiassen's* processor (as otherwise modified by *McKeeth*) to populate a database according to an instruction, where an exemplary instruction is an instruction to enroll a new user. *Dec.,* 245, 234.

To the extent CPC contends the claimed "according to the instruction" means populating the database with a series of entries corresponding to a particular

instruction, *Mathiassen* teaches such. Specifically, as discussed, *Mathiassen* teaches "[t]ranslation means…[that] analyzes and categorizes the omni-directional finger movements across the fingerprint sensor **according to predefined sets of finger movement sequences**" and then implementing specific commands by reference to a command table translating the categorized finger movements into control signals. *Mathiassen*, [0192]; *Dec.*, 246. Therefore, *Mathiassen* teaches a database of biometric signatures each representative of a particular instruction.

### 13. Claim 1(e)

*Mathiassen* teaches the controlled item is a "locking mechanism of a physical access structure," (i.e., the physical car door locks of the central locking system). *Mathiassen,* [0187]; *Dec.,* 247.

## B. Claim 4

*Mathiassen, McKeeth,* and *Anderson* render obvious Claim 1.

*See* Mapping for Claim 1(a). *Mathiassen* teaches a database of biometric signatures located in the transmitter sub-system, namely master minutiae tables of fingerprint representations located in memory 7A/7B of portable car control 20. *Dec.,* 248-249.

## C. Claim 6

### 1. Claim 6(a)

*Mathiassen*, *McKeeth*, and *Anderson* render obvious Claim 1.

*Mathiassen* teaches the biometric sensor 5 authenticates the identity of a user via their fingerprints by matching an access minutiae against stored master minutiae tables. *Mathiassen*, Abstract, [0053]; *Dec.,* 251-252.

### 2.    Claim 6(b)

*Mathiassen's* transceiver 27 of portable door control 20, as modified by *McKeeth,* is configured to transmit information capable of granting access dependent upon the user's inputted biometric signal, i.e., "request from the user." The information "capable of granting access" is included in an encrypted command "wirelessly transmitted" to the ignition control and/or central car computer. *Mathiassen,* [0186-0188]; *see Claim 1(b3) Mapping*. Signals are transmitted from the portable door control 20 dependent upon a user swiping "his finger across the sensor (5)" and "provided the processor (2) established a match between the access attempt and one of the resident master minutiae tables," indicating to a POSITA the secure wireless signal is transmitted "dependent upon a request from the user and the authentication of the user identity." *Mathiassen,* [0176-186]; *Dec.,* 253-256.

The transmitted encrypted command contains "information capable of granting access to the controlled item." The encrypted command of *Mathiassen-McKeeth* grants different types of access (i.e., grants access, grants duress access, or grants alert access when no authentication occurs), when decrypted and authenticated by the ignition control or central car computer. *Claim 11(Pre3)(d).*

These commands grant unconditional access, grant access and issue a silent alert, or deny access and sound an alarm. *Claim 11(Pre3)(d).*

### 3.    Claim 6(c)

The '705 Patent does not describe or identify a "control panel." *Dec.* 257. Based on the claimed function, *Mathiassen's* IC of ignition control 15 is a control panel configured to receive the information (i.e., receiving the secure wireless signal containing the access information) and provide the secure access requested. *Mathiassen,* [0186-187], *Dec.,* 257-258. A POSITA would have understood or found obvious the IC of ignition control performs the function and is a "control panel." *Dec.,* 258-259.

### D.    Claim 10

#### 1.    Claim 10(Pre)

*See* Claims 1(b) ("transmitter subsystem"), 1(Pre) ("for operating in a system…").

#### 2.    Claim 10(a)

*See* Claim 1(b1).

#### 3.    Claim 10(b)

*See* Claim 1(b2).

#### 4.    Claim 10(c)

*See* Claim 1(b3).

### 5.     *Claim 10(d)*

*See* Claim 1(d).

### 6.     *Claim 10(d1)*

*See* Claim 1(d1).

### 7.     *Claim 10(d2)*

*See* Claim 1(d2).

### 8.     *Claim 10(d3)*

*See* Claim 1(d3).

### 9.     *Claim 10(e)*

*See* Claim 1(e).

## E.     Claim 11

### 1.     *Claim 11(Pre1)*

To the extent the preamble is limiting, *Mathiassen* teaches a method for providing secure access to a controlled item, such as providing secure access to a central locking system in a vehicle. *Claim 1(Pre) Mapping* (mapping a system for performing the "method" of providing secure access); *Dec.,* 269; *Mathiassen,* Abstract, [0018], [0145-0147].

### 2.     *Claim 11(Pre2)*

*See* Claim 1(a).

### 3.    *Claim 11(Pre3)*

*See* Claim 1(b)-1(b3). Regarding the claimed "capable of granting access to the controlled item," *Mathiassen* in view of *McKeeth* teaches "granting access to the controlled item." The transmitter (i.e., transceiver) of *Mathiassen's* modified portable control 20 is capable of granting access, duress access, and alert access to the controlled item (i.e., car door locks).

*Mathiassen* teaches transmitter of transceiver at the portable control sending an open door command to the vehicle, and the ignition control and/or central car computer receiving the encrypted open door command and unlocking the car door locks (i.e., "controlled item") after the received command is decrypted and authenticated. *Mathiassen,* [0187]; *see Claims 1(c2), 6(b) Mapping.* A POSITA would have understood opening door locks provides access to the car door locks via the car's "central locking system" when the car owner/administrator requests access. *Mathiassen*, [0145]; *Dec.,* 272-275, 278-280.

*Mathiassen* modified by *McKeeth* teaches processor outputting an accessibility attribute in the secure access signal (i.e., encrypted command) indicating to grant a user access when under duress and signal a silent alarm or deny access and sound an alarm. A POSITA would have understood granting access to the car door locks and issuing a security alarm, as taught by *McKeeth*, when the user is under duress is "granting access to the controlled item." *Dec.,* 276, 281. A

POSITA would also have understood that locking up or otherwise denying access to the car door locks is a type of access that prevents non-authorized use of the car door locks. *Dec.,* 277, 282. *Claim 1(b3).*

### 4.    Claim 11(Pre4)

*See* Claim 1(b3), 1(c)-(c2). *Dec.,* 283-286.

### 5.    Claim 11(a)

*Mathiassen* teaches populating the database of biometric signatures, namely generating master minutiae tables of fingerprint representations (i.e., "database of biometric signatures") and storing the tables in memory 7/7A/7C during enrollment. *See Claim 1(d3).*

### 6.    Claim 11(a1)-(a2)

*See* Claim 1(d1). *Mathiassen* alone or *Mathiassen* modified by *Anderson* teaches receiving a series of entries of the biometric signal, either a series of fingerprint movements or a fingerprint access code. *Mathiassen* modified by *Anderson* teaches "determining" the number/duration of the entries, as *Anderson* teaches analyzing the series of finger movements by establishing and ascertaining definitely after consideration, investigation, or calculation when comparing the series to the stored code. *Mathiassen*, [0192]; *Anderson*, 7:28-47, *Dec.* 288.

### 7.    Claim 11(a3)

*See* Claim 1(d2).

### 8.    *Claim 11(a4)*

*See* Claim 1(d3).

### 9.    *Claim 11(b)*

*See* Claim 1(b1).

### 10.    *Claim 11(c)*

*See* Claim 1(b2).

### 11.    *Claim 11(d)*

*See* Claim 1(b3).

### 12.    *Claim 11(e)*

*See* Claim 1(c2).

### 13.    *Claim 11(f)*

*See* Claim 1(e).

## F.    Claim 12

*Mathiassen* teaches Claim 12. The "populating the database" including "enrolling a biometric signature" and "receiving a biometric signal" were mapped for Claim 11(a) (referencing Claim 1(d3), cited for this Claim 12). *Mathiassen,* [0164]; *Dec.,* 296. *Mathiassen* teaches enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty. *Mathiassen* teaches the "**first person to enroll his fingerprint** on the portable door control (20) **becomes the 'owner' of the car, in the sense that he becomes the system administrator**." *Mathiassen,* [0165]. Thus, a POSITA would have understood the

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

fingerprint (i.e., biometric signal) is enrolled as an administrator when the database is empty, seeing as no other users had previously been enrolled. *Dec., 297-298.*

### G. Claim 14

#### 1. Claim 14(Pre)

To the extent the preamble is limiting, *Mathiassen* teaches the IC stores "program code, e.g., administrative software" on memory 7,7A,7E. *Mathiassen*, [0050]. Non-volatile memory 7,7A,7E is well known to be a "non-transitory computer readable storage medium." *Dec.,* 299, 301. It is well known that a processor, such as processor 2 of IC, executes program code to perform functions. *Dec.,* 300, 302-303. The modified processor of *Mathiassen's* portable control and *Mathiassen's* modified ignition control/car computer thus include or render obvious the storage medium storing a computer program comprising instructions. *Id.*

#### 2. Claim 14(a)

*See* Claim 1(d1).

#### 3. Claim 14(b)

*See* Claim 1(d1), 11(a2).

#### 4. Claim 14(c)

*See* Claim 1(d2).

#### 5. Claim 14(d)

*See* Claim 1(d3), 1(a) ("of biometric signatures").

### 6.    *Claim 14(e)*

*See* Claim 1(b1), 1(d1).

### 7.    *Claim 14(f)*

*See* Claim 1(b2).

### 8.    *Claim 14(g)*

*See* Claim 1(b3).

### 9.    *Claim 14(h)*

*See* Claim 1(c2).

### 10.    *Claim 14(i)*

*See* Claim 1(e).

## H.    Claim 15

### 1.    *Claim 15(Pre)*

*See* Claim 1(Pre).

### 2.    *Claim 15(a)*

*See* Claim 1(a).

### 3.    *Claim 15(b)*

*See* Claim 1(b).

### 4.    *Claim 15(b1)*

*See* Claim 1(b1).

### 5.    *Claim 15(b2)*

*See* Claim 1(b2).

### 6.　Claim 15(b3)

*See* Claim 1(b3).

### 7.　Claim 15(c)

*See* Claim 1(c).

### 8.　Claim 15(c1)

*See* Claim 1(c1).

### 9.　Claim 15(c2)

*See* Claim 1(c2).

### 10.　Claim 15(d)

*See* Claim 1(d).

### 11.　Claim 15(d1)

*See* Claim 1(d1).

### 12.　Claim 15(d2)

*See* Claim 1(d2).

### 13.　Claim 15(d3)

*See* Claim 1(d3).

### 14.　Claim 15(e)

*See* Claim 1(e).

## I.　Claim 16

### 1.　Claim 16(Pre)

*See* Claims 1(b) ("transmitter subsystem"), 1(Pre) ("for operating in a system…").

### 2.     *Claim 16(a)*

*See* Claim 1(b1).

### 3.     *Claim 16(b)*

*See* Claim 1(b2).

### 4.     *Claim 16(c)*

*See* Claim 1(b3).

### 5.     *Claim 16(d)*

*See* Claim 1(d).

### 6.     *Claim 16(d1)*

*See* Claim 1(d1).

### 7.     *Claim 16(d2)*

*See* Claim 1(d2).

### 8.     *Claim 16(d3)*

*See* Claim 1(d3).

### 9.     *Claim 16(e)*

*See* Claim 1(e).

## J.     Claim 17

### 1.     *Claim 17(Pre1)*

*See* Claim 11(Pre1).

### 2.     *Claim 17(Pre2)*

*See* Claim 11(Pre2).

### 3.    *Claim 17(Pre3)*

*See* Claim 11(Pre3).

### 4.    *Claim 17(Pre4)*

*See* Claim 11(Pre4).

### 5.    *Claim 17(a)*

*See* Claim 11(a).

### 6.    *Claim 17(a1)*

*See* Claim 11(a1).

### 7.    *Claim 17(a2)*

*See* Claim 11(a2).

### 8.    *Claim 17(a3)*

*See* Claim 11(a3).

### 9.    *Claim 17(a4)*

*See* Claim 11(a4).

### 10.    *Claim 17(b)*

*See* Claim 11(b).

### 11.    *Claim 17(c)*

*See* Claim 11(c).

### 12.    *Claim 17(d)*

*See* Claim 11(d).

### 13.    *Claim 17(e)*

*See* mapping for Claim 1(c2).

53

### 14.    Claim 17(f)

*See* Claim 11(f).

## VII.    DISCRETIONARY CONSIDERATIONS

### A.    The *Fintiv* Factors Favor Institution

Under the "*Fintiv* factors," the Board asserted it may consider parallel litigation, including an early trial date, in determining whether to institute under 35 U.S.C. § 314(a). *NHK Spring Co., Ltd., v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 at 19–20 (PTAB Sept. 12, 2018) (precedential); *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 2–3, 6 (PTAB Mar. 20, 2020) (precedential). Those factors favor institution here.

### 1.    Stay

Parallel litigation is ongoing. While no stay has been requested, Petitioner will seek a stay if institution is granted, thus favoring institution. At worst, this factor is neutral because the Board "will not attempt to predict" how the district court will proceed. *Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB Jun. 16, 2020).

### 2.    Proximity of the Court's Trial Date

"This factor looks at the proximity of the trial date to the date of [FWD] to assess the weight to be accorded a trial date set earlier than the expected [FWD] date." *Shenzhen Carku Tech. Co., Ltd. v. The Noco Co.*, IPR2020-00944, Paper 20 at 61 (PTAB Nov. 12, 2020). The District Court scheduled trial for January 23, 2023,

with the notation the "Court expects to set these dates at the conclusion of the *Markman* hearing," thus indicating the Court recognizes the scheduled date is pursuant to the Court's default schedule and may not be the "actual trial date." *See* Ex. 1065 (Scheduling Order in District Court Litigation), 5, FN 4.

Trial dates are notoriously unreliable and should be an insufficient basis upon which to deny institution. "A court's general ability to set a fast-paced schedule is not particularly relevant," especially where "the forum [i.e., WDTX] itself has not historically resolved cases so quickly." *In re Apple Inc.*, No 20-135, slip op. at 16 (Fed. Cir. Nov. 9, 2020); *DISH Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 at 13-16 (PTAB Feb. 4, 2021). The Federal Circuit found error in the Board's reliance on the case's scheduled trial date. *In re Apple Inc.*, No 20-135, slip op. at 15 (Ex. 1071). It would be error for the Board speculatively rely upon the current schedule, especially with a motion to transfer pending. The Board would be no better suited to speculate as to the prospective trial date than it would be to speculate as to the likely outcome of the motion to transfer pending and especially as the District Court's own Scheduling Order recognizes the current trial date is set pursuant to "default" deadlines. (Ex. 1065, 5, FN 4).

Trial date speculation is particularly concerning where the statistics show frequent trial delays in WDTX. "70% of [WDTX] trial dates initially relied upon by the PTAB to deny petitions have slid," as of July 2020. *District Court Trial Dates*

*Tend to Slip After PTAB Discretionary Denials* (Ex. 1068). Such delays impacted the *NHK* and *Fintiv* cases, where, after the Board denied institution, associated trial dates were delayed to after the FWD dates—the same WDTX court in *Fintiv* as is handling the Texas Litigation. IPR2018-01680, Paper 22 at 17, n. 6 (PTAB Apr. 3, 2019) ("In the district court case running parallel to *NHK Spring*, the court ultimately moved the trial date back six months, illustrating the uncertainty associated with litigation schedules."); *Order Setting Jury Selection and Trial* (Ex. 1069) (resetting *Fintiv* trial to June 21, 2022, nearly thirteen months after the FWD would have been due in the associated IPR). In contrast, the Board adhered to the one-year statutory deadline for FWDs prescribed by 35 U.S.C. § 316(a)(11).

CPC undoubtedly will argue that Apple waited too long to file its IPR and that the delay in filing the IPR should be a basis for discretionary denial. Any such argument, however, should be given little merit. Commensurate with filing this Petition for the '705 Patent, Apple is filing a Petition for the related '208 Patent. *See* IPR2022-00601. The grounds, prior art applied, and merits of the '208 and '705 Patent are similar in many respects. The '208 Patent includes numerous means-plus-function limitations warranting waiting to file the '208 Petition until CPC finalized its constructions and the Court's *Markman* Order. *See* IPR2022-00601, Paper 1, at 6-9 (Section III.C.1).

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

Filing the '705 Patent's Petition at the same time as filing the '208 Patent's Petition allows for efficient and consistent review by the Board, i.e., the Board is reviewing similar merits of different patents at the same time. Moreover, filing the petitions at the same time eliminates any argument by CPC that Apple is attempting to obtain a strategic advantage in receiving a Patent Owner Preliminary Response on the '705 Patent's IPR prior to filing the '208 Patent's IPR.

### 3.    *Investment in Parallel Proceeding*

Beyond claim construction, the parties have invested little in the parallel proceeding. Petitioner has diligently worked since the litigation's filing on locating prior art and preparing the Petition and supporting evidence. Minimal fact discovery has been conducted. Expert discovery does not close until September 21, 2022. (Ex. 1065, 4). This factor weighs in favor of institution.

### 4.    *Overlap*

Petitioner stipulates that if the Board institutes the Petition on the same grounds presented, then Apple will not seek resolution in the District Court of any ground of invalidity that utilizes *Mathiassen*, *McKeeth*, or *Anderson*. In so stipulating, Apple seeks to avoid multiple proceedings addressing the validity of the '705 Patent based on any of the same prior art references. This factor weights in favor of institution.

### 5.    *Same Party*

The Parties are the same in the district court litigation. However, members of the Board have noted *Fintiv* addresses only the scenario in which the petitioner is unrelated to a defendant in a parallel proceeding, finding this should weigh against denying institution, but that *Fintiv* "says nothing about situations in which the petitioner is the same as, or is related to, the district court defendant." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 at 10 (PTAB May 15, 2020) (APJ Crumbley, dissenting) (noting that disfavoring a "defendant in the district court" is "contrary to the goal of providing district court litigants an alternative venue to resolve questions of patentability").

### 6.    *Other Circumstances*

The strength of the proposed grounds weighs strongly in favor of institution.

The *Fintiv* factors require the Board to take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Fintiv*, Paper 11 at 6. Were the Board to deny institution, years of district court litigation would be required just to obtain a finding of invalidity. Such a scenario runs directly counter to *Fintiv's* goals of preserving efficiency and the system's integrity. Denying institution harms system integrity by rejecting the PTAB as the lead agency in assessing patentability.

**B.      The *Fintiv* Framework Should Be Overturned**

The *Fintiv* framework should be overturned because it is legally invalid and unwise policy. The framework (1) exceeds the Director's authority, (2) is arbitrary and capricious, (3) and was adopted without notice-and-comment rulemaking.

### 1.      The Fintiv Framework Exceeds the Director's Authority

The Director cannot deny IPRs based on parallel litigation if the IPR was timely under § 315(b). And the Director cannot create reasons to deny institution that conflict with the statutory language or exceed the authority under the AIA, such as, denial of institution based on parallel litigation.

Under § 315(b), IPRs are permissible when parallel litigation is pending. Ultimately, strategies like *Fintiv* "cannot be invoked to preclude adjudication of a claim…brought within the [statutory] window." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667, 677-680, 685 (2014). And the AIA's provisions confirm the Director lacks authority to apply the *Fintiv* framework. *See, e.g.*, §§ 315(a), (d), 325(d). None of the provisions grant the Director discretion to reject IPRs because there is a parallel lawsuit.

### 2.      The Fintiv Framework Is Arbitrary and Capricious

The *Fintiv* framework is arbitrary and capricious. First, it requires the Board to rely on speculation about parallel litigation. *See, e.g.*, *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("agency actions based upon speculation are arbitrary and capricious"). Second, the *Fintiv* factors are vague,

resulting in the Board treating "similar situations differently without reasoned explanation"—a hallmark of arbitrary and capricious agency action. *Port of Seattle v. FERC*, 499 F.3d 1016, 1034 (9th Cir. 2007). Third, the *Fintiv* framework is not connected to promoting efficiency. Instead, it pressures defendants to file premature IPRs and allows infringement plaintiffs to block IPRs through forum shopping.

### 3. The *Fintiv* Framework Was Impermissibly Adopted Without Notice-and-Comment Rulemaking

The *Fintiv* factors were adopted without notice-and-comment rulemaking. Through the Director's designation of *NHK* and *Fintiv* as precedential, those decisions' framework became "binding" on the Board "in subsequent matters involving similar facts or issues," Patent Trial and Appeal Board, Standard Operating Procedure 2 (Rev. 10) ("SOP-2"), at 11 (Sept. 20, 2018)—that is, they became a "rule" as defined in the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 551(4) (defining "rule"). But that designation process did not entail public notice or comment, contrary to the requirements of both the APA and the AIA. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019); §§ 2(b)(2), 316(a).

## VIII. CONCLUSION

Petitioner requests *inter partes* review of the Challenged Claims of U.S. Patent No. 9,269,705.

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

Respectfully submitted,

BY:  /s/   *Jennifer C. Bailey*
Jennifer C. Bailey, Reg. No. 52,583
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

## IX.   MANDATORY NOTICES UNDER UNDER 37 C.F.R. § 42.8(A)(1)

### A.   Real Party-In-Interest

Apple Inc. is the real party-in-interest.  37 C.F.R. § 42.8(b)(1).

### B.   Related Matters

(1) a patent infringement lawsuit filed on February 23, 2021, by Patent Owner, CPC Patent Technologies Pty Ltd., against Petitioner in the United States District Court for the Western District of Texas, Case No. 6:21-cv-00165;

(2) *CPC Patent Technologies Pty Ltd., v. HMD Global Oy* in the United States District Court for the Western District of Texas, Case No. 6:21-cv-00166;

(3) *Apple Inc. v. CPC Patent Technologies Pty Ltd.*, *Inter Partes* Review Case No. IPR2022-00601, filed February 23, 2022, of U.S. Patent No. 9,269,208; and

(4) *Apple Inc. v. CPC Patent Technologies Pty Ltd.*, *Inter Partes* Review Case No. IPR2022-00600, filed February 23, 2022, of U.S. Patent No. 8,620,039 (unrelated patent).

### C.   Lead and Back-Up Counsel

Petitioner provides the following designation and service information for lead and back-up counsel. 37 C.F.R. § 42.8(b)(3) and (b)(4).

| Lead Counsel | Back-Up Counsel |
| --- | --- |
| Jennifer C. Bailey (Reg. No. 52,583) Jennifer.Bailey@eriseip.com PTAB@eriseip.com | Adam P. Seitz (Reg. No. 52,206) Adam.Seitz@eriseip.com PTAB@eriseip.com |
| Postal and Hand-Delivery Address: | Postal and Hand-Delivery Address: |

| | |
|---|---|
| ERISE IP, P.A.<br>7015 College Blvd., Suite 700<br>Overland Park, Kansas 66211<br>Telephone: (913) 777-5600<br>Fax: (913) 777-5601 | ERISE IP, P.A.<br>7015 College Blvd., Suite 700<br>Overland Park, Kansas 66211<br>Telephone: (913) 777-5600<br>Fax: (913) 777-5601 |

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

**CLAIMS LISTING APPENDIX**

U.S. Patent No. 9,665,705, Claims 1, 4, 6, 10-12, and 14-17

| Claim Designation | Claim Language |
|---|---|
| Claim 1(Pre) | 1. A system for providing secure access to a controlled item, the system comprising: |
| Claim 1(a) | a memory comprising a database of biometric signatures; |
| Claim 1(b) | a transmitter sub-system comprising: |
| Claim 1(b1) | a biometric sensor configured to receive a biometric signal; |
| Claim 1(b2) | a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and |
| Claim 1(b3) | a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 1(c) | a receiver sub-system comprising: a receiver sub-system controller configured to: |
| Claim 1(c1) | receive the transmitted secure access signal; and |
| Claim 1(c2) | provide conditional access to the controlled item dependent upon said information; |
| Claim 1(d) | wherein the transmitter sub-system controller is further configured to: |
| Claim 1(d1) | receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; |
| Claim 1(d2) | map said series into an instruction; and |
| Claim 1(d3) | populate the data base according to the instruction, |
| Claim 1(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 4 | 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/ or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. |
| Claim 6(a) | 6. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; |

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

| Claim Designation | Claim Language |
| --- | --- |
| Claim 6(b) | wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and |
| Claim 6(c) | the system further comprising a control panel configured to receive the information and provide the secure access requested. |
| Claim 10(Pre) | 10. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises |
| Claim 10(a) | a biometric sensor configured to receiving a biometric signal; |
| Claim 10(b) | a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; |
| Claim 10(c) | a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; |
| Claim 10(d) | wherein the controller is further configured to: |
| Claim 10(d1) | receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; |
| Claim 10(d2) | map said series into an instruction; and |
| Claim 10(d3) | populate the database according to the instruction, |
| Claim 10(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 11(Pre1) | 11. A method for providing secure access to a controlled item in a system comprising |
| Claim 11(Pre2) | a database of biometric signatures; |
| Claim 11(Pre3) | a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, |
| Claim 11(Pre4) | a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, |
| Claim 11(a) | the method comprising: populating the database of biometric signatures by: |

| Claim Designation | Claim Language |
|---|---|
| Claim 11(a1) | receiving a series of entries of the biometric signal; |
| Claim 11(a2) | determining at least one of the number of said entries and a duration of each said entry; |
| Claim 11(a3) | mapping said series into an instruction; and |
| Claim 11(a4) | populating the database according to the instruction; |
| Claim 11(b) | receiving the biometric signal; |
| Claim 11(c) | matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; |
| Claim 11(d) | emitting a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 11(e) | providing conditional access to the controlled item dependent upon said information, |
| Claim 11(f) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 12 | 12. The method according to claim 10, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: receiving a biometric signal; and enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. |
| Claim 14(Pre) | a non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: |
| Claim 14(a) | receive a series of entries of a biometric signal; |
| Claim 14(b) | determine at least one of the number of said entries and a duration of each said entry; |
| Claim 14(c) | map said series into an instruction; |
| Claim 14(d) | populate the database of biometric signatures according to the instruction; |
| Claim 14(e) | receive the biometric signal; |
| Claim 14(f) | match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; |

| Claim Designation | Claim Language |
|---|---|
| Claim 14(g) | emit a secure access signal conveying information dependent upon said accessibility attribute; |
| Claim 14(h) | provide conditional access to a controlled item dependent upon said information; |
| Claim 14(i) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 15(Pre) | 15. A system for providing secure access to a controlled item, the system comprising: |
| Claim 15(a) | a memory comprising a database of biometric signatures; |
| Claim 15(b) | a transmitter sub-system comprising: |
| Claim 15(b1) | a biometric sensor capable of receiving a biometric signal; |
| Claim 15(b2) | a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and |
| Claim 15(b3) | a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 15(c) | a receiver sub-system comprising: a receiver sub-system controller capable of: |
| Claim 15(c1) | receiving the transmitted secure access signal; and |
| Claim 15(c2) | providing conditional access to the controlled item dependent upon said information; |
| Claim 15(d) | wherein the transmitter sub-system controller is further capable of: |
| Claim 15(d1) | receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; |
| Claim 15(d2) | mapping said series into an instruction; and |
| Claim 15(d3) | populating the database according to the instruction, |
| Claim 15(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 16(Pre) | 16. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: |
| Claim 16(a) | A biometric sensor capable of receiving a biometric signal; |

| Claim Designation | Claim Language |
|---|---|
| Claim 16(b) | a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; |
| Claim 16(c) | a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; |
| Claim 16(d) | wherein the controller is further capable of: |
| Claim 16(d1) | receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; |
| Claim 16(d2) | mapping said series into an instruction; |
| Claim 16(d3) | populating the database according to the instruction; |
| Claim 16(e) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |
| Claim 17(Pre1) | 17.  A method for providing secure access to a controlled item in a system comprising |
| Claim 17(Pre2) | a database of biometric signatures, |
| Claim 17(Pre3) | a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and |
| Claim 17(Pre4) | a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, |
| Claim 17(a) | the method comprising: populating the database of biometric signatures by: |
| Claim 17(a1) | receiving a series of entries of the biometric signal; |
| Claim 17(a2) | determining at least one of the number of said entries and a duration of each said entry; |
| Claim 17(a3) | mapping said series into an instruction; and |
| Claim 17(a4) | populating the database according to the instruction; |
| Claim 17(b) | receiving the biometric signal; |

| Claim Designation | Claim Language |
|---|---|
| Claim 17(c) | matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; |
| Claim 17(d) | emitting a secure access signal conveying information dependent upon said accessibility attribute; and |
| Claim 17(e) | providing conditional access to the controlled item dependent upon said information, |
| Claim 17(f) | wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. |

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

**APPENDIX OF EXHIBITS**

| | |
|---|---|
| **Exhibit 1001** | U.S. Patent No. 9,665,705 to Burke ("the *'705 Patent'*") |
| **Exhibit 1002** | File History for the '705 Patent ("the *'818 Application File History*") |
| **Exhibit 1003** | Declaration of Dr. Andrew Sears |
| **Exhibit 1004** | U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*") |
| **Exhibit 1005** | U.S. Patent No. 6,766,456 to McKeeth ("*McKeeth*") |
| **Exhibit 1006** | U.S. Patent No. 6,509,847 to Anderson ("*Anderson*") |
| **Exhibit 1007** | U.S. Patent No. 6,927,668 to Odle et al. ("*Odle*") |
| **Exhibit 1008** | Exhibit intentionally left blank |
| **Exhibit 1009** | Merriam Webster, Webster's New Collegiate Dictionary, 1981 |
| **Exhibit 1010** | U.S. Patent No. 6,612,928 to Bradford, et al. ("Bradford") |
| **Exhibit 1011** | Anil Jain, et al., Biometric Identification, Communication of the ACM, February 2000 |
| **Exhibit 1012** | Henry C. Lee, et al., Advances in Fingerprint Technology, Second Edition, CRC Press, copyright 2001 |
| **Exhibit 1013** | P. Jonathon Phillips, et al., An Introduction to Evaluating Biometric Systems, National Institute of Standards and Technology, IEEE, copyright 2000 |
| **Exhibit 1014** | U.S. Patent Publication No. 2003/0117261 to Gunsch ("*Gunsch*") |
| **Exhibit 1015** | U.S. Patent Publication No. 2003/0036825 to Kim ("Kim") |
| **Exhibit 1016** | U.S. Patent No. 6,140,939 to Flick ("*Flick*") |
| **Exhibit 1017** | U.S. Patent No. 6,164,403 to Wuidart ("*Wuidart*") |
| **Exhibit 1018** | U.S. Patent No. 7,239,227 to Gupta, et al. ("*Gupta*") |
| **Exhibit 1019** | U.S. Patent No. 6,877,097 to Hamid, et al. ("*Hamid*") |
| **Exhibit 1020** | U.S. Patent Publication No. 2001/0049785 to Kawan, et al. ("*Kawan*") |
| **Exhibit 1021** | U.S. Patent Publication No. 2002/0091937 to Ortiz ("*Ortiz*") |
| **Exhibit 1022** | U.S. Patent Publication No. 2003/0046552 to *Hamid '552* ("*Hamid '552*") |
| **Exhibit 1023** | U.S. Patent Publication No. 2002/0063154 to Hoyos, et al. ("*Hoyos*") |
| **Exhibit 1024** | U.S. Patent No. 6,484,260 to Scott, et al. ("*Scott*") |
| **Exhibit 1025** | U.S. Patent No. 7,404,086 to Sands, et al. ("*Sands*") |
| **Exhibit 1026** | Ross Tester, A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code", Silicon Chip.com.au, July 2002 |

70

| | |
|---|---|
| **Exhibit 1027** | Brent A. Miller, et al., Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications, 2001 |
| **Exhibit 1028** | U.S. Patent No. 7,284,266 to Morris, et al. ("*Morris*") |
| **Exhibit 1029** | Bricolage: Data Compression – Morse Code, https://perl.plover.com/Huffman/huffman.html, 1998 |
| **Exhibit 1030** | U.S. Patent No. 6,323,565 to Williams, Jr., et al. ("*Williams*") |
| **Exhibit 1031** | U.S. Patent No. 7,020,270 to Ghassabian ("*Ghassabian*") |
| **Exhibit 1032** | U.S. Patent Publication No. 2003/0048260 to Matusis ("*Matusis*") |
| **Exhibit 1033** | International Publication WO 02/27455 to Mathiassen ("*Mathiassen '455*") |
| **Exhibit 1034** | European Patent Application No. 88301738.6 to Araki et al. ("*Araki*") |
| **Exhibit 1035** | U.S. Patent No. 7,152,045 to Hoffman ("*Hoffman*") |
| **Exhibit 1036** | U.S. Patent No. 6,833,785 to Brown, et al. ("*Brown*") |
| **Exhibit 1037** | U.S. Patent Publication No. 2004/0015450 to Zingher, et al. ("*Zingher*") |
| **Exhibit 1038** | U.S. Patent No. 6,498,970 to Colmenarez, et al. ("*Colmenarez*") |
| **Exhibit 1039** | U.S. Patent No. 6,100,811 to Hsu, et al. ("*Hsu*") |
| **Exhibit 1040** | U.S. Patent No. 4,638,292 to Mochida, et al. ("*Mochida*") |
| **Exhibit 1041** | K-9 Car Alarm Owner's Guide and Installation Instructions, K-9 Mundial, Omega Research and Development, 2000 |
| **Exhibit 1042** | U.S. Patent No. 7,110,580 to Bostrom ("*Bostrom*") |
| **Exhibit 1043** | U.S. Patent No. 7,336,174 to Maloney ("*Maloney*") |
| **Exhibit 1044** | Microsoft Press Computer Dictionary, second edition, Microsoft Press, 1994 |
| **Exhibit 1045** | Microsoft Computer Dictionary, fifth edition, Microsoft Press, 2002 |
| **Exhibit 1046** | OnStar Features, OnStar, https://web.archive.org/web/20000619021703/http://www.onstar.com/features/3button.htm June 19, 2000 |
| **Exhibit 1047** | U.S. Patent No. 6,420,975 to DeLine, et al. ("*DeLine*") |
| **Exhibit 1048** | Exhibit Intentionally left blank |
| **Exhibit 1049** | PC Basics: Get a Great Start, Survive and Thrive, 2002 |
| **Exhibit 1050** | U.S. Patent Publication 2003/0160692 to Nonaka ("*Nonaka*") |
| **Exhibit 1051** | U.S. Patent No. 5,307,048 to Sonders ("*Sonders*") |
| **Exhibit 1052** | Merriam Webster's Collegiate Dictionary, tenth edition, 1998 |
| **Exhibit 1053** | Alan Gatherer, et al., The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications, 2002 |

71

| | |
|---|---|
| **Exhibit 1054** | McGraw-Hill, Dictionary of Electrical and Computer Engineering, 2003 |
| **Exhibit 1055** | U.S. Patent No. 6,970,970 to Jung et al. ("*Jung*") |
| **Exhibit 1056** | Exhibit Intentionally left blank |
| **Exhibit 1057** | Exhibit Intentionally left blank |
| **Exhibit 1058** | Exhibit Intentionally left blank |
| **Exhibit 1059** | Exhibit Intentionally left blank |
| **Exhibit 1060** | Exhibit Intentionally left blank |
| **Exhibit 1061** | Exhibit Intentionally left blank |
| **Exhibit 1062** | Exhibit Intentionally left blank |
| **Exhibit 1063** | Exhibit Intentionally left blank |
| **Exhibit 1064** | Exhibit Intentionally left blank |
| **Exhibit 1065** | Case No. 6:21-cv-00166-ADA Scheduling Order (Dkt No. 37) |
| **Exhibit 1066** | Case No. 6:21-cv-00165-ADA Motion to Transfer Venue (Dkt No. 22 |
| **Exhibit 1067** | Federal Court Management Statistics–Comparison Within Circuit, June 30, 2021 (Average time to trial statistics) |
| **Exhibit 1068** | Scott McKeown, District Court Trial Dates Tend to Slip After PTAB Discretionary Denials, July 24, 2020 |
| **Exhibit 1069** | Case No. 1:21-cv-00896-ADA, Order Setting Jury Selection and Trial (Dkt No. 423) |
| **Exhibit 1070** | Judge Albright's Second Amended Standing Order Regarding Motions for Inter-District Transfer, August 18, 2021 |
| **Exhibit 1071** | In re Apple Inc., No 20-135 Order (Dkt No. 55) |
| **Exhibit 1072** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Proposed Claim Constructions ("*CPC's Initial Constructions*") |
| **Exhibit 1073** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Proposed Updated Claim Constructions ("*CPC's Initial Updated Constructions*") <br> * Note that document was served without a cover page |
| **Exhibit 1074** | Case No. 6:21-cv-00165 (W.D. Tex.), Joint Claim Construction Statement |
| **Exhibit 1075** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Response to Defendant Apple Inc.'s Claim Construction Brief |
| **Exhibit 1076** | Case No. 6:21-cv-00165 (W.D. Tex.), Plaintiff CPC Patent Technologies Pty Ltd.'s Sur-Reply to Defendant Apple Inc.'s Claim Construction Brief |

| | |
|---|---|
| **Exhibit 1077** | Case No. 6:21-cv-00165 (W.D. Tex.), Claim Construction Order, Dated February 10, 2022 |
| **Exhibit 1078** | Case No. 6:21-cv-00166 (W.D. Tex.), Email from Peter Tong, Law Clerk to J. Albright, to the Parties Re Meet & Confer, Dated February 10, 2022 |
| **Exhibit 1080** | Case No. 6:21-cv-00166 (W.D. Tex.), Claim Construction Order, Dated January 25, 2022 ("HMD Claim Construction Order") |

*Inter Partes* Review No. IPR2022-00602

U.S. Patent No. 9,665,705

## CERTIFICATION OF WORD COUNT

The undersigned certifies pursuant to 37 C.F.R. § 42.24 that the foregoing Petition for *Inter Partes* Review, excluding any table of contents, mandatory notices under 37 C.F.R. § 42.8, certificates of service or word count, or appendix of exhibits, contains 11,064 words according to the word-processing program used to prepare this document (Microsoft Word).

Dated: February 23, 2022

Respectfully submitted,

BY:  */s/     Jennifer C. Bailey*

Jennifer C. Bailey, Reg. No. 52,583

Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

*Inter Partes* Review No. IPR2022-00602
U.S. Patent No. 9,665,705

**CERTIFICATE OF SERVICE ON PATENT OWNER**
**UNDER 37 C.F.R. § 42.105**

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105, the undersigned certifies that on February 23, 2022, a complete and entire copy of this Petition for *Inter Partes* Review including exhibits was provided via Priority Mail Express to the Patent Owner by serving the correspondence address of record for the '705 Patent as listed on PAIR:

> Crowell/BGL
> P.O. Box 10395
> Chicago, IL 60610

Further, a courtesy copy of this Petition for *Inter Partes* Review was sent via electronic mail to Patent Owner's litigation counsel:

> Ben Roxborough (ben.roxborough@klgates.com)
> Dhohyung Kim (dk.kim@klgates.com)
> George C. Summerfield (george.summerfield@klgates.com)
> James A. Shimota (jim.shimota@klgates.com)
> Stewart Mesher (stewart.mesher@klgates.com)
> Elizabeth Abbott Gilman (beth.gilman@klgates.com)
> Jonah Heemstra (jonah.heemstra@klgates.com)

Respectfully submitted,

BY: _/s/    Jennifer C. Bailey_
Jennifer C. Bailey, Reg. No. 52,583
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

75

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

---

Case IPR2022-00602
U.S. Patent No. 9,665,705

---

# PRELIMINARY PATENT OWNER'S RESPONSE

IPR2022-00602
U.S. Patent No. 9,665,705

## TABLE OF CONTENTS

I. Introduction..................................................................................................1

II. Discussion...................................................................................................3

    A. The Genesis of the *Fintiv* Factors for Discretionary Denial of Institution ..................................................................................................3

    B. The Application of the *Fintiv* Factors, as Supplemented by the *Interim* Procedures, Mandate Discretionary Denial ...............................................4

        1. *Fintiv* Factor One ........................................................................4

        2. *Fintiv* Factor Two.......................................................................5

        3. *Fintiv* Factor Three.....................................................................7

        4. *Fintiv* Factor Four ....................................................................10

        5. *Fintiv* Factor Five.....................................................................12

        6. *Fintiv* Factor Six.......................................................................12

            a. Apple's Numerous Other Prior Art References .............12

            b. The Petition's Merits ....................................................14

                i. The "Duration" Limitation .......................................14

                ii. The "Under Which Conditions" Requirement.........17

                iii. The Circumstances Do Not Compel Institution......19

        7. Conclusion Regarding the *Fintiv* Factors ................................19

    C. *Fintiv* Should not be Overruled..........................................................19

        1. *Fintiv* did not Exceed the Director's Authority ........................19

        2. *Fintiv* is Neither Arbitrary nor Capricious...............................21

        3. *Fintiv* does not Represent Improper Rulemaking.....................21

III. Conclusion ...............................................................................................22

IPR2022-00602
U.S. Patent No. 9,665,705

## EXHIBIT LISTING

| Exhibit | Description |
|---|---|
| 2001 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, 6:21-cv-00166 (Dkt. 27) (Sept. 23, 2021) |
| 2002 | HMD Global Oy's Final Invalidity Contentions, Chart B15 - Mathiassen, dated March 16, 2022 |
| 2003 | Apple Inc.'s Final Invalidity Contentions, dated March 16, 2022 |
| 2004 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 37) (Sept. 23, 2021) |
| 2005 | March 19, 2020 Letter from George Summerfield to Brian Ankenbrandt |
| 2006 | Defendant Apple Inc.'s Notice of Motion and Motion to Stay Pending *Inter Partes* Review, 5:22-cv-02553 (Dkt. 119) (June 14, 2022) |
| 2007 | HMD Global Oy's Final Invalidity Contentions, dated March 16, 2022 |

IPR2022-00602
U.S. Patent No. 9,665,705

## I.    INTRODUCTION

Patent Owner, CPC Patent Technologies ("CPC" or "Patent Owner"), submits this Patent Owner Preliminary Response ("POPR") pursuant to 37 C.F.R. § 42.107(a) to the *Inter Partes* Review ("IPR") petition ("Petition") filed by Petitioner Apple Inc. ("Apple" or "Petitioner") for Claims 1, 4, 6, 10-12, and 14-17 ("Challenged Claims") of U.S. Patent No. 9,665,705 ("the '705 Patent," Ex. 1001).

The instant Petition presents a novel, but nonetheless compelling, set of circumstances as it concerns the *Fintiv* factors for discretionary denial of institution. Apple filed its Petition while the '705 Patent was also the subject of a pending district court action between the parties ("the Apple Litigation").[1]  *See* Paper No. 1 at 62.

Furthermore, in a co-pending matter styled *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, No. 6:21-cv-00166 (W.D. Tex.) ("the HMD Litigation"),[2]

---

[1] Apple succeeded in having the Apple Litigation, originally filed in the Western District of Texas (*CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 6:21-cv-00165 (W.D. Tex.)), transferred to the Northern District of California.  *In re Apple Inc.*, No. 2022-128, 2022 WL 1196768 (Fed. Cir. Apr. 22, 2022).  The case is now styled *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, No. 5:22-cv-02553 (N.D. Cal.).

[2] Apple identifies the HMD Litigation as a Related Matter.  Paper No. 1 at 62.

1
**Appx3293**

defendant HMD Global Oy ("HMD"), as part of its invalidity defenses, cites the same prior art combination as allegedly teaching the limitation "at least one of the number of said [biometric signal] entries and a duration of each said entry" ("the Duration Limitation") in the challenged claims of the '705 Patent. Ex. 2002 at 63-64. That case is scheduled for trial in January 2023. Ex. 2001 at 5. Thus, whether that same prior art combination in fact teaches that limitation will be litigated in district court nine months *before* the Final Written Decision would be scheduled to issue in this proceeding in the event of institution. These circumstances warrant discretionary denial of institution.

Apple recognizes the problems it faces in light of the Board's decisions regarding discretionary denial in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019 ("*Fintiv*"). In fact, after presenting a lukewarm analysis of the six *Fintiv* factors, Apple ultimately resorts to arguing that the analytical framework under *Fintiv*, as explained in informational (Paper 15) and precedential (Paper 11) opinions of this Board, should be overruled. *See* Paper No. 1 at 59-60. Of course, Apple is wrong and not a single *Fintiv* factor weighs in favor of institution, as explained herein. The case for discretionary denial of the instant Petition is so clear that Patent Owner has determined not to burden the Board with a full discussion of the merits of the Petition

in this Preliminary Response.[3]  The Board should exercise its discretion under 35 U.S.C. § 314(a) to deny institution in this case.

## II.    DISCUSSION

### A.    The Genesis of the *Fintiv* Factors for Discretionary Denial of Institution

As Apple notes, the Board has the discretionary ability to deny institution under 35 U.S.C. § 314(a) in light of parallel litigation.  In 2019, the Board issued its precedential opinion in *NHK Spring Co., Ltd. v. Intri-plex Technologies, Inc.*, wherein it exercised its discretion under section 314(a) to deny institution of an otherwise timely-filed petition for *inter partes* review in light of the advanced stage of an earlier-filed district court litigation. *NHK Spring Co., Ltd. v. Intri-plex Technologies, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018) (designated precedential May 7, 2019).  Thereafter, the Board issued its precedential opinion in *Fintiv* in which it identified six factors that are to be considered for discretionary denial in light of corresponding district court litigation.  *Apple Inc. v. Fintiv, Inc.*,

---

[3] Patent Owner will address the merits of the Petition in the unlikely event that the Board institutes *inter partes* review, notwithstanding the result mandated by the application of the *Fintiv* factors.

IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (designated precedential May 5, 2020).[4]

### B. The Application of the *Fintiv* Factors, as Supplemented by the *Interim* Procedures, Mandate Discretionary Denial

#### 1. *Fintiv* Factor One

The first factor articulated by the Board in *Fintiv* is whether there has been a stay of the subject district court proceeding, which is as neutral when there has been no district court ruling on a stay. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 12 (PTAB May 13, 2020) (designated informative July 13, 2020); *Sand Revolution II, LLC v. Continental Intermodal Grp. Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020); *MediaTek Inc. v. Nippon Tel. and Tel. Corp.*, IPR2020-01607, Paper 12 at 12 (PTAB April 2, 2021) ("Petitioner represents it will move to stay the District Court Lawsuit [if institution is granted but does not know] how the District Court will rule … [t]hus, this factor should be viewed as neutral").

---

[4] CPC is cognizant of the *interim* procedures regarding discretionary denial propounded by the Director on June 21, 2022 ("*Interim* Procedures"). CPC understands those procedures as clarifying the *Fintiv* decision, rather than undoing that decision. The clarifications contained in the *Interim* Procedures are addressed herein where appropriate.

IPR2022-00602
U.S. Patent No. 9,665,705

This is because the Board has consistently declined to infer "how the District Court would rule should a stay be requested by the parties." *Fintiv*, Paper No. 15 at 12. *See also Dish Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-01280, Paper 17 at 13 (PTAB Feb. 4, 2021) (how a court might handle the issue of stay in the absence of a motion therefor "invites conjecture" and this factor remains "neutral").

Despite having indicated to the Board that it would seek a stay of the district court action in the event institution is granted (Paper No. 1 at 54), Apple has moved for a ***pre-institution*** stay now that the matter has been transferred to the Northern District of California.  Ex. 2006.  Putting aside Apple's about-face on this issue, there has been no ruling regarding the requested stay in the Apple Litigation. Separately, in the co-pending HMD Litigation, HMD has not moved for a stay, meaning that, as currently scheduled, the validity of the '705 Patent in light of the same prior art cited in this proceeding will be litigated in January 2023.  *See* Ex. 2001 at 5.  Absent such a stay, this factor is neutral at best.

### 2. *Fintiv* Factor Two

The second *Fintiv* factor considers the relative timing between a district court trial and a projected date for a Final Written Decision from the Board.  If the district court trial is projected to be earlier than the projected Final Written Decision date, this factor tends to weigh in favor of institution denial.  *Fintiv*, Paper No. 11 at 9. The *Interim* Procedures further admonish that "[t]he PTAB will weigh this factor

5
**Appx3297**

against exercising discretion to deny institution under *Fintiv* if the median time-to-trial is around the same time or after the projected statutory deadline for the PTAB's final written decision." *Interim* Procedures at 9.

In the HMD Litigation, HMD is challenging the validity of the '705 Patent based upon, *inter alia*, the precise combination relied upon by Apple - specifically, the teachings of *Mathiassen* supplemented by *Anderson* for the Durational Limitation in the challenged claims, which, as explained below, mirrors Apple's approach in the instant Petition. *See, e.g.*, Ex. 2002 at 63-64. The trial in the HMD Litigation is scheduled for January 2023, over **nine months** before the final written decision is scheduled to issue in this IPR. Ex. 2001 at 5.

The Board has consistently found that a six-month gap weighs heavily in favor of denial. *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.,* IPR2020-00122, Paper 15 at 7-8 (PTAB May 15, 2020); *SK Innovation Co. v. LG Chem, Ltd.*, IPR2020-01240, Paper 15 at 16-17 (PTAB Jan. 12, 2021); *Supercell OY v. Gree, Inc.*, IPR2020-00310, Paper 13 at 10-12 (PTAB Jun. 18, 2020). The *Interim* Procedures, which mandate weighing this factor against denial only where the time to trial is around the same time or after the final written decision, does not disturb the Board's decisions on this point. *Interim* Procedures at 9. Accordingly the nine-month gap between the trial in the HMD Litigation and the final written decision weighs heavily in favor of denial.

Apple argues that a scheduled trial date "may not be the 'actual trial date,'" which would presumably apply to the HMD litigation as well. Paper No. 1 at 54-55. The *Interim* Procedures actually address this issue by referencing "median time-to-trial" in the relevant jurisdiction as the appropriate metric. *Interim* Procedures at 9. The most recent statistics indicate that, in the Western District of Texas, the approximate time to trial is two years from the filing of the complaint. *VoIP-Pal.com v. Google LLC*, 6:21-cv-00667, 2022 WL 2068254, at *7 (W.D. Tex. June 8, 2022). CPC filed the complaint in the HMD Litigation on February 23, 2021. *See CPC Patent Technologies Pty Ltd., v. HMD Global Oy*, No. 6:21-cv-00166 (W.D. Tex. Feb. 23, 2021) [ECF Docket No. 1]. Given that filing date, the median time to trial in the Western District of Texas would be approximately February 2023, which coincides with the trial schedule in that case. In light of the *Interim* Procedures, this second *Fintiv* factor weighs against institution.

### 3.    *Fintiv* Factor Three

The third *Fintiv* factor includes a diligence component. *Fintiv*, Paper No. 11 at 11. This factor, evaluated "at the time of the institution decision," considers whether "the parallel proceeding is more advanced . . . and instituting would lead to duplicative costs." *Id.* at 9-10. This factor favors denial where "the district court has issued substantive orders related to the patent," such as a claim construction order. *Id.* As such, filing a petition "at or around the same time that the patent

owner responded to the petitioner's invalidity contentions," may weigh in favor of discretionary denial. *Medtronic, Inc. v. Teleflex Innovs. S.A.R.L.*, IPR2020-01341, Paper 11 at 10-11 (PTAB Feb. 9, 2021).

The Western District of Texas issued claim construction orders in the Apple Litigation and in the HMD Litigation on February 10, 2022 and January 25, 2022, respectively. Paper No. 1 at 5; Exs. 1077;1080. The litigants' final infringement and invalidity contentions in both the HMD and Apple Litigations were exchanged on March 16, 2022. Ex. 2001 [HMD Schedule] at 3; Ex. 2004 [Apple Schedule] at 3. In the HMD litigation, factual discovery closes on July 29, 2022. Ex. 2001 at 3. The parties' initial expert reports are due in that litigation on August 12, 2022 and expert discovery closes on September 21, 2022. *Id.* at 4. Therefore, both fact and expert discovery will be fully complete before "the time of the institution decision."

Further, Apple may argue that it was entitled to avail itself of the one year statutory deadline for filing a review petition. *See* Paper No. 1 at 56. However, Apple was on notice of CPC's position regarding infringement of the '705 Patent by virtue of a letter CPC sent on March 19, 2020. Ex. 2005. While Apple may have been statutorily entitled to take the entire one-year period to file the instant Petition

(which it did),[5] that does not establish the diligence required to avoid discretionary denial.

Apple also argues that its delay in filing was attributable to its waiting for the district court's constructions of various means-plus-function limitations in the claims of U.S. Patent No. 9,269,208 ("the '208 Patent"). Paper No. 1 at 56-57. Apple provides no explanation as to why a district court construction was a prerequisite to *inter partes* review, as the Board regularly performs claim construction as part of such a review, and the "means" limitations of the '208 Patent do not appear in the claims of the '705 Patent.

Given Apple's lack of diligence in waiting almost two years after becoming aware of Patent Owner's infringement position, and the amount of effort that the parties have already expended, this factor weighs in favor of exercising the Board's discretion to deny institution.

---

[5] CPC served the complaint on Apple on March 1, 2021. *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (W.D. Tex. March 3, 2022) [ECF Docket No. 10] (reflecting complaint service on March 1, 2022). The Petition was filed on February 23, 2022, or 359 days after service.

### 4.    *Fintiv* Factor Four

As explained above, in the HMD Litigation, HMD is urging that the *Mathiassen*/*Anderson* prior art combination teaches the Duration Limitation of the '705 Patent. *See* Ex. 2002 at 63-64. This is the same prior art combination relied upon by Apple for an alleged teaching of that limitation. *See* Paper No. 1 at 3. In other words, this issue, common to both the instant proceeding and the HMD Litigation, will be decided **nine months** before the final written decision would issue in this proceeding.

Apple has stated that, in the event of institution, it will not urge "any ground of invalidity that utilizes *Mathiassen*, *McKeeth*, or *Anderson*" in the Apple Litigation. Paper No. 1 at 57. As the *Interim* Procedures make clear, a stipulation is only effective "where a petitioner stipulates not to pursue in a parallel district court proceeding the same grounds as in the petition ***or any grounds that could have reasonably been raised in the petition***." *Interim* Procedures at 9 (emphasis added).

Apple has not so stipulated, which is especially problematic, seeing that, in its final invalidity contentions in the Apple Litigation, Apple has asserted 23 different grounds for alleged anticipation based upon alleged prior art patents, publications, and systems, 22 of which do not involve *Mathiassen*, *McKeeth*, or *Anderson*. Ex. 2003 at 67-68. Apple has also urged 23 different grounds for alleged obviousness

IPR2022-00602
U.S. Patent No. 9,665,705

based upon published prior art. *Id.* at 67-74.[6] And, while *Mathiassen* is part of each obviousness combination, it is the lead reference in only one. *See id.* For the remainder, it is part of a list of 30 or more references, separated by "and/*or*," to be combined with the primary reference. *See id.*

Thus, Apple's narrow concession, apart from failing to comply with the *Interim* Procedures, does little to address the "concerns regarding duplicative efforts and potentially conflicting decisions." *Sand Rev'n II LLC v. Cont'l Intermodal Grp. – Trucking LLC*, IPR2019-01393, Paper 24 at 12 (PTAB June 16, 2020) (designated informative July 13, 2020).

Finally, while Apple asserts a single challenge ground in the Petition involving a combination of three references, Apple refers to eight additional prior art patents and patent applications in its Petition that are also identified as prior art in Apple's final infringement contentions in district court. *See* Exs. 1007, 1010, 1017, 1019, 1020, 1023 and 1025; and Ex. 2003 at 67-68. Even HMD relies on four of these references in the HMD Litigation. *See* Exs. 1017, 1019, 1023, and 1025; and Ex. 2007 at 6. Given Apple's references to these prior art references in both the

---

[6] Six of Apple's obviousness combinations cite to a prior art system as the lead reference. *See* Ex. 2003 at 67-74. However, in each instance, the subject system is to be combined with one of a multiplicity of publications. *See id.*

Petition and the district court in the Apple Litigation and HMD's reliance on these references in the HMD Litigation, there is additional overlap that militates against institution.

### 5.    *Fintiv* Factor Five

Under the fifth *Fintiv* factor, when the petitioner is also a defendant in the district court litigation, this factor has generally weighed in favor of discretionary denial. *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 16 (PTAB Dec. 1, 2020) (designated precedential Dec. 17, 2020). Apple cites to the dissenting opinion in *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 at 10 (PTAB May 15, 2020), which noted that there had been no pronouncement "about situations in which the petitioner is the same as, or is related to, the district court defendant." Paper No. 1 at 58. Certainly, the precedential opinion in *Sotera* has changed that, and Apple being both Petitioner here, and a defendant in a co-pending district court action weighs in favor of discretionary denial, especially given that its former co-defendant, HMD, has cited the very same prior art in challenging the claims of the '705 Patent.

### 6.    *Fintiv* Factor Six

#### a.    Apple's Numerous Other Prior Art References

Finally, the sixth *Fintiv* factor involves an all-encompassing consideration of the "relevant circumstances" in the case. *Fintiv*, Paper No. 11 at 14. Beyond the

eight additional prior art references common to both the Petition and the district court proceeding, Apple references more than three dozen additional prior art references in its Petition. *See* Exs. 1011-1016, 1018, 1021, 1022, 1024, 1026, 1027-1047, 1050-1051, 1053 and 1055. Thus, while the Petition includes a single challenge ground, Apple's Trojan horse approach to introducing several dozen additional references would not result in an efficient use of the Board's time and resources, and discretionary denial is warranted. *Deeper, UAB v. Vexilar, Inc.*, Case IPR2018-01310, Paper No. 7, at 43 (PTAB Jan. 24, 2019). Indeed, through this approach, Apple has shifted a substantial amount of work to the Board (and Patent Owner), who will be required to study each of these dozens of references and ascertain what they do and do not teach. This stands in stark contradiction to the requirement of the patent statute's directive for IPR petitions to identify "**with particularity**…the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016).

More importantly, the inclusion of several dozen additional references beyond those relied upon in the single ground raised by the Petition undermines the strength of the merits of the formal ground Apple is asking the Board to review. In other words, had Apple been confident in its asserted combination of *Mathiassen*, *McKeeth*, and *Anderson*, it would not have had to resort to raising any additional

references—let alone dozens. This approach just creates unnecessary work and inefficiencies for Patent Owner and the Board, explicitly against the policy of efficiency that motivated Congress to establish *inter partes* reviews in the first place. *See Intelligent Bio-Sys.*, 821 F.3d at 1369.

### b.    The Petition's Merits

### i.    The "Duration" Limitation

The strength of the merits of the Petition is relevant to the analysis when weighing this sixth factor. *Fintiv*, Paper No. 11 at 14. In this case, all of the challenged claims contain the Duration Limitation.[7] The Western District of Texas construed this limitation such that "at least" modifies "one of the number of said entries" and that the claims further require "a ***duration*** of each said entry," and Apple relies on that construction in the instant Petition. *See* Paper No. 1 at 31 (emphasis added). Thus, to teach this limitation, a prior art reference must disclose a duration for each entry in a series of ***biometric*** signal entries.

The sole teaching of this claimed "duration" requirement in the cited prior art according to Apple is contained in the *Anderson* reference. Apple characterizes *Anderson*'s teachings as "inputting an access code at a ***fingerprint*** sensor that is a

---

[7] In Apple's Claim Listing Appendix, this limitation is included in what Apple labeled as elements 1(d1), 10(d1), 11(a2), 14(b), 15(d1), 16(d1) & 17(a2).

'series of pressure pulses having varying durations.'" Paper No. 1 at 34 (emphasis added). Apple's characterization of *Anderson* is wrong, as it conflates two separate features described in that reference. On the one hand, *Anderson* teaches an "access code" generated by "inputting information by temporally varying the amount of pressure applied to a touch interface such as ***a digitizer (touch) pad, cursor control stick, touch screen, or the like***." Ex. 1006, col. 1, lines 52-65 (emphasis added).

On the other hand, *Anderson* teaches that "[t]he entered access code may be utilized ***in conjunction with*** other security measures," such as where a "digitizer pad" also includes "an optical scanner or thermal sensor for collecting an image of the user's fingerprint as the pressure access code is entered." *Id.*, col. 7, lines 1-7 (emphasis added). In other words, the digitizer pad works with or without fingerprint imaging, and the durational variation applied to *Anderson*'s digitizer pad is unrelated to the optionally simultaneous fingerprint imaging taught by *Anderson*. In fact, *Anderson* denigrates "fingerprint recognition," which "utilize[s] specialized equipment and may require sophisticated software for implementation." *Id.*, col. 1, lines 54-58. Thus, *Anderson* fails to teach any duration for the individual biometric signals within a series of such signals. Even if the Board believes resolution of this issue warrants further investigation, that investigation will be fully resolved in the HMD Litigation nearly nine months before a Final Written Decision is expected through this Petition.

15

Apple's expert, Dr. Andrew Sears, opined that "[a] POSITA would have been motivated and found it obvious [to] add Anderson's series of presses or pulses as an input on the portable door control or replace *Mathiassen*'s finger movements with *Anderson*'s series of presses or pulses to input commands into the portable door control 20." Ex. 1003, ¶ 222. However, Dr. Sears failed to address the distinction between *Anderson*'s digitizer pad, which allows durational variation, and the optional optical scanner or thermal sensor, which allows for fingerprint imaging.

Rather, Dr. Sears opined in conclusory fashion that "[m]odifying *Mathiassen*'s portable control to include receipt of a command via presses of a particular duration allows for simplified input of multiple commands using *Mathiassen*'s portable door control." *Id.* Dr. Sears fails to explain how *Mathiassen*'s fingerprint sensor could be modified to receive any durational information, in *lieu* of receiving traditional fingerprint data. Such a conclusory argument is insufficient to support a petitioner's burden for institution purposes. *See Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012); *see also Coalition for Affordable Drugs V LLC v. Biogen Int'l GmbH*, IPR2015-01086, Paper No. 18, at 11 (PTAB Oct. 27, 2015). Further, it is improper to ignore instances of teaching away, such as *Anderson*'s denigration of fingerprint recognition, while favoring broad statements regarding a motivation to combine.

16

*Andrea Electronics Corp. v. Apple, Inc.,* App. No. 2021-1248, 2022 WL 1197341, at *5 (Fed. Cir. April 22, 2022).

Finally, even if one could jerry-rig a combination of the teachings of *Mathiassen* and *Anderson*, Dr. Sears provides no explanation regarding how the resulting durational information in such combination relates to the ***biometric*** signal entries, as required by the challenged claims. This alone belies the conclusion that Apple is likely to satisfy its invalidity burden.

### ii.    The "Under Which Conditions" Requirement

As Apple notes, the district court defined "accessibility attribute" as an "attribute that establishes whether and ***under which conditions*** access to the controlled item should be granted to a user." Paper No. 1 at 6 (emphasis added). The independent claims of the '705 Patent make clear that the output of the claimed "accessibility attribute" is a function of "matching the biometric signal against members of the database of biometric signatures." *See, e.g.*, Ex. 1001, col. 16, lines 1-4.

Apple relies on *McKeeth*'s teaching of outputting "both a duress instruction and an alert instruction when there is no [biometric signal] match" to supplement *Mathiassen* in order to satisfy the "under which conditions" requirement of the "accessibility attribute" limitation. Paper No. 1 at 18. According to Apple, "it [would have been] obvious to modify *Mathiassen's* portable door control processor

to output a duress or an alert accessibility attribute, as taught by *McKeeth*…."  *Id.* at 22; *see also* Ex. 1003, ¶ 130.

Apple does not explain how the purported "accessibility attribute" taught by *McKeeth* results from a comparison of **biometric** information, as required by the challenged claims.  In actuality, *McKeeth* teaches using a peripheral device to generate a "unique geometric pattern," *e.g.*, "a triangle," that the peripheral device then sends to a "computer system."  *See* Ex. 1005, col. 6, lines 35-44.  If the transmitted geometric pattern does not match a pattern stored in the computer system, the computer system may "generate a security alert to the responsible authorities."  *Id.,* col. 6, lines 48-52.

In other words, *McKeeth*'s security alert is **not** a function of a comparison of any biometric information.  Thus, even if one were motivated to combine *Mathiassen* and *McKeeth* as Apple suggests, the result would not include outputting an "accessibility attribute" resulting from a comparison of biometric information. This belies Apple's claim that the combination of *Mathiassen* and *McKeeth* renders obvious the invention claimed in the '705 Patent.

Otherwise, Apple equates *Mathiassen*'s "open door" command with "under which conditions" (as opposed to "whether") access to a car is granted.  *See* Paper No. 1 at 19.  However, as Apple acknowledges, its expert characterizes this "open door" command as "**unconditional** access."  *Id.* (emphasis added).  By imputing a

conditionality to unconditional access, Apple improperly attempts to conflate the "whether" and "under which conditions" requirements of the claimed "accessibility attribute."

### iii.    The Circumstances Do Not Compel Institution

The *Interim* Procedures provides for institution notwithstanding the *Fintiv* factors "when a petition presents compelling evidence of unpatentability." *Interim* Procedures at 9.  In its Petition, Apple does not identify any compelling factor requiring institution.

### 7.    Conclusion Regarding the *Fintiv* Factors

Only the first *Fintiv* factor, regarding the absence of a stay, is neutral.  The remaining **five** factors weigh in favor of discretionary denial.  There can be little dispute under those circumstances that the Board should exercise its discretion under section 314(a) in denying institution of *inter partes* review in this case.

### C.    *Fintiv* Should not be Overruled

In a last gasp effort to avoid discretionary denial of its Petition, Apple argues that the precedential decision in *Fintiv* should be overruled for a variety of reasons, none of which is well-founded for the reasons set forth below.

### 1.    *Fintiv* did not Exceed the Director's Authority

Section 314(a) is clear on its face – "[t]he Director may not authorize an *inter partes* review to be instituted unless the Director determines that the information

presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).  While this plain language limits the Director's ability to institute *inter partes* review, it places no limit on the Director's discretion to deny institution.  *See Harmonic Inc. v. Avid Technology, Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (given the language of section 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding").

Apple argues nonetheless that *Fintiv* exceeded the Director's authority.  Paper No. 1 at 59.  The sole authority cited by Apple for that proposition, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, deals with the inapposite issue of whether the common law doctrine of laches applies to bar a cause of action under the Copyright Statute. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686-87 (2014).  There is nothing in the Copyright Statute equivalent to the Board's institution decision in an *inter partes* review.  Rather, the copyright owner "is entitled, subject to the requirements of section 411,[8] to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. §501(b).

---

[8] Section 411 addresses the registration of a copyright, and confers no discretion on a court not to proceed with a copyright infringement action.  17 U.S.C. § 411.

*Petrella*, then, is unhelpful in evaluating the Director's authority as it concerns discretionary denial.

### 2.    *Fintiv* is Neither Arbitrary nor Capricious

Apple next critiques the *Fintiv* decision as requiring "speculation about parallel litigation." Paper No. 1 at 59. As noted above, the Board does not simply create its impressions about parallel litigation out of whole cloth. This is in contrast to the situation in *Horsehead Resource Dev. Co. v. Browner*, in which the Environmental Protection Agency had "***no*** information on this issue" of "quantifying CO and THC baselines." *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). Further, this purported speculation impacts only one out of the six *Fintiv* factors. The remainder of the factors are based upon objective, knowable facts.

### 3.    *Fintiv* does not Represent Improper Rulemaking

Finally, Apple posits that *Fintiv* constitutes improper rulemaking without the requisite notice and public comment. Paper No. 1 at 60. In fact, the rules governing the denial of institution, which gives broad discretion therefor, is already in place. Specifically, "[a]t any time prior to a decision on institution of *inter partes* review, the Board may deny all grounds for unpatentability for all of the challenged claims." 37 C.F.R. § 42.108(b). The rules also parrot the language of the statute that only limits the ability to institute *inter partes* review with no corresponding limitation on

21
**Appx3313**

IPR2022-00602
U.S. Patent No. 9,665,705

the ability to deny such institution. 37 C.F.R. § 42.108(c). In short, far from representing improper rulemaking, *Fintiv* represents the Board's efforts to provide additional clarity to existing rules that it was not required to provide.

In any event, the Commissioner has now issued the *Interim* Procedures, which resulted from 822 comments from a wide range of stakeholders. *Interim* Procedures at 2. As the *Interim* Procedures clarify the *Fintiv* factors, the public rulemaking requirement, to the extent it applies here, has been satisfied.

## III.    CONCLUSION

The decision in *Fintiv*, as clarified by the *Interim* Procedures, is precedential, and therefore binding. The factors set forth in that decision weigh heavily in favor of a discretionary denial of institution. As such, the Board should exercise its discretion and deny institution.

Dated: June 30, 2022                          Respectfully submitted,

By:    /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

*Counsel for Patent Owner*

22
**Appx3314**

IPR2022-00602
U.S. Patent No. 9,665,705

## CERTIFICATION UNDER 37 C.F.R. § 42.24(d)

Under the provisions of 37 C.F.R. § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Patent Owner's Preliminary Response totals 4,930 words, which is less than the 14,000 words allowed under 37 C.F.R. § 42.24(b)(1).

Dated: June 30, 2022

/Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

*Counsel for Patent Owner*

23

**Appx3315**

IPR2022-00602
U.S. Patent No. 9,665,705

## CERTIFICATION OF SERVICE UNDER 37 C.F.R. § 42.6(E)(4)

I hereby certify that on June 30, 2022, I caused a true and correct copy of the

foregoing to be served on the following counsel for Petitioner by electronic mail to

the following email address:

Jennifer C. Bailey
Adam P. Seitz
Erise IP
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com


By:      /Darlene F. Ghavimi-Alagha/
         Darlene F. Ghavimi-Alagha
         Reg. No. 72,631
         K&L GATES LLP
         Darlene.Ghavimi@klgates.com
         T: (512) 482-6919
         F: (512) 482-6859
         2801 Via Fortuna, Suite 650
         Austin, Texas 78746

         *Counsel for Patent Owner*

24
**Appx3316**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**PATENT TRIAL AND APPEAL BOARD**

APPLE INC.,
Petitioner

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner

CASE: IPR2022-00602
U.S. PATENT NO. 9,665,705

**PATENT OWNER RESPONSE**

IPR2022-00602
U.S. Patent No. 9,665,705

**TABLE OF CONTENTS**

I.    Introduction.................................................................................................1

II.   '705 Patent Overview ................................................................................4

III.  Level of Ordinary Skill.............................................................................5

IV.   Claim Construction ...................................................................................6

    **A.**   "Accessibility Attribute" ................................................................6

    **B.**   "A Series of Entries of the Biometric Signal, Said Series Being Characterised According to at Least One of the Number of Said Entries and a Duration of Each Said Entry"..........................................7

    **C.**   "Populate the Data Base According to the Instruction".....................11

    **D.**   "Configured To" v. "Capable Of"....................................................12

V.    THE PRIOR ART FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS..................................................................................................14

    **A.**   The Prior Art Does Not Teach the "Accessibility Attribute" Limitation .......................................................................................14

        1.    *Mathiassen* Does Not Teach an "Accessibility Attribute" .......14

        2.    There is No Motivation to Combine Apple's Cited Prior Art to Arrive at the "Accessibility Attribute" as Properly Construed.18

    **B.**   The Prior Art Does Not Teach the Biometric Signal Duration Limitation .......................................................................................26

        1.    Anderson Does Not Teach a Durational Component to a Biometric Signal Entry .........................................................26

        2.    There is No Motivation to Combine *Mathiassen* and *Anderson* ......................................................................................28

    **C.**   Apple's Cited Prior Art Does Not Populate the Data Base According to the Instruction.................................................................32

    **D.**   Independent Claims 10, 11 & 14-17 ..................................................35

    **E.**   Dependent Claims .........................................................................35

VI.   CONCLUSION........................................................................................35

IPR2022-00602
U.S. Patent No. 9,665,705

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 2001 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. HMD Global Oy*, 6:21-cv-00166 (Dkt. 27) (Sept. 23, 2021) |
| 2002 | HMD Final Invalidity Contentions, Chart B15 – *Mathiassen*, dated March 16, 2022 |
| 2003 | Apple Inc. – Final Invalidity Contentions dated March 16, 2022 |
| 2004 | Scheduling Order, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 37) (Sept. 23, 2021) |
| 2005 | March 19, 2020 Letter from George Summerfield to Brian Ankenbrandt |
| 2006 | Defendant Apple Inc.'s Notice of Motion and Motion to Stay Pending *Inter Partes* Review, 5:22-cv-02553 (Dkt. 119) (June 14, 2022) |
| 2007 | HMD Global Oy – Final Invalidity Contentions dated March 16, 2022 |
| 2008 | Declaration of George C. Summerfield in Support of Motion for *Pro Hac Vice* Admission |
| 2009 | Biography of George C. Summerfield |
| 2010 | Declaration of Jonah Heemstra in Support of Motion for *Pro Hac Vice* Admission |
| 2011 | Apple's Opening Claim Construction Brief, *CPC Patent Technologies Pty Ltd. v. Apple Inc.*, 6:21-cv-00165 (Dkt. 46) (Nov. 19, 2021) |
| 2012 | Final Deposition Transcript of Dr. Andrew Sears, dated November 8, 2022 |

ii
**Appx3392**

| Exhibit No. | Description |
|:---:|:---|
| 2013 | Declaration of William C. Easttom II (Chuck Easttom) Ph.D., D.Sc. |
| 2014 | CV of Dr. Chuck Easttom |

IPR2022-00602
U.S. Patent No. 9,665,705

## I.    INTRODUCTION

The limitations of the independent claims of U.S. Patent No. 9,665,705 ("the '705 Patent") can be divided as follows: 1) the preamble; 2) a memory with the biometric signature database (representative clause 1(a));[1] 3) a transmitter subsystem and its components involved in capturing and matching of biometric data (representative clause 1(b)); 4) a receiver subsystem to give access to a device based upon information received from the transmitter subsystem (representative clause 1(c)); 5) the transmitter subsystem to the extent it is involved in the capture and registration of biometric data associated with a user (representative clause 1(d)); and 6) the device to be unlocked (representative clause 1(e)).  Apple cobbles together a single, three-reference challenge to the claims of the '705 Patent.  Even with these three references in hand, Apple must ignore its own characterization of the prior art and its construction of the subject claims to mount an obviousness challenge.

---

[1] These clauses refer to the numbering system used by the Board to label the various claim limitations in claim 1 of the '705 Patent.  As the Board notes, the only difference between claim 1 and claim 15 (the only other independent claim directed to a "system for providing secure access to a controlled item") is the phrase "configured to" in the former and the phrase "capable of" in the latter.  Paper No. 11 at 6.  The distinction between those terms is addressed later herein.

1

**Appx3394**

**First**, the "transmitter subsystem" (representative clause 1(b)) specifies a "controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an ***accessibility attribute***" (emphasis added). Apple successfully urged that "accessibility attribute" be construed as an "attribute that establishes whether ***and under which conditions*** access to the controlled item should be granted to a user" (emphasis added). According to Apple, the challenged claims go beyond the binary access decision of "yes" or "no." Yet, Apple improperly calls upon prior art teachings that are limited to this very binary decision as allegedly teaching the "accessibility attribute" limitation.

**Second**, the transmitter subsystem limitation (representative clause 1(d)) specifies "a series of entries of the ***biometric*** signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry" (representative clause 1(d)(1)) (emphasis added) ("the Biometric Signal Duration Limitation"). In discussing the prior art that allegedly teaches this limitation, Apple's expert, Dr. Andrew Sears, initially draws a bright line distinction between biometric security devices, such as a fingerprint sensor, and knowledge-based security devices, such as a capacitive touch sensor and Morse code.

Yet, when cobbling together a multi-reference challenge to the validity of the subject claims, Dr. Sears and Apple completely blur that distinction, combining teachings from both realms, and treating knowledge-based security features as

2
**Appx3395**

biometrics to satisfy the Biometric Signal Duration Limitation. This necessarily dooms Apple's challenge, lest the Board also ignore the fundamental distinction between "knowledge," which can be learned and stolen, and "biometrics," which cannot. Apple also provides no explanation as to *how* or *why* teachings from these disparate technologies could be combined to arrive at the claimed invention, especially when the afore-referenced simpler solutions had presented themselves.

**Third**, the claim specifies that the received series of biometric signals be mapped into an instruction (representative clause 1(d)(2)), and that instruction is used to populate the data base (representative clause 1(d)(3)). In other words, as Apple acknowledges, the series of biometric signal is used in the user enrollment process. Yet, in describing its principal reference, Apple points to one thing - finger movements – as purportedly satisfying the "receive" and "map" limitations, and to another thing – "master minutiae tables" of fingerprints – for the "populate" limitation. This clearly contravenes the plain language of the claims and the antecedents therein.

**Finally**, if Apple is somehow correct that combining knowledge-based and biometric security is fair game in challenging the claims of the '705 Patent, Apple fails to explain why one of ordinary skill in the art would have been motivated in the name of enhancing security to modify an existing biometric sensor in some fashion, with the reprogramming that would be required therefor, rather than employing

myriad simpler, albeit unpatented, security alternatives, such as a physical push button, to be used in conjunction with such existing biometric sensor. This is particularly problematic, given that one of the three prior art references relied upon by Apple in its single challenge ground (*Anderson*) denigrates fingerprint recognition as requiring "sophisticated software for implementation," and itself teaches the use of a push button,

Any one of the foregoing problems with Apple's single challenge ground is sufficient to defeat the instant petition. The combination of all four issues, however, means that the Board should give the petition the short shrift it deserves.

## II.    '705 PATENT OVERVIEW

The '705 Patent issued on May 30, 2017 from an application claiming priority of August 13, 2003. The '705 Patent has 17 claims, claims 1, 10, 11, and 14-17 of which are independent. Representative claim 1 of the '705 Patent reads:

> A system for providing secure access to a controlled item, the system comprising: a memory comprising a database of biometric signatures;
>
> a transmitter sub-system comprising:
>
> a biometric sensor configured to receive a biometric signal; a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;
>
> and a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute;

and a receiver sub-system comprising: a receiver sub-system controller configured to: receive the transmitted secure access signal;

and provide conditional access to the controlled item dependent upon said information;

wherein the transmitter sub-system controller is further configured to: receive a series of entries of the biometric signal,

said series being characterised according to at least one of the number of said entries and a duration of each said entry;

map said series into an instruction;

and populate the data base according to the instruction,

wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

Ex. 1001, 15:62-16:24.

As the Board noted, "[t]he '705 Patent discloses a system 'or providing secure access to a controlled item.'" Paper No. 11 at 4 (citation omitted).  "The 'controlled item' can be, for example, the locking mechanism of a door or an electronic lock on a personal computer."  *Id*. (citation omitted).  "The system uses a database of 'biometric signatures' such as a fingerprint for determining authorized access."  *Id*. (internal citations omitted).

## III.    LEVEL OF ORDINARY SKILL

CPC does not dispute Apple's characterization that a hypothetical person of ordinary skill in the art "would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least

one year experience in the field of human-machine interfaces and device access security," and "[a]dditional education or experience may substitute for the above requirements."  Paper No. 1 at 3.

## IV.   CLAIM CONSTRUCTION

### A.   "Accessibility Attribute"

Claim 1 of the '705 Patent requires an output of an "accessibility attribute" based upon a biometric signal match, and emitting "a secure access signal conveying information dependent upon said accessibility attribute."  Ex. 1001, 16:1-8.  Apple proposed, and the Board adopted, an "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user" as the construction of "accessibility attribute."  Paper No. 1 at 6; Paper No. 11 at 13.  According to Apple this construction "is consistent with the description of the invention throughout the specification and the claims, ***which goes beyond mere matching—the binary decision of "yes" or "no***"—and instead describes a system that provides for different types of access."  Ex. 2011, 26 (emphasis added).  *See also id.*, 28 ("[b]inary matching—"match/no match"—is not what the inventor was trying to invent").

The '705 Patent teaches the following examples of accessibility attributes:

[A]n access attribute (granting unconditional access), a duress attribute (granting access but with activation of an alert tone to advise authorities

of the duress situation), an alert attribute (sounding a chime indicating that an unauthorised, but not necessarily hostile, person is seeking access).

Ex. 1001, 8:28-35.

In short, a mere binary decision to grant access to a device does not constitute an "accessibility attribute" under Apple's claim construction. As discussed below, however, Apple improperly tries to back away from that distinction in challenging the validity of the subject claims.

### B. "A Series of Entries of the Biometric Signal, Said Series Being Characterised According to at Least One of the Number of Said Entries and a Duration of Each Said Entry"

As the Board noted, "[t]he '705 Patent discloses a system 'for providing secure access to a controlled item,'" wherein "[t]he 'controlled item' can be . . . an electronic lock on a personal computer." Paper No. 11 at 4. "The system uses a database of 'biometric signatures,' such as a fingerprint for determining authorized access." *Id.* (internal citations omitted).

Representative claim 1 of the '705 Patent requires, *inter alia*, a transmitter sub-system controller that is configured to "receive a series of entries of the *biometric* signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry" (representative clause 1(d1)). Paper No. 11 at 29 (emphasis added). Subsumed within this Biometric

Signal Duration Limitation is the term "biometric signal."  Apple proposed, and the Board adopted, "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" as the construction of that term.  Paper No. 1 at 6; Paper No. 11 at 13.  In other words, biometric information identifies "an individual via unique physiological or behavioral characteristics" Ex. 1003, ¶ 39.  *See also* Ex. 2012, 20:9-21, 21:13-15 (a biometric signal is unique to an individual user).  According to Apple's own expert, a biometric signal is based on an inherent attribute of an individual, cannot be learned, and cannot be stolen.  Ex. 1003, ¶ 38; Ex. 2012 at 28:12-21.

The claimed "biometric signal" is in contradistinction to what Dr. Sears references in the prior art as "knowledge-based" security measures, such as a password.  Ex. 1003, ¶¶ 37-38.  A knowledge-based approach is "not based on any inherent attributes of an individual."  *Id.*, ¶ 38.  The '705 Patent itself speaks of a "biometric signal" as an "alternative" to a "secret code," *i.e.,* a knowledge-based security measure.  Ex. 1001, 1, limes 21-29.  The following table summarizes the distinctions between knowledge-based and biometric-based security measures:

| Knowledge-Based Security | Biometric-Based Security |
|---|---|
| Knowledge can be learned by another. Ex. 2012, 28:12-21. | A biometric feature cannot be "learned."  Ex. 2012, 36:5-11 (cannot "teach" a mug shot). |
| Knowledge is not based on an inherent attribute of an individual.  Ex. 1003, ¶ 38. | Biometric information identified an individual via unique physiological or behavioral characteristics.  Ex. 2012, |

|  |  |
|---|---|
|  | 20:9-21, ("unique to the user"). *See also id.* at 29:4-16 ("essentially part of a person"); *id.* at 33:11-16 ("unique patterns form via the ridges and bifurcations on the skin of fingerprints" are "biometric"); and Ex. 1003, ¶¶ 37, 40. |
| Knowledge, e.g., a password, can be stolen. Ex. 1003, ¶ 38. | One cannot "steal" biometric information. Ex. 1003, ¶ 38; Ex. 2012, 20:9-21, 21:13-15. |

Despite proposing this construction, Apple seeks to blur the lines between what its expert calls "knowledge-based" security features (those based on knowledge, such as a passcode or particular pattern, and not on any attribute of the user), and a biometric signal based on the unlearnable attribute of the user, in an effort to show the Biometric Signal Durational Limitation is taught by its single challenge ground. Indeed, Apple itself proposed, the District Court found, and the Board has preliminarily adopted, a construction that the claimed "series [is] characterised according to at least one of the number of said entries and a duration of each said entry." Crucially, the antecedent for this series is "a series of entries of the biometric signal," *i.e.*, the entries and corresponding series are "of the biometric signal," and the "number of said entries and a duration of each said entry" refers to the entries of the biometric signal, and not an entry of some other information, such as knowledge-based information.

The distinction between knowledge-based and biometric information is also evident in the prosecution history.  The Examiner found the closest prior art of record to be two references disclosing biometric security.  Ex. 1002, 155-56 (*Hoffman*'s "biometric samples" and *Pu*'s "fingerprints").  The applicant successfully pointed out, however, that combining *Hoffman* biometric sampling with *Pu*'s use of human body parts to form a "secret sequence code," *i.e.*, knowledge-based information, required impermissible hindsight.  *Id.* at 121.[2]

Blurring the line between knowledge-based and biometric information is improper given the construction Apple proposed, and the Board adopted, for the term "biometric signal" - "[p]hysical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)."  Paper No. 1 at 6; Paper No. 11 at 13.  It is also improper considering the claims' clear requirement of a number and duration of each entry of the *biometric signal*.  Ex. 2011, 17-18; Ex. 1077, 2.

In short, given the foregoing, the Biometric Signal Durational Limitation ***cannot*** be disclosed by the duration of a signal generated by a knowledge-based

---

[2] The Examiner allowed these claims (which eventually became Claims 1, 10, 11, and 15-17) based on the "reasons argued by applicant in pages 13-15 of the Remarks, filed 10/19/2016," which included applicant's statement regarding impermissible hindsight. Ex. 1002 at 121, 155.

security feature.  As discussed herein, however, that is precisely what Apple has attempted to do in its single challenge ground.

## C.  **"Populate the Data Base According to the Instruction"**

Apple points to "enrolling a new user's fingerprint by providing control information via a sequence of presses of certain amount and duration" as one of the purportedly distinguishing features of the invention claimed in the '705 Patent. Paper No. 1 at 1.  The "populate" limitation in claim 1 is part of that enrolling feature. Ex. 2013, ¶ 82.  Representative Claim 1 makes clear that, once the series of biometric signals characterized by number and duration is received by the transmitter subsystem (representative clause 1(d1)), that series is mapped into an instruction (representative clause 1(d2)), and the resulting instruction is used to populate the database of biometric signatures (representative clause 1(d)(3)).  Ex. 1001, 16:13-23.  To satisfy the requirements for antecedent claiming, "said series" in clause 1(d2) must refer to the "series of entries of the biometric signal" in clause 1(d1),[3] and "the instruction" in clause 1(d3) must refer to "an instruction" in clause 1(d2).  *See, e.g.,* MPEP, § 2173.05(e).  The following is a depiction of this information flow:

---

[3] The Board recognized that "said series" refers to the "series of entries of the biometric signal" as shown by the board placing "of entries of the biometric signal" in brackets.  Paper No. 11 at 32.



Ex. 2013, ¶ 82.

To show a teaching of these limitations, Apple must identify the same "biometric signal" series received by the transmitter sub-system, mapped into an instruction, and resulting in an instruction for populating the database.  As discussed below, Apple did not do that.

### D.     "Configured To" v. "Capable Of"

The Board requested the parties address the difference between "configured to" which appears in Claims 1, 10, and 11, and "capable of" which appears in Claims 15, 16, and 17.  Paper 11 at 14.  The Federal Circuit addressed the distinction between terms falling onto either side of a line in *Parkervision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018).  *See also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (recognizing the distinction between the narrower "configured to" and the broader "capable of").

For claims which are recited using "capable of" language, the Federal Circuit held that prior art other references are sufficient for invalidity if they "disclose[] an apparatus that is reasonably capable of operating so as to meet the claim limitations, even if it does not meet the claim limitations in all modes of operation."

*Parkervision*, 903 F.3d at 1361.  This is consistent with the description of "capable of" being broader than "configured to" in *Aspex*.  *Aspex*, 672 F.3d at 1349.

In contrast, the Federal Circuit described that when the claim is written using "configured to"-type language, whether an accused product was "reasonable capable of being put into the claimed configuration was insufficient for a finding of infringement."  *Parkervision*, 903 F.3d at 1361.  By the same token, in the context of invalidity, in order to invalidate a claim which is written with "configured to" language, the prior art must be *more than* just "capable of" being put into the claimed configuration.  *In re Giannelli*, 739 F.3d 1375, 1379-80 (Fed. Cir. 2014) (finding that the Board's conclusion that a function *could* be performed using the prior art was insufficient; the correct inquiry was whether it would have been obvious to modify the prior art to contain structure "adapted to" or configured to perform the function).  This is consistent with the Federal Circuit's earlier analogizing between this term, "configured to," with "adapted to," "made to," or "designed to."  *Id.*; *see also Aspex*, 672 F.3d at 1349.

Looking at the claims challenged in this proceeding, the Federal Circuit's reasoning means that Claims 1, 10, and 11 should be construed to mean the claimed inventions are "configured to," "designed to," "adapted to," or "made to" achieve what is claimed.  Prior art that is "capable of" teaching the claimed configuration will not invalidate these claims unless a POSITA would have found it obvious that

the prior art is not only "capable of" achieving the claimed configuration, but also renders obvious the narrower construction of "configured to."  Claims 15, 16, and 17, therefore, should be construed such that prior art will not invalidate these claims unless the prior art is capable of achieving the claimed configuration.

As discussed below, the prior art combination proposed in Apple's single-challenge ground is not capable of, much less configured to, achieve the claimed configuration at least because a POSITA would not have combined the references, and even if they would have combined the references, the resulting combination would not teach, or render obvious, the capabilities of the claimed invention.

## V.    THE PRIOR ART FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS

### A.    The Prior Art Does Not Teach the "Accessibility Attribute" Limitation

#### 1.    *Mathiassen* Does Not Teach an "Accessibility Attribute"

Apple's position on the "accessibility attribute" limitation is muddied at best. As explained above, Apple successfully argued before the district court that such limitation should be construed as having both "whether" and "under which conditions" components to an access decision, eschewing a construction limited to a binary (yes/no) access decision.  Ex. 2011, 26 ("The definition…goes beyond mere matching—the binary decision of 'yes' or 'no'…."); *see also id.*, 28 ("Binary matching—"match/no match"—is not what the inventor was trying to invent").

Now, however, Apple and its expert appear to argue that "accessibility attribute" *can* include a binary access decision.  Paper 1 at 18-20.

Specifically, according to Dr. Sears, the binary decision whether to unlock a car door using *Mathiassen*'s portable control, in addition to determining "whether" to grant access to the car, also constitutes determining "under which conditions" such "access should be granted," as such access grant in the event of a fingerprint match is "unconditional."  Ex. 1003, ¶¶ 139-140.  The only alternative to granting access is to deny access by aborting the process in the event that there is no fingerprint match.  *See id.*, ¶ 139.  Such access does not provide any incremental condition to access beyond the "whether" inquiry, and Apple's reading of *Mathiassen* consequently merges the "whether" and "under which conditions" components of its own construction of the "accessibility attribute" limitation.

Dr. Sears, for his part, could not point to another type of accessibility attribute taught in *Mathiassen*, volunteering at deposition that *Mathiassen* somehow renders other accessibility attributes "obvious."  Ex. 2012, 60:1-12.  Apart from the fact that Dr. Sears was not asked what *Mathiassen* by itself rendered obvious with regard to the "accessibility attribute," neither Dr. Sears nor Apple ever raised *Mathiassen* as a

single-reference obviousness challenge.[4]  As such, Apple should not be allowed to avail itself of that theory now.  *See, e.g., Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'") (citing 35 U.S.C. § 312 (a)(3)).

The Board, in instituting this proceeding, adopted Apple's reasoning which plainly ignores the "under which conditions" aspect of Apple's own construction of "accessibility attribute:"

> Here, consistent with the proposed construction, Petitioner relies solely on *Mathiassen* to satisfy the proposed claim construction of an attribute that establishes whether and under which conditions access to the

---

[4] As Apple argues that, while "*Mathiassen* teaches portable door control outputting an encrypted command to grant access to the car door locks," "***McKeeth teaches outputting other signals indicating when a user is under duress*** or when a user is unauthorized," and "[m]odifying *Mathiassen*'s portable control to output information indicating duress access and alert access, in addition to *Mathiassen*'s taught grant access . . . would have been obvious to a POSITA."  Paper No. 1 at 3 (emphasis added).

controlled item should be granted to a user. ***If the processor 2 in Mathiassen does not find a match, then no access will be granted. That is all this clause of claim 1 requires***.

Paper No. 11 at 25 (emphasis added).

In other words, the Board preliminarily found that the type of binary decision that Apple characterized as antithetical to the claimed invention in fact falls within the scope of the "accessibility attribute" limitation. Under the Board's treatment of *Mathiassen*, a binary decision limited to access/abort satisfies both the "whether" and "under which conditions" requirement for "accessibility attribute." This is inconsistent with the construction Apple fought for in the district court litigation, proposed in this proceeding, and adopted by the Board. Ex. 2011, 26; Paper 1 at 6; Paper 11 at 13.

After Apple expended its energy championing a construction of "accessibility attribute" that excludes binary access decisions, it cannot now challenge the claims of the '705 Patent based upon a construction that incorporates such a binary decision. The necessary result is that *Mathiassen*'s access/abort teaching does not correspond to an "accessibility attribute" under the controlling construction of that term, and any invalidity decision based upon such correspondence is simply wrong.

**2.    There is No Motivation to Combine Apple's Cited Prior Art to Arrive at the "Accessibility Attribute" as Properly Construed**

Recognizing that *Mathiassen* does not satisfy Apple's construction of "accessibility attribute," Dr. Sears falls back on the opinion that "*Mathiassen* in combination with McKeeth teaches outputing two or more accessibility attributes," i.e., it is non-binary. *See* Ex. 1003, ¶ 143. The teaching from *McKeeth* to which Dr. Sears refers is a "geometric pattern (e.g., using a mouse)" that when *incorrectly* entered "concurrently with, or after a predetermined duration from, scanning his/her fingerprint," allows for a duress signal. Ex. 1003, ¶ 145; Ex. 1005, 4:10-32.

Apart from being a tacit admission that *Mathiassen* only teaches binary access, this opinion, to be cognizable, must rely upon a motivation to combine these two references going beyond improper hindsight reconstruction. *See, e.g.*, *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000) (citation omitted) (impermissible to use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention).

This purported combination presupposes that one would have thought it necessary to look beyond *Mathiassen* to add a duress signal to the existing fingerprint security thereof. However, as Dr. Sears notes, *Mathiassen* teaches finger movement that can provide for additional security. Ex. 1003, ¶ 86 ("*Mathiassen*

teaches commands other than 'open door' may be implemented in the secure access control system by a user providing certain finger movements"). One such command could be to send a distress signal. Ex. 2012, 55:2-6. There would have been no reason, then, to look to *McKeeth* to modify *Mathiassen* in the fashion that Dr. Sears describes. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012); Ex. 2013, ¶ 51.

Even if *Mathiassen* could be modified to add a distress signal resulting from finger movements, such modification would not involve a biometric signal. Ex. 2013, ¶¶ 52-53. Claim 18 of *Mathiassen* calls for "a fingerprint sensor (5)." Ex. 1004, 28. That device is the biometric sensor. Ex. 2012, 47:16-48:6. Claim 20, which depends from claim 18, further calls for "translation means in the form of a hardware or a software translation program module for analyzing and categorizing the omni-directional finger movements across the fingerprint sensor." Ex. 1004, 28. To one of ordinary skill in the art, these finger movements are not biometric signals, as something more than the fingerprint sensor is required to track them. Ex. 2013, ¶¶ 52-53. One of ordinary skill in the art would understand that, in the context of tracking "omni-directional finger movements," the fingerprint sensor, in conjunction with the translation means hardware or software, is not acting like a fingerprint sensor. *Id.* In light of *Mathiassen*'s teachings, there would have been no motivation

to combine that reference with anything to arrive at a duress signal, let alone selecting *McKeeth* specifically.

Assuming that one could presuppose looking beyond *Mathiassen*, Dr. Sears posits several reasons supporting a purported motivation to combine *Mathiassen* and *McKeeth*: 1) vehicle security was a known problem (Ex. 1003, ¶ 150); 2) duress access was known to be desirable (*id.*, ¶¶ 151-156); denying access to unauthorized users was well known (*id.*, ¶¶ 157-161); and 4) there would have been a reasonable expectation of success in the modification (*id.*, ¶¶ 162-171).

To begin with, the first factor calls out a problem in the automotive space. Indeed, Apple maps claim 1 of the '705 Patent to "*Mathiassen*'s portable control 20 embodiment of *Mathiassen*, where the 'controlled item' is *Mathiassen*'s car door locks in the 'central locking system.'" Paper No. 1 at 11.  *McKeeth*, however, does not teach an automotive embodiment.  *See generally* Ex. 1005; *see also* Ex. 2012, 61:14-62:4 ("Q. Does McKeeth teach an automotive embodiment, as far as you recall?  And if you need to look at it, please do. … A. Based on my quick review, I don't believe McKeeth teaches an automotive embodiment.  Q. Well, do you recall in your opinion relying upon any automotive embodiment that McKeeth taught?  A. I do not.").  Rather, as the Board noted, *McKeeth* discloses a method and system for authenticating a user to access a computer system.  Paper No. 11 at 16.

Indeed, while Apple repeatedly claims it would have been obvious to modify the portable control of *Mathiassen* with *McKeeth*, it wholly ignores this major distinction between these references. *See* Paper 1 at 22. *McKeeth* teaches a user inputting a 1) password using a keyboard, 2) unique set of clicks using a mouse, or 3) geometric pattern using a computer peripheral device on a flat surface "concurrently with, or after a predetermined duration from, scanning his/her fingerprint" as the mechanism by which a duress access and/or alert generation takes place. Ex. 1006, 2:65-3:4; 3:38-42; 4:10-32; 5:34-38 ("Accordingly, concurrently with or shortly after the fingerprint scan, the user may move the peripheral device 200 on a flat surface in a predetermined geometric pattern…."). The portable device of *Mathiassen* notably lacks a keyboard, screen, and even a button to perform these very functions. Ex. 1004, ¶ [0147]. Apple's and Dr. Sears blind assumption that these references could be combined without explaining how the resulting combination would be achieved is therefore wholly inadequate. *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

Neither Apple nor Dr. Sears explains why an ordinarily skilled person would have looked to computer art to solve a problem in the automotive field. *See Belden Inv. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). As explained below, given the alternative solutions available in the automotive field, there would have

been no reason to look for, let alone find, a reference such as *McKeeth* for modifying the teachings of *Mathiassen*.

Further, the second two factors only serve to demonstrate that there were countless references from which an ordinarily skilled person could have selected for combination with *Mathiassen*, assuming it would even have occurred to that person to modify *Mathiassen* at all.  *See* Ex. 1003, ¶ 151 ("[v]ehicle security systems were well-known to provide specific types of access when a car owner indicated they were under a duress condition or in a dangerous situation"); *id.,* ¶ 159 ("car alarms very well-known and widely available security measures included in cars"); and *id.*, ¶ 161 ("it was known prior to August 13, 2003, that portable vehicle key fobs included security measures that simultaneously locked car door locks and sounded an alarm").  Dr. Sears provides no explanation as to why one would have selected *McKeeth* specifically, from among all of this referenced art, to combine with *Mathiassen* – a burden of proof clearly imposed upon Apple.  *See, e.g.*, *IPR Licensing, Inc. v. ZTE Corp.*, 685 Fed. Appx. 933, 940 (Fed. Cir. 2017).

Looking at the individual prior art references discussed by Dr. Sears in connection with the alleged motivation to combine, several such references teach simple, non-biometric security measures.  For example, the remote keyless entry system of *Williams* "included a button on the fob that performed different functions when pushed once or twice."  Ex. 1003, ¶ 58, *citing* Ex. 1030, 14:5-31.  This one

press, two press system is not biometric. Ex. 2012, 41:16-42:9. Similarly, *Araki* "discloses invoking certain commands based on user input but does so via a touch sensor without sensing a user's fingerprint." Ex. 1003, ¶ 62, *citing* Ex. 1034, 5:28-33. As such, *Araki* teaches a knowledge-based security system. Finally, the key fob described in *K-9 Car Alarm Owner's Guide and Installation Instructions* ("*K-9*") has a "panic mode" security measure. Ex. 1003, ¶ 161, *citing* Ex. 1041, 7. The panic mode is activated by a push button transmitter. Ex. 1041, 7. This reference does not teach biometric sensing, either. Ex. 2012, 77:8-78:1.

As Dr. Sears acknowledges, "creating a quickly, easily, and most importantly, natural-functioning entry system is vital in portable electronics using input devices was also desirable, and their making user manipulation of such devices easy was a key feature." Ex. 1003, ¶ 229 (internal quotation marks omitted). Furthermore, as is evident from the foregoing, push buttons on key fobs or similar devices were well known in the prior art. Ex. 2012, 65:20-66:1. *Mathiassen* could have been modified by adding a physical push button to generate a duress signal. *Id.*, 63:2-14. In addition, Dr. Sears suggests that if a fob is in a user's pocket or in a bag, "it would be simpler and more efficient for the user to simply press the fingerprint interface at varying durations rather than moving the finger directionally to enter commands." Ex. 1003, ¶ 221. This simplicity consideration would be a key feature in determining

23

how one might modify an existing system, such as that described in *Mathiassen*. *See id.*; *see also* Ex. 2012, 75:1-15.

Returning now to the alleged motivation to combine, and recognizing the afore-referenced desire for simplicity, Apple provides ***no*** rationale for a preference to combine two fingerprint recognition references (*Mathiassen* and *McKeeth*), and the programming associated therewith, over combining *Mathiassen*'s fingerprint sensor with the simpler push button feature taught in one of the references discussed below. The fingerprint sensor in this combination provides for biometric security in the first instance. *See Kinetic Concepts*, 688 F.3d at 1369; Ex. 2013, ¶¶ 46, 60-61.

Further, according to the references discussed by Dr. Sears, a push button can provide additional security, such as initiating a distress signal. Ex. 2013, ¶¶ 55-57. A push button is a simple mechanical feature, and is easy to install in a device such as a key fob, which explains why push buttons of the type contained in *Williams*, *Araki*, and *K-9* were as prevalent in the prior art as Dr. Sears describes. *Id.* Further, as Dr. Sears notes, the push button on a key fob located in a pocket or purse would be easy to operate in the event of a duress situation. Ex. 1003, ¶ 221.

In contrast, according to one of the references Apple cites in its single challenge ground (*Anderson*), fingerprint recognition requires "specialized equipment and may require Sophisticated Software for implementation." Ex. 1006, 1:54-58. Dr. Sears, for his part, has not evaluated what type of software

24

modifications to *Mathiassen* would be required to accommodate a durational component.[5]  Ex. 2012, 65:15-19.  And, when testifying as to which option would have been easier as between adding a push-button and fingerprint sensor re-programming in *Mathiassen*, Dr. Sears stated that "I think it would depend on exactly who you're talking to and what -- and a lot of details of the context.  One involves changes of the hardware; the other involves changes to the software."  *Id.*, 64:14-18.

That Dr. Sears could not do better in responding to this question is unsurprising, given that he "was thinking about it at just this moment," *i.e.*, he had not considered this issue in rendering his opinions on the motivation to combine.  *See id.*, 65:9-14.  In any event, CPC has now presented unrebutted testimony that a push button is the simpler solution, undermining Apple's theory regarding prior art combinations requiring fingerprint sensor re-programming.  *See* Ex. 2013, ¶¶ 59-61.  Apple should not be allowed to provide contrary evidence for the first time in reply.[6]  *See Intelligent Bio-Sys.,* 821 F.3d at 1370.

---

[5] In point of fact, Dr. Sears has never written or modified software to recognize fingerprints.  Ex. 2012 at 99:5-19, 102:3-6.

[6] In response to questioning from Apple's counsel, Dr. Sears testified that "very minor modifications" would be required "to modify *Mathiassen*'s fingerprint sensor

B.    **The Prior Art Does Not Teach the Biometric Signal Duration Limitation**

1.    **Anderson Does Not Teach a Durational Component to a Biometric Signal Entry**

Apple expressly acknowledges that *Mathiassen,* which serves as its principal reference "does not teach determining a duration of each [biometric signal] entry." Paper No. 1 at 33; *see also id.* at 3. Apple therefore looks to *Anderson* for a purported teaching of "***fingerprint*** presses of varying duration."  *Id.* (emphasis added). Apple's reference to "fingerprint presses" in Anderson is pure fiction. In fact, as the Board expressly noted, the portion of Anderson quoted in the Petition teaches "a series of ***pressure pulses*** having varying durations." *See* Paper No. 11 at 29, *quoting* Ex. 1006, 6:45-48 (emphasis added). That series of pressure pulses translates to an "access code," which is compared to a "stored code template." Ex. 1006, 6:45-51. However, the term "***fingerprint*** access code," used by Dr. Sears and adopted by the Board on institution, does not even appear in *Anderson*. Ex. 2012, 91:20-92:14; *see generally* Ex. 1006.

---

to detect a touch, no touch press of a particular duration." Ex. 2012 at 98:19-22. This entirely conclusory testimony fails to explain what these modifications would be, why they are "very minor," and, most importantly, why such modifications would be preferable to the installation of a push button.

IPR2022-00602
U.S. Patent No. 9,665,705

In fact, the "pressure pulses" in *Anderson* are not, and do not generate, *biometric* signals as they are knowledge-based. Ex. 2012, 58:3-10, 58:17-22; Ex. 2013, ¶ 66. The hardware embodiments taught in *Anderson* for accepting these "pressure pulses" include "resistive" and "capacitive touch pads." Ex. 1006, 5:24-37. Such touch pads may optionally be equipped with "an optical scanner or thermal sensor for collecting an image of the user's fingerprint." *Id.*, 7:5-7. However, such fingerprint images (biometric signals) are captured "as the pressure code is entered," *i.e.*, they are not part of the pressure code itself. *See id.* at 7:4-7. And, as Dr. Sears acknowledged, *Anderson*'s pressure code is knowledge-based – not biometric. Ex. 2012, 58:3-22. If a sensor only captures the knowledge of a user is not properly characterized as a *biometric* sensor. *Id.* at 33:4-8. More specifically, a capacitive touch sensor that merely captures user taps or finger movements is not a biometric sensor. *Id.* at 39:21-40:6, 42:12-43:16.

Further illustrating that its pressure code is not biometric, *Anderson* provides as examples of such code "[a] known code key (e.g., Morse code) or a memory mnemonic (*e.g.*, the melody of a favorite song) may be utilized to aid the user in selecting, remembering, and entering the access code." Ex. 1006, 7:40-43. A Morse code key is obviously not a biometric signal. Ex. 2012, 41:3-15. A memory mnemonic is also obviously not a biometric signal. Ex. 1003, ¶ 41; Ex. 2012, 28:12-21. Nonetheless, the Board cited to waveforms corresponding to such mnemonics

as exemplifying a biometric signal.  Paper 11 at 30, *citing* Ex. 1006, Figs. 4A and 4B.

The point to all of the foregoing is that, if one were to combine *Mathiassen* with *Anderson* in a purported effort to attain the Biometric Signal Duration Limitation, the result would be the fingerprint sensor of *Mathiassen*, which captures fingerprint images, and *Anderson*'s touch pad that captures a non-biometric pressure code at the same time fingerprint images are captured.  Ex. 2013, ¶ 68.  As Apple looks solely to *Anderson*'s teachings for the durational requirement of the biometric signal series, combining *Mathiassen*'s fingerprint sensor with *Anderson*'s pressure code does not produce the claimed invention, as any duration would apply to a ***non***-biometric signal.  *Id.*, ¶¶ 69-71.  In short, even if a person of ordinary skill were to combine *Mathiassen* and *Anderson*, the purported combination would not render obvious the claimed "means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said [biometric] entry."  Ex. 1001, 16:15-18.

### 2.    There is No Motivation to Combine *Mathiassen* and *Anderson*

Dr. Sears opines that there would have been a motivation to modify *Mathiassen* with *Anderson* to incorporate a durational component to biometric signals, which, in turn, would allow for additional types of signals to be sent.  *See,*

*e.g.*, Ex. 1003, ¶ 222.  As discussed above, if the sole purpose of modification were to enable sending additional signals, *Mathiassen* already provides the mechanism for doing so without modifications taught in other references.  *See Kinetic Concepts*, 688 F.3d at 1369.

According to Dr. Sears, however, a skilled person "would have been motivated and found it obvious [*sic* "to"] add *Anderon's* [*sic "Anderson*'s*"*] series of presses or pulses as an input on the portable door control or replace *Mathiassen*'s finger movements with *Anderson*'s series of presses or pulses to input commands into the portable door control 20."  Ex. 1003, ¶ 222.  Dr. Sears' rationale is that *Anderson*'s "press operations make the input operations easier for the user to perform in certain situations," as "a user holding the portable control fob in their hand could more easily press a series of finger presses against the control's fingerprint sensor, as opposed to directionally swipe the finger presses."  *Id.*

As with the combination of *Mathiassen*'s automobile key fob and *McKeeth*'s computer, *Anderson* does not teach an automotive embodiment.  *See generally* Ex. 1006; Ex. 2013, ¶ 75.  Additionally, while *Anderson* shows a variety of devices for the entry of finger presses, it only suggests that the digitizer pad 120 (shown below) of a personal computer may include an optical scanner or thermal sensor for collecting an image of the user's fingerprint.  Ex. 1006, 7:4-8.



Ex. 1006, Fig. 1.  Neither Apple nor Dr. Sears explains why skilled persons would have turned to personal computer art to modify a security feature on an automotive key fob.  *See Belden*, 805 F.3d at 1073; *see also* Ex. 1006; Ex. 2013, ¶ 76.

Further, as noted above with regard to the proposed combination of *Mathiassen* and *McKeeth*, a push button would have been a simpler combination to arrive at the benefits of additional commands, especially in light of Dr. Sears' reasoning that pressing is easier than swiping.  Ex. 1003, ¶ 222; Ex. 2013, ¶ 77.  If a fob were in a user's pocket or purse, *i.e.,* out of eyesight of the user, it would be easier to feel a push button, which is typically raised or indented from the surface of the fob, than a flat capacitive touch surface.  Ex. 2013, ¶ 77.  Along these lines, an

30

**Appx3423**

embodiment is shown in *Anderson* wherein a keyboard 512 is equipped with a cursor control stick 514, as shown below.  Ex. 1006, 7:54-55.



FIG. 5

Ex. 1006, Fig. 5.

In that configuration, cursor control stick 514 may sense variations in force or pressure "applied along a "Z" axis perpendicular to keyboard 512," and "may be utilized as a touch interface to facilitate entry of access codes," *i.e.,* a push button. Ex. 1006, 7:55-59; Ex. 2013, ¶¶ 78-79.  To the extent Apple is correct that one would have thought to combine *Mathiassen*'s automotive embodiment with the computer teachings of *Anderson*, a simpler solution would have been to add *Anderson*'s control stick to *Mathiassen*'s key fob.  Ex. 2013, ¶ 80.  However, as there is no

suggestion in *Anderson* to add a fingerprint sensor to the control stick,[7] the combination of *Mathiassen*'s fingerprint sensor with *Anderson*'s non-biometric push button would not have rendered the invention claimed in the '705 Patent obvious, as that combination would lack the claimed "series of entries" of a ***biometric*** signal.

### C. Apple's Cited Prior Art Does Not Populate the Data Base According to the Instruction

As noted above, as part of the user enrollment process in claim 1 of the '705 Patent, "said series" in representative clause 1(d2) refers to the "series of entries of the biometric signal" in representative clause 1(d1), and "the instruction" in representative clause 1(d3) refers to "an instruction" in representative clause 1(d2). Thus, Apple cannot point to one thing for the "series" that is mapped into an instruction, and another thing contained in an instruction to populate the database. Yet, that is precisely what Apple does.

The "series" requirement, according to Dr. Sears, is purportedly disclosed in *Mathiassen* as "omni-directional finger movements across the sensor in two dimensions." Ex. 1003, ¶ 205 (emphasis omitted). For the requirement of

---

[7] Indeed, *Anderson* denigrates the use of fingerprint sensors, saying fingerprint recognition requires "specialized equipment and may require sophisticated software for implementation." Ex. 1006, 1:54-58.

"mapping," according to Petitioner's expert, these movements are categorized according to "***predefined*** sets of finger movement sequences." *Id.*, 226 (emphasis added). A "command table" is then used "to translate the categorized finger movements into control signals." *Id.* This has nothing to do with user enrollment, as *Mathiassen* makes clear that the control signal are "for controlling the device." Ex. 2013, ¶ 85. *Mathiassen* has no teaching that either the "predefined sets of finger movement sequences" or the "command table" constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process, as required by representative Claim 1.

Unsurprisingly, then, with regard to the populating requirement of clause 1(d3), Apple points to "one or more ***master minutiae tables***," rather than the "predefined sets of finger movement sequences," or the "command table" used "to translate the categorized finger movements into control signals." *Id.,* ¶ 231 (emphasis added). This hodgepodge of teachings from *Mathiassen* does not line up with the language of claim 1, as shown in the chart below:

| Clauses 1(d1)-(d3) | Apple's Position |
|---|---|
| receive a series of entries of the biometric signal | The transmitter subsystem receives a series of "omni-directional" finger movements. |
| map said series into an instruction; | The finger movements are categorized according to pre-defined movements. |
| and populate the data base according to the instruction, | The database is populated by "master minutiae tables." |

Ex. 2013, ¶ 87.

Otherwise, Dr. Sears claims that "[i]t would have been obvious to modify *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to populate a database according to an instruction that the processor 2 translated from a car owner/system administrator's input of a series of presses/pulses of varying durations, with such an instruction being to initiate the enrollment of a new user (i.e., populating the database)." Ex. 1003, ¶ 234. Dr. Sears, however, does not explain what actually is being modified, and how such modification corresponds to the "populating" limitation.

If *Mathiassen*'s master minutiae tables are to be modified, Dr. Sears fails to explain how such tables could be modified with *Anderson*'s pressure and duration information, and why there would be a motivation to do so. Simply saying that such modification is possible and desirable is impermissibly conclusory. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (rejecting expert invalidity opinion as "conclusory and factually unsupported" where "[t]he expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims").

If, on the other hand, the proposed modification is to create a discrete database of pressure/duration information separate from the fingerprint data, such database

would not have been created using ***biometric*** signals, as pressure and duration are not ***biometric*** measurements. Ex. 2012, 58:3-22; Ex. 2013, ¶¶ 89-90. In short, Apple cannot show how the prior art reads on clauses 1(d1) through 1(d3) of claim 1.

### D.    Independent Claims 10, 11 & 14-17

Independent claims 10, 11 and 14-17 of the '705 Patent also contain the "populating," "duration," and "accessibility attribute" limitations, and, as the prior art cited by Apple does not teach these limitations, the cited prior art does not render these independent claims obvious as a result thereof. Ex. 2013, ¶ 91.

### E.    Dependent Claims

Each of the dependent claims of the '705 Patent challenged in the Petition depend from either independent Claim 1 or independent Claim 11, both of which contain the "populating," "duration," and "accessibility attribute" limitations. As the prior art cited by Apple does not teach these limitations, the cited prior art does not render these dependent claims obvious as a result thereof. Ex. 2013, ¶ 92.

## VI.    CONCLUSION

Apple has thrown an enormous amount of information at the wall, hoping that such information will not be closely scrutinized. Scrutiny, however, reveals that Apple has combined teachings when there is no compelling reason to do so, and, even when such combinations are considered, they lack features of the claimed invention. Dr. Sears, in the 349 paragraphs of his declaration, does not remedy these

infirmities, which are fatal to Apple's challenge. The Board should find that Apple

has failed in its burden to show the challenged claims of the '705 Patent are obvious.

Dated: December 22, 2022                    Respectfully submitted by

                                            K&L GATES LLP,

                           By:    /Darlene F. Ghavimi-Alagha/
                                  Darlene F. Ghavimi-Alagha
                                  Reg. No. 72,631
                                  K&L GATES LLP
                                  Darlene.Ghavimi@klgates.com
                                  T: (512) 482-6919
                                  F: (512) 482-6859
                                  2801 Via Fortuna, Suite 650
                                  Austin, Texas 78746

IPR2022-00602
U.S. Patent No. 9,665,705

**Certification of Word Count Under 37 C.F.R. §42.24(d)**

The undersigned hereby certifies that the foregoing contains 7,852 words according to the word count feature of the word-processing software used to prepare the foregoing.

By:    /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859
2801 Via Fortuna, Suite 650
Austin, Texas 78746

IPR2022-00602
U.S. Patent No. 9,665,705

## Certification of Service Under 37 C.F.R. §42.6(e)(4)

I hereby certify that on <u>December 22, 2022</u>, I caused a true and correct copy

of the foregoing to be served on the following counsel for Petitioner by electronic

mail to the following email address:

Jennifer C. Bailey
Adam P. Seitz
**ERISE IP**
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com

By:    /Darlene F. Ghavimi-Alagha/
       Darlene F. Ghavimi-Alagha
       Reg. No. 72,631
       K&L GATES LLP
       Darlene.Ghavimi@klgates.com
       T: (512) 482-6919
       F: (512) 482-6859
       2801 Via Fortuna, Suite 650
       Austin, Texas 78746

38
**Appx3431**

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

Case IPR2022-00602
U.S. Patent No. 9,665,705

## PATENT OWNER'S REQUEST FOR DIRECTOR REVIEW

Pursuant to the Revised Interim Rules Governing the Director Review Process (Sept. 18, 2023), Patent Owner respectfully requests that the Commissioner review the Final Written Decision ("FWD") finding all claims of U.S. Patent No. 9,665,705 ("the '705 Patent") invalid. The issues warranting such review are:

1)    After it adopted for institution purposes a construction of the limitation "accessibility attribute" previously urged by the Petitioner before the district court, the Panel changed that construction materially to capture the prior art without providing notice to the Patent Owner sufficient for due process under the Administrative Procedures Act ("APA"), thereby prejudicing Patent Owner. *See, e.g, Qualcomm Inc. v. Intel Corp.,* 6 F.4th 1256, 1265 (Fed. Cir. 2021).

2)    The proposed modification of the Mathiassen reference with the non-biometric teachings of Anderson does not result in a series of received **biometric** signal entries that are mapped into an instruction used to populate the database as part of an enrollment process, as required by the challenged claims.

3)    The Panel misapplied the law regarding the motivation to combine references in recognizing the combination of the Mathiassen reference, on the one hand, and the McKeeth and Anderson references, on the other hand, as valid combinations.

## A.    The Panel's Changed Construction of "Accessibility Attribute"

The challenged claims of the '705 Patent require, *inter alia,* "a transmitter sub-system controller configured to match the biometric signal against members of

the database of biometric signatures to thereby output an *accessibility attribute*." *See, e.g.,* Ex. 1001, claim 1 (emphasis added). The parties disputed the meaning of "accessibility attribute" in a co-pending district court proceeding, during which Petitioner vociferously argued that the term be construed as an "attribute that establishes whether *and under which conditions* access to the controlled item should be granted to a user." Ex. 2011 at 26 (emphasis added).

Petitioner argued that its proposed construction was "consistent with the description of the invention throughout the specification and the claims, which goes beyond mere matching—the binary decision of 'yes' or 'no'—and instead describes a system that provides for different types of access." *Id.* at 26. The Petitioner then described the "multi-tiered access" system taught in the '705 Patent, which "can only be facilitated by the different types of fingerprint (or other biometric) input - *i.e.*, the number of presses and duration—recited elsewhere in the claim" *See id.*

To drive the point home, Petitioner reiterated that "[b]inary matching—'match/no match'—is not what the inventor was trying to invent. Instead, he sought to provide a more sophisticated system with, inter alia, multiple types of access." *Id.* at 28. In contrast, according to Petitioner, CPC's proposed plain and ordinary meaning construction "would gut the clear definition given to it by the patentee, and improperly broaden the scope of the claims to encompass mere matching, a feature described as prior art." *Id.*

As the Panel acknowledged in the FWD, it adopted, for purposes of institution Petitioner's construction "accessibility attribute," which includes both the "whether" and "under which conditions" components of that construction. *See* FWD at 19 & 21. In doing so, the Panel confirmed that adopted the construction excludes "a 'binary decision' to grant or not grant access to a locked structure or device." *Id.*

The principal reference relied upon by Petitioner is Mathiassen, which it represented teaches a "portable control processor . . . configured to match the user's biometric signal against the database of biometric signatures," and, ***[i]f there is a match, the processor will proceed to open (or lock) the car doors***." FWD at 44 (emphasis added) (internal citations omitted). This is clearly a ***binary*** operation, as there only two options – unlock the door if there is a match, or not if there is not. There is no third option. This was effectively confirmed by ***Petitioner's*** expert, who acknowledged that "Mathiassen is silent as to any incremental access that a car owner is granted, as opposed to any other user." PO Sur-Reply at 22, *citing* Ex. 2015 at 66:1-67:9. In other words, Mathiassen teaches precisely the type of "mere matching" that would "gut the clear definition" of "accessibility attribute" that Petitioner warned against. *See* Ex. 2011 at 28.

That Petitioner originally agreed with this proposition is evident from its Petition - "[a]pplying the [District] Court's construction, Mathiassen's 'open door' command ***as modified by McKeeth's teaching of duress and alert conditions***

3

**Appx3528**

teaches or renders obvious outputting an accessibility attribute, as claimed." Petition at 17 (emphasis added). Put another way, Mathiassen needs McKeeth's teachings to satisfy the "accessibility attribute" under the construction proposed by it, and adopted by both the district court and the panel.

In dealing with Mathiassen in the FWD, the Panel inexplicably found that, "[b]ased on the language of the claims and specification, the 'accessibility attribute' may include only an 'access attribute,' which is 'unconditional,'" which is precisely the type of binary (yes/no – lock/unlock) decision that Petitioner adamantly opposed including in the very construction it successfully urged to the Panel for institution purposes. *See* FWD at 21. Nonetheless, the Panel stated that its original construction (again expressly excluding binary decisions) includes "unconditional access, if no conditions are imposed." FWD at 45-46. Notwithstanding this supposed inclusion, the Panel felt compelled to "modify" the construction of "accessibility attribute" to include the term "if any," *i.e.,* potentially none, such that the new construction reads "an attribute that establishes whether and under which conditions, ***if any***, access to the controlled item should be granted." FWD at 21 (emphasis added).

As a result of this obviously changed construction, the Panel went on to find that Mathiassen, which it found to teach at most a lock/unlock operation, "discloses or suggests" the "accessibility attribute" limitation. *See* FWD at 47. As such, Petitioner was allowed to benefit from one construction of that limitation before the

4
**Appx3529**

district court and before the Panel on institution, but when that construction became inconvenient after institution, the Panel gave Petitioner a different construction, allowing the unique capture of prior art. More importantly, however, Patent Owner had no opportunity to address the impropriety of this changed construction, as the Panel gave *no* indication that there would be such a change.[1]

The Federal Circuit has ruled that a panel cannot, consistent with the APA, issue a new claim construction after institution without giving the parties notice thereof. *Qualcomm,* 6 F.4th at 1265. The Panel recognized as much in the FWD. *See* FWD at 26, n.20 (citation omitted) ("the Board 'must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond'"). Yet, as explained above, the Panel went on to ignore that administrative guardrail, changing claim construction with no opportunity for Patent Owner to respond thereto. Without its "if any" change to the construction of

---

[1] A stark example of this lack of opportunity is the Panel's reliance on claim 3 of the '705 Patent as purportedly supporting its changed construction. As the Panel acknowledged, the parties "did not discuss specifically claim differentiation as part of their claim construction analysis," the precise purpose for the Panel's reliance on claim 3. *See* FWD at 26, n.20. As an aside, Patent Owner indeed disagrees that claim 3 supports the Panel's changed construction.

"accessibility attribute," which demonstrably allows for a binary access/no access operation, the Panel could *not* have found Mathiassen teaches that limitation. As such, the Panel's belated claim construction modification is clearly prejudicial to Patent Owner.[2] There cannot, then, be any doubt that this changed construction, which was neither proposed by Petitioner, nor addressable before the Panel by Patent Owner, runs afoul of the holding in *Qualcomm,* 6 F.4th at 1265, and its progeny.

**B. The Mathiassen/Anderson Combination does not Yield a Series of Biometric Signals as Part of an Enrollment Process**

"Illustrative" claim 1 requires receiving "a series of entries of the ***biometric*** signal, said series being characterised according to at least one of the number of said entries ***and a duration of each said entry***." FWD at 10 (emphasis added). This function is part of the "enrolling feature." FWD at 32. According to the plain language of the claim, "the number and/or duration of entries is based on entries of

---

[2] Of important note is that the Panel, after discussing the combination of the Mathiassen and McKeeth references, failed to find that it was that combination that teaches the "accessibility attribute" limitation – only that Mathiassen purportedly does so. *See* FWD at 47 ("Based on Petitioner's arguments and evidence as summarized above, we determine Petitioner has sufficiently shown that Mathiassen discloses or suggests" the "accessibility attribute" limitation).

a ***biometric*** signal, such as a finger press on a fingerprint sensor." FWD at 31 (emphasis added).

As the Panel noted, "Mathiassen does not teach determining a duration of each entry." FWD at 50. Therefore, Petitioner relies upon Anderson for the purported teaching of "inputting an access code including fingerprint presses of varying duration." *See id.* The substitution proposed by the Petitioner, and found invalidating by the Panel, is described in the FWD as follows:

> A POSITA would have found it obvious to substitute or modify such directional finger movements [from Mathiassen] with a series of presses of varying duration, as taught by Anderson, for instructing a command at portable device 20.

FWD at 51.

As the Panel noted, Patent Owner argued in response to this proposed combination that "Mathiassen has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process." FWD at 56. Specifically, the Patent Owner pointed out the following in the passage from the POR:

> The 'series' requirement, according to Dr. Sears, is purportedly disclosed in Mathiassen as 'omni-directional finger movements across the sensor in two

dimensions.' For the requirement of 'mapping,' according to Petitioner's expert, these movements are categorized according to 'predefined sets of finger movement sequences.' A 'command table' is then used 'to translate the categorized finger movements into control signals.' This has nothing to do with user enrollment, as Mathiassen makes clear that the control signal are 'for controlling the device.' Mathiassen has no teaching that either the 'predefined sets of finger movement sequences' or the 'command table' constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database **as part of the enrollment process**, as required by representative Claim 1.

POR at 33 (emphasis added) (internal citations omitted). *See also* Sur-Reply at 22-23 ("Mathiassen's finger movements providing command functionality are pre-defined, i.e., they are not part of the enrollment process").

After expressly referencing this portion of the POR, the Panel entirely ignores this point, focusing solely on whether Mathiassen's finger motions are "biometric." *See* FWD at 57. Thus, even if everything else Petitioner maintains about the Mathiassen/Anderson combination were true, that combination would still lack a biometric signal series received as part of an enrollment process – a requirement that the Panel expressly called out as being part of the challenged claims.

The Panel does reference Mathiassen's master *minutiae* tables, which are part of Mathiassen's enrollment process. *See, e.g.,* FWD at 55-56. However, as Patent Owner has submitted, the master *minutiae* tables have **nothing** to do with Mathiassen's pre-stored finger movement sequences – the only feature from Mathiassen that Petitioner proposes to modify with Anderson. *See* POR at 33. The Panel, nonetheless, accepts Petitioner's mapping of the prior art to this claim limitation, including Petitioner's reference to the master *minutiae* tables, which is needed to tether the prior art's teachings to an enrollment process, despite its irrelevance to Mathiassen's pre-stored finger movements. *See* FWD at 56. As the Panel failed to provide **any** explanation as to how the Mathiassen/Anderson combination relates in any relevant way to an enrollment process, the FWD, which rejects Patent Owner's argument on this issue must be vacated. *See In re Nuvasive, Inc.,* 842 F.3d 1376, 1383 (2016) ("it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument").

Separately, even if one could get past the fact that the Mathiassen/Anderson combination is unrelated to an enrollment process, it remains that Anderson does not teach a "biometric" signal series as required by the challenged claims. According to the Panel's findings, "Anderson's disclosed system inputs an access code 'via temporal variations in the **amount of pressure** applied to a touch interface'" FWD at 38 (emphasis added). Further, Anderson's system "may sense only 'temporal

applications of pressure,' relying on *timing* of the pressure applications for entry of the access code." *Id.* (emphasis in original). Petitioner's own expert admitted that pressure and duration patterns of the type taught in Anderson are knowledge-based, *i.e.,* non-biometric, making that point undisputed. PO Sur-Reply at 19, *citing* Sears Dep. Tr. [Ex. 2012] at 18, 58:3-10.

The Panel, however, goes on to refer mistakenly to the purported teachings in Anderson of a "series of *fingerprint* pressure pulses of varying duration" (FWD at 50 (emphasis added)), and "*fingerprint* access code" (*id.* at 53 (emphasis added)). Based on these purported teachings, the Panel found that "there can be no reasonable dispute that Anderson discloses input *biometric* signals that vary in number and duration." *Id.* at 51 (emphasis added). The problem with the Panel's reasoning is that the terms "fingerprint pressure pulses" and "fingerprint access code" appear nowhere in Anderson, let alone in the portions of Anderson cited by the Panel as supposedly teaching these features. *See* Anderson [Ex. 1006] at 6:45-54 & 7:28-47. Rather, those terms were created by Petitioner's expert and adopted by the Panel for institution purposes. *See* POR at 26

Anderson does teach "an optical scanner or thermal sensor for collecting *an* image of the user's fingerprint" that may optionally be part of the "digitizer pad 120" used "as a touch interface." FWD at 53 (emphasis added). This collection of "an" image of a fingerprint is contradistinct from the claimed "*series* of entries of the

biometric signal" that are received as part of the enrollment process. FWD at 10 (emphasis added). At no point did Petitioner or the Panel identify any teaching in Anderson that a *series* of biometric signals is received at all, let alone as part of an enrollment process. As such, to the extent the Panel's decision turns on a purported teaching in Anderson of a "biometric" signal series, the decision must be reversed.[3]

### C. The Lack of a Motivation to Combine Mathiassen, on the One Hand, and Anderson and McKeeth, on the Other Hand

The Petitioner and the Panel turned to the combination of Mathiassen and McKeeth to yield the "accessibility attribute" limitation, the latter of which "teaches both a duress instruction and an alert instruction when there is no match." FWD at 45. The panel gave short shrift to Patent Owner's argument against a motivation to combine, stating that, while there may have been "simpler alternative solutions available," "[i]t's not necessary to show that a combination is the *best* option, only

---

[3] The Panel appears to contradict itself regarding Anderson's teachings, stating that Anderson only contributes "a number and duration of pulses as inputs," while Mathiassen and McKeeth allegedly provide a teaching of "biometric sensing." FWD at 52. Even if that is the true nature of the combination, despite the Panel's great pains in finding a biometric signal series in Anderson, as explained above, any resulting biometric signal series from the Mathiassen/Anderson combination would not be part of an enrollment process.

that it be a *suitable* option." FWD at 46 (emphasis in original). The Patent Owner's alternative to the proposed combination was to look to the functionality already taught in Mathiassen, which was undeniably simpler, as the Petitioner's expert acknowledged. POR at 18-19; PO Sur-Reply at 5-6.

The lead case for the "suitable" proposition cited by the Panel, *Intel Corp. v. PACT XPP Schweiz AG*, illustrates the risk for mischief in blindly applying the "suitable" standard when evaluating the motivation to combine. The relevant portion of that decision reads as follows:

> '[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.' This is the so-called 'known-technique' rationale. And if there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

The *entirety* of Petitioner's reasoning upon which the Panel relies is that it would have been obvious to a skilled person "to increase user safety of Mathiassen by providing accessibility attributes indicating duress access or alert access, as proposed in McKeeth, to thereby increase user security." FWD at 45. There is no

discussion in the FWD, for example, of a "known technique" in McKeeth, warranting the application of the rationale in *Intel.* Indeed, neither the Petitioner nor the Panel pointed to anything magical about McKeeth specifically that would have occasioned a skilled person to modify Mathiassen's teachings therewith, rather than using Mathiassen alone.

Further, this "suitability" test must be viewed in light of precedent cited by the Panel requiring that that "a person of ordinary skill at the time of the invention 'would have selected and combined ***those prior art elements*** in the normal course of research and development to yield the claimed invention.'" FWD at 13 (emphasis added) (citation omitted). As a corollary proposition, one cannot view the suitability of a prior art combination through the lens of hindsight reconstruction, especially where the functionality to be added already exists in the reference to be modified by such combination. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012).[4]   Intuitively, availing oneself of Mathiassen's own

---

[4] Patent Owner is cognizant of decisions such as in *Elekta Limited v. ZAP Surgical Systems, Inc.*, ___ F.4th ___, 2023 WL 6152418 (2023), wherein the Federal Circuit ruled that the difficulty involved in combining references is not dispositive on the issue of the motivation to combine. However, that decision, and those like it, do not

teachings is a simpler solution to the generation of a duress signal than looking to an entirely different reference for such modification. Under the circumstances, absent hindsight reconstruction, there is **no** motivation to combine Mathiassen with any other reference, including McKeeth.

As to motivation to combine Mathiassen and Anderson, again, Patent Owner contends that the simpler solution, were one to desire adding Anderson's functionality to Mathiassen to achieve the heightened security, would be to utilize Mathiassen's existing teachings alone. *See, e.g.,* PO Sur-Reply at 4-8. The Panel, however, simply reiterated that a combination need only be "suitable," rejecting any need to consider simplicity as an incentivizing factor when evaluating a purported motivation to combine. FWD at 54. Simply labeling a combination as "suitable" in a vacuum is insufficient to establish a motivation to combine references.

In the case of both prior art combinations discussed herein, neither Petitioner nor the Panel disputed that: 1) Mathiassen already taught functionality that made combination with McKeeth and/or Anderson unnecessary; and 2) relying on Mathiassen alone was simpler than combining Mathiassen with another reference. As the test is **motivation** to combine, as opposed to a potential to combine, it was

---

involve instances, such as here, where a reference sought to be modified already contained the functionality sought in the combination proposed.

error simply to brush aside the simplicity of relying upon Mathiassen alone in favor of what was purportedly "suitable."[5] This is especially the case given that the Patent Owner submitted unrebutted expert testimony that, given Mathiassen's existing functionality, there would have been no reason to modify Mathiassen in the manner Petitioner and its expert proposed. *See* POR at 19, *citing* Ex. 2013, ¶ 51. That the Panel did not credit such testimony was error. *See, e.g., Polaris Industries, Inc. v. Arctic Cat, Inc.,* 882 F.3d 1056 (2018).

The three-issues discussed above, which were each mishandled by the Panel, merit Director review and reversal of the FWD.

Dated: October 4, 2023

Respectfully submitted by
K&L GATES LLP,

By: */Darlene F. Ghavimi-Alagha/*
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
darlene.ghavimi@klgates.com
(512) 482-6919
2801 Via Fortuna, Suite 650
Austin, Texas 78746

---

[5] Petitioner did not propose a single-reference obviousness challenge based upon Mathiassen, so whether Mathiassen by itself renders the challenged claims is irrelevant. In any event, even availing oneself of Mathiassen's teachings alone would not yield the "duration" limitation. *See* FWD at 50.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 4, 2023, a true and correct copy of the foregoing Patent Owner's Request for Director Review was submitted in the Patent Trial and Appeal Case Tracking System (P-TACTS), and sent by electronic mail to the following:

Director
Email: Director_PTABDecision_Review@uspto.gov

Counsel for Petitioner:

Jennifer C. Bailey
Adam P. Seitz
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com


By:    /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, Texas 78746
Darlene.Ghavimi@klgates.com
T: (512) 482-6919
F: (512) 482-6859

Director_PTABDecision_Review@uspto.gov                    Paper 35
571.272.7822                                    Date: November 6, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

_____

APPLE INC.
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

_____

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

The Office received a request for Director Review of the Final Written Decision in each of the above-captioned cases.  *See* IPR2022-00601, Paper 32; Ex. 3100; IPR2022-00602, Paper 34; Ex. 3100.  The requests were referred to me.

Upon consideration of the requests, it is:

ORDERED that the requests for Director Review are denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decisions in these cases are the final decisions of the agency.

2

IPR2022-00601 (Patent 9,269,208 B2)
IPR2022-00602 (Patent 9,665,705 B2)

For PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com

For PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

---

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

---

Case IPR2022-00602
U.S. Patent No. 9,665,705

---

# PATENT OWNER'S REQUEST FOR REHEARING OF DIRECTOR'S DENIAL OF PANEL REVIEW

914488849.1

**Appx3545**

## I.    INTRODUCTION

This case represents a rare occasion where rehearing[1] is warranted – inconsistent panel decisions on an identical issue resulting in opposite determinations of patentability.  Here, the Panel was asked to determine whether finger presses taught in the cited prior art are biometric signals.  Patent Owner has argued repeatedly that they are not. In this case, the Panel disagreed, and found all claims of U.S. Patent No. 9,665,705 ("the '705 Patent") unpatentable. In a separate proceeding (IPR2022-01006, "the ASSA ABLOY IPR"), the *same* Panel, reviewing the *same* patent (the '705 Patent) and *same* claim limitations, found that the prior art's finger presses "are *not* biometric entries at all." The Panel then found, in the ASSA ABLOY IPR, all claims of the '705 Patent *not* unpatentable.

In this case Patent Owner unsuccessfully petitioned for Director Review as to whether the prior art teaches a "series of entries of [a] *biometric* signal."  After the Director denied Patent Owner's review request, the Panel issued the decision in the ASSA ABLOY IPR, finding that the prior art's finger presses "are *not* biometric entries at all" (emphasis added).

The PTAB has now issued two inconsistent decisions regarding the prior art's teaching of the same limitation in the same patent. This inconsistency is dispositive

---

[1] Pursuant to Section 5(C)(ii) of the Revised *Interim* Director Review Process, Patent Owner requests rehearing of the Director's denial of Panel review.

2

**Appx3546**

of the Panel's decisions – finding the claims unpatentable in one proceeding and patentable in another – and warrants a rehearing in this matter. As Patent Owner has repeatedly urged in this proceeding, finger presses are not biometric – they are knowledge-based. The Panel's abrupt about face on whether finger presses are biometric, resulting in opposite findings of patentability, glaringly demonstrates that the decision in this proceeding was incorrect and should be reviewed.

## II. DISCUSSION

### A. The History of This Proceeding

In its petition, Petitioner sought review of Claims 1, 4, 6, 10-12, and 14-17 of the '705 Patent in light of *Mathiassen* in view of *McKeeth* and *Anderson*. Paper No. 1 at 5. Common to all challenged claims is limitation 1(d1), "receive a series of entries of the **biometric signal**, said series being characterised according to at least one of the number of said entries and a duration of each said entry." *See* Paper No. 31 at 50 (emphasis added).

Petitioner's prior art starting point for this limitation was *Mathiassen's* "finger movements," which can be "a touch/no touch finger movement," *i.e.,* a finger press. Paper No. 1 at 32. However, according to Petitioner, "*Mathiassen* does not teach characterizing the series based on a 'duration' of each entry." *Id.* at 33. Petitioner therefore looked to *Anderson's* teaching of a "series of pressure pulses having varying durations." *Id.* at 34.

3

**Appx3547**

In response, Patent Owner argued that "the 'pressure pulses' in *Anderson* are not, and do not generate, biometric signals as they are knowledge-based." Paper No. 17 at 26. As a result, "combining *Mathiassen's* fingerprint sensor with *Anderson's* pressure code does not produce the claimed invention, as any duration would apply to a ***non***-biometric signal." *Id.* at 28 (emphasis in original). Later, Patent Owner explained that *Mathiassen's* fingerprint sensor "cannot analyze movement," *e.g.,* finger presses. *See* Paper No. 26 at 14. Rather, movement analysis in *Mathiassen* requires "[m]ovement analyzing means, in the form of a hardware or a software movement analyzing program module." *Id.*

Ultimately, in addressing this limitation, the Panel determined first that, *Mathiassen* "will detect the biometric part of the input signal, ***while also sensing the number and duration of inputs***." Paper No. 31 at 52 (emphasis added). The Panel them accepted Petitioner's argument that *Mathiassen* could be "modified to recognize a touch duration, per *Anderson*, of the fingerprint representation on the fingerprint sensor." *See id.* According to the Panel, "there can be no reasonable dispute that *Anderson* discloses input ***biometric*** signals that vary in number and duration." *Id.* at 51 (emphasis added). The Panel concluded that "Petitioner has sufficiently shown that the cited references, as combined by Petitioner, disclose or suggest limitation 1(d1)." *Id.* at 54. In short, the Panel looked to a series of pressure pulses to satisfy the "biometric signal" series limitation.

Patent Owner sought Director Review of the Panel's Decision.  The second issue on which Patent Owner sought review was whether the combination of the *Mathiassen* and *Anderson* references results "in a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of an enrollment process, as required by the challenged claims."  Paper No. 34 at 1 (emphasis added).  In explaining the Panel's error, Patent Owner began by noting that *Mathiassen's* finger movement sequences do not "constitute a series of received biometric signal entries that are mapped into an instruction used to populate the database as part of the enrollment process."  *Id.* at 7.  Patent Owner then pointed out that Anderson's system "may sense only 'temporal applications of pressure,' relying on timing of the pressure applications for entry of the access code," which is "knowledge-based, i.e., non-biometric."  *Id.* at 9.  The Director denied Patent Owner's review request on November 6, 2023.  *See* Paper No. 35.

## B.    The ASSA ABLOY IPR

In a separate proceeding, ASSA ABLOY AB and its co-petitioners sought review of the '705 Patent.  *ASSA ABLOY AB*, *et al. v. CPC Patent Technologies PTY, Ltd.,* IPR2022-01006, Final Written Decision (PTAB Nov. 30, 2023) [Paper No. 47] at 2.  Of relevance here is the first challenge ground, where the petitioners asserted

the *Bianco* and *Mathiassen-067*[2] references against claims 1, 3-5, and 9-17 of the '705 Patent. *See id.* at 13. Specifically, the Petitioners in that proceeding argued that *Mathiassen-067* "discloses 'using the same fingerprint sensor (i.e., biometric sensor) for the dual purposes of: (i) reading fingerprints for enrollment, authentication, and access control and (ii) receiving commands through a series of finger inputs of varying durations." *Id.* at 82.

Patent Owner responded that "the 'finger movements' and 'finger commands' disclosed in *Mathiassen*-067 'are not entries of a biometric signal,'" but are, rather, "merely the touching of a touch-sensitive pad during which no biometric measurement is taken at all." *Id.* at 83. The petitioners' expert acknowledged that, in *Mathiassen-067*, while commands are entered using the same biometric sensor that can be used for validating the fingerprint, "there's no disclosure one way or the other as to whether it's also reading the fingerprint." *Id.* at 85. The Panel agreed with Patent Owner, finding that "there is a substantive distinction between the finger press command entry function and the fingerprint user authentication function" in *Mathiassen-067*, despite both functions using "the same 'touch sensitive switch.'"

---

[2] The *Mathiassen* reference at issue in this proceeding and the *Mathiassen-067* reference at issue in the ASSA ABLOY IPR are different references. *See* IPR2022-01006, Paper No. 47 at 3.

*Id.* at 84.  In other words, simple finger presses are ***not*** biometric signals.  The Panel made no effort to reconcile its decision with the decision in this matter.

### C.    This Matter Should be Reheard

Reduced to their essences, these two *inter partes* review proceedings turned on one key issue – whether knowledge-based finger movements can satisfy the "biometric signal" series limitation of the challenged claims.  The answer in this proceeding was yes – that *Anderson's* pressure pulses are "biometric signals that vary in number and duration."  Paper No. 31 at 51.  Tellingly, the same Panel in co-pending ASSA ABLOY IPR answered that same question in the negative, agreeing that finger presses "are not biometric entries at all."  IPR2022-01006, Final Written Decision [Paper No. 47] at 82-83.  The Panel's clear reversal of position on this key issue warrants rehearing.  And, the Panel's reasoning in the later decision is sound – there is indeed "a substantive distinction" between finger presses and fingerprint use, even if the same instrumentality is involved in both operations.  *Id.* at 84.

It is of no moment that, in the ASSA ABLOY IPR, the petitioners relied upon the *Mathiassen-067* reference or the "biometric signal" series limitation, while Petitioner here relies upon the combination of *Mathiassen* and *Anderson*.  The issue is the same in both instances – do finger presses comprise biometric signals?  In any event, if anything, the Panel's decision in the ASSA ABLOY IPR is even more applicable here.  As the Panel in that proceeding noted, there is no disclosure in

7

**Appx3551**

*Mathiassen-067* "one way or the other as to whether it's also reading the fingerprint."

*Id.* at 85. Here, in contrast, there is evidence that *Anderson's* pressure pulses are

clearly knowledge-based, as illustrated below:



Dr. Easttom

As Dr. Sears acknowledged and as discussed above, *Anderson's* pressure code is knowledge-based, not biometric. Ex. 2010 at 54:9-55:6. Dr. Sears is certainly correct that, if a sensor only captures the knowledge of a user, it is not properly characterized as a ***biometric*** sensor. *Id.* at 29:6-10. More specifically, a capacitive touch sensor that merely captures user taps or finger movements is not a biometric sensor. *Id.* at 36:1-9, 38:14-39:19.

POR at 28, citing Ex. 2013, ¶ 69



Dr. Sears

Q. Would you characterize the pressure and duration patterns that Anderson teaches as knowledge-based?

A. Yes, I think when you start using things like the amount of pressure that you need to apply, and you might have a light pressure or more forceful pressure or a short contact or a long contact, that is starting to leverage some knowledge-based.

Sur-Reply at 20, citing Ex. 2012 at 58:3-10

Ex. 2016 at 14.

Nonetheless, here, the Panel concluded "there can be no reasonable dispute

that *Anderson* discloses input ***biometric*** signals that vary in number and duration."

Paper No. 31 at 51 (emphasis added). The Panel in the ASSA ABLOY IPR finally

came to the realization that Patent Owner has been urging in this proceeding all along

– that knowledge-based information entries, such as finger presses, are not biometric

signals. That realization, however, does not undo the earlier decision that finger

presses are biometric signals, requiring a rehearing,

8

**Appx3552**

## III.    CONCLUSION

For the foregoing reasons, the Patent Owner's request for rehearing should be granted.

Dated: December 5, 2023                     Respectfully submitted by

K&L GATES LLP,

By: */Darlene F. Ghavimi-Alagha/*
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
darlene.ghavimi@klgates.com
(512) 482-6919
2801 Via Fortuna,
Suite 650
Austin, Texas 78746

9

**Appx3553**

Director_PTABDecision_Review@uspto.gov    Paper 37
571.272.7822    Date January 8, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD,
Patent Owner.

IPR2022-00602
Patent 9,665,705 B2

Before NONA DURHAM, *Legal Administrative Specialist.*

ORDER

**Appx3554**

IPR2022-00602
Patent 9,665,705 B2

On December 5, 2023, Patent Owner CPC Patent Technologies PTY, LTD filed a Request for Rehearing of the Director's prior denial of Patent Owner's Request for Director Review. *See* Ex. 3104; Paper 36 (Request for Rehearing); *see also* Paper 34 (Request for Director Review); Paper 35 (Order Denying Request for Director Review).

A party may not file a request for rehearing of the Director's decision to deny Director Review. *See* Revised Interim Director Review Process § 5.C.ii.

Accordingly, Patent Owner's request is *dismissed*.

IPR2022-00602
Patent 9,665,705 B2

FOR PETITIONER:

Jennifer C. Bailey
Adam P. Seitz
ERISE IP, P.A.
jennifer.bailey@eriseip.com
adam.seitz@eriseip.com


FOR PATENT OWNER:

Darlene Ghavimi-Alagha
Brian Bozzo
K&L GATES LLP
darlene.ghavimi@klgates.com
brian.bozzo@klgates.com

3

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY LTD.,
Patent Owner.

_____

CASE: IPR2022-00602
U.S. PATENT NO. 9,665,705

_____

# PATENT OWNER'S NOTICE OF APPEAL

IPR2022-00602
U.S. Patent No. 9,665,705

Notice is hereby given, pursuant to 37 C.F.R. §§ 90.2(a), 90.3, and 35 U.S.C. §§ 141 and 142, that Patent Owner CPC Patent Technologies PTY Ltd. ("Patent Owner") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board in IPR2022-00602, entered on September 27, 2023 (Paper 31), and from all underlying orders, decisions, rulings, and opinions. A copy of the Final Written Decision is attached hereto as Exhibit A.

This notice is timely because Patent Owner filed a Request for Director Review, which was decided on November 6, 2023 (Paper 35) (attached hereto as Exhibit B). *See* 37 C.F.R. § 90.3(b)(1).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner states that the issues on appeal include, but are not limited to, the Board's determination that the challenged claims of U.S. Patent No. 9,665,705 are unpatentable, and any related issues, findings, or determinations, leading thereto or underlying that decision.

Patent Owner is filing one copy of this Notice of Appeal with the Director of the United States Patent and Trademark Office, and a copy of this Notice of Appeal is being filed electronically with the Board. In addition, a copy of this Notice of Appeal is being electronically filed with the United States Court of Appeals for the Federal Circuit, along with the required docketing fee.

IPR2022-00602
U.S. Patent No. 9,665,705

Respectfully submitted,

Dated: January 8, 2024

/Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631
K&L GATES LLP
2801 Via Fortuna, Suite 650
Austin, Texas 78746
(512) 482-6919
Darlene.Ghavimi@klgates.com

*Counsel for Patent Owner*

IPR2022-00602
U.S. Patent No. 9,665,705

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 90.2(a)(1), on January 8, 2024 the foregoing Notice of Appeal was electronically filed with the Patent Trial and Appeal Board via the P-TACTS System in accordance with 37 C.F.R. § 42.6(b)(1), and mailed to the Director via Priority Mail Express in accordance with 37 C.F.R. §§ 1.10 and 104.2 at the following address:

Director of the U.S. Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Pursuant to 37 C.F.R. § 90.2(a)(2) on January 8, 2024, the foregoing Notice of Appeal was electronically filed with the Court of Appeals for the Federal Circuit via CM/ECF with requisite fees paid via pay.gov.

Pursuant to 37 C.F.R. § 42.6(e) and the parties' agreement to accept electronic service, on January 8, 2024, the foregoing Notice of Appeal was served via email on the following counsel of record for Petitioners:

Jennifer C. Bailey
Adam P. Seitz
**ERISE IP, P.A.**
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Telephone: (913) 777-5600
Email: Jennifer.Bailey@eriseip.com
Email: Adam.Seitz@eriseip.com
Email: PTAB@eriseip.com

3
**Appx3560**

IPR2022-00602
U.S. Patent No. 9,665,705

By: /Darlene F. Ghavimi-Alagha/
Darlene F. Ghavimi-Alagha
Reg. No. 72,631

4
**Appx3561**

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner

v.

CPC Patent Technologies PTY, LTD.,
Patent Owner

_____

*Inter Partes* Review Case No. IPR2022-00602

U.S. Patent No. 9,665,705

**DECLARATION OF DR. ANDREW SEARS**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

## TABLE OF CONTENTS

I.     **INTRODUCTION** ..........................................................................10

     A.    MATERIALS CONSIDERED ...................................................... 14

II.    **LEGAL FRAMEWORK** ..............................................................16

     A.    ANALOGOUS ART .................................................................. 17

     B.    OBVIOUSNESS ........................................................................ 17

     C.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS ...........23

III.   **CLAIM CONSTRUCTION** .........................................................24

     A.    NON-CONSTRUED CLAIM TERMS......................................... 24

     B.    CONSTRUED CLAIM TERMS .................................................. 24

IV.   **BACKGROUND OF TECHNOLOGY** .........................................27

     A.    BIOMETRIC ACCESS SYSTEMS ............................................. 27

     B.    HARDWARE COMPONENTS OF A BIOMETRIC ACCESS SYSTEM ..................36

     C.    SECURE ACCESS SIGNAL ..................................................... 40

     D.    INPUTTING A SERIES OF ENTRIES FOR INVOKING FUNCTIONS IN A BIOMETRIC ACCESS SYSTEM ..................................................... 43

     E.    PROVIDING DIFFERENT TYPES OF ACCESS ............................ 47

V.     **OPINIONS REGARDING THE '705 PATENT AND PRIOR ART** ................................................................................................54

     A.    DESCRIPTION OF THE ALLEGED INVENTION OF THE '705 PATENT ............ 55

     B.    OPINIONS REGARDING *MATHIASSEN* ................................. 59

     C.    OPINIONS REGARDING *MCKEETH* ...................................... 65

     D.    OPINIONS REGARDING *ANDERSON* ..................................... 68

     E.    BRIEF OVERVIEW OF THE OPINIONS ON THE '705 PATENT .......... 73

VI.   **OVERVIEW OF *MATHIASSEN'S* ARCHITECTURE** .........................76

VII. **GROUND 1: OPINIONS REGARDING THE COMBINATION OF *MATHIASSEN*, *MCKEETH*, AND *ANDERSON* ...........................79**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

A.    CLAIM 1 ...............................................................................79

1.    *Claim 1(Pre): "A system for providing secure access to a controlled item, the system comprising:"* ......................................79

2.    *Claim 1(a): "a memory comprising a database of biometric signatures;"* ..............................................................................84

3.    *Claim 1(b): "a transmitter sub-system comprising:"* .......................88

4.    *Claim 1(b1): "a biometric sensor configured to receive a biometric signal;"* ...........................................................................91

5.    *Claim 1(b2): "a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"* ...........................................................................92

6.    *Claim 1(b3): "a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute"* ............................................................................118

7.    *Claim 1(c)-1(c1)* ......................................................................127

    *Claim 1(c): "a receiver sub-system comprising: a receiver sub-system controller configured to"* ........................................127

    *Claim 1(c1): "receive the transmitted secure access signal"* .........127

8.    *Claim 1(c2): "provide conditional access to the controlled item dependent upon said information"* ...............................................133

9.    *Claim 1(d): "wherein the transmitter sub-system controller is further configured to"* .................................................................135

10.   *Claim 1(d1): "receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry"* ....135

11.   *Claim 1(d2): "map said series into an instruction"* .......................156

12.   *Claim 1(d3): "populate the database according to the instruction"* .............................................................................160

13.   *Claim 1(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"* ...........................................173

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

B.    CLAIM 4 ...................................................................................174

    CLAIM 4: "THE SYSTEM ACCORDING TO CLAIM 1, WHEREIN THE
        BIOMETRIC SENSOR IS RESPONSIVE TO ONE OF VOICE, RETINAL
        PATTERN, IRIS PATTERN, FACE PATTERN, AND PALM
        CONFIGURATION, AND/OR THE DATABASE OF BIOMETRIC
        SIGNATURES IS LOCATED IN AT LEAST ONE OF THE
        TRANSMITTER SUB-SYSTEM AND THE RECEIVER SUB-SYSTEM."......174

C.    CLAIM 6 ...................................................................................175

    1.    Claim 6(a): "The system as claimed in claim 1, wherein the
          biometric sensor is further configured to authenticate the
          identity of a user;" ...........................................................175

    2.    Claim 6(b): "wherein the transmitter is further configured to
          transmit information capable of granting access to the
          controlled item using a secure wireless signal dependent upon a
          request from the user and the authentication of the user
          identity;" .......................................................................176

    3.    Claim 6(c): "the system further comprising a control panel
          configured to receive the information and provide the secure
          access requested." ...........................................................178

D.    CLAIM 10 .................................................................................180

    1.    Claim 10(Pre): "A transmitter sub-system for operating a
          system for providing secure access to a controlled item,
          wherein the transmitter sub-system comprises:"...........................180

    2.    Claim 10(a): "a biometric sensor configured to receiving a
          biometric signal;"..............................................................180

    3.    Claim 10(b): "a controller configured to match the biometric
          signal against members of a database of biometric signatures to
          thereby output an accessibility attribute;" ...................................181

    4.    Claim 10(c): a transmitter configured to emit a secure access
          signal conveying information dependent upon said accessibility
          attribute;"......................................................................181

    5.    Claim 10(d): "wherein the controller is further configured to:".....181

    6.    Claim 10(d1): "receive a series of entries of the biometric
          signal, said series being characterized according to at least one

*of the number of said entries and a duration of each said entry;"* ...................................................................................181

7.    *Claim 10(d2): "map said series into an instruction;"* ..............181

8.    *Claim 10(d3): "populate the database according to the instruction,"* ...............................................................................181

9.    *Claim 10(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."* ...............................................181

E.    CLAIM 11 .............................................................................181

1.    *Claim 11(Pre1): "A method for providing secure access to a controlled item in a system comprising"* ............................182

2.    *Claim 11(Pre2): "a database of biometric signatures;"* .............182

3.    *Claim 11(Pre3): "a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item;"* .......................182

4.    *Claim 11(Pre4): "a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal,"* ..........................................................................189

5.    *Claim 11(a): "the method comprising: populating the database of biometric signatures by:"* .................................................191

6.    *Claim 11(a1)-(a2) "receiving a series of entries of the biometric signal;" and "determining at least one of the number of said entries and a duration of each said entry* ............................191

7.    *Claim 11(a3): "mapping said series into an instruction;"* .............191

8.    *Claim 11(a4): "populating the database according to the instruction;"* ...............................................................................191

9.    *Claim 11(b): "receiving the biometric signal;"* .............................192

10.    *Claim 11(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"* ..............................................................192

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

11.    *Claim 11(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute;"* ..............192

12.    *Claim 11(e): "providing conditional access to the controlled item dependent upon said information;"* ...........................192

13.    *Claim 11(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device;"* ...............................192

F.    CLAIM 12 ........................................................................193

CLAIM 12: "THE METHOD ACCORDING TO CLAIM 10, WHEREIN POPULATING THE DATABASE OF BIOMETRIC SIGNATURES FURTHER COMPRISES ENROLLING A BIOMETRIC SIGNATURE INTO THE DATABASE OF BIOMETRIC SIGNATURES, AND WHEREIN ENROLLING THE BIOMETRIC SIGNATURE INTO THE DATABASE COMPRISES: RECEIVING A BIOMETRIC SIGNAL; AND ENROLLING THE BIOMETRIC SIGNAL AS AN ADMINISTRATOR SIGNATURE IN RESPONSE TO THE DATABASE OF BIOMETRIC SIGNATURES BEING EMPTY."...........................................193

G.    CLAIM 14 ........................................................................194

1.    *Claim 14(pre): "a non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to:"* ......194

2.    *Claim 14(a): "receive a series of entries of the biometric signal;"* .....................................................................197

3.    *Claim 14(b): "determine at least one of the number of said entries and a duration of each said entry;"* ....................197

4.    *Claim 14(c): "map said series into an instruction;"* .......198

5.    *Claim 14(d): "populate the database of biometric signatures according to the instruction;"* .......................................198

6.    *Claim 14(e): "receive the biometric signal;"* .................198

7.    *Claim 14(f): "match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"* ...............................................198

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

8.    *Claim 14(g): "emit a secure access signal conveying information dependent upon said accessibility attribute;"* ..............198

9.    *Claim 14(h): "provide conditional access to a controlled item dependent upon said information;"* ..................................198

10.   *Claim 14(i): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."* ...............................199

H.    CLAIM 15 ............................................................................199

1.    *Claim 15(pre): "a system for providing secure access to a controlled item, the system comprising:"* .........................199

2.    *Claim 15(a): "a memory comprising a database of biometric signatures;"* ...................................................................199

3.    *Claim 15(b): "a transmitter sub-system comprising:"* ...................199

4.    *Claim 15(b1): "a biometric sensor capable of receiving a biometric signal;"* ...............................................................199

5.    *Claim 15(b2): "a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"* ...................................................................199

6.    *Claim 15(b3): "a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute;"* .........................................................199

7.    *Claim 15(c): "a receiver sub-system comprising: a receiver sub-system controller capable of:"* ..................................199

8.    *Claim 15(c1): "receiving the transmitted secure access signal;"* ...................................................................200

9.    *Claim 15(c2): "providing conditional access to the controlled item dependent upon said information;"* .........................200

10.   *Claim 15(d): "Wherein the transmitter sub-system controller is further capable of:"* .........................................................200

11.   *Claim 15(d1): "receiving a series of entries of the biometric signal, said series being characterized according to at least one*

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

*of the number of said entries and a duration of each said entry;"* ................................................................................200

12. *Claim 15(d2): "mapping said series into an instruction;"* ..............200

13. *Claim 15(d3): "populating the database according to the instruction;"* ........................................................................200

14. *Claim 15(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."* ...............................................200

I.    CLAIM 16 ...........................................................................................201

1. *Claim 16(Pre): "A transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:"* ..............................201

2. *Claim 16(a): "A biometric sensor capable of receiving a biometric signal;"* ...........................................................................201

3. *Claim 16(b): "A controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;"* .......................................201

4. *Claim 16(c): "a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute;"* ................................................................201

5. *Claim 16(d): "wherein the controller is further capable of:"* .........201

6. *Claim 16(d1): "receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry;"* ........................................................................................201

7. *Claim 16(d2): "mapping said series into an instruction;"* ..............201

8. *Claim 16(d3): "populating the database according to the instruction;"* ........................................................................202

9. *Claim 16(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."* ...............................................202

J.    CLAIM 17 ...........................................................................................202

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

1.  *Claim 17(Pre1): "A method for providing secure access to a controlled item in a system comprising"* ...........................................202

2.  *Claim 17(Pre2): "a database of biometric signatures,"* .................202

3.  *Claim 17(Pre3): "a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item;"* .....................................202

4.  *Claim 17(Pre4): "a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal,"* .................................................................................202

5.  *Claim 17(a): "the method comprising: populating the database of biometric signatures by:"* ..........................................................202

6.  *Claim 17(a1): "receiving a series of entries of the biometric signal;"* ..............................................................................................203

7.  *Claim 17(a2): "determining at least one of the number of said entries and a duration of each said entry;"* .....................................203

8.  *Claim 17(a3): "mapping said series into an instruction;"* ..............203

9.  *Claim 17(a4): "populating the database according to the instruction;"* ..........................................................................................203

10. *Claim 17(b): "receiving the biometric signal;"* .............................203

11. *Claim 17(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"* .................................................................203

12. *Claim 17(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute;"* .............203

13. *Claim 17(e): "providing conditional access to the controlled item dependent upon said information;"* .........................................203

14. *Claim 17(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device;"* ..........................................203

**VIII.  CONCLUSION** .....................................................................................**205**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

I, Andrew Sears, PhD, hereby declare the following:

## I.    INTRODUCTION

1.    My name is Andrew Sears, and I am over 21 years of age and otherwise competent to make this Declaration. I make this Declaration based on facts and matters within my own knowledge and on information provided to me by others, and, if called as a witness, I could and would competently testify to the matters set forth herein.

2.    I have been retained as a technical expert witness in this matter by Counsel for the Petitioner, Apple Inc. ("Petitioner") to provide my independent opinions on certain issues requested by Counsel for Petitioner relating to the accompanying Petition for Inter Partes Review of U.S. Patent No. 9,665,705 ("the '705 Patent"). I am being compensated at an hourly rate of $750.00. My compensation in this matter is not based on the substance of my opinions or on the outcome of this matter. I have been informed that CPC Patent Technologies PTY, LTD. is the purported owner of the '705 Patent. I note that I have no financial interest in CPC Patent Technologies PTY, LTD. or Petitioner, and I have no other interest in the outcome of this matter.

3.    I have been informed by counsel that the claims being challenged in the accompanying Petition for the '705 Patent is Claims 1, 4, 6, 10-12, and 14-17 ("the Challenged Claims of the '705 Patent).

IPR2022-00602
Apple EX1003 Page 10

**Appx3820**

4.    I have summarized in this section my educational background, career history, and other qualifications relevant to this matter. I have also included a current version of my curriculum vitae, attached as Appendix B.

5.    I am currently a Professor and Dean of the College of Information Sciences and Technology at The Pennsylvania State University ("Penn State").

6.    I received a Bachelor of Science degree in Computer Science from the Rensselaer Polytechnic Institute in May of 1988. I received my Ph.D. in Computer Science from University of Maryland-College Park in May of 1993. My dissertation focused on human-computer interaction.

7.    From July 1993 to June 1999, I was employed by DePaul University as an Assistant Professor for the School of Computer Science, Telecommunications and Information Systems. In July 1999, I joined the University of Maryland, Baltimore County (UMBC) as an Associate Professor in the Information Systems Department where I was subsequently promoted to Professor in 2003. I served as the Chair for the Information Systems Department (2002-2011). From August 2008 to July 2011, I served as the Constellation Professor of Information Technology and Engineering.

8.    In August of 2011, I joined the Rochester Institute of Technology as Professor and Dean of the B. Thomas Golisano College of Computing and Information Sciences. In July of 2015, I joined Penn State as Professor and Dean of

the College of Information Sciences and Technology, and I continue to serve in this position. From September 2015 to December 2017, I also served as the Interim Chief Information Security Officer at Penn State.

9.     My research has explored a variety of topics related to human-centered computing. My research projects have addressed topics related to interacting with touchscreen technologies, interacting with mobile computing devices, evaluating user interfaces, health information technologies, speech recognition-based interactions, and accessibility for individuals with a variety of disabilities. My research projects have been supported by a variety of government agencies (e.g., the National Science Foundation, the National Institute on Disability and Rehabilitation Research, the National Institute of Standards and Technology, and NASA), companies (e.g., IBM, Intel, Microsoft, and Motorola), and non-profit organizations (e.g., the Verizon Foundation).

10.     Beginning in 2006, I served as founding Editor-in-Chief of the Association for Computing Machinery's (ACM) Transactions on Accessible Computing, and I served in this capacity until 2013. From 2013 to 2018, I served as a Member of the Editorial Board for ACM's Transactions on Accessible Computing. From 2008 to 2020, I served as a Member of the Editorial Board for the International Journal of Human-Computer Studies. From 2011 to 2021, I served as an Associate Editor for ACM's Transactions on Computer-Human Interaction.

11.     From 2013 to 2019, I served as a Member of the Board of Directors for the Computing Research Association. I have also served as a member of the Accessibility Committee of the ACM U.S. Public Policy Council, as well as a member of the ACM Council, the ACM Special Interest Group Governing Board, and in various capacities with the ACM Special Interest Group for Accessible Computing. I have chaired or co-chaired various conferences including the premier conferences on human computer interaction and accessibility in the context of computing technologies. I have served on a numerous program and organizing committees for other conferences in this field.

12.     I have served as editor on multiple scholarly books. In particular, I was an editor for the first and second editions of "The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications," published in 2003 and 2008 respectively. I am also author or co-author on more than a dozen book chapters and more than 100 journal articles and conference/workshop papers.

13.     I am being compensated for my time spent in connection with this case. I have no financial interest in the outcome of this case. The opinions provided in this report are my own and my compensation does not depend in any way on the substance of my opinions.

14. Based on my experiences described above, and as indicated in my Curriculum Vitae, I am qualified to provide the following opinions with respect to the patents in this case. Additionally, I was at least a person having ordinary skill in the art as of the priority date of the '705 Patent.

## A.    Materials Considered

15. As part of my work and in forming my opinions in connection with this proceeding, I have reviewed the following materials. For any prior art listed below, it is my opinion persons of ordinary skill in my field would reasonably rely upon such prior art in forming opinions regarding the subject matter of this proceeding:

- Petition for *Inter Partes* Review of U.S. Patent No. 9,665,705 (the "Petition");
- U.S. Patent No. 9,665,705 ("the '705 Patent") (Ex. 1001);
- File History for U.S. Patent 9,665,705 (Ex. 1002);
- U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*") (Ex. 1004);
- U.S. Patent No. 6,766,456 to McKeeth ("*McKeeth*") (Ex. 1005);
- U.S. Patent No. 6,509,847 to Anderson ("*Anderson*") (Ex. 1006);
- *Webster's New Collegiate Dictionary,* Merriam Webster, copyright 1981 (Ex. 1009);
- U.S. Patent No. 6,612,928 to Bradford et al. ("Bradford") (Ex. 1010);
- *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011);
- *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012);
- *An Introduction to Evaluating Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1013);
- U.S. Patent Application Publication No. 2003/0117261 to Gunsch ("Gunsch") (Ex. 1014);

- U.S. Patent Application Publication No. 2003/0036825 ("Kim") (Ex. 1015);
- U.S. Patent No. 6,140,939 to Flick ("Flick") (Ex. 1016);
- U.S. Patent No. 6,164,403 to Wuidart ("Wuidart") (Ex. 1017);
- U.S. Patent No. 7,239,227 to Gupta et al. ("Gupta") (Ex. 1018);
- U.S. Patent No. 6,877,097 to Hamid et al. ("Hamid") (Ex. 1019);
- U.S. Patent Application Publication No. 2001/0049785 to Kawan ("Kawan") (Ex. 1020);
- U.S. Patent Application Publication No. 2002/0091937 to Ortiz ("Ortiz") (Ex. 1021);
- U.S. Patent Application Publication No. 2003/0046552 to Hamid ("Hamid '552") (Ex. 1022);
- U.S. Patent Application Publication No. 2002/0063154 to Hoyos et al. ("Hoyos") (Ex. 1023);
- U.S. Patent No. 6,484,260 to Scott ("Scott") (Ex. 1024);
- U.S. Patent No. 7,404,086 to Sands ("Sands") (Ex. 1025);
- *A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code",* Ross Tester, Silicon Chip.com.au, July 2002 (Ex. 1026);
- *Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications,* Brent A. Miller, Chatschik Bisdikian, 2001 (Ex. 1027);
- U.S. Patent No. 7,284,266 to Morris et al. ("Morris") (Ex. 1028);
- *Bricolage: Data Compression – Morse Code,* https://perl.plover.com/Huffman/huffman.html, 1998 (Ex. 1029);
- U.S. Patent No. 6,323,565 to Williams, Jr. et al. ("Williams") (Ex. 1030);
- U.S. Patent No. 7,020,270 to Ghassabian ("Ghassabian") (Ex. 1031);
- U.S. Patent Application Publication No. 2003/0048260 to Matusis ("Matusis") (Ex. 1032);
- International Publication WO 02/27455 to Mathiassen ("Mathiassen '455") (Ex. 1033);
- European Patent Application No. 88301738.6 to Araki et al. ("Araki") (Ex. 1034);
- U.S. Patent No. 7,152,045 to Hoffman ("Hoffman") (Ex. 1035);
- U.S. Patent No. 6,833,785 to Brown et al. ("Brown") (Ex. 1036);
- U.S. Patent Application Publication No. 2004/0015450 to Zingher et al. ("Zingher") (Ex. 1037);
- U.S. Patent No. 6,498,970 to Colmenarez ("Colmenarez") (Ex. 1038);

- U.S. Patent No. 6,100,811 to Hsu et al. ("Hsu") (Ex. 1039);
- U.S. Patent No. 4,638,292 to Mochida ("Mochida") (Ex. 1040);
- *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041);
- U.S. Patent No. 7,110,580 to Bostrom ("Bostrom") (Ex. 1042);
- U.S. Patent No. 7,336,174 to Maloney ("Maloney") (Ex. 1043);
- *Microsoft Press Computer Dictionary,* Second edition, JoAnne Woodcock, 1994 (Ex. 1044);
- *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 (Ex. 1045);
- *OnStar Features*, OnStar, June 19, 2000 (Ex. 1046);
- U.S. Patent No. 6,420,975 to DeLine et al. ("DeLine") (Ex. 1047);
- *PC Basics: Get a Great Start,* Survive and Thrive, copyright 2002 (Ex. 1049);
- U.S. Patent Application Publication No. 2003/0160692 to Nonaka et al. ("Nonaka") (Ex. 1050);
- U.S. Patent No. 5,307,048 to Sonders ("Sonders") (Ex. 1051);
- *Merriam Webster's Collegiate Dictionary,* tenth edition, copyright 1998 (Ex. 1052);
- *The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications*, Alex Gatherer and Edgar Auslander, 2002 (Ex. 1053);
- *Dictionary of Electrical and Computer Engineering,* McGraw-Hill, 2003 (Ex. 1054); and
- U.S. Patent No. 6,970,970 to Jung et al. ("Jung") (Ex. 1055).

## II.    LEGAL FRAMEWORK

16.    I am a technical expert and do not offer any legal opinions. However, I have been informed about certain legal principles regarding patentability and related matters under United States patent law, which I have applied in performing my analysis and arriving at my technical opinions in this matter.

## A.     Analogous Art

17.     I have been informed by counsel that for prior art to be used to establish the unpatentability of a patent based on obviousness, the prior art must be "analogous art" to the claimed invention. I have also been informed by counsel that a prior art reference is analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention, even if it addresses a different problem; or (2) the reference is reasonably pertinent to the problem faced by the invention, even if it is not in the same field of endeavor as the claimed invention.

## B.     Obviousness

18.     I have been informed that a person cannot obtain a patent on an invention if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ("POSITA"). I been informed that a conclusion of obviousness may be founded upon more than a single item of prior art. I have been further informed that obviousness is determined by evaluating the following factors: (1) the scope and content of the prior art, (2) the differences between the prior art and the claim at issue, (3) the level of ordinary skill in the pertinent art, and (4) secondary considerations of non-obviousness. In addition, the obviousness inquiry should not be done in hindsight. Instead, the obviousness

inquiry should be done through the eyes of a POSITA at the time of the alleged invention.

19.    In considering whether certain prior art renders a particular patent claim obvious, I have been informed that I can consider the scope and content of the prior art, including the fact that one of skill in the art would regularly look to the disclosures in patents, trade publications, journal articles, conference papers, industry standards, product literature and documentation, texts describing competitive technologies, requests for comment published by standard setting organizations, and materials from industry conferences, as examples. I have been informed that for a prior art reference to be proper for use in an obviousness analysis, the reference must be "analogous art" to the claimed invention. I have been informed that a reference is analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention (even if it addresses a different problem); or (2) the reference is reasonably pertinent to the problem faced by the inventor (even if it is not in the same field of endeavor as the claimed invention). In order for a reference to be "reasonably pertinent" to the problem, it must logically have commended itself to an inventor's attention in considering his problem. In determining whether a reference is reasonably pertinent, one should consider the problem faced by the inventor, as reflected either explicitly or implicitly, in the specification. I believe that all of the references I considered in forming my opinions

in this IPR are well within the range of references a POSITA would have consulted to address the type of problems described in the Challenged Claims.

20.    I have been informed that, in order to establish that a claimed invention was obvious based on a combination of prior art elements, a clear articulation of the reason(s) why a claimed invention would have been obvious must be provided. Specifically, I am informed that, under the U.S. Supreme Court's KSR decision, a combination of multiple items of prior art renders a patent claim obvious when there was an apparent reason for one of ordinary skill in the art, at the time of the invention, to combine the prior art, which can include, but is not limited to, any of the following rationales: (A) combining prior art methods according to known methods to yield predictable results; (B) substituting one known element for another to obtain predictable results; (C) using a known technique to improve a similar device in the same way; (D) applying a known technique to a known device ready for improvement to yield predictable results; (E) trying a finite number of identified, predictable potential solutions, with a reasonable expectation of success; (F) identifying that known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art; or (G) identifying an explicit teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine

the prior art references to arrive at the claimed invention. I am also informed that where there is a motivation to combine, claims may be rejected as prima facie obvious provided a POSITA would have had a reasonable expectation of success regarding the proposed combination.

21.     I am informed that the existence of an explicit teaching, suggestion, or motivation to combine known elements of the prior art is a sufficient, but not a necessary, condition to a finding of obviousness. This so-called "teaching-suggestion-motivation" test is not the exclusive test and is not to be applied rigidly in an obviousness analysis. In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. Instead, the important consideration is the objective reach of the claim. In other words, if the claim extends to what is obvious, then the claim is invalid. I am further informed that the obviousness analysis often necessitates consideration of the interrelated teachings of multiple patents, the effects of demands known to the technological community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art. All of these issues may be considered to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent.

22.     I also am informed that in conducting an obviousness analysis, a precise teaching directed to the specific subject matter of the challenged claim need not be

sought out because it is appropriate to take account of the inferences and creative steps that a POSITA would employ. The prior art considered can be directed to any need or problem known in the field of endeavor at the time of invention and can provide a reason for combining the elements of the prior art in the manner claimed. In other words, the prior art need not be directed towards solving the same specific problem as the problem addressed by the patent. Further, the individual prior art references themselves need not all be directed towards solving the same problem. I am informed that, under the KSR obviousness standard, common sense is important and should be considered. Common sense teaches that familiar items may have obvious uses beyond their primary purposes.

23.    I also am informed that the fact that a particular combination of prior art elements was "obvious to try" may indicate that the combination was obvious even if no one attempted the combination. If the combination was obvious to try (regardless of whether it was actually tried) or leads to anticipated success, then it is likely the result of ordinary skill and common sense rather than innovation. I am further informed that in many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature or knowledge, will drive the design of an invention. I am informed that an invention that is a combination of prior art must do more than yield predictable results to be non-obvious.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

24.    I am informed that for a patent claim to be obvious, the claim must be obvious to a POSITA at the time of the alleged invention. I am informed that the factors to consider in determining the level of ordinary skill in the art include (1) the educational level and experience of people working in the field at the time the invention was made, (2) the types of problems faced in the art and the solutions found to those problems, and (3) the sophistication of the technology in the field.

25.    I am informed that it is improper to combine references where the references teach away from their combination. I am informed that a reference may be said to teach away when a POSITA, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the patent applicant. In general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the patentee. I am informed that a reference teaches away, for example, if (1) the combination would produce a seemingly inoperative device, or (2) the references leave the impression that the product would not have the property sought by the patentee. I also am informed, however, that a reference does not teach away if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

## C.    Secondary Considerations of Non-Obviousness

26.    I am informed that even if a prima facie case of obviousness is established, the final determination of obviousness must also consider "secondary considerations" if presented. In most instances, the patentee raises these secondary considerations of non-obviousness. In that context, the patentee argues an invention would not have been obvious in view of these considerations, which include: (a) commercial success of a product due to the merits of the claimed invention; (b) a long-felt, but unsatisfied need for the invention; (c) failure of others to find the solution provided by the claimed invention; (d) deliberate copying of the invention by others; (e) unexpected results achieved by the invention; (f) praise of the invention by others skilled in the art; (g) lack of independent simultaneous invention within a comparatively short space of time; (h) teaching away from the invention in the prior art.

27.    I am further informed that secondary-considerations evidence is only relevant if the offering party establishes a connection, or nexus, between the evidence and the claimed invention. The nexus cannot be based on prior art features. The establishment of a nexus is a question of fact. While I understand that the Patent Owner here has not offered any secondary considerations at this time, I will supplement my opinions in the event that the Patent Owner raises secondary considerations during the course of this proceeding.

IPR2022-00602
Apple EX1003 Page 23

**Appx3833**

## III.   CLAIM CONSTRUCTION

28.    I have been informed by counsel that the first step in an unpatentability analysis involves construing the claims, as necessary, to determine their scope. Second, the construed claim language is then compared to the disclosures of the prior art. I am informed that claims are generally given their ordinary and custom meaning as understood by one of ordinary skill in the art at the time of the invention, in light of the patent specification.

### A.    Non-Construed Claim Terms

29.    For any claim terms not construed, I have applied the meaning of the claim terms of the '705 Patent that are generally consistent with the terms' ordinary and customary meaning, as a person of ordinary skill in the art would have understood them at the time of the invention. I have been instructed to assume for purposes of this proceeding that the time of the invention is August 13, 2003.

### B.    Construed Claim Terms

30.    For purposes of this proceeding, I have been instructed to apply the below claim constructions for the listed terms:

| Claim Term | Construction |
|---|---|
| Claims 1,4,10-12,14-17: "database" | "Organized structure of data" |
| Claims 1, 11,14-17: "conditional access" | "Access based on accessibility attribute" |

| Claims 1, 10-12,14-17: "biometric signal" | "Physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)" |
|---|---|
| Claims 1,10,11,14,15,16,17: "accessibility attribute" | "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user" |

## 31.   OPINIONS REGARDING LEVEL OF SKILL OF A PERSON HAVING ORDINARY SKILL IN THE ART

32.    I was asked to provide my opinion as to the level of skill of a person having ordinary skill in the art ("POSITA") of the '705 Patent at the time of the claimed invention, which I have been instructed to assume is August 13, 2003. In determining the characteristics of a hypothetical person of ordinary skill in the art of the '705 Patent at the time of the claimed invention, I was told to consider several factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field. I also placed myself back in the time frame of the claimed invention and considered the colleagues with whom I had worked at that time.

33.    In my opinion, a person having ordinary skill in the art of the '705 Patent at the time of its filing would have been a person having, as of August 13, 2003, having at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year of experience in the

field of human-machine interfaces and device access security. Additional education may substitute for lesser work experience and vice-versa. Such a person of ordinary skill in the art would have been capable of understanding the '705 Patent and the prior art references discussed herein.

34.    Based on my education, training, and professional experience in the field of the claimed invention, I am familiar with the level and abilities of a person of ordinary skill in the art at the time of the claimed invention. Additionally, I met at least these minimum qualifications to be a person having ordinary skill in the art at least as of August 13, 2003. Further, although my qualifications may exceed those of the hypothetical person having ordinary skill in the art defined above, my analysis and opinions regarding the '705 Patent have been rendered from the perspective of a person having ordinary skill in the art at the time of the invention.

35.    My opinions provided in this Declaration are made as of the priority date of the '705 Patent (which counsel has informed me is August 13, 2003), unless expressly stated otherwise. To the extent that any verb tense used in this Declaration or any deposition or testimony provided in this matter is a present tense, e.g., "would understand," such verb tense should be understood to be my opinion as of the '705 Patent's priority date (again, unless expressly stated otherwise).

## IV.   BACKGROUND OF TECHNOLOGY

36.   I was asked to briefly summarize the background of the technology from the standpoint of a POSITA prior to August 13, 2003.

### A.   Biometric Access Systems

37.   Traditionally, authorizing an individual in industries such as finance, healthcare, or government facilities, used a token-based or knowledge-based approach where the person provided a password or ID card. *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011),  p. 91, ("Knowledge-based and token-based automatic personal identification approaches have been the two traditional techniques widely used" for personal identification).

38.   Several disadvantages existed with these traditional methods, such as easily allowing intruders access and denying authorized personnel access when these passwords or cards were lost or stolen. *Id.* at pp. 91-92 ("Since these traditional approaches are not based on any inherent attributes of an individual to make a personal identification, they suffer from the obvious disadvantages: tokens may be lost, stolen, forgotten, or misplaced, and a PIN may be forgotten by a valid user or guessed by an impostor."). Biometric information identified an individual via unique physiological or behavioral characteristics, which can help address concerns often associated with traditional tokens or passwords. *Id.* at 92 ("Biometric identification

refers to identifying an individual based on his or her distinguishing physiological and/or behavioral characteristics"; "Because many physiological or behavioral characteristics are distinctive to each person, biometric identifiers are inherently more reliable and more capable than knowledge-based and token-based techniques"). Thus, several industries started using biometric authorization as an improved method of securing access (see Table below listing industries).

| Table 1. Biometric applications | | |
|---|---|---|
| **Forensic** | **Civilian** | **Commercial** |
| Criminal investigation | National ID | ATM |
| Corpse identification | Driver's license | Credit card |
| Parenthood determination | Welfare disbursement | Cellular phone |
| | Border crossing | Access control |

*Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011), p. 92.

39.     Biometric characteristics used in authorization included fingerprints, retinal, palm, speech, and face recognition. *Id.* at 95 ("There are a multitude of biometric techniques either widely used or under investigation. These include, facial imaging (both optical and infrared), hand and finger geometry, eye-based methods (iris and retina), signature, voice, vein geometry, key-stroke, and finger- and palm-print imaging."). Initially, the individual enrolled in a biometric system by scanning the biometric characteristic via a biometric sensor. *Id.* at 92 ("During the enrollment phase, the biometric characteristic of an individual is first scanned by a biometric

sensor to acquire a digital representation of the characteristic."). The digital representation of the biometric was then stored in a central database or on a local memory of an issued card or device. *Id.* ("Depending on the application, the template may be stored in the central database of the biometric system or be recorded on a magnetic card or smartcard issued to the individual."). Then, when a user required authorization, they presented their biometric to the system which compared the presented feature to the stored template and successfully identified the user when finding a match. *Id.* at 92 ("During the recognition phase, the biometric reader captures the characteristics of the individual to be identified and…" feeds a processed version "to the feature matcher that compares it against the template(s) to establish the identity of the individual.").

40.    Fingerprints served as one well-known biometric characteristic that had been used to identify individuals since the 1970's, as each person's fingerprints contained unique patterns formed via the ridges and bifurcations on the skin. *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012) at 3 ("The ridges and furrows form patterns on the last joint of the fingers and toes, forming four basic types", "The everyday use of fingers as an identification method and the production of finger and palm evidence in courts of law are based on one magnificent premise: no one has ever been found who has a sequence of ridge detail on the hands and feet that is

identical to the ridge detail of any other person."), 6 ("During the summer of 1976, I was, as always, fully occupied in my work as a fingerprint expert in Hertfordshire, specializing in searching for the ownership of finger imprints found at crime scenes, known in the U.S. by the particularly apt expression "cold searching."). The table below shows an example of the four well-known and established types of patterns found on human fingers.



**Figure 1.2** Basic fingerprint patterns.

*Id.* at 3. These ridges and bifurcations making up the patterns were known as "minutiae". *Biometric Identification,* Anil Jain, Lin Hong, and Sharath Pankanti, Communication of the ACM, February 2000, vol. 43, No. 2 (Ex. 1011) at 96 ("… landmark features on a finger, for example, the fingerprint ridges endings and ridge bifurcations (collectively known as "minutiae"), are used in fingerprint-based authentication system."). Representations of fingerprints were stored in authorization systems by extracting these minutiae from fingerprint images. *Id.* ("The feature extraction system detects the minutiae from the input image"). The placement of the stored minutiae, as represented by vectors, was then compared to

the vector generated from a person's fingerprint to distinguish a match and thus successfully identify an authorized user. *Id.* ("Once the feature vectors are aligned and overlaid, the number of corresponding minutiae, that is, minutiae in close proximity to each other with similar attributes, constitutes a basis for quantifying the likelihood of fingerprint feature vectors originating from the same finger.").

41.    Two types of biometric systems existed that served to (1) identify or (2) verify the individual. *An Introduction to Evaluating Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1013) at 56. Essentially, a biometric system for identification only compared the newly presented biometric with the stored signatures to recognize the person, with this system often used for identifying a criminal in a mugshot. *Id.* ("In identification systems, a biometric signature of an unknown person is presented to a system. The system compares the new biometric signature with a database of biometric signatures of known individuals.", "Systems that rely on identification include those that the police use to identify people from fingerprints and mug shots."). A verification system used the presented biometric as a claimed identity, and then checked whether the presentation matched their own stored representation (i.e. was the user who they claimed they were), with these systems used in such applications as a sale transaction or controlled access to computers or secure buildings. *Id.* at 56-57 ("In verification systems, a user presents a biometric signature

and a claim that a particular identity belongs to the biometric signature.", "Verification applications include those that authenticate identity during point-of-sale transactions or that control access to computers or secure buildings.").

42.    Early biometric authentication systems included optical fingerprint sensors contained in desktop PCs and laptops to allow users secure access. *Id.* ("The small size and cost of these" optical fingerprint-capture "devices can provide secure access to desktop PCs, laptops…"). Implementing fingerprint sensors into mobile phones and palm computers also occurred prior to August 13, 2003. *Id.* at 58 ("The small size and cost of these" optical fingerprint-capture "devices can provide secure access… most recently, to mobile phones and palm computers"). Implementing biometric systems in automobiles to ensure secure vehicle access was also well-known, with manufacturers building "prototype cars with access and personalization (of seat position, radio channels, and so on) that are controlled by fingerprint authentication devices." *Id.* It was contemplated that these biometric verification systems would be placed in even smaller devices, such as a key fob, in order to "facilitate secure access to everything from front doors to car doors, computers, and bank machines." *Id., see also,* 60 (generally describing use of fingerprint systems in vehicular security).

43.    In fact, biometric vehicular security systems were well-known prior to August 13, 2003. *See, e.g., Gunsch, Odle*. For example, *Gunsch* disclosed a

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

fingerprint reader on a car key fob for "user identification." *Gunsch* (Ex. 1014)*,*

Abstract. A microprocessor in the key fob compared the stored biometric signature

with the presented fingerprint to authorize execution of certain commands. *Gunsch,*

[0070] ("All authorized users would have their fingerprints (at least two) scanned

and stored in the transmitter's or secure asset's memory. The menu system can then

define which user is allowed to perform which functions.").



Fig. 7B

*Gunsch,* 7B, (Fig. 7B shows "the primary operational logic of the universal

transmitter's microprocessor."). Any user "unrecognized by the system would be

denied access." *Id.*

44.    *Odle* disclosed a "Fingerprint Enrollment and Verification Module"

(FEVM). *Odle* (Ex. 1007)*,* 2:37-38 ("The system is referred to as Fingerprint

Enrollment and Verification Module, FEVM."). *Odle* mounted the FEVM near the door handle of the car. *Odle,* 3:36-38 ("In one embodiment, the FEVM 14 is mounted in an aperture in the door near the door handle."). The FEVM stored a template of a user's fingerprint in memory. *Odle,* 4:6-8, 4:15-17 ("The image of the fingerprint on the sensor 18 is processed by the FEVM to form a template of the fingerprint" and "When the template is complete, it is stored in the flash memory"). When the sensor then detected the presence of a user's finger, the FEVM compared the image to the stored template to verify the user and, if matched, the desired operation was performed (e.g. unlocking a door). *Odle,* 4:35-45 ("The prospective operator places a finger on the passive sensor 18, the sensor activates and detects the presence of the finger, the fingerprint image is compared to the templates in the flash memory to verify the prospective user.", "If there is a verification and the fingerprint image has a template in the memory, the door unlocks."). Additionally, *Flick, Kim, Wuidart,* and *Gupta,* each disclosed a system including a fingerprint sensor for authenticating user access to a car. *Kim* (Ex. 1015)*,* [0017], [0032], [0034]; *Flick* (Ex. 1016), 5:39-56; *Wuidart* (Ex. 1017)*,* 3:9-36; *Gupta* (Ex. 1018), Abstract, 3:13-22. These vehicle security systems utilized biometric authorization to provide extra security to the owner and increase the security of the car. *See, e.g., Gunsch*, [0007]; *Gupta,* 1:22-30, 1:51-58; *Wuidart,* 1:40-51; *Kim,* [0006].

45.     Biometric systems authorizing access to devices and buildings were also well-known prior to August 13, 2003. For example, *Hamid* disclosed a portable device including a biometric sensor, such as a fingerprint sensor. *Hamid* (Ex. 1019), 7:24-27 ("In Fig. 2a, the portable fingerprint device is housed in an ubiquitous object, in this example within a housing 40 of a functional wristwatch…"), 7:30-33 ("biometric sensor" in the housing for "sensing biometric characteristics of any of a person's digit tips", such as "sensing of the finger's print."). The portable device then provided access to various doors within a building when the fingerprint presented matched one of the stored fingerprint patterns. *Hamid,* 8:46-59 ("A portable fingerprint security device 30a has been initialized to be responsive to 3 different fingerprint patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2, and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door."). *McKeeth* disclosed using a fingerprint sensor to authenticate users for accessing an electronic device, such as a computer. *McKeeth* (Ex. 1005), 2:53-3:10 ("When using an optical scanner, the user may scan his/her fingerprint or other physical feature such as the retina into the computer system 100 for authentication."). If the presented biometric matched a stored fingerprint, then the user gained access to the computer system. *McKeeth,* 3:52-4:2 ("If there is a match between the input and security information, the compare circuit 150 issues a "pass"

signal to the computer system 100 (e.g., a host processor) indicating acceptance of and authorizing access by the user."). Additionally, *Kawan* and *Ortiz* disclosed a biometric systems including a fingerprint sensor for authenticating access to physical locations and/or electronic devices. *Kawan* (Ex. 1020)*, [0024]; *Ortiz* (Ex. 1021)*, [0029], [0046], [0060-61].

46.    Thus, implementing biometric authorizing for providing access was well-known prior to August 13, 2003.

### B.    Hardware Components of a Biometric Access System

47.    Biometric authorization systems were well-known to require certain hardware elements to successfully provide access to an individual prior to the filing date of the '705 Patent. For example, these systems required a biometric sensor, which included anything from audio sensor for speech recognition to an optical scanner for sensing fingerprints, or other physical features such as the retina, a user's face, or even a user's vein patterns. *Ortiz* (Ex. 1021)*, [0089-90] ("User interface 222 may be integrated with a microphone 230 that may receive voiceprint from a user. User interface 222 may also be integrated with a fingerprint scanner 228 that captures fingerprints as biometric data from users."); *McKeeth* (Ex. 1005)*, 3:5-10 ("When using an audio sensor, such as a microphone, the user may enter audio information, such the user's voice, which may be uniquely identified by the computer system 100. When using an optical scanner, the use may scan his/her

fingerprint or other physical feature such as the retina into the computer system 100 for authentication."); *Flick* (Ex. 1016)*, 4:61-66 ("The biometric sensor 29 may be any of a number of types, such as a sensor for fingerprints, retinal patterns, speech recognition patterns, facial recognition patterns, skin patterns, hand patterns, venous patterns, etc. as would be readily appreciated by those skilled in the art.").

48.     These biometric authentication systems also required a storage medium to store biometric signatures of individuals which were authorized access. The representations of a user's biometric were stored in a memory or database. *Hamid '552* (Ex. 1022)*, [0055] ("A processor 110 compares the captured biometric data with biometric data of an authorized person stored in memory 112 to produce a comparison result."); *Hoyos* (Ex. 1023)*, [0045] ("…when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. That representation is compared to the local database of user information."). Thus, it was known prior to August 13, 2003 to include databases in biometric authorization systems for storing biometric signatures.

49.     These biometric authorization systems also included either a controller or processor that executed the step of comparing the presented biometric with the stored signatures to detect a match. *See, e.g., Hamid '552* (Ex. 1022)*, [0055] (processor performing comparison between presented and stored fingerprint); *Hamid* (Ex. 1019)*, 7:64-8:16; *Flick* (Ex. 1016)*, 4:32-37, 8:30-34 (controller

performing matching operation); *Wuidart* (Ex. 1017)*,* 4:37-40, 54-58 (microcontroller determining correspondence of a measured fingerprint with a stored biometric signature). In systems utilizing remote or portable fingerprint sensing devices, the controller or processor additionally directed the transmission of a signal to provide access. *See, e.g., Hamid '522,* [0055] ("If the comparison result is indicative of a match an authorization signal is provided to a transmitter 114 for transmitting the signal to a port 120 of the receiving module 104."); *Wuidart,* 4:54-61 ("When the data elements of the measurement signal SM2 correspond to the data elements stored in one of the areas of the memory DB2, the microcontroller M1 delivers an output signal OUT." which was subsequently transmitted "through an antenna, infrared diode, or electrical connection."); *Scott* (Ex. 1024)*,* 11:14-25 ("Processing unit 16 causes transmitter module 28 to transmit a signal representing the encrypted random number to host system 30 (122)…"). The portable fingerprint sensing device then additionally included a transmitter. *Hamid '522* (Ex. 1021)*,* [0055]; *Scott,* 6:52-53 ("PID 6 further includes a communication unit 24, which has a transmitter module 28…"). Thus, biometric authorization systems were well-known to include a processor/controller for detecting a match with a stored biometric signature and causing a transmitter to send an access signal prior to August 13, 2003.

50.    When transmitting access signals, biometric authorization systems also contained a receiver for receiving the signal that connected to a different processor

and/or controller to execute providing access to the individual, e.g., by unlocking a physical lock to a structure. *See, e.g., Hamid '552,* [0055] ("A locking mechanism 122 comprising a processor 124 at the receiving module 104 then provides access to the secure entity or service in dependence upon the received authorization signals."). Some of these processors in biometric authorization systems were also capable of providing access to a user to perform a certain function, instead of simply providing access to a lock.  *Scott* (Ex. 1024)*,* 12:17-21, ("… PID 6A is configured as shown in Fig. 2 to transmit, and host facility 4A is configured to only receive. Receiver module 38 is a standard automobile or garage door type of installation."), 12:30-59 ("…host processing unit 4A retrieves the stored encryption key and decrypts the encrypted portion of the received encrypted signal (21))…", "If the synchronization counter information matches the stored information, then the user is granted access," with such access "**determined by the function button information contained in the encrypted signal**.").

51.    These systems required some item which was being accessed, such as a physical lock (e.g., a door lock) as disclosed by *Hamid '552. Hamid '552* (Ex. 1022)*,* [0055] ("A locking mechanism 122 comprising a processor 124 at the receiving module 104 then provides access to the secure entity or service in dependence upon the received authorization signals."). Furthermore, the item being accessed also included locks to electronic devices, such as an ATM login account.

*Ortiz* (Ex. 1021)*,* [0047] ("a user attempting to retrieve cash through ATM 20 can be required to authentication his or her identification, based on previously stored biometric attributes contained within database 14 and/or user profile 15."). Biometric authorization systems even granted access to online networks via a user presenting their biometric credentials. *Sands* (Ex. 1025)*,* 5:10-18 ("The biometric scanner(s) are used to read one or more particular biometrics associated with an individual and send the biometric measurements to the computer network for use in authenticating the individual as a valid user of the computer network.").

52.    Thus, it was known that biometric authorization systems for providing access included such hardware components as a database for storing biometric signatures, processor and/or controller for executing comparison between the presented biometric and biometric signature, transmitters and receivers for communicating access signals, and another processor and/or controller for executing the step of providing access prior to August 13, 2003.

### C.    Secure Access Signal

53.    When implementing biometric authorization systems, maintaining security of the signal during transmission, especially in wireless transmission, was a well-known problem. *'705 Patent* (Ex. 1001)*,* 6:35-41 (describing using "secure protocols and serial number ciphering techniques which…hide the clear text values required for authentication between" the transmitter and receiver subsystems of the

biometric authorization system). Security protocols such as rolling code or by another common name, code hopping, were known as ways "of preventing unauthorized access to a digital code which might be transmitted via a short-range radio link to do something: open a garage door, lock or unlock a car and perhaps turn its own security system on and off – and much more." *A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code",* Ross Tester, Silicon Chip.com.au, July 2002 (Ex. 1026) at 23. In fact, Microchip invented a rolling code system that "simply present a different code every time" a piece of information is transmitted. *Id.* The receiver knows the algorithm that chooses the changing code "so it knows what code to expect." *Id.* The codes sent with the access signal are "random", but because the receiver knows the code algorithm it "can still work out what the code is going to be in advance." *Id.* This rolling code protocol was well-known to give users "almost total peace-of-mind", leading to its adoption in "many vehicle entry/exit and alarm system manufacturers, access controllers and so on." *Id.*

54. Biometric authorization systems were known to employ this KeeLoq approach from Microchip Technology, Inc. *Scott* (Ex. 1024)*, 6:41-44 ("PID 6 includes a biometric sensor."), 7:51-54, 7:59-63 (in one embodiment, PID 6A includes an encoder with encoder chip, "for example, the HSC200 or HSC300 KeeLoq® Code Hopping Encoder, available from Microchip Technology, Inc. of

Chandler, Ariz., that contains the encryption algorithm."). *Scott* discloses the PID embodiment with the KeeLoq code hopping encryption was "employed with systems such as garage door openers, automobile security systems, door locks, and the like." *Id.* at 8:1-3. Thus, it was known that code hopping or rolling code simply employed an "encryption algorithm" for encrypting the secure access signal. *Scott,* 7:59-63.

55. Bluetooth was also known and employed as a secure wireless protocol due to its use of frequency hopping, where "a single message packet" was transmitted along several different frequencies, "thereby spreading the message across the available frequency spectrum." *Bluetooth Revealed: The Insider's Guide to an Open Specification for Global Wireless Communications,* Brent A. Miller, Chatschik Bisdikian, 2001 (Ex. 1027) at 18. Frequency hopping was known to "provide a degree of security for communications in that only a receiver that knows the frequency hopping pattern can receive and assemble all the packets of a message.", with this protocol often "employed to hinder eavesdropping" on a given signal. *Id.* at 19.

56. Biometric authorization systems were known to utilize these secure wireless protocols when sending sensitive access signals. *Morris* (Ex. 1028), 3:4-14 ("The encrypted biometric data signal is received by a server antenna 42 and a second wireless Bluetooth enabled transceiver 44.), *Scott* (Ex. 1024), 7:51-54, 7:59-63. Thus, it was known prior to August 13, 2003, that biometric authorization

systems secured their transmitted access signals using various secure wireless protocols.

**D.    Inputting a Series of Entries for Invoking Functions in a Biometric Access System**

57.    Using a single switch for communicating various functions and commands has been known ever since the telegraph was used to send morse code message by "tapping the switch at one end" and making "the relay at the other end click." *Bricolage:    Data    Compression    –    Morse    Code,* https://perl.plover.com/Huffman/huffman.html*, 1998 (Ex. 1029) at 1. Morse code then used a single switch to "tap" out any number of communications, with letters and digits represented by sequences of short and long clicks, or dots and dashes, respectively. *Id.* at 1. Thus, the length of time the switch was pressed and the number of presses in a row formed the information a user wanted to communicate.

58.    Additionally, vehicle remote keyless entry systems were also known to employ a single switch or button for invoking multiple functions in a vehicle security system. For example, *William's* remote keyless entry system included a button on the fob that performed different functions when pushed once or twice. *Williams* (Ex. 1030)*, 14:5-31 ("The Unlock input 60A **produces a different result if pressed twice within five seconds**, as illustrated by block 60I. **One press of the button will unlock only the drivers door**, block 60M, and **pressing the button twice will**

**unlock all doors and the liftgate**, block 60K."). Thus, implementing a single switch or button for invoking multiple functions was well known prior to August 13, 2003.

59.    As many electronic devices became portable for user convenience, it was important to ensure the input process was simple for the user to implement. *Ghassabian* (Ex. 1030), 7:65-67, 1:54-58 (a "key feature for a successful technological product is its easily manipulation," further stating a "**quickly, easily and most importantly, naturally…function entry system is vital**."). *Ghassabian* contemplated a method of simplifying user input on a portable device by providing "multiple presses of a single key." *Ghassabian,* 2:12-16. This method was implemented by including a "fingerprint detection device" that "maps a particular fingerprint with a corresponding symbol or function, such as a number, letter, macro or other activity." *Ghassabian,* 3:16-18, 8:23-26. *Ghassabian's* fingerprint detection device mapped "tapping once with a finger" to produce the number '0' while "the same finger with a double tap may produce the number '6.' *Ghassabian*, 9:1-4.

60.    In more detail, *Ghassabian* teaches a "fingerprint detection device" that "**maps a particular fingerprint with a corresponding**…**function**." *Ghassabian,* 8:23-26. *Ghassabian* illustrates a "mapping table" that maps distinct fingerprint movements to certain functions, symbols, or activities, with the "fingerprint index" identifying what fingerprint is used for each operation.



FIG.2

*Ghassabian,* Fig. 2, *see also* 8:59-9:8 (describing the "mapping table" in further detail, "Illustratively, tapping once with a finger corresponding to identification number 212 may produce the number '0', whereas the same finger with a double tap may produce the number '6.'"). *Ghassabian* states implementing fingerprint movements mapped to certain functions enhances "accuracy, but [] also **enables individuals to more easily and quickly input distinct** characters**, and/or function**." *Ghassabian,* 12:11-13.

61.    *Matusis* recognized the same issue in "the art of input devices or sensors," namely the need to increase "functionality and improving user-friendliness while minimizing the size of the device." *Matusis* (Ex. 1032)*, [0004], see also,* [0015] ("there is still a strong need to develop new systems and methods that would be able to maximize the number of actions while minimizing the size of the input

device"). *Matusis* teaches a system including an "input sensor [that] could be an arbitrary small input sensor" for detecting different "fingertips whereby each fingertip corresponds to an upward and a downward motion," each coinciding with a certain function. *Matusis,* [0045], [0046], Fig. 3.

62.    Additionally, *Mathiassen '455* also discloses implementing a user's series of fingerprint presses as input information to invoke certain functions. *Mathiassen '455* (Ex. 1034), 5:18-23 (analyzing means 2 coupled to a fingerprint sensor "measures the duration, direction and speed of finger moves on the switch, and categorises the signal from the switch into categories"), 12:12-19 (entering a period "**may be entered as two consecutive <Long Taps>**" with a user signaling the end of a text message "**by finger command sequence comprising two consecutive <Extra Long Taps>**"). *Araki* similarly discloses invoking certain commands based on user input but does so via a touch sensor without sensing a user's fingerprint. *Araki* (Ex. 1034)*,* 5:28-33 ("these commands can be issued by utilization of, for instance, seven finger operations on the touch panel" such as "**touching the panel with the finger twice (2HIT)**."), *see also* 5:56-58 ("The command HIT is output when the finger is kept on the panel for 0.5 second or less" while the "2HIT is outputted when, within two seconds after the issue of the command HIT, the finger is operated in the same manner").

63.    Portable devices also started implementing biometric sensors as an input for the user to instruct certain functions to maintain security when using a portable device. *Ghassabian* (Ex. 1032), 3:18-22 ("Furthermore, such a technology should also provide means for a **more secure and efficient mechanism that can prevent unauthorized use of devices**, among other things, as compared with the prior art"). For example, both *Ghassabian* and *Mathiassen '455* also teach their systems authenticate users via their fingerprints. *Ghassabian,* 4:20-25 ("…the fingerprint detection device is configured to distinguish between fingers based on their fingerprints" and thus "only operate based on a particular finger and is rendered useless in the hands of an unauthorized user."); *Mathiassen '455* (Ex. 1034)*,* 6:33-38 (describing the fingerprint sensor of the system "To provide combined user authentication by finger print biometrics, accurate cursor control and fast, versatile and flexible text input, all served by the very same single-button sensor"). Thus, invoking various functions based on a series of inputs of a user's single fingerprint was well-known to be included in biometric authorization systems prior to August 13, 2003.

### E.    Providing Different Types of Access

64.    Systems for providing secure access not only considered situations where a user was requesting access alone, but also coercive scenarios where an intruder or assailant was forcing a user to access a secure item. *Hoffman* (Ex. 1035)*,*

5:62-65 (disclosing the need for access systems that "affords an authorized user the ability to alert authorities that a third party is coercing the user to request access without the third party being aware that an alert has been generated"). For example, *Hoffman* teaches a biometric system that includes "emergency notification to permit an authorized user to alert authorities an access attempt is coerced." *Hoffman,* Abstract. The system stores different access codes for a single user, with some "recognized by the computer system as the standard access codes, and others which would be recognized as emergency codes." *Hoffman,* 9:21-24. When a user input an emergency code "simultaneously with a user's personal identification code," the system would "activate the emergency alert" and additionally afford limited "access to the requested secured computer system" to prevent the assailant or intruder from "knowing that an emergency notification had been entered by the user." *Hoffman,* 9:24-35. Separately, *Brown* disclosed a vehicle security system that allowed a user to enter their vehicle when "the duress code has been entered" but additionally "triggers a process by which authorities are notified and the location of the vehicle may be provided," with such code being a non-biometric number input. *Brown* (Ex. 1036), Abstract, 3:3-13 ("…the predetermined option codes may include: '0' to indicate no duress; and '1' through '9' to indicate duress" when entered with "the unique identification number"). *Brown's* vehicle security system "disabled" the

vehicle either after a "pre-determined amount of time passing or a pre-determined distance driven" when receiving a duress indication from a user input. *Id.*

65.    *Zingher* teaches a system that determines "whether the biometric information represents a normal identification or a duress identification" and if it indicates duress, initiates "an emergency response, such as (for example) triggering a silent alarm." *Zingher* (Ex. 1037)*,* Abstract. Specifically, *Zingher's* system addressed the "need for the discreet identification of a duress transaction and the discreet notification of authorities that a crime is being committed at an ATM where biometrics are used to confirm the identity of a user." *Zingher,* [0010]. *Zingher's* system recognized a user is in duress when a different fingerprint corresponding to the duress identification information is input to provide access. *Zingher,* [0014] ("However, by using a different finger, the ATM may also make a positive identification of a customer and instruct the system to trigger an alarm sequence without alerting a criminal that the transaction has been identified as a duress transaction.").

66.    *Zingher* additionally disclosed the system for "discreetly identifying and signaling a user's duress" at other "biometric identification" sites, including "an automobile." *Zingher,* [0011]. Thus, it was also known prior to August 13, 2003, that vehicle security systems including biometric authorization also benefited from recognizing when a user was under coercion, such as that taught by *Kim. Kim* taught

a "multiway control system for replacing conventional keyset with user's identification data," which included a "data input means" that comprised, as an example, "a finger print scanner." *Kim* (Ex. 1015)*, [0031, 0032]. In an embodiment where the system is used "for a vehicle," users enrolled "personal identification data" for both a normal driving situation and an emergency. *Kim,* [0045, 0047]. The user may then provide emergency data when an intruder is coercing them, which then signals the multiway control system to limit access by driving "the vehicle in a normal manner for 20 seconds only" and then sounds the horn, flashes the blinkers, etc. to alert any nearby persons of the dangerous situation, similar to the pre-determined disablement initiated in *Brown's* vehicle security system, as discussed above. *Kim,* [0048] ("When users are forced to hand over the driving card and or password that was used as "key" to the vehicle to an intruder, the users give a card and or password used for emergency situations."), [0049] ("…the CPU will control the ignition system (209) of vehicle through the control board (206) to drive the vehicle in a normal manner for 20 seconds only, and after 20 seconds, the CPU commences control of all lighting system (213) (e.g. blinking), the horn (212) is accidentally operated, and the door of the trunk compartment (214) is automatically opened.").

67.    Thus, it was known prior to August 13, 2003, that biometric authorization systems providing access implemented different user inputs for indicating when a user was under coercion or duress from a third party.

68.    Additionally, systems for providing access also implemented more stringent security measures when an unauthorized user requested entry, such as sounding alarms alerting authorities. *Colmenarez* (Ex. 1039), 1:51-52, 1:59-62 (disclosing a system for "activating a vehicle mechanism using biometrics", with the vehicle only "activated" via face recognition of an authorized user), 7:14-17 ("For example, a short sound of a buzzer may indicate that the person whose identification has been attempted is not authorized to activate any of the vehicle mechanisms."). Other systems simply denied access to unauthorized users when their presented fingerprint did not provide a match with stored biometric signatures. *Hamid* (Ex. 1019), 8:16-18 ("If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted."); *Hsu* (Ex. 1040), 8:50-53 ("In any event, when all permissible fingerprint reference data have been checked, as determined in decision block 130, access will be denied.").

69.    Other secure access systems even issued security alerts or alarms when an unauthorized user attempted entry, such as *Mochida's* vehicle security system. *Mochida's* vehicle security system produced "an alarm signal in response to door opening when the theft preventive system is in the door-lock position." *Mochida*

(Ex. 1040), 1:35-43. In the system, an automotive keyless entry system contains the "theft preventive system," which includes a "push-button-type function key for operating a door-lock mechanism for locking a vehicle door." *Mochida,* 1:44-49. When the door is opened while the car is in a "door-locking condition," an alarm circuit produces "an alarm signal." *Mochida,* 1:53-56. Vehicle security systems for alerting when an unauthorized user attempted entry, especially in dangerous situations, were commercially available at least as early as 2000, with the K-9 Car Alarm providing a "remote panic operation" where "Should it be needed in a threatening situation, the system can be activated remotely by using the transmitter" to sound sirens and flash parking lights, while concurrently locking the vehicle's doors to keep any carjacker or thief from entering the vehicle. *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041) at 7 ("Upon activating panic: The siren sounds and parking lights flash." And "the vehicle's doors will lock.")

70.     Alerting security of potential unauthorized access was also implemented in biometric authorization systems, such as that disclosed by *Hsu. Hsu* disclosed an "exterior fingerprint sensor 14" attached to a car that was used to "unlock the car and to disable a security system 36." *Hsu* (Ex. 1040), 4:65-67. The "security system 36" shown in Fig 5., when enabled, included activating an alarm as well as a "call for help" feature. *Hsu,* Fig. 5.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705



*Hsu,* Fig. 5. *Bostrom* also disclosed a "biometric access control" apparatus for opening "a door, gate or the like of the entrance." *Bostrom* (Ex. 1042)*,* Abstract. *Bostrom's* apparatus "compares" a "fingerprint scan" with "fingerprint parameters in templates stored in memory device 64", and if no match was found, the person was "not granted access." *Bostrom,* 10:23-26, 10:33-36, 10:41-43 ("If the fingerprint parameters do not correspond to the template, the person is not identified in step G, is not authorized, and thus is not granted access."). Additionally, when a person was not granted access, "an alarm can be sounded" or "proper personnel can be notified." *Bostrom,* 10:43-46. *Maloney* disclosed a system using identification via a "biometric identification unit 26" for "scanning a selected unique biometric feature of users who request access to the system", which "may take the form of a fingerprint reader," among other biometric sensors. *Maloney* (Ex. 1043)*,* 6:42-48. When "biometric data extracted from the user" did not match with any biometrics in "a stored biometric

identification database", then the user was not provided "access to the system." *Maloney*, 7:57-63. When an unauthorized user requested access, "appropriate alarms may be generated and security personnel notified of the attempted unauthorized access." *Maloney*, 8:1-3.

71.   Thus, biometric authorization systems were well-known to include several types of access depending on the conditions under which a person tried to authorize themselves prior to August 13, 2003.

72.   Accordingly, the solutions of the prior art had already developed the various features discussed above prior to August 13, 2003, including biometric authorization, transmitting wireless secure access signals, inputting a series of fingerprints to invoke different functions or commands, and providing different types of access to a controlled item. A POSITA would have been well aware of the above-described state of the art as of August 13, 2003.

## V.   OPINIONS REGARDING THE '705 PATENT AND PRIOR ART

73.   I have been asked to review and provide my opinion as to unpatentability of at least some of the Challenged Claims of the '705 Patent. In my opinion, the below-discussed combinations of references teach or at least render obvious each of the Challenged Claims of the '705 Patent. A summary of the mappings from each of these references to the claim language of the '705 Patent is provided below for reference as Appendix A.

## A.    Description of the Alleged Invention of the '705 Patent

74.    I have reviewed the '705 Patent (Ex. 1001). Descriptions of the system and method of the '705 Patent that may be pertinent to my analysis are provided herein, and my descriptions are intended only as a summary of the patent and/or intended as being pertinent to the Challenged Claims of the '705 Patent. My opinions provided herein are not intended as a discussion of my entire understanding of the '705 Patent.

75.    The ' 705 Patent describes a method and system for "providing secure access to a controlled item." *' 705 Patent,* Abstract, 14:28-29 (stating the ' 705 Patent discloses "secure access methods"). The "controlled item 111 can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer (PC) that is to be accessed by the user 101." *Id.* at 6:17-20. Thus, the '705 Patent generally describes a system for providing secure access to either a physical lock (i.e., "door locking mechanism") or an electronic lock (i.e., "electronic key circuit" in a computer). *Id.* at 16:21-23.

76.    The system comprises two subsystems: a "transmitter sub-system 116" and a "receiver sub-system 117." The transmitter sub-system includes a user identity database 105 and a code entry module 103 that contains a biometric sensor 121. *Id.* at 5:57-60. This database 105 stores biometric signatures. *Id.* at 7:15-16. The biometric sensor 121 may be "a fingerprint sensor," in which case any "request 102"

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

for access "takes the form of a thumb press" on the sensor. *Id.* at 5:56-57, 60-63. The transmitter sub-system also includes a controller/transmitter 107 that sends an "access signal" to the controller 109 in the receiver sub-system 117. *Id.* at 6:6-9, 6:20-21 (noting the "controller 109 contains a receiver 118 that receives the transmitted access signal 108"). The receiver sub-system 117 also includes a database 115 of rolling codes and is in communication with the controlled item 111. *Id.* at 6:11-14, 6:17-20. Figure 2 below illustrates the components of the transmitter and receiver sub-systems.



Fig. 2

*Id.* at Fig. 2.

77. The main purpose of the secure access system is to prevent unauthorized use of a system through the application of "wireless transmission of

security code information." *Id.* at 1:14-16, 1:57-67 (describing the problem to be addressed to strengthen the security of a wireless signal to keep the access signal from being "deciphered, replayed in order" for an unauthorized user to "gain the access which rightfully belongs to" an authorized user). To strengthen the security of the access signal, the secure access system sends access signals over a wireless connection employing rolling codes, which "provide a substantially non-replayable non-repeatable and encrypted radio frequency data communications scheme for secure messaging." *Id.* at 6:39-41. The codes are different "each time the transmission of the access signal 108 occurs." *Id.* at 6:47-53. This variation of the code for each transmission then results "in a non-repeatable data transfer" that "significantly reduces the likelihood that an intruder can access the information replay the information to thereby gain entry…." *Id.* at 6:56-60.

78.    The system provides secure access to the controlled item as discussed below. The biometric sensor 121 receives a request from a user, such as a "thumb press on the biometric sensor panel 121." *Id.* at 5:65-67. This "thumb press" is also described as a "biometric signal." *Id.* at 8:6-10 (disclosing "the biometric sensor 121 in the code entry module 103 checks whether a biometric signal 102 is being received"), 1:29-30 (describing "One example of a biometric signal is a fingerprint"). The "processor module 107" or controller 107 then "compares the received biometric signal 102" to signatures in the biometric signature database 105.

*Id.* at 8:14-17, 14:27-37 (stating that "the method steps for providing secure access," such as the steps in Figs. 3-4 and 6-9, "are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117"). If the comparison "yields the desired authentication," or in other words, "the user 101 is authenticated successfully," then the controller 107 updates the rolling code and sends it as a secure access signal to the controller 109 of the receiver sub-system. *Id.* at 6:4-10.

79. Specifically, this authentication occurs via the matching of the biometric signal to a biometric signature in the database 105 to "produce[s] an accessibility attribute," which "establishes whether and under which conditions access to the controlled item 111 should be granted to a user." *Id.* at 8:24-28. Examples of accessibility attributes provided include granting unconditional access, granting access while also activating an alert (referred to as duress access), and alerting that an unauthorized user is trying to gain access. *Id.* at 8:28-35. The controller 107 includes this accessibility attribute in the access signal to the receiver sub-system controller 109. *Id.* at 8:43-45. When the controller 109 (containing a receiver) receives the access signal, the controller 109 checks if the rolling code in the signal matches the "reference code in the database 115." *Id.* at 9:6–11. If the received code matches the reference code, "the controller 109 send the control signal

110 to the controlled item 111 (for example opening the secured door)." *Id.* at 9:11-18.

80.     The '705 Patent also describes a process by which a user is enrolled in the system, such that their biometric signature is stored in the biometric signature database 105 in the transmitter sub-system 116. The process is initiated when an "administrator" provides a "succession of finger presses to the biometric sensor 121," each of a certain duration and the succession including an "appropriate quantity" of presses. *Id.* at 10:56-60. The controller 107 then checks the "control information," or successive presses, "against a stored set of legal control signals." *Id.* at 10:65-67. The '705 Patent describes an example of such control signal being to "Enrol an ordinary user." 11:1-3.

## B.     Opinions Regarding *Mathiassen*

81.     I have been informed that U.S. Patent Application Publication No. 2004/0123113 to Mathiassen et al. ("*Mathiassen*" or "Ex. 1004*")* is prior art to the '705 Patent. I have reviewed *Mathiassen* and provide herein my opinions on the teachings of *Mathiassen*. The opinions provided herein do not necessarily represent my entire understanding of *Mathiassen*.

82.     *Mathiassen* teaches a method for "providing secured access control" using "a portable or embedded access device…for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g., a computer

terminal, an internet bank or a corporate or government intranet." *Mathiassen,* Abstract. Additionally, *Mathiassen's* secure access system may provide "access control" to "stand-alone applications, or applications within a local network e.g. within a car," as well as stand-alone applications not in a network including access to a hotel safe and medicine cabinet, among others. *Mathiassen* (Ex. 1004)*,* [0108-0113].

83.    The "core of the device of the invention" is an integrated circuit (IC) 1 that contains several hardware blocks including an Image Capture and pre-processing block 5C, a secure key generation (SKG) block, an encryption block, as well as a central processor 2 and non-volatile memory. *Mathiassen,* [0049-0050]. The IC 1 also connects with a fingerprint sensor 5. *Mathiassen,* [0050]. The figure below illustrates the components of the IC 1.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705



*Mathiassen,* FIG. 2b.

84.    The method of providing secure access control using the IC 1 is outlined in *Mathiassen* in various different embodiments, including both networked and stand-alone embodiments. One such embodiment is a "central locking system" that acts as a "key to the doors of the car." *Mathiassen* (Ex. 1004)*,* [0145]. The system for providing central locking access includes a portable door control 20 that "contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1)" and includes a transceiver 27. *Mathiassen,* [0147]. Figure 8 below depicts the portable door control and its various components.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705



Figure 8

*Mathiassen,* Fig. 8. The central locking system also includes an "embedded ignition control (15)" and "central car computer." *Mathiassen,* [0148-0149]. The portable door control connects to the central car computer via its transceiver 27 while the ignition control 15 connects to the central car computer through hard wires. *Mathiassen,* [0149]. The secure access control provided by the portable door control 20 is to the car door locks. *Mathiassen* (Ex. 1004), [0187].

85.    Using the central locking embodiment, the method of providing secure access control starts by the car user or owner presenting their fingerprint on the fingerprint sensor 5 of the portable door control 20. *Mathiassen,* [0175-0176]. The pre-processing block 5C and processor 2 comprised in the IC 1 of the portable door control 20 then work together to reduce the received fingerprint images to "access

minutiae," which are then compared with pre-stored master minutiae tables in the non-volatile memory of the IC 1. *Mathiassen,* [0178-0180]. If the processor 2 determines a match through the comparison, then it feeds a seed to the SKG block (8A), which "will generate a valid, and temporary, password that will be input to the encryption block (8B or 8C)." *Mathiassen,* [0182-0184]. The processor then issues an "open door" command to the encryption block, which encrypts the command based on the temporary password. *Mathiassen,* [0185]. The transceiver 27 of the portable door control then wirelessly transmits the encrypted "open door" command to the embedded ignition control or the central car computer for decryption and authentication. *Mathiassen,* [0186-0188]. If the processor 2 of the IC 1 resident on the ignition control determines the decrypted message is "a valid and authenticated 'open door' command," then the command is relayed to the door locks. *Mathiassen,* [0187].

86.    *Mathiassen* also teaches the secure access control system implementing an enrollment process where minutiae (i.e., fingerprint representations) of a user generate master minutiae tables that are stored in non-volatile memory of the IC 1. *Mathiassen,* [0164], [0050] (disclosing a "captured fingerprint image" is reduced "to compact fingerprint representations, called minutiae"). Additionally, *Mathiassen* teaches commands other than "open door" may be implemented in the secure access control system by a user providing certain finger movements. *Mathiassen,* [0192].

87.    A POSITA would have understood *Mathiassen* is in the same field of invention as the '705 Patent, namely secure access systems. *Compare '705 Patent* (Ex. 1001), 1:14-16 ("The present invention relates to **secure access systems**…"), *with Mathiassen* (Ex. 1004)*,* [0023] ("It is yet a further object of the invention to provide a method of improved **secure access control…**"), Abstract ("A portable or embedded access device is provided for…**allowing only authorized users access**…"). Furthermore, the secure access systems of *Mathiassen* and the '705 Patent similarly provide this access by receiving a biometric, comparing it to stored representations of authorized user's biometrics, and then outputting a signal to provide a user access to a physical door or electronic lock if a match is found. *Compare '705 Patent*, 5:65-6:18 (generally describing receiving a user's thumbprint request, comparing it against signatures in a biometric database, and sending out a signal to "a door locking mechanism on a secure door"), *with Mathiassen,* [0175-0187] (generally disclosing receiving a user's swipe of a fingerprint, comparing it against stored fingerprint representations, and sending out a command to open door locks).

88.    Additionally, both *Mathiassen* and the '705 Patent secure access systems provide a similar advantage, in that they make the wireless access signal secure by encrypting a non-repeatable, non-replayable signal. *Compare '705 Patent,* 6:47-60 (describing the rolling code as non-repeatable and encrypted), *with*

*Mathiassen,* [0184-0185] (disclosing the encryption block encrypting the command "based on the valid, and temporary password" generated at the SKG block). In fact, *Mathiassen* teaches the password used for encrypting this command "**changes for every transaction**," similar to the '705 Patent using a "different code variant each time" the access signal is transmitted. *Mathiassen,* [0050]; *'705 Patent*, 6:47-48. Thus, a POSITA would have understood that *Mathiassen's* secure access control system is in the same field of endeavor and solves the same problem as the system described in the '705 Patent.

### C. Opinions Regarding *McKeeth*

89. I have been informed that U.S. Patent No. 6,766,456 to *McKeeth* ("*McKeeth*" or "Ex. 1005") is prior art to the '705 Patent. I have reviewed *McKeeth* and provide herein my opinions on the teachings of *McKeeth*. The opinions provided herein do not necessarily represent my entire understanding of *McKeeth*.

90. *McKeeth* generally teaches a "method and system for authenticating a user to access a computer system." *McKeeth* (Ex. 1005)*,* Abstract. The computer system 100 may include "an optical scanner," where the "user may scan his/her fingerprint or other physical feature such as the retina into the computer system 100 for authentication." *McKeeth,* 3:8-10. *McKeeth* also teaches the user providing his fingerprint to be scanned "from an optical scanner" while concurrently providing a specific pattern of movement. *McKeeth,* 3:12-16, 19-24. The user may not be granted

access to the computer system until the correct input is applied. *McKeeth,* 3:24-28, *see also* 38-42 ("…the computer system 100 may be configured to recognize and accept for processing input signals (e.g., password) that occur within a predetermined duration of time from other input signals (e.g., fingerprint scan or pattern)").

91.    To provide access to the computer system 100, "the user performs a fingerprint scan and/or pattern within the designated time" that is then compared with stored fingerprint information "for recognition by the computer system 100." *McKeeth,* 3:52-65. If a match is found, then the user is provided access to the computer system 100. *McKeeth,* 3:65-4:2. *McKeeth* also teaches that if the geometric pattern concurrently input with the fingerprint scan is not the correct pattern, the computer system recognizes that the user "is experiencing duress or force to access the computer system 100." *McKeeth* (Ex. 1005)*,* 4:10-14, 19-23. The computer system 100 then provides access (though limited) when recognizing a user is under duress and "concurrently with the limited access, a silent security alert may be issued to security personnel." *McKeeth,* 4:33-36, 4:39-41. *McKeeth* additionally teaches, in another configuration, that if the computer system 100 determines the input does not match, the system 100 may "lock up the computer system 100 and generate a security alert to the responsible authorities," thus denying user access and issuing a security alert. *McKeeth,* 5:48-53.

92.    A POSITA would have understood *McKeeth's* access system to be in the same field of endeavor as the '705 Patent. For example, *McKeeth's* system authenticates "a user to access a computer system." *McKeeth,* Abstract. Similarly, the access system of the '705 Patent provides an authenticated user access a personal computer. *'705 Patent* (Ex. 1001)*,* 6:2-17 (generally describing only providing access to the controlled item when the user is authenticated), 6:17-20 (stating controlled item may be a computer), *see also* Abstract (describing the system "for providing secure access to a controlled item.") Additionally, the process of authenticating a user in both *McKeeth* and the '705 Patent requires receiving a request via fingerprint, comparing the fingerprint to stored biometric information, and determining a match. *McKeeth,* 3:52-4:2 (generally describing a user is authenticated and provided access when the presented fingerprint matches with a stored fingerprint); *'705 Patent*, 5:65-6:2 (describing authenticating the user by comparing the presented thumb press with stored biometric signatures).

93.    Additionally, *McKeeth* and the '705 Patent both provide similar advantages by allowing different types of access to the "controlled item," such as when a user indicates they are in a duress situation as opposed to providing normal access. *McKeeth,* 4:29-36 (disclosing the computer system 100 may recognize "that while the user may be legitimate," their input "may be an indication that the user is experiencing duress or force…."), 4:39-41 (when the computer system 100

recognized the user is under duress it grants access, even though its limited, and issues a silent alert to authorities); *'705 Patent*, 8:31-32 (describing the access system may grant access "but with activation of an alert tone to advise authorities of the duress situation."), 11:45-50 (describing that the user's input may indicate they are under duress or coercion). Both systems also deny access and issue an alert when an unauthorized user attempts to access the system. *McKeeth*, 5:48-53 (teaching that if the user input does not match any "stored pattern," then the system denies access by locking up the computer system 100 and generating "a security alert"), *see also* 6:59-62 (stating that the "computer 100 applies a stringent authentication process and issues security alerts in the event of an absent or incorrect pattern signal."); *'705 Patent,* 8:33-35 (describing the access system "sounding a chime indicating that an unauthorized, but not necessarily hostile, person is seeking access…"), *see also* 12:25-27, 30-33 (generally describing when a user's input does not match any stored biometric, access is denied and an alert tone is sounded "to alert personnel in the vicinity…that an unauthorized user is attempting to gain access…"). Thus, a POSITA would have understood that *McKeeth* is both in the same field of endeavor and provides similar advantages to access systems as the '705 Patent.

### D. Opinions Regarding *Anderson*

94. I have been informed that U.S. Patent No. 6,509,847 to *Anderson* ("*Anderson*" or "Ex. 1006") is prior art to the '705 Patent. I have reviewed *Anderson*

and provide herein my opinions on the teachings of *Anderson*. The opinions provided herein do not necessarily represent my entire understanding of *Anderson*.

95.    *Anderson* teaches "a method for inputting an access code" so a user may gain access to certain functions in an information handling system. *Anderson* (Ex. 1006)*,* Abstract, 2:14-26 ("…the code may be used to enable a function" in an information handling system). A user gains access by "comparing the generated code with a stored code template" and providing access to information system functions if the comparison results in a match. *Anderson,* 2:10-15.

96.    *Anderson's* method of inputting an access code uses a "digitizer pad 120 as a touch interface," which may "include an optical scanner or thermal sensor for collecting an image of the user's fingerprint…." *Anderson,* 5:43-44, 7:4-7. The user then enters the access code "as a series of pressure pulses having varying durations." *Anderson,* 6:45-47. This fingerprint access code is then compared with the "stored code template" to determine a "match" to enable the desired function. *Anderson,* 6:48-54. *Anderson* teaches two different access code applications: one where both the pressure of each press and the duration of each press is detected (Fig. 4A), and another where only the duration of each press is detected (Fig. 4B). *Anderson,* 7:28-39. *Anderson* discloses that in the second option, the "access code would be entered as a series of alternating pressure applications of varying duration" where the touch interface "may only sense temporal applications of pressure" and

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

"not detect variations in pressure magnitude or intensity." *Anderson,* 7:28-34. In contrast, in the first "the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity." *Anderson,* 7:34-37.

97.    Figures 4A and 4B below show the touch interface detecting both the duration and pressure applied with each press (FIG. 4B), or the touch interface detecting only the duration of each press (FIG. 4A).



FIG. 4A



FIG. 4B

*Anderson,* FIGs. 4A and 4B. Below, I have annotated the figures to provide further context. In FIG. 4A, the height of each bar is the same because the magnitude or intensity of the finger pressure press is not detected. However, at least some of the presses have a different duration than other presses, as represented by the width of each bar.



FIG. 4A

98.    In contrast, FIG. 4B illustrates variations in both the amount of pressure applied using the height of each bar and the duration of the applied pressure using the width of each bar.



FIG. 4B

*Anderson*, FIG. 4A, FIG. 4B (illustrating variations in both pressure magnitude and duration), 7:34-39, 7:11-27.

99.    A POSITA would have understood *Anderson* and the '705 Patent describe methods pertaining to the same field of endeavor, namely providing authorized users with access. *Anderson* (Ex. 1006), Abstract ("The method facilitates the input of access codes" to allow only authorized users to gain access "to a system or function"); *'705 Patent* (Ex. 1001), 3:12-14 ("a method for providing secure access…."). Furthermore, both *Anderson* and the '705 Patent employ a

biometric sensor that the user uses to provide an input in order to gain access. *Anderson*, 7:4-11 (disclosing the digitizer pad on the touch interface "may include an optical scanner…for **collecting an image of the user's fingerprint** as the pressure access code is entered and **verified against a stored fingerprint template**. Verification of both the collected fingerprint image and the access code may then be required before the **user is allowed access to the system or information**."); *'705 Patent,* 5:60-6:2 (describing the biometric sensor 121 may be "a fingerprint sensor" and a user requests access via "a thumb press on the biometric sensor panel 121"). Both *Anderson* and the '705 Patent are also concerned with providing a user with improved security when accessing a computer. *Anderson,* 1:65-2:3 (disclosing the method of inputting the access code is used to "reduce the possibility that the access code may be stolen and used for unauthorized access to a system or information by undesired third parties," with such a system being an "information handling system"); *'705 Patent*, 1:57-67 (generally describing the problem to be solved as keeping unauthorized users from easily obtaining access), *see also* 6:17-20 (describing such access may be provided to "a personal computer (PC) that is to be accessed by the user 101").

100. Additionally, similar to the '705 Patent describing inputting a series of "successive presses…of appropriate duration" to control the device, *Anderson* teaches inputting a series of pressure applications of varying durations to invoke

certain functions within the information handling-system. *'705 Patent,* 10:56-67; *Anderson,* 6:45-54. Thus, a POSITA would have understood *Anderson's* method to be in the same field of endeavor and provide similar advantages as the '705 Patent.

### E.    Brief Overview of the Opinions on the '705 Patent

101.    The following sections provide my detailed opinions on the '705 Patent and the respective claims mappings presented in the concurrently-filed '705 Petition.

102.    The independent claims of the '705 Patent generally comprise three concepts combined into a single access system or method of providing access: (1) storing a user's fingerprints in a database when an instruction formed by a series of fingerprints (of a certain number and each of certain duration) is received; (2) generating and transmitting a secure access signal; and (3) providing access based on the information contained in the secure access signal. Additionally, to perform these steps, the specification of the '705 Patent describes hardware, such as a transmitter, receiver, processor/controller, and biometric sensor, as well as certain security protocols to make the access signal "secure," such as Bluetooth or rolling code. These hardware components and wireless security protocols for performing such steps were well-known, developed, and documented prior to the priority date of the '705 Patent, as discussed above in my Background of the Technology Section.

103.    As I discuss below, each of these concepts and technologies was known in the art. *Mathiassen*, for example, teaches a secure access system comprising a

central IC 1 connected to a fingerprint sensor 5 that includes a processor 2 as well as other components for encrypting an access signal using a changing password to make the signal secure. *Mathiassen* (Ex. 1004), [0050]. In one embodiment, the secure access system is a "central locking system" with an IC 1 contained in a remote portable door control 20, which transmits a secure access signal to "open (or lock) the car doors." *Mathiassen,* [0145], [0176-0188]. *McKeeth* teaches signaling other conditions of access in a biometric access system, such as providing access but issuing a silent alert when recognizing a user is under duress or denying access and issuing a security alert to authorities. *McKeeth* (Ex. 1005), 4:28-42 (disclosing duress condition), 5:48-53 (disclosing alert condition). As I discuss in detail for the individual limitations, a POSITA would have found it obvious and been motivated to combine the teachings of *McKeeth* into the system of *Mathiassen* to result in increased safety of the user and higher levels of security than is taught by *Mathiassen* alone.

104. Furthermore, the portable door control 20 of *Mathiassen* also senses finger movements or sequences of touch/no touch to instruct certain commands to operate the system. *Mathiassen,* [0192]. *Anderson* teaches providing an access code comprising a series of presses of a particular duration on a fingerprint sensor to authorize the user and invoke a certain function. *Anderson* (Ex. 1006), 7:4-11, 7:28-34, 7:40-47. As I discuss in detail for the individual limitations, a POSITA would

have found it obvious and been motivated to combine the teachings of *Anderson* into *Mathiassen* to result in easier and simpler user command input on the sensor of the portable door control taught by *Mathiassen.*

105. Additionally, *Mathiassen* teaches storing new users' fingerprints on the portable door control 20 by an administrator (or car owner) placing their finger on the sensor to initiate enrollment. *Mathiassen,* [0163-0166], [0190], [0131] (disclosing enrolling new users via input of an administrator's fingerprint in a different medicine cabinet embodiment). A POSITA would have found it obvious, upon these teachings, to enroll a new user in the portable door control 20 of the combined *Mathiassen-Anderson* system based on a series of pressure pulses correlating to an instruction to enroll.

106. Notably, each of the references discussed above is directed to a biometric access system for authorizing access of a user when providing a fingerprint, leading a POSITA to a conclusion that the references would have been appropriate and beneficial for combination, with a reasonable expectation of success. *Mathiassen* (Ex. 1004)*,* [0018]; *McKeeth* (Ex. 1005)*,* Abstract, 3:8-10; *Anderson* (Ex. 1006)*,* 7:4-11.

107. A detailed discussion of my opinions is in the following sections. A summary of the mappings for each of these references to the claim language of the '705 Patent is provided in Appendix C. These appendices are not intended to be

exhaustive and merely provide an overview or summary of the sections of the respective references teaching the respective claim limitations.

## VI.    OVERVIEW OF *MATHIASSEN'S* ARCHITECTURE

108.    *Mathiassen* teaches an integrated circuit (IC) serves as the "core device" of the secure access system invention. *Mathiassen,* [0048]. The IC 1 contains a processor 2 that executes "program code, e.g., administrative software" stored in the non-volatile memory 7/7A of the IC. *Mathiassen,* [0050] (describing the "administrative software, stored in the non-volatile memory (7, 7A or 7C) and **run on the central processor (2).**") Algorithms are included in the administrative software for providing secure access. For example, *Mathiassen* teaches a matching algorithm as a "subset" of the administrative software. *Mathiassen,* [0072]. Additionally, *Mathiassen* teaches the administrative software including an SKG algorithm. *Mathiassen,* [0076]. *Mathiassen* teaches other software, such as movement analyzing and translation software that are additionally executed to provide secure access. *Mathiassen,* [0192]. A POSITA would have understood the movement analyzing and translation software are executed by processor 2 because *Mathiassen* already teaches other software, namely administrative software, is executed by such processor. Additionally, *Mathiassen* only teaches one processor 2 residing on IC that "runs" software. *Mathiassen,* [0050]. Thus, for the "core device" of the secure access system to perform the functions of the movement analyzing and

translation software, a POSITA would have understood these software are executed by processor 2.

109. The '705 Patent interchangeably uses the terms "controller" and "processor" in describing the claimed invention. *See, e.g., comparing '705 Patent* (Ex. 1001) 14:33-37 ("…**the method steps for providing secure access are effected by instructions in the software that are carried out under direction of the respective processor modules 107 and 109 in the transmitter and receiver sub-systems 116 and 117.**") to 14:53-57 ("The computer system 100' is formed, having regard to the transmitter sub-system 116, by the **controller module 107**….") or 6:6-7 and 6:4 (referring to element 107 as "controller 107" or "controller/transmitter 107", respectively). Additionally, the '705 Patent describes the "**controller module 107** typically **includes at least one processor unit 1005.**" 15:6-9, Fig. 10.

110. Because the inventor themselves used a "processor" and "controller" to describe the same element and because it was well known that both controllers and processors are capable of executing "instructions in the software" described to provide secure access within the '705 Patent, a POSITA would have understood processors to be functionally equivalent to the disclosed controllers of the '705 Patent, including controller 107 and 109. Additionally, the '705 Patent mainly describes the controllers 107 and 109 in terms of their functions performed. Such

functions generally include executing the software containing instructions to perform the processes "of FIGS. 3-4, and 6-9." *'705 Patent,* 14:27-37. Some of the steps in FIGs. 3-4 include matching a received biometric signal to a signature in a database, outputting an attribute regarding a user's requested access, comparing the code of the secure access signal to a reference code in a database, and sending a control signal to provide access to a user. *'705 Patent*, 8:6-26, 8:43-45, 67-9:18. As a specific example of some functions carried out, the controller 107 (i.e., controller/transmitter 107) updates a rolling code in the secure access signal and the controller 109 compares this code to a reference code in a database and, if they match, sends a control signal to the physical lock or electronic lock to provide a user with access dependent on a produced accessibility attribute. *'705 Patent,* 6:2-9. These types of processes, which are described to be "implemented by software, such as application program modules," were well known to be carried out by either controllers/processors at the time of the '705 Patent. *'705 Patent,* 14:27-36. In fact, the '705 Patent supports such by referring to the same elements for executing this software or programs as a "controller module" or "processor module." *'705 Patent,* 14:27-36, 53-57.

111. Therefore, it is my opinion a POSITA would have understood any claimed functions being carried out by the controller 107 or controller 109 may equivalently be carried out by a processor, and thus a processor may equivalently

serve as the claimed "controller." Thus, a POSITA would have understood such controller is satisfied by *Mathiassen's* processor for the reasons provided above. I rely on this discussion in Section VII below for each claimed "controller" so as not to repeat myself.

## VII. GROUND 1: OPINIONS REGARDING THE COMBINATION OF *MATHIASSEN*, *MCKEETH*, AND *ANDERSON*

### A. Claim 1

#### 1. Claim 1(Pre): "A system for providing secure access to a controlled item, the system comprising:"

112.  *Mathiassen* expressly teaches a "portable access device…for allowing **only authorized users access to**, an access-limited apparatus, device, network or system…." *Mathiassen,* [0016], Abstract. Examples of such "access-limited apparatus" disclosed in *Mathiassen* include a USB[0054] or PCMCIA [0054]. Additionally, *Mathiassen* teaches providing access to stand-alone devices, such as hotel safes, medicine cabinets, and automobiles among others. *Mathiassen,* [0108-0113]. Specifically, *Mathiassen* discloses a portable remote door control 20 for unlocking car doors as part of a vehicle security system. *Mathiassen,* [0145], [0147], claim 23. The listed "stand-alone appliances" are some of the "access-limited" devices disclosed in *Mathiassen,* with each access-limited item disclosed being a "controlled item," as claimed, because "only authorized users" may access them. *Mathiassen,* [0047].

113. *Mathiassen's* portable access device thus provides "secure access control" to these items because the access is controlled or otherwise secured, such that only authorized persons are granted access. *Mathiassen,* [0047]. *Mathiassen* aims to improve security in certain embodiments such as "car systems for the automotive industry," where "secure access by blocking non-authorized users access to the car" is emphasized. *Mathiassen,* [0145]. *Mathiassen's* secure access control system also provides the benefit of improved security because "the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some token." *Mathiassen,* [0190]. In this way, if the "portable access device" is lost, an individual who finds the item cannot easily access the item (i.e., car). Additionally, the access provided "does not require a transfer of biometrics fingerprint information over otherwise open and insecure parts of communications systems." *Mathiassen,* [0020]. Based on these collective teachings, it is my opinion *Mathiassen* teaches "a system for providing secure access to a controlled item," as claimed.

114. *Mathiassen* teaches a "system," as claimed, for providing such a method of "secure access control" that comprises several components. *Mathiassen,* Abstract. Generally, control of each "access-limited" device occurs via an integrated circuit (IC) 1, with this component being "the core device of the invention." *Mathiassen,* [0048]. The IC 1 connects to a "biometrics sensor in the form of a

fingerprint sensor (5)" to perform the method of secure access control. *Mathiassen,* [0049-0051], FIGs. 2A-2B. This disclosed IC with connection to fingerprint sensor 5 is the same IC 1 residing in the portable door control 20 implemented in the vehicle security embodiment, as *Mathiassen* teaches the same IC being used in each of the disclosed embodiments. *Mathiassen,* [0048] (referring to IC 1 being a core device "of the invention"). The IC 1 includes a central processor 2 and non-volatile memory 7,7A,7E as well as an additional pre-processing block 5C for processing images from the fingerprint sensor and "hardware blocks (8 or 8B or 8C)" for encrypting transactions to generate "secure communication between the IC (1) and a network server (30)." *Mathiassen,* [0049-0050]. *Mathiassen* notes that the IC 1 is "designed as a multi-purpose tool that can service a fingerprint sensor (5) in a stand-alone mode," with such stand-alone applications including "applications within a local network e.g. within a car." *Mathiassen,* [0051], [0108].

115. One such stand-alone application taught by *Mathiassen* is the portable door control 20 used in a system providing vehicle security. *Mathiassen,* [0145, 0147]. In this embodiment, the system includes the IC 1 connected to the fingerprint sensor 5 and additionally connected to a "wireless 2-way transceiver (27)," all housed inside the portable control 20. *Mathiassen,* [0147]. Figure 8 below illustrates the components of the portable door control 20.



*Mathiassen,* Fig. 8.

116.    The system also contains an ignition control 15 with its own IC 1 residing in the gear stick 71 or steering wheel 72 of the car. *Mathiassen,* [0148], [0187] (describing the "resident IC 1" on the ignition control 15). Both the ignition control 15 and portable control 20 are connected to a central car computer, with the ignition control 15 connected via hard wires and the portable door control 20 connected via transceivers in the central car computer and the portable door control 20. *Mathiassen,* [0149], [0186] (describing the central car computer contains transceivers). Additionally, the central car computer contains a transceiver 27 to receive the "open door" command from the portable door control 20 [0186] and "relay" (i.e., transmit) the re-encrypted "open door" command, after performing

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

decryption and authentication, to transceivers on the door locks [0187]. The car door locks are also disclosed as part of this system and contain their own transceivers for communication with the central car computer and portable door control 20. *Mathiassen,* [0186-0187].

117.  As I noted above, *Mathiassen* discloses several embodiments for its access device, including a USB dongle and the portable remote door control 20. My discussion of how *Mathiassen* teaches certain claim elements of present patent primarily relies on *Mathiassen's* vehicle security system embodiment using the portable door control 20. *Mathiassen,* [0145]. In this embodiment, the claimed "controlled item" is each car door lock of the "central locking system," with the portable door control 20 "controlling" this item because it serves as the "keys to the doors of the car," thus controlling access to the car doors. *Id. Mathiassen's* IC 1 is used in all the embodiments of the system, including the car door lock embodiment, because the disclosed portable door control 20 contains the IC 1 that is illustrated in Fig. 2B. *Mathiassen,* [0146] ("**The automotive application of the invention will be explained by reference to FIGS. 2B**, 8 and 9," with FIG. 2B illustrating the IC 1). The mapping for which I provide this opinion additionally relies on other embodiments of *Mathiassen's* secure access control system, and in these cases I provide motivations to combine these internal embodiments into the portable door control 20 embodiment for vehicles.

**2.    Claim 1(a): "a memory comprising a database of biometric signatures;"**

118.    I apply the construction of "database" to mean an "organized structure of data." *See* Section III.B. *Mathiassen* teaches a non-volatile memory 7A/7B of IC 1 where master minutiae tables storing fingerprint representations reside. *Mathiassen* (Ex. 1004), [0050]. As the portable door control 20 contains the IC 1, these master minutiae tables of fingerprint representations are stored in non-volatile memory 7A/7B of the portable door control 20. *Mathiassen,* [0174] (describing the master minutiae tables of the owner's fingerprint are stored in "the IC (1) of both the portable door control (20) and the embedded ignition control (15)"). *Mathiassen* teaches that one or more minutiae tables may be stored for a single user. *Mathiassen,* [0164] (describing "master minutiae tables" being stored when a car owner enrolls "**one or more of his fingers on the portable door control unit (20)**.") The figure below annotates where the non-volatile memory storing the master minutiae tables resides on the IC 1:

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705



*Mathiassen* at FIG. 2B.

119. Specifically, to store fingerprint representations in these master minutiae tables stored in memory 7A/7B, the "image capture and pre-processing block (5C)" of the IC 1 captures images of the user's fingerprint when presented on the sensor and processes "the captured raw images to… intermediate fingerprint data." *Mathiassen,* [0049-0050]. The processor then reduces the intermediate fingerprint data to "compact fingerprint representations, called minutiae," which are then stored in non-volatile memory. *Id.* This same process is applied by the IC 1 in the portable door control 20 when an owner (or other user) enrolls their fingerprints.

*Mathiassen,* [0162-0164] (describing storing a car owner's fingerprint "involves successful capturing of a minimum of images (say three) **reduced to master minutiae tables by the pre-processing block (50C) and the central processor (2) of the IC (1) on the portable device (20),**" with the master minutiae tables "stored in the non-volatile memory (7A) of the IC (1)"), [0190] (disclosing that the owner "may have enrolled" other users in addition to enrolling their own fingerprints on the portable door control 20).

120.    As discussed above at ¶ 40, it was well-known to reduce fingerprints to minutiae data prior to storage and that this minutiae uniquely identified each and every individual by including data indicating the ridge and bifurcation patterns of a person's fingerprint. *See also, Mathiassen* [0050] (describing minutiae as "**distinct points where fingerprint lines (ridges) starts or stops…**"). This minutiae data is unique because every person's fingerprints are unique, as **"no one has ever been found who has a sequence of ridge detail on the hands and feet that is identical to the ridge detail of any other person."** *Advances in Fingerprint Technology,* Second Edition, Henry C. Lee and R.E. Gaensslen, CRC Press, copyright 2001 (Ex. 1012) at 3; *see also, Mathiassen* (Ex. 1004), [0005] (stating **"fingerprints"** were known to serve as **"some sort of secure identification by biometrics"**). Furthermore, stored fingerprint representations were known to be defined as "biometric signatures." *See,* ¶ 41*, specifically, An Introduction to Evaluating*

*Biometric Systems,* P. Jonathan Phillips et al., National Institute of Standards and Technology, IEEE, copyright 2000 (Ex. 1013) at 56 (describing the process of biometric identification via a fingerprint including comparing the newly presented print "**with a database of biometric signatures of known individuals**"). Thus, a POSITA would have understood the minutiae stored in *Mathiassen's* master minutiae tables serves as "biometric signatures," as claimed, because the minutiae identify users via their unique fingerprint representation.

121. Furthermore, the '705 Patent does not further define the term "biometric signatures," except to state that a user's "thumb press on the biometric sensor" authenticates the user by comparing this "request" to the database of biometric signatures. *'705 Patent* (Ex. 1001)*, 5:65-6:2 ("Thus for example if the request 102 is the **thumb press on the biometric sensor** panel 121 **then the user database 105 contains biometric signatures for authorized users against which the request 102 can be authenticated**"). This description of the "biometric signatures" would have additionally led a POSITA to understand these "biometric signatures" included some representation of a user's fingerprint. Thus, a POSITA would have understood *Mathiassen's* master minutiae tables comprise "biometric signatures," namely minutiae, because the minutiae represent users' fingerprints. *Mathiassen* (Ex. 1004)*, [0050] ("Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized **fingerprint**

**representation by compact minutiae tables**, **pre-stored in the non-volatile memory** (7, 7A or 7C).”).

122. A POSITA would have understood these master minutiae tables containing the minutiae (i.e., biometric signatures) and stored in memory 7,7A are a “database,” as claimed, or otherwise renders such obvious. Tables are a well-known “structure” used for organizing data. Thus, when *Mathiassen* discloses master minutiae **tables** containing minutiae (i.e., biometric signatures), a POSITA would have understood or found it obvious that the memory 7A/7B comprises such master minutiae tables that are a database of biometric signatures, i.e., organized structure of data, specifically, biometric signatures.

### 3.    *Claim 1(b): “a transmitter sub-system comprising:”*

123. *Mathiassen* teaches a “transmitter subsystem,” as claimed. Specifically, transceiver 27, fingerprint sensor 5, the IC 1 that contains processor 2 and non-volatile memory 7,7A included in portable door control 20 are collectively a “transmitter subsystem.” *Mathiassen* (Ex. 1004)*,* [0147] (disclosing the “door control, being a portable device (20)”). The portable door control 20 contains “**a fingerprint sensor (5)** coupled to a miniature printed circuit board (21) on **which is mounted the IC (1)**” and “equipped **with a wireless 2-way transceiver (27)**.” *Id.*

124. A POSITA would have understood the transceiver 27 of the portable door control 20 to be a “transmitter,” as transceivers were defined as “a device that

can **both transmit** and receive signals," thus indicating to a POSITA that the transceiver 27 serves as a transmitter. *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 at 527 (Ex. 1045) ("short for **transmitter/receiver. A device that can both transmit** and receive **signals**."). The figure below shows the portable door control 20 with certain components annotated.



*Mathiassen* (Ex. 1004)*,* Fig. 8 (with transceiver 27 annotated in green and fingerprint sensor 5 annotated in orange).

125.   As discussed above at Claim 1(Pre1), the IC 1 in the portable door control includes a processor 2 and connection to the fingerprint sensor 5, as well as memory 7,7A. *Mathiassen,* [0050]. The figure below illustrates the components of the IC 1 contained in the portable door control 20, with the processor 2, memory, and connection to the fingerprint sensor 5 annotated:

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705



*Mathiassen,* Figs. 8, 2B (annotated to show IC 1 of portable door control containing processor 2, memory, and connection to fingerprint sensor 5).

126.    The transceiver 27, fingerprint sensor 5, IC 1 including the processor 2 and memory 7,7A form a "transmitter subsystem" in the portable door control 20, as claimed, because the components work together to transmit a signal to a receiver (or receiver subsystem). More specifically, the processor 2 of the IC 1 contained in the portable door control 20 issues an "open door" command that is "**wirelessly transmitted by the transceiver (27) from the portable door control (20)**" to the ignition control 15 or central car computer. *Mathiassen,* [0185-0188].

### 4.    Claim 1(b1): "a biometric sensor configured to receive a biometric signal;"

127.   As stated above at ¶¶ 39-45, a "biometric sensor" was well-known in the art to include a sensor for reading fingerprints. Thus, *Mathiassen's* disclosed fingerprint sensor 5 is a "biometric sensor," as claimed.

128.   Under the applied construction of a "biometric signal" being "a physical attribute of a user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)", *Mathiassen* teaches the biometric sensor (i.e., fingerprint sensor 5) receiving a "biometric signal" (i.e., fingerprint). *Mathiassen* teaches that "**When a finger is detected on the sensor (5) surface**," the pre-processing block 5C then processes "**the captured raw images to an intermediate stage of significantly compressed information**, i.e. a dataset of reduced size, **denoted intermediate fingerprint data**." *Mathiassen,* [0049-0050], [0178]. Thus, a POSITA would have understood either these "captured raw images" or the "intermediate fingerprint data" from the fingerprint received by the biometric sensor (fingerprint sensor 5) are biometric signals of the user's biometric, because they include "information" representing the fingerprint. Therefore, *Mathiassen* teaches a biometric sensor for receiving a biometric signal, namely a fingerprint sensor 5 for receiving a fingerprint and processing said fingerprint into captured images or intermediate fingerprint data.

129.   Specifically, *Mathiassen* teaches the car owner "swipe[ing] his finger across the sensor (5) of the portable door control (20)" in order to "access the car."

*Mathiassen* (Ex. 1004)*, [0175-0176]. The pre-processing block 5C of the IC 1 on portable door control 20 then "reduce[s] the captured fingerprint image to a reduced intermediate format" and feeds it to the processor 2 of the IC 1 which "reduce[s] the captured and pre-processed fingerprint image to compact master minutiae format." *Mathiassen,* [0177-0179].

> **5.** **Claim 1(b2): "a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"**

130. I apply the construction of "accessibility attribute" to mean "attribute that establishes whether and under which conditions access to the controlled item should be granted to a user." Section III.B. It is my opinion that *Mathiassen's* processor 2 of portable control as modified by *McKeeth* teaches "a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute. As I discuss below, *Mathiassen* teaches outputting an accessibility attribute that is an "access" attribute, namely when the car owner/administrator's access minutiae match the stored minutiae. *McKeeth* teaches outputting an accessibility attribute that is either a "duress" attribute or an "alert" attribute. It would have been obvious to modify *Mathiassen* to include the duress and alert attributes described in *McKeeth* for the reasons I discuss in Section VII.A.5.d (¶¶ 149-171), below.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

a)    **"database of biometric signatures"**

131.   As discussed above for Claim 1(a), a POSITA would have understood *Mathiassen* teaches a "database of biometric signatures," as claimed, which are the master minutiae tables comprised in the memory 7,7A of the portable door control 20. *Mathiassen* (Ex. 1004)*, [0165] (disclosing storing master minutiae tables "in the non-volatile memory (7A) of the IC (1)" in the portable door control 20).

b)    **"matching the biometric signal against members"**

*132.    Mathiassen* teaches processor 2 of portable control 20 executing "administrative software" that includes similar functions performed to those listed in the '705 Patent executed by the transmitter controller 107. *Compare '705 Patent,* 14:30-36 (generally describing controllers 107/109 to perform the steps outlined in FIGS. 3-4), 8:6-7 (Fig. 3 "shows the method of operation" of the transmitter sub-system 116), 8:20-24 (describing the step of FIG. 3 where the controller 107 executes a comparison with biometric signatures to find a match) *to Mathiassen,* [0050] (describing processor 2 of IC 1 runs the "administrative software"), [0182] (describing the processor 2 of IC 1 in portable control "establishing a match" with stored master minutiae tables. Thus, *Mathiassen's* processor 2 of the IC 1 in the portable door control teaches a "transmitter sub-system controller," as claimed. *See* Section VII.

133. As discussed above for Claim 1(a), a POSITA would have understood *Mathiassen* teaches a "database of biometric signatures," as claimed, which are the master minutiae tables comprised in the memory 7,7A of the portable door control 20. *Mathiassen* (Ex. 1004), [0165] (disclosing storing master minutiae tables "in the non-volatile memory (7A) of the IC (1)" in the portable door control 20).

134. *Mathiassen* teaches processor 2 is "configured" to match a received biometric signal (i.e., fingerprint) against the stored master minutiae tables (i.e. claimed "members of the database"). More specifically, when a user swipes their finger on the fingerprint sensor 5 of portable control 20, the pre-processing blocks and processor 2 of the IC 1 collectively reduce the captured fingerprint image to "compact minutiae format." *Mathiassen,* [0176-0179]. The processor 2 "will then compare this access minutiae table with the master minutiae table(s) pre-stored" in the non-volatile memory (7A). *Mathiassen,* [0180]. The processor 2 then "establishe[s] a **match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors**." *Mathiassen,* [0182], *see also* [0181] (describing when the processor compares the access minutiae to stored minutiae, "[i]n case of **a match the process will be allowed to continue. If no match, the process will be aborted**.").

135. Additionally, the processor 2 is configured to match the biometric signal against members of the database of biometric signatures (stored master

minutiae tables) because the raw images received from the biometric signal (i.e., fingerprint) are reduced down to access minutiae tables by processor 2, which themselves are compared to the stored master minutiae tables. *Mathiassen,* [0050] (disclosing the minutiae are representations of the fingerprint reduced from "the captured fingerprint image"). Therefore, the processor 2 "is configured to match the biometric signal," as represented by the access minutiae tables reduced from raw images, "against members of the database of biometric signatures," (i.e., stored master minutiae tables) as claimed.

136. *Mathiassen* teaches that if the access minutiae table matches with one of the pre-stored master minutiae table(s), the processor 2 of the portable door control 20 "will proceed to open (or lock) the car doors." *Mathiassen* (Ex. 1004), [0180-0182]. When a user requests to open the car door locks, the processor 2 "issue[s] the 'open door' command to the encryption block (8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)." *Mathiassen,* [0185]. This temporary password is generated by the SKG block 8A when the processor 2 "fetch[es] the seed from the non-volatile memory (7A) and feed it to the SKG block (8A)." *Mathiassen,* [0183-0184]. The encrypted "open door" command is then "wirelessly transmitted by the transceiver 27 from the portable door control (20) to the embedded ignition control," with this transmitting process further discussed above at Claim 1(b2). *Mathiassen,* [0186].

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

c)    **"to thereby output an accessibility attribute"**

137.  My opinions apply the construction of an "accessibility attribute" provided in Section III.B.1. *Mathiassen's* "open door" command issued by the processor 2 as modified by *McKeeth's* teaching of duress and alert modes teaches or renders obvious an accessibility attribute, as claimed.

138.   I first note that the '705 Patent describes one of the "accessibility attributes" to be an "access attribute (granting unconditional access)." *'705 Patent,* 8:28-30. The '705 Patent also describes that upon matching an access biometric signal with a stored signal, access is provided to the controlled item. *Id.* at 12:15-24. I note that in the '705 Patent, the biometric signal provided by the user determines which category of access is provided, e.g., access, duress access, or alert access. *Id.* at 11:40-55, 12:13-41. Therefore, in instances where the user is a user with unconditional access and is providing a biometric signal instructing opening the controlled item, then per the '705 Patent, 12:15-24, access to the controlled item is granted. The '705 Patent further describes that when the user indicates a duress condition via their biometric signature, "duress" access is provided. *Id.* at 11:40-55. And, when there is no match with the provided biometric signature, access is not provided to the controlled item and an alert tone is actuated. *Id.* at 12:25-41.

139.  Turning to *Mathiassen's* teachings, *Mathiassen's* "open door" command issued by the processor 2 to the encryption block comprises outputting an

IPR2022-00602
Apple EX1003 Page 96

Appx3906

accessibility attribute because the "open door" command establishes "whether and under which conditions access to the controlled item should be granted to the user." When issuing the "open door" command, this command indicates "whether" access should be granted because the command instructs opening the car door locks in response to the user's access minutiae matching with a stored biometric signature of the car owner/administrator and thus, access should be granted to open the car door locks. *Mathiassen* (Ex. 1004)*, [0182]. In contrast, if the processor 2 does not find a match, then no access will be granted because **"the process will be aborted**." *Mathiassen,* [0181]. Thus, the "open door" command indicates that access should be granted.

140.    *Mathiassen's* open door command issued in response to the matching of the car owner/system administrator's access minutiae also indicates **under which conditions** access is granted, specifically an access condition. In my opinion, a POSITA would have reasonably understood the car owner/administrator requesting access to the car doors has unconditional access to the central locking system. *See, e.g., Mathiassen,* [0190] (discussing "other users" the car owner/administrator may have enrolled). An "administrator" that is the car owner would have been reasonably understood to have unconditional access to the car's central locking system. This is especially true as *Mathiassen* describes the car owner/administrator enrolling other

users, thus indicating that the administrator has full access capabilities, including requesting access and granting access to others. *Mathiassen,* [0090].

141.   In *Mathiassen*, when the processor 2 of the portable control 20 matches the owner's access minutie table to a pre-stored master minutiae table, the "open door" command is issued to the encryption block to grant unconditional access, much like the "accessibility attribute" example described in the '705 Patent. Thus, *Mathiassen* also teaches the "open door" command includes outputting an accessibility attribute indicating under which conditions, namely providing full access based on the matching of the access minutiae to the car owner/administrator's pre-stored master minutiae table, to thereby issue the "open door" command.

142.   I note that the access provided to the car owner/administrator in *Mathiassen* is substantially similar to the access granted to a user under the "access" attribute in the '705 Patent. *See '705 Patent*, 8:28-30, 12:15-24. Specifically, the '705 Patent describes that upon a successful match of a user's biometric signature to a stored signature in the "access" category, the user is granted access. This is substantially similar to *Mathiassen's* teaching of providing access upon a successful match to stored minutiae. Thus, *Mathiassen* teaches outputting an accessibility attribute, where the outputted accessibility attribute indicates under what conditions access is granted, namely full or unconditional access

143. Turning now to *McKeeth's* teaching, in my opinion *Mathiassen* in combination with *McKeeth* teaches outputting two or more accessibility attributes. *McKeeth* teaches outputting at least two accessibility attributes, namely a duress attribute and an alert attribute. Specifically, *McKeeth* teaches different conditions under which a certain type of access may be granted, namely a **duress** condition and an **alert** condition (which *McKeeth* refer to as a "mode of operation"). *McKeeth* (Ex. 1005), 4:29-43, 5:48-53, 6:36-40.

144. In *McKeeth*, access is granted where "there is a match between the input and security information." *McKeeth*, 3:65-67, 3:11-28 (describing different types of input security information, including a fingerprint scan). "If the input and security information do not match, the compare circuit issues a 'flag' signal indicating denial of access by the user." *McKeeth*, 4:2-4. Therefore, *McKeeth*, like Mathiassen, teaches whether access is granted.

145. *McKeeth* further teaches a user "performs a fingerprint scan and/or pattern" to gain access to the computer system 100. *McKeeth,* 3:52-4:4. The disclosed "pattern" is a geometric pattern that may be required "concurrently with, or after a predetermined duration from, scanning his/her fingerprint" that indicates the user is requesting normal access. *McKeeth,* 4:10-27. Upon the user indicating a duress condition, the system grants access while concurrently issuing a "silent

security alert" to security personnel. *McKeeth,* 4:33-43 (disclosing that "[u]sing the silent security alert mode silent alert minimizes risk to the user under duress").

146.   This is similar to the '705 Patent description of a "duress attribute" that indicates to the system to grant "access but with activation of an alert tone to advise authorities of the duress situation." *'705 Patent,* 8:31-32. Specifically, the '705 Patent describes a user providing an input that indicates "that the user 101 is in a coercive situation where, for example, an armed criminal is forcing the user 101" to access the controlled item. *'705 Patent,* 11:45-50. Furthermore, the '705 Patent describes this duress type of access may "overlap" with other types of access provided to a user, such as an administrator having an input indicating duress stored in the biometric signature database in addition to a regular administrator signature indicating the user requesting normal access. *'705 Patent,* 10:49-55 (describing that a single person, such as an "administrator," can enroll multiple fingers for providing different levels of access (i.e., administrative access or ordinary user access)). Thus, based on the '705 Patent describing a person enrolling multiple fingers and describing an administrator may have a biometric signature saved for indicating they are under duress, it is my opinion that this "duress attribute" may be outputted when any type of user (administrator or ordinary user) provides an input that indicates they are under duress (i.e., scan a fingerprint of a different finger). Thus, *McKeeth's* system determining the user is under duress and instructing such to the system

teaches the claimed "outputting an accessibility attribute," because the instructed duress condition indicates whether and **under what condition**, namely a duress condition, to grant access.

147. In an alternative configuration, if "**the computer system 100 determines that the generated pattern does not match a stored pattern**, the computer system 100 may…**lock up the computer system 100 and generate a security alert to the responsible authorities.**" *McKeeth,* 5:48-53. The computer system 100 locking up the computer would have indicated to a POSITA that the user was denied access, as any electronic or physical lock is known to deny access when it is locked. Furthermore, *McKeeth* teaches that in a "less stringent" embodiment of the authorization system, the computer 100 simply "denies the user's request to access the computer system 100" and "avoids issuing" a security alert. *McKeeth,* 6:52-58, *see also* 5:50-52 (disclosing the computer system 100 may either simply deny access or deny access AND "generate a security alert"). Thus, based on *McKeeth's* teaching of the alert being "more stringent," a POSITA would have understood this response of the computer system 100 to deny access in a more stringent manner by **also** generating a security alert. *McKeeth*, 6:36-40.

148. The '705 Patent describes an "alert attribute" as an "accessibility attribute" that sounds "a chime indicating that an **unauthorized**…person is seeking access." *'705 Patent,* 8:26-28, 32-35. Additionally, the alert attribute indicates to the

system to "(a) **not to provide access to the controlled item 111**, and (b) **to provide an alert tone**, **like ringing a chime or a bell** (not shown), **to alert personnel in the vicinity…that an unauthorized user is attempting to gain access to the controlled item 111**." *'705 Patent,* 12:29-35, *see also* 16:57-60 (describing "denial of access to the controlled item and sounding of an alert if the accessibility attribute comprises an alert attribute."). Thus, a POSITA would have understood *McKeeth's* system transmitting a signal to deny access and concurrently issue of a security alert is outputting an "accessibility attribute," as claimed, similar to the '705 Patent's described alert attribute.

### d)    Motivation to Combine *McKeeth* with *Mathiassen*

149.    A POSITA would have been motivated and found it obvious to modify *Mathiassen's* processor 2 of portable door control to output a duress attribute or an alert attribute, as taught by *McKeeth*, in addition to issuing an "open door" command unlocking a car door lock for the car owner/administrator unconditionally, as otherwise taught by *Mathiassen*. The emitted secure access signal in this modification then conveys information regarding the user being in a duress or alert condition.

### (1)    Vehicle Security Was a Known Problem

150.    *Mathiassen's* "central locking system," which is controlled by the portable door control 20, increases the security provided to a car owner by only

allowing authorized users to unlock the car doors. *Mathiassen* (Ex. 1004)*, [0145].*

In fact, *Mathiassen* expressly discloses "A **key issue** of the application of the invention to car systems is **the security issue**, **to prevent theft or non-authorized use of the car**." And that this embodiment in particular may be placed anywhere in the car "**where additional access limitation is useful**." *Id.* This disclosure would have indicated to a POSITA that increasing security measures to make car owner's feel safer was a well-known and desirable feature in vehicle security systems, especially considering the "automotive industry **is emphasizing secure access**…" *Id.* Additionally, as stated above at ¶¶ 42-44, increasing the security of a car owner when accessing their car was well-known as a desirable feature of vehicle security systems implementing biometric authorization. *See, e.g., Gunsch* (Ex. 1014)*, [0007]* ("…this invention **provides security to the owner** by limiting the use of the universal transmitter to **registered users only, through an authorization mechanism**."); *Wuidart* (Ex. 1017)*, 1:40-51 (describing increasing the security level of a vehicle locking/unlocking system via "a security system can **be associated with its authorized user (or users)** so that **only an authorized user can unlock the doors of the vehicle**."). Thus, a POSITA would have been motivated to further improve the safety of a car owner and security of *Mathiassen's* central locking system by providing other types of access when a user was under a duress condition or denying unauthorized users access and generating a security alert.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

### (2)     Duress Access Was Known to Be Desirable

151.    Vehicle security systems were well-known to provide specific types of access when a car owner indicated they were under a duress condition or in a dangerous situation, such as granting access and issuing a silent alert to authorities. *See,* ¶¶ 66-69. For example and as discussed above at ¶ 66, *Kim* teaches a vehicle security system that provides a specific type of access when the user indicates to the system that they are in an "**emergency situation**," such as under force by an intruder to provide the correct "key" for vehicle access. *Kim* (Ex. 1015)*, [0048].* Upon detecting an "emergency situation" based on the user's input indicating duress, the vehicle security system grants access by controlling the ignition "to drive the vehicle in a normal manner for 20 seconds only, and after 20 seconds" issuing alerts such as blinking lights and honking the horn. *Kim,* [0049]. *Kim* even teaches the security system sending "a rescue message" when an "emergency situation is detected" if the vehicle is equipped with a mobile communication system. *Kim,* [0052]. This access provided when the user indicates they are under duress was considered an "**improved anti-theft of the vehicle**" and prevents carjacking, thus increasing the security of a vehicle security system. *Kim,* [0055].

152.    Another vehicle security system providing duress access when a user indicates they are under a duress condition is taught by *Brown*, where the system "**triggers a process by which authorities are notified** and the location of the

vehicle may be provided" when a user indicates they are under duress (i.e., "the duress code has been entered"). *Brown* (Ex. 1036)*, Abstract. Additionally and similar to *Kim's* duress access, *Brown's* vehicle security system initially allowed the intruder or carjacker to access the vehicle, but then "disabled" the vehicle after a "pre-determined amount of time passing or a pre-determined distance driven," thus providing access while concurrently notifying authorities. *Brown,* Abstract. Furthermore, this notification preferably occurred via a "telephone service" to send a message "**in a silent manner**." *Brown,* 4:20-28, 6:44-64 (describing the user indicating duress to cause the system to place "a **silent telephone call**" to play a "**recorded message to the authorities reporting the theft**," with this telephone call occurring "**without sending any audio signals to the vehicle**").

153. *Zingher* provides yet another example, implementing biometric authorization, where a user's fingerprint of a certain finger corresponds to a "duress identification" and when the system receives a "duress identification" from the user, it initiates "**an emergency response, such as (for example) triggering a silent alarm**." *Zingher* (Ex. 1037)*, Abstract, [0014], *see also,* [0011] ("The present system and method provides for **discreetly identifying and signaling a user's duress** at an automatic teller machine **or other biometric identification site** (e.g., a building checkpoint or **an automobile**"). Thus, *Zingher's* security system grants access to the user while sending out a silent alert.

154. Furthermore, systems for sending a silent alert or silent alarm to authorities in cars for increasing user safety were well-known prior to August 13, 2003, as is seen by the references I describe above disclosing message notifications or silent alerts that are generated and sent to authorities from the vehicles implementing these security systems when a user indicates they are in duress. Furthermore, these silent alerting systems were common-place and commercially placed in vehicles, with one well-known example being the OnStar™ service. The OnStar™ service was already "standard on some GM vehicles and featured as an option on others" in 2000. *OnStar Features*, OnStar, June 19, 2000 (Ex. 1046). In fact, the service was already "commercially available" by the end of 1999. *DeLine* (Ex. 1047), (22), 6:45-46 ("…an **emergency communication system, such as the ONSTAR™ system commercially available in certain General Motors vehicles**"). The emergency button included in the "three-button system" sent "**a priority call to an OnStar Advisor**" who will "**contact the nearest emergency services providers** who can dispatch ambulance, police, fire or other emergency services **to your location**."

155. The above-discussed systems indicate the desirability and prevalence of secure access systems outputting various attributes to indicate a user requires a specific type of access. These systems outlined the advantage of still providing access when a user was under duress and issuing a silent alert as opposed to flat out

denial in order to keep the user safe from the assailant while authorities were notified and came to their aid. *See, e.g., Kim* (Ex. 1015)*,* [0048-0049] (disclosing allowing the "intruder" to enter the car and drive "for 20 seconds only" when a user feels threatened by an "emergency situation"); *Zingher* (Ex. 1037)*,* [0009, 0011] (disclosing providing a duress access to solve the "security problem" of an assailant intimidating the user "**by threat of physical harm**" when accessing their "automobile"); *Brown* (Ex. 1036)*,* 1:24-31, 39-46 (disclosing that "disabling a vehicle **during a forcible robbery in the presence of a car owner or operator can be dangerous, since the prolonged contact between the car owner and thief allows the thief to direct violence against the car owners**" and stating this issue as the reason "the vehicle may be entered and driven away" while "**alerting authorities**" when a user indicates to the security system they are under duress).

156.   Because systems for silently alerting authorities were well-known to be included in commercial vehicles, a POSITA would have been motivated to implement a similar feature in *Mathiassen's* portable door control 20 where processor would issue a command (as modified by *McKeeth* to contain a duress attribute) in a car containing such silent alert capabilities and thus used this system, such as OnStar, to silently alert authorities that a user was under duress.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

### (3)    Denying Access to Unauthorized Users Was Well Known

157.    *Mathiassen* additionally teaches the importance of denying access to unauthorized users in the central locking system, stating that "A key issue of application of the invention to car systems is… **to prevent theft or non-authorized use of the car**." *Mathiassen* (Ex. 1004)*,* [0145]. This goal is achieved using *Mathiassen's* portable door control 20 of the central locking system because "the **security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled),** and not in some tokens…" *Mathiassen,* [0190]. As stated above at ¶ 39, one of the advantages of using biometric authorization in an access system over traditional access cards or passwords was preventing any intruder or thief from finding the lost device and gaining unauthorized entry.

158.    *Mathiassen's* denial of access does not alert anyone that a theft is in progress or that an unauthorized user is attempting to access the vehicle. Thus, the issue is not entirely resolved, because the car thief or carjacker could find the lost portable door control or steal it, find their request for access fails due to them being unauthorized, and still continue to steal the car by physically jimmying the lock, breaking the car window, etc. even after being denied access. A POSITA would have appreciated that a car owner would therefore desire a more stringent security response of denying access and additionally issuing a security alert so the appropriate people would be alerted of the situation and stop the car thief from

further physical break-in attempts after biometric authorization failed. This would have increased the peace-of-mind of the car owner to know that even if the portable door control was lost or stolen, someone would be notified and potentially call the police on the carjacker.

159. A POSITA would have understood the "security alert," as taught by *McKeeth,* to include various forms of alerting people of the unauthorized access. This would include sounding an alarm, with car alarms very well-known and widely available security measures included in cars that would alert any nearby security personnel or individuals if someone tried to enter a locked car without having the key. As stated above at ¶¶ 68-70, several vehicle security systems implemented such alarms when denying access to an unauthorized person or recognizing a request was unauthorized. *See, e.g., Colmenarez* (Ex. 1038)*,* 7:14-17; *Bostrom* (Ex. 1042)*,* 10:43-46; *Maloney* (Ex. 1043)*,* 8:1-3. Thus, because vehicle security systems for sounding an alarm to alert authorities were well-known to be included in commercial vehicles, a POSITA would have implemented *Mathiassen's* portable door control 20 for issuing a command (as modified by *McKeeth* to contain an alert attribute) in a car including such a car alarm and sounded the alarm when denying access to an unauthorized user to alert nearby authorities.

160. I note that when *Mathiassen's* system is modified to include *McKeeth's* alert access, the modified *Mathiassen* system would send a command from the

portable control and to the central car computer/ignition control. In my opinion, it would have been obvious to connect the central car computer to a car alarm system, which was well-known as included within cars prior to August 13, 2003. Thus, when the central car computer or ignition control received a secure access signal conveying an alert accessibility attribute (i.e., alert command), the central car computer would not relay a command to the car door locks to keep them from opening and would send a signal to the car alarm to sound the alarm. *See, e.g., Nonaka* (Ex. 1050)*, [0072] (describing a micro-computer of a vehicle controlling a speaker to output an "alarm sound or the like."), *see also* [0017-0018]; *Sonders* (Ex. 1051), 7:20-35, 8:61-65 (describing "logic control circuitry" in a vehicle sends a signal via a closed "relay" to sirens in a car to sound an alarm).

161. Alternatively, it was known prior to August 13, 2003, that portable vehicle key fobs included security measures that simultaneously locked car door locks and sounded an alarm. *K-9 Car Alarm Owner's Guide and Installation Instructions,* K-9 Mundlal, Omega Research and Development, 2000 (Ex. 1041) at 7 (describing a "panic mode" security measure on a vehicle key fob where "**the siren sounds** and parking lights flash," and "**the vehicle's doors will lock**."). Thus, instead of not relaying a command, the central car computer would alternatively relay an encrypted command to lock the car doors and concurrently transmit a signal to the car alarm to activate it.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

**(4)   There Would Have Been a Reasonable Expectation of Success in the Modification**

162.   Modifying *Mathiassen's* command issued by the processor 2 of the portable door control 20 to include a duress or an alert accessibility attribute, as taught by *McKeeth,* would have had a reasonable expectation of success. *Mathiassen* already teaches the hardware and software for outputting duress and alert accessibility attributes. *Mathiassen* teaches receiving, storing, and matching access minutiae tables with pre-stored master minutiae tables (database of biometric signatures), which includes the processor 2, pre-processing block 5C, sensor 5. *Mathiassen,* [0180-0182]. *Mathiassen* also already includes hardware/software for issuing a command to the encryption block 8A or 8C, namely processor 2, SKG block, and non-volatile memory (7A). *Mathiassen,* [0183-0185].

163.   *Mathiassen* also contemplates a user enrolling multiple fingers and instructing multiple commands in a command table through a series of finger movements. *Mathiassen,* [0164], [0192]. More specifically, *Mathiassen* teaches translating different fingerprint representations into various commands. *Mathiassen* (Ex. 1004)*,* [0192]. *Mathiassen* teaches the portable door control 20 sending other commands generated by the processor 2 of IC 1 that are mapped to different fingerprint movements provided by the user, even characterizing this capability "**as an additional safety feature**" of the portable device. *Id*. ("a **command table** is used to translate the **categorized** finger movements **into control signals for controlling**

**the device, e.g., the stand-alone appliance**.”). Specifically, *Mathiassen* teaches storing a "series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C)," with these representations obtained and measured via "movement analyzing" hardware or software. *Id.* The fingerprint representations are then categorized "according to predefined sets of finger movement sequences" which are associated with a specific command in a "command table." *Id.* Thus, the user fingerprint input instructs specific commands, and this input would be either movements of the same finger or movements of different fingers. Therefore, *Mathiassen* already teaches hardware and software for receiving multiple fingerprint inputs instructing different commands.

164. A POSITA would have understood *Mathiassen's* processor is "capable" of issuing commands other than the "open door" command by sensing different fingerprint movements and accordingly instructing the command based on the fingerprint movements. *Mathiassen* also teaches that a user may enroll more than one of their fingerprints in the portable door control 20, indicating that *Mathiassen* contemplated using finger movements from different fingers to cause the portable door control 20 to send certain commands. *Mathiassen,* [0164] ("…the **car owner will enroll one or more of his fingers on the portable door control unit (20)**"). Therefore, *Mathiassen's* processor is already capable of issuing different commands

other than the "open door" command, and thus would have required only simple programming modifications to include a "duress" and "alert" command to either grant access and issue a silent alert or deny access and sound an alarm. Furthermore, as discussed above, silent alert systems for notifying authorities and alarms were well-known and commonly available in commercial vehicles, so a POSITA would only need to use *Mathiassen's* modified portable control in an already-existing car having a silent alert system and alarm system.

165.    *Mathiassen* teaches the car owner inputting their fingerprint to open the car door locks and that the car owner may enroll "one **or more of his fingers**." *Mathiassen,* [0164]. *Mathiassen* also teaches a user may instruct different commands for the central locking system by providing different finger movements on the portable door control 20. *Mathiassen,* [0192]. Thus, for the portable door control to output a duress attribute in an encrypted command, the modification to *Mathiassen* simply requires enrolling a car owner's second finger or series of fingers for this duress command while a first enrolled finger indicates an "open door" command, so that when the second finger's or series of fingers' access minutiae match with the pre-stored master minutiae table, the processor 2 of the portable door control 20 issues a duress command (i.e., claimed outputting an accessibility attribute) indicating to grant access and issue a silent alert. Seeing as *Mathiassen* already teaches a "command table," where different finger movement inputs are translated

to output different control signals, it would have been within a POSITA's expertise to include pre-set movement of the second fingerprint to translate to a duress command within this table, as taught by *McKeeth*.

166.    Additionally, *Mathiassen* already teaches denying access to un-authorized users. *Mathiassen,* [0145], [0181] (disclosing aborting the process "to open (or lock) the car doors" when the provided fingerprint does not match any of the pre-stored master minutiae tables). *Mathiassen* also teaches processor 2 is at least capable of issuing two commands: a lock command or an "open door" command. *Mathiassen,* [0182], [0167]. Thus, a POSITA would not have found it challenging to include an additional alert command output when the user was denied access to instruct the car alarm to sound (i.e., issuing a security alert). Thus, when the biometric signal did not match with any members of the database of biometric signatures, the alert command would be issued by the processor 2 (i.e., outputting an accessibility attribute).

167.    Thus, modifying *Mathiassen* to enroll a second finger, or series of finger movements, to instruct a duress command requires simple programming add-on to the techniques already taught by *Mathiassen*, namely to simply enroll another fingerprint or finger movement (already taught by *Mathiassen*) and encoding another command for placement in the command table.

168. Additionally, remote fobs for vehicles were well-known to use actuation of a single button to send a signal to control the operation of various vehicle components. For example, *Williams'* remote keyless entry system uses the same "unlock input 60A" to both send a signal to only the driver side door to unlock (when pressed once) or to send a signal to each door lock of the car to unlock (when pressed twice). *Williams* (Ex. 1030), 14:30-34. *Williams* even teaches a user performing a single input to then generate a signal that both (1) unlocks a door and (2) opens/closes a power-sliding door. *Williams,* 14:10-25. Thus, because other remote fob systems were well-known to be capable of sending one signal that performed multiple functions, a POSITA would have found reasonable success in modifying *Mathiassen's* command, as taught by *McKeeth,* to similarly perform instruct multiple functions when including a duress or alert command by (1) unlocking car doors and issuing a silent alert to authorities or (2) locking car doors (if not already locked, in order to deny access) and sounding the car alarm, respectively.

169. A POSITA would also have understood that *Mathiassen's* fingerprint sensor 5 on the portable control 20 would be capable of receiving a user's input associated with an "open door" command (i.e., unlocking the doors responsive to a system administrator's fingerprint movement), as well as a user's input indicating a duress (granting access and issuing a silent alert) and alert (denying access and sounding an alarm) command, as modified by *McKeeth*. As discussed above, a single

input, such as a button, was well-known to provide different accessibility through different actuation (i.e., pressed once or twice), such as unlocking only a single car door vs. unlocking all car doors. *Williams* (Ex. 1030), 14:10-25, 30-34. Thus, a POSITA would have understood *Mathiassen's* single input, being the fingerprint sensor 5, to similarly receives various inputs that the processor 2 then issued an "open door," duress, or alert command through different finger movements either of the same finger or of a different finger. After all, *Mathiassen* already teaches a user providing different finger movements to output different commands from the portable door control 20. *Mathiassen* (Ex. 1004), [0192].

170.    This command would contain information indicating to the central locking system to issue a silent security alert or sound an alarm when a duress or alert command are issued by the processor 2, respectively. This encoding and issued command would not have required any challenging modification outside the knowledge of a POSITA, because *Mathiassen* already teaches embodiments connecting the secure access controlled item to the portable device via a network for sending the encrypted signal to a third-party, [0047] (disclosing using the portable access device "in an access-limited apparatus, device, **network or system (N),** e.g. a computer terminal, an **internet** bank or a corporate or government **intranet**.") Furthermore, as discussed above at ¶ 154, commercially-available cars were well-known to include such connections to a third-party, such as OnStar™ for sending a

silent alert. Thus, a POSITA would have found it obvious to implement *Mathiassen's* central locking system in such a vehicle already containing network access to a third-party, such as through a cellular communication network or via an internet connection, and thus would have transmitted the duress command to this network, like OnStar™, to issue a silent alert. *See, e.g., Hsu* (Ex. 1039), 4:54-65, 5:46-54 (disclosing a car computer for fetching electronic mail, which is known to be retrieved via internet connection); *DeLine* (Ex. 1047), 31:46-48 (describing OnStar™ as a "wireless telecommunication system"), *see also id.* at 32:2-3. In fact, *Mathiassen* even contemplates including "cellular phone" access within the car embodiment. *Mathiassen* (Ex. 1004)*,* Fig. 9. Thus, a POSITA would have utilized *Mathiassen's* central locking system in a car capable of transmitting the encrypted duress command incorporating an output duress accessibility attribute to a third-party via a network, such as via a cellular network as used in OnStar™.

171.  Additionally, *Mathiassen* teaches sending the issued command to the central car computer or embedded ignition control, after it is encrypted, for decryption and authentication, which then relays the "similarly encrypted command to the car door locks." *Mathiassen,* [0186-0188]. Because *Mathiassen* teaches that central car computer or ignition control may send the encrypted signal to the car door locks, a POSITA would have found reasonable success in additionally relaying the signal with an outputted alert accessibility attribute to the vehicle's car alarm in order

to issue an alert. All of these components are within the car, and *Mathiassen* states

the car embodiment applies the secure access control method in a "local network,"

thus indicating to a POSITA that any components of the car may be connected to

one another. *Mathiassen,* [0108]. Furthermore, a POSITA would have understood

that because the central car computer is hard-wired to the ignition control, similarly

wiring the central car computer to the car alarm would not have produced any

technical hurdles. *Mathiassen,* [0149]. Thus, a POSITA would have found

reasonable success in modifying *Mathiassen's* central car computer to be wired to

the car alarm for relaying the alert command encompassing an alert attribute so the

car alarm would sound and thus generate a security alert.

> ### 6. Claim 1(b3): "a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute"

172.    *Mathiassen's* portable door control contains a "transceiver 27" that

"wirelessly" transmits the issued "open door" command after it has been encrypted.

*Mathiassen,* [0185-0186]. As further discussed below, *Mathiassen's* transceiver 27

is a "transmitter configured to emit a secure access signal" (i.e., encrypted

command) "conveying information dependent upon said accessibility attribute" (i.e.,

conveys the access the user will be granted).

173.    A POSITA would have understood *Mathiassen's* transceiver 27

includes a "transmitter" because transceivers are defined as "a device that can **both**

**transmit** and receive **signals**," thus indicating to a POSITA that the transceiver 27 of the portable door control 20 serves as a "transmitter," as claimed. *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 (Ex. 1045) at 527 ("short for **transmitter**/receiver. **A device that can both transmit** and receive **signals**."). Additionally, the transceiver is at least "configured to emit" because it wirelessly transmits the encrypted command to "transceivers of the door locks and the central car computer." *Mathiassen,* [0186]. Thus, a POSITA would have understood the transceiver 27 teaches the "transmitter," as claimed.

### a)    "secure access signal"

174.    An exemplary secure access signal described in the '705 Patent is a rolling code. *'705 Patent* (Ex. 1001)*,* 6:6-9 ("The controller 107 then updates the code and **sends the updated code, this being referred to as an access signal**, as depicted by an arrow 108 to a controller 109."). The system described in the '705 Patent allegedly improves upon prior access systems by encrypting wirelessly transmitted signals with codes hiding the original signal content from unauthorized individuals. *'705 Patent*, 1:50-67, 6:6-9, 6:39-46. Different encryption protocols including Bluetooth, WiFi, or a rolling code are described for securing the access signal. *Id.*, 6:32-38.

175.    Regarding the described rolling code in the '705 Patent, the rolling code protocol "uses a different code variant each time the transmission of the access signal

108 occurs," with this code variation "achieved by **encrypting the data from the controller 107 with a mathematical algorithm**." *'705 Patent,* 6:47-53. The rolling code protocol thus generates "a non-repeatable data transfer" and "reduces the likelihood that an intruder can access the information replay the information to thereby gain entry…" *'705 Patent,* 6:53-59.

176.    As stated above at ¶¶ 53-56, the rolling code protocol was already well-known and commonly implemented in access systems including garage door openers, remote keyless entry for vehicles, etc. and even used in biometric authorization systems for transmitting access signals. In my opinion, a POSITA would have understood a rolling code protocol to include an algorithm that generated a different code every time a signal was sent, with the receiver knowing the unique algorithm that varies the code each time so that it can correctly match the code on the receiver side. *See, ¶* 53, *specifically, A Rolling Code 4-Channel UHF Remote Control: What is "Code Hopping" or "Rolling Code",* Ross Tester, Silicon Chip.com.au, July 2002 (Ex. 1026) at 23. Thus, in a single use, the rolling code protocol would generate a single random code which was used when sending a signal that was then matched to a code generated by the same encryption algorithm on the receiver end. The varying nature of the "rolling code" assigned to each transmitted signal was known to decrease the likelihood of someone repeating the coded signal and gaining unauthorized access. *Id.* (describing the rolling code protocol "gives

almost total peace-of-mind" to the user that their access is protected). Thus, a POSITA would have understood the claimed "secure access signal" is a single use signal that is non-repeatable, non-replayable, and encrypted.

177. *Mathiassen's* processor 2 issues a "secure access signal," that the transceiver 27 is then "configured to emit," namely an encrypted command like an "open door" command, which is used for a single access request. *Mathiassen,* [0182-0188], [0050]. A POSITA would have understood *Mathiassen's* encrypted door command is a "signal," because it is electrically "issued" to other hardware components such as the encryption block 8B or 8C and it signals the encryption block 8B or 8C to initiate encryption. *Mathiassen,* [0186] ("The **processor will issue the "open door" command to the encryption block (8B or 8C) that in turn will encrypt it**"). Furthermore, the encrypted open door command is transmitted via transceiver 27 between electronic components, thus indicating to a POSITA that the encrypted "open door" command is a signal.

178. In my opinion, the encrypted open door command is an *access* signal, as claimed, as the command instructs a type of access based on matching the user's biometric signature to a stored biometric signature. Specifically, when the "processor (2) establishes a match between the access attempt and one of the resident master minutiae tables," the processor 2 (of the IC 1) instructs the SKG block 8A to "generate a valid, and temporary, password" via a seed passed to the SKG block.

*Mathiassen,* [0182-0184], [0050]. The "match" refers to a match between the presented minutiae or live fingerprint representations and the stored master minutiae in the master minutiae tables. The temporary password is input to the encryption block 8A/8C and the processor 2 issues an "open door" command, with this command encrypted "based on the valid, and temporary password from the SKG block (8A)." *Mathiassen,* [0185], [0050]. The transceiver 27 in the portable door control 20 then wirelessly transmits the encrypted "open door" command to a transceiver at the central car computer. *Mathiassen,* [0186]. After the signal is transmitted to the central car computer, either (1) the central car computer performs decryption and relays the "open door" command to transceivers in the door locks [0188], or (2) the central car computer sends the encrypted "open door" command to the ignition control via wired connection so that ignition control 15 may decrypt the "open door" command [0187]. In the second scenario, the ignition control then sends the "similarly encrypted command" via wire back to the central car computer that relays the command to transceivers in the door locks. *Mathiassen,* [0187]. As discussed above at Claim 1(Pre), the central car computer includes a transceiver 27. *Mathiassen,* [0149], [0186].

179.    In my opinion, the encrypted open door command is also a ***secure*** access signal, as claimed. To help explain why the transmitted open door command

is secure, I will first explain how *Mathiassen* operates to transmit the open door command, receive the open door command, and open/lock the car door locks.

180.    Upon the open door command being transmitted from the portable door control, the processor 2 on the resident IC of the ignition control 15 decrypts the received command by fetching a seed from its own memory 7A and entering the seed into the SKG block to generate "the **identical, and temporary** password fed on to the encryption block (8B or 8C)." *Mathiassen,* [0187].  A command to open car door locks is then sent from the wired connection to the central car computer and to the transceiver of the door locks via the central car computer's transceiver if "the decrypted message confirms a valid and authenticated 'open door' command was sent." *Id.*

181.    As an aside, I note that in the first scenario of the central car computer performing "the decryption and authentication algorithms" instead of the ignition control 15, a POSITA would have understood the central car computer to include an IC in order to carry out and store the disclosed algorithms. *Mathiassen,* [0188]. Furthermore, in this implementation, the central car computer would also act as a "receiver" that received the encrypted "open door" command and performed the decryption and authentication.

182.    In disclosing the encryption and decryption process carried out by the IC 1, *Mathiassen* teaches the SKG algorithms for generating the same temporary

password must be identical in both the transmitter subsystem, i.e., the IC 1 of portable door control 20, and on the receiver end, such as the IC 1 in the central car computer or ignition control 15. *Mathiassen,* [0050] ("If the same SKG algorithm is run on two separate computers (e.g. a server (30) **and the central processor (2) on the IC (1)**) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed."), [0187-0188]. A POSITA would have understood the two "computers" of the car embodiment to be the IC 1 containing processor 2 in the portable door control 20 and the IC containing processor 2 in the central car computer or ignition control 15, and therefore the algorithms in the IC 1 of each are identical in order to produce the "identical, and temporary password." *Mathiassen,* [0187]. Furthermore, *Mathiassen* also teaches that this SKG algorithm used to generate the secure "key" or password "may be constructed to produce a **pseudo-random identical key on both computers** (2 and 30) that is either valid for a time frame**, or alternatively changes for each transaction**." *Mathiassen,* [0050]. In the car embodiment, transmitting a single "open door" command from the portable door control 20 to the ignition control 15 or central car computer for decryption serves as a single "transaction."

183. Thus, because *Mathiassen* teaches that the key or password used to encrypt and decrypt a single transaction "changes for each transaction," the encrypted command is non-repeatable and non-replayable. Additionally,

*Mathiassen's* description of the encryption/decryption process having the same algorithm match between the transmitting system and the receiver as well as the password generated changing from transaction to transaction mirrors the definition of a rolling code as well-known in the art prior to August 13, 2003. *See,* ¶ 53. Therefore, *Mathiassen* teaches a processor 2 of portable door control that issues a "secure access signal" (i.e., encrypted command used for a single transaction) that the transceiver 27 "is configured to emit," as claimed.

184.    *Mathiassen* teaches the secure access signal conveys "information dependent upon said accessibility attribute," as claimed. As discussed above for Claim 1(b2), *Mathiassen* teaches outputting an accessibility attribute (i.e., information that access should be granted to the user) in the encrypted command (secure access signal). From the description in the '705 Patent, a POSITA would have understood the "information" to be conveyed by the secure access signal to convey the access being granted, e.g., granting access, granting duress access, or no access. *'705 Patent* (Ex. 1001)*,* 8:26-32 (describing unconditional access and providing access when the user is under duress), 12:30-33 (describing denying access to the controlled item). Similarly, in *Mathiassen* when a user requests to open the car door locks, the information conveyed in the encrypted "open door" command (i.e., secure access signal) is to grant access. This information conveying the access granted is dependent upon the accessibility attribute, such as granting full or

unconditional access to the car owner/administrator. The information in the command results from determining the type of access that should be provided to the user and encrypting the command using the temporary password from the SKG block.

185.    In more detail, when viewing *Mathiassen* alone without *McKeeth's* teachings, we know that *Mathiassen* matches a fingerprint of a car owner/administrator and further provides for the car owner to enroll other users. When the car owner's fingerprint is matched against the stored minutiae tables, access is granted. The access has no restrictions because it is the car owner whose fingerprint was matched. By matching the car owner's fingerprint and issuing an open door command, *Mathiassen* teaches outputting an accessibility attribute, where the accessibility attribute is simply "grant access," similar to as described in the '705 Patent, 8:26-30.

186.    When viewing *Mathiassen* in combination with *McKeeth's* teachings, the processor 2 of the modified *Mathiassen* portable control can now output multiple accessibility attributes when issuing a command. By providing another command input (e.g., series of fingerprint movements or another finger) to instruct another command, the modified *Mathiassen* portable control is operable to output an access attribute, a duress attribute, and an alert attribute, dependent on the input command. In each circumstance, the encrypted command emitted by the transceiver 27 of the

portable control conveys information specific to the inputted command. That is, the emitted command conveys information dependent on whether the matched fingerprint movements or fingerprint translated to an access command, a duress command, or an alert command. Thus, the emitted command conveys information dependent on the accessibility attribute, as claimed. *See the motivation to combine Mathiassen and McKeeth above at Claim 1(b2).*

### 7.    Claim 1(c)-1(c1)

**Claim 1(c): "a receiver sub-system comprising: a receiver sub-system controller configured to"**

**Claim 1(c1): "receive the transmitted secure access signal"**

#### a)    "receiver sub-system"

187.    *Mathiassen* teaches a "receiver sub-system" that comprises transceivers of the central car computer and door locks, the central car computer, and ignition control 15. *Mathiassen,* [0186-0188].

188.    To assist with understanding the bases for my opinion, I will provide a detailed explanation of *Mathiassen's* teachings regarding transmission and receipt of the encrypted commands. As discussed above, the processor 2 of the IC 1 of the portable control 20 issues the "open door" command for encryption via encryption blocks, and the transceiver 27 of portable control 20 then transmits the encrypted command to the central car computer. *Mathiassen*, [0185-0186], *see also* [0149] (describing the central car computer communicates via "2-way wireless"

transmission from the portable door control). I note that *Mathiassen* also contemplates implementing these same procedures "to-authorize encryption and transmission of straight commands," including a "lock door" command in addition to performing such transmission and decryption/authentication of the "open door" command. *Mathiassen,* [0167].

189. Specifically, once the processor 2 of the IC 1 in the portable door control 20 encrypts the command, such as the "open door" command, via the encryption block 8B or 8C, the transceiver 27 of portable control 20 transmits the encrypted command signal via its transceiver 27 "to the embedded ignition control (15) via the transceivers of the door locks and the central car computer." *Mathiassen,* [0186]. The open door command (which is a claimed "signal," as I discuss herein) is first received by the central car computer's transceiver and then electrically transmitted via a wired connection to the ignition control 15 for decryption and authentication. *Mathiassen,* [0187-0188], *see also* [0148] (disclosing ignition control 15 connects via "hard wires to the central car computer"). *Mathiassen* discloses an alternative configuration, where the command received at the central car computer is not transmitted to the ignition control, and the central car computer instead performs the decryption and authentication. *Mathiassen*, [0188]. In both configurations, once the "open door" command is authenticated, "a **similar encrypted command will be relayed to the door locks by the car computer**."

*Mathiassen,* [0187]. Thus, after the signal is decrypted and authenticated, the re-encrypted command is received by the car door locks via a car door lock transceiver, where the central car computer performs transmission to the transceiver of the car door locks.

190. A POSITA would have understood the transceivers to include a "receiver," as transceivers are defined as "a device that can **both** transmit and **receive signals**," thus indicating to a POSITA that the transceivers in the door locks and central car computer serve as receivers. *Microsoft Computer Dictionary,* fifth edition, Microsoft Press, 2002 (Ex. 1045) at 527 ("short for transmitter/**receiver. A device that can both** transmit and **receive signals**.").

191. Because *Mathiassen* teaches the central car computer and door locks receive encrypted commands [0186-0187] and both include transceivers [0186], a POSITA would have understood the central car computer and door locks received the encrypted commands via the transceivers, thus teaching a receiver sub-system, as claimed. Therefore, the claimed "receiver sub-system" includes, at least, *Mathiassen's* transceiver for the central car computer and transceiver for the door lock because *Mathiassen* discloses the transceivers of the door locks and central car computer receive signals like the "open door" command signal. *Mathiassen* (Ex. 1004)*,* [0186-0187].

b)    **"receiver sub-system controller…"**

192.    *Mathiassen* teaches a "receiver sub-system controller" comprised in the "receiver sub-system," as claimed. As discussed above at Section VII, a POSITA would have understood a processor performing the claimed function of receiving the signal and providing conditional access is at least equivalent to the claimed "controller." As discussed further below, *Mathiassen* teaches or renders obvious a processor of IC in ignition control or a processor in central car computer as a "receiver sub-system controller," either individually or collectively.

193.    As discussed earlier, *Mathiassen* teaches two configurations for authenticating and decrypting the received encrypted command. In a first configuration the processor of the IC receives the command and performs decryption, and in the second configuration, the central car computer receives the command and performs decryption. *Mathiassen*, [0186-0188]. In either configuration, the processor (either of the IC of ignition control or of central car computer) is configured to "receive the transmitted secure access signal," as claimed.

194.    Regarding the first configuration where the ignition control performs the decryption and authentication, *Mathiassen* teaches the processor 2 of the IC 1 in the ignition control 15 decrypting the encrypted "open door" command (i.e., "secure access signal") after receiving such a command and relaying a similar command "to

the door locks by the car computer." *Mathiassen* (Ex. 1001)*,* [0187]. Thus, the processor 2 of the ignition control 15 **alone** provides conditional access by instructing the transceiver of the central car computer to relay the "similar encrypted signal" to the car door locks. *Mathiassen,* [0186-0187].

195.    Alternatively, the collective processors of the ignition control and the central car computer teach the "receiver sub-system controller" in this first configuration. After processor 2 initially receives the encrypted command and decrypts/authenticates it, the central car computer contains a processor (as I discuss below at ¶ 197) that collectively works with the processor of the ignition control to relay the "similar encrypted command" from processor 2 to the car door locks. *Mathiassen*, [0186-0187]. In other words, the processor 2 of ignition control would still receive and decrypt/authenticate the encrypted command (i.e., secure access signal), while the processor of central car computer then relayed the "similar encrypted command" generated by processor 2 to the car door locks. Thus, a POSITA would have understood either the processor 2 of the ignition control alone (per ¶ 194, above), or the processor of the ignition control and the processor of the central car computer working together are a receiver sub-system controller configured to perform the functions of receiving the transmitted secure access signal and providing conditional access.

196.    Regarding the second configuration where the central car computer performs the decryption and authentication, *Mathiassen* teaches the central car computer includes a processor for providing conditional access. I first note that a POSITA would have understood that for the central car "**computer**" to perform "decryption and authentication algorithms," it includes or otherwise renders obvious a processor, as these same algorithms are disclosed as being performed by a processor when implemented in the ignition control. *Mathiassen,* [0187] (processor 2 of IC 1 in ignition control 15 performing decryption and authentication). A POSITA would have understood that computers contain a processor as a common component. *PC Basics: Get a Great Start,* Survive and Thrive, Copyright 2002 (Ex. 1049) at 7, 11 (listing a central processing unit as a common computer component and providing examples of such well-known CPU's as "the Pentium® and Celeron® **processors**."). Therefore, the central car computer also includes or renders obvious a processor.

197.    When the central car computer performs the decryption/authentication, *Mathiassen* teaches the same "**decryption and authentication algorithms**," as discussed above with regard to the processor 2 of IC 1 in ignition control, **"may be performed on the central car computer instead of on the embedded ignition control**." *Mathiassen,* [0188]. A POSITA would have understood the central car computer processor received the encrypted command from the car computer's

transceiver for performing such subsequent decryption/authentication. *Mathiassen*, [0186] (describing transceivers of the central car computer receive the transmitted encrypted command from the portable control's transceiver 27). After the processor of the central car computer receives the encrypted command to then perform decryption/authentication thereon, the processor generates a similar encrypted command that it then relayed to the car door locks to provide conditional access. *Mathiassen*, [0187-0188]. Therefore, the central car computer also includes a receive sub-system controller for performing the claimed function.

### 8.   Claim 1(c2): "provide conditional access to the controlled item dependent upon said information"

198.   I apply the construction of "conditional access" meaning "access based on accessibility attributes." *See* Section III.B. *Mathiassen's* ignition control processor 2 or central car computer processor is configured to "provide conditional access to the controlled item," (i.e., car door locks), based on the accessibility attribute output in the secure access signal (i.e., encrypted command). Thus, the access provided to the car door locks is "conditional" because it is based on the accessibility attribute output in the "open door" command. For example, if the relayed open door command was input by the car owner/administrator, the open door command includes full or unconditional access to the central locking system, as I discuss for Claim 1(b2).

199.   As discussed above at Claim 1(b2), when the car owner (otherwise referred to in *Mathiassen* as a system administrator) provides their fingerprint, and the car owner's fingerprint is matched against stored minutiae, the car owner/system administrator is provided access to the vehicle's locking system. A POSITA would have understood this access is provided in response to the car owner/administrator providing their fingerprint for the purpose of accessing the car. *Mathiassen*, [0175] (discussing the "owner" of the car may now access the car). Thus, *Mathiassen* also teaches providing "conditional" access, where in *Mathiassen,* the access is based on the inputted fingerprint information corresponding to a car owner/system administrator applying their fingerprint for purposes of accessing the car.

200.   To the extent the information in the secure access signal is for instructing a function, *Mathiassen* also teaches the processor of the portable door control "will proceed to open (**or lock**) the car doors" [0182] and that the portable door control performs "**encryption and transmission of straight commands, such as 'open door' or 'lock door**.'" *Mathiassen,* [0167]. Therefore, the command invokes different functions depending on information in the command. Yet further, *Mathiassen* teaches instructing different commands according to the fingerprint input ([0192]), further indicating *Mathiassen* teaches the command instructing a particular function depending on information in the command. Thus, a POSITA would have understood the access granted to the car doors, namely unlocking them,

is dependent upon information in the "open door" command, with this command relayed to the transceivers of the car door locks by the ignition control or central car computer processor.

201.    Similarly, *Mathiassen's* processor 2 of portable control, when modified by *McKeeth* to issue duress and alert commands that are then emitted via the transceiver 27, the access provided by the encrypted or re-crypted duress or alert commands is conditional because it is based on the respective accessibility attribute of the duress command or alert command that is included in the secure access signal received by the processor of ignition control or processor central car computer. *See Mappings at Claims 1(b2)-(b3)* (discussing the duress command and alert command as accessibility attributes conveyed in the secure access signal).

### 9. Claim 1(d): "wherein the transmitter sub-system controller is further configured to"

202.    As discussed above regarding the mapping of Claim 1(b2), *Mathiassen* teaches processor 2 of IC 1 in portable door control that is "the transmitter sub-system controller," as claimed. *Mathiassen,* [0050] (describing IC 1 containing processor 2), [0147] (describing portable door control 20 comprises IC 1).

### 10. Claim 1(d1): "receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry"

203.    As a preliminary matter, I was instructed by counsel the claim term "at least" modifies "one of the number of said entries" and that the claim requires "a

duration of each said entry." Applying this construction, *Mathiassen* (as otherwise modified by *McKeeth*) as further modified by *Anderson* teaches Claim 1(d1).

### a)    *Mathiassen's* Teachings

204.    As discussed above with regard to the mapping of Claim 1(b1), a POSITA would have understood *Mathiassen's* raw fingerprint images or intermediate fingerprint data to form a "biometric signal" because they contain information about a user's biometric. *Mathiassen,* [0050]. *Mathiassen* expressly teaches such "**intermediate fingerprint data are fed to the central processor (2)**" of the IC 1. *Mathiassen,* [0050], *see also* [0176-0178] (describing "captured fingerprint image" is reduced to an "intermediate format" and then fed to the processor (2) of portable door control when a user swipes their finger across the sensor 5). Additionally, *Mathiassen* also teaches the processor 2 together with the pre-processing block 5C receives fingerprint images to reduce them to "master minutiae tables." *Mathiassen,* [0164]. It is my opinion from these combined teachings that *Mathiassen's* processor 2 of portable control is thus configured to "receive  a biometric signal," namely fingerprint images or intermediate fingerprint data that contains biometric information.

205.    Furthermore, *Mathiassen* also teaches the processor 2 of "portable device" (i.e., portable door control 20) receiving and storing "**a series of consecutive fingerprint representations** generated by the fingerprint sensor signal capturing

and pre-processing block (5C)." *Mathiassen,* [0192], Claim 20. These "series of consecutive fingerprint representations" indicate "omni-directional **finger movements** across the sensor in two dimensions." *Id.* In other words, this "series" comes from multiple movements of the same fingerprint to categorize the received finger movements to stored sequences that translate to certain commands:

> Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the **<u>obtained series of fingerprint representations</u>** to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and **categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals** whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor.

*Mathiassen,* [0192], Claim 20.

206. Therefore, a POSITA would have understood *Mathiassen* teaches the following:

(1) the portable door control 20 detects a series of finger movements across the sensor;

(2) the portable door control categorizes the series based on a known set of finger movement sequences, and

(3) via this categorization, the portable door control translates the movement to a particular command to then send out a control signal.

*Mathiassen* further teaches the control signals control the operation of components of "e.g., the stand-alone appliance, **in response to the finger movements on the sensor**." When the portable control is controlling the central locking system of the car door locks, the finger movement sequences on the portable control are used to instruct functions associated with the car door locks. These finger movements include "touch/no touch" operations where the user touches their fingerprint to the sensor and the user does not touch their fingerprint to the sensor. *Id.* It is my opinion that *Mathiassen's* finger movements are a "series" because they comprise a number of things or events of the same class coming one after the other in spatial or temporal succession.

207. A POSITA would have understood the predefined "touch/no touch" finger movements comprise pressing down on the sensor 5 of the portable control to indicate a touch and releasing at least some pressure on the sensor to indicate a "no touch," with certain sequences of touch/no touch associating with a specific command to control the portable door control. *Mathiassen*, [0147], [0192] ([0147] characterizing "The door control, being a **portable** device" compared to [192]

stating "the **portable** or embedded **device could be equipped with means for the input of code or commands**"). I note *Mathiassen* does not teach that the portable door control 20 includes any other inputs, such as buttons or switches, to cause the portable door control 20 to distinguish between the open door and lock door commands. *Mathiassen,* [0182] ("the processor will proceed to **open (or lock) the car doors**"), [0167] ("At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of **straight commands, such as 'open door' or 'lock door'**"), FIG. 8. This further indicates to me that the portable door control 20 may use different received finger movements, e.g., touch/no touch, matching predefined finger movement sequences for instructing such commands to differentiate them from one another, especially given *Mathiassen* explicitly states each touch/no touch sequence translates to a certain "command." *Mathiassen,* [0192].

208.   In view of the above-discussed teachings of *Mathiassen*, a POSITA would thus have understood *Mathiassen*'s processor 2 of portable door control 20 receives "a series of entries of the biometric signal," as claimed, where the biometric signal is a fingerprint image or intermediate fingerprint data and the series of entries corresponds to the user's series of fingerprint movements on the sensor 5 of the portable control 20.

209.   In my opinion, it also would have been obvious to use *Mathiassen's* portable door control to input different instructions, as further indicated by *Mathiassen,* [0192]. Specifically, it was well known in the prior art to use a single input, such as a single button or single fingerprint sensor to receive multiple instructions. *See,* ¶¶ 58-63. For example, *Williams* uses a single "unlock button" to receive a first press and a second press within a predetermined amount of time to command different operations of unlocking only the driver-side door and unlocking all the car doors, respectively. *Williams* (Ex. 1030)*,* 14:30-34. *Matusis* teaches using a single input sensor to detect the upward or downward motion of a single fingertip to invoke two different functions. *Matusis* (Ex. 1032)*,* Fig. 3, [0045] (disclosing each fingertip to have an "upward and downward motion" where each "function is now dependent on the selected fingertip and the provided motion by the selected fingertip"), [0046] (describing "input sensor" to be any input mechanism, with examples provided being a button, touchscreen, trackpad, among others). *Ghassabian* specifically uses a "fingerprint detection interface 100" to detect fingerprint movements, such as tapping, double tapping, or swiping, that indicate different instructions. *Ghassabian* (Ex. 1031), 7:49-63 ("For example, an individual can double tap his or her right thumb" or "swipe his or her left index finger"), 9:1-6 (disclosing tapping once with a fingerprint to provide one instruction and tapping twice with that same finger providing a different instruction, stating that these

instructions "**can be inputted with** one hand and **one fingerprint pad, by only using single and double taps**"). Thus, different instructions were known to be received by a single input, e.g., a single fingerprint sensor as taught in *Mathiassen*'s portable control 20. Thus, a POSITA would have understood or found it obvious that *Mathiassen's* processor 2 on the portable door control 20 receives a series of entries of biometric signals (i.e., fingerprint images from single sensor 5) at least for instructing the "lock door" and "open door" commands.

210. Additionally, a POSITA would have understood the processor 2 of IC 1 in portable control 20 receives the series of fingerprint movements. *Mathiassen* expressly teaches "movement analyzing means, in the form of a hardware or a software movement analyzing program module" for analyzing the series of fingerprint representations by measuring the "omni-directional finger movements." *Mathiassen,* [0192]. Additionally, "program modules" are also employed for categorizing and translating the series of fingerprint movements. *Mathiassen,* [0192]. The only processor disclosed in the portable door control 20 for executing such "program modules" is the processor 2 of the IC 1, indicating to a POSITA that the processor 2 of IC 1 performs or would have obviously executed the functions of measuring, categorizing, and translating the fingerprint movements. Additionally, *Mathiassen* teaches "fingerprint sensor signal capturing and pre-processing block (5C)" on the IC 1 generates the "series of consecutive fingerprint representations,"

which are then measured via the movement analyzing program. *Mathiassen,* [0192].

This pre-processing block 5C is used for reducing captured fingerprint images to intermediate data which is then received by the processor 2, thus further indicating to a POSITA that the processor 2 receives the series of fingerprint representations to execute the "program modules." *Mathiassen,* [0178], [0050].

### b)     *Anderson's* Teachings

211.   As discussed above, although *Mathiassen* teaches the processor 2 of portable control is configured to "receive a series of entries of a biometric signal," namely a series of entries of a fingerprint, I note that *Mathiassen* does not teach that these series of fingerprint movements are characterized based on a "duration" of each entry. However, characterizing a fingerprint press to determine the commanded instruction was well known, as taught by *Anderson,* and it would have been obvious to a POSITA to include a duration parameter as part of the series of fingerprint movements to instruct commands, as already taught by *Mathiassen.*

212.   *Anderson* teaches a "method for inputting an access code via **temporal variations**" applied to a touch interface." *Anderson* (Ex. 1006)*,* Abstract, 6:45-48 (describing the access code as "**a series of pressure pulses having varying durations**"). The user applies pressure "**in a temporal pattern**," thus generating an access code. *Anderson,* 6:11-18, 23-26. The generated access code is "utilized to allow the information handling system to enable" the requested function if it matches

with a stored "code template." *Anderson,* 6:22-39, 6:51-54 ("Wherein **the inputted access code and the code template are a close match** (i.e., they match within the predetermined tolerance), the **function is enabled** at step 324."), 2:4-21, FIG. 3B. These enabled functions include "allowing access to a restricted area," amongst other functions. *Anderson,* 2:15-21. Additionally, *Anderson* teaches the access code may be "utilized in conjunction with other security measures," such as concurrently using an "optical scanner or thermal sensor for **collecting an image of the user's fingerprint as the pressure access code is entered and verified against a stored fingerprint template**." *Anderson,* 7:1-11. Figure 3B, below, summarizes the steps of the method for enabling a function via an access code of "temporal pressure variations":



FIG. 3B

Anderson, Fig. 3B, see also, FIG. 3A.

213. *Anderson* teaches an example of the entered access code is "a **series of pressure pulses having <u>varying durations</u>**," with a user implementing "a **known code key (<u>e.g. Morse code</u>)** … to aid the user in selecting, remembering, and entering the access code." *Anderson,* 6:45-48, 7:40-47 (describing the Morse code-like pressure pulses "consisting of a **series of long and short pressure applications**"). This teaching in *Anderson* indicates to me the access code is comprised of a series of finger movements, specifically including pressing down and

releasing (*i.e.,* pulses) the finger on the fingerprint sensor, with each pulse having a certain known duration. *Anderson's* comparison of the access code to Morse code would have been understood to represent a series of short and long presses, as Morse code is well known to be characterized as a series of presses of short and long duration.

214.  *Anderson* teaches two different embodiments of entering the access code. In a first embodiment, *Anderson* teaches "the touch interface may sense **only temporal applications of pressure relying on timing of the pressure applications for entry of the access code**. In such an embodiment, "**the touch interface would not detect variations in pressure magnitude or intensity**." *Anderson,* 7:28-34. Instead, the touch interface would only detect variations in duration of each fingerprint application and "Thus, the access code would be entered as a series of alternative pressure applications of **varying duration**." *Id.* In a second embodiment, *Anderson* teaches varying both the *pressure* and the *duration* of each finger press. *Anderson,* 6:11-13 ("The user enters the access code by temporally varying the amount of pressure applied to the touch interface."), 7:34-39.

215.  *Anderson's* FIG. 4A illustrates the first embodiment where the access code comprises "a series of alternating pressure applications of varying duration." *Id.* ("**As shown in Fig. 4A, the touch interface may sense only temporal applications.**"). I annotated FIG. 4A, below, to highlight that the magnitudes or

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

amount of pressure is recorded using just two values, one to indicate that pressure is being applied and a second indicating that little or no pressure is being applied. A POSITA would have understood that the user resting their finger on the fingerprint sensor interface causes some pressure on the sensor, which is indicated by the higher bars.

216.    Figure 4A further illustrates the durations of the finger presses are different, as indicated by the varying widths of each pressure bar. *Anderson,* 7:28-34. *Anderson* teaching "the pressure applications" illustrated in Figs. 4A and 4B "are sensed by the touch interface as variations in pressure **relative to a baseline pressure (e.g., no application of pressure)**" indicates the dashed line represents a pressure of zero with the bars representing other pressure amounts that are not zero. *Anderson,* 7:12-19. In other words, one bar represents a single finger press, with the width of each bar indicating the time for which the fingerprint sensor is pressed.



FIG. 4A

*Anderson,* Fig. 4A (blue bar annotating varying duration pressure is applied), (orange circle annotating a single pressure pulse), *see also* 7:28-34 (describing Fig. 4A), 7:11-27. The consistent magnitudes shown by the straight yellow bar indicate

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

that though different pressures may be applied, the digitizer pad 120 only senses that a pressure is applied or not applied as the different pressure amounts (i.e. magnitudes) are not distinguishable from one another.

217. *Anderson*, FIG. 4B, contrastingly, illustrates the touch interface sensing a varying duration of each pulse **and** a varying amount of pressure, as is depicted by the change in the bar heights.



FIG. 4B

*Anderson,* Fig. 4B, 7:34-39 ("Alternately, as shown in FIG. 4B, the touch interface may sense both temporal applications of pressure and variations in pressure magnitude or intensity.").

218. I note that *Anderson's* teachings of determining a duration of a finger press as part of the access code is similar to the '705 Patent's description. The '705 Patent states "the first administrator can provide control information to the code entry module by providing a **succession of finger presses** to the biometric sensor 121, providing that **these successive presses are of the appropriate duration**, the

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

appropriate quantity, and are input within a predetermined time." *'705 Patent* (Ex. 1001)*,* 10:56-60. *Anderson* similarly teaches finger presses to the fingerprint sensor comprising the access code. In the first embodiment where only the duration of each pulse is sensed without sensing the applied pressure (*see* FIG. 4A), these pulses would be generated from any pressure above some predefined threshold (e.g., threshold of zero/no pressure) being applied by the user's finger to the touch interface. Specifically, when employing the fingerprint access code via the optical scanner in the touch interface, such an applied pressure is sensed when a user places their finger on the fingerprint sensor, presses downward on the interface to generate a "press," holding that "press" down for a certain amount of time, and then releasing the "press." *Anderson* describes the user applying pressure of varying durations, which is consistent with the understanding that a press is the application of pressure. *Merriam Webster's Collegiate Dictionary,* tenth edition, copyright 1998 (Ex. 1052) at 923, *see also* 922 (the term "press" defined as "**to move by means of pressure**"). Thus, because the '705 Patent describes a "series of entries" as a "succession of presses" and *Anderson* teaches inputting an access code of a user's fingerprint, with the code including a series of fingerprint presses (i.e., entries) of particular duration, *Anderson* teaches determining a duration of each received entry (i.e., fingerprint press).

219.  *Anderson* also teaches characterizing such series of entries "according to at least one of the number of said entries and a duration of each said entry." *Anderson* teaches the "temporal pattern of pressure applications," or finger presses, are used to generate the access code, with this code then compared to a stored "code template" to authorize access. *Anderson* (Ex. 1006)*, 6:22-36 ("The temporal pattern of pressure applications applied by the user is **sensed by the touch interface**" and then "**compared, at step 320, with a code template** created by the user at an earlier time."). In order for the presented access code to be compared to the stored code template and find a match, some or more likely all of the finger presses would have to be characterized by the duration of the press to accurately determine the specific "temporal pattern." It is noted that *Anderson* teaches allowing for "some variation, within a predetermined tolerance, between the inputted access code and the code template" when performing the comparison, such as a predetermined tolerance being provided for "variations in the lengths of the pulses" (i.e., duration of the presses). *Anderson,* 6:39-54. However, *Anderson* also teaches that "a **determination** may then be made at step 322 whether the **entered access code and the code template** are a close match (i.e., **they match within the predetermined tolerance**)." *Anderson,* 6:48-51. *Anderson* teaching that a comparison still has to be performed between the access code and code template even when using a "predetermined tolerance" would have indicated to a POSITA that *Anderson's* access code is still

characterized by the duration of each pulse and the number of pulses in order to result in a match. In other words, a POSITA would have understood that the "determination" still required characterizing the access code input even when allowing for variations in the entry, and that the access code would have been determined by at least at least one of the number of presses (i.e., pulses) and a "varying duration" of each press (i.e., pulse). Furthermore, as *Anderson* teaches the access code being entered as "a series of alternating pressure applications of **varying durations**," a POSITA would have understood that the system differentiated between these variations of duration to properly compare the access code to the code template. *Anderson,* 7:32-34. This determination of the variations of duration would have occurred whether using a predetermined tolerance or not, considering if the tolerance is "predetermined" that the durations would require checking with the stored code template durations to ensure they were within this tolerance range. Thus, *Anderson* teaches characterizing the series of entries (i.e., access code) according to at least one of the number of said entries (i.e., at least one of the number of presses or pulses) and a duration of each entry (i.e., the "varying duration" of each press or pulse), as claimed.

c)      **Motivation to Combine *Anderson* with *Mathiassen* as modified by *McKeeth***

220. In my opinion, a POSITA would have been motivated and found it obvious to modify *Mathiassen's* processor 2 of portable control (As otherwise modified by *McKeeth*) to characterize an access code input or other command containing a series of presses by the number of presses and duration of each press, as taught by *Anderson*, for the reasons I discuss below.

221. *Mathiassen* teaches detecting a series of touch/no touch or directional finger movements to instruct a particular command, with these finger movements stored as "sequences" that associate with specific commands in the "command table." *Mathiassen* (Ex. 1004)*, [0192] ("A command table is used to translate the **categorized finger movements** into control signals…for controlling the device…**in response to the finger movements on the sensor**."). As discussed above at ¶¶ 205-208, a POSITA would have understood or found it obvious that these finger movements were input on the sensor 5 of the portable door control 20 and translated to the associated command by processor 2. Thus, *Mathiassen's* processor 2 of portable door control 20 already receives a series of entries determined by the movement of the fingerprint on the sensor surface and compares them to a stored finger movement sequence to invoke the correct command.

222. Modifying *Mathiassen's* portable control to include receipt of a command via presses of a particular duration allows for simplified input of multiple

commands using *Mathiassen's* portable door control. A POSITA would have been motivated and found it obvious add *Anderon's* series of presses or pulses as an input on the portable door control or replace *Mathiassen's* finger movements with *Anderson's* series of presses or pulses to input commands into the portable door control 20, as these press operations make the input operations easier for the user to perform in certain situations. For example, a user holding the portable control fob in their hand could more easily press a series of finger presses against the control's fingerprint sensor, as opposed to directionally swipe the finger presses. A car owner with only a single free hand to hold the key fob and enter the command would have additionally found it more challenging to input the correct directional swipe because they would have to ensure the single hand both stabilized the fob and allowed the finger to move enough to swipe directionally on the sensor. With a series of presses, the user would maintain a stable hold on the portable device more easily as they only had to use one finger to press down on the sensor. Further, if the fob was in the user's pocket or in a bag, it would be simpler and more efficient for the user to simply press the fingerprint interface at varying durations rather than moving the finger directionally to enter commands. Additionally, a POSITA would have appreciated that in certain situations, such as when the user was holding various items in their other hand and needed to open the car doors, that a series of press operations would have been easier for a car owner to perform than a finger movement, as discussed

above. Furthermore, in situations where the car owner had to direct their visual attention to something else while trying to unlock the car door, such as in monitoring their children before they were safely buckled in, a POSITA would additionally have appreciated that a simple press series would have been easier to input than a directional swipe when the user was unable to look while they performed the input.

223. Furthermore, a POSITA would have been motivated and found it obvious to modify *Mathiassen's* detection of finger movements with *Anderson's* detection of a number of presses and a duration of each press to decrease the complexity required when analyzing the fingerprint inputs. *The Application of Programmable DSPs in Mobile Communications: Biometric Systems applied to Mobile Communications*, Alex Gatherer and Edgar Auslander (Ex. 1053) at 226 (stating that fingerprint sensing procedures that "require the user to slide his finger slowly across the sensor" are known to "seriously distort[ ] the skin and has significant operational and performance liabilities."). It was known in the art as of the August 13, 2003, date of the Patent that fingerprint sensors "that require finger movement (such as swiping) during scanning must compensate for varying shift in finger position during the scan process," otherwise known as data skew compensation or image stitching. *Id.* at 249. In contrast, using a scanning method to sense a press or "slap" that requires no finger movement "does not require data skew compensation or image stitching." *Id.* at 249-250. Furthermore, detecting and

scanning the fingerprint by placing the "stationary" finger on the sensor was also known to minimize distortion when applying certain algorithms for determining a match. *Id.* at 244, 245 (describing matching algorithms that "**benefit from the low distortion achieved by modern slap sensors when compared to rolled finger sensors and swipe sensors**"), 237 ("Strip sensors that are used with a swiping finger motion have very special sensor control and **image reconstruction needs that require much more complicated logic than stationary finger sensors**."). Therefore, a POSITA would have been motivated to substitute the more complex process of detecting finger direction movements (as taught by *Mathiassen*) with a simpler processing procedure of merely detecting duration pulses when capturing raw images and reducing them to fingerprint representations of presses or pulses.

224. The modification of the portable door control 20's processor 2 to receive a series of presses or pulses characterized by the duration of each press and the number of presses would have had a reasonable expectation of success because *Mathiassen's* portable control 20 already includes software and hardware that the processor 2 executes and directs for detecting a series of inputs, such as directional finger movement and even a series of touches and no touches. *Mathiassen* (Ex. 1004)*, [0192]. As discussed above at ¶ 206, a POSITA would have found it obvious or understood that *Mathiassen's* "central processor" of portable control performs the movement analysis, categorization, and translation of the series of finger movements

via "program modules" and/or other required hardware. *Mathiassen,* [0050] (describing processor 2 as "**central processor**" that communicates "**with other on-chip components or modules**."). *Mathiassen's* processor 2 of door control 20 being capable of sensing (i.e., analyzing movement) a touch/no touch pattern is very similar to *Anderson's* method of sensing a press, as discussed above, in the embodiment where the access code is only detected based on the duration of each press and not the pressure applied. *Anderson* (Ex. 1006)*, 7:28-34.* In fact, a touch of the sensor 5 generates some pressure on the surface, even if it is small, indicating to a POSITA that the "touch/no touch finger movement sequences" analyzed by the processor 2 included a series of presses/pulses. Additionally, *Mathiassen's* processor 2 is already operable to detect these "touch/no touch," or press operations, because it receives fingerprint representations reduced from the raw images captured at the sensor 5, as discussed above at ¶ 210. *Mathiassen,* [0192], [0050], [0178] (all generally describing processor 2 of IC 1 receiving reduced form of captured fingerprint images). Thus, *Mathiassen's* processor 2 is already capable of detecting finger presses because it receives a "series of consecutive fingerprint representations" (from the sensor 5 via pre-processing block 5C) when measuring a "touch/no touch finger movement sequence." *Mathiassen,* [0192]. Thus, because *Mathiassen's* processor 2 of portable control is already capable of receiving a series of presses, the modification would have simply required programming the software

translation program executed by the processor 2 to count the amount and the duration of touches in the touch/no touch sequence, with this programming modification being well within the knowledge of a POSITA at the time.

225.  *Mathiassen* discusses receiving finger movements across the sensor including directional and touch/no-touch finger movement sequences. *Mathiassen*, [0192]. In my opinion, finger sensors for detecting tapping or pressing motions were well known, and any modifications to *Mathiassen's* sensor to provide for receiving a series of entries of a particular duration would have required simply programming the software translation program to count the amount and duration of touches in the touch/no touch sequence. *See* ¶ 209 (opining tapping sensors and their associated hardware/software were well-known in the art prior to August 13, 2003). Thus, it would have been well within a POSITA's knowledge to employ such a sensor for receiving entries of a particular duration into *Mathiassen's* portable door control.

### 11.    Claim 1(d2): "map said series into an instruction"

226.  It is my opinion that *Mathiassen's* processor 2 is configured to "map said series into an instruction," or *Mathiassen's* processor 2 (otherwise modified by *McKeeth*) as modified by *Anderson* teaches such. As discussed above with regard to Claim 1(d1), *Mathiassen* teaches processor 2 on the portable door control 20 receives a "series of fingerprint representations" correlating to directional finger movements and uses "translation means" to categorize the finger movements

"**according to pre-defined sets of finger movement sequences including directional and touch/no touch finger movement sequences**." *Mathiassen* (Ex. 1004), [0192]. After categorizing the finger movements, "a **command table is used to translate the categorized finger movements into control signals**" for controlling the device. *Id.*

227.   The '705 Patent describes checking "the input information" (i.e., series of entries) "**against a stored set of legal control signals**" when the "controller 107 **accepts the presses as potential control information**." *'705 Patent* (Ex. 1001), 10:63-67. A POSITA would have understood *Mathiassen's* processor 2 using the command table to translate the categorized finger movement sequences into control signals to at least be equivalent to or include checking the series of inputs against a stored set of control signals, as described in the '705 Patent, to find the appropriate command. In *Mathiassen*, translating the finger movements to control signals via the command table assists with quickly determining the inputted instruction. Thus, *Mathiassen* disclosing the categorized finger movements are translated to a control signal based on a command table would have indicated to a POSITA that these predefined finger movements are mapped to an instruction, with the instruction being *Mathiassen's* disclosed commands within the command table. The reference to a command in the command table serves as a reference to an "instruction" because it is a command given to the processor 2.

228.    Additionally, *Mathiassen's* teaching that "a command table is used to **translate**" a plurality of **"categorized finger movements into control signals**…in response to the finger movements on the sensor" would have indicated to a POSITA that a plurality of predefined finger movements is each mapped to a specific command when received by the processor 2, with this command then implemented via a corresponding control signal for "controlling the device." *Mathiassen* (Ex. 1004)*,* [0192]. *Mathiassen's* "predefined **sets** of finger movement sequences" that the presented finger movements are categorized into indicates that there is more than one "series." Thus, the processor 2 would have mapped each categorized finger movement sequence to a single command corresponding to a control signal.

229.    I note that *Mathiassen's* teaching of mapping a particular instruction or function to a specific fingerprint input was well-known in the art. Such multi-fingerprint movements were known as a desirable input method to simplify the process for users, as it was well-known that creating a "quickly, easily, and most importantly, naturally…function[ing] entry system is vital" in portable electronics using input devices was also desirable, and that making user manipulation of such devices easy was a "key feature." *Ghassabian* (Ex. 1031)*,* 1:54-58; *Mathiassen '455* (Ex. 1033)*,* 6:33-38 (disclosing the mapping of fingerprint movements to certain text symbols or device instructions provides "combined user authentication by finger

print biometrics, accurate cursor control and **fast, versatile, and flexible text input,** all served by the very same single-button sensor").

230. A POSITA would have understood or found it obvious that *Mathiassen's* "mapping" of the categorized finger movement to a particular command was performed by the processor of the IC 1 in the portable door control 20. *Mathiassen* expressly teaches "translation means in the form of a hardware or a software **translation program** module" for categorizing the finger movements to predefined finger movements sequences, and that a "command table is used to **translate** the categorized finger movements into control signals." *Mathiassen* (Ex. 1004)*,* [0192]. Because only one "translation means" is disclosed and the "mapping" of the particular command to the categorized finger movement is done via translation, a POSITA would have understood the "translation means," which includes a hardware or software translation program, performs both the categorizing and the mapping steps. The only processor disclosed in the portable door control 20 for performing such a "software translation program" is the processor 2 of the IC 1, indicating to a POSITA that the processor 2 of IC 1 performs or would have obviously performed the translation program. Additionally, *Mathiassen* teaches that the "fingerprint sensor signal capturing and pre-processing block (5C)" on the IC 1 generates the "series of consecutive fingerprint representations," which are then used by the processor 2 controlling the "translation means" to categorize and map the

finger movement to a particular command "in response to the finger movements on the sensor." *Mathiassen,* [0192]. From this teaching, a POSITA would have understood or found it obvious that the processor 2 categorized the measured finger movement sequences (that were received as a "series of fingerprints representations" from the pre-processing block (5C) when sensor 5 detected a fingerprint on the surface) and mapped these sequences to particular commands in the command table via executing the translation program or controlling the translation hardware. Thus, a POSITA would have understood or found it obvious that the processor 2 of the IC 1 in the portable door control performs "mapping said series into an instruction," with the processor 2 receiving the "series," namely series of fingerprint representations, from the sensor 5 and pre-processing block 5C.

### 12. Claim 1(d3): "populate the database according to the instruction"

231. As discussed above at Claim limitation 1(a), the one or more master minutiae tables comprise a "database of biometric signatures," as they include minutiae data representing a user's fingerprint or fingerprints. The processor 2 of IC 1 in portable control (with reference to the pre-processing block 5C) generating these master minutiae tables for one or multiple fingers of at least one user from minutiae taken by reducing raw images of a fingerprint thus populates the database of biometric signatures, as claimed, with these tables then stored in memory 7,7A.

Thus, *Mathiassen's* processor 2 of portable door control (i.e., transmitter sub-system controller) is configured to "populate the database…."

232. Additionally, *Mathiassen* alone further teaches or renders obvious the database is populated "according to the instruction," as claimed. Alternatively, *Mathiassen* (as modified by *McKeeth*) modified by *Anderson* teaches or renders obvious population occurs "according to the instruction."

### a)　"populating the database"

233. Specifically, *Mathiassen* teaches that prior to "providing secured access control" to the central locking system of the car, a unique seed for secure key generation (SKG) is downloaded to the portable control 20 using a remote terminal. *Mathiassen*, [0150], [0153-0161]. After the seed is downloaded, "the IC (1) of the portable door control (20) will be set in protected mode, **waiting for the first user to be enrolled to be the** <u>system administrator</u> of the biometrics system in the car." *Mathiassen,* Abstract, [0145], [0162]. During this enrollment process, "the **car owner will enroll one or more of his fingers on the portable door control unit (20)**" by presenting his fingerprint(s) for "successful capturing of a minimum of images (say three)" that are "**reduced to master minutiae tables** by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20)." *Mathiassen,* [0163-0165]. These master minutiae tables are then stored in the memory 7,7A of the IC 1. *Mathiassen,* [0164]. After the tables are encrypted

and transmitted to the ignition control 15 of the car, the owner may enroll other users. *Mathiassen*, [0177-0174], [0190] ("…the security of the complete system resides in the fingerprints of the car owner **(or other users he may have enrolled)**"). *Mathiassen* teaches the "first person to enroll his fingerprint on the portable door control (20) **becomes the 'owner' of the car, in the sense that he becomes the system administrator**." *Mathiassen,* [0165].

234.    This paragraph provides a summary of the mapping of *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to "populate the database according to the instruction." First, *Mathiassen* renders obvious initiating the enrollment of a new user by the car owner/system administrator providing their fingerprint that is subsequently received by the processor 2 (in reduced format) and compared with stored master minutiae tables to authenticate the request. *Mathiassen* also teaches processor 2 of portable control 20 translating different finger movement sequences to various commands for instructing the system. Thus, *Mathiassen* teaches processor 2 is configured to "populate the database" according to a specific user's input (i.e., administrator's fingerprint) and teaches instructing operations in the portable door control 20 "according to the instruction" (i.e., processor translating command from the presented finger movement). As stated above at claim 1(d1), *Anderson* teaches providing a series of entries being presses/pulses of varying durations, and a POSITA would have found it obvious and been motivated to either

substitute *Mathiassen's* taught finger movements with *Anderson's* series of presses/pulses of varying durations or add *Anderson's* series of presses/pulses of varying durations. It would have been obvious to modify *Mathiassen* (as otherwise modified by *McKeeth*) in combination with *Anderson* to populate a database according to an instruction that the processor 2 translated from a car owner/system administrator's input of a series of presses/pulses of varying durations, with such an instruction being to initiate the enrollment of a new user (i.e., populating the database).

235. In more detail, *Mathiassen* teaches enrolling a user's fingerprint (i.e., biometric signature) on the portable door control 20 by processor 2 generating master minutiae tables stored in memory 7,7A, so the user can access the central locking system. *Mathiassen* (Ex. 1004)*, [0162-0165], see also,* [0131] (describing the enrollment procedure of *Mathiassen's* secure access control system in further detail for the medicine cabinet embodiment). *Mathiassen* also teaches that the first enrolled user in the portable door control 20 is the car owner, "**in the sense that he becomes the system administrator**." *Mathiassen,* [0165] ("This first person to enroll his fingerprint on the portable door control (20) becomes the 'owner' of the car, in the sense that he becomes the system administrator."), [0162] (further disclosing the "first user to be enrolled to be the **system administrator of the biometrics system in the car**"). The car owner (i.e., "system administrator") may

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

"enroll one or more of his fingers on the portable door control unit (20)." *Mathiassen,* [0164]. The car owner may also direct the enrollment of other user's biometric signatures on the portable door control (20), as indicated by *Mathiassen's* disclosure of the "**car owner** (or other users **he may have enrolled**)." *Mathiassen,* [0190].

236. In the medicine cabinet embodiment, *Mathiassen* teaches that "the system administrator will have to open" the enrollment "procedure by authenticating himself by his fingerprint." *Mathiassen,* [0131]. Once the system administrator is authenticated, "the next user can be enrolled." *Id. Mathiassen* discloses that this user enrollment process "is performed as described above," with such enrollment including processor 2, with pre-processing block 5C, creating master minutiae tables for each user for each enrolled finger which are stored in memory 7, 7A. *Mathiassen,* [0071] ("…a master minutiae table, **created during the enrolment of the authorized user(s), stored in non-volatile memory (7, 7A, or 7C)**."), *see also* [0050] (generally describing process of images being reduced by processor and pre-processing block to generated master minutiae tables).

237. This same process of processor 2 creating master minutiae tables during enrollment occurs when the car owner enrolls "one or more of his fingers." *Mathiassen,* [0164]. Thus, enrolling new users and the car owner involves processor

2, with pre-processing block 5C, creating master minutiae tables that are then stored in 7, 7A, which teaches the claimed "populating the database."

238. The created master minutiae tables make up a database, such that creating and storage of the tables is "populating the database," as claimed. As discussed above at Claim 1(a), a POSITA would have understood the master minutiae tables comprise a "database of biometric signatures." Thus, a POSITA would have understood that the processor 2 generating the minutiae or fingerprint representations from a user's fingerprint that were then contained in these master minutiae tables thereby populates the database, as claimed.

239. *Mathiassen* discloses for the medicine cabinet embodiment the process of the system administrator enrolling other users into the system, with the process beginning with the system administrator authenticating themselves. *Mathiassen*, [0131]. *Mathiassen* teaches that this authentication process requires the processor 2 to compare the requesting minutiae with stored master minutiae tables to find a match, indicating the processor 2 initiates the enrollment process upon authenticating the administrator. *Mathiassen,* [0130-0131]. It would have been obvious to a POSITA for this enrollment process for the medicine cabinet embodiment to be similarly applied for the portable door control embodiment. *Mathiassen* expressly discloses the car owner becomes the system administrator, thus indicating the car owner has the capability to enroll other users. *Mathiassen,*

[0131] (disclosing the system administrator enrolls "the next user"). The car owner, desiring to enroll other users, would then have initiated the enrollment process by providing their fingerprint (per *Mathiassen* as otherwise modified by *Anderson*) that was thus compared to stored master minutiae via processor 2 for authentication. Furthermore, because *Mathiassen* teaches the portable door control embodiment is concerned with keeping un-authorized users from accessing the car, a POSITA would have been motivated to implement this extra level of security of requiring the car owner/system administrator to initiate the enrollment process of creating master minutiae tables for a user. *Mathiassen,* [0145]. This extra level of security prevents just any person from providing their fingerprint to the portable door control and potentially becoming an authorized user, even if they were not meant to be one. *Mathiassen,* [0131] ("When the next user is to be enrolled, the system administrator **will have to open this procedure by authenticating himself by his fingerprint.** When such **access by the system administrator is authenticated**…the next user can be enrolled."). Thus, it would have been obvious and desirable for enrollment of other users on the portable control to be implemented in a similar method as for the medicine cabinet embodiment, i.e., by having the administrator initiate enrollment with the administrator's fingerprint and subsequently processor 2 generating master minutiae tables for the new user's fingerprint.

240.   I note *Mathiassen* teaches the medicine cabinet embodiment and the portable door control embodiments are "fundamentally different" because the "main intention" of the medicine cabinet embodiment "was not to prevent access, but to guarantee access," as opposed to the goal of "blocking non-authorized users access to the car." *Mathiassen,* [0145]. In other words, the medicine cabinet embodiment grants access to everyone, while the central locking system of the car embodiment only grants access to authorized users. However, implementing an enrollment procedure similar to that disclosed for the medicine cabinet embodiment would not have kept *Mathiassen's* central locking system from still blocking an un-authorized user of the car, because the access would still reside "**in the fingerprints of the car owner (or other users he may have enrolled**)." *Mathiassen,* [0190]. In fact, implementing an enrollment procedure similar to that disclosed for the medicine cabinet embodiment would facilitate the key objective of the car embodiment by allowing the system to know which individuals are known and should be granted access. Therefore, a POSITA would not have been dissuaded from looking to the procedure of enrolling other users in the medicine cabinet embodiment to understand the car owner (i.e., system administrator) enrolling other car users in the central locking system.

b)    **"according to the instruction"**

241.  I note that Claim 1(d3) recites that the population of the database is "according to the instruction." As one example of *Mathiassen's* teachings of populating the database according to the instruction, *Mathiassen* teaches or renders obvious initiating an enrollment process via the car owner/administrator's fingerprint, as I discuss above.  However, *Mathiassen* does not directly teach that the enrollment process, which populates the database of biometric signatures, occurs according to an instruction mapped *from a series of fingerprint entries*. However, as discussed above with regard to Claim 1(d2), *Mathiassen* does teach a processor translating a series of fingerprint representations into a particular command (i.e., claimed "instruction") that controls the portable control. *Mathiassen,* [0192]. Additionally, *Anderson* similarly teaches invoking a certain requested function via a series of fingerprint presses or pulses of specific durations. *Anderson* (Ex. 1006)*,* 6:37-54, 7:28-34. Thus, a POSITA would have found it obvious and been motivated to modify *Mathiassen's* enrollment procedure to be initiated with a series of fingerprint presses of particular durations, as taught by *Anderson*, which is input by the car owner/system administrator and categorized/translated by the processor 2 to an instruction to enroll a new user (i.e., processor 2 generating master minutiae tables and thus populating the database).

242. As discussed for Claim 1(d2) at ¶ 229, it was a well-known desire within the field of portable devices to increase the simplicity of user input. *See Ghassabian* (Ex. 1031)*,* 1:54-58 (disclosing that a "key feature for a successful technological product is its easily manipulation," further stating a "**quickly, easily and most importantly, naturally…function entry system is vital**."); *see also, Mathiassen '455* (Ex. 1033)*,* 6:33-38 (further disclosing the mapping of fingerprint movements to certain text symbols or device instructions provides "combined user authentication by finger print biometrics, accurate cursor control and **fast, versatile, and flexible text input,** all served by the very same single-button sensor"). Thus, a POSITA would have found it obvious or understood to employ a series of finger interactions on the sensor 5 of portable door control 20 that processor 2 categorized and translated to a certain command for instructing a certain function, especially given *Mathiassen's* express teaching of predefined finger movement sequences being translated to commands in a command table for outputting certain control signals for controlling the device. *Mathiassen* (Ex. 1004), [0192]. This teaching indicates to me that *Mathiassen* desires to use different finger movements to instruct different commands for operating the portable door control and central locking system. Furthermore, *Mathiassen's* disclosure at [0192] already teaches means for inputting of commands via a portable device. *Id.*

243. Additionally, in cases where *Mathiassen's* method of secure access control is implemented in a portable device, such as portable door control 20, a POSITA would have appreciated that car owners/system administrators would have benefited from the increased functionality of enrolling users on-the-go, by simply providing a series of presses/pulses of certain durations (as modified by *Anderson*) to instruct a command to enroll. For example, when a car owner desired using a valet service, they would simply input the series of presses/pulses of certain durations (as modified by *Anderson*) to initiate the enrollment procedure in real-time as opposed to requiring a specific terminal. *Mathiassen,* [0062] (disclosing another enrollment procedure which requires use of a "terminal connected to the server (30)"). *Mathiassen* also already teaches requiring a certain type of input to instruct the portable door control 20 to enroll a new user by a car owner/system administrator providing their fingerprint, thus indicating to a POSITA that an instruction was directed by a certain type of entry. *Mathiassen,* [0190], [0165], [0131].

244. *Mathiassen's* teaching of a car owner/system administrator's inputs invoking the enrollment process and invoking access to the central locking system (i.e., opening the car door locks) indicates to a POSITA that one user, namely an administrator, provides more than one command to the portable door control. *Mathiassen,* [0190], [0175-188] (describing the command of opening the car door locks), [0131] (describing the system administrator providing an instruction to start

enrollment of a new user). For a car owner/system administrator to input different commands and for the portable door control to differentiate these inputs and categorize them to their respective requested commands, a POSITA would have desired implementing a different input, such as a series of presses/pulses of varying duration (as modified by *Anderson*) for initiating the enrollment process and a different input, such as a simple fingerprint, for commanding the car door locks to open. This differentiation of inputs for each command requested by the car owner would then have allowed the portable door control to easily translate the categorized finger movement using the command table to generate the correct control signal. Additionally, *Mathiassen* teaches or renders obvious the processor of a portable device (e.g., portable door control) categorizing and translating these different commands from unique series' of finger movements, as discussed above at Section VII.A.11. *Mathiassen*, [0192].

245.   Indeed, administrators providing a specific input for initiating the enrollment of new users was well-known in the field of biometric authorization. *Bradford* (Ex. 1010), 14:21-41 ("In one preferred embodiment, casino personnel **will be required to enter two fingertips' worth of fingerprint data in succession**…**to be allowed access to the privileged screens on the player ID system**."). More specifically, *Bradford* discloses a system using biometric authorization to create "an entry having biometric data in a player ID database." *Bradford,* 14:21-23. For a

player to create an entry, a "trusted employee" such as an "authorized casino personnel" presents an employee ID card followed by their biometric to "open the privileged screens allowing data entry." *Bradford*, 14:31-37. *Bradford* teaches in a "preferred embodiment" that the "casino personnel will be required" to enter two fingerprints in succession in order to open the privileged screens and thus allow enrollment of a new player to occur. *Bradford,* 14:37-41. Thus, *Bradford* illustrates that it was already known in the art to implement an enrollment procedure for populating a database by using a series of fingerprints, and that this procedure was specific for indicating enrollment initiation, as it was done after the administrator provided a first biometric (i.e., fingerprint). Therefore, a POSITA would have been motivated and found it obvious to similarly implement a specific series of presses/pulses of various durations, as taught by *Anderson*. The car owner/system administrator would have input this specific series into the portable door control 20, whose processor 2 then analyzed, categorized, and translated such series into a particular command for initiating enrollment to thereby cause the processor 2 to subsequently generate master minutiae tables, thus teaching the processor 2 of portable control is configured to "populate the database according to the instruction," as claimed.

246. I have been asked to opine as to whether *Mathiassen* teaches populating "according to the instruction" if this claim phrase means populating the database

with a series of entries corresponding to a particular instruction. In my opinion, *Mathiassen* also teaches such. *Mathiassen* teaches or renders obvious analyzing and categorizing finger movements "**according to predefined sets of finger movement sequences**" to various commands by reference of a command **table**, with the command table used to translate the categorized finger movements into control signals. *Mathiassen,* [0192]. As previously discussed for Claim 1(d1), *Mathiassen's* teaching of "sets" of finger movement sequences and that these sets of finger movement sequences are translated to control signals via a command "table" indicates that there are multiple series of biometric signals, and that each series of biometric signals matches to a certain command in the table to invoke a particular control signal. A POSITA would have understood such a disclosed set corresponding to commands in a "command table" is at least equivalent to a database of instructions, as the '705 Patent similarly describes a "**stored set of legal control signals**." *'705 Patent,* 10:63-67.

> **13.    Claim 1(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device"**

247. As discussed above at Claim 1(Pre), the "controlled item" of *Mathiassen* is the central locking system, with this locking system including physical locks on the car doors. *Mathiassen* (Ex. 1004), [0187] ("If the decrypted message confirms a valid and authenticated 'open door' command, a similar encrypted

command will be **relayed to the car door** locks by the computer."), [0145] (disclosing one "application" of the secure access control method "to car systems" as a "key to the doors of the car (central locking system)…"). These car door locks are "a locking mechanism of a physical access structure," namely a locking mechanism of a door to the car. Thus, *Mathiassen* teaches a controlled item that is "a locking mechanism of a physical access structure."

### B.    Claim 4

**Claim 4: "The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system."**

248.    As discussed above with regard to the mapping of Claim 1, *Mathiassen* in view of *McKeeth* in further view of *Anderson* renders obvious Claim 1.

249.    *Mathiassen* teaches a database of biometric signatures located in the transmitter sub-system. Specifically and as discussed above with regard to the mapping of Claim 1(a), *Mathiassen* teaches master minutiae tables containing fingerprint representations via minutiae data (i.e., database of biometric signatures) that are stored in the memory 7, 7A of the IC 1 included in the portable door control (20). As the portable door control 20 is the transmitter sub-system, *Mathiassen* thus teaches that the database of biometric signatures is located therein. *See discussion of claim mapping for 1(b), (claimed "transmitter sub-system").*

### C.    Claim 6

#### 1.    Claim 6(a): "The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user;"

250.    As discussed above with regard to the mapping of Claim 1, *Mathiassen* in view of *McKeeth* in further view of *Anderson* renders obvious Claim 1.

251.    The '705 Patent describes "the identity of the user 10 is authenticated" when a user's "request 102 can be authenticated" against "biometric signatures for authorized users" stored in a "user identity database 105." *'705 Patent* (Ex. 1001), 5:64-6:2. This described process includes comparing a user's "request," in the form of a fingerprint, "against" stored biometric signatures to successfully authenticate a user because the '705 Patent's description of emitting an access signal when "the identity of the user 101 is authenticated successfully" includes comparing the presented fingerprint to the biometric database. *'705 Patent,* 6:2-9.

252.    Similarly, *Mathiassen's* teaching of the car owner swiping "his finger across the sensor (5) of the portable door control (20)" to "establish a match between the access attempt and one of the resident master minutiae tables," authenticates the identity of the user, as claimed. *Mathiassen* (Ex. 1004), [0176-182]. *Mathiassen* also expressly teaches that the user is authenticated, thus their identity is authenticated because fingerprint representations are well known to identify a person. [0053],

Abstract (both disclosing using *Mathiassen's* IC 1 in the secure access control system for authenticating a user).

> **2.    Claim 6(b): "wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity;"**

253.    *Mathiassen* in view of *McKeeth* teaches a transceiver 27, which includes a transmitter, "for transmitting information capable of granting access," namely unconditional access, access when under duress, and denial of access, "dependent upon a request from the user and authentication of the user identity," namely a user swiping their fingerprint across the sensor and the result of comparing that fingerprint to fingerprint representations in the master minutiae tables. *See also Discussion for Claim 1(b2-b3).* I also note that *Mathiassen* teaches the portable control *wirelessly* transmits the open door command. *Mathiassen*, [0186].

254.    In my opinion, *Mathiassen* in combination with *McKeeth* also teaches the granting of access is dependent upon (1) a request from the user, and (2) the authentication of the user identity. As explained below at Claim 11(Pre3), the *Mathiassen-McKeeth* combination grants multiple types of access (i.e., grants access, grant duress access, or grants alert access when no authentication occurs). These types of access are akin to the described types of access in the '705 Patent, 8:24-38.

255.  Regarding the claimed "dependent upon a request from the user," similar to the requesting action described in the '705 Patent, *Mathiassen* teaches a user "will swipe his finger across the sensor (5) of the portable door control (20)" in order to "access the car." *Mathiassen* (Ex. 1004)*, [0175-0176]. The "swipe" disclosed by *Mathiassen* is at least applying some form of pressure to the sensor 5, making it a press on the biometric sensor. Therefore, a POSITA would have understood that *Mathiassen's* swiping motion is a "request from the user," as claimed, because the fingerprint is pressed when swiped along the sensor.

256.  Regarding the "dependent upon…the authentication of the user identity," the *Mathiassen-McKeeth* combination also teaches such. For example, depending on the authentication of the user identity as the car owner/system administrator, full access is granted, but if the enters a duress identity instead, a different type of access is granted. And, if the authentication is not valid, an alert type of access is provided. *See also* (Claim 1(b2-b3)). These types of accesses are indicated based on information in the encrypted command that is "wirelessly transmitted by the transceiver (27) of the portable door control (20)." *Mathiassen,* [0186]. Therefore, dependent on the authentication of the user identity as system administrator, duress, or alert, a particular type of access is granted in the *Mathiassen-McKeeth* combination.

3.    *Claim 6(c): "the system further comprising a control panel configured to receive the information and provide the secure access requested."*

257.    The '705 Patent does not describe a "control panel" except in the recited claim language. Thus, based on the function recited in the claim limitation to "receive the information and provide the secure access requested," *Mathiassen's* IC of the ignition control 15 serves as the "control panel." This is because the IC 1 in the ignition control 15 receives the encrypted "open door" command by the transceiver 27 of the portable door control 20, which wirelessly transmits the command to the central car computer transceivers that then sends the command via hard wire connection "to the embedded ignition control (15)." *Mathiassen* (Ex. 1004)*, [0186], [0149] (describing hard wire connection of central car computer to ignition control). *Mathiassen* then teaches "The encrypted message will be **decrypted by the embedded ignition control (15) by its processor (2) on its resident IC (1)**" and, if the message is valid and authenticated, the processor 2 of the "resident IC (1)" then relays a "similar encrypted command…to the car door locks…." *Mathiassen,* [0187]. The relayed command being similarly encrypted indicates that the processor 2 on the IC 1 once again encrypts the command and directs the sending of the command to the car door locks. Additionally, the "similar encrypted command" relays the claimed "information" to the car door locks to provide secure access to the car. Thus, the IC 1 on the ignition control 15 receives

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

the information (i.e., encrypted command being a secure wireless signal that contains information regarding the access to provide) and provides the requested secure access, namely the requested opening of the car door locks. A diagram of the IC 1 is shown in Fig. 2b below.



*Mathiassen*, FIG. 2b.

258. A POSITA would have understood or found obvious that the IC of ignition control performs the claimed functions of "receiving the information" and "providing the secure access requested" because it receives the encrypted command in order to decrypt it using the processor 2 and relays the encrypted command to the car door locks in order to provide secure access to open the car door locks.

259. Additionally, a POSITA would have understood the IC 1 of the ignition control to be at least equivalent to a "control panel." It was known that a "control panel" is defined as containing "**an array of jacks or sockets in which wires (or other elements) may be plugged to control the action of an electromechanical device**." *Dictionary of Electrical and Computer Engineering,* McGraw-Hill, 2003 (Ex. 1054) at 118. The locks on a car door are an electromechanical device and these locks are controlled by the IC 1 in the ignition control to open. Furthermore, the IC contains wiring connections to elements for controlling the action of the car door locks, such as the wiring to the central car computer to then relay the "similar encrypted command" to the car door locks. *Mathiassen* (Ex. 1004)*,* [0187]. Therefore, a POSITA would have understood or found it obvious that the IC of ignition control either teaches or is at least equivalent to a "control panel."

### D. Claim 10

**1. Claim 10(Pre): "A transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:"**

260. *See* discussion of mapping for Claim 1(b) regarding the "transmitter sub-system" and discussion of the mapping for Claim 1(Pre) "for operating a system for providing secure access to a controlled item…."

**2. Claim 10(a): "a biometric sensor configured to receiving a biometric signal;"**

261. *See* discussion of mapping for claim 1(b1) above.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

3.    **Claim 10(b): "a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;"**

262.  *See* discussion of mapping for claim 1(b2) above.

4.    **Claim 10(c): a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute;"**

263.  *See* discussion of mapping for claim 1(b3) above.

5.    **Claim 10(d): "wherein the controller is further configured to:"**

264.  *See* discussion of mapping for claim 1(d) above.

6.    **Claim 10(d1): "receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry;"**

265.  *See* discussion of mapping for claim 1(d1) above.

7.    **Claim 10(d2): "map said series into an instruction;"**

266.  *See* discussion of mapping for claim 1(d2) above.

8.    **Claim 10(d3): "populate the database according to the instruction,"**

267.  *See* discussion of mapping for claim 1(d3) above.

9.    **Claim 10(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."**

268.  *See* discussion of mapping for claim 1(e) above.

**E.    Claim 11**

**1.    Claim 11(Pre1): "A method for providing secure access to a controlled item in a system comprising"**

269.    *Mathiassen* teaches a method for "providing secure access to a controlled item," such as a central locking system. *Mathiassen* (Ex. 1004)*, [0145].* Additionally, *Mathiassen* expressly teaches "a **method of improved secure access control**," to such stand-alone appliances such as a car. *Mathiassen,* [0023], Abstract, [0108], [0113] (describing providing secure access control system in a stand-alone application via a "biometric system for the automotive industry."). As discussed above at Claim 1(Pre), the claimed "system" includes portable door control 20, ignition control 15, and central car computer. *Mathiassen* (Ex. 1004)*, [0145-0147].* In short, the portable door control transmits encrypted commands to the ignition control 15 or central car computer which relays the authenticated command after decryption to the car door locks in order to "open (or lock) the car doors." *Mathiassen,* [0182-0188]; *See discussion above for mapping of Claim 1(Pre) which recites a* "**a system for providing secure access to a controlled item**".

**2.    Claim 11(Pre2): "a database of biometric signatures;"**

270.    *See* discussion of mapping for Claim 1(a) above.

3.  **Claim 11(Pre3): "a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item;"**

271.  *See* discussion of mapping for Claim 1(b)-1(b3) above, namely discussion of "a transmitter sub-system" at Claim 1(b), a "biometric sensor…" as Claim 1(b1), and a "transmitter…" at Claim 1(b3).

a)  **"…capable of granting access to the controlled item;"**

272.  Additionally, *Mathiassen's* processor 2, as modified by *McKeeth,* issues a secure access signal that the transceiver 27 of portable control (i.e., claimed "transmitter") emits, with this signal capable of granting unconditional access to the controlled item (i.e., car door locks), access when a user is under duress, and denying access.

(1)  **Discussion of the '705 Patent**

273.  I first note the '705 Patent describes a similar portable control as disclosed in *Mathiassen*. The '705 Patent describes the transmitter sub-system 116 being "incorporated into a **remote fob (which is a small portable device carried by the user 101)**" for transmitting the access signal 108 (claimed "secure access signal") "**via the wireless communication channel**" to the receiver sub-system 117. *'705 Patent* (Ex. 1001)*,* 6:44-46 (describing the "key fob (transmitter) sub-system 116), 6:63-7:3.

274. The '705 Patent describes the remote key fob transmitter sub-system transmits an "access signal 108" when the key fob "authenticates the user" through their presented fingerprint. *'705 Patent,* 7:27-43 ("Once the key fob authenticates the user through biometric signature (e.g. fingerprint) verification, the rolling code in the access signal 108 is transmitted to the controller for authorisation of the user for that location at that time."). The user is then authorized to access the "controlled item," which the '705 Patent describes "can be a **door locking mechanism on a secure door**." *'705 Patent,* 6:17-20. Thus, the user is provided a type of access to a door locking mechanism after they are authenticated.

275. Additionally, the '705 Patent describes "unconditional access." *'705 Patent*, 8:26-30. The '705 Patent does not describe what is meant by "unconditional access," but in my opinion, a reasonable understanding would be that unconditional access is access without any conditions, e.g., simply grant access but without a duress condition. The '705 Patent also describes a system administrator that may enroll other users. *'705 Patent*, 10:26-45. The '705 Patent describes that the first user is automatically categorized as the administrator. *Id.* The '705 Patent also differentiates between classes of users, such as administrators, ordinary users, and duress users. *Id.*

276. The '705 Patent also describes a "duress" type of access where a requesting user is granted access "but with activation of an alert tone to advise

authorities of the duress situation." *'705 Patent,* 8:31-32. Specifically, the '705 Patent describes a user providing an input that indicates "that the user 101 is in a coercive situation where, for example, an armed criminal is forcing the user 101" to access the controlled item. *'705 Patent,* 11:45-50. Furthermore, the '705 Patent describes this duress type of access may "overlap" with other types of access provided to a user, such as an administrator having an input indicating duress stored in the biometric signature database in addition to a regular administrator signature indicating the user requesting normal access. *'705 Patent,* 10:49-55 (describing that a single person, such as an "administrator," can enroll multiple fingers for providing different levels of access (i.e., administrative access or ordinary user access)). Thus, based on the '705 Patent describing a person enrolling multiple fingers and describing an administrator may have a biometric signature saved for indicating they are under duress, it is my opinion that this duress access is provided to any type of user (administrator or ordinary user) when they provide an input that indicates they are under duress (i.e., scan a fingerprint of a different finger).

277. The '705 Patent describes another type of "access to the controlled item" as "sounding a chime indicating that an **unauthorized**…person is seeking access." *'705 Patent,* 8:26-28, 32-35. Additionally, this type of access is described as "(a) **not to provide access to the controlled item 111**, and (b) **to provide an alert tone**, **like ringing a chime or a bell** (not shown), **to alert personnel in the**

**vicinity…that an unauthorized user is attempting to gain access to the controlled item 111**." *'705 Patent,* 12:29-35. Therefore, one type of access described in the '705 Patent is not granting access.

### (2)    *Mathiassen's    Teaching    of    Granting Unconditional Access*

278.    *Mathiassen's* transceiver 27 of portable door control transmits an open door command that grants access. A user (e.g., car owner) initially provides their fingerprint to the sensor 5 on the portable door control 20. *Mathiassen* (Ex. 1004)*,* [0176]. If the processor 2 on the IC 1 of the portable control 20 determines a match between the presented fingerprint minutiae and the stored minutiae in the tables of memory 7/7A [0180-0182], then the processor 2 of the IC 1 in the portable door control 20 issues an "open door" command to be encrypted by the encryption block 8B or 8C also resident on the IC 1, with the transceiver 27 of portable door control then transmitting the encrypted command (the claimed "secure access signal") to the central car computer via transceiver 27 of the portable control 20. *Mathiassen,* [0185-0186] ("The **encrypted 'open door' command** will then be **wirelessly transmitted by the transceiver (27) from the portable door control (20) to the embedded ignition control (15) <u>via the transceivers</u>** of the door locks **<u>and the central car computer</u>**."). The ignition control 15 then decrypts the encrypted command, with a "similar encrypted command" then "relayed to the door locks by the car computer." *Mathiassen,* [0187]. Additionally, *Mathiassen* teaches that the

"decryption and authentication algorithms may be performed on the central car computer instead of the embedded ignition control," thus indicating, in both implementations, that the transceiver of the central car computer receives the command from the portable door control 20 and either passes it along to the ignition control 15 or decrypts the signal. *Mathiassen,* [0188]. *Mathiassen* teaches this portable door control 20 is "**a portable device (20)**" as well as being a "**remote control (20)**." *Mathiassen,* [0147]. Thus, *Mathiassen's* wireless transmission of the encrypted command (i.e., "secure access signal") from the remote portable control 20 to the central car computer via transceivers is similar to the key fob embodiment described in the '705 Patent for wirelessly transmitting the secure access signal to the receiver sub-system. *Mathiassen* thus teaches the claimed "transmitter", namely transceiver 27, is capable of granting access.

279.   Turning to the claimed "access," *Mathiassen's* processor 2 of portable door control 20 authenticates a user's presented fingerprint by matching it with stored minutiae in the master minutiae tables and transceiver 27 transmits an encrypted "open door" command to open the car door locks, thus providing a user access to the "central locking system." *Mathiassen,* [0145]. Thus, because *Mathiassen* teaches providing access to the "controlled item" (i.e., car door locks of central locking system) by the encrypted command being relayed to the transceivers of the door locks for unlocking them, a POSITA would have understood

*Mathiassen's* encrypted command (i.e., claimed "secure access signal") is "capable of granting access," as claimed.

280. *Mathiassen* teaches a type of access similar to the access described in the '705 Patent. *Mathiassen* teaches "the first user to be enrolled [is] the system administrator of the biometrics system in the car" and "becomes the 'owner' of the car." *Mathiassen,* [0162-0164]. Because *Mathiassen* teaches the car owner is provided access to the "central locking system" by opening the car door locks and teaches that the first stored minutiae tables belong to the owner, a POSITA would have understood *Mathiassen's* "open door" command provides access to a system administrator when the car owner presented their fingerprint. The fingerprint of the enrolled first user of the car ("the system administrator of the biometrics system in the car") results in a condition of access, i.e., access is granted, such that the open door command issued in response to matching the car owner's fingerprint instructs the portable control's processor to "proceed to open (or lock) the car doors." *Mathiassen*, [0181-0182]. Therefore, *Mathiassen* teaches a secure access signal capable of providing a type of access, namely of opening the car door locks to a user, such as a system administrator.

### (3)    *McKeeth's* Teaching of Granting Duress and Alert Access

281. As mapped for Claim 1(b2), *Mathiassen's* processor 2 of portable control as modified by *McKeeth* outputs accessibility attributes in the encrypted

command (i.e., claimed "secure access signal") indicating to grant a user access while signaling the issuance of a silent alarm when the user is under duress or indicating to deny access and signal the car alarm to sound. Thus, in the modified *Mathiassen-McKeeth* central locking system, a POSITA would have understood granting access to the car door locks and issuing silent alert when the user indicated they were under duress to be "granting access," as claimed, because the doors would still unlock for the user in addition to a silent alert being signaled. Furthermore, this type of access is similar to that of the duress access described in the '705 Patent.

282.    Additionally, a POSITA would have also understood the modified system denying access by locking up the door locks and sounding the car alarm to "grant" a type of access, namely preventing un-authorized users from entering the vehicle. This type of access is similar to the alert access described in the '705 Patent when an alert attribute is included in the secure access signal. Thus, in the modified *Mathiassen* central locking system, a POSITA would have understood denying access to open the car door locks and issuing a security alert is a type of access granted.

**4.** **Claim 11(Pre4): "a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal,"**

**a)** **"receiver sub-system comprising a receiver sub-system controller"**

283. *See* discussion of mapping for Claim 1(c)-1(c1) above.

**b)** **"…configured to receive the transmitted secure access signal"**

284. *See* discussion of mapping for Claim 1(c1) and 1(b3) ("transmitted secure access signal") above.

**c)** **"provide conditional access to the controlled item dependent upon information in said secure access signal"**

285. *See* discussion of mapping for Claim 1(c2) above regarding "provide conditional access to the controlled item.

286. With regard to the conditional access provided being "dependent upon information in said secure access signal," as claimed, *Mathiassen* teaches the encrypted command contains specific information for providing unconditional access of unlocking car doors when the owner/administrator provides their fingerprint, namely an accessibility attribute for full (i.e., unconditional) access, and the processor of ignition control or central car computer relays a similar "open door" command. *See discussion of mapping for Claim 1(c2).*

**5.    Claim 11(a): "the method comprising: populating the database of biometric signatures by:"**

287.    *Mathiassen* teaches "populating the database of biometric signatures" by generating master minutiae tables containing fingerprint representations (i.e. database of biometric signatures) and storing them in memory 7,7A of the portable door control 20 when a user is enrolled. *See discussion of mapping at Claim 1(d3) regarding "populating the database."*

**6.    Claim 11(a1)-(a2) "receiving a series of entries of the biometric signal;" and "determining at least one of the number of said entries and a duration of each said entry**

288.    *See* discussion of mapping for Claim 1(d1) above. Specifically, either *Mathiassen* or *Mathiassen* in view of *Anderson* teaches "receiving a series of entries of the biometric signal," either as a series of fingerprint movements or a fingerprint access code. *Mathiassen* in view of *Anderson* teaches "determining" the number and duration of the entries in the series because the access code is compared against a code template. *Mathiassen*, [0192]; *Anderson*, 7:28-47. Specifically, the duration of each pulse and the number of pulses is established and ascertained definitely after consideration, investigation, or calculation in order to result in a match with the stored code template.

**7.    Claim 11(a3): "mapping said series into an instruction;"**

289.    *See* discussion of mapping for Claim 1(d2) above.

**8.     Claim 11(a4): "populating the database according to the instruction;"**

290.    *See* discussion of mapping for Claim 1(d3) above.

**9.     Claim 11(b): "receiving the biometric signal;"**

291.    *See* discussion of mapping for Claim 1(b1) above.

**10.    Claim 11(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"**

292.    *See* discussion of mapping for Claim 1(b2) above.

**11.    Claim 11(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute;"**

293.    *See* discussion of mapping for Claim 1(b3) above.

**12.    Claim 11(e): "providing conditional access to the controlled item dependent upon said information;"**

294.    *See* discussion of mapping for Claim 1(c2) above.

**13.    Claim 11(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device;"**

295.    *See* discussion of mapping for Claim 1(e) above.

### F.    Claim 12

**Claim 12: "The method according to claim 10, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: receiving a biometric signal; and enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty."**

296.    *Mathiassen* teaches Claim 12. As discussed above with regard to the mapping of Claim 11(a) (referencing Claim 1(d3), cited for this Claim 12), *Mathiassen* teaches "populating the database of biometric signatures." This process includes enrolling a user's fingerprint into the portable door control by generating master minutiae tables (i.e., populating the database) that contain fingerprint representations in the form of minutiae (i.e., biometric signatures) reduced from raw captured fingerprint images when a fingerprint is received on the sensor 5 (i.e., biometric signal received), with these tables then stored in memory 7, 7A. *Mathiassen* (Ex. 1004)*, [0164] ("Then the car owner will **enroll one or more of his fingers on the portable door control unit (20)**" by capturing images of the fingerprint which are reduced to master minutiae tables stored in "memory (7A) of the IC (1)").

297.    *Mathiassen* teaches "enrolling the biometric signal as an administrator signature if the database of biometric signatures is empty," because when the sensor 5 of the portable door control 20 receives a fingerprint (i.e. biometric signal) from "**the first person to enroll**," this person "**becomes the 'owner' of the car, in the**

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

sense that he becomes the **system administrator**." *Mathiassen*, [0165], [0162] (disclosing the "IC (1) of the portable door control (20)" to be "waiting for the **first user to be enrolled to be the system administrator** of the biometric system in the car**").

298.    A POSITA would have understood that because *Mathiassen* teaches the "first person to enroll" becoming the administrator, that the received fingerprint (i.e., biometric signal) is enrolled as an administrator when the database is empty (i.e., no master minutiae tables are generated). If the user is the first person to enroll, then no one else has enrolled their fingerprint and therefore no master minutiae tables have been generated to subsequently be stored in the memory 7, 7A. Furthermore, *Mathiassen's* teachings that the first person to enroll "becomes the 'owner' of the car, **in the sense that he becomes the system administrator**" would have indicated to a POSITA that minutiae of the car owner are stored in reference to the user being an administrator, thus making them an "administrator signature," as claimed.

## G.    Claim 14

### 1.    Claim 14(pre): "a non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to:"

299.    *Mathiassen* as modified by *McKeeth* and *Anderson* teaches Claim 14. *Mathiassen's* "non-volatile memory (7, 7A, 7E)" residing on the IC 1 stores "program code, e.g., administrative software, tailored security output responses,"

among other information. *Mathiassen* (Ex. 1004)*, [0050]. Furthermore, *Mathiassen* teaches this "administrative software" includes a "matching algorithm" for comparing the access minutiae to pre-stored master minutiae tables and also calculates the secure key (or password) used for encrypting and decrypting the transmitted signals, among other instructions. *Mathiassen,* [0072], [0076]. *Mathiassen* further teaches that processor 2 of IC 1 executes this "administrative software," thus indicating the processor 2 of IC in ignition control and portable control execute the instructions of the "computer program comprising instructions." *Mathiassen,* [0050].

300.   Additionally, a POSITA would have understood that for the processor of IC in the portable door control, ignition control, and processor in the central car computer to perform the claimed steps (with references to mappings of Claim 1), the *Mathiassen* portable device and ignition control (both of which include an IC) would store program code for performing the described steps. Furthermore, in order for the components of the IC 1 (pre-processing block 5C, processor 2, SKG block, encryption block, etc.) to carry out the claimed functions, this hardware would have required some form of program code providing instructions to follow.

301.   The described non-volatile memory for storing the "program code" on the IC 1 is a well-known "non-transitory computer readable storage medium," as claimed. For example, the "non-volatile" memory taught by *Mathiassen* is "non-

transitory" because information remains in the storage even when the power is disconnected. *Mathiassen,* [0050]. This is in contrast to *Mathiassen's* "volatile memory," which is only used for short periods of time to store the access minutiae when a user swipes their fingerprint across the sensor. *Mathiassen,* [0049], *see also* [0067-0069] (describing that the volatile memory is used temporarily for storing the intermediate representation of the fingerprint before it is finally sent to the processor 2 for reduction to minutiae). Additionally, the non-volatile memory 7, 7A is a "computer readable storage medium" because it is a physical piece of hardware residing on the IC 1 that contains instructions read by the processor 2, among other components of the IC 1. In fact, *Mathiassen* teaches such an example of the non-volatile memory being a "SmartCard" [0060], which was well-known to be a physical "storage medium." *Jung* (Ex. 1055), 1:12-15 (describing a smart card being a "data storage device" that contains a "non-volatile memory"). Thus, *Mathiassen's* "non-volatile memory 7, 7A" is a "non-transitory computer readable storage medium," as claimed.

302.    Additionally, it is well known that a processor, such as processor 2 in the IC 1, executes a "computer program **comprising instructions**," as claimed, to perform functions. *Microsoft Press Computer Dictionary,* Second Edition, JoAnne WoodCock, 1994 (Ex. 1044) at 69 (defining a processing unit as "The computational and control unit of a computer; the **device that interprets and executes**

**instructions,"** further stating it "has the ability to fetch, decode, and execute instructions…").

303. Therefore, for all of the reasons discussed above, the modified portable control of *Mathiassen* and ignition control/car computer include or render obvious the "non-transitory computer readable storage medium storing a computer program comprising instructions" that are executed by "processors" to cause them to execute the steps claimed herein (with reference to discussion of mapping such steps at Claim 1), namely the program code stored in non-volatile memory 7, 7A of the IC's in the ignition control and portable door control as well as memory in the central car computer. It is noted that computers were known to contain "computer readable storage medium," and that the central car computer would have had a non-volatile memory for storing instructions to implement the decryption of the encrypted command so when power was lost to the central car computer the instructions were still maintained in the memory, as discussed above with regard to Claim 1(c-c1). *PC Basics Get a Great Start,* Gateway, 2002 (Ex. 1049) at 12-13 (listing both "memory cards" and "storage devices" as common components in a computer).

> **2. Claim 14(a): "receive a series of entries of the biometric signal;"**

304. *See* discussion of mapping at Claim 1(d1) above.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

**3.    Claim 14(b): "determine at least one of the number of said entries and a duration of each said entry;"**

305.    *See* discussion of mapping at Claims 1(d1) regarding "…at least one of the number of said entries and a duration of each said entry;" and 11(a2) regarding "determine" above.

**4.    Claim 14(c): "map said series into an instruction;"**

306.    *See* discussion of mapping for Claim 1(d2) above.

**5.    Claim 14(d): "populate the database of biometric signatures according to the instruction;"**

307.    *See* discussion of mapping for Claim 1(d3) regarding "populate the database…according to the instruction," and 1(a) regarding "of biometric signatures" above.

**6.    Claim 14(e): "receive the biometric signal;"**

308.    *See* discussion of mapping for Claim 1(b1), 1(d1) above.

**7.    Claim 14(f): "match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"**

309.    *See* discussion of mapping for Claim 1(b2) above.

**8.    Claim 14(g): "emit a secure access signal conveying information dependent upon said accessibility attribute;"**

310.    *See* discussion of mapping for Claim 1(b3) above.

**9.    Claim 14(h): "provide conditional access to a controlled item dependent upon said information;"**

311.    *See* discussion of mapping for Claim 1(c2) above.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

10.   *Claim 14(i): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."*

312.   *See* discussion of mapping for Claim 1(e) above.

**H.    Claim 15**

1.    *Claim 15(pre): "a system for providing secure access to a controlled item, the system comprising:"*

*313.*   *See* discussion of mapping for Claim 1(Pre) above.

2.    *Claim 15(a): "a memory comprising a database of biometric signatures;"*

314.   *See* discussion of mapping for Claim 1(a) above.

3.    *Claim 15(b): "a transmitter sub-system comprising:"*

315.   *See* discussion of mapping for Claim 1(b) above.

4.    *Claim 15(b1): "a biometric sensor capable of receiving a biometric signal;"*

316.   *See* discussion of mapping for Claim 1(b1) above.

5.    *Claim 15(b2): "a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"*

317.   *See* discussion of mapping for Claim 1(b2) above.

6.    *Claim 15(b3): "a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute;"*

318.   *See* discussion of mapping for Claim 1(b3) above.

7.    *Claim 15(c): "a receiver sub-system comprising: a receiver sub-system controller capable of:"*

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

319.  *See* discussion of mapping for Claim 1(c) above.

        **8.**        ***Claim 15(c1): "receiving the transmitted secure access signal;"***

320.  *See* discussion of mapping for Claim 1(c1) above.

        **9.**        ***Claim 15(c2): "providing conditional access to the controlled item dependent upon said information;"***

321.  *See* discussion of mapping for Claim 1(c2) above.

        **10.**     ***Claim 15(d): "Wherein the transmitter sub-system controller is further capable of:"***

322.  *See* discussion of mapping for Claim 1(d) above.

        **11.**     ***Claim 15(d1): "receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry;"***

323.  *See* discussion of mapping for Claim 1(d1) above.

        **12.**     ***Claim 15(d2): "mapping said series into an instruction;"***

324.  *See* discussion of mapping for Claim 1(d2) above.

        **13.**     ***Claim 15(d3): "populating the database according to the instruction;"***

325.  *See* discussion of mapping for Claim 1(d3) above.

        **14.**     ***Claim 15(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."***

326.  *See* discussion of mapping for Claim 1(e) above.

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

## I. Claim 16

> **1.    Claim 16(Pre): "A transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:"**

327.    *See* discussion of mapping for Claims 1(b) ("transmitter subsystem"), 1(Pre) ("for operating a system…") above.

> **2.    Claim 16(a): "A biometric sensor capable of receiving a biometric signal;"**

328.    *See* discussion of mapping for Claim 1(b1) above.

> **3.    Claim 16(b): "A controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute;"**

329.    *See* discussion of mapping for Claim 1(b2) above.

> **4.    Claim 16(c): "a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute;"**

330.    *See* discussion of mapping for Claim 1(b3) above.

> **5.    Claim 16(d): "wherein the controller is further capable of:"**

331.    *See* discussion of mapping for Claim 1(d) above.

> **6.    Claim 16(d1): "receiving a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry;"**

332.    *See* discussion of mapping for Claim 1(d1) above.

> **7.    Claim 16(d2): "mapping said series into an instruction;"**

333.    *See* discussion of mapping for Claim 1(d2) above.

8.     *Claim 16(d3): "populating the database according to the instruction;"*

334.  *See* discussion of mapping for Claim 1(d3) above.

9.     *Claim 16(e): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device."*

335.  *See* discussion of mapping for Claim 1(e) above.

**J.    Claim 17**

1.     *Claim 17(Pre1): "A method for providing secure access to a controlled item in a system comprising"*

336.  *See* discussion of mapping for Claim 11(Pre1) above.

2.     *Claim 17(Pre2): "a database of biometric signatures,"*

337.  *See* discussion of mapping for Claim 11(Pre2) above.

3.     *Claim 17(Pre3): "a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item;"*

338.  *See* discussion of mapping for Claim 11(Pre3) above.

4.     *Claim 17(Pre4): "a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal,"*

339.  *See* discussion of mapping for Claim 11(Pre4) above.

5.     *Claim 17(a): "the method comprising: populating the database of biometric signatures by:"*

340.  *See* discussion of mapping for Claim 11(a) above.

**6.      Claim 17(a1): "receiving a series of entries of the biometric signal;"**

341.   *See* discussion of mapping for Claim 11(a1) above.

**7.      Claim 17(a2): "determining at least one of the number of said entries and a duration of each said entry;"**

342.   *See* discussion of mapping for Claim 11(a2) above.

**8.      Claim 17(a3): "mapping said series into an instruction;"**

343.   *See* discussion of mapping for Claim 11(a3) above.

**9.      Claim 17(a4): "populating the database according to the instruction;"**

344.   *See* discussion of mapping for Claim 11(a4) above.

**10.     Claim 17(b): "receiving the biometric signal;"**

345.   *See* discussion of mapping for Claim 11(b) above.

**11.     Claim 17(c): "matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute;"**

346.   *See* discussion of mapping for Claim 11(c) above.

**12.     Claim 17(d): "emitting a secure access signal conveying information dependent upon said accessibility attribute;"**

347.   *See* discussion of mapping for Claim 11(d) above.

**13.     Claim 17(e): "providing conditional access to the controlled item dependent upon said information;"**

348.   *See* discussion of mapping for Claim 1(c2) above.

14.    **Claim 17(f): "wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device;"**

349.   *See* discussion of mapping for Claim 11(f) above.

## VIII. CONCLUSION

I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Date: _22 Feb 2022_

By: _____
Dr. Andrew Sears

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

APPENDIX A – '705 PATENT

| U.S. Patent No. 9,665,705 Claim Language | Teachings of *Mathiassen*, *McKeeth*, and *Anderson* |
|---|---|
| 1(Pre) A system for providing secure access to a controlled item, the system comprising: | ***Mathiassen* teaches a method of providing secure access control to devices, such as car door locks.**<br><br>*Mathiassen* at Abstract, [0016], [0145] (explaining car embodiment),<br><br>***Mathiassen* teaches a central locking system that includes portable door control, embedded ignition control, central car computer, and transceivers of car door locks.**<br><br>*Mathiassen* at [0147-0149] |
| 1(a) a memory comprising a database of biometric signatures | ***Mathiassen* teaches master minutiae tables containing minutiae/fingerprint representations that are stored in memory 7/7A residing on the portable door control's IC 1.**<br><br>*Mathiassen* at [0050], [0164] |
| 1(b) A transmitter subsystem comprising: | ***Mathiassen* teaches a portable door control 20 containing transceiver 27.**<br><br>*Mathiassen* at [0147] |
| 1(b1) a biometric sensor configured to receive a biometric signal; | ***Mathiassen* teaches fingerprint sensor 5 in portable door control 20 that receives a fingerprint from a user and reduces it to captured fingerprint images.**<br><br>*Mathiassen* at [0049-0050], [0176-0178] |

IPR2022-00602
Apple EX1003 Page 206

Appx4016

| | |
|---|---|
| 1(b2) a transmitter sub-system controller configured to match the biometric signal members of the database of biometric signatures to thereby output an accessibility attribute | **"a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures…"**<br>*Mathiassen* **teaches processor 2 of portable door control matches the presented fingerprint minutiae to the stored minutiae in the master minutiae tables.**<br><br>*Mathiassen* at [0182]<br><br>**"…output an accessibility attribute"**<br><br>*Mathiassen* **teaches the "open door" command is output containing an accessibility attribute that establishes whether (i.e., access is granted) and under which conditions (i.e., access that is granted is full) when processor 2 matches the access minutiae to stored master minutiae tables of the car owner/administrator, thus providing full access to unlock all car doors.**<br><br>*Mathiassen* at [0182], [0185]<br><br>**Additionally,** *Mathiassen* **as modified by** *McKeeth* **teaches processor 2 of portable door control outputting an "open door" command, duress command, or alert command.**<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| 1(b3) a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute;" | *Mathiassen* **teaches transceiver 27 of portable control 20 that transmits an encrypted command (i.e., secure access signal) that is issued from processor 2. The encrypted "open door" command is the "secure access signal" because it is only valid for a single transaction and the password for encryption changes every time.**<br><br>*Mathiassen* at [0050], [0182-0186] |

| | |
|---|---|
| | **"…information dependent upon said accessibility attribute"** <br><br> *Mathiassen* **teaches the "open door" encrypted command conveys information to the car door locks to unconditionally unlock, dependent on the command being "open door" and the requesting user being the owner/administrator of the car (i.e. provide full access).** <br><br> *Mathiassen* **at [0182-0186]** <br><br> **Additionally,** *McKeeth* **teaches emitting a signal indicating a duress condition (user is under duress) and alert condition (user is unauthorized).** <br><br> *McKeeth* **at 4:29-43, 5:48-53** |
| 1(c)-1(c)1 A receiver sub-system comprising: a receiver sub-system controller configured to: receive the transmitted secure access signal | **A receiver sub-system** <br> *Mathiassen* **teaches an ignition control, central car computer and its transceiver, and transceivers of the door locks.** <br><br> *Mathiassen* **at [0186-0188], [0148-0149]** <br><br> **A receiver sub-system controller** <br> **The car computer processor or processor 2 of IC 1 in ignition control receives the encrypted command from the car computer transceiver and decrypts/authenticates it to relay a similar encrypted command to the door locks.** <br><br> *Mathiassen* **at [0186-0188]** |
| 1(c2) provide conditional access to the controlled item dependent upon said information | **"provide conditional access to the controlled item"** <br> *Mathiassen's* **processor 2 of ignition control OR processor of central car computer decrypts/authenticates the received encrypted** |

| | |
|---|---|
| | "open door" command, and if successful, relays a similar encrypted command to door lock receivers. The access is conditional because it is provided based on the requesting fingerprint matching with stored master minutiae, and that stored master minutiae belonging to the car owner, thus indicating to provide unconditional access, or full access.<br><br>*Mathiassen* at [0187-0188], [0063] (regarding other users – i.e., not car owner – having partial or less than total access)<br><br>**"…dependent upon said information"**<br>*Mathiassen's* processor of ignition control OR computer sends a similar encrypted "open door" command to the door locks that contains information regarding the user is the owner and should be provided unconditional access (i.e., full access).<br><br>Alternatively, *Mathiassen* as modified by *McKeeth* additionally teaches providing access while issuing a silent alarm when received encrypted command is duress command and denying access while sounding an alarm for alert command.<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| 1(d) Wherein the transmitter sub-system controller is further configured to: | *See* **Claim 1(b2).** |
| 1(d1) receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | **"receive a series of entries of the biometric signal"**<br>*Mathiassen* teaches the processor 2 of portable control executing movement analyzing software to receive a series of fingerprint movements on the portable door control. |

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

| | *Mathiassen* at [0192]<br><br>**"…said series being characterized according to at least one of the number of said entries and a duration of each said entry"**<br><br>*Anderson* **teaches detecting a fingerprint access code by the duration of a pressure pulse and number of pressure pulses.**<br><br>*Anderson* at 7:4-11, 28-34 |
|---|---|
| 1(d2) map said series to an instruction; | *Mathiassen* **teaches portable control processor executes translation software program that maps a categorized series of fingerprint sequence or pressure pulses (as modified by** *Anderson***) to a control signal via a command table.**<br><br>*Mathiassen* at [0192]<br><br>*Anderson* at 7:28-34 |
| 1(d3) populate the database according to the instruction; | *Mathiassen* **teaches enrolling users on portable door control by generating master minutiae tables containing fingerprint representations.**<br><br>*Mathiassen* at [0164]<br><br>*Mathiassen* **renders obvious processor of portable control generating master minutiae tables containing fingerprint representations by the processor receiving a series of fingerprint movements applied by an administrator and translating them to a command to enroll a new user.**<br><br>*Mathiassen* at [0131], [0190], [0192]<br><br>*Anderson* **teaches this series of fingerprint movements is determined by the duration of each** |

Declaration of Dr. Andrew Sears
U.S. Patent No. 9,665,705

| | |
|---|---|
| | **pressure pulse and the number of pressure pulses.**<br><br>*Anderson* at 7:28-34 |
| Claim 1(e) wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device | *Mathiassen* **teaches car door locks.**<br><br>*Mathiassen* at [0187], [0145] |
| Claim 4 The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system | *See Claim 1(b-b1).*<br><br>*Mathiassen* **teaches the master minutiae tables containing fingerprint representations/minutiae are stored in the portable door control (i.e., claimed "transmitter sub-system."**<br><br>*Mathiassen* at [0164] |
| Claim 6(a) The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user | *Mathiassen* **teaches authenticating user when they swipe their finger on the fingerprint sensor 5 of portable door control by matching it to minutiae in stored tables.**<br><br>*Mathiassen* at [0176], [0182] |
| Claim 6(b) wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the | *See claim 6(a) for "request from the user and the authentication of the user identity".*<br><br>*See claim 1(b3) for transceiver 27 wirelessly emitting an encrypted command to either grant unconditional access (i.e., unlock car doors), grant access while issuing a silent alert (as modified by McKeeth), or deny access and sound an alarm (as modified by McKeeth).* |

| | |
|---|---|
| authentication of the user identity; | *Mathiassen* at [0186]<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| Claim 6(c) the system further comprising a control panel configured to receive the information and provide the secure access requested. | ***Mathiassen* teaches IC 1 of ignition control 15 receives the encrypted command and decrypts/authenticates it via processor 2 for providing access to the car door locks.**<br><br>*Mathiassen* at [0186], [0187] |
| Claim 10(Pre) a transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See Claim 1(b) regarding "transmitter subsystem" and 1(Pre) for "operating a system for providing secure access…"* |
| Claim 10(a) a biometric sensor configured to receiving a biometric signal; | *See Claim 1(b1).* |
| Claim 10(b) a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; | *See Claim 1(b2).* |
| Claim 10(c) a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; | *See Claim 1(b3).* |
| Claim 10(d) wherein the controller is further configured to: | *See Claim 1(d).* |

| | |
|---|---|
| Claim 10(d1) receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | *See Claim 1(d1).* |
| Claim 10(d2) map said series into an instruction;" | *See Claim 1(d2).* |
| Claim 10(d3) populate the database according to the instruction, | *See Claim 1(d3).* |
| Claim 10(e) wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See Claim 1(e).* |
| Claim 11(Pre1) A method for providing secure access to a controlled item in a system comprising | *See Claim 1(Pre).*<br><br>*Mathiassen* at [0023] for "…a method of improved secure access control" |
| Claim 11(Pre2) a database of biometric signatures | *See Claim 1(a).* |
| Claim 11(Pre3) a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item; | *See Claims 1(b-b3).*<br><br>*"…capable of granting access to the controlled item"*<br><br>***Mathiassen* teaches the encrypted command grants access to the car door locks because it unconditionally unlocks them when the owner requests access (i.e. providing full access), once the encrypted command is relayed to the car door locks after decryption/authentication.** |

| | |
|---|---|
| | **Additionally, *McKeeth* teaches signaling a system to grant duress access or alert access. Thus, *Mathiassen* as modified by *McKeeth* teaches transceiver 27 of portable control emitting an "open door" command to grant unconditional access, a duress command to grant access but issue a silent alert, and an alert command to deny access.**<br><br>*McKeeth* at 4:29-43, 5:48-53 |
| 11(Pre4) a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, | *See claims 1(c-c2)*<br><br>***"…dependent upon information in said secure access signal"***<br><br>***Mathiassen* teaches the access provided to the car door locks is dependent on the encrypted command relayed to the locks after being decrypted/authenticated by the processor of the ignition control OR car computer, as the command can either be to "unlock" or "lock door".**<br><br>*Mathiassen* at [0187], [0167] |
| 11(a) the method comprising: populating the database of biometric signatures by: | *See Claim 1(d3).*<br><br>***Mathiassen* teaches generating master minutiae tables that contain fingerprint representations when a user enrolls their finger in the system.**<br><br>*Mathiassen* at [0164] |
| 11(a1) receiving a series of entries of the biometric signal; | *See Claim 1(d1) regarding "receiving a series of entries of the biometric signal".* |
| 11(a2) determining at least one of the number of said | *See Claim 1(d1) regarding "according to at least one of the number of said entries and a duration of each said entry".* |

| | |
|---|---|
| entries and a duration of each said entry; | |
| 11(a3) mapping said series into an instruction; | *See Claim 1(d2).* |
| 11(a4) populating the database according to the instruction; | *See Claim 1(d3).* |
| 11(b) receiving the biometric signal; | *See Claim 1(b1).* |
| 11(c) matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See Claim 1(b2).* |
| 11(d) emitting a secure access signal conveying information dependent upon said accessibility attribute; | *See Claim 1(d3).* |
| 11(e) providing conditional access to the controlled item dependent upon said information; | *See Claim 1(c2).* |
| 11(f) wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device; | *See Claim 1(e).* |
| 12 The method according to claim 10, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the | *Mathiassen* **teaches receiving a fingerprint at the fingerprint sensor 5 of portable door control, enrolling this first fingerprint as the administrator when no other users have prior enrolled.** |

| | |
|---|---|
| database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: receiving a biometric signal; and enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty." | *Mathiassen* at [0164-0165] |
| 14(Pre) a non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | ***Mathiassen* teaches memory 7,7A,7E that stores administrative software executed by processor 2 in IC 1 of ignition control, portable door control, and processor of central car computer for performing all of the steps of providing secure access control.**<br><br>*Mathiassen* at [0050] |
| 14(a) receive a series of entries of the biometric signal; | **ptr*See claim 1(d1) regarding "receiving a series of entries of the biometric signal"**<br><br>**Namely, processor 2 of portable control receives a series of fingerprint movements.** |
| 14(b) determine at least one of the number of said entries and a duration of each said entry; | **ptr*See claim 1(d1) regarding "…at least one of the number of said entries and a duration of each said entry" and Claim 11(a2) regarding "determine".** |
| 14(c) map said series into an instruction; | **ptr*See claim 1(d2).** |
| 14(d) populate a database of biometric signatures according to the instruction; | **ptr*See claim 1(d3).** |
| 14(e) receive the biometric signal; | **ptr*Mathiassen* teaches the processor 2 of IC 1 of portable control 20 receives the biometric signal (i.e., intermediate fingerprint data or captured** |

| | **fingerprint images) when a user provides their finger on the fingerprint sensor 5.** *Mathiassen* at [0049-0050], [0176], [0179] |
|---|---|
| 14(f) match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See Claim 1(b2).* |
| 14(g) emit a secure access signal conveying information dependent upon said accessibility attribute; | ***Mathiassen* teaches processor 2 of IC 1 in portable control issues a command and sends it to the encryption block for encryption, then directs the transceiver 27 of the portable control to emit the encrypted command (i.e., secure access signal).** *Mathiassen* at [0182-0186] *See Claim 1(b3) regarding "conveying information dependent upon said accessibility attribute"* |
| 14(h) provide conditional access to a controlled item dependent upon said information | *See Claim 1(c2).* |
| 14(i) wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device." | *See Claim 1(e).* |
| 15(pre) | *See Claim 1(Pre).* |
| 15(a) | *See Claim 1(a).* |
| 15(b) | *See Claim 1(b).* |

| | |
|---|---|
| 15(b1) | *See Claim 1(b1).* |
| 15(b2) | *See Claim 1(b2).* |
| 15(b3) | *See Claim 1(b3).* |
| 15(c) | *See Claim 1(c).* |
| 15(c1) | *See Claim 1(c1).* |
| 15(c2) | *See Claim 1(c2).* |
| 15(d) | *See Claim 1(d).* |
| 15(d1) | *See Claim 1(d1).* |
| 15(d2) | *See Claim 1(d2).* |
| 15(d3) | *See Claim 1(d3).* |
| 15(e) | *See Claim 1(e).* |
| 16(pre) a transmitter sub-system for operating a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See Claim 1(b) regarding "transmitter subsystem" and 1(Pre) for "operating a system for providing secure access…"* |
| 16(a) | *See Claim 1(b1).* |
| 16(b) | *See Claim 1(b2).* |
| 16(c) | *See Claim 1(b3).* |
| 16(d) | *See Claim 1(d).* |
| 16(d1) | *See Claim 1(d1).* |

| 16(d2) | *See Claim 1(d2).* |
|---|---|
| 16(d3) | *See Claim 1(d3).* |
| 16(e) | *See Claim 1(e).* |
| 17(Pre1) | *See Claim 11(Pre1) (citing 1(Pre)).* |
| 17(Pre2) | *See Claim 1(a).* |
| 17(Pre3) | *See:* <br><br> *Claim 1(b) regarding "transmitter sub-system,"* <br><br> *Claim 1(b1) regarding "biometric sensor capable of receiving a biometric signal,"* <br><br> *Claim 1(b3) regarding "transmitter capable of emitting a secure access signal,"* <br><br> *Claim 11(Pre3) regarding "…capable of granting access to the controlled item."* |
| 17(Pre4) | *See:* <br><br> *Claim 1(c) regarding "receiver sub-system comprising a receiver sub-system controller,"* <br><br> *Claim 1(c1) regarding "…configured to receive the transmitted secure access signal,"* <br><br> *Claim 1(c2) regarding "…provide conditional access to the controlled item,"* <br><br> *Claim 11(Pre4) regarding "…dependent upon information in said secure access signal"* |
| 17(a) | *See Claim 11(a).* |

| | |
|---|---|
| 17(a1) | *See Claim 11(a1).* |
| 17(a2) | *See Claim 11(a2).* |
| 17(a3) | *See Claim 1(d2).* |
| 17(a4) | *See Claim 1(d3).* |
| 17(b) | *See Claim 1(b1).* |
| 17(c) | *See Claim 1(b2).* |
| 17(d) | *See Claim 1(b3).* |
| 17(e) | *See Claim 1(c2).* |
| 17(f) | *See Claim 1(e).* |

Trials@uspto.gov
571-272-7822

Paper 47
Date: November 30, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

ASSA ABLOY AB, ASSA ABLOY INC.,
ASSA ABLOY RESIDENTIAL GROUP, INC., AUGUST HOME, INC.,
HID GLOBAL CORPORATION, and
ASSA ABLOY GLOBAL SOLUTIONS, INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

———————————

IPR2022-01006
Patent 9,665,705 B2

———————————

Before SCOTT A. DANIELS, BARRY L. GROSSMAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

GROSSMAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

**Appx4220**

IPR2022-01006
Patent 9,665,705 B2

## I.    INTRODUCTION

### A.    *Background and Summary*

ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc. (collectively "Petitioner"[1]) filed a Petition requesting *inter partes* review of claims 1–17 (the "challenged claims") of U.S. Patent No. 9,665,705 B2 (Ex. 1001, "the '705 patent"). Paper 2 ("Pet."), 1, 4. CPC Patent Technologies Pty Ltd. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 9 (Prelim. Resp."). With our authorization to address Patent Owner's arguments that the Petition is time-barred under 35 U.S.C. § 315(b) (*see* Paper 16), Petitioner filed a Preliminary Reply (Paper 18 ("Prelim. Reply")); and Patent Owner filed a Preliminary Sur-Reply (Paper 20 ("Prelim. Sur-Reply")).

We entered a Decision granting institution of an *inter partes* review of claims 1–17 based on all grounds asserted in the Petition. Paper 23 (the "initial Decision to Institute"). Our initial Decision to Institute addressed the issue of whether the Petition was time-barred, and determined on the record at that time that there was no time bar. Paper 23 at 11–35. We also addressed the issue of patentability asserted in the Petition.

---

[1] *See Cradlepoint, Inc. et al v. 3G Licensing S.A.,* IPR2021-00639, Paper 12, 2 (PTAB May 13, 2021) ("[F]or each 'petition' there is but a single party filing the petition, no matter how many companies are listed as petitioner or petitioners and how many companies are identified as real parties-in-interest. . . . Even though the separate sub-entities regard and identify themselves as 'Petitioners,' before the Board they constitute and stand in the shoes of a single 'Petitioner' . . . they must speak with a single voice, in both written and oral representation.").

2

IPR2022-01006
Patent 9,665,705 B2

The parties filed a Joint Request for Rehearing of the initial Decision to Institute asserting two errors in the Decision to Institute. Paper 25. The two errors noted by the parties in the Joint Request for Rehearing involved confusion between two different "Mathiassen" references, each labelled as "Ex. 1004," in two different, but related IPR proceedings. *See id.* at 1–2. We denied the Joint Request for Rehearing because correction of the identified errors did not change our decision to institute this IPR proceeding. Paper 26 ("Because the corrections to our Decision to Institute involve inadvertent and harmless error, which does not change the outcome of our Decision, we deny the Request for Rehearing. We simultaneously issued a Corrected Decision to Institute, correcting the errors noted by the parties."). The Corrected Decision is Paper 27 ("Corrected Decision to Institute" or "Corr. Dec. Inst."). The Corrected Decision to Institute contained the same Section 315(b) analysis as was in the Initial Decision to Institute. Paper 27 at 11–35.

Patent Owner submitted a Response to the Corrected Decision to Institute. Paper 31 ("Patent Owner Response" or "PO Resp.").

Petitioner submitted a Reply. Paper 35 ("Reply").

Patent Owner submitted a Sur-reply. Paper 41 ("Sur-reply").

Petitioner submitted twenty-nine exhibits. *See* Exs. 1001–1015, 1017–1030[2] (there is no exhibit numbered 1016); *see also* Paper 44

---

[2] Exhibit 1030 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. *See* PTAB Consolidated Trial Practice Guide, 84 (Nov. 2019 ("CTPG") ("Demonstrative exhibits used at the final hearing are aids to oral argument and not evidence.").

IPR2022-01006
Patent 9,665,705 B2

(Petitioner's Updated Exhibit List). Petitioner relies on the Declaration testimony of Andrew Sears, Ph.D. *See* Exs. 1005, 1029.

Patent Owner submitted thirty-seven exhibits. *See* Exs. 2001–2018, 2023–2041[3] (there are no exhibits numbered 2019–2022; Exhibit 2005 includes Parts 1, 2, and 3); *see also* Paper 44 (Patent Owner's Updated Exhibit List). Patent Owner relies on the Declaration testimony of Samuel Russ, Ph.D. *See* Exs. 2031, 2032.

A hearing was held September 28, 2023. *See* Paper 46 ("Transcript" or "Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings and conclusions below, we determine that Petitioner has not established by a preponderance of the evidence that claims 1–17 are unpatentable. We also determine that the Petition is not barred by 35 U.S.C. § 315(b).

### B. Real Parties-in-Interest

Petitioner identifies "ASSA ABLOY AB, ASSA ABLOY Inc. and its wholly owned subsidiaries ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc." as the real parties-in-interest. Pet. 1. Petitioner also states "ASSA ABLOY AB is the ultimate parent of all parties-in-interest." *Id.*

---

[3] Exhibit 2041 is a demonstrative exhibit used at the final hearing. It is not an evidentiary exhibit. *See id.*

IPR2022-01006
Patent 9,665,705 B2

Patent Owner identifies itself as the sole real party-in-interest. Paper 5, 2.

We note here that Patent Owner asserts that the Petition is time-barred under 35 U.S.C. § 315(b) because Apple, Inc. ("Apple") is a real party-in-interest ("RPI") and/or privy of one or more of the individual companies that collectively comprise the Petitioner, and because Patent Owner served a complaint on Apple alleging infringement of the '705 Patent more than 1 year before this Petition was filed. *See, e.g.,* PO Resp. 4, 47–64 (asserting that the Petition is time-barred under 35 U.S.C. § 315(b)). This argument would impact the underlying proceeding if we were to determine that Apple is a real party-in-interest or privy with Petitioner. *See Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413, Paper 76, 5 (PTAB May 22, 2023) (Decision granting Director review and (1) vacating the Board's real party-in-interest determination in the Final Written Decision, and (2) vacating the Board's Order Identifying the asserted real party-in-interest). As stated in *Unified v. MemoryWeb*,

> [t]he Board can and should make a determination of the real parties in-interest or privity in any proceeding in which that determination may impact the underlying proceeding, for example, but not limited to, a time bar under 35 U.S.C. § 315(b) or an estoppel under 35 U.S.C. § 315(e) that might apply.

*Id.* That is the situation here. Patent Owner asserts there is a time bar. *See, e.g.,* PO Resp. 47–64. Thus, following the guidance in *Unified v. MemoryWeb*, we consider in Section II whether Apple is a real party-in-interest, or privy, in this proceeding.

IPR2022-01006
Patent 9,665,705 B2

## C.    *Related Matters*

Petitioner identifies the following matters as being related to this proceeding:

1)    *ASSA ABLOY AB, et al. v. CPC Patent Technologies Pty Ltd., et al.*, No. 3-22-cv-00694 (D. Conn.);

2)    *CPC Patent Technologies Pty Ltd v. HMD Global Oy*,[4] WDTX-6-21-cv-00166-ADA (W.D. Tex.);

3)    *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 5:22-cv-02553-NC (N.D. Cal); and

4)    IPR2022-00602 and IPR2022-00601, identified as pending IPR challenges filed by Apple against, respectively, the '705 patent and related U.S. Patent No. 9,269,208 (the "'208 patent).[5]

Pet. 1–2.

Petitioner also informs us that it has filed "two petitions (IPR2022-01045 and -01089) challenging the claims of" the related '208 patent. Pet. 1.

Patent Owner identifies the above matters as related to the present IPR proceeding.  Paper 5, 2.  Patent Owner further identifies the following IPR proceedings:  IPR2022-00600; IPR2022-01093; and IPR2022-01094. *Id.* at 2–3.

---

[4] Petitioner states HID Global, one of the named Petitioners in this IPR proceeding, and HMD Global, the named defendant in the cited litigation, "have no relation to one another."  Pet. 2, n 2.

[5] The '705 patent, challenged in the Petition now before us, is a "[c]ontinuation of application No. 13/572,166, filed on Aug. 10, 2012, now Pat. No. 9,269,208."  Ex. 1001 code (63).

IPR2022-01006
Patent 9,665,705 B2

### D.    The '705 Patent

We make the following findings concerning the disclosure of the '705 patent.

The '705 patent discloses a system "for providing secure access to a controlled item." Ex. 1001, Abstr. The "controlled item" can be, for example, the locking mechanism of a door or an electronic lock on a personal computer. *Id.* at 1:43–46.[6] The system uses a database of "biometric signatures" (*id.* at 2:32), such as a fingerprint (*id.* at 7:36) for determining authorized access.

Figure 2 from the '705 patent is reproduced below.



Figure 2 is a functional block diagram of an arrangement for providing secure access according to the system disclosed in the '705 patent. Ex. 1001, 5:18–19.

---

[6] Citations are to column:line[s] of the '705 patent.

IPR2022-01006
Patent 9,665,705 B2

As described in the written description of the '705 patent, and as illustrated generally in Figure 2, user 101 makes a request to code entry module 103. *Id.* at 5:56–57. Code entry module 103 includes biometric sensor 121. *Id.* at 5:57–58. If biometric sensor 121 is a fingerprint sensor, for example, then the request "typically takes the form of a thumb press" on a sensor panel (not shown) on code entry module 103. *Id.* at 5:60–63.[7] "Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, [and] palm configuration." *Id.* at 1:30–32; *see also id.* at 16:45–49 (claim 4 stating "the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration").

Code entry module 103 then "interrogates" an authorized user identity database 105, which contains "biometric signatures" for authorized users, to determine if user 101 is an authorized user. Ex. 1001, 5:64–6:2. If user 101 is an authorized user, code entry module 103 sends a signal to "controller/transmitter" 107. *Id.* at 6:2–4.

Database 105 of authorized users is prepared by an "administrator." *Id.* at 10:38–42 ("The first user of the code entry module 103 . . . is automatically categorised[8] as an administrator."). This "first administrator"

---

[7] *See* Ex. 1001, 10:35–38 ("Although the present description refers to 'Users', in fact it is 'fingers' which are the operative entities in system operation *when the biometric sensor 121 (see FIG. 2) is a fingerprint sensor*.") (emphasis added). Thus, it is clear that biometric sensor 121 is *not* limited to a fingerprint sensor.

[8] The Specification uses the British spelling, which we also use when quoting the Specification.

8
**Appx4227**

IPR2022-01006
Patent 9,665,705 B2

can direct the system 100 to either accept further administrators, or alternatively, to accept further "ordinary users." *Id.* at 10:43–45.[9]

The process for enrolling authorized users is shown generally in Figure 8 and described in the related written description. *See id.* at 12:54–13:44 (describing enrollment process 800). In order to add authorized biometric signatures of additional users to database 105, the administrator must set the system using "control information" or a "legal control signal." *Id.* at 10:56–67. When biometric sensor 121 is a fingerprint sensor, the legal control signal for adding new users may be activated by the administrator using a succession of finger presses to biometric sensor 121. *Id.* at 10:56–58. If these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time, controller 107 accepts the presses "as potential control information" and checks the input information against a stored set of "legal control signals." *Id.* at 10:59–67. "In one arrangement, the control information is encoded by *either or both* (a) the number of finger presses and (b) the relative duration of the finger presses." *Id.* at 10:60–63 (emphasis added).

---

[9] The use of the phrase "ordinary users" at the cited portion of the written description (column 10, line 45) is somewhat misleading, and should, more accurately, refer to "authorized users." The written description states that "[t]he disclosed remote entry system can accommodate at least three classes of user, namely administrators, (ordinary) users, and duress users." Ex. 1001, 10:34–36; *see also, id.* at 13:16–19 (stating "It is noted that all signatures stored in the database are tagged as belonging to one or more of the classes of administrator, ordinary user, and duress users."). A "duress" category signature indicates the user "is in a coercive situation." *Id.* at 11:45–53.

9

IPR2022-01006
Patent 9,665,705 B2

An example of this type of "control information" or "legal control signal" is "dit, dit, dit, dah," where "dit" is a finger press of one second's duration . . . and "dah" is a finger press of two second's duration." *Id.* at 11:1–7.[10]

After all authorized users have been added to database 105, in operation, the disclosed system and method compare biometric input signal 102 to database 105 of authorized biometric signatures to determine if user 101 is an authorized user. *Id.* at 5:65–6:2 ("Thus for example if the request 102 is the thumb press on the biometric sensor panel 121 [producing a thumbprint] then the user database 105 contains biometric signatures [*i.e.,* thumbprints] for authorised users against which the request 102 can be authenticated.").

If user 101 is an authorized user based on the inputs to code entry module 103, controller/transmitter 107 then sends "an access signal," based on a "rolling code," to controller 109. Ex. 1001, 6:2–9. According to the written description, "[t]he rolling code protocol offers non-replay encrypted communication." *Id.* at 6:9–10. Other secure codes, such as "the Bluetooth™ protocol, or the Wi Fi™ protocols" also can be used. *Id.* at 6:32–38.

If controller 109 determines that the rolling code received is "legitimate," then controller 109 sends a command to "controlled item 111," which, for example "can be a door locking mechanism on a secure door, or

---

[10] We have not been directed to any persuasive evidence of how the enrollment process is activated by an administrator when the biometric sensor is something other than a fingerprint sensor.

IPR2022-01006
Patent 9,665,705 B2

an electronic key +circuit in a personal computer" that is to be accessed by user 101. *Id.* at 6:11–20.

Code entry module 103 also incorporates at least one mechanism for providing feedback to user 101. *Id.* at 6:24–25. This mechanism can, for example, take the form of "one or more Light Emitting Diodes (LEDs) 122," and/or audio transducer 124, which provide visual or audio feedback to the user. *Id.* at 6:25–31.

### E.   Illustrative Claim

Among the challenged claims, claims 1, 10, 11, 14, 15, 16, and 17 are independent claims.

Independent claims 1 and 15 are directed to a "system for providing secure access to a controlled item." Ex. 1001, 15:62–63, 18:39–40. These claims are identical except for claim 1 using the phrase "configured to," whereas claim 15 uses the phrase "capable of." For example, claim 1 includes "a biometric sensor *configured to receive* a biometric signal" (*id.* at 15:66–67 (emphasis added)), whereas claim 15 includes "a biometric sensor *capable of receiving* a biometric signal." (*id.* at 18:43–44 (emphasis added)). This same distinction also applies to the claimed elements of "a transmitter sub-system controller," "a transmitter," and "a receiver sub-system controller." *Compare id.* at 16:1–23 (claim 1), *with id.* at 18:45–67 (claim 15).

Independent claims 10 and 16 are directed to a "transmitter sub-system for operating in a system for providing secure access to a controlled item." *Id.* at 17:19–20; 19:1–2. The only distinction between claims 10 and 16 is the same "capable of"/"configured to" distinction discussed above for

IPR2022-01006
Patent 9,665,705 B2

claims 1 and 15.  *Compare id.* at 17:19–39 (claim 10), *with id.* at 19:1–20 (claim 16).

Independent claims 11 and 17 are directed to a "method for providing secure access to a controlled item."  *Id.* at 17:40–41.  Again, the only distinction between claims 11 and 17 is the same "capable of"/"configured to" distinction discussed above for claims 1 and 15.  *Compare id.* at 17:40–67 (claim 11) *with id.* at 19:21–20:23 (claim 17).

Independent claim 14 is directed to a "non-transitory computer readable storage medium storing a computer program."  *Id.* at 18:18–19.

Independent claim 1 is illustrative and is reproduced below.

> 1. A system for providing secure access to a controlled item, the system comprising:
>> a memory comprising a database of biometric signatures;
>> a transmitter sub-system comprising:
>> a biometric sensor configured to receive a biometric signal;
>> a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and
>> a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and
>> a receiver sub-system comprising:
>> a receiver sub-system controller configured to:
>> receive the transmitted secure access signal; and
>> provide conditional access to the controlled item dependent upon said information;
>> wherein the transmitter sub-system controller is further configured to:
>> receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
>> map said series into an instruction; and

12
**Appx4231**

IPR2022-01006
Patent 9,665,705 B2

populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

Ex. 1001, 15:62–16:23.

### F.    Prior Art and Asserted Grounds

Petitioner asserts that the Challenged Claims are unpatentable based on following three grounds (Pet. 4):

| | Claim(s) Challenged | 35 U.S.C. §[11] | References/Basis |
|---|---|---|---|
| 1 | 1, 3–5, 9–17 | 103 | Bianco[12], Mathiassen-067[13] |
| 2 | 2, 6, 7 | 103 | Bianco, Mathiassen-067, Houvener[14] |
| 3 | 8 | 103 | Bianco, Mathiassen-067, Houvener, Richmond[15] |

---

[11] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[12] Bianco et al., US 6,256,737 B1, issued July 3, 2001 (Ex. 1003, "Bianco").

[13] Mathiassen, WO 02/28067 A1, published Apr. 4, 2002 (Ex. 1004, "Mathiassen-067").

[14] Houvener et al., US 5,790,674, issued Aug. 4, 1998 (Ex. 1013, "Houvener").

[15] Richmond et al., US 6,856,237 B1, issued Feb. 15, 2005 (Ex. 1005, "Richmond").

13

IPR2022-01006
Patent 9,665,705 B2

Petitioner relies on the declaration testimony of Stuart Lipoff (Exs. 1005, 1029) in support of these grounds.

## II.     REAL PARTY-IN-INTEREST
## SECTION 315(B) TIME BAR

We first address whether the Petition is time-barred.

Patent Owner asserts the Petition in this proceeding should be denied as time-barred under 35 U.S.C. § 315(b) because Apple, an argued real party-in-interest or privy, was served with a complaint for infringement of the '705 patent more than a year before the Petition was filed.  PO Resp. 47. Patent Owner also asserts that once Patent Owner introduces "*some* evidence" of a complaint served more than one year before the Petition was filed, and of an "RPI relationship," Petitioner bears the "burden of persuasion to show that its petition is not time-barred."  *Id.*

One fundamental omission, however, in Patent Owner's Response is that Patent Owner fails to cite any evidence establishing the date that Apple was served with a complaint alleging infringement of the patent.  This evidence is in the record (*see* Exs. 2003, 2004), and was discussed in Patent Owner's Preliminary Response (*see* Prelim. Resp. 1), but was not cited in the Response.[16]  This evidence also was cited and considered in our Decision to Institute this proceeding.  *See* Dec. Inst. 11 ("There is no dispute that Apple was served with a complaint alleging infringement of the '705 patent on March 1, 2021 (citing Ex. 2003, 6; Ex. 2004).

---

[16] Our Scheduling Order in this proceeding states "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 24 at 9.

IPR2022-01006
Patent 9,665,705 B2

In general, the Federal Rules of Evidence apply to this proceeding. 37 C.F.R. § 42.62(a). Under Rule 201(b)(2) of the Federal Rules of Evidence, we take official notice[17] that Apple was served with a complaint alleging infringement of the '705 patent on March 1, 2021. *See* Ex. 2003, 6 (Complaint alleging as its "Second Cause of Action" "Infringement of the '705 Patent"); Ex. 2004 (Affidavit of Service on Apple on March 1, 2021).

Under 35 U.S.C. § 315(b), an *inter partes* review "may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party-in-interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1346 (Fed. Cir. 2018) ("*AIT*").

Petitioner bears the burden of establishing that no RPI or privy was served with a complaint alleging infringement more than one year prior to the May 31, 2022, filing date (*see* Paper 3) of the Petition in this proceeding. *RPX v Applications in Internet Time, LLC*, IPR2015-01750, Paper 128 at 6–7 (PTAB (Oct. 2, 2020) (precedential), (rehearing denied, Paper 142, Dec.4, 2020 ) ("*RPX*");[18] *see also Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.*, IPR2017-00651, Paper 152 at 4–5 (PTAB Jan. 24, 2019) (precedential) (citing *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242 (Fed. Cir. 2018).

---

[17] *See* 37 C.F.R. § 42.62(c) stating that the term "Judicial notice" in the Federal Rules of Evidence means "official notice" in the context of an *inter partes* review proceeding.
[18] We cite to the public version of Board's decision following remand from the Federal Circuit in *AIT*. This same Decision also was entered in the related cases IPR2015-01751 and IPR2015-01752.

IPR2022-01006
Patent 9,665,705 B2

In *Power Integrations, Inc. v. Semiconductor Components Industries, LLC*, 926 F.3d 1306, 1314 (Fed. Cir. 2019), the Federal Circuit stated,

> [t]he Board's decision under § 315(b) is whether to institute or not. The condition precedent for this decision is whether a time-barred party (a party that has been served with a complaint alleging infringement of the patent more than one year before the IPR was filed) is the petitioner, real party in interest, or privy of the petitioner.

There is no dispute that Apple was served with a complaint alleging infringement of the '705 patent on March 1, 2021. See Ex. 2003, 6 (Complaint alleging as its "Second Cause of Action" "Infringement of the '705 Patent"); Ex. 2004, (Affidavit of Service on Apple on March 1, 2021). Thus, the dispositive issue under Section 315(b) before us is whether Apple is an RPI or privy with Petitioner.

### A. The Petitioner Entities

Before addressing in detail Petitioner's relationship with Apple, and to put that relationship in its proper context, it is helpful to identify the parties that, collectively, are included as Petitioner.

The individual companies that collectively are referred to as "Petitioner" are more than just an Apple supplier or business partner. ASSA ABLOY AB "is the parent company of several entities worldwide, that are leaders in the delivery of secure identity solutions for millions of customers throughout the world." Ex. 2007 ¶ 10. ASSA ABLOY AB is the ultimate parent company of ASSA ABLOY Inc. *Id.*

ASSA ABLOY Inc., a named Petitioner, is the main holding entity for ASSA ABLOY AB's North and South American assets and is "the immediate parent company of Yale, August, HID, and Hospitality." *Id.* ¶ 11; *see also id.* ¶¶ 6–9 (providing complete corporate citations for

IPR2022-01006
Patent 9,665,705 B2

"Yale," "August," "HID," and "Hospitality," each of which is a named entity collectively comprising the Petitioner in this IPR proceeding).

The Petitioner companies provide "identity solutions used in a variety of applications, including physical access control, logical access control, access card printing and personalization, highly secure government identification, and commercial and residential opening solutions." *Id.* ¶ 14. These products, solutions, and services "are sold through a well-established network of OEMs, developers, systems integrators, and distributors worldwide." Ex. 2007 ¶ 14.

"Yale protects millions of homes and businesses worldwide and is the brand behind locks of every design and function in over 125 countries." *Id.* ¶ 15. "August is the leading provider of smart locks and smart home access products and services. August's products and services give customers total control over the front door from a smartphone." *Id.* ¶ 16. "HID is a worldwide leader in trusted identity solutions. Its products range from physical access control products, like ID cards and readers for opening doors, to solutions for accessing digital networks, verifying transactions, and tracking assets." *Id.* ¶ 19. "Hospitality similarly provides advanced electronic locking and access solutions to hotels, cruise ships, construction, critical infrastructure, education, senior care, and multi-family residential industries worldwide." *Id.* at ¶ 20. "HID and Hospitality offer the HID Mobile Access and ASSA ABLOY Mobile Access software solutions, respectively. Each allows an individual's mobile device (e.g., smartphone or wearable) to be used to gain access to secured doors, gates, networks, services, and more." *Id.* ¶ 21.

IPR2022-01006
Patent 9,665,705 B2

Petitioner filed a Declaratory Judgment action against Patent Owner and its parent company based on Patent Owner's written allegations to Petitioner that one or more of the Petitioner companies infringe patents owned by Patent Owner, including the '705 patent challenged in this proceeding. *Id.* ¶¶ 58–73.

There also is no dispute that Petitioner and Apple have a sophisticated and substantive business relationship. *See, e.g.*, Ex. 2009. Petitioner supplies products, which are locking systems, to Apple, which Apple then sells to consumers. Ex. 2027. Also, Apple's iPhone is one of the smartphone products that can be used with Petitioner's lock products. *Id.* Thus, Petitioner must design its locking products to interact with the iPhone operating system and software. Patent Owner asserts that this arrangement makes Apple a real party-in-interest and/or a privy with Petitioner. Petitioner, who has the burden of persuasion, disagrees.

As explained below, when considering the entirety of the evidentiary record, including evidence relating to the business model and operating relationship between Petitioner and Apple, and considering the equitable and practical considerations of the relationship between Petitioner and Apple, we determine that Apple is *not* an RPI or in privy with Petitioner.

We discuss below the evidence and arguments on which the parties rely.

### B.    RPI Status

Section 315(b) "is unambiguous: Congress intended that the term 'real party in interest' have its expansive common-law meaning." *AIT*, 897 F.3d at 1351. "Determining whether a non-party is a 'real party in interest' demands a flexible approach that takes into account both equitable and

18
**Appx4237**

IPR2022-01006
Patent 9,665,705 B2

practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner." *Id.* As stated in *AIT*, "a patent owner dragged into an IPR by a petitioner, who necessarily has an interest in canceling the patent owner's claims, should not be forced to defend against later judicial or administrative attacks on the same or related grounds by a party that is so closely related to the original petitioner as to qualify as a real party in interest." *Id.* at 1350. The corollary to this principle is that a patent owner who sues, or threatens to sue, several independent and distinct entities should not be surprised when each mounts an independent and distinct defense, whether in a federal court, in a post-grant proceeding in the Patent and Trademark Office, or both.

This concept of avoiding repeated challenges of a patent by distinct, but related, parties also is supported in the legislative history of Section 315(b). *Id.*; *see also RPX*, Paper 128 at 8–9 (concluding that the legislative history supports the concepts that "the RPI and privity requirements were designed to avoid harassment [of patent owners] and preclude parties from getting 'two bites at the apple' by allowing such parties to avoid either the estoppel provision or the time-bar").

"The statutory terms 'real party in interest' and 'privy' are not defined in Title 35. However, they are well-established common law terms." *Power Integrations*, 926 F.3d at 1315. The Federal Circuit has determined "that Congress intended to adopt common law principles to govern the scope of the section 315(b) one-year bar." *Id.* We therefore look "to common law preclusion principles for guidance" to determine whether a real party-in-interest or privity relationship exists. *Id.*

19

IPR2022-01006
Patent 9,665,705 B2

Whether a party who is not a named participant in a given proceeding nonetheless constitutes a "real party-in-interest" or "privy" to that proceeding "is a highly fact-dependent question." Consolidated Trial Practice Guide (Nov. 2019) (CTPG)[19], 13 (citing *Taylor v. Sturgell*, 553 U.S. 880 (2008) (summarizing common law preclusion principles)). "[A]t a general level, the 'real party-in-interest' is the party that desires review of the patent." CTPG, 14. Thus, the "real party-in-interest" may be the petitioner itself, and/or it may be the party or parties "at whose behest the petition has been filed." *Id*; *see AIT*, 897 F.3d at 1351 (recognizing the "fact-dependent" nature of the RPI inquiry, and explaining that the two questions lying at its heart are whether a non-party "desires review of the patent" and whether a petition has been filed at a nonparty's "behest"). A common meaning of "behest" is "because someone has ordered or requested it." *See* Ex. 3002.

> As explained in *AIT*:
>
> [D]etermining whether a non-party is a "real party in interest" demands a flexible approach that takes into account both equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner. Indeed, the Trial Practice Guide . . . suggests that the agency understands the "fact-dependent" nature of this inquiry, explaining that the two questions lying at its heart are whether a non-party "desires review of the patent" and whether a petition has been filed at a nonparty's "behest."

897 F.3d at 1351 (quoting Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48759 (Aug. 14, 2012)); *accord* CTPG 13–14.

---

[19] Available at: https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=TrialPracticeGuideConsolidated.

20
**Appx4239**

IPR2022-01006
Patent 9,665,705 B2

In *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018 (Fed. Cir. 2021), the Federal Circuit stated that:

> [Determining whether a party is a RPI] has no bright-line test— relevant considerations, however, may include, "whether a . . . party exercises [or could exercise] *control* over a petitioner's participation in a proceeding, or whether a . . . party is *funding* the proceeding or directing the proceeding.

*Id*. at 1028 (emphasis added) (quoting *AIT*, 897 F.3d at 1342, which cited "Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012)"); *see also* CTPG, 16 ("A common consideration is whether the non-party exercised or could have exercised control over a party's participation *in a proceeding*. The concept of control generally means that 'it should be enough that the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties.'" (citing 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4451 (2d ed. 2011) (hereinafter cited generally as "WRIGHT & MILLER")). Thus, factors such as "control" and "funding" clearly are relevant. They are *not*, however, the sole, or dispositive, factors. *See* CTPG, 17 (noting that "whether something less than complete funding and control suffices to justify similarly treating the party [as a real party-in-interest] requires consideration of the pertinent facts" (citing *Cal. Physicians Serv. v. Aoki Diabetes Research Inst.*, 163 Cal. App. 4th 1506, 1523–25 ("discussing the role of control in the 'privy' analysis, and observing that 'preclusion can apply even in the absence of such control'")).

Consistent with *Uniloc 2017*, and as further explained in the CTPG, "[c]ourts and commentators agree . . . that there is no 'bright-line test' for

IPR2022-01006
Patent 9,665,705 B2

determining the necessary quantity or degree of participation to qualify as a 'real party-in-interest' or 'privy' based on the control concept." CTPG, 16 (emphasis added) (citing *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994); WRIGHT & MILLER § 4451 ("The measure of control by a nonparty that justifies preclusion cannot be defined rigidly.")). As stated in *Gonzalez*, the evidence as a whole must establish that "the nonparty possessed effective control over a party's conduct . . . as measured from a practical, as opposed to a purely theoretical, standpoint." *Gonzalez*, 27 F.3d at 759. Theoretical, hypothetical, or speculative assertions about effective control, unsupported by evidence, are neither probative nor persuasive.

Additional relevant factors to those discussed above include: the non-party's relationship with the petitioner; the non-party's relationship to the petition itself, including the nature and/or degree of involvement in the filing; and the nature of the entity filing the petition. CTPG, 17–18.

A party is not considered a real party-in-interest in an *inter partes* review solely because it is a joint defendant with a petitioner in a patent infringement suit or is part of a joint defense group with a petitioner in the suit. *Id.* Joint defendants sued for patent infringement have common interests in establishing that their products do not infringe and/or the asserted patent or patents are invalid. That common interest, however, does not, by itself, automatically establish a real party-interest or privy relationship. *Id.*

We consider all the various factors discussed in the legislative history, case law, and other authority and guidance cited above. No one factor is dispositive. *See, e.g., id.* at 18 ("In short, because rarely will one fact, standing alone, be determinative of the inquiry, the Office cannot prejudge

22

IPR2022-01006
Patent 9,665,705 B2

the impact of a particular fact on whether a party is a 'real party-in-interest' or 'privy' of the petitioner.").

Patent Owner takes a different view of the criteria to establish status as a real party-in-interest. Patent Owner states:

> In this matter, Patent Owners' assertion that Apple is an RPI is not based on Apple's control (or lack thereof) over the IPR; rather, Patent Owner's contention is based upon the established, significant business relationship between Apple and Petitioners as concerns the technology at issue, coupled with the undeniable fact that Apple would be a clear beneficiary of an invalidity finding in this proceeding.

PO Resp. 49.

Additionally, Patent Owner further asserts that "[a]s is plainly stated in *AIT*, the RPI analysis must be made 'with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner.'" PO Resp. 49 (citing *AIT*, 897 F.3d at 1351).

Petitioner asserts that "Apple never knew the petition [in this proceeding] would be filed, never requested that it be filed, and never directed, controlled or contributed to it financially or otherwise." Reply 21. Petitioner also asserts that it filed the Petition in this proceeding "based on their own interests, without any consideration of Apple." *Id.* Additionally, Petitioner notes that "Apple has its own IPR petition challenging the patent-at-issue," and that Petitioner "likewise had no involvement in Apple's petition." *Id.*

We address the parties' contentions below.

IPR2022-01006
Patent 9,665,705 B2

### 1.    *Apple's Prior IPR Petition*

As noted above in Section I.C (Related Matters), Apple timely filed its own petition, IPR2022-00602 (the '602 Petition), challenging some, but not all, claims of the '705 patent. *See Apple, Inc. v. CPC Patent Technologies, PTY, LTD.*, IPR2022-00602, Paper 1 (PTAB February 23, 2022) (the "'602 Apple IPR"). The '602 Apple IPR challenges claims 1, 4, 6, 10–12, and 14–17 based on three references, Mathiassen-113, McKeeth, and Anderson. *Id.* The Petition now before us challenges all 17 claims of the '705 patent based on various combinations of four references, Bianco, Mathiassen-067, Houvener, and Richmond. Pet. 4.

In the '602 Apple IPR, the Board instituted trial on all asserted grounds and all asserted claims. *Apple*, IPR2022-00602, Paper 11 (PTAB Sep. 28, 2022). On September 27, 2023, the Board issued its Final Written Decision in that proceeding, determining all challenged claims, claims 1, 4, 6, 10–12, and 14–17, were unpatentable. *Id.*, Paper 31 (Sep. 27, 2023). Patent Owner requested Director Review of the Final Written Decision (*id.*, Paper 34), which was denied (*id.*, Paper 35).

In *Unified Patents v. Uniloc USA, Inc. et al*, IPR2018-00199, Paper 33 (PTAB May 31, 2019), the Board determined that the fact that Apple, also asserted to be an unnamed RPI in that case, filed its own similar petition around the same time as the petitioner in that case "does not suggest Apple is an unnamed RPI. To the contrary, it suggests that Apple did not need Petitioner to file this Petition on its behalf, and chose to file its own similar petition, giving Apple control over its own proceeding." *Unified Patents*, IPR2018-00199, Paper 33 at 9. A similar determination can be made here. The fact that Apple filed the '602 Apple IPR on February, 23, 2022, about

IPR2022-01006
Patent 9,665,705 B2

three months *before* the Petition in the case before us was filed, suggests that Apple did not need Petitioner to file the Petition in this case on its behalf, because Apple had previously filed its own similar petition, giving Apple control over its own proceeding.

We also note here that Petitioner filed its Petition because it was independently threatened with a law suit by Patent Owner based on an alleged infringement of the '705 patent and other patents, as explained in Petitioner's Declaratory Judgment complaint. *See* Ex. 2007.

### 2.    *Apple's Relationship to Petitioner*

There is no dispute that Apple has a business relationship with Petitioner. Petitioner filed a Declaratory Judgment complaint against "CPC Patent Technologies Pty. Ltd." (Patent Owner in the proceeding before us) and "Charter Pacific Corporation Ltd." (collectively referred to in the complaint as "Charter Pacific"). Ex. 2007 ¶ 1. In the Declaratory Judgment complaint, Petitioner states "Charter Pacific is also engaged in an aggressive litigation campaign that includes Apple Inc. ("Apple"), *a business partner* of the ASSA ABLOY Entities [the Petitioner in the proceeding before us]." *Id.* ¶ 30 (emphasis added); *see also, e.g., id.* ¶¶ 21, 43, 98–106 (referring to products sold by Petitioner to Apple).

The business relationship between Apple and Petitioner is that Petitioner, or one of the named entities collectively referred to as Petitioner, makes products that interface with Apple products and may be sold on Apple's website. For example, ASSA ABLOY Residential Group, Inc., a named entity included as a Petitioner in this proceeding, makes and sells security locks under the brand name "Yale." *See* Ex. 2007 ¶¶ 53–73 (discussing the infringement allegation against "Yale Smart Locks");

25

**Appx4244**

IPR2022-01006
Patent 9,665,705 B2

Ex. 2027 (screen shots from Apple's website concerning the "Yale Assure Lock SL Touchscreen Deadbolt"). As described, in Exhibit 2007, the Yale Assure Lock uses a software application ("App") on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store. Ex. 2027 (*see* page 1 stating "you can lock or check current status just by asking Siri").

Petitioner asserts Petitioner and Apple have a standard business relationship like that of over 34 million application developers on Apple's platform (EX-1023 at 6–7) and hundreds of MFi Program[20] participants (collectively its business partners). Reply. 23. Petitioner does not dispute that it has accepted the "Apple Developer Program License Agreement" allowing it to use Apple software to develop applications for Apple products. *See* Ex. 2009. Exhibit 2009 is an 88-page document governing Petitioner's relationship with Apple. *Id.* Essentially, Petitioner sells its products with and through Apple, and creates software applications that

---

[20] The acronym "MFi" refers to "Made for iPhone/iPod/iPad." *See* Ex. 3003. Apple's Developer Program License Agreement (Ex. 2009) defines "MFi Program" to mean "a separate Apple program that offers developers, among other things, a license to incorporate or use certain Apple technology in or with hardware accessories or devices for purposes of interfacing, communicating or otherwise interoperating with or controlling select Apple-branded products." (Ex. 2009, 6); *see also* Ex. 2017 (explaining how the MFi program works); Ex. 3004 (summarizing who needs to join the MFi program, and who does *not* need to join); Ex. 3005 (referring to undefined "MFi certification requirements"); Ex. 1022, 6 (stating that "at least one exemplary product from the August Smart Lock family of products; and at least one exemplary product from the Yale Assure Lock family of products" were "submitted to Apple for certification purposes").

26
**Appx4245**

IPR2022-01006
Patent 9,665,705 B2

allow those products to interface with Apple's iPhone and other Apple products.

Our rules do *not* provide for interrogatories between the parties. Our rules provide, however, that "[t]he parties may agree to additional discovery between themselves." 37 C.F.R. § 42.51(b)(2)(i). Apparently, Petitioner agreed to respond to interrogatories from Patent Owner. Petitioner asserts that its "verified responses to CPC's Interrogatories confirm that Apple never provided any direction, control, or financing in this proceeding." Reply 21 (citing Ex. 1022, responses to Interrogatory Nos. 3, 4).

Exhibit 1022 contains responses to five interrogatories posed by Patent Owner to Petitioner in this IPR proceeding and its related proceedings. Ex. 1022, 1 ("These answers are made solely for the purpose of IPR2022-01006, IPR2022-01045, IPR2022-01089, IPR2022-01093, and IPR2022-01094").

In the interrogatory responses, Petitioner states:

1. "Petitioners do not have any insurance policy or policies that name Apple as an additional insured" (Ex. 1022, 7);

2. "Petitioners have not had any communications with Apple, directly or through counsel, . . . other than communications that relate solely to Petitioners seeking Apple's permission to produce documents in response to CPC's discovery request" ((*id.* at 8);

3. "Petitioners and other ASSA ABLOY entities have not had any communications with Apple, directly or through counsel, regarding the validity or invalidity of the . . . '705 Patent" (*id.* at 10); and

4. "There have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or

27
**Appx4246**

IPR2022-01006
Patent 9,665,705 B2

obligation to indemnify based on assertion of . . . U.S. Patent No. 9,665,705) (*id.* at 11–12).

Additionally, Petitioner states in its interrogatory responses:

• Apple had no role whatsoever in Petitioners' IPRs.

• Petitioners never informed Apple that the IPR petitions were being prepared, never communicated with Apple regarding the substance of the IPR petitions, and never told Apple when or why the IPR petitions would be filed.

• Petitioners provide all direction to their outside counsel regarding the IPRs and the district court litigation between Petitioners and Apple [sic].[21]

• Apple previously filed its own IPR petitions regarding the subject patents (IPR2022-00600, IPR2022-00601, and IPR2022-00602). Petitioners likewise had no involvement whatsoever in Apple's IPR petitions. Petitioners never knew that Apple's IPR petitions were being prepared or that they would be filed.

• Petitioners did not file any of Petitioners' IPR petitions at Apple's behest. Apple never requested that Petitioners file any IPR petitions challenging any of the patents-at-issue.

• Apple has never had any control or say whatsoever in Petitioners' IPR petitions.

• Apple has not contributed financially or in any other manner to any of Petitioners' IPR petitions.

Ex. 1022, 8–9.

There is no evidence that refutes or contradicts these interrogatory responses. The record before us contains no evidence of communications

---

[21] This appears to be a misstatement. We have not been informed of any litigation between "Petitioners and Apple." The only litigation cited by the parties involves Petitioner and Patent Owner, Patent Owner and Apple, or Patent Owner and HMD Global. *See* Section I.C ("Related Matters") of this Decision.

IPR2022-01006
Patent 9,665,705 B2

between Petitioner and Apple regarding this proceeding or the preparation of the Petition filed in this proceeding.

Patent Owner relies on several specific clauses in the Developer Agreement to establish the asserted RPI relationship, including: (1) representations and warranties of noninfringement (PO Resp. 56–58); indemnification clauses (*id.* at 58–59); product inspection and insurance clauses (*id.* at 59–61); and appointment of Apple as an agent for distribution of Petitioner's "software on the Apple App Store;" (*id.* at 61). Patent Owner also asserts that Apple is "a clear beneficiary of the Petition (*id.* at 62–63). Additionally, Patent Owner asserts that the fact that Petitioner filed a Declaratory Judgment complaint seeking a declaration of non-infringement of the '039 patent is significant. PO Resp. 63.

We discuss these issues below.

*a)    Developer Agreement (Ex. 2009)*

The Apple Developer Agreement is an 88-page agreement between Apple and software developers who need to use Apple software "to develop one or more Applications . . . for Apple-branded products." Ex. 2009, 1. The Developer Agreement provides "a limited license" to use Apple software "to develop and test" the Developer's software applications for Apple products. *Id.* "In order to use the Apple" software and related services," the prospective developer "must first accept" the Developer Agreement. *Id.*

*(1)    Representations and warranties*
*of noninfringement (PO Resp. 56–58);*

Patent Owner cites Section 3.2(d) of the Developer Agreement for its "warranties of noninfringement." PO Resp. 56–58. Section 3.2(d) states

IPR2022-01006
Patent 9,665,705 B2

"*[t]o the best of Your knowledge and belief . . .* the Developer's products don't infringe any Apple or third party intellectual property or other rights." Ex. 2009, 16. We do *not* consider Section 3.2(d) to be "warranty." It is not a guarantee that products will not infringe. It is a representation of the developer's current "knowledge and belief." It is far different from the obligations created by the App developer's agreement in *Bungie*.

In *Bungie*, Bungie represented and warranted to Activision that Bungie owns or controls all the rights in "the Licensor Product Intellectual Property." *Bungie*, IPR2015-01264, Paper 64 at 29. In *Bungie*, there also was a representation that "the use, development, distribution and publishing [of the Licensor Product] as contemplated by and set forth in [the *Bungie*] Agreement, *shall not infringe upon or violate the rights of, nor require the consent of, any other party*." *Id.* (citations to the evidentiary record omitted). The representation in Section 3.2(d) of the Developer Agreement (Ex. 2009) in the case before us is *not* a similar warranty of noninfringement.

Patent Owner also cites Schedule 1, Section 4.1, of the Developer Agreement as evidence of a representation and warranty of noninfringement. PO Resp. 56–58.

The Developer Agreement refers to three "Schedules": Schedule 1, Schedule 2, and Schedule 3. *See* Ex. 2009, 1 ("Purpose," referring to the different purposes of Schedules 1 and 2); *id.* § 7.1 ("Delivery of Free Licensed Applications"); *id.* § 7.2 (delivery of "Fee-Based Licensed"); (*see also id.* 73–88 (Schedule 1)).

Schedules 2 and 3 of the Developer Agreement were not included with Patent Owner's filed Exhibit 2009.

30
**Appx4249**

IPR2022-01006
Patent 9,665,705 B2

The Developer Agreement defines when Schedule 1 will apply:

Distribution of free (no charge) Applications (including those that use the In-App Purchase API for the delivery of free content) via the App Store or Custom App Distribution will be subject to the distribution terms contained in Schedule 1 to this Agreement.

Ex. 2009, 1 ("Purpose" section).

The Developer Agreement also defines when Schedule 2 will apply:

If You would like to distribute Applications for which You will charge a fee or would like to use the In-App Purchase API for the delivery of fee-based content, You must enter into a separate agreement with Apple ("Schedule 2").

*Id.*

Schedule 3 applies to "Custom App Distribution." *Id.*

We have not been directed to any evidence establishing the financial terms of how Petitioner's applications will be distributed. Thus, we do not know whether Petitioner's applications will be distributed for free, and thus subject to Schedule 1; whether Petitioner's applications will be distributed for a fee, and thus subject to Schedule 2; or whether Petitioner's applications will be distributed by "Custom App Distribution," and thus subject to Schedule 3.

Without evidence of which of the three schedules apply to Petitioner, Patent Owner's arguments about the scope of the warranty in Schedule 1 are not probative evidence that Apple is an RPI in this proceeding.

Moreover, a contractual obligation of a representation and warranty, without more, does not establish that Apple is an RPI in this proceeding.

In *Bungie*, one responsibility of Bungie under the terms of the agreement in that case was to conduct "legal reviews." *Bungie*, IPR2015-01264, Paper 64 at 29. These "legal reviews were *in addition to* the

31

IPR2022-01006
Patent 9,665,705 B2

representations and warranty of noninfringement.  In *Bungie*, the agreement identified as an item to "be managed by and be the responsibility of Licensor [Bungie]": "[c]onducting legal reviews of the Products to ensure that all Intellectual Property and other rights are fully cleared for use." *Id.*  The responsibilities of Bungie listed in the agreement, including these "legal reviews," were "subject to prior review and approval of [Licensee] Activision, (budget to [be] mutually approved) such approval not to be unreasonably withheld." *Id.* (citations to evidentiary record omitted).  The stated purpose or required result of the "legal reviews" was "to ensure that all Intellectual Property and other rights are fully cleared for use." *Id.* at 29–30.

In *Bungie*, the Board determined that "unlike an opinion letter that opines merely as to *whether* rights are clear for use, the Agreement requires the 'legal reviews' to be conducted so as 'to ensure' the rights are 'fully cleared for use.'" *Bungie*, IPR2015-01264, Paper 64 at 30.  The Board concluded:

> [t]he reference to Activision being involved in mutually approving the budget further suggests that Activision would be funding, at least in part, the legal reviews.  Thus, non-party Activision had a contractual interest in Petitioner Bungie's commitment to take actions "to ensure that all Intellectual Property and other rights are fully cleared for use."

*Id.*

In the case before us, we have not been directed to evidence of Petitioner being obligated to conduct for Apple "legal reviews" of allegedly infringed patents.  Also, we have not been directed to evidence of Apple being involved in funding and/or managing such "legal reviews" of allegedly infringed patents.

32
**Appx4251**

IPR2022-01006
Patent 9,665,705 B2

Accordingly, we give no probative weight to the "representations and warranties" clause in the Developer Agreement towards establishing an RPI relationship between Apple and Petitioner.

(2)    *Indemnification clauses (PO Resp. 58–59)*

Patent Owner asserts that the Developer Agreement "provides broad indemnification rights to Apple." PO Resp. 58–59 (citing Ex. 2009, 43).

The Developer Agreement provides the following indemnification clause:

> To the extent permitted by applicable law, You agree to indemnify and hold harmless, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to any of the following: . . . (ii) any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights; . . .

> In no event may You enter into any settlement or like agreement with a third party that affects Apple's rights or binds Apple in any way, without the prior written consent of Apple.

Ex. 2009 § 10.

While it is clear that there is an indemnification clause, we note that Petitioner states "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 9,665,705) (Ex. 1022, 11–12). As discussed above, Apple has been sued for

33
**Appx4252**

IPR2022-01006
Patent 9,665,705 B2

infringement by Patent Owner based on products provided by Petitioner. Thus, based on the record before us, it appears that Apple and Petitioner may have a different understanding than Patent Owner of the applicability of the indemnification clause.

According to Patent Owner, the "Board has previously found such indemnification arrangements to be significant evidence of RPI status."  PO Resp. 58–59 (citing *Ventex*, IPR2017-00651, Paper 148 at 7, 10, 12 (PTAB Jan. 24, 2019) (Precedential)).

Patent Owner mischaracterizes the holding in *Ventex*.  The existence of an indemnification agreement was not the determining factor in finding the existence of an RPI relationship.  Moreover, the Board has held repeatedly that an indemnification agreement, without something more, was insufficient to establish a RPI relationship.  *See Bae Sys. Info. & Elec. Sys. Integration, Inc. v. Cheetah Omni, LLC*, IPR2013-00175, Paper 20 at 4 (PTAB July 23, 2013) (holding indemnity provisions do not establish a right of control of a proceeding, and noting "indemnification is not one of the 'substantive legal relationships' cited in *Taylor*, 553 U.S. at 894, as binding a person not a party to a lawsuit to a judgment in that suit); *Dep't of Justice v. Discovery Patents, LLC.*, IPR2016-01041, Paper 29 at 8 (PTAB Nov. 9, 2017) ("[W]e are unaware of any *inter partes* review decision in which a real party in interest finding was based solely on evidence of an indemnification clause.").

In *Ventex*, the parties had a preexisting substantive legal relationship in the form of two contracts: (1) a Supplier Agreement with an obligation to indemnify and defend; and (2) an Exclusive Manufacturing Agreement. *Ventex*, IPR2017-00651, Paper 148 at 12.  The Board determined that it was

34
**Appx4253**

IPR2022-01006
Patent 9,665,705 B2

"clear" that the parties "had a specially structured, preexisting, and well established business relationship with one another, including indemnification *and exclusivity arrangements*." *Id.* at 10 (emphasis added). In *Ventex*, the Board stated "[t]he exclusive business relationship between [the parties] . . . , and Ventex's express desire to shield its customers and potential buyers from infringement lawsuits by Columbia *strongly suggest* that Ventex filed the Petition, at least in part, on Seirus's behalf." *Id.* at 9.

There is no persuasive evidence to which we have been directed that establishes or suggests an *exclusive* manufacturing or *exclusive* licensing agreement between Petitioner and Apple.

In *Ventex*, the Board also determined that "Seirus was, in effect, funding the *inter partes* reviews, whether wittingly or unwittingly" based on the "timing, structure, and amounts" of payments made by Seirus to the petitioner. These payments "suggest[ed] a correlation with legal fees incurred by Ventex in connection with the preparation and prosecution of these IPRs by its counsel." *Ventex*, IPR2017-00651, Paper 148 at 13. An internal email linked these payments as "necessary to cover the attorney's fees in these *inter partes* reviews." *Id.* There is no such evidence in this proceeding.

Based on the record before us, we have not been directed to any persuasive evidence or argument that Apple is funding this IPR proceeding.

The Board in *Ventex* specifically determined that it was the "totality of the circumstances" that "calls into considerable question Ventex's premise that Seirus is an entity divorced from this proceeding." *Id.* Our facts and circumstances here are significantly different.

IPR2022-01006
Patent 9,665,705 B2

We have not been directed to any probative evidence that causes us to doubt Petitioner's statement in the interrogatory responses that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 9,665,705." Ex. 1022, 11–12. Also, there is no exclusive agreement between the parties and no evidence that Apple is funding this proceeding, as in *Ventex*. Indeed, the evidence is to the contrary. *See id.* at 8–9 (Response to Interrogatory No. 3, stating "Petitioners have not had any communications with Apple, directly or through counsel, regarding any of IPR2022-01006, IPR2022-01045, IPR2022-01089"; "Apple had no role whatsoever in Petitioners' IPRs"; "Petitioners provide all direction to their outside counsel regarding the IPRs and the district court litigation between Petitioners and Apple"; "Petitioners did not file any of Petitioners' IPR petitions at Apple's behest"; and "Apple has never had any control or say whatsoever in Petitioners' IPR petitions.").

Accordingly, give minimal probative weight to the existence in the Developer Agreement of an indemnity clause towards determining the existence of an RPI relationship between Apple and Petitioner.

### (3)    Product inspection and insurance coverage clauses (PO Resp. 59–61)

Patent Owner asserts that "Petitioners' products-at-issue include physical components that connect to their respective apps that are installed upon and run on Apple devices." PO Resp. 59 (citing Ex. 2026). Patent Owner then asserts that "Apple enjoys the right, *and indeed has exercised*

36
**Appx4255**

IPR2022-01006
Patent 9,665,705 B2

*the right*, to physically inspect the Petitioners' products-at issue." *Id.* (citing "*Id.* at 36 [sic]").[22]

Patent Owner also asserts that "Petitioners have admitted that numerous ASSA ABLOY products identified in the Parallel Litigation were sent to Apple for 'compliance' and/or 'certification' purposes." PO Resp. 59 (citing "Ex. 2032 (Response to Interrogatory No. 1)."[23]

Patent Owner asserts "the right to inspect shows the special closeness of Petitioners' relationship to Apple." *Id.* at 60.

Patent Owner also asserts "Section 6.1 [of the Development Agreement] also imposes certain insurance obligations upon Petitioners." PO Resp. 60.

Allowing a buyer to inspect products to be sold and requiring a seller to obtain insurance for those products are typical commercial clauses. Moreover, the evidence before us establishes that Petitioners do not have any insurance policy that names Apple as an insured party. *See* Ex. 1022, 7 (response to Interrogatory No. 2).

Accordingly, we give these inspection, certification, and insurance clauses minimal probative weight in establishing an RPI relationship between Apple and Petitioner.

---

[22] This cite is incorrect. The cite to "*Id.*" refers to Ex. 2026, the immediately previous citation. Ex. 2026, however, is a three page document. There is no page "36."

[23] Exhibit 2032 is an incorrect citation. The correct citation to the only interrogatory responses in this proceeding is Exhibit 1022.

IPR2022-01006
Patent 9,665,705 B2

> (4)   *Appointment of Apple as an agent*
> *for distribution of Petitioner's software*
> *on the Apple App Store (PO. Resp. 61).*

Patent Owner also asserts that Apple's appointment as Petitioner's agent is probative of Apple's RPI status to this IPR proceeding. PO Resp. 61 (citing "Exhibit A to Schedule 1"). The cited language from Schedule 1 is:

> You appoint Apple Inc. as Your agent pursuant to California Civil Code §§ 2295 et seq. for the marketing and end-user download of the Licensed Applications by end-users located in the following regions: United States

*Id.* The cited California code merely defines agency and states the authority, obligations, and other aspects of a principal and agent relationship.

As noted above, we have not been directed to evidence that Schedule 1 applies to Petitioner's relationship to Apple. Assuming it does, we do not see how a standard agency appointment in this context establishes or suggests that Apple is an RPI to this IPR proceeding.

> b)   *Whether Apple Is A Clear Beneficiary Of The Petition*

Patent Owner asserts "Apple is a 'clear beneficiary' of the Petition and 'has an interest in and will benefit from [Petitioners'] actions.'" PO Resp. 62 (citing *AIT*, 897 F.3d at 1351, 1353). Patent Owner selectively gleans one phrase from *AIT* and asserts it is the controlling factor in the proceeding before us. We disagree.

First, we look at the totality of the evidence and applicable factors, not just the "benefit" factor.

Second, as we have stated II.B.1 of this Decision, on September 27, 2023, the Board issued its Final Written Decision in the prior '602 Apple IPR challenging claims in the '705 patent, determining that all challenged

38

IPR2022-01006
Patent 9,665,705 B2

claims, claims 1, 4, 6, 10–12, and 14–17, were unpatentable. '602 Apple IPR, Paper 31 (Sep. 27, 2023). Thus, Apple has already received all the benefits it requested from an *inter partes* review.

Third, Patent Owner fails to acknowledge the unique business arrangement involved in the *AIT* case, which is completely different from the standard commercial software licensing and product development arrangement between Apple and Petitioner in this proceeding.

In *AIT*, the petitioner, RPX Corporation ("RPX") was:

> a public company whose stated "mission is to transform the patent market by establishing RPX as the essential intermediary between patent owners and operating companies." One of its strategies is "to help members of [its] client network quickly and cost-effectively extricate themselves from [non-practicing entity ('NPE')] lawsuits."

*AIT*, 897 F.3d 1339 (internal record citations omitted). As further explained by the Federal Circuit:

> [g]iven that one of RPX's publicly stated business solutions is to file IPRs where its clients have been sued by non-practicing entities to "reduce expenses for [its] clients," and that any IPR petitions Salesforce might have wanted to file would have been time-barred, this evidence at least suggests that RPX may have filed the three IPR petitions, in part, to benefit Salesforce [an RPX member].

*AIT*, 897 F.3d at 1353 (internal record citations omitted). As stated above, Apple was not time-barred, Apple timely filed its own petition, and Apple received the relief it requested, which was invalidating all challenged claims.

The numerous other factors identified and discussed above, further establish significant and substantive differences between the business relationships in *AIT* and in the proceeding before us.

IPR2022-01006
Patent 9,665,705 B2

### 3.    The '039 Patent Issue

Patent Owner asserts Petitioners filed IPR petitions against all three patents that Patent Owner asserted in the Apple Action, including Patent No. 8.620,039 ("the '039 patent), even though Patent Owner "never mentioned the '039 Patent to Petitioners prior to Petitioners' IPRs."  PO Resp. 63 (citing Exs. 2005, 2006, 2008).  The IPR petitions filed by Petitioner challenging the '039 patent are IPR2022-01093 and IPR2022-01094.  These two petitions challenge different claims from the '039 patent.

Patent Owner then points out that "the Federal Circuit identified 'the fact that the five patents asserted in the Activision litigation *were the same five patents* Bungie challenged in its IPR petitions' as one of three significant factors indicating that Activision was an RPI."  PO Resp. 63 (citing *Worlds v. Bungie*, 903 F.3d at 1244).

Petitioner states clearly in its Declaratory Judgment complaint why it is challenging the '039 patent in that complaint, which also explains its interest in challenging the '039 patent in an IPR proceeding.

Petitioner states:

The First [Patent Owner] Letter also purported to attach a list of patent assets owned by Charter Pacific that are "available for licensing" ("Charter Pacific Portfolio"), but that attachment was missing in the package that Yale received.  On information and belief, the '039 Patent is one of the assets that Charter Pacific points out as being "available for licensing."

Ex. 2007 ¶ 60.  Petitioner further states:

Based on Charter Pacific's broad infringement allegations against Apple, it is likely that Charter Pacific would consider HID's and Hospitality's products and software solutions to be covered by the '039 patent.

*Id.* ¶ 105.  Additionally, Petitioner states:

IPR2022-01006
Patent 9,665,705 B2

> Charter Pacific has already selected each of the Patents-In-Suit from a larger family of patents in the Charter Pacific portfolio and alleged infringement on grounds that are substantially similar to the allegations that are likely to be raised in any lawsuit brought against the ASSA ABLOY Entities.

*Id.* ¶ 108.

Thus, Petitioner has identified valid reasons why it believed it would be sued for infringement of the '039 patent, justifying its challenge of the '039 in an IPR proceeding.

### 4.    *Conclusion on RPI*

Considering the totality of the evidence and the controlling legal authority discussed above, we determine that Petitioner has met its burden in establishing that Apple is not a real party-in-interest.

We recognize that "a nonparty to an IPR can be a real party in interest even without entering into an express or implied agreement with the petitioner to file an IPR petition." *AIT*, 897 F.3d at 1354.  In *RPX*, decided on remand from the Federal Circuit in *AIT*, "the evidence strongly suggest[ed]" that RPX was representing Salesforce's interests in filing the IPR proceedings at issue in that case.  *RPX*, IPR2015-01750, Paper 128 at 31.  There is no such evidence in the proceeding before us.  Indeed, the evidence is to the contrary.  *See, e.g.*, Ex. 1022 (Petitioner's Interrogatory Responses).

"Most critically," in *RPX*, "Salesforce paid RPX to reduce Salesforce's patent litigation exposure, and RPX filed the[ ] IPRs despite having no apparent risk of infringement liability itself."  *RPX*, IPR2015-01750, Paper 128 at 31.  Again, the evidence in *RPX* is significantly different from the evidence in the proceeding before us, where Petitioner

41

IPR2022-01006
Patent 9,665,705 B2

was sufficiently threatened with infringement by Patent Owner to establish jurisdiction for Petitioner's Declaratory Judgment complaint against Patent Owner to establish that Petitioner did not infringe the '705 patent. *See, e.g.*, Ex. 2007 ¶¶ 111–119 (Petitioner's Declaratory Judgment complaint seeking in Count I "a declaration that each entity [comprising Petitioner] does not infringe any claim of the '705 Patent."). The Declaratory Judgment complaint was filed on May 23, 2022 (*see* Ex, 2007 stating "Filed 05/23/22"). The Petition in this IPR proceeding was filed eight days after the complaint, on May 31, 2022 (*see* Paper 3). The perceived benefits of challenging patentability in an *inter partes* review rather than challenging validity in a district court are well-known. *Apple Inc. v. Vidal*, 63 F.4th 1, 17 (Fed. Cir. 2023) (acknowledging "the realistically perceived advantages of the IPR process, including the applicability of a lighter burden of persuasion to prevail in challenging a patent claim than the burden applicable in district court."). In such circumstances, "equitable and practical considerations" point clearly towards Petitioner having a valid, independent interest in filing the Petition in this proceeding.

In *AIT*, the Federal Circuit also points us to our own Trial Practice Guide, which instructs us to consider "whether a petition has been filed at a nonparty's 'behest.'" *AIT*, 897 F.3d at 1351 (quoting Trial Practice Guide, 77 Fed. Reg. at 48,759); accord CTPG 14. We acknowledge that even if Apple did not directly fund, control, or expressly request Petitioner to file this IPR proceeding, it could still be a RPI, as held in *RPX*. Unlike *RPX*, however, the evidence as discussed above does not support such an outcome.

Moreover, Apple initiated an IPR proceeding challenging claims of the '705 patent, which has resulted in all claims of the '705 patent

42

IPR2022-01006
Patent 9,665,705 B2

challenged by Apple to be unpatentable. *See* '602 Apple IPR, Paper 31. Thus, Apple will not benefit from any similar substantive determination in this proceeding. We have not been directed to any persuasive evidence that Apple needs, wants, funds, controls, or benefits from a second, later-filed petition, such as the one before us.

We recognize that Apple may derive some benefit if additional claims of the '705 patent are determined to be unpatentable in this post-grant proceeding. This derived benefit does not, however, make Apple an RPI to this proceeding. *See WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1321 (Fed. Cir. 2018) (stating in the context of the broader concept of privity that "[a]s a general proposition, we agree with the Board that a common desire among multiple parties to see a patent invalidated, without more, does not establish privity").

Here, we determine for purposes of this decision that, similar to the determination in *Uniloc 217*, "[w]ithout such evidence of control, in addition to no evidence of joint funding, or even any evidence of substantial [direct or implied] coordination between the parties as to their respective decisions to bring these proceedings, a finding that [a non-party to this IPR proceeding] is an RPI of or in privity with [Petitioner] here would be improper." *Uniloc 2017*, 989 F.3d at 1029.

Thus, based on the evidence before us and the analysis above, we determine that Apple is not an RPI in this IPR proceeding.

### 5.     *Privy Status*

Patent Owner asserts that "Apple is a privy to this proceeding based at least on its pre-existing substantive legal relationship with Petitioners." PO Resp. 64. According to Patent Owner, "[t]he facts discussed above

43
**Appx4262**

IPR2022-01006
Patent 9,665,705 B2

concerning Petitioners' relationship with Apple equally demonstrate a privy relationship between Petitioners and Apple." *Id.*

The issue of privity in the context of an IPR proceeding was discussed in *RPX*, IPR2015-01750, Paper 128 at 36–38. As stated in *RPX*, Section 315(b) explicitly imposes time bars on privies to "prevent successive challenges to a patent by those who previously have had the opportunity to make such challenges in prior litigation." *RPX*, IPR2021-01750, Paper 125 at 36 (citing *WesternGeco*, 889 F.3d at 1319; *AIT*, 897 F.3d at 1360 (Reyna, J., concurring)). In his concurrence, Judge Reyna explained: "privity is '[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property).'" *AIT*, 897 F.3d at 1359 (Reyna, J., concurring) (quoting Privity, Black's Law Dictionary (10th ed. 2014)).

The Leahy-Smith America Invents Act does not define "privity." *WesternGeco*, 889 F.3d at 1317. Rather, "privity" has a common-law meaning. *Id.* "Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case." *Id.* at 1318 (quoting Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012)[24]). The privity "analysis seeks to determine whether the relationship between the purported 'privy' and the relevant other party is sufficiently close such that both should be bound by the trial outcome and related estoppels." CTPG, 14–15.

The Supreme Court has identified a number of circumstances where privity exists between two otherwise independent parties: (1) where there is

---

[24] *See also* CTPG, 15 (including the same quotation).

IPR2022-01006
Patent 9,665,705 B2

an agreement between the parties to be bound; (2) where there is a pre-existing substantive legal relationship between the parties; (3) where there is adequate representation by the named party; (4) where the non-party had control of the prior litigation; (5) where the non-party acts as a proxy for the named party to relitigate the same issues; and (6) where special statutory schemes foreclose successive litigation by the non-party (e.g., bankruptcy and probate). *See Taylor*, 553 U.S. at 894–95; *AIT*, 897 F.3d at 1360 (Reyna, J., concurring). "Analysis under any one of the [*Taylor*] factors can support a finding of privity. *See Ventex*, IPR2017-00651, Paper 148 at 12 (describing "six categories that create independent exceptions" to the normal rule forbidding non-party preclusion); *AIT*, 897 F.3d at 1363 (emphasizing that any one of the factors can independently establish privity).

The CTPG explains that "privity" is even more expansive than RPI, "encompassing parties that do not necessarily need to be identified in the petition as a 'real party-in-interest.'" CTPG, 14. The Board "evaluate[s] what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." *Id.* "This approach is consistent with the legislative history of the AIA, which indicates that Congress included 'privies' within the parties subject to the statutory estoppel provisions in an effort to capture 'the doctrine's practical and equitable nature,' in a manner akin to collateral estoppel." *Id.* at 15 (quoting 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl)). [25] As stated in *WesternGeco*, when considering privity, "the [PTAB's]

---

[25] As explained by the Federal Circuit, "the related concept of privity 'is an equitable rule that takes into account the "*practical situation*," and should extend to parties to transactions and other activities relating to the property

IPR2022-01006
Patent 9,665,705 B2

Trial Practice Guide observes: 'The emphasis is not on a concept of identity of parties, but on the practical situation.'" 889 F.3d at 1318. "[T]he standards for the privity inquiry must be grounded in due process." *Id.* at 1319.

Petitioner asserts that "none of the Supreme Court's *Taylor* exceptions apply to the general common-law rule against nonparty preclusion. Reply 26–28. Petitioner discusses each *Taylor* factor and concludes that none of the factors, individually or collectively, establish that Apple is a privy of Petitioner.

Here, the practical situation presented was created by Patent Owner. Patent Owner first sued Apple for allegedly infringing the '705 patent. *See* Section 1.C of this Decision (Related Matters). Patent Owner did not sue or join Petitioner to this suit. Apple answered the allegations in the complaint and timely filed the '602 Apple IPR Petition. Patent Owner separately wrote to Yale (Ex. 2005) asserting that Yale infringed the '705 patent. Yale, one of the named Petitioners, filed the present IPR proceeding along with its related companies.

Patent Owner asserts that "the existence of a pre-existing substantive legal relationship between Apple and Petitioner cannot be reasonably disputed." Prelim. Resp. 40. Additionally, Patent Owner asserts that it cannot "be reasonably disputed that Apple has 'a direct relationship to the petitioner with respect to the allegedly infringing product or service.'" *Id.* Patent Owner concludes that the pre-existing substantive business

---

in question.'" *AIT*, 897 F.3d at 1350 (emphasis altered) (quoting Trial Practice Guide, 77 Fed. Reg. at 48,759 (citing 157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl))).

IPR2022-01006
Patent 9,665,705 B2

relationship, involving legally binding contractual relationships between Apple and Petitioner, is sufficient under *Taylor* to make Apple a privy to this IPR proceeding. *Id*. Patent Owner also asserts that Apple is a privy to this IPR proceeding because Petitioner is capable of adequately representing Apple's interests in this IPR proceeding. *Id*. On the record before us, for purposes of this Decision, we disagree with Patent Owner's conclusion that Apple is a privy for purposes of this IPR proceeding. Patent Owner ignores the practical consequences of its own actions that precipitated the current situation.

Control is one factor we consider in determining whether Apple is a privy to this IPR proceeding. As stated in *WesternGeco*, "'control' is not the exclusive analytical pathway for analyzing privity . . . it is but one of a variety of considerations." *WesternGeco*, 889 F.3d at 1320. We determine, as noted above in our RPI analysis, that there is no persuasive evidence that Apple has any control in the context of this IPR proceeding. We reach the same conclusion, based on the evidentiary record, regarding privity.

We do not, however, focus only on the "control" factor. We also look to all of the non-exclusive factors identified in *Taylor v. Sturgell*, 553 U.S. at 894–95, and reach the same conclusion – there is no persuasive evidence in the record before us that Apple should be considered a privy in this IPR proceeding.

*WesternGeco* recognized that a pre-existing business alliance, as well as indemnity provisions contained in the purchase agreements for the product accused of infringing were "insufficient to make PGS and ION privies within the meaning of the statute." *WesternGeco*, 889 F.3d at 1321

IPR2022-01006
Patent 9,665,705 B2

("[W]e agree with the Board that these factors are insufficient to make PGS and ION privies within the meaning of the statute.").

Here, as found in *WesternGeco*, the parties "had a contractual and fairly standard customer-manufacturer relationship regarding the accused product." *Id.* "This finding does not necessarily suggest that the relationship is sufficiently close that both should be bound by the trial outcome and related estoppels, nor does it suggest, without more, that the parties were litigating either the district court action or the IPRs as proxies for the other." *Id.* We determine that this same analysis applies to this IPR proceeding.

Thus, based on the evidence and our analysis above, we determine that Apple is not a privy to Petitioner.

### 6. *Conclusion Concerning Section 315(b)*

The totality of the evidence before us does not establish anything other than a traditional business relationship between Petitioner, who manufactures locks and similar security products that interface with smartphones, and Apple, who sells a smartphone. There is a sharing of confidential information between these parties. This common form of conducting business, without more, does *not* establish a relationship sufficient to make Apple a real party-in-interest or a privy of Petitioner in this *inter partes* review. There is no persuasive evidence that Apple has any control or substantive involvement over the Petition or over Petitioner's role in this proceeding.

Accordingly, based on the totality of the evidence of record and our analysis above, we conclude for purposes of this Decision that Apple is *not*

48
**Appx4267**

IPR2022-01006
Patent 9,665,705 B2

an RPI or in privity with Petitioner, and thus Petitioner is *not* time-barred under Section 315(b).

### III.    ANALYSIS OF PETITIONER'S CHALLENGES

#### A.    *Legal Standards*

Petitioner's asserted grounds of unpatentability are based on obviousness under 35 U.S.C. § 103, quoted below.

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103 (2011).

The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long-felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007) ("While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls."). The Court in *Graham* explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." *Graham*, 383 U.S. at 18.

49

IPR2022-01006
Patent 9,665,705 B2

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To reach this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F. 2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness.") (citation omitted); *see also Stratoflex,*

50

IPR2022-01006
Patent 9,665,705 B2

*Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.") (citation omitted).

"A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to common sense" or to that which the prior art teaches. *Id.*

Against this general background, we consider the references, other evidence, and arguments on which the parties rely.

### B.    Level of Ordinary Skill in the Art

The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a court cannot properly assess obviousness "because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986). Thus, the level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

IPR2022-01006
Patent 9,665,705 B2

"This reference point prevents . . . factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

Additionally, the Supreme Court informs us that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Petitioner states "[a] person having ordinary skill in the art ('POSITA') at the time of the alleged invention would have had at least an undergraduate degree in electrical engineering, or equivalent education, and at least two years of work experience in the field of security and access-control." Pet. 9 (citing Ex. 1005, ¶ 30). Mr. Lipoff's cited testimony merely repeats, verbatim, Petitioner's asserted level of ordinary skill, preceded by the phrase "In my opinion." Ex. 1005 ¶ 30. Mr. Lipoff does

IPR2022-01006
Patent 9,665,705 B2

not provide any facts or data to support his conclusory opinion. Accordingly, we give it minimal probative weight. 37 C.F.R. §42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

Patent Owner states it "does not object to the defined level of skill in the art adopted in co-pending IPR2022-00602 (the '602 IPR) challenging the '705 Patent." PO Resp. 8 (citing "IPR2022-00602, Paper 11 at 12"). The cited claim construction is from our Decision granting *institution* of an *inter partes* review in the '602 IPR. The level of skill in the '602 IPR was revised slightly in our *Final Written Decision* in the '602 IPR. *See* '602 IPR, Paper 31 at 16. The level of skill in the '602 IPR was based on the arguments and evidence in the '602 IPR, which differ from the arguments and evidence in the case before us.

Accordingly, based on the prior art and the sophistication of the technology at issue, we determine that a person of ordinary skill at the time of the alleged invention would have had an undergraduate degree in a relevant technology or discipline, such as computer engineering, computer science, electrical engineering, or a related field, with one or two years of relevant experience in the field of human-machine interfaces and device access security, or an equivalent balance of education and work experience. This level of ordinary skill is consistent with Petitioner's proposed definition, the cited references (Bianco, Mathiassen-067, Houvener, and Richmond), and the disclosure of the '705 patent.

IPR2022-01006
Patent 9,665,705 B2

### C.    Claim Construction

As stated in 37 C.F.R. § 42.100(b),

> a claim of a patent . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.  Any prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the *inter partes* review proceeding will be considered.

37 C.F.R. § 42.100(b).  Under this standard, claim terms are generally given their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Petitioner proposes constructions for two claimed terms: dependent claim 2's "signal for directing input" (Pet. 9); and dependent claim 13's similar "signal adapted to direct provision of . . . the biometric signal" (*id.*).

Petitioner also states that various claim terms were construed in the related, parallel litigation in the Western District of Texas.  *Id.* at 11–12 (citing Ex. 1009, Ex. 1010)[26].  Petitioner asserts, however, that the terms

---

[26] Exhibits 1009 and 1010 are each a "Claim Construction Order."  Exhibit 1009 is a 4-page document that provides twelve "claim constructions for U.S. Patent Nos. 9,269,208 ("'208 Patent); 8,620,039 ("'039 Patent"); and 9,665,705 ("'705 Patent") after considering the parties' briefs and oral argument held February 10, 2022."  Exhibit 1010 is a three page document that provides an additional eight claim constructions "after considering the parties' briefs and oral argument held January 25, 2022."

IPR2022-01006
Patent 9,665,705 B2

construed by the Texas court "are not material to the unpatentability of the challenged claims, so need not be construed." *Id.* at 11. Nonetheless, we have considered these timely filed District Court constructions, as required by our rules. 37 C.F.R. § 42.100(b) ("Any prior claim construction determination concerning a term of the claim in a civil action . . . that is timely made of record in the *inter partes* review proceeding will be considered.").

Patent Owner also refers to the claim constructions in the related Texas District Court litigation. *See* PO Resp.8–9 (citing Exs. 1009, 1010, 2033).

Additionally, Patent Owner refers to four terms that Petitioner Apple proposed in the '602 Apple IPR, which also involved the '705 patent, and asserts that we should use the same construction of the term "biometric signal" in the proceeding before us. *Id. at* 9–19 (citing the '602 Apple IPR, Paper 1 at 6). At the hearing, counsel for Patent Owner stated that "the real heart of this matter comes down certainly to what is a biometric signal?" Tr. 37:12–13. Because Patent Owner refers to the '602 Apple IPR claim construction, we provide some background analysis of that proceeding.

In the '602 Apple IPR, our Decision to Institute adopted, without further analysis, the unopposed proposed constructions by Petitioner Apple. '602 Apple IPR, Paper 11 at 13 ("Based on the record before us, we adopt, for purposes of this Decision, Petitioner's unopposed proposed claim constructions."). The unopposed proposed construction by Petitioner Apple for "biometric signal" was "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." '602 Apple IPR, Paper 1 at 6. This

IPR2022-01006
Patent 9,665,705 B2

is the construction that Patent Owner asserts in the proceeding now before us. *See, e.g.*, PO Resp. 9–10.

In our Final Written Decision in the '602 Apple IPR, we construed three terms requested by Patent Owner, which were constructions for (1) the term "accessibility attribute;" (2) the phrase requiring a series of entries of the biometric signal "characterised according to at least one of the number of said entries and a duration of each said entry;" and (3) the "populate" the database limitation concerning enrolling or authorizing new users. *See* '602 Apple IPR, Paper 31 at 17–34. We did not specifically construe the term "biometric signal" in our Final Written Decision. *Id.*

> Returning to the proceeding now before us, Patent Owner states:
>
> To the extent there is any dispute regarding construction of "biometric signal" as it is used in the claims of the '705 Patent, Patent Owner submits that the construction *adopted by the Board in the ['602] Apple IPR is the correct construction* and it should be applied is this proceeding as well."

PO Resp. 9–10, 19 (emphasis added)[27].

Responding to Patent Owner's assertion on claim construction, Petitioner asserts that "when read in light of the specification, the 'biometric signal' is simply the input and output of the biometric sensor." Reply 8.

---

[27] Patent Owner misconstrues what claim construction was "adopted" in the '602 Apple IPR. Patent Owner asserts we "adopted" a claim construction for "biometric signal" in our Decision to Institute ('602 IPR, Paper 11). This Decision was not a final agency action under 5 U.S.C. § 704, nor was it binding precedent. Our final agency action was in our final written decision (*id.*, Paper 31), which did not adopt a specific construction for the term "biometric signal." The '602 Apple IPR also involved a different petitioner, different evidence, and different arguments than what was asserted in the proceeding before us.

IPR2022-01006
Patent 9,665,705 B2

Clearly, there is a dispute concerning the construction of the term "biometric signal." Accordingly, we determine that we need to construe specifically the term "biometric signal" in this proceeding. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (claims are construed only to the extent necessary to resolve a dispute).

Before addressing the substance of this claim construction, we consider the procedural issue raised by Patent Owner that the claim construction asserted by Petitioner in its Reply is "untimely." Sur-reply 1 ("Petitioners' effort to challenge this claim construction for the first time in the Reply is untimely"); *id.* at 5 ("The Board should not consider Petitioners' untimely construction"); *id.* ("It is well-established that a petitioner must present proposed claim constructions in the Petition, not belatedly in a Reply"). We disagree on the facts of this proceeding.

This issue was addressed in *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374 (Fed. Cir. 2023). The Federal Circuit held:

> [W]here a patent owner in an IPR first proposes a claim construction in a patent owner response, a petitioner must be given the opportunity in its reply *to argue and present evidence* of anticipation or obviousness under the new construction, at least where it relies on the same embodiments for each invalidity ground as were relied on in the petition.

*Id.* at 1384 (emphasis added). This is exactly the situation in this proceeding. Thus, we must consider Petitioner's arguments and evidence submitted in its Reply.

Accordingly, we address the claim construction issues and evidence in this case.

IPR2022-01006
Patent 9,665,705 B2

### 1. Claim Construction Principles

In general, we give the claims their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the claims, patent disclosure, and prosecution history. *Phillips*, 415 F.3d at 1313. "[T]here is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324). Fortunately, however, there is substantial judicial guidance.

Claim construction requires determining how a skilled artisan would understand a claim term "in the context of the entire patent, including the specification." *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313. *Id.* (citation omitted). "[C]laims must be read in view of the specification, of which they are a part." *Id.* ((citation omitted; quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc)). The Specification, or more precisely, the written description, is the "single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims." *Id.* (citation omitted). Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the Specification into the claims. *Phillips*, 415 F.3d at 1323. Thus, we are careful not to cross that "fine line" that exists between properly construing a claim in light of the specification and improperly importing into the claim a limitation from the specification." *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("We recognize that there is sometimes a fine line

IPR2022-01006
Patent 9,665,705 B2

between reading a claim in light of the specification, and reading a limitation into the claim from the specification.").

While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

We also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317.

In construing the claims, we may also look to available "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### 2.    *Biometric Signal*

Patent Owner's proposed construction for the term "biometric signal" is "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." PO Resp. 9–10, 19.  This is the construction asserted in the '602 Apple IPR and referred to in the Decision to Institute that proceeding. Patent Owner relies on intrinsic and extrinsic evidence to support its proposed construction.

Patent Owner asserts that "the specification makes clear that a 'biometric signal' as used in connection with the claimed invention is a *physical attribute* of the user." PO Resp. 10 (citing Ex. 1001, 1:29–33).  The cited portion of the Specification states:

IPR2022-01006
Patent 9,665,705 B2

> One example of a biometric signal is a fingerprint. Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration and so on.[28]

Ex. 1001, 1:29–33.

Patent Owner focuses on the reference to "[o]ther physical attributes" in this disclosure and asserts that this reference to "physical attributes" defines the claim term "biometric signal." PO Resp. 10 ("This definition as established by the patentee controls" [the meaning of the claim term "biometric signal"]). Patent Owner also asserts that "[f]ingerprints, retinal patterns, iris patterns, face pattern, and palm configuration are all physical attributes." *Id.* at 11 (citing several extrinsic exhibits). Conspicuously absent from this list is the Specification's reference to "voice" and to "and so on."

Patent Owner also relies substantially on extrinsic evidence to support its proposed construction of "biometric signal," which we will discuss below. First, we turn to the intrinsic evidence. We start with the claims.

### a)      Claims

The term "biometric signal" appears extensively throughout the challenged claims. Claim 1 is illustrative.

First we note that the challenged claims state the specific objective of the claimed invention as a "system for providing secure access to a controlled item." *See, e.g.*, Ex. 1001, 5:62–63 (representative claim 1). Thus, the purpose of the biometric signal is to achieve this objective – "secure access to a controlled item."

---

[28] As we discuss below, the phrase "and so on" creates ambiguity concerning the meaning of "biometric signal."

IPR2022-01006
Patent 9,665,705 B2

Claim 1 includes "a biometric sensor configured to receive a biometric signal." Ex. 1001, 15:66–67. Claim 1 also includes "a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures." *Id.* at 16:1–3. The transmitter subsystem also is configured to "receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry." *Id.* at 16:15–18. This "series of entries of the biometric signal," for example, to enroll new users, is the Morse code-like entries of "dit, dit, dit, dah" described in the Specification. *See id.* at 11:1–7.

We also note that claim 4, dependent from claim 1, states "the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration." *Id.* at 16:45–47. Because claim 4 must further limit claim 1, the "biometric sensor" in claim 1, must have a broader scope than the limited options stated in claim 1. We also note that the list of biometric sensors in claim 4 does *not* include a sensor responsive to a fingerprint. None of the claims refers specifically to a "fingerprint sensor."

Based on the claims, the term "biometric signal" is a signal that can be received by a biometric sensor and by a transmitter subsystem, and also can be matched to a database.

*b)    Specification*

The Specification states that "[o]ne example of a biometric signal is a fingerprint." Ex. 1001, 1:29–20. A fingerprint is "the pattern of curved lines on the end of a finger or thumb that is different in every person, or a

IPR2022-01006
Patent 9,665,705 B2

mark left by this pattern"[29] Thus, whatever claim construction we give to the term "biometric signal," it must be able to include a "fingerprint" as exemplary of the adopted construction. This example of a fingerprint is consistent with Petitioner's assertion that "the 'biometric signal' is simply the input and output of the biometric sensor" because the input to the biometric sensor is pressing a finger against the biometric sensor, and the output of the biometric sensor is an electronic representation of a fingerprint. *See, e.g.*, Ex. 1001, Fig. 10, and related text; *see also* Ex. 1005 ¶ 32 (Mr. Lipoff's Declaration testimony explaining an annotated Figure 10 from the '705 patent).

After stating this one "example" of a "biometric signal," the Specification then states "[o]ther physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration *and so on*." *Id.* at 1:30–33 (emphasis added). These other "physical attributes," like the fingerprint example, are additional examples of a "biometric signal." There is nothing in the quoted language from the Specification that suggests that this list of "attributes" is intended to be a closed list that excludes other attributes, or is intended to be a definition of the term "biometric signal." In fact, the phrase "and so on" included in this list suggests exactly the opposite. It suggests there are additional, unlisted attributes that also can be a "biometric signal."

We recognize that the "Background" section of the Specification states that "[o]ther *physical attributes* . . . can be used to provide biometric signals." *Id.* at 1:30–33 (emphasis added). This discussion of the

---

[29] from Cambridge Dictionary, Available at:
https://dictionary.cambridge.org/us/dictionary/english/fingerprint

IPR2022-01006
Patent 9,665,705 B2

background technology is the sole use of the phrase "physical attributes," or similar phrase, in the '705 patent, and is the only reference to the "physical" class of biometric signals.

The Summary section of the Specification states that the basic objective of the disclosed invention is "a system for providing secure access to a controlled item." Ex. 1001, 2:29–31. As stated above, the challenged claims also state this specific objective. *See, e.g.*, *id.* at 15:62–63 (representative claim 1 claiming a "system for providing secure access to a controlled item").

The Specification also states that whatever form the biometric signal takes, it must be matched with a coordinated biometric sensor. As explained in the Specification, "for example, if the biometric sensor 121 in the code entry module 103 is a fingerprint sensor, then the request 102 typically takes the form of a thumb press on a sensor panel (not shown) on the code entry module 103." *Id.* at 5:60–63. A fingerprint sensor would not work if the biometric signal is, for example, a "face pattern."

*c)*   *Prosecution History*

Neither party directs our attention to any persuasive evidence in the prosecution history of the '705 patent that informs our construction of the term "biometric signal."

*d)*   *Extrinsic Evidence*

Patent Owner asserts that at the time of the invention of the '705 Patent, *i.e.*, August 2003, "a POSITA[30] would have understood that there

---

[30] "POSITA" is a common patent law acronym for a "person of ordinary skill in the art," as used in 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is

63

**Appx4282**

IPR2022-01006
Patent 9,665,705 B2

were two basic categories of biometric measurements, namely, measurements of (i) physical attributes and (ii) behavioral attributes." PO Resp. 11–12 (citing Ex. 2031 ¶ 34). The cited Declaration testimony is from Dr. Russ, Patent Owner's expert witness, who merely repeats verbatim Patent Owner's argument. We give this testimony no probative weight. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (August 24, 2022) (precedential) (holding an expert's declaration testimony is entitled to little weight when it contains an exact restatement of the petition's arguments without any additional supporting evidence or reasoning).

Patent Owner also cites the Bianco reference asserted in this proceeding for the disclosure that:

> Biometric identification mechanisms include ***two basic categories of biometric measurements. The first category involves measuring a unique characteristic found on a user's body***. This may include, but is not limited to, finger and hand geometry, retina and facial images, weight, DNA data and breath. ***The second category involves measuring a user's behavioral characteristics***. This may include, but is not limited to, voice, typing stroke and signature.

PO Resp. 12 (citing Ex. 1003, 7:57-65) (all emphasis is in the cited PO Response). This quote from Bianco clearly states that the generic concept of

---

not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to *a person having ordinary skill in the art* to which the claimed invention pertains.") (emphasis added).

IPR2022-01006
Patent 9,665,705 B2

"biometric identification" or "biometric measurement" includes two distinct categories: (1) unique characteristics found on a user's body; and (2) "behavioral characteristics." Ex. 1003, 7:57–67. These two categories are the same two categories identified by Patent Owner. *See* PO Resp. 11–12 (identifying "two basic categories of biometric measurements, namely, measurements of (i) physical attributes and (ii) behavioral attributes"). Both categories represent a "biometric measurement" or, using the term from the '705 patent, a "biometric signal."

As defined in Bianco, the biometric signals in the first category – unique characteristics found on a user's body – include "finger and hand geometry, retina and facial images, *weight*, DNA data and breath." *Id.* at 7:61–62 (emphasis added). We take official notice that a person's "weight" is a highly variable measurement. We also take official notice that two different people may have the exact same "weight." Nonetheless, Bianco, as cited by Patent Owner, states that this is a physical attribute. The biometric signals of "weight," "DNA data," and "breath" are not included in the list of "[o]ther physical attributes that can be used to provide biometric signals" as disclosed in the '705 patent. *See* Ex. 1001, 1:29–33. Thus, the biometric signals of "weight," "DNA data," and "breath" must be included in the phrase "and so on" used to expand the limited examples of a biometric signal disclosed in the '705 patent.

As disclosed in Bianco, the generic category of a biometric signal also includes "voice, typing stroke and signature" in the "behavorial category" of a biometric signal. Ex. 1003, 7:62–65.

There is no persuasive evidence to which we have been directed that establishes that the generic term "biometric signal" used in the '705 patent

65
**Appx4284**

IPR2022-01006
Patent 9,665,705 B2

includes only the first category of signals and excludes the second category. Thus, based on the disclosure in Bianco, and Patent Owner's acknowledgement that Bianco is representative of what a person of ordinary skill would have known about the two basic categories of biometric measurements, namely, measurements of (i) physical attributes and (ii) behavioral attributes (PO Resp. 11–12), "typing stroke and signature," as disclosed in Bianco, also must be included in the phrase "and so on" used to expand the limited examples of a biometric signal disclosed in the '705 patent. "Voice," disclosed in Bianco as a behavioral measurement, is already included in the '705 patent's list of "attributes" that can be used as a biometric signal.

Bianco concludes its discussion of what is a biometric measurement or biometric signal by stating that "[i]n general, anything that can be measured on a user that is unique can be used as a biometric measurement." Ex. 1003, 7:65–67.

Patent Owner asserts that "[t]his clear distinction between biometric identification via physical attributes versus via behavioral attributes drawn by Bianco is consistent with other teachings in the art at the time of the invention of the '705 Patent." PO Resp. 12. Patent Owner discusses this other extrinsic evidence, which is consistent with, and repetitive of, Bianco. *See* PO Resp. 12–19.

We recognize that the distinction between physical attributes and behavioral attributes exists. But, Bianco's analysis is consistent with the other extrinsic evidence cited by Patent Owner (PO Resp. 12–19) that there is no bright-line separating which biometric measurements fall into each category. Bianco includes "weight" and "breath" as physical measurements,

66
**Appx4285**

IPR2022-01006
Patent 9,665,705 B2

and "voice" as a behavioral measurement. Ex. 1003, 7:57–65. Patent Owner asserts "voice" is a biometric signal "that appears in both categories." PO Resp. 14.

Mr. Lipoff also provides his opinion in his Declaration testimony that "'biometric signal' should be given its plain and ordinary meaning—i.e., the input and output of a biometric sensor." Ex. 1029 ¶ 12; *see also id.* ¶¶ 10–15 (providing supporting analysis for his opinion testimony). Mr. Lipoff also testifies that, in his opinion, "there is no basis to limit the term "biometric signal" to exclude behavioral biometrics. So long as the biometric sensor can output a biometric signal capable of uniquely identifying a user, the claims and purported invention would be viable." Ex. 1029 ¶ 14.

### e)    Claim Construction Conclusion for "Biometric Signal"

We recognize that "[t]he very nature of words would make a clear and unambiguous claim a rare occurrence." *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967). The Federal Circuit, however, has provided a beacon, which we have followed, to guide us in determining the proper construction when we encounter ambiguities or differing interpretations from the parties:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

IPR2022-01006
Patent 9,665,705 B2

Based on the evidence and the analysis above, we determine that the term "biometric signal" means a physical or behavioral biometric attribute that provides secure access to a controlled item. This is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention. It also is supported by the extrinsic evidence.

Based on the evidence, there is no bright-line distinction for what specific biometric attribute is "physical" or "behavioral." The specific category, however, is not relevant because neither the Specification nor the claims establish that the generic term "biometric signal" is limited to the examples in the Specification or to a specific sub-category of a "physical" or "behavioral" attribute. When the '705 patent intended to limit the type of biometric signal, it did so in claim 4, as discussed above.

We now address the merits of Petitioner's challenge of the '705 patent.

### D. Ground 1: Patentability of Claims 1, 3–5, and 9–17 Over Bianco and Mathiassen-067

Petitioner asserts claims 1, 3–5, and 9–17 would have been obvious over Bianco and Mathiassen-067. Pet. 12–78.

### 1. Bianco (Ex. 1003)

Bianco discloses a "system, method and computer program product that utilizes biometric measurements for the authentication of users to enterprise resources. Ex. 1003, Abstract. "Enterprise resources include computers, applications and data." *Id.* at 1:15–16. As explained in Bianco, "[b]iometric devices utilize a scientific technique to identify a user based on compared measurements of unique personal characteristics. These measurements, called biometric measurements, may include, but are not

IPR2022-01006
Patent 9,665,705 B2

limited to, measurements of finger and hand geometry, retina and facial images, weight, DNA data, breath, voice, typing stroke and signature." *Id.*, Abstract.

Bianco's Figure 2 is reproduced below.

Bianco's Figure 2 illustrates a block diagram of enterprise network system 202 incorporating biometric system 102 (reference character not shown) according to a preferred embodiment. *Id.* at 11:55–57. Generally



FIG.2

Bianco's Figure 2

speaking, network 114 connects the functional components of biometric system 102 and additional functional components of network system 202. *Id.* at 12:7–9. Biometric system 102 includes biometric server 104, enrollment station 106, administration station 108, alternate biometric server

69

IPR2022-01006
Patent 9,665,705 B2

110, and satellite enrollment station 112. *Id.* at 9:52–55. The additional functional components include web server 212, web server interface 214, and one or more of applications 204, application interfaces 206, user computers 208, and remote/web computers 210. *Id.* at 11:67–12:7.

In biometric system 102, biometric server 104 stores the engine for biometric system 102, e.g., collections of data required by system 102. *Id.* at 10:1–3. Administration station 108 is used by the administrator of biometric system 102 to perform management duties. *Id.* at 10:14–17. Enrollment stations 106, 112 enroll users into biometric system 102 and accordingly communicate with the biometric devices of biometric system 102 (satellite enrollment station 112 being scaled-down to enroll users at remote locations). *Id.* at 10:8–12, 10:23–24. Secondary biometric server 110 is a backup/standby server of biometric server 104. *Id.* at 10:28–29.

In the additional functional components, application 204 may include electronic mail and word processing. *Id.* at 12:11–12. Application interface 206 connects application 204 to network 114 and, thereby, to other resources or network system 202. *Id.* at 12:12–15. User computer 208 provides users access to the enterprise resources (to enterprise network 212) and includes both a biometric device and interface for authentication of the user by biometric system 102. *Id.* at 12:15–22. Remote/web computer 210 is also a user computer having the above functions, but operates remotely via communications with web server 212 and web server interface 214 (which collectively 212, 214 provide access to other enterprise resources such as biometric system 102). *Id.* at 12:23–30.

IPR2022-01006
Patent 9,665,705 B2

Biometric servers 104, 110, enrollment stations 106, 112, and administration station 108 can be implemented on computer 302 illustrated by Bianco's Figure 3, reproduced below. *Id.* at 14:26–29.



Bianco's Figure 3

Bianco's Figure 3 depicts a block diagram of a computer system used to implement the disclosed invention.

Computer 302 includes one or more of the following items connected to communication bus 306: processor 304; main memory 308 storing control logic 310 (i.e., software) and data 312; secondary storage 314; input

71

IPR2022-01006
Patent 9,665,705 B2

devices 322 (e.g., keyboard); and display devices 324 (e.g., monitors).
*Id.* at 14:32–39.

Bianco's Figure 10 is reproduced below.



FIG.10

Bianco's Figure 10

Bianco's Figure 10 is a block diagram of objects involved in biometric authentication. *Id.* at 25:60–62. Generally speaking, Figure 10 shows user computer 208 in communication with biometric server 104. *Id.* at Fig. 10. User computer 208 (or remote/web computer 210) includes monitor object 1004 and biometric device object 1006. *Id.* at Fig. 10, 25:62–65. Biometric system 104 includes identify user ID object 1008 and database object 1010. *Id.*

Monitor object 1004 of user computer 208 is "up and waiting" to receive "live" biometric data (e.g., fingerprint data) that can "start" the engine of the biometric system 102 (i.e., initiate authentication of the user). *Id.* at 25:66–26:7,10:1–3 (biometric server 104 stores the engine of biometric system 102). Monitor object 1004 generates biometric device object 1006 that prompts a biometric device to read and return the live

72
**Appx4291**

IPR2022-01006
Patent 9,665,705 B2

biometric data. *Id.* at 26:8–18, Fig. 11 (steps 1102–06). Monitor object 1004 generates an "identify request" including the biometric data and sends the request to biometric server 104. *Id.* at 26:19–22, Fig. 11 (step 1108).

Using ID 512 of user computer 208, biometric server 104 identifies user ID object 1008 and provides th biometric data to object 1008. *Id.* at 26:22–27. User ID object 1008 has previously created data base object 1010 and stored therein a biometric template, biometric policy, biometric group, biometric device, user ID, computer ID, and application ID. *Id.* at 23:17–21, 26:27–31. User ID object 1008 passes the live biometric data to data base object 1010, which then attempts to match the live biometric data to the stored data (e.g., to the biometric template). *Id.* at 26:27–33, Fig. 11 (steps 1110–12). Successful matching is a condition of authentication. *Id.* at 26:34–39, Fig. 11 (steps 1114–18).

Bianco's Figure 12 is reproduced below.



FIG. 12

Bianco's Figure 12

IPR2022-01006
Patent 9,665,705 B2

Bianco's Figure 12 is a block diagram of objects involved in the biometric enrollment. *Id.* at 26:53–55. Figure 12 shows enrollment station 106 in communication with biometric server 104. *Id.* at 26:60–62.

Enrollment station 106 includes enrollment interface 1204, enrollment object 1220 with attached comm object 1218, and biometric device object 1222. *Id.* at 26:55–60, Fig. 12. Biometric server 104 includes enrollment interface 1206, enrollment object 1220 with attached comm object 1214 and policy object 1212, and database object 1210 (which is the above-discussed database object 1010 of Figure 10). *Id.* at 26:6–12, 26:55–60, Fig. 12.

Enrollment station 106 and biometric server 104 communicate via respectively a client role and server role. *Id.* at 26:60–62. Respective enrollment interfaces 1204, 1204 are any operating interfaces permitting client-server communication (e.g., specific to the given operating systems). *Id.* at 27:1–5. In response to communications of interfaces 1204, 1204 (see below), two-way direct communication is established between respective comm objects 1218, 1214. *Id.* at 15:57–16:19, 27:8–12, 27:57–60.

To start the enrollment process, a user inputs their user ID 510 to enrollment station 106. *Id.* at 27:29–31, Fig. 13 (step 1302). Enrollment interface 1204 generates an enrollment request including user ID 510 and then sends the request to biometric server 104. *Id.* at 27:31–39, Fig. 13 (step 1304).

In response to the request, biometric server 104 initializes enrollment object 1208. *Id.* at 27: 39–42, Fig. 13 (step 1306). Enrollment object 1208 creates database object 1210 and passes user ID 510 to object 1210. *Id.* at 27:45–46. Based on user ID 510, database object 1210 determines

74

IPR2022-01006
Patent 9,665,705 B2

the user's biometric group 506 (to which an administrator previously assigned the user). *Id.* at 27:46–50, Fig. 13 (steps 1308–10). Based on biometric group 506, database object 1210 determines biometric policy 504 (of biometric group 506). *Id.* at 27:50–52. Database object 1210 creates policy object 1212 providing biometric policy 504 (e.g., identifying the corresponding biometric device/s) and then passes policy object 1212 to enrollment object 1208. *Id.* at 27:53–57, Fig. 13 (steps 1312). Based on biometric policy 504, enrollment object 1208 requests enrollment station 106 to test the user on a particular biometric device. *Id.* at 27:60–65, Fig. 13 (steps 1316).

Based on the request, enrollment station 106 creates enrollment object 1220. *Id.* at 27:66–67, Fig. 13 (step 1318). Based on the particular biometric device, enrollment object 1220 creates biometric device object 1222. *Id.* at 27:67–28:2, Fig. 13 (step 1320). Biometric device object 1222 causes the respective, attached biometric device to read biometric measurements of the user (e.g., fingerprint measurements). *Id.* at 28:2–6, Fig. 13 (step 1320–22). Based on the measurements, enrollment object 1220 generates biometric template 502 and then sends template 502 to enrollment object 1208 of biometric server 104 (where template 502 is stored by database object 1010/1210). *Id.* at 28:6–12, Fig. 13 (step 1324–26).

We discussed in Section III.C of this Decision Bianco's discussion of what is a biometric signal, which we repeat below for convenient reference:

> Biometric identification mechanisms, or biometric devices, utilize a scientific technique to identify a user based on compared measurements of unique personal characteristics. Biometric identification mechanisms include two basic categories of biometric measurements. The first category involves measuring a unique characteristic found on a user's body. This may include,

75

IPR2022-01006
Patent 9,665,705 B2

> but is not limited to, finger and hand geometry, retina and facial images, weight, DNA data and breath. The second category involves measuring a user's behavioral characteristics. This may include, but is not limited to, voice, typing stroke and signature. In general, anything that can be measured on a user that is unique can be used as a biometric measurement.

Ex. 1003, 7:54–67

### 2.    *Mathiassen-067 (Ex. 1004)*

In the context of inputting information into mobile phones and computer devices, and providing access to the information in these products, Mathiassen-067 discloses using the same biometric (fingerprint) sensor (Ex. 1004, 8:39–9:2, referring to "switch 1, in the form of a fingerprint sensor") for the dual purposes of (i) reading fingerprints for authentication and access control and (ii) as a means of issuing commands/instructions through a series of "taps" of varying durations. *Id.* at Abstract, 21:9–21.[31]

Mathiassen-067 "relates to a sign/character generator represented by a fingerprint sensor with navigation means[] for text/sign input[.]" Ex. 1004, 3:3–5. Noting device access to sensitive information is typically via passwords for identity verification of the user, Mathiassen-067 instructs that "these are not personal as they can be given to other persons . . . or stolen" and "[a]ccordingly there is a strong trend to base access control on

---

[31] Citations to Mathiassen-067 are in the form of exhibit page number:line number[s]. We also note that the *exhibit* page number for Exhibit 1004, in the bottom right corner of each page of the exhibit, differs from the *document* page number, which is centered on the top of each page. Petitioner's page numbering is in accordance with our rules requiring each page of an exhibit to be "uniquely numbered in sequence." 37 C.F.R. § 42.63(d)(2). We cite to the exhibit page number in the bottom right corner of each page.

IPR2022-01006
Patent 9,665,705 B2

biometrics[.]" *Id.* at 3:14–21. Mathiassen-067 further criticizes the typical "[i]mplementation[s] of such sensors . . . [as] in many cases [raising] a question of available space on the device." *Id.* at 3:31–35.

Mathiassen-067 advises that "such identity verification devices[,] e.g., fingerprint sensors[,] will therefore be significantly enhanced if . . . combined with other functionality." *Id.* at 3:35–38. It is thus "an objective of [the] invention to provide a sign generator . . . through a single-button 'keyboard' . . . incorporat[ing] fingerprint scanning for authentication." *Id.* at 8:1–9.

In the described example, a smartphone includes touch sensor 1, analyzing means 2, memory 3, translation means 4, and display 5. *Id.* at 8:37–9:13. Touch sensor 1 (e.g., a touchpad) reads a fingerprint and outputs data indicating the composition and motion. *Id.* at 8:39–9:2. Analyzing means 2 both measures the duration, direction, and speed of the fingerprint's movement on the switch; and receives and categorizes the data output by switch 1. *Id.* at 9:2–4; 12–13 (Table 2, "Finger Command Structure"). Memory 3 stores the categories of data. *Id.* at 9:5. Translation means 4 maps (e.g., via tables) the categories (e.g., fingerprint movements and sequences thereof) to user-readable characters/signs. *Id.* at 9:5–8. Display 5 presents the signs in a known manner. *Id.* at 9:8–10.

By reading the fingerprint and its motion, "single-button sensor" 1 (along with above components 2–5) combines biometric reading for user authentication and cursor-type control for text input. *Id.* at 10:21–25.

### 3.    *Claim 1*

Petitioner provides a comprehensive, clause-by-clause analysis of claim 1, explaining where, in Petitioner's view, each element is disclosed in

77

IPR2022-01006
Patent 9,665,705 B2

the combination of Bianco and Mathiassen-067, and why claim 1,
considered as a whole, would have been obvious over the combined
disclosures of those references. Pet. 12–57. We note that, in general, that
Petitioner relies primarily on Bianco for the disclosure of the claim elements
and limitations. Petitioner relies on Mathiassen-067 multiple finger-tap
control system to send any of Bianco's control signals, including its
biometric enrollment request. Pet. 54 (citing Ex. 1005 ¶¶ 188–202).

Patent Owner asserts that "neither Bianco nor Mathiassen[32]—alone or
in combination—teach or suggest at least limitations D(P)–D(3) of claim 1."
PO Resp. 19 (citing Ex. 2031 ¶ 51). The labels "D(P)–D(3)" refer to the
paragraph and clause limitations used by Petitioner. For convenient
reference, we list these clauses and their limitations below.

> [D(P)] wherein the transmitter sub-system controller is further
> configured to:
>
> [D(1)] receive a series of entries of the biometric signal, said
> series being characterised according to at least one of the number
> of said entries and a duration of each said entry;
>
> [D(2)] map said series into an instruction; and
>
> [D(3)] populate the data base according to the instruction

*See* Ex. 2031 ¶ 50

---

[32] The parties refer to the Mathiassen-067 reference in this proceeding as
"Mathiassen." As explained in the introduction, we adopted the term
Mathiassen-067 in this proceeding to correct confusion in our Decision to
Institute between two different "Mathiassen" references, each labelled as
"Ex. 1004," in two different, but related IPR proceedings. To avoid future
confusion and to maintain consistency, we will modify the parties citation of
Mathiassen-067 by using brackets (*e.g.*, Mathiassen[-067]) in any quotes
from the parties referring to "Mathiassen."

IPR2022-01006
Patent 9,665,705 B2

Patent Owner states that "[l]imitations corresponding to [clauses] D(P)–D(3) are present in all independent claims of the '705 Patent." PO Resp. 19–20. Patent Owner concludes that "[t]herefore, Petitioners fail to prove that any claims of the '705 Patent are unpatentable." According to Patent Owner, "[i]n short, and critically important to the issues here, each of the limitations D(P)–D(3) are based upon and require some step or action related to a ***biometric signal***." *Id.* at 21 (emphasis in original). We note that our construction of the claim term "biometric signal" in Section III.C.2 of this Decision is different from the construction proposed by Patent Owner.

Our analysis uses the clause designations relied on by the parties.

### a)   *Limitation [D(P)]*
*wherein the transmitter sub-system controller*
*is further configured to*

This limitation merely provides an introduction to the requirements for the "transmitter sub-system controller." Petitioner relies on Bianco for the disclosure of the transmitter sub-system controller limitation. Petitioner provides the following annotated Figure 3 from Bianco.

IPR2022-01006
Patent 9,665,705 B2



Figure 2 from Bianco is a block diagram, annotated by Petitioner, of a typical enterprise network system incorporating one embodiment of the biometric authentication system disclosed in Bianco. Ex. 1003, 3:57–58. Petitioner asserts that Processor 304 is the claimed "controller." Pet. 18. Additionally, Petitioner asserts that Bianco's processor 304, transmitting over bus 306, also is the transmitter. *Id.* Petitioner asserts that this is the same structure and system used in the '705 Patent, where processor/controller 107 may also be the transmitter. *Id.* (citing Ex. 1001, Fig. 2).

It is beyond reasonable dispute that Bianco discloses a transmitter sub-system controller, as required by clause [D(P)].

IPR2022-01006
Patent 9,665,705 B2

> b)    *Limitation [D(1)]*
> *receive a series of entries of the biometric signal,*
> *said series being characterised according to at least one of*
> *the number of said entries and a duration of each said entry*

According to Petitioner, "this limitation requires a 'series' of the biometric signals, *i.e.*, at least two signals or measurements. *Id.* (citing Ex. 1005 ¶ 161).

Although Petitioner relies on Mathiassen-067 for this limitation, Petitioner begins with Bianco.

It is Petitioner's position that "Bianco discloses receiving multiple biometric entries, each of which has a duration." *Id.* at 42. Petitioner uses a "signature" biometric signal, as disclosed in Bianco, as an example. *Id.*

When performing biometric "signature" analysis, Bianco discloses taking "multiple samples of a signature" and analyzing "each sample." *Id.* (citing Ex. 1003, 8:43–45) ("Here, a user is prompted for multiple samples of a signature. For each sample, characteristics or measurements are identified."). Bianco also discloses that "[t]he characteristics or measurements include the pressure, sequence of events, direction, relative vectors and speed" of the signature. Ex. 1003, 8:45–47.

Patent Owner asserts that "the hand-written signature of Bianco is not a 'biometric signal' as that term is properly construed in the '705 Patent - *i.e.*, a 'physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.).'" PO Resp. 21. We disagree.

Based on our claim construction of the term "biometric signal" in this Decision, Bianco's "signature" is a "biometric signal," just like a fingerprint, voice, retinal or iris pattern, face pattern, or palm configuration. Bianco clearly relies on a "signature" as "a physical or behavioral biometric

81

IPR2022-01006
Patent 9,665,705 B2

attribute that provides secure access to a controlled item," which is how we have construed the term "biometric signal."

Petitioner asserts that Mathiassen-067 discloses "using the number/duration of the biometric entries to issue an instruction." Pet. 43.

According to Petitioner, Mathiassen-067 discloses "using the same fingerprint sensor (*i.e.*, biometric sensor) for the dual purposes of: (i) reading fingerprints for enrollment, authentication, and access control and (ii) receiving commands through a series of finger inputs of varying durations. *Id.* (citing Ex. 1004, 21:15–19). *Id.*

As disclosed in Mathiassen-067, the:

> preferred embodiment of the invention enables a multi-function single-button input key which combines several functions;
>
> - Fingerprint scanning for user authentication for access control.
>
> - A powerful text input device where sets of extensive finger commands supports convenient and fast input of complex text/signs/characters in a versatile and flexible manner for text input of alphabetic languages and sign-based languages

Ex. 1004, 23:25–34.

In addition, Mathiassen-067 also discloses using a series of short and long taps for entering control commands, as is done in the '705 patent. Mathiassen-067 discloses:

> Word separation may be done by finger command <Long Tap> and period ("punctum") may be entered as two consecutive <Long Taps>, etc. The user may at any time toggle to Edit Text Mode by finger command sequence <Extra long Tap> - <Finger Down> as per Table 2.

Ex. 1004, 16:14–19. Table 2 appears on pages 12–13 of Mathiassen-067. A highlighted excerpt from Table 2, prepared by Petitioner and reproduced

IPR2022-01006
Patent 9,665,705 B2

below, illustrates some of the various commands that can be entered in
Mathiassen using the Morse code-like series of finger presses.

| Edit Text Commands | | | |
|---|---|---|---|
| Home of Text Field | <Slanted Up Left> | Toggle to/from Edit Mode | *See Screen Manip. Commands* |
| End of Text Field | <Slanted Down Right> | Mark *n* characters left | <Long Tap> + *n* <Short Taps> |
| Move one position left | <Finger Left> | Mark *n* words left | <Long Tap> + *n* <Finger Left> |
| Scroll left | <Finger Left – Hold> | Shift marked letters' case | <Long Tap> |
| Move one position right | <Finger Right> | Delete marked character(s) | <Extra Long Tap> |
| Scroll right | <Finger Right – Hold> | Copy marked character(s) | <Double Tap> |
| One line up | <Finger Up> | Paste marked character(s) | Two <Double Taps> |
| Scroll up | <Finger Up – Hold> | Insert space right of cursor | <Short Tap> |
| One line down | <Finger Down> | Write to right of cursor | *Exit Edit to Input Mode* |
| Scroll down | <Finger Down – Hold> | | |

Petitioner's annotated excerpt
from Fig. 2 in Mathiassen-067.

Patent Owner also argues the "finger movements" and "finger
commands" disclosed in Mathiassen-067 "are not entries of a biometric
signal." PO Resp. 21–22. Patent Owner asserts that "they are merely the
touching of a touch-sensitive pad during which no biometric measurement is
taken at all." *Id.* at 22 (citing Ex. 2031 ¶ 53). Patent Owner further asserts
that "[b]ecause the '705 Patent claims require entries of a biometric signal

IPR2022-01006
Patent 9,665,705 B2

that is characterized by a number and a duration, the finger presses of Mathiassen[-067] – which are not biometric entries at all – do not teach or suggest these '705 Patent claim limitations." PO Resp. 22.  Here we agree with Patent Owner.  We find that there is a substantive distinction between the *finger press* command entry function and the *fingerprint* user authentication function in Mathiassen-067.  Both functions use the same "touch sensitive switch 1, in the form of a fingerprint sensor with navigation means." Ex. 1004, 8:39–9:1.

Mathiassen-067 provides the following description of the operation of its multi-function single-button input key:

> Prior to this text input (when the cellular phone is switched ON) the cellular phone has automatically set the switch 1 to authentication mode for access control to the cellular phone.  The user is then asked by text on the display to wipe his finger down over the sensor.  When authentication by finger print biometrics is completed, the cellular phone sets the sign-generator to sleep mode, for energy saving.  The sign-generator is then waked up e.g. when a request for the sign-generator is called for, e.g. by SMS input as per above.  If the user wants to play a game on the cellular phone its control system sets the switch 1 to Cursor Control Mode as per Table 3a.  Two-dimensional finger moves combined with combined finger command sequences (such as taps, etc.) thereby gives an accurate cursor control combined with numerous command functions for quite complex games.  This example demonstrates that the invention is capable of rendering full input versatility and flexibility even through a single-button sign-generator, thereby enabling the use of a large display as exemplified in fig. 2 still maintaining full functionality.

Ex. 1005, 16:22–17:2.

Dr. Russ testifies that "when the Mathiassen[-067] device is in navigation [cursor control] mode it does not 'map a series,' characterized by

IPR2022-01006
Patent 9,665,705 B2

a number or a duration of a biometric signal 'into an instruction'" Ex. 2031 ¶ 66. Essentially switch 1, a fingerprint sensor, does not, in fact, act as a fingerprint sensor when switched to the cursor command mode. Dr. Russ testifies that "Mathiassen teaches that the mode for fingerprint authentication (i.e., Access Control Mode) is separate and distinct from the modes for navigation (i.e., Text Input Modes and Cursor Control Mode)." *Id.* at ¶ 71 (referring to Table 3a of Mathiassen-067). Table 3a (*see* Ex. 1004, 14) is reproduced below.

Table 3a
MODE LEVEL 1
Automatically set by the Device

| ACCESS CONTROL MODE | TEXT INPUT MODES | CURSOR CONTROL MODE |
|---|---|---|
| Fingerprint sensor used for User Authentication | See Table 3b "Mode Level 2" | For cursor navigation on display |

Petitioner's expert, Mr. Lipoff, testified at his deposition that "finger commands [ ] are entered upon the same biometric sensor that can be used for validating the fingerprint, but there's no disclosure one way or the other as to whether it's also reading the fingerprint." EX-2034 at 65:2-24. Thus, Mr. Lipoff agrees that there is no evidence establishing that sensor in Mathiassen-067 in fact receives a series of entries of the *biometric signal* and then, as required in limitation [D(2)], maps the entered series into an instruction. As disclosed in Mathiassen-067 and discussed above, when Mathiassen-067 switches to text input mode or cursor control mode, it exits access control mode and is no longer functioning as a fingerprint sensor.

85

IPR2022-01006
Patent 9,665,705 B2

### c)  *Limitation [D(2)]*
*map said series into an instruction*

As discussed above, because Mathiassen does not acquire a "series of entries of the biometric signal," it cannot map such a series into an instruction.

### d)  *Limitation [D(3)]*
*populate the data base*
*according to the instruction*

Because Mathiassen does not create the required "instruction," it cannot populate the data base according to such an instruction.

## IV. CONCLUSION

All of the challenged independent claims include claim limitations substantively identical to limitations D(1), D(2), and D(3) discussed above. Because we conclude that cited references do not disclose or suggest these claim limitations, Petitioner has *not* met its burden to establish by a preponderance of the evidence that any of the challenged claims are unpatentable.

## V.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has not shown by a preponderance of the evidence that any of claims 1–17 are unpatentable;

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

86

**Appx4305**

IPR2022-01006
Patent 9,665,705 B2

## VI.    SUMMARY TABLE

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 3–5, 9–17 | 103 | Bianco, Mathiassen-067 | | 1, 3–5, 9–17 |
| 2, 6, 7 | 103 | Bianco, Mathiassen-067, Houvener | | 2, 6, 7 |
| 8 | 103 | Bianco, Mathiassen-067, Houvener, Richmond | | 8 |
| **Overall Outcome** | | | | 1–17 |

IPR2022-01006
Patent 9,665,705 B2

For PETITIONER:

Dion Bregman
Andrew Devkar
James Kritsas
MORGAN, LEWIS & BOCKIUS LLP
dion.bregman@morganlewis.com
andrew.devkar@morganlewis.com
james.kritsas@morganlewis.com

For PATENT OWNER:

Andrew Ryan
CANTOR COLBURN LLP
ryan@cantorcolburn.com

Trials@uspto.gov                                     Paper 42
571-272-7822                               Entered: December 20, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

ASSA ABLOY AB, ASSA ABLOY INC.,
ASSA ABLOY RESIDENTIAL GROUP, INC., AUGUST HOME, INC.,
HID GLOBAL CORPORATION, and
ASSA ABLOY GLOBAL SOLUTIONS, INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD.,
Patent Owner.

———————

IPR2022-01045 and IPR2022-01089
Patent 9,269,208 B2

———————

Before SCOTT A. DANIELS, BARRY L. GROSSMAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

GROSSMAN, *Administrative Patent Judge.*

JUDGMENT[1]
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] This Judgment addresses the two proceedings listed above, which raise the same issues for different claims of the same patent. We issue this one Judgment, which will be filed in each proceeding. Unless specifically authorized by the Board, the parties are not authorized to use this style of filing.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

# I.    INTRODUCTION

## A.    *Background and Summary*

ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc. (collectively "Petitioner"[2]) filed two Petitions, collectively requesting *inter partes* review of claims 1–13 (the "challenged claims") of U.S. Patent No. 9,269,208 B2 (Ex. 1007 in each proceeding, "the '208 patent").  Paper 3, 3[3] ("Pet.").  CPC Patent Technologies Pty Ltd. ("Patent Owner") filed a Preliminary Response to each Petition.  Paper 8 ("Prelim. Resp.").  With our authorization to address Patent Owner's arguments that the Petition is time-barred under 35 U.S.C. § 315(b) (*see* Paper 10), Petitioner filed a Reply (Paper 14 ("Prelim. Reply")); and Patent Owner filed a Sur-Reply (Paper 18 ("Sur-Reply")).

We entered a consolidated Decision allowing Petitioner to proceed with the two distinct Petitions and granting institution of an *inter partes* review of claims 1–13 based on all grounds asserted in the two Petitions.

---

[2] *See Cradlepoint, Inc. et al v. 3G Licensing S.A.,* IPR2021-00639, Paper 12, 2 (PTAB May 13, 2021) ("[F]or each 'petition' there is but a single party filing the petition, no matter how many companies are listed as petitioner or petitioners and how many companies are identified as real parties-in-interest. . . .  Even though the separate sub-entities regard and identify themselves as 'Petitioners,' before the Board they constitute and stand in the shoes of a single 'Petitioner. . . . they must speak with a single voice, in both written and oral representation.").

[3] We cite to the record in IPR2022-01045, unless a specific citation to each Petition is required for clarity.  Similar documents, generally having the identical exhibit number, were filed in each of the two proceedings to which this Decision applies.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Paper 21 (the "Decision to Institute").  Our Decision to Institute addressed the issue of whether the Petition was time-barred, and determined on the record at that time that there was no time bar.  Paper 21 at 13–37.  We also addressed the issue of patentability asserted in the Petition.

Patent Owner submitted a Response to the Decision to Institute. Paper 26 ("Patent Owner Response" or "PO Resp.").

Petitioner submitted a Reply.  Paper 30 ("Reply").

Patent Owner submitted a Sur-reply.  Paper 36 ("Sur-reply").

Petitioner submitted twenty-nine exhibits.  *See* Exs. 1001–1015, 1017–1030[4] (there is no exhibit numbered 1016); *see also* Paper 39 (Petitioner's Updated Exhibit List).  Petitioner relies on the Declaration testimony of Stuart Lipoff.  *See* Exs. 1005, 1029.

Patent Owner submitted thirty-eight exhibits.  *See* Exs. 2001–2018, 2023–2029, and 2031–2041[5] (there are no exhibits numbered 2019–2022 or 2030; Exhibit 2005 includes Parts 1, 2, and 3); *see also* Paper 40 (Patent Owner's Updated Exhibit List)[6].  Patent Owner relies on the Declaration testimony of Samuel Russ, Ph.D.  *See* Exs. 2031, 2032.

A joint hearing was held September 28, 2023.  *See* Paper 41 ("Transcript" or "Tr.").

---

[4] Exhibit 1030 is a demonstrative exhibit used at the final hearing.  It is not an evidentiary exhibit.  *See* PTAB Consolidated Trial Practice Guide, 84 (Nov. 2019 ("CTPG") ("Demonstrative exhibits used at the final hearing are aids to oral argument and not evidence.").

[5] Exhibit 2041 is a demonstrative exhibit used at the final hearing.  It is not an evidentiary exhibit.  *See id.*

[6] Exhibits 2029 and 2030 on Patent Owner's Exhibit list are inconsistent with the document filings at the Board.  *See* Ex. 3009.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the findings and conclusions below, we determine that Petitioner has not established by a preponderance of the evidence that claims 1–13 are unpatentable. We also determine that the Petition is not barred by 35 U.S.C. § 315(b).

### B.     Real Parties-in-Interest

Petitioner identifies "ASSA ABLOY AB, ASSA ABLOY Inc. and its wholly owned subsidiaries ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc." as the real parties-in-interest. Pet. 1. Petitioner also states "ASSA ABLOY AB is the ultimate parent of all parties-in-interest." *Id.*

Patent Owner identifies itself as the sole real party-in-interest. Paper 6, 2.

We note here that Patent Owner asserts that the Petition is time-barred under 35 U.S.C. § 315(b) because, as asserted by Patent Owner, Apple, Inc. ("Apple") is a real party-in-interest ("RPI") and/or privy of one or more of the individual companies that collectively comprise the Petitioner, and because Patent Owner served a complaint on Apple alleging infringement of the '208 patent more than 1 year before this Petition was filed. *See, e.g.,* PO Resp. 4, 46–64 (asserting that the Petition is time-barred under 35 U.S.C. § 315(b)). This argument would impact the underlying proceeding if we were to determine that Apple is a real party-in-interest or privy with Petitioner. *See Unified Patents, LLC v. MemoryWeb, LLC,*

4
**Appx4311**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

IPR2021-01413, Paper 76, 5 (PTAB May 22, 2023) (Decision granting Director review and (1) vacating the Board's real party-in-interest determination in the Final Written Decision, and (2) vacating the Board's Order Identifying the asserted real party-in-interest).  As stated in *Unified v. MemoryWeb*,

> [t]he Board can and should make a determination of the real parties in-interest or privity in any proceeding in which that determination may impact the underlying proceeding, for example, but not limited to, a time bar under 35 U.S.C. § 315(b) or an estoppel under 35 U.S.C. § 315(e) that might apply.

*Id.*  That is the situation here.  Patent Owner asserts there is a time bar. *See, e.g.,* PO Resp. 46–64.  Thus, following the guidance in *Unified v. MemoryWeb*, we consider in Section II whether Apple is a real party-in-interest, or privy, in this proceeding.

### C.    Related Matters

Petitioner identifies the following matters as being related to this proceeding:

1)    *ASSA ABLOY AB, et al. v. CPC Patent Technologies Pty Ltd., et al.*, No. 3-22-cv-00694 (D. Conn.);

2)    *CPC Patent Technologies Pty Ltd v. HMD Global Oy*,[7] WDTX-6-21-cv-00166-ADA (W.D. Tex.);

3)    *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 5:22-cv-02553-NC (N.D. Cal); and

---

[7] Petitioner states HID Global, one of the named Petitioners in this IPR proceeding, and HMD Global, the named defendant in the cited litigation, "have no relation to one another."  Pet. 2, n.2.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

4)      IPR2022-00602 and IPR2022-00601, identified as pending IPR challenges filed by Apple against, respectively, the U.S. Patent No. 9,665,705 (the "'705 patent") and the '208 patent.[8]

Pet. 2–3.

Patent Owner also identifies the above matters as related to the present IPR proceeding.  Paper 6, 2–3.  Patent Owner further identifies the following IPR proceedings:  IPR2022-00600; IPR2022-01006; IPR2022-01093; and IPR2022-01094.  *Id.*

### D.      The '208 Patent

We make the following findings regarding the disclosure of the '208 patent.

The '208 patent discloses a system "for providing secure access to a controlled item." Ex. 1007, Abstr.  As stated in the disclosure, the system can also be used "to provide authorised access to lighting systems, building control devices, exterior or remote devices such as air compressors and so on." *Id.* at 15:38–40.  "The concept of 'secure access' is thus extendible beyond mere access to restricted physical areas." *Id.* at 15:36–38.  The disclosed system uses a database of "biometric signatures" (*id.*), such as a fingerprint (Ex. 1007, 1:29–30) for determining authorized access.

Figure 2 from the '208 patent is reproduced on the following page.

---

[8] The '705 patent is a "[c]ontinuation of application No. 13/572,166, filed on Aug. 10, 2012, now Pat. No. 9,269,208." Ex. 1001, code (63).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Figure 2 from the '208 patent is reproduced below.



Figure 2 is a functional block diagram of an arrangement for providing secure access according to the system disclosed in the '208 patent. Ex. 1007, 5:15–16.

As described in the written description of the '208 patent, and as illustrated generally in Figure 2, user 101 makes a request to code entry module 103. Code entry module 103 includes biometric sensor 121. *Id.* at 5:52–53. If biometric sensor 121 is a fingerprint sensor, for example, then the request "typically takes the form of a thumb press" on a sensor panel (not shown) on code entry module 103. *Id.* at 5:56–59.[9] "Other physical

---

[9] *See* Ex. 1007, 10:35–38 ("Although the present description refers to 'Users', in fact it is 'fingers' which are the operative entities in system operation *when the biometric sensor 121 (see FIG. 2) is a fingerprint*

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, [and] palm configuration." Ex. 1007, 1:30–32; *see also id.* at 16:25–27 (claim 4 stating "the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration").

Code entry module 103 then "interrogates" an authorized user identity database 105, which contains "biometric signatures" for authorized users, to determine if user 101 is an authorized user. *Id.* at 5:60–65. If user 101 is an authorized user, code entry module 103 sends a signal to "controller/transmitter" 107. *Id.* at 5:65–67.

Database 105 of authorized users is prepared by an "administrator." *Id.* at 10:38–42 ("The first user of the code entry module 103 . . . is automatically categorised[10] as an administrator."). This "first administrator" can direct the system 100 to either accept further administrators, or alternatively, to accept further "ordinary users." *Id.* at 10:28–34.[11]

---

*sensor.*") (emphasis added). Thus, it is clear that biometric sensor 121 is *not* limited to a fingerprint sensor.

[10] The Specification uses the British spelling, which we also use when quoting the Specification.

[11] The use of the phrase "ordinary users" at the cited portion of the written description (column 10, line 34) is somewhat misleading, and should, more accurately, refer to "authorized users." The written description states that "[t]he disclosed remote entry system can accommodate at least three classes of user, namely administrators, (ordinary) users, and duress users." Ex. 1001, 10:24–26; *see also id.* at 12:67–13:3 (stating "It is noted that all signatures stored in the database are tagged as belonging to one or more of the classes of administrator, ordinary user, and duress users."). A "duress" category signature indicates the user "is in a coercive situation." *Id.* at 11:32–37.

8
Appx4315

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

The process for enrolling authorized users is shown generally in Figure 8 and described in the related written description. *See* Ex. 1007, 12:39–13:3 (describing enrollment process 800). In order to add authorized biometric signatures of additional users to database 105, the administrator must set the system using "control information" or a "legal control signal." *Id.* at 10:45–56. When biometric sensor 121 is a fingerprint sensor, the legal control signal for adding new users may be activated by the administrator using a succession of finger presses to biometric sensor 121. *Id.* at 10:49–56. If these successive presses are of the appropriate duration, the appropriate quantity, and are input within a predetermined time, controller 107 accepts the presses "as potential control information" and checks the input information against a stored set of "legal control signals." *Id.* "In one arrangement, the control information is encoded by *either or both* (a) the number of finger presses and (b) the relative duration of the finger presses." *Id.* at 10:49–52 (emphasis added).

An example of this type of "control information" or "legal control signal" is "dit, dit, dit, dah," where "dit" is a finger press of one second's duration . . . and "dah" is a finger press of two second's duration." *Id.* at 10:57–63.[12]

After all authorized users have been added to database 105, in operation, the disclosed system and method compare biometric input signal 102 to database 105 of authorized biometric signatures to determine if user 101 is an authorized user. *Id.* at 5:60–65 ("Thus for example if the request

---

[12] We have not been directed to any persuasive evidence of how the enrollment process is activated by an administrator when the biometric sensor is something other than a fingerprint sensor.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

102 is the thumb press on the biometric sensor panel 121 [producing a thumbprint] then the user database 105 contains biometric signatures [*i.e.,* thumbprints] for authorised users against which the request 102 can be authenticated.").

If user 101 is an authorized user based on the inputs to code entry module 103, controller/transmitter 107 then sends "an access signal," based on a "rolling code," to controller 109.  Ex. 1007, 6:1–5.

If controller 109 determines that the rolling code received is "legitimate," then controller 109 sends a command to "controlled item 111," which, for example "can be a door locking mechanism on a secure door, or an electronic key circuit in a personal computer" that is to be accessed by user 101.  *Id*. at 6:7–16.

### E.    *Illustrative Claim*

Among the challenged claims in the '045 Petition and the '089 Petition, claims 1, 9, and 10 are independent claims.  Independent claim 1 is directed to a "system for providing secure access to a controlled item." Ex. 1007, 15:42–16:3.  Independent claim 9 is directed to a "transmitter sub-system for operating in a system for providing secure access to a controlled item."  *Id*. at 16:64–17:18.  Independent claim 10 is directed to a "method for providing secure access to a controlled item."  *Id*. at 17:19–18:13.

Independent claim 1 is illustrative and is reproduced below.

> 1. A system for providing secure access to a controlled item, the system comprising:
> a database of biometric signatures;
> a transmitter sub-system comprising:
> a biometric sensor for receiving a biometric signal;

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

means for matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and

means for emitting a secure access signal conveying information dependent upon said accessibility attribute; and

a receiver sub-system comprising:

means for receiving the transmitted secure access signal; and

means for providing conditional access to the controlled item dependent upon said information,

wherein the transmitter sub-system further comprises means for populating the data base of biometric signatures, the population means comprising:

means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;

means for mapping said series into an instruction; and

means for populating the data base according to the instruction,

wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device.

Ex. 1007, 15:42–16:3.

### F.    *Prior Art and Asserted Grounds*

Petitioner asserts that the challenged claims are unpatentable based on following three grounds (Pet. 4):

11

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

|   | Claim(s) Challenged | 35 U.S.C. §[13] | References/Bases |
|---|---|---|---|
| 1 | 1, 3–5, 9, 10–13[14] | 103 | Bianco[15], Mathiassen-067[16] (1, 3–5, 9 in '045 petition; 10–13 in '089 petition) |
| 2 | 2, 6, 7 | 103 | Bianco, Mathiassen-067, Houvener[17] ('045 petition) |
| 3 | 8 | 103 | Bianco, Mathiassen-067, Houvener, Richmond[18] ('045 petition) |

Petitioner relies on the declaration testimony of Stuart Lipoff

(Ex. 1005; Ex. 1029) in support of these grounds.

---

[13] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[14] IPR 2022-01089 Petition, 4.

[15] Bianco et al., US 6,256,737 B1, issued July 3, 2001 (Ex. 1003, "Bianco").

[16] Mathiassen, WO 02/28067 A1, published Apr. 4, 2002 (Ex. 1004, "Mathiassen-067").

[17] Houvener et al., US 5,790,674, issued Aug. 4, 1998 (Ex. 1013, "Houvener").

[18] Richmond et al., US 6,856,237 B1, issued Feb. 15, 2005 (Ex. 1005, "Richmond").

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

## II.   REAL PARTY-IN-INTEREST
## SECTION 315(b) TIME BAR

We first address whether the Petition is time-barred.

Patent Owner asserts the Petition should be denied as time-barred under 35 U.S.C. § 315(b) because Apple, an argued real party-in-interest or privy, was served with a complaint in *CPC Patent Technologies Pty Ltd. v. Apple, Inc.*, No. 6:21-cv-00165 (W.D. Tex., Waco Division) for infringement of the '208 patent on March 1, 2021, more than a year before the Petition was filed.  PO Resp. 4, 46–64.  As stated in Section I.B of this Decision, we considered Patent Owner's Section 315(b) defense in our Decision to Institute this IPR proceeding.  *See* Paper 21 at 13–37.

One fundamental omission in Patent Owner's Response is that Patent Owner fails to cite any evidence establishing the date that Apple was served with a complaint alleging infringement of the patent.  This evidence is in the record (*see* Exs. 2003, 2004), and was discussed in Patent Owner's Preliminary Response (*see* Prelim. Resp. 1), but was not cited in the Response.[19]  This evidence also was cited and considered in our Decision to Institute this proceeding.  *See* Dec. Inst. 13 ("There is no dispute that Apple was served with a complaint alleging infringement of the '208 patent on March 1, 2021" (citing Ex. 2003, 5; Ex. 2004).

In general, the Federal Rules of Evidence apply to this proceeding. 37 C.F.R. § 42.62(a).  Under Rule 201(b)(2) of the Federal Rules of

---

[19] Our Scheduling Order in this proceeding states "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 22 at 9.

13
**Appx4320**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Evidence, we take official notice[20] that Apple was served with a complaint alleging infringement of the '208 patent on March 1, 2021. *See* Ex. 2003, 5 (Complaint alleging as its "First Cause of Action" "Infringement of the '208 Patent"); Ex. 2004 (Affidavit of Service on Apple on March 1, 2021).

Under 35 U.S.C. § 315(b), an *inter partes* review "may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party-in-interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1346 (Fed. Cir. 2018) ("*AIT*").

Petitioner bears the burden of establishing that no RPI or privy was served with a complaint alleging infringement more than one year prior to the June 3, 2022, filing date (*see* Paper 5) of the Petition in this proceeding. *RPX v Applications in Internet Time, LLC*, IPR2015-01750, Paper 128 at 6–7 (PTAB (Oct. 2, 2020) (precedential), (rehearing denied, Paper 142, Dec.4, 2020) ("*RPX*");[21] *see also Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.*, IPR2017-00651, Paper 152 at 4–5 (PTAB Jan. 24, 2019) (precedential) (citing *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242 (Fed. Cir. 2018).

In *Power Integrations, Inc. v. Semiconductor Components Industries, LLC*, 926 F.3d 1306, 1314 (Fed. Cir. 2019), the Federal Circuit stated,

> [t]he Board's decision under § 315(b) is whether to institute or not. The condition precedent for this decision is whether a time-

---

[20] *See* 37 C.F.R. § 42.62(c) stating that the term "Judicial notice" in the Federal Rules of Evidence means "official notice" in the context of an *inter partes* review proceeding.

[21] We cite to the public version of Board's decision following remand from the Federal Circuit in *AIT*. This same Decision also was entered in the related cases IPR2015-01751 and IPR2015-01752.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

barred party (a party that has been served with a complaint alleging infringement of the patent more than one year before the IPR was filed) is the petitioner, real party in interest, or privy of the petitioner.

There is no dispute that Apple was served with a complaint alleging infringement of the '208 patent on March 1, 2021, which is more than one year before the June 3, 2022 filing date (Ex. 2005) of the Petition in this proceeding. *See* Ex. 2003, 5 (Complaint alleging as its "First Cause of Action" "Infringement of the '208 Patent"); Ex. 2004, (Affidavit of Service on Apple on March 1, 2021). Thus, the dispositive issue before us under Section 315(b) is whether Apple is an RPI or privy with Petitioner.

### A. The Petitioner Entities

Before addressing in detail Petitioner's relationship with Apple, and to put that relationship in its proper context, it is helpful to identify the parties that, collectively, are included as Petitioner.

ASSA ABLOY AB "is the parent company of several entities worldwide, that are leaders in the delivery of secure identity solutions for millions of customers throughout the world." Ex. 2007 ¶ 10. ASSA ABLOY AB is the ultimate parent company of ASSA ABLOY Inc. *Id.*

ASSA ABLOY Inc. is the main holding entity for ASSA ABLOY AB's North and South American assets and is "the immediate parent company of Yale, August, HID, and Hospitality." *Id.* ¶ 11; *see also id.* ¶¶ 6–9 (providing complete corporate citations for "Yale," "August," "HID," and "Hospitality," each of which is a named entity collectively comprising the Petitioner in this IPR proceeding).

The Petitioner companies provide "identity solutions used in a variety of applications, including physical access control, logical access control,

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

access card printing and personalization, highly secure government identification, and commercial and residential opening solutions." *Id.* ¶ 14. These products, solutions, and services "are sold through a well-established network of OEMs, developers, systems integrators, and distributors worldwide." *Id.*

"Yale protects millions of homes and businesses worldwide and is the brand behind locks of every design and function in over 125 countries." *Id.* ¶ 15. "August is the leading provider of smart locks and smart home access products and services. August's products and services give customers total control over the front door from a smartphone." *Id.* ¶ 16.

"HID is a worldwide leader in trusted identity solutions. Its products range from physical access control products, like ID cards and readers for opening doors, to solutions for accessing digital networks, verifying transactions, and tracking assets." *Id.* ¶ 19.

"Hospitality similarly provides advanced electronic locking and access solutions to hotels, cruise ships, construction, critical infrastructure, education, senior care, and multi-family residential industries worldwide." *Id.* ¶ 20. "HID and Hospitality offer the HID Mobile Access and ASSA ABLOY Mobile Access software solutions, respectively. Each allows an individual's mobile device (e.g., smartphone or wearable) to be used to gain access to secured doors, gates, networks, services, and more." *Id.* ¶ 21.

Petitioner filed a Declaratory Judgment action against Patent Owner and its parent company based on Patent Owner's written allegations to Petitioner that one or more of the Petitioner companies infringe patents owned by Patent Owner, including the '208 patent challenged in this

16
**Appx4323**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

proceeding. *Id.* ¶¶ 58–73; Count II ("Declaratory Judgment of Non-infringement of the '208 Patent").

There also is no dispute that Petitioner and Apple have a sophisticated and substantive business relationship. *See, e.g.*, Ex. 2009 ("Apple Developer Program License Agreement"). Petitioner supplies products, which are locking systems, to Apple, which Apple then sells to consumers. Ex. 2027. Also, Apple's iPhone is one of the smartphone products that can be used with Petitioner's lock products. *Id.* Thus, Petitioner must design its locking products to interact with the iPhone operating system and software. Patent Owner asserts that this arrangement makes Apple a real party-in-interest and/or a privy with Petitioner. Petitioner, who has the burden of persuasion, disagrees.

As explained below, when considering the entirety of the evidentiary record, including evidence relating to the business model and operating relationship between Petitioner and Apple, and considering the equitable and practical considerations of the relationship between Petitioner and Apple, we determine that Apple is *not* an RPI or a privy of Petitioner.

We discuss below the evidence and arguments on which the parties rely.

### B. RPI Status

Section 315(b) "is unambiguous: Congress intended that the term 'real party in interest' have its expansive common-law meaning." *AIT*, 897 F.3d at 1351. "Determining whether a non-party is a 'real party in interest' demands a flexible approach that takes into account both equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship

17

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

with the petitioner." *Id.* As stated in *AIT*, "a patent owner dragged into an IPR by a petitioner, who necessarily has an interest in canceling the patent owner's claims, should not be forced to defend against later judicial or administrative attacks on the same or related grounds by a party that is so closely related to the original petitioner as to qualify as a real party in interest." *Id.* at 1350. The corollary to this principle is that a patent owner who sues, or threatens to sue, several independent and distinct entities should not be surprised when each mounts an independent and distinct defense, whether in a federal court, in a post-grant proceeding in the Patent and Trademark Office, or both.

This concept of avoiding repeated challenges of a patent by distinct, but related, parties also is supported in the legislative history of Section 315(b). *Id.*; *see also RPX*, Paper 128 at 8–9 (concluding that the legislative history supports the concepts that "the RPI and privity requirements were designed to avoid harassment [of patent owners] and preclude parties from getting 'two bites at the apple' by allowing such parties to avoid either the estoppel provision or the time-bar").

"The statutory terms 'real party in interest' and 'privy' are not defined in Title 35. However, they are well-established common law terms." *Power Integrations*, 926 F.3d at 1315. The Federal Circuit has determined "that Congress intended to adopt common law principles to govern the scope of the section 315(b) one-year bar." *Id.* We therefore look "to common law *preclusion* principles for guidance" to determine whether a real party-in-interest or privity relationship exists. *Id.* (emphasis added).

Whether a party who is not a named participant in a given proceeding nonetheless constitutes a "real party-in-interest" or "privy" to that

18
**Appx4325**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

proceeding "is a highly fact-dependent question." Patent Trial and Appeal Board Consolidated Trial Practice Guide, November 2019 ("CTPG"), 13 (citing *Taylor v. Sturgell*, 553 U.S. 880 (2008) (summarizing common law *preclusion* principles)).[22] "[A]t a general level, the 'real party-in-interest' is the party that desires review of the patent." CTPG, 14. Thus, the "real party-in-interest" may be the petitioner itself, and/or it may be the party or parties "at whose behest the petition has been filed." *Id*; *see AIT*, 897 F.3d at 1351 (citing the initial Trial Practice Guide, recognizing the "fact-dependent" nature of the RPI inquiry, and explaining that the two questions lying at its heart are whether a non-party "desires review of the patent" and whether a petition has been filed at a nonparty's "behest"). A common meaning of "behest" is "because someone has ordered or requested it." *See* Ex. 3002.

> As explained in *AIT*:
>
> [D]etermining whether a non-party is a "real party in interest" demands a flexible approach that takes into account both

---

[22] The CTPG accurately identifies *Taylor* as focusing on "preclusion principles." *Power Integrations* also focuses on "preclusion principles." 926 F.3d at 1315. Indeed, *Taylor* did not use the term "privity" in its opinion. *See Taylor,* 553 U.S. at 894, n.8 ("The substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.' . . . The term 'privity,' however, has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground. . . . To ward off confusion, we avoid using the term 'privity' in this opinion.") (internal citations omitted). In *Taylor*, the Court vacated and remanded the appellate court's decision because "we disapprove *the theory of virtual representation* on which the decision below rested. The preclusive effects of a judgment in a federal-question case decided by a federal court should instead be determined according to the established grounds for nonparty *preclusion* described in this opinion." *Id.* at 904 (emphases added).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

> equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner. Indeed, the Trial Practice Guide . . . suggests that the agency understands the "fact-dependent" nature of this inquiry, explaining that the two questions lying at its heart are whether a non-party "desires review of the patent" and whether a petition has been filed at a nonparty's "behest."

897 F.3d at 1351 (quoting Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48759 (Aug. 14, 2012)); *accord* CTPG 13–14.

In *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018 (Fed. Cir. 2021), the Federal Circuit stated that:

> [Determining whether a party is a RPI] has no bright-line test—relevant considerations, however, may include, "whether a . . . party exercises [or could exercise] *control* over a petitioner's participation in a proceeding, or whether a . . . party is *funding* the proceeding or directing the proceeding.

*Id.* at 1028 (emphasis added) (quoting *AIT*, 897 F.3d at 1342, which cited "Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012)"); *see also* CTPG, 16 ("A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding [citing *Taylor*, 553 U.S. at 895]. The concept of control generally means that 'it should be enough that the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties.'" (citing 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4451 (2d ed. 2011) (hereinafter cited generally as "WRIGHT & MILLER")).

Thus, factors such as "control" and "funding" clearly are relevant. They are *not*, however, the sole, or dispositive, factors. *See* CTPG, 17

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

(noting that "whether something less than complete funding and control suffices to justify similarly treating the party [as a real party-in-interest] requires consideration of the pertinent facts" (citing *Cal. Physicians Serv. v. Aoki Diabetes Research Inst.*, 163 Cal. App. 4th 1506, 1523–25 ("discussing the role of control in the 'privy' analysis, and observing that 'preclusion can apply even in the absence of such control'"))).

Consistent with *Uniloc 2017*, and as further explained in the CTPG, "[c]ourts and commentators agree . . . that there is no 'bright-line test' for determining the necessary quantity or degree of participation to qualify as a 'real party-in-interest' or 'privy' based on the control concept." CTPG, 16 (emphasis added) (citing *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994); WRIGHT & MILLER § 4451 ("The measure of control by a nonparty that justifies preclusion cannot be defined rigidly.")). As stated in *Gonzalez*, the evidence as a whole must establish that "the nonparty possessed effective control over a party's conduct . . . as measured from a practical, as opposed to a purely theoretical, standpoint." *Gonzalez*, 27 F.3d at 759. Theoretical, hypothetical, or speculative assertions about effective control, unsupported by evidence, are neither probative nor persuasive.

Additional relevant factors to those discussed above include: the non-party's relationship with the petitioner; the non-party's relationship to the petition itself, including the nature and/or degree of involvement in the filing; and the nature of the entity filing the petition. CTPG, 17–18.

A party is not considered a real party-in-interest in an *inter partes* review solely because it is a joint defendant with a petitioner in a patent infringement suit or is part of a joint defense group with a petitioner in the suit. *Id.* Joint defendants sued for patent infringement have common

21
**Appx4328**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

interests in establishing that their products do not infringe and/or the asserted patent or patents are invalid. That common interest, however, does not, by itself, automatically establish a real party-interest or privy relationship. *Id.*

We consider all the various factors discussed in the legislative history, case law, and other authority and guidance cited above. No one factor is dispositive. *See* CTPG 18 ("In short, because rarely will one fact, standing alone, be determinative of the inquiry, the Office cannot prejudge the impact of a particular fact on whether a party is a 'real party-in-interest' or 'privy' of the petitioner.").

Patent Owner takes a different view of the criteria to establish status as a real party-in-interest. Patent Owner states:

> In this matter, Patent Owners' assertion that Apple is an RPI is not based on Apple's control (or lack thereof) over the IPR; rather, Patent Owner's contention is based upon the established, significant business relationship between Apple and Petitioners as concerns the technology at issue, coupled with the undeniable fact that Apple would be a clear beneficiary of an invalidity finding in this proceeding.

PO Resp. 49.

Additionally, Patent Owner further asserts that "[a]s is plainly stated in *AIT*, the RPI analysis must be made 'with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner.'" PO Resp. 48–49 (citing *AIT*, 897 F.3d at 1351).

Petitioner asserts that "Apple never knew the petition [in the two proceedings now before us] would be filed, never requested that it be filed, and never directed, controlled or contributed to it financially or otherwise." Reply 20–21. Petitioner also asserts that it filed the Petition in this

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

proceeding "based on their own interests, without any consideration of Apple." *Id.* at 21. Additionally, Petitioner notes that "Apple has its own IPR petition challenging the patent-at-issue," and that Petitioner "likewise had no involvement in Apple's petition." *Id.*

We address below the parties' contentions.

### 1. Apple's Prior IPR Petition

As noted above in Section I.C (Related Matters), Apple timely filed its own petition, IPR2022-00601 challenging some, but not all, claims, of the '208 patent. *See Apple, Inc. v. CPC Patent Technologies, PTY, LTD.*, IPR2022-00601, Paper 1 (PTAB Feb. 23, 2022) (the "'601 Apple IPR"). The '601 Apple IPR challenges claims 1, 3–7, 9–11, and 13 of the '208 patent based on three references, Mathiassen-113, McKeeth, and Anderson. *Id.* The two Petitions now before us collectively challenge claims 1–9 and 10–13[23] of the '208 patent based on various combinations of four references, Bianco, Mathiassen-067[24], Houvener, and Richmond. Pet. 4.

In the '601 Apple IPR, the Board instituted trial on all asserted grounds and all asserted claims. *Apple*, IPR2022-00601, Paper 11 (PTAB Sep. 28, 2022). On September 27, 2023, the Board issued its Final Written

---

[23] As explained above, the '045 petition challenges claims 1–9, and the '089 petition challenges claims 10–13.

[24] The parties refer to the Mathiassen-067 reference in this proceeding as "Mathiassen." As explained in the introduction, we adopted the term Mathiassen-067 in this proceeding to correct confusion in our Decision to Institute between two different "Mathiassen" references, each labelled as "Ex. 1004," in two different, but related IPR proceedings. To avoid future confusion and to maintain consistency, we will modify the parties citation of Mathiassen-067 by using brackets (*e.g.*, Mathiassen[-067]) in any quotes from the parties referring to "Mathiassen."

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Decision in that proceeding, determining all challenged claims, claims 1, 3–7, 9–11, and 13, were unpatentable. *Id.*, Paper 31. Patent Owner requested Director Review of the Final Written Decision (*id.*, Paper 32), which was denied (*id.*, Paper 33).

In *Unified Patents v. Uniloc USA, Inc. et al*, IPR2018-00199, Paper 33 (PTAB May 31, 2019), the Board determined that the fact that Apple, also asserted to be an unnamed RPI in that case, filed its own similar petition around the same time as the petitioner in that case "does not suggest Apple is an unnamed RPI. To the contrary, it suggests that Apple did not need Petitioner to file this Petition on its behalf, and chose to file its own similar petition, giving Apple control over its own proceeding." *Unified Patents*, IPR2018-00199, Paper 33 at 9. Based on the record before us, a similar determination can be made here. The fact that Apple filed the '601 Apple petition on February, 23, 2022, about three months *before* the Petition in the case before us was filed, suggests that Apple did not need Petitioner to file the Petition in this case on its behalf, because Apple had previously filed its own similar petition, giving Apple control over its own proceeding.

We also note here that Petitioner filed its Petition because it was independently threatened with a law suit by Patent Owner based on an alleged infringement of the '208 patent and other patents, as explained in Petitioner's Declaratory Judgment complaint. *See* Ex. 2007.

### 2. *Apple's Relationship to Petitioner*

There is no dispute that Apple has some relationship with Petitioner. Petitioner filed a Declaratory Judgment complaint against "CPC Patent Technologies Pty. Ltd." (Patent Owner in the proceeding before us) and "Charter Pacific Corporation Ltd." (collectively referred to in the complaint

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

as "Charter Pacific"). Ex. 2007 ¶ 1. In the Declaratory Judgment complaint, Petitioner states "Charter Pacific is also engaged in an aggressive litigation campaign that includes Apple Inc. ("Apple"), *a business partner* of the ASSA ABLOY Entities." *Id.* ¶ 30 (emphasis added); *see also, e.g., id.* ¶¶ 21, 43, 98–106 (referring to products sold by Petitioner to Apple).

The business relationship between Apple and Petitioner is that Petitioner, or one of the named entities collectively referred to as Petitioner, makes products that interface with Apple products and may be sold on Apple's website. For example, ASSA ABLOY Residential Group, Inc., a named entity included as a Petitioner in this proceeding, makes and sells security locks under the brand name "Yale." *See* Ex. 2007 ¶¶ 53–73 (discussing the infringement allegation against "Yale Smart Locks"); Ex. 2027 (screen shots from Apple's website concerning the "Yale Assure Lock SL Touchscreen Deadbolt"). As described, in Exhibit 2007, the Yale Assure Lock uses a software application ("App") on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. *E.g.*, Ex. 2007 ¶ 65 ("The download page for the Yale Access application identifies August as the developer in the Apple App Store"). The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store. Ex. 2027 (*see* page 1 stating "you can lock or check current status just by asking Siri").

Petitioner asserts "Petitioners and Apple have a standard business relationship like that of over 34 million application developers on Apple's platform." Reply. 22 (citing Ex. 1023, 6–7, stating "[t]here are over 34M registered Apple Developers from 227 regions"). Also, at least one of the August Smart Lock family of products and Yale Assure Lock family of

25
**Appx4332**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

products were submitted to Apple for certification, which Apple requires of hundreds of MFi Program[25] participants, including Petitioner.  Reply 25.

Petitioner does not dispute that it has accepted the "Apple Developer Program License Agreement" allowing it to use Apple software to develop applications for Apple products.  *See* Ex. 2009.  Exhibit 2009 is an 88-page document governing Petitioner's relationship with Apple.  *Id.*  Essentially, Petitioner sells its products with and through Apple, and creates software applications that allows those products to interface with Apple's iPhone and other Apple products.  *See, e.g.,* Ex. 2027.

Our rules do *not* provide specifically for interrogatories between the parties.  Our rules provide, however, that "[t]he parties may agree to additional discovery between themselves."  37 C.F.R. § 42.51(b)(2)(i).  Apparently, Petitioner agreed to respond to interrogatories from Patent Owner.  Petitioner asserts that its "verified responses to CPC's Interrogatories confirm that Apple never provided any direction, control, or

---

[25] The acronym "MFi" refers to "Made for iPhone/iPod/iPad." *See* Ex. 3003.  Apple's Developer Program License Agreement (Ex. 2009) defines "MFi Program" to mean "a separate Apple program that offers developers, among other things, a license to incorporate or use certain Apple technology in or with hardware accessories or devices for purposes of interfacing, communicating or otherwise interoperating with or controlling select Apple-branded products." (Ex. 2009, 6); *see also* Ex. 2017 (explaining how the MFi program works); Ex. 3004 (summarizing who needs to join the MFi program, and who does *not* need to join); Ex. 3005 (referring to undefined "MFi certification requirements"); Ex. 1022, 6 (stating that "at least one exemplary product from the August Smart Lock family of products; and at least one exemplary product from the Yale Assure Lock family of products" were "submitted to Apple for certification purposes").

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

financing in this proceeding." Reply 21 (citing Ex. 1022, responses to Interrogatories Nos. 3, 4).

Exhibit 1022 contains responses to five interrogatories posed by Patent Owner to Petitioner in this IPR proceeding and its related proceedings. Ex. 1022, 1 ("These answers are made solely for the purpose of IPR2022-01006, IPR2022-01045, IPR2022-01089, IPR2022-01093, and IPR2022-01094.").

In the interrogatories, Petitioner states:

1. "Petitioners do not have any insurance policy or policies that name Apple as an additional insured" (*id.* at 7);

2. "Petitioners have not had any communications with Apple, directly or through counsel, . . . other than communications that relate solely to Petitioners seeking Apple's permission to produce documents in response to CPC's discovery request" (*id.* at 8);

3. "Petitioners and other ASSA ABLOY entities have not had any communications with Apple, directly or through counsel, regarding the validity or invalidity of the '208 Patent . . ." (*id.* at 10); and

4. "There have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 9,269,208 (*id.* at 11–12).

Additionally, Petitioner states in its interrogatory responses:

• Apple had no role whatsoever in Petitioners' IPRs.

• Petitioners never informed Apple that the IPR petitions were being prepared, never communicated with Apple regarding the substance of the IPR petitions, and never told Apple when or why the IPR petitions would be filed.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

- Petitioners provide all direction to their outside counsel regarding the IPRs and the district court litigation between Petitioners and Apple [sic].[26]

- Apple previously filed its own IPR petitions regarding the subject patents (IPR2022-00600, IPR2022-00601, and IPR2022-00602). Petitioners likewise had no involvement whatsoever in Apple's IPR petitions. Petitioners never knew that Apple's IPR petitions were being prepared or that they would be filed.

- Petitioners did not file any of Petitioners' IPR petitions at Apple's behest. Apple never requested that Petitioners file any IPR petitions challenging any of the patents-at-issue.

- Apple has never had any control or say whatsoever in Petitioners' IPR petitions.

- Apple has not contributed financially or in any other manner to any of Petitioners' IPR petitions.

Ex. 1022, 8–9.

There is no evidence that refutes or contradicts these interrogatory responses. The record before us contains no evidence of communications between Petitioner and Apple regarding this proceeding or the preparation of the Petition filed in this proceeding.

Patent Owner relies on several specific clauses in the Developer Agreement to establish the asserted RPI relationship, including: (1) representations and warranties of noninfringement (PO Resp. 55–57); indemnification clauses (*id.* at 57–59); product inspection and insurance clauses (*id.* at 59–61); and appointment of Apple as an agent for distribution

---

[26] This appears to be a misstatement. We have not been informed of any litigation between "Petitioners and Apple." The only litigation cited by the parties involves Petitioner and Patent Owner, Patent Owner and Apple, or Patent Owner and HMD Global. *See* Section I.C ("Related Matters") of this Decision.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

of Petitioner's "software on the Apple App Store;" (*id.* at 61). Patent Owner also asserts that Apple is "a clear beneficiary of the Petition (*id.* at 61–62). Additionally, Patent Owner asserts that the fact that Petitioner filed a Declaratory Judgment complaint seeking a declaration of non-infringement of the '039 patent is significant. PO Resp. 63.

We discuss these issues below.

### a)    *Developer Agreement (Ex. 2009)*

The Apple Developer Agreement is an 88-page agreement between Apple and software developers who need to use Apple software "to develop one or more Applications . . . for Apple-branded products." Ex. 2009, 1. The Developer Agreement provides "a limited license" to use Apple software "to develop and test" the Developer's software applications for Apple products. *Id.* "In order to use the Apple" software and related services," the prospective developer "must first accept" the Developer Agreement. *Id.*

### (1)    *representations and warranties*
### *of noninfringement (PO Resp. 55–57);*

Patent Owner cites Section 3.2(d) of the Developer Agreement for its "warranties of noninfringement." Resp. 55–57. Section 3.2(d) states "*[t]o the best of Your knowledge and belief . . .* the Developer's products don't infringe any Apple or third party intellectual property or other rights." Ex. 2009, 16. We do *not* consider Section 3.2(d) to be "warranty." It is not a guarantee that products will not infringe. It is a representation of the developer's current "knowledge and belief." It is far different from the obligations created by the App developer's agreement in *Bungie*.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

In *Bungie*, Bungie represented and warranted to Activision that Bungie owns or controls all the rights in "the Licensor Product Intellectual Property." *Bungie*, IPR2015-01264, Paper 64 at 29. In *Bungie*, there also was a representation that "the use, development, distribution and publishing [of the Licensor Product] as contemplated by and set forth in [the *Bungie*] Agreement, *shall not infringe upon or violate the rights of, nor require the consent of, any other party*." *Id.* (citations to the evidentiary record omitted). The representation in Section 3.2(d) of the Developer Agreement (Ex. 2009) in the case before us is *not* a similar warranty of noninfringement.

Patent Owner also cites Schedule 1, Section 4.1, of the Developer Agreement as evidence of a representation and warranty of noninfringement. Resp. 56.

The Developer Agreement refers to three "Schedules": Schedule 1, Schedule 2, and Schedule 3. *See* Ex. 2009, 1 ("Purpose," referring to the different purposes of Schedules 1 and 2); *id.* § 7.1 ("Delivery of Free Licensed Applications"); § 7.2 (delivery of "Fee-Based Licensed"); (*see also* 73–88 (Schedule 1)).

Schedules 2 and 3 of the Developer Agreement were not included with Patent Owner's filed Exhibit 2009.

The Developer Agreement defines when Schedule 1 will apply:

> Distribution of free (no charge) Applications (including those that use the In-App Purchase API for the delivery of free content) via the App Store or Custom App Distribution will be subject to the distribution terms contained in Schedule 1 to this Agreement.

Ex. 2009, 1 ("Purpose" section).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

The Developer Agreement also defines when Schedule 2 will apply:

> If You would like to distribute Applications for which You will charge a fee or would like to use the In-App Purchase API for the delivery of fee-based content, You must enter into a separate agreement with Apple ("Schedule 2").

*Id.*

Schedule 3 applies to "Custom App Distribution." *Id.*

We have not been directed to any evidence establishing the financial terms of how Petitioner's applications will be distributed. Thus, we do not know whether Petitioner's applications will be distributed for free, and thus subject to Schedule 1; whether Petitioner's applications will be distributed for a fee, and thus subject to Schedule 2; or whether Petitioner's applications will be distributed by "Custom App Distribution," and thus subject to Schedule 3.

Without evidence of the which of the three schedules apply to Petitioner, Patent Owner's arguments about the scope of the warranty in Schedule 1 are not probative evidence that Apple is an RPI in this proceeding.

Moreover, a contractual obligation of a representation and warranty, without more, does not establish that Apple is an RPI in this proceeding.

In *Bungie*, one responsibility of Bungie under the terms of the agreement in that case was to conduct "legal reviews." *Bungie*, IPR2015-01264, Paper 64 at 29. These "legal reviews were *in addition to* the representations and warranty of noninfringement. In *Bungie*, the agreement identified as an item to "be managed by and be the responsibility of Licensor [Bungie]": "[c]onducting legal reviews of the Products to ensure that all Intellectual Property and other rights are fully cleared for use." *Id.* The

31
**Appx4338**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

responsibilities of Bungie listed in the agreement, including these "legal reviews," were "subject to prior review and approval of [Licensee] Activision, (budget to [be] mutually approved) such approval not to be unreasonably withheld." *Id.* (citations to evidentiary record omitted). The stated purpose or required result of the "legal reviews" was "to ensure that all Intellectual Property and other rights are fully cleared for use." *Id.* at 29–30.

In *Bungie*, the Board determined that "unlike an opinion letter that opines merely as to *whether* rights are clear for use, the Agreement requires the 'legal reviews' to be conducted so as 'to ensure' the rights are 'fully cleared for use.'" *Bungie*, IPR2015-01264, Paper 64 at 30. The Board concluded:

> [t]he reference to Activision being involved in mutually approving the budget further suggests that Activision would be funding, at least in part, the legal reviews. Thus, non-party Activision had a contractual interest in Petitioner Bungie's commitment to take actions "to ensure that all Intellectual Property and other rights are fully cleared for use."

*Id.*

In the case before us, we have not been directed to evidence of Petitioner being obligated to conduct for Apple "legal reviews" of allegedly infringed patents. Also, we have not been directed to evidence of Apple being involved in funding and/or managing such "legal reviews" of allegedly infringed patents.

### (2)    *indemnification clauses (PO Resp. 57–59)*

Patent Owner asserts that the Developer Agreement "provides broad indemnification rights to Apple." PO Resp. 57 (citing Ex. 2009, 43).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

The Developer Agreement provides the following indemnification clause:

> To the extent permitted by applicable law, You agree to indemnify and hold harmless, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to any of the following: . . . (ii) any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights; . . .

> In no event may You enter into any settlement or like agreement with a third party that affects Apple's rights or binds Apple in any way, without the prior written consent of Apple.

Ex. 2009 § 10.

While it is clear that there is an indemnification clause, we note that Petitioner states "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 9,269,208" (Ex. 1022 at 11–12). As discussed above, Apple has been sued for infringement by Patent Owner based on products provided by Petitioner. Thus, based on the record before us, it appears that Apple and Petitioner may have a different understanding than Patent Owner of the applicability of the indemnification clause.

According to Patent Owner, the "Board has previously found such indemnification arrangements to be significant evidence of RPI status."

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Prelim. Resp. 27 (citing *Ventex Co., Ltd., v. Columbia Sportswear North America, Inc.*, IPR2017-00651, Paper 148 at 7, 10, 12 (PTAB Jan. 24, 2019) (Precedential)).

Patent Owner mischaracterizes the holding in *Ventex*. The existence of an indemnification agreement was not the determining factor in finding the existence of an RPI relationship. Moreover, the Board has held repeatedly that an indemnification agreement, without something more, was insufficient to establish a RPI relationship. *See Bae Sys. Info. & Elec. Sys. Integration, Inc. v. Cheetah Omni, LLC*, IPR2013-00175, Paper 20 at 4 (PTAB July 23, 2013) (holding indemnity provisions do not establish a right of control of a proceeding, and noting "indemnification is not one of the 'substantive legal relationships' cited in *Taylor*, 553 U.S. at 894, as binding a person not a party to a lawsuit to a judgment in that suit"); *Dep't of Justice v. Discovery Patents, LLC.*, IPR2016-01041, Paper 29 at 8 (PTAB Nov. 9, 2017) ("[W]e are unaware of any *inter partes* review decision in which a real party in interest finding was based solely on evidence of an indemnification clause.").

In *Ventex*, the parties had a preexisting substantive legal relationship in the form of two contracts: (1) a Supplier Agreement with an obligation to indemnify and defend; and (2) an Exclusive Manufacturing Agreement. *Ventex*, IPR2017-00651, Paper 148 at 12. The Board determined that it was "clear" that the parties "had a specially structured, preexisting, and well established business relationship with one another, including indemnification *and exclusivity arrangements*." *Id.* at 10 (emphasis added). In *Ventex*, the Board stated "[t]he exclusive business relationship between [the parties] . . . , and Ventex's express desire to shield its customers and

34

**Appx4341**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

potential buyers from infringement lawsuits by Columbia *strongly suggest* that Ventex filed the Petition, at least in part, on Seirus's behalf." *Id.* at 9.

There is no persuasive evidence to which we have been directed that establishes or suggests an *exclusive* manufacturing or *exclusive* licensing agreement between Petitioner and Apple.

In *Ventex*, the Board also determined that "Seirus was, in effect, funding the *inter partes* reviews, whether wittingly or unwittingly" based on the "timing, structure, and amounts" of payments made by Seirus to the petitioner. These payments "suggest[ed] a correlation with legal fees incurred by Ventex in connection with the preparation and prosecution of these IPRs by its counsel." Ventex, IPR2017-00651, Paper 148 at 13. An internal email linked these payments as "necessary to cover the attorney's fees in these *inter partes* reviews." *Id.*

We have not been directed to any persuasive evidence or argument that Apple is funding this IPR proceeding.

The Board specifically determined that it was the "totality of the circumstances" that "calls into considerable question Ventex's premise that Seirus is an entity divorced from this proceeding." *Id.* Our totality of facts and circumstances here are significantly different.

We have not been directed to any probative evidence that causes us to doubt Petitioner's statement in the interrogatory responses that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 9,269,208." Ex. 1022, 11–12. Also, there is no exclusive agreement between the parties and no evidence that Apple is funding this proceeding. Indeed, the evidence is to the contrary.

35

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

*See id.* at 8–9 (Response to Interrogatory No. 3, stating "Petitioners have not had any communications with Apple, directly or through counsel, regarding any of IPR2022-01006, IPR2022-01045, IPR2022-01089"; "Apple had no role whatsoever in Petitioners' IPRs"; "Petitioners provide all direction to their outside counsel regarding the IPRs and the district court litigation between Petitioners and Apple"; "Petitioners did not file any of Petitioners' IPR petitions at Apple's behest"; and "Apple has never had any control or say whatsoever in Petitioners' IPR petitions.").

### (3) *product inspection and insurance coverage clauses (PO Resp. 59–61)*

Patent Owner asserts that "Petitioners' products-at-issue include physical components that connect to their respective apps that are installed upon and run on Apple devices." PO Resp. 59 (citing Ex. 2026). Patent Owner then asserts that "Apple enjoys the right, *and indeed has exercised the right*, to physically inspect the Petitioners' products-at issue." *Id.* (citing "*Id.* at 36 [sic]").

Patent Owner also asserts that "Petitioners have admitted that numerous ASSA ABLOY products identified in the Parallel Litigation were sent to Apple for 'compliance' and/or 'certification' purposes." PO Resp. 59 (citing "Ex. 2032 (Response to Interrogatory No. 1)."[27]

According to Patent Owner, "the right to inspect shows the special closeness of Petitioners' relationship to Apple." *Id.* at 60.

---

[27] Exhibit 2032 is an incorrect citation. The correct citation to the only interrogatory responses in this proceeding is Exhibit 1022.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Patent Owner also asserts "Section 6.1 [of the Development Agreement] also imposes certain insurance obligations upon Petitioners." *Id.*

Patent Owner concludes that the product inspection and insurance coverage clauses in the Development Agreement (Ex. 2009) are evidence of a "'specially structured, preexisting, and well-established business relationship with one another' with respect to the technology at issue." *Id.* at 59–60 (citing "*Ventex*," "at 10").

There can be no reasonable dispute that the 88-page Development Agreement (Ex. 2009) is clear evidence of a specially structured business relationship between Petitioner and Apple. Indeed, every contract between a buyer and a seller, or between a supplier and a manufacturer, provides a specially structured business relationship between the contracting parties. Every contractual business relationship, however, does not create a RPI legal relationship.

We have discussed in the preceding subsection the *Ventex* case on which Patent Owner relies. As we stated, the Board specifically determined that it was the "totality of the circumstances" in that case, not merely a business relationship, that established the RPI relationship in that case. *Ventex*, IPR2017-00651, Paper 148 at 13. In *Ventex*, one party was funding the IPR filed by another party. *Id.* As stated above, our facts and circumstances here are significantly different.

Moreover, the evidence before us establishes that Petitioner does not have any insurance policy that names Apple as an insured party. *See* Ex. 1022, 7 (response to Interrogatory No. 2).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Accordingly, we give these inspection, certification, and insurance clauses minimal probative weight in establishing an RPI relationship between Apple and Petitioner.

### (4)    appointment of Apple as an agent for distribution of Petitioner's software on the Apple App Store (Prelim. Resp. 32).

Patent Owner also asserts that Apple's appointment as Petitioner's agent is probative of Apple's RPI status to this IPR proceeding.  PO Resp. 61 (citing "Exhibit A to Schedule 1").  The cited language from Schedule 1 is:

> You appoint Apple Inc. as Your agent pursuant to California Civil Code §§ 2295 et seq. for the marketing and end-user download of the Licensed Applications by end-users located in the following regions: United States

*Id.*  The cited California code merely defines agency and states the authority, obligations, and other aspects of a principal and agent relationship. Moreover, this clause is specifically limited to Apple's role in "marketing and end-user download of the Licensed Applications," which concerns Apple's role in selling Petitioner's products.

As noted above, we have not been directed to evidence that Schedule 1 applies to Petitioner's relationship to Apple.  Assuming it does, we do not see how a standard and limited agency appointment in this context establishes or suggests that Apple is an RPI to this IPR proceeding.

### b)    *Whether Apple Is A Clear Beneficiary of the Petition*

Patent Owner asserts "Apple is a 'clear beneficiary' of the Petition and 'has an interest in and will benefit from [Petitioners'] actions.'" PO Resp. 61–62 (citing *AIT*, 897 F.3d at 1351, 1353).  Patent Owner

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

selectively gleans one phrase from *AIT* and asserts it is the controlling factor in the proceeding before us.  We disagree.

First, we look at the totality of the evidence and applicable factors, not just the "benefit" factor.

Second, as we have stated II.B.1 of this Decision, on September 27, 2023, the Board issued its Final Written Decision in the prior '601 Apple IPR challenging claims in the '208 patent, determining that all challenged claims, claims 1, 3–7, 9–11, and 13, were unpatentable.  '601 Apple IPR, Paper 31 (Sep. 27, 2023).  Thus, Apple has already received all the benefits it requested from an *inter partes* review.

Third, Patent Owner fails to acknowledge the unique business arrangement involved in the *AIT* case, which is completely different from the standard commercial software licensing and product development arrangement between Apple and Petitioner in this proceeding.

In *AIT*, the petitioner, RPX Corporation ("RPX") was:

> a public company whose stated "mission is to transform the patent market by establishing RPX as the essential intermediary between patent owners and operating companies."  One of its strategies is "to help members of [its] client network quickly and cost-effectively extricate themselves from [non-practicing entity ('NPE')] lawsuits."

*AIT*, 897 F.3d 1339 (internal record citations omitted).  As further explained by the Federal Circuit:

> [g]iven that one of RPX's publicly stated business solutions is to file IPRs where its clients have been sued by non-practicing entities to "reduce expenses for [its] clients," and that any IPR petitions Salesforce might have wanted to file would have been time-barred, this evidence at least suggests that RPX may have filed the three IPR petitions, in part, to benefit Salesforce [an RPX member].

39
**Appx4346**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

*AIT*, 897 F.3d at 1353 (internal record citations omitted). As stated above, Apple was not time-barred, Apple timely filed its own petition, and Apple received the relief it requested, which was invalidating all challenged claims.

The numerous other factors identified and discussed above, further establish significant and substantive differences between the business relationships in *AIT* and in the proceeding before us.

### 3.   *The '039 Patent Issue*

Patent Owner asserts Petitioners filed IPR petitions against all three patents that Patent Owner asserted in the Apple Action, including Patent No. 8.620,039 ("the '039 patent), even though Patent Owner "never mentioned the '039 Patent to Petitioners prior to Petitioners' IPRs." PO Resp. 63 (citing Exs. 2005, 2006, 2008). The IPR petitions filed by Petitioner challenging the '039 patent are IPR2022-01093 and IPR2022-01094. These two petitions challenge different claims from the '039 patent.

Patent Owner then points out that "the Federal Circuit identified 'the fact that the five patents asserted in the Activision litigation *were the same five patents* Bungie challenged in its IPR petitions' as one of three significant factors indicating that Activision was an RPI." PO Resp. 63 (citing *Worlds v. Bungie*, 903 F.3d at 1244).

Petitioner states clearly in its Declaratory Judgment complaint why it is challenging the '039 patent in that complaint, which also explains its interest in challenging the '039 patent in an IPR proceeding.

Petitioner states:

The First [Patent Owner] Letter also purported to attach a list of patent assets owned by Charter Pacific that are "available for licensing" ("Charter Pacific Portfolio"), but that attachment was missing in the package that Yale received. On information and

40
**Appx4347**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

belief, the '039 Patent is one of the assets that Charter Pacific points out as being "available for licensing."

Ex. 2007 ¶ 60.  Petitioner further states:

> Based on Charter Pacific's broad infringement allegations against Apple, it is likely that Charter Pacific would consider HID's and Hospitality's products and software solutions to be covered by the '039 patent.

*Id.* ¶ 105.  Additionally, Petitioner states:

> Charter Pacific has already selected each of the Patents-In-Suit from a larger family of patents in the Charter Pacific portfolio and alleged infringement on grounds that are substantially similar to the allegations that are likely to be raised in any lawsuit brought against the ASSA ABLOY Entities.

Ex. 2007 ¶ 108.

Thus, Petitioner has identified valid reasons why it believed it would be sued for infringement of the '039 patent, justifying its challenge of the '039 patent in an IPR proceeding.

### 4.  *Conclusion on RPI*

Considering the totality of the evidence and the controlling legal authority discussed above, we determine that Petitioner has met its burden in establishing that Apple is not a real party-in-interest.

We recognize that "a nonparty to an IPR can be a real party in interest even without entering into an express or implied agreement with the petitioner to file an IPR petition." *AIT*, 897 F.3d at 1354.  In *RPX*, decided on remand from the Federal Circuit in *AIT*, "the evidence strongly suggest[ed]" that RPX was representing Salesforce's interests in filing the IPR proceedings at issue in that case.  *RPX*, IPR2015-01750, Paper 128 at 31.  There is no such strong evidence in the proceeding before us.  Indeed,

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

the evidence is to the contrary. *See, e.g.*, Ex. 1022 (Petitioner's Interrogatory Responses).

"Most critically," in *RPX*, "Salesforce paid RPX to reduce Salesforce's patent litigation exposure, and RPX filed the [ ] IPRs despite having no apparent risk of infringement liability itself." *RPX*, IPR2015-01750, Paper 128 at 31. Again, the evidence in *RPX* is significantly different from the evidence in the proceeding before us, where Petitioner was sufficiently threatened with infringement by Patent Owner to create jurisdiction for Petitioner's Declaratory Judgment complaint against Patent Owner to establish that Petitioner did not infringe the '208 patent. *See, e.g.*, Ex. 2007 ¶¶ 120–128 (Petitioner's Declaratory Judgment complaint seeking in Count II "a declaration that each entity [comprising Petitioner] does not infringe any claim of the '208 Patent."). The Declaratory Judgment complaint was filed on May 23, 2022 (*see* Ex, 2007 stating "Filed 05/23/22"). The Petition in this IPR proceeding was filed on June 3, 2022 (*see* Paper 5). The perceived benefits of challenging patentability in an *inter partes* review rather than challenging validity in a district court are well-known. *Apple Inc. v. Vidal*, 63 F.4th 1, 17 (Fed. Cir. 2023) (acknowledging "the realistically perceived advantages of the IPR process, including the applicability of a lighter burden of persuasion to prevail in challenging a patent claim than the burden applicable in district court."). In such circumstances, "equitable and practical considerations" point clearly towards Petitioner having a valid, independent interest in filing the Petition in this proceeding.

In *AIT*, the Federal Circuit also points us to our own Trial Practice Guide, which instructs us to consider "whether a petition has been filed at a

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

nonparty's 'behest.'" *AIT*, 897 F.3d at 1351 (quoting Trial Practice Guide, 77 Fed. Reg. at 48,759); accord CTPG 14. We acknowledge that even if Apple did not directly fund, control, or expressly request Petitioner to file this IPR proceeding, it could still be a RPI, as held in *RPX*. Unlike *RPX*, however, the evidence as discussed above does not support such an outcome.

Moreover, Apple initiated an IPR proceeding challenging claims of the '208 patent, which has resulted in all claims of the '208 patent challenged by Apple to be unpatentable. *See* '601 Apple IPR, Paper 31. Thus, Apple will not benefit from any similar substantive determination in this proceeding. We have not been directed to any persuasive evidence that Apple needs, wants, funds, controls, or benefits from a second, later-filed petition, such as the one before us.

We recognize that Apple may derive some benefit if additional claims of the '208 patent are determined to be unpatentable in this post-grant proceeding. This derived benefit does not, however, make Apple an RPI to this proceeding. *See WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1321 (Fed. Cir. 2018) (stating in the context of the broader concept of privity that "[a]s a general proposition, we agree with the Board that a common desire among multiple parties to see a patent invalidated, without more, does not establish privity").

Here, we determine for purposes of this decision that, similar to the determination in *Uniloc 217*, "[w]ithout such evidence of control, in addition to no evidence of joint funding, or even any evidence of substantial [direct or implied] coordination between the parties as to their respective decisions to bring these proceedings, a finding that [a non-party to this IPR

43

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

proceeding] is an RPI of or in privity with [Petitioner] here would be improper." *Uniloc 2017*, 989 F.3d at 1029.

Thus, based on the evidence before us and the analysis above, we determine that Apple is not an RPI in this IPR proceeding.

### C.    *Privity Status*

Patent Owner also asserts that "Apple is a privy to this proceeding based at least on its pre-existing substantive legal relationship with Petitioners." PO Resp. 63. According to Patent Owner, "[t]he facts discussed above concerning Petitioners' relationship with Apple equally demonstrate a privy relationship between Petitioners and Apple." *Id.* at 64.

The issue of privity in the context of an IPR proceeding was discussed in *RPX*, IPR2015-01750, Paper 128 at 36–38. As stated in *RPX*, Section 315(b) explicitly imposes time bars on privies to "prevent successive challenges to a patent by those who previously have had the opportunity to make such challenges in prior litigation." *RPX*, IPR2021-01750, Paper 125 at 36 (citing *WesternGeco*, 889 F.3d at 1319).

The Leahy-Smith America Invents Act does not define "privity." *WesternGeco*, 889 F.3d at 1317. Rather, "privity" has a common-law meaning. *Id.* "Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case." *Id.* at 1318 (quoting Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012)[28]). The privity "analysis seeks to determine whether the relationship between the purported 'privy' and the relevant other party is sufficiently close such that

---

[28] *See also* CTPG, 15 (including the same quotation).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

both should be bound by the trial outcome and related estoppels."
CTPG, 14–15.

The Supreme Court stated in *Taylor* that "the rule against nonparty preclusion is subject to exceptions," which can be grouped into six categories." *Taylor*, 553 U.S. at 893. These six categories are: (1) where there is an agreement between the parties to be bound; (2) where there is a pre-existing substantive legal relationship between the parties; (3) where there is adequate representation by the named party; (4) where the non-party had control of the prior litigation; (5) where the non-party acts as a proxy for the named party to relitigate the same issues; and (6) where special statutory schemes foreclose successive litigation by the non-party (e.g., bankruptcy and probate). *See Taylor*, 553 U.S. at 894–95 (describing "six categories that create independent exceptions" to the normal rule forbidding non-party preclusion).

The CTPG explains that "privity" is even more expansive than RPI, "encompassing parties that do not necessarily need to be identified in the petition as a 'real party-in-interest.'" CTPG, 14. The Board "evaluate[s] what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." *Id.* "This approach is consistent with the legislative history of the AIA, which indicates that Congress included 'privies' within the parties subject to the statutory estoppel provisions in an effort to capture 'the doctrine's practical and equitable nature,' in a manner akin to collateral estoppel." *Id.* at 15 (quoting 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl)).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

As stated in *WesternGeco*, when considering privity, "the [PTAB's] Trial Practice Guide observes: 'The emphasis is not on a concept of identity of parties, but on the practical situation.'" 889 F.3d at 1318. "[T]he standards for the privity inquiry must be grounded in due process." *Id.* at 1319. As the Federal Circuit further explains,

> This inquiry is grounded in due process concerns for both the petitioner . . . and the opposing party . . . In other words, the inquiry has a dual-focus on preventing the petitioner from now lodging a successive attack for which it already had a first bite, thus, protecting the defending party from an unwarranted second attack, while also ensuring that the petitioner is not unfairly limited in its ability to lodge its challenges if it has not had a full and fair opportunity to do so already.

*Uniloc 2017*, 989 F.3d at 1028 (citations omitted).

Petitioner asserts that "none of the Supreme Court's *Taylor* exceptions apply to the general common-law rule against nonparty preclusion. Reply 26–28 citing *Taylor*, 553 U.S. at 893–895). Petitioner discusses each *Taylor* factor and concludes that none of the factors, individually or collectively, establish that Apple is a privy of Petitioner. *Id.*

Here, the practical situation presented was created by Patent Owner. Patent Owner first sued Apple for allegedly infringing the '208 patent. *See* Section 1.C of this Decision (Related Matters). Patent Owner did not sue or join Petitioner to this suit. Apple answered the allegations in the complaint and timely filed the '601 Apple IPR Petition. Patent Owner separately wrote to Yale (Ex. 2005) asserting that Yale infringed the '208 patent. Yale, one of the named Petitioners, filed the present IPR proceeding challenging patentability of the '208 patent and separately filed a

46

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Declaratory Judgment action challenging the allegation of infringement (Ex. 2007), along with its related companies.

Patent Owner asserts that the "second *Taylor* factor," a pre-existing substantive legal relationship between Apple and Petitioner "clearly applies here for all the reasons discussed above [in Patent Owner's Response]." PO Resp. 64. We disagree.

First, we note that Patent Owner does not assert or discuss any of the other five *Taylor* factors. Implicit in Patent Owner's argument is that we ignore the other *Taylor* factors. As stated in *WesternGeco*, however, each factor "is but one of a variety of considerations." *WesternGeco*, 889 F.3d at 1320 (stated in the context of discussing the "control factor"). *WesternGeco* also stated that the control factor considered in that case "is not the exclusive analytical pathway for analyzing privity," thus indicating that the privity analysis should consider all the other analytical pathways discussed in *Taylor*.

The majority opinion in *AIT* did not reach the issue of privity; it decided the case solely on the issue of real party-in-interest. *AIT*, 897 F.3d at 1344, n.1 ("Because AIT focused its arguments on whether Salesforce was an unnamed real party in interest and because we vacate the Board's determination on that score, we need not address in this opinion whether RPX and Salesforce were in privity, and leave this argument for the Board to consider on remand."). Judge Reyna, however, filed a comprehensive concurring opinion dealing with the issue of privity. In the concurring opinion, he discussed the *Taylor* factors (*AIT*, 897 F.3d at 1362) and noted "[t]o be clear, the existence of any one of these forms of legal relationships alone does not necessarily establish privity." *Id.*

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Thus, we look to all of the non-exclusive factors identified in *Taylor v. Sturgell*, 553 U.S. at 894–95 to determine whether Apple is a privy of Petitioner. After doing so, we reach the conclusion that there is no persuasive evidence that Apple is a privy of Petitioner because:

- There is no persuasive evidence that there is an agreement between the Petitioner and Apple to be bound by any prior litigation or post-grant reviews concerning the '208 patent;

- There is no persuasive evidence of a pre-existing substantive legal relationship between Apple and Petitioner relating to prior litigation or post-grant reviews concerning the '208 patent;

- There is no persuasive evidence that Petitioner had adequate representation in any of Apple's prior litigation or post-grant reviews concerning the '208 patent;

- There is no persuasive evidence that Petitioner had control of any prior litigation or post-grant reviews concerning the '208 patent;

- There is no persuasive evidence that Petitioner acts as a proxy for Apple to relitigate the same patentability issues concerning the '208 patent; and

- There is no persuasive evidence of a special statutory scheme that forecloses successive litigation by Petitioner.

In fact, the record is to the contrary. *See* Ex. 1022 (Interrogatory responses).

*WesternGeco* recognized that a pre-existing business alliance, as well as indemnity provisions contained in the purchase agreements for the product accused of infringing were "insufficient to make PGS and ION privies within the meaning of the statute." *WesternGeco*, 889 F.3d at 1321 ("[W]e agree with the Board that these factors are insufficient to make PGS

48
Appx4355

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

and ION privies within the meaning of the statute."). Here, as found in *WesternGeco*, the parties "had a contractual and fairly standard customer-manufacturer relationship regarding the accused product." *Id.* "This finding does not necessarily suggest that the relationship is sufficiently close that both should be bound by the trial outcome and related estoppels, nor does it suggest, without more, that the parties were litigating either the district court action or the IPRs as proxies for the other." *WesternGeco*, 889 F.3d at 1321. We determine that this same analysis applies to this IPR proceeding.

Thus, based on the evidence and our analysis above, we determine that Apple is not a privy to Petitioner.

### D.    *Conclusion Concerning Section 315(b)*

The totality of the evidence before us does not establish anything other than a traditional business relationship between Petitioner, who manufactures locks and similar security products that interface with smartphones, and Apple, who sells a smartphone. There is a sharing of confidential information between these parties. This common form of conducting business, without more, does *not* establish a relationship sufficient to make Apple a real party-in-interest or a privy of Petitioner in this *inter partes* review.

There is no persuasive evidence that Apple has any control or substantive involvement over the Petition or over Petitioner's role in this proceeding. There is no persuasive evidence of joint funding. There is no persuasive evidence of direct or implied coordination between Apple and Petitioner as to their respective decisions to bring these proceedings. There

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

is no persuasive evidence that Apple was a "litigating agent" for Petitioner.[29]
Under these circumstances, a finding that Apple is a privy of Petitioner
"would be improper." *See Uniloc 2017*, 989 F.3d at 1029; *see also Google
LLC v. DDC Technology, LLC*, IPR2023-00708, Paper 29 at 21–37 (PTAB
Oct. 25, 2023) (determining that the mere existence of some business
relationship was not sufficient to establish an RPI or privy status between
the parties).

Accordingly, based on the totality of the evidence of record and our
analysis above, we conclude that Apple is *not* an RPI or in privity with
Petitioner, and thus Petitioner is *not* time-barred under Section 315(b).

## III.    ANALYSIS OF PETITIONER'S CHALLENGES

### A.    *Legal Standards*

Petitioner's asserted grounds of unpatentability are based on
obviousness under 35 U.S.C. § 103, quoted below.

> A patent for a claimed invention may not be obtained,
> notwithstanding that the claimed invention is not identically
> disclosed as set forth in section 102, if the differences between

---

[29] As stated in *Taylor*,

> We have never defined the showing required to establish that a
> nonparty to a prior adjudication has become a litigating agent for
> a party to the earlier case. Because the issue has not been briefed
> in any detail, we do not discuss the matter elaboratively here. We
> note, however, that courts should be cautious about finding
> preclusion on this basis. *A mere whiff of "tactical maneuvering"
> will not suffice*; instead, principles of agency law are suggestive.
> They indicate that *preclusion is appropriate only if the putative
> agent's conduct of the suit is subject to the control of the party
> who is bound by the prior adjudication*.

*Taylor*, 553 U.S. at 906 (emphases added).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

> the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103.

The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long-felt but unsolved needs, and failure of others.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007) ("While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls.").  The Court in *Graham* explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context."  *Graham*, 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness.  *KSR*, 550 U.S. at 415.  Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417.  To reach this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  Rather, obviousness

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason *why* a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017).

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F. 2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness.") (citation omitted); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.") (citation omitted).

"A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to common sense" or to that which the prior art teaches. *Id.*

Against this general background, we consider the references, other evidence, and arguments on which the parties rely.

### B.    *Level of Ordinary Skill in the Art*

The *Graham* analysis includes a factual determination of the level of ordinary skill in the art. Without that information, a court, or this Board, cannot properly assess obviousness "because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986). Thus, the level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). "This reference point prevents . . . factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. *Env't Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376,

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima*, 261 F.3d at 1355.

Additionally, the Supreme Court informs us that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Petitioner states "[a] person having ordinary skill in the art ('POSITA') at the time of the alleged invention would have had at least an undergraduate degree in electrical engineering, or equivalent education, and at least two years of work experience in the field of security and access-control." Pet. 8 (citing Ex. 1005, ¶ 26). Mr. Lipoff's cited testimony merely repeats, verbatim, Petitioner's asserted level of ordinary skill, preceded by the phrase "In my opinion." Ex. 1005 ¶ 26. Mr. Lipoff does not provide any facts or data to support his conclusory opinion. Accordingly, we give it minimal probative weight. 37 C.F.R. §42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (August 24, 2022) (precedential) (holding an expert's declaration testimony is entitled to little weight when it contains an exact restatement of the petition's arguments without any additional supporting evidence or reasoning).

54
**Appx4361**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Patent Owner states it "does not object to the defined level of skill in the art adopted in co-pending IPR2022-00601 (the '601 IPR) challenging the '208 Patent." PO Resp. 8 (citing "IPR2022-00601, Paper 11 at 11–12"). The cited claim construction is from our Decision granting *institution* of an *inter partes* review in the '601 IPR. The level of skill in the '601 IPR was revised slightly in our *Final Written Decision* in the '601 IPR. *See* '601 IPR, Paper 31 at 15. The level of skill in the '601 IPR was based on the arguments and evidence in the '601 IPR, which differ from the arguments and evidence in the case before us.

Accordingly, based on the prior art and the sophistication of the technology at issue, we determine that a person of ordinary skill at the time of the alleged invention would have had an undergraduate degree in a relevant technology or discipline, such as computer engineering, computer science, electrical engineering, or a related field, with one or two years of relevant experience in the field of human-machine interfaces and device access security, or an equivalent balance of education and work experience. This level of ordinary skill is consistent with Petitioner's proposed definition, the cited references (Bianco, Mathiassen-067, Houvener, and Richmond), and the disclosure of the '208 patent.

### C.    *Claim Construction*

As stated in 37 C.F.R. § 42.100(b),

> a claim of a patent . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. Any prior claim construction determination concerning a term of the claim in a

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

civil action, or a proceeding before the International Trade Commission, that is timely made

of record in the *inter partes* review proceeding will be considered.

37 C.F.R. § 42.100(b). Under this standard, claim terms are generally given their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the claims, patent disclosure, and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

### 1. *Claim Construction Principles*

"[T]here is no magic formula or catechism for conducting claim construction." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324). Fortunately, however, there is substantial judicial guidance.

Claim construction requires determining how a skilled artisan would understand a claim term "in the context of the entire patent, including the specification." *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1313. *Id.* (citation omitted). "[C]laims must be read in view of the specification, of which they are a part." *Id.* ((citation omitted; quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc)). The Specification, or more precisely, the written description, is the "single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims." *Id.* (citation omitted). Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the Specification into the

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

claims. *Phillips*, 415 F.3d at 1323. Thus, we are careful not to cross that "fine line" that exists between properly construing a claim in light of the specification and improperly importing into the claim a limitation from the specification." *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.").

While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

We also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317.

In construing the claims, we may also look to available "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Petitioner proposes construction for the terms "signal for directing input," in dependent claim 2 ('045 Petition 9–10), "feedback signal adapted to direct provision of . . . the biometric signal," in dependent claim 12 ('089 Petition 8–9), and all the "means-plus-function limitations" in the challenged claims. Pet. 10 ("Judge Albright (WDTX) construed seven means-plus-function limitations from the Challenged Claims, which Petitioners propose here. Petitioners also propose constructions for the remaining means-plus-

57

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

function limitations that Judge Albright did not construe due to his procedural limitations, which appear in their respective Argument sections below.").

Petitioner also notes that some terms construed in the related District Court litigation in Texas "need not be construed" in these proceedings. Pet. 10–11. Nonetheless, we have considered these timely filed District Court constructions, as required by our rules. 37 C.F.R. § 42.100(b) ("Any prior claim construction determination concerning a term of the claim in a civil action . . . that is timely made of record in the *inter partes* review proceeding will be considered.").

Patent Owner also refers to the claim constructions in the related Texas District Court litigation. *See* PO Resp. 8–9 (citing Exs. 1009, 1010, 2033).

Additionally, Patent Owner refers to four terms that "Apple proposed and the Board adopted" in the '601 Apple IPR, which also involved the '208 patent. *Id.* at 9 (citing the '601 Apple IPR, Paper 1 at 9; Paper 11 at 13). Patent Owner asserts that "[t]o the extent there is any dispute regarding construction of 'biometric signal' as it is used in the claims of the '208 Patent, Patent Owner submits that the construction adopted by the Board in the ['601] Apple IPR is the correct construction and it should be applied i[n] this proceeding as well." *Id.* at 9–10.

Because Patent Owner refers to the '601 Apple IPR claim construction, we provide some background analysis of that proceeding.

In the '601 Apple IPR, our Decision to Institute adopted, without further analysis, the unopposed proposed constructions by Petitioner Apple. '602 Apple IPR, Paper 11 at 13 ("Based on the record before us, we adopt,

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

for purposes of this Decision, Petitioner's unopposed proposed claim constructions."). The unopposed proposed construction by Petitioner Apple for "biometric signal" was "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." '601 Apple IPR, Paper 1 at 9. This is the construction that Patent Owner asserts in the proceeding now before us. *See, e.g.*, PO Resp. 9–10 ("Patent Owner submits that the construction adopted by the Board in the ['601] Apple IPR is the correct construction and it should be applied is this proceeding as well").

In our Final Written Decision in the '601 Apple IPR, we construed three terms requested by Patent Owner, which were constructions for (1) the term "accessibility attribute"; (2) the phrase requiring a series of entries of the biometric signal "characterised according to at least one of the number of said entries and a duration of each said entry"; and (3) the "populate" the database limitation concerning enrolling or authorizing new users. *See* '601 Apple IPR, Paper 31 at 23–40. We did not specifically construe the term "biometric signal" in our Final Written Decision. *Id.*

Returning to the proceeding now before us, Patent Owner states:

> To the extent there is any dispute regarding construction of "biometric signal" as it is used in the claims of the '208 Patent, Patent Owner submits that the construction *adopted by the Board in the ['601] Apple IPR is the correct construction* and it should be applied is this proceeding as well."

PO Resp. 9–10, 19 (emphasis added)[30].

---

[30] Patent Owner misconstrues what claim construction was "adopted" in the '601 Apple IPR. Patent Owner asserts we "adopted" a claim construction for "biometric signal" in our Decision to Institute ('601 IPR, Paper 11). This Decision was not a final agency action under 5 U.S.C. § 704, nor was it binding precedent. Our final agency action was in our final written decision

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Responding to Patent Owner's assertion on claim construction, Petitioner asserts that "when read in light of the specification, the 'biometric signal' is simply the input and output of the biometric sensor."  Reply 8.

"[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'"  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Clearly, there is a dispute concerning the construction of the term "biometric signal."  Accordingly, we determine that we need to construe specifically the term "biometric signal" in this proceeding.

Before addressing the substance of this claim construction, we consider the procedural issue raised by Patent Owner that the claim construction asserted by Petitioner in its Reply is "untimely."  Sur-reply 1 ("Petitioners' effort to challenge this claim construction for the first time in the Reply is untimely"); *id.* at 5 ("The Board should not consider Petitioners' untimely construction"); *id.* ("It is well-established that a petitioner must present proposed claim constructions in the Petition, not belatedly in a Reply").  We disagree on the facts of this proceeding.

This issue was addressed in *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374 (Fed. Cir. 2023).  The Federal Circuit held:

> [W]here a patent owner in an IPR first proposes a claim construction in a patent owner response, a petitioner must be

_____

(*id.*, Paper 31), which did not adopt a specific construction for the term "biometric signal."  The '601 Apple IPR also involved a different petitioner, different evidence, and different arguments than what is asserted in the proceeding before us.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

> given the opportunity in its reply *to argue and present evidence* of anticipation or obviousness under the new construction, at least where it relies on the same embodiments for each invalidity ground as were relied on in the petition.

*Id.* at 1384 (emphasis added). This is exactly the situation in this proceeding. Patent Owner first proposed a construction for the term "biometric signal" in its Response. PO Resp. 9–10. Petitioner addressed this newly identified construction in this proceeding in its Reply. Reply 7–11. Thus, as held in *Axonics*, we must consider Petitioner's arguments and evidence submitted in its Reply.

Accordingly, we address the claim construction issues and evidence in this case.

### 2. Biometric Signal

At the hearing, counsel for Patent Owner stated that "the real heart of this matter comes down certainly to what is a biometric signal?" Tr. 37:12–13. We agree. Indeed, we consider it dispositive.

Patent Owner's proposed construction for the term "biometric signal" is "physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.)." PO Resp. 9–10, 19. This is the construction asserted in the '601 Apple IPR and referred to in the Decision to Institute that proceeding. Patent Owner relies on intrinsic and extrinsic evidence to support its proposed construction.

Patent Owner asserts that "the specification makes clear that a 'biometric signal' as used in connection with the claimed invention is a *physical attribute* of the user." PO Resp. 10 (citing Ex. 1007, 1:29–33) (emphasis added by Patent Owner). The cited portion of the Specification states:

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

> One example of a biometric signal is a fingerprint. Other physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration and so on.[31]

Ex. 1007, 1:29–33.

Patent Owner focuses on the reference to "[o]ther physical attributes" in the disclosure and asserts that this reference to "physical attributes" defines the claim term "biometric signal." PO Resp. 10 ("This definition as established by the patentee controls" [the meaning of the claim term "biometric signal"]). Patent Owner also asserts that "[f]ingerprints, retinal patterns, iris patterns, face pattern, and palm configuration are all physical attributes." *Id.* at 11 (citing several extrinsic exhibits). Conspicuously absent from this list is the Specification's reference to "voice" and to the phrase "and so on."

Patent Owner also relies substantially on extrinsic evidence to support its proposed construction of "biometric signal," which we will discuss below.

First, we turn to the intrinsic evidence. We start our analysis with the claims.

### a)    Claims

The term "biometric signal" appears extensively throughout the challenged claims. Claim 1 is illustrative.

First, we note that the challenged claims state the specific objective of the claimed invention as a "system for providing secure access to a controlled item." *See, e.g.*, Ex. 1007, 15:42–43. Thus, the purpose of the

---

[31] As we discuss below, the phrase "and so on" creates ambiguity concerning the meaning of "biometric signal."

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

biometric signal is to achieve this objective – "secure access to a controlled item."

Claim 1 includes "a biometric sensor for receiving a biometric signal." *Id.* at 15:46.

Claim 1 also includes "means for matching the biometric signal against members of the database of biometric signatures." *Id.* at 15:47–49. The disclosed structure for this "means-plus-function" term is software or "code" to match the biometric signal against members of the database of biometric signatures." *Id.* at 4:47–48.

Additionally, claim 1 includes "means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry." *Id.* at 15:61–64. This "series of entries of the biometric signal," for example, is to enroll new users, and is the Morse code-like entries of "dit, dit, dit, dah" described in the Specification. Ex. 1007, 10:50–63. The structure for this limitation is software or code. *Id.* at 4:33–37.

We also note that claim 4, dependent from claim 1, states "the biometric sensor [which receives the biometric signal] is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration [biometric signals]." *Id.* at 16:25–27. Because claim 4 must further limit claim 1, the "biometric sensor" in claim 1, must have a broader scope of received biometric signals than the limited options stated in claim 4. We also note that the list of biometric signals sent to the biometric sensor in claim 4 does *not* include a fingerprint signal. None of the claims in the '208 patent refer specifically to a fingerprint signal or a fingerprint sensor.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Based on the claims, the term "biometric signal" is a signal that can be received by a biometric sensor, and also can be matched to a database.

### b)    Specification

The Specification states that "[o]ne example of a biometric signal is a fingerprint." Ex. 1007, 1:29–30. A commonly understood definition of "fingerprint," which we determine (based on, *inter alia*, the intrinsic record) would also be understood at the relevant time by the ordinarily skilled artisan, is "the pattern of curved lines on the end of a finger or thumb that is different in every person, or a mark left by this pattern."[32] Thus, whatever claim construction we give to the term "biometric signal," it must be able to include a "fingerprint" as exemplary of the adopted construction. This example of a fingerprint is consistent with Petitioner's assertion that "the 'biometric signal' is simply the input and output of the biometric sensor" because the input to the biometric sensor is pressing a finger against the biometric sensor, and the output of the biometric sensor is an electronic representation of a fingerprint. *See, e.g.,* Ex. 1007, Fig. 10, and related text; *see also* Ex. 1005 ¶ 28 (Mr. Lipoff's Declaration testimony explaining annotated Figure 10 from the '208 patent ("The patent discloses granting access to a controlled item . . . by reading a biometric (e.g., a fingerprint) using a 'sensor.'")).

After stating a fingerprint as one "example" of a "biometric signal," the Specification then states "[o]ther physical attributes that can be used to provide biometric signals include voice, retinal or iris pattern, face pattern, palm configuration *and so on*." *Id.* at 1:30–32 (emphasis added). These

---

[32] From Cambridge Dictionary, available at:
https://dictionary.cambridge.org/us/dictionary/english/fingerprint.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

other "physical attributes," like the fingerprint example, are additional examples of a "biometric signal." There is nothing in the quoted language from the Specification that suggests that this list of "attributes" is intended to be a closed list that excludes other attributes, or is intended to be a definition of the term "biometric signal." In fact, the phrase "and so on" included in this list suggests exactly the opposite. It acknowledges there are additional, unlisted attributes that also can be a "biometric signal."

We recognize that the "Background" section of the Specification states that "[o]ther *physical attributes* . . . can be used to provide biometric signals." *Id.* at 1:30–31 (emphasis added). This discussion of the background technology is the sole use of the phrase "physical attributes," or similar phrase, in the '208 patent, and is the only reference to the "physical" class of biometric signals.

The Summary section of the Specification states that the basic objective of the disclosed invention is "a system for providing secure access to a controlled item." Ex. 1007, 2:27–28. As stated above, the challenged claims also state this specific objective. *See, e.g., id.* at 15:42–43 (representative claim 1 claiming a "system for providing secure access to a controlled item").

The Specification also states that whatever form the biometric signal takes, it must be matched with a coordinated biometric sensor. As explained in the Specification, "for example, if the biometric sensor 121 in the code entry module 103 is a fingerprint sensor, then the request 102 typically takes the form of a thumb press on a sensor panel (not shown) on the code entry module 103." *Id.* at 5:56–50. A fingerprint sensor would not work if the biometric signal is, for example, a "face pattern."

65
Appx4372

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

### c)        *Prosecution History*

Neither party directs our attention to any persuasive evidence in the prosecution history of the '208 patent that informs our construction of the term "biometric signal."

### d)        *Extrinsic Evidence*

Patent Owner asserts that at the time of the invention of the '208 Patent, *i.e.*, August 2003, "a POSITA[33] would have understood that there were two basic categories of biometric measurements, namely, measurements of (i) physical attributes and (ii) behavioral attributes." PO Resp. 11–12 (citing Ex. 2031 ¶ 34).  The cited Declaration testimony is from Dr. Russ, Patent Owner's expert witness, who merely repeats verbatim Patent Owner's argument.  We give this testimony no probative weight. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (August 24, 2022) (precedential) (holding an expert's declaration testimony is entitled to little weight when it contains an exact restatement of the petition's arguments without any additional supporting evidence or reasoning).

---

[33] "POSITA" is a common patent law acronym for a "person of ordinary skill in the art," as used in 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to *a person having ordinary skill in the art* to which the claimed invention pertains.") (emphasis added).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Patent Owner also cites the Bianco reference asserted in this

proceeding for the disclosure that:

> Biometric identification mechanisms include ***two basic categories of biometric measurements.  The first category involves measuring a unique characteristic found on a user's body***.  This may include, but is not limited to, finger and hand geometry, retina and facial images, weight, DNA data and breath.  ***The second category involves measuring a user's behavioral characteristics***. This may include, but is not limited to, voice, typing stroke and signature.

PO Resp. 12 (citing Ex. 1003, 7:57–65) (all emphasis is in the cited PO

Response).  This quote from Bianco clearly states that the generic concept of

"biometric identification" or "biometric measurement" includes two distinct

categories: (1) unique characteristics found on a user's body; and

(2) "behavioral characteristics."  Ex. 1003, 7:57–67.  These two categories

are the same two categories identified by Patent Owner.  *See* PO Resp. 11–

12 (identifying "two basic categories of biometric measurements, namely,

measurements of (i) physical attributes and (ii) behavioral attributes").  Both

categories represent a "biometric measurement" or, using the term from the

'208 patent, a "biometric signal."

In general, Bianco discloses that "[b]iometric devices utilize a

scientific technique to identify a user based on compared measurements of

unique personal characteristics."  Ex. 1003, 2:67–3:2.  These measurements,

called "biometric measurements" in Bianco, may include, but are not limited

to, measurements of "finger and hand geometry, retina and facial images,

weight, DNA data, breath, voice, typing stroke and signature."  *Id.* at 3:2–6.

As defined in Bianco, the biometric signals in the first category –

unique characteristics found on a user's body – include "finger and hand

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

geometry, retina and facial images, *weight*, DNA data and breath."
*Id.* at 7:61–62 (emphasis added). We take official notice that a person's
"weight" is a highly variable measurement. We also take official notice that
two different people may have the exact same "weight." Nonetheless,
Bianco, as cited by Patent Owner, states that this is a physical attribute. The
biometric signals of "weight," "DNA data," and "breath" are not included in
the list of "[o]ther physical attributes that can be used to provide biometric
signals" as disclosed in the '208 patent. *See* Ex. 1001, 1:29–33. Thus, the
biometric signals of "weight," "DNA data," and "breath" must be included
in the phrase "and so on" used to expand the limited examples of a biometric
signal disclosed in the '208 patent (Ex. 1007, 1:30–32).

As further disclosed in Bianco, the generic category of a biometric
signal also includes "voice, typing stroke and signature" in the "behavioral
category" of a biometric signal. Ex. 1003, 7:62–65.

There is no persuasive evidence to which we have been directed that
establishes that the generic term "biometric signal" used in the '208 patent
includes only the first category of signals ("physical") and excludes the
second category ("behavioral"). Thus, based on the disclosure in Bianco,
and Patent Owner's acknowledgement that Bianco is representative of what
a person of ordinary skill would have known about the two basic categories
of biometric measurements, namely, measurements of (i) physical attributes
and (ii) behavioral attributes (PO Resp. 11–12), "typing stroke and
signature," as disclosed in Bianco, also must be included in the phrase "and
so on" used to expand the limited examples of a biometric signal disclosed
in the '208 patent. "Voice," disclosed in Bianco as a behavioral

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

measurement, is already included in the '208 patent's list of "attributes" that can be used as a biometric signal.

Bianco concludes its discussion of what is a biometric measurement or biometric signal by stating that "[i]n general, anything that can be measured on a user that is unique can be used as a biometric measurement." Ex. 1003, 7:65–67.

Patent Owner asserts that "[t]his clear distinction between biometric identification via *physical attributes* versus via *behavioral attributes* drawn by Bianco is consistent with other teachings in the art at the time of the invention of the '208 Patent." PO Resp. 12. Patent Owner discusses this other extrinsic evidence, which is consistent with, and repetitive of, Bianco. *See* PO Resp. 12–19.

We recognize that the distinction between physical attributes and behavioral attributes exists. But Bianco's analysis is consistent with the other extrinsic evidence cited by Patent Owner (PO Resp. 12–19) that there is no bright-line separating which biometric measurements fall into each category. Bianco includes "weight" and "breath" as physical measurements, and "voice" as a behavioral measurement. Ex. 1003, 7:57–65. Patent Owner asserts "voice" is a biometric signal "that appears in both categories." PO Resp. 14.

Mr. Lipoff also provides his opinion in his Declaration testimony that "'biometric signal' should be given its plain and ordinary meaning—i.e., the input and output of a biometric sensor." Ex. 1029 ¶ 12; *see also id.* ¶¶ 10–15 (providing supporting analysis for his opinion testimony). Mr. Lipoff also testifies that, in his opinion, "there is no basis to limit the term "biometric signal" to exclude behavioral biometrics. So long as the

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

biometric sensor can output a biometric signal capable of uniquely identifying a user, the claims and purported invention would be viable." Ex. 1029 ¶ 14.

### e)    *Claim Construction Conclusion for "Biometric Signal"*

We recognize that "[t]he very nature of words would make a clear and unambiguous claim a rare occurrence." *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967). The Federal Circuit, however, has provided a beacon, which we have followed, to guide us in determining the proper construction when we encounter ambiguities or differing interpretations from the parties:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

Based on the evidence and the analysis above, we determine that the term "biometric signal" means a physical or behavioral biometric attribute that provides secure access to a controlled item. This is the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention. It also is supported by the extrinsic evidence.

Based on the evidence, there is no bright-line distinction for what specific biometric attribute is "physical" or "behavioral." The specific category, however, is not relevant because neither the Specification nor the claims establish that the generic term "biometric signal" is limited to the

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

examples in the Specification or to a specific sub-category of a "physical" or "behavioral" attribute. When the '208 patent intended to limit the type of biometric signal, it did so in claim 4, as discussed above.

We now address the merits of Petitioner's challenge of the '208 patent.

### D.   Ground 1: Patentability of Claims 1, 3–5, and 9-13 Over Bianco and Mathiassen-067

Petitioner asserts claims 1, 3–5, and 9, and 10–13[34] are obvious over Bianco and Mathiassen-067. Pet. 11–71.

### 1.   Bianco (Ex. 1003)

We make the following findings regarding Bianco.

Bianco "relates . . . to the utilization of biometric measurements for the authentication of users[] and thus access[] to enterprise resources." Ex. 1003, 1:8–13. "Enterprise resources include computers, applications and data." *Id.* at 1:15–16. As disclosed in Bianco,

> [b]iometric devices utilize a scientific technique to identify a user based on compared measurements of unique personal characteristics. These measurements, called biometric measurements, may include, but are not limited to, measurements of finger and hand geometry, retina and facial images, weight, DNA data, breath, voice, typing stroke and signature.

*Id.* at 2:67–3:6,

---

[34] For claims 10–13, *see* IPR 2022-01089 Petition, 11–79.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Bianco's Figure 2, reproduced below, illustrates a block diagram of enterprise network system 202 incorporating biometric system 102 (reference character not shown) according to a preferred embodiment. *Id.* at 11:55–57.



FIG.2

Bianco's Figure 2

Generally speaking, network 114 connects the functional components of biometric system 102 and additional functional components of network system 202. *Id.* at 12:7–9. Biometric system 102 includes biometric server 104, enrollment station 106, administration station 108, alternate biometric server 110, and satellite enrollment station 112. *Id.* at 9:52–55. The additional functional components include web server 212, web server

72
**Appx4379**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

interface 214, and one or more of applications 204, application interfaces 206, user computers 208, and remote/web computers 210. *Id.* at 11:67–12:7.

In biometric system 102, biometric server 104 stores the engine for biometric system 102, e.g., collections of data required by system 102. *Id.* at 10:1–3. Administration station 108 is used by the administrator of biometric system 102 to perform management duties. *Id.* at 10:14–17. Enrollment stations 106, 112 enroll users into biometric system 102 and accordingly communicate with the biometric devices of biometric system 102 (satellite enrollment station 112 being scaled-down to enroll users at remote locations). *Id.* at 10:8–12, 23–24. Secondary biometric server 110 is a backup/standby server of biometric server 104. *Id.* at 10:28–29.

In the additional functional components, application 204 may include electronic mail and word processing. *Id.* at 12:11–12. Application interface 206 connects application 204 to network 114 and, thereby, to other resources or network system 202. *Id.* at 12:12–15. User computer 208 provides users access to the enterprise resources (to enterprise network 212) and includes both a biometric device and interface for authentication of the user by biometric system 102. *Id.* at 12:15–22. Remote/web computer 210 is also a user computer having the above functions, but operates remotely via communications with web server 212 and web server interface 214 (which collectively 212, 214 provide access to other enterprise resources such as biometric system 102). *Id.* at 12:23–30.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Biometric servers 104, 110, enrollment stations 106, 112, and administration station 108 can be implemented on computer 302 illustrated by Bianco's block diagram in Figure 3, reproduced below. *Id.* at 14:26–29.



Bianco's Figure 3

Computer 302 includes one or more of the following items connected to communication bus 306: processor 304; main memory 308 storing control logic 310 (i.e., software) and data 312; secondary storage 314; input devices 322 (e.g., keyboard); and display devices 324 (e.g., monitors). *Id.* at 14:32–39.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Bianco's Figure 10, reproduced below, is a block diagram of objects involved in the disclosed biometric authentication. *Id.* at 25:60–62. It shows user computer 208 in communication with biometric server 104. *Id.* at Fig. 10.



FIG.10

Bianco's Figure 10

User computer 208 (or remote/web computer 210) includes monitor object 1004 and biometric device object 1006. *Id.* at Fig. 10, 25:62–65. Biometric system 104 includes identify user ID object 1008 and database object 1010. *Id.*

Monitor object 1004 of user computer 208 is "up and waiting" to receive "live" biometric data (e.g., fingerprint data) that can "start" the engine of the biometric system 102 (i.e., initiate authentication of the user). *Id.* at 25:66–26:7; 10:1–3 (biometric server 104 stores the engine of biometric system 102). Monitor object 1004 generates biometric device object 1006 that prompts a biometric device to read and return the live biometric data. *Id.* at 26:8–18, Fig. 11 (steps 1102–06). Monitor object

75

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

1004 generates an "identify request" including the biometric data and sends the request to biometric server 104. *Id.* at 26:19–22, Fig. 11 (step 1108).

Using ID 512 of user computer 208, biometric server 104 identifies user ID object 1008 and provides the biometric data to object 1008. *Id.* at 26:22–27. User ID object 1008 has previously created data base object 1010 and stored therein a biometric template, biometric policy, biometric group, biometric device, user ID, computer ID, and application ID. *Id.* at 23:17–21, 26:27–31. User ID object 1008 passes the live biometric data to data base object 1010, which then attempts to match the live biometric data to the stored data (e.g., to the biometric template). *Id.* at 26:27–33, Fig. 11 (steps 1110–12). Successful matching is a condition of authentication. *Id.* at 26:34–39, Fig. 11 (steps 1114–18).

Bianco's Figure 12, reproduced below, is a block diagram of objects involved in the biometric enrollment. *Id.* at 26:53–55.



FIG. 12

Bianco's Figure 12

Figure 12 shows enrollment station 106 in communication with biometric server 104. *Id.* at 26:60–62. Enrollment station 106 includes

76

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

enrollment interface 1204, enrollment object 1220 with attached comm object 1218, and biometric device object 1222. *Id.* at 26:55–60; Fig. 12. Biometric server 104 includes enrollment interface 1206, enrollment object 1220 with attached comm object 1214 and policy object 1212, and database object 1210 (which is the above-discussed database object 1010 of Figure 10). *Id.* at 26:6–12, 55–60; Fig. 12.

Enrollment station 106 and biometric server 104 communicate via respectively a client role and server role. *Id.* at 26:60–62. Respective enrollment interfaces 1204, 1204 are any operating interfaces permitting client-server communication (e.g., specific to the given operating systems). *Id.* at 27:1–5. In response to communications of interfaces 1204, 1204 (see below), two-way direct communication is established between respective comm objects 1218, 1214. *Id.* at 15:57–16:19, 27:8–12, 57–60.

To start the enrollment process, a user inputs their user ID 510 to enrollment station 106. *Id.* at 27:29–31, Fig. 13 (step 1302). Enrollment interface 1204 generates an enrollment request including user ID 510 and then sends the request to biometric server 104. *Id.* at 27:31–39, Fig. 13 (step 1304).

In response to the request, biometric server 104 initializes enrollment object 1208. *Id.* at 27: 39–42, Fig. 13 (step 1306). Enrollment object 1208 creates database object 1210 and passes user ID 510 to object 1210. *Id.* at 27:45–46. Based on user ID 510, database object 1210 determines the user's biometric group 506 (whereto an administrator previously assigned the user). *Id.* at 27:46–50, Fig. 13 (steps 1308–10). Based on biometric group 506, database object 1210 determines biometric policy 504 (of the biometric group 506). *Id.* at 27:50–52. Database object 1210 creates

77

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

policy object 1212 providing biometric policy 504 (e.g., identifying the corresponding biometric device/s) and then passes policy object 1212 to enrollment object 1208. *Id.* at 27:53–57, Fig. 13 (steps 1312). Based on biometric policy 504, enrollment object 1208 requests enrollment station 106 to test the user on a particular biometric device. *Id.* at 27:60–65, Fig. 13 (steps 1316).

Based on the request, enrollment station 106 creates enrollment object 1220. *Id.* at 27:66–67, Fig. 13 (step 1318). Based on the particular biometric device, enrollment object 1220 creates biometric device object 1222. *Id.* at 27:67–28:2, Fig. 13 (step 1320). Biometric device object 1222 causes the respective, attached biometric device to read biometric measurements of the user (e.g., fingerprint measurements). *Id.* at 28:2–6, Fig. 13 (steps 1320–22). Based on the measurements, enrollment object 1220 generates biometric template 502 and then sends template 502 to enrollment object 1208 of biometric server 104 (where template 502 is stored by database object 1010/1210). *Id.* at 28:6–12, Fig. 13 (steps 1324–26).

### 2. *Mathiassen-067 (Ex. 1004)*

We make the following findings regarding Mathiassen-067.

In the context of inputting information into mobile phones and computer devices, and providing access to the information in these products, Mathiassen-067 discloses using the same biometric (fingerprint) sensor for the dual purposes of (i) reading fingerprints for authentication and access

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

control and (ii) as a means of issuing commands/instructions through a series of "taps" of varying durations. Ex. 1004 Abstract; 21:9–21.[35]

Mathiassen-067 "relates to a sign/character generator represented by a fingerprint sensor with navigation means[] for text/sign input[.]" Ex. 1004, 3:3–5. Noting device access to sensitive information is typically via passwords for identity verification of the user, Mathiassen-067 instructs that "these are not personal as they can be given to other persons . . . or stolen" and "[a]ccordingly there is a strong trend to base access control on biometrics[.]" *Id.* at 3:14–21. As defined in Mathiassen-067, "biometrics" is a "mathematical description of characteristic elements of the owner's body or behaviour that can not be separated from this person, and which describes him uniquely." *Id.* at 3:21–24. Mathiassen-067 further criticizes the typical "[i]mplementation[s] of such sensors . . . [as] in many cases [raising] a question of available space on the device." *Id.* at 3:31–4:3.

Mathiassen-067 advises that "such identity verification devices[,] e.g., fingerprint sensors[,] will therefore be significantly enhanced if . . . combined with other functionality." *Id.* at 3:35–38. It is thus "an objective of [the] invention to provide a sign generator . . . through a single-button 'keyboard' . . . incorporat[ing] fingerprint scanning for authentication." *Id.* at 8:1–9.

---

[35] Citations to Mathiassen-067 are in the form of *exhibit* page number:line number[s]. We also note that the *exhibit* page number for Exhibit 1004, in the bottom right corner of each page of the exhibit, differs from the *document* page number, which is centered on the top of each page. Petitioner's *exhibit* page numbering is in accordance with our rules requiring each page of an exhibit to be "uniquely numbered in sequence." 37 C.F.R. § 42.63(d)(2).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

In the described example, a smartphone includes touch sensor 1, analyzing means 2, memory 3, translation means 4, and display 5. *Id.* at 8:37–9:13. In one mode of operation, touch sensor 1 operates as a fingerprint sensor that can read a fingerprint and send a fingerprint signal that initiates the process of authorization to a controlled item. In a second mode of operation, touch sensor 1 operates as a touchpad and outputs data indicating the composition and motion of a finger movement. *Id.* at 8:39–9:2. Analyzing means 2 both measures the duration, direction, and speed of the finger's movement on the switch; and receives and categorizes the data output by switch 1. *Id.* at 9:2–4, 12–13 (Table 2, "Finger Command Structure"). Memory 3 stores the categories of data. *Id.* at 9:5. Translation means 4 maps (e.g., via tables) the categories (e.g., finger movements and sequences thereof) to user-readable characters/signs. *Id.* at 9:5–8. Display 5 presents the signs in a known manner. *Id.* at 9:8–10.

By reading both the fingerprint and its motion in the two separate and distinct operating modes, "single-button sensor" 1 (along with components 2–5 described above) combines biometric reading and signaling for user authentication and cursor-type control for text input. *Id.* at 10:21–25. In the text input mode, however, sensor 1 does *not* put out a fingerprint or other biometric signal; it puts out a "finger tap."

### 3. Claims 1 and 10

Petitioner provides a "Claim Listing" identifying, for each independent claim, each clause by a unique identifier. Pet. 94–97 (*e.g.* clause 1[P] is the preamble of claim 1). Using the claim clause identifiers, Petitioner provides a detailed clause-by-clause analysis of the challenged claims, explaining where, in Petitioner's view, each element is disclosed in

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

the combination of Bianco and Mathiassen-067, and why the challenged claim, considered as a whole, would have been obvious over the combined disclosures of those references. Pet. 11–62. Throughout the analysis, Petitioner relies on the declaration testimony of Mr. Lipoff.

For claim 1, for example, for each "means-plus-function" limitation, Petitioner identifies the function and corresponding structure disclosed in the Specification. Petitioner then asserts where each claimed element is disclosed in either Bianco or Mathiassen-067 (Pet. 11–57) and concludes that "[i]t would have been obvious to modify Bianco's biometric authentication system to receive enrollment instructions using Mathiassen[-067]'s multiple finger-tap system" (*id.* at 57 (citing Ex. 1005 ¶¶ 214–228). According to Petitioner,

> a POSITA would have been **motivated** to modify Bianco's biometric sensor to also receive its instructions from a single biometric input sensor for simple enrollment and access, as taught by Mathiassen[-067], to avoid the expense and complexity of using a separate touchpad/keyboard/keypad and biometric input sensor, while having a smaller form-factor for convenient installation at doorways, access points, etc. Indeed, Mathiassen[-067] provides an express motivation that "it will be desirable to combine such a touch-pad and fingerprint sensor, if technically possible, for cost and space reasons."

Pet. 59 (emphasis in original).

Throughout Petitioner's assertions, Petitioner relies extensively on annotated figures from the references to illustrate its assertions. *See, e.g.*, *id.* at 15, 16, 18, 19, 30, 39, 44, 46. For claim 1, Petitioner's assertions are supported by the Declaration testimony of Mr. Lipoff. Ex. 1005 ¶¶ 63–228).

Petitioner provides a similar analysis for independent claim 10. '089 Pet. 11–73 (citing Ex. 1005 ¶¶ 262–423).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Patent Owner asserts that "neither Bianco nor Mathiassen[-067]—alone or in combination—teach or suggest at least limitations D(P)–D(3) of claim 1." PO Resp. 19 (citing Ex. 2031 ¶ 51). The labels "D(P)–D(3)" refer to the paragraph and clause limitations used by Petitioner. For convenient reference, we list below these clauses and their limitations in representative claim 1.

> [D(P)] wherein the transmitter sub-system controller further comprises means for populating the data base of biometric signatures, the populations means comprising:
>
> [D(1)] means for receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry;
>
> [D(2)] means for mapping said series into an instruction; and
>
> [D(3)] means for populating the data base according to the instruction.

Pet. 94.

The focus on clauses D(P)–D(3) is Patent Owner's sole substantive defense concerning patentability of the challenged claims. Patent Owner asserts that "[l]imitations corresponding to D(P)–D(3) are present in all independent claims of the '208 Patent. Therefore, Petitioners fail to prove that any claims of the '208 Patent are unpatentable." PO Resp. 19–20.

According to Patent Owner, "[i]n short, and critically important to the issues here, each of the limitations D(P)–D(3) are based upon and require some step or action related to a ***biometric signal***." *Id.* at 20 (emphasis in original). We note that our construction of the claim term "biometric signal" in Section III.C.2 of this Decision is different from the construction proposed by Patent Owner.

Our analysis uses the clause designations relied on by the parties.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

### a)    Limitation [D(P)]
*"wherein the transmitter sub-system controller*
*further comprises means for populating*
*the data base of biometric signatures,*
*the population means comprising"*

Petitioner states the function of this means-plus-function clause is "populating the database with at least one biometric signature." Pet. 40. According to Petitioner, the structure disclosed for performing this function is "a computer program product having a computer readable medium having a computer program recorded therein, with code for populating the biometric-signature database." *Id.* Patent Owner does not dispute or comment on this proposed construction. For purposes of this Decision, we adopt Petitioner's proposed construction.

This limitation provides an introduction to the requirements for the "transmitter sub-system controller," wherein the "population means" is further defined in in three additional sub-limitations (labeled by Petitioner as Limitations D(1), D(2), and D(3)), which are also in means-plus-function form. Patent Owner does not address the merits of this introductory clause, but provides arguments on sub-limitations D(1), D(2), and D(3), discussed below.

Petitioner provides the following annotated Figure 3 from Bianco. Pet. 15.

83
**Appx4390**

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2



Figure 3 from Bianco is a block diagram, annotated by Petitioner, of a typical enterprise network system incorporating one embodiment of the biometric authentication system disclosed in Bianco. Ex. 1003, 3:57–58. Petitioner asserts that Processor 304 is the claimed "controller." Pet. 15. Additionally, Petitioner asserts that Bianco's processor 304, transmitting over bus 306, also is the "transmitter." *Id.* Petitioner asserts that this is the same structure and system used in the '208 patent, where processor/controller 107 may also be the transmitter. *Id.* (citing Ex. 1007, Fig. 2).

Patent Owner does not dispute that Bianco discloses a transmitter sub-system controller, as required by clause [D(P)].

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

*b)    Limitation [D(1)]*
*"means for receiving a series of entries of the biometric signal,*
*said series being characterised according to at least one of*
*the number of said entries and a duration of each said entry"*

Petitioner states the function of this means-plus-function clause is "receiving a series of entries of the biometric signal." Pet. 41. According to Petitioner, the structure disclosed for performing this function is "a computer program product having a computer readable medium having a computer program recorded therein, with **code for receiving a series of entries of the biometric signal**." *Id.* (emphasis in original). Patent Owner does not dispute or comment on this proposed construction. For purposes of this Decision, we adopt Petitioner's proposed construction.

It is Petitioner's position that "Bianco discloses receiving multiple biometric entries, each of which has a duration." *Id.* at 42. Petitioner uses a "signature" biometric signal, as disclosed in Bianco, as an example. *Id.*

When performing biometric "signature" analysis, Bianco discloses taking "multiple samples of a signature" and analyzing "each sample." *Id.* (citing Ex. 1003, 8:43–45) ("Here, a user is prompted for multiple samples of a signature. For each sample, characteristics or measurements are identified."). Bianco also discloses that "[t]he characteristics or measurements include the pressure, sequence of events, direction, relative vectors and speed" of the signature. Ex. 1003, 8:45–47.

Patent Owner asserts that "a hand-written signature [as disclosed in Bianco] is a behavioral attribute, not a physical biometric attribute." PO Resp. 21. Patent Owner then concludes that "the hand-written signature of Bianco is not a 'biometric signal' as that term is properly construed in the

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

'208 Patent - *i.e.*, a 'physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.).'" PO Resp. 21.  We disagree.

Based on our claim construction of the term "biometric signal" in this Decision, Bianco's "signature" is a "biometric signal," just like a fingerprint, voice, retinal or iris pattern, face pattern, or palm configuration.  Bianco clearly relies on a "signature" as "a physical or behavioral biometric attribute that provides secure access to a controlled item," which is how we have construed the term "biometric signal."

Petitioner asserts that Mathiassen-067 discloses "using the number/duration of the finger presses on the biometric sensor to issue an instruction."  Pet. 43.  According to Petitioner, Mathiassen-067 discloses "using the same fingerprint sensor (*i.e.*, biometric sensor) for the dual purposes of: (i) reading fingerprints for enrollment, authentication, and access control and (ii) receiving commands through a series of finger inputs of varying durations.  *Id.* (citing Ex. 1004, 21:15–19).  *Id.*

As disclosed in Mathiassen-067, the:

> preferred embodiment of the invention enables a multi-function single-button input key which combines several functions;
>
>     - Fingerprint scanning for user authentication for access control.
>
>     - A powerful text input device where sets of extensive finger commands supports convenient and fast input of complex text/signs/characters in a versatile and flexible manner for text input of alphabetic languages and sign-based languages

Ex. 1004, 23:25–34.[36]

---

[36] Again we note that we cite the *exhibit* page number for Exhibit 1004, in the bottom right corner of each page of the exhibit, which differs from the *document* page number, which is centered on the top of each page.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

In addition, Mathiassen-067 also discloses using a series of short and long taps for entering control commands, as is done in the '208 patent. Mathiassen-067 discloses:

> Word separation may be done by finger command <Long Tap> and period ("punctum") may be entered as two consecutive <Long Taps>, etc. The user may at any time toggle to Edit Text Mode by finger command sequence <Extra long Tap> - <Finger Down> as per Table 2.

Ex. 1004, 16:14–19.  Table 2 appears on pages 12–13 of Mathiassen-067.  A highlighted excerpt from Table 2, prepared by Petitioner (*see* Pet. 44) and reproduced below, illustrates some of the various commands that can be entered in Mathiassen-067 using the Morse code-like series of finger presses.

87

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

| Edit Text Commands | | | |
|---|---|---|---|
| Home of Text Field | <Slanted Up Left> | Toggle to/from Edit Mode | *See Screen Manip. Commands* |
| End of Text Field | <Slanted Down Right> | Mark *n* characters left | <Long Tap> + *n* <Short Taps> |
| Move one position left | <Finger Left> | Mark *n* words left | <Long Tap> + *n* <Finger Left> |
| Scroll left | <Finger Left - Hold> | Shift marked letters' case | <Long Tap> |
| Move one position right | <Finger Right> | Delete marked character(s) | <Extra Long Tap> |
| Scroll right | <Finger Right - Hold> | Copy marked character(s) | <Double Tap> |
| One line up | <Finger Up> | Paste marked character(s) | Two <Double Taps> |
| Scroll up | <Finger Up - Hold> | Insert space right of cursor | <Short Tap> |
| One line down | <Finger Down> | Write to right of cursor | *Exit Edit to Input Mode* |
| Scroll down | <Finger Down - Hold> | | |

Patent Owner also argues the "finger movements" and "finger commands" disclosed in Mathiassen-067 "are not entries of a biometric signal." PO Resp. 21. Patent Owner asserts that "they are merely the touching of a touch-sensitive pad during which no biometric measurement is taken at all." *Id.* (citing Ex. 2031 ¶ 53). Patent Owner further asserts that "[b]ecause the '208 Patent claims require entries of a biometric signal that is characterized by a number and a duration, the finger presses of Mathiassen[-067] – which are not biometric entries at all – do not teach or suggest these '208 Patent claim limitations." PO Resp. 21–22.

88

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Here we agree with Patent Owner. As Patent Owner reasons, and we agree, there is a substantive distinction between the *finger press* command entry function and the *fingerprint* user authentication function in Mathiassen-067. Both functions use the same "touch sensitive switch 1, in the form of a fingerprint sensor with navigation means." Ex. 1004, 8:39–9:1. Mathiassen-067 discloses, however, that there are two independent and distinct operating modes for these two independent and distinct functions. As we explain below, Petitioner has not shown adequately that in the finger press command entry function, Mathiassen-067 detects a fingerprint or other biometric signal.

Mathiassen-067 provides the following description of the operation of its multi-function single-button input key:

> Prior to this text input (when the cellular phone is switched ON) the cellular phone has automatically set the switch 1 to *authentication mode for access control to the cellular phone.* The user is then asked by text on the display to wipe his finger down over the sensor. When authentication by finger print biometrics is completed, the cellular phone sets the sign-generator to sleep mode, for energy saving. The sign-generator is then waked up e.g. when a request for the sign-generator is called for, e.g. by SMS input as per above. If the user wants to play a game on the cellular phone its control system sets the switch 1 to *Cursor Control Mode* as per Table 3a. *Two-dimensional finger moves combined with combined finger command sequences (such as taps, etc.) thereby gives an accurate cursor control combined with numerous command functions for quite complex games*. This example demonstrates that the invention is capable of rendering full input versatility and flexibility even through a single-button sign-generator, thereby enabling the use of a large display as exemplified in fig. 2 still maintaining full functionality.

Ex. 1005, 16:22–17:2 (emphases added).

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Dr. Russ testifies that "when the switch is in its navigation [or cursor control] mode it does not take biometric readings or measurements." Ex. 2031 ¶ 62. Dr. Russ further opines that "when the Mathiassen[-067] device is in navigation [cursor control] mode it does not 'map a series,' characterized by a number or a duration of a biometric signal 'into an instruction'" Ex. 2031 ¶ 66.

The evidence of record indicates that switch 1, a fingerprint sensor, does not, in fact, act as a fingerprint sensor when switched to the cursor command mode. In that regard, we credit the testimony of Dr. Russ, who testifies that "Mathiassen[-067] teaches that the mode for fingerprint authentication (i.e., Access Control Mode) is separate and distinct from the modes for navigation (i.e., Text Input Modes and Cursor Control Mode)." *Id.* at ¶ 71 (referring to Table 3a of Mathiassen-067). Dr. Russ' testimony is supported by, e.g., Table 3a (*see* Ex. 1004, 14), reproduced below.

Table 3a
MODE LEVEL 1
Automatically set by the Device

| ACCESS CONTROL MODE | TEXT INPUT MODES | CURSOR CONTROL MODE |
|---|---|---|
| Fingerprint sensor used for User Authentication | See Table 3b "Mode Level 2" | For cursor navigation on display |

Petitioner's expert, Mr. Lipoff, testified at his deposition that "finger commands [ ] are entered upon the same biometric sensor that can be used for validating the fingerprint, but there's no disclosure one way or the other as to whether it's also reading the fingerprint." Ex. 2034, 66:11–24.[37] Thus,

---

[37] We cite to the exhibit page number, not the document page number.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Mr. Lipoff agrees that there is no evidence establishing that the sensor in Mathiassen-067 in fact receives a series of entries of the *biometric signal* and then, as required in Limitation D(2), maps the entered series into an instruction.

Based on the evidence of record, we find that, as disclosed in Mathiassen-067 and discussed above, when Mathiassen-067 switches to text input mode or cursor control mode, it exits access control mode and is no longer functioning as a fingerprint sensor.

For the foregoing reasons, Petitioner fails to persuade us that the combination of Bianco and Mathiassen-067 teaches or suggests Limitation D(1).

### c)    Limitation [D(2)]
*"means for mapping said series into an instruction"*

As discussed above, because Mathiassen-067 does not acquire a "series of entries of the biometric signal," it cannot map such a series into an instruction.

Thus, also for the reasons discussed above in connection with Limitation D(1), Petitioner fails to persuade us that the combination of Bianco and Mathiassen-067 teaches or suggests Limitation D(2).

### d)    Limitation [D(3)]
*"means for populating the data base according to the instruction."*

Because Mathiassen-067 does not create the required "instruction," as discussed above, it cannot populate the data base according to such an instruction.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

Thus, also for the reasons discussed above in connection with Limitation D(1), Petitioner fails to persuade us that the combination of Bianco and Mathiassen-067 teaches or suggests Limitation D(3).

## IV. CONCLUSION

All of the challenged independent claims include claim limitations substantively identical to limitations D(1), D(2), and D(3) discussed above. Because we conclude that the cited references do not disclose or suggest these claim limitations, Petitioner has *not* met its burden to establish by a preponderance of the evidence that any of the challenged claims are unpatentable.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, that Petitioner has not shown by a preponderance of the evidence that any of claims 1–13 are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

## VI.    SUMMARY TABLE

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 3–5, 9, 10–13 | 103 | Bianco, Mathiassen-067 | | 1, 3–5, 9, 10–13 |
| 2, 6, 7 | 103 | Bianco, Mathiassen-067, Houvener | | 2, 6, 7 |
| 8 | 103 | Bianco, Mathiassen-067, Houvener, Richmond | | 8 |
| **Overall Outcome** | | | | 1–13 |

IPR2022-01045
IPR2022-01089
Patent 9,269,208 B2

For PETITIONER:

Dion Bregman
Andrew Devkar
James Kritsas
MORGAN, LEWIS & BOCKIUS LLP
dion.bregman@morganlewis.com
andrew.devkar@morganlewis.com
james.kritsas@morganlewis.com


For PATENT OWNER:

Andrew Ryan
CANTOR COLBURN LLP
ryan@cantorcolburn.com